**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, CORBIN CABRERA, DANIEL MATIAS CABRERA, GILLIAN LEIGH CABRERA, M.G.C. BY AND THROUGH HIS NEXT FRIEND AUGUST ~~CABRERA~~WILDMAN, R.X.C. BY AND THROUGH HIS NEXT FRIEND AUGUST ~~CABRERA~~WILDMAN, ROBERT CABRERA, RONALD PAUL HOPKINS, SUZANNE RENAE MARTINEZ, JD PROSSER, GLORIA DIANE TRELFA, JONATHAN L. ASHLEY III, JONATHAN LEIGH ASHLEY IV, JORDAN T. ASHLEY, TAMMIE MARIA ASHLEY, CHERYL ATWELL, ERIN RIEDEL, ANGELA KAHLER, PAMELA E. ALEXANDER BELL, JAMES BELL, LONDON JACINDA BELL, ANDREA ROE, FREDERICK C. BENSON, BEVERLY MILLS, MAGGIE MAE BILYEU, KATHERINE ABREU-BORDER, MARY BORDER, DELAYNIE K. PEEK, FRANCISCO JAVIER BRISEÑO GUTIERREZ, LUIS BRISEÑO, MARISSA BROWN, ARIELL S. TAYLOR, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CHRISTOPHER L. BROWN, WILLIAM A. BURLEY, WILLIAM MICHAEL BURLEY, MICHAEL COLLINS, DAN OLMSTEAD, TAMMY OLMSTEAD, CYNTHIA CAROL CAMPBELL, RAMIRO CARDOZA JR., RAMIRO CARDOZA SR., MARIA CARDOZA, BRITTANI MARIE CARNER, T.M.C. BY AND THROUGH HIS NEXT FRIEND TIMOTHY NORMAN CARNER, TIMOTHY NORMAN CARNER, CORDARO DEVONE CLARK, CORTEIZE CLARK, KEYKO D. CLARK, PRECIOUS CLARK, CLEVELAND DAVIS, APRIL CLEARY, JONATHAN CLEARY, B.C. BY AND THROUGH HIS NEXT FRIEND HOLLY CONRAD, HOLLY CONRAD, PEYTON COONEY, A.C. BY AND THROUGH HIS NEXT FRIEND NICOLE COX, BRENNAN COX, H.C. BY AND THROUGH HER NEXT FRIEND NICOLE COX, NICOLE COX, ROSS COX, ANTHONY D'AUGUSTINE, JENNIFER ~~D'AUGUSTINE~~D'AUGUSTINE, NICOLE D'AUGUSTINE, PATRICIA

**AMENDED COMPLAINT**
**UNDER THE**
**ANTI-TERRORISM ACT**
**(18 U.S.C. § 2333)**

JURY TRIAL DEMANDED

No. ~~———~~1:21-CV-4400-KAM-RML

D'AUGUSTINE, MICHELE KULESA, ~~ADAM DAEHLING,~~ BRENDA DAEHLING, KAYLA MARIE DAEHLING, KIRK W. DAEHLING, SAMANTHA ~~DAEHLING~~JEAN MCNAMARA, HEATHER FRANCES DANIELS, JAMES L. DANIELS, LUCAS DANIELS, SOPHIE DANIELS, JUDITH SARA DARROUGH, ROBERT CHARLES DARROUGH, C.D. BY AND THROUGH HIS NEXT FRIEND HELENA DAVIS, HELENA DAVIS, JOSEPH ROGER DESLAURIERS, LISA DESLAURIERS, ALBERTO D. DIAZ, ANTHONY M. DIAZ, FRANCES P. DIAZ, KAYLA N. DIAZ, MATTHEW J. DIAZ, MAXIMO DIAZ, N.J.A.D. BY AND THROUGH HIS NEXT FRIEND KAYLA N. DIAZ, N.J.D. BY AND THROUGH HER NEXT FRIEND KAYLA N. DIAZ, B.C.D. BY AND THROUGH HIS NEXT FRIEND KELLI DODGE, KELLI DODGE, P.A.D. BY AND THROUGH HER NEXT FRIEND KELLI DODGE, PHOUTHASITH DOUANGDARA, ROBERT ALEXANDER DOVE, JOSEPH DUARTE, SARAH PETERS-DUARTE, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF CURTIS JOSEPH DUARTE, JOY COY, ROBERT L. DUNNING, INDIVIDUALLY AND ON BEHALF OF THE ESTATE OF TOMOE DUNNING, CAREY GREGGORY DUVAL, ERICH MARTIN ELLIS, JAMES RUSSELL ELLIS, JAMES EARL ELLIS, JOELLE R. ELLIS, JOHN F. ELLIS, VANESSA MARIE ANZURES, BRIAN EDWARD ELLIS, JULIE ANN ELLIS, VICTOR RAYMOND ELLIS, CATHERINE ELM BOATWRIGHT, MARGARET ELM CAMPBELL, DENNIS JOHN ELM, DONNA LEE ELM, MATTHEW ELM, CHRISTINE RANGEL, CHARLES ESSEX, MARION RUTH HOPKINS, JOHN L. FANT, STEPHANIE JANE FISHER, C.F. BY AND THROUGH HIS NEXT FRIEND STEPHANIE JANE FISHER, K.F. BY AND THROUGH HIS NEXT FRIEND STEPHANIE JANE FISHER, THOMAS ANTHONY FOGARTY, ERICA FOX, G.F. BY AND THROUGH HIS NEXT FRIEND ~~ERICA FOX~~MICHAEL FESTUS FOX, MICHAEL FESTUS FOX, JASON WAYNE GIBSON, KARA GIBSON, Q.G. BY AND THROUGH HIS NEXT FRIEND KARA GIBSON, JESSICA ANNE BENSON, JOANNA GILBERT, EMMITT DWAYNE BURNS,

JANICE CARUSO, PAUL EDWARD GOINS III, PATRICIA GOINS, DANA RAINEY, L.C.D. BY AND THROUGH HIS NEXT FRIEND BRIDGETT L. DEHOFF, KIRK ANDREW GOLLNITZ, TYLER GOLLNITZ, CONCHETTA MICHELL DIAZ, CEDRIC DONSHAE GORDON SR., CEDRIC FRANK GORDON, ADRIAN KIE-ALUN SHERROD, KRISTIN CARACCIOLO, SUNI CHABROW, PAIGE ERLANGER, COLBY ANDERSON, HAYLEY ANDERSON, A.G. BY AND THROUGH HER NEXT FRIEND ~~JULIE~~TRAVIS SCOTT GREEN, A.G. BY AND THROUGH HER NEXT FRIEND ~~JULIE~~TRAVIS SCOTT GREEN, E.G, BY AND THROUGH HER NEXT FRIEND ~~JULIE~~TRAVIS SCOTT GREEN, GLENDA GREEN, JULIE GREEN, T.G. BY AND THROUGH HER NEXT FRIEND ~~JULIE~~TRAVIS SCOTT GREEN, TRAVIS SCOTT GREEN, CAROL GRIFFIN, DANIEL GRIFFIN, MATT GRIFFIN, SHAWN PATRICK GRIFFIN, SHEILA RISTAINO, JERRY HARDISON, INDIVIDUALLY AND ON THE BEHALF OF THE ESTATE OF TERESA HARDISON, JUSTINA HARDISON, HOLLY MARIE HARPE, ANGELA MARIE HARPER, BRIAN HARPER, JOSEPH TROY HULSEY JR., ADAM SAMUEL HARTSWICK, ALEX HENIGAN, KEVIN HONAKER, LARRY D. HORNS, TAMARA ELAINE HORNS, TIFFANY LOUISE HORNS, BENJAMIN HORSLEY, JOHN HORSLEY, SONGMI KIETZMANN, KATHLEEN LYNN ALEXANDER, DANIEL OWEN HUGHES, PATRICIA SHIRLEY HUGHES, KRISTINE ANNE ZITNY, BETTY DARLENE BLACK, JOEY J. HUNTER II, JOEY J. HUNTER SR., ERIC M. HUNTER, J.H. BY AND THROUGH HIS NEXT FRIEND ~~ERIC M.~~KENNA HUNTER, KENNA HUNTER, K.H. BY AND THROUGH HER NEXT FRIEND ~~ERIC M.~~KENNA HUNTER, NICHOLAS WALTER ROBINSON IV, MICHAEL IUBELT, SHELBY IUBELT, V.I. BY AND THROUGH HER NEXT FRIEND SHELBY IUBELT, CHARLOTTE LOQUASTO, J.A.L. BY AND THROUGH HIS NEXT FRIEND CHARLOTTE LOQUASTO, BRADLEY DYLAN IVANCHAN, ADAM MATTHEW JAYNE, AYZIA J. JAYNE, PAUL ELMER JAYNE, G.A.S. BY AND THROUGH HIS

NEXT FRIEND KENT ALAN SKEENS, KENT
ALAN SKEENS, SHERRY A. SKEENS, TRENT
LORNE SKEENS, Z.R.S. BY AND THROUGH HER
NEXT FRIEND KENT ALAN SKEENS, BRIAN
CHRISTOPHER JERGENS, TERENCE LONNIE
JONES, JOHN C. MCCARTHY, ALISON R. POHN,
KEVIN KING, STEPHANIE ANN MILLER,
EDWARD KLEIN, ABBY KNAPP-MORRIS, K.K.
BY AND THROUGH HER NEXT FRIEND ABBY
KNAPP-MORRIS, BRANDON KORONA, BRIAN
LAMBKA, JORDAN LAMBKA, ~~L.A.E.L.B. BY
AND THROUGH HER NEXT FRIEND NATASHA
BUCHANAN, NATASHA BUCHANAN, S.L.L.B.
BY AND THROUGH HER NEXT FRIEND
NATASHA BUCHANAN, DOUGLAS A.~~DOUGLAS
A. LANDPHAIR, JEAN S. LANDPHAIR,
MEREDITH LANDPHAIR, B.R.L. BY AND
THROUGH HER NEXT FRIEND MIRANDA
LANDRUM, G.B.L. BY AND THROUGH HIS
NEXT FRIEND MIRANDA LANDRUM, JAMES R.
LANDRUM, JANET LANDRUM, MIRANDA
LANDRUM, HOLLY LAU ABRAHAM, LEROY
WINGKIT LAU JR., ALEXANDER LAU, DAVID
WILLIAM HAALILIO LAU, HAMIDE LAU, K.L.
BY AND THROUGH HIS NEXT FRIEND DAVID
WILLIAM HAALILIO LAU, M.L. BY AND
THROUGH HER NEXT FRIEND DAVID
WILLIAM HAALILIO LAU, VIVIAN PERRY,
MICHELLE LEE RAUSCHENBERGER, JAMMIE
JOANN SMITH, ERIC DANIEL LUND, KARYN
SUE STONE ~~MARTA~~, LAWRENCE MARTA,
TAYLOR MARTA, BOB SURPRENANT, KRISTIE
SURPRENANT, BRIAN M. MARTIN, CATHERINE
G. MARTIN, ELIZABETH A. MARTIN, JULIE K.
MARTIN, JOSE LUIS MARTINEZ HERNANDEZ,
LISETH MARTINEZ-ARELLANO, CHESTER R.
MCBRIDE SR., ANNIE L. MCBRIDE,
ALEXANDRA DORIAN MCCLINTOCK, D.C.M.
BY AND THROUGH HIS NEXT FRIEND
ALEXANDRA DORIAN MCCLINTOCK, GEORGE
B. MCCLINTOCK, JOYCE PATRICIA PAULSEN~~,
KEVIN WILLIAMS~~, KATHLEEN MCEVOY,
MICHELLE ROSE MCEVOY, PATRICK
CHARLES MCEVOY, JANICE H. PROCTOR,
LUANN VARNEY, SHANNON K. MCNULTY,
JOHN MEANS, CLARENCE JOSEPH METCALF,

KIMBERLY METCALF, JEREMY J. METZGER,
THERESA KARLSON, ANNA MARIA BANZER,
ANDREA KESSLER, SOFIA KESSLER, ERIC
MORGADO, JOSE ALBERTO MORGADO,
CONNOR ALEXIAN PLADECK-MORGADO,
ANNA MORGAN, JEDIDIAH DANIEL MORGAN,
MIRIAM A. MULLEN, NANCY MARIE MULLEN,
WILLIAM J. MULLEN, CATHERINE MULLINS,
THOMAS MULLINS, BETHANY ROSE MULLINS
RANDALL, CHET MURACH, WILLIAM
ANTHONY MURACH, WILLIAM R. NEVINS,
DERRICK ANTHONY DAVIS, DONALD
EDWARD NEWMAN SR., AMANDA NEWMAN,
MARY R. HAMMERBACHER-NICHOLS,
BRANDON NICHOLS, CYNTHIA NICHOLS,
DOUGLAS NICHOLS, MONTE DOUGLAS
NICHOLS, NICOLE ANN ROBLES, BRUCE K.
NICHOLS, JEANNE M. NICHOLS, M.G.N. BY
AND THROUGH HER NEXT FRIEND BRUCE K.
NICHOLS, ADOLF OLIVAS, CHRISTA L.
OSBORN, CREIGHTON DAVID OSBORN, KADE
M. OSBORN, KATLYN M. OSBORN, JULIA OTT,
NANCY R. WILSON, ROBIN ELIZABETH
AKERS, TRACY ANNE HERRING, ADAN PEREZ,
ANTHONY PEREZ, DEBRA ANN PEREZ,
NICHOLAS JOSEPH FRANCIS PEREZ, B.M. BY
AND THROUGH HIS NEXT FRIEND DARILYN
PEREZ, RICARDO J. ~~PEREZ-RAMOS~~PEREZRAMOS, A.P. BY AND THROUGH
HER NEXT FRIEND RICARDO J. PEREZRAMOS,
DARILYN PEREZ~~, DARILYN PEREZ RAMOS~~,
S.P. BY AND THROUGH HER NEXT FRIEND
RICARDO J. ~~PEREZ-RAMOS~~PEREZRAMOS,
A.T.P. BY AND THROUGH HER NEXT FRIEND
STEWART LAMAR PERRY, G.W.P. BY AND
THROUGH HIS NEXT FRIEND JULIANNE GOOD
PERRY, JULIANNE GOOD PERRY, KATHLEEN
PERRY, L.R.P. BY AND THROUGH HER NEXT
FRIEND JULIANNE GOOD PERRY, STEWART
LAMAR PERRY, ASHLEY PETERS, DEBORAH
JEAN PETERS, DENNIS W. PETERS, G.R.P. BY
AND THROUGH HIS NEXT FRIEND ASHLEY
PETERS, CHRISTINE H. PHILLIPS, S.N.P. BY
AND THROUGH HER NEXT FRIEND CHRISTINE
H. PHILLIPS, BETHANY ROSE WESLEY, JOHN
TERRY PITTMAN SR., IDA BELLE PITTMAN,

AARON WILLIAM PRESCOTT, JACOB RICHARD PRESCOTT, JOSHUA MICHAEL PRESCOTT, TRACEY MARIE PRESCOTT, JUDITH L. ASHLEY, LOUISE P. CONLON, MEGHAN JANET HOLLINGSWORTH, MARYJANE G. MEDEIROS, SARAH TIFFANY PETERSON, BRIAN PROVOST, GAIL PROVOST, GERTRUDE PROVOST, JOHN A. PROVOST, LOUIS PROVOST, PAUL PROVOST, SCOTT PETER PROVOST, ~~SPENCER DANA PROVOST,~~ LONA L. BOSLEY, ANDREA N. RATZLAFF, HANNAH MASON, SUMMER REEVES DUNN, CHARLOTTE ANN REEVES, JENNIFER KATHERINE REEVES, ~~KATRINA M. REEVES,~~ VICTORIA JANE REEVES, JOYCE ANN TULLOCH, MALLORY TAYLOR WILLIAMS, SCOTT REGELIN, SHIRENE REGELIN, CASSIE MARIE RICHARDSON, CYNTHIA JEFFRIES RICHMOND, MICHELLE RILEY, RODNEY RILEY, NATHAN JEREMY RIMPF, CHRISTOPHER POWERS, ~~H.R. BY AND THROUGH HER NEXT FRIEND RANDY~~HALIE RISTAU, RANDY RISTAU, SUZANNE RISTAU, DANIEL MARK ROBINSON, RODOLFO RODRIGUEZ SR., ~~D.R. BY AND THROUGH HIS NEXT FRIEND MELISSA RODRIGUEZ~~DEREK RODRIGUEZ, K.R. BY AND THROUGH HER NEXT FRIEND MELISSA RODRIGUEZ, MELISSA RODRIGUEZ, ~~RODZIE EFREN RODRIGUEZ,~~ BARBARA A. ROLAND, ERICA M. ROLAND, MARK K. ROLAND, ANGEL R. ROLDAN, LIESELOTTE R. ROLDAN, MATTHIAS P. ROLDAN, SAMANTHA G. ROLDAN, CHRISTOPHER J. ROSEBROCK, ALEX JASON ROZANSKI, JOSHUA ANTHONY SAMS, COLLEEN WHIPPLE, A.L.S. BY AND THROUGH HIS NEXT FRIEND NATALIE SCHMIDT, BRANDON TYLER SCHMIDT, LEEANN SCHMIDT, NATALIE SCHMIDT, PHILLIP J. SCHMIDT, SHEESHTA MARIE PERRY, A.M.S. BY AND THROUGH HER NEXT FRIEND TAMMIE SUE SCHOONHOVEN, A.R.S. BY AND THROUGH HER NEXT FRIEND TAMMIE SUE SCHOONHOVEN, CHRISTOPHER SCOTT SCHOONHOVEN, DEBORAH FERN SCHOONHOVEN, TAMMIE SUE SCHOONHOVEN, SARAH MELINDA

SCHWALLIE, SAMUEL ROBERT SHOCKLEY,
SPENSER J. FERNANDEZ, SUZI L. FERNANDEZ,
JORDAN L. SIBLEY, LOWELL BRENT SIBLEY,
INDIVIDUALLY AND ON BEHALF OF THE
ESTATE OF FORREST B. SIBLEY, G.S. BY AND
THROUGH HIS NEXT FRIEND GEORGANNE M.
SIERCKS, G.S. BY AND THROUGH HIS NEXT
FRIEND GEORGANNE M. SIERCKS,
GEORGANNE M. SIERCKS, JOAN M.
SMEDINGHOFF, MARK T. SMEDINGHOFF,
MARY BETH SMEDINGHOFF, REGINA C.
SMEDINGHOFF, THOMAS SMEDINGHOFF, JAN
MARIE HURNBLAD SPARKS, ERIK SPARKS,
GARRY LEE SPARKS, JANE SPARKS, ZACHARY
DOUGLAS SPARKS, LISA MARTINUSEN,
MARIE SENTINA MIELKE, ANNETTE SPEHAR,
JACOB LOUIS SPEHAR, LUKE SPEHAR,
PATRICK SPEHAR, MITCHELL L. STAMBAUGH,
CHARLES WESLEY STRANGE III, ~~C.E.S. BY
AND THROUGH HER NEXT FRIEND CHARLES
WESLEY~~ CARLY ELIZABETH STRANGE,
CHARLES WESLEY STRANGE, KATELYN
MARIE STRANGE, GARRETT LAYNE FUNK,
JOSHUA NICHOLAS SUST, ERIN NICOLE GOSS,
TRECIA BROCK HOOD, WENDY SHEDD,
FREDDIE DEWEY SUTTON, HARRIET SUTTON,
SUMMER BREANNE SUTTON, DIANE
TIMONEY, GREGORY TIMONEY, RYAN
GREGORY TIMONEY, FREDERICK ALLEN
TOLON, ESTA SMITH, JIMMY SMITH, EMILY
TORIAN, JOE TORIAN, NATHAN EWELL
TORIAN, BRITTANY TAYLOR TOWNSEND,
KEVIN TRIMBLE, CHRISTOPHER MICHAEL
VAN ETTEN, CATHERINE KIMBERLY VAUGHN
KRYZDA, C.C.V. BY AND THROUGH HER NEXT
FRIEND CATHERINE KIMBERLY VAUGHN
KRYZDA, R.C.V. BY AND THROUGH HIS NEXT
FRIEND CATHERINE KIMBERLY VAUGHN
KRYZDA, ROBERT MARTIN KAHOKULANI
VICKERS JR., ROBERT MARTIN KAHOKULANI
VICKERS SR., HORTENSE KAINOA WAINANI
VICKERS, K.N.V. BY AND THROUGH HIS NEXT
FRIEND HORTENSE KAINOA WAINANI
VICKERS, K.E.F.V. BY AND THROUGH HER
NEXT FRIEND HORTENSE KAINOA WAINANI
VICKERS, K.M.G.V. BY AND THROUGH HER

NEXT FRIEND HORTENSE KAINOA WAINANI
VICKERS, MARK MATTHEW KALEINANI
VICKERS, MARY JANE VICKERS, VANCE
MARSHALL KELIIOLANI VICKERS, MAKAHEA
XHELILI, MICHELLE JOY
KAPUNAHELEOKALANI YARBOROUGH,
BARRY WELCH, LORRIA WELCH, ZACKARY
WELCH, JEFFREY L. WHITE SR., KYLE WHITE,
MICHAEL WHITE, PAULA K. WHITE,
MICHELLE CAROLINA ROTELLI, MARTHA
CAROLINA SMITH, THOMAS ELMER
WICKLIFF, BRIAN ANTHONY WILLIAMS,
CLARENCE WILLIAMS JR., ABRILL RENEE
WILLIAMS, SAMANTHA SHERVON WILLIAMS,
TALISA SHERVON WILLIAMS, MONA G.
BETZEN, CODY WORLEY, GREGORY W.
WORLEY, JAMES WAYNE WORLEY, MARK G.
WORLEY, BAILY ZIMMERMAN, CHRIS LEE
ZIMMERMAN, MICHELLE ZIMMERMAN,
DANIEL LEE BROWN, KRISTINA BROWN,
DANIEL EDWARD STAMPER JR., CAMERON
STUART, KATY STUART, ADRIANA
WAKELING, SETH WAKELING,

Plaintiffs,

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT,
DEUTSCHE BANK UK, DEUTSCHE BANK AG,
DUBAI BRANCH, DEUTSCHE BANK AG, NEW
YORK BRANCH, DEUTSCHE BANK TRUST
COMPANY AMERICAS, STANDARD
CHARTERED BANK, STANDARD CHARTERED
PLC, STANDARD CHARTERED BANK LIMITED,
STANDARD CHARTERED BANK (PAKISTAN)
LIMITED, STANDARD CHARTERED BANK,
DUBAI MAIN BRANCH, DANSKE BANK A/S,
DANSKE MARKETS INC., PLACID NK
CORPORATION d/b/a PLACID EXPRESS, and
WALL STREET EXCHANGE LLC,

Defendants.

**Formatte**

**Formatte**

## <u>COMPLAINT UNDER THE ANTI-TERRORISM ACT</u>

Formatte

# TABLE OF CONTENTS

Page

INTRODUCTION AND EXECUTIVE SUMMARY ................................................................. 1

THE DEFENDANTS .............................................................................................................. 17

    A.    The Deutsche Bank Defendants ............................................................... 17

    B.    The Standard Chartered Bank Defendants ............................................... 19

    C.    The Danske Bank Defendants ................................................................... 21

    D.    Placid Express ........................................................................................... 22

    E.    Wall Street Exchange ............................................................................... 22

JURISDICTION AND VENUE ............................................................................................. 23

FACTUAL ALLEGATIONS ................................................................................................. 25

I.    DESIGNATED FOREIGN TERRORIST ORGANIZATIONS LED BY AL-QAEDA COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS ..................... 25

    A.    After 9/11, Al-Qaeda Organized And Led A Terrorist Syndicate Comprising Its Affiliates, Including The Taliban, The Haqqani Network, Lashkar-E-Taiba, D-Company, To Attack Americans In Afghanistan ............... 25

        1.    Al-Qaeda ................................................................................... 32

        2.    The Taliban (Including Its Haqqani Network) ........................... 36

        4.    Lashkar-e-Taiba .......................................................................... 41

        5.    Jaish-e-Mohammed .................................................................... 44

        6.    The Kabul Attack Network ......................................................... 46

        7.    D-Company ................................................................................ 48

    B.    Al-Qaeda Planned And Authorized The Terrorist Attacks That Killed And Injured Plaintiffs ....................................................................... 52

    C.    Al-Qaeda Committed The Terrorist Attacks That Killed And Injured Plaintiffs, And Often Did So As Part Of Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba ................................................. 66

i

II.    THE SYNDICATE RELIED ON EXPLOSIVE FERTILIZER AND U.S. DOLLARS TO CARRY OUT ATTACKS ON AMERICANS IN AFGHANISTAN ........................................................................................... 69

A.    Al-Qaeda And The Haqqani Network Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System ................................................................................................. 70

1.    Al-Qaeda And The Haqqani Network Relied Upon Transnational Crime As A Key Source Of Terrorist Finance ............................... 78

2.    The U.S. Financial System Was Key To Syndicate Operations And The U.S. Dollar Was The "Gold Standard" For Syndicate Terrorist Fundraising And Finance ............................................ 83

3.    Al-Qaeda And The Haqqani Network Were Aware Of The Laundromat Market Signals Communicated By Banks And Remitters ......... 85

B.    Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Relied Upon A Transnational Network Of Terrorist Finance And Logistics Cells Operating In Afghanistan, Pakistan, The U.A.E., Russia, And Europe To Finance And Arm Syndicate Terrorist Attacks Against Americans In Afghanistan ................................................................. 87

1.    Afghanistan, Pakistan, And The U.A.E. ...................................... 88

2.    Russia .......................................................................................... 95

3.    Cyprus ......................................................................................... 102

4.    Germany ...................................................................................... 103

5.    Estonia ......................................................................................... 105

C.    From 2011 Through 2016, Al-Qaeda And The Haqqani Network Relied Upon Fatima And Pakarab CAN Fertilizer To Source The Explosives Used In Nearly All CAN Fertilizer Bomb Attacks Against Americans ............. 105

1.    CAN Fertilizer Bombs Made With Fatima And Pakarab CAN Fertilizer Caused 90 Percent Of American Casualties In Afghanistan ......... 105

2.    In 2011, Fatima And Pakarab Joined The Rogue ISI Conspiracy With The Haqqani Network To Support And Supply The Syndicate's CAN Fertilizer Bomb Campaign Against Americans in Afghanistan ................... 109

III.    AL-QAEDA AND THE HAQQANI NETWORK RELIED UPON A GLOBAL NETWORK OF AGENTS, OPERATIVES, FRONTS, CELLS,

AND BUSINESS PARTNERS TO HELP FUND, ARM, AND
LOGISTICALLY SUPPORT SYNDICATE ATTACKS AGAINST
AMERICANS IN AFGHANISTAN ....................................................................... 118

A.      Altaf Khanani and the Khanani Money Laundering Organization .................... 119

   1.      Khanani And The Khanani MLO Were Agents For Al-Qaeda, The
           Taliban (Including Its Haqqani Network), Lashkar-E-Taiba, Jaish-E-
           Mohammed And Khanani Was Also A D-Company Operative .................. 120

   2.      Khanani And The Khanani MLO Transferred, Managed, Invested,
           And Protected Al-Qaeda And Its Allies' U.S. Dollars Worldwide And
           Financed Attacks Against Americans In Afghanistan ................................. 121

   3.      The Khanani MLO's Transactions Funded Khanani's Profit-Sharing
           With Syndicate Members Who Financed, Armed, And Conducted
           Attacks, Including D-Company And The Haqqani Network ........................ 125

   4.      Khanani MLO Transactions Relating To Russia, Europe, The U.A.E.,
           Pakistan, Or Afghanistan Ordinarily Financed Al-Qaeda, The Taliban
           (Including Its Haqqani Network), Lashkar-E-Taiba, Jaish-E-
           Mohammed, And/Or D-Company ............................................................... 128

   5.      The Khanani MLO Required Complicit Banks And Money Remitters ....... 130

B.      Samir Azizi and the Azizi Cell ......................................................................... 137

C.      Imran Yakub Ahmed and the Ahmed Cell ........................................................ 143

D.      Mustafa Ahmed al-Hisawi ............................................................................... 144

E.      Mamoun Darkazanli and the Hamburg Cell ..................................................... 144

F.      Viktor Bout ..................................................................................................... 145

G.      Abdul Baqi Bari .............................................................................................. 148

H.      Hikmatullah Shadman ..................................................................................... 150

IV.   DEFENDANTS EACH PLAYED A ROLE IN THE SYNDICATE'S
       CAMPAIGN OF TERROR AGAINST AMERICANS IN AFGHANISTAN ......... 151

A.      Deutsche Bank Enabled Syndicate Terrorist Finance ....................................... 151

   1.      Altaf Khanani and the Khanani MLO ........................................................ 160

   2.      Samir Azizi and the Azizi Cell .................................................................. 190

   3.      Imran Yakub Ahmed and the Ahmed Cell ................................................. 201

4.      Mamoun Darkazanli and the Hamburg Cell .............................................. 208

B.      Standard Chartered Bank Enabled Syndicate Terrorist Finance ........................ 210

1.      Altaf Khanani and the Khanani MLO ...................................................... 220

2.      Mustafa Ahmed al-Hisawi ...................................................................... 229

3.      Viktor Bout .............................................................................................. 230

4.      Abdul Baqi Bari ...................................................................................... 232

5.      Hikmatullah Shadman ............................................................................ 234

C.      Standard Chartered Bank Enabled Syndicate CAN Fertilizer Bomb
Logistics ............................................................................................................... 236

D.      Danske Bank Enabled Syndicate Terrorist Finance ........................................... 267

1.      Danske Bank Enabled Syndicate Terrorist Finance Through Its
Laundromat ............................................................................................. 267

2.      Danske Bank Enabled Syndicate Terrorist Finance Through Its VAT
Fraud Schemes ........................................................................................ 270

E.      Placid Express Enabled Syndicate Terrorist Finance ......................................... 273

F.      Wall Street Exchange Enabled Syndicate Terrorist Finance .............................. 275

V.      DEFENDANTS WERE GENERALLY AWARE OF THE ROLE THEY
PLAYED IN ILLEGAL ACTIVITY BECAUSE ANY REASONABLE
FINANCIAL INSTITUTION WOULD KNOW ITS CONDUCT WAS
ADVANCING AL-QAEDA'S AND THE HAQQANI NETWORK'S
TERRORIST CAMPAIGN TARGETING AMERICANS IN
AFGHANISTAN ............................................................................................... 278

A.      Defendants Knew That Their Provision Of U.S.-Linked Financial Services
To Syndicate Fronts, Operatives, Agents, And Partners Had A Close Link
To Syndicate Terrorism .................................................................................... 281

B.      Defendants Knew That Operating Laundromats For Customers In High-
Risk Terrorist Finance Jurisdictions Foreseeably Aided Terrorism ................. 287

C.      Defendants Knew The U.S. and U.K. Governments Opposed Conduct
Like Their Own ................................................................................................ 303

D.      Defendants Possessed Sufficient Data To Prevent The Syndicate From
Using Their Services For Terrorist Fundraising, Finance, and Logistics
Operations ......................................................................................................... 304

E.   Defendants Knew Transactions In High-Terrorist-Finance-Risk Jurisdictions That Used "Buffers," "Shell Companies," Or "Intermediaries" Foreseeably Aided Syndicate Terrorist Fundraising, Finance, And Logistics Operations ............................................................ 308

F.   Defendants Knew Altaf Khanani Was A Notorious Terrorist Financier Of, And Agent For, Al-Qaeda, The Taliban, The Haqqani Network, Lashkar-E-Taiba, Jaish-E-Mohammed, And D-Company ............................................. 310

G.   Defendants Knew Terrorists Regularly Used Tax Fraud, Including VAT Fraud, Schemes To Finance Attacks .................................................................. 317

H.   Defendants Knew Terrorists Regularly Used Capital Flight Schemes To Finance Attacks .................................................................................................. 321

I.   Defendants Knew Of The Close Link Between Narcotics-Related Transactions And Syndicate Violence ....................................................... 321

J.   Defendants Knew Of Al-Qaeda's Role .......................................................... 324

VI.   EACH DEFENDANT KNEW THEY WERE AIDING THE SYNDICATE'S CAMPAIGN OF TERROR IN AFGHANISTAN ...................................................... 324

A.   Deutsche Bank Knew It Was Aiding Terrorists ........................................... 324

1.   Deutsche Bank Knew It Operated As A Criminal Enterprise And Laundromat Until 2016 ..................................................................... 324

2.   Deutsche Bank Knew Terrorists Could Foreseeably Benefit From Its Russian Laundromat Because It Knew The Laundromat Was Designed By The Same Russian Mafia Organization That Notoriously Laundered Opium Money For Al-Qaeda And Its Allies .............................. 336

3.   Deutsche Bank Knew Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Deutsche Bank Knew Were Red Flags For Terrorist Finance ....................................................... 343

4.   Deutsche Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions ......................................................................................... 351

B.   Standard Chartered Bank Knew It Was Aiding Terrorists ................................. 353

1.   Standard Chartered Bank Knew That It Operated As A Criminal Enterprise And Laundromat Until 2016 ........................................... 353

2.   Standard Chartered Bank Knew That Its Clients Were Engaged In Money Laundering And Contributing To Bombmaking ............................. 383

3.     Standard Chartered Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions ............................................................. 383

4.     Standard Chartered Bank Knew It Regularly Disregarded Terrorist Finance Red Flags Recognized By Others.................................... 386

C.     Danske Bank Knew It Was Aiding Terrorists ....................................... 387

1.     Danske Bank Knew That It Operated As A Criminal Enterprise And Laundromat Until 2017........................................................... 387

2.     Danske Bank Knew That Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Danske Bank Knew Were Red Flags For Terrorist Finance ................................. 388

D.     Placid Express Knew It Was Aiding Terrorists ..................................... 390

E.     Wall Street Exchange Knew It Was Aiding Terrorists .......................... 392

VII.     DEFENDANTS' FINANCIAL AND LOGISTICAL ASSISTANCE TO AL-QAEDA, THE HAQQANI NETWORK, AND THEIR ALLIES WAS SUBSTANTIAL, AND AIDED TERRORIST ATTACKS AGAINST AMERICANS IN AFGHANISTAN BETWEEN 2011 AND 2016 ........................ 395

A.     Defendants Provided Support Tailored To The Violence At Issue Here............ 395

B.     The Amount Of Money, And Concealment Of The Same, Were Both Significant .......................................................................................... 400

C.     Defendants Had Culpable Mental States ............................................. 403

1.     Deutsche Bank Had A Culpable Mental State .............................. 404

2.     Standard Chartered Bank Had A Culpable Mental State ............... 413

3.     Danske Bank Had A Culpable Mental State ................................. 413

4.     Placid Express Had A Culpable Mental State............................... 414

5.     Wall Street Exchange Chartered Bank Had A Culpable Mental State ......... 414

D.     Defendants Had A Close Relationship To The Tortfeasors................... 415

E.     The Duration Of Support Was Long..................................................... 415

VIII.    DEFENDANTS' ASSISTANCE TO THE SYNDICATE HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES ........................................... 416

A.    Deutsche Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States ................................................................................ 416

  1.    Deutsche Bank's Laundromat Terrorist Finance Transactions For Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Had A Substantial Nexus To The United States ............................... 417

  2.    Deutsche Bank's VAT-Fraud Terrorist Finance Transactions For Al-Qaeda And The Haqqani Network Had A Substantial Nexus To The United States ................................................................................ 425

B.    Standard Chartered Bank's Terrorist Finance Routed To Al-Qaeda, The Haqqani Network, Lashkar-e-Taiba, and D-Company Through Its Laundromat Had A Substantial Nexus To The United States ............................ 428

  1.    Standard Chartered Bank's Terrorist Finance Had A Substantial Nexus To The United States ...................................................... 430

  2.    Standard Chartered Bank's CAN Fertilizer Bomb Logistical Support For The Syndicate Had A Substantial Nexus To The United States ............ 433

C.    Danske Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States ................................................................................ 438

D.    Placid Express's Assistance To The Syndicate Had A Substantial Nexus To The United States ................................................................................ 440

E.    Wall Street Exchange's Assistance To The Syndicate Had A Substantial Nexus To The United States ...................................................... 440

IX.    THE SYNDICATE USED DEFENDANTS' ASSISTANCE TO COMMIT ATTACKS THAT KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE COMMITTED, PLANNED, AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK ............................................................................. 441

CLAIMS FOR RELIEF .................................................................................... 585

COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants:  Aiding-And-Abetting Liability, Attack Predicate] ......................... 585

COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants:  Aiding-And-Abetting Liability, RICO Predicate] ........................... 587

JURY DEMAND .............................................................................................. 590

PRAYER FOR RELIEF ..................................................................................... 590

INTRODUCTION ................................................................................................. 1

THE DEFENDANTS ........................................................................................... 23

    A.       The Deutsche Bank Defendants ............................................................... 23

    B.       The Standard Chartered Bank Defendants ............................................... 27

    C.       The Danske Bank Defendants ................................................................... 32

    D.       Placid Express .......................................................................................... 34

    E.       Wall Street Exchange .............................................................................. 35

JURISDICTION AND VENUE ........................................................................... 36

FACTUAL ALLEGATIONS ............................................................................... 40

I.   DESIGNATED FOREIGN TERRORIST ORGANIZATIONS COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS ........................................................................ 41

    A.       After 9/11, Al-Qaeda Organized And Led A Terrorist Syndicate Comprising Its Affiliates, Including The Taliban, The Haqqani Network, Lashkar-E-Taiba, D-Company, To Attack Americans In Afghanistan, Which Was Substantially Aided By Iran's Hezbollah Division and Qods Force ................................. 42

    B.       Al-Qaeda, The Haqqani Network, Hezbollah And The Qods Force Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System .............................................................................. 92

    C.       Al-Qaeda Leader Sirajuddin Haqqani Served Both Al-Qaeda And The Taliban, Including Its Haqqani Network, Optimized The Syndicate's Transnational Terrorist Enterprise And Partnerships With Other FTOs, Including Hezbollah And The Qods Force, And Facilitated The FTOs' Shared Terrorist Campaign Targeting Americans In Afghanistan ........................119

    D.       Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Relied Upon A Transnational Network Of Terrorist Finance And Logistics Cells Operating In Afghanistan, Pakistan, The U.A.E., Russia, And Europe To Finance And Arm Syndicate Terrorist Attacks Against Americans In Afghanistan ...........................................................................................130

    E.       Iran's Islamic Revolutionary Guard Corps, Acting Through Its Hezbollah Division And Qods Force, Materially Supported The Syndicate's Terrorist Attacks Against Americans In Afghanistan By Regularly Supplying Funds,

Arms, Communications Equipment, Training, And Logistical Support To Al-Qaeda, The Taliban, Including Its Haqqani Network, And D-Company ................. 162

F.      Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs ............................................................................................. 202

G.      Al-Qaeda Committed Terrorist Attacks That Killed And Injured Plaintiffs, Often In Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba ................................................................................................................ 215

II.  DEFENDANTS ASSISTED THE SYNDICATE ................................................................ 220

A.      The Syndicate Relies on an International Criminal Network to Access Funds. ........ 221

B.      Deutsche Bank Enabled Syndicate Terrorist Finance .................................................. 291

B.      Standard Chartered Bank Enabled Syndicate Terrorist Finance ................................ 363

C.      Standard Chartered Bank Enabled Syndicate CAN Fertilizer Bomb Logistics ........ 396

D.      Danske Bank Enabled Syndicate Terrorist Finance .................................................... 436

E.      Placid Express Enabled Syndicate Terrorist Finance ................................................. 442

F.      Wall Street Exchange Enabled Syndicate Terrorist Finance ..................................... 445

III. DEFENDANTS WERE GENERALLY AWARE THAT THEY WERE PLAYING A ROLE IN ILLEGAL ACTIVITY FROM WHICH TERRORIST VIOLENCE WAS A FORESEEABLE RISK ............................................................................................................ 449

A.      Defendants Knew That Their Provision Of U.S.-Linked Financial Services To Syndicate Fronts, Operatives, Agents, And Partners Had A Close Link To Syndicate Terrorism ........................................................................................................ 452

B.      Defendants Knew That Operating Laundromats For Customers In High-Risk Terrorist Finance Jurisdictions Foreseeably Aided Terrorism .................................. 458

C.      Defendants Knew The U.S. and U.K. Governments Opposed Conduct Like Their Own ........................................................................................................................ 475

D.      Defendants Possessed Sufficient Data To Prevent The Syndicate From Using Their Services For Terrorist Fundraising, Finance, and Logistics Operations ......... 476

E.      Defendants Knew Transactions In High-Terrorist-Finance-Risk Jurisdictions That Used "Buffers," "Shell Companies," Or "Intermediaries" Foreseeably Aided Syndicate Terrorist Fundraising, Finance, And Logistics Operations ........... 480

F.     Defendants Knew Altaf Khanani Was A Notorious Terrorist Financier Of, And Agent For, Al-Qaeda, The Taliban, The Haqqani Network, Lashkar-E-Taiba, Jaish-E-Mohammed, And D-Company .......................................................... 482

G.     Defendants Knew Terrorists Regularly Used Tax Fraud, Including VAT Fraud, Schemes To Finance Attacks.......................................................... 492

H.     Defendants Knew Terrorists Regularly Used Capital Flight Schemes To Finance Attacks.......................................................... 496

I.     Defendants Knew Of The Close Link Between Narcotics-Related Transactions And Syndicate Violence .......................................................... 497

J.     Defendants Knew Of Al-Qaeda's, The Haqqani Network's, Hezbollah's, And The Qods Force's Role .......................................................... 499

K.     Defendants Knew That Their Transactions Were Not Routine ............................... 500

L.     Defendants Knew That Even If Their Transactions Were Ostensibly Routine, Such Transactions Still Aided Terrorist Attacks .......................................................... 501

M.     Defendants Knew That They Served Terrorists Who Did Not "Trick" Them ......... 503

N.     Defendants Knew That Their Transactions With Fronts, Operatives, Cut-Outs, Agents, Or Orbits Of The IRGC, Including Hezbollah And The Qods Force, Foreseeably Aided The Syndicate's Terrorist Attacks Against Americans In Afghanistan .......................................................... 507

IV. EACH DEFENDANT KNEW THEY WERE AIDING THE SYNDICATE'S CAMPAIGN OF TERROR IN AFGHANISTAN.......................................................... 514

A.     Deutsche Bank Knew It Was Aiding Terrorists .......................................................... 514

B.     Standard Chartered Bank Knew It Was Aiding Terrorists ....................................... 550

C.     Danske Bank Knew It Was Aiding Terrorists .......................................................... 585

D.     Placid Express Knew It Was Aiding Terrorists .......................................................... 588

E.     Wall Street Exchange Knew It Was Aiding Terrorists.......................................................... 590

V.  DEFENDANTS' ASSISTANCE WAS SUBSTANTIAL.......................................................... 593

A.     Defendants Provided Support Tailored To The Violence At Issue Here.................. 594

B.     The Amount Of Money, And Concealment Of The Same, Were Both Significant .......................................................... 599

C.     Defendants Had Culpable Mental States .......................................................... 602

D.      Defendants Had A Close Relationship To The Tortfeasors.......................................614

E.      The Duration Of Support Was Long....................................................................614

VI. DEFENDANTS' ASSISTANCE TO THE SYNDICATE HAD A SUBSTANTIAL
NEXUS TO THE UNITED STATES..................................................................................616

A.      Deutsche Bank's Assistance To The Syndicate Had A Substantial Nexus To
The United States..............................................................................................616

B.      Standard Chartered Bank's Terrorist Finance Routed To Al-Qaeda, The
Haqqani Network, Lashkar-e-Taiba, and D-Company Through Its Laundromat
Had A Substantial Nexus To The United States.......................................................627

C.      Danske Bank's Assistance To The Syndicate Had A Substantial Nexus To
The United States..............................................................................................638

D.      Placid Express's Assistance To The Syndicate Had A Substantial Nexus To
The United States..............................................................................................639

E.      Wall Street Exchange's Assistance To The Syndicate Had A Substantial
Nexus To The United States................................................................................640

VII.     THE SYNDICATE USED DEFENDANTS' ASSISTANCE TO COMMIT
ATTACKS THAT KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF
INTERNATIONAL TERRORISM THAT WERE COMMITTED, PLANNED, AND
AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK...........................640

CLAIMS FOR RELIEF ...........................................................................................................822

JURY DEMAND ....................................................................................................................827

PRAYER FOR RELIEF ..........................................................................................................827

**INTRODUCTION** ~~AND EXECUTIVE SUMMARY~~

1.      Plaintiffs~~, are~~ American service members and civilians~~, and their families,~~ who were killed or wounded ~~while serving their country~~ in Afghanistan between 2011 and 2016, ~~now bring claims for aiding and abetting acts of international terrorism in violation of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333.~~ as well as their families. While these men and women worked to rebuild Afghanistan, they were attacked by a terrorist syndicate led by al-Qaeda and the Haqqani Network, the most extreme faction of the Taliban (~~hereinafter referred to as the "Syndicate").  Defendants are Deutsche Bank, Standard Chartered Bank, Danske Bank, Placid Express, and Wall Street Exchange, who each knowingly facilitated transfers of millions of U.S. Dollars to the terrorists, and in other ways enabled their campaign of violence against Americans in the region.[1]~~collectively the "Syndicate"). The Syndicate organizations share anti-American terrorist objectives, which they pursue by jointly planning and committing terrorist attacks, as well as sharing resources (including but not limited to financial resources) and knowhow.[2]

2.      ~~Defendants' conduct was outrageous.  While most global financial institutions, by 2009 at the latest, responsibly adhered to rules designed to keep money away from violent terrorists, Defendants did the exact opposite:  Defendants acted as "Laundromats," i.e., complex~~

---

[1] ~~The factual allegations in this complaint are based on information from witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence and financial-intelligence reporting, congressional testimony and reports, press accounts, Defendants' own statements, and Plaintiffs' recollections.~~

[2] The factual allegations in this complaint are based on information from witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence and financial-intelligence reporting, congressional testimony and reports, press accounts, Defendants' own statements, and Plaintiffs' recollections.

criminal schemes designed to enable criminal terrorist financiers to secretly move their funds and evade regulatory scrutiny.  *See infra* Part IV.

3. "Laundromats" allow suspicious customers (who would be rejected by other financial institutions) to execute high-risk transactions (that would be refused by other financial institutions) and to otherwise use the financial institution's resources and facilities to perpetrate unlawful conduct, such as concealing the illicit source or use of money.

4. Here, the terrorists used Defendants' Laundromats to change dirty money into clean money and convert dirty foreign currency into clean U.S. Dollars.  The U.S. Dollar is the preferred currency of terrorists because it is a safe, stable currency that can be spent easily anywhere in the world.  *See infra* Part II.A.2.  Although money laundering is not unique to terrorists (other criminals do it), Defendants laundered money for customers (Syndicate agents, operatives, and fronts) in jurisdictions (Afghanistan, Pakistan, Russia, and the U.A.E.) and with types of transactions that all alerted Defendants that they were laundering money for terrorists. *See infra* Part V.  Defendants knew they were aiding terrorism and yet did so anyway.

5. Defendants intentionally set up and operated their respective Laundromats. They knowingly sought out and catered to customers seeking to evade laws against terror financing. *See infra* Part IV.  The overwhelming evidence that Defendants knew what they were doing comes from public reports, company documents, regulators and other government investigations, whistleblowers, and admissions from Defendants' own executives.  *See infra* Part V.

2. When Defendants operated their Laundromats, they directly financed terrorists, including al-Qaeda, the Taliban (including its Haqqani Network), and other Syndicate allies.  In this way, financial institutions and remitters like Defendants played a vital role in lubricating al-Qaeda and the Haqqani Network's transnational terrorist finance and logistics enterprises,

~~directly supporting attacks against Americans in Afghanistan.~~ The factual allegations in this complaint are based on information from witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence and financial-intelligence reporting, congressional testimony and reports, press accounts, Defendants' own statements, and Plaintiffs' recollections.

3.      Plaintiffs have one extra source, which Plaintiffs lacked before, that is unique, precise, and eliminates any plausible basis to doubt Plaintiffs' terrorist finance allegations against Deutsche Bank and Standard Chartered Bank:  a complete, "final" version of the confidential investigative summary prepared by an elite Western law enforcement agency that had direct access to Samir Azizi himself, and his bank records (the "Final Azizi Memo").[3]

4.      As memorialized in the Final Azizi Memo, one or more members of the Azizi Cell "generally confessed" and "cooperat[ed] with the investigation."  The Final Azizi Memo erases any possible doubt that Deutsche Bank and Standard Chartered Bank, through their combined services to Azizi and the al-Qaeda fundraising cell he led, helped route tens of millions, if not more than $100 million, in value to al-Qaeda, and Azizi and the Azizi Cell appear to have been one of the most prolific fundraisers for al-Qaeda in its history.

5.      The Syndicate's operations are far-reaching and expensive. Accordingly, the Syndicate relies on an international criminal network to generate money and then move that money back to Afghanistan and Pakistan, where it can be used to pay for terrorist personnel and infrastructure, and also to purchase weapons, explosives, and other matériel. The Syndicate's preferred currency for these transactions is the U.S. Dollar ("USD"), because it is stable and can

---

[3] Given al-Qaeda and the Taliban's long history of intimidating witnesses, Plaintiffs paraphrase the substance – but not the math – from this confidential law enforcement summary.

be spent anywhere. That makes access to the international financial system—and especially to the U.S. banking system—critically important to the Syndicate's operations.

6.      Defendants are Deutsche Bank, Standard Chartered Bank, Danske Bank, Placid Express, and Wall Street Exchange. Defendants played critical roles in criminal terrorist finance by knowingly facilitating transfers of hundreds of millions in USD to the terrorists. Defendants did so through a variety of mechanisms.

7.      All Defendants worked with the world's most notorious and successful money launderer, Altaf Khanani, and his Khanani Money Laundering Organization ("Khanani MLO"). Khanani was a Pakistani national charged by the Pakistani authorities in 2008 with money laundering who then fled to Dubai and set up a worldwide money laundering operation servicing terrorist groups, organized crime outfits, and drug cartels. Through a web of companies spanning the globe, Khanani received, moved, concealed, and repatriated Syndicate funds to and from Afghanistan. It is a matter of public record that Defendants did business with Khanani's organization, helping the Syndicate acquire *at least* tens of millions of dollars during the relevant time period.

8.      Defendants also provided financial services to Iran's terrorist-funding proxies, the Islamic Revolutionary Guard Corps and the Qods Force. These entities provided financial and logistical support to Syndicate terrorists specifically to enable terrorist violence against Americans in Afghanistan. Defendants supported Iran's terrorist proxy war by helping people and entities acting on Iran's behalf move money in violation of critical counterterrorism sanctions.

9.      Defendants also assisted other criminal organizations that were known to play a role in the Syndicate's unlawful terrorist activities. These included: the Russian Mafia, which

had a symbiotic relationship with the Syndicate originally developed through selling Syndicate opium and laundering the proceeds into USD; Syndicate-trained cells that committed fraud in Europe, which converted the proceeds into USD and repatriated them to the Syndicate; and other Syndicate operatives and financiers. All of these transactions helped the Syndicate finance its ongoing campaign of terrorist violence against Americans in Afghanistan.

10.     In addition to these financing activities, Standard Chartered Bank played a role in terrorist bombmaking by knowingly assisting two Pakistani fertilizer companies that produced critically important precursor materials for the Syndicate's improved explosive devices ("IEDs"). Standard Chartered engaged in this conduct even after the mainstream media reported that these companies' products were used in the vast majority of IEDs in Afghanistan, and even after the head of the United States's project to curb deaths from IEDs personally visited Standard Chartered in New York to implore the bank to take action. In effect, Standard Chartered knowingly financed the production of Syndicate IEDs.

6.     Plaintiffs' claims for relief sound in aiding and abetting under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by~~As Dr. Louise Shelley, the Director of the Terrorism, Transnational Crime and Corruption Center at George Mason University, testified before Congress in 2016:~~

> ~~Many [] hybrid criminal-terrorists have European passports.  Therefore, the new hybrid terrorists … have more mobility...  My present research … continues to see the problem of illicit trade as a *key funding source for terrorism*. …  We [] need to *focus on legitimate banks* that can help facilitate the storing and transport of money for terrorists.  Recent investigations reveal that *legitimate large banks such as Deutsche Bank*, in violation of international regulations, *receive funds that are associated with terrorists* and criminals *as this helps increase profits*.  Officials at Deutsche Bank, in a significant number of suspicious files examined~~

by auditors, revealed that officials were *told to avoid warning signs or not to commit due diligence on what should be suspicious clients*.[4]

7.      From 2000 through 2017, Defendants enabled hundreds of millions of U.S. Dollars to flow from their respective branch accounts and correspondent accounts in New York to al-Qaeda- and Haqqani Network-controlled accounts operated by known or suspected terrorist financiers.  Defendants did so by providing financial services to customers whom Defendants knew were acting for the Syndicate, including, but not limited to:

(i)     **Altaf Khanani**, the world's most notorious terrorist money launderer, whose transactions relied upon each Defendant's New York branch to launder and then repatriate hundreds of millions U.S. Dollars in Syndicate's income back to al-Qaeda and the Haqqani Network, among other Syndicate clients, to support Syndicate attacks against Americans in Afghanistan from 2001 through 2016;

(ii)    **Samir Azizi**, a notorious al-Qaeda and Haqqani Network financier who led a Value Added Tax (or "VAT") fraud[5] cell in Europe that partnered with the Deutsche Bank Defendants to execute a massive VAT fraud scheme planned by al-Qaeda and the Haqqani Network, through which Azizi's cell fraudulently obtained more than 60 million euros from European governments and enabled Azizi to transfer more than $8 million to al-Qaeda and the Haqqani Network to fund terrorist attacks against Americans in Afghanistan from 2007 through 2012;

(iii)   **Imran Yakub Ahmed**, another notorious Syndicate financier and fundraiser, whom the Deutsche Bank Defendants helped execute a massive VAT fraud scheme designed by the Syndicate to fraudulently obtain more than a billion euros, millions of which were converted to U.S. Dollars, through Deutsche Bank, and repatriated to the Syndicate to support attacks against Americans in Afghanistan from the mid-2000s through 2010;

---

[4] Statement of Dr. Louise Shelley Director, Terrorism, Transnational Crime and Corruption Center George Mason University, *Current Terrorist Financing Trends, Hearing Before the U.S. House of Representatives Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence*, Congressional Testimony via FDCH (May 12, 2016), 2016 WLNR 14564170.

[5] VAT is "value added tax," the European equivalent of a sales tax.  The VAT fraud schemes at issue in this case were complex; at a high level, the gist is that al-Qaeda and Haqqani Network operatives (often dual-hatted) orchestrated transnational fraud rings designed to obtain refunds of fictitious VAT tax payments arising out of transactions purportedly between arms-length counterparties.  They did this with the help of complicit financial institutions.  Al-Qaeda and the Haqqani Network would then transfer a substantial percentage of the resulting money stolen from the European governments, again with the help of complicit financial institutions, to fund their, and the Taliban's, attacks against Americans in Afghanistan.

(iv) ~~**Mustafa Ahmed al-Hisawi**, "al-Qaeda's Money Man," whom the Standard Chartered Bank Defendants recklessly permitted to use SCB Dubai and SCB New York to move more than $100,000 to fund al-Qaeda operations before and after 9/11;~~

(v) ~~**Mamoun Darkazanli and Mamdouh Mahmud Salim**, al-Qaeda supporters, operatives, and fundraisers who were each a member of al-Qaeda's notorious Hamburg Cell in Germany, who relied upon Deutsche Bank to source more than $500,000 in terrorist finance for al-Qaeda from 1995 through 2003;~~

(vi) ~~**Viktor Bout**, the infamous al-Qaeda and Taliban arms supplier known as the "Merchant of Death," whom the Standard Chartered Bank Defendants recklessly permitted to use SCB accounts to facilitate weapons smuggling to both groups before and after 9/11;~~

(vii) ~~**Abdul Baqi Bari**, an al-Qaeda, Haqqani Network, and Taliban operative who served as the Taliban's "bank," whom the Standard Chartered Bank Defendants recklessly serviced through 2006, during which time the Syndicate used Standard Chartered Bank accounts to source at least several million U.S. Dollars for the Syndicate from 2001 through 2006; and~~

(viii) ~~**Hikmatullah Shadman**, a notorious Afghan warlord, whose transactions, recklessly facilitated by the Standard Chartered Bank Defendants, relied upon the SCB New York and SCB Afghanistan accounts to pay at least several million dollars to the Syndicate from 2009 through 2012.~~

~~8.      Between the mid-1990s and 2017, Deutsche Bank operated one of the worst Laundromats in the world's financial history.  When a whistleblower demanded to know why Deutsche Bank would so flagrantly engage in obvious financial crime, the reply came back: "Because we're that greedy."~~

~~9.      For decades, Deutsche Bank was a financier for al-Qaeda and the Taliban. Deutsche Bank provided every key component of the Syndicate's finance needs, including by:~~

- ~~actively aiding two large-scale VAT fraud schemes while knowing that its customers were likely al-Qaeda and/or Haqqani Network terrorists;~~

- ~~working with notorious al-Qaeda agents, including the Russian Mafia and Altaf Khanani;~~

- ~~secretly disclosing sensitive non-public data about its own counter-terrorist-finance controls to the Russian Mafia, so the criminals could evade core post-9/11 safeguards; and~~

- dissembling with regard to its Laundromat, including by intimidating potential critics, retaliating against known and suspected whistleblowers, and pursuing strategies, discussed internally by key employees, to remain willfully blind so as to evade accountability by appearing ignorant when questioned about the Bank's misconduct.

10.     From 1995 through 2016, Deutsche Bank intentionally transferred or enabled the transfer of *at least $59,326,477* (discovery will show the amount was much more than this) to the Syndicate.  Deutsche Bank knew these transactions were perpetrated by notorious Syndicate agents and operatives who managed accounts for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-E-Taiba, Jaish-e-Mohammed, and D-Company.

11.1.     The table below summarizes Plaintiffs' allegations concerning Deutsche Bank's direct financial aid to the Syndicate through a litany of long-term relationships with notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $49,787,832 minimum (likely at least $100,000,000) | Deutsche Bank<br>DB Moscow<br>DB New York (DBTCA)<br>DB London |
| Samir Azizi and the Azizi Cell | 2007-2012 | $8,568,060 minimum (likely at least $10,000,000) | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |
| Imran Yakub Ahmed and the Ahmed Cell | 2005-2010 | Likely at least $10,000,000 | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Mamoun Darkazanli and Mamdouh Mahmud Salim (The Hamburg Cell) | 1995-2003 | $970,585 minimum (likely least $2,000,000) | Deutsche Bank DB New York (DBTCA) DB Frankfurt DB London |
| **TOTAL** | | **$59,326,477 minimum** (likely more than $120,000,000) | |

12.1.    David Enrich, the award-winning Business Investigations editor for the *New York Times*, concluded that Deutsche Bank operated as "[a] criminal enterprise," whose Laundromat that systematically facilitated terrorist finance was "not the work of an isolated crew of rogue Deutsche employees;" indeed, "[m]anagers knew.  Their bosses knew.   American regulators … [found] evidence that at least one member of the bank's *vorstand*—[] one of Deutsche's most senior executives—knew about and approved of the scheme."[6]  Deutsche Bank spent "decades" always making "expedient, easy choices with the single-minded purpose of maximizing immediate profits":[7]

> [Deutsche Bank's] ascent [was] fueled by *greed, sloppiness, hubris, and criminality*, and when the reckoning came, it was brutal.  Deutsche's risk-taking—the product of years of make-money-at-all-costs mismanagement—was *out of control*. … Managers were incentivized to shirk responsibilities. … Deutsche exhibited a *jarring lack of interest in its clients' reputations*.  It would soon become enveloped in scandals relating to money laundering, tax evasion, manipulating interest rates, manipulating the prices of previous metals, manipulating the currencies markets, bribing foreign officials, accounting fraud, violating international sanctions, ripping off customers, and ripping off the German, British, and United States governments.  (*The list went on.*)[8]

---

[6]  David Enrich, *Dark Towers: Deutsche Bank, Donald Trump, and an Epic Trail of Destruction*, at 7, 16, 105 (Custom House 2020) ("Enrich, *Dark Towers*")..

[7]  *Id.* at 7.

[8]  *Id.* at 8-9 (emphasis added).

13.1.    Deutsche Bank insiders concurred.  For example, Eric Ben-Artzi, a former Deutsche Bank risk analyst, stated in an on-the-record interview with *The New Yorker*, "There was cultural criminality.  Deutsche Bank was structurally designed by management to allow corrupt individuals to commit fraud."[9]

14.    Deutsche Bank further evidenced it knew about the terrorist finance by charging premium rates for it.  As one journalist reported, colleagues at Deutsche Bank "understood that [DB Moscow Head Equities Trader Tim Wiswell] had the blessings of his superiors, who on occasion pushed him to charge higher fees for this unique offering."

15.    Deutsche Bank acted with actual knowledge of the VAT frauds committed by the Azizi Cell and the Ahmed Cell.  Early on, a Deutsche Bank employee emailed a Deutsche Bank compliance colleague and informed Deutsche Bank's compliance department that "[t]he CO2 market" that Deutsche Bank was orchestrating for Azizi and Ahmed "[was] ***showing typical characteristics of a sales tax carousel***," referring to a universally recognized red flag for terrorist finance generally and especially for al-Qaeda and the Haqqani Network finance activities.  Protecting Deutsche Bank's Laundromat, the compliance officer responded, in effect, that there was nothing to worry about with respect to the potential terrorist finance risk that had been identified because "[t]he measures taken [were] ***sufficient to document our duty of care in the event of a claim***." Thereafter, millions of U.S. Dollars poured into al-Qaeda's and the Haqqani Networks' coffers in Afghanistan, financing their devastating terrorist campaign there.

16.1.    Standard Chartered Bank also operated as a Laundromat.  In 2012, the New York Department of Financial Services ("NYDFS") entered a Consent Order which labeled Standard

---

[9] Ed Caesar, *The Moscow Laundromat: Deutsche Bank's $10-Billion Scandal*, The New Yorker (Aug. 29, 2016) ("Caesar, *The Moscow Laundromat*").

Chartered Bank as a "rogue institution," and made clear that for "nearly a decade," Standard Chartered Bank "programmatically engaged in deceptive and fraudulent misconduct [] to move at least $250 billion … then covered up its transgressions." NYDFS concluded that "[Standard Chartered Bank's] actions left the U.S. financial system vulnerable to terrorists."[10] NYDFS determined that SCB London, SCB Dubai, and SCB New York, helped "finance terrorist groups"[11] and had "indisputably helped sustain a global threat to peace and stability."[12]

17. Standard Chartered Bank's conduct was brazen. In October 2006, when reminded of the requirement that the Bank comply with terrorism-related sanctions prohibiting banks from transacting with suspected terrorist fronts a Standard Chartered Bank Group Executive Director infamously berated his American colleagues: *"You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."*

18. This attitude (and admission) that the risk of violating American terrorism laws and regulations, and abetting anti-American terrorist violence, was something only "F—ing Americans" cared about, informed Standard Chartered Bank's policies and conduct regarding terrorist finance. Indeed, in October 2006, when Standard Chartered Bank's Group Executive Director admitted the Bank's willingness to fund terror, Iranian terrorist proxies killed dozens of Americans and four U.K. nationals. For Standard Chartered Bank, however, customers' terrorist attacks against American and British service members were merely the cost of doing business.

19.1. From 1999 through 2016, Standard Chartered Bank intentionally transferred or enabled the transfer of *at least $13,066,300* (discovery will show the amount was much more

---

[10] NYDFS, *In re Standard Chartered Bank, New York Branch*, Consent Order, at 1, 2, 4 (Aug. 6, 2012) ("2012 Consent Order").

[11] *Id.* at 8.

[12] *Id.* at 22.

than this) to the Syndicate.  The table below summarizes Plaintiffs' allegations concerning

SCB's direct financial aid to the Syndicate through a litany of long-term relationships with

notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | SCB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $5,350,000 minimum (likely at least $100,000,000) | Standard Chartered Bank SCB New York SCB London SCB Dubai SCB Pakistan |
| Mustafa Ahmed al-Hisawi | 2000-2001 | $116,300 | Standard Chartered Bank SCB Dubai SCB London SCB New York |
| Victor Bout | 1999-2008 | Likely at least $18,000,000 | Standard Chartered Bank SCB Dubai SCB New York |
| Abdul Baqi Bari | 2000-2006 | $2,600,000 minimum (likely at least $3,000,000) | Standard Chartered Bank SCB Dubai SCB London SCB Pakistan SCB New York |
| Hikmatullah Shadman | 2008-2013 | Likely at least $1,200,000 | Standard Chartered Bank SCB Dubai SCB Afghanistan SCB New York |
| Fatima Fertilizer Co. & Pakarab Fertilizers Ltd. | 2008-2014 | $5,000,000 minimum (likely at least $10,000,000) | Standard Chartered Bank SCB London SCB Dubai SCB Pakistan SCB New York |
| TOTAL | | $13,066,300 minimum (likely more than $130,000,000) | |

**Formatte** Double

20.     Standard Chartered Bank also assumed a key logistical role in the Syndicate's terrorist enterprise by aiding al-Qaeda's bombmaking campaign through financial services they provided to two closely-affiliated Pakistani fertilizer companies, Fatima Fertilizer Co. Ltd. and Pakarab Fertilizers Ltd. Standard Chartered knew that both companies deliberately provided key support to the Haqqani Network through their monopoly on the manufacture, sale, and distribution of calcium ammonium nitrate (or "CAN") fertilizer, a notoriously dangerous dual-use product that al-Qaeda used to make powerful improvised explosive devices ("IEDs") for use against American troops.

21.     Fatima and Pakarab were not normal corporations engaged in routine business. Instead, they were widely understood active co-conspirators with Haqqani Network terrorists. By the end of 2011, Standard Chartered Bank knew that Fatima and Pakarab had intentionally joined the conspiracy between the Taliban (including its Haqqani Network) and rogue elements of the Pakistani Inter-Services Intelligence (or "ISI"). The object of the conspiracy was to ensure the Haqqani Network's uninterrupted supply chain of high quality, reliable CAN fertilizer to provide the explosives for the CAN fertilizer bombs that Syndicate terrorists used to attack Americans in Afghanistan from 2011 through 2016.

22.     Even though Standard Chartered Bank knew that CAN fertilizer was the Syndicate's "low-cost weapon of choice" and responsible for "90% of American casualties in Afghanistan," Standard Chartered Bank provided essential U.S. Dollar-related financial services to Fatima and Pakarab from 2011 until at least 2014, including, but not limited to, the trade finance and credit services that enabled Haqqani Network agents, operatives, and fronts in the U.A.E. and Pakistan to buy CAN fertilizer.

23.    By 2013, several whistleblowers had alerted Standard Chartered Bank, and each Standard Chartered Bank Defendant therefore knew, the foreseeable possibility that it was enabling anti-American terrorist finance:

(i)    one whistleblower concluded that Standard Chartered Bank's illicit banking practices contributed to funds which were ultimately used to support terrorist activities that killed and wounded American service members;

(ii)    a second whistleblower concluded that Standard Chartered Bank's misconduct generated cash flow to finance terrorist activities that were killing and injuring American service members; and

(iii)    a third whistleblower concluded that Standard Chartered Bank had blood on its hands because it had enabled terrorist finance, including U.S. Dollar-related terrorist finance transactions executed by Al Zarooni Exchange, which Standard Chartered Bank knew at the time to be a notorious Khanani MLO-related terrorist finance vehicle used by anti-American terrorists to finance their operations.

24.    Despite knowing that it was aiding terrorist finance, Standard Chartered Bank continuing aiding the terrorists, and Americans continued dying.

25.    Standard Chartered Bank was so committed to its own U.S. Dollar Laundromat that it persisted in servicing its terrorist customers even after being specifically warned by the U.S. government that its financial services were playing a direct role in enabling attacks against Americans in Afghanistan.  In January 2013, Standard Chartered Bank's senior leadership were directly confronted with an in-person warning from Lt. Gen. ("LTG") Michael Barbero, who as head of the Department of Defense's Joint IED Defeat Organization ("JIEDDO") was tasked with overseeing America's efforts to protect Americans from CAN fertilizer bomb attacks, among other IED types.  LTG Barbero told Standard Chartered Bank, during in-person meetings in the United States, in sum and substance, that its business practices were enabling the Syndicate's CAN fertilizer bomb campaign targeting Americans in Afghanistan and helping kill and injure Americans by the thousands each year.

14

26.     The U.S. government in 2013 askEd SCB to change its practices to save American lives there.  Despite the U.S. government's request, Standard Chartered did not stop providing substantial assistance to the terrorists.

27.     Every Plaintiff who was injured, or whose loved one was killed or injured, by a Syndicate IED or suicide bomb attack from 2011 through 2016 was killed or injured by terrorists using a CAN fertilizer bomb.

28.    From 2007 through 2016, out of its Estonia branch, Defendant Danske Bank's Laundromat executed $233 billion dollars in suspicious transactions, the majority of which facilitated money laundering for Khanani, the Russian Mob, the leadership of Azerbaijan, the Syndicate, and others.

29.    Danske Bank let Khanani, a known al-Qaeda and Syndicate money launderer, exchange large and suspicious amounts of U.S. Dollars via his Dubai-registered company Mazaka General Trading.  Richard Grant, the former head of the Australian intelligence service was quoted as saying "[t]here can only be one reason why money has been moved out of Danske Bank and into his trading companies—and that is money laundering.  Because that was the only thing that happened in those companies."[13]

30.    From the beginning, Danske Bank knew.  In 2007, for example, the Russian Central Bank told the Danish Financial Services Authority that Danske Bank Estonia was facilitating crime and money laundering with significant magnitude and regularity, and the Danish authorities passed that message on to Danske Bank.  The volume of these transactions and their timing reveal that Danske Bank, in Estonia and also in its headquarters in Denmark, knew that it

---

[13] Business Recorder, *FinCEN Files: Pakistan's Altaf Khanani got huge sums from account in Danske Bank* (Sept. 21, 2020), https://www.brecorder.com/news/40020006.

operated a Laundromat, and that it chose to do so despite knowing that by doing so it was financing terrorism.

31.    Again in 2012, Estonian regulators warned Danske Bank about its Estonian branch and its customers, but Danske Bank did nothing.

32.    In 2013, Danske Bank internally realized that some of the Estonian branch's customers may be "black-listed," when one of Danske Bank's New York correspondent accounts terminated its relationship with Danske Bank's Estonian branch due to suspicious activity, and an internal Danske Bank Estonian branch employee whistleblower reported internally that Danske Bank was dealing with criminals.  Still, Danske Bank did not stop its Laundromat.

33.    The magnitude of the Danske Bank Laundromat, the amount of money laundered, the number of accounts for which it laundered money, and the period over which it did so, all make clear that Danske Bank knew that it was participating in illegal activity and that terrorist finance was a foreseeable result.

34.    The fallout from these revelations has been devastating.  Danske Bank has been charged by the Danish authorities with violating the Danish Anti-Money Laundering Act, and U.S. financial crime authorities continue to investigate.  In the wake of this scandal, the CEO of Danske Bank has resigned.

35.    Defendants Placid Express and Wall Street Exchange also served as Laundromats to terrorists.  Placid Express and Wall Street Exchange both served as core financial partners for the world's most notorious al-Qaeda and Taliban fundraiser and his money-laundering organization: Altaf Khanani.  In so doing, Placid Express and Wall Street Exchange each enabled tens of millions of U.S. Dollars to flow from accounts in New York to Syndicate accounts in

Afghanistan, Pakistan, and the U.A.E. from 2001 through 2016, directly funding attacks against Americans in Afghanistan.

36. When each Defendant made the conscious choice to serve as a Laundromat in a high-risk jurisdiction for al-Qaeda and Haqqani Network terrorist finance and logistics, each prioritized its own profits over the certain risk that Americans would be killed and maimed in Afghanistan by the thousands every year through a terrorist campaign aided and abetted by their reckless practices. Thus, when Defendants applied their Laundromat model to high-risk jurisdictions for al-Qaeda and Haqqani Network activity, Defendants deliberately assumed a role in the Syndicate's terrorist enterprise and each Defendant played such role for years, doing so well after the U.S. government (among others) had warned that their conduct was potentially helping al-Qaeda and its affiliates attack Americans.

37. By helping Syndicate fronts launder overseas income back into the Syndicate's coffers in Afghanistan, Pakistan, the U.A.E., and/or Russia, each Defendant knowingly assumed a role in the Syndicate's terrorist campaign against Americans in Afghanistan. Without Defendants' decades-long financial partnership, the Syndicate would not have been able to carry out the same scale of terrorist campaign or conduct mass casualty attacks, with the same frequency, lethality, or reliability.

38. Each Defendant's support for the Syndicate's agents, operatives, and fronts in Afghanistan, Pakistan, the U.A.E., and Russia intensified the Syndicate's terrorist campaign against Americans in Afghanistan. Laundered overseas Syndicate profits were quantitatively significant—by most accounts one of the Syndicate's largest funding sources overall. Even relatively low-dollar recycling of profits had an outsized effect on the Syndicate's terrorist capabilities by subsidizing salaries and weapons for multiple terrorists. Each Defendant's

17

~~decision to facilitate larger, seven-figure transactions had an even greater effect:  such~~

~~transactions translated into thousands of CAN fertilizer bombs, CAN suicide bombs, advanced~~

~~surface-to-air-missiles, and the terrorists to detonate them, all of which the Syndicate used to kill~~

~~and injure Americans in Afghanistan.  Plaintiffs bore the consequences of that decision.~~

11.    ~~This is a paradigmatic case for aiding-and-abetting liability, which Congress~~

~~added to the ATA when it enacted~~ the Justice Against Sponsors of Terrorism Act ("JASTA"),

Pub. L. No. 114-222, 130 Stat. 852 (2016). ~~JASTA~~The elements of this cause of action are: (1)

the attacks that injured the plaintiffs must have been committed, planned, or authorized by a

designated Foreign Terrorist Organization ("FTO"); (2) the defendant must have provided

assistance, either directly or indirectly, to the organizations that committed the attack; (3) the

defendant must have been generally aware at the time it provided the assistance that it was

playing a role in an overall illegal activity, from which the attacks that injured the plaintiffs were

a foreseeable consequence; and (4) the assistance the defendant provided must have been

"substantial," as that term is used in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). Each

of these elements is met in this case.

12.    Part I, *infra*, explains that the attacks that injured Plaintiffs were almost all

committed by the FTO al-Qaeda, either alone or in conjunction with one or more other FTOs.

Some attacks were committed by the Taliban, including its Haqqani Network, which was

designated an FTO on September 19, 2012. Every attack after that date was committed by an

FTO—and the attacks committed before that date were "planned" or "authorized" by al-Qaeda,

and therefore satisfy this element.

13.    Part II, *infra*, describes the assistance Defendants provided to the Syndicate. It

explains how each Defendant processed transactions for an international ring of criminals that

raised, laundered, and repatriated money for the Syndicate. The money came from drug sales, fraud schemes, protection rackets, and other criminal activity; it was used to finance terrorist violence against Americans in Afghanistan. Part II also describes the role Standard Chartered Bank played in the Syndicate's fertilizer bomb enterprise.

14.     Parts III and IV, *infra*, describe Defendants' knowledge, which went well beyond "general awareness" of a role in unlawful activity. Plaintiffs allege that Defendants knowingly and intentionally participated in criminal terrorist finance. Thus, Part III lays out facts that were public knowledge, which every Defendant knew at the time, that alerted them all to the risks of their conduct. These are the sorts of public facts that every reasonable financial institution would have understood. Part IV provides additional Defendant-specific allegations of awareness. Plaintiffs believe that discovery will show even more facts establishing knowledge because Defendants are sophisticated financial institutions that had the ability to look at both public and non-public information for suspicious indicators attached to their customers, those customers' counterparties, and the transactions those customers were executing.

15.     Part V, *infra*, explains why Defendants' assistance was substantial under *Halberstam*. The inquiry looks to: the nature of the act assisted, *i.e.*, terrorism; the amount, which was tens of millions of dollars that we know about for sure, and discovery is likely to reveal hundreds of millions more; the defendant's state of mind, which was culpable here; and the duration of the assistance, which was many years, all against the backdrop of an ongoing campaign of horrific violence against Americans in Afghanistan.

16.     Part VI, *infra*, explains how even Defendants' conduct that occurred overseas had a substantial nexus to the United States.

17.     Finally, Part VII, *infra*, describes the terrorist attacks that injured Plaintiffs and their family members—including who planned and committed the attacks, and the injuries they caused.

18.     For several reasons, the allegations in this complaint are quite detailed, and take a fair amount of space. First, this case involves multiple Defendants that engaged in partially overlapping and partially distinct misconduct, and several Defendants supported terrorism in multiple ways. It takes space to describe each of Defendants' misconduct in detail, and to show how these various terror-financing schemes operated and also reinforced each other. Second, the allegations in this case are complex. As described in greater detail below, terrorists use a variety of schemes to raise and move money around the world, and a variety of means to carry out sophisticated attacks on Americans. It takes space to expose the many ways that criminal conduct causes funds to flow back to the Syndicate, and to explain how the various Syndicate organizations collaborate and reinforce each other's terrorist agendas. Third, the allegations in this Complaint are serious, and so Plaintiffs have meticulously sourced them to make it clear that their claims for relief are not based on speculation or mere negligence, but instead on plausible allegations of grievous misconduct. It takes space to lay out those sources. Finally, this case involves a large number of Plaintiffs, and it takes space to describe the attacks that killed or injured them or their loved ones, and their relationships to the attack victims.

~~39.~~19.  The upshot of those detailed allegations is that this Complaint will show that this is a paradigmatic case for aiding-and-abetting liability under JASTA, which provides "civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against

the United States." JASTA § 2(b) (emphasis added). Defendants provided exactly that sort of support to the Syndicate, and Congress wanted every such defendant to be held to account for the violence it subsidized.

40. An action for aiding and abetting is available whenever an act of international terrorism was "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization" (or FTO) by the U.S. government. 18 U.S.C. § 2333(d)(2). Designation as an FTO is a severe sanction: it is a felony to knowingly provide any material support to any organization designated as such. 18 U.S.C. § 2339B.

41. Al-Qaeda, which led the Syndicate that committed, planned, and authorized the attacks that injured Plaintiffs in this case was a designated Foreign Terrorist Organizations ("FTOs") at the time of the attacks. *See infra* Part I.A.-C.

42. Aiding and abetting liability under JASTA has three elements. First, the person the defendant aids must perform a wrongful act that causes injury to the plaintiff. Second Circuit law is clear that even if the aid is delivered indirectly, *i.e.*, through intermediaries, it still triggers liability. Moreover, the plaintiff need not trace funds from a defendant bank through to an individual terrorist attacker. Even indirect aid to a terrorist group satisfies this element.

43. Here, Defendants aided FTOs. *See infra* Part IV. Sometimes, this aid was given directly to al-Qaeda and Haqqani Network operatives and agents. Other times, it was given indirectly to intermediaries acting on al-Qaeda's behalf, or companies supplying the Haqqani Network with explosive materials as part of the Syndicate's conspiracy. In every case, however, Defendants helped the Syndicate carry out terrorist violence in Afghanistan.

44. The Syndicate FTOs, in turn, committed, planned, and authorized terrorist attacks against Americans in Afghanistan. *See infra* Part I. The Syndicate did so pursuant to a broader

campaign to perpetrate anti-American violence in the region.  The attacks and the campaign were each acts of international terrorism that caused Plaintiffs' injuries.

45.     The second element is that the defendant must be generally aware that it is playing a role in an illegal or tortious scheme that foreseeably could lead to acts of international terrorism.  A defendant need not have actual knowledge that it is supporting terrorism *per se*, and certainly does not need specific intent to advance terrorism.  Instead, it is enough if the defendant knows that it is involved in illegal activity that carries a foreseeable risk of terrorism.

46.     Here, each Defendant knew that they were participating in criminal activity.  *See infra* Part V.  Indeed, the transactions they facilitated were themselves criminal.  Laundering money is criminal.  And Defendants knew they were thereby supporting terrorist organizations, terrorist financiers, terrorist money launderers, and transnational criminal organizations with established links to FTOs.  They also knew that the FTOs in question were engaged in a campaign of anti-American violence at the time.  *See infra* Part V.J.  Terrorist attacks were an easily foreseeable consequence of that support.  *See infra* Part V.A.

47.     The final element is that the defendant's assistance must be substantial.  Substantiality is based on a number of factors, including the nature of the act encouraged, the amount of assistance provided, and the duration of the assistance.

48.     These factors weigh heavily in favor of liability.  The Syndicate needed funds, especially U.S. Dollars, to fund its campaign of violence against Americans in Afghanistan.  *See infra* Part II.A.  Defendants helped the Syndicate obtain and access hundreds of millions of U.S. Dollars over a period of several years.  *See infra* Part IV.

49.     For the foregoing reasons, Defendants are liable for aiding and abetting on two theories. First, they aided and abetted acts of terrorist violence against Americans in Afghanistan.

~~Second, they aided and abetted a racketeering enterprise: al-Qaeda and the Haqqani Network's~~

~~campaign of terror in Afghanistan, which has killed over 1500 American service members and~~

~~injured over 20,000 more.  Both are acts of international terrorism that render Defendants liable.~~

## THE DEFENDANTS

**A.      The Deutsche Bank Defendants**

~~50.~~20.   Defendant Deutsche Bank Aktiengesellschaft ("Deutsche Bank~~" or,~~," "Deutsche,"

or "DB") is one of the largest banks in the world, with more 100,000 employees and agents in 62

countries.  Deutsche Bank is a publicly traded German financial institution whose principal place

of business is in Frankfurt, Germany ("DB Frankfurt").  Its stock trades in the U.S. (NYSE: DB).

~~51.~~21.   Defendant Deutsche Bank AG London ("DB London") is Deutsche Bank's

branch in London, and is registered as the UK establishment of Deutsche Bank AG.  DB London

offers banking services to corporate and institutional clients.  DB London and its employees in

London are agents and representatives of Deutsche Bank AG.

~~52.~~22.   Defendant Deutsche Bank AG does business in New York under the name

Deutsche Bank Securities, Inc., which is Deutsche Bank's branch in New York.  Deutsche Bank

Securities, Inc. offers banking services to corporate and institutional clients only, primarily U.S.

Dollar (or "USD") clearing for international wire payments and letters of credit.  Since 1972,

Deutsche Bank has operated as a foreign bank branch in New York, New York pursuant to a

license issued by the state of New York.  Deutsche Bank was first registered to do business in the

State of New York on January 19, 1972, under the name Cyrus J. Lawrence & Sons

Incorporated, Deutsche Bank Securities Inc. assumed its current name as the survivor entity of a

merger on September 28, 1993.

53.23.   Deutsche Bank's USA PATRIOT Act certification applies to Deutsche Bank Securities, Inc.. It states that "Deutsche Bank AG, New York Branch is a resident of the United States at … 60 Wall Street, New York, NY 10005."

54.24.   Defendant Deutsche Bank Trust Company Americas ("DBTCA") is a wholly owned subsidiary of Deutsche Bank Trust Corporation, which is a wholly owned subsidiary of Defendant Deutsche Bank. DBTCA is a New York State chartered bank regulated by NYDFS, and it resides in New York.

55.25.   Deutsche Bank Securities, Inc.., DBTCA, and DBTCADeutsche Bank AG's employees and representatives in New York (collectively, "Deutsche Bank New York" or "DB New York") serve as one of the largest U.S. Dollar correspondent banks in the world. Significant Deutsche Bank Laundromat transactions alleged in this Complaint, totaling more than $50 million dollars, were executed by and through Deutsche's branches in the U.S.

56.26.   Defendant Deutsche Bank AG, Dubai Branch ("DB Dubai") is an Emirati financial institution that serves as Deutsche Bank's branch in Dubai, United Arab Emirates. DB Dubai and its employees in Dubai are agents and representatives of Deutsche Bank AG.

57.27.   Defendant Deutsche Bank Ltd, also known as Deutsche Bank LLC, ("Deutsche Bank Russia" or "DB Moscow") is a wholly owned subsidiary of Deutsche Bank. DB Moscow serves Deutsche Bank's customers in Russia, primarily in connection with their U.S. Dollar-related transaction needs. DB Moscow is a Russian corporation, and it resides in Moscow, Russian Federation.

58.28.   Deutsche Bank regularly reached into the United States to assert its interests in U.S. court. For example, Deutsche Bank used "foreclosure mills" to illegally file foreclosure

lawsuits in American courts against U.S. service members who were deployed to Iraq and Afghanistan in violation of the Servicemembers Civil Relief Act.

59.29.   Deutsche Bank does extensive business throughout the United States and holds significant assets in the United States. Deutsche Bank operates, through DB New York (including DBTCA), one of the largest USD-clearing banks in the world. Significant Deutsche Bank Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Deutsche Bank's branches in the United States.

30.     Deutsche Bank, DB London, DB Dubai, and DB Moscow acted as an agent for Deutsche Bank Securities, Inc. and DBTCA in order to promote Deutsche Bank Securities, Inc.'s and DBTCA's transactions to generate more income for both.

31.     Deutsche Bank, DB London, DB Dubai, and DB Moscow **acted for the benefit** of Deutsche Bank Securities, Inc. and DBTCA.  Deutsche Bank, DB London, DB Dubai, and DB Moscow, including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., followed a top-down, globally integrated business model, which DB and its personnel call "One Bank."   Under DB's "One Bank" strategy, each such DB Defendant aggressively promoted Deutsche Bank Securities, Inc. and DBTCA to their global customer base regardless of transaction type in order to cause more income to flow to Deutsche Bank Securities, Inc. and DBTCA through the fees both earned through Deutsche Bank's referral business model.

32.     Every DB Defendant knew that the purpose of Deutsche Bank's "One Bank" policy was to structure a two-part, mutually profitable relationship, through which Deutsche Bank, DB London, DB Dubai, and DB Moscow, on the one hand, and DBTCA and Deutsche Bank Securities, Inc., on the other, each realized billions in net income from 2001 through 2017

directly attributable to the former's collective service as "One Bank" designed to refer business to DBTCA and Deutsche Bank Securities, Inc.

33.     Deutsche Bank, DB London, DB Dubai, and DB Moscow, including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., **served as the agent** in Deutsche Bank's "One Bank" model.[14]

34.     Deutsche Bank Securities, Inc. and DBTCA **served as principals** in Deutsche Bank's "One Bank" model.

35.     Deutsche's "One Bank" comprised DB's vast global network of branches, subsidiaries and affiliates, all of whom collectively constituted the "One [Deutsche] Bank" and restructured DB's entire global business from the late 1990s through 2003 to move to its "One Bank" concept, which was centered on generating as much banking and security-related transaction fee income as was possible through intensive, top-down global collaboration and cross-selling.  As a result, the above-described agent/principal relationship keyed the business models of both Deutsche Bank, on the one hand, and Deutsche Bank Securities, Inc. and DBTCA, on the other, all of whom purpose-built their entire business models around the interplay between Deutsche Bank (as agent) and Deutsche Bank Securities, Inc. and DBTCA (as principal for relevant securities and banking transactions, respectively).

36.     Deutsche Bank, DB London, DB Dubai, and DB Moscow **acted with the knowledge and consent** of Deutsche Bank Securities, Inc. and DBTCA.  From 2001 through 2017, Deutsche Bank Securities, Inc. and DBTCA regularly revealed their knowledge of, and consent to, Deutsche's Bank's, DB London's, DB Dubai's, and DB Moscow's global

---

[14] Unless otherwise indicated, whenever Plaintiffs refer to "One Bank" in this Complaint, Plaintiffs mean this particular group of DB Defendants (including any combination thereof), acting in the capacity of an agent to Deutsche Bank Securities, Inc. and DBTCA as principals.

Laundromat strategy, with which Deutsche Bank Securities, Inc. and DBTCA were familiar through their receipt of data, formally and informally, from each of the other DB Defendants.

37.     Deutsche Bank designed and pursued its "One Bank" policy from 2001 through 2017 to route as much business as possible to the "One Bank's" two key affiliates in the United States: Deutsche Bank Securities, Inc. and DBTCA.

38.     As such, Deutsche Bank Securities, Inc. and DBTCA knew, through a litany of communications channels including, but not limited to, the information that Deutsche Bank Securities, Inc. and DBTCA learned from Deutsche's Bank's, DB London's, DB Dubai's, and DB Moscow's officers, directors, employees, and agents, including those employed by such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E.

39.     Deutsche Bank, DB London, DB Dubai, and DB Moscow including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E., **acted under some degree of control** of Deutsche Bank Securities, Inc. and DBTCA, each of whom regularly exercised a certain amount of control Deutsche Bank, DB London, DB Dubai, and DB Moscow including such DB Defendants' branches and affiliates in Germany, the U.K., and the U.A.E.

### B.     The Standard Chartered Bank Defendants

60.40.   Defendant Standard Chartered Bank (("Standard Chartered" or "SCB") is one of the largest banks in the world, with more than 1,700 branches in more than 60 countries. SCB is a publicly traded United Kingdom financial institution whose principal place of business is in London, England, and whose stock trades in the United States (ADR: SCBFY), United Kingdom (Ticker: STAN), and Hong Kong (Ticker: 2888.HK).

61.41.   Since 1976, SCB has operated as a foreign bank branch in New York, New York pursuant to a license issued by the state of New York.

62.42.  Defendant Standard Chartered PLC ("SCB London") is the parent of SCB New York, SCB Dubai, and SCB Pakistan, as defined below, and is based in London, England.

63.43.  Defendant Standard Chartered Bank Ltd. ("SCB New York") is SCB's branch in New York. SCB New York offers banking services to corporate and institutional clients only, primarily U.S. Dollar clearing for international wire payments and letters of credit. As one regulator found, SCB New York "primarily conducts a U.S. dollar clearing business, which clears approximately $190 *billion* per day for its international clients."[15] SCB New York "also engages in corporate lending, project and structured finance, trade finance, cash management, foreign exchange trading, and wire transfer services."[16] SCB New York is one of the largest USD-clearing banks in the world.

64.44.  Standard Chartered Bank'sChartered's USA PATRIOT Act certification applies to SCB New York, and also "covers … Standard Chartered Bank Branches and Subsidiaries" including, among others, Standard Chartered Bank'sChartered's branches and subsidiaries in Dubai, ("U.A.E."), and Karachi, Pakistan, and states that Standard Chartered Bank is a resident of the United States at 1095 Avenue of the Americas, New York, NY 10036.

65.45.  Defendant Standard Chartered Bank, Dubai Main Branch ("SCB Dubai") is Standard Chartered Bank's branch in the U.A.E. has agents and isrepresentatives based in Dubai, U.A.E. ("SCB Dubai").

66.46.  Defendant Standard Chartered Bank (Pakistan) Limited ("SCB Pakistan") is Standard Chartered Bank'sChartered's branch in Pakistan and is based in Karachi, Pakistan.

---

[15] 2012 Consent Order at 6.

[16] *Id.*

67.47.  Defendants Standard Chartered Bank, SCB London, SCB New York, SCB Dubai, and SCB Pakistan are, collectively, "Standard Chartered Bank" or "the SCB Defendants," and each is individually an "SCB Defendant."

68.48.  SCB does extensive business throughout the United States and holds significant assets in the United States.  Significant SCB Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through SCB's branches in the United States.

49.     Since the 1980s, Standard Chartered Bank's core business model has been to serve as the correspondent bank and clearing bank for USD-denominated transactions in high-risk emerging markets, with a particular emphasis on facilitating cross-border transactions in the Middle East and Asia. As the Economist explained in 2012, "[a]lthough its purely American operations are negligible, Standard Chartered's wholesale franchise rests on providing a financial bridge between the 70 countries in which it does operate, much of it denominated in dollars that must pass through America's financial system."[17]

50.     This business strategy required that Standard Chartered Bank branches, subsidiaries, and affiliates work closely with, and ordinarily seek to route transactions through, SCB New York. Standard Chartered Bank specialized as a USD-focused bank that emphasizes cross-border trade finance[18] work in "emerging markets" in the Middle East and Asia. As an "emerging-markets specialist" bank, Standard Chartered Bank's core business is processing USD-denominated transactions because the U.S. Dollar is the currency of choice, or otherwise

---

[17] Economist, *Standard Chartered: My Dollar, My Rules* (Aug. 11, 2012) (emphasis added), 2012 WLNR 16987066.

[18] "Trade finance" refers to products and financial instruments offered by banks that companies use to support international trade and commerce, which enable importers and exporters to conduct business through trade by making transactions feasible.  The role of trade finance is to introduce a third-party, like SCB, to a transaction to eliminate the payment risk and supply risk.

used to backstop transactions, in most emerging markets around the world, most of all those in the Middle East and Asia with a long history of trade in goods where the markets are traditionally USD-denominated, *e.g.*, petroleum-based products.

51.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan acted as an agent for SCB New York in order to promote SCB New York's transactions to generate more income for both.

52.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan **acted for the benefit** of SCB New York.  Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E., followed a top-down, globally integrated business model, which SCB and its personnel, like their counterparts at Deutsche Bank, often call "One Bank."[19]   Under SCB's "One Bank" strategy, each such SCB Defendant aggressively promoted SCB New York to their global customer base regardless of transaction type in order to cause more income to flow to SCB New York through the fees both earned through Standard Chartered's referral business model.

53.     Every SCB Defendant knew that the purpose of Standard Chartered's "One Bank" policy was to structure a two-part, mutually profitable relationship, through which Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, on the one hand, and SCB New York, on the other, each realized billions in net income from 2001 through 2017 directly attributable to the former's collective service as "One Bank" designed to refer business to SCB New York.

---

[19] Unless otherwise indicated, whenever Plaintiffs refer to SCB's "One Bank" in this Complaint, Plaintiffs mean this particular group of SCB Defendants (including any combination thereof), acting in the capacity of an agent to SCB New York as principal.

54.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan, including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E., **served as the agent** in Standard Chartered's "One Bank" model.

55.     SCB New York **served as the principal** in Standard Chartered's "One Bank" model.

56.     Standard Chartered's "One Bank" comprised SCB's vast global network of branches, subsidiaries and affiliates, all of whom collectively constituted the "One Bank" and restructured SCB's entire global business from the late 1990s through 2003 to move to its "One Bank" concept, which was centered on generating as much banking and security-related transaction fee income as was possible through intensive, top-down global collaboration and cross-selling.  As a result, the above-described agent/principal relationship keyed the business models of both Standard Chartered, on the one hand, and SCB New York, on the other, all of whom purpose-built their entire business models around the interplay between Standard Chartered (as agent) and SCB New York (as principal for relevant securities and banking transactions, respectively).

57.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan **acted with the knowledge and consent** of SCB New York.  From 2001 through 2017, SCB New York regularly revealed their knowledge of, and consent to, Standard Chartered's, SCB London's, SCB Dubai's, and SCB Pakistan's global Laundromat strategy, with which SCB New York were familiar through their receipt of data, formally and informally, from each of the other SCB Defendants.

58.     Standard Chartered designed and pursued its "One Bank" policy from 2001 through 2017 to route as much business as possible to the "One Bank's" key affiliate in the United States: SCB New York.

59.     As such, SCB New York knew, through a litany of communications channels including, but not limited to, the information that SCB New York learned Standard Chartered's, SCB London's, SCB Dubai's, and SCB Pakistan's officers, directors, employees, and agents, including those employed by such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E.

60.     Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E., **acted under some degree of control** of SCB New York, who regularly exercised a certain amount of control over Standard Chartered, SCB London, SCB Dubai, and SCB Pakistan including such SCB Defendants' branches and affiliates in Pakistan, the U.K., and the U.A.E.

**C.     The Danske Bank Defendants**

61.     Defendant Danske Bank A/S (or "Danske Bank") is one of the largest banks in the world, with approximately 180 branches in 12 countries. Danske Bank is publicly traded on the Nasdaq Nordic exchange in Copenhagen, Denmark, under "DK0010274414." Its principal place of business is in Copenhagen, Denmark.

62.     Danske Bank has operated bank branches and/or subsidiaries in New York since 1985. According to Danske Bank's USA PATRIOT Act certification regarding correspondence accounts from 2011, Danske Bank operated a New York branch as of that date. Danske Bank's 2018 USA PATRIOT Act certification does not disclose a New York branch, but does disclose that Danske Bank maintains at least one correspondent account with a U.S. bank or U.S. broker-dealer in securities.

~~C.~~A.   **Danske Bank's USA PATRIOT Act certification discloses Danske Bank's branches in Finland, Germany, Sweden, the United Kingdom, Poland, Norway, Ireland, Lithuania, Estonia, Latvia, Luxembourg, and Russia. It also states that Danske Bank has authorized Robert I. Bodian, Esq., of Mintz Levin Cohn Ferris Glovsky and Popeo P.C., to accept service of legal process on behalf of Danske Bank, at 666 Third Avenue, New York, NY, 10017.** ~~The Danske Bank Defendants~~

~~69.~~1.   ~~Defendant Danske Bank A/S (or "Danske Bank") is one of the largest banks in the world, with approximately 180 branches in 12 countries.  Danske Bank is publicly traded on the Nasdaq Nordic exchange in Copenhagen, Denmark, under "DK0010274414."  Its principal place of business is in Copenhagen, Denmark.~~

~~70.~~1.   ~~Danske Bank has operated bank branches and/or subsidiaries in New York since 1985.  According to Danske Bank's USA PATRIOT Act certification regarding correspondence accounts from 2011, Danske Bank operated a New York branch as of that date.  Danske Bank's 2018 USA PATRIOT Act certification does not disclose a New York branch, but does disclose that Danske Bank maintains at least one correspondent account with a U.S. bank or U.S. broker-dealer in securities.~~

~~71.     Danske Bank's USA PATRIOT Act certification discloses Danske Bank's branches in Finland, Germany, Sweden, the United Kingdom, Poland, Norway, Ireland, Lithuania, Estonia, Latvia, Luxembourg, and Russia.  It also states that Danske Bank has authorized Robert I. Bodian, Esq., of Mintz Levin Cohn Ferris Glovsky and Popeo P.C., to accept service of legal process on behalf of Danske Bank, at 666 Third Avenue, New York, NY, 10017.~~

63.

~~72.~~64.   Defendant Danske Markets Inc. ("Danske New York") is Danske Bank's New York subsidiary and agent. Danske New York is a registered U.S. broker-dealer which provides U.S. Dollar clearing for international wire payments and letters of credit, and foreign exchange

and interest rate derivatives transactions as agent for Danske Bank A/S. ~~Danske New York is a registered U.S. broker-dealer which provides U.S. Dollar clearing for international wire payments and letters of credit, and foreign exchange and interest rate derivatives transactions as agent for Danske Bank A/S.~~ Danske New York is incorporated in Delaware and has its principal place of business in New York. Danske New York has operated in New York since at least 2001.

65.      On information and belief, Danske New York facilitated USD-related transactions by Danske Bank's branches in Finland, Germany, Sweden, the United Kingdom, Poland, Norway, Ireland, Lithuania, Estonia, Latvia, Luxembourg, and Russia and, among other things, provided the above-described aid to al-Qaeda and the Haqqani Network through, among others, financial services provided to: (1) Altaf Khanani, and/or (2) the al-Qaeda and Haqqani Network VAT fraud schemes, both of which aided al-Qaeda's and the Haqqani Network's finance and logistics schemes in support of the attack campaign in Afghanistan from 2006 through 2017 by routing millions in U.S. Dollar value from the United States to such terrorists through Danske New York's and Danske Bank's combined Laundromat from 2008 through 2018.

66.      Defendants Danske Bank and Danske New York are, collectively, "Danske Bank" or "the Danske Bank Defendants," and each is individually a "Danske Bank Defendant."

67.      Danske Bank does extensive business throughout the United States and holds significant assets in the United States. Significant Danske Bank Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Danske Bank's branches and/or its correspondent accounts in the United States.

**D.      Placid Express**

68.      Defendant Placid NK Corporation d/b/a Placid Express ("Placid Express") is a licensed U.S.-based money transmitter that focuses its business on facilitating U.S. Dollar

transactions between the United States and customers in mostly high-risk geographies overseas, including, but not limited to, Pakistan, India, Nepal, and Bangladesh.

69.     Placid Express is a Delaware corporation and United States as well as Global Headquarters are at 7210 37th Avenue, Jackson Heights, NY 11372.

70.     Placid Express does extensive business throughout the United States and holds significant assets in the United States. Significant Placid Express Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Placid Express's facilities in the United States. All Placid Express's conduct alleged herein occurred, in whole or in part, within this District.

**E.     Wall Street Exchange**

71.     Defendant Wall Street Exchange ("Wall Street Exchange") is a licensed U.A.E.-based money transmitter that focuses its business on facilitating U.S. Dollar transactions between the United States and customers in mostly high-risk geographies overseas.

72.     Wall Street Exchange is a U.A.E. corporation and is headquartered in Dubai. Wall Street Exchange is not an organ of U.A.E., and its employees are not government employees; rather it is an ordinary commercial money remitter based in U.A.E. with a significant international presence. The U.A.E. government does not directly own Wall Street Exchange; the owner of Wall Street Exchange is Emirates Post Group, which is itself a corporation separate from the government, owned by the U.A.E. government.

73.     Wall Street Exchange does extensive business throughout the United States and holds significant assets in the United States. Significant Wall Street Exchange Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Wall Street Exchange's facilities in the United States. Wall Street Exchange's United States commercial activities (including transactions initiated and executed by and through facilities in

the United States) form the core of the allegations against Wall Street Exchange. All Wall Street Exchange's conduct alleged herein occurred, in whole or in part, within this District.

### JURISDICTION AND VENUE

73.1.    This Court has subject-matter jurisdiction under Defendants Danske Bank and Danske New York are, collectively, "Danske Bank" or "the Danske Bank Defendants," and each is individually a "Danske Bank Defendant."

74.1.    Danske Bank does extensive business throughout the United States and holds significant assets in the United States. Significant Danske Bank Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Danske Bank's branches and/or its correspondent accounts in the United States.

**D.A.    Placid Express**

75.1.    Defendant Placid NK Corporation d/b/a Placid Express ("Placid Express") is a licensed U.S.-based money transmitter that focuses its business on facilitating U.S. Dollar transactions between the United States and customers in mostly high-risk geographies overseas, including, but not limited to, Pakistan, India, Nepal, and Bangladesh.

76.1.    Placid Express is a Delaware corporation and United States as well as Global Headquarters at 7210 37th Avenue, Jackson Heights, NY 11372.

77.1.    Placid Express does extensive business throughout the United States and holds significant assets in the United States. Significant Placid Express Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Placid Express's facilities in the United States. All Placid Express's conduct alleged herein occurred, in whole or in part, within this District.

~~E.A.    Wall Street Exchange~~

~~78.1.    Defendant Wall Street Exchange ("Wall Street Exchange") is a licensed U.A.E.-based money transmitter that focuses its business on facilitating U.S. Dollar transactions between the United States and customers in mostly high-risk geographies overseas.~~

~~79.1.    Wall Street Exchange is a U.A.E. corporation and is headquartered in Dubai. Wall Street Exchange is not an organ of U.A.E., and its employees are not government employees; rather it is an ordinary commercial money remitter based in U.A.E. with a significant international presence.  The U.A.E. government does not directly own Wall Street Exchange; the owner of Wall Street Exchange is Emirates Post Group, which is itself a corporation separate from the government, owned by the U.A.E. government.~~

~~80.1.    Wall Street Exchange does extensive business throughout the United States and holds significant assets in the United States.  Significant Wall Street Exchange Laundromat transactions alleged in this Complaint, totaling millions of dollars, were executed by and through Wall Street Exchange's facilities in the United States.  Wall Street Exchange's United States commercial activities (including transactions initiated and executed by and through facilities in the United States) form the core of the allegations against Wall Street Exchange.  All Wall Street Exchange's conduct alleged herein occurred, in whole or in part, within this District.~~

**JURISDICTION AND VENUE**

~~81.~~74.  ~~This Court has subject-matter jurisdiction under~~ 18 U.S.C. § 2338 and 28 U.S.C. § 1331 and 18 U.S.C. § 2338.

75.    This Court has personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

~~82.1.~~Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because each of Standard Chartered

Bank's, Deutsche Bank's, Danske Bank's, Placid Express's, and Wall Street Exchange's conduct (and that of each affiliated Defendant) had a substantial nexus to the U.S. and to New York, including the transfer of This Court has personal jurisdiction over each Defendant under Federal Rule of Civil Procedure 4(k)(1)(C) and/or 4(k)(2), and 18 U.S.C. § 2334(a).

83.76.   Defendants are subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a), N.Y. C.P.L.R. § 302, and Fed. R. Civ. P. 4(k). That is because each of Standard Chartered Bank's, Deutsche Bank's, Danske Bank's, Placid Express's, and Wall Street Exchange's conduct (and that of each affiliated Defendant) had a substantial nexus to the U.S. and to New York, including the transfer of U.S. DollarsUSD from the U.S. to bank accounts abroad in order to finance and arm al- Qaeda, the Taliban (including its Haqqani Network), and their Syndicate allies.

84.77.   Each DefendantsDefendant has also entered the United States voluntarily, maintained a physical presence here, and have claimed the benefit of U.S. law by initiating legal actions in this Court and/or the Supreme Court of New York.

85.78.   Each Defendant has also purposefully availed themselvesitself of U.S. jurisdiction to commit their tortious acts, including the processing of transactions for the terrorists that injured Plaintiffs through each Defendants'Defendant's affiliated New York, or through such Defendant's correspondent account transactions with a bank in New York.

79.      Certain defendants, including Deutsche Bank Securities, Inc., DBTCA, Standard Chartered Bank Ltd., Danske Markets Inc., and Placid Express also have their principal place of business in New York, and are therefore subject to general jurisdiction.

80.      As financial institutions with branches in the United States, Defendants are also charged with knowledge of U.S. law, including the Congressional finding, incorporated in

Section 2(a)(6) of JASTA, that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities."

81. Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant Placid Express resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## **FACTUAL ALLEGATIONS**

86.1.    As a bank with a branch in the United States and/or a licensed money remitter headquartered in the United States, the Standard Chartered Bank Defendants, Deutsche Bank Defendants, Danske Bank Defendants, Placid Express, and Wall Street Exchange, respectively, are also charged with knowledge of U.S. law, including the Congressional finding, incorporated in Section 2(a)(6) of JASTA, that companies that "contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism" should "reasonably anticipate being brought to court in the United States to answer for such activities."

87.1.    Venue is proper in this District under 18 U.S.C. § 2334(a) because Defendant Placid Express resides in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## ~~FACTUAL ALLEGATIONS~~

**I.      DESIGNATED FOREIGN TERRORIST ORGANIZATIONS ~~LED BY AL-QAEDA~~ COMMITTED, PLANNED, AND AUTHORIZED THE ATTACKS THAT INJURED PLAINTIFFS AND THEIR FAMILY MEMBERS**

82.      ~~A.~~ This Section provides important background about the Syndicate, and also alleges that FTOs committed, planned, and/or authorized the attacks that injured Plaintiffs.

83.      For background, Section I.A. describes the Syndicate and its members; Section I.B. describes the Syndicate's global terrorist finance network; Section I.C. describes the special role played by Sirajuddin Haqqani, a leader in al-Qaeda, the Taliban, and its Haqqani Network; and Section I.D. describes the geographies from which the Syndicate raised funds and other resources during the relevant time period.

84.      The attacks in this case occurred between 2011 and 2016. Each attack was committed, planned, and/or authorized by at least one FTO: al-Qaeda. Most of the attacks in this case were committed directly by al-Qaeda, working either alone or in joint cells with other Syndicate members.

85.      Some of the attacks in this case were committed by the Taliban, including its Haqqani Network. The Haqqani Network was designated an FTO on September 19, 2012. Thus, after that date, each and every Taliban attack was also committed by an FTO.

86.      For attacks that were: (1) committed only by the Taliban; and (2) carried out prior to September 19, 2012, Plaintiffs allege that those attacks were authorized and planned by the FTO al-Qaeda.

87.      Al-Qaeda's critical role in committing, planning, and/or authorizing the attacks that injured Plaintiffs is described in Sections I.E and I.F.

88.      Finally, Section I.G describes the role that the Islamic Revolutionary Guard Corps played in supporting Syndicate violence.

41

**A.** **After 9/11, Al‑Qaeda Organized And Led A Terrorist Syndicate Comprising Its Affiliates, Including The Taliban, The Haqqani Network, Lashkar-E-Taiba, D‑Company, To Attack Americans In Afghanistan, Which Was Substantially Aided By Iran's Hezbollah Division and Qods Force**

88.89.  At all relevant times, al‑Qaeda led a joint venture of terrorists in Afghanistan and Pakistan, which included al‑Qaeda, (designated an FTO in 1999), the Taliban (including its part of which, the Haqqani Network, a part of the Taliban),was designated an FTO in September 2012),[20] Lashkar-e-Taiba, ("LT") (a designated FTO since 2001), Jaish-e-Mohamed, and D-Company. Mohammad ("JEM") (a designated FTO since 2001), and D-Company (the leader of which, Dawood Ibrahim, has been a Specially Designated Global Terrorist ("SDGT") since 2003). This joint venture has been described by the U.S. government as al‑Qaeda's "Syndicate."

89.    Prior to 9/11, al-Qaeda was closely allied with the Taliban, including its Haqqani Network.  The Taliban provided bin Laden shelter while al-Qaeda was closely fused with the Haqqani Network based on bin Laden's long-standing personal alliance with its leaders, Jalaluddin Haqqani.

90.    After 9/11, these groups formed a terrorist Syndicate in Afghanistan and Pakistan that was led by al-Qaeda and included an array of terrorist groups on both sides of the Afghanistan-Pakistan border who shared a common Sunni Islamist terrorist agenda and desire to kill Americans in Afghanistan.

---

[20] Unless Plaintiffs specifically indicate otherwise, Plaintiffs' references to **"the Taliban"** in this Complaint mean "**the Taliban (including its Haqqani Network).**"  The Taliban and the Haqqani Network are inseparable when it comes to matters of terrorism. For example, the leader of the Haqqani Network, Sirajuddin Haqqani, has publicly commented that the Haqqani Network and the Taliban are inseparable, as have other Taliban leaders. Sirajuddin Haqqani also served on the Quetta Shura, which was the Taliban's governing council.  Now, Haqqani is the most powerful Taliban terrorist in Afghanistan, and is, according to some, Afghanistan's top terrorist.

91.     Under al-Qaeda's Syndicate approach, al-Qaeda and its most trusted terrorist ally, the Haqqani Network, ran every aspect of the Syndicate's transnational terror related strategies. Al-Qaeda and the Haqqani Network and specifically acted on behalf of the Taliban outside of Afghanistan as the Syndicate sought to fund and source its terrorist campaign against Americans in Afghanistan from terrorist finance activity worldwide.

92.     By 2009, al-Qaeda and the Haqqani Network intensified their attack campaign inside Afghanistan.  To do so, they ramped up their terrorist finance campaigns worldwide, putting out a call to all al-Qaeda and Haqqani Network financiers to support the jihad against Americans in Afghanistan the same way both groups had previously rallied terrorist financiers worldwide to support the campaign against the Soviets in the 1980s.

93.     Thereafter, due in large part to the Syndicate's terrorist finance, al-Qaeda's terrorist campaign grew more lethal each month and year.

94.     Al-Qaeda's Syndicate counterattack strategy reflected bin Laden's long-standing vision of al-Qaeda (and him, specifically) as the leader of a grand terrorist coalition across Afghanistan and Pakistan.[21]  Due to the mutually reinforcing ties between al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and D-Company in Afghanistan—including their practice of cross-donations to each other—support for the one benefited all.  Defendants' support to the Syndicate's terrorist finance bombmaking logistics thus had crosscutting effects: they enabled wide-ranging terrorist attacks against Americans in Afghanistan.

95.     Al-Qaeda's leadership of that terrorist syndicate reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined.  As India's Permanent

---

[21] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda—Taliban Connection*, Weekly Standard (July 4, 2011) ("*The al Qaeda—Taliban Connection*").

Representative to the United Nations explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."[22]  By the fall of 2009, noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity.  The signs of this are everywhere."[23]

96.     Internationally, al-Qaeda and the Haqqani Network (and through it, the Taliban) shared intertwined streams for fundraising, financing, logistics, smuggling, and weapons. According to Haqqani Network expert Gretchen Peters, international "funding streams" were "intertwined across" amongst al-Qaeda, the Haqqani Network, and the Taliban.[24]  As Ms. Peters explained in 2012, al-Qaeda, the Haqqani Network, and their allies "derive[d] income in and outside Afghanistan" and their "money move[d] between key network actors and into banks in Pakistan, the [U.A.E.] and beyond."[25]

97.     Director of National Intelligence John Negroponte has publicly explained that "Osama bin Laden, and al Qa'ida more broadly, had a mergers and acquisition strategy," under which al-Qaeda "acquire[d]" its affiliates and allies, including each Syndicate member.

98.     In 2010, one terrorism scholar warned against drawing a bright line between al-Qaeda and the Afghan terrorist groups that it sponsored.  In explaining the importance of "recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a

---

[22] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[23] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) ("*The Front*").

[24] Gretchen Peters, *Haqqani Network Financing: The Evolution Of An Industry* 32, Combatting Terrorism Ctr. (July 2012) ("Peters, *Haqqani Network Financing*").

[25] *Id.*

"policy focused on targeting al-Qa'ida—and not the Taliban, Haqqani Network, or other groups —would ignore one of the most egregious lessons from September 11."[26]

99.    The U.S. government agreed.  During the relevant timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in a terrorist "syndicate," and warned against efforts to distinguish between them.  Examples include:

90.    Since 2001, al-Qaeda and its Syndicate allies, including the Taliban, also depended upon the regular, substantial, and comprehensive support provided by Iran's Islamic Revolutionary Guard Corps ("IRGC" or "Guard Corps"), including the IRGC's Lebanese Hezbollah Division ("Hezbollah Division" or "Hezbollah") and the IRGC's Qods Force ("Qods Force" or "IRGC-QF"),[27] which the IRGC, including Hezbollah and the Qods Force, regularly provided to al-Qaeda, the Taliban, and their allies in order to further their shared agreement to attack and kill Americans in Afghanistan to drive the United States out of the Middle East.

91.    At all relevant times, Iran's IRGC (an FTO since 2019) provided an unending flow of funds, weapons, communications and transportation support, training, false papers, and nearly every manner of support possible to al-Qaeda and the Taliban to support the Syndicate's terror against Americans in Afghanistan, primarily acting through the IRGC's Hezbollah Division (an FTO since 1997) and the IRGC's Qods Force (a Specially Designated Global Terrorist since 2007, and an FTO since 2019).

---

[26] Seth G. Jones, *In the Graveyard of Empires:  America's War in Afghanistan* at 332 (W.W. Norton & Co. 2010) ("*Graveyard of Empires*").

[27] Unless Plaintiffs specifically indicate otherwise, Plaintiffs' references to **"the IRGC"** in this Complaint mean "**the IRGC (including its Hezbollah Division and Qods Force)."**  The IRGC's three components – the Regular IRGC, Hezbollah Division, and Qods Force are inseparable concerning matters of terrorism.  For example, Hezbollah operatives swear an oath of allegiance to the Grand Ayatollah, who is the head of the IRGC, while the IRGC, in turn, finances, arms, and directs Hezbollah.

92.     The Syndicate's – and Hezbollah's and the Qods Force's –  purpose is to plan and commit terrorist attacks in Afghanistan and Pakistan using the expertise and resources of its members, which excel at planning and committing suicide bombings, IED attacks, kidnappings, and insider attacks, as further reinforced by the world's leading global terrorist sponsors, Hezbollah and the Qods Force (both of whom had decades-long alliances with al-Qaeda).

93.     By 2006, the Syndicate's IRGC-backed plan was in full bloom, as was the pipeline of Hezbollah- and Qods Force-provided aid to al-Qaeda and the Taliban to support attacks against Americans in Afghanistan and Iraq. This aid was delivered through transactions conducted by a range of notorious Hezbollah and Qods Force fronts in Europe, the Middle East, and Asia that were often routed through Dubai.  The IRGC, through Hezbollah and the Qods Force, also regularly participated in joint cell attacks against Americans in Iraq, and on occasion jointly committed attacks with al-Qaeda and/or the Taliban in Afghanistan.

94.     In Afghanistan, the Syndicate's attacks were intended to intimidate and coerce the U.S. government (and other Coalition countries) to withdraw Coalition personnel from Afghanistan. The terrorists also sought to intimidate the elected (and U.S.-backed) recognized government of Afghanistan. The Syndicate also used violence to intimidate and coerce the civilian population of Afghanistan to abide by a severe form of Islamic Sharia law.

95.     As a thumbnail sketch, members of the Syndicate, and the IRGC terrorists that supported them, played the following roles:

(i)     **Al-Qaeda** led the Syndicate; committed attacks against U.S. and Coalition forces; created the philosophical, religious, and moral framework for the Syndicate's violence; set strategic priorities; and provided resources including training, manpower, weapons, funds, connections, strategic insight, and notoriety.

(ii)    **The Taliban, including its Haqqani Network**, committed attacks against U.S. and Coalition forces; provided resources, manpower, and protection in Afghanistan; and collaborated closely with al-Qaeda; indeed, many senior Taliban leaders (including

Sirajuddin Haqqani, the leader of the Taliban's Haqqani Network), were simultaneously al-Qaeda *and* Taliban operatives; these dual-hatted terrorists, or "polyterrorists," cemented ties between al-Qaeda and the Taliban, and facilitated joint planning and attacks.

(iii)  **Lashkar-e-Taiba** was a Pakistani terror group that provided funding and weapons to al-Qaeda; recruited terrorists, especially suicide bombers, to participate in al-Qaeda attacks; and embedded its own terrorists in joint al-Qaeda/Taliban cells.

(iv)  **Jaish-e-Mohammad** was a Pakistani terror group that recruited terrorists, especially suicide bombers, to join al-Qaeda and Taliban attacks, and also paid out so-called "martyr payments" to the families of al-Qaeda's suicide bombers; such payments constituted a critical financial incentive for suicide attacks, and therefore a powerful subsidy to al-Qaeda's suicide bombing program.

(v)  **D-Company** was a transnational criminal organization headed by Dawood Ibrahim, an SDGT and SDN who had been internationally infamous since the 1990s as "India's Bin Laden," and had been described as the second-wealthiest gangster in the world after notorious cocaine Kingpin Pablo Escobar; D-Company provided narco-terrorist expertise to the Syndicate terrorist groups, enabling them to access funds from transnational drug crime and other illicit activities including money laundering.

(vi)  **Hezbollah and the Qods Force**, were both parts of Iran's IRGC that, while not members of the Syndicate, nevertheless provided essential support to every Syndicate member including, but not limited to, al-Qaeda, the Taliban, Lashkar-e-Taiba, and D-Company; for each of these FTOs and/or SDGTs, the IRGC instructed, and resourced, Hezbollah's and the Qods Force's regular deliveries of tens of millions of U.S. Dollars' worth of funds, bounty payments (for killing Americans), bombs, guns, missiles, communications gear, training, transportation assistance, and narcotics-related aid from the IRGC, through Hezbollah and the Qods Force, to the Syndicate, through its constituent member.

96.  The existence of the Syndicate, as well as al Qaeda's leading role, have been

repeatedly acknowledged by senior U.S. government officials.  Examples include:

(i)  Secretary of State Hillary Clinton, July 2009: "[W]e had an intensive strategic review upon taking office[.]  And we not only brought the entire ~~United States~~[U.S.] government together, but we reached out to friends and allies . . . [T]~~he result of that~~ hat strategic review ~~was to~~… conclude[d] that al-Qaeda ~~is~~[was] supported by and ~~uses~~use[d] its extremist allies like elements within the Taliban .~~—~~ . . to be proxies for a lot of its attacks . . . So the Taliban . . . [~~is~~was] part of a kind of terrorist syndicate with al-Qaeda at the center[.]"[28]

---

[28] *Sec. of State Hillary Clinton*, NBC News: Meet the Press (July 26, 2009).

(ii)     Secretary of State Hillary Clinton, December 2009: "[W]e have increasingly come to see these organizations not as separate independent operators that occasionally cooperate with one another, but as part of a syndicate of terrorism. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially. ~~"[W]e have increasingly come to see these organizations not as separate independent operators that occasionally cooperate with one another, but as part of a syndicate of terrorism. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially.~~ And at the head of the table, like an old Mafia kind of diagram, sits al Qaeda."[29]

(iii)    Secretary of Defense Robert Gates, January 2010: "Defense Secretary Robert M. Gates said ~~yesterday~~[] that Al Qaeda was using proxy terrorist groups to orchestrate attacks in . . . Afghanistan as part of a broader strategy to destabilize the region. ~~In a news conference held after two days of meetings with Indian officials, Gates~~ ... [and] said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan . . . [Gates said,] 'What we ~~see is~~[saw] [was] that the success of any one of these groups ~~leads~~[led] to new capabilities and a new reputation for all,' ~~Gates said.~~ '~~A~~[and] '[a] victory for one ~~is~~[was] a victory for all.' US intelligence officials ~~have~~[] said that jihadi groups in the region ~~are~~[were] cooperating more closely than ever . . . Gates said all of the factions were working under the umbrella of Al Qaeda."[30]

(iv)    Secretary of Defense Robert Gates, May 2010: ~~"The other concern we have . . . is the~~"[T]he creation of the syndicate of terrorist organizations that ~~are~~[were] working with each other, al Qaeda, the Taliban in Pakistan, the Taliban in Afghanistan, the Haqqani Network. ~~There are~~" [consisted of] "five or six of these groups that ~~are now~~[were by May 2010] really working together and a success for one ~~is~~[was] a success for all . . . And so this problem ~~has become~~[became] more complex as these groups ~~have gotten~~[got] closer and cooperated operationally in a way that ~~we~~[the U.S.] really ~~haven't~~[had not] seen, ~~I think,~~ ... significantly before 2007, 2006."[31]

(v)     Under Secretary of Defense for Policy Michele Flournoy, April 2011: "We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate of groups that help each other. The Pakistanis tend to make finer distinctions between them—you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others. We are trying to work with them to shift that perspective and shift that calculus."[32]

---

[29] S. Hr'g 111-479, at 24.

[30] *Gates Casts Qaeda As Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 ("*Gates Casts Qaeda As Terror Syndicate*").

[31] *John King Presents: Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364.

[32] Hindustan Times, *Pakistan Must Meet Certain Expectations on Counter-Terrorism* (Apr. 22, 2011).

97.     Others, including foreign governments,[33] terrorism experts,[34] and prominent journalists[35] have all agreed that al-Qaeda and its allies formed a syndicate of terrorists.

98.     As these sources indicate, al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and has remained so ever since. The overlap between the organizations meant that al-Qaeda often played a key role in attacks by the Taliban, including its Haqqani Network. As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[36]

---

[33] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[34] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard (July 4, 2011) ("*The al Qaeda – Taliban Connection*"); Gretchen Peters, *Haqqani Network Financing: The Evolution Of An Industry* 32, Combatting Terrorism Ctr. (July 2012) ("Peters, *Haqqani Network Financing*"); Seth G. Jones, *In the Graveyard of Empires: America's War in Afghanistan* 332 (W.W. Norton & Co. 2010) ("*Graveyard of Empires*"); Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé"); *Al-Qaeda In Afghanistan and Pakistan: An Enduring Threat*, Hr'g Before the U.S. House Committee On Foreign Affairs, Subcommittee On Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156, at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260; Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO: Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108; Walter Laquer and Christopher Wall, *The Future of Terrorism* 153 (St. Martin's Press 2018) ("Laquer and Wall, *Future of Terrorism*").

[35] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) ("*The Front*").

[36] *The al Qaeda – Taliban Connection*.

99.     Al-Qaeda's Syndicate strategy was consistent with its broader corporate approach to Islamist terror. Indeed, "Al Qaeda became the first terrorist organization to sponsor other terrorist organizations."[37]

100.    After 9/11, U.S. and European counter-terrorist finance scholars and practitioners widely concluded that al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force each depended upon some variant of Osama bin Laden's visionary international corporate model for enabling attack by such FTOs, and their proxies, against Americans in Afghanistan and Iraq:

(i)     Dr. Matthew Levitt, 2003:  "Al-Qaeda successfully built an entrenched and sophisticated international logistical and financial support network of the kind that eventually facilitated the attacks of September 11. There is no question that Hezbollah is engaged in exactly the same infrastructure-building today. Given our experience in September 2001 it should be abundantly clear that we ignore such activity, and the acute security threat it represents, at our peril."[38]

(ii)    Martin S. Navias, 2007:  "Such a wide range of international operations" "would not have been possible without bin Laden's knowledge of the functioning of contemporary international banking and financial practices" "firstly as a financial entrepreneur" reflected by the title of his first "CIA profile" in 1996:  "Islamic Extremist Financier."[39]

(iii)   Dr. Jodi Vittori, 2011:  "Al Qaeda, more than any other terrorist group in history, has been compared to a transnational corporation and described using standard business terms, such an organization with 'franchises' and 'subcontractors,' the 'Ford Foundation of Terrorism,' with [] bin Laden as its 'CEO' and 'al Qaeda' akin to a brand name."[40]

---

[37] _Id._ at 62. Jodi Vittori, _Terrorist Financing and Resourcing_ 62 (Palgrave Macmillan 2011) ("Vittori, _Terrorist Financing_").

[38] Dr. Matthew Levitt, _Hezbollah: A Case Study of Global Reach_, Remarks to a Conference on Post-Modern Terrorism (Sept. 8, 2003), https://tinyurl.com/5pdjpkza.

[39] Martin S. Navias, "Global Terror and International Finance in the Immediate Aftermath of 9/11," _in_ Christopher Ankersen (ed.), _Understanding Global Terror_ 172-3 (Polity 2007).

[40] _Id._ at 74-75; _see also id._ ("Much of this derives from the fact that al Qaeda was designed from inception along a business-oriented model, with much of the leadership of al Qaeda, including Usama bin Laden himself, with backgrounds in business and economics.").  Other knowledgeable commentators, including investigative journalist Nick Kochan, have agreed that al-Qaeda resembles a multinational corporation capable of cooperation across borders, with a business-like mentality toward its infrastructure and operations. Kochan, _The Washing Machine_, at 69-70.

True to

~~100.   Al-Qaeda's interdependence and joint venture with its affiliates in Afghanistan and Pakistan continued throughout the period in which Plaintiffs were killed and injured.  As two journalists noted in 2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke apart its Syndicate:  Afghanistan's southern and eastern provinces remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[41]  Similarly, as two terrorism scholars explained in a 2018 book, "[t]he Taliban still retain[ed] a close alliance with al-Qaeda," which represented "the worst possible scenario for terrorism."[42]~~

101.   ~~From 9/11 through today, al-Qaeda's terrorist enterprise benefited from al-Qaeda operatives who were "polyterrorists," *i.e.*, al-Qaeda terrorist operatives who *also* simultaneously served as a terrorist operative for one or more al-Qaeda affiliates.  By design, al-Qaeda operatives were often members of other Pakistan-based al-Qaeda affiliates, most commonly, the Haqqani Network and Lashkar-e-Taiba.  Typically, al-Qaeda's and the Haqqani Network's polyterrorist operatives or agents served the group's transnational terrorist activities in support of the attack campaign against Americans in Afghanistan.  Former assistant Treasury secretary for terrorist finance~~ its corporate model, al-Qaeda followed a "franchise" model,[43] under which the Taliban (including its Haqqani Network), LT, and JEM operated as al-Qaeda "franchises," and D-Company, Hezbollah and the Qods Force each operated as "partners" to multiple terrorist

---

[41] ~~Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO:  Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.~~

[42] ~~Walter Laquer and Christopher Wall, *The Future of Terrorism* 153 (St. Martin's Press 2018) ("Laquer and Wall, *Future of Terrorism*").~~

[43] "The term 'franchise' has been extensively used to describe al Qaeda-associated groups, in which terrorist organizations have made a formal or informal agreement to join the overall al Qaeda organization. This provides al Qaeda extra manpower, financing and logistics networks, while the smaller organization accepts the al Qaeda brand name."  Vittori, *Terrorist Financing*, at 100.

organizations.[44]  As Professor Gurulé observed,  al-Qaeda "used its substantial financial resources to establish links, leverage support and maintain the loyalty of more than 20 militant jihadist groups globally" and "provided financial assistance to these terrorist surrogates to underwrite specific jihadi operations, purchase weapons, and train thousands of their members at al Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[45]

102.    Through decades of terrorist operations, al-Qaeda developed a comprehensive infrastructure designed to route money anywhere in the world al-Qaeda and its allies needed resources. According to Martin S. Navias, a terrorism researcher at King's College in London, in the 1990s, "international terrorist organizations" "such as al-Qaida" – and similarly, Hezbollah Division and the Qods Force – "developed … a well-oiled and sophisticated machine for":

> generating funds and [] exploiting loopholes in the … international banking system for purposes of moving these funds around the world in support of cell sustenance and the propagation of terrorist activities.  Counterterrorist finance … therefore… aim[ed] [to] block[] terrorist fund generation capabilities and prevent[] the movement across borders of these illicit monies.[46]

103.    After 9/11, counter-terrorist finance practitioners broadly recognized  that "[t]he key point about al-Qaeda financing [was] its global nature and its sophistication" because "Al-Qaeda ha[d] cells in Africa, the Middle East, Asia, Europe, and North America" and "carried out operations in Africa, the Middle East, Asia, and North America and therefore, for structural and operational reasons, require[d] funds to be raised and delivered globally."[47]

104.    The imports of al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's application of bin Laden's transnational corporate model are that: (1) al-Qaeda, the

---

[44] Vittori, *Terrorist Financing*, at 100.

[45] Gurulé, *Unfunding Terror*, at 73.

[46] Navias, *Understanding Global Terror*, at 172-3.

[47] *Id.* at 183.

Haqqani Network, and other FTOs, like Hezbollah, regularly pursued fused terrorist finance and logistics strategies, *e.g.*, joint al-Qaeda and Haqqani Network cells in Europe, Afghanistan, or Pakistan,  and/or allied terrorist finance and logistics strategies, *e.g.*, Hezbollah and the Haqqani Network collaborating to smuggle Taliban opium through cooperation between their respective global cells and financiers for the shared purpose of routing funds, arms, and fighters to terrorist cells targeting Americans in Afghanistan and Iraq; and (2)  al-Qaeda and other FTOs, like Hezbollah, collaborated in Afghanistan, Pakistan, and key surrounding areas, like the U.A.E., to carry out terrorist attacks against Americans in Afghanistan and Iraq during the relevant period.

105.    One of the most important developments in anti-American terrorism after 9/11 was the nearly universal reliance amongst Islamist terrorist groups, Shiite and Sunni alike, on the use of **"polyterrorist"** financial, logistical, operational, attack planning, and leadership operatives, fronts, cut-outs, funders, and partners in order to support the global latticework of cells necessary to successfully attack and kill Americans in Afghanistan and Iraq.  As Matthew Levitt, who would later become a senior-counter terrorism official at Treasury, explained in 2003

101.    As Juan C. Zarate explained, formerly of Treasury, recalled in 2013:

106.    his book, *Treasury's War*: "Treasury's [counter-terror] strategy …." "aimed at targeting networks of key financial actors and nodes in the terrorist support system.  The point was …." in order "to make it harder for individuals who were financing terrorists to access the formal financial system.  Our."[48] According to Mr. Zarate, "[Treasury's] analyses therefore focused on the networks of actors and institutions providing the financial backbone to terrorist

---

[48] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*").

enterprises.  Interestingly, we found that there were all-purpose financiers who would give to multiple causes— "polyterror"—'polyterror' supporters.."[49]

102.1.  Since the mid-2000s, Sirajuddin Haqqani was—and remains today—the signal example of an al-Qaeda "polyterrorist" operative who killed Americans.  Sirajuddin Haqqani was the son of bin-Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani.  By 2008, Sirajuddin Haqqani was simultaneously:  (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, it's terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

103.1.  On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.[50]

104.  Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

---

[49] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41 (Public Affairs 2013) ("Zarate, *Treasury's War*"). *Id.*

[50] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended,* 73 Fed. Reg. 12,499 (Mar. 7, 2008); Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012).

105.   When Plaintiffs were injured between August 2011 and 2016, Sirajuddin Haqqani served as the top Syndicate "polyterrorist" responsible for coordinating key transnational-facing aspects of the Syndicate's terrorist campaign in Afghanistan and, in coordination with other al-Qaeda and affiliated terrorists:

(i)   Sirajjudin Haqqani planned and authorized the Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a tactical priority – that were committed by joint al-Qaeda/Taliban (including Haqqani Network)/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces;

(ii)   Sirajjudin Haqqani planned and authorized al-Qaeda's CAN fertilizer bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's strategy for: (1) sourcing CAN fertilizer from Fatima and Pakarab; (2) purchasing and transporting the CAN fertilizer; (3) operating al-Qaeda bombmaking factories hosted at Sirajuddin Haqqani's personal network of joint al-Qaeda-Haqqani Network terrorist camps in Pakistan; and (4) deploying CAN fertilizer bombs as IEDs and suicide bombs to attack Americans in Afghanistan;

(iii)   Sirajjudin Haqqani planned and authorized al-Qaeda's suicide bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's shared strategy for: (1) planning the targets for suicide bomber attacks in Afghanistan; (2) sourcing suicide bombers through al-Qaeda's and the Haqqani Network's long-standing allies, Lashkar-e-Taiba and Jaish-e-Mohammed; and (3) coordinating the "suicide bomber infrastructure" of camps, madrassas, ratlines, and safehouses, which relied heavily upon al-Qaeda and Haqqani Network resources and polyterrorists like Sirajuddin;

(iv)   Sirajuddin Haqqani planned and authorized the kidnapping of Kevin King; and

(v)   Sirajuddin Haqqani planned and authorized al-Qaeda's and the Haqqani Network's transnational terrorist finance operations, including, but not limited to: (1) its collaboration with the Russian Mafia to derive terrorist finance from Syndicate opium exports; (2) its use of Altaf Khanani and the Khanani Money Laundering Organization ("Khanani MLO"), who served as Sirajuddin's personal financier, and as a key transnational terrorist finance agent for the Haqqani Network to finance its and its allies' operations in Afghanistan; and (3) al-Qaeda and the Haqqani Network's transnational VAT fraud terrorist finance schemes, which al-Qaeda and the Haqqani Network jointly planned and administered by training dual-hatted al-Qaeda/Haqqani Network terrorists in camps in Afghanistan and Pakistan, and then deploying such terrorists in Europe to serve as transnational fundraising cells for the specific purpose of sending terrorist finance denominated in U.S. Dollars back to the Syndicate to attack Americans in Afghanistan.

106.    Each of the terrorist entities below used indiscriminate violence against American armed forces members serving as part of Operation Enduring Freedom or the ISAF, as well as civilians, to achieve political ends.  Their primary goal was to intimidate and coerce the U.S. government (and other Coalition countries) to withdraw Coalition personnel from Afghanistan, and to affect the conduct of those governments by mass destruction, assassination, and kidnapping.  The terrorists also sought to intimidate the newly elected (and U.S.-backed) recognized government of Afghanistan.  And the insurgency used violence to intimidate and coerce the civilian population of Afghanistan to abide by a severe form of Islamic Sharia law.

107.    At all relevant times, Deutsche Bank, SCB, Danske Bank, Place Express, and Wall Street Exchange Defendants knew that al-Qaeda, the Taliban (including its Haqqani Network), Lashkar e-Taiba, Jaish-e-Mohammed, the Kabul Attack Network, and D-Company were terrorist organizations targeting both American service members and American and Afghan civilians.  They knew this not only because it was common knowledge in Afghanistan—a prevailing understanding of which Defendants and their agents were aware—but also because it was reported by both the U.S. government and the Western press.

108.    None of the terrorist entities identified below adhered to the Geneva Conventions or the laws of war.  Among other violations, they refused to wear uniforms or otherwise distinguish themselves from civilians; they intentionally slaughtered civilians; and they used indiscriminate weapons.  None was associated with a recognized government.  And none was waging a civil war, nor did any have a legitimate claim to sovereignty over Afghan territory.

## 1.    Al-Qaeda

109.    Bin Laden declared war on the United States in a published *fatwa* (an authoritative religious decree) in 1996.

110.    On October 8, 1999, the U.S. State Department designated al-Qaeda as an FTO.

111.    In the spring 2001, Osama bin Laden, on behalf of al-Qaeda, pledged an oath of allegiance to Mullah Omar and the Taliban.

112.    Professor Jimmy Gurulé served in a senior terrorist-finance facing role at the Treasury Department and now teaches law at Notre Dame.   As Professor Gurulé explained in his book, *Unfunding Terror*, "[s]ince the September 11, 2001 terrorist attacks, al Qaeda [] emerged as the head of a global Islamist terror movement, comprised of dozens of deadly jihadist groups" and "[s]everal members of the al Qaeda terror movement [were] designated as FTOs" including, but not limited to, "Islamic Movement of Uzbekistan," "Jaish-e-Mohammed," and "Lashkar-e-Tayyiba."[51]  This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

113.    Since 9/11, and continuing through the present, Al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and have remained so ever since.  The overlap between the organizations meant that al-Qaeda often played a key role in Taliban and Haqqani Network attacks.   As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin.  This is by design.  Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition.  Al Qaeda was always a joint venture."[52]  Mr. Joscelyn testified that the word "syndicate"—referring to al-Qaeda's terrorist

---

[51] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").

[52] *The al Qaeda—Taliban Connection.*

joint venture with its Afghan and Pakistani affiliates—offers an "excellent description of how al Qaeda operates."[53]

114.   Al-Qaeda's Syndicate strategy was consistent with its broader corporate approach to Islamist terror.  "A further advance has been the rise of franchising."[54]  Indeed, "Al Qaeda became the first terrorist organization to sponsor other terrorist organizations."[55]

115.   According to Dr. Jodi Vittori, "Al Qaeda, more than any other terrorist group in history, has been compared to a transnational corporation and described using standard business terms, such an organization with 'franchises' and 'subcontractors,' the 'Ford Foundation of Terrorism,' with Usama bin Laden as its 'CEO' and 'al Qaeda' akin to a brand name.  Much of this derives from the fact that al Qaeda was designed from inception along a business-oriented model, with much of the leadership of al Qaeda, including Usama bin Laden himself, with backgrounds in business and economics."[56]

116.   True to this approach, al-Qaeda followed a "franchise" model, under which the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company operated as al-Qaeda "franchises" (all but D-Company) or "partners" (D-Company).  "The term 'franchise' has been extensively used to describe al Qaeda-associated groups, in which terrorist organizations have made a formal or informal agreement to join the overall al Qaeda organization.  This provides al Qaeda extra manpower, financing and logistics networks, while the smaller organization accepts the al Qaeda brand name."[57]

---

[53]  *Al-Qaeda In Afghanistan and Pakistan:  An Enduring Threat*, Hr'g Before the U.S. House Committee On Foreign Affairs, Subcommittee On Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156, at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260.

[54]  Jodi Vittori, *Terrorist Financing and Resourcing* 61 (Palgrave Macmillan 2011) ("Vittori, *Terrorist Financing*").

[55]  *Id.* at 62. Jodi Vittori, *Terrorist Financing and Resourcing* 62 (Palgrave Macmillan 2011) ("Vittori, *Terrorist Financing*").

[56]  *Id.* at 74-75.

[57]  Vittori, *Terrorist Financing*, at 100.

117.    Moreover, according to Professor Gurulé, "Al Qaeda has used its substantial financial resources to establish links, leverage support and maintain the loyalty of more than 20 militant jihadist groups globally" and "has provided financial assistance to these terrorist surrogates to underwrite specific jihadi operations, purchase weapons, and train thousands of their members at al Qaeda-run camps in Afghanistan, Pakistan, … and elsewhere."[58]

118.    Through decades of terrorist operations, al-Qaeda developed a comprehensive infrastructure designed to route terrorist finance anywhere in the world to wherever al-Qaeda and its allies needed their money or logistical resources to be sent.  According to Martin S. Navias, a terrorism researcher at King's College in London:

> [In the 1990s,] international terrorist organizations such as al-Qaida developed … a *well-oiled and sophisticated machine* for generating funds and also for exploiting loopholes in the increasingly interconnected international banking system for purposes of *moving these funds around the world in support of cell sustenance and the propagation of terrorist activities*.  Counterterrorist finance warfare … [after 9/11] therefore… aim[ed] [to] block[] terrorist fund generation capabilities and prevent[] the movement across borders of these illicit monies.[59]

119.    Counter-terrorist finance practitioners recognized that al-Qaeda's globally integrated, corporate-inspired tactic of funding and logistically supporting terrorist operations against Americans from a network of cells, agents, and allied terrorist groups in Europe, Asia, and the Middle East was the vital to understanding al-Qaeda strategy after 9/11:

> The *key point* about al-Qaeda financing *is its global nature and its sophistication*.  Al-Qaeda has cells in Africa, the Middle East, Asia, Europe, and North America.  Since 1998 it has carried out operations in Africa, the Middle East, Asia, and North America and therefore, for structural and operational reasons, requires funds to be raised and delivered globally. …  Such a wide range of international operations would not have been possible without bin Laden's knowledge of the functioning of contemporary international banking and financial

---

[58] Gurulé, *Unfunding Terror*, at 73.

[59] Martin S. Navias, "Global Terror and International Finance in the Immediate Aftermath of 9/11," *in* Christopher Ankersen (ed.), *Understanding Global Terror* 172-3 (Polity 2007).

practices…. bin Laden was firstly as a financial entrepreneur.  A 1996 CIA profile of bin Laden was entitled: "Islamic Extremist Financier."[60]

120.   Al-Qaeda integrated the terrorist finance and logistics activities of its cells around the world through agents like Altaf Khanani and polyterrorists like Sirajjuddin Haqqani.  As Mr. Kochan documented in 2005:

Al Qaida is the quintessential global conglomerate.  It has or had offices and cells throughout Europe, the Middle East, Africa, Asia and even South America.  It draws expertise from personnel with myriad skills.  Its structure mimics the horizontal cellular hierarchy so typical of progressive multinationals.  This devolution of power from the center to outlying cadres has increased since the United States launched its full-scale war against the movement in 2001.[61]

121.   In 2002, Joseph M. DeThomas, the U.S. Ambassador to Estonia, highlighted the interconnectedness between al-Qaeda and its allies' activities around the world and their ability to attack Americans in places like Afghanistan.  As Mr. Kochan summarized:

Joseph M. DeThomas, U.S. Ambassador to Estonia, amplified the paradox of Al Qaida as a business-like entity in a speech he gave to the business daily Aripäev in June 2002.  He said, "The global society has helped engender global villains. Groups hostile to democratic values have also gone global.  Al Qaida is the equivalent of a terrorist multinational corporation with branches in more than 30 countries.  Sitting in Afghanistan, Osama Bin Laden had operatives in Germany designing an attack on the United States…"[62]

### 2.   The Taliban (Including Its Haqqani Network)

122.   The Taliban is a Sunni Islamic terrorist organization composed originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan.

123.   In 2002, the U.S. designated the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists. President Bush found that these designations guarded against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[63]

---

[60] *Id.* at 183.

[61] Kochan, *The Washing Machine*, at 69.

[62] Kochan, *The Washing Machine*, at 70.

[63] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

124.    On December 26, 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the Taliban shall be considered to be a terrorist organization."[64] As a State Department official explained, the U.S. government treats the Taliban "as a Foreign Terrorist Organization for immigration purposes."[65]

125.    At all relevant times, the U.S. government viewed the Taliban as a terrorist group, not as the legitimate armed force of any nation.

126.    The Taliban's principal goal has long been to expel Americans from the country and undermine the democratically elected government of Afghanistan. To that end, the Taliban attacked U.S. forces From 2001 through 2016.

127.    At all times, the Taliban (including its Haqqani Network) routinely engaged in acts of terror in Afghanistan designed to compel Afghan civilians to submit to the jurisdiction of the Taliban's illegal shadow-government rather than the duly constituted Government of the Islamic Republic of Afghanistan.  Terrorism scholars Walter Laquer and Christopher Wall explained how this strategy was as core Taliban terrorist tactic and ensured that the Taliban's purported "shadow government services" were inextricably linked to its terrorist enterprise:

> [T]he most successful terrorist groups also provide benefits exclusively to [their] members.  These can [include] social services. … [When the] Taliban managed to take over large swaths of Afghanistan …, [the Taliban] *demanded that individuals adhere to the [Taliban's] values to receive these benefits*, further strengthening the bond of solidarity individuals felt.  Looking beyond individual rationality, when a person *adopts and organization's values, his or her worldview alters*.  Taking into account the *club goods model for terrorism*, what emerges is a rational explanation for the acts of terror.[66]

---

[64] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[65] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

[66] Laquer and Wall, *Future of Terrorism*, at 213.

128.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is a member of the Syndicate, has been a part of the Taliban for decades, and is closely allied and interdependent with al-Qaeda.

129.    On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.

130.    The U.S. designated multiple Haqqani leaders as SDGTs.  As previously mentioned, the U.S. designated Sirajuddin Haqqani as an SDGT in 2008 and, in 2010 and 2011, the followed up by designating three other Haqqanis—Nasiruddin, Khalil Al-Rahman, and Badruddin—as fundraisers and commanders of the Haqqani Network.  By February 2014, the U.S. had designated fourteen leaders in the Haqqani Network under Executive Order 13224.[67]

131.    The Haqqani Network was especially active in the southeastern parts of Afghanistan, particularly in the Paktia, Paktika, and Khost ("P2K") Provinces.  It also developed a significant presence in the surrounding Provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas.

132.    The Haqqani Network's influence is not limited to one Afghan region. There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani has been a member of the Taliban's governing council since at least 2010.

[67] It is not uncommon for the U.S. government to issue a terrorism-related designation years, and sometimes even decades, after a terrorist suspect first becomes internationally notorious for his or her role enabling terror.  This ordinarily does not reflect uncertainty about whether someone was a terrorist, only the uniquely cumbersome inter-agency legal and diplomatic process, which often stretches years, that the U.S. government completes before most terrorism-related designations including, on information and belief, each designation identified in this Complaint.

Since 2015, he has been the Deputy Emir of the Taliban, the Taliban's second in command. Working alongside al-Qaeda, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. For example, after September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government while sheltering al-Qaeda leadership at the time.

133.   Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban. The Taliban has rejected claims that the Haqqani Network is separate from the Taliban.

134.   The Haqqani Network has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After September 11, the Haqqanis provided sanctuary to bin Laden.

135.   The Haqqani Network's close relationship with al-Qaeda and other terrorist groups has helped grow the modern terrorist Syndicate operating in Afghanistan. In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad. Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one. And in July 2008, Jalaluddin Haqqani's son—18-year-old Muhamman Omar Haqqani—was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

136.1.   When the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT, it noted that he "has also acted on behalf of al-Qa'ida

and has been linked to al-Qa'ida military operations."[68] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

137.   Along with After 9/11, al-Qaeda, the Haqqani Network jointly operated and conducted al-Qaeda's CAN fertilizer bomb campaign in Afghanistan, and Haqqani Network agents, operatives, and fronts, including Haqqani Network co-conspirators Fatima and Pakarab, were vital to sourcing every component necessary for the Syndicate to execute its CAN fertilizer bomb campaign at a nationwide scale throughout Afghanistan.

138.   The Haqqani Network ordinarily managed the Taliban's transnational terrorist finance and logistics operations and also often aided al-Qaeda's transnational terrorist finance and logistics activities.  When doing so, the Haqqani Network used its network of agents, operatives, and fronts in the U.A.E. as an alias for its fellow Syndicate terrorists.  As explained by Haqqani Network expert Gretchen Peters, the Haqqani Network's interlocking financial support of other Syndicate members through cross-border transactions included, but was not limited to: (1) managing the Taliban's international narcotics enterprises, and repatriating[69] profits back to affiliates, such as the Taliban to fund attacks against Americans in Afghanistan; (2) raising funds for al-Qaeda and the Taliban from commercial activities overseas and repatriating those monies back to al-Qaeda and the Taliban to fund attacks against Americans in

---

[68] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[69] By "repatriating profits," Plaintiffs refer to the process through which al-Qaeda, the Haqqani Network, and their allies, used their operatives, agents, fronts, or partners to launder illicit overseas income, convert such funds into U.S. Dollars from their original currency (*e.g.*, Russian Rubles), and transfer such cleansed money back to the terrorist group's designated "controller," *e.g.*, Altaf Khanani, who then manages the money and disperses it consistent with the needs and request of the terrorist group.  Such "repatriation" by al-Qaeda, the Taliban (including the Haqqani Network), and their allies occurred through their use of operatives, agents, fronts, and partners throughout the world.

Afghanistan; and (3) committing transactions through known Haqqani Network operatives, agents, or fronts around the world, including, but not limited to, such Haqqani Network assets in the U.A.E., Afghanistan, Pakistan, Russia, Central Asia, Germany, Italy, Cyprus, and other key sites in Europe, the Middle East, and Asia, all of which directly funded al-Qaeda and Haqqani Network operations that supported, and their shared terrorist campaign against Americans in Afghanistan.

139.    The Treasury Department determined thatallies the Haqqani Network regularly used its transnational terrorist finance activities to fund multiple al-Qaeda affiliated Syndicate members simultaneously.  For example, example, on February 9, 2011,IRGC, including the Treasury Department designated Syndicate operatives, Said Jan Abd Al-SalamIRGC's Hezbollah Division and Khalil Al-Rahman Haqqani (Jalaluddin' s brother), as SDGTs to "target[] the financial and support networks of al-Qa'ida, the Taliban and the Haqqani Network leadership."[70]

140.    By 2010, CAN fertilizer sourced from Pakistan was "one of the most coveted substances in a Taliban bomb-maker's arsenal" and served as "the basic ingredient of the Taliban's roadside bombs,"[71] and the Syndicate had developed a sophisticated end-to-end logistics chain for the sourcing, manufacture, and distribution of al-Qaeda CAN fertilizer bombs. By 2011, "U.S. military officials believe[d] the Haqqani [N]etwork" was "working closely with [CAN fertilizer] suppliers," *e.g..*, Fatima, "to help smuggle the fertilizer across the border."[72]

---

[70] *Id.*

[71] Alex Rodriguez, *Bribes Keep Taliban Flush with Explosives*, L.A. Times (May 8, 2010), 2010 WLNR 9039604.

[72] Aamer Madhani, *Tensions With Pakistan Rise Over Bomb Ingredient*, National Journal Daily (Jul. 6, 2011), 2011 WLNR 13371684.

141. By the time it was designated as an FTO on September 19, 2012, the Haqqani Network, working closely with al-Qaeda, had grown and refined the Syndicate's CAN fertilizer bomb logistics chain in Afghanistan and Pakistan for more than five years.

### 4. Lashkar-e-Taiba

142. Lashkar-e-Taiba (or "LT") means "Army of the Pure," and was founded in Pakistan in the early 1990s. Since its inception, the group has been engaged in terrorist activities, causing the United States to designate it as an FTO on December 26, 2001—and to subsequently renew that designation and expand it to include Lashkar-e-Taiba's aliases and affiliates.

143. At Qods Force, **all** relevant times, Lashkar-e-Taiba was a member of the Syndicate and known to be a terrorist group that targeted Americans in Afghanistan for attack.

144. Lashkar-e-Taiba and Al-Qaeda have close ties dating back to the anti-Soviet war. Lashkar-e-Taiba has a long history of providing support to al-Qaeda members.

145. As an al-Qaeda "franchise," Lashkar-e-Taiba provided key funding, which al-Qaeda relied upon to fund and arm Qaeda terrorists throughout the world. According to Mr. Zarate, by 2011, "Al Qaeda core struggle[ed] financially and rel[ied] more heavily on its affiliates for funding" and by 2013, "Al Qaeda in Pakistan" "increasingly collaborat[ed] and shar[ed] resources with Pakistani-based militant groups" and "[was] known to share resources and secure funding from Lashkar-e-Taiba," which was an "example" of how al-Qaeda relied on "relationships" "that tie[d] [al-Qaeda's' financing to the infrastructure and operations of other organizations" as a central component of the al-Qaeda's terrorist finance embraced a corporate-inspired **strategy.**[73]

---

[73] Zarate, *Treasury's War*, at 362, 364.

146.   As an al-Qaeda "franchise," Lashkar-e-Taiba's operations and finances were heavily intertwined with al-Qaeda, and Lashkar-e-Taiba regularly provided funds and weapons, and deployed Lashkar-e-Taiba terrorists, to al-Qaeda for use by the Syndicate's that was these FTOs' analogue to a joint cells in eastern Afghanistan.   Thus, a substantial percentage of the terrorist finance that flowed to Lashkar-e-Taiba ordinarily flowed through Lashkar-e-Taiba and on to al-Qaeda to support the latter's terrorist operations in Afghanistan.

147.   Collaborationventure between Lashkar-e-Taiba and its al-Qaeda, Taliban, and Haqqani Network partners in the Syndicate "was centered on the jihad in Afghanistan" and "included the joint recruitment and infiltration of fighters into Afghanistan; sharing safe houses and resources, including weapons, explosives and information; and joint training and fighting in Afghanistan."[74]

148.   The U.S. government and terrorism scholars recognized that LT played a key role in the Syndicate's ability to commit attacks in Afghanistan.

149.   As the insurgency targeting Americans in Afghanistan "gained strength in 2005-2006," Lashkar-e-Taiba "began facilitating access" to Afghanistan for Lashkar-e-Taiba members to fight under al-Qaeda and the Taliban's banner.[75]  From 2005 through the present, Lashkar-e-Taiba's Afghanistan-facing operations have effectively been fused with al-Qaeda and the Taliban, including its Haqqani Network.

150.   As an affiliate of al-Qaeda, Lashkar-e-Taiba provided critical support to the Syndicate by sourcing thousands of foreign fighters to receive training by al-Qaeda to be deployed in Afghanistan on behalf of the joint al-Qaeda/Taliban (including Haqqani Network)

---

[74] Tankel, *supra* note 20, at 19 (2011).

[75] Stephen Tankel, *Lashkar-e-Taiba: Past Operations and Future Prospects*, at 6 (2011).

cells operating in the key provinces there.  For example, substantial numbers of Lashkar-e-Taiba terrorists were embedded in joint al-Qaeda/Taliban (including Haqqani Network) cells in P2K and N2KL, where Lashkar-e-Taiba operatives were part of the joint cells targeting Americans.

151.    Lashkar-e-Taiba and its front organizations also provide essential logistical support to facilitate the operation of al-Qaeda-run training camps in Waziristan by providing funding, safe houses, travel support, and recruits, for the camps.

152.    Lashkar-e-Taiba also played the key role in sourcing nearly all the suicide bombers who were ultimately trained by al-Qaeda and deployed as suicide attackers on behalf of the joint al-Qaeda/Taliban (including Haqqani Network) cells operating in N2KL, P2K, and the Kabul Attack Network-related Provinces. "[R]ecruitment for suicide bombings conducted by other groups" was a particular "LT specialty."[76]  On information and belief, Lashkar-e-Taiba (along with Jaish-e-Mohamed, below) directly or indirectly helped furnish every suicide bomber who was ultimately trained to become an al-Qaeda operative and executed a suicide attack.

153.    Lashkar-e-Taiba terrorists did not openly participate in attacks in Afghanistan under Lashkar-e-Taiba's banner.  Instead, Lashkar-e-Taiba terrorists were (and remain) embedded in joint al-Qaeda/Taliban cells in Afghanistan. This was an operational manifestation of al-Qaeda's syndicate strategy, which efficiently embedded Lashkar-e-Taiba terrorists into the terrorist cells that were of greatest importance to the shared al-Qaeda/Taliban enterprise.

154.    Lashkar-e-Taiba terrorists sometimes worked on behalf of more than one jihadist group. Sheikh Abu Mohammed Ameen Al-Peshawari (also known as Sheikh Aminullah), for example, was a triple-hatted operative of al-Qaeda, Lashkar-e-Taiba, and the Taliban.

---

[76] Ashley J. Tellis, *The Menace That Is Lashkar-e-Taiba*, Carnegie Endowment for International Peace Policy Outlook (Mar. 13, 2012), https://carnegieendowment.org/2012/03/13/menace-that-is-lashkar-e-taiba-pub-47512.

Lashkar-e-Taiba and al-Qaeda terrorists were often dual-hatted, as Lashkar-e-Taiba was the Pakistani jihadist group that most closely adhered to al-Qaeda's interpretation of Islam.

### 5.    Jaish-e-Mohammed

155.    Jaish-e-Mohammed (or "JEM") was a member of the Syndicate and a Sunni extremist group founded by Masood Azhar with funding and support from Osama bin Laden. JEM has long served as one of the Taliban's Punjabi allies in both Afghanistan and Pakistan.

156.    Jaish-e-Mohammed has openly declared war against the United States, which designated JEM an FTO in 2001.

157.    After the Taliban and al-Qaeda were routed by U.S. forces in the fall of 2001, "the Taliban and al-Qaida" "receiv[ed] help from" "Jaish-e-Mohammed."[77]

158.    Jaish-e-Mohammed has a history of helping al-Qaeda and the Taliban commit spectacular suicide bombing attacks in Afghanistan and Pakistan.

159.    Jaish-e-Mohammed was a key member of the Syndicate by the mid-2000s. As one analyst put it in late 2008, "[o]ne plausible theory" is that Jaish-e-Mohammed, Lashkar-e-Taiba, al-Qaeda, the Taliban, Haqqanis, and Pakistani Taliban "have forged an alliance that is executing a strategy in the region to defend themselves against a new US-led strategy" in the Afghanistan/Pakistan theater.[78] Indeed, by 2009, it was "now accepted" even within elements of the Pakistani military "that Al Qaeda, the Taliban and their allies among the Punjabi jihadis operate as a syndicate," and that such allies "included the Jaish-e-Mohammed."[79]

---

[77] Associated Press, *Pockets of Taliban, al-Qaeda Fighters are Said to be Regrouping in Afghanistan*, St. Louis Post Dispatch (Mar. 2, 2002), 2002 WLNR 1220832.

[78] Richard Beeston, *Washington Crucial as Attack Exposes Terror Groups' Deadly Strategies*, Australian (Dec. 2, 2008).

[79] Nirupama Subramanian, *Pakistan: Two Questions, Multiple Realities*, Hindu, 2009 WLNR 23938767 (Nov. 27, 2009).

160.   Jaish-e-Mohammed's participation in the Syndicate continued at all relevant times. The U.S. designated Jaish-e-Mohammed as an FTO because of the role it plays in augmenting al-Qaeda and other al-Qaeda-linked terrorists operating in Afghanistan and Pakistan as part of the Syndicate.

161.   Like its ally Lashkar-e-Taiba, another of Jaish-e-Mohammed's key roles is to serve as a "talent scout" for al-Qaeda, Taliban, and Haqqani terrorists in Afghanistan. The U.S. government itself recognized the key role that Masood Azhar and Jaish-e-Mohammed have played in recruiting suicide bombers to support the Taliban and al-Qaeda's shared jihad in Afghanistan. Specifically, according to the Treasury Department, "In 2008, [Jaish-e-Mohammed] recruitment posters in Pakistan contained a call from Azhar for volunteers to join the fight in Afghanistan against Western forces."[80]

162.   The Indian government concurred. As a former senior Indian official summarized in March 2009, "[i]t is now established that while the Taliban's cadres in Afghanistan are primarily Afghan nationals, a *substantial number of suicide bombers in Afghanistan are from militant groups drawn from Pakistan's Punjab province*, like [LT] and [JEM]."[81]

163.   Jaish-e-Mohammed plays a special role in al-Qaeda's Syndicate as the terrorist group responsible for taking the lead in collecting and paying out so-called "martyr payments" to the families of al-Qaeda-aligned suicide bombers who blow themselves up in Afghanistan, which encouraged them to attack Americans.

---

[80] U.S. Dep't of Treasury, *Treasury Targets Pakistan-Based Terrorist Organizations Lashkar-E-Tayyiba and Jaish-E-Mohammed* (Nov. 4, 2010).

[81] G. Parthasaraty (Former High Commissioner to Pakistan), *Pakistan Under Jihadi Threat*, Business Line (Mar. 5, 2009) (emphasis added).

164.     Jaish-e-Mohammed facilitated martyr payments to many of the suicide bombers who committed the attacks in this case. Martyr payments provide a direct and powerful incentive to the perpetrators of suicide bombings. The knowledge that such payments are available makes people more likely to join terrorist causes, and more likely to carry out suicide attacks on behalf of FTOs. The payments are a key incentive not only from a monetary standpoint, but also because they confer prestige on the recipients.

### 6.     The Kabul Attack Network

165.     The Kabul Attack Network was an operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including its Haqqani Network.  Specifically, the Kabul Attack Network was a set of terrorist cells, which included members from each of the terrorist groups involved in the syndicate and focuses on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and Zabul.[82]  It was active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province.

166.     The Kabul Attack Network's forward-deployed terrorists were drawn from joint cells comprised of al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and Jaish-e-Mohammed, each of whom participated in Kabul Attack Network attacks and contributed personnel and resources to such attacks.  For each group, the Kabul Attack Network's attacks were the most important, or among the most important, priorities of the Syndicate's entire terrorist campaign since 9/11, and thus received special focus from each Syndicate member.

---

[82] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

167.    Attacks committed by the Kabul Attack Network were committed jointly by a combined cell comprised of these terrorists.  By the same token, funding for any of the involved terrorist groups contributed to the Network's attacks.

168.    The Kabul Attack Network was responsible for high profile and/or mass casualty attacks on Americans in Kabul and the surrounding areas that relied upon CAN fertilizer IEDs, suicide bomber, kidnappers, or insider attacks.[83]

169.    On January 24, 2010, the Afghan government accused al-Qaeda of specifically planning the Kabul Attack Network's CAN fertilizer bomb attacks in Kabul, which the Syndicate delivered via IED and suicide bomb.

170.    Sirajuddin Haqqani, the dual-hatted al-Qaeda-Taliban terrorist, planned and authorized every attack committed by the Kabul Attack Network, working with local commanders like Mullah Dawood. to execute the Kabul Attack Network's attacks.  As a result, at all relevant times, the Kabul Attack Network's attacks were planned and authorized by at least one FTO (al-Qaeda), and after September 19, 2012, Kabul Attack Network attacks were planned and authorized jointly by two FTOs (al-Qaeda and the Haqqani Network).

171.    According to an ISAF public affairs officer, the "Haqqani Network is deeply entrenched in the Kabul Attack Network specifically with the facilitation of weapons and fighters into the area south of Kabul in Logar and Wardak."[84]  Additionally, senior Haqqani leaders operating from their traditional strongholds often planned and executed terrorist attacks by the Kabul Attack Network, sometimes even giving tactical advice during attacks.

---

[83] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

[84] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

172.    The Kabul Attack Network's attacks were funded and logistically supported by al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company access to terrorist finance in Afghanistan, Pakistan, and worldwide.  Thus, terrorist finance that flowed to any of these groups aided Kabul Attack Network attacks.

### 7.    D-Company

173.    D-Company was a criminal terrorist organization and notorious affiliate of al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and Jaish-e-Mohammed.

174.    D-Company was a member of the Syndicate through its long-standing alliances with Syndicate members including, but not limited to, al-Qaeda and Lashkar-e-Taiba.

175.    D-Company was led by the notorious terrorist drug lord Dawood Ibrahim, a Specially Designated Global Terrorist ("SDGT") and Specially Designated National ("SDN"), who has been internationally infamous since the 1990s as "India's Bin Laden," and was sanctioned in 2003 under the UN's al-Qaeda/Taliban-related sanctions authority.  D-Company was fusion terrorist/criminal organization, with Dawood Ibrahim at the top as the Boss.

176.    In his book, *Treasury*'s War, Mr. Zarate confirmed that "Al Qaeda and" "Lashkar-e-Taiba have benefited from [their] alliances with Indian crime lord Dawood Ibrahim and [D-Company]."[85]  According to Mr. Zarate, "Dawood Ibrahim—sometimes known as Sheikh Dawood Hassan—was not just a notorious international crime boss.  He demonstrated a willingness to help Al Qaeda and financed and supported Lashkar-e-Taiba (LT)."[86]  Thus, "Dawood Ibrahim" "represented the nightmare scenario of the allegiance between powerful international organized crime and terror."[87]

---

[85] Zarate, *Treasury's War*, at 364-65.

[86] *Id.* at 115.

[87] *Id.*

177.   Moreover, according to Mr. Zarate, "[t]he overlaps between the criminal underworld, illicit financial activity, and terrorist operations and funding" meant that it was "critical" that "counterterrorism officials" "[f]ocus[ed] on key financial conduits, nodes, and networks that serve[d] not just terrorists but transnational criminals."[88]  "Because [the Syndicate] [was] seeking alternative financing sources and efficient vehicles for moving money, it [would] continue to develop nefarious relationships and operations that tie[d] its funding to the infrastructure and operations of other organizations" such as D-Company.[89]

178.   "On October 16, 2003, [the Treasury Department] designated [Dawood] Ibrahim, sending messages out to banks" "around the world to do whatever was possible to identify and freeze Ibrahim's assets."[90]  According to Mr. Zarate, "When we designated [Ibrahim], I laid out what that action meant to our strategy:  'This designation signals our commitment to identifying and attacking the financial ties between the criminal underworld and terrorism.  We are calling on the international community to stop the flow of dirty money that kills.  For [D-Company], the business of terrorism forms part of the larger criminal enterprise, which must be dismantled."[91]

179.   From 2001 through 2016, D-Company also operated as an agent for several members of the Syndicate, including al-Qaeda, the Taliban (including its Haqqani Network), and Lashkar-e-Taiba—and was always notorious for doing so since 9/11.  While serving as an agent for al-Qaeda, the Taliban (including its Haqqani Network), and Lashkar-e-Taiba, D-Company provided, among other things, narco-terrorist expertise to each group through D-Company's work for its members.

---

[88] *Id.* at 365.

[89] *Id.* at 364-65.

[90] *Id.* at 116.

[91] *Id.*

180. ~~Summarizing the then-current threat from D-Company in 2013, Mr. Zarate wrote, "[Dawood] Ibrahim" "remained active and dangerous.  Ibrahim has been a primary financier of the narcotics trade in Afghanistan and has maintained close ties to Al Qaeda's senior ranks.  In the 1990s, he was sponsored and protected by the Taliban when he traveled to Afghanistan.  Most disturbingly, Osama bin Laden and Al Qaeda relied on Ibrahim's smuggling routes, with reports that a financial arrangement had been made for bin Laden to be able to use the routes and elements of the network to move men and material for Al Qaeda safely through the Middle East and South Asia."[92]~~

181. ~~From 2001 through 2016, D-Company also regularly funded—and was notorious since 9/11 for funding—the Taliban (including its Haqqani Network).  According to Professor Gurulé, "The Taliban has become closely aligned with Afghan drug syndicates.  The drug organizations provide financial support to the Taliban."[93]~~

182. ~~From 2001 through 2016, D-Company also regularly provided—and was notorious since 9/11 for providing—logistical and funding support to every member of the Syndicate and served to augment the Syndicate's financial, smuggling, and logistical narcotics-related capabilities.  As Mr. Zarate explained, "[Dawood Ibrahim, the Boss of D-Company] may not have been a classic Al Qaeda jihadist, but he was a most dangerous facilitator" (for al-Qaeda, the Taliban, and Lashkar-e-Taiba) and "the kind of target we needed to isolate financially."[94]~~

183. ~~From 2001 through 2016, Notorious Syndicate financier Altaf Khanani, *infra* Part III.A., was widely known to serve as a D-Company operative, and widely known to have been Dawood Ibrahim's personal financier and D-Company's CFO for decades.  Both benefited from their relationship:  Khanani protected D-Company's money, while D-Company protected Khanani.  In short, "Khanani [was] Dawood Ibrahim's biggest financier" while Ibrahim was~~

---

[92] ~~*Id.*~~

[93] ~~Gurulé, *Unfunding Terror*, at 109.~~

[94] ~~Zarate, *Treasury's War*, at 116.~~

South Asia's biggest narcotrafficker,[95] and the "second richest gangster of all time" (net worth: $6.7B), behind "[o]nly notorious drug smuggler and gangster Pablo Escobar" (net worth: $9B).[96]

184.   Khanani and the Khanani MLO were, therefore, affiliated with D-Company. Khanani, as a D-Company operative, regularly kicked back a portion of his income, and that of the Khanani MLO, to D-Company. D-Company's own regular practice of funding, arming, and logistically supporting al-Qaeda, the Taliban (including its Haqqani Network), and Lashkar-e-Taiba meant that a percentage of every dollar earned by Khanani and the Khanani MLO flowed through D-Company to these terrorist groups.

### B.   Al-Qaeda Planned And Authorized The Terrorist Attacks That Killed And Injured Plaintiffs

185.   Since at least the mid-2000s, al-Qaeda planned and authorized the Taliban's, including its Haqqani Network's, attacks on U.S. forces in Afghanistan in several ways.

186.   **Authorization.** Al-Qaeda provided critical religious authorization for Taliban (including its Haqqani Network) attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Afghan Taliban, conferring religious permission for them to attack Americans in Afghanistan.

187.1.   After Osama bin Laden was killed in May 2011 (about three months prior to the first attack on Plaintiffs), the Taliban confirmed his religious and moral authority over their Afghan jihad, stating: "Osama Bin Laden You were the *sheikh of the Umma*, a zealous man,

---

[95] Zee News, *US Arrests D-Company's Financier; Is Dawood Ibrahim the Next Target?; The US has Strong Evidence to Prove that Altaf Khanani is Dawood Ibrahim's Biggest Financier* (Dec. 4, 2015).

[96] India Today, *Dawood Ibrahim is 2nd Richest Gangster of All Time; 10 Things About Most Wanted Global Terrorist* (Apr. 29, 2017).

and *the scholar and imam of the nation at the level of Jihad* and the fighting of the enemies and their minions.  You were *our* sheikh, *our* imam and *role model*, the hero and miracle of our times, unique among your peers, pious and highly sensible."[97]

188.    Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in Syndicate, which involved periodic mafia-style meetings in which al-Qaeda, the Taliban (including its Haqqani Network), and other members of the syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[98]  The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members.  Among other things, the syndicate specifically approved:  (1) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (2) the campaign of suicide attacks against Americans throughout Afghanistan; (3) the Taliban's campaign of using anti-American IED and suicide attacks specifically in Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces and P2K; (4) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012; and (5) the Syndicate's use of, and later aggressive focus on, CAN fertilizer bomb attacks specifically targeting Americans.

189.    The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan.

190.    Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban (including Haqqani Network) members.

---

[97] Al-Somood, *Bin Laden Is Alive O Dead Ones And The Cowards Should Not Dare Close Their Eyes* (July 1, 2011) (emphasis added).

[98] *See The al-Qaeda – Taliban Connection.*

Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[99]

191.    Al-Qaeda's messages of authorization extended to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq.  A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[100]  Afghan terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible.  Al-Qaeda trumpeted that success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[101]  With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006.

192.    As a result, al-Qaeda's role in that suicide-bombing trend was pivotal and was the but-for cause of each Taliban, including Haqqani Network, suicide bomb attack.

193.1.  Al-Qaeda also authorized the Taliban's (including its Haqqani Network's) use of IED attacks against Americans in Afghanistan, and Osama bin Laden regularly called for terrorists to attack Americans with IEDs.

194.    **Planning.**  Al-Qaeda also planned the Taliban's, including its Haqqani Network's, terrorist attacks against Americans in Afghanistan.  Working through its Syndicate

---

[99] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019) ("*Al Qaeda Growing Stronger*").

[100] *Osama bin Laden:  Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[101] Brian Glyn Williams, *Suicide Bombings in Afghanistan* at 5, Jane's Islamic Affairs Analyst (Sept. 2007).

partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as regional terrorist attacks, particularly in Afghanistan."[102] Two terrorism scholars explained al-Qaeda's syndicate-related shuras as follows:

> The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to *coordinate strategy, operations, and tactics* against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in *planning and carrying out suicide attacks, developing improved explosive devices, and helping conduct operations* against high-value targets.[103]

195.   Al-Qaeda training provided another key mechanism through which that planning occurred.  Before the September 11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request.  By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans.  At all relevant times, these al-Qaeda camps trained terrorists in the al-Qaeda signature of turning fertilizer into bombs.

196.   By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] *Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda* (AQ) in North Waziristan.   . . . A list and brief description of each facility follows.
>
> A.  Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
>
> B.  There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah.  Approximately 45 U/I Arabs and Uzbeks receive training there.

---

[102] *Resilient al-Qaeda* at 3.

[103] *Id*. at 3-4.

C.  An AQ training facility called "Shaki Masood" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).

D.  Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan.  Over 80 Arabs receive training there (NFI).[104]

197.    The training continued throughout the relevant timeframe of this case.  In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province—both reportedly "hosted by the Taliban."[105]  One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles.  On information and belief, this camp trained terrorists in how to make CAN fertilizer bombs and included an on-site al-Qaeda CAN fertilizer bomb factory.

198.    Working jointly with polyterrorist Sirajuddin Haqqani, al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its suicide bomber attacks.  As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," "through operations [that al-Qaeda] planned together with Sirajuddin Haqqani."[106]

199.    Al-Qaeda also planned the Taliban's (including its Haqqani Network's) attacks by devising the operational scheme through which the Taliban carried out its attacks.  Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates those activities.  For example, according to purported Gitmo intelligence files

---

[104] Def. Intelligence Agency, *Intelligence Information Report:  Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (emphasis added; original emphasis omitted).

[105] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

[106] *Resilient al-Qaeda* at 9.

quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the groups' respective leaders conceived during a meeting in Pakistan in early spring 2003[107] Another purported Gitmo detainee file as quoted by Messrs. Roggio and Joscelyn concerning Haroon al-Afghani, a dual-hatted al-Qaeda/HIG terrorist, stated:

> [Afghani] is assessed to have attended a joint operations meeting among extremist elements in mid-2006. A letter describing an 11 August 2006 meeting between commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party (probably a reference to the HIG), disclosed that the groups decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations.[108]

Taken together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[109]

200. Al-Qaeda also taught the Taliban (including its Haqqani Network) effective terrorist tradecraft. Through its relationship with al-Qaeda, the Taliban (including its Haqqani Network) "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[110] multinational corporations and They also "share[d] communication and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[111] The Taliban's (including its Haqqani Network's) effective terrorist tradecraft was essential to its ability to

---

[107] *The al Qaeda – Taliban Connection*.

[108] *Id.* (brackets in original)

[109] *Id.*

[110] *Id.* at 293.

[111] *Resilient al-Qaeda* at 9.

execute al-Qaeda's nationwide CAN fertilizer bomb campaign, which depended upon sophisticated logistics, communications, smuggling, storage, and other technical skills that the Taliban (including its Haqqani Network) only acquired through its relationship with al-Qaeda.

201.     All these activities were part of al-Qaeda's planning of the Taliban's CAN fertilizer bomb attacks in Afghanistan.  By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends.  In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies.  As terrorism scholar Thomas Ruttig observed:  "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[112]  Here, its "cooptation" of the Taliban was especially effective.

202.     Al-Qaeda's planning activities extended specifically to the two CAN fertilizer bomb attack types that account for every attack in this case:  IEDs and suicide bombs.

203.     **IEDs.**  Al-Qaeda planned the Taliban's campaign of IED attacks in Afghanistan in which the explosive was ammonium nitrate derived from Fatima Group CAN Fertilizer manufactured, sold, and distributed by Fatima and Pakarab.

204.     At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to converting fertilizer into ammonium nitrate for use in CAN fertilizer bomb attacks against Western targets.  As Senator Charles Schumer stated in 2004, "bombs using [CAN] [were] the weapon of choice of al-Qaida."

205.1.  From 2001 through 2016, al-Qaeda supported fertilizer-based bomb strategies in every theater in which al-Qaeda pursues terrorist attacks against America and its allies.  As one

---

[112] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertiliser packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[113]

206. CAN fertilizer bombs were also a literal part of al-Qaeda's terrorism playbook, and al-Qaeda regularly instructed Taliban and Haqqani Network terrorists, in person and in writing, regarding CAN fertilizer bombs. For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan in 2004 provided that military explosives were often impractical to acquire, and instructed instead that jihadists should use home-made explosives, including ammonium nitrate bombs derived from CAN fertilizer.

207.107. Al-Qaeda and the Haqqani Network agents, operatives, and fronts in Afghanistan and Pakistan facilitated al-Qaeda's CAN fertilizer bomb infrastructure by purchasing every essential element of the Syndicate's bombmaking enterprise and managing the transportation and logistics of huge volumes of bombs and bomb precursors. These Syndicate front companies serviced the litany of joint al-Qaeda / Haqqani Network bombmaking factories and training camps in eastern Afghanistan and Syndicate-controlled territory in Afghanistan and Pakistan. It did so because the Haqqani Network have historically played a key role in obtaining and securing bomb components and precursors for use by al-Qaeda bombmakers operating in camps in Afghanistan and Pakistan jointly run by al-Qaeda and the Haqqani Network under the leadership of Syndicate, most of all, on their deployment of **polyterrorists** like Sirajuddin Haqqaniwho served multiple allied organizations at the same time.

208. While al-Qaeda and Haqqani Network fronts and agents were sourcing their key explosive ingredient exclusively from Fatima and Pakarab, al-Qaeda forward-deployed terrorist

---

[113] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

trainers in Afghanistan and Pakistan specifically instructed the Taliban (including its Haqqani Network) to acquire Fatima Group CAN Fertilizer, convert it into an ammonium nitrate bomb, and use the resulting weapon to kill and maim Americans in Afghanistan.

209.1.  Al-Qaeda's plan for the nationwide deployment of CAN fertilizer bombs against Americans in Afghanistan also included aggressive support by al-Qaeda bombmakers and logisticians in Pakistan, aided by their Taliban and Haqqani Network allies, to maintain a series of joint al-Qaeda/Taliban (including through the Haqqani Network) bombmaking sites, where the purpose was specifically to construct large volumes of CAN fertilizer bombs detonated via a Syndicate IED or suicide bomber.  In so doing, bin Laden and his Taliban allies, including its Haqqanis, were reprising one of their celebrated roles against the Soviets during the Afghan war, when they worked together to help arm the mujaheddin with key anti-armor weapons.

210.  By 2009, according to famed journalist Peter Bergen, al-Qaeda's strategy to teach the Taliban how to turn CAN fertilizer into CAN fertilizer bombs to kill Americans in Afghanistan was widely known:

> [I]n recent years, Taliban leaders have drawn especially close to Al Qaeda. . . . Today, at the leadership level, the Taliban and Al Qaeda function *more or less as a single entity*. The signs of this are everywhere. For instance, IED attacks in Afghanistan have increased dramatically since 2004. What happened? As a Taliban member told Sami Yousafzai and Ron Moreau of *Newsweek*, "*The Arabs taught us how to make an IED by mixing nitrate fertilizer and diesel fuel and how to pack plastic explosives and to connect them to detonators and remote-control devices like mobile phones*. We learned how to do this blindfolded so we could safely plant IEDs in the dark."[114]

211.  At all relevant times, dual al-Qaeda/Haqqani Network operative Sirajjudin Haqqani planned the Syndicate's CAN fertilizer bombing campaign, and focused above all else

---

[114] *The Front* (emphases added).

on producing a regular, reliable, and deadly supply of CAN fertilizer bombs for use in Syndicate IED and suicide bomb attacks targeting Americans in Afghanistan.

212.    Like his al-Qaeda brothers, Sirajuddin Haqqani viewed the Syndicate's CAN fertilizer bomb campaign infrastructure as a key source of al-Qaeda and Haqqani Network power in Afghanistan and Pakistan, and leverage over other members of the Syndicate.  Consequently, al-Qaeda and Haqqani Network operatives, including Sirajuddin Haqqani and other Haqqani family members, closely oversaw the core commercial and financial relationships that enabled Syndicate's regular and reliable flow of Fatima Group CAN Fertilizer for conversion into CAN fertilizer bombs.  This close involvement by senior al-Qaeda and Haqqani Network leadership ensured a tight nexus between Defendants' reckless financial services to al-Qaeda and Haqqani Network agents, operatives, and fronts and the Syndicate's CAN fertilizer bomb infrastructure.

213.    In this relationship, the Haqqani Network provided the location, support, and funding for the CAN fertilizer bombmaking sites, while al-Qaeda bombmakers presided over an assembly line of explosives creation in which bombmakers would convert Fatima Group CAN Fertilizer into CAN fertilizer bombs.

214.    Once al-Qaeda's bombmakers had cooked down Fatima Group CAN Fertilizer into ammonium nitrate, al-Qaeda would then prepare the ammonium nitrate to be used in one or more CAN fertilizer bombs derived from al-Qaeda schematics, including:  (1) large CAN fertilizer-based IEDs specifically designed to destroy an American armored vehicle; (2) small CAN fertilizer-based IEDs specifically designed to kill or maim Americans on foot; and (3) CAN fertilizer-based suicide vests and suicide VBIEDs specifically designed to take out the largest possible American armor, or to be deployed as part of a complex attack targeting an American installation.  Different bomb types require different component parts, and therefore al-

Qaeda's bombmakers would coordinate the correct parts with the correct designs to ensure maximal effect. Once al-Qaeda's designed- and manufactured-CAN fertilizer bombs were completed, al-Qaeda and the Haqqani Network would distribute the CAN fertilizer bombs to the relevant Syndicate terrorist cells throughout Afghanistan to blow up Americans.

215.1. More broadly, al-Qaeda members regularly trained Taliban and Haqqani Network commanders in sophisticated CAN fertilizer bomb-making techniques that were material to the terrorists' ability to assemble and deploy explosives against Coalition forces. According to the terrorist scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated [IEDs], including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[115]

216. Al-Qaeda's support of Taliban and Haqqani Network IED attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan. For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida . . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide attacks and other [IED]" attacks.[116] Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL. At all relevant times, al-Qaeda's forward deployed trainers directed the CAN fertilizer bomb campaign in keeping with its status as a "signature" al-Qaeda attack type.

---

[115] *Graveyard Of Empires* at 292.

[116] *Id.* at 330.

217.1.  Al-Qaeda's planning efforts were significant and amplified the lethality of Taliban and Haqqani Network attacks.  Indeed, al-Qaeda's ability to export its terrorism expertise to local groups is what "renders al-Qaeda effective in the first place."[117]  In the case of the Taliban and the Haqqani Network, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[ ]ing of what some observer[s] call 'strategic-level funding.'"[118]  Those activities were material to the Taliban's and Haqqani Network's ability to execute the type of attacks that killed and injured Plaintiffs.  As Mr. Ruttig concluded, al Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[119]

218.   As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do – as trainers and force multipliers."[120]  Al-Qaeda's sophistication and support was important to the Taliban's (including its Haqqani Network's) terrorist enterprise.  And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks.  For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[121]

219.   **Suicide Attacks.**  Al-Qaeda's planning activities extended to suicide bombings. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy.  Al-Qaeda exported its suicide-bombing expertise to the Taliban (including its Haqqani Network) through their joint syndicate, and in so doing played a pivotal leadership and operational role in every Taliban (including Haqqani Network) suicide bombing in Afghanistan during the relevant

---

[117] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[118] *Id.*

[119] *Id.*

[120] *The Front.*

[121] *Al Qaeda Growing Stronger.*

time period.  For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

220.   Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans.  This campaign included messages touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

221.1.  Al-Qaeda used this message—and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations—to change the Taliban's (including its Haqqani Network's) organizational posture toward suicide bombing.  As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard."[122]

222.   To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other syndicate members, Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal the explosives in a Suicide VBIED, navigate a checkpoint, and detonate for maximum impact. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

223.   To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban (including its Haqqani Network) relied upon a series of dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which

---

[122] *Graveyard of Empires* at 293.

they were refined into suicide weapons.  Such dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists include, but are not limited to, the following:

(i)   **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network, who has stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [*i.e.*, the Americans] by cooperating with us and us with them in one trench," pursuant to cooperation "at the highest limits"[123];

(ii)   **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces; and

(iii) **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari)**, a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban.

224.   Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers, and the suicide bombs they detonated, in support of the Taliban's jihad against Americans in Afghanistan.  The Syndicate's suicide attack infrastructure included:  (1) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the Syndicate; (2) joint al-Qaeda/Taliban safe houses and ratlines to support the deployment of suicide bombers inside Afghanistan; (3) joint al-Qaeda/Taliban explosives factories, in which the Syndicate converted Fatima Group CAN Fertilizer into ammonium nitrate for use in suicide vests and suicide VBIEDs; (4) joint al-Qaeda/Taliban suicide VBIED development sites, in which al-Qaeda and Taliban (including Haqqani Network) bombmakers married the CAN fertilizer bomb with a vehicle to create a suicide VBIED; and (5) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for increasing the likelihood that a particular attacker would carry out his or her attack, as well as incentivizing the next generation of suicide bombers.

---

[123] *Taliban Cooperation.*

225.    As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles."  By following a strategy in which the weapons (*i.e.*, the suicide bomber) was created by al-Qaeda and then deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan.  Indeed, when a suicide bomber detonated a CAN fertilizer bomb, as happened in every suicide bomb attack in this case, al-Qaeda created both the suicide bomber and the explosive device itself.

> **C.     Al-Qaeda Committed The Terrorist Attacks That Killed And Injured Plaintiffs, And Often Did So As Part Of Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba**

226.    In few places were Syndicate members more intertwined in a common jihadist cause than with respect to the manufacturing and distribution of CAN fertilizer bombs and the raising, transfer, and deployment of terrorist funds raised overseas.  Consistent with bin Laden's playbook, al-Qaeda provided the technical expertise, training, ratlines, forward deployed support in Afghanistan, and fundraising support, while the Taliban, Haqqani Network, Lashkar-e-Taiba, and Jaish-e-Mohammed provided training camps, safe houses, front companies to purchase components, and terrorists to be trained.  Working together, these terrorist groups committed every IED and suicide bomb attack in this case.

108.    Al-Qaeda members also committed attacks alongside the Taliban (including its Haqqani Network), including some of the attacks that killed or injured Plaintiffs or their family members.  In fact, many terrorist operatives were "dual-hatted," meaning that they were both al-Qaeda and Taliban (including Haqqani Network) members.  Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs.  Examples After 9/11, FTOs commonly embraced polyterrorists for the same reason multinational corporations commonly operate a joint venture (or "JV"), even sometimes doing so with competitors:  because when

people are conducting an enormous, long, and expensive trans-national enterprise that depends on personnel, intelligence, money, goods, and collaboration across borders, having a leader who can serve in both organizations, understands both, and is accepted by both, creates unique, and dynamic value that facilitates far greater profits to flow to the people behind the collaboration. For the Syndicate terrorists targeting Americans in Afghanistan, that meant, among other things, a higher attack tempo, more sophisticated weapons, and more dead and maimed Americans, including Plaintiffs and their loved ones.

109.    FTOs and JVs both rely on so-called "polyperformers" (polyterrorists for FTOs, and senior JV officials in the corporate example) to cause dramatic value growth for their respective organizations by improving their group's operational efficiency, communications, and – every one of which, on its own, would be a big deal but, collectively, constituted nothing less than a revolutionary new terrorism model that posed a far greater threat, from a counter-terrorism first principles perspective, than did the pre-9/11 counter-terror model, which assumed most terrorists only belong to one group.  For the Syndicate FTOs and their terrorist allies targeting Americans in Afghanistan, such benefits translated to an accelerated attack tempo, more collaborative leadership dynamics, enhanced recruiting, new fundraising streams, and better cover and concealment for terrorist operatives deployed in high-risk areas, *e.g.*, Afghanistan, Iraq, the U.A.E., and other locations where U.S. forces, or their allies, could quickly kill or detain a terrorist who threatened America or its allies.

110.    Plaintiffs outline the aspects of the Syndicate's global financial, logistical, and operational leadership, networks, strategies, and key geographies that directly facilitated al-Qaeda and Taliban (including Haqqani Network) attacks in Afghanistan.  Throughout, Plaintiffs also explain the structures through which the Standard Charted Bank Defendants' and Deutsche

Bank Defendants' substantial assistance to Hezbollah and the Qods Force flowed through to these IRGC entities to their Syndicate allies and facilitated terrorist attacks against Americans in Afghanistan from 2006 through 2021.[124]

> **B.      Al-Qaeda, The Haqqani Network, Hezbollah And The Qods Force Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System**

227.1.   are set forth below.

228.   **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.**  Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces (known as "N2KL"), which were well-known al-Qaeda strongholds.  In N2KL, al-Qaeda, the Taliban, and Lashkar-e-Taiba maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan.  The polyterrorists who ran the cells include:

(iv)(i)   **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[125]

(v)(i)   **Sakhr al-Taifi**, al-Qaeda's second-highest leader in Afghanistan, who, while embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against Afghan security forces and coalition troops throughout eastern Afghanistan," and "also supplie[d] weapons and equipment to insurgents."[126]

(vi)(i)   **Mufti Assad**, an al-Qaeda network and "insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an

---

[124] Even though Plaintiffs were injured between 2011 and 2017, most Defendants assisted the Syndicate for even longer than this six-year period, with most having aided al-Qaeda and the Taliban since shortly after 9/11 (if not prior to that date).  Most Defendants' decades-long services to the Syndicate did not happen in a vacuum, but occurred against a backdrop of continually escalating violence in Afghanistan.

[125] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan* (Nov. 4, 2016).

[126] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

explosives expert who provided training to insurgents on how to construct and use [IEDs].”[127]

(vii)(i) **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.

(viii)(i) **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.

(ix) **Abu Ikhlas al-Masri**, an al-Qaeda commander responsible for helping coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture in December 2010.

(x)(i) **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces" and "conducted training" for terrorists throughout Kunar Province, "as well as weapons procurement."[128]

(xi)(i) **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province and was specifically responsible for "planning attacks against Afghan and coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[129]

(xii) **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct [IED] attacks" in the N2KL area.[130]

229. **Paktia, Paktika, and Khost ("P2K") Provinces.** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as a "traditional al-Qaeda safe haven[]."[131] In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The dual-hatted terrorists who ran the cells included:

(xiii) **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's military council;

[127] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

[128] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[129] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

[130] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

[131] *Resilient al-Qaeda* at 11-12.



Formatted
Formatted
Numbering
Aligned at
Formatted
Formatted
Numbering
Aligned at
Formatted
Formatted
Numbering
Aligned at
Formatted
Formatted
Numbering
Aligned at
Formatted
Formatted
same style
Formatted
Formatted

(xiv)    **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network;

(xv)(i)  **Khalil al-Rahman Haqqani**, Jalaluddin Haqqani's brother and a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational commander" for the Haqqani Network,[132] as well as an agent who "acted on behalf of al-Qa'ida"[133] and had "been linked to al-Qa'ida terrorist operations."[134]

230.    **Kabul Attack Network-Related Provinces.**  Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city.  This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including its Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing terrorist attacks, each of which executed the Syndicate's CAN fertilizer bomb campaign in Kabul Attack Network-related provinces.  *See supra* Part V.A.3.  The dual-hatted al-Qaeda/Taliban terrorists who ran the cells included:

(xvi)    **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.

(xvii)(i)    **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban.

**II.    THE SYNDICATE RELIED ON EXPLOSIVE FERTILIZER AND U.S. DOLLARS TO CARRY OUT ATTACKS ON AMERICANS IN AFGHANISTAN**

231.111.    Defendants collectively engaged in illicit transactions that directly or indirectly aided nearly every significant senior al-Qaeda and, Haqqani Network, Hezbollah, and Qods Force leader, fundraiser, logistician, and partner who supported the Syndicate's terrorist campaign in Afghanistan.  This section sets forth examples from nearly every major hub of

---

[132] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[133] Press Release, U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[134] Press Release, U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

Syndicate terrorist finance and logistics.  To provide the context for those specific Syndicate agents, operatives, and fronts, and cut-outs who served al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and their Syndicate allies; Plaintiffs separately identify each Defendant's relationships with these agents, operatives, and fronts in Part IV below. , as well as their affiliated Hezbollah and Qods Force allies, Plaintiffs first identify these terrorist groups' core fundraising and logistics strategies relevant to the specific terrorist fundraising, logistics, and operations schemes alleged by Plaintiffs, and describe how al-Qaeda andQaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's use of complex transnational financial and criminal strategies after 9/11 supported their campaign against Americans in Afghanistan. and Iraq.  Plaintiffs then identify certain key geographic hubs from which the particular al-Qaeda, Haqqani Network, D-Company, Hezbollah, and/or Qods Force operative, agent, cell, cut-out, or front at issue in this Complaint supported terrorist attacks against Americans in Afghanistan.

**A.      Al-Qaeda And The Haqqani Network Financed And Armed Terrorists Targeting Americans In Afghanistan Through Global Terrorist Finance And Logistics Networks That Relied On Access To The U.S. Financial System**

232.112.      "Money is the 'lifeblood' of al Qaeda" "and other likeminded terrorist groups."[135]  According toAs Professor Jimmy Gurulé, who teaches law at Notre Dame and previously served in a senior counter-terrorist-finance-facing role at the Treasury Department,, publicly explained in his 2008 book, *Unfunding Terror:*  "[a]l Qaeda and its global network of affiliated terrorist organizations cannot successfully implement their deadly agenda without financial resources" and therefore "[d]isrupting and dismantling terrorist financing networks is essential to combat terrorism."[136]

---

[135] Gurulé, *Unfunding Terror*, at 21.

[136] *Id.*

~~233.~~113.  "Once the scope of al Qaeda's global reach is fully understood," according to Professor Gurulé, "it becomes eminently clear that the Islamist militant group needs vast sums of money to sustain and support its global terrorist ties."[137]  According to Professor Gurulé,

(i)  "Money [was] central to the growth and development of al Qaeda's network," (at 21);

(ii)  "The ability to raise and transfer funds to [al-Qaeda's allies] [was] essential to sustaining terrorist operations" in Afghanistan after 9/11;

(iii)  "Money [was] critical to sustaining al Qaeda's global presence and successfully waging its global jihad," (at 73);

(iv)  "Money [was] critical to financing al Qaeda's terrorist operations (operational costs) as well as sustaining its organizational infrastructure (organizational costs)," (at 21);

(v)  "Simply stated, depriving al Qaeda of funding [was] as important as targeting the operational terror cells themselves" (at 22).

~~234.  "After September 11, 2001, the United States unleashed a counter-terrorist financing campaign that reshaped the very nature of financial warfare."[138]  "The Treasury Department waged an all-out offensive, using every tool in its toolbox to disrupt, dismantle, and deter the flows of illicit financing around the world" and "sanctions" "were now put on steroids to target the Al Qaeda and Taliban network and anyone providing financial support to any part of that network."[139]  As a result, countering the flow of terrorist finance through financial institutions and money remitters became a core consideration of most governmental and financial stakeholders in the international community.  The U.S. "led the way in combating terrorist financing through" "an 'aggressive, multifaceted approach,'"[140] under which "the Bush~~

---

[137] *Id.* at 89.

~~[138] Zarate, *Treasury's War*, at 7.~~

~~[139] *Id.* at 7-8.~~

~~[140] Jayesh D'Souza, *Terrorist Financing, Money Laundering, and Tax Evasion* 45 (CRC Press 2012) ("D'Souza, *Terrorist Financing*")~~

administration ordered America's banks to disclose information to the government on suspected money laundering that might be used to provide financing to terrorists."[141]

235.114.      On September 22, 2001, President George W. Bush announced Executive Order 13224, publicly stating that "banks and financial institutions around the world" were "on notice" that they must "freeze or block terrorists' ability to access funds in foreign accounts" to protect Americans from terrorist attacks committed by al-Qaeda and its affiliates.

236.115.      On September 28, 2001, the UNU.N. Security Council adopted Resolution 1373, which made it mandatory for member states to adopt broad prohibitions against terrorist finance in response to 9/11.  According to MrJuan C. Zarate, the firstformer assistant Treasury secretary of the Treasury dedicated to counteringfor terrorist finance, "[t]his resolution was significant because it was not limited to Al Qaeda or the Taliban. Its"; instead, "[i]ts scope was intentionally broad to ." which "ensure[d] that the international community was putting " adopted "broad measures in place " "to go after terrorist financing" and "shape[d] the financial regulatory and diplomatic environment" because "[b]anks" "knew that the world was watching and that there was a steep reputational price to pay for falling outside the lines of legitimacy as they were being redrawn."[142]   Most responsible global financial institutions and money remitters cared about their reputations and so heeded this approach.  (Defendants did not.)

237.    After 9/11, al-Qaeda and the Taliban (including its Haqqani Network), responded to the U.S. financial pressure by committing to a financial strategy that emphasized maximizing the Syndicate's financial resources by attempting to source as much U.S. currency as possible and working together with their Syndicate allies.  Under this strategy, "Al Qaeda [and] the

---

[141] Robert Kuttner, *Financial Hardball and Financial Beanbag*, American Prospect Blogs (Jan. 13, 2020), 2020 WLNR 1155456.

[142] Zarate, *Treasury's War*, at 33.

Taliban," including its Haqqani Network, "use[d] conventional banks to transfer money to underwrite their global terrorist activities" "because" banks "offer[ed] a broad range of financial services, rapid transaction security, and wide geographic availability."[143]

116.    According to Beginning in the months after 9/11, and continuing ever since, Treasury unleashed a comprehensive financial assault on al-Qaeda and the Taliban, in effect using sanctions, the financial system, and the power of U.S. financial markets and the U.S. Dollar to operate *both* as a key **counter-terrorism strategy**, *i.e.*, choke off the al-Qaeda's and the Taliban's access to transnational terrorist finance, logistics, communications, and safe havens, and a vital **counter-terrorism tactic**, *i.e.*, pursue a range of actions from formal (*e.g.*, impose aggressive, sweeping, sanctions), semi-formal (*e.g.*, public speeches and pronouncements) and informal (*e.g.*, private messaging to stakeholders who are potentially aiding terrorists, like a bank servicing Hezbollah and Qods Force fronts who coordinate key finance or logistics operations,  or a fertilizer company knowingly servicing Haqqani Network customers who purchase key bomb parts like fertilizer.

117.    Under Treasury's post-9/11 offensive against al-Qaeda and the Taliban, including its Haqqani Network, countering the flow of terrorist finance through financial institutions and money remitters became a core consideration of most governmental and financial stakeholders in the international community.  The U.S. "led the way in combating terrorist financing through" "an 'aggressive, multifaceted approach,'"[144] under which Treasury aggressively pursued a comprehensive approach that, among other things, emphasized to banks and remitters the tight nexus between money laundering and terrorism.

---

[143] Gurulé, *Unfunding Terror*, at 181.

[144] Jayesh D'Souza, *Terrorist Financing, Money Laundering, and Tax Evasion* 45 (CRC Press 2012) ("D'Souza, *Terrorist Financing*")

118.     For example, the Bush Administration  "ordered America's banks to disclose information to the government on suspected money laundering that might be used to provide financing to terrorists"[145] and, in so doing, prioritized that such banks share data with the U.S. government regarding suspected anti-money laundering (or "AML") violations specifically because of the foreseeably close nexus between AML violations, on the one hand, and al-Qaeda and/or Taliban finance and/or logistics after 9/11, on the other, as long as the AML violations occurred featured one or more data points that alerted Defendants that the AML violation could foreseeably be in furtherance of an al-Qaeda and/or Taliban linkage to terror.  Such data points known to Defendants and alleged specifically throughout this Complaint concerning each terrorist customer, including features that suggest possible terrorist finance, including, but not limited to: (i) customer identity; (ii) geography; (iii) transaction type; (iv) transaction amount; (v) counterparties (including their agents and banks); and (vi) a host of other factors such as specific prior warnings from a U.S., European, U.N., and/or Israeli official to a bank or corporation that was aiding al-Qaeda and/or Taliban-related terrorist finance or logistics.

119.     From 2001 through 2016, al-Qaeda and its allies, including the Haqqani Network, Hezbollah, and the Qods Force, followed a globalized strategy that ignored borders and read like something that might be followed by a "Multi-National Corporation" for terror, with al-Qaeda being the most aggressive practitioner of a model that all followed.[146]

---

[145] Robert Kuttner, *Financial Hardball and Financial Beanbag*, American Prospect Blogs (Jan. 13, 2020), 2020 WLNR 1155456.

[146] At all times, al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force – FTOs all – ordinarily deployed substantially similar tactics and tradecraft in comparison to one another to accomplish their respective transnational terrorist finance, logistics, operations, communications, transportation, propaganda, and attack operations.  This trend endured in the decades after 9/11 for numerous historical, practical, relationship or other reasons that included, but were not limited, each such FTO's:  **(i) joint terrorist training and common terrorist doctrines**, *e.g.*, al-

120.    After 9/11, the borderless, MNC-style approach to terror – practiced by Hezbollah, the Qods Force, the Haqqani Network, and most of all al-Qaeda – obliterated pre-9/11 terrorism theories that suggested FTOs were only substantially supported by allies who were in-country or a nearby geography.

121.    After 9/11, al-Qaeda and its allies, including the Haqqani Network, Hezbollah, and the Qods Force, operated much like a global corporation (such as most Defendants) that had vast footprints, numerous distinct products, thousands of personnel, and facilities distributed in dozens of countries worldwide that required global supply chains, financial muscle, and communications abilities, and at all times supported attacks against Americans in Afghanistan and Iraq through cells and lanes of effort that:

(i)      were "**geographically dispersed**,"[147] which supported each FTO's attacks against Americans in Afghanistan and Iraq from al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's cells in dozens of countries on six continents, including, but not limited to: the United States, Canada, Mexico, Colombia, Panama, Brazil, Venezuela, Germany, Denmark, the Netherlands, Spain, the U.K., France, Nigeria, South Africa, the U.A.E., Qatar,  Lebanon, Syria, Iraq, Iran, Cyprus, Estonia, Latvia, Russia, Afghanistan, Pakistan, Malaysia, Thailand, China, and Australia;

(ii)     were "**functionally dispersed**,"[148] which facilitated each FTO's attacks against Americans in Afghanistan and Iraq from every mode of cell, function, operative, and

Qaeda and Hezbollah's long-standing tactical cross-pollination through joint training facilitated by the IRGC, including its Qods Force; **(ii) long-term economic and logistical alliances concerning key funding and weapons streams**, *e.g.*, Hezbollah's and the Qods Force's narcotics venture with al-Qaeda and the Haqqani Network; and **(iii) leadership emphasis**, including, but not limited to, that of Usama bin Laden (al-Qaeda), Sirajuddin Haqqani (al-Qaeda; Taliban, including its Haqqani Network), Hassan Nasrallah (IRGC, including its Hezbollah Division), and Qassem Soleimani (IRGC, including its Qods Force).

[147] Vittori, *Terrorist Financing*, at 147 (while "no terrorist organization ha[d] ever 'gone global' to the theoretical extent of a [Trans-National Corporation]," "al Qaeda represent[ed] the closest [] so far" because "[l]ike a hypothetical [Trans-National Corporation], al Qaeda operate[d] globally, with cells or supporters on all continents except Antarctica, including the most developed countries, … and the most collapsed").

[148] *Id.* (al-Qaeda was "[n]ot only" "geographically dispersed, but also *functionally dispersed*": al-Qaeda and its allies "[r]esourc[ed]" attacks against Americans from "across [the] spectrum of

partner, including, but not limited to, their own – and one another's – financiers, logisticians, black market traders, and recruiters;

(iii)    were **U.S. Dollar-focused** and emphasized stockpiling as much American currency as possible in as many geographies as possible to support as many functions as possible, which aided each FTO's ability to sustainably finance the networks necessary to facilitate terrorist attacks against Americans in Afghanistan and Iraq after 9/11;[149] and

(iv)    leveraged **relationships with corporate and financial partners specifically known for lacking ethics**, like Defendants, which afforded each FTO benefits by allowing such FTOs to better conceal their operatives, fundraising, or U.S. Dollar transfers, *e.g.*, when SCB Dubai helped a Hezbollah front conceal its conduct, or when DBTCA facilitated an al-Qaeda cell's VAT fraud.

238.    ~~Dr. Jodi Vittori, "[N]o terrorist organization has ever 'gone global' to the theoretical extent of a [Trans-National Corporation], but al Qaeda represents the closest manifestation so far.  Like a hypothetical [Trans-National Corporation], al Qaeda operates globally, with cells or supporters on all continents except Antarctica, including the most developed countries, … and the most collapsed … Not only is al Qaeda geographically dispersed, but also functionally dispersed.  Resourcing across spectrum of the organization – financing, tangible goods, training, recruitment, and logistics – occurs throughout the world and uses multiple nodes."[150]~~

---

the[ir] organization[s] – financing, tangible goods, training, recruitment, and logistics – [which] occur[red] ***throughout the world*** and use[d] ***multiple nodes***") (emphasis added).

[149] Al-Qaeda and its allied did so by maximizing their own (and their allies') U.S. Dollar reserves through and 6-, 7-, and 8-figure U.S. Dollar balances, and similarly-sized U.S. Dollar cash transfers, through banks and remitters like Defendants.  Like corporations, from 2001 through 2020, these terrorist groups prioritized stockpiling large balances of U.S. currency by, among other ways, cooperating with their Syndicate allies (in the case of Syndicate members) in addition to Hezbollah and the Qods Force (for assistance with money laundering, narcotics, and other financial matters).  Under this strategy, "Al Qaeda [and] the Taliban," including its Haqqani Network, "use[d] conventional banks to transfer money to underwrite their global terrorist activities" "because" banks "offer[ed] a broad range of financial services, rapid transaction security, and wide geographic availability."  Gurulé, *Unfunding Terror*, at 181.

[150] ~~Vittori, *Terrorist Financing*, at 147.~~

122.   Al-Qaeda led the Syndicate's transnational financial efforts just as it led the planning and commission of attacks:  in the leadership role as the parent corporation, but working closely as an ally or agent, of its Syndicate partners.  franchises (*e.g.*, the Haqqani Network) and partners (*e.g.*, D-Company, Hezbollah, and the Qods Force).

239.123.        For example, al-Qaeda (alongside the Haqqani Network) has traditionally managed the Afghan Taliban's opium activities outside of Afghanistan, including, but not limited to, the export, sale, laundering, and repatriation of drug profits back to al-Qaeda and the Taliban (including the Haqqani Network) to support terrorist operations.  Historically, al-Qaeda and the Haqqani Network extracted commissions, ranging from ten percent (10%) to twenty percent (20%) on the income derived from the opium pipelines they managed for the Taliban, and through such close coordinationalliances, each member of the Syndicate member funded the shared terror enterprise.

240.   From 2001 through 2016, al-Qaeda followed a globalized strategy that ignored borders and read like something that might be followed by a "Multi-National Corporation" for terror.  Al-Qaeda's borderless, MNC-style approach to terror obliterated traditional terrorism theories, which suggested that terrorist groups were only substantially supported by allies who were in-country or a nearby geography.  Bin Laden, like Khanani and other al-Qaeda terrorist financiers, understood that while most global financial institutions and money remitters with ties to America were no longer open for business to al-Qaeda, there would always be outliers in any market who deviate from the norm and attempt to profit through crime.  For al-Qaeda, the willingness of certain financial institutions and money remitters, like Defendants, to act as Laundromats offered incomparable economic, financial, logistical, operational, and communications advantages for al-Qaeda and its Syndicate allies.

124.    After 9-11, al-Qaeda and the Taliban (including its Haqqani Network) – like their Islamist allies Hezbollah and the Qods Force – depended upon ~~its~~ a latticework of transnational terrorist ~~finance infrastructure~~financial and logistical cells, partners, cut-outs, and agents on every continent but Antarctica.  Similarly, and also like their Islamist allies Hezbollah and the Qods Force, al-Qaeda and the Taliban (including its Haqqani Network) relied upon cooperative "joint cell" or "fusion" approaches in which terrorist organizations fused with others into hybrid cells, funding streams, logistical pipeline, transportation routes, and the like, which ~~it often accessed through~~was led by Syndicate polyterrorists like Sirajjudin Haqqani.

125.    Ever since 9/11, and continuing through today, al-Qaeda and the Taliban, including its Haqqani Network, have depended upon the totality of the terrorists' global relationships ~~with other Syndicate groups, to maintain a~~to sustain the high attack tempo against Americans in Afghanistan. ~~According to~~ that was necessary to eventually drive the U.S. out in 2021 and achieve a key goal for every affiliated terrorist, including, but not limited to: (i) al-Qaeda; (ii) the Taliban, including its Haqqani Network; (iii) Hezbollah; and (iv) the Qods Force.

126.    As Dr. Jodi Vittori~~, "Under a [~~ explained, "[u]nder" the post-9/11 "[Trans-National Corporation] structure~~, terrorists ~~" these Islamist terrorist allies "create[d] an alliance network of sympathetic groups that provide[d] the parent organization its true regional or global reach~~" and,~~" which "was a tactic first developed by al Qaeda," ~~which~~for whom the global hubs strategy "remain[ed] *its primary means to maintain a high operational tempo*, even while its leadership ha[d] limited mobility and communications on the Pakistan-Afghanistan border."[151] ~~As Under Secretary for Terrorism and Financial Intelligence David S. Cohen explained in 2012,~~

---

[151] Vittori, *Terrorist Financing*, at 160~~.~~ (emphasis added).

241.127.        In 2012, the Treasury Department stated that the Syndicate's "financial networks [were] ***instrumental in funneling money for terrorist operations*** [in Afghanistan].""]"[152]

242.128.        The Syndicate's strategy for both sides of the terrorist finance coin – illicit fundraising and illicit fund transfer – depended upon its ability to maintain a diversified international financial portfolio befitting the global transnational enterprise it was.  This meant that al-Qaeda and the SyndicateTaliban, including its Haqqani Network, prioritized several streams of illicit fundraising, including the protection money it obtained from corrupt corporations, the income it derived from the Afghanistan-to-Russia Opium Pipeline, funds raised through fraud schemes, (particularly large-scale VAT frauds.), and overseas donations, to name four examples.

243.        For every strategy, al-Qaeda and the Syndicate could stretchTaliban, including its Haqqani Network, stretched its financial resources the most – and killkilled the most Americans – throughvia a balanced and diversified global financial portfolio, for which it required thethe terrorists needed the institutional services of both global financial institutions and money remitters.  As Mr. Zarate, who served as the first ever assistant secretary of the Treasury for terrorist financing, explained inIn his acclaimed2013 book, *Treasury's War:*

129.    [S]temming, Mr. Zarate explained how "stemming terrorist financing … plays" "play[ed] an important role in stemming terrorism itself for three fundamental reasons: [1] it makes it harder, costlier, and risker for terrorists to raise and move money; [2] it forces terrorist leaders to make tough budget decisions; and [3] it ***constricts the global reach of their***

---

[152] *Id.* Press Release, U.S. Dep't of Treasury, *Treasury Targets Money Exchange House Operator for Supporting the Taliban* (Feb. 26, 2013).

***organizations***. … When a counter-terror-finance effort is successful, it ostracizes known financiers from the formal financial and commercial worlds and deters fundraisers, donors, and sympathizers from giving support and money to terrorist groups. … If done well, a campaign to disrupt terrorist financing not only ***stops attacks***, but can change ***the strategic reach and trajectory of the enemy's network***.[153]"[154]

244.    "Unfortunately," according to Mr. Zarate, "when there [was] money to be made" and a "staggering" "magnitude" of "illicit transactions" from which a bank could profit if it operated a Laundromat, a subset of global financial institutions, money remitters and corporations determined—even after 9/11—their "[c]rime" could "pay" because "[w]here there is money to be made and moved, financial institutions will be implicated":

> Banks and financial intermediaries will continue to ***weigh the balance between making significant amounts of money while doing business with suspect customers*** and the need to apply the most stringent financial controls and standards on money flowing through their systems.  ***We have seen this over and over with multinational banks***, including, most recently, ***HSBC and Standard Chartered***.  There is little mercy for those … [i]nstitutions that attempt to evade sanctions and scrutiny in order to tap lucrative business lines or markets.[155]

245.    Thomas Creal served in Afghanistan as the Lead Forensic Accountant for Task Force 2010, which examined how "dirty money" aided Syndicate attacks.  In 2017, he explained the key role financial institutions like Defendants played for the Syndicate:

> Having served in Afghanistan … as the lead forensic accountant [for Task Force 2010] I saw up close the start of dirty money and subsequently how it was moved around the world, using banks … The money movers are critical as Al Capone witnessed … [and] can be banks, very large banks, as seen by recent billion dollar settlements by … ***Deutsche Bank***, … and others.  But the funds were dirty as they

---

[153] Zarate, *Treasury's War*, at 29.

[154] Juan Zarate, *Treasury's War: The Unleashing Of A New Era Of Financial Warfare* 29 (PublicAffairs 2013) (emphasis added) ("Zarate, *Treasury's War*").

[155] *Id.* at 370.

entered the bank[s] … I suggest a refocus on black money, the banks, hawalas and money movers. The amounts will be billions of dollars and as once a tactic by … George Washington, if you bankrupt the enemy you will win the war.[156]

246.    According to Mr. Zarate, the former assistant secretary of the Treasury for terrorist finance, even in a well-functioning financial system, there will always be a need to "target" "bad banks" that make a conscious decision to embrace enormous criminal risks to profit from serving the terrorist financiers who could not do business with responsible banks:

Bad banks would be our target.  There are *always banks engaged in fraudulent and criminal activity someplace in the world* … More interesting, for our purposes, were the banks serving … terrorist networks.  They not only provide criminals access to banking services, but also allow for illicit financial activity to be hidden from the view of regulators, law enforcement, and intelligence services.  BCCI, as an all-purpose bank for criminals and suspected terrorists of all stripes, was one such bank that we had seen in the past.  … [T]here were banks around the world that were *serving as nodes of illicit financing*.  At these banks, the dirty money of suspect actors mixed to access the international financial system.  For any criminal or terrorist enterprise to have global and sustained reach, it must have a financial infrastructure to raise, hide, and move money to its operatives and operations.  Banks are the most convenient and important of these nodes of the financial system and are *critical to nefarious networks*.  Where there is a *transnational network of concern, there is likely also a bank or family of banks serving as a facilitator of that activity*.[157]

130.    At all times After 9/11, counter-terrorist finance practitioners universally understood that there was a direct, no-steps linkage between al-Qaeda, Taliban (including Haqqani Network), Hezbollah and/or Qods Force terrorist finance or logistics activities anywhere worldwide and such terrorists' allied strategies to attack Americans in Afghanistan and Iraq.  As a result, any bank or remitter that suggested at the time (or now) that a terrorist finance or logistics-related transaction by al-Qaeda, the Taliban (including its Haqqani Network), Hezbollah, and/or the Qods Force require multiple links in a chain before such aid facilitated

---

[156] Thomas Creal (Former U.N. Panel Expert and Lead Forensic Accountant for Task Force 2010), *A Re-Focus on Black Money*, PR NewsChannel (Apr. 20, 2017), 2017 WLNR 12209363.

[157] Zarate, *Treasury's War*, at 8 (emphasis added).

terrorist attacks against Americans in Afghanistan or Iraq was followed an approach that directly conflicted with U.S. counter-terror finance policy after 9/11 and universal counter-terrorist finance norms broadly practiced by responsible banks and remitters throughout the world since 2001.  Former Treasury official Juan Zarate, for example, confirmed that such views were the foundation of U.S. strategies to protect against al-Qaeda and the Taliban after 9/11.[158]

131.    Moreover, as terrorist finance scholar Jayesh D'Souza explained in his 2012 book, *Terrorist Financing, Money Laundering, and Tax Evasion*, "[t]here [was] consensus ," after 9/11, "that the heart of terrorism [was] its financing," "stopping the flow of funds to terrorist groups [was] like sticking a dagger into the heart of the problem," and it was "evident" that "al-Qaeda" embodied "[t]he international nature of financial crime."[159] By 2007, as the British government explained at the time, "Al-Qaida" and its affiliates had "attacked over 25 countries and killed thousands," supported by a latticework of fundraising, logistical and operational cells around the world, under which the Syndicate's "financing" was "equally international with funds very often [] raised in one country, used for training in a second, for procurement in a third and for terrorist acts in a fourth."[160]

247.132.    In this Complaint, Plaintiffs refer to terrorist financing and its composite activities—money laundering, tax fraud, and tax evasion—as "financial crime" consistent with broad post-9/11 practice.[161]

---

[158] *Id.* ("When a counter-terror-finance effort is successful, it ostracizes known financiers from the formal financial and commercial worlds and deters fundraisers, donors, and sympathizers from giving support and money to terrorist groups. … If done well, a campaign to disrupt terrorist financing not only stops attacks, but can change the strategic reach and trajectory of the enemy's network.").

[159] D'Souza, *Terrorist Financing*, at 27.

[160] *Id.*

[161] *Id.*

248.    According to Professor Gurulé, "The major methods used to move terror money include the traditional banking system, alternative remittance systems, such as hawala, and bulk cash couriers.  Contrary to popular belief, terrorists use banks and other financial institutions to transfer funds.  Deposit-taking institutions are particularly attractive because they provide an extensive range of financial services.  Also, banks provide wide geographic availability either through their foreign branch offices or through correspondent accounts with foreign banks.  Finally, large sums of money can be transferred instantaneously from a bank located in the United States, through bank accounts in the Middle East, to an offshore account in some other foreign country with the push of a button."[162]

133.    Al Qaeda's uniqueKey NATO allies have confirmed al-Qaeda's and the Haqqani Network's global strategy for facilitating attacks against Americans in Afghanistan and Iraq through cell activities on six continents.  For example, the United Kingdom publicly confirmed in 2007 that al-Qaeda and its affiliates had "attacked over 25 countries and killed thousands," which the U.K. concluded was supported by al-Qaeda's global web of fundraising, logistical and operational cells operating on six continent, under which the al-Qaeda's and the Haqqani Network's "financing" was "equally international with funds very often [] raised in one country, used for training in a second, for procurement in a third and for terrorist acts in a fourth."[163]

249.134.    Through each FTO's globally dispersed financial and logistical structure meantintegrated terrorist networks – which also benefited from cross-pollination amongst each other – al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force ensured that the Syndicate supported its terrorist campaign in Afghanistan not from 4 or 5 countries but from 4 or

---

[162] Gurulé, *Unfunding Terror*, at 151.

[163] *Id.*

5 *dozen* countries.  By doing so, al-Qaeda could ensure that the Syndicate could ruthlessly exploitcapitalized on any opportunitieschances presented by a complicit financial institution.bank, remitter, or corporation.  As a result, preventing al-Qaedaterrorist attacks against Americans in Afghanistan and Iraq meant stopping al-Qaeda, Haqqani Network, Hezbollah, and Qods Force financiers from finding entry points into the global financial system, and, most of all, the U.S. financial systemmarkets.  For this reason, after 9/11, any bank or remitter that operated as a "Laundromat" affirmatively chose to support terror no differently than if it directly delivered money to al-Qaeda or, the Haqqani Network, Hezbollah, or the Qods Force.   According to Professor Gurulé, "[t]he international economic sanctions regime established" after 9/11 were "the *sole vehicle for truly global action against the twin threats of al Qaeda and the Taliban*.'"[164]

### 1. Al-Qaeda And The Haqqani Network Relied Upon Transnational Crime As A Key Source Of Terrorist Finance

250.135.     Al-Qaeda and the Haqqani Network, like their allies Hezbollah and the Qods Force, operated transnational terrorist finance and logistics enterprises, which they used in order to fund, arm, and logistically support Syndicate anti-American terrorists in Afghanistan and Iraq from a constellation of al-Qaeda and Haqqani Network terrorist cells worldwide scattered across six continents, including but not limited, to such groups' cells in Europe, Asia, and the Middle East.   Every specific terrorist operative, agent, cut-out, or front identified in this Complaint hails from these cells, or otherwise aided them.

251.136.     The Syndicate'sIt would not be proper to suggest that the terrorist logistics, financial, and/or operational activities of al-Qaeda, the Taliban (including its Haqqani

---

[164] *Id.* at 233.

Formatte

Network), other Syndicate members, or their Islamist allies like Hezbollah and the Qods Force, segregated their cells such that financial, logistical, and operational activities by one cell in one region does not benefit the broader linked terrorist campaigns in Afghanistan and Iraq.  To the contrary, al-Qaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's income derived from criminal activity in Afghanistan, Pakistan, the U.A.E., Iraq, Iran, Russia, Asia, the Americas, and Europe directly funded Syndicate terrorist attacks against Americans in Afghanistan and Iraq.  According to Dr. Kimberley L. Thachuk, "the large amounts of money realized through criminal activity allow[ed] [Syndicate] terrorist criminal enterprises to prosper, increase their numbers, and buy matériel in support of terrorist plots."[165]

252.137.    From 9/11 to 2016, al-Qaeda andQaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's, transnational finance and logistics activities depended upon the groups' complete fusion of crime with terrorist finance worldwide. According to Christopher Brown, a terrorism analyst at the Hudson Institute, to prevent attacks it was vital to "target the logistical foundation on which [terrorism] operates," meaning "the means and methods by which the groups communicate, are financed, manage transportation and supply operations. …Whether it is the Russian [M]afia supplying weapons, the Chinese Triads distributing al Qaeda-grown heroin or banks knowingly laundering criminal and terrorist funds, these international criminal organizations *form the logistical base that makes it possible for the terrorists to operate*."[166]

---

[165] Dr. Kimberley L. Thachuk, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime* 22 (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) ("Thachuk, *Terrorist Criminal Enterprises*").

[166] Christopher Brown (Transitions to Democracy Project at the Hudson Institute), *Plan B on Terror*, Washington Times (July 10, 2005), *2005* WLNR 10855164.

253.138.       The U.S. government also repeatedly recognized the foreseeably close linkage between transnational crime in Afghanistan, Pakistan, the Middle East, Russia, and Europe, on the one hand, and al-Qaeda-ledterrorist violence against Americans in Afghanistan and Iraq committed by proxies of al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, on the other.

254.139.       Indeed, the Syndicate'sIndeed, al-Qaeda's, the Taliban's (including its Haqqani Network's), Hezbollah's, and the Qods Force's operations went beyond "nexus" to the point of achieving a complete "fusion" with transnational organized criminal organizations, like the Russian Mafia, as a single cohesive entity on the subject matters upon which the Syndicate these terrorists cooperated with itstheir criminal allies.  Christopher A. Kojm,, often through the same people.  For example, Altaf Khanani was a Syndicate member who served as Director ofhelped move its money working closely with the National Intelligence Council of the Office of the Director of National Intelligence from 2009 through 2014, explained that, by the 2000sRussian mafia and ever sinceDefendants.  Moreover, after 9/11, there was often a complete "fusion" between terrorist groups like the Syndicate and transnational organized crime groups like the Russian Mafia:

> [A]cross many terrorist organizations, [] there is a ***complete fusion*** of terrorist and criminal activity.  ***There is not a "nexus" between the two worlds; they are one and the same.*** … [C]ompelling examples [show] how ***criminal activity is inseparable from every aspect of terrorist organizations*** and their behavior.  … [T]here are many implications of the ***fusion of these two world***s. [including that] … [w]e cannot understand the phenomenon of terrorist criminal enterprises when analysis takes place in separate [lanes]. …[167]

---

[167] Christopher A. Kojm, Foreword in *Terrorist Criminal Enterprises: Financing Terrorism Through Organized Crime* viii-ix (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) (emphasis added).

255.    In their book, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime*, Dr. Kimberley L. Thachuk, the former National Counterintelligence Officer for Transnational Issues, and Dr. Rollie Lal, a professor of Security Studies at George Washington University, explained the fusion between Counter-terrorism and organized crime after 9/11:

140.    ~~Terrorism has~~professionals recognize that, because "[t]errorism [] steadily gangsterized over the past several decades~~. … Financing,~~"  "[f]inancing terrorist operations ~~today, [],~~" "including ~~the payment of~~" "pay[ing] clandestine operatives and ~~the purchase of~~" "purchas[ing] [] weapons and explosives, ~~requires~~require[d] the types of transactions that only illicit operations ~~can~~[could] satisfy~~. As~~" and, "[a]s such, the evolution to terrorist criminal enterprises ~~has "~~"not only enabled many terrorist groups to survive and expand, but it also ~~has "~~"afforded them added resiliency and mobility~~. … [R]ather than continuing to treat terrorists solely as zealots, such groups should be understood for their engagement in complex illicit commerce. … Articulating the combined ideological goals *and* criminal activities of terrorist criminal enterprises will be necessary to … effective counterterrorism strategies. … [O]utmoded and stovepiped conceptualizations [] treat terrorism and organized crime as distinct entities. … Although at one time there was significant evidence of a "nexus" with organized crime, or a terrorist-criminal continuum, **such symbioses may have been largely transcended altogether**. Hence, breaking the false dichotomy that defines these groups as separate phenomena will [help in the effort to] … deter and dismantle terrorist groups.~~"[168]

---

[168] Dr. Kimberley L. Thachuk and Dr. Rollie Lal, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime* 1-3 (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) (emphasis added) ("Thachuk and Lal, *Terrorist Criminal Enterprises*").

256.141.        ~~The Syndicate's~~Al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's shared "fusion" strategy obliterated the distinction between organized crime and terrorist criminal enterprise operations in geographies that posed a high risk of ~~Syndicate~~terrorist finance and logistics in support of attacks in Afghanistan and Iraq, including, but not limited to, Afghanistan, Pakistan, the U.A.E., ~~and~~Iraq, Iran, Russia~~.  According to Dr. Thachuk and Dr. Lal: "Terrorist~~, and parts of Europe, the Americas, Asia and Africa, where "[t]errorist criminal enterprises differ from conventional organized crime only in their motivations for making and spending illicit funds.  Otherwise, the criminal modus operandi is the same."[169]  As a result, according to ~~Dr. Lal~~one terrorism scholar, one must view "terrorist criminal enterprises as the cohesive threat that they are."[170]

257.142.        At all relevant times, the Syndicate, acting through al-Qaeda and the Taliban (including its Haqqani Network), was entrenched throughout Afghanistan's and Pakistan's economies and established as a transnational terrorist enterprise that was known for its universal employment of mafia-like tactics in all transactions.  The Syndicate's collective use of front companies and associated bank accounts reflected such scale.

258.143.        By 2008, the Syndicate had a monopoly on (or, at a minimum, a share of all transactions in) each core aspect of the criminal marketplace in the Afghanistan/Pakistan border regions stretching into the geographic strongholds of each group in Afghanistan and Pakistan, respectively.  The Syndicate's effective participation in all criminal profits in these

---

[169] *Id.* at 7.

[170] ~~Dr. Rollie~~Thachuk and Lal, *Terrorist Criminal Enterprises~~: Financing Terrorism through Organized Crime~~,* at 193 ~~(Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.) ("Lal")..~~

areas extended to organized money laundering, smuggling, criminal extortion rackets, and drugs.[171]

259.144.    With respect to narcotics, because of the Syndicate's control over various chokepoints in the Afghan opium industry, including agricultural supply, labor pool, protection rackets, control over the chemicals necessary for industrial-scale processing, and the export and smuggling routes outside of Afghanistan, even the financial activities of non-Syndicate drug warlords directly funded the Syndicate, because the Syndicate charged a "tax" on every drug deal and every drug lord in Afghanistan and Pakistan.  Indeed, the Taliban (including its Haqqani Network), established elaborate procedures to collect "taxes" from every criminal actor in their geography, and was highly effective at doing so.

260.145.    From 2008 through 2016, the Syndicate's members collectively controlled or contested most of Afghanistan and Pakistan, with respect to geography, population, and areas of economic activity.  In those areas, Syndicate control of criminal economies was so complete that any illicit transaction was likely to fund the Syndicate or benefit a Syndicate front.

261.146.    The Syndicate's tentacles, however, spread far outside of geographies in Afghanistan and Pakistan that the Syndicate contested or controlled.  This was assured by the Syndicate's practice of extracting "donations" or "taxes" from any and all significant players in the Afghani and Pakistani criminal marketplace in areas the Syndicate controlled *or contested* including, most of all, the  narcotics infrastructure, black marketeers selling dual-use goods,

---

[171] Like any other transnational organization that earns income from various streams of goods and services, the Syndicate's level of control over the illicit economy in Afghanistan and Pakistan varied depending on the subject matter.  In some industries, such as narcotics, smuggling, and protection rackets, the Syndicate maintained a functional monopoly in Afghanistan and Pakistan.  For other aspects of the illicit economy, e.g., illegal mining,

*hawala*[172] brokers who move money between (and within) Afghanistan and Pakistan, and notorious money launderers who set up overseas structures dependent on large banks to help al-Qaeda and the Haqqani Network transfer their overseas profits back to accounts controlled by al-Qaeda, the Haqqani Network, and their Syndicate allies.

262.147.       The customary "donation" or "tax" was ten percent (10%) to twenty percent (20%) of the criminal's profit from the transaction.[173]  In this way, the Syndicate leveraged its mafia-like practices to ensure that all major criminal revenue streams in Afghanistan and Pakistan directly or indirectly funded the Syndicate's attacks against Americans in Afghanistan.  Since the Syndicate controlled or contested nearly all of Afghanistan, and much of Pakistan, by 2009, its geographic reach was substantial and included most of the geographies in Afghanistan and Pakistan in which Defendants conducted business or engaged in sales or transaction-related activity, ensuring the Syndicate's ability to collect its standard "taxes," directly or indirectly, from most illicit activity in most parts of Afghanistan and Pakistan.

263.148.       The Syndicate also extracted significant income from the "taxes" it imposed on criminal activity in the U.A.E., as well as amongst Pakistani and Afghan diaspora in Europe, the Middle East, and Asia.

264.149.       Al-Qaeda and the Haqqani Network also followed long-standing al-Qaeda doctrine that called for jihadists to achieve monopolies in key industries operating in their

---

[172] A *hawala* is an old form of money transfer. In a nutshell, a person hands money to one *hawala* operator, for the benefit of a second person near a second *hawala* operator somewhere else in the world. The second person can immediately get the money from the second operator, and the two *hawala* operators square the transaction between themselves. *Hawala* networks rely on trust between operators, and therefore often involve close-knit structures like extended families or communities.

[173] These numbers are separate from the customer 2.5% contributions often made as *Zakat*, which is a form of contribution long relied upon by al-Qaeda, the Taliban (including its Haqqani Network), and every other member of the Syndicate.

geographies to leverage such monopolistic power as a vehicle for terrorist fundraising, finance, and logistics.  For example, when bin Laden was based in Sudan before 9/11, he famously supported al-Qaeda operations through a host of activities that leveraged al-Qaeda and its affiliates' monopoly on various Sudanese agricultural industries to support terrorist operations.

> **2.      The U.S. Financial System Was Key To Syndicate Operations And The U.S. Dollar Was The "Gold Standard" For ~~Syndicate~~The Syndicate's And IRGC's Terrorist Fundraising And Finance**

~~265.~~150.         The U.S. Dollar was, and is, the "gold standard" of Syndicate terrorist finance throughout the Middle East and Asia, including in Afghanistan, Pakistan, and the U.A.E. Like any other large transnational enterprise that is dependent upon purchasing key parts through commercial markets, the Syndicate and its constituent members sought to improve their operational efficiencies – *e.g.*., buy more bomb parts and pay for more terrorists – by strategically maximizing the value of their currency holdings.  No other currency provides the terrorists with the overall advantages of the U.S. Dollar.

~~266.~~151.         Al-Qaeda and the Haqqani Network, as managers for the Syndicate's transnational finances, employed a blended terrorist finance strategy in which they used large global financial institutions, regional Pakistani banks, and *hawalas*.  In most large cross-border transactions, large global financial institutions played a role in the movement of U.S. Dollars even when the final disbursement of the money was handled by a *hawala* broker.  In this way, global financial institutions that could access the U.S. financial system, ~~like the~~*e.g.*, Defendants, played an especially vital role in al-Qaeda and the Haqqani Network's ability to repatriate their illicit income, which typically was USD-denominated, and came in large, chunky amounts from dozens of countries.  This made it harder to initially move the payments through a regional bank or the *hawala* system, since both tended to work best for smaller-scale transfers (*e.g.*., 5-figure or

6-figure) rather than bulk 7- and 8-figure USD cash transfers that were common in the Syndicate's opium trade.

267.152.    While al-Qaeda and the Haqqani Network could – and did – use regional Pakistani banks to raise and launder millions of dollars for direct use in terrorist operations throughout Afghanistan, it also used global financial institutions to accomplish the industrial-scale global profit repatriation from its transnational criminal enterprise, including narcotics.

268.153.    Apart from the U.S. Dollar's universally recognized status as the world' reserve currency, the Dollar is independently the currency of choice for every major global narcotics cartel, including the Syndicate and its agent, the Russian Mafia.

269.154.    Syndicate terrorists, including members of al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, prioritized terrorist fundraising and finance strategies that targeted U.S. Dollars, which the terrorists knew, like their corporate counterparts, provided the greatest return on their terrorist finance investment.

270.155.    After 9/11, a common strategy emerged amongst Syndicate terrorist financiers who required U.S. Dollars given their geographic, commercial, or operational needs, but sought to avoid interacting with American banks that were rigorously following post-9/11 financial rules:  partner with a European or Middle Eastern bank notorious for laundering money and possessing a branch in the United States, and use the European or Middle Eastern banking partner's Laundromat, and U.S. branch, to source U.S. Dollars while leveraging the intentionally built-to-fail compliance systems at the European or Middle Eastern bank being used.

271.156.    The Syndicate's widespread protection money rackets show how the Syndicate leveraged financial institutions and money remitters to obtain the U.S. Dollars that

turbocharged the power of its key terrorist fundraising schemes.  From the mid-2000s through present day, the Syndicate has operated a nation-wide protection money scheme throughout Afghanistan, and much of Pakistan, through which it earned vast sums of money each year to fund attacks against Americans in Afghanistan.  The Syndicate's ability to access the international financial system and conduct U.S. Dollar-denominated transactions magnified the potency of its protection money rackets by, among other things, providing the mechanisms by which to manage and distribute the enormous cash flow from payments made by corporations and contractors doing business in Afghanistan and Pakistan.

### 3. Al-Qaeda And The Haqqani Network Were Aware Of The Laundromat Market Signals Communicated By Banks And Remitters

272.    "Ultimately," according to Professor Gurulé, "much of the burden of securing [] financial services against abuse by terrorist organizations must be borne by financial institutions."[174]  Al-Qaeda understood this as well.

273.    Writing in 2005, when each Defendant was already aiding al-Qaeda or about to begin doing so, Mr. Kochan explained that "terrorists [] waged wars on the financial system to fund their outrages" after 9/11 "and companies [] made themselves available" to such groups "in a Faustian laundering pact."[175]  He explained:

Criminals need the services provided by global corporations especially banks and other financial institutions, to move and clean their money.  *Criminals in developing countries look to Western banks for a huge array of devices* that include offshore companies and tax structures, false names for their bank accounts, and lawyers and accountants for their complex financial structures.  *Some banks will provide them willingly, satisfying the authorities with the formalities of due diligence* that have increased in volume in recent years in response to the perceived terrorist threat to the economic system. … [H]owever it comes about, … [t]he maker of the corrupt or fraudulent money and the financial

---

[174] Gurulé, *Unfunding Terror*, at 173.

[175] *Id.*

institution who helps move it are equally complicit in a process, where both are conspirators, in both parts of the activity.[176]

274.    Defendants' transactions with the Syndicate reflected a long-standing tacit deal between each Defendant and the Syndicate—*not* that that the Syndicate "tricked" any Defendant into aiding it.  Former federal undercover agent Robert Mazur spent a career investigating the flow of dirty money through the global financial system and explained that each Defendant's conduct reflected a long-standing tacit deal between each Defendant and the Syndicate:

> Court filings show that since 2006 more than a dozen banks have reached settlements with [DOJ] regarding violations related to money laundering[,] … [including] Standard Chartered.  All admitted to criminal offenses; all were handed the equivalent of traffic tickets.  This has been the U.S. government's playbook in fighting terrorism and the drug trade. **C.    Al-Qaeda Leader Sirajuddin Haqqani Served Both Al-Qaeda And The Taliban, Including Its Haqqani Network, Optimized The Syndicate's Transnational Terrorist Enterprise And Partnerships With Other FTOs, Including Hezbollah And The Qods Force, And Facilitated The FTOs' Shared Terrorist Campaign Targeting Americans In Afghanistan**

157.    From 2006 through today, Sirajuddin Haqqani was one of deadliest terrorists in the world, responsible for more finance, logistics, attack planning, and leadership activities in furtherance of the al-Qaeda/Taliban attack campaign targeting Americans in Afghanistan than almost any other terrorist in the world.  Indeed, Sirajuddin was the single most important al-Qaeda leader after 9/11 aside from bin Laden himself (and only one remains alive).

158.    Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

---

[176] Kochan, *The Washing Machine*, at x.

159.    By 2008, Sirajuddin Haqqani was simultaneously:   (1) a senior al-Qaeda operative, leader, and attack planner, who served as the most important member of al-Qaeda's military council (essentially, it's terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

160.    On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.[177]

161.    When the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT, it noted that he "has also acted on behalf of al-Qa'ida and has been linked to al-Qa'ida military operations."[178] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

### 1.    Sirajuddin Haqqani Was A Key Al-Qaeda/Taliban Leader

162.    By joining al-Qaeda management, Sirajuddin Haqqani achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign, through Sirajuddin's service on behalf of the Syndicate as a dual-hatted al-Qaeda/Taliban terrorist.

---

[177] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended,* 73 Fed. Reg. 12,499 (Mar. 7, 2008); Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012).

[178] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

163.    Whenever Sirajuddin Haqqani acted as a dual-hatted (al-Qaeda/Taliban) polyterrorist and simultaneously providing polyterrorist financial, logistical, operational, attack planning, and leadership services to aid al-Qaeda and the Taliban, such conduct comported with bin Laden's programmatic emphasis since the 1980s, which strongly encouraged al-Qaeda terrorists to join other allied groups, and vice versa, in order to grow the al-Qaeda brand and develop more affiliate relationships for one primary purpose:  killing Americans.  Indeed, by design, al-Qaeda operatives were often members of other Pakistan-based al-Qaeda affiliates, most commonly, the Haqqani Network and Lashkar-e-Taiba.

### 2.    Sirajuddin Haqqani Helped Lead Al-Qaeda's And The Taliban's Global Transnational Terrorist Enterprise To Facilitate Syndicate Attacks Against Americans In Afghanistan

164.    Sirajuddin Haqqani's polyterrorist status matters because Sirajuddin was one of the key al-Qaeda terrorists who led Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012, which relied upon Sirajuddin and the Haqqani Network to help al-Qaeda leverage every transnational relationship that the Haqqani family, or al-Qaeda's other non-Haqqani leaders, maintained with other FTOs, including Hezbollah and the Qods Force, to drive the U.S. out of Afghanistan.  Throughout the decade after the peak of the anti-American attacks in Afghanistan from 2010 through 2012, and continuing until the fall of Kabul, Sirajuddin's polyterrorist services directly or indirectly strengthened the assistance provided by *every* FTO and SDGT identified in this Complaint.

#### i.    Sirajuddin Haqqani Leveraged His Unique Biography To Serve As A Transnational Terrorist Consensus Builder Who Erected Bridges Between FTOs

165.    When Plaintiffs were attacked, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda, the Taliban (including its Haqqani Network), and the IRGC (including its Hezbollah Division and Qods Force).

166.     Aside from his reputation for being an al-Qaeda terrorist and mobster,  Sirajuddin Haqqani also benefited from his unique biographical narrative, which gave Sirajuddin what amounted to a Syndicate "terrorist superpower"—the demonstrated ability to equally inspire (through respect, fear, or both) the global community of al-Qaeda and Taliban operatives, financiers, fundraisers, logisticians, attack planners, agents, and corrupt allies in the international financial and corporate communities (including Defendants) who were necessary for the Syndicate to succeed in its terrorist campaign against Americans in Afghanistan.[179]

167.     Like his father Jalaluddin, Sirajuddin Haqqani was also famous for his pragmatism in defense of his extremism and was a "consensus builder" in the organizational and partnership sense who strove to cut deals with potential allies who shared his desire to attack Americans in Afghanistan.  Sirajuddin was willing to do deals and make trades with people, groups, and governments whom he may otherwise wish to kill if the deal in question made it more likely that al-Qaeda and the Taliban, including its Haqqani Network, could kill Americans in Afghanistan.

ii.     **Sirajuddin Haqqani Facilitated Close Collaboration Between Al-Qaeda, The Taliban, And The IRGC That Funded, Armed, And Supported Attacks Against Americans In Afghanistan**

168.     Sirajuddin Haqqani ranked among the Syndicate's most important transnational leaders and played a vital role in harmonizing al-Qaeda's various strategies and tactics and optimizing al-Qaeda and Taliban network efficiencies with each other, and with Syndicate

---

[179] For his entire life, Sirajuddin Haqqani was continually exposed to the leaders of al-Qaeda (*e.g.*, bin Laden) and the Taliban (*e.g.*, Sirajuddin's father, Jalaluddin), who groomed Sirajuddin for leadership form a young age and encouraged Sirajuddin's development of his comprehensive al-Qaeda and Taliban terrorist skillset, which afforded the Syndicate an unparalleled ability to integrate nearly every aspect of al-Qaeda's and the Taliban's global terrorist superstructure supporting Syndicate attacks against Americans in Afghanistan from 2006 to 2021.

partners like the IRGC.  Thus, for example, if an al-Qaeda operative needed to smuggle $500,000 in a duffle bag into Afghanistan (before it fell), Sirajuddin could ensure that the Haqqani Network facilitated an efficient, safe, and reliable smuggling solution for its al-Qaeda partner so that the al-Qaeda cash could help fund attacks against Americans in Afghanistan. Similarly, if a Qods Force "security" operative needed secure travel into Paktika Province (a Haqqani Network stronghold), Sirajuddin's pragmatic alliances meant that the Qods Force terrorist could contact someone from the Haqqani clan and make the necessary arrangements.

169.    When Plaintiffs were injured between 2011 and 2017, Sirajuddin Haqqani served as the top dual-hatted al-Qaeda/Taliban terrorist responsible for ensuring the close collaboration between al-Qaeda, the Taliban, and their IRGC allies, including Hezbollah an dhte Qods Force. This role comported with the Haqqani Network's most important, long-standing core competency:  its ability to fund terrorism through the operation of the Haqqani Network as a transnational terrorist mafia family (that is part of the Taliban), which profited from, among other things, illicit cross-border income through activities like narcotics trafficking.

170.    Acting as a dual-hatted leader serving both al-Qaeda and the Taliban, Sirajuddin Haqqani (and certain of his family members) coordinated key aspects of both groups' key transnational-facing aspects of the Syndicate's terrorist campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists.  Each below attack campaign or type constituted an act of international terrorism committed by al-Qaeda, the Taliban, including its Haqqani Network, that was aided by the IRGC, including Hezbollah and the Qods Force.

(i)    **Kabul Attack Network Attacks.**  Sirajjudin Haqqani planned and authorized the Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a tactical priority – that were committed by joint al-Qaeda/Taliban/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces.

(ii)     **Fertilizer Bomb Attacks.**  Alongside al-Qaeda, Sirajjudin Haqqani planned and authorized al-Qaeda's fertilizer bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's strategy for:  (a) sourcing fertilizer; (b) purchasing and transporting fertilizer; (c) operating al-Qaeda bombmaking factories hosted at Sirajuddin's personal network of joint al-Qaeda-Haqqani Network terrorist camps in Pakistan; and (d) deploying fertilizer bombs as IEDs and suicide bombs to attack Americans in Afghanistan.

(iii)    **Suicide Bomb Attack**s.  Sirajjudin Haqqani planned and authorized al-Qaeda's suicide bombing campaign, including, but not limited to, al-Qaeda's and the Taliban, including its Haqqani Network's, shared strategy for:  (a) planning the targets for suicide bomber attacks in Afghanistan; (b) sourcing suicide bombers through al-Qaeda's and the Haqqani Network's long-standing allies, Lashkar-e-Taiba and Jaish-e-Mohammed; and  (c) coordinating the "suicide bomber infrastructure" of camps, madrassas, ratlines, and safehouses, which relied heavily upon al-Qaeda and Haqqani Network resources and polyterrorists like Sirajuddin.

(iv)    **Kidnapping Attacks.**  Sirajjudin Haqqani planned and authorized kidnappings.

(v)     **Transnational Terrorist Finance and Logistics.**  Sirajuddin Haqqani planned and authorized al-Qaeda's and the Taliban's, including its Haqqani Network's, transnational terrorist logistics, including, but not limited to:

  a.   al-Qaeda and the Taliban's transnational financial operations necessary to the success of their: (i) criminal funding efforts, *e.g.*, money laundering, protection rackets, and tax fraud); (ii) fundraising and money movement, *e.g.*, diaspora donations, banking relationships; and/or "tax" collection from the criminal underworld of their diaspora globally, *e.g.*, logistics, communications in the U.A.E., Pakistan, Afghanistan, and Europe; and

  b.   al-Qaeda's and the Haqqani Network's transnational-logistics operations in Afghanistan, Pakistan, and the U.A.E., which ensured that the Syndicate and all its members benefited from a reliable terrorist supply chain, for which Sirajuddin also collaborated with the IRGC, including Hezbollah and the Qods Force, which materially supported the Syndicate's terrorist attacks against Americans in Afghanistan.

(vi)    **Coordination Between FTOs.**  Sirajuddin Haqqani led two FTOs (al-Qaeda and the Haqqani Network) and was responsible for, or supervised those who were responsible for (like his brother Anas) managing al-Qaeda's and the Taliban's (including its Haqqani Network's) relationships with a broad international alliance of allied terrorists, including, but not limited to: (a) the IRGC, including Hezbollah and the Qods Force; and (b) the Pakistani Taliban, Lashkar-e-Taiba, and Jaish-e-Mohammed, each members of the Syndicate.

124

171.     Sirajuddin Haqqani played the roles above from 2006 through 2021, and his above-described activities directly relied upon Defendants' provision of financial services to, among others, the al-Qaeda, Taliban, and/or IRGC (including Hezbollah and Qods Force) agents, operatives, fronts, cut-outs, funders, and partners set forth in this complaint.

172.     For example, every Defendant directly facilitated Altaf Khanani's laundering activities on behalf of the Taliban, which regularly flowed hundreds of thousands, if not millions, of precious U.S. Dollars from Defendants' New York branches through Altaf Khanani and into accounts and companies ultimately owned or controlled by Sirajuddin Haqqani, which supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources that operationalized Sirajuddin's above-described terrorist schemes on behalf of al-Qaeda and the Taliban relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan.

173.     In addition to their assistance to the terrorists through Khanani, most Defendants also knowingly facilitated one or more other non-Khanani-related value streams to Syndicate members or their IRGC benefactors that directly facilitated more attacks by aiding Sirajuddin Haqqani's leadership of the Syndicate's terrorist campaign.

174.     For example, the Standard Chartered Bank and Deutsche Bank Defendants, each knowingly helped notorious fronts for the IRGC conduct transactions that facilitated IRGC terrorist finance and logistics operations that supported al-Qaeda and Taliban attacks against Americans in Afghanistan.

175.     Similarly, the Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants also enabled the activities of the Haqqani Network's VAT fraud cells in the U.S., Europe, Afghanistan, and the U.A.E., which flowed millions of precious U.S. Dollars each year from Defendants' New York branches through the Haqqani Network's VAT fraud cells

worldwide, into accounts and companies ultimately owned or controlled by Sirajuddin Haqqani, which supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources that operationalized Sirajuddin's above-described terrorist schemes on behalf of al-Qaeda and the Taliban relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan.

### 3. Sirajuddin Haqqani Facilitated Al-Qaeda's And The Taliban's Mafia-Like Transnational Criminal Activities, Transactions, And Partnerships That Funded, Armed, And Logistically Supported Syndicate Terrorist Attacks Against Americans In Afghanistan

176.    From 2006 through 2021, Sirajuddin Haqqani was also a key contributor to the fundraising and logistics pipelines upon which al-Qaeda and the Taliban depended to facilitate attacks against Americans in Afghanistan. He did so by facilitating the flow of hundreds of millions of U.S. Dollars' worth of funds, weapons, and logistical support every year from the resources, cells, financiers, logisticians, and fronts controlled by the cells, operatives, and partners supporting al-Qaeda's, the Haqqani Network's, and the IRGC's, including Hezbollah's and the Qods Force's, global networks, through which these FTOs flowed the value, arms, logistics, and personnel necessary to wage their successful two-decade campaign against Americans in Afghanistan.

177.    Sirajuddin Haqqani's father, Jalaluddin served as "the godfather" "to the Taliban and Al Qaeda" who also "dominated" the Afghanistan/Pakistan border "[f]or more than 20 years."  Once Sirajuddin Haqqani replaced his father as head of the Haqqani family's transnational terrorist mafia, i.e., the Haqqani Network, on or about 2008, Sirajuddin quickly set out to modernize the large global criminal empire his father had already established by growing the Haqqani's ambitions, deployment of violence, economic output, criminal reach, and terrorist results.  As an American who was directly threatened by Sirajuddin explained in 2021, "Siraj

Haqqani [was] the terrorist version of Tony Soprano."[180]  While the foregoing quote occurred last year, similar characterizations of Sirajuddin Haqqani were commonplace in the U.S., Afghanistan, and Pakistan from 2008 through 2017, when every Defendant directly aided him.

178.    Sirajuddin Haqqani ensured that al-Qaeda and the Taliban were run with the ruthless efficiency of a mafia organization, like the Haqqani Network had always been under his leadership.[181]  Indeed, as Sirajuddin surged through the al-Qaeda and Taliban leadership ranks form 2006 through 2015, so did the Syndicate's operation as a global terrorist mafia, which aided the Syndicate's terror campaign to force the United States out of Afghanistan.

179.    Through his use of mafia activities to facilitate attacks against Americans in Afghanistan, Sirajuddin Haqqani personified how al-Qaeda and the Taliban pragmatically (from the terrorists' perspective) reinvested their illicit transnational profits to facilitate terrorist attacks against Americans in Afghanistan and create a "virtuous cycle" by aiding the Syndicate's ability to obtain more money from illicit schemes, which, in turn, created new cash flows and funded more attacks.[182]  For example, the Haqqani Network's mafia-like practices materially improved

---

[180] *Quoted in* FOX: Tucker Carlson Tonight, *Biden Puts Pressure on Companies to Force Vaccines; Biden's Drone Strike Killed the Wrong People; Fighting Continues against the Taliban* (Sept. 11, 2021), 2021 WLNR 29808500.   Sirajuddin's father, Jalaluddin served as "the godfather" "to the Taliban and Al Qaeda" who also "dominated" the Afghanistan/Pakistan border "[f]or more than 20 years."  Matthew Carney (Reporter, Australian Broadcasting Corporation), *Program Transcript*, Four Corners (Feb. 23, 2009), 2009 WLNR 3496892.

[181] Greg Miller, *U.S. Eyes A Haven For Militants In Pakistan*, Washington Post (Dec. 17, 2010) ("[C]onsidered part of the Taliban insurgency, and a key ally of al-Qaeda," the Haqqani Network sought "to oust U.S.-led forces from provinces on [Afghanistan]'s eastern edge" after 9/11 "and exert mafia-style control.").

[182] Sirajuddin Haqqani calibrated the Syndicate's illicit transnational activities alongside its terrorist attack operations so that both fueled the other in a "virtuous cycle" for al-Qaeda's attack tempo—more funds paid for more attacks, which additional attacks further increased the coercive power of the terrorists to extract even greater sums of money, which in turn paid for even more weapons, and so on.

the flow of income to each member of the Syndicate from its transnational narcotics income streams because Sirajuddin Haqqani ensured that the Syndicate's customers knew that: (i) they must always pay on time, and in full; and (ii) if they failed to do so, Sirajuddin and his family of terrorist sociopaths would hunt them down, torture them, murder them, and then torture and murder their entire family, which was widely known to be Sirajuddin's usual approach to resolve a criminal underworld-related dispute.

> **4.    Today, Sirajuddin Haqqani Is Now The Most Powerful Al-Qaeda And Taliban Terrorist In The World And Effectively Controls The "Islamic Emirate Of Afghanistan" Through His Responsibility For The "Islamic Emirate's" Weapons, Fighters, Intelligence, And Logistics, And Transnational "Security" Relationships**

180.    For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans (he still is).

181.    Even though he was (and remains) an FBI-Most-Wanted mass murderer with a reputation for savagery that was extreme even by Islamist standards, the *New York Times's* editorial board shamefully elected to publish an op-ed authored by Sirajuddin himself, titled "What We, the Taliban, Want,"[183] on February 20, 2020.  Sirajuddin's op-ed was pure terrorist propaganda designed to persuade an American audience that the Taliban, including its Haqqani Network, had turned a more "inclusive" and "peaceful" page.  Other than its title and the fact that Sirajuddin wrote it, the *Times* opinion piece was propaganda and of no value.

182.    Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.

---

[183] Sirajuddin Haqqani, *What We, the Taliban, Want*, New York Times (Feb. 20, 2020).

183.    Sirajuddin Haqqani and his uncle Khalil Haqqani are now two of the world's most powerful terrorists and operate the transnational criminal organization calling itself the "Islamic Emirate of Afghanistan."  As the *Daily News & Analysis* summarized in September 2021:

(i)    The Taliban "formed" its new terror regime "on the lines of the Iranian model."

(ii)    It is "clearly visible" to outside observers "that leaders of the Haqqani Network terrorist outfit" "dominate the new Afghan cabinet."

(iii)    "Sirajuddin Haqqani is the new Afghan interior minister" even though he also serves as "the head of Haqqani Network, an Islamist terrorist mafia with close links to" "al-Qaeda" and remains "a designated global terrorist" according to "the FBI."

(iv)    "Khalil Haqqani, brother of Jalaluddin Haqqani and uncle of Sirajuddin is the new minister for refugees. He too is a Specially Designated Global Terrorist with close ties to al-Qaeda."[184]

184.    Through its Rewards for Justice Program, the FBI is currently "offering a reward of up to $10 million for information leading directly to the arrest of Sirajuddin Haqqani," whom the FBI described "a senior leader of the Haqqani network," who "maintain[ed] close ties to the Taliban and al Qaeda."[185]

185.    According to more than one expert consulted by Plaintiffs, Sirajuddin Haqqani is probably the most powerful and important al-Qaeda and Taliban terrorist in the world – regardless of his paper title in the "Islamic Emirate of Afghanistan."  Sirajuddin won the victory that eluded bin Laden and his own father alike, and now effectively controls the "Islamic Emirate's" weapons, fighters, intelligence, logistics, and transnational "security" relationships through his own positions, or those of his family members or Haqqani Network allies.

---

[184] Daily News & Analysis, *DNA Explainer: Decoding New Afghanistan Government And What It Means For India* (Sept. 8, 2021), 2021 WLNR 29468221.

[185] Federal Bureau of Investigation, *Sirajuddin Haqqani*, Rewards for Justice Program, online at https://www.fbi.gov/wanted/terrorinfo/sirajuddin-haqqani (last accessed Feb. 13, 2022).

186.    When Plaintiffs or their loved ones were attacked from 2011 through 2016, the biggest threat facing Sirajuddin Haqqani was that of instant death from above courtesy of an American drone strike against him while he plotted attacks in Afghanistan from the safety of his compound deep inside Pakistan.  Today, the most immediate threat facing Sirajuddin is no longer (but should be) the risk of a Predator strike.  Instead, Sirajuddin concerns himself with spreading his terrorist recruitment propaganda through media engagements he hosts at the former Afghan government's Ministry of Interior subject to three rules:  no women, no Jews, and no photos.[186]

> D For make no mistake: Without the ability to "wash" billions of dollars from illicit sources each year, these criminal enterprises would falter. … I have seen this firsthand.  I was a federal agent for 27 years and worked undercover as a money launderer within this murky realm for five of them. … The largest and most sophisticated of these criminal enterprises *don't trick banks* into laundering their money; *rather, they partner with that small segment of the international banking … community that recirculates drug profits and cash from other illicit trades, like black-market arms dealing*.  The only way to stop the flow of this dirty money is to get *tough on the bankers who help mask and transfer it around the world*. … The stakes are simply too high … [A]s long as terrorists can move their cash freely around the world, we'll have no chance to halt their deadly trades.[187]

> 275.    According to Dr. Jodi Vittori, "Al Qaeda has also been particularly adept at manipulating the international banking system.  Bin Laden once remarked to a Pakistani journalist that his financial backers "are as aware of the cracks inside the Western financial system as they are of the lines in their hands."  It used the international banking system regularly,

---

[186] Sirajuddin Haqqani's first two rules are both offensive and need no explanation.  His third rule, however, notably reflects Sirajuddin's awareness that he will be at dire risk the rest of his life considering he has more American blood on his hands than any other terrorist alive today other than bin Laden's original number 2, Ayman al-Zawahiri, and regardless of the recent United States withdrawal from Afghanistan, if history has taught one lesson, it's that the United States eventually always gets its justice, and therefore, Sirajuddin does not want anyone to ever take or publish any photo or drawing of him, or even to describe his appearance or clothing.
[187] Robert Mazur, *How To Halt The Terrorist Money Train*, International Herald Tribune (Jan. 4, 2013) (emphasis added), 2013 WLNR 184047.

and millions of dollars in accounts suspected connected with al Qaeda have been frozen.  *Al Qaeda understood the limits due to the regulations of the banking business,* and it allegedly used the regional banking systems of the Middle East, including the United Arab Emirates, Kuwait, Bahrain, and Lebanon, as they had been notoriously underregulated.  While in Afghanistan, Pakistani banks were frequently used for the same reason."[188]

> **B.** **Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Relied Upon A Transnational Network Of Terrorist Finance And Logistics Cells Operating In Afghanistan, Pakistan, The U.A.E., Russia, And Europe To Finance And Arm Syndicate Terrorist Attacks Against Americans In Afghanistan**

276.187.    After 9/11, al-Qaeda and its affiliates, including the Taliban and Haqqani Network, greatly intensified bin Laden's long-standing transnational, corporate-collaborative approach.  Al-Qaeda and the Haqqani Network – which often represented other Syndicate members, like the Taliban, overseas – needed far more resources to sustain its ever-growing jihad against Americans in Afghanistan and looked to their cells around the world for critically needed financial and logistical support.  As al-Qaeda and the Haqqani Network did so, the Syndicate's burgeoning commercial enterprises after 9/11 only heightened the importance of its members' ability to access the global financial system through banks and remitters.  Defendants conducted business in an environment in which participants understood that certain geographies carried a substantially elevated risk of terrorist finance.

277.188.    Al-Qaeda and the Haqqani Network, however, did not limit the funding and resourcing of their terrorist campaign to activities in the extreme-risk Afghanistan-Pakistan-U.A.E. terrorist finance triangle.  Both groups also relied upon critical financial and logistical support from cells and on-the-ground terrorists in Russia, Central Asia, and Europe, including

---

[188] Vittori, *Terrorist Financing,* at 150-51.

Estonia (a key location for the Syndicate's opium trade) and Germany (a long-standing al-Qaeda financial and logistical hub).

~~278.~~189.       Al-Qaeda and the Haqqani Network relied upon cells in Europe to fund, finance, and logistically support al-Qaeda's terrorist campaign in Afghanistan.  As Dr. Jodi Vittori explained in her 2011 book, *Terrorist Financing and Resourcing*, "the relative sanctuary that al Qaeda enjoy[ed] in both the developed world" "provided the organization the critical breathing room it needed to recover" as demonstrated by how "al Qaeda-associated cells in Europe continue[d] to be uncovered."[189]

~~279.~~190.       Indeed, supporting the terrorist campaign in Afghanistan was typically the primary reason most al-Qaeda and Haqqani Network cells were created in the first place.  After 9/11, according to Professor Gurulé, al-Qaeda's and the Haqqani Network's "ability to raise and transfer funds" between their cells around the world was "essential to sustaining" the "terrorist operations" conducted by al-Qaeda and its affiliates in Afghanistan because the continued flow of funds from cells around the world was "critical to sustaining al Qaeda's global presence and successfully waging its global jihad."[190]  Plaintiffs briefly outline these geographies below.

1.      **Afghanistan, Pakistan, And The U.A.E.**

191.    From 2001 through 2021, Afghanistan, Pakistan, and the U.A.E. served as an integrated finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide.  Indeed, all three geographies were widely known throughout this time as "Top 10" overall geographies with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in

---

[189] Vittori, *Terrorist Financing*, at 154.

[190] Gurulé, *Unfunding Terror*, at 73.

furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

280.192.      With respect to Afghanistan, Pakistan, and the U.A.E., Defendants' support for al-Qaeda's and the Haqqani Network's transnational terrorist enterprises occurred in an economic, regulatory, and business context in Pakistan, Afghanistan, and the U.A.E. in which all three countries were essentially *one interlocking hub* of terrorist fundraising, finance, logistics, operations, and planning.  As Haqqani Network expert Gretchen Peters explained in 2009, transactions in these three countries played a key role funding and arming al-Qaeda and Haqqani Network terrorists targeting Americans in Afghanistan:

> Eight years after 9/11, the single greatest failure in the war on terror [was] … the spectacular incapacity … to disrupt the flow of money that [kept] [the Syndicate's] networks afloat. … *The trading zone that groups Afghanistan, Pakistan, and the UAE [was] the financial world's Wild West*, where there [were] disincentives to going legal. … Since 2001, the UAE, Pakistan, and Afghanistan [] adopted or [] drafted laws banning money laundering … However, there [was] … no effort to go after those appearing to break the law. … Drug money … often bounc[ed] through Russia and South Africa and usually passing through Dubai, the flashy free-trade emirate that [was] a hub for money laundering and underground banking.  … *If you [were] a drug smuggler, it would be hard to find a more accommodating region to launder your money*.[191]

281.193.      From 2001 through 2016, Afghanistan, Pakistan, and the U.A.E. were extremely permissive environments for terrorist fundraising and finance.  Throughout this time, all three countries were plagued by robust flows of "dirty money" from terrorist-controlled transnational criminal organizations.  In all three places, according to Haqqani Network expert Gretchen Peters, it was "important to recognize that none of the money-laundering mechanisms being used in South Asia and the Gulf [were] the least bit unusual."[192]  "[T]errorist financiers did

---

[191] Gretchen Peters, *Seeds of Terror: How Drugs, Thugs, and Crime Are Reshaping the Afghan War* 167-69 (Picador 2009) (emphasis added) ("Peters, *Seeds of Terror*").

[192] *Id.* at 176-77.

not create this system, … [t]hey simply stepped into the mechanisms we ha[d] created to make it easy to shift money across borders."[193]

282.194.    Syndicate agents, operatives, and fronts in Afghanistan, Pakistan, and the U.A.E. were regularly open and obvious about their U.S. Dollar-related transactions in a manner that made the Syndicate terrorism risk apparent from the face of the transaction materials alone.

283.195.    For example, in 2009, prominent local traders in Afghanistan admitted to *Euromoney* that terrorist operatives, and agents regularly leveraged the global financial system to conduct U.S. Dollar-denominated transactions that were obviously intended to aid the Taliban (including its Haqqani Network) based upon simple details appearing on the face of the transaction itself, including, but not limited to, large, round, lump-sum U.S. Dollar-denominated deals.[194]  Indeed, according to *Euromoney*, traders openly admitted that: (1) Syndicate terrorist finance "hot money flows into and out of Kabul all the time"; (2) ordinary business people reviewing the transactions always "***always [knew] if [it was] headed for the Taliban as it [was] always in big sums, often $100,000 or more***"; (3) the Syndicate conducted transfers of "[a]t least" "$1 million" if not "[m]aybe much more"; (4) it was "clear that" "trades [were] made that might benefit aggressor forces" (*i.e.*, the Syndicate); and (5) Afghans were familiar with how to use the global financial system and found that it was "not hard to get banking right."[195]

i.    **Al-Qaeda And Haqqani Network Terrorist Finance**

284.196.    **Afghanistan and Pakistan.**  From the 2000s through 2016, Pakistan was notorious as one of the highest-risk terrorist finance and logistics geographies in the world.  As

---

[193] *Id.* at 177.

[194] Elliot Wilson, *Afghanistan: Making Money in Kabul Markets*, Euromoney (Sept. 1, 2009), 2009 WLNR 26664795.

[195] *Id.* (emphasis added).

the *Guardian* reported in 2007, "[f]oreign money [was] fuelling the tide of Islamist violence washing across northern Pakistan, according to diplomats, analysts and money laundering experts," and terrorist finance was enabled by "Pakistan's notoriously lax financial system," which "help[ed] [Islamists] to move the money into the country."[196]

285.197.      In 2010, international affairs commentator Fareed Zakaria explained that: (1) "Pakistan" "remain[ed] a terrorist hothouse even as jihadism [was] losing favor elsewhere"; (2) "From its founding, the Pakistani government has supported and encouraged jihadi groups, creating an atmosphere that has allowed them to flourish"; (3) "For a wannabe terrorist shopping for help, Pakistan [was] a supermarket" through which groups like "al-Qaeda, Jalaluddin [and] Siraj Haqqani's network" and their allies "operate[d] openly via front groups throughout the country" and did not "have any difficulty getting money and weapons."[197]

286.198.      From 2001 through 2016, Afghanistan-related transactions also posed extreme red flags for terrorist finance and logistics similar to those in Pakistan.  The *Economist Intelligence Unit* – a popular due diligence resource that was regularly read by Defendants' employees – observed in 2006 that "[t]he [Afghanistan] banking system was another casualty of the war, having collapsed after the mujahideen seized power" in the 1990s.[198]  After 9/11, the country's "financial sector's primitive state mean[t] that its [] economic role [was] limited," and "[t]he financial sector's development [was] also [] hampered by the lack of a sound legal basis

---

[196] Declan Walsh, *Faith, Charity and the Money Trail to Pakistan's Islamist Militants; Religious Donations Fuel Boom in Islamic Schools and Get Money to Extremists*, Guardian (Aug. 21, 2007), 2007 WLNR 28283961 ("Guardian, *Faith, Charity and the Money Trail*").

[197] Fareed Zakaria, *Terrorism's Supermarket*, Washington Post (May 10, 2010).

[198] EIU ViewsWire, *Afghanistan: Financial Services* (Aug. 18, 2006), 2006 WLNR 26662236.

for the industry."[199] Afghanistan presented the ultimate-in-risk banking culture, which had grown

rapidly since the Afghan Parliament enacted the banking law in 2004.

287.199.     From the mid-2000s through 2016, Afghanistan regularly ranked first or

second in in global risk ratings, usually vying with Iraq or Somalia, "a trio of failed states in the

wrong sort of league of their own."[200]  A financial services industry observer commented in

2009, "[i]t's little wonder then that being a banker in a state run – at least in rural areas – by

heroin barons, gangsters and Taliban zealots is a nervy business."[201]

288.200.     Afghanistan and Pakistan also featured pervasive criminal monopolies,

which the Syndicate leveraged to fund operations.  From 2008 through 2016, the overlap

between Syndicate members having monopolistic control over the entire criminal marketplace in

their areas of operation in Afghanistan and Pakistan, and resulting fusion with terroristic

violence, meant that risky commercial transactions that enabled criminal activities relating to

Afghanistan and Pakistan, or facilitated the sale of key bomb precursors ingredients like CAN

fertilizer, posed a uniquely high risk to enable terrorist violence because it was virtually certain

that the end customer was either a Syndicate-affiliated terrorist or a criminal organization that

directly funded the Syndicate through its criminal enterprise by paying a percentage of its

criminal profits to the Syndicate as "taxes."  For this reason, from 2008 through 2016, each

Defendant understood that any substantial transnational financial crime involving Afghanistan

and/or Pakistan foreseeably would financially support, directly or indirectly, attacks by

Syndicate terrorists against Americans in Afghanistan.

---

[199] *Id.*

[200] Elliot Wilson, *Afghanistan: No Country for Bankers*, Euromoney (Sept. 1, 2009), 2009 WLNR 26664799.

[201] *Id.*

289.201.        From 2008 through 2016, the Syndicate's dominance of al-Qaeda-allied terrorists in the underworld in eastern Afghanistan and bordering Pakistan was so complete that it was functionally impossible to engage in any illicit transaction, including money laundering, narcotics trafficking, or criminal rackets along the Afghan/Pakistan border, or relating to products or money flowing out of Afghanistan and Pakistan, without enriching the Syndicate because Syndicate members, including but not limited to, the Taliban (including its Haqqani Network), D-Company (including Altaf Khanani), and others either ran the criminal enterprise themselves, or "taxed" those who did and shared such tax proceeds with the Syndicate.

290.202.        Al-Qaeda and Haqqani Network terrorist finance routed to agents, operatives, or fronts in Pakistan and Afghanistan directly supported terrorist attacks against Americans in Afghanistan.  As al-Qaeda scholar Seth Jones told the *Guardian* at the time: "Without significant funding from abroad, especially the Gulf states, we would be nowhere near the current level of Islamist militancy," estimating that "[w]e're talking about tens if not hundreds of millions of dollars" funneled to the Syndicate from overseas sources in order to support attacks in Afghanistan and Pakistan.[202]  In the same *Guardian* article, U.S. Undersecretary of State Nicholas Burns confirmed that "[t]here's a lot of financing, money that gets laundered through banks that support these terrorist groups," referencing the Syndicate's use of bank accounts to use laundered money to support terrorist operations.[203]

291.203.        **The U.A.E.**  Defendants operated in a financial services environment in which the "cross-pollination of criminality between Afghanistan and Dubai" facilitated financial activity in which "billions of dollars" of proceeds from corrupt economic activities were

---

[202] Guardian, *Faith, Charity and the Money Trail*.

[203] *Id*.

"funneled from Afghanistan … to Dubai," which "outflows" "played a part in … facilitating the resurgence of the Taliban."[204]  Similar "Pakistan to Dubai" interactions also supported the Syndicate.[205]

292.204.        Al-Qaeda and Haqqani Network terrorist finance routed to agents, operatives, or fronts in the U.A.E. directly supported terrorist attacks against Americans in Afghanistan.  For example, according to Dr. Kimberley L. Thachuk, the Syndicate's use of transnational criminal strategies, banks, and money remitters combined to make Dubai an epicenter of Syndicate funding, financing, and logistical activities in direct support of attacks against Americans in Afghanistan because Syndicate "funds" were "moved" to "Dubai" so that the Syndicate's "criminal cash" was "used to pay for weapons and other needed supplies" to conduct attacks.[206]

### ii.    Al-Qaeda And Haqqani Network Terrorist Logistics

293.205.        **Afghanistan and Pakistan.**  Defendants operated in a banking, corporate, and governance climate in Afghanistan and Pakistan where it was widely understood that al-Qaeda, the Haqqani Network, and other Syndicate members:  (1) viewed Afghanistan and Pakistan – correctly – as among the most favorable possible environments to obtain explosives and other supplies for their bomb-making enterprise; (2) universally found it easy to raise and distribute money and purchase bombs and bomb components; and (3) often operated through open and obvious fronts when acquiring bomb materials or other goods vital to the bomb campaign.

---

[204] *Id.* at 85.

[205] Timothy L. O'Brien, *U.S. Focusing on Dubai as a Terrorist Financial Center*, N.Y. Times (Oct. 5, 2003).

[206] Thachuk, *Terrorist Criminal Enterprises*, at 15.

294.206.        Al-Qaeda and Haqqani Network terrorist logistics routed to agents, operatives, or fronts in Afghanistan and Pakistan directly supported terrorist attacks against Americans.

295.207.        **The U.A.E.**  As it was for some Defendants, the U.A.E. was always a useful logistics hub for al-Qaeda and the Haqqani Network because it offered easy access to Russia, Europe and the Middle East via land, water, and air, and al-Qaeda and Haqqani Network terrorist logisticians, sometimes working with Lashkar-e-Taiba.

296.208.        Al-Qaeda and Haqqani Network terrorist logistics routed to the agents, operatives, or fronts in U.A.E. directly supported terrorist attacks against Americans in Afghanistan.  For example, on June 21, 2011, the Treasury Department designated Fazl Rabbi as someone who "committed, pose[d] a significant risk of committing, or support[ed] acts of terrorism."[207]  Similarly, in designated Khalil Haqqani as an SDGT, Treasury found that he leveraged activities in Dubai to provide fundraising and logistics support to al-Qaeda and Taliban, including Haqqani Network, operations in Afghanistan.[208]

### 2.        Russia

209.    Russia was, and is, The notorious conditions in Afghanistan, Pakistan, and the U.A.E. described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Afghanistan, Pakistan, and/or the U.A.E., such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or

---

[207] Federal Register (June 28, 2011), https://www.govinfo.gov/content/pkg/FR-2011-06-28/pdf/2011-16185.pdf.

[208] *Id.*

technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Afghanistan, Pakistan, and/or the U.A.E. and, through such FTO's Afghan, Pakistani, and/or U.A.E. intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

210.    The Afghanistan/Pakistan/U.A.E.-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York.   Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(i)      **Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Afghanistan-, Pakistan-, and U.A.E.-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on all three jurisdictions to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(ii)     **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of U.A.E.-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of U.A.E.-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(iii)    **Value Chains That Supported FTO Operatives**.  The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of the U.A.E.-related transactions enabled the transactions by Syndicate VAT fraud cells in Europe, like the Ahmed and Azizi Cells, which repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through U.A.E.-related transactions.  Similarly, the Standard Chartered Bank and Deutsche Bank Defendants provided services to a host of on-the-ground Syndicate operatives in Afghanistan, Pakistan, and the U.A.E., which ordinarily entailed routing U.S. Dollars to such operatives through their Laundromat-related transactions.  When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(iv)    **Value Chains That Supported FTO Partners.**  The Standard Chartered Bank Defendants aided the Syndicate by facilitating the activities of the Haqqani Network's corporate co-conspirators, Fatima Fertilizer and PakArab Fertilizers, which transactions depended upon the SCB Defendants providing an array of U.S. Dollar services to Fatima and Pakarab, that, on information and belief, ordinarily involved transactions in at least Pakistan and/or the U.A.E. (and sometimes both), and facilitated the Haqqani Network's ability to maintain a robust supply of CAN fertilizer for al-Qaeda's CAN fertilizer bombing campaign in Afghanistan.  When they did so, the SCB Defendants aided the Haqqani Network's supply chain by leveraging unique-to-the-U.S.A.-market features, including the purchasing power and reliability afforded by the ability to denominate transactions in U.S. Dollars, and the improved concealment that attaches when the SCB Defendants combined the the credibility provided by U.S. financial institutions and concealment afforded by the U.A.E.'s and Pakistan's opaque systems, in turn, all of which facilitated Syndicate attacks on Americans in Afghanistan.

       **2.    Russia**

211.    From 2001 through 2021, Russia served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide.  Indeed, Russia was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

~~297.~~212.        Russia was a global epicenter for money laundering on behalf of violent actors, including Syndicate members al-Qaeda and the Haqqani Network (who represent the Taliban's opium interests in Russia).  Thus, Russian "dirty money" transactions posed a

foreseeable risk of aiding al-Qaeda and Taliban (including Haqqani Network) terrorist finance

and logistics.

298.213.      Andrew Rennemo worked as an intelligence analyst at the Treasury

Department and explained that the Russian financial marketplace served as "one of the world's

largest exporters of dirty money,"[209] which status it maintained at all relevant times.  According

to Mr. Zarate, the former assistant secretary of the Treasury for terrorist finance:

> ***Russia had been a center of money laundering and illicit financial activity for
> years***, with a banking system unaccustomed to the anti-money-laundering strictures
> of most of the world.  The Financial Action Task Force had blacklisted Russia in
> 1999 for its lack of anti-money-laundering laws and measures.  Organized crime,
> the global arms trade, corruption at the highest levels, and a willingness to do
> business with rogue states ***made the Russian commercial and financial system a
> problematic intersection of illicit financial flows***.[210]

214.    When Defendants conducted financial transactions with Russian-related

counterparties, Defendants knew that they operated in one of the most notorious environments

for financial crime in the world.  As a former American trader who worked in Moscow explained

to the *New Yorker*, Russia was "the wild, wild East" because "[i]":

> If you wanted to be competitive, ***you had to do a lot of things that were not done
> in the developed world, because it was Russia***. It was a very aggressive sales
> mentality, which was going on across the board across all the Russian banks.".[211]

299.

300.215.      Defendants doing business in Russia also had to contend with two unique

– and notorious – facts about the Russian financial services marketplace:  (1) the Russian

Mafia's notorious decades-long service as one of al-Qaeda's narcotics-related finance agents;

and (2) the Russian Mafia's decades-long opium joint venture with most of the Syndicate, which

---

[209] Andrew Rennemo, *Russia's Crafty Financial Crimes Have Become A Foreign Policy Problem*, Press Release by Center for the National Interest, States News Service (Apr. 28, 2019).

[210] Zarate, *Treasury's War*, at 159 (emphasis added).

[211] Caesar, *Moscow Laundromat* (emphasis added).

managed the Afghanistan-to-Russia Opium Pipeline, also called the northern route, through an

OPEC-style cartel. ~~As a result~~Because of both notorious aspects of Russia's economy, suspect

~~financial~~ transactions relating to Russian customers, banks, or remitters, were known to, and did,

pose an elevated risk of funding al-Qaeda, the Haqqani Network, and their allies. ~~Plaintiffs~~

~~briefly outline each aspect below.~~

~~301.~~216.      Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics

routed to agents, operatives, or fronts in Russia directly supported terrorist attacks against

Americans in Afghanistan. For example, according to an unclassified FBI report, the FBI

concluded that the Russian Mafia served as a key long-standing commercial ally of al-Qaeda and

the Taliban in Afghanistan by purchasing large amounts of Afghan opium from them and then

laundering the Syndicate's resulting profits as their agent, paying them back in guns and

laundered money.

~~i.      Russian Mafia's Agency Relationship With al-Qaeda~~

~~302.   "Regrettably," Victor "Bout [was] not an isolated case" and "[t]here [were]~~

~~numerous other similar stories of gun-running 'former' Soviet agents … supplying arms to some~~

~~of the world's worst terrorists."²¹²  Foremost among them was the Solntsevskaya Group, also~~

~~known as the Solntsevo Group (the "Group"), which was Russia's largest transnational narco-~~

~~terrorist cartel, routinely committed acts of international terrorism itself.²¹³~~

---

~~²¹² Patrick Krey, *Lords of Chaos: The Kremlin's Arms Merchants: Moscow's Merchants of*~~
~~*Death Arm Terrorist Groups and Foment Violent Anarchy, Fueling the Call for Global Gun*~~
~~*Control and Expanded UN Powers to Deal with the Chaos*, New American (Sept. 14, 2009),~~
~~2009 WLNR 18794639.~~

~~²¹³ While based in Russia, the Russian Mafia also maintained cells throughout the world and was~~
~~widely known to be among the most powerful, violent, organized, and well-resourced, narco-~~
~~terrorist cartels in the world.  Through this global network, the Russian Mafia sometimes works~~
~~with other violent groups if there is mutual benefit to be had.~~

303.1.   The Group was led by notorious narco-terrorist and Russian Mafia "boss of bosses" Semyon Mogilevich, who was publicly described by media outlets as "one of the world's most dangerous terrorists,"[214] notoriously nicknamed "the face of Russian organised crime," and the "Brainy Don" because of his reputation for ruthlessness, business prowess, and possession of an economics degree.   Plaintiffs refer to Solntsevskaya Group and Mogilevich collectively as the "Russian Mafia" because they *were* (and remain) the Russian Mafia.

304.   At all relevant times, the Russian Mafia was expressly hostile to the United States.  For example, according to Mr. Unger, Russian Mafia leader "Mogilevich made no secret of the contempt he had for the United States" and his view that America was "the enemy."[215]

305.   Beginning no later than the early 1990s, under bin Laden's personal leadership, al-Qaeda and the Taliban (including its Haqqani Network) pursued a close working relationship with the Russian Mafia, including Mogilevich.  The close partnership between al-Qaeda, the Taliban, and the Russian Mafia was the direct result of bin Laden's Syndicate vision:  he personally oversaw the development of al-Qaeda's relationship with the Russian Mafia on behalf of the Taliban because he reasoned that the Taliban (and by extension, al-Qaeda) could convert their control over Afghanistan's opium market into a reliable source of terrorist finance for al-Qaeda and its affiliates, through close partnership with the Russian Mafia.

306.   From the late 1990s through 2016, al-Qaeda and the Taliban (including its Haqqani Network) employed the Russian Mafia as one of their agents that, alongside Khanani and the Khanani MLO, managed a substantial portion of the Syndicate's terrorist finance operations each year, including those relating to opium.  This strategy accorded with al-Qaeda's

---

[214] Lyndsey Telford, *Tape Reveals Slain Journalist Probing Putin Link to Terrorist*, Irish Independent (Jan. 24, 2015), 2015 WLNR 2357960.

[215] Craig Unger, *House of Trump, House of Putin* 108 (Dutton 2d. ed. 2019) ("Unger").

reputation for following a "pragmatic" and "corporate" approach to Islamist terrorism; al-Qaeda wisely employed both the Russian Mafia and D-Company, augmenting al-Qaeda's own power with the resources, personnel, and financial muscle of the largest narco-terrorist organizations in South Asia and the former Soviet Union—the perfect narco-terrorist allies for the Syndicate.

307.1.   Yossef Bodansky served as the director of the Congressional Task Force on Terrorism and Unconventional Warfare.  In his pre-9/11 book, *bin Laden*, Mr. Bodansky presciently warned about the dire looming threat from al-Qaeda, which he attributed, in part, to its agent/principal relationship with the Russian Mafia, which allowed al-Qaeda to leverage the Russian Mafia's existing geographies, relationships, competencies, resources, smuggling routes, corrupt relationships, and safe houses to kickstart the Syndicate's growth as a terrorist enterprise:

bin Laden and the Russian Mafia have ***established yet another complex money laundering operation*** described by an insider as "an extended and octopus-like network***"*** … These funds are ***used to finance the Taliban [] and a host of Islamist terrorist operations***.  Bin Laden makes a commission on these transactions, ***which is laundered by the Russian mafia*** … Bin Laden administers and manages [the Taliban's opium profits]—***laundering them through the Russian Mafia***—in return for a commission of between 10 and 15 percent…[216]

308.1.   The agency relationship described by Mr. Bodansky continued through 2016, as Sirajuddin Haqqani and a host of other Syndicate terrorists have carefully tended the relationship.  Indeed, according to Mr. Zarate, "As [Transnational Criminal Organizations] grow more interconnected in ways that transcend national boundaries," "the ability of such [Transnational Criminal Organizations] to provide their infrastructure and expertise to" "terrorists" "raises the specter of alliances of convenience and profit aligned dangerous against

---

[216] Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 315 (Forum 1999) (emphasis added) ("Bodansky, *Bin Laden*").

the United States. The reach of the Russia-based organized crime network of Semion Mogilevich is a stark example of this point."[217]

309. The Russian Mafia's services as al-Qaeda's and the Haqqani Network's money laundering agent was notorious for decades. For example, in 2002, Mark Galeotti explained that, because al-Qaeda's "underground banking system" was "under serious threat [after 9/11 and brokers [were] being deterred from handling their money," "[t]he Russians [could] and [did] *offer the services of their own huge and well-established money laundering operations*, which already deal[t] *securely and efficiently* with *much larger sums* than the [Syndicate] terrorists need to move."[218]

310. From the late 1990s through 2016, public statements from U.S. and Russian government officials, and regular media reports, documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban (including its Haqqani Network) for financial crime purposes, while also being partners in the Syndicate-Russian Mafia Opium Joint Venture. These reports alerted Defendants to the Russian Mafia's agency relationship with al-Qaeda and the foreseeable risk that Russian Mafia-related laundering transactions were laundering al-Qaeda money.

ii. The Syndicate-Russian Mafia Opium Joint Venture

311. Beginning in the late 1990s, al-Qaeda, the Taliban, and the Russian Mafia intensified their close working relationship into, effectively, a terrorist joint venture through which a two-way "Afghanistan-to-Russia Opium Pipeline" flows. From Afghanistan-to-Russia, Afghan opium flowed from the Taliban in Afghanistan and Pakistan to the Russian Mafia in Russia and other parts of Central Asia and once received, through the Russian Mafia, to Europe,

---

[217] Zarate, *Treasury's War*, at 379.

[218] Mark Galeotti, *Crime Pays*, World Today (Aug./Sept. 2002), 2002 WLNR 16294207.

Africa, and the Middle East; from Russia to Afghanistan, Russian weapons, explosives, and freshly laundered money (usually converted from other currencies into U.S. Dollars) flowed back to al-Qaeda and the Taliban.

312.   The purpose of the Syndicate-Russian Mafia Opium Joint Venture was to maximize each JV member's profits from their control over the "pipeline" that turns Afghan poppy and Pakistani-sourced chemicals into refined heroin, then smuggles the product through Central Asia into Russia, where the Russian Mafia controls global distribution and, as al-Qaeda's and the Taliban's agent, helps "wash" the resulting heroin profits on their behalf.  In short, it was to manage and maintain every aspect of this "Afghanistan-to-Russia Opium Pipeline."

313.1.  Under this Joint Venture arrangement, al-Qaeda and the Haqqani Network act as agents for the Quetta Shura Taliban, and coordinated the Russian Mafia's money laundering activities on the Taliban's behalf; for such services, al-Qaeda and the Haqqani Network earned commissions in addition to aiding the Syndicate's cause.  Plaintiffs refer to this deal as the "Syndicate-Russian Mafia Opium Joint Venture," "Joint Venture," or "JV".

314.   From 9/11 through the present, the Syndicate has maintained an exclusive or nearly exclusive opium supply relationship with the Russian Mafia, who trust one another after decades of close partnership.  Moreover, the Taliban and Russian Mafia are bonded by the practical reality that, of the world's major opium-growing regions, Afghanistan offers -- by far -- the closest and most secure smuggling route to Russia and, through Russia, to the rest of Central Asia, Europe, and the Middle East.  As a result, al-Qaeda, the Taliban, and the Russian Mafia have found it in their own mutual interest to pursue a decades-long joint venture to manage and regulate the world's opium trade, playing much the same role as OPEC does with oil.

315.1.   From 9/11 through the present, approximately ninety-five percent (95%) of all opium sold in Russia, Central Asia, the Middle East, and Europe flowed through the same pipeline:  from the Taliban (who grew it), then to al-Qaeda and the Haqqani Network (who worked with Syndicate members and al-Qaeda affiliates like D-Company to export it), then to the Syndicate's long-standing joint venture partners in the Russian Mafia (who took it to the world market and helped launder the resulting proceeds).

316.1.   In March 2009, Russian Federal Drug Control Service Director Viktor Ivanov publicly stated that: (1) "Afghanistan [] produce[d] 95% of the opium in the world"; and (2) "[d]rug trafficking from Afghanistan seriously affect[ed] Russia" because approximately "90% of Russian drug addicts use[d] heroin compared to just 10% in European countries."[219]

317.   The Russian Mafia, al-Qaeda and the Taliban (including its Haqqani Network) pursued their Joint Venture under the leadership of Mogilevich, bin Laden, and Jalaluddin Haqqani (and later Sirajuddin Haqqani), respectively, each of whom personally supported the JV as a key strategy for their respective organizations.

318.   From the late 1990s through 2016, media reports regularly documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban (including its Haqqani Network) for financial crime purposes, while also being partners in the Syndicate-Russian Mafia Opium Joint Venture.

3.   Cyprus

217.   The notorious conditions in Russia described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit

---

[219] Interfax Russia & CIS Military Newswire, *Afghan Drugs Problem Has No Military Solution – FSKN Chief* (Mar. 24, 2009).

**Formatte**

transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Russia, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Russia and, through such FTO's Russian intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

218.    The Russia-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(v)    **Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Russia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on the U.S. and Russia to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(vi)    **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.**
Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Russia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of U.A.E.-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers,

usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(vii)   **Value Chains That Supported FTO Operatives**.  The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of Russia-related transactions enabled the easy flow of the Syndicate's U.S. Dollar profits through its transnational schemes, including through nearly every financier and agents identified in this Complaint, which regularly repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Russia-related transactions.  When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated their attacks against Americans in Afghanistan.

(viii)   **Value Chains That Supported FTO Partners.**  Each Defendant aided the Syndicate by facilitating the Russia-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), and the Standard Chartered Bank Defendants also aided the Syndicate by facilitating the Russia-related transactions of Viktor Bout (the "Merchant of Death" who served nearly every FTO who participated in the Afghanistan campaign), all of which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

### 3.      Cyprus

219.    From 2001 through 2021, Cyprus served as a central finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC.  Indeed, Cyprus was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.

220.    American enforcement actions confirm Cyprus's key role in the global terrorist architecture of many FTOs.  When the Treasury Department invoked its so-called "Section 311" powers under the Patriot Act for the first time in 2004, doing so to shut down First Merchant

Bank in Cyprus, which the Treasury Department publicly announced had laundered narcotics money for terrorists; in response, commentators credited Treasury's decision to media coverage that raised awareness that al-Qaeda was known to be using Cyprus to launder money to support terrorist attacks against Americans in Afghanistan.

221.    When Syndicate financiers like Altaf Khanani needed to source U.S. Dollars, they sometimes conducted transactions in, or related to, Cyprus (or involving Cypriot banks) as part of the value chain sometimes used by Syndicate financiers, like Altaf Khanani, to help al-Qaeda and the Taliban illicitly source U.S. Dollars form New York banks, through Cyprus-related transactions, ultimately supplying resources to aid the terrorist campaign against American in Afghanistan.  This section therefore briefly outlines Cyprus's role in the Afghanistan campaign.

222.    Cyprus was, and is, a global epicenter for money laundering on behalf of al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and other Syndicate allies., as well as the IRGC, including its Hezbollah Division and Qods Force because, simply put, everyone prefers washing their dirty money there if they have the chance to do so.[220]

319.223.    Al-Qaeda has long relied upon Cyprus as a key financial and logistical hub for al-Qaeda and its affiliates, including its Haqqani Network and Lashkar-e-Taiba., to source the funds, arms, and logistical resources needed to fund, arm, and sustain their shared terrorist campaign against Americans in Afghanistan.

---

[220] Cyprus's size meant that each FTO that facilitated terrorist finance or logistics-related transfers through Cyprus had to be mindful of the maxim "pigs get fat, hogs get slaughtered," meaning that Cyprus's small size and financial system made it less suitable for large-scale value transfers, or transfers where the terrorists needed better cover or concealment, such as that provided by a corrupt bank, like Defendants, or corporate ally.  For such mega-transactions, the terrorists typically preferred to use a combination of banks in Dubai and Europe as backdoors to access the U.S. financial system in order to obtain the U.S. Dollars that al-Qaeda, the Taliban, and the IRGC all craved above all other currencies to maximize the lethality of their terrorist campaign against Americans in Afghanistan.

320.224.          ─Al-Qaeda operatives have confirmed the terrorist group's use of Cyprus as a geography for planning and logistical purposes and Cyprus-related companies, banks, and remitters as a cog in al-Qaeda and its allies' financial networks.  Al-Qaeda operatives have also conducted, or attempted to conduct, terrorist attacks from Cyprus and within Cyprus.

321.225.          Geographically, Cyprus was, and is, almost perfectly situated to be equidistant to nearly every major theater in which al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba operated and targeted Americans.  From Cyprus, these groups' agents and operatives could easily travel, ship goods, or send money to Afghanistan, Pakistan, the U.A.E., Europe, or any other location worldwide that al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba leveraged to support the Syndicate's attacks in Afghanistan.

322.226.          In addition to Cyprus's ideal location (from al-Qaeda's and the Haqqani Network's perspective), and notoriously lax anti-money-laundering/counter-terrorist-finance environment, al-Qaeda and the Haqqani Network preferred Cyprus as an operational, financial, and logistical hub for another reason:  Cyprus's large diasporas from Afghanistan, Pakistan, and other key geographies.

323.227.          Al-Qaeda's terrorist playbook emphasizes locating terrorist cells within the diaspora of countries from which al-Qaeda and its affiliates draw most of their members because such geographies afforded natural "cover" to al-Qaeda and Haqqani Network cells operating there, and provided a ready-made community of targets (*i.e.*, the members of the diaspora who reside in the overseas geography in question) whom the terrorist could attempt to recruit and, failing that, "tax" as part of al-Qaeda and the Haqqani Network's strategy to use criminal rackets to fund the terrorist campaign against Americans in Afghanistan.

324.228.    Al-Qaeda and the Haqqani Network also had a significant intelligence need for a large presence in Cyprus:  it was a key hub for many of their Afghan and Pakistani enemies, including Afghan groups that opposed al-Qaeda and the Taliban.  Al-Qaeda and the Haqqani Network have always hewed to a "keep your friends close, but your enemies closer" strategy that, in particular, emphasized infiltrating their opponents' organizations and geographies for intelligence purposes and to "turn" people to their cause.

325.    Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Cyprus directly supported terrorist attacks against Americans in Afghanistan.  For example, when the Treasury Department invoked its so-called "Section 311" powers under the Patriot Act for the first time in 2004, doing so to shut down First Merchant Bank in Cyprus, which the Treasury Department publicly announced had laundered narcotics money for terrorists; in response, commentators credited Treasury's decision to media coverage that raised awareness that al-Qaeda was known to be using Cyprus to launder money to support terrorist attacks against Americans in Afghanistan.

229.    Like its al-Qaeda and Taliban allies, the IRGC, including its Hezbollah Division and Qods Force, have also long relied on Cyprus for the same purposes and for the same reasons.

230.    The notorious conditions in Cyprus described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Cyprus, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-

denominated transactions), to such FTO's intermediary in Cyprus and, through such FTO's Cypriot intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

231.     The Cyprus-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(ix)     **Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Cyprus-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's use of Cyprus-related transactions to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(x)     **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.**  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Cyprus-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Cyprus-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xi)     **Value Chains That Supported FTO Operatives**.  On information and belief, the Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' Cyprus-related transactions facilitated the terrorist finance schemes operated by al-Qaeda's VAT fraud cells in Europe, including the Ahmed and Azizi Cells, which repatriated

U.S. Dollar income back to al-Qaeda and the Haqqani Network through Cyprus-related transactions.  When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(xii)   **Value Chains That Supported FTO Partners.**  On information and belief, the Standard Chartered Bank Defendants aided the Syndicate by facilitating Viktor Bout's support for al-Qaeda and the Taliban through transactions that depended upon on transactions that included a USD-to-Cyprus component.[221]  When they did so, the SCB Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks on Americans in Afghanistan.

### 4.   Germany

326.   For decades, al-Qaeda and its allies have relied upon Germany as a key geography to support terrorism worldwide.

232.   From 2001 through 2021, Germany served as a central finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC.  Indeed, Germany was widely known throughout this time as a "Top 10" overall geography with respect to al-Qaeda, Taliban, and/or IRGC terrorist finance, logistics, operations, communications, and transportation activities in furtherance of their shared campaign to attack Americans in Afghanistan and Iraq in order to drive the United States out of the Middle East.[222]

327.233.   Within weeks of 9/11, the U.S. government and virtually every media outlet in the world had reported that al-Qaeda maintained a web of German associates, bank accounts, and front companies, which al-Qaeda had used to support several 9/11 hijackers.  Most

---

[221] Among other reasons, Bout's transnational terrorist logistics support for his FTO clients, including al-Qaeda, required that Bout often move large amounts of U.S. Dollars involving Russian intermediaries between Bout and his terrorist clients, and Cyprus has long been a preferred location for such transfers amongst the Russian diaspora, as well as with Russian organized crime.

[222] Germany's inclusion in this list does not reflect the commitment of the German government to anti-terrorism, merely al-Qaeda's, the Taliban's, and the IRGC's decades-long preference for using Germany as a hub for financial and logistical activities designed to facilitate terrorist attacks in the U.S., Europe, and the Middle East.

infamously, it was widely known throughout the world in the aftermath of 9/11 that lead hijacker Mohamed Atta had resided in Hamburg, Germany prior to the attack, where he maintained a "no show" job with a fake German company and used German banks.

328.234.      Responding to President Bush's call to action by foreign banks against terrorist finance, including Deutsche Bank, then-German Chancellor Gerhard Schroeder publicly backed up the American request, and called on banks and remitters to do whatever they could to interdict terrorist finance in Germany that benefited al-Qaeda and its affiliates, stating:

> I understand that many people equate bank secrecy with the Magna Carta of internal security, but that's not the case. … He who wants to fight money laundering and dry out the financing sources of international terrorism – something we have to do – must talk about how to get at these finance sources.[223]

329.235.      Al-Qaeda, and the Haqqani Network, both used Germany as a hub for finance and logistics From 2001 through 2016.  By 2008, "Germany ha[d] served as the base of operations for some of the [deadliest] terrorists associated with al Qaeda,"[224] which role has endured since.

330.236.      Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Germany directly supported terrorist attacks against Americans in Afghanistan.  For example, Coalition special forces found direct evidence that a joint al-Qaeda and Haqqani Network cell operating in Germany (*i.e.*, the Azizi Cell) directly funded the operations of joint al-Qaeda-Haqqani Network-Lashkar-e-Taiba cells in Afghanistan.

237.      The notorious conditions in Germany described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an

---

[223] Stephen Graham, *German Probe Focuses on Finances*, AP Online (Sept. 26, 2001).

[224] Gurulé, *Unfunding Terror*, at 80.

156

al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Germany, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Germany and, through such FTO's German intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

238. The Germany-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(xiii) **Value Chains That Supported FTO Leaders**. Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Germany-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on Germany and the U.S. to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(xiv) **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Germany-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Germany-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain

each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xv)   **Value Chains That Supported FTO Operatives**.  The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' Germany-related transactions facilitated the terrorist finance schemes operated by al-Qaeda's VAT fraud cells in Europe, including the Ahmed and Azizi Cells, which repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Germany-related transactions, and the Deutsche Bank Defendants also aided the Syndicate by facilitating the Germany-related transactions of Mamoun Darkazanli and Mamdouh Mahmud Salim of al-Qaeda's infamous "Hamburg Cell." When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated Syndicate attacks against Americans in Afghanistan.

(xvi)   **Value Chains That Supported FTO Partners.**  Each Defendant aided the Syndicate by facilitating the Germany-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

### 5.   Estonia

239.    From 2001 through 2021, Estonia served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide. While Estonia, unlike the other geographies, was not one of the "Top 10" overall geographies (out of more than 200 nations) from which al-Qaeda, the Taliban, and/or the IRGC could prepare for worldwide attacks, Estonia was absolutely in the Top 10 for these groups with respect to one of the Syndicate's most important funding streams:  Afghan opium.

331.240.          Estonia bordered Russia, sat on the "northern route" of the Afghanistan-to-Russia Opium Pipeline, and was a vital geography for al-Qaeda and the Haqqani Network in Europe.

332.241.	Befitting Estonia's status as a critical geography for al-Qaeda's and the Haqqani Network's drugs, arms, and money pipeline, both groups operated cells there at all times.

333.242.	Given Estonia's importance to the Afghanistan-to-Russia Opium Pipeline, Defendants knew that transactions raising a risk of financial crimes like money laundering also foreseeably risked aiding al-Qaeda and the Haqqani Network.  For example, due diligence publications regularly alerted Defendants to the significant presence of Islamist terrorist cells and operations in Estonia.

334.243.	Al-Qaeda and Haqqani Network terrorist finance and terrorist logistics routed to agents, operatives, or fronts in Estonia directly supported terrorist attacks against Americans in Afghanistan.  For example, in 2019, Estonia extradited Haji Abdul Satar Abdul Manaf, who was a Haqqani Network operative who led a cell in Estonia that, among other things, helped manage the Syndicate's narco-trafficking operations to fund attacks against Americans in Afghanistan.

244.	The notorious conditions in Estonia described above flourished throughout the period from 2001 through 2021.  Accordingly, whenever a Defendant facilitated illicit transactions on behalf of, or with a counterparty that was owned or otherwise controlled by, an al-Qaeda, Taliban, and/or IRGC agent, operative, front, cut-out, and/or Orbit in Estonia, such Defendant caused the value at issue – including, but not limited to, the U.S. Dollars, services, goods, and/or technologies that are the subject of the transaction at issue – to travel through such Defendant's branches (including such Defendant's New York branch for all or nearly all USD-denominated transactions), to such FTO's intermediary in Estonia and, through such FTO's

German intermediary, on to al-Qaeda's, the Taliban's, and/or the IRGC's global terrorist networks supporting attacks in Afghanistan.

245.    The Estonia-to-Syndicate terrorist finance and logistics value chains that Defendants helped al-Qaeda, the Taliban, and the IRGC build, grow, sustain, and protect, which Defendants normally facilitated through transactions denominated in U.S. Dollars and routed through their New York branches, *i.e.*, DBTCA, SCB New York, and/or Danske New York. Examples of the FTO-related value chains that operationalized Defendants' provision of illicit financial services into potent streams of al-Qaeda, Taliban, and IRGC finance and logistical support for their Afghanistan campaign include, but are not limited to:

(xvii)  **Value Chains That Supported FTO Leaders**.  Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Estonia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to Altaf Khanani and the Khanani MLO that facilitated the Khanani MLO's regular use of transactions touching on Estonia and the U.S. to regularly flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Khanani MLO, all of which flowed back to al-Qaeda and the Taliban and aided their attacks against Americans in Afghanistan.

(xviii)  **Value Chains That Supported FTO Logisticians, Agents and/or Financiers.** Each Defendant aided Sirajuddin Haqqani and al-Qaeda's use of Estonia-related transactions to support terrorist logistics flow for the Haqqani Network by providing financial services to the Russian Mafia that facilitated the Russian Mafia's extensive use of Estonia-related transactions to regularly help clean al-Qaeda and Taliban opium profits and flow through the Syndicate's desired 6-, 7-, and 8-figure value transfers, usually in USD-related deals, from Russia and Europe, clean them, convert into Dollars, and then repatriate back to the Syndicate, which value transfer chain each Defendant facilitated through their illicit transactions with the Russian Mafia, all of which flowed back to al-Qaeda and the Taliban and aided the Syndicate's campaign to attack Americans in Afghanistan.

(xix)   **Value Chains That Supported FTO Operatives**.  The Standard Chartered Bank, Deutsche Bank, and Danske Bank Defendants' facilitation of Estonia-related transactions enabled the easy flow of the Syndicate's U.S. Dollar profits through its transnational schemes, including through decades of Russia Mafia laundering activity in Estonia, which regularly repatriated U.S. Dollar income back to al-Qaeda and the Haqqani Network through Russia-related transactions identified in this Complaint,

which, on information and belief, often involved Estonia as well.  When they did so, Defendants caused significant U.S. Dollar value to flow through to, and aid, al-Qaeda and the Taliban, which facilitated their attacks against Americans in Afghanistan.

(xx)    **Value Chains That Supported FTO Partners.**  Each Defendant aided the Syndicate by facilitating the Estonia-related transactions, which depended upon each Defendant's ability to offer an array of U.S. Dollar services, on behalf of, or for the benefit of, al-Qaeda's key transnational partners in the narcotics trade, including, but not limited to, Dawood Ibrahim and D-Company (both of whom have been designated by the U.S. for their relationship with al-Qaeda), which significantly funded and resourced the Syndicate's supply chains and facilitated its attacks on Americans in Afghanistan.

**E.      Iran's Islamic Revolutionary Guard Corps, Acting Through Its Hezbollah Division And Qods Force, Materially Supported The Syndicate's Terrorist Attacks Against Americans In Afghanistan By Regularly Supplying Funds, Arms, Communications Equipment, Training, And Logistical Support To Al-Qaeda, The Taliban, Including Its Haqqani Network, And D-Company**

246.    The SCB Defendants and Deutsche Bank Defendants did not limit their aid to al-Qaeda and the Taliban, including its Haqqani Network: both banks also provided routed millions of U.S. Dollars each year from the early 2000s through on or about 2015.  To lay the foundation for Plaintiffs' allegations concerning the SCB Defendants' and Deutsche Bank Defendants' substantial assistance to al-Qaeda and the Taliban, including its Haqqani Network, through such Defendants' illicit deals with known Hezbollah and Qods Force fronts in, among other places, the U.S., U.A.E., Europe, South Africa, and Russia, Plaintiffs first outline how the IRGC, including its Hezbollah Division and Qods Force, facilitated anti-American terror worldwide. Plaintiffs then allege in detail how the IRGC directly supported Syndicate terrorist attacks against Americans in Afghanistan since 2006, using every means of material support traditionally supplied by Hezbollah and the Qods Force to the IRGC's terrorist proxies, including funds, weapons, training, equipment, and logistical support.

**1.      The Islamic Revolutionary Guard Corps Has Long Supported Anti-American Terrorism As Part Of Iran's Foreign Policy**

247.    Iran has been designated as a State Sponsor of Terrorism since 1984.[225]  Iran has remained designated continuously since then.

---

[225] Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780).

248.     The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States' role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[226]  Since the Iranian Revolution, Iran has engaged in and supported acts of terrorism directed at the United States and its allies as an instrument of Iran's foreign policy.

249.     Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-Qaeda is well-documented.[227]  Iran's support for such groups is especially prevalent in areas where Iran abstains from open conflict.  As a result of Iran's consistent and longstanding support of anti-American terrorism, the U.S. State Department formally designated Iran as a State Sponsor of Terrorism in 1984.[228]  It has maintained that designation at all times since.[229]  In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[230]

250.     Iran carries out its support of terrorism largely through the IRGC.

---

[226] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*"), http://jcpa.org/killing-americans-allies-irans-war/.

[227] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011) ("*Iran's Balancing Act*").

[228] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm.

[229] *Id.*

[230] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

251.   The IRGC "has a relatively strict command-and-control protocol and answers directly to the Supreme Leader, Ayatollah Ali Khamenei."[231]  The Supreme Leader serves as head of the IRGC and routinely employs the IRGC to further Iran's global terrorist agenda.

252.   As the U.S. Treasury Department noted in 2010 when it designated certain IRGC officials pursuant to Executive Order 13224, "Iran also uses the . . . IRGC . . . to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups."[232]

253.   Iran is politically and ideologically hostile to the United States and its allies. Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including Hezbollah Division and the Qods Force, both of which report to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[233]

**i.   Islamic Revolutionary Guard Corps (Regular IRGC)**

254.   The IRGC was established to safeguard the revolution, meaning, to pursue violence inside of Iran, *i.e.*, terrorism against its own people, and external to Iran, *i.e.*, terrorism

---

[231] *Iran's Balancing Act* at 10.

[232] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

[233] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

against the United States and Israel, whom the IRGC considered to be the "Great Satan" and

"Little Satan," respectively.  As Monika Gill, a defense researcher, explained in an analysis

published by NATO in 2020: "The aphorism that 'war made the state and the state made war'

applies to the IRGC; war made the Guard and the Guard made war."[234]

255.    Under Article 176 of the Iranian Constitution, as widely interpreted, the IRGC's

stated mission is to facilitate terrorist attacks against the United States and Israel.[235]

256.    To execute its constitutionally-mandated function to terrorize Americans to export

Iran's Islamic Revolution, the IRGC often acts through its lead terrorist agent, Lebanese

Hezbollah – a designated Foreign Terrorist Organization since 1997 – which Iran funds, arms,

and logistically supports.  Through Hezbollah, Iran provides material support and resources for

acts of international terrorism targeting the United States and its overseas interests.[236]

257.    As a result of the IRGC's consistent and longstanding support of anti-American

terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to

---

[234] Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020) ("Gill, *Capitalism, Communications, and the Corps*").

[235] Article 176 provides that Iran's "security policies" sought to "preserv[e] the Islamic revolution" (*i.e.*, export Iran's Islamist revolution abroad through proxy terrorism), through the "[e]xploitation of materialistic and intellectual resources of the country" (*i.e.*, Iranian funds, arms, and training for terror proxies), "for facing the internal and external threats" (meaning, to target the United States for terrorist violence).  Article 176 is widely understood, in Iran and worldwide, to explicitly enshrine the IRGC's anti-American terrorist mission into Iran's constitution because the IRGC is directed to "fac[e]" (*i.e.*, target) "the" (*i.e.*, an identified object) "external threats" (*i.e.*, the U.S. and Israel).

[236] Federal courts have repeatedly held that Hezbollah is an agent of the IRGC, including the Qods Force.  *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018); *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55 (D.D.C. 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780). The United States has maintained that designation at all times since.

258.   On October 29, 1987, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action against U.S.-flag vessels." Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

259.   In 1990, the IRGC transferred activities outside of Iran to its subordinate branch, the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to destroy the state of Israel and take back Jerusalem.

260.   On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security … of the United States. …" Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

261.   On August 21, 1997, President Clinton issued Executive Order 13059 to consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade intended to benefit, among other things, the IRGC, including its Hezbollah Division and Qods Force. Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997). (That same year, the U.S. also designated Iran's lead terror agent, Hezbollah, as an FTO.)

262.   In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

263.   The Department of Treasury implemented regulations pursuant to these Executive Orders which, in general, broadly prohibit any economic transactions with any entities that are controlled by the Government of Iran. 31 C.F.R. § 560.304 (defining "Government of Iran"), 31

C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran"); 31 C.F.R. § 560.314 (defining "United States person").

264.    In 2007, the U.S. State Department described Iran as "the most active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[237]

265.    The IRGC, including its Hezbollah Division and Qods Force, has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing.  It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often working side-by-side with Hezbollah.

266.    On April 15, 2019, the U.S. State Department designated the IRGC, including its Qods Force, as a Foreign Terrorist Organization.[238]  Announcing the designation, President Trump explained that "the IRGC actively participates in, finances, and promotes terrorism as a tool of statecraft."[239]  According to the State Department's public statement explaining the designation, the IRGC had "been directly involved in terrorist plotting; its support for terrorism [was] foundational and institutional, and it [had] killed U.S. citizens."[240]  Through the IRGC's support for terrorist organizations in the region, the IRGC "made a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across the Middle East."[241]

---

[237] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[238] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

[239] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as a Foreign Terrorist Organization (Apr. 8, 2019).

[240] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8, 2019).

[241] *Id.*

267.    When the State Department designated the IRGC as an FTO, Secretary of State Michael R. Pompeo officially confirmed the following points concerning U.S. policy:

(i)      "[The IRGC's FTO designation] is the first time that the United States has designated a part of another government as an FTO."

(ii)     "[T]he Iranian regime's use of terrorism as a tool of statecraft makes it fundamentally different from any other government."

(iii)    "For 40 years, the [IRGC] has actively engaged in terrorism and created, supported, and directed other terrorist groups."

(iv)    "The IRGC" "regularly violates the laws of armed conflict; it plans, organizes, and executes terror campaigns all around the world."

(v)     "The IRGC institutionalized terrorism shortly after its inception, directing horrific attacks against the Marine barracks [] in 1983 and the U.S. embassy annex in 1984 alongside the terror group it midwifed, Lebanese Hizballah."

(vi)    "[The IRGC's] operatives have worked to destabilize the Middle East from Iraq to Lebanon to Syria and to Yemen."

(vii)   "The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas, Kata'ib Hizballah, among others, all of which are already [FTOs]."

(viii)  "[The IRGC's FTO] designation makes clear … that [the] Iranian regime not only supports terrorist groups, but engages in terrorism itself."

(ix)    "[The IRGC's FTO] designation [] brings unprecedented pressure on [IRGC] terror campaign [leaders]… like Qasem Soleimani … [who] doles out the regime's profits to terrorist groups across the region and around the world."[242]

268.    As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal" country, but a place where the IRGC, including its Hezbollah Division and Qods Force, rely upon their corporate allies to directly enable violence in an open and shocking manner.[243]

---

[242] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr. 8, 2019) (emphasis added).

[243] According to Ambassador Mark D. Wallace, the CEO of United Against Nuclear Iran ("UANI"): "International organizations must also realize that their relationship with Iran is not just … 'business as usual,' …  Put bluntly, Iran is in violation of many of its international treaty

269.    The IRGC's terrorist doctrine emphasizes the reliance upon charities, corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers for the IRGC, including its Hezbollah Division and Qods Force.

270.    IRGC operatives follow sophisticated tradecraft designed to maximize the IRGC's ability to route funds, materials, and arms obtained through IRGC fronts, including Hezbollah and Qods Force fronts, through Hezbollah to IRGC proxies like the Taliban in Afghanistan and Jaysh al-Mahdi in Iraq.

271.    One such tactic known as the IRGC's **"Orbit" Strategy**, pursuant to which the IRGC, including its Hezbollah Division and the Qods Force, ordinarily structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC, including its Hezbollah Division and Qods Force, did not directly benefit from an otherwise suspect transaction because the counterparty itself was "not IRGC."

272.    In 2020, NATO confirmed the IRGC's "Orbit" Strategy in an analysis by Monika Gill, a defense scholar who closely the IRGC, which NATO published in *Defence Strategic Communications*, "[t]he official journal of the NATO Strategic Communications Centre of Excellence."[244]  According to Ms. Gill's study of the IRGC's terrorist finance and logistics strategies, the IRGC's practices while exercising control of Iran's heavy construction industry show the IRGC's "Orbit" strategy as being part of their terrorist tradecraft, because the entire

---

obligations, and it should not be treated like a member in good standing of international bodies." Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added) ("Wallace May 17, 2012 Testimony"), 2012 WLNR 10405070.

[244] *Id*.

point of the strategy is to enable a future accomplice – like a company that gets caught red-handed – to protest that there is no direct linkage between them and the IRGC:

> The IRGC-CF is comprised of a complex network of Orbit 1 companies and Orbit 2 companies. In Orbit 1 companies, the IRGC-CF is directly represented on the board of directors, whilst in Orbit 2 companies, there ***appears to be no direct representation and therefore, seemingly no links*** to the IRGC-CF. Whilst Orbit 2 companies appear independent of the IRGC, they maintain ties to the directly affiliated companies, and therefore remain under indirect IRGC influence. Baharahn Gostar Kish for example, is an information technology and communications company that has no formal links to the IRGC-CF, with no IRGC members on the board of directors.  However, two board members represent Baharahn and Mowj Nasr Gostar, which are both Orbit 1companies, ***meaning that the company still effectively falls under the IRGC economy***.[245]

273.    When NATO published Ms. Gill's "Orbit" Strategy discussion, NATO essentially vouched for her conclusions because NATO would not have published an article that NATO believed to contain implausible or conclusory assertions.[246]

### ii.    Hezbollah

274.    Hezbollah is a Lebanon-based terrorist group that has pledged fealty to Iran's Supreme Leader.  The IRGC has long used Hezbollah (in collaboration with the Qods Force), to establish, expand, and oversee nationwide terror campaigns targeting Americans in the Middle East, doing so in Afghanistan, Iraq, Lebanon, Yemen, Syria, Israel, and elsewhere.

---

[245] *Id.* at 101-102 (emphasis added).

[246] On information and belief, NATO would have only published Ms. Gill's study of the IRGC if the professional staff at NATO, on behalf of NATO, believed that such article:  (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, *e.g.*, a government official working for NATO to defend the U.S. and Europe from, *inter alia*, terrorism; (2) offered reasonable opinions worthy of consideration by responsible parties; and (3) strengthened NATO's ability to fight terrorism, as that was NATO's primary mission for the two decades after 9/11.

275.    Hezbollah "first emerged as a militia in opposition to the 1982 Israeli invasion of Lebanon,"[247] when the IRGC established Hezbollah as a subordinate part of the IRGC known as the IRGC's "Hezbollah Division,"[248] which IRGC status Hezbollah has maintained ever since.

276.    Hezbollah was and is the IRGC's, including the Qods Force's, lead terrorist proxy throughout the world, including in the U.S., Europe, and Dubai, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with the Qods Force.

277.    Articles 150 and 154 of the Iranian Constitution enshrines Hezbollah's anti-American terrorist mission by ordering the IRGC to specifically target Americans in order to export Iran's Islamic Revolution.  Article 150 empowers the IRGC with the responsibility for "guarding the revolution and its achievements," (meaning, exporting the Islamist revolution),[249] while Article 154 confirms that Iran "supports the just struggles of the *mustad'afun* [downtrodden] against the *mustakbirun* [oppressors] in every corner of the globe."  Thus, Iran's

---

[247] Marc Lindemann (Captain, New York National Guard), *Laboratory of Asymmetry: The 2006 Lebanon War and the Evolution of Iranian Ground Tactics*, Military Review (May 1, 2010), 2010 WLNR 28507137 ("Lindemann, *Laboratory of Asymmetry*").  "Although Iran was engaged in the Iran-Iraq War at the time of the Israeli occupation, Iran's [IRGC] took the lead in organizing, training, and equipping Hezbollah. … 2,500 members of the IRGC [] enter[ed] Lebanon and set up training camps among the Shi'ite population in the Beqa'a Valley … Training at the IRGC camps became a prerequisite for membership in Hezbollah." *Id.*

[248] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

[249] Under Iran's revolutionary doctrine, the Iranian government posits that it must always remain on the attack with respect to its promotion of insurgents against the Great Satan because, if Iran were to fall back (according to this paranoid theory), the U.S. would overrun Iran. Consequently, inside Iran and around the world, people familiar with Iran and the IRGC understand that references to "guarding the revolution" are ***not*** defense, but rather, are ***offensive*** because, under the paranoid Iranian view, the only way to "guard the revolution" is to go on the attack outside of Iran, through proxy terror campaigns.  Any suggestion to the contrary is, quite literally, IRGC terrorist propaganda.

constitution directly embraces Hezbollah proxy terror (*i.e.*, "the just struggles of the downtrodden") targeting the United States (*i.e.*, "against the oppressors").[250]

278.    Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as the 'A-Team of Terrorists,'"[251] and former CIA director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[252]

279.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[253]  Hezbollah also frequently functions as a terrorist proxy for the IRGC committing and orchestrating terrorist attacks abroad with the IRGC's, including the Qods Force's, support.  Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[254]

---

[250] When the Iranian government references "the oppressors" without any specification as to whom, that *exclusively* means only two countries:  the United States and Israel.  This is so because the Iranian regime was founded in direct opposition us and our ally, and Iran's founding documents mention no other hostile actor beyond the U.S. and Israel.  Any suggestion to the contrary is, literally, Iranian propaganda designed for a western audience.

[251] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

[252] *Current and Future Worldwide Threats to the National Security of the United States: Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet).

[253] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[254] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

280.     In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[255]

281.     Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground."[256] Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf.  Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); Khobar, Saudi Arabia (1996); Iraq (2005-present); and Yemen (2012-present).

282.     On January 25, 1995, the United States designated Hezbollah as a Specially Designated Terrorist.

283.     On October 8, 1997, the United States designated Hezbollah as an FTO, and it has retained that designation ever since.

284.     Hezbollah is, and has always been widely understood in the U.S., Europe, Middle East, and Asia to be Iran's purpose-built anti-American and anti-Israeli Arabic Shiite terrorist division, which the IRGC designed to integrate within the IRGC's terror architecture, including, but not limited to, its financial, operational, and logistics networks in order to ensure that Hezbollah was inseparable from the Regular IRGC and Qods Force and always remained a

---

[255] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

[256] Matthew Levitt, *Hezbollah:  A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism:  Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

formal part of the IRGC.  The IRGC built Hezbollah this way because the IRGC wanted to be able to control Hezbollah's every move while simultaneously maintaining the fiction that Hezbollah were merely "resistance" fighters.  The IRGC's ploy was key to facilitating its worst terrorist plots because the IRGC's primary purpose when it created its Hezbollah Division was to secure the IRGC's plausible deniability on a structural level by interposing a buffer – Hezbollah – between the IRGC and the Americans whom the IRGC wanted to murder.

285.    The IRGC has long relied on Hezbollah to aid the Qods Force's efforts to supply al-Qaeda and Taliban terrorists who were targeting Americans in Afghanistan and Iraq:

(i)    The IRGC has relied upon Hezbollah and the Qods Force to aid attacks against Americans by al-Qaeda and the Taliban ever since the early 1990s (in the case of al-Qaeda) and/or shortly after 9/11 (in the case of the Taliban).

(ii)    Before 9/11, the IRGC, al-Qaeda, and their respective affiliates, worked together to broker combined Islamist terrorist training activities at Taliban sites in Afghanistan, during which time terrorists from Hezbollah, the Qods Force, al-Qaeda, the Taliban, Hamas, and Palestinian Islamic Jihad trained, prayed, and studied together in order to develop the long-term skills and relationships that bin Laden demanded under his corporate "always be closing" model of terror, which emphasized cross-pollination with every possible Islamist terrorist group as long as such group wanted to help al-Qaeda and its allies kill Americans.[257]

(iii)    After 9/11, al-Qaeda, the IRGC, and their respective affiliates, intensified their transnational terrorist alliance; the IRGC acted primarily through its Hezbollah and Qods Force operatives distributed in cells worldwide, while al-Qaeda and the Taliban, for their part, acted primarily through al-Qaeda-related "polyterrorists" who served both al-Qaeda and the Taliban, including its Haqqani Network, *e.g.*, Sirajuddin Haqqani, Anas Haqqani, and Khalil Haqqani (al-Qaeda/Taliban), Dawood Ibrahim (D-Company/al-Qaeda), Altaf Khanani (All).

---

[257] *See, e.g.*, Hal Bernton, Mike Carter, David Heath and James Neff, *Going To Camp*, Seattle Times (Aug. 4, 2002) ("By [1998], al-Qaida training was formalized. There was even a textbook, available in Arabic, French and other languages. … Trainees practiced with small arms, assault rifles and grenade launchers provided by the Taliban …. They learned about explosives and land mines. Representatives of terrorist groups, including Hamas, Hezbollah and Islamic Jihad, gave lectures on their organizations."), 2002 WLNR 2584645.

286.     It would be improper to suggest that the IRGC's Hezbollah Division is not a part of the IRGC, does not benefit from IRGC funds and resources, and/or does not help flow through such IRGC resources to IRGC terrorist proxies like the Taliban.  Every relevant IRGC-related leader, division, and doctrine has always reflected the universal understanding amongst Iran-led terrorists that Hezbollah was a part of the IRGC and benefited accordingly:

(i)     **IRGC Structure.**   The IRGC embedded Hezbollah within the IRGC as the IRGC's Hezbollah Division when the IRGC created Hezbollah in the 1980s, maintained the IRGC's "Hezbollah Division" within the IRGC ever since.[258]

(ii)     **Direct IRGC Funding.**  The IRGC directly funds its Hezbollah Division like its Qods Force, as they are two sides of the same IRGC external terror coin.  As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[259]  DIA concluded: "[e]lements of Iran's Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[260]

(iii)     **Hezbollah Founder Statements.**  Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) confirmed that "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[261]

(iv)     **Common IRGC Terrorist Tradecraft.**  The IRGC, including its Hezbollah Division and Qods Force, long practiced common terrorist tradecraft[262] across every component of the IRGC (regular, Hezbollah Division, and Qods Force) – including the use of

---

[258] *See, e.g.*, Knights, *The Evolution of Iran's Special Groups in Iraq*.

[259] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

[260] *Id*.

[261] *Killing Americans and Their Allies*.

[262] "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage.  Terrorists and clandestine intelligence operatives both practice tradecraft.

Hezbollah as the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.[263]

(v)      **Emphasis on Joint Hezbollah/Qods Force Cells.**  IRGC doctrine ordinarily calls for Hezbollah and Qods Force terrorists to be co-located out of joint cells when conducting IRGC terrorist operations outside of Iran.  The IRGC's joint cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans.  The common practice of Hezbollah and the Qods Force nearly always following the joint cell model when they are within striking distance of American –*i.e.*, when the IRGC perceives its odds of success, and risk of danger, to both be at the highest level – also confirms the Hezbollah-IRGC integration.

(vi)     **Hezbollah's Public Declarations.**  Like the IRGC, Hezbollah considers itself a part of the IRGC.  In 1985, "Hezbollah publicly acknowledged its reliance on Iran," and publicly pledged their loyalty to the IRGC.[264]

(vii)    **Hezbollah Operatives' Loyalty Oaths to IRGC.**  Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader (and head of the IRGC), Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

### iii.      The Qods Force

287.    The IRGC has a special foreign division called the Qods Force.  The U.S. State Department has observed that "Iran used the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) to implement foreign policy goals, provide cover for intelligence operations, and create instability in the Middle East.  The Qods Force is Iran's primary mechanism for

---

[263] The IRGC's tradecraft rules governing the IRGC, Hezbollah Division and the Qods Force, are ironclad, inflexible, widely known, and universally applied worldwide, befitting the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization.  IRGC tradecraft emphasizes concealment and cover above all else.

[264] In its 1985 Statement, Hezbollah publicly proclaimed, among other things:  "We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world. We abide by the orders of one single … leadership, represented by 'WaIi Faqih' [rule of the jurisprudent] and personified by [Grand Ayatollah] Khomeini," who led Iran's Islamic Revolution and, as such, also served as the head of the IRGC and Hezbollah's sworn leader.

cultivating and supporting terrorists abroad."[265]  The Qods Force is the driving force behind Iran's activities in Afghanistan, as well as in Iraq and elsewhere in the region.

288.    Major General Qassem Soleimani, who was the chief of the Qods Force for more than twenty years, oversaw the Qods Force's support for terrorist groups to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace him.

289.    In October 2007, the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 for providing material support to the Taliban and other terrorist organizations, including Hezbollah and terrorist groups in Iraq.[266]  The U.S. Treasury Department also designated multiple Qods Force members as Specially Designated Nationals pursuant to Executive Order 13224, based on their activities in Afghanistan.[267]

290.    Announcing the Qods Force's SDGT-related designations, the Treasury Department confirmed in its official press release that "[t]he Qods Force":

(i)      "provide[d] material support to the Taliban, Lebanese Hizballah, Hamas, [and] Palestinian Islamic Jihad";

(ii)     "[was] the [IRGC's] primary instrument for providing lethal support to the Taliban";

(iii)    "provide[ed] weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan";

(iv)     "support[ed] Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support";

---

[265] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

[266] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[267] *Id.*

(v)      "operate[d] training camps for Hizballah in Lebanon" "and" "trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran";

(vi)     "provide[d] roughly $100 to $200 million in funding a year to Hizballah and" "assisted Hizballah in rearming in violation of UN Security Council Resolution 1701"; and

(vii)    "provide[d] lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target[ed] and kill[ed] Coalition [] forces."[268]

291.    In light of the foregoing, Treasury confirmed, on behalf of the U.S. government, that "[t]hrough Qods Force material support to the Taliban, we believe Iran [was] seeking to inflict casualties on U.S." "forces" in Afghanistan.[269]

292.    The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region.  Soleimani took his directions from Khamenei, with whom he shared a close personal relationship.  Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020.  Khamenei then appointed General Esmail Ghaani to replace Soleimani.

293.    The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region.  The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

294.    The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem

---

[268] *Id.* (emphases added).

[269] *Id.* ("Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.").

Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan." Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and explosively formed penetrators ("EFP") built by Hezbollah with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

295.    The Qods Force provides weapons, funding, and training for terrorist operations targeting American citizens, including by supporting terrorist organizations such as al-Qaeda, the Taliban, and the Haqqani Network.  Iran's Supreme Leader and central government are aware of and encourage those acts.  As the U.S. government's Joint Improvised Explosive Device Defeat Organization ("JIEDDO") concluded:  "Iran's use of weapons smuggling networks is fairly predictable and meant to shape the manner in which foreign countries deal with Iran."[270]  For that reason, the Qods Force varies the quantity, rate, and types of weapons provided to its proxy terrorist organizations depending on the amount of pressure Iran wants to exert on a particular country.  Applying pressure against the United States by funding and supplying terrorist proxies in the Middle East and Central Asia is thus an official component of Iran's foreign policy.

296.    The Qods Force operates a broad global network of front companies, often co-located with Hezbollah.  Indeed, in recognition of the central role of cover to IRGC doctrine, the IRGC created the Qods Force's Unit 400, which was tasked with the mission of facilitating the IRGC's, including Hezbollah's and the Qods Force's, terrorist finance and logistics activities through illicit commercial transactions conducted by an international network of Qods Force

---

[270] Eric Parks, *Iranian Weapons Smuggling Activities in Afghanistan* at 9, JIEDDO J2 Open Source Augmentation and Analysis Cell (Sept. 3, 2009) ("*JIEDDO Report*").

front companies, which depended on the Qods Force maintaining a close working relationship with transnational criminal organizations, *e.g.*, the Khanani MLO or the Russian Mafia.[271]

297.     The U.S. State Department designated the Qods Force as a FTO in April 2019, along with the IRGC.[272]

### 2.     The IRGC Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There

298.     While Americans worked to rebuild post-war Afghanistan, they were attacked by Taliban and al-Qaeda terrorists.  The IRGC, including its Hezbollah Division and Qods Force, sponsored those terrorist attacks in an effort to undermine American foreign policy in Afghanistan.  To that end, the IRGC, including Hezbollah and the Qods Force, supported the Taliban (including its Haqqani Network) by, among other things, training Taliban terrorists how to attack Americans effectively and paying terrorists who killed U.S. forces.  The IRGC, including Hezbollah and the Qods Force, also provided the Taliban with sophisticated weapons that it used to kill and injure thousands of Americans.

299.     The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda was equally potent.  That support dates back decades and has included money, weapons, training, logistical assistance, and safe harbor for key al-Qaeda leaders.  In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for funds, personnel, and

---

[271] *See., e.g.*, Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz (Bangladesh) (Dec. 4, 2021) ("Unit 400 has a network of facilitators and proxies, including elements in organized crime syndicates. These individuals collect information, make preliminary logistical preparations, and carry out operations if necessary. These individuals sometimes are trained inside Iran and sometimes in the Quds Force's training camps across the globe.  Unit 400 has various front companies that both provide cover and money for this terrorist entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front companies, religious or charitable organizations around the world to recruit facilitators."), 2021 WLNR 39679934.

[272] *See* 84 Fed. Reg. 15278-01 (Apr. 15, 2019).

communication."  The IRGC's, including its Hezbollah Division's and Qods Force's, longstanding decision to back al-Qaeda despite sectarian differences between the two reflected Iran's overriding desire to foment anti-American terrorism around the world.  That decision, like the one to provide material support to the Taliban, paid dividends.  the IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda's activities in Afghanistan substantially contributed to the terrorist violence that killed and injured Americans there.

300.    The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda complemented its support for the Taliban because of the close relationship between the two terrorist groups.  Although al-Qaeda and the Taliban were nominally separate groups, they acted together in a terrorist "syndicate" that planned and authorized terrorist violence throughout Afghanistan.  That syndicate – which involved mafia-style meetings between leaders of the syndicate's various members – provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan.  By funneling material support to multiple members of that syndicate, the IRGC, including its Hezbollah Division and Qods Force, ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect.

301.    The IRGC's conspiracy succeeded.  The U.S. substantially completed its withdrawal from Afghanistan on or about August 2021, which was one of the four primary objects of the conspiracy.  Afghanistan was also, along with Iraq, one of the two central theaters where both the IRGC, including its Hezbollah Division and Qods Force, and its Sunni allies al-Qaeda and the Taliban, regularly collaborated in a two-way manner, sharing resources, personnel, smuggling routes, financiers (in-country and around the world), and sometimes even jointly committing attacks with one another.

302.     The public reaction of the IRGC, including its Hezbollah Division and Qods Force, to the U.S. withdrawal from Afghanistan confirms that the terrorists believe they achieved one of the objects of the conspiracy:

303.     Iran's support for multiple components of this "syndicate" ensured that its support had maximum effect.  Due to the mutually reinforcing ties between the Taliban and al-Qaeda in Afghanistan, support for the one benefited the other – and vice versa.  Iran recognized those interrelationships and so spread its support across multiple parts of the Afghan terror syndicate. In doing so, Iran was able to achieve its intended effect:  wide-ranging terrorist attacks against Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed with) al-Qaeda and the other components of the syndicate.

304.

### i.      The IRGC Provided Material Support to Al-Qaeda

305.

306.     Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan.  As Judge Daniels found, "[i]n 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."[273]  "Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[274]

---

[273] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *11 (findings of fact).

[274] *Id.*

307.    "In 1993, in a meeting in Khartoum, Sudan, arranged by Ah Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a multipurpose member of the Iranian terrorist structure."[275]

308.    "At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism."[276]

309.    "Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda."[277]  "Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist."[278]

310.    "The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security."[279]

---

[275] *Id.* (internal citations and quotations omitted).

[276] *Id.* (internal citations and quotations omitted).

[277] *Id.*

[278] *Id.* (internal citations and quotations omitted).

[279] *Id.* (internal citations and quotations omitted).

311.    "Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security."[280]

312.    "Iran's *Charge d'Affaires* in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah."[281]

313.    Under its alliance with al-Qaeda, Iran also regularly hosted Zawahiri during al-Qaeda's formative years.  As Judge Daniels previously found, "[a]s a result of the creation of this terrorist alliance, al Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS [Iran's Ministry of Intelligence and Security], including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi."[282]

314.    "The creation of the Iran–Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies," leading to the first World Trade Center attack in 1993, the Khobar Towers bombing in 1996, the African embassy bombings in 1998, the USS Cole attack in 2000, and 9/11.[283]

315.    As a result of the foregoing, Iran was the proximate and but-for cause of al-Qaeda's embrace of suicide bombing as a tactic.  Qods Force and Hezbollah agents acting at Iran's direction originally instructed al-Qaeda in the theological, technological, and tactical aspects of suicide bombing as a terrorist strategy based upon Iran's and Hezbollah's own successful use of suicide bombers during Iran's war against Iraq and during the joint Iranian/Hezbollah terrorist campaign

---

[280] *Id*. (internal citations and quotations omitted).

[281] *Id*. at *12 (internal citations and quotations omitted).

[282] *Id*. (internal citations and quotations omitted).

[283] *Id*.

against Americans in Lebanon in 1983, in which Hezbollah terrorists used suicide bombers to kill hundreds of Americans serving in Lebanon.

316.     When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States."[284]  A court in this District subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[285]

317.     The 9/11 Commission has also confirmed that there was solid and substantial proof of Iran's repeated willingness to support terrorist proxies targeting Americans in the Middle East, including Sunnis with whom the Iranians are normally hostile, which had been demonstrated by Iranian assistance to a litany of terrorists, including 9/11 hijackers.[286]

318.     After 9/11, senior al-Qaeda leadership, sheltering in Iran under the patronage and with the counsel of Qods Force operatives, explicitly modeled their post-9/11 organization and tactics on the approach of Hezbollah and the Qods Force.

319.     While al-Qaeda was re-building itself in Iran after 9/11, the Iranians were busy rejecting U.S. and allied requests to stop aiding al-Qaeda.  For example, on or about 2002 or 2003, Iran rejected a lawfully issued extradition request by the Jordanian government for Zarqawi on the

---

[284] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[285] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[286] *See, e.g., The 9/11 Commission Report* at 60 ("[T]he evidence of Iranian involvement" in the June 1996 truck bomb attack against Americans in Khobar Tower in Saudi Arabia was "strong" and there were "also signs that al Qaeda played some role.") (July 1, 2004); *see also id.* at 240-241 (significant Iranian transportation and logistical support for 9/11 attackers).

preposterous grounds that Zarqawi – whom the Iranians knew well – was not Jordanian but, rather, Syrian.  Similarly, in a 2003 face-to-face meeting in Geneva, Switzerland, then-U.S. ambassador to Iraq Ryan Crocker implored Iranian officials to cease their support for al-Qaeda's terrorism targeting Americans in the Persian Gulf, which request the Iranians refused.  By then, al-Qaeda had demonstrated its usefulness to Iran with respect to its ability to kill Americans, and Iran was already sheltering and supporting al-Qaeda's military leader, Saif al-Adel (who was also al-Qaeda's manager for Zarqawi's activities in Iraq) in his Qods Force-provided Tehran safe house.

320.    The Iranians rebuffed U.S. outreach because they had already reached a secret deal with al-Qaeda.  Following the 9/11 attacks on the United States and subsequent routing of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, Iran met with senior al-Qaeda leaders who had fled Afghanistan into Iran to offer military aid to support al-Qaeda's fight against America.  Iran hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002.  As part of this initial offer of support, Iran pledged to provide funds and logistical support to facilitate the development of terrorist activities targeting Americans in countries bordering Iran.  While the focus at the time was on Afghanistan, all involved expected the U.S. to eventually move into Iraq and for their shared terrorist enterprise to follow us there.

321.    Under this secret deal between Iran and al-Qaeda after 9/11, Iran intensified its material support for al-Qaeda's terrorist campaign against Americans around the world.  Through the secret deal between Iran and al-Qaeda and the assistance that the former provided to the latter thereafter, Iran was the proximate and but-for cause of al-Qaeda's survival as a terrorist organization after 9/11 and the al-Qaeda linked terrorist attacks against Americans in Iraq, including Plaintiffs, that inevitably followed.

322.     Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by Iran.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving assistance that Iran had been providing to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "***main artery for funds, personnel, and communication***."[287]

323.     Zawahiri also emphasized close strategic cooperation between al-Qaeda and Iran, following a pragmatic approach under which al-Qaeda focused on expanding its presence in Iran.  Like bin Laden, Zawahiri agreed that al-Qaeda could not survive and thrive without the support it received from Iran.  In a letter reportedly written by Zawahiri, al-Qaeda thanked Iran for the Qods Force's support in setting up al-Qaeda's terrorist network in Yemen in 2008 and stated, in effect, that al-Qaeda could not have established its franchise in Yemen without the IRGC's assistance.

324.     The U.S. government has also recognized the close partnership between Iran and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between Iran and al-Qaeda.[288]  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations

---

[287] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence (2016) (emphasis added).  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including this letter.  *See* Bin Laden's Bookshelf, Office of the Director of National Intelligence.

[288] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities. In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities." The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[289] Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shiite Muslims elsewhere in the Middle East.

325. The U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations under Executive Order 13224. In February 2012, the agency designated the Iranian Ministry of Intelligence and Security ("MOIS") as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda.[290] In 2014, the agency likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."[291]

326. The close relationship between al-Qaeda and Iran has continued in recent years. In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed [al-Qaeda] facilitators to operate a core facilitation pipeline through the country, enabling [al-Qaeda] to move funds and fighters to South Asia and Syria."[292] It further accused Iran of remaining unwilling to

---

[289] *Id.*

[290] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012).

[291] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[292] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

bring to justice or identify al-Qaeda members in its custody.[293]   The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[294]

327.    Iran also supported al-Qaeda through its proxy, Lebanese Hezbollah.  As the *Washington Post* reported at the time in 2002, Iran's lead terrorist proxy, Lebanese Hezbollah, was "increasingly teaming up with al Qaeda on logistics and training for terrorist operations, according to U.S. and European intelligence officials and terrorism experts."[295]  "The new cooperation … includes coordination on explosives and tactics training, money laundering, weapons smuggling and acquiring forged documents, according to knowledgeable sources.  This new alliance, even if informal, has greatly concerned U.S. officials in Washington and intelligence operatives abroad who believe the assets and organization of Hezbollah's formidable militant wing will enable a hobbled al Qaeda network to increase its ability to launch attacks against American targets."[296]

328.    The "collaboration" between Iran (through Lebanese Hezbollah) and al-Qaeda "illustrate[d] what analysts [said] [was] an evolving pattern of decentralized alliances between terrorist groups and cells that share[d] enough of the same goals to find common ground: crippling the United States, and forcing the U.S. military out of the Middle East and Israel out of Palestinian territory.  'There's a convergence of objectives,' said Steven Simon, a former National Security Council terrorism expert." [297]  As the *Washington Post* reported, "[a]lthough cooperation between al Qaeda and Hezbollah may have been going on at some level for years, the U.S. war against al

---

[293] *Id.*

[294] *Country Reports on Terrorism 2017* at Foreword.

[295] Dana Priest and Douglas Farah, *Terror Alliance Has U.S. Worried; Hezbollah, Al Qaeda Seen Joining Forces*, Washington Post (June 30, 2002), 2002 WLNR 15332564.

[296] *Id.*

[297] *Id.*

Qaeda [] hastened and deepened the relationship. U.S. officials believe that after al Qaeda was driven from Afghanistan, leader Osama bin Laden sanctioned his operatives to ally themselves with helpful Islamic-based groups, said a senior administration official with access to daily intelligence reports."[298]  The *Post* concluded:

> European and U.S. intelligence operatives on the ground in Africa and Asia said they have been trying to convince headquarters of the new alliances but have been rebuffed.  "We have been screaming at them for more than a year now, and more since September 11th, that these guys all work together," an overseas operative said. "What we keep hearing back is that it can't be because al Qaeda doesn't work that way. ***That is [expletive]*.** Here, on the ground, these guys all work together as long as they are Muslims. There is no other division that matters."[299]

329.    Al-Qaeda's alliance with Iran's lead terrorist proxy, Lebanese Hezbollah, continued at all relevant times and proved the intelligence operatives on the ground had been right all along.  For example, in 2012, the Council on Foreign Relations reported that "al-Qaeda ha[d] stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[300]

330.    On or about August 7, 2020, on the anniversary of the Iran/al-Qaeda bomb attack against U.S. embassies in Africa, Israeli commandos acting at the request of the United States killed al-Qaeda's number 2 leader, Abu Muhammad al-Masri, in a covert mission in Tehran.[301] Masri was in Iran as a guest of the Iranian government and was permitted to freely plan attacks against the United States from an Iranian-provided safe-haven in Tehran.  The timing of the attack was not a coincidence, but a rather a professional slap in the terrorists' face extended by the U.S.

---

[298] *Id.*

[299] *Id.*

[300] *al-Qaeda (a.k.a. al-Qaida, al-Qa`ida)*, Council on Foreign Relations (June 6, 2012).

[301] Goldman at al., *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*.

and Israeli governments to Iran and al-Qaeda, as the latter allies suffered an embarrassing and catastrophic loss on the anniversary of one of their greatest terrorist triumphs.

331.    The mafia-style "syndicate" of which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a part, made attacks by each group more lethal.  Iran's mutually reinforcing support for al-Qaeda, AQI, and AI therefore made each group more effective.

332.    By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families.  Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members. Moreover, al-Qaeda was closely intertwined with al-Qaeda-in-Iraq and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda planned and authorized the Sunni attacks in which it did not directly participate.  Material support and resources provided to al-Qaeda thus also flowed to al-Qaeda-in-Iraq and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### ii.    The IRGC Provided The Taliban With Weapons, Explosives, and Lethal Substances

333.    Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban.  Many of the weapons Iran provided were designed to be particularly effective against U.S. and allied forces operating in Afghanistan.  For example, Iran provided the Taliban with anti-tank mines, long range rockets, explosively formed penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

334.    U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Afghanistan, many of which bore markings of Iranian origin.  A purported April

2007 military-intelligence summary (as published online) reported that "Iranian officials" were sending "to Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide vehicle-borne improvised explosive devices]."[302]  A purported U.S. government document from August of that year (as published online) also reported that the Afghanistan National Police had found evidence of a planning meeting for 25 suicide attacks in which it was stated that "[t]he materials for the bombs will be supplied by Iran Government . . . ."

335.    When the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 in October 2007, it specifically documented Iran's frequent shipments of weapons to the Taliban over at least the prior year.  A purported December 2007 military-intelligence summary (as published online) further reported that explosive samples in suicide vests seized from four suicide bombers "tasked by Taliban/Al-Qaeda leaders" with carrying out a suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

336.    In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made.[303]  That same month the U.S. Ambassador to Afghanistan stated that "[t]here is no question that elements of insurgency have received weapons from Iran."[304]

337.    A purported June 2008 U.S. State Department cable (as published online) detailed multiple instances of Iran transferring arms to the Taliban in 2007 and 2008 and concluded that

---

[302] *Afghanistan War Logs:  Anti-aircraft Missiles Clandestinely Transported From Iran Into Afghanistan – US Report,* The Guardian (July 25, 2010) ("*Anti-aircraft Missiles Clandestinely Transported*"); *see also Afghanistan War Logs: Afghan Government Seeking to Maintain Friendly Relations With Iran,* The Guardian (July 25, 2010) (referencing Iranian-made weapons recently found in Kandahar Province).

[303] *JIEDDO Report* at 10.

[304] Brian Bennett, *Iran Raises the Heat in Afghanistan*, Time (Feb. 22, 2008).

analyses of the weaponry "indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007." Similarly, Afghan forces discovered a large cache of Iran-made explosives hidden near the Bakhshabad Dam in Farah Province in March 2009. That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

338.    In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province. Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines bound for Afghan militants. And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers. That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."[305]

339.    By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan. In February 2011, British forces intercepted more than four dozen 122-milimeter rockets in Nimruz Province near the Iranian border, which gave the terrorists roughly double the range to attack Coalition targets. British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."[306] The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of

---

[305] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[306] Julian Borger & Richard Norton-Taylor, *British Special Forces Seize Iranian Rockets In Afghanistan*, The Guardian (Mar. 9, 2011).

their discovery, give them a 'high degree' of confidence that they came from the Revolutionary Guard's overseas unit, the Qods Force."[307]  General Petraeus later confirmed that the Qods Force had supplied these rockets to a "known Taliban facilitator."[308]  The U.S. Department of Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."[309]

340.     In June 2015, Iran hired smugglers to ferry supplies across the Iranian border and deliver them to Taliban units in Afghanistan.  These Iran-supplied weapons included 82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making roadside bombs.

341.     Iran also provided EFPs to the Taliban.  EFPs are specially shaped charges, first used by Hezbollah in Lebanon, which typically employ a manufactured concave copper disk and an explosive-packed liner.  Thus, when Iran "smuggled [EFPs] to Afghan insurgents for use against U.S. Forces,"[310] Iran supplied the Taliban with a particularly lethal form of support.  Indeed, Iran and Hezbollah designed EFPs to defeat armored vehicles like the ones used by Coalition forces in Afghanistan.  Those EFPs gave the Taliban a sophisticated anti-American weapon that it could not have obtained or deployed effectively on its own.

342.     The Taliban began using EFPs against Coalition forces in 2007.  A purported May 2007 U.S. State Department cable (as published online) reported on increased IED attacks and

---

[307] Jay Solomon, *Iran Funnels New Weapons to Iraq and Afghanistan*, Wall St. J. (July 2, 2011).

[308] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/ content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[309] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 107 (Apr. 2011).

[310] *JIEDDO Report* at 1.

noted that recent attacks had been successful against armored ISAF vehicles, which indicated an Iran-supplied EFP.  Just days later another purported cable (as published online) reported that two EFPs had been discovered in April 2007 in Herat Province.  Through the summer of 2007, at least four EFPs were discovered in Herat Province, near other Iranian arms shipments.

343.    A purported September 2007 cable (as published online) stated that British forces "in Farah Province, Afghanistan intercepted an arms convoy they had been tracking from inside Iran," which included EFPs "of Iranian origin."  One week later, another purported cable (as published online) reported that, according to the U.K. Ambassador to NATO, Stewart Eldon, analysis of the munitions "showed a clear link to Iran and weapons the Iranian Revolutionary Guard Corps Qods Force has sent to insurgents in Iraq."  In 2008, the United Kingdom obtained proof that Iran was supplying the components for these EFPs.

344.    By 2007, the JIEDDO concluded that Iran was attempting to "inflict psychological damage" on the United States by smuggling EFPs "to Afghan insurgents for use against U.S. Forces."[311]

345.    In Afghanistan, Iranian EFPs earned the nickname "Dragons" because their explosive force was concentrated in the direction of the designated target rather than blasting in all directions and dispersing the impact.[312]  Unlike ordinary mines that cause only minor damage to U.S. military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank.[313]  According to one Taliban commander, "If you lay an ordinary mine, it will only cause

---

[311] *JIEDDO Report* at 3.
[312] Kate Clark, *Taliban Claim Weapons Supplied By Iran*, The Telegraph (Sept. 14, 2008).
[313] *Id*.

minor damage to Humvees or one of their big tanks.  But if you lay a[n] [Iranian] Dragon, it will destroy it completely."[314]

346.    On information and belief, many Plaintiffs, or their family members, were severely injured or killed in terrorist attacks using Iran-supplied EFPs.

347.    Iran also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces.  A purported April 2007 military-intelligence summary (as published online), for example, reported that Iran had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan.[315]  A purported Afghanistan Police Report from the next month (as published online) claimed that Iran intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander.  A purported March 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran.  Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

348.    According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters.  The launcher was marked "Made In Iran."  The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

---

[314] Steven O'Hern, *Iran's Revolutionary Guard: The Threat That Grows While America Sleeps* at 112 (Potomac Books, 1st ed. 2012) (internal quotations and citation omitted); Kate Clark, *Taliban claim weapons supplied by Iran*, The Telegraph (Sept. 14, 2008).

[315] *Anti-aircraft Missiles Clandestinely Transported*.

### iii.    The IRGC Provided The Taliban With Lodging, Training, Expert Advice or Assistance, Safehouses, Personnel, and Transportation

349.    Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation.  Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces.  Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

350.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the Americans forces."[316]  A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.[317]

351.    Iran also trained Taliban fighters at camps within Iran.  For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border.[318]  A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

352.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained

---

[316] *Afghanistan War Logs: US Claims Iran Spies Helping Insurgents to Attack Coalition Forces,* The Guardian (July 25, 2010).

[317] *Afghanistan War Logs: Iranians Alleged to Be Sheltering Wounded Taliban Fighters in Tehran*, The Guardian (July 25, 2010).

[318] *Anti-aircraft Missiles Clandestinely Transported.*

terrorists.  Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran."  And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

353.     Iran provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces.  A purported December 2008 military-intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province using weapons that "Iran Intelligence could have provided."  According to a purported April 2009 military-intelligence summary (as published online), Iran was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters.  And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

354.     A March 21, 2010 article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs.  The *Times* interviewed two Taliban commanders – from Wardak and Ghanzi province – who had traveled to Iran with groups of Taliban terrorists for training, which improved their ability to launch lethal attacks on Coalition forces.  According to the commanders, Iran paid for this travel and training.  One commander who received training in Iran observed that the Taliban's and Iran's "religions and . . . histories are different, but our target is the same — we both want to kill Americans."[319]

---

[319] Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Times (Mar. 21, 2010).

355.    By 2009, U.S government officials were openly accusing the IRGC of training the Taliban.  In an August 2009 report, ISAF Commander General Stanley McChrystal explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents."[320]  He confirmed again in May 2010 that Iran was training Afghan fighters in Iran.[321]  In its 2009 Country Reports on Terrorism, the U.S. State Department reported:  "Iran's Qods Force provided training to the Taliban in Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons . . . ."[322]  Similarly, in 2012 it explained: "the IRGC-QF trained Taliban elements on small unit tactics, small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."[323]

356.    Iran's training of Taliban terrorists has not diminished.  By 2015, the IRGC was operating at least four Taliban training camps within Iran.

357.    Iran also facilitated the Taliban's attacks by allowing the Taliban to establish offices in Iran to serve as bases for planning terrorist attacks.  For example, Iran permitted a senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with Afghanistan and Pakistan.  In or about 2014, the Taliban also opened an office in Mashhad, Iran, where the Fourth Corps of the Qods Force is headquartered.[324]  As of January 2019, the Taliban maintained an office in Tehran, Iran.[325]

---

[320] Quoted by Sajjan M. Gohel, in *Iran's Ambiguous Role in Afghanistan* at 13, CTC Sentinel (March 2010).

[321] *Killing Americans and Their Allies*.

[322] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[323] U.S. State Dep't, *Country Reports on Terrorism 2012* at 196 (May 2013).

[324] Oved Lobel, *Afghanistan:  The Forgotten Front Against Iran*, Australia/Israel & Jewish Affairs Council (Nov. 16, 2018).

[325] *Iran and the Taliban:  A Tactical Alliance?*

358.    Iranian fighters also conducted attacks alongside Taliban terrorists.  In an October 2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of the other Taliban dead were taken across the border to Iran for burial.

359.    Mohammad Arif Shahjahan, the governor of Farah Province in western Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling frequently to Iran, where they received protection and support.[326]  He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.[327]

360.    Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces.  The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

### iv.    The IRGC Provided The Taliban With Financial Support

361.    Iran has also supported the Taliban financially.  On an annual basis, Iran provided large cash payments to the Taliban.  For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.[328]

362.    Iran also directly paid Taliban insurgents to kill U.S. forces.  Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and

---

[326] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[327] *Id.*

[328] *Afghanistan War Logs:  Iran Smuggles Money into Afghanistan to Fund Insurgents, says US Report*, The Guardian (July 25, 2010).

$3,481 for each Government of Afghanistan official killed.  The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful.[329]  Iran paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000 for each destroyed American military vehicle.  In one specific example, Taliban fighters received $18,000 from Iran as a reward for an attack in 2010 than killed several Afghan forces and destroyed an American armored vehicle.[330]

363.    Iran also provided funding to individual Taliban commanders, often as they were returning to Afghanistan from training in Iran.  A purported May 2008 military-intelligence summary (as published online) reported on a Taliban leader returning from training in Iran "along with a considerable amount of money."  A purported May 2009 U.S. State Department Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah Sangin with financial support to engage Coalition forces, including U.S. contractors.

364.    Iran has also supported the Taliban's finances by supporting its ability to traffic narcotics, which Taliban terrorists use "to finance their acts of terror and violence."[331]  As the U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate

---

[329] *Afghanistan War Logs:  Iran Offers Reward for Each Afghan Official and Solider Killed, According to Coalition Report*, The Guardian (July 25, 2010).

[330] Miles Amoore, *Iran pays the Taliban to Kill US Soldiers*, The Times (Sept. 5, 2010).

[331] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012).

shipments of opium into Iran."[332]  General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.[333]

365.    As reported in a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists. The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by Iran – if he fought with the Taliban in Afghanistan.[334]  And in 2017, officials in Ghor Province accused Iran of financing a Taliban offensive that briefly enabled the Taliban to overtake a key district.[335]

**F.      Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs**

366.    Since at least the mid-2000s, al-Qaeda authorized and planned the Taliban's attacks on U.S. forces in Afghanistan in several ways.

367.    **Authorization.** Al-Qaeda provided critical religious authorization for Taliban attacks on U.S. forces. As noted above, in 1998 Osama bin Laden himself directed all Muslims to kill Americans at every opportunity. In the ensuing years, senior al-Qaeda leaders issued a series of *fatwas* directed toward the Taliban, conferring religious permission for them to attack Americans in Afghanistan.

368.    After bin Laden was killed in May 2011 (about three months prior to the first attack on Plaintiffs), the Taliban confirmed his religious and moral authority over their Afghan jihad, stating: "Osama Bin Laden You were the *sheikh of the Umma*, a zealous man, and *the*

---

[332] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran* (Mar. 7, 2012).

[333] *Id.*

[334] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[335] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

*scholar and imam of the nation at the level of Jihad* and the fighting of the enemies and their minions. You were *our* sheikh, *our* imam and *role model*, the hero and miracle of our times, unique among your peers, pious and highly sensible."[336]

369.    Consistent with all these activities, al-Qaeda operatives often assumed a position of moral, religious, and tactical authority over Taliban (including Haqqani Network) members. Al-Qaeda members, for example, often "act[ed] as instructors and religious teachers for Taliban personnel and their family members."[337]

370.    Al-Qaeda also authorized the Taliban's terrorist attacks through its participation in Syndicate, which involved periodic mafia-style meetings in which al-Qaeda, the Taliban, and other members of the syndicate (such as Lashkar-e-Taiba) would confer about geographies and targets to attack.[338] The Syndicate jointly authorized particular types of terrorist attacks in particular geographies to be carried out by the syndicate's individual members. Among other things, the Syndicate specifically approved: (1) the creation and operation of the Kabul Attack Network to attack Americans in Kabul and the surrounding provinces; (2) the campaign of suicide attacks against Americans throughout Afghanistan; (3) the Taliban's campaign of using anti-American IED and suicide attacks specifically in Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces and P2K; (4) the Taliban's "surge" in Kandahar and Helmand from 2010 through 2012; and (5) the Syndicate's use of, and later aggressive focus on, CAN fertilizer bomb attacks specifically targeting Americans.

---

[336] Al-Somood, *Bin Laden Is Alive O Dead Ones And The Cowards Should Not Dare Close Their Eyes* (July 1, 2011) (emphasis added).

[337] Thomas Joscelyn, *Al Qaeda Growing Stronger Under Taliban's Umbrella, UN Finds*, Long War J. (June 23, 2019) ("*Al Qaeda Growing Stronger*").

[338] *See The al Qaeda – Taliban Connection*.

371.    Al-Qaeda's messages of authorization were particularly influential with respect to suicide bombings. In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq. A few months later, he reiterated in a *fatwa* directed at Afghans that "jihad against [the Coalition] is your duty" and that, "If you start suicide attacks, you will see the fear of Americans all over the world."[339] Afghan terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced it that such attacks were religiously permissible. Al-Qaeda trumpeted that success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[340] With al-Qaeda's authorization, the number of suicide attacks in Afghanistan increased from one in 2002, two in 2003, and six in 2004 to 21 in 2005, and more than 100 in 2006. Thereafter, suicide bombings remained a cornerstone of the Taliban's strategy.

372.    As a result, al-Qaeda's role in that suicide-bombing trend was pivotal and was the but-for cause of each Taliban suicide bomb attack.

373.    Al-Qaeda also authorized the Taliban's use of IED attacks against Americans in Afghanistan, and bin Laden regularly called for terrorists to attack Americans with IEDs.

374.    **Planning.** Al-Qaeda also planned the Taliban's terrorist attacks against Americans in Afghanistan. Working through its Syndicate partners and from its safe havens on both sides of the Afghanistan-Pakistan border, al-Qaeda "plan[ned] international as well as

---

[339] *Osama bin Laden:  Calls for Martyrdom Operations Against US and British Interests* (Apr. 10, 2003) (emphasis added).

[340] Brian Glyn Williams, *Suicide Bombings in Afghanistan* at 5, Jane's Islamic Affairs Analyst (Sept. 2007).

regional terrorist attacks, particularly in Afghanistan."[341] Two terrorism scholars explained al-Qaeda's syndicate-related shuras as follows:

> The staying power of al-Qaeda became rooted in its ability to draw from and coordinate with allied groups embedded in multiple networks on both sides of the border. . . . It established a number of shuras to **coordinate strategy, operations, and tactics** against the West and regional allied governments. In particular, al-Qaeda fighters have been involved in **planning and carrying out suicide attacks, developing improved explosive devices, and helping conduct operations** against high-value targets.[342]

375.     Al-Qaeda training provided another key mechanism through which that planning occurred. Before the September 11 attacks, al-Qaeda operated training camps in eastern Afghanistan at the Taliban's request. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans. At all relevant times, these al-Qaeda camps trained terrorists in the al-Qaeda signature of turning fertilizer into bombs.

376.     By the mid-2000's, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan, many of which were also affiliated with Sirajuddin Haqqani.[343]

377.     The training continued throughout the relevant timeframe of this case. In 2015, for example, U.S. and Afghan forces raided two al-Qaeda training camps in Kandahar Province – both reportedly "hosted by the Taliban."[344] One camp was the largest al-Qaeda facility discovered since the September 11 attacks, occupying nearly 30 square miles. On information

---

[341] *Resilient al-Qaeda* at 3.

[342] *Id.* at 3-4.

[343] Def. Intelligence Agency, *Intelligence Information Report: Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))* (Apr. 16, 2008) (listing training camps and some of the terrorists there).

[344] Thomas Joscelyn & Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

and belief, this camp trained terrorists in how to make CAN fertilizer bombs and included an on-site al-Qaeda CAN fertilizer bomb factory.

378.     Working jointly with polyterrorist Sirajuddin Haqqani, al-Qaeda specifically planned the Kabul Attack Network's campaign of terror, including its suicide bomber attacks. As two terrorism scholars explained, the "operational and tactical cooperation" provided by al-Qaeda "increased the ability of the Haqqani Network to carry out sophisticated attacks in Kabul," "through operations [that al-Qaeda] planned together with Sirajuddin Haqqani."[345]

379.     Al-Qaeda also planned the Taliban's attacks by devising the operational scheme for them. Information derived from al-Qaeda and Taliban detainees held at Guantanamo Bay, Cuba ("Gitmo") corroborates those activities. For example, according to purported Gitmo intelligence files quoted by terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was "a high-level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami Gulbuddin ("HIG")] and Taliban forces within Afghanistan," which the groups' respective leaders conceived during a meeting in Pakistan in early spring 2003.[346] Another Gitmo detainee files similarly documented "joint operations meeting[s]" where the participants, which included al Qaeda, Taliban and LT commanders "decided to increase terrorist operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide bombings, mines, and assassinations."[347] Together, these reports "demonstrate a high degree of collusion between al Qaeda and other terrorist groups" as part of a "jihadist hydra" that shared the "common goal" of seeking to "drive the U.S.-led coalition out of Afghanistan."[348]

---

[345] *Resilient al-Qaeda* at 9.

[346] *The al Qaeda – Taliban Connection.*

[347] *Id.* (brackets in original)

[348] *Id.*

380.    Al-Qaeda also taught the Taliban effective terrorist tradecraft. Through its relationship with al-Qaeda, the Taliban "developed or acquired new commercial communications gear and field equipment," as well as "good tactical, camouflage, and marksmanship training."[349] They also "share[d] communication and transportation routes, coordinate[d] attacks, and even utilize[d] the same explosive and suicide-bomber networks."[350] The Taliban's (including its Haqqani Network's) effective terrorist tradecraft was essential to its ability to execute al-Qaeda's nationwide CAN fertilizer bomb campaign, which depended upon sophisticated logistics, communications, smuggling, storage, and other technical skills that the Taliban only acquired through its relationship with al-Qaeda.

381.    All these activities were part of al-Qaeda's planning of the Taliban's CAN fertilizer bomb attacks in Afghanistan. By providing an array of advice, direction, and material support to the Taliban, al-Qaeda was able to use the Taliban for its own jihadist ends. In so doing, al-Qaeda followed its more general practice of planning terrorist attacks whose details it would delegate to local Islamic proxies. As terrorism scholar Thomas Ruttig observed: "Both in Afghanistan and Pakistan, al-Qaeda exploits local conditions by co-opting militant groups with local battle experience."[351] Here, its "cooptation" of the Taliban was especially effective.

382.    Al-Qaeda's planning activities extended specifically to the two CAN fertilizer bomb attack types that account for every attack in this case: IEDs and suicide bombs.

---

[349] *Id.* at 293.

[350] *Resilient al--Qaeda* at 9.

[351] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

383.    **IEDs.** Al-Qaeda planned the Taliban's campaign of IED attacks in Afghanistan in which the explosive was ammonium nitrate derived from Fatima Group CAN Fertilizer manufactured, sold, and distributed by Fatima and Pakarab.

384.    At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to converting fertilizer into ammonium nitrate for use in CAN fertilizer bomb attacks against Western targets. As Senator Charles Schumer stated in 2004, "bombs using [CAN] [were] the weapon of choice of al-Qaida."

385.    From 2001 through 2016, al-Qaeda supported fertilizer-based bomb strategies in every theater in which al-Qaeda pursues terrorist attacks against America and its allies. As one journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertiliser packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[352]

386.    CAN fertilizer bombs were also a literal part of al-Qaeda's terrorism playbook, and al-Qaeda regularly instructed Taliban and Haqqani Network terrorists, in person and in writing, regarding CAN fertilizer bombs. For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan in 2004 provided that military explosives were often impractical to acquire, and instructed instead that jihadists should use home-made explosives, including ammonium nitrate bombs derived from CAN fertilizer.

387.    Al-Qaeda and the Haqqani Network agents, operatives, and fronts in Afghanistan and Pakistan facilitated al-Qaeda's CAN fertilizer bomb infrastructure by purchasing every essential element of the Syndicate's bombmaking enterprise and managing the transportation and logistics of vast volumes of bombs and bomb precursors. These Syndicate front companies

---

[352] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

serviced the litany of joint al-Qaeda / Haqqani Network bombmaking factories and training camps in eastern Afghanistan and Syndicate-controlled territory in Afghanistan and Pakistan. It did so because the Haqqani Network have historically played a key role in obtaining and securing bomb components and precursors for use by al-Qaeda bombmakers operating in camps in Afghanistan and Pakistan jointly run by al-Qaeda and the Haqqani Network under the leadership of Syndicate polyterrorists like Sirajuddin Haqqani.

388. While al-Qaeda and Haqqani Network fronts and agents were sourcing their key explosive ingredient exclusively from Fatima and Pakarab, al-Qaeda forward-deployed terrorist trainers in Afghanistan and Pakistan specifically instructed the Taliban to acquire Fatima Group CAN Fertilizer, convert it into an ammonium nitrate bomb, and use the resulting weapon to kill and maim Americans in Afghanistan.

389. Al-Qaeda's plan for the nationwide deployment of CAN fertilizer bombs against Americans in Afghanistan also included aggressive support by al-Qaeda bombmakers and logisticians in Pakistan, aided by their Taliban and Haqqani Network allies, to maintain a series of joint al-Qaeda/Taliban (including through the Haqqani Network) bombmaking sites, where the purpose was specifically to construct large volumes of CAN fertilizer bombs detonated via a Syndicate IED or suicide bomber. In so doing, bin Laden and his Taliban allies, including its Haqqanis, were reprising one of their celebrated roles against the Soviets during the Afghan war, when they worked together to help arm the mujaheddin with key anti-armor weapons.

390. By 2009, according to famed journalist Peter Bergen, al-Qaeda's strategy to teach the Taliban how to turn CAN fertilizer into CAN fertilizer bombs to kill Americans in Afghanistan was widely known:

> [I]n recent years, Taliban leaders have drawn especially close to Al Qaeda. . . . Today, at the leadership level, the Taliban and Al Qaeda function *more or less as*

*a single entity*. The signs of this are everywhere. For instance, IED attacks in Afghanistan have increased dramatically since 2004. What happened? As a Taliban member told Sami Yousafzai and Ron Moreau of *Newsweek*, "*The Arabs taught us how to make an IED by mixing nitrate fertilizer and diesel fuel and how to pack plastic explosives and to connect them to detonators and remote-control devices like mobile phones*. We learned how to do this blindfolded so we could safely plant IEDs in the dark."[353]

391.    At all relevant times, dual al-Qaeda/Haqqani Network operative Sirajjudin Haqqani planned the Syndicate's CAN fertilizer bombing campaign, and focused above all else on producing a regular, reliable, and deadly supply of CAN fertilizer bombs for use in Syndicate IED and suicide bomb attacks targeting Americans in Afghanistan.

392.    Like his al-Qaeda brothers, Sirajuddin Haqqani viewed the Syndicate's CAN fertilizer bomb campaign infrastructure as a key source of al-Qaeda and Haqqani Network power in Afghanistan and Pakistan, and leverage over other members of the Syndicate. Consequently, al-Qaeda and Haqqani Network operatives, including Sirajuddin Haqqani and other Haqqani family members, closely oversaw the core commercial and financial relationships that enabled Syndicate's regular and reliable flow of Fatima Group CAN Fertilizer for conversion into CAN fertilizer bombs. This close involvement by senior al-Qaeda and Haqqani Network leadership ensured a tight nexus between Defendants' reckless financial services to al-Qaeda and Haqqani Network agents, operatives, and fronts and the Syndicate's CAN fertilizer bomb infrastructure.

393.    In this relationship, the Haqqani Network provided the location, support, and funding for the CAN fertilizer bombmaking sites, while al-Qaeda bombmakers presided over an assembly line of explosives creation in which bombmakers would convert Fatima Group CAN Fertilizer into CAN fertilizer bombs.

---

[353] *The Front* (emphases added).

394.    Once al-Qaeda's bombmakers had cooked down Fatima Group CAN Fertilizer into ammonium nitrate, al-Qaeda would then prepare the ammonium nitrate to be used in one or more CAN fertilizer bombs derived from al-Qaeda schematics, including: (1) large CAN fertilizer-based IEDs specifically designed to destroy an American armored vehicle; (2) small CAN fertilizer-based IEDs specifically designed to kill or maim Americans on foot; and (3) CAN fertilizer-based suicide vests and suicide VBIEDs specifically designed to take out the largest possible American armor, or to be deployed as part of a complex attack targeting an American installation. Different bomb types require different component parts, and therefore al-Qaeda's bombmakers would coordinate the correct parts with the correct designs to ensure maximal effect. Once al-Qaeda's designed- and manufactured-CAN fertilizer bombs were completed, al-Qaeda and the Haqqani Network would distribute the CAN fertilizer bombs to the relevant Syndicate terrorist cells throughout Afghanistan to blow up Americans.

395.    More broadly, al-Qaeda members regularly trained Taliban and Haqqani Network commanders in sophisticated CAN fertilizer bomb-making techniques that were material to the terrorists' ability to assemble and deploy explosives against Coalition forces. According to the terrorist scholar Seth Jones:

> Insurgent groups also used al Qa'ida support to construct increasingly sophisticated [IEDs], including remote controlled detonators. For example, al Qa'ida ran a handful of manufacturing sites in the Bush Mountains, the Khamran Mountains, and the Shakai Valley in Pakistan's Federally Administered Tribal Areas. They ranged from small facilities hidden within compounds that build IEDs to much larger "IED factories" that doubled as training centers and labs whose recruits experimented with IED technology. Some of this explosives expertise came from Iraqi groups that provided information on making and using various kinds of remotely controlled devices and timers.[354]

---

[354] *Graveyard Of Empires* at 292.

396.    Al-Qaeda's support of Taliban and Haqqani Network IED attacks also included the use of forward deployed al-Qaeda terrorist trainers throughout Afghanistan. For example, by 2010, "[i]n southern Afghanistan, there [were] pockets of al Qa'ida . . . in Helmand and several neighboring provinces, such as Kandahar and Zabol," which helped the Taliban "conduct suicide attacks and other [IED]" attacks.[355] Al-Qaeda also forward deployed IED terrorist trainers in P2K and N2KL. At all relevant times, al-Qaeda's forward deployed trainers directed the CAN fertilizer bomb campaign in keeping with its status as a "signature" al-Qaeda attack type.

397.    Al-Qaeda's planning efforts were significant and amplified the lethality of Taliban and Haqqani Network attacks. Indeed, al-Qaeda's ability to export its terrorism expertise to local groups is what "renders al-Qaeda effective in the first place."[356] In the case of the Taliban and the Haqqani Network, al-Qaeda executed the "transfer of technical knowhow, devices, and training for IED use, truck and suicide bombings as well as the channel[ ]ing of what some observer[s] call 'strategic-level funding.'"[357] Those activities were material to the Taliban's and Haqqani Network's ability to execute the type of attacks that killed and injured Plaintiffs. As Mr. Ruttig concluded, al-Qaeda's activities "raise[d] the level of sophistication of Taleban and associated networks' operations."[358]

398.    As Mr. Bergen put it in November 2009, "Small numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do

---

[355] *Id.* at 330.

[356] Thomas Ruttig, *The Other Side* at 22, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[357] *Id.*

[358] *Id.*

– as trainers and force multipliers."[359] Al-Qaeda's sophistication and support was important to the Taliban's (including its Haqqani Network's) terrorist enterprise. And al-Qaeda's involvement went beyond technical support; it also worked actively with Taliban leadership to set strategy and orchestrate attacks. For that reason, "Al Qaeda leader Ayman al-Zawahiri, Hamza bin Laden and the Taliban leadership 'have repeatedly emphasized the importance of the alliance between' the two groups."[360]

399.   **Suicide Attacks.** Al-Qaeda's planning activities extended to suicide bombings. The suicide attacker is a core component of al-Qaeda's ideology and operational philosophy. Al-Qaeda exported its suicide-bombing expertise to the Taliban through their joint syndicate, and in so doing played a pivotal leadership and operational role in every Taliban (including Haqqani Network) suicide bombing in Afghanistan during the relevant time period. For that reason, every suicide bombing alleged in this case was jointly planned and committed by al-Qaeda and the Taliban.

400.   Al-Qaeda planned suicide bombings in Afghanistan by mounting a coordinated communications campaign to persuade Taliban (including Haqqani) terrorists to embrace suicide attacks against Americans. This campaign included messages touting suicide attacks and honoring "martyrs" through al-Qaeda print and video outlines; promoting religious "scholarly" outreach; and emphasizing in-person indoctrination of Taliban and Haqqani leadership.

401.   Al-Qaeda used this message – and the moral authority conveyed by bin Laden's 2003 *fatwa* authorizing martyrdom operations – to change the Taliban's (including its Haqqani

---

[359] *The Front.*

[360] *Al Qaeda Growing Stronger.*

Network's) organizational posture toward suicide bombing. As Dr. Jones summarized the evidence, "Al Qa'ida's involvement was particularly important in this regard."[361]

402.    To implement its planned suicide-bombing campaign, al-Qaeda also created and ran training camps that converted disaffected recruits into suicide bombers at an industrial scale. In collaboration with other syndicate members, Al-Qaeda created and designed a process for identifying candidates for martyrdom operations; indoctrinating them with the necessary religious and socio-political concepts; and training them how, for example, to conceal the explosives in a Suicide VBIED, navigate a checkpoint, and detonate for maximum impact. Some of this training occurred in al-Qaeda-affiliated camps in Pakistan.

403.    To carry-out their joint suicide bombing campaign, al-Qaeda and the Taliban relied upon a series of dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists to support the key nodes of the training and recruitment effort, including the madrassas from which most recruits were drawn and the training camps in which they were refined into suicide weapons. Such dual-hatted al-Qaeda/Taliban (including Haqqani Network) terrorists include, but are not limited to:

(i)      **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network, who has stated that al-Qaeda "enlighten[s] the road for [the Taliban] and they resist against the cross worshippers [*i.e.*, the Americans] by cooperating with us and us with them in one trench," pursuant to cooperation "at the highest limits"[362];

(ii)     **Qari Ziaur Rahman**, a dual-hatted al-Qaeda/Taliban terrorist who was a top regional commander of both organizations in Kunar and Nuristan Provinces; and

(iii)    **Sheikh Aminullah (aka Fazeel-a-Tul Shaykh Abu Mohammed Ameen al Peshwari),** a dual-hatted al-Qaeda/Taliban terrorist who ran the Ganj Madrassa, which trained and recruited suicide bombers for al-Qaeda and the Taliban.

---

[361] *Graveyard of Empires* at 293.

[362] *Taliban Cooperation*.

404.    Al-Qaeda also created the suicide network infrastructure necessary to deploy al-Qaeda suicide bombers, and the suicide bombs they detonated, in support of the Taliban's jihad against Americans in Afghanistan. The Syndicate's suicide attack infrastructure included: (1) high-level meetings between representatives of al-Qaeda, the Taliban, and other members of the Syndicate; (2) joint al-Qaeda/Taliban safe houses and ratlines to support the deployment of suicide bombers inside Afghanistan; (3) joint al-Qaeda/Taliban explosives factories, in which the Syndicate converted Fatima Group CAN Fertilizer into ammonium nitrate for use in suicide vests and suicide VBIEDs; (4) joint al-Qaeda/Taliban suicide VBIED development sites, in which al-Qaeda and Taliban (including Haqqani Network) bombmakers married the CAN fertilizer bomb with a vehicle to create a suicide VBIED; and (5) a constellation of al-Qaeda-affiliated propaganda outlets that glorified the attackers, which was essential both for increasing the likelihood that a particular attacker would carry out his or her attack, as well as incentivizing the next generation of suicide bombers.

405.    As a reflection of the joint nature of al-Qaeda-Taliban martyrdom operations, al-Qaeda suicide bombers were often referred to as "Mullah Omar's Missiles." By following a strategy in which the weapons (*i.e.*, the suicide bomber) was created by al-Qaeda and then deployed by the Taliban, both organizations played to their respective operational competencies to maximize the impact of their shared jihad against Americans in Afghanistan. Indeed, when a suicide bomber detonated a CAN fertilizer bomb, as happened in every suicide bomb attack in this case, al-Qaeda created both the suicide bomber and the explosive device itself.

### G.    Al-Qaeda Committed Terrorist Attacks That Killed And Injured Plaintiffs, Often In Joint Cells With The Taliban, The Haqqani Network, And Lashkar-E-Taiba

406.    Working together, the Syndicate terrorist groups committed every IED and suicide bomb attack in this case. Consistent with bin Laden's playbook, al-Qaeda provided the

technical expertise, training, ratlines, forward deployed support in Afghanistan, and fundraising support, while the Taliban, Haqqani Network, Lashkar-e-Taiba, and Jaish-e-Mohammed provided training camps, safe houses, front companies to purchase components, and terrorists to be trained.

Al-Qaeda members also committed attacks alongside the Taliban, including some of the attacks that killed or injured Plaintiffs or their family members. In fact, many terrorist operatives were "dual-hatted," meaning that they were both al-Qaeda and Taliban (including Haqqani Network) members. Those dual-hatted terrorists directly committed many of the attacks that killed and injured Plaintiffs. C.      From 2011 Through 2016, Al-Qaeda And The Haqqani Network Relied Upon Fatima And Pakarab CAN Fertilizer To Source The Explosives Used In Nearly All CAN Fertilizer Bomb Attacks Against Americans

1.      CAN Fertilizer Bombs Made With Fatima And Pakarab CAN Fertilizer Caused 90 Percent Of American Casualties In Afghanistan

335.   Like other terrorist groups, the Syndicate substantially adapted its bombing tactics in direct response to lessons learned by al-Qaeda and its allies in Afghanistan.  In 2008, the Syndicate began dramatically increasing its emphasis on the use of ammonium nitrate bombs derived from CAN fertilizer, often called "CAN fertilizer bombs," which is a long-standing signature al-Qaeda bomb design.  While associated with suicide truck bombs, al-Qaeda also used CAN fertilizer to make large anti-armor IEDs, small anti-personnel IEDs, suicide vests, and all other manners of suicide vehicle-borne IEDs ("suicide VBIEDs").

336.   The Syndicate's increased emphasis on CAN fertilizer bombs as a countermeasure to U.S. efforts to protect Americans in Afghanistan during the Surge was essential to its ability to execute bomb attacks against Americans in Afghanistan after 2008.

337.   When "American military fatalities in Afghanistan doubled in 2009" "perhaps the strongest force driving the Taliban's ability to inflict mounting casualties" "[was] its use of crude but powerful roadside bombs" "made of [CAN] -- fertilizer bombs, in essence, but of a size

unseen before 2009, and now commonly ranging up to 1,000 pounds, big enough to flip a heavy armored vehicle like a toy."[363] "[T]hese" CAN fertilizer bombs "proved to be 'the surface-to-air missile of this war,' as a senior intelligence official" explained, "a rueful reference to the weapon that helped" the "mujahedin" "drive the Soviet military out of Afghanistan in 1989."[364]

338.   By 2007, "deadly fertiliser bombs" had been "used by terrorists worldwide" and "ha[d] prove[n] their deadly effectiveness in a series of horrific terror attacks."[365] In this "new age of Islamist terrorism" after the Syndicate's rebirth in the mid-2000s, "ammonium nitrate fertilizer" bombs became "an al Qaida trademark" and the Syndicate's "desire to cause maximum loss of life mean[t] the fertiliser bomb's true capacity for carnage ha[d] become horribly apparent" to observers, including each Defendant.[366]

339.   CAN fertilizer bombs derived from Fatima and Pakarab CAN fertilizer were the Syndicate's single most effective weapon for killing and maiming Americans in Afghanistan and countering the most advanced American armored vehicles. JIEDDO concluded that "[a] 110-pound bag of [CAN], a common fertilizer produced in Pakistan," exclusively made and sold by Fatima and Pakarab, "can produce 82 pounds of explosives, enough to destroy an armored truck or 10 smaller bombs targeting troops on foot."[367] As one analyst observed:

---

[363] Laura King, *War Toll Likely to Get Even Worse; U.S. Troop Fatalities in Afghanistan Doubled to 318 Last Year. The Taliban's Bomb Tactics were a Big Factor*, L.A. Times (Jan. 1, 2010), 2010 WLNR 32019. CAN is sometimes referred to simply as "ammonium nitrate" and Plaintiffs refer to ammonium nitrate as "CAN" for efficiency's sake.

[364] *Id.*

[365] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, PA News (Apr. 30, 2007).

[366] *Id.*

[367] Tom Vanden Brook, *Drones Fight IEDs in Afghanistan*, USA Today (July 15, 2012).

Formatte

407.   None of the existing technology, to the chagrin of U.S. commanders, has been able to crack the toughest nut of the war on IEDs:  bombs made of [CAN] fertilizer.  Lacking enough metal content to make them detectable by traditional sensors, these explosives have been the bane of U.S. forces. Examples are set forth below.

408.   **Nangarhar, Nuristan, Kunar and Laghman ("N2KL") Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical (and contiguous) Nangarhar, Nuristan, Kunar and Laghman Provinces (known as "N2KL"), which were well-known al-Qaeda strongholds. In N2KL, al-Qaeda, the Taliban, and Lashkar-e-Taiba maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The polyterrorists who ran these joint cells included:

(i)    **Farouq al-Qahtani**, al-Qaeda's "emir for eastern Afghanistan" who "supported the Taliban-led insurgency against the Afghan government, US forces and their allies."[368]

(ii)   **Sakhr al-Taifi**, al-Qaeda's number two in Afghanistan, who embedded with the Taliban, "coordinate[d] and direct[ed] insurgent attacks against" "coalition troops throughout eastern Afghanistan," and "supplie[d] weapons and equipment to insurgents."[369]

(iii)  **Mufti Assad**, an al-Qaeda network and "insurgent leader who controlled al-Qaida terrorists operating in Kunar," "led dozens of all-Qaida affiliated fighters throughout eastern Afghanistan and coordinated their attacks across the region," and "was also an explosives expert who" "train[ed] [] insurgents on how to construct and use [IEDs]."[370]

(iv)   **Abdallah Umar al-Qurayshi**, a senior al-Qaeda operative who commanded the joint al-Qaeda/Taliban cells operating in Kunar and Nuristan Provinces.

(v)    **Abu Atta al-Kuwaiti**, a senior al-Qaeda explosives expert who coordinated the Nuristan and Kunar Province al-Qaeda/Taliban joint cells' IED and suicide bomb attacks.

---

[368] Thomas Joscelyn, *Pentagon Confirms Death of Senior al Qaeda Leader In Afghanistan* (Nov. 4, 2016).

[369] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (May 28, 2012).

[370] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Aug. 5, 2012).

(vi)    **Abu Ikhlas al-Masri**, an al-Qaeda commander who helped coordinate al-Qaeda / Taliban attacks in Kunar Province from 2008 until his capture in December 2010.

(vii)   **Sa'ad bin Abi Waqas**, a senior al-Qaeda leader who "coordinated attacks against coalition forces," throughout Kunar Province, "conducted training" and helped terrorists with "weapons procurement".[371]

(viii)  **Abu Hafs al-Najdi (aka Abdul Ghani)**, a senior al-Qaeda operative who directed al-Qaeda operations in Kunar Province, with specific responsibility for "planning attacks against" "coalition forces" and "directing suicide-bomb attacks targeting U.S. government officials" that were facilitated by his "network" of Taliban terrorists.[372]

(ix)    **Fatah Gul**, an al-Qaeda facilitator who "ran terrorist training camps where insurgents learned how to conduct [IED] attacks" in the N2KL area.[373]

409.    **Paktia, Paktika, and Khost ("P2K") Provinces.** Like N2KL, P2K was a strategically critical area that historically served as a Haqqani Network stronghold and also operated as a "traditional al-Qaeda safe haven[]."[374] In this area, al-Qaeda and the Taliban, through the Haqqani Network, maintained joint cells responsible for anti-American terrorism, each of which executed the Syndicate's CAN fertilizer bomb campaign in Afghanistan. The dual-hatted terrorists who ran the cells included:

(i)     **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network;

(ii)    **Bekkay Harrach (aka al-Hafidh Abu Talha al-Almani)**, a senior member of al-Qaeda's external operations branch, who specifically planned, authorized, and helped commit Haqqani Network attacks while living under the direct protection of Siraj Haqqani, himself a member of al-Qaeda's military council; and

(iii)   **Khalil al-Rahman Haqqani**, Jalaluddin Haqqani's brother and a dual-hatted al-Qaeda/Taliban terrorist, serving as a "fundraiser, financier, and operational

---

[371] ISAF Joint Command, *Morning Operational Update*, Def. Visual Info. Distribution Serv. (Apr. 16, 2011).

[372] U.S. Dep't of Def., *Strike Kills No. 2 Insurgent in Afghanistan* (Apr. 26, 2011).

[373] ISAF Joint Command, *Morning Operational Update* (Aug. 5, 2012).

[374] *Resilient al-Qaeda* at 11-12.

commander" for the Haqqani Network,[375] as well as an agent who "acted on behalf of al-Qa'ida"[376] and had "been linked to al-Qa'ida terrorist operations."[377]

410.   **Kabul Attack Network-Related Provinces.** Al-Qaeda deployed senior operatives to coordinate attacks in the strategically critical cluster of provinces around the capital city. This area was the focus of the Kabul Attack Network, where al-Qaeda and the Taliban, including its Haqqani Network, maintained joint al-Qaeda/Taliban cells responsible for planning and committing terrorist attacks, each of which executed the Syndicate's CAN fertilizer bomb campaign in Kabul Attack Network-related provinces. *See supra* Part V.A.3. The dual-hatted al-Qaeda/Taliban terrorists who ran the cells included:

(i)   **Sirajuddin Haqqani**, a member of al-Qaeda's military council and commander of the Haqqani Network.

(ii)   **Ahmed Jan Wazir**, a dual-hatted al-Qaeda/Taliban terrorist who, in 2008, was named commander of jihadist forces in Ghazni Province by both al-Qaeda and the Taliban.

II.   Soldiers have dubbed these large bombs 'Buffalo killers' because they can destroy a heavily armored Buffalo mine-protected truck [also known as an "MRAP"].  Barbero has estimated that the majority of [IED]s in Afghanistan are made from [CAN].[378]

340.   For that reason, following al-Qaeda's instruction, led by al-Qaeda operatives, using al-Qaeda's playbook, and deploying CAN fertilizer bombs built by al-Qaeda bombmakers, Syndicate operatives relied upon Fatima and Pakarab fertilizers to wage a devastating CAN fertilizer bomb campaign against Americans in Afghanistan from 2008 through 2016.  This

---

[375] Bill Roggio, *US Designates al Qaeda, Haqqani Network Leaders As Terrorists*, Long War J. (Feb. 9, 2011).

[376] Press Release, U.S. Dep't of Treasury, *Treasury Targets The Financial And Support Networks of Al Qa'ida And The Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

[377] Press Release, U.S. Dep't of State, *Rewards for Justice - Reward Offers for Information on Haqqani Network Leaders* (Aug. 20, 2014).

[378] Sandra I. Erwin, *Buried Bombs Can Be Destroyed, But Not Defeated*, National Defense, Volume 96; Issue 698 (Jan. 2012), 2012 WLNR 30107637.

required a "whole-of-Syndicate" effort directly analogous to the countervailing "whole-of-government" effort within the U.S. government to defeat the CAN fertilizer bomb threat.  For the Syndicate, this meant that al-Qaeda and Haqqani Network operatives and agents at every level prioritized the development and growth of each aspect of al-Qaeda and Haqqani Network transnational terrorist finance and logistics activities that could aid the Syndicate's CAN fertilizer bomb attacks against Americans in Afghanistan, including fundraising, money transfer, purchasing, transportation, smuggling, chemical refinement (*i.e.*, "cooking"), bomb construction, terrorist training, and terrorist deployment.

From 2009 through 2016, al-Qaeda and the Haqqani Network's combined efforts enabled them to sustain a devastating nationwide CAN fertilizer bomb campaign against Americans in Afghanistan.  By 2009, "*[a]mmonium nitrate fertilizer bombs* [had] become the deadliest weapons used by" Syndicate terrorists to attack Americans.[379] **DEFENDANTS ASSISTED THE SYNDICATE**

**A.  The Syndicate Relies on an International Criminal Network to Access Funds.**

341.   The By 2011, "[t]he use of roadside bombs in Afghanistan" "ha[d] reached record highs, with US forces struggling to cut off the flow of Pakistani fertilizer used to build them."[380] As JIEDDO explained, "[d]uring the last 12 months, an unending supply of [CAN], originating almost exclusively from Pakistan, has been used to produce IEDs in Afghanistan despite a countrywide ban" on importing CAN fertilizer.[381]  As *UPI* reported the views of JIEDDO, "*Afghan insurgents rel[ied] on fertilizer bombs*," with  Fatima and Pakarab CAN fertilizer

---

[379] UPI NewsTrack, *Huge Bomb-Making Operation Found* (Nov. 11, 2009).

[380] Mathieu Rabechault, *In Afghanistan, More and More Roadside Bombs*, Agence France Presse English Wire (Aug. 7, 2011).

[381] *Id.*

**Formatte**

being "*the low-cost choice for [IED] makers in Afghanistan*."[382]  This trend continued through 2016.

342.    In a 2011 speech to the Institute of Land Warfare, the head of JIEDDO, LTG Barbero amplified the U.S. government's concerns and stated, among other things, that JIEDDO had concluded that:  (1) about "80 percent of IEDs in Afghanistan [were] made from [CAN] coming from fertilizer plants in Pakistan, specifically, two factories in Pakistan" (alluding to Fatima and Pakarab), where "[e]ach factory produce[d] as much as 400,000 metric tons of the material each year"; (2) under Fatima's and Pakarab's practices, "about one percent" of their CAN fertilizer was transferred "to insurgents," who "easily turned" the CAN fertilizer "into inexpensive explosives"; and (3) about "*90 percent* of [U.S.] casualties in Afghanistan" came "from ammonium nitrate explosive" derived from Fatima and Pakarab CAN fertilizer.[383]

343.    By January 2012, the U.S. government had "decided to clean up the major source of fertilizer CAN" by going after Fatima and Pakarab fertilizer production because the U.S. military was "capturing hundreds of thousands of pounds of CAN, much of it in original bags" and there was "no doubt [it was] all coming from Pakistan."[384]

---

[382] UPI NewsTrack, *Afghan Insurgents Rely on Fertilizer Bombs* (Nov. 26, 2011) (emphasis added).

[383] C. Todd Lopez, *JIEDDO Working to Reverse Trend for Larger IEDs in Afghanistan*, Army News Service (Nov. 10, 2011) (emphasis added).  The casualty percentage (90%) is higher than the IED percentage (80%) because fertilizer bombs derived from CAN fertilizer were the most devastating weapon in the Syndicate's arsenal, and uniquely capable of countering American protective measures, even the most heavily armored U.S. vehicles.

[384] Asian News International, *US Look to Crackdown Source of Pakistani Fertilizer CAN Explosive* (Jan. 11, 2012), 2012 WLNR 665399.

2.      In 2011, Fatima And Pakarab Joined The Rogue ISI Conspiracy With The Haqqani Network To Support And Supply The Syndicate's CAN Fertilizer Bomb Campaign Against Americans in Afghanistan

344.    Al Qaeda's CAN fertilizer bomb campaign depended upon the close cooperation of one of the Syndicate's most notorious Pakistani corporate sponsors, the related CAN fertilizer manufacturers Fatima Fertilizer Company Limited ("Fatima") and Pakarab Fertilizers Limited ("Pakarab").  The following 24 paragraphs of this Complaint provide relevant historical context.

345.    Pakarab was a fully integrated producer, manufacturer, and distributor of CAN fertilizer and subsidiary of Fatima.  Like Pakarab, Fatima was a fully integrated producer, manufacturer, and distributor of CAN fertilizer.  Plaintiffs collectively refer to any CAN fertilizers manufactured, sold, and/or distributed by Fatima and/or Pakarab from 2001 through 2016 as "Fatima Group CAN Fertilizer."[385]

346.    Both companies were in high-risk Haqqani Network geographies in Pakistan. Pakarab was headquartered in Multan, Pakistan, in Punjab Province, a Syndicate stronghold effectively controlled or contested by al-Qaeda, the Afghan Taliban, and the Haqqani Network. Fatima was headquartered in Lahore, Pakistan, which has at all times been widely understood as a notorious Syndicate area of operations in Punjab Province that was contested by elements of al-Qaeda, the Afghan Taliban, and the Haqqani Network.

---

[385] Fatima and Pakarab are widely understood to be part of the same corporate family, known as the "Fatima Group" and for good reason:  Fatima and Pakarab share common management, supply chains, sales channels, customer bases, and back-office functions.  At all relevant times, Fatima Group has portrayed Pakarab as one of the "star performers" of the Group, and Fatima Group explicitly modeled Fatima CAN fertilizer practices, strategies, and products off what Pakarab did.  If Pakarab engaged in a practice or relationship, one can assume Fatima did as well, and the flip side is also correct:  if Fatima had a practice or relationship, one can assume Pakarab engaged in the same.

347.    At all relevant times, Fatima and Pakarab had an effective monopoly on the supply of CAN fertilizer to the Syndicate.

348.    Fatima and Pakarab were not normal companies whose goods were unforeseeably diverted by terrorists.  Instead, they were the Haqqani Network's open corporate co-conspirators, and were widely understood to have joined rogue ISI's conspiracy to help the Haqqani Network commit attacks against Americans in Afghanistan.

349.    Fatima and Pakarab regularly sold large amounts of fertilizer to known Haqqani Network fronts, including bulk purchases of Fatima Group CAN fertilizer financed from Syndicate fronts from the U.A.E.  As a result, across their transactions, Fatima and Pakarab facilitated the sale of Fatima Group CAN Fertilizer to Haqqani Network agents and operatives worth more than one million U.S. Dollars each year from 2008 through 2016, which supplied the precursor explosives for between 100,000 to 300,000 al-Qaeda CAN fertilizer bombs used to kill or injure thousands of Americans in Afghanistan per year.

350.    Fatima and Pakarab supplied thousands of pounds of Fatima Group CAN Fertilizer to Haqqani Network agents, operatives, and fronts each month from 2001 through 2016.  At the prevailing rate of Syndicate logistics flow—*i.e.*, that the Haqqani Network accounted for about one percent (1%) of all Fatima and Pakarab sales of Fatima Group CAN Fertilizer—Fatima and Pakarab collectively supplied thousands of tons of fertilizer each year to the Haqqani Network for the Syndicate's use in its bombing campaign against Americans in Afghanistan, and at least several hundred pounds ***each day***.

351.    For example, at the 1% Syndicate use rate, in 2013 and 2014, Fatima and Pakarab collectively supplied more than 4,000 tons of Fatima Group CAN fertilizer to Haqqani Network agents, operatives, or fronts each year.  Pakarab supplied roughly comparable volumes of Fatima

Group CAN Fertilizer every year from 2001 through 2011 (when Pakarab had a monopoly on the manufacture of CAN fertilizer in Afghanistan), and Fatima and Pakarab collectively supplied roughly comparable volumes of Fatima Group CAN Fertilizer every year from 2010 (when Fatima's CAN fertilizer facility came online) through 2016.

352.    Fatima's and Pakarab's open support for the Haqqani Network alarmed the entire U.S. government.  From 2010 through 2013, a series of high-profile U.S. government-related events confirmed the U.S. government's deep concerns about Fatima's and Pakarab's deliberate support for the Haqqani Network's CAN fertilizer bomb pipeline.

353.    In August 2011, a major international incident between Afghanistan and Pakistan, which garnered widespread media coverage, highlighted both the key role played by Fatima Group CAN Fertilizer in Syndicate bomb attacks and Pakarab's and Fatima's complete refusal to do anything about it.  In sum and substance, Coalition forces seized a large cache of indisputable evidence of Fatima and Pakarab CAN fertilizer supply to Syndicate bombmakers, Afghan officials demanded Fatima and Pakarab do more to halt the flow of explosives to terrorists, and the latter publicly refused to do so.

354.    On November 26, 2011, a NATO strike against a Pakistani outpost (inside the Pakistani side of the border) killed 24 Pakistani soldiers; in response, Pakistani fertilizer companies Fatima and Pakarab cut-off even their lip service claims of opposing the Syndicate and ceased engaging with the U.S. government.  Fatima's and Pakarab's decision to do so was promptly reported by the media.

355.    Within days of November 26, 2011, Fatima and Pakarab entered rogue ISI's conspiracy with the Haqqani Network by, among other things, cutting off all direct contact with the U.S. government, including JIEDDO, and all efforts to prevent terrorist interdiction, which

Fatima and Pakarab were widely understood to have done to curry favor with rogue ISI. When they did so, Fatima and Pakarab relayed the message to the U.S. government that all future communications with Fatima or Pakarab must be routed through the Pakistani Foreign Ministry. Both developments were promptly reported by the media.

356.   The deterioration of U.S.-Pakistan military and intelligence relations after the November 2011 border incident continued at all relevant times to this case, and as a result, "the U.S. [] found it more difficult to get Pakistan to better control the fertilizer shipments that flow illegally into Afghanistan."[386]  Specifically, Fatima and Pakarab refused to do anything positive, or even merely mimicked the "cooperation lip service" they had previously performed before JIEDDO prior to November 26, 2011.

357.   Throughout 2012, a series of high-profile U.S. government-related events, including Congressional testimony and JIEDDO statements, regularly emphasized that Fatima and Pakarab continued to provide the key explosives for nearly all Syndicate IEDs and suicide bombs in Afghanistan and had refused to do—literally—anything about it.[387]

358.1.   On January 27, 2013, the *Washington Times* reported that Fatima was seeking to "expand in [the] U.S., but balk[ing] on controlling bomb materials":

> ***Fatima's fertilizer components are used by terrorists in Pakistan and Afghanistan to build homemade bombs*** — the No. 1 killer of American service members in Afghanistan.  ***Fatima's corporate leaders know this is happening.***

---

[386] Jen Judson, *Official: Pakistani Border Incident has Deterred Progress on Countering IEDs*, Inside the Army (Jan. 28, 2013), 2013 WLNR 2201966.

[387] From November 26, 2011, through on or about at least the Spring of 2014, Fatima and Pakarab (a) refused to take any material steps to prevent logistics flow while (b) refusing to even speak with the U.S. or even (c) publicly acknowledge the key role that their own products played in the bombing.  During this time, the only thing they did was continue to deliberately supply the Syndicate with nearly all its explosives, openly defying the United States while doing so.  For this reason, Plaintiffs use the word "literally."

~~based on communications with [] administration officials and military leaders, **but they have refused pleas to control the flow**, according to [Barbero].[388]~~

~~In the same article, the *Washington Times* reported that, "[a]s Fatima stiff-arm[ed] the U.S. military, it [was] eyeing a chunk of the American fertilizer market," and simultaneously planned a new investment in an American fertilizer plant in Indiana through a new Fatima Group subsidiary called Midwest Fertilizer Corporation.[389]~~

~~359.~~1.   On January 29, 2013, the *Washington Times* reported that American officials who ~~focused~~ relied on ~~the IED threat had concluded that:~~ (1) Fatima's and Pakarab's deliberate practices relating to Fatima Group CAN Fertilizer were indispensable to the Haqqani Network's ability to commit CAN fertilizer bomb attacks at scale against Americans in Afghanistan; and (2) Fatima and Pakarab were intentionally aiding the Haqqani Network by obstructing U.S. efforts to reduce the CAN fertilizer bomb threat in order to side with rogue ISI, who opposed any changes to Fatima's and Pakarab's CAN fertilizer practices:

~~[Former Congressman Duncan Hunter] served as Marine officer in Iraq and Afghanistan says *"it's crazy"* that [Fatima] is being allowed to build a plant in the U.S. while it rejects Pentagon pleas to control its products that end up in homemade bombs that kill American troops, adding that *Fatima was a "pseudo-terrorist organization that won't comply with any of our requests."* "We're not asking them to curtail production," said Mr. Hunter, who has been a leading voice in Congress in urging the Pentagon to come up with ways to defeat homemade bombs. "At the very least, they should have to comply with our requests for them to manage their [CAN] better. Fatima controls it all," Mr. Hunter said, adding that Fatima's assistance could drastically reduce the number of homemade bombs in Afghanistan. … Mr. Hunter also said that *Fatima is influenced by "bad actors in Pakistan who want to create havoc and chaos in Afghanistan and thwart the U.S. efforts there…"*[390]~~

---

~~[388] Rowan Scarborough, *Pakistani Fertilizer Firm to Expand in U.S., But Balks on Controlling Bomb Materials*, Washington Times (Jan. 27, 2013) (emphasis added), 2013 WLNR 2165350.~~

~~[389] *Id.*~~

~~[390] Rowen Scarborough, *Subsidy for Fertilizer Company 'Crazy'; Marine Vet Can't Fathom a Deal with Pakistanis Tied to Roadside Bombs*, Washington Times (Jan. 29, 2013) (emphasis added), 2013 WLNR 2278333.~~

360.   The *Washington Times* corroborated Congressman Hunter's Fatima allegations and reported that "a government source who was informed of the congressman's comments said there is evidence that Pakistan's [ISI] is influencing Fatima," "[e]lements of ISI helped establish the Taliban in Afghanistan as an ally on its western front, and U.S. intelligence sources say ISI continues to help the insurgents to this day in their war with the elected government in Kabul," and that American efforts to get Fatima to reduce the Syndicate's CAN fertilizer bomb supply had been "cut off by the Pakistan government."[391] On information and belief, every Defendant was aware of the above *Washington Times* reporting.

361.   Rogue elements of the Pakistani ISI participated in the Haqqani Network's conspiracy to attack Americans in Afghanistan in violation of Pakistani law and policy. Fatima and Pakarab obeyed a request from rogue ISI to obstruct the U.S. efforts to change Fatima's and Pakarab's deliberate support of the Haqqani Network's CAN fertilizer bomb infrastructure, including Fatima's and Pakarab's multi-year refusal to use any colorful dyes, in order to support rogue ISI's objectives in Afghanistan, which included maximizing the flow of CAN fertilizer bombs to Syndicate terrorists targeting Americans there.

362.   Fatima and Pakarab joined a conspiracy to commit terrorist attacks against Americans. Fatima's and Pakarab's terrorist customers from the Haqqani Network were engaged in an ongoing conspiracy with rogue ISI, and carried out through the Syndicate, to commit CAN fertilizer bomb attacks against Americans. This conspiracy was purposely directed at the United States because the Haqqani Network sought to kill Americans specifically, and to

---

[391] *Id.*

undermine U.S. foreign policy interests by targeting U.S. soldiers and civilians abroad.  Indeed, U.S. officials have long accused rogue ISI of supporting terrorist groups in Afghanistan.

363.    To achieve the objective of that conspiracy, the conspirators sought to ensure that the Haqqani Network maintained a reliable pipeline of Fatima Group CAN Fertilizer that it could then provide to the joint Haqqani/al-Qaeda bomb factories in Pakistan (where al-Qaeda bombmakers manufactured the Syndicate's CAN fertilizer bombs) could arm al-Qaeda's nationwide CAN fertilizer bomb campaign targeting Americans in Afghanistan.

364.    Fatima's and Pakarab's terrorist customers and enablers were themselves members of the conspiracy because they were either members of the Syndicate (as in the case of the Haqqani Network agents, operatives, and fronts who purchased Fatima Group CAN Fertilizer) or rogue ISI officials who conspired with the Haqqani Network to support its logistics, operations, and objective (as in the case of rogue ISI operatives who encouraged Fatima and Pakarab to refuse to substantially change their intentional sales and product practices in order to maintain the free flowing supply of Fatima Group CAN Fertilizer to the Syndicate).  By agreeing to help these conspirators acquire bomb parts and ensure stable bomb component logistics flow for the Haqqani Network by supplying Fatima Group CAN Fertilizer while knowing that al-Qaeda and Haqqani Network terrorists would use the goods and services to prepare the CAN fertilizer bombs, Fatima and Pakarab joined the Haqqani Network's conspiracy with rogue ISI.

365.    Plaintiffs' allegations track the contemporaneous views of U.S. government personnel familiar with Fatima and Pakarab.  U.S. government officials, including American military personnel, have concluded that, when Fatima and Pakarab refused to make the reasonable product integrity and security reforms, including changing product color, requested by JIEDDO, Fatima and Pakarab entered the Haqqani Network's conspiracy by supporting rogue

ISI's efforts to help Haqqani Network to target Americans in Afghanistan with CAN fertilizer bomb attacks.  This conclusion was widely shared within the U.S. government, including by JIEDDO leadership, and intelligence professionals in the Executive and Legislative branches.

366.   Moreover, Members of Congress, along with U.S. military personnel, repeatedly, and publicly, expressed their real-time conclusions that:  (1) Fatima and Pakarab understood that Taliban and Haqqani Network operatives, agents, and/or fronts were purchasing Fatima Group CAN Fertilizer; and (2) Fatima and Pakarab recklessly supplied the Syndicate's CAN fertilizer pipeline specifically to curry favor with rogue elements of Pakistani ISI by joining the terrorists' conspiracy and facilitating the uninterrupted flow of weapons to the rogue ISI's preferred terrorists, the Taliban and the Haqqani Network.

367.   A September 21, 2012 exchange between LTG Barbero and a Member reflected the widespread U.S. government view at the time that Fatima and Pakarab had joined rogue ISI's conspiracy with the Haqqani Network to support CAN fertilizer bomb attacks against Americans in Afghanistan, including the specific view that Fatima's and Pakarab's refusal to dye their Fatima Group CAN Fertilizer was the give-away that Fatima and Pakarab intended to support rogue ISI's conspiracy to aid Haqqani Network CAN fertilizer bomb attacks:

> MEMBER: … [W]e're all extremely frustrated … this has been going on for years… we [] keep going back to Pakistan, our supposed ally …what kind of ally would allow for this type of activity to continue? … [I]f we had two major fertilizer plants in Mexico and people were smuggling across … a small amount of fertilizer and killing five U.S. citizens a week, … we'd do something about it pretty quickly.  And here we are today losing approximately five U.S. servicemen a week or having horrific injuries, and it seems that we're unable to do anything with our supposed ally in Pakistan. …  ***The Haqqani Network continues to operate with impunity*** … especially in some of the border regions … Without any assistance with the Pakistanis at all, how are we going to deal with this?
>
> BARBERO: ***Congressman, I can't argue with anything you said.*** …
>
> MEMBER: … [A]ny aid and assistance that we have to Pakistan should be directly tied to their assistance to us to help us deal with these fertilizer plants in Pakistan and ***especially something as simple as adding a color or an odor to the***

*production of this fertilizer.* And I know those offers have been made. Those offers have been made to cover the cost of it and *they're not interested in doing it because I'm sure the ISI finds it convenient to continue to be able to work with the Haqqani Network to smuggle this* across the border. *Let's just call it the way it is.* They *like to destabilize* the Afghan government, destabilize the NATO allies. *They're fighting in Afghanistan and the Pakistanis continue to deal with these people [...] to kill American soldier[s] every day.*[392]

368.1.   Terrorism experts also noted the nexus between rogue ISI hostility towards the United States and Fatima's and Pakarab's refusal to change their intentional practices relating to Fatima Group CAN Fertilizer. For example, in September 2012, Daniel Goure of the Lexington Institute, explained that the "green on blue problem" – *i.e.*, a terrorist threat from an ally – involves not just individuals or small groups but also rogue actors of national governments, which was a "problem that has confronted the U.S. vis-à-vis Pakistan for most of the last decade," and had been demonstrated by the fact, among other things, that "[m]ost of the [CAN] that goes into Taliban IEDs that kill Americans in Afghanistan comes from two Pakistani [*i.e.*, Fatima- and Pakarab-owned] factories."[393]

369.   Prominent retired American General Officers have reached the same conclusion about Fatima's and Pakarab's willingness to conspire with rogue ISI to provide direct operational support for the Taliban, including the Haqqani Network. For example, in 2020, former Vice Chief of Staff of the U.S. Army General Jack Keane publicly stated, in sum and substance, that rogue ISI supported the Taliban and had "built two chemical fertilizer factories for them," referencing the Fatima and Pakarab factories that supplied Fatima Group CAN Fertilizer to the Syndicate. In the same statement, GEN Keane identified rogue ISI's relationship with Fatima

---

[392] *Rep. C.W. Bill Young Holds a Hearing on Joint IED Defeat Organization*, CQ RollCall Political Transcriptions (Sept. 21, 2012) (emphasis added), 2012 WLNR 30213606.

[393] Daniel Goure, Ph.D., Lexington Institute, *What are the Rules of Engagement in a World of Green on Blue Violence?*, States News Service (Sept. 24, 2012).

and Pakarab, and the resulting supply of Fatima Group CAN Fertilizer to Syndicate terrorists targeting Americans in Afghanistan, as an example of "support" for the Taliban.

370.    The conclusions drawn by U.S. military personnel and Members of Congress were corroborated by the Department of Justice when it pursued at least one an international criminal prosecution based, in part, of the conduct of a rogue ISI operative named Major Iqbal who helped facilitate the Syndicate's infamous mass casualty terrorist attack in Mumbai, India.

### III.    AL-QAEDA AND THE HAQQANI NETWORK RELIED UPON A GLOBAL NETWORK OF AGENTS, OPERATIVES, FRONTS, CELLS, AND BUSINESS PARTNERS TO HELP FUND, ARM, AND LOGISTICALLY SUPPORT SYNDICATE ATTACKS AGAINST AMERICANS IN AFGHANISTAN

411.    A.    Altaf Khanani andnetwork to access funds. The entities in this network include, but are not limited to, the Khanani Money Laundering Organization ("Khanani MLO"); Value Added Tax ("VAT") fraud cells in Europe operated by Samir Azizi and Imran Yakub Ahmed; the Russian Mafia; contributions from narco-warlords like Hikmatullah Shadman; and others. These Syndicate agents are described herein.

#### 1.    The Khanani MLO

371.247.    Altaf Khanani and his laundering empire, the Khanani MLO, were vital to the al-Qaeda'sSyndicate's efforts to raise hundreds of millions of dollars annually through the illicit overseas income generated by al-Qaeda and its affiliates, like the Haqqani Network.[394]

372.    From 2008 through 2016,Altaf Khanani andestablished the Khanani MLO used companies, including **Al Zarooni Exchange** and **Mazaka General Trading**, that were created and operatedin the 1990s for the soleprimary purpose of carrying out Khanani's terrorist finance activities on behalf of his clients,laundering the transnational organized crime profits, mostly but

---

[394] Plaintiffs refer to Altaf Khanani, the Khanani MLO, Mazaka Trading LLC, and Al Zarooni Exchange collectively as "Khanani."

not entirely from opium, realized by al-Qaeda, the Taliban (including its Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, Jaish-e-Mohammed,), and D-Company.

373.        The Khanani MLO's operations were based in Pakistan from 2001 to 2008, when the Khanani MLO was known as Khanani and Kalia International (or "KKI"), and then Dubai from 2008 until 2016, when the Khanani MLO operated through Al Zarooni Exchange, Mazaka General Trading, and other companies known to be affiliated with Khanani.  , which three designated terrorist groups were the Syndicate's original

374.   Through a combination of witness intimidation, bribery, and potentially murder, Khanani ultimately escaped justice in Pakistan.

375.   After the FIA's case against him in Pakistan collapsed in 2008, Khanani moved his terrorist finance operation to Dubai.  This was the logical move for Khanani because Dubai was a recognized terrorist finance hub for both the Syndicate—whose every member used Dubai as a financial and "visionaries' behind turning Afghanistan's opium economy into the potent, worldwide, and vast funds and logistical hub.  From a Dubai corporate office, Khanani laundered terrorist funds from 2008 until he was arrested again in 2015.

248.   1.        Khanani And The Khanani MLO Were Agents For Albenefits that al-Qaeda, The Taliban (Including Its and the Haqqani Network), Lashkar-E-Taiba, Jaish-E-Mohammed And Khanani Was Also A D-Company Operative gained from their alliance with the Khanani MLO.

249.   The Khanani MLO was a purpose-built narco-terrorist finance Laundromat for providingAmong the reasons for the Khanani MLO's notoriety was Altaf Khanani's long-standing practice of using his relatives to manage and operate the Khanani MLO's network of notorious terrorist fronts.  Since it was created, the Khanani MLO has always employed the Khanani family members and Khanani-associated entities, each of whom usually carried their

own indelible stench of terrorist finance given their direct paper connections to other Khanani family members or entities.

250.    With respect to the Khanani MLO's entities, the Khanani MLO relied upon notorious Khanani-related fronts, which included, but were not limited to:  (1) Khanani & Kalia International; (2) Al-Zarooni Exchange; (3) Mazaka General Trading L.L.C.; (4) Jetlink Textiles Trading; (5) Seven Sea Golden General Trading LLC; (6) Aydah Trading LLC; (7) Wadi Al Afrah Trading LLC; (8) Kay Zone General Trading LLC; (9) Landtek Developers; (10) Kay Zone Builders & Developers; and (11) Unico Textiles.

251.    With respect to the Khanani MLO's leadership, Altaf Khanani borrowed a page from the Haqqani family playbook and stacked the Khanani MLO's leadership with members of Khanani's family including, but not limited to: **(1) Obaid Khanani**, Altaf's son and senior manager at Al Zarooni Exchange, who held a leadership role in the Khanani MLO; **(2) Hozaifa Khanani**, Altaf's nephew and manager of Khanani MLO real estate investments; and **(3) Javed Khanani**, Altaf's brother and key launderer, who cleansed the FTOs' criminal proceeds through money service businesses in the U.A.E., including but not limited to Al Zarooni Exchange, for or on behalf of the Khanani MLO, and also managed the Khanani MLO's operations in Pakistan.

~~376.~~252.        The Khanani MLO has provided a full spectrum of illicit financial services to Khanani's original core customer base in from the early 1990s through the late 2000s: al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, all of whom Khanani had long served in his role as the world's leading opium-related money launderer. Khanani also served as the personal financier and agent to Sirajuddin Haqqani and Dawood Ibrahim, both leaders of Syndicate entities.

253.    By no later than 2008, and continuously ever since, Altaf Khanani, Khanani's family, and the Khanani MLO (collectively, "the Khanani Cell") were notorious in the U.S., Pakistan, the U.A.E., Europe, and amongst the banking and remitter communities, for Khanani's status as one of the world's worst polyterrorist financiers and the Khanani MLO's reputation as the worst terrorist finance enterprise in the world.  Among other things, Khanani, Khanani's family, and the Khanani MLO were notorious for funding:  (i) al-Qaeda, an FTO since 1999; (ii) the Taliban, an SDGT since 2002, including its Haqqani Network, an FTO since 2012; (iii) D-Company, an SDGT since 2002; (iv) Hezbollah, an FTO since 1997; and (v) the Qods Force, an SDGT since 2007 and an FTO since 2019.  For each such FTO and SDGT, Khanani, the Khanani family, and the Khanani MLO were internationally infamous as:

(i)     **Syndicate intelligence agents**, who served, among others, al-Qaeda, the Haqqani Network, and D-Company, to whom the Khanani Cell provided financial services, management consulting, and commercial intelligence to aid the terrorist enterprise;

(ii)    **Syndicate terrorist financiers**, who served, among others, al-Qaeda, the Taliban (including its Haqqani Network), D-Company, and Hezbollah, to whom the Khanani Cell provided a comprehensive suite of U.S. Dollar-related financial services worldwide; and

(iii)   **Syndicate terrorist taxpayers**, who paid "taxes" to, among others, D-Company and the Haqqani Network for decades through the relationships between Altaf Khanani and Dawood Ibrahim (with respect to D-Company) and between Altaf Khanani and most senior leaders of the Haqqani family, which have existed since the 1990s.

254.    Khanani's relationship with the Haqqani Network was especially close.  Ever since the 1990s, Khanani, the Khanani family, and the Khanani MLO have served as agent, financier, and ally to the Haqqani Network, including, but not limited to, through Khanani's services for senior Haqqani family members.  On information and belief, from the 1990s through the present, Khanani, the Khanani family, and the Khanani MLO served the Haqqani Network through their service to, among others, senior members of the Haqqani family as follows:

(i)     Altaf Khanani, the Khanani family, and the Khanani MLO served the Haqqani family since at least the 1990s, when they helped Jalaludin Haqqani fund, arm, and lead the Taliban's first successful conquest of Kabul.

(ii)    Altaf Khanani, the Khanani family, and the Khanani MLO continued serving the Haqqani family in the Syndicate's post-9/11 rebuilding years from 2002 through 2006, when they helped Jalaluddin enable al-Qaeda's logistical renaissance in Afghanistan, Pakistan, and the U.A.E.

(iii)   Altaf Khanani, the Khanani family, and the Khanani MLO grew their relationship with the Haqqani family in the mid-2000s, when they served Sirajuddin Haqqani (responsible for overall transnational operations) and his uncle Khalil Haqqani (responsible for transnational terrorist finance and logistics), and helped each manage aspects Haqqani Network finances.

(iv)    Beginning around this time, Khanani, the Khanani family, and the Khanani MLO coordinated directly with, and paid "taxes" to, the Haqqani Network's transnational leaders responsible for collecting "taxes" or "donations" from transnational criminal organizations led by Pakistanis, most of all, helping al-Qaeda manage the Taliban's global opium pipeline in the mid-2000s, by serving Sirajuddin Haqqani (responsible for overall transnational operations) and his uncle Khalil Haqqani (responsible for transnational terrorist finance and logistics), and helped each manage aspects Haqqani Network finances.

377.   From Khanani and the entities he controlled were agents and fronts for the Syndicate through Khanani's service as the lead transnational banker for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, all of which were members of the Syndicate and all of which used Khanani to repatriate overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans.

(v)     2008 through at least 2016, Sirajuddin Haqqani and Khalil Haqqani were responsible for receiving and redistributing the Haqqani Network's transnational "tax," "donation," and narcotics income from the U.A.E., Pakistan, and other vital Khanani MLO laundering hubs for the Syndicate.

(vi)    On or about 2008, Altaf Khanani, the Khanani family, and the Khanani MLO intensified their relationship with the Haqqani Network after Khanani and the Khanani MLO relocated from Pakistan to the U.A.E.  Their decision to collaborate was mutually beneficial because Khanani operated the largest global Pakistani criminal organization in world history (*i.e.*, the Khanani MLO) and the Haqqani Network specialized in providing operational, logistical, and terrorist muscle to

transnational criminal organizations (*e.g.*, to help drug smugglers move product across a border).

(vii)   By 2010, Khanani, the Khanani MLO's, and the Haqqani Network's growing transnational alliance benefited all involved:  Khanani gained a powerful protector in Pakistan and the U.A.E., while the Haqqani Network was aided by Khanani's and the Khanani MLO's terrorist intelligence, finance, and management consulting activities, in addition to the separate, multi-million dollar annual "tax" payments, which Khanani and the Khanani MLO made to the Haqqani Network each year from the 1990s through the present.

(viii)   When Altaf Khanani was arrested in 2015, the Khanani family and the Khanani MLO remained faithful servants to the Haqqani Network through their services to the Haqqani family even after Khanani was extradited to the U.S.

(ix)   Today, the Khanani MLO continues to serve as a financier for the Haqqani Network. As a result, the Khanani MLO likely financed Sirajuddin Haqqani's terrorist conquest of Kabul in 2021, which would be the ***second*** time the Khanani family helped finance the Haqqani family's conquest of Kabul on behalf of the Taliban.

378.   Aside from his pivotal decades-long relationship with the Haqqani Network, Khanani was also *himself* both a Syndicate agent and operative through his membership in one or more constituent members of the Syndicate, including, but not limited to, his status as a member of al-Qaeda affiliate, D-Company.  In this way, Khanani demonstrated how the Syndicate grew its ranks after 9/11 to include Pashtuns, like Khanani, who may not agree on every issue but share a desire to expel Americans from Afghanistan, as well as another instance in which a key Syndicate operative supported the Syndicate through membership and activities on behalf of more than one affiliate.

379.255.   Altaf Khanani and the Khanani MLO also served as D-Company. Specifically, Khanani was the equivalent of the Chief Financial Officer for D-Company, and a personal financier and agent to numerous notable Syndicate leaders including, but not limited to: (1) Sirajuddin Haqqani (from at least 2008 through 2016); and (2) Dawood Ibrahim (from the 1990s through 2016).  In such capacity, Khanani and the Khanani MLO managed, moved,

protected, invested, and concealed funds controlled by, among others, Sirajuddin Haqqani and to D-Company leader Dawood Ibrahim.

> **2.      Khanani And The Khanani MLO Transferred, Managed, Invested, And Protected Al-Qaeda And Its Allies' U.S. Dollars Worldwide And Financed Attacks Against Americans In Afghanistan**

380.   On November 12, 2015, the Treasury Department sanctioned Khanani and the Khanani MLO after finding that Khanani "laundered funds for designated terrorist organizations," was "involved in the movement of funds for the Taliban," including its Haqqani Network,[395] and maintained "relationships with Lashkar-e-Tayyiba, Dawood Ibrahim, al-Qa'ida, and Jaish-e-Mohammed,"[396] each of which funded and resourced attacks against Americans in Afghanistan through their membership in the Syndicate.

381.   Khanani was one of the most prominent and effective money launderers in the world.  His operations were based in Pakistan from 2001 to 2008, and then Dubai from 2008 until 2015.  For that entire period, his influence stretched across the globe.  Khanani's reach has been recognized by U.S. government officials, the media, and knowledgeable commentators.

256.   TheBy 2008, the Syndicate was earning money from criminal operations worldwide, including but not limited to narco-trafficking, fraud, and other rackets., and Khanani enabled al-Qaeda and the Haqqani Network to managereffectively manage their global finances, launder their illicit income, and then repatriate it back to al-Qaeda or Haqqani Network-controlled accounts to be shared with the other members of the Syndicate for use in their joint terrorist campaign against the U.S. in Afghanistan.  From 2000 through 2016, the

---

[395] The Taliban was inclusive of the Haqqani Network.  Moreover, Khanani and the Khanani MLO were specifically notorious for their long-standing service to both Sirajuddin Haqqani personally and the Haqqani Network organizationally.

[396] U.S. Department of the Treasury, Press Center, *Treasury Sanctions The Khanani Money Laundering Organization* (Nov. 12, 2015), tinyurl.com/qkhn42es.

382.257.     The Khanani MLO played a key role operationalizing much of the transnational terrorist finance architecture used by Al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company to transfer the U.S. Dollars they all earned (often working together as allies) through USD-dependent transnational criminal operations.  The Khanani MLO was essential to this shared terrorist finance enterprise because it relied heavily on the movement of U.S. Dollars between countries and banks that financed Syndicate activities in Afghanistan through criminal schemes inside of Afghanistan (such as the Haqqani Network's protection money rackets) and worldwide (such as al-Qaeda's VAT fraud rackets in Europe).  The Khanani MLO helped each Syndicate member manage much of its global criminal income, including but not limited to, the U.S. Dollars each group earned through terrorist finance schemes such as protection payments, narco-trafficking, large-scale VAT fraud, and other core criminal rackets upon which al-Qaeda and the Haqqani Network notoriously relied after 9/11 to finance attacks against Americans in Afghanistan.

383.258.     Khanani and the Khanani MLO enabled each of the above al-Qaeda affiliates and Syndicate members to seamlessly transfer their worldwide criminal income streams to terrorist operatives – also around the world – who directly supported attacks against Americans in Afghanistan.  For example, through the terrorist finance that each Defendant routed to al-Qaeda, the Haqqani Network, and other Syndicate members through the Khanani MLO, al-Qaeda could use the Khanani MLO to convert the Russian Rubles and European Euros into U.S. Dollars (which greatly improved al-Qaeda's killing power).  Thereafter, the Khanani MLO discretely transferred al-Qaeda's and the Haqqani Network's U.S. Dollars to another country in Europe or the Middle East, where al-Qaeda and Haqqani Network finance and logistics cells supported the terrorist campaign against Americans, such as an al-Qaeda finance

cell in Europe that sent regular payments to senior Haqqani Network commanders, or a Haqqani Network logistics cell in the U.A.E. that purchased Fatima Group CAN Fertilizer or other key bomb parts needed to maximize the lethality of the Syndicate's terrorist campaign against Americans in Afghanistan.

384.    In 2018, the Financial Action Task Force ("FATF") issued a public report that was "the first time the FATF "under[took] a project which concentrate[d] on professional money launderers ("PMLs") that specialise[d] in enabling criminals to evade anti-money laundering and counter terrorist financing safeguards and sanctions in order to enjoy the profits from illegal activities" (the "2018 FATF Report").[397]

385.    With respect to the general features of Professional Money Launderers, the 2018 FATF Report noted that:

(i)      "[Professional Money Launderers] operate under a number of business models and may be individuals; criminal organisations with a clear structure and hierarchy; or networks of loosely affiliated members" (FATF Report at 6);

259.    "[Professional Money Launderers] may provide the entire infrastructure The Khanani MLO operated from 2001 until 2008 in Pakistan, when the Pakistani government charged Khanani and many of his family members with illegally siphoning USD$10 billion out of Pakistan. The charges made international news at the time because even then, Khanani's business was massive, turning over more than USD$10 billion annually. Khanani avoided conviction in Pakistan, where rumors had it "that the bribe paid" by Khanani to achieve that

---

[397] Financial Action Task Force, *FATF Report: Professional Money Laundering*, at 6 (July 2018), https://www.fatf-gafi.org/media/fatf/documents/Professional-Money-Laundering.pdf.

outcome "was in the nine figures."[398] Khanani then moved his operation to Dubai, where it

operated from 2008 until 2016.

(ii)     From 2008 until 2016, the Khanani MLO used entities, including Al Zarooni Exchange and Mazaka General Trading, to carry out terrorist financing for complex money laundering schemes (*e.g.*, a 'full service') or construct a unique scheme tailored to the specific needs of a client that wishes to launder the proceeds of crime." (*Id.*)

(iii)    "These [Professional Money Launderers] provide a menu of generally applicable services, with the result that the same laundering techniques (and potentially the same financial channels and routes) may be used for the benefit of multiple organised crime groups. As such, professional money laundering networks may act transnationally in order to exploit vulnerabilities in countries and particular businesses, financial institutions, or designated non-financial businesses or professions." (*Id.*)

(iv)     "[Professional Money Launderers], themselves," like the Khanani MLO, "pose[d] a threat to the financial system, as they facilitate[d] money laundering and criminality more broadly" (*id.*), and for the Khanani MLO, terrorism.

(v)      "In general," under the second step of "a cross-border [money laundering] scheme arranged by a proxy network," like the Khanani MLO, "[f]unds [were] moved through a complex chain of accounts established by domestic shell companies under fictitious contracts. The funds from different clients [were] mixed within the same accounts, which [made] it difficult for [government] investigators to trace the funds coming from a particular client." (*Id.* at 26.)

386.    The 2018 FATF Report outlined the Khanani MLO's operations and reported, among other things, that:

(i)      "The Khanani MLO was an [Organized Crime Group[399]] composed of individuals and entities operating under the supervision of Pakistani national, Altaf Khanani, whom the US Drug Enforcement Administration (DEA) arrested in 2015." (*Id.* at 13.)

(ii)     "The Khanani MLO facilitated illicit money movements between Pakistan, the United Arab Emirates (UAE), the United States, the United Kingdom, Canada, Australia and

---

[398] Linton Besser, *Catching the Money Man*, ABC News (Australia) (Feb. 5, 2018), https://www.abc.net.au/news/2018-02-05/the-billion-dollar-bust/9383890?nw=0&r=HtmlFragment

[399] An "Organised Crime Group" was "synonymous" with a "Transnational Criminal Organisation (TCO)" as "used in the US designation process." 2018 FATF Report at 14.

other countries. It was responsible for laundering billions of dollars in criminal proceeds annually." (*Id.*)

(iii)   "Khanani was responsible for depositing drug proceeds via bank wires from a foreign business account in an effort to conceal and disguise the nature, source, ownership and control of the funds." (*Id.* at 14.)

(iv)   "Khanani conducted transactions, which involved multiple wire transfers from a number of general trading companies." (*Id.*)

(v)   "Khanani's commission to launder funds was 3% of the total value of funds laundered." (*Id.*)

387.   The FATF team "examined potential links between [professional money launderers] and terrorist financing," and concluded that "[t]he Khanani [MLO] *provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organisation*."[400] The FATF concluded that "terrorists *use[d] the services of*" the Khanani MLO "to move funds." (Id. at 7.)

388.   The FATF also documented the "Moldovan Laundromat": "[t]here [were] also indications that clients from other countries used" the Moldovan Laundromat and "[i]n a demonstration of the interconnectedness of [Professional Money Laundering], some companies involved in [the Moldovan Laundromat] scheme ha[d] financial links with a UAE company designated by the US in relation to the [Khanani MLO]." (*Id.* at 29.)

389.   The FATF also documented how "In one case, funds were channelled to accounts of companies registered in the Middle East, with subsequent cash withdrawals via exchange houses. Cash was then transported back to the country of origin and declared on the border as profits from legitimate business activities in the Middle East, which were intended to be used for the purchase of real estate." (*Id.* at 29-30.) The Khanani MLO was the only group referenced in

---

[400] 2018 FATF Report at 7 (emphasis added).

the FATF report that had a substantial nexus to the Middle East, and on information and belief, the FATF's quote described the Khanani MLO's movement of cash on behalf of one or more Syndicate terrorist groups from the U.A.E. to Pakistan (the "country of origin").

### 3. The Khanani MLO's Transactions Funded Khanani's Profit-Sharing With Syndicate Members Who Financed, Armed, And Conducted Attacks, Including D-Company And The Haqqani Network

390.     Defendants' provision of financial services to the Khanani MLO aided al-Qaeda, Haqqani Network, and their allies' attacks for a separate reason wholly apart from any specific transaction.  The Defendants enabled the Khanani MLO's success as a privately-held terrorist corporation, thus allowing the MLO to pay al-Qaeda, the Haqqani Network, and D-Company a cut of the Khanani MLO's profits.

391.     From 2008 through 2016clients. During that period, the Khanani MLO laundered between $13 billion and $16 billion per year.

392.     Khanani, through the Khanani MLO, charged a three percent (3%) commission on every trade the Khanani MLO conducted at every step in the chain.  As a result, the Khanani MLO earned hundreds of millions of U.S. Dollars per year in income.

393.     Khanani had direct personal relationships with, and served as the personal financier for, among others:  (1) Dawood Ibrahim, the Specially Designated Global Terrorist leader of D-Company who was a key ally of al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba, all of whom he funded and logistically supported; and (2) Sirajuddin Haqqani, the polyterrorist leader of al-Qaeda, the Haqqani Network, and the Taliban.

394.     From 2001 through 2016, Khanani served as a personal financier to Dawood Ibrahim and, in effect, CFO of D-Company.  On information and belief, Khanani transferred a percentage of the Khanani MLO's net income each year to Dawood Ibrahim and D-Company in Khanani's capacity as a *caporegime* to Ibrahim's role as *don* of D-Company, and Khanani

transferred at least ten percent (10%) of the Khanani MLO's total net income each year to D-Company.[401]  At such rate, the Khanani MLO directly transferred tens of millions of U.S. Dollars to D-Company each year from 2008 through 2016 that was ***in addition to*** the vast sums of terrorist finance that the Khanani MLO managed, moved, and concealed on D-Company's behalf.  Given D-Company's substantial annual financial support for al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba, some of the money that Khanani kicked back to D-Company also flowed onto those groups.

395.    From 2001 through 2016, Khanani served as a personal financier to Sirajuddin Haqqani and a key terrorist finance agent for the Haqqani Network, which, in turn, managed the flow of its own, and the Taliban's, opium money as a key shareholder of the Khanani MLO.  As a matter of terrorist tradecraft (and self-dealing that benefited the Haqqani Network), Sirajuddin Haqqani and the Haqqani Network did not entrust any terrorist financier or logistician with the Haqqani Network's precious U.S. Dollars, shell companies, or finances unless such person was either a member of the Haqqani Network or made regular payments to the Haqqani Network to show their respect.[402]  On information and belief, Khanani transferred at least two-point-five percent (2.5%) of the total income of the Khanani MLO each year to the Haqqani Network, and at such rate, the Khanani MLO directly transferred at least several million U.S. Dollars in

---

[401]  Plaintiffs' belief that Khanani's kickback percentage to Dawood Ibrahim was most likely 10 percent is based upon prevailing practices of every Syndicate member from 2008 through 2016, each of whom followed a similar mafia-like playbook, under which 10-20 percent of a terrorist cell leader's net income was transferred to the person on top of them in the organization.  Here, Ibrahim was the only person who outranked Khanani in D-Company and therefore the person Khanani had to pay.

[402]  To avoid confusion, such "donations," "respect payments," or *Zakat* from terrorist financers like Khanani to the Haqqani Network were different from the "protection payments" that the Haqqani Network charged western contractors and the like.  On information and belief, the Haqqani Network's rate assessed to people like Khanani was 2.5%, while the Haqqani Network's "protection payments" rates ranged from 10%-20% and were often more.

"donations" each year to the Haqqani Network from 2008 through 2016. At such rate, the Khanani MLO directly transferred at least several million U.S. Dollars to the Haqqani Network each year from 2008 through 2016 that was *in addition to* the vast sums of terrorist finance that the Khanani MLO managed, moved, and concealed on the Haqqani Network's behalf.

396.   As a result, *every* Khanani MLO transaction with each Defendant caused a three percent (3%) "commission" to flow to Khanani as the Khanani MLO's profit for conducting the terrorist finance transaction at issue. As a result, every Khanani MLO transaction directly enabled a second potent stream of terrorist finance that flowed to D-Company (and through it, to al-Qaeda and Lashkar-e-Taiba, which D-Company funded as an ally), and the Haqqani Network (and through it, the Taliban, of which the Haqqani Network was a part).

397.   Aside from their knowledge that Khanani and the Khanani MLO acted as agent for al-Qaeda, the Haqqani Network, and other Syndicate members, Defendants also knew that their financial dealings with Khanani funded Khanani's own substantial personal "tax" contributions to the Syndicate. On information and belief, Khanani regularly transferred a percentage of the Khanani MLO's income to al-Qaeda and the Haqqani Network as a "tax" payment to the Syndicate to show respect to the Syndicate, including its Haqqani Network's domination of the segments of the Afghani, Pakistani, and Emirati criminal underworlds relevant to Khanani's business.

> **4.   Khanani MLO Transactions Relating To Russia, Europe, The U.A.E., Pakistan, Or Afghanistan Ordinarily Financed Al-Qaeda, The Taliban (Including Its Haqqani Network), Lashkar-E-Taiba, Jaish-E-Mohammed, And/Or D-Company**

398.260.   From 2008 through 2016During this period, Khanani and the Khanani MLO exclusively served a narco-terrorist clientele. The members of the, and Syndicate members, collectively, comprised Khanani's largest group of clients. On information and belief,

Syndicate members also collectively accounted for most of the Khanani MLO's transactions relating to the U.A.E., Afghanistan, Pakistan, the U.A.E., Russia, Estonia, and other geographies in which al-Qaeda and the Haqqani Network managed the Syndicate's transnational terrorist finance and logistics architecture from 2008 through 2016.

399.    Given the complete control of the Pakistani underworld by Syndicate members like the Haqqani Network, Lashkar-e-Taiba, and D-Company, and the fact that no other organized crime group would ever want to secure its money in Pakistan, Defendants knew that the money laundering operations conducted by sophisticated transnational Pakistan-linked criminal organizations typically financed al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and D-Company, rather than non-terrorist-finance explanations.  As one analyst explained:

> [M]echanisms in place [] trace the origins of transactions so that you cannot simply evade the rules by going through a third country, though as the fines on … Standard Chartered Bank in New York … illustrated, there are clearly ways to get around those … Bear in mind that *the reason* Pakistan was placed on the grey list due to its failure to take sufficient steps to curb terrorist financing, *not* specifically anti-money laundering. ***No international criminal gangs use Pakistani banks to launder their money***, certainly not the kind that the rest of the world would care about. ***But funds for terrorism do flow through Pakistani banks***.[403]

400.261.    While the Khanani MLO also serviced narco-terrorists operating in Mexico, Colombia, and China, their transaction activity for such customers generally took place in their own spheres of influence – not Europe, Russia, the Middle East, or South Asia.

401.262.    Khanani and the Khanani MLO ordinarily used banksbranches within the relevant region to launder narcotics money for a particular narco-terrorist group as a strategy to better conceal their terrorist finance activities.  This meant that when Defendants' employees

---

[403] Farooq Tirmizi, *The FATF 'Grey List' Means More Trouble For Pakistan Than You Think*, Daily Pakistan Today (Mar. 5, 2018) (emphasis added), 2018 WLNR 6953120. (emphasis added).

understood that Khanani or the Khanani MLO was engaged in finance activity, the likely identity of the Khanani MLO's narco-terrorist client (or clients, in the case of the Syndicate) was obvious from the geographies of the banks upon which the Khanani MLO relied to conduct the transaction.

402.263.     From 2001 through 2016, al-Qaeda, the Haqqani Network (representing the Taliban), Lashkar-e-Taiba, and D-Company, in combination with their Russian Mafia Opium JV partners, collectively controlled the narcotics markets in Europe, the Middle East, Central Asia, Afghanistan, and Pakistan:  Syndicate members controlled both opium supply and the key smuggling route chokepoints from Afghanistan and Pakistan necessary to travel on to Central Asia, the Middle East, and Europe, while their Russian Mafia JV partners managed transnational aspects throughout Central Asia and Europe, in coordination with overseas al-Qaeda and Haqqani Network cells operating in those same European and Central Asian geographies. Mexican, Colombian, and Chinese narco-terrorists largely focused on their own spheres of influence (the Americas for the first two, East Asia for the third).

403.264.     As a result, any time that Khanani or the Khanani MLO conducted transactions through banks or remitters in Europe, Russia, Central Asia, the Middle East, Afghanistan, or Pakistan, al-Qaeda and the Haqqani Network were more likely than not the beneficiary because the Khanani MLO's other (non-Syndicate) narco-terrorists clients ordinarily laundered their money in the Americas (for the Mexican and Colombian cartels) or East Asia (for the Chinese cartels), and it would have been contrary to the operational security of such non-Syndicate narco-terrorists' laundering efforts for the non-Syndicate terrorists to use European, Middle Eastern, Russian, or Pakistani banks in connection with drug transactions in geographies like Mexico City, Medellin, or Hong Kong.

5.     The Khanani MLO Required Complicit Banks And Money Remitters

404.    From 2001 through 2016, Khanani used long-standing financial partnerships with an array of complicit financial institutions and money remitters, including every Defendant, to collectively repatriate hundreds of millions of U.S. Dollars earned by al-Qaeda and its allies back to accounts controlled by Syndicate agents and operatives to finance attacks in Afghanistan.

405.    To accomplish this, Khanani built his own Laundromat — *i.e.*, the Khanani MLO — which, in turn, he caused to be embedded within other Laundromats run by Defendants.

265.    Khanani himself was arrested by the United States in September 2015.  A few months later, on November 12, 2015, the U.S. Department of the Treasury designated the Khanani MLO a transnational criminal organization. The press release accompanying the designation explained, among other things, that:

(i)     "The Khanani Money Laundering Organization exploit[ed] its relationships with financial institutions to funnel billions of dollars across the globe on behalf of terrorists, drug traffickers, and criminal organizations."

(ii)    "The Khanani MLO facilitate[d] illicit money movement between Pakistan, the United Arab Emirates (UAE), United States, United Kingdom, Canada, Australia, and other countries, and … launder[ed] billions of dollars in … crime proceeds annually."

(iii)   "Altaf Khanani and , the head of the Khanani MLO used companies, including , and Al Zarooni Exchange and Mazaka General Trading, that were created and operated for the sole purpose of carrying out[were] involved in the movement of funds for the Taliban, and Altaf Khanani [was] known to have had relationships with Lashkar-e-Tayyiba, Dawood Ibrahim, al-Qa'ida, and Jaish-e-Mohammed."

(iv)    "The Khanani MLO offer[ed] money laundering services to … individuals associated with Hizballah."

(v)     "DEA['s] Miami Field Division Special Agent in Charge" stated that "'[t]he DEA's arrest of Khanani, who [was] a major international money launderer for multiple transnational criminal organizations as well as designated terrorist groups across the globe, and the Treasury's designation of [the Khanani MLO], reiterate[d] the U.S.

**Formatte**

government's commitment to targeting the world's top criminals, including those who blur[red] the line between drug trafficking, terrorism, and organized crime."[404]

~~406.~~266.        Khanani was convicted of money laundering in 2016 and sentenced to prison in 2017.  On information and belief, the Khanani MLO continued operating after Khanani's ~~terrorist finance activities on behalf of his clients, al-Qaeda, the Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company.~~ arrest and remains in operation to this day.

267.     Further confirming the allegations herein, the Financial Action Task Force in 2018 issued a report on money laundering and the Khanani MLO that "examined potential links between [professional money launderers] and terrorist financing," and concluded that "[t]he Khanani [MLO] provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organisation" because "terrorists use[d] the services of" the Khanani MLO "to move funds."[405]

~~407.~~    The Khanani MLO supported the Syndicate in seven different ways.  *First*, Khanani and the entities he controlled ~~were~~, including but not limited to, Mazaka General Trading and Al-Zarooni Exchange served as agents and fronts for ~~the Syndicate through~~

---

[404] U.S. Department of the Treasury, Press Center, *Treasury Sanctions The Khanani Money Laundering Organization* (Nov. 12, 2015), tinyurl.com/qkhn42es.

[405] Financial Action Task Force, *FATF Report: Professional Money Laundering*, at 7 (July 2018), https://www.fatf-gafi.org/media/fatf/documents/Professional-Money-Laundering.pdf. The FATF also documented, *id.* at 29-30, how "[i]n one case, funds were channelled to accounts of companies registered in the Middle East, with subsequent cash withdrawals via exchange houses. Cash was then transported back to the country of origin and declared on the border as profits from legitimate business activities in the Middle East, which were intended to be used for the purchase of real estate." On information and belief, the FATF's quote described the Khanani MLO's movement of cash on behalf of al-Qaeda and/or the Haqqani Network cells in the U.A.E. to Pakistan (the "country of origin") because, among other reasons, the Khanani MLO was the only group consistent with the described organization, which was referenced in the FATF report as having a substantial nexus to the Middle East.

~~Khanani's service as the lead transnational banker for~~ al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, all of which ~~were members of the Syndicate and all of which used Khanani to repatriate~~used Khanani to repatriate overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans.  As one of al-Qaeda's and the Haqqani Network's most valuable financial minds, Khanani and the Khanani MLO he directed, did not just move the Syndicate's ~~illicit income back to~~ money:  they also served as a global economic intelligence arm for the Syndicate, providing vital nonpublic information concerning nearly every data point relevant to al-~~Qaeda,~~Qaeda's and the Haqqani ~~Network, and their allies.~~

408.    ~~Khanani was also *himself* a Syndicate **operative** through his membership in one or more constituent members of the Syndicate,~~Network's ability to manage the Syndicate's financial affairs including, but not limited to~~, his status as a member of al-Qaeda affiliate, D-Company.~~At all relevant times, Khanani's activities on behalf of his al-Qaeda, Taliban, and Haqqani Network clients relied upon the use of accounts associated with fronts in the U.A.E., including Al Zarooni Exchange and Mazaka General Trading.  Given his status as one of the world's most notorious suspected terrorist financiers, who had a particular need for U.S. Dollars given the currency of the criminal enterprises for which he was laundering (*e.g.*., narcotics), Khanani required financial institution partners located in permissive jurisdictions, through which he could use a local branch to access U.S. Dollars to launder the Syndicate's money.

409.    ~~One reason the Khanani MLO depended upon complicit banks and remitters as that Khanani, unlike other professional money launderers, generally only laundered narco-terrorist client money after he relocated from Pakistan to Dubai in 2008.  As a result, the Khanani MLO did not have many (or any) of the quasi-legitimate customers (*e.g*., corrupt~~

oligarch seeking to illicitly transfer money out of a country) who turned to professional money launderers like him.  This matters because the Khanani MLO served as a transnational criminal terrorist finance organization that helped its narco-terrorist customers, like al-Qaeda, move their money.  As a result, when the Khanani MLO transferred funds to geographies in which al-Qaeda, the Haqqani Network, or another Khanani Syndicate terrorist client did business—such as Europe, Russia, the U.A.E., and Pakistan, to name four examples—the most likely explanation for the transaction in question is that the Khanani MLO was engaged in terrorist finance and transferred funds to a cell operated by one or more of the above Syndicate-related terrorist customers whom the Khanani MLO had served for decades:  al-Qaeda, the Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, Jaish-e-Mohammed, or D-Company.

268.  To enable the Khanani MLO's activities, Khanani chose three global financial institution partners:  Defendants Deutsche Bank, Standard Chartered Bank, and Danske Bank, all of which matched the Syndicate's terrorist finance needs because each was (a):  (i) identifying corrupt banks, remitters, corporations, service providers, and politicians who are **willing** to transact business with terrorists; and (ii) discerning, and helping terrorist clients, take advantage of new trends in global finance and money laundering, *e.g.*, "mirror trades."

410.  *Second,* the Khanani MLO was originally purpose-built to **serve** as a Laundromat and (b) had access to the U.S. financial system and U.S. Dollars.  Khanani also relied upon two global money remitter services, Defendants Placid Express and Wall Street Exchange. Defendants perfectly fit the bill and fulfilled the Khanani MLO's operational needs as Khanani and the Khanani MLO used Defendants' accounts to collectively repatriate hundreds of millions of illicit al-Qaeda and Haqqani Network U.S. Dollars back to accounts controlled by Syndicate agents or operatives to finance attacks in Afghanistan.

411.   The Khanani MLO operated as a full-spectrum terrorist finance vehicle for al-, and always served as, an agent for al-Qaeda, the Haqqani Network (and though them, the Taliban), and their ally, D-Company.

412.269.      *First*, the Khanani MLO was originally purpose-built specifically to serve as an agent for al-Qaeda, the Haqqani Network (and though them, the Taliban), and their ally, D-D-Company, to manage every financial aspect of their coordinated transnational opium enterprise.- Every aspect of the Khanani MLO's structure and operation was designed to enable the Syndicate's terrorist finance. -While the Khanani MLO also later grew in the mid-2000s to service other narco-terrorists, it was created to service al--Qaeda and its affiliates, and from 2008 onward, the Khanani MLO served an exclusively narco-terrorist clientele.

270.   *SecondThird*, the Khanani MLO provided a comprehensive suite of financial services to al-Qaeda, the Haqqani Network (and through them, the Taliban), LT, and D-Company, including, but not limited to: (1) laundering their money obtained from opium sales, fraud, and other unlawful schemes; (2) converting their money from an array of local currencies, such as Russian Rubles, into USD, which al-Qaeda and the Haqqani Network insisted upon as the currency of choice to maximize the lethality of their terrorist campaign in Afghanistan; (3) moving their money through the global financial system, including extracting it from countries like Russia; (4) investing their money in commercial ventures in order to launder it; (5) protecting their money by serving, in effect, as a transnational bank for it; and (6) transferring cleansed profits back to Syndicate agents and operatives. Each of these functions independently aided al-Qaeda and the Haqqani Network (and the Taliban through it), as well as Lashkar-e-Taiba and D-Company.

271.     *Fourth*, Khanani himself paid kickbacks (also called "taxes") to both D-Company and the Haqqani Network. Specifically, Khanani was known to take a 3% commission on funds laundered from all his clients. He was also a senior member of D-Company, and it was normal practice for such senior members to pay ten percent (10%) or more of one's money to Dawood Ibrahim, D-Company's head, as a form of tribute.[406]

272.     Khanani also managed finances for Sirajuddin Haqqani, a terrorist leader for the Haqqani Network and al-Qaeda, and other members of the Haqqani family, and it was common practice for Sirajuddin and the other Haqqani family members to require anybody with close access to Haqqani affairs to pay approximately 2.5% of their income, also as a form of tribute or "tax."[407] Through this mechanism, each transaction that benefited the Khanani MLO also indirectly lent financial support to the Syndicate through the income that flowed from Khanani to D-Company and the Haqqani Network.

273.     On information and belief, Khanani and the Khanani MLO transferred at least two-point-five percent (2.5%) of the total income of the Khanani MLO each year to the Haqqani Network, and at such rate, each Defendant directly or indirectly facilitated at least $100,000, each year from 2008 through 2016, which U.S. Dollars flowed through Defendants' New York branches, including SCB New York, DBTCA, and Danske New York, to help the Khanani MLO

---

[406] Plaintiffs' belief that Khanani's kickback percentage to Dawood Ibrahim was most likely 10 percent is based upon prevailing practices of every Syndicate member from 2008 through 2016, each of whom followed a similar mafia-like playbook, under which 10-20 percent of a terrorist cell leader's net income was transferred to the person on top of them in the organization.  Here, Ibrahim was the only person who outranked Khanani in D-Company and therefore the person Khanani had to pay.

[407] To avoid confusion, such "donations," "respect payments," or *Zakat* from terrorist financers like Khanani to the Haqqani Network were different from the "protection payments" that the Haqqani Network charged western contractors and the like.  On information and belief, the Haqqani Network's rate assessed to people like Khanani was 2.5%, while the Haqqani Network's "protection payments" rates ranged from 10%-20% and were often more.

earn income by servicing its clients while knowing that the Khanani MLO would necessarily, and inevitably, pay the Haqqani Network's 2.5% terrorist "tax" as a direct and foreseeable result of Defendants' deliberate facilitation of Khanani MLO transaction activities.

274.    On information and belief, each Defendant's facilitation of the Khanani MLO's illicit services collectively caused more than $500,000 in value of Khanani MLO "tax payments" or "donations" to flow into the terrorist budgets of the Haqqani Network from 2008 through 2016, and the Khanani MLO directly transferred at least several million U.S. Dollars to the Haqqani Network each year during this period, which "tax payments" and donations" were *in addition to* the vast sums of terrorist finance that the Khanani MLO managed, moved, and concealed on the Haqqani Network's (and other Syndicate FTOs') behalf.

413.275.        *Fifth*, one key feature of the Khanani MLO's strategy was that it did not segregate terrorist customers' money but, instead, co-mingled the funds into one pot of money, for the benefit of all Khanani MLO's customers. Because money is fungible, and the Khanani MLO regularly made payments to each Syndicate member, every time any Defendant aided Khanani or the Khanani MLO it was, by definition, aiding the Syndicate because it was helping their agent manage their money.

414.   *Third*, the Khanani MLO provided a comprehensive suite of financial services to al-Qaeda, the Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, and D-Company, including, but not limited to: (1) laundering their opium money; (2) converting their opium money from an array of local currencies, such as Russian Rubles, into U.S. Dollars, which al-Qaeda and the Haqqani Network insisted upon as the specific currency of choice to maximize the lethality of their terrorist campaign in Afghanistan; (3) moving their opium money through the global financial system, including extracting it from countries like Russia; (4) investing their

~~opium money into commercial ventures in order to launder it; (5) protecting their opium money by serving, in effect, as a transnational bank for it; and (6) transferring their cleansed profits back to Syndicate agents and operatives.  Each of these functions independently aided al-Qaeda and the Haqqani Network (and the Taliban through it), as well as Lashkar-e-Taiba and D-Company.~~

~~415.~~276.          *~~Fourth~~Sixth*, because the Khanani MLO comingled the money of al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and its other terrorist customers, and then reinvested such commingled funds through commercial and real estate ventures to "clean~~" the money,,~~" protect ~~the money~~, and grow the money, the Khanani MLO effectively functioned as a terrorist finance investment vehicle, through which each terrorist customer was paid shares of Khanani MLO "clean" money in proportion to the money they put into the Khanani MLO.  As a result, *every* Khanani MLO-related transaction aided the flow of terrorist finance to al-Qaeda and the Haqqani Network (and the Taliban through it), as well as Lashkar-e-Taiba and D-Company, based on their respective "shares" of the Khanani MLO's commingled, reinvested funds.

~~416.~~277.          *~~Fifth~~Seventh*, the Khanani MLO helped al-Qaeda, the Haqqani Network (and through it, the Taliban), Lashkar-e-Taiba, and D-Company manage and diversify their vast narco-terrorist-related financial operations and income streams through a number of means including, but not limited to, facilitating each group's ability to:  (1) diversify the geographies in which they operated, which provided operational and law enforcement risk diversity; (2) diversify the strategies they deployed to conceal their terrorist finance amongst a range of vehicles, including real estate and commercial services; and (3) diversify their financial partners, by maintaining a mix of global financial institutions (the ~~Standard Chartered Bank~~SCB, Deutsche Bank, and Danske Bank Defendants) and money remitters (Placid Express and Wall

Street Exchange). This diversification aided each group's and the Syndicate's ability to raise and protect its money.

417.278.       Thus, even for Khanani-related transactions that did not directly or indirectly touch on Afghanistan, Pakistan, or the U.A.E., Defendants' provision of financial services to Khanani still aided al-Qaeda's and the Haqqani Network's terrorist campaign against Americans in Afghanistan by aiding both group'sgroups' broader management of their (and the Taliban's) finances, which allowed the Syndicate, like any other transnational organization, to spend more money on what it prized most: attacking Americans in Afghanistan. At the scale at which Khanani operated, even marginal improvements in the Syndicate's financial portfolio promised enormous resources to attack Americans in Afghanistan. For example, even if the Syndicate's financial diversification through Khanani only improved its overall portfolio performance by one-tenth-of-one percent (0.1%) – which is a fraction of what is ordinarily accomplished by diversification and was likely much less than the results Khanani produced – such an outcome helped the Syndicate repatriate at least several hundred thousand additional U.S. Dollars per year.

418.279.       Simply put, any time a bank or money transmitter helped Khanani engage in any transaction anywhere in the world it was directly or indirectly aiding-and-abetting terrorist attacks against Americans in Afghanistan because al-Qaeda, the Haqqani Network (and through them, the Taliban), Lashkar-e-Taiba, and D-Company all were effectively "shareholders" of the Khanani MLO and received, as a result, owned a direct percentage of every Khanani MLO dollar.

419.       "In general," under the second step of "a cross-border [money laundering] scheme arranged by a proxy network," like the Khanani MLO, "[f]unds [were] moved through a complex

chain of accounts established by domestic shell companies under fictitious contracts.  The funds from different clients [were] mixed within the same accounts, which [made] it difficult for [government] investigators to trace the funds coming from a particular client."  In the 2018 FATF Report, the FATF stated, among other things:

(i) "[Professional Money Launderers] may occupy positions within the financial services industry (*e.g.*, bankers and [remitters])" as well as "lawyers, accountants and real estate professionals) and use their occupation, business infrastructure and knowledge to facilitate [money laundering for criminal clients." (*Id.* at 35.)

(ii) "Criminals will actively seek to recruit complicit insiders within existing institutions or businesses, since these individuals have insider access and may be able to falsify records or initiate transactions in a manner, which bypasses AML/CFT regulations or institutional practices." (*Id.* at 36.)

(iii) "In rare circumstances, criminals may be able to compromise entire institutions or businesses, including by acquiring ownership or control of the institution and appointing their own criminal management." (*Id.*)

(iv) "A reputation for weak compliance, however, may make the institution more attractive for an [Organized Crime Group," like the Khanani MLO, "seeking out a corrupt insider." (*Id.*)

(v) "The use of the international financial system has been instrumental in facilitating large-scale [Professional Money Laundering] schemes." (*Id.* at 38.)

(vi) "Investigative authorities have been able to detect patterns in how PMLs choose certain jurisdictions and banks that are used to move illicit proceeds.  For example, some criminals seek to use banks that operate in lax regulatory environments or have reputations for non-compliance with AML/CFT regulations." (*Id.* at 38-39.)

(vii) "Bank insiders generally do not communicate openly about their criminal conduct and may be able to leverage their insider status to conceal misdeeds.  This can make it difficult to detect and prosecute wilful misconduct by complicit financial services professionals.  A range of employees within financial institutions (from lower-level tellers to higher-level management) pose a significant vulnerability that can be exploited by money launderers, but also senior insiders who knowingly assist in ML may cause more damage." (*Id.* at 39.)

(viii) "Complicit bank employees may perform functions such as:"
- "Creating counterfeit checks;"
- "Monitoring (or not appropriately monitoring) money flows between accounts controlled by the co-conspirators;"

- "Co-ordinating financial transactions to avoid [Suspicious Transaction Report] reporting;"
- "Accepting fictitious documents provided by clients as a basis for transactions, without asking any additional questions;" and
- "Performing 'virtual transactions' on the accounts of their clients—numerous transactions conducted, without an essential change of the net balance at the beginning and end of a working day." (*Id.*)

(ix)    "An investigation by Russian authorities, conducted in co-operation with foreign FIUs, uncovered an ML and tax evasion scheme that was arranged by complicit bank employees and brokers" "via mirror trading." (*Id.* at 40.)[408]

(x)    "The cases analysed and information received also demonstrated that private banking advisors may act as PMLs and provide services to conceal the nature, source, ownership and control of the funds in order to avoid scrutiny, by employing various techniques, including:"

- "Opening and transferring money to and from bank accounts held in the names of individuals or offshore entities, other than the true beneficial owners of the accounts;"
- "Making false statements on bank documents required by the bank to identify customers and disclose the true beneficial owners of the accounts;"
- "Using "consulting services" agreements and other similar types of contracts to create an appearance of legitimacy for illicit wire transfers;"
- "Maintaining and using multiple accounts at the same bank so that funds transfers between those accounts can be managed internally, without reliance on international clearing mechanisms that are more visible to law enforcement authorities;" and
- "Opening multiple bank accounts in the names of similarly-named companies at the same, or different, institutions so wires do not appear to be coming from third parties." (*Id.* at 40-41.)

420.    In 2015, the Treasury Department sanctioned Khanani and the Khanani MLO, and Khanani himself was arrested.  Thereafter, however, the Khanani MLO continued to use banks and money remitters.  On information and belief, the Khanani MLO continued routing funds through Defendants to al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, D-Company, Sirajuddin Haqqani, and Dawood Ibrahim until at least 2016.

---

[408] On information and belief, this was a reference to Deutsche Bank's Russian Laundromat, and the "complicit bank employees and brokers" included one or more Deutsche Bank and/or DB Moscow employees or agents, including, but not limited to, Tim Wiswell.

421.   In 2016, the UAE's Central Bank revoked the license of Al Zarooni Exchange due to terrorist finance and anti-money laundering violations.

422.   On October 26, 2016, Khanani pleaded guilty to federal money laundering charges.  In 2017, he was sentenced to 68 months in prison.

**B.   Samir Azizi and the Azizi Cell**

**2.   VAT Fraud Cells**

423.280.   Since the 2000s, al-Qaeda and the Taliban have raised funds to finance terrorist attacks through European tax fraud schemes, usually seeking to fraudulently obtain VAT refunds, and such of VAT. Such trends have continued through the present.

281.   VAT is similar to U.S. sales taxes in the sense that it is calculated as a percentage of the purchase price of a good. The difference between VAT and sales tax is that sales taxes ordinarily are charged only to end consumers, while VAT is paid at each step along a chain of distribution, with each purchaser paying the increment of VAT that corresponds to the value it adds to a sale. Taxing authorities manage this by requiring every seller in the chain to collect VAT based on the price it charges its buyers, and permitting that seller to deduct any VAT it paid to acquire the product. For example, imagine a distributor that buys a cell phone from a manufacturer, and then sells the cell phone to a retailer. The distributor pays VAT to the manufacturer at the time it purchases the phone (which the manufacturer remits to the taxing authority), and the distributor then charges VAT to the retailer when it sells the phone (which the distributor then remits to the taxing authority). Because the distributor is only supposed to pay VAT on the amount of value it adds to the transaction, the distributor can then seek a refund of any VAT it paid to the manufacturer.

282.   Because the European Union consists of many taxing authorities with different VAT rates, it is possible to engage in fraud by moving goods across borders through a chain of

sham businesses issuing fake invoices that give the appearance that VAT was paid when it was not. The sham businesses can then seek a refund of the VAT that they falsely claimed to have paid in another country, causing governments to issue refunds that they should not. By the time the government figures out what has happened (which often involves an investigation across multiple borders), the sham business will usually be dissolved and the fraudsters will have moved on to a new scheme.

424.283.    By 2006, the Syndicate had developed a sophisticated infrastructure to train up VAT fraudsters to create a new stream of terrorist finance. Al-Qaeda and the Taliban maintained "research departments" to identify the best strategies and organized "VAT fraud boot camps" to train a younger generation of terrorists in Afghanistan and Pakistan, who subsequently set up fundraising cells in Europe for the express purpose of sending money back to the Syndicate to attack and kill Americans in Afghanistan.

284.    Syndicate VAT fraud cells based their fraud on various commodities, including mobile phones. As they grew more sophisticated, they traded carbon emissions credits.[409]

425.285.    These trends continued continue through the present day. In 2019, for example, Spanish police arrested ten members of a transnational al-Qaeda fundraising cell that committed "tax fraud," which sums it then "laundered" and used for the "financing of terrorism" committed by "Al Qaeda," through the transfer of the fraudulently obtained tax funds "to

---

[409] Michael Day & Tom Bawden, *Briton 'Used Carbon Trading to Fund Terror'*, The Independent (UK) (Sept. 24, 2014), https://www.independent.co.uk/news/uk/crime/briton-used-carbon-trading-to-fund-terror-9754108.html.

[al-Qaeda to] provide sustenance and economic support to [its] terrorist militias" as part of the tax fraud cell's "support" of "Al-Qaeda" and "related" "jihadist terrorist organizations."[410]

426.286.    While every al-Qaeda and Haqqani Network financier who raised funds throughThe perpetrators of Syndicate-sponsored VAT fraud schemes repatriated a substantial portionremitted *at least* 10% of the monies backproceeds to accounts controlled by al-Qaeda and Haqqani Network agents and operatives and used to finance attacks by al-Qaeda and its allies against Americans in Afghanistan, the percentage they repatriated to the al-Qaeda and/or the Haqqani Network—whether a 10-20% cut, or a 100% transfer—varied (upward) from financier to financier.Syndicate. Some VAT fraudsters repatriated all or nearly all their fraudulently obtained VAT refunds to these groups., however, remitted 100% based on the theological logic that anyVAT was un-Islamic and therefore a pious al-Qaeda terrorist must divert essentially all the resulting money to the jihad. The rest followed the Haqqani Network's more traditional, mafia-style approach, under which each member was required to kick back at least ten percent (10%) of their VAT fraud profit, and often much more, to the Syndicate. Under every scenario, however, *any* VAT fraudster working for the al-Qaeda or the Haqqani Network *necessarily* repatriated *at least* ten percent (10%) of their fraudulently obtained VAT income to al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

427.    Samir Azizi, a German citizen who was born in Afghanistan, was the ringleader of a Syndicate VAT fraud fundraising cell.

428.287.    Azizi was an operative and Imran Yakub Ahmed  were both dual-hatted polyterrorist operatives or agentagents for al-Qaeda and the Taliban, including its Haqqani

---

[410] Euclid Infotech: Banks and Financial Institution News, *Spain: Disarticulated a Criminal Organization Dedicated Allegedly to the Financing of Terrorism and Money Laundering* (June 19, 2019).

Network, whom he began serving as a teenager.  On information and belief, Azizi. These men received specialized training from al‑Qaeda and the Taliban, including its Haqqani Network, concerning how to: (1) operate a VAT fraud scheme; (2) use global financial institutions to convert the eurosEuros obtained through the VAT fraud into U.S. DollarsUSD, which the Syndicate greatly preferred; and (3) transfer the resulting U.S. DollarsUSD back to the Syndicate in Afghanistan, Pakistan, and the U.A.E. to support attacks against Americans in Afghanistan.

### i.    Samir Azizi and the Azizi Cell

429.288.    Samir Azizi was a dual-hatted, Afghan-born German operative of Al-Qaeda and the Haqqani Network.  By the time he was sixteen, Azizi led a Syndicate finance cell operating out of Europe and the U.A.E. whose purpose was to generate cash flow for al‑Qaeda and the Taliban, including its Haqqani Network, through financial crime schemes involving global financial institutions. The cell operated from the mid-2000s through 2015. Plaintiffs refer to Azizi and the European and U.A.E. associates who directly participated in his frauds collectively as the "Azizi Cell."

430.    The Azizi Cell relied upon Deutsche Bank to execute a series of frauds relating to Value Added Tax ("VAT") refunds arising out of certain transactions purportedly between arms-length counterparties that were, in fact, part of a fraud scheme to generate funds to finance al-Qaeda and Taliban (including Haqqani Network) operations in Afghanistan and Pakistan. Plaintiffs refer to the Azizi Cell's schemes, collectively, as the "Azizi VAT Scheme."

431.    Deutsche Bank intentionally financed the Syndicate, through the Ahmed Cell's scheme to defraud European governments by obtaining fraudulent refunds relating to European value added taxes (or "VAT taxes").  Deutsche Bank employees directly assisted the Ahmed Cell's VAT fraud terrorist finance scheme by, among other things, facilitating transactions they knew to pose an extreme risk for Syndicate terrorist fundraising and finance.  As Mr. Laabs

explained, "Traders at [Deutsche Bank] in London and Frankfurt had helped a network of international gangsters"—including the Azizi Cell and the Ahmed Cell, *see infra* Part III.C—"to swindle back VAT payments by faking the sale of CO2 emission rights."[411]

432.     The Azizi Cell's use of fraud schemes to fund al-Qaeda and the Haqqani Network comported with long-standing al-Qaeda and Haqqani Network strategy, including, but not limited to, both groups' well-documented tactic of financing terrorism through tax frauds.

433.     From the mid-2000s through 2015, the Azizi Cell raised millions of dollars through financial crimes executed with the direct assistance of complicit financial institutions.

289.     Azizi operated the Azizi Cell consistent with its status as an al-Qaeda and Haqqani Network terrorist finance scheme that relied upon transactions with unethical western banks to convert such funds to U.S. Dollars to then be repatriated back to accounts controlled by Syndicate agents or operatives to finance attacks against Americans in Afghanistan.

434.     While Azizi had a talent for terrorist finance, he sometimes displayed a teenager's indiscretion in ways that made it spectacularly obvious, when combined with the millions of U.S. Dollars and Euros that Azizi was raising and moving through his schemes, all while Azizi was a teenageras a young man with no advanced education and no obvious (or even plausible) explanation for the millions sloshing around in his accounts.

435.290.          —revealed that his activities were unlawful. For example, Azizi openly discussed fraudulent activities, regularly used aliases that indicated criminal action was afoot, like when Azizi called himself "Al Capone"—"—the iconic murderous gangster known to criminals around the world as the patron saint of money launderers based on his reputation for having invented the crime.

---

[411] Laabs, *Bad Bank*, at 451 (translated by Plaintiffs) (emphasis added).

436.291.     The German government concluded that Azizi was a Syndicate operative who raised money to support terrorist attacks in Afghanistan. When Germany requested Azizi's extradition, German prosecutors represented to the U.S. government, in support of Azizi's extradition, that "[t]here [were] numerous indications here that the cash flows" generated by the Azizi Cell "[were] used to finance terrorism."[412]

437.292.     On March 20, 2015, United States Magistrate Judge Howard R. Lloyd granted the U.S. government's motion for a certificate of extraditability concerning Azizi, to extradite him from California to Germany to stand trial for criminal charges arising out of his participation in the Syndicate's VAT Finance Scheme.[413] In his Order, Judge Lloyd found that the German government had represented to the United States that "there were also indicators that [Azizi and the Azizi Cell] were using the VAT [money] procured through such fraud, not only for personal enrichment, but also to finance terrorism."[414]

293.     The linkage between the Azizi and Ahmed VAT fraud schemes in Europe and anti-American terrorist violence in Afghanistan is in fact irrefutable. Coalition special forces recovered direct evidence establishing that both cells had been funding al-Qaeda and the Haqqani Network when they raided what was the cave hideout of a joint al-Qaeda/Haqqani Network cell operating near the Afghan/Pakistan border in 2010 and discovered there documents relating to both VAT fraud cells.

---

[412] *In re Extradition of Samir Azizi*, Formal Request for Extradition, No. 5:14-xr-90282 PSG, at 11 (N.D. Cal. Mar. 20, 2015).

[413] *In re Extradition of Samir Azizi*, Dkt. 60, No. 5:14-xr-90282 PSG (N.D. Cal. Mar. 20, 2015) (Order granting U.S. government's motion for certificate of extraditability concerning Azizi).

[414] *Id.* at 22.

438.294.       Even before that date, though, U.S. and European counter-terrorist-finance-facing regulators regularly emphasizeemphasized the direct link between sophisticated tax fraud schemes and terrorist finance, including VAT frauds, and terrorist violence, including, but not limited to:  (1. These statements included, but were not limited to: (1) a statement in 2006 by United kingdom Home Secretary John Reid, reported in the Guardian newspaper as well as other English-language outlets, that drew "an explicit link . . . between fundraising by terrorist groups and the European-wide so-called 'carousel' VAT fraud"[415]; (2) a 2007 report by the Financial Action Task Force noting the need for "an increasing global awareness of the use of carousel style frauds as a vehicle for raising funds for other crimes and terrorism"[416]; (3) the FBI's statement that "criminal organizations engaged in tax fraud schemes that may be tied to" "terrorism"[417]; (24) Pierre Moscovici, the EU's Economic and Financial Affairs Commissioner, statement that "cross-border [VAT] fraud 'carousel[s]' … serve[d] to finance criminal activities, including, no doubt, terrorist activities"[418]; (35) the European Commission's statement that "VAT fraud schemes can be used to finance … terrorists"[419]; and (46) the European Parliament's findings that "Europol estimate[d] that around EUR 60 billion of VAT fraud [was] linked to organised crime and terrorism financing" and that "money laundering … assume[d] various

---

[415] Alan Travis & Ashley Seager, *Reid Wants Europe to Fight VAT Fraud Linked to Terror Funds*, The Guardian (Oct. 26, 2006), https://www.theguardian.com/politics/2006/oct/26/eu.terrorism.

[416] FATF, *Laundering the Proceeds of VAT Carousel Fraud* 19 (2007), https://www.fatf-gafi.org/media/fatf/documents/reports/Laundering%20the%20Proceeds%20of%20VAT%20Caroussel%20Fraud.pdf.

[417] FBI, *Investigating Tax Refund Fraud*, Press Release, States News Service (Mar. 18, 2014).

[418] MENA Report, *Belgium: Opening Remarks by Commissioner Moscovici on the Commission's Proposal on the Import and Trafficking of Cultural Goods* (Aug. 17, 2017), 2017 WLNR 21814135.

[419] European Commission, Press Release, *Fair Taxation*, States News Service (Nov. 30, 2017).

forms, and that the money laundered [could] have its origin in various illicit activities, such …

tax evasion and fraud," which could foreseeably "be used to finance terrorism."[420] Tom

Kirchmaier, a professor and researcher of financial crime at the Copenhagen Business School

and the London School of Economics, confirmed the recognized fact that "VAT Money for

Jihadists" aided al–Qaeda attacks: "If you are to stop [al–Qaeda] jihadists, you have to stop

their financing and this starts with stopping the [VAT fraud] scams."[421]

439.    A broad array of scholars documented how al-Qaeda and Haqqani Network VAT

fraud schemes directly finance and resource both groups' terrorist operations in Afghanistan.

For example, Tom Kirchmaier, a professor who studies financial crime at the Copenhagen

Business School and the London School of Economics, explained that "VAT Money for

Jihadists" directly aided attacks by al-Qaeda and its allies and thus "[i]f you are to stop jihadists,

you have to stop their financing and this starts with stopping the [VAT fraud] scams."[422]

> The linkage between the Azizi and Ahmed VAT fraud schemes
> in Europe and anti-American terrorist violence in
> Afghanistan is irrefutable—one can draw a straight line
> from the VAT fraud funds obtained by the Azizi Cell
> and the cell led by Yakub Imran Ahmed (*infra* Part
> III.C.) and the terrorist attacks executed by joint al-
> Qaeda/Haqqani Network cells against Americans in
> Afghanistan because Coalition special forces recovered
> direct evidence establishing that both Cells had been
> funding al-Qaeda and the Haqqani Network when they
> raided what was the cave hideout of a joint al-
> Qaeda/Haqqani Network cell operating near the

---

[420] European Parliament Special Committee on Financial Crimes, Tax Evasion and Tax Avoidance, *Report on Financial Crimes, Tax Evasion and Tax Avoidance (2018/2121(INI))*, Co-Rapporteurs Jeppe Kofod and Luděk Niedermayer (Mar. 8, 2019), https://www.europarl.europa.eu/doceo/document/A-8-2019-0170_EN.html ("European Parliament Report").

[421] Yerepouni Daily News (Lebanon), *Danish VAT Money for Jihadists in Syria* (Sept. 12, 2019), 2019 WLNR 27689949.

[422] *Id.*

**Afghan/Pakistan border in 2010.ii. Imran Yakub Ahmed and the Ahmed Cell**

440.

441.    After years of investigation and trials, Deutsche Bank repaid €145 million (about $165 million) of stolen VAT to the German state, and one or more Deutsche Bank employees or agents were jailed for their involvement in the Azizi and Ahmed VAT frauds.

C.    **Imran Yakub Ahmed and the (“Ahmed Cell**

442.295.    Imran Yakub Ahmed,”), a British-Pakistani citizen, was the ringleader of oneanother such Syndicate VAT fraud fundraising and finance cell.

296.    Imran Yakub Ahmed was a dual-hatted operative of Al-Qaeda and the Haqqani Network.   He led the Ahmed Cell, which functioned as an al-Qaeda and Haqqani Network front that was created to raise funds through financial crimes, convert such funds to U.S. Dollars, and repatriate such freshly laundered dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

443.    Ahmed was, and is, an operative or agent for al-Qaeda and the Taliban, including its Haqqani Network.  On information and belief, Ahmed received specialized training from al-Qaeda and the Taliban, including its Haqqani Network, concerning how to:  (1) operate a VAT fraud scheme; (2) use global financial institutions to convert the euros obtained through the VAT fraud into U.S. Dollars, which the Syndicate greatly preferred; and (3) transfer the resulting U.S. Dollars back to the Syndicate in Afghanistan, Pakistan, and the U.A.E. to support attacks against Americans in Afghanistan.

444.297.    From the mid-2000s through 2010, Ahmed led a Syndicate fundraising and finance cell operating out of Europe and the U.A.E. whose purpose was to generate cash flow for al-Qaeda and the Taliban, including its Haqqani Network, through financial crime schemes involving global financial institutions. From the mid-2000s through 2010, the Ahmed

Cell raised more than a 1.15 **billion** Euros through VAT fraud schemes aided by complicit financial institutions. In 2017, Ahmed was convicted by a court in Italy for conspiracy to steal VAT. Plaintiffs refer to Ahmed and the European and U.A.E. associates who directly participated in his frauds, collectively as the "Ahmed Cell."

### 1.  The Russian Mafia

298.    Beginning no later than the early 1990s, under bin Laden's personal leadership, al-Qaeda and the Taliban pursued a close working relationship with the Russian Mafia. The close partnership between al-Qaeda, the Taliban, and the Russian Mafia was the direct result of bin Laden's Syndicate vision: he personally oversaw the development of al-Qaeda's relationship with the Russian Mafia on behalf of the Taliban because he reasoned that the Taliban (and by extension, al-Qaeda) could convert their control over Afghanistan's opium market into a reliable source of terrorist finance for al-Qaeda and its affiliates, through close partnership with the Russian Mafia.

299.    Foremost among Russian Mafia groups was the Solntsevskaya Group, which was Russia's largest transnational narco-terrorist cartel, and routinely committed acts of international terrorism itself. The Group was led by notorious narco-terrorist and Russian Mafia "boss of bosses" Semion Mogilevich, who was publicly described by media outlets as "one of the world's most dangerous terrorists,"[423] notoriously nicknamed "the face of Russian organised crime," and the "Brainy Don" because of his reputation for ruthlessness, business prowess, and possession of an economics degree. Plaintiffs refer to Solntsevskaya Group and Mogilevich collectively as the "Russian Mafia" because they *were* (and remain) the Russian Mafia.

---

[423] Lyndsey Telford, *Tape Reveals Slain Journalist Probing Putin Link to Terrorist*, Irish Independent (Jan. 24, 2015), 2015 WLNR 2357960.

300.     At all relevant times, the Russian Mafia was expressly hostile to the United States. For example, according to journalist Craig Unger, "Mogilevich made no secret of the contempt he had for the United States" and his view that America was "the enemy."[424] Mogilevich was known as a powerful gangster to the FBI since the 1990s (the agency issued a report about him in 1998 saying as much), and on October 21, 2009 was placed on the Ten Most Wanted Fugitives list. At the time, FBI agents commented that Mogilevich "has access to so much, including funding, including other criminal organizations, that he can, with a telephone call and order, affect the global economy."[425]

301.     From the late 1990s through 2016, al-Qaeda and the Taliban employed the Russian Mafia as one of their agents that, alongside Khanani and the Khanani MLO, managed a substantial portion of the Syndicate's terrorist finance operations each year, including those relating to opium.

302.     Yossef Bodansky served as the director of the Congressional Task Force on Terrorism and Unconventional Warfare. In his pre-9/11 book, *bin Laden*, Mr. Bodansky presciently warned about the dire looming threat from al-Qaeda, which he attributed, in part, to its agent/principal relationship with the Russian Mafia, which allowed al-Qaeda to leverage the Russian Mafia's existing geographies, relationships, competencies, resources, smuggling routes, corrupt relationships, and safe houses to kickstart the Syndicate's growth as a terrorist enterprise:

> bin Laden and the Russian Mafia have ***established yet another complex money laundering operation*** described by an insider as "an extended and octopus-like network***" …*** These funds are ***used to finance the Taliban [] and a host of Islamist terrorist operations***. Bin Laden makes a commission on these transactions, ***which is laundered by the Russian mafia*** … Bin Laden administers

---

[424] Craig Unger, *House of Trump, House of Putin* 108 (Dutton 2d. ed. 2019) ("Unger").

[425] CNN, *FBI: Mobster More Powerful Than Gotti* (Oct. 24, 2009), https://www.cnn.com/2009/CRIME/10/24/mogilevich.fbi/.

and manages [the Taliban's opium profits]—***laundering them through the Russian Mafia***—in return for a commission of between 10 and 15 percent…[426]

303.    The agency relationship described by Mr. Bodansky continued through 2016, tended by Sirajuddin Haqqani and a host of other Syndicate terrorists. Indeed, according to Mr. Zarate, "As [Transnational Criminal Organizations] grow more interconnected in ways that transcend national boundaries," "the ability of such [Transnational Criminal Organizations] to provide their infrastructure and expertise to" "terrorists" "raises the specter of alliances of convenience and profit aligned dangerous against the United States. The reach of the Russia-based organized crime network of Semion Mogilevich is a stark example of this point."[427]

304.    The Russian Mafia's services as al-Qaeda's and the Haqqani Network's money laundering agent was notorious for decades. For example, in 2002, Mark Galeotti explained that, because al-Qaeda's "underground banking system" was "under serious threat [after 9/11] and brokers [were] being deterred from handling their money," "[t]he Russians [could] and [did] ***offer the services of their own huge and well-established money laundering operations***, which already deal[t] ***securely and efficiently*** with ***much larger sums*** than the [Syndicate] terrorists need to move."[428]

305.    From the late 1990s through 2016, public statements from U.S. and Russian government officials, and regular media reports, documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban for financial crime purposes, while also being partners in the Syndicate-Russian Mafia opium joint

---

[426] Yossef Bodansky, *Bin Laden: The Man Who Declared War on America* 315 (Forum 1999) (emphasis added) ("Bodansky, *Bin Laden*").

[427] Zarate, *Treasury's War*, at 379.

[428] Mark Galeotti, *Crime Pays*, World Today (Aug./Sept. 2002), 2002 WLNR 16294207.

venture. These reports alerted Defendants to the Russian Mafia's agency relationship with al-Qaeda and the foreseeable risk that Russian Mafia-related laundering transactions were laundering al-Qaeda money.

306.    Beginning in the late 1990s, al-Qaeda, the Taliban, and the Russian Mafia intensified their close working relationship into, effectively, a terrorist joint venture through which a two-way "Afghanistan-to-Russia Opium Pipeline" flows. From Afghanistan-to-Russia, Afghan opium flowed from the Taliban in Afghanistan and Pakistan to the Russian Mafia in Russia and other parts of Central Asia and once received, through the Russian Mafia, to Europe, Africa, and the Middle East; from Russia-to-Afghanistan, Russian weapons, explosives, and freshly laundered money (usually converted from other currencies into U.S. Dollars) flowed back to al-Qaeda and the Taliban.

307.    From 9/11 through the present, the Syndicate has maintained an exclusive or nearly exclusive opium supply relationship with the Russian Mafia, who trust one another after decades of close partnership. Moreover, the Taliban and Russian Mafia are bonded by the practical reality that, of the world's major opium-growing regions, Afghanistan offers – by far – the closest and most secure smuggling route to Russia and, through Russia, to the rest of Central Asia, Europe, and the Middle East. As a result, al-Qaeda, the Taliban, and the Russian Mafia have found it in their own mutual interest to pursue a decades-long joint venture to manage and regulate the world's opium trade, playing much the same role as OPEC does with oil.

308.    From 9/11 through the present, approximately ninety-five percent (95%) of all opium sold in Russia, Central Asia, the Middle East, and Europe flowed through the same pipeline: from the Taliban (who grew it), then to al-Qaeda and the Haqqani Network (who worked with Syndicate members and al-Qaeda affiliates like D-Company to export it), then to

the Syndicate's long-standing joint venture partners in the Russian Mafia (who took it to the world market and helped launder the resulting proceeds).

309.    In March 2009, Russian Federal Drug Control Service Director Viktor Ivanov publicly stated that: (1) "Afghanistan [] produce[d] 95% of the opium in the world"; and (2) "[d]rug trafficking from Afghanistan seriously affect[ed] Russia" because approximately "90% of Russian drug addicts use[d] heroin compared to just 10% in European countries."[429]

310.    ~~mid~~ The Russian Mafia, al-Qaeda and the Taliban pursued their joint venture under the leadership of Mogilevich, bin Laden, and Jalaluddin Haqqani (and later Sirajuddin Haqqani).

311.    From the late 1990s through 2016, media reports regularly documented allegations that the Russian Mafia, including but not limited to Mogilevich, served as an agent of al-Qaeda and the Taliban for financial crime purposes, while also being partners in the Syndicate-Russian Mafia Opium Joint Venture.

### 3. Tribute from Warlords like Hikmatullah Shadman

312.    From the 2000s through at least 2013, Hikmatullah Shadman was a notorious Taliban-adjacent warlord in Afghanistan who was known to provide, and did in fact provide, financial and logistical support to the Taliban, including its Haqqani Network. As such, Shadman fit the classic high-threat terrorist finance profile of someone who, while not a member of the Syndicate himself, had direct and notorious connections to the Taliban.

313.    Shadman's criminal enterprise relied on USD transactions. Shadman was paid in USD, Shadman relied upon USD-denominated financial services, and Shadman regularly made

---

[429] Interfax Russia & CIS Military Newswire, *Afghan Drugs Problem Has No Military Solution – FSKN Chief* (Mar. 24, 2009).

bulk USD cash payments to Syndicate organizations in amounts of at least $30,000, usually denominated in $100 bills.

314.   Shadman's criminal enterprise depended upon regular bulk cash payments to the Taliban and Haqqani Network, including direct cash "tax" payments to the Taliban and the Haqqani Network, which were enforced as part of the Syndicate's monopoly on the criminal activity, including protection rackets and money laundering enterprises, upon which Shadman's business depended.

315.   2010, the Ahmed Cell raised more than a 1.15 *billion* euros through VAT fraud schemes aided by complicitShadman's ability to access and distribute money from his accounts with financial institutions like Defendants was critical to Shadman's ability to fund Taliban and Haqqani Network operations. As a former forensic accountant from Task Force 2010 explained:

> The greater impact was civil forfeiture – taking the money away. Attack the money of aiders and abettors, not just beneficiaries, along the lines of the chain. Petraeus' "money as a weapons system" was right; it's also a weapon if you take it away. …. An example was Hikmatullah Shadman, who was criminally indicted in 2015. … We attacked 2 accounts that added up to $70 million.… That's using money as a weapon. Follow and attack the money.[430]

316.   U.S. government investigators found that Shadman transferred money to a notorious Taliban money launderer who had been linked to one or more suicide bombings committed by the Syndicate.

317.   The U.S. government also determined that Shadman made regular "tax" payments of his Afghanistan-related income to the Taliban, including its Haqqani Network, as part of the Taliban's extortion rackets in Afghanistan and Pakistan.

---

[430] Office of the Special Inspector General for Afghanistan Reconstruction, LL-03 – U.S. Perception and Responses to Corruption in Afghanistan, Lessons Learned Record of Interview, *Interview with Thomas Creal, Former Forensic Accountant on Task Force 2010*, at 1 (Mar. 23, 2016).

445. .

446. In 2017, Ahmed was convicted by a court in Italy for conspiracy to steal VAT.

**D.   4.   Iran's Terrorist Sponsors:  The National Iranian Oil Company (NIOC) and National Iranian Tanker Company (NITC)**

318.   In this Complaint, Plaintiffs allege that Defendants Standard Chartered Bank and Deutsche Bank knowingly routed hundreds of millions of U.S. Dollars to the IRGC, including its Hezbollah Division and Qods Force, through USD-denominated transactions involving Standard Chartered Bank, SCB Dubai, and SCB New York (for the SCB Defendants), and similar USD-denominated transactions conducted by Deutsche Bank, DB Dubai, and DBTCA that directly or indirectly facilitated illicit transactions by two long-term fronts for Hezbollah and Qods Force funding and supply operations in support of Iranian proxies.

319.   To lay the foundation for those allegations, Plaintiffs first outline the relevant Hezbollah and Qods Force fronts, agents, operatives, and cut-outs whom al-Qaeda and the Taliban relied upon, through their alliance with Hezbollah and the Qods Force, to serve as an additional stream of terrorist finance that was nearly equal to the value of every Defendant's – even Deutsche Bank's – aid to the Syndicate.

320.   To support their shared terrorist campaign against Americans in Afghanistan, al-Qaeda, the Taliban, and the IRGC, including its Hezbollah Division and Qods Force, followed similar strategies to satisfy the transnational financial, operational, and logistical needs required by their campaign against the United States in Afghanistan.

321.   For the IRGC, including its Hezbollah Division and the Qods Force, resourcing Iran's alliance with al-Qaeda and the Taliban did not call for anything unusual, merely that Hezbollah, the Qods Force, and the Regular IRGC do what they have done since Iran created

each: rely heavily upon *criminal* financial institutions and *criminal* corporate partners, which Hezbollah and the Qods Force relied upon to provide "cover" to facilitate, among other things:

(i)      illicit financial transactions to acquire and distribute U.S. Dollars, e.g., laundering and recycle U.S. Dollar-denominated drug profits to finance Hezbollah operations;

(ii)     illicit purchases of embargoed American technology, e.g., bulk purchasing thousands of black market secure American mobile phones;

(iii)    illicit movement of terrorist operatives, e.g., a Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company;

(iv)     illicit safe havens, e.g., a fictitious company used as cover for an al-Qaeda safehouse in Afghanistan; and

(v)      illicit cache sites, e.g.,  Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company.

322.     From 2006 through 2021, the Regular IRGC funded Hezbollah and the Qods Force through several primary means, including, but not limited to, the Regular IRGC's overall budget, and the Regular IRGCs "off-books" slush funds, which the IRGC financed through its mafia-like system for extracting value out of every conceivable transaction in order to finance the IRGC's terrorist campaign against Americans in Afghanistan and Iraq.

323.     From 2006 through 2021, Hezbollah and the Qods Force also funded their own – and one another's – operations, logistics, and personnel through their shared fundraising and logistics networks and cells.  Most commonly, joint cells operating in Dubai, and comprised Hezbollah and Qods Force operatives, coordinated a vast effort to source the precious U.S. Dollars, state-of-the-art American technologies, and irreplaceable services it needed from the United States by leveraging the IRGC's relationships with the corporate criminal community – in which Defendants Standard Chartered Bank and Deutsch Bank had especially notorious reputations for criminality.

324.    To provide al-Qaeda and the Taliban with every manner of material support one can offer, the IRGC relied on its Hezbollah Division and Qods Force to deploy both FTOs' global terror networks, which, by 2006, were already heavily integrated around the world as a result of, among other things, both groups applying the lessons they had learned from their attempted terrorist attacks against Americans and Israelis from 2001 through 2006 in Iraq, Afghanistan, Lebanon, and Israel (one relevant lesson here: joint cells produce more reliable supply and logistical chains, while also giving the IRGC more visibility and control (through Hezbollah) of its local proxies without harming the IRGC's core "plausible deniability" mantra.

325.    As a result, from 2006 through 2021, Hezbollah and the Qods Force ordinarily applied the same joint cell approach that worked for its operatives in like Iraq and Syria thinking, correctly, that the organizational efficiencies generated by the joint cell model are even greater in the financial and logistical setting. As set forth below, Hezbollah and the Qods Force jointly raised money and supported the logistical needs of the IRGC's proxies, including al-Qaeda and the Taliban, by arranging industrial-sized channels of financial and logistical support through a litany of notorious fronts and cut-outs, all of which served only one purpose:  to source the huge amounts of U.S. Dollars and American technologies upon which Hezbollah, the Qods Force, al-Qaeda, and the Taliban all relied to sustain their shared terrorist campaign against Americans in Afghanistan.

326.    As a notorious front for Hezbollah and the Qods Force, funds and weapons (including weapons components) provided to **HF1XXX** through its financial and/or commercial transactions inevitably flowed through **HF1XXX** to both Hezbollah and the Qods Force, regardless of which IRGC component had the "first taste" of the value in question because both

FTOs' master – the Grand Ayatollah – has always demanded that his IRGC terrorists share with one another and treat each other equitably.

327.    From 2006 through 2021, Hezbollah and Qods Force operatives ordinarily followed the Ayatollah's "share with one another" approach to support their key financial and logistical needs.  As a result, Hezbollah and the Qods Force ordinarily received a significant percentage of any financial support (including U.S. Dollars) or logistical support (including embargoed American technologies) that flowed to the other, and in roughly equal percentages.

328.    Under longstanding IRGC doctrine, which Hezbollah and the Qods Force always followed from 2001 through 20201, Hezbollah, the Qods Force, and the Regular IRGC were constitutionally required, in effect, to regularly allocate a percentage of all their assets, including their funds, to support the "resistance" (i.e., proxy terrorist) movements that sought to "challenge" (i.e., attack through terror) the "oppressors" (i.e., the U.S. and Israel) that Hezbollah and the Qods Force sponsored pursuant to both FTOs' obligations under Iran's constitution to export the revolution by targeting Americans for terrorist violence.

329.    Accordingly, a broad consensus of counter-terrorism professionals would usually reach two basic conclusions – and recommend U.S. government actions based upon such conclusions – when confronted with information suggesting that Hezbollah or the Qods Force obtained money, weapons, or technology through an illicit commercial transaction pursued by a cell in an overseas financing or logistical hub like the U.A.E., South Africa, U.K., or Germany.

330.    *First*, because of the institutional sharing of funds, arms, and supplies between Hezbollah and the Qods Force, both FTOs would almost certainly be expected to receive a material share of any windfall that the other engineers through an illicit commercial deal because

it would be an affront to the Ayatollah himself for one IRGC component not to share with the other in such circumstances.

331.    *Second*, considering Hezbollah's and the Qods Force's legal mission under Iran's constitution to support "resistance movements" who "challenge" the "oppressors" – i.e., IRGC terrorist proxies, like al-Qaeda and the Taliban, who attack Americans or Jews in the Middle East – Hezbollah and the Qods force would almost certainly eb expected to share a material portion of any financial or technical "scores" that either IRGC component obtained through illicit commercial deals with key IRGC proxies who were killing the most Americans at the time, which from 2006 through 2021 meant only two places in the world:  Afghanistan and Iraq.

332.    As a result, from 2001 through 2021, the IRGC, including its Hezbollah Division and Qods Force, ordinarily shared – by redistributing – a portion of every increment of value that Hezbollah and the Qods Force derived from any illicit transaction designed to route money to the IRGC with the IRGC's proxies in Afghanistan and Iraq.

333.    From 2001 through 2011, the IRGC, including its Hezbollah Division, prioritized Afghanistan and Iraq roughly equally, but recognized that the different cultural, religious, ethnic, tribal, political, and historical contexts called for different approaches.  Most of all, Hezbollah and the Qods Force regularly participated directly in attacks against Americans in Iraq.  In Afghanistan, in contrast, Hezbollah and the Qods Force mostly accomplished their terrorist agenda through proxies (al-Qaeda and the Taliban), but even then, Hezbollah and the Qods Force occasionally jointly committed attacks alongside al-Qaeda and the Taliban.[431]  Regardless of

---

[431] For example, the Qods Force and the Haqqani jointly committed a sophisticated IED attack in Kabul in 2020 in order to retaliate for an earlier American air strike in Iraq that killed Brigadier General Qassem Soleimani, who led the Qods Force for decades until his death in 2020.  Similarly, al-Qaeda, the Taliban, Hezbollah, and the Qods Force jointly committed numerous attacks in the sparsely populated provinces of western Afghanistan, which Hezbollah and the Qods Force used, in effect, as a "live fire" training grounds for al-Qaeda and Taliban (including Haqqani

how often Hezbollah and Qods Force terrorists jointly participated in attacks in Iraq as compared to Afghanistan, the river of supplies that the IRGC poured into both countries was roughly equal.[432]

334.    After the United States substantially departed from Iraq in 2011, Afghanistan was the only place on earth where the IRGC, including its Hezbollah Division and Qods Force, could still pursue a large-scale terror campaign against the United States in the Middle East in which the IRGC knew it could kill a lot of Americans if it tried.  As a result, from 2011 through 2021, whenever the IRGC, including its Hezbollah Division and Qods Force, obtained any major infusion of funds, technologies, weapons, communications devices, or other items that could aid their terrorist enterprise, the most reasonable "default" assumption was that the IRGC would redeploy most of these resources to support its campaign against Americans in Afghanistan.

335.    With respect to the monetary fruit of their terrorist finance schemes, Hezbollah and the Qods Force ordinarily shared any U.S. Dollars or other currency that either obtained through their shared transnational finance and logistics schemes worldwide, including, but not limited to, the money they earned through their procurement and laundering activities in the United States, U.A.E., South Africa, Lebanon, Germany, and United Kingdom.  For example, if Hezbollah or the Qods Force obtains a major terrorist finance "win" in a key overseas hub, e.g., a $100 million transfer in Dubai, most counter-terrorist finance practitioners would ordinarily expect Hezbollah and the Qods Force toe each receive a significant share of the windfall.

---

Network) terrorist, meaning, that Hezbollah and the Qods Force helped "train" the al-Qaeda and Taliban terrorists with whom the Hezbollah and Qods Force operatives were co-located by joining with them, and participating in, their attacks against American targets in Afghanistan.

[432] The IRGC's distribution of Hezbollah's signature roadside bomb, the explosively formed penetrator (or "EFP") was the primary exception to the IRGC's (including its Hezbollah Division and Qods Force's)

336.     With respect to the technological fruit of their terrorist diversion schemes, Hezbollah and the Qods Force applied the same "share with each other" approach to meet each FTOs' vast logistical needs:  front and center of which was ensuring the river of IRGC financial, technical, and operational support for its al-Qaeda and Taliban proxies in Afghanistan remained flowing at all times.

337.     Iran created the National Iranian Oil Company and National Iranian Tanker Company to fund the export of the Iran's Islamist Revolution around the world, meaning, to support anti-American terror operations in the Middle East in order to drive the United States out of the region.

338.     The National Iranian Oil Company ("NIOC") has been sanctioned by the U.S Department of the Treasury's Office of Foreign Assets Control ("OFAC") under four Treasury Department programs: Iranian Transactions and Sanctions Regulations, 31 CFR part 560 ("IRAN"); Iran Freedom and Counter-Proliferation Act of 2012 ("IFCA"); Iranian Financial Sanctions Regulations ("IFSR"); and Global Terrorism Sanctions Regulations ("SDGT").  Its OFAC listing specifies that it is linked to Iran's Islamic Revolutionary Guard Corps Qods Force ("IRGC-QF").[433]

339.     The National Iranian Tanker Company ("NITC") is a subsidiary of NIOC.[434] It too is sanctioned by the Department of the Treasury's Office of Foreign Assets Control

---

[433433] U.S. Department of the Treasury Office of Foreign Assets Control, Sanctions List (Updated 2/10/2022) https://sanctionssearch.ofac.treas.gov/details.aspx?id=11317.

[434] U.S. Department of the Treasury, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force* (October 26, 2020) https://home.treasury.gov/news/press-releases/sm1165.

("OFAC").  It is sanctioned under the same four programs as NIOC (IRAN, IFCA, IFSR, and SDGT).  Its OFAC listing specifies that it is linked to IRGC-QF.[435]

340.    NIOC's and NITC's purpose were to raise funds and obtain weapons (including weapons components) for IRGC terrorist proxies that the IRGC supplied through its Hezbollah Division and Qods Force.

341.    At all times, NIOC and NITC have been led by an agent or cut-out for the IRGC, including its Hezbollah Division and Qods Force, and has served as a central hub of Hezbollah and Qods Force fundraising and logistics, which value has flowed through to al-Qaeda and the Taliban, including its Haqqani Network, to facilitate attacks against Americans in Iraq.

342.    On September 24, 2012, Treasury Department identified NIOC as an agent or affiliate of the IRGC,[436] and described the IRGC's use of NIOC as follows:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil … NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.
>
> Under the current Iranian regime, the IRGC's influence has grown within NIOC.  For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum.  Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC.  Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbia has obtained billions of dollars worth of

---

[435] U.S. Department of the Treasury Office of Foreign Assets Control, Sanctions List (Updated 2/10/2022) https://sanctionssearch.ofac.treas.gov/details.aspx?id=15117.
[436] U.S. Department of the Treasury, Frequently Asked Questions (February 6, 2013) https://home.treasury.gov/policy-issues/financial-sanctions/faqs/266.

contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.[437]

343.    On November 8, 2012, OFAC added NIOC to its Specially Designated Nationals ("SDN") List in implementation of Sections 214 through 216 of the Iran Threat Reduction and Syria Human Rights Act of 2012.[438]

344.    On September 4, 2019 the Treasury Department acted against "a large shipping network that is directed by and financially supports the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxy Hizballah" using oil originating with NIOC and NITC. The Treasury Department described the scheme benefiting IRGC-QF and Hezbollah as follows in its press release:

> Over the past year, the IRGC-QF has moved oil worth hundreds of millions of dollars or more through this network for the benefit of … Hizballah, and other illicit actors.  Senior IRGC-QF official and former Iranian Minister of Petroleum Rostam Qasemi oversees this sprawling network, which features dozens of ship managers, vessels, and facilitators.  … The IRGC-QF … relies heavily on Hizballah officials and front companies to broker associated contracts.  …
>
> ["]Treasury's action against this sprawling petroleum network makes it explicitly clear that those purchasing Iranian oil are directly supporting Iran's militant and terrorist arm, the IRGC-Qods Force," said Treasury Secretary Steven Mnuchin. "Our actions over the last two weeks should serve as a strong warning to anyone considering facilitating the Qods Force's oil sales that there will be swift consequences."

---

[437] U.S. Department of the Treasury, Press Release, *Treasury Submits Report To Congress On NIOC And NITC* (September 24, 2012) https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

[438] U.S. Department of the Treasury, Press Release, *Update to the Iranian Financial Sanctions Regulations; Iran Sanctions Designations; Non-proliferation Sanctions Designations; Anti-terrorism Designations; Non-proliferation Sanctions Designations Updates; Anti-terrorism Sanctions Designations Updates* (November 8, 2012) https://home.treasury.gov/policy-issues/financial-sanctions/recent-actions/20121108.

"The Iranian regime is leveraging a terrorist organization as its chief conduit for obfuscating and selling hundreds of millions of dollars of illicit oil to fuel its nefarious agenda.  Iran's exportation of oil directly funds acts of terrorism by Iranian proxies …," said Sigal Mandelker, Under Secretary for Terrorism and Financial Intelligence.  "This vast oil-for-terror shipping network demonstrates how economically reliant Tehran is on the IRGC-QF and Hizballah as financial lifelines.  The international community must vehemently reject Iranian oil and related products in the same way that it rejects the violent acts of terrorism these networks fund." …

Today, OFAC is announcing the designation of some 16 entities and 10 individuals pursuant to E.O. 13224, and is also identifying 11 vessels as property in which blocked persons have an interest. The IRGC and Hizballah, both identified as Foreign Terrorist Organizations by the U.S. Department of State under Section 219 of the Immigration and Nationality Act, are also designated pursuant to E.O. 13224.

OFAC SHIPPING ADVISORY

Today OFAC also issued a new advisory to the maritime community to warn of the risks involved with participating in illicit schemes such as the IRGC-QF's oil-for-terror shipping network. This advisory is in addition to the Maritime Petroleum Shipping Community issued by OFAC on March 25, 2019, which warns of sanctions risks related to oil shipments to Syria, including those from Iran.

IRGC-QF NETWORK OVERSIGHT

The IRGC-QF's highest-ranking officials have long overseen exports of Iranian oil, often masking its origins and sending it to the Syrian regime or IRGC-QF proxies across the region.

IRGC-QF Commander Qasem Soleimani (Soleimani) supervises fellow IRGC-QF official Rostam Qasemi, who has continued taking advantage of his domestic and international connections in the energy industry since his tenure as Iran's Minister of Petroleum from 2011 to 2013.

IRGC-QF official Rostam Qasemi, who is also the head of the Iranian-Syrian Economic Relations Development Committee, manages a group of individuals, shipping and oil companies, and vessels to sell Iranian crude, condensates, and gas oil.  Qasemi

283

relies on trusted IRGC-QF officials and associates to run the network, including his son, Morteza Qasemi.  Morteza Qasemi has helped finalize the network's oil contracts.

Ali Qasir, a Lebanese national and IRGC-QF associate, also serves as a lynchpin for this IRGC-QF-orchestrated network.  His responsibilities for the network's financial affairs include negotiating sales prices for the goods and settling vessel-related payments.  Additionally, Ali Qasir assigns vessels to conduct shipments for the network based on the IRGC-QF's guidance. …

CONNECTIONS WITH THE IRANIAN ENERGY, SHIPPING, AND INSURANCE SECTORS

The crude oil and condensate sold by this IRGC-QF network originates with the National Iranian Oil Company (NIOC), and ultimately is delivered to Syria.  The IRGC-QF relies on persons embedded within the shipping industry to keep this oil moving by ensuring that vessel insurance and registration are in order, among other things.

National Iranian Tanker Company (NITC) vessels have been used in the IRGC-QF-run operation.  These vessels include the DESTINY, the HAPPINESS I, and the SINOPA, which were identified on November 5, 2018, as blocked property in which NITC has an interest.  The DEVREZ and the DELICE also were identified on that day as blocked property in which the Islamic Republic of Iran Shipping Lines (IRISL) has an interest. …

TIES TO HIZBALLAH AND ASSOCIATED FRONT COMPANIES

The IRGC-QF also uses several front companies to mask its role in selling the crude oil, condensate, and gas oil.  The companies are overseen by Hizballah officials Muhammad Qasir and Muhammad Qasim al-Bazzal (al-Bazzal), both of whom were designated pursuant to E.O. 13224 in 2018 in connection with another oil-for-terror scheme.

345.    NIOC and NITC funds IRGC terrorist proxies in Afghanistan, through the fundraising and logistical support that flows through Hezbollah and the Qods Force.

### 5.    Other Syndicate Operatives and Financiers

346.    In addition to the foregoing examples, the Syndicate also relied on others who did business with Defendants. These included:

**Mustafa Ahmed al-Hisawi**

447.347.    Mustafa Ahmed al-Hisawi ("Hisawi") was al-. al-Qaeda's paymaster, and a key lieutenant of 9/11 mastermind Khalid Shaikh Mohammed.  Before helping plan and pay for 9/11, Hisawi served as bin Laden's CFO when al-Qaeda was based in Sudan from 1991 through 1996.

448.    After 9/11, Hisawi continued to play a key leadership role at al-Qaeda.  Among other things, Hisawi helped bin Laden plan for al-Qaeda's immediate survival needs after 9/11, when bin Laden anticipated (correctly) that he and his leadership team would have to go underground and needed money to do so.

449.    Hisawi was captured in March 2003 and is currently a detainee at Gitmo.

### E.    **Mamoun Darkazanli and** the Hamburg Cell

450.    Mamoun Darkazanli ("Darkazanli") and Mamdouh Mahmud Salim ("Salim") were al-Qaeda supporters, operatives, and fundraisers who were each a membermembers of al-Qaeda's notorious cell in Hamburg, Germany (the "Hamburg Cell").

451.    Darkazanli was a key al-Qaeda fundraiser, financier, and logistician based in Europe.  Among other things, he raised millions of U.S. Dollars for al-Qaeda and helped source communications technologies from Europe for use by al-Qaeda cells around the world.

452.    Salim was a senior al-Qaeda operative based in Europe and Africa.  U.S. government officials publicly described as "a right-hand man to bin Laden."

453.348.    Darkazanli, Salim, and al-Qaeda's Hamburg Cell grew notorious for their ties to terrorism beginning in late 1998, when they were directly and indirectly linked to the

terrorist attacks that al-Qaeda cells executed against American embassies in Kenya and Tanzania earlier that year.  According to Professor Gurulé, "Mamoun Derkanzali had close ties to the members of the Hamburg cell andthat raised funds, helped to fund their activities."[439]source technology, and acted as close confederates of Osama bin Laden.

454.    After 9/11, Darkazanli continued to provide financial and fundraising support to al-Qaeda until 2003, and he was outed for doing so by Salim after the latter had been detained.

**F.    Viktor Bout**

455.    "Viktor Bout, the 'Merchant of Death'" "reigned as the world's most notorious arms merchant for nearly two decades.".".[440]  Fromwho was from the 1990s through his detention in 2008, Viktor Anatolyevich Bout ("Bout") served as a  a known agent and facilitator for al-Qaeda and the Taliban, whom he served as a client from the 1990s through 2008.

456.    From before 9/11 through his capture in 2008, Bout provided key logistical assistance to al-Qaeda and the Taliban and was widely known to serve as an agent for them, on whose behalf heBout sourced weapons, explosives, and other key items for theiral-Qaeda and the Taliban's terrorist enterprise.

457.    According to Mr. Zarate, "in the world of international criminality[,]" "Bout" "represented" the "all-purpose force multiplier for international conflict" "who was willing to play with anyone willing to pay his price" and "had also been untouchable."[441]

458.    According to Mr. Zarate, "Bout's network was unique in that it took care of all aspects of the illicit arms process for the customer:  the weapons themselves, transportation of

---

[439] Gurulé, *Unfunding Terror*, at 80.

[440] Zarate, *Treasury's War*, at 119.

[441] *Id.* at 122.

the cargo, regardless of location or international restrictions on arms transfers, and money-laundering mechanisms to disguise the purchases.  If a customer could pay, Bout would deliver arms of any sort" "without care for international restrictions or moral boundaries."[442]

459.    In 2006, a U.S. investigator testified that Bout "and his numerous, using shell companies … were [] identified as significant participants in providing weapons to … [t]he Taliban."  Bout's fusion with terrorism was so strong that, after 9/11, Bout and his network were the U.S. government's second overall terrorism-related target, behind only bin Laden and his inner circle.

460.    From the late 1990s until November 2002, Bout used his aviation company in the U.A.E., San Air General Trading ("SAGT") to move weapons and explosives to Syndicate operatives in Afghanistan and Pakistan, and to facilitate Syndicate finance by transporting in the United States to operate a worldwide arms smuggling empire, and to transport Syndicate gold and opium.  Both services helped the Syndicate survive in the key period as it was reeling from the U.S. counterattack after 9/11 by resupplying al-Qaeda and the Taliban with regular shipments of weapons and explosives, stabilizing Syndicate finances by facilitating millions in gold and opium sales, and ensuring the Syndicate's logistics pipeline remained effective during the key months after 9/11 when the Syndicate was fighting for its very survival by, effectively, providing an aviation service for the terrorists through his SAGT front.

461.    Bout and his front companies (including, but not limited to SAGT) provided more than $50 million, collectively, in terrorist finance, logistical support, and/or weapons to al-Qaeda and the Taliban after 9/11 through 2008, and Bout and his network regularly provided 7-figure terrorist support to the Syndicate each year through 2008.

---

[442] *Id.* at 119.

462.    From the late 1990s through his capture in 2008, Bout was aided by Defendants' reckless commercial practices while he was running guns, bombs, gold, cash, and drugs for al-Qaeda and the Taliban.

463.    Bout was an expert terrorist financier and logistician and, as such, his choice of Defendants is revealing.  Aside from Bout's key role supporting the Syndicate in its most desperate hour after 9/11, Bout's decision to rely upon Defendants also reflects Bout's "seal of approval" on Defendants as reliable and loyal partners for terrorist financiers and logisticians, like Bout, who needed to move large amounts of money or terrorist material across international borders to support operations in Afghanistan and Pakistan.

464.    In February 2002, Belgian authorities issued an international arrest warrant for Bout, who was later arrested on an American warrant in Thailand in 2008 and extradited to the U.S. in 2010.  After Bout was indicted for providing material support to terrorist organizations, Senator Carl Levin publicly stated that Bout was an "example [of] how our corporations are being misused by terrorists," because Bout "carried out his activities in part by using shell companies … right here in the United States."[443]

465.    According to Mr. Zarate, Bout's arrest in 2008 demonstrated to the "international scofflaws who served as an operational nexus for terrorist [] networks"—like the banks that operated as Laundromat for terrorists—that the Treasury Department "had focused on the nexus between organized criminal activity and terrorism for years" and responsible banks and money remitters needed to cease doing business with the other "international scofflaws who served as an operational nexus for terrorist [] networks," *e.g.*., customers like Altaf Khanani.

---

[443] Senator Carl Levin *in* Federal News Service Transcripts, *Hearing of the Senate Homeland Security and Governmental Affairs Committee Subject: "Nine Years After 9/11"* (Sept. 22, 2010), 2010 WLNR 27825155.

466.349.      On November 2, 2011, Bout was convicted for providing material support to terrorists.  Commenting on the conviction, Congressman Ed Royce stated that Bout had "done irreparable damage across the world - arming insurgents, militias and terrorists," ~~whose~~and that his "'Merchant of Death' moniker was well-earned" on account of, among other things, the fact that Bout "armed the Taliban."[444]  Bout is currently serving his 25-year sentence in federal prison.

**~~G.~~      Abdul Baqi Bari**

~~467.    Abdul Baqi Bari ("Bari") was~~, a member of al-Qaeda, the Taliban, and the Haqqani Network who also worked directly for Jalaluddin Haqqani as a "right hand" man.

~~468.    By 2001, Bari was an internationally notorious al-Qaeda~~, and ~~Taliban (including Haqqani Network)~~as a money launderer and financial manager, who used Pakistani banks to secure and manage millions of ~~U.S. Dollars given to hm by~~USD for the Taliban, and to distribute the Taliban's money to al-Qaeda and Taliban terrorists to attack Americans in Afghanistan.

~~469.    Among other things, Bari was openly associated with Taliban-linked businesses and accounts that were, on paper, connected to Mullah Omar, and his terrorist connections were open and notorious to anyone with whom he or his associated interacted, including the financial institutions that serviced him until 2006.~~

~~470.~~After 9/11, Bari played a key role as al-Qaeda guided the Taliban in its post-9/11 transformation from failed illegitimate regime to key cog in al-~~Qaeda's terrorist Syndicate.  Bari was directly tasked by Mullah Omar and the Haqqanis with managing a network of businesses in~~

---

[444] States News Service, Press Release from Congressman Ed Royce, *Royce Commends Guilty Verdict in Trial of International Arms Dealer Viktor Bout "Justice Served," Says Terrorism Chair* (Nov. 2, 2011).

Afghanistan, Pakistan, the U.A.E., and Europe that existed for the sole purpose of financing, funding, and logistically supporting terrorist attacks against Americans in Afghanistan.

471.    Between 2001 and 2006, Bari regularly used bank accounts associated with his business to finance al-Qaeda and Taliban (including Haqqani Network) operations in Afghanistan and Pakistan by moving millions of U.S. Dollars to al-Qaeda and Taliban (including Haqqani Network) terrorists in both countries.

472.    Bari's ability to access financial institutions in the U.S. and Europe was essential to his ability to finance, fund, and logistically support al-Qaeda and Taliban (including Haqqani Network) operations in Afghanistan and Pakistan.

473.350.    From 2001 through 2006, Bari effectively served as a personal banker to top Syndicate leaders, including al-Qaeda commanders, the Haqqanis, and Mullah Omar himself. To do so, Bari used complicit financial institutions, to help him directly or indirectly transfer at least $2.8 million, in U.S. Dollars, from accounts maintained by U.S. and/or European financial institutions to Syndicate-controlled accounts in Pakistan to support  Qaeda's terrorist Syndicate. Bari was directly tasked by Mullah Omar and the Haqqanis with managing a network of businesses in Afghanistan, Pakistan, the U.A.E., and Europe that existed for the sole purpose of financing, funding, and logistically supporting terrorist attacks against Americans in Afghanistan. On May 17, 2012, the Treasury Department sanctioned Bari based on findings that substantially track Plaintiffs' allegations.[445]  operations, including, but not limited to, a $400,000 transfer for the direct benefit of Mullah Omar.

---

[445] U.S. Department of the Treasury, Press Release, *Treasury Imposes Sanctions on Individuals Linked to the Taliban and Haqqani Network* (May 17, 2012).

**B.     Deutsche Bank Enabled Syndicate Terrorist Finance**

474.    From 2009 through 2016, Deutsche Bank Defendants knowingly and directly transmitted at least $59,326,477 to Syndicate agents and operatives. ~~In addition to his financial role, Bari also supplied al-Qaeda and Taliban (including Haqqani Network) terrorists with weapons to attack Americans in Afghanistan.~~

~~475.    In 2006, Pakistani authorities seized more than $5 million in al-Qaeda and Taliban (including Haqqani Network) funds contained in dozens of bank accounts controlled by Bari, citing their conclusion that the Syndicate had used the financial services provided by the banks in question to finance, fund, and arm terrorists in Afghanistan and Pakistan.~~

~~476.    On May 17, 2012, the Treasury Department sanctioned Bari based on findings that substantially track Plaintiffs' allegations.[446]~~

~~H.     Hikmatullah Shadman~~

477.~~1.~~   ~~From the 2000s through at least 2013, Hikmatullah Shadman ("Shadman") was a notorious Taliban-adjacent warlord in Afghanistan who was known to provide, and did in fact provide, financial and logistical support to the Taliban, including its Haqqani Network.  As such, Shadman fit the classic high-threat terrorist finance profile of someone who, while not a member of the Syndicate himself, had direct and notorious connections to the Taliban (including its Haqqani Network).~~ During

478.~~1.~~   ~~Shadman's criminal enterprise relied on USD transactions.~~  ~~Shadman was paid in USD, Shadman relied upon USD-denominated financial services, and Shadman regularly made bulk USD cash payments in amounts of at least $30,000, usually denominated in $100 bills.~~

---

[446] ~~U.S. Department of the Treasury, Press Release, *Treasury Imposes Sanctions on Individuals Linked to the Taliban and Haqqani Network* (May 17, 2012).~~

479.1.  Shadman's criminal enterprise depended upon regular bulk cash payments to the Taliban and Haqqani Network, including direct cash "tax" payments to the Taliban and the Haqqani Network, which were enforced as part of the Syndicate's monopoly on the criminal activity, including protection rackets and money laundering enterprises, upon which Shadman's business depended.

480.1.  Shadman's ability to access and distribute monies from his accounts with financial institutions like Defendants was critical to Shadman's ability to fund Taliban and Haqqani Network operations.  As a former forensic accountant from Task Force 2010 explained:

> The greater impact was civil forfeiture – taking the money away.  Attack the money of aiders and abettors, not just beneficiaries, along the lines of the chain.  Petraeus' "money as a weapons system" was right; it's also a weapon if you take it away. … An example was Hikmatullah Shadman, who was criminally indicted in 2015. … We attacked 2 accounts that added up to $70 million.… That's using money as a weapon.  Follow and attack the money.[447]

481.1.  U.S. government investigators found that Shadman transferred money to a notorious Taliban money launderer who had been linked to one or more suicide bombings committed by the Syndicate.

482.1.  The U.S. government also determined that Shadman made regular "tax" payments of his Afghanistan-related income to the Taliban, including its Haqqani Network, as part of the Taliban's extortion rackets in Afghanistan and Pakistan.

---

[447] Office of the Special Inspector General for Afghanistan Reconstruction, LL-03 – U.S. Perception and Responses to Corruption in Afghanistan, Lessons Learned Record of Interview, *Interview with Thomas Creal, Former Forensic Accountant on Task Force 2010*, at 1 (Mar. 23, 2016).

## IV.    DEFENDANTS EACH PLAYED A ROLE IN THE SYNDICATE'S CAMPAIGN OF TERROR AGAINST AMERICANS IN AFGHANISTAN

### A.    Deutsche Bank Enabled Syndicate Terrorist Finance

351.    From 2009 through 2016, Deutsche Bank Defendants knowingly and directly transmitted at least $59,326,477 to Syndicate agents and operatives.  Indeed, during this time, Deutsche Bank transferred at least $49,787,832 to Khanani and the Khanani MLO, at least $8,568,060 to Samir Azizi and the Azizi Cell, likely at least $10,000,000 to Imran Yakub Ahmed and the Ahmed Cell, and at least $970,585 to Mamoun Darkazanli and Mamdouh Mahmud Salim (Thethe Hamburg Cell).

352.    The table below summarizes Plaintiffs' allegations concerning Deutsche Bank's direct financial aid to the Syndicate through a litany of long-term relationships with notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $49,787,832 minimum (likely at least $100,000,000) | Deutsche Bank<br>DB Moscow<br>DB New York (DBTCA)<br>DB London |
| Samir Azizi and the Azizi Cell | 2007-2012 | $8,568,060 minimum (likely at least $10,000,000) | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |
| Imran Yakub Ahmed and the Ahmed Cell | 2005-2010 | Likely at least $10,000,000 | Deutsche Bank<br>DB New York (incl. DBTCA)<br>DB Frankfurt<br>DB London |

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | DB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Mamoun Darkazanli and Mamdouh Mahmud Salim (The Hamburg Cell) | 1995-2003 | $970,585 minimum (likely least $2,000,000) | Deutsche Bank DB New York (DBTCA) DB Frankfurt DB London |
| **TOTAL** | | **$59,326,477 minimum** (likely more than $120,000,000) | |

Formatte

353.   *See* Table *supra* [pp. 5-6]. Even this, however, is just the tip of the iceberg, as discovery is likely to reveal Deutsche Bank transferred hundreds of millions of U.S. DollarsUSD to the Syndicate during this time. For decades, Deutsche Bank deliberately served as a terrorist financier for al-Qaeda. While Plaintiffs allege that Deutsche Bank aided a litany of terrorist financiers, that is a separate point. *Deutsche Bank itself was a financier for al-Qaeda and the Taliban.* Even against the depraved conduct exhibited by the other Defendants in this case, Deutsche Bank's stands out for one reason: Deutsche Bank affirmatively executed every key component of the Syndicate's end-to-end finance needs for two of its most important income streams.

483.1. *First,* from 2000 through 2016, Deutsche Bank brazenly operated its own **"Russian Laundromat"** alongside a series of other Deutsche Bank-managed or aided Laundromats in Russia and eastern Europe, including, but not limited to, the **"Moldovan Laundromat"** and the **"Azeri Laundromat."**

354.   *First,* from 2000 through 2016, Deutsche Bank brazenly operated its own **"Russian Laundromat"** alongside a series of other Deutsche Bank-managed or aided Laundromats in Russia and eastern Europe, including, but not limited to, the **"Moldovan Laundromat"** and the **"Azeri Laundromat."**

355.    Deutsche Bank's "Russian Laundromat" used illicit transactions like "mirror trades"[448] while providing purpose-built, bespoke, end-to-end terrorist finance and fundraising service to the Syndicate, through al-Qaeda and the Taliban via their agents Khanani and the Russian Mafia.[449]

356.    Deutsche Bank's personnel ***directly conspired with known Russian Mafia money launderers*** to custom build a Laundromat that Khanani and the Russian Mafia ~~then~~ used to convert al-Qaeda's and the Taliban's sea of ~~rubles~~Rubles from their Russian opium sales, which were nearly worthless as an instrument of terrorist finance in Afghanistan, into ~~U.S. Dollars~~USD, which directly resulted in more Syndicate terrorist attacks and more dead and injured Americans in Afghanistan by leveraging the purchasing power and stability afforded by ~~the U.S. Dollar~~USD, the "gold standard" of Syndicate terrorist finance.[450]

~~484.~~1.   "[T]he Deutsche Bank 'mirror trading' scheme … used Western banks" to move illicit income "out of Russia."[451]

---

[448] Mirror trades are money laundering transactions that can only be enabled by multinational banks. The essence of the transaction is that a company in Russia contacts the trading desk of a multinational bank (*e.g.*, DB Moscow) and buys, with Rubles, shares of a blue chip Russian stock. Around the same time, another company somewhere else calls a foreign trading desk at the same bank (*e.g.*, DB London) and sells the same number of shares of the same Russian stock in USD. The two companies (the buyer and the seller) are in fact owned by the same person. The net effect of the transactions is that Russian Rubles become USD—without scrutiny from currency regulators, tax regulators, or others who could spot cross-border currency flows.

[449] On information and belief, the lead DB Moscow architect of the Russian Laundromat, Mr. Wiswell, is currently evading his widely anticipated arrest and extradition to the United States.

[450] Plaintiffs believe discovery is likely to reveal that Khanani directly or indirectly~~,~~ aided the creation, operation, or refinement, of one or more of Deutsche Bank's Laundromats, including, but not limited to, the Bank's "Russian Laundromat." ~~T~~hus, for the avoidance of all doubt, Plaintiffs do not mean to imply that Khanani was uninvolved in the creation of the Russian Laundromat.

[451] Anne Applebaum, *A KGB Man to the End*, The Atlantic (July 27, 2020), 2020 WLNR 22507368.

485.357.    "[T]he Deutsche Bank 'mirror trading' scheme … used Western banks" to move illicit income "out of Russia."[452] According to Mr.award-winning *New York Times Business Investigations editor David* Enrich's summary of the scheme, the "customer [] participat[ed] in mirror trades with Deutsche to extract rubles from Russia and convert them into dollars, ***using Deutsche's U.S. Operations—DBTCA—as a Laundromat***," after which Deutsche Bank wired the Syndicate's freshly converted and cleansed U.S. Dollars to another high-risk jurisdiction where the "beneficiary" did "with the money as he pleased."[453]

358.    Deutsche Bank's services were essential to the Russian Laundromat. The Syndicate, through Khanani and the Russian Mafia, needed to clean an avalanche of opium dollarsDollars, which grew larger as the Syndicate's terrorist campaign intensified. Given the sheer volume of its opium cash flow, the Syndicate (through Khanani and the Russian Mafia) desired a custom-built Laundromat designed to conceal the Syndicate's torrent of cash during the key Russian and eastern European legs of its journey to market before profits (and weapons) could flow back to the Syndicate in Afghanistan and Pakistan.

486.1.    Given the sheer volume of its opium cash flow, the Syndicate (through Khanani and the Russian Mafia) desired a custom-built Laundromat designed to conceal the Syndicate's torrent of cash during the key Russian and eastern European legs of its journey to market before profits (and weapons) could flow back to the Syndicate in Afghanistan and Pakistan.

359.    *Second,* from the mid-2000s through at least 2015, Deutsche Bank affirmatively assumed a second direct role as a Syndicate financier and fundraiser through the activities of

---

[452] Anne Applebaum, *A KGB Man to the End*, The Atlantic (July 27, 2020), 2020 WLNR 22507368.

[453] David Enrich, ***Dark Towers***, at *: Deutsche Bank, Donald Trump, and an Epic Trail of Destruction* 232 (emphasis added).Custom House 2020) ("Enrich, *Dark Towers*").

Deutsche Bank's German Laundromat, which the Bank operated through DB Frankfurt, and supported through DB London and DB New York (including DBTCA).

487.1.   Deutsche Bank's German Laundromat provided end-to-end terrorist finance services to the Syndicate like its Russian Laundromat counterpart.

488.360.      Deutsche Bank's German Laundromat provided end-to-end terrorist finance services to the Syndicate like its Russian Laundromat counterpart. While the Russian Laundromat was all about al–Qaeda and Taliban opium, the German Laundromat was about specially trained al–Qaeda and Haqqani Network fundraising cells who raised tens of millions of U.S. Dollars for the Syndicate through a VAT fraud-based terrorist fundraising and finance scheme. This scheme involved al–Qaeda and Haqqani Network operatives working hand-in-hand with Deutsche Bank personnel to defraud European governments.

489.361.      Like the Russian Laundromat, Deutsche Bank's financial services were also essential to both sides of the terrorist finance equation: (1) Deutsche Bank helped the Syndicate illicitly fundraise through the scheme when it cloaked the Syndicate's fraudulent transactions with the legitimacy of a global financial institution; and (2) thereafter, Deutsche Bank helped the Syndicate illicitly convert the fruit of their theft (denominated in eurosEuros) into the precious U.S. Dollars that the Syndicate required in Afghanistan, Pakistan, and the U.A.E. to support attacks against Americans in Afghanistan.

490.362.      When Deutsche Bank helped its Syndicate customers raise, wash, and transfer tens of millions of U.S. Dollars through its Russian Laundromat and German Laundromat, Deutsche Bank assumed an active operational role in al–Qaeda and its Syndicate affiliates. It was *Deutsche Bank* — not the Syndicate — whoaffiliates. It was *Deutsche Bank* – not the Syndicate – that took two key affirmative steps that enabled the Syndicate to raise and then

move their ~~U.S. Dollars~~USD back to the Syndicate to be used in Afghanistan, Pakistan, and the U.A.E. to attack Americans in Afghanistan.

~~491.~~363. With respect to the Syndicate's illicit ~~U.S. Dollar~~USD fundraising, it was Deutsche Bank~~, not Khanani, who~~ that conducted the coordinated "mirror trades" through the Russian Laundromat that ~~functioned as fundraising by moving~~moved the Syndicate's money (through Khanani) out of Russia so that the Syndicate (through Khanani) could ~~then~~ convert ~~their~~its largely worthless (for their purposes) Russian rubles into precious ~~U.S. Dollars~~USD to fund attacks against Americans. ~~And~~ it was Deutsche Bank, not Azizi or Ahmed, who prepared key documentation that enabled the Syndicate to execute its VAT fraud to raise their desired terrorist funds.

364. With respect to the Syndicate's illicit ~~U.S. Dollar~~USD transfers, it was Deutsche Bank, not Khanani, who provided the key non-public information concerning the ***Bank's own controls against terrorist finance***, which the Bank deliberately did to make even more money from its Russian Laundromat by making it easier for the terrorist financiers using it to cover their tracks – and thereby win a larger share of the global "dirty money" business. And it was Deutsche Bank, not Azizi or Ahmed, who approved a host of transactions, as well as overrode the concerns of whistleblowers, to maintain the secrecy of the Syndicate's VAT fraud schemes for years.

365. In two separate multi-year, 9-figure Syndicate terrorist finance schemes, Deutsche Bank twice chose to directly partner with the terrorists by helping them (through their agents and operatives) design and execute both the Syndicate's illicit ***fundraising*** schemes ***and*** their associated illicit ***transfer*** schemes as well – the two sides of the terrorist finance coin.

492.1.  As Mr. Enrich explained, "Deutsche's embrace of a profits-at-any-price approach, its extreme tolerance for risks that were unbearable for most banks, had real-world consequences."[454]  And it was Deutsche Bank, not Azizi or Ahmed, who approved a host of transactions, as well as overrode the concerns of whistleblowers, to maintain the secrecy of the Syndicate's VAT fraud schemes for years.

493.1.  In two separate multi-year, 9-figure Syndicate terrorist finance schemes, Deutsche Bank twice chose to directly partner with the terrorists by helping them (through their agents and operatives) design and execute both the Syndicate's illicit *fundraising* schemes *and* their associated illicit *transfer* schemes as well – the two sides of the terrorist finance coin.

494.366.    As Mr. Enrich explained, "Deutsche's embrace of a profits-at-any-price approach, its extreme tolerance for risks that were unbearable for most banks, had real-world consequences."[455] Because local currencies were notoriously unstable, violent actors needed "an international currency" to reliably source weapons, and "[t]he U.S. dollar [was] the closest thing to a globally accepted form of money—and Deutsche started helping" terrorist facilitators "get access to gobs of American currency."[456]

495.367.    A broad consensus of independent observers have concludedis that Deutsche Bank operated as a Laundromat and was notorious for such conduct amongst the financial services marketplace, media, and its former employees:  (1) David Enrich (*New York Times*):  "Deutsche Bank" "got in" "trouble for being essentially a laundromat for Russian money"; (2) *Philadelphia Inquirer*:  "Deutsche Bank" "developed a reputation as a laundromat";

---

[454] *Id.* at 103.

[455] *Id.* at 103.

[456] *Id.*

(3) *New Yorker*: -"Deutsche Bank helped" "[t]he Moscow Laundromat";- (4) *Evening Standard*: "Deutsche Bank" "process[ed] the cash in" "the UK end of the so-called Laundromat[,]" "[its] Russian money-laundering scam"; (5) *Associated Press*: -"Between 2011 and 2014," "21 shell companies['-']"['-']" "funds were transferred worldwide via 112 bank accounts" "including" "Deutsche Bank" via "a scheme, dubbed Laundromat"; (6) *Newsweek*: -"[T]he Global Laundromat" "scheme" "cleaned at least $20 billion," and "[m]ost U.S. banks" "refused to offer banking services[,]" but "Deutsche Bank" "agreed" so "[o]nce again, Deutsche was the entry point for criminal Russian money into the global financial system"; (7) *Bloomberg*: -"More than $889 million" was "transferred from Deutsche Bank accounts" "in the" "Troika Laundromat between 2003 and 2017"; and (8) Luke Harding (*Guardian*): -"A group of Moscow bankers" "sen[t] cash out of [Russia] via a different route, nicknamed the Global Laundromat[,]" which was "another Russian money-laundering scheme" that "also involve[ed] Deutsche Bank."[457]

496.    U.S. law enforcement personnel have similarly excoriated Deutsche Bank for its role as one of the world's worst criminal banks.  For example, on May 4, 2015, Securities and Exchange Commission Kara M. Stein publicly stated:

> Deutsche Bank's illegal conduct involved ***nearly a decade of lying, cheating, and stealing***. This criminal conduct was ***pervasive and widespread, involving dozens of employees from Deutsche Bank offices including New York, Frankfurt, [] and London***.  Deutsche Bank's traders engaged in a brazen scheme …The

---

[457] David Enrich, quoted in *Hardball with Chris Matthews for March 15, 2019, MSNBC*, MSNBC: Hardball with Chris Matthews (Mar. 19, 2019), 2019 WLNR 8784955; Philadelphia Inquirer, *Risky Debtedness* (Sept. 30, 2020), 2020 WLNR 27621985; Caesar, *Moscow Laundromat*; Simon English, *Banking Controls Over 'Dirty Money' Laundering Slammed*, Evening Standard Online (Mar. 21, 2017), 2017 WLNR 8783127; Matti Huuhtanen, *Report Reveals $21b Money-Laundering Plan; Scheme Allegedly Linked 21 Firms To 96 Countries*, Associated Press, *republished by* Boston Globe (Mar. 22, 2017), 2017 WLNR 8845066; Luke Harding, *Is Donald Trump's Dark Russian Secret Hiding in Deutsche Bank's Vaults?*, Newsweek (Dec. 29, 2017), 2017 WLNR 39561107; Bloomberg, *The Banks That Are Involved In The Russian Money Laundering Scandal*, Republished by NoticiasFinancieras - English (Mar. 6, 2019), 2019 WLNR 7192074; Luke Harding, *Collusion* 316 (Vintage Books 2017) ("Harding").

conduct is appalling. It was a complete criminal fraud upon the worldwide marketplace. … the egregious criminal nature of the conduct and the duration of the manipulation (almost a decade) weigh heavily in my mind … Additionally, *Deutsche Bank is a recidivist*, and its past conduct undermines its current promise of future good conduct … many aspects of Deutsche Bank's disclosures … to clients and the public also were clearly false. Based on this conduct, *I do not find any basis to support the assertion that Deutsche Bank's culture of compliance is dependable, or that its future disclosures will be accurate and reliable*. … As the U.S. Commodity Futures Trading Commission's ("CFTC") Director of Enforcement noted: *"Deutsche Bank's culture allowed such egregious and pervasive misconduct to thrive."*[458]

497.368.   "For over a decade, Deutsche has been part of almost every high-profile banking scandal."[459] Properly understood, Deutsche Bank's "rampant misconduct was not an accident but the inevitable consequence of the culture, incentives, and neglect emanating from the top of Deutsche."[460] Deutsche Bank followed a "typical plan" whenever one of its criminal schemes was discovered: "Keep quiet, downplay the severity of the problem, and hope everyone gets distracted and moves on."[461]

498.369.   According to Ulrich Thielemann, a German business ethicist who studied Deutsche Bank's conduct, it was reasonable to conclude that Deutsche Bank was "actually close to a criminal organization" because "[t]here [were] employees who [said] that the bank [was] designed in a way to make sure employees cheat[ed] and carr[ied] out fraudulent acts" with the understanding that "when this bec[ame] public," the Bank could "always" (falsely) "say [that] these [were] isolated cases" of misconduct committed by "rogue employees," rather than what

---

[458] U.S. Securities and Exchange Commission, *Dissenting Statement in the Matter of Deutsche Bank AG, Regarding WKSI* (May 4, 2015) (emphasis added).

[459] New Europe, *Germany Probes Deutsche Bank's Role in Danske-Laundromat Scandal* (October 16, 2019), 2019 WLNR 31204583.

[460] Enrich, *Dark Towers*, at 263.

[461] *Id.* at 318.

was, in fact, Deutsche Bank's systematic Bank-wide operation as a Laundromat for Syndicate terrorist financiers through 2016.[462]

499.370.     Wall Street analysts also branded "Serial Offender Status" upon Deutsche Bank.  For example, in 2018, *TheStreet.com* reported that "Deutsche Bank's Serial Offender Status" had "[d]raw[n] [c]riticism of" the Bank's "Executives" and that "Deutsche Bank's inability to learn from its checkered past has many market watchers questioning [] [Deutsche Bank] bigwigs" in light of the Bank's "Laundromat" scandals, which had "drag[ed] Deutsche further into disrepute as well as the still churning Russian laundry."[463]  Moreover, *TheStreet.com* reported that a prominent American CEO who was familiar with the allegations against Deutsche Bank concluded that the transactions in question  "raise[d] red flags" of "criminal" activity, and, referencing Deutsche Bank, assessed that "[o]ver the next five to ten years we are going to discover that a number of prestigious banks," including Deutsche Bank, "have been essentially laundering money for the Russian mafia."[464]

500.371.     *Newsweek*'s deep-dive investigation also concluded that Deutsche Bank's Laundromat behavior was the product of broader criminality running throughout the Bank, including DB New York (including DBTCA), DB London, and DB Frankfurt:

> Between 2010 and 2014, Moscow bankers were sending cash out of the country through something called the Global Laundromat—a scheme that cleaned at least $20 billion, according to investigators in Moldova and the Balkans, though the true figure may be much greater. … According to one senior ex-employee, who worked in equities in Asia and New York, the ***bank's problems went way beyond***

---

[462] Deutschlandfunk Kultur, *Enthüllungen um die Deutsche Bank: In der Nähe einer kriminellen Vereinigung, Ulrich Thielemann im Gespräch mit Ute Welty* (Sept. 22, 2020) (translated by Plaintiffs).

[463] Kevin Curran, *Deutsche Bank's Serial Offender Status Draws Criticism of Executives, Regulators; The Hot Seat Atop Deutsche Bank Got a Bit Hotter After Thursday Morning's Raid on the Company's Frankfurt Headquarters*, TheStreet.com (Nov.29, 2018) (Westlaw).

[464] *Id.*

***these [Laundromat] scams.*** The 2008 crash hit Deutsche Bank hard, the employee said. In order to cover up holes in the balance sheet, a few members of staff took part in risky, complex and possibly illegitimate forms of finance. These practices were extensive, the person alleged. They might have involved innovative and opaque ways of getting outside parties to underwrite risky loans, the banker added, using structures to disguise who ultimately are the lenders and the beneficiaries.[465]

~~501.~~372.      Members of Congress ~~from both parties~~ have also recognized that Deutsche Bank has operated as a rogue institution and direct threat to the safety of Americans. ~~For example, Senator Ben Sasse stated that "Deutsche Bank turned a blind eye to blatant misdealing and suspicious transactions from a known" violent criminal who regularly attacked young American victims.  Similarly~~For example, Senator Chris Van Hollen and Senator Elizabeth Warren excoriated Deutsche Bank for its systemic provision of financial services to terrorists: "[t]he compliance history of [Deutsche Bank] raises ***serious questions about the national security and criminal risks posed by its U.S. operations***. This is particularly so, given its history of inadequate risk management and compliance policies and controls [and] poor corporate culture."[466] After Representative Maxine Waters, Chairwoman of the House Committee on Financial Services, investigated Deutsche Bank, she concluded it was "the biggest money laundering bank in the world."

~~502.     The common thread tying all the Deutsche Bank Defendants' misconduct was their pursuit of their Laundromat business model.  This model, which posed an extreme risk for terrorist finance, necessarily involved accepting the inevitable flow of vast sums of terrorist~~

---

[465] Luke Harding, *Is Donald Trump's Dark Russian Secret Hiding in Deutsche Bank's Vaults?,* Newsweek (Dec. 29, 2017) (emphasis added), 2017 WLNR 39561107.

[466] Senator Chris Van Hollen and Senator Elizabeth Warren, *Letter to the Honorable Mike Crapo* (Dec. 13, 2018).

finance through Deutsche Bank accounts to Syndicate fronts, operatives, agents, and customers as Deutsche Bank's necessary "cost of doing business" in "emerging markets."

503.    It was not a coincidence that the Syndicate's overseas top money men and groups like Altaf Khanani, Imran Ahmed, Samir Azizi, and the Russian Mafia turned to Deutsche Bank. It was the foreseeable, inevitable—and desired—result of Deutsche Bank's deliberate Laundromat strategy to maximize profits by recklessly facilitating illicit USD-denominated transactions in high-terrorist finance risk jurisdictions like Russia, Pakistan, and the U.A.E.

504.    Deutsche Bank's unlawful acts were not "one-off" instances of Syndicate operatives slipping through the cracks of a bank's otherwise rigorous counter-terrorist finance practices.  Rather, they were symptoms of pervasive money laundering, terrorist fundraising, and terrorist finance tolerated at Deutsche Bank, and aggressively practiced by DB New York, DB Moscow, and DB Dubai if the customer relationships were sufficiently lucrative.

505.    Plaintiffs' allegations concerning Deutsche Bank's facilitation of Syndicate finance and logistics are most likely the "tip of the iceberg."  Discovery would likely identify additional relationships between Deutsche Bank and other Syndicate financiers or logisticians from 2001 through 2016 in addition to those set forth herein.

### 1.    Altaf Khanani and the Khanani MLO

506.    Altaf Khanani was a Syndicate operative who also served as an agent and front for the Syndicate, including al-Qaeda, the Taliban (together with the Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company.  *Supra* Part III.A.1.

### 1.    The Khanani MLO and the Russian Mafia

507.373.    Deutsche Bank served as a key financial partner for Khanani and, through its transactions with the Khanani MLO, enabled vast amounts of terrorist finance to flow through to the Syndicate's members to support attacks against Americans in Afghanistan.

### i.      DB's Agent/Principal Relationships Relevant To Khanani

~~508.~~374.      As context for Plaintiffs' Khanani allegations, Plaintiffs first briefly outline the history of Deutsche Bank's "Russian Laundromat" and mirror trades scheme, which was one of (but not the only) Deutsche Bank Laundromats that serviced al-–Qaeda, the Haqqani Network, Lashkar-e-Taiba, and D-–Company through the Khanani MLO.  The scheme was complex, and involved an array of Deutsche Bank entities who served in an agent/principal manner somewhat like B's more general agent/principal relationships previously described.

375.      In 2011, DB Moscow's head equities trader, Tim Wiswell, met with two known launderers who were notoriously associated with the Russian Mafia. *Infra* Part V.A.2.

376.      During the meeting, DB Moscow (through Mr. Wiswell) and Mr. Wiswell each acted as an agent for Deutsche Bank, ~~DB New York (including~~ Deutsche Bank Securities, Inc., DBTCA~~),~~., and DB London. *Infra* Part V.A.2.

377.      DB Moscow and Mr. Wiswell **acted for the benefit of** Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London.

378.      Moscow and Mr. Wiswell followed Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's standard "Laundromat" strategy.

379.      DB Moscow and Mr. Wiswell designed DB's Russia Laundromat to flow billions of illicit USD-related deals through Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's accounts, and intentionally structured the deal to maximize the revenue of each DB Defendant.

380.      Indeed, such DB Defendants were included in these trades for the purpose of growing Deutsche Bank's, Deutsche Bank Securities, Inc.'s, DBTCA's, and DB London's own income:  the DB Defendants' income from these trades was not incidental to DB Moscow's and Mr. Wiswell's scheme, but rather, the entire point of it.

381.    DB Moscow and Mr. Wiswell **acted with the knowledge and consent** of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London, whose knowledge and consent was repeatedly ratified by such DB Defendants in emails, phone calls, bonus decisions, fee discussions, watercooler talk, order discussions, revenue discussions, and on.

382.    From 2001 through 2017, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, DB London, and DB Moscow, including their branches and affiliates, pursued an integrated global "Laundromat" strategy under DB's "One Bank" approach that laundered transnational criminal organizations' illicit profits at a scale that only a few other banks in world history have matched.

383.    Through their pursuit of DB's Laundromat strategy, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit deals involving the applicable DB Defendant in furtherance of the scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

384.    Until its Russian Laundromat was exposed, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London actively encouraged DB Moscow and Mr. Wiswell to continue to source mirror trade-related income for the DB Defendants by, among other things, encouraging DB Moscow and Mr. Wiswell to charge premium rates that exceeded the normal fees that the DB Defendants charged for similar services.  When they did so, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

385.    On information and belief, one or more officers, directors, attorneys, employees, and/or agents of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London each provided pre-authorizations, or otherwise knew such pre-authorizations had been provided, to DB Moscow and Mr. Wiswell in furtherance of the mirror trading scheme.  DB Moscow's and Mr. Wiswell's ability to act through pre-authorized ordering channels confirms that, through their pre-authorization, Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

386.    DB Moscow and Mr. Wiswell **acted under some degree of control of** Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London, each of whom regularly exercised a certain amount of control over DB Moscow and Mr. Wiswell, doing so through formal and informal channels that included, but were not limited to, written instructions transmitted by email and text message, official contracts and authorizations, telephonic instructions, and communications that took place during in-person meetings in Russia, Germany, the U.S., and the U.K., all of which confirmed executed between the DB agent and principal entities described above.

387.    One or more officers, directors, employees, and/or agents of Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and/or DB London provided pre-authorization to DB Moscow and Mr. Wiswell to confer the legal authority, and database access, necessary so that DB Moscow and Mr. Wiswell could execute certain trades that were essential to the operation of the mirror trading scheme (by promoting its concealment) and profitability of the scheme (by

facilizing heavier trading volume), both of which were the primary reason the scheme benefited al-Qaeda and the Taliban in the first place: discreetly convert their opium exports into a reliable and robust pipeline for sourcing precious U.S. Dollars and repatriating their transnational criminal profits in order to fund attacks against Americans in Afghanistan.

388.   By doing so, these DB Defendants confirmed their control in the principal/agent relationship with DB Moscow and Mr. Wiswell because Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London knew that DB Moscow and Mr. Wiswell would facilitate illicit transactions involving the applicable DB Defendant in furtherance of DB's Laundromat scheme, and Deutsche Bank, Deutsche Bank Securities, Inc., DBTCA, and DB London consented to DB Moscow's and Mr. Wiswell's services as their agent.

509.389.     Mr. Wiswell and agreed to an expansive scheme during the meeting to launder "dirty money" through the use of illicit trades, such as "mirror trades," whose only purpose was to facilitate financial crime, including terrorist finance. *Infra* Part V.A.2. After this meeting with the Russian Mafia, Deutsche Bank helped the Russian Mafia establish and operate the terrorist finance facility that Deutsche Bank itself internally described as its "Russian Laundromat" or "Laundromat." *Infra* Part V.A.2.

510.390.     - When it created, operated, and serviced its criminal clients through the Russian Laundromat, Deutsche Bank, and each DB Defendant, understood that the Russian Laundromat was serving al-Qaeda, Haqqani Network, Lashkar-e-Taiba, and D-CompanySyndicate terrorist financiers as well. Among other reasons, Deutsche Bank knew that: (1) each such Syndicate member had a long-standing money-laundering relationship with the same Russian Mafia organization that Deutsche Bank partnered with to operate its Russian Laundromat; (2) the Russian Laundromat was, by design, meant to service not just the Russian

Mafia, but also the Russian Mafia's transnational criminal joint venture partners, most of all, the Syndicate members who supplied the opium that served as one of the Russian Mafia's top income streams; and therefore (3) any Laundromat in such circumstances would – and did – inevitably be used by agents, operatives, or fronts for ~~al-Qaeda, the Haqqani Network (and through it, the Taliban), Lashkar-e-Taiba, and D-Company to enable terrorist finance activities through the Russian Laundromat~~the Syndicate.

### ii.    DB's Khanani MLO and Russian Mafia Transactions

~~511.~~391.     Once Deutsche Bank's Russian Laundromat was fully operational, the Russian Mafia quickly put the word out to the terrorist financier community – chief among them, ~~the world's most notorious financer of them all, Altaf Khanani – who in turn flocked to Deutsche Bank.~~ Altaf Khanani. This was exactly what Deutsche Bank intended when it created its "~~Russian~~ Laundromat" in the first instance.- Soon thereafter, according to *Guardian* investigative journalist and best-selling author Luke Harding, "[DB Moscow] began notching up profits of $500 million to $1 billion a year."[467]

~~512.    Mr. Enrich reported that "[a]s word spread about" Deutsche Bank's "valuable money-laundering service" through the Bank's mirror trading scheme, "Deutsche's Moscow offices became a go-to destination for shadowy Russians."[468]~~

~~513.    Khanani and the Khanani MLO knew of, and were a key customer in, the Russian Laundromat, and every other Europe-related Laundromat exposed since 2015.~~

---

[467] Harding at 310.

~~[468] Enrich, *Dark Towers*, at 198.~~

514.    Khanani and the Khanani MLO controlled every bank account and corporate form operated on behalf of Al Zarooni Exchange, Mazaka General Trading and other Khanani MLO entities in the U.A.E., Europe, and Asia.

515.    From 2001 through 2016, Khanani and the Khanani MLO notoriously operated as an operative for D-Company, and personal financier agent for D-Company head (and SDGT) Dawood Ibrahim, was always allied with, funded, and logistically supported al-Qaeda, Lashkar-e-Taiba, and other Syndicate members while Khanani served as its agent.

516.    From 2001 through 2016, Khanani and the Khanani MLO also notoriously operated, among other roles for them, as a terrorist finance agent for: (1) al-Qaeda; (2) Sirajuddin Haqqani personally; (3) the Haqqani Network (who represented the Taliban's interests); (4) Lashkar-e-Taiba; and (5) and Jaish-e-Mohammed.

517.    Thus, when Deutsche Bank transferred U.S. Dollars from New York to any account controlled by Khanani or the Khanani MLO, Deutsche Bank aided the terrorist finance activities and strategies of, and caused terrorist finance to flow to, al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and/or Jaish-e-Mohammed.

518.392.    From 2011 through 2016,[469] and likely since after 9/11,[470] Deutsche Bank provided financial services to Khanani and the Khanani MLO. During this period, Deutsche Bank transferred at least **$50,507,832** U.S. Dollars from DBTCA accounts in New York to accounts operated on the Syndicate's behalf by Khanani as the Syndicate's agent. On

---

[469] On information and belief, Deutsche Bank, DB London, DB Moscow, and DB New York (including DBTCA) continued providing financial services to Khanani and his front companies until on or about 2016, when regulators in the U.A.E. moved against him.

[470] On information and belief, Khanani used Deutsche Bank, including DB London, DB New York (including DBTCA), and/or DB Moscow, collectively, for most of the "30 years" in the terrorist finance "market" that Khanani described during a secretly recorded Skype call.

information and belief, these numbers are the "tip of the iceberg." Deutsche Bank's true amount of Syndicate terrorist finance routed through Khanani from 2011 through 2016 likely exceeded $100 million. Most of those funds were then passed on to Khanani's Syndicate clients, al-Qaeda and the Haqqani Network.

519.   As a top terrorist financier for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, Khanani regularly sent large U.S. Dollar sums to each Syndicate member through a combination of global financial institutions, money remitters, and regional banks.  At all times, Khanani commingled the terrorist finance strategies he deployed jointly on behalf of his entire roster of Syndicate clients.

520.   On information and belief, after Khanani received Deutsche Bank's U.S. Dollar transfers of at least $50,507,832, Khanani transferred at least $48,992,597 (the sum less the Khanani MLO's 3% commission) to his Syndicate confederates and clients including al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company to support terrorist attacks against Americans in Afghanistan.

521.   From 2008 through 2016, and most likely since 2001, Khanani, acting as al-Qaeda's, the Taliban's, and the Haqqani Network's agent, regularly laundered the Syndicate's overseas income, including opium-related profits, through Deutsche Bank, DB Frankfurt, DB New York, DB Dubai, and DB Moscow accounts. The Khanani MLO used such Deutsche Bank accounts to repatriate more than $100,000 per month, each year from 2008 through 2016, in laundered al-Qaeda and Taliban (including Haqqani Network) funds back to accounts controlled by agents or operatives for al-Qaeda, the Haqqani Network, or another Syndicate group to finance attacks against Americans in Afghanistan. These USD-denominated transactions originated in locations that included, but were not limited to, Europe, the former

Soviet Union, and the Middle East, Hong Kong, Australia, and the United States, but were ordinarily routed through DB New York accounts held in the name of Al Zarooni Exchange, Mazaka General Trading, or other Khanani-related accounts.

522.   Each Khanani MLO transaction with each Defendant caused a three percent (3%) "commission" to flow to Khanani as the Khanani MLO's profit for conducting the terrorist finance transaction at issue.  As a result, every Khanani MLO transaction directly enabled a second potent stream of terrorist finance that flowed to D-Company (and through it, to al-Qaeda and Lashkar-e-Taiba, which D-Company funded as an ally), and the Haqqani Network (and through it, the Taliban, of which the Haqqani Network was a part).  In short, through Khanani's own profit-sharing with D-Company and the Haqqani Network, the latter two terrorist groups directly profited every time the Khanani MLO earned its 3% commission from any Deutsche Bank-related transaction.  This stream of terrorist finance alone caused the Syndicate to realize, at least, hundreds of thousands of U.S. Dollars each year through the profits shared by Khanani.

523.393.      At the Khanani MLO's standard three percent (3%) commission, Deutsche Bank's $50,507,832 transactions for the Khanani MLO generated a profit of $1,515,234.  On information and belief, based on these transactions alone, Khanani transferred ten percent (10%) or more of this profit (*i.e.*, $150,000 or more) to D-Company and Khanani transferred 2.5% of this profit (*i.e.*, approximately $38,000) to the Haqqani Network.

524.   Given the volume of business that Khanani did through Deutsche Bank, on information and belief, Khanani's collective U.S. Dollar profit-transfers to Dawood Ibrahim and the Haqqani Network, which were directly attributable to commissions the Khanani MLO earned on its transactions through Deutsche Bank, exceeded at least $100,000 per year to the Haqqani Network and at least $500,000 per year to Dawood Ibrahim.  These are the numbers one may

reasonably infer on the mere assumption that Deutsche Bank only did $100 million in transactions per year with the Khanani MLO. This, however, is not plausible given the scale of Deutsche Bank's Laundromats, which collectively moved tens of billions, and the Khanani MLO's operations, which moved billions annually.

525.394.    Deutsche Bank used multiple separate terrorist finance Laundromats to send U.S. Dollars to the Syndicate via Khanani, including, but not limited to, through Deutsche Bank's Russian Laundromat and Moldovan Laundromat.

526.395.    Deutsche Bank financed the Syndicate through the transactions it executed on behalf of Khanani though the Russian Laundromat. Through Mazaka General Trading and Al Zarooni Exchange, Khanani helped repatriate enormous sums for each member of the Syndicate. On information and belief, the Syndicate customers were, collectively, the largest part of Khanani's customer base.  Khanani collectively helped finance terrorism in vast sums denominated in U.S. Dollars per year, for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company.

527.396.    For example, over a little more than a year between 2013 and 2014, the Khanani MLO, acting through Mazaka General Trading, partnered with Deutsche Bank, through DB Moscow, DB London, and DB New York (including DBTCA), to repatriate at least $49,787,832 from overseas accounts to its Syndicate clients, al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, through Deutsche Bank-designed and-executed mirror trades and/or one-legged trades on behalf of Mazaka General Trading. These transactions facilitated the Syndicate repatriating tens of millions ofin precious U.S. DollarsUSD – its gold standard currency – from narcotics sales back to al-Qaeda and the Haqqani Network for use by Syndicate terrorists to attack Americans in Afghanistan.

528.   DB Moscow managers, employees, and agents regularly colluded with terrorist financiers, including on information and belief the Khanani MLO and one or more other Syndicate fronts, operatives, or agents, to help Khanani and other Syndicate financiers evade U.S. and U.K. anti-money-laundering/counter-terrorist-finance controls in order to specifically route U.S. Dollars from DBTCA in New York to terrorists through DB Moscow and DB London.  In so doing, these DB Moscow personnel crafted bespoke "mirror trades" and "one-legged trades" that were specifically designed to enable U.S. Dollars to flow through DBTCA to known or suspected terrorist agents, operatives, and fronts without detection by investigators.

529.397.       On information and belief, the Syndicate repatriated at least tens of millions of illicit U.S. Dollars each year from 2011 through 2016 via Deutsche Bank's mirror trades and one-legged trades on behalf of Mazaka General Trading, including but not limited to, trades executed for Khanani by DB Moscow, DB New York (including DBTCA), and DB London.

530.   Deutsche Bank, through DB Moscow acting on behalf of DB New York (including DBTCA) and DB London as their agent, therefore fulfilled Khanani's operational needs.  Khanani used Deutsche Bank accounts to repatriate tens of millions (if not hundreds of millions) of illicit Syndicate USD-related income back to accounts controlled by agents or operatives of al-Qaeda, the Haqqani Network, or another Syndicate ally, to finance attacks against Americans in Afghanistan annually between 2011 and 2016.

531.   From 2011 through 2015, Deutsche Bank, DB Moscow, DB London, and DB New York (including DBTCA), regularly engaged in multi-million-dollar "mirror trades" with Khanani through Deutsche Bank's "Russian Laundromat."

532.398.    Deutsche Bank knew of the terrorist finance flowing to the Syndicate through DBTCA's Laundromat-related transactions based upon the data it possessed.  NYDFS, for example, caught Deutsche Bank by using simple data analysis techniques.  The data and analytical tools available to each DB Defendant was far greater than the comparable data available to NYDFS, and therefore each DB Defendant knew of the terrorist finance risks of Deutsche Bank's Syndicate-related transactions.

533.399.    From 2011 through 2015, Deutsche Bank's mirror trading scheme directly enabled Khanani's repatriation of at least several million dollars per year from illicit al-Qaeda and Taliban (including Haqqani Network) profits in Russia and the Former Soviet Union, through other Khanani-controlled accounts, and ultimately landing back at accounts controlled by Syndicate agents or operatives, where the U.S. Dollars illicitly provided by Deutsche Bank to al-Qaeda and its allies through its mirror trading scheme could be used – and were used – to support terrorist attacks against Americans in Afghanistan.

534.400.    Like many terrorist financiers, Khanani generally divided his activities among more than one front.  To service the Syndicate's U.S. DollarUSD cash flow needs, Khanani relied relatively equally upon Al Zarooni Exchange and Mazaka General Trading.  As a result, if one entity engaged in a transaction, ordinarily one would expect to learn that the other entitylikely engaged in a similar transaction, near in time, and in a similar amount.

535.401.    On information and belief, al-Qaeda, the Haqqani Network, and other Syndicate members repatriated at least tens of millions of illicit U.S. DollarUSD income each year from 2011 through 2016 via Deutsche Bank's mirror trades and one-legged trades on behalf of Al Zarooni Exchange, including but not limited to, such trades executed for the Khanani MLO by DB Moscow, DB New York (including DBTCA), and DB London.

536.402.        On information and belief, Khanani and his related entities constituted one or more of the specific entities described by NYDFS as having used Deutsche Bank's mirror trading scheme to be "paid … in U.S. dollars" through "trades" that did not "demonstrate[] any legitimate economic rationale."

537.403.        Deutsche Bank's assistance to al-Qaeda and its franchises through the Russian Laundromat aided al-Qaeda and its allies by helping conceal the terrorist finance enterprise itself. This extended the value of the enterprise and the Khanani MLO's ability to extract more money from it. Indeed, this is a well-recognized – and critical – value-add from terrorist finance separate and apart from the money itself.

538.404.        Deutsche Bank also financed the Syndicate through the transactions it executed on behalf of Khanani though the Bank's Moldovan Laundromat. Deutsche Bank also aided and abetted Syndicate fundraising and finance through the financial services it provided to Khanani via the Bank's "Moldovan Laundromat," which continued to operate until 2016, running even after the Bank began shutting down its "Russian Laundromat."

539.405.        For example, in just one four-month period alone in 2014, Deutsche Bank processed $720,000 in U.S. Dollar-denominated transactions on behalf of al-Qaeda and the Haqqani Network through their agent, the Khanani MLO, via Mazaka General Trading.

540.406.        On information and belief, Khanani used Deutsche Bank to conduct the trades necessary for the Khanani MLO to collectively repatriate at least $100,000 per month to al-Qaeda, the Haqqani Network (and, through it, the Taliban), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Companythe Syndicate throughout the duration of the Moldovan Laundromat from 2008 through 2016.

541.   **Deutsche Bank's transactions with Khanani through its Russian and Moldovan Laundromats directly aided Syndicate attacks against Americans in Afghanistan.**   The Deutsche Bank Defendants' provision of financial services to Khanani funded Syndicate terrorists in Afghanistan and Pakistan from 2011 through 2016, though likely the Deutsche Bank Defendants were doing so since the early 2000s.

542.   Deutsche Bank occupied a market position that was uniquely valuable to the Syndicate, as DB was the only major global financial institution with a robust presence in both Russia (through DB Moscow)—vital to the Syndicate's overseas drug income—and the U.A.E. (through DB Dubai)—the Syndicate's finance and logistics headquarters for the Middle East.  As a result, Deutsche Bank was essential to the Syndicate's ability to move money out of Russia through its allies in Russian organized crime and agents like Khanani, because no other major global financial institution would willingly do so.

543.   Aside from the purchasing power afforded to the Syndicate by Deutsche Bank's provision of U.S. Dollars to it through its mirror trades on behalf of Khanani, Deutsche Bank's scheme to route terrorist finance to the Syndicate through its Laundromats also afforded crucial tactical advantages for the Syndicate's lead drug financier:  Khanani's trades through his Deutsche Bank Laundromat accounts evaded terrorism-related sanctions and repatriated funds back to al-Qaeda and the Haqqani Network, which they used to attack Americans in Afghanistan.

544.   Deutsche Bank's Laundromat schemes directly undermined the U.S. anti-terror regime after 9/11.  According to Ms. Belton, "[i]n the wake of the Bank of New York scandal and September 11 terror attacks, the US introduced tougher baking regulations that at first glance made the path for Russian black cash into American more difficult," which required "more sophisticated schemes" so that "routes in" to the U.S. financial system can be "found" by

criminals working with banks like Deutsche Bank.[471]  "In London, the doors were being opened ever wider to Russian cash," such as through "the Deutsche mirror trade … scam," which "showed that [] Russian shadow bankers took particular advantage" of UK banking rules to illicitly obtain U.S. Dollars through Deutsche Bank's Russian Laundromat.[472]

545.    Deutsche Bank's provision of "mirror trading" services to the Syndicate through its relationship with Khanani had a devastating impact:  it provided the Syndicate with the global financial institution analogue to *hawala* trading, backstopped by the legitimacy of Deutsche Bank.  From the Syndicate's terrorist finance perspective, "mirror trading" through Deutsche Bank offered much of the same upside as it obtained by moving terrorist funds through the *hawala* system.  "Mirror trades" and *hawala* trades share the same hallmark: both facilitate the potentially concealed movement of funds between jurisdictions in a manner designed to evade ordinary course counter-terrorist finance scrutiny.  Thus, when Deutsche Bank helped the Khanani MLO move millions of U.S. Dollars back to al-Qaeda and its allies, it facilitated cash flows that were harder to scrutinize and therefore easier for the terrorists to use, which enabled Khanani's repatriation of the Syndicate's opium money back to al-Qaeda and the Taliban.

546.    **Deutsche Bank knew its Laundromat transactions with Khanani aided the Syndicate.**  In addition to Plaintiffs' general knowledge allegations concerning Khanani, *supra* Part V.F, a litany of additional factors specific to Deutsche Bank show each Deutsche Bank Defendant knew that Khanani was a Syndicate operative (through Khanani's relationship with D-Company) who also served as an agent for every constituent member of the Syndicate (for whom

---

[471] Catherine Belton, *Putin's People: How the KGB Took Back Russia and Then Took On the West* 416 (Macmillan 2020) ("Belton").

[472] *Id.*

Khanani laundered much of their overseas income, including their narcotics income), and whose entities served as a front for every constituent member of the Syndicate.

547.    Deutsche Bank, DB Moscow, DB London, and DB New York (including DBTCA) knew about Khanani's identity.  Deutsche Bank followed counter-terrorist-finance policies that were designed to facilitate the Bank's activities as a Laundromat while creating the veneer of legality through sham diligence processes in which the Bank deliberately avoided creating a paper trail when it provided services to customers, like Khanani, whom it suspected as terrorist financiers.  Under this approach, each Deutsche Bank Defendant continually reviewed its business and individual relationships to ensure that Deutsche Bank provided the highest possible client service to its criminal/terrorist customers while hewing to Deutsche Bank's reckless "risk appetite," pursued until at least 2016, to facilitate U.S. Dollar transactions regardless of the level of terrorist finance risk.

548.    Media reports at the time alerted Deutsche Bank to the extreme risk of processing any "mirror trades" or "one-legged trades."  For example, on August 1, 2011, the independent Russian news website *Novaya Gazeta* reported—in an article that the BBC translated into English and re-distributed throughout the world—that "illegal banking operations" were universal in Russia, that "the flows of 'grey money' and 'black money' for ultimate beneficiaries who" ranked in "the top [Russian Mafia] criminal hierarchy" were "fully comparable in [] overall amount with the [Russian government's official] budget."[473]

549.    Moreover, *Novaya Gazeta* reported (and BBC re-reported) that "[a]n entire industry of illegal banking operations [was] engaged in legitimizing, withdrawing, and 'cashing

---

[473] Leonid Nikitinskiy, *Who is Mister Dvoskin?*, Novaya Gazeta *translated and re-published by* BBC International Reports (Former Soviet Union), *Russian Secret Service, Ministry said Vying to Control "Illegal" Banking Sector* (Aug. 1, 2011).

out' of funds" through financial crime schemes executed with the complicity of global financial institutions "[u]nder the pretext of some kind of contract" that "used" "overseas companies in off-shore zones" "where it [was] very difficult" for someone outside of the transaction "to locate the ultimate beneficiary, *i.e.*, the actual owner of the money."[474]

550.    Further, *Novaya Gazeta* reported (and BBC re-reported) that Russian investigators familiar with the "industry" of financial crime in Russia had "specifically investigated banks through which special schemes (that involved both cashless as well as cash transactions) financed" "terrorism."[475]

551.    The *Novaya Gazeta* reported (and BBC re-reported) that one of the persons who met with Deutsche Bank (via Mr. Wiswell) in Deutsche Bank's 2011 Mafia Meeting was most likely acting as an agent of Vyacheslav Ivankov, the decades-long notorious Russian mobster who belonged to the same Russian Mafia organization as Semyon Mogilevich.

552.    Other media reports in 2011 further contextualized Deutsche Bank's earlier interactions with Cypriot Bank A as raising the extreme terrorist finance red flags they did. NYDFS documented that, after Deutsche Bank's communications with Cypriot Bank A, "[a] second and strikingly clear warning arose shortly thereafter in November 2011, when a mainstream Russian-language business journal noted that the [Russian Federal Service for Financial Markets (or "FSFM")] had suspended the operating licenses of several financial firms for engaging in suspicious trading" (the "November 2011 Article").[476]

---

[474] *Id.*

[475] *Id.*

[476] NYDFS, *In re Standard Chartered Bank, New York Branch*, Consent Order, ¶ 35 (Apr. 21, 2017) (emphasis added) ("2017 Consent Order").

553.    As recounted by NYDFS, the November 2011 Article "described an artifice very similar to the instant [Deutsche Bank] mirror trade scheme:

> According to an intelligence officer, the scheme operated as follows: a client wishing to move the money transferred the funds to a brokerage firm which then bought blue chips … Then the shares were sold in favor of a company-nonresident … which then sold the securities on the market and transferred the money minus the commission fee to the client abroad. The law enforcement authorities believe that approximately 100 billion rubles were siphoned abroad in this manner this year.

"Notably," according to NYDFS, "[Cyprus Bank A] was identified in the article."[477]

554.    According to NYDFS, "[t]he [November 2011 Article] led to an e-mail circulated to several members of management, in both Moscow and London, requesting that certain trading accounts be suspended.  The e-mail also contained a link to the article, and its recipients included a senior compliance staffer in London, along with several chief operating officers for various interested divisions.  Numerous responsible managers were thus on notice of" the risk that "mirror trades" and "one-legged trades" could be used to facilitate terrorist finance through transactions that violated core anti-money-laundering and counter-terrorist-finance principles. Exactly what happened.

555.    Even after Deutsche Bank knew that DB Moscow had engaged in mirror trades on behalf of a suspicious customer and knew that such trades posed an elevated risk of terrorist finance, "senior Deutsche Bank employees continued to discuss, for several months, how to obtain payment for the failed trades involving the suspended counterparty, which apparently cost the bank about $1.5 million in profit."[478]

---

[477] *Id.*

[478] 2017 Consent Order ¶ 37.

556.    Deutsche Bank knew that Khanani did not have any "legitimate" Deutsche Bank customers, accounts and/or trades.

557.    Deutsche Bank "ignored their own red flags" when executing their mirror trades for the Syndicate (through Khanani) while operating the Bank's "Russian Laundromat."[479]  Each Deutsche Bank Defendant's officers, employees, and agents also understood that Deutsche Bank was helping Khanani regularly launder money between 2008 and 2016, and most likely going back to 2001.  Data available to DB Moscow, DB London, DB New York, and DB Dubai regularly revealed suspicious USD-denominated transactions involving Russia, Pakistan, Afghanistan, and/or the U.A.E. that would have generated substantial discussion at each Deutsche Bank branch given the volume of account activity and corresponding DB profits.  As a result, Khanani's laundering activities would have been widely known throughout Deutsche Bank under its integrated approach to banking, including at the DB Defendants, because Khanani laundered, on information and belief, at least tens of millions of USD each year from 2001 through 2016 through DB Frankfurt, DB New York, DB Dubai, and DB Moscow.  The volume of his activity—and Deutsche Bank's associated profits—was such that Khanani's use of Deutsche Bank would have been widely known throughout Deutsche Bank.

558.    The Deutsche Bank Defendants also knew that Khanani was engaged in inherently suspicious "mirror trading" activity using DB Frankfurt, DB New York, DB Dubai, and/or DB Moscow accounts, and that such mirror trading, in context of other red flags relating to Khanani, was highly indicative of potential terrorist finance.

---

[479] Equities.com, *Deutsche Bank Ignored Their Own Red Flags Over Russia 'Mirror-Trading'* (Apr. 16, 2016), 2016 WLNR 11556118.

559.    The Deutsche Bank Defendants knew that Khanani regularly engaged in "mirror trading" strategies to launder money, and "mirror trading" was a common Khanani MLO strategy when repatriating Syndicate opium income from Europe and the former Soviet Union.

560.    By early 2014, Deutsche Bank personnel began openly discussing "red flags" relating to one or more Khanani mirror trades through Deutsche Bank, including, but not limited to, through DB Moscow and DB New York.  Deutsche Bank personnel understood that such Khanani mirror trades aided and abetted a violent life-endangering enterprise that, among other things, funded the Syndicate.

561.    Deutsche Bank knew that it was unable to prevent any terrorist finance from flowing through its Laundromats.  Indeed, even after learning that DB Moscow knew there was an active money laundering scheme using Deutsche Bank accounts, Deutsche Bank's anti-money laundering and counter-terrorist finance team consciously disregarded the need to eliminate the ongoing terrorist finance flowing through Deutsche Bank at the time.  Among other red flags they knew of and disregarded, Deutsche Bank's counter-terrorist finance team ignored the crimson terrorist finance red flags present when they were told, by the Bank's operations personnel that:  "***providing a spread-sheet [was] not [] possible*** as this [was] done manually by a team member and ***capturing so many records [would] be painful***." (Emphasis added.)

562.    Deutsche Bank's knowledge of the terrorist finance coursing through its branches via the Russian Laundromat was not limited to DB Moscow.  Based on all the data, as Martin Flanagan explained, one may infer that DB London and DB New York (including DBTCA) knew of the USD-denominated terrorist finance that DB Moscow was enabling on behalf of the Syndicate through Deutsche Bank's Russian Laundromat:

> It is strange Deutsche Bank did not realise it was on uneven terrain … [Russia's] recent economic problems and the 'cultural' repercussions were [] well-known.

… Russia [] gained a reputation in the City of London as the 'wild East' as crime in that country became virtually institutionalised, with public assets worth billions of dollars being sold for hundreds of millions of dollars. At one stage, Iceland was rumoured to be venue of choice for washing the rotten roubles. But Deutsche Bank in the regulatory dock shows the web went wider. … The rap sheet for the banking giant … clearly cannot be all laid at the door of the DB Moscow subsidiary. There were systemic failings here, not just a rogue Russo offshoot.[480]

563. Deutsche Bank, including DB Moscow, DB London, and DB New York, knew of the foreseeable terrorism risk when it processed Khanani's transactions in though the Russian, Moldovan, and/or New York Laundromats. On information and belief, each such mirror trade that involved U.S. Dollars, or otherwise required the use of the U.S. financial system, was reviewed by compliance personnel in DB Moscow, DB London, and/or DB New York. In such reviews, the relevant Deutsche Bank personnel would have learned, among other things, that Deutsche Bank was facilitating obvious money laundering transactions (mirror trading) in huge volumes on behalf of the world's most notorious terrorist money launderer (Khanani).

564. On information and belief, Deutsche Bank, including DB Moscow, DB London, and/or DB New York knew of such specific terrorist finance risks attendant to the Khanani-related mirror trades processed by Deutsche Bank and consciously disregarded such risks as the price of doing business with Khanani.

565. Deutsche Bank knew that the use of "mirror trades" and "one-legged trades" was always notorious as an age-old Russian technique for covertly financing violent transnational activities and laundering money.

566. On information and belief, Deutsche Bank, including DB Moscow, DB London, and DB New York, also subjected Khanani to scrutiny specifically because Khanani was a

---

[480] Martin Flanagan, *Deutsche Bemused by Russian Deception*, Scotsman (Feb. 1, 2017), 2017 WLNR 3328390.

Pakistani national who, on information and belief, was known by Deutsche Bank to move money to Pakistan.  Deutsche Bank, like Standard Chartered Bank, subjected transactions that had a Pakistani nexus to heightened scrutiny.

567.   On information and belief, Deutsche Bank, including DB Moscow, DB London, and DB New York, knew that the Khanani-related mirror transactions processed by Deutsche Bank bore numerous red flags for terrorist finance, including, but not limited to:  (1) that DB Moscow's U.S. Dollar mirror trades were with Khanani, whom the Deutsche Bank Defendants knew to be a wanted terrorist financier with a specific reputation for enabling terrorist finance by al-Qaeda, the Taliban, and Lebanese Hezbollah; (2) that DB Moscow's U.S. Dollar mirror trades for Khanani regularly resulted in unprofitable or minimally profitable (on paper) outcomes for Khanani, and therefore were not to generate income but to move money out of Russia, an indicator of illicit activity; (3) that DB Moscow's U.S. Dollar mirror trades for Khanani were so egregious as to lack any plausible innocent explanation; and (4) that Khanani's accounts experienced high turnover, but low beginning and ending daily balances, which was a signature terrorist finance and money laundering red flag that Khanani was specifically known for based on his KKI-related history, which the media extensively covered after 9/11.

568.   Deutsche Bank knew that the Bank's mirror trades, as practiced by DB Moscow, were inherently suspect for money laundering and terrorist finance.  This was obvious to the Deutsche Bank personnel at DB London and DB New York who facilitated DB Moscow's execution of the mirror trading scheme.  Indeed, Deutsche Bank traders admitted to NYDFS that they knowingly conducted mirror trades they understood to be wrongful because such trades generated "good commission[s]."[481]

---

[481] 2017 Consent Order ¶ 26.

569. On information and belief, Deutsche Bank's internal investigations, including but not limited to Project Square, determined that, among other things: (1) Deutsche Bank engaged in one or more illegal U.S. Dollar trades on behalf of Khanani, including front entities affiliated with Khanani, between 2011 and 2014; and (2) Deutsche Bank had no reason to contest the conclusion that Deutsche Bank engaged in systemic terrorist-finance-related misconduct in connection with Deutsche Bank activity at DB Moscow, DB London, and DB New York. According to Mr. Laabs, the Project "Square audit" "delivered *clear results*: Deutsche Bank employees in Moscow had *helped Russian clients smuggle money, via London and the DBTCA in New York*, into offshore accounts that were registered in Cyprus, among other places."[482]

570. During a presentation in 2017, Deutsche Bank's senior executives were advised that the Bank's investigators had concluded that Deutsche's "Russian Laundromat" was illegal and exposed the Bank's senior executives to significant legal risk. On information and belief, Deutsche Bank's investigators specifically determined that the Bank broke one or more laws when Deutsche Bank, DB Moscow, DB London, and/or DB New York (including DBTCA) conducted transactions with Altaf Khanani, the Khanani MLO, Mazaka General Trading, Al Zarooni Exchange, Wadi al Afrah, and/or other Khanani-related parties.

571. Deutsche Bank's "mirror trades" and "one-legged" trades were deliberately pursued by DB Moscow managers, employees, and agents with the actual knowledge that they were helping terrorists, including but not limited to Altaf Khanani, obtain U.S. Dollars through Deutsche Bank's financial services.

572. Deutsche Bank has publicly admitted that DB Moscow engaged in a multi-year criminal scheme and has effectively admitted that DB Moscow deliberately aided Khanani's

---

[482] Laabs, *Bad Bank*, at 517 (translated by Plaintiffs) (emphasis added).

terrorist finance efforts on behalf of the Syndicate.  For example, during a hearing in Russian court on February 1, 2016, a Deutsche Bank lawyer admitted that DB Moscow had been the site of a "scheme for the withdrawal of billions of dollars from [Russia]" and that such "scheme" had been "mastermind[ed]" by a senior DB Moscow manager, and American national, Tim Wiswell.

573.    Deutsche Bank's attempt to paint Mr. Wiswell as a "rogue employee" reflected Deutsche Bank's consciousness of guilt concerning the Khanani- and Russian Mafia-related Syndicate finance enabled by the Bank.  This was a strategy by Deutsche Bank to deflect attention from the much broader Laundromat it operated for decades, as well as to conceal the extent of the involvement of its executives, DB New York (including DBTCA), and DB London.

574.    Aside from Deutsche Bank's "mirror trade" schemes under its "Russian Laundromat," Deutsche Bank, DB London, DB New York (including DBTCA), and DB Moscow also knew that Khanani's other account activity at the DB Defendants, including but not limited to activity by Al Zarooni Exchange and Mazaka General Trading, manifested clear "red flags" of terrorist finance including, but not limited to:  (1) substantial, regular USD-denominated cash transfers between and amongst Russia, Pakistan, the U.S., and/or the U.A.E.; (2) direct or indirect affiliations with Khanani; (3) strong indicia of Syndicate narcotics-related laundering activity, including the large volume of cash, and geographies, associated with Syndicate narcotics trafficking; and (4) an inability to explain the enormous volume of activity through any legitimate business.  Simply put, the Deutsche Bank Defendants knew there was no plausible explanation for the scale of financial activity associated with Khanani's companies, and therefore they knew the specific risks that these two entities were laundering money for terrorists like the Syndicate, as they were.

575.    Deutsche Bank has also admitted its culpability through its subsequent conduct. For example, on or about November 2015, Deutsche Bank announced that it would cease accepting new clients in what Deutsche Bank understood to be high-risk markets.  On information and belief, Deutsche Bank made this announcement, at least in part, because Deutsche Bank understood that its mirror trades on behalf of Khanani were illegal, which Deutsche Bank knew had aided and abetted anti-American terrorism.

576.    On information and belief, Deutsche Bank managers, employees, and agents, including but not limited to, those at DB Moscow and DBTCA, identified Khanani as a "priority" client based upon the volume of business Khanani sent to Deutsche Bank and, as such a "prioritized client," Deutsche Bank affirmatively sought to ease Khanani's transactions.

577.    Deutsche Bank knew that the Khanani MLO's use of Deutsche Bank accounts to finance attacks by al-Qaeda, the Taliban (including the Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company was a foreseeable consequence of DB London's, DB Frankfurt's, DB New York's, DB Dubai's continued use of DB Moscow as agent for their trades.

578.    Deutsche Bank and each Deutsche Bank Defendant knew that the Khanani MLO's terrorist clients, including al-Qaeda and its affiliates, attempts to access the U.S. financial system through its Laundromats depended upon the involvement of DB London, DB Frankfurt, and DB New York and each DB Defendant understood that its role was directly necessary to enabling the terrorists' desired U.S. Dollar transactions.

579.    Deutsche Bank knew that Deutsche Bank, DB London, DB New York (including DBTCA), and DB Moscow, were, collectively, one of the Russian Mafia's preferred banks, and had been for decades.  According to investigative journalist David Cay Johnston, "Deutsche

Bank [was] a preferred bank for Russian criminal money laundering" since the 1990s;[483] commentator Deborah Long noted that "Deutsche Bank [was] known as the go-to bank for international money laundering, particularly for the Russian Mob."[484]

580.   Deutsche Bank also knew of the specific threat that serving its Russian Mafia-affiliated customers posed to the physical safety of Deutsche Bank personnel.  For example, in 1999, the *Evening Standard* reported that "life in a city in the grip of the Russian mafia," *i.e.*, Moscow, could "be dangerous so" Deutsche Bank offered generous "life insurance" benefits to its DB Moscow executives.[485]  Such knowledge, among other things, alerted Deutsche Bank to the foreseeable risk that its provision of financial services to customers could lead to acts of terrorism.

581.   DB London and DB New York (including DBTCA) knew that any U.S. Dollar correspondent bank in New York would quickly become a bank of choice for terrorist financiers and money launderers, including the Russian Mafia, if the American bank did not maintain a robust system of internal controls.  DB New York knew so because it publicly mocked other banks in New York (before its' own criminality was exposed) for disregarding such risks.  In 1999, for example, Deutsche Bank mocked Bank of New York Co. (or "BNY")—a staunch rival of DB New York—for conduct that was eerily like Deutsche Bank's own conduct at the time (and later).  "A massive investigation into potential money laundering at Bank of New York Co.," in which "federal authorities … investigat[ed] thousands of transactions" relating to

---

[483] *Quoted in* CNN: Anderson Cooper 360, *11/22/18 CNN: Anderson Cooper 360* (Nov. 22, 2018), 2018 WLNR 37373021.

[484] Deborah Long (Development Management Group, Inc.), *In Flagrante Delicto*, The Moderate Voice (Dec. 9, 2019), 2019 WLNR 36911935.

[485] Melanie Tringham, *Spilling the Beans on How the Highflier's Pay Package Stacks Up*, Evening Standard (Feb. 26, 1999), 1999 WLNR 9175501.

allegations that "up to $10 billion may have passed through a series of accounts with possible links to Russian organized crime."[486]  On these allegations, Deutsche Bank commented in an on-the-record interview with *American Banker* that the allegations that BNY helped wash the Russian Mafia's money "raises the question of whether there were lax controls," concluding: "[m]aybe they need to do things differently."[487]  Moreover, Deutsche Bank's awareness of the Russian Mafia's U.S. Dollar Laundromat at BNY also prompted the Bank to acknowledge, as then-CEO Rolf Breuer admitted, "It is possible that we were misused as intermediaries" by the same Russian Mafia group that had executed the Laundromat at BNY.

582.   Deutsche Bank knew of the terrorist finance risk attendant to its Laundromat business model based upon Bankers Trust's extensive business and negotiations history with notorious terrorist aider-and-abettor BCCI.  Among other things, Bankers Trust knew that BCCI had contemplated acquiring Bankers Trust, but that BCCI's management had specifically walked away from the negotiations because doing so would have made New York BCCI's "home state," subjecting BCCI to New York's aggressive regulators, and reduced BCCI's profits by making it harder for BCCI to operate as a Laundromat that aided (and profited from) customers' financial crimes, including terrorist finance.  Indeed, "Deutsche Bank" has "steadily [been] revealed to be the greatest repository of corporate corruption since BCCI."[488]

583.   Each Deutsche Bank Defendant also knew the violent consequences of its provision of banking services to fronts, operatives, and/or agents of al-Qaeda and the Haqqani

[486] Liz Moyer, *Laundering Probe Not Expected to Harm Business at Bank of N.Y.*, American Banker (August 20, 1999), 1999 WLNR 2772716.

[487] *Id.*

[488] Marshall Auerback, *Recession Signs Are Hitting Europe; Is Lagarde Up For The Challenge?*, Phil's Stock World (Aug. 4, 2019), 2019 WLNR 23807442.

Network, among other designated terrorists, because Deutsche Bank was charged with, and admitted to, knowledge of United States laws that prohibited material support to, aiding and abetting of, and conspiracy with terrorist groups.  Deutsche Bank submitted responses to a questionnaire from the Wolfsberg Group and represented that DB maintained "documented policies and procedures consistent with applicable AML [anti-money laundering], CTF [counter-terrorist finance] & Sanctions regulations to reasonably prevent, detect, and report: Money laundering[;] Terrorist financing[;] [and] "Sanctions violations." (or "CTF"), and "policies and practices" were "being applied to all branches and subsidiaries of [Deutsche Bank] both in the home country and in locations outside of that jurisdiction." Each DB Defendant knew such rules and regulations in order to comply with them. Accordingly, the DB Defendants, including DB New York, should be charged with knowledge of U.S. banking rules and regulations in connection with each DB Defendant's involvement of DB New York in any transactions.

584.    Deutsche Bank knew that terrorists from outside of Russia—precisely like the Syndicate, through Khanani—would foreseeably take advantage of the "Russian Laundromat" that it built with the Russian Mafia.  For example, according to Ms. Belton, one of the primary lessons that observers, like Deutsche Bank, took from the BNY scandal in the late 1990s was that "the architecture of the [BNY Laundromat]" did not just benefit Russian interests: "those who used [the Laundromat] included anyone who wanted to move money out of Russia into a safe haven in the West."[489]  According to Ms. Belton, "Just as with the later Russian black-cash schemes, such as the Moldovan Laundromat and the Deutsche Bank mirror trades," "the beneficiaries … included mobsters" from other countries.[490]  As a result, "[t]he way was being

---

[489] Belton at 414.

[490] *Id.*

paved for the later schemes, including the … Deutsche Bank mirror trades that would funnel … billions of dollars in Russian black cash into the West."[491]

585.    Deutsche Bank understood, and publicly explained to others, the tight fusion between providing banking services to terrorist agents, operatives, and fronts, one the one hand, and anti-American terrorist violence, on the other.  For example, Deutsche Bank hosted a large public forum in 2010 in which the keynote speaker discussed the size of the terrorist economy. The speaker explained that terrorist groups require money to conduct attacks and therefore halting the flow of funds to groups through the financial system is necessary to preventing terrorist violence, among other things.

586.    Deutsche Bank closely monitored terrorist finance and operational risk around the world as part of its normal business operations and regularly issued public statements reflecting its close observation of terrorism-related trends.  For example, in separate public comments in 2004, Deutsche Bank analysts discussed the economic "implications of further terrorism" in the Middle East in one analysis and the investment risks attendant to the U.S. government's "ongoing terrorist concerns" in another.[492]  Similar Deutsche Bank public reports and comments demonstrated scrutiny of terrorism-related trends followed every year thereafter until 2016.

587.    Ever since 9/11, Deutsche Bank has maintained a corporate security program to carefully stay abreast of terrorism-related trends.  In the aptly entitled article "Bank Security Sees Threats Everywhere," the *Australian Financial Review* reported that "[t]he rising tide of terrorism … has also forced banks to cast their net for security experts more widely.  The

---

[491] *Id.* at 415.

[492] Agence France Presse English Wire, *Oil Prices Slip, Supply Fears Linger* (May 25, 2004); Fleur Leyden with Bloomberg, *Metal Rises Boost Aussie*, Sunday Age (May 30, 2004), 2004 WLNR 24055766.

managing director of Deutsche Bank's global cash and trade operations, Lester Owens, said it was now routine for banks to hire experts from government intelligence agencies, the military and even the medical sector to staff their risk management practices."[493]

588.    In his detailed book studying Deutsche Bank, titled *Bad Bank*, Dirk Laabs reported that Deutsche Bank's conscious decision to literally place profits above terrorist finance risk in its decision-calculus reflected the recognition by the Bank's executive leadership and Board that "[t]he bank unabashedly benefited from deliberately letting dirty money flow through its official channels."[494]  "In order to do so," according to Mr. Laabs, "Deutsche Bank employees have regularly broken US laws since 1999," including counter-terrorism laws specifically prohibiting financial services and/or transactions with counter-parties who were "suspected of directly financing and supporting terrorists."[495]

589.    Deutsche Bank understood, and accepted, that it would specifically aid al-Qaeda and its affiliates through its provision of banking services.  For example, according to Mr. Laabs, even though the U.S. government requested that global financial institutions cease doing business with Sudanese customers whom the U.S. government determined posed a high risk of serving as terrorist fronts for "financing al-Qaeda," "the responsible employees of Deutsche Bank did not care" about the specific al-Qaeda terrorist finance risk — "they did not want to forego" what one Deutsche Bank employee described as the Bank's "very lucrative business"

---

[493] Julian Bajkowski, *Bank Security Sees Threats Everywhere*, Australian Financial Review (Oct. 13, 2006), 2006 WLNR 26979526.

[494] Laabs, *Bad Bank*, at 154-55 (translated by Plaintiffs).

[495] *Id.* (translated by Plaintiffs).

notwithstanding the specific U.S. government concern about the risk that such business would aid-and-abet al-Qaeda.[496]

590.    Deutsche Bank's knowing tolerance of the high risk its transactions would benefit al-Qaeda was also demonstrated by the Bank's willingness to continue servicing bin Laden's family company, the Saudi Binladen Group, even after U.S. counter-terrorism experts warned (correctly) that at least some of the money sent to the Saudi Binladen Group was flowing through to Osama bin Laden and/or the numerous other bin Laden family members who actively supported al-Qaeda.  By doing so, Deutsche Bank demonstrated that it was willing to, in effect, blindly bank with potential customers who had as direct a relationship with bin Laden as possible.  Deutsche Bank did so even though it was widely reported in the media at the time that bin Laden remained in touch with, and received financial support from, certain members of his family.  As Steven A. Cook, an Arab policy specialist at the Council on Foreign Relations, explained at the time, "[t]he [bin Laden] family ha[d] said they've cut [Osama bin Laden] off, but [that was] a fiction.  He'[d] been in constant touch with some family members—their situation [was] very murky. You [could not] separate the [bin Laden] family from the [Saudi Binladen Group]."[497]

591.    Deutsche Bank also specifically understood the extreme risk that its financial services could aid-and-abet al-Qaeda terror attacks against Americans because Deutsche Bank knew that numerous Deutsche Bank accounts had done exactly that prior to 9/11.  Indeed, after 9/11, Deutsche Bank finally acted against ten customer accounts associated with individuals (whom Deutsche Bank on information and belief knew prior to 9/11) were affiliated with al-

---

[496] Laabs, *Bad Bank*, at 155-56 (translated by Plaintiffs).

[497] *Quoted in* Jennifer Gould Keil, *In Bad Company—U.S. Firms Still Working With Bin Laden's Relatives*, N.Y. Post (June 13, 2004), 2004 WLNR 19625177.

Qaeda, which contained currencies valued at more than one million U.S. Dollars.  On information and belief, however, Deutsche Bank only did this *after* the 9/11 attack had revealed the linkage to the Deutsche Bank customers in question and *after* the U.S. government specifically identified the al-Qaeda customers in question.

592.    Deutsche Bank also had a uniquely up-front-and-personal vantage point in Pakistan from which to watch the Taliban rebuild after 9/11:  the Talban's public, post-9/11 headquarters in Pakistan was mere blocks from Deutsche Bank's then-existing branch in Islamabad.  As a result, Deutsche Bank's personnel in Pakistan regularly witnessed, or were otherwise aware of, Taliban-related traffic, activity, and events in Pakistan.

593.    Each Deutsche Bank Defendant closely monitored al-Qaeda, Taliban, and Haqqani Network activity in Afghanistan and Pakistan, as Deutsche Bank tracked the level of violence in Afghanistan to project economic growth trends in key markets like Asia.

594.    Deutsche Bank also specifically understood that al-Qaeda and the Taliban posed a terrorist threat to Americans after 9/11, and that Americans in Afghanistan remained under significant threat of terrorist attack from al-Qaeda and the Taliban.  For example, as a Deutsche Bank currency strategist stated in a research note published after 9/11, "[t]he hard work of finding [al-Qaeda and Taliban] terrorists and ferreting them out from caves still remain[ed]."  Similarly, after bin Laden was killed in 2011, a Deutsche Bank analyst publicly stated that "[t]here [was] still some follow-through from Osama bin Laden's ending," and "it [was] hard do see how [it] really [was] the case" that bin Laden's death would "remove" "geopolitical risk."

595.    Deutsche Bank also publicly admitted that the Bank foresaw that it was possible that Deutsche Bank could refuse to take acts requested by the U.S. government specifically to reduce the threat of terrorist attacks by al-Qaeda and the Taliban.  For example, in October 2001,

Rolf Breuer, Deutsche Bank's then-CEO, stated that while the Bank had already provided all or nearly all the assistance necessary to interdict al-Qaeda and Taliban finance flowing through its branches—another lie by Mr. Breuer—Deutsche Bank's support for the U.S. counterterrorism agenda was limited. *"So far,"* Mr. Breuer warned, Deutsche Bank "fully [stood] behind everything President Bush has ordered" with respect to al-Qaeda, the Taliban, and terrorist finance after 9/11. Mr. Breuer's statement necessarily admitted that Deutsche Bank reserved the right to disregard U.S. counter-terrorism requests relating to al-Qaeda and the Taliban.

596. Deutsche Bank's willingness to profit from serving the Syndicate through its al-Qaeda terrorist customers was not out of place for Deutsche Bank: from the 1990s through November 2001, Deutsche Bank also directly serviced Taliban accounts at Bank Millie Afghan that Deutsche Bank knew helped the Taliban launder money, including on information and belief, opium-related money.

597. Deutsche Bank knew that large volumes of "mirror trades" foreseeably raised red flags for terrorist finance operations. In a public research report published by DB London on March 9, 2015, for example, Deutsche Bank "[a]nalyz[ed] data from other countries, [and] deduced where the vast majority of unrecorded capital flowing into the U.K. was coming from."[498] As reported by *The New Yorker*:

Since 2010, [DB London] wrote, about a billion and a half dollars had arrived, unrecorded, in London every month; "a good chunk" of it was from Russia. "At its most extreme," the [DB London] authors explained, the unrecorded capital flight from Moscow included "criminal activity such as tax evasion and money laundering." In a connected and digitized financial system, how could such capital flight happen? … [DB London] did not have to wait long, or look far, to learn the shameful answer: of the eighteen billion dollars that [DB London] had estimated was flowing into the U.K. each year, about twenty per cent had arrived there as the result of trades made at their own bank.[499]

---

[498] Caesar, *Moscow Laundromat*.

[499] *Id.*

598.     Deutsche Bank knew that Khanani's transactions through Deutsche Bank raised red flags: on information and belief, Khanani consistently lost money on every trade. As *The New Yorker* reported, Deutsche Bank's:

> mirror trades[] on behalf of other counterparties … were supposedly subjected to a rigorous "client review" process, and all of them were deemed satisfactory by a Deutsche Bank compliance team. But there was a pattern suggesting malfeasance. Clients of the scheme consistently lost small amounts of money: the differences between Moscow and London prices of a stock often worked against them, and clients had to pay Deutsche Bank a commission for every transaction — between ten hundredths and fifteen hundredths of a percentage point per trade. The apparent willingness of counterparties to lose money again and again, a former manager at Deutsche Bank told me, should have "sounded an air-raid alarm" that the true purpose of the mirror trades was to facilitate capital flight.[500]

599.     From 2008 through 2016, and most likely since 2001, each Deutsche Bank Defendant knew that Deutsche Bank was facilitating laundering efforts by Khanani that benefited, among others, al-Qaeda and the Taliban (including its Haqqani Network), but the DB Defendants declined to take any meaningful steps to interdict the Syndicate's recycling of overseas profits back into terrorist operations through Deutsche Bank accounts, including DB Frankfurt, DB New York, DB Dubai, and DB Moscow accounts.

600.407.     On information and belief, DB Moscow and DB Dubai only stopped providing financial services to Al Zarooni Exchange after the UAE's Central Bank revoked its license in 2016, which rendered Deutsche Bank's earlier posture no longer tenable.

601.408.     On or about 2017, after every Plaintiff was injured, Deutsche Bank fully ended every Russian Mafia- and Khanani-Relatedrelated Laundromat. As Ms. Belton reported, "[t]hough all of the [Deutsche Bank Laundromat] schemes were eventually shut down after they

---

[500] Caesar, *Moscow Laundromat.*

attracted too much scrutiny, each time it was too little too late. ~~By the time Russian regulators moved in on them, tens of billions of dollars had already moved illegally into the West."[501]

### 2. ~~Samir Azizi and the Azizi Cell~~

~~602.    Samir Azizi was a dual-hatted operative of Al-Qaeda and the Haqqani Network. He led the Azizi Cell, which functioned as an al-Qaeda and Haqqani Network front that was created to raise funds through financial crimes, convert such funds to U.S. Dollars, and repatriate such freshly laundered dollars back to accounts controlled by Syndicate agents or operatives to finance attacks against Americans in Afghanistan.  *Supra* Part III.B.~~

~~603.    **The Azizi Cell relied upon Deutsche Bank to execute a series of frauds relating to Value Added Tax ("VAT") refunds arising out of certain transactions purportedly between arms-length counterparties that were, in fact, part of a fraud scheme to generate funds to finance Syndicate operations in Afghanistan and Pakistan.  Plaintiffs refer to the Azizi Cell's schemes, collectively, as the "Syndicate's VAT**~~ Finance Scheme." **Fraud Cells**

~~604.~~409.        Deutsche Bank intentionally aided the Azizi ~~Cell's~~and Ahmed Cells' terrorist ~~finance for the al-Qaeda and the Haqqani Network through fraud relating to European VAT.~~financing VAT fraud schemes. At least seven ~~(7)~~Deutsche Bank employees~~, and on information and belief more,~~ directly assisted the Syndicate's VAT ~~Finance Scheme.  They did so~~finance scheme by, among other things, facilitating transactions they knew to pose an extreme risk for Syndicate terrorist fundraising and finance.[502]

---

[501] Belton at 411.

[502] Alexander Hübner & Jonathan Gould, *Seven Deutsche Bank Staff Charged Over Carbon Trading Scandal*, Reuters (Aug. 13, 2015), https://www.reuters.com/article/uk-deutsche-bank-carbon-idUKKCN0QI0M220150813.

**i.      Samir Azizi and the Azizi Cell**

410.    Deutsche Bank deliberately aided the flow of hundreds of millions of dollars of VAT fraud funds to the Azizi Cell, likely supplying al-Qaeda and the Taliban with tens of millions of U.S. dollars from 2009 through 2015.

411.    "Early on," according to Mr. Enrich, a financial crimes investigator "warned Deutsche in writing that its traders appeared to be partaking in tax fraud. But the Deutsche traders … kept doing it."[503] "In November 2009," Mr. Enrich reported, the same investigator "marched into [DB London's] offices and told its lawyers that Deutsche had already been put on written notice that it was likely engaged in fraud and that the consequences for the continued misbehavior could be severe."[504] "[T]he following month," according to Mr. Enrich, the same investigator "paid another visit … and read [Deutsche Bank's] lawyer the riot act. From… When a Deutsche employee asked a colleague why [Deutsche Bank] was willing to take such a large legal risk, the response came back: 'Because we're that greedy.'"[505]

412.    In December 2012, German authorities raided multiple Deutsche Bank offices in connection with these schemes, and criminal charges were later brought against some of the people involved.

605.   For about a decade from the mid-2000s through 2015, Deutsche Bank, DB Frankfurt, DB London, and DB New York (including DBTCA), knowingly or recklessly aided Azizi and the Azizi Cell, enabling them to execute upon their al-Qaeda-designed terrorist finance scheme, which:  (1) funded al-Qaeda and the Haqqani Network (and, through it, the Taliban) by

---

[503] Enrich, *Dark Towers*, at 150.

[504] *Id.* at 150-151.

[505] *Id.* at 151.

extracting Euros through fraudulent transactions conducted by Deutsche Bank; (2) improved the purchasing power of al-Qaeda and the Haqqani Network (and, through it, the Taliban) by upgrading the currency of the terrorists' profits from Euros to U.S. Dollars through currency conversions executed by Deutsche Bank; and (3) repatriated such U.S. Dollars to accounts controlled by agents or operatives for al-Qaeda and its allies to finance their groups. Each type of aid directly supported Syndicate attacks against Americans in Afghanistan.

606.413.        Azizi used Deutsche Bank accounts at DB Frankfurt, DB London, and DB New York (including DBTCA) to enable the Syndicate's VAT Finance Scheme.

607.414.        In a post-arrest interview, Azizi directly admitted to using Deutsche Bank as his willing financial partner in the Syndicate's VAT Finance Scheme.

608.        Deutsche Bank's financial services to al-Qaeda and the Taliban, through Azizi, were essential to realizing both the terrorist finance and terrorist fundraising benefits that al-Qaeda and the Taliban derived from the Syndicate's VAT Finance Scheme.

609.        With respect to al-Qaeda and Haqqani Network terrorist fundraising, Deutsche Bank and DB Frankfurt directly enabled the underlying fraudulent trades, and their conduct was a proximate and but-for cause of the terrorist fundraising that flowed through the Syndicate's VAT Fraud Scheme.

610.        With respect to al-Qaeda and Haqqani Network terrorist finance, Deutsche Bank, DB Frankfurt, DB London, and DB New York (including DBTCA) directly enabled the Syndicate's: (1) execution of the trades that formed the basis for the VAT fraud in a professional, and therefore more discreet, manner for years, which concealed the terrorists' fundraising activities and the operatives, including Azizi, who conducted them; (2) Euro-to-U.S.-Dollar conversion of the millions in income Azizi and other al-Qaeda/Haqqani Network

operatives regularly fraudulently extracted from the German government through the VAT fraud that was enabled by Deutsche Bank, which maximized al-Qaeda and the Haqqani Network's purchasing power, and therefore logistical impact, from the income flowing to al-Qaeda and the Haqqani Network (and, through it, the Taliban) through illicit trades with Deutsche Bank; and (3) repatriation of the income realized through the al-Qaeda/Haqqani Network VAT Finance Scheme from Azizi to accounts controlled by other Syndicate agents or operatives to finance their groups.  Each manner of aid by Deutsche Bank directly aided the Syndicate's ability to attack Americans in Afghanistan by concealing al-Qaeda/Haqqani Network operatives and conduct, improving al-Qaeda/Haqqani Network purchasing power, and covertly routing funds back to Syndicate agents and operatives for deployment against Americans.

611.415.      Through its support for the Azizi Cell, Syndicate VAT fraud, Deutsche Bank was the but-for cause of al-Qaeda's and the Haqqani Network's ability to realize terrorist finance through the Azizi Cell's VAT fraud scheme. For example, according to the German media outlet *Handelsblatt* (as translated by Plaintiffs), al-Qaeda's "illegal sales tax carousel" "**would not have worked without the involvement of a bank**."[506] According to the German magazine *Der Spiegel*, Deutsche Bank's involvement afforded key operational benefits to the terrorists' VAT fraud schemes:

> Several witnesses testified that [the fraudster's] ***relations with Deutsche Bank had proven to be particularly helpful***. [Deutsche Bank's] role … was to buy up the certificates from various front companies, export them, and put them back into the system. Deutsche Bank ***made the accounts available to the fraudulent companies*** and ***made sure that there were no indications of suspected money laundering***. Deutsche Bank ***gave the dealings a serious demeanor*** … [and] used

---

[506] Yasmin Osman and René Bender, *Staatsanwaltschaft Erhebt Anklage Gegen Hochrangigen Ex-Deutschbanker*, Handelsblatt (Aug. 8, 2019) (translated by Plaintiffs), https://www.handelsblatt.com/finanzen/banken-versicherungen/banken/umsatzsteuerkarussell-staatsanwaltschaft-erhebt-anklage-gegen-hochrangigen-ex-deutschbanker/24883420.html?ticket=ST-1320507-gU7JbkSULqmb0ejP7krR-ap4.

a *special Deutsche Bank program* that enabled super-fast transfers. In just a few minutes, the transactions were run across multiple accounts. This allowed the carousel to turn faster and generate even more profit.[507]

Several witnesses testified that [the fraudster's] *relations with Deutsche Bank had proven to be particularly helpful*. [Deutsche Bank's] role … was to buy up the certificates from various front companies, export them, and put them back into the system. Deutsche Bank *made the accounts available to the fraudulent companies* and *made sure that there were no indications of suspected money laundering*. Deutsche Bank *gave the dealings a serious demeanor* … [and] used a *special Deutsche Bank program* that enabled super-fast transfers. In just a few minutes, the transactions were run across multiple accounts. This allowed the carousel to turn faster and generate even more profit.[508]

612.   Consistent with Syndicate training, the Azizi Cell always promptly transferred to the Syndicate, as its share of the "loot," ten percent (10%) or more of the Azizi Cell's fraudulently obtained VAT within a month or so after receiving the funds from the relevant European government.

613.416.       On information and belief, from 2007 through 2012, the Azizi Cell transferred more than $8.6 million to al-Qaeda and the Haqqani Network and regularly repatriated illicit income to al-Qaeda and Haqqani Network-controlled accounts in Afghanistan, Pakistan, the U.A.E., Germany, and elsewhere to directly finance operations by joint cells operated by al-Qaeda, the Haqqani Network, and their allies in Afghanistan and Pakistan.

614.417.       and elsewhere to support attacks against Americans in Afghanistan, and regularly transferred U.S. Dollars back to al-Qaeda and the Haqqani Network as set forth in the table below. Plaintiffs set forth the Azizi Cell's total estimated transfers to al-Qaeda and the

---

[507] Martin Hesse and Andreas Ulrich, *Batman vor Gericht*, Spiegel (Mar. 30, 2017) (translated by Plaintiffs), https://www.spiegel.de/wirtschaft/unternehmen/co2-betrug-urteil-gegen-peter-virdee-singh-erwartet-a-1140945.html.

[508] Martin Hesse and Andreas Ulrich, *Batman vor Gericht*, Spiegel (Mar. 30, 2017) (translated by Plaintiffs), https://www.spiegel.de/wirtschaft/unternehmen/co2-betrug-urteil-gegen-peter-virdee-singh-erwartet-a-1140945.html.

Haqqani Network, which Plaintiffs identify by VAT scheme ~~and,~~ approximate amounts, and dates:[509]

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
| 1 | On or about December 2007 | $21,000 | WOG GmbH |
| 2 | On or about March 2008 | $6,000 | WOG GmbH |
| 3 | On or about April 2008 | $8,000 | WOG GmbH |
| 4 | On or about May 2008 | $11,000 | WOG GmbH |
| 5 | On or about June 2008 | $7,000 | WOG GmbH |
| 6 | On or about July 2008 | $21,000 | WOG GmbH |
| 7 | On or about August 2008 | $43,000 | WOG GmbH |
| 8 | On or about September 2008 | $56,000 | WOG GmbH |
| 9 | On or about January 2009 | $12,000 | Wega Mobile GmbH |
| 10 | On or about February 2009 | $37,000 | Wega Mobile GmbH |
| 11 | On or about March 2009 | $41,000 | Wega Mobile GmbH |
| 12 | On or about April 2009 | $38,000 | Wega Mobile GmbH |
| 13 | On or about May 2009 | $46,000 | Wega Mobile GmbH |
| 14 | On or about June 2009 | $80,000 | Wega Mobile GmbH |
| 15 | On or about July 2009 | $51,000 | Wega Mobile GmbH |
| 16 | On or about August 2009 | $1,000 | Ferrograph GmbH |
| 17 | On or about August 2009 | $81,000 | Wega Mobile GmbH |

---

[509] Deutsche Bank enabled a broad array of the Azizi Cell's VAT Frauds; Plaintiffs identify the various schemes by the company used by the Azizi Cell in furtherance of the scheme. With respect to the amounts, plaintiffs have rounded to the nearest thousand dollars for all estimated sums above $500 and to the nearest $10 for all estimated sums below $500.

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
| 18 | On or about September 2009 | $27,000 | Ferrograph GmbH |
| 19 | On or about September 2009 | $21,000 | Wega Mobile GmbH |
| 20 | On or about October 2009 | $6,000 | Wega Mobile GmbH |
| 21 | On or about October 2009 | $31,000 | Hamster Mobile GmbH |
| 22 | On or about November 2009 | $16,000 | iTrading GmbH |
| 23 | On or about November 2009 | $60 | iCell GmbH |
| 24 | On or about November 2009 | $19,000 | Hamster Mobile GmbH |
| 25 | On or about December 2009 | $19,000 | iTrading GmbH |
| 26 | On or about December 2009 | $8,000 | iCell GmbH |
| 27 | On or about December 2009 | $22,000 | Hamster Mobile GmbH |
| 28 | On or about January 2010 | $2,000 | iTrading GmbH |
| 29 | On or about January 2010 | $31,000 | iCell GmbH |
| 30 | On or about January 2010 | $33,000 | Hamster Mobile GmbH |
| 31 | On or about February 2010 | $945,000 | iTrading GmbH |
| 32 | On or about February 2010 | $231,000 | iCell GmbH |
| 33 | On or about February 2010 | $197,000 | Nexo Chafka GmbH |
| 34 | On or about February 2010 | $19,000 | Hamster Mobile GmbH |
| 35 | On or about March 2010 | $234,000 | iTrading GmbH |
| 36 | On or about March 2010 | $358,000 | iCell GmbH |
| 37 | On or about March 2010 | $51,000 | Nexo Chafka GmbH |
| 38 | On or about March 2010 | $40,000 | Hamster Mobile GmbH |
| 39 | On or about April 2010 | $314,000 | iCell GmbH |

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|---|---|---|---|
| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
| 40 | On or about April 2010 | $96,000 | Nexo Chafka GmbH |
| 41 | On or about April 2010 | $7,000 | Hamster Mobile GmbH |
| 42 | On or about May 2010 | $323,000 | iTrading GmbH |
| 43 | On or about May 2010 | $130,000 | iCell GmbH |
| 44 | On or about May 2010 | $467,000 | AS Handel GmbH |
| 45 | On or about May 2010 | $93,000 | Nexo Chafka GmbH |
| 46 | On or about May 2010 | $91,000 | Amaan Enterprise GmbH |
| 47 | On or about June 2010 | $323,000 | iCell GmbH |
| 48 | On or about June 2010 | $49,000 | Amaan Enterprise GmbH |
| 49 | On or about July 2010 | $25,000 | iCell GmbH |
| 50 | On or about July 2010 | $5,000 | Nexo Chafka GmbH |
| 51 | On or about July 2010 | $127,000 | Amaan Enterprise GmbH |
| 52 | On or about August 2010 | $38,000 | iCell GmbH |
| 53 | On or about August 2010 | $77,000 | Nexo Chafka GmbH |
| 54 | On or about August 2010 | $81,000 | Amaan Enterprise GmbH |
| 55 | On or about September 2010 | $46,000 | iCell GmbH |
| 56 | On or about September 2010 | $284,000 | AS Handel GmbH |
| 57 | On or about September 2010 | $46,000 | Nexo Chafka GmbH |
| 58 | On or about September 2010 | $100,000 | Hamster Mobile GmbH |
| 59 | On or about September 2010 | $186,000 | Amaan Enterprise GmbH |
| 60 | On or about October 2010 | $104,000 | iCell GmbH |
| 61 | On or about October 2010 | $75,000 | Nexo Chafka GmbH |

| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
|-----|-----|-----|-----|
| No. | Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network | Estimated Amount Repatriated (USD) | Related VAT Fraud by Azizi Cell |
| 62 | On or about October 2010 | $500,000 | Hamster Mobile GmbH |
| 63 | On or about October 2010 | $231,000 | Amaan Enterprise GmbH |
| 64 | On or about November 2010 | $41,000 | iCell GmbH |
| 65 | On or about November 2010 | $210,000 | AS Handel GmbH |
| 66 | On or about November 2010 | $9,000 | Nexo Chafka GmbH |
| 67 | On or about November 2010 | $110,000 | Hamster Mobile GmbH |
| 68 | On or about November 2010 | $118,000 | Amaan Enterprise GmbH |
| 69 | On or about December 2010 | $62,000 | iCell GmbH |
| 70 | On or about December 2010 | $55,000 | Nexo Chafka GmbH |
| 71 | On or about December 2010 | $110,000 | Amaan Enterprise GmbH |
| 72 | On or about January 2011 | $48,000 | iCell GmbH |
| 73 | On or about January 2011 | $32,000 | Nexo Chafka GmbH |
| 74 | On or about January 2011 | $138,000 | Amaan Enterprise GmbH |
| 75 | On or about February 2011 | $68,000 | Amaan Enterprise GmbH |
| 76 | On or about March 2011 | $57,000 | AS Handel GmbH |
| 77 | On or about March 2011 | $63,000 | Amaan Enterprise GmbH |
| 78 | On or about April 2011 | $21,000 | Amaan Enterprise GmbH |
| 79 | On or about May 2011 | $10,000 | Amaan Enterprise GmbH |
| 80 | On or about June 2011 | $53,000 | Amaan Enterprise GmbH |
| 81 | On or about July 2011 | $82,000 | Amaan Enterprise GmbH |
| 82 | On or about July 2011 | $5,000 | My iCell GmbH |
| 83 | On or about August 2011 | $22,000 | Amaan Enterprise GmbH |

| ~~No.~~ | ~~Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network~~ | ~~Estimated Amount Repatriated (USD)~~ | ~~Related VAT Fraud by Azizi Cell~~ |
|---|---|---|---|
| **No.** | **Estimated Date U.S. Dollars Repatriated to al-Qaeda and Haqqani Network** | **Estimated Amount Repatriated (USD)** | **Related VAT Fraud by Azizi Cell** |
| 84 | On or about August 2011 | $32,000 | My iCell GmbH |
| 85 | On or about September 2011 | $32,000 | My iCell GmbH |
| 86 | On or about October 2011 | $3,000 | My iCell GmbH |
| 87 | On or about November 2011 | $4,000 | BAK Enterprise GmbH |
| 88 | On or about February 2012 | $303,000 | BAK Enterprise GmbH |
| 89 | On or about May 2012 | $192,000 | BAK Enterprise GmbH |

~~615.~~418.        Deutsche Bank's illicit transactions directly aided Syndicate cells operating in the Afghanistan and Pakistan border regions, including on information and belief, joint cells ~~comprised of~~comprising al-~~-~~Qaeda and Taliban ~~(including Haqqani Network)~~ fighters ~~in the al-Qaeda strongholds known as P2K and N2KL.  *Supra* Part III.B.~~.

~~616.~~419.        The nexus between Deutsche Bank's conduct and terrorist attacks committed by joint Syndicate cells against Americans in Afghanistan was tight.  ~~ ~~For example, evidence of Azizi's financial support for the Syndicate includes "documents found by British special forces in a cave on the Afghan-Pakistan border," from which the *Independent* "traced the proceeds" from Deutsche Bank's trades "to Middle Eastern terror groups" operating "in a cave on the Afghan-Pakistan border"—*i.e.*, al-~~-~~Qaeda and the Taliban, including its Haqqani Network.[510]

---

[510] Jim Armitage, *Life Is A Carousel Of Fraud And The People Involved Can Be Clever And Very Dangerous*, Independent (Aug. 14, 2015), 2015 WLNR 24079306.

420.    The Final Azizi Memo confirms the direct, operational, and devastating value chain that through which Deutsche Bank and Standard Chartered Bank facilitated the flow of enormous volumes of untraceable mobile phones sourced by the Azizi Cell because the Azizi Cell operationalized its VAT fraud scheme by regularly purchasing mobile phones in the United States and then reexporting them to Afghanistan – and cell phone exports to Afghanistan were the definitive red flag of all red flags for suspected VAT fraud-related transactions because cell phones purchased in the United States – like the thousands of phones Azizi supplied to al-Qaeda, provide enormous operational advantages for terrorists because they are functionally untraceable by U.S. counter-terrorism professionals.

421.    Deutsche Bank also, through the same VAT fraud scheme, facilitated the regular deliverer of thousands, if not tens of thousands, of untraceable American and Chinese cell phones that that the Azizi Cell purchased, on information and belief, in the United States, including in Oakland, California.   Al-Qaeda terrorists could – and did – use these American-purchased cell phones that DB (and SCB) helped Azizi finance, and effectively smuggle, from Oakland, through Europe and Dubai, finally landing in Afghanistan for the Syndicate's use.

422.    The Syndicate's cell phone pipeline through the Azizi Cell – which DB and SCB built – benefited every facet of al-Qaeda's terrorist campaign against Americans:

(i)    **Communications and Concealment.**  Al-Qaeda terrorists could communicate with one another securely, knowing that the illicit nature of their phone acquisition , most of all, how their illicit export from the United States (because Azizi did not follow laws designed to prevent cell phones from being illicitly reexported to FTOs like al-Qaeda), concealed the al-Qaeda and Haqqani Network terrorists whom Azizi supplied from many of the most potent American counter-terror tools and strategies.  Which was the entire point of al-Qaeda's emphasis on its VAT fraud cells' bulk purchase of cell phones in the first instance.

(ii)    **Cash Flow.**  Al-Qaeda and Haqqani Network operatives regularly re-sold the black market cell phones they obtained through operatives like Azizi on black markets around the world, where the universal rate for untraceable phones like the ones Azizi

Supplied was a 10X markup, resulting in a net profit of about $2,000 per phone.  And Azizi exported at least thousands, if not tens of thousands, of such phones each year from 2009 until 2015.  At that rate, the "free goods" value of Azizi's cell phones alone supplied al-Qaeda and Haqqani Network operatives in Afghanistan with at least several hundred thousand U.S. Dollars' worth of untraceable cell phones each year from 2008 through 2015.

(iii)    **Attacks.**  Al-Qaeda and the Haqqani Network also used the illicitly supplied cell phones provided to directly facilitate attacks both by enabling communications between operatives in the field as well as by serving as part of the IED itself.

617.   Since Deutsche Bank knew that Azizi was using DB London, DB Frankfurt, and DB New York (including DBTCA) to operationalize a sophisticated, and criminal VAT fraud scheme.  Deutsche Bank's own role in the fraud was enabling Azizi to: (1) regularly extract millions of euros, through DB Frankfurt, which (2) Azizi then caused to be converted into U.S. Dollars through transactions routed through DB London and DB New York (including DBTCA) and ultimately returning to Azizi, after which (3) Azizi contributed a substantial percentage to the Syndicate for operations against Americans in Afghanistan in accordance with Azizi's status as a member of al-Qaeda and the Taliban (including its Haqqani Network).

618.   Deutsche Bank's employees also knowingly ignored direct warnings that Deutsche Bank was aiding an obvious VAT fraud scheme being carried out by the Azizi Cell, just as it did with Ahmed Cell.

619.   The U.S. government concluded that Deutsche Bank knowingly aided the transactions with Azizi and the Azizi Cell that enabled the Syndicate's VAT Finance Scheme.

620.   The U.S. government concluded that Deutsche Bank and Azizi understood that the Syndicate's VAT Finance Scheme depended on transactions flowing through Deutsche Bank.

621.   Deutsche Bank knew that one or more current or former Deutsche Bank executives, managers, employees, or agents had raised substantial allegations that Deutsche Bank

personnel were intentionally helping customers commit financial crimes that raised specific "red flags" for al-Qaeda and Haqqani Network terrorist finance.

622.    From the face of the transaction data before Deutsche Bank alone, Deutsche Bank knew that Azizi was likely engaged in terrorist finance and money laundering for reasons including, but not limited to: (1) substantial indicia of terrorist finance on the face of the transaction, *e.g.*., financial activity that was inconceivable given the purported businesses; (2) Azizi's biographical, personal and professional history, including his connections to Afghanistan, the U.A.E., and Germany, which were three known al-Qaeda terrorist finance hubs; (3) the nature of the scheme, which tracked warnings of potential al-Qaeda and Haqqani Network strategies to raise money through fraud; (4) Azizi's course of dealings throughout the scheme, which underscored the criminal nature of the acts that Deutsche Bank was enabling; and (5) the basic economic data associated with the transactions, which alerted one or more whistleblowers to the strong possibility (which proved correct) that Deutsche Bank was enabling systemic VAT fraud, which Deutsche Bank knew to be a terrorist finance "red flag" generally, and a specific terrorist finance "red flag" for al-Qaeda and Haqqani Network activities.

623.    On information and belief, Deutsche Bank managers, employees, and agents, including but not limited to, those at DB London, DB Frankfurt, and DB New York (including DBTCA), identified Azizi as a "priority" client based upon the volume of business Azizi sent to Deutsche Bank and, as such a "prioritized client," Deutsche Bank affirmatively sought to ease the Azizi Cell's transactions.

423.    9/11, every other major FTO has prioritized the acquisition of the industrial volumes of mobile phones from the U.S. for the same reasons identified above – - most of all, al-Qaeda's ally, the IRGC.  Because the typical terrorist operative often required five (5) or more

cell phones for tradecraft reasons, and cell phones were one of the best ways to detonate IEDs, transnational cell phone exports conducted by small start-ups that had some nexus to Afghanistan were, more or less, the single brightest counter-terrorism red flag possible by 2012, when Defendants' scheme was in full bloom.

424.    Indeed, Azizi left nothing to the imagination and foreclosed any ability of his banking partners to pretend there was not a nexus between his VAT fraud and Afghan terror, because the key instrumentality of his fraud (cell phones sales) were directly connected through and unbroken chain of carousel transactions that began in Oakland, California, and ended in Afghanistan with, as Azizi disclosed to his terrorist finance allies at Deutsche Bank and Standard Chartered Bank:  *"Sale of Chinese cheap cell phones to Afghanistan."*

~~624.~~425.    Deutsche Bank's senior management, including, but not limited to, Mr. Ackermann and Mr. Jain, knew that Deutsche Bank's deliberate facilitation of VAT fraud enabled Syndicate fundraising by no later than April 2010, when German law enforcement searched Deutsche Bank's offices in Frankfurt based upon German law enforcement's belief that Deutsche Bank had been "aiding and abetting VAT fraud" relating to, among other things, Deutsche Bank's carbon-related trades on behalf of the Azizi Cell ~~(*supra* Part IV.A.2)~~ and the Ahmed Cell ~~(*supra* Part IV.A.3).~~.

~~625.~~426.    After the German raid in late December 2012, Jürgen Fitschen, Deutsche Bank's co-CEO at the time, manifested his (and the Bank's) consciousness of guilt over the Bank's Syndicate terrorist finance through the VAT fraud schemes the Bank enabled when he called a senior German official to ~~lodge a complaint on Deutsche Bank's behalf~~complain about the audacity German prosecutors had displayed by even suggesting that Deutsche Bank could have deliberately enabled the VAT fraud schemes that Deutsche Bank had, in fact, enabled on

behalf of its VAT fraudster customer base. This customer base included the Syndicate's Ahmed Cell and Azizi Cell (the "December 2012 Fitschen Call"). According to Mr. Laabs:

> The many hunters, prosecutors, and banking authorities were closing in, especially the EU investigators were making progress … The managers of Deutsche Bank could decide how to deal with the situation: Either act as if they were above the law or they take the questions and deep suspicions to heart. Jürgen Fitschen, the bank's Co-CEO, had already made a decision. He seemed to believe that his employer was above the law. In December 2012, when the public prosecutor went with various police officers to secure evidence in the bank that could prove that traders had participated in the CO2 emissions trading fraud, Fitschen picked up the phone to complain to the Hessian Prime Minister. Apparently, [Fitschen] had forgotten that the [German] judiciary should and must be independent.[511]

626.427.      The December 2012 Fitschen Call reflected Mr. Fitschen's, and Deutsche Bank's, consciousness of guilt relating to the Bank's substantial assistance to the VAT fraudsters whom Deutsche Bank serviced, including the Ahmed Cell and the Azizi Cell.

### 3.      Imran Yakub Ahmed and the Ahmed Cell

627.1.  Imran Yakub Ahmed was a dual-hatted operative of Al-Qaeda and the Haqqani Network.  He led the Ahmed Cell, which functioned as an al-Qaeda and Haqqani Network front that was created to raise funds through financial crimes, convert such funds to U.S. Dollars, and repatriate such freshly laundered dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

628.   The Ahmed Cell relied uponIndeed, the Final Azizi Memo explicitly confirms Plaintiffs' core thesis – that Deutsche Bank to execute a series of frauds relating to VAT refunds arising out of certain transactions purportedly between arms-length counterparties that were, in fact, part of a fraud scheme to generate funds to finance al-Qaeda and Taliban (including

---

[511] Laabs, *Bad Bank*, at 476 (translated by Plaintiffs) (emphasis added).

Haqqani Network) operations in Afghanistan and Pakistan.  Plaintiffs refer to the Ahmed Cell's schemes, collectively, as the "Ahmed VAT Scheme."

629.    Deutscheand Standard Chartered **Bank** intentionally financed the Syndicate, through the Ahmed Cell's scheme to defraud European governments by obtaining fraudulent refunds relating to European VAT taxes.  Deutsche Bank employees directly assisted the Ahmed Cell's VAT fraud terrorist finance scheme by, among other things, facilitating transactions they knew to pose an extreme risk for Syndicate terrorist fundraising and finance.  As Mr. Laabs explained, "Traders at [Deutsche Bank] in London and Frankfurt had helped a network of international gangsters"—including the Ahmed Cell and the Azizi Cell, *supra* Part IV.A.2.   "to swindle back VAT payments by faking the sale of CO2 emission rights."[512]

630.    From the mid-2000s through 2010, Deutsche Bank, DB Frankfurt, DB London, and DB New York (including DBTCA), knowingly or recklessly aided Ahmed and the Ahmed Cell, enabling them to execute upon, through **their** al-Qaeda-designed terrorist finance scheme, which:  (1) funded the Syndicate by extracting Euros through fraudulent transactions conducted by Deutsche Bank; (2) improved the Syndicate's purchasing power by upgrading the currency of the terrorists' profits from Euros to U.S. Dollars through currency conversions executed by Deutsche Bank; and (3) repatriated such freshly laundered dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives.  Each type of aid directly supported Syndicate attacks against Americans in Afghanistan.

631.    In some instances, Deutsche Bank provided "end-to-end" support for the Ahmed Cell's transactions.  In other instances, the Bank only served in the final, essential role of completing the transaction.  In every instance, however, "Deutsche Bank acted as the last link in

---

[512] *Id.* at 451 (translated by Plaintiffs) (emphasis added).

the chain,"[513] and was the but-for and proximate cause of every VAT fraud that the Ahmed Cell executed in order to raise money for the Syndicate.

632.   Ahmed used Deutsche Bank accounts at DB Frankfurt, DB London, and DB New York (including DBTCA) to enable the Syndicate's VAT Finance Scheme.

633.   Through its support for the Ahmed Cell, Deutsche Bank was the but-for cause of al-Qaeda's and the Haqqani Network's ability to realize terrorist finance through the Ahmed Cell's VAT fraud scheme, just as the Bank was for the Azizi Cell.

634.   Deutsche Bank's financialcombined services to al-Qaeda and the Taliban, through Ahmed, were essential to realizing both the terrorist finance and terrorist fundraising benefits that al-Qaeda and the Taliban derived from the Syndicate's VAT Finance Scheme.

635.   With respect to Syndicate terrorist fundraising, Deutsche Bank, DB Frankfurt, and DB London directly enabled the underlying fraudulent trades, and their conduct was a proximate and but-for cause of the terrorist fundraising that flowed through the Syndicate's VAT Fraud Scheme.

636.   With respect to Syndicate terrorist finance, Deutsche Bank, DB Frankfurt, DB London, and DB New York (including DBTCA) directly enabled the Syndicate's:  (1) execution of the trades that formed the basis for the Ahmed VAT Scheme in a professional, and therefore more discreet, manner for years, which concealed the Syndicate's fundraising activities and the operatives, including Ahmed, who conducted them; (2) Euro-to-U.S.-Dollar conversion of theAzizi and the al-Qaeda fundraising cell he led likely routed tens of millions in income Ahmed and other Syndicate operatives regularly fraudulently extracted from the German government

---

[513] SeeNews Banking, *Prosecutors Charge Deutsche Bank Employees in Carbon Tax Fraud Case* (Aug.13, 2015).

through the VAT fraud that was enabled by Deutsche Bank, which maximized the Syndicate's purchasing power, and therefore logistical impact, from the income flowing to the Syndicate through illicit trades with Deutsche Bank; and (3)

637.   Repatriation of the income realized through the Syndicate's VAT Finance Scheme from Ahmed to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.  Each manner of support by Deutsche Bank directly aided the Syndicate's ability to attack Americans in Afghanistan by concealing Syndicate operatives and conduct, improving Syndicate purchasing power, and covertly routing funds back to Syndicate operatives for deployment against Americans.

638.   Deutsche Bank's illicit transactions directly aided Syndicate cells operating in the Afghanistan and Pakistan border regions, including on information and belief, joint cells comprised of al-Qaeda and Taliban (including Haqqani Network) fighters in the al-Qaeda strongholds known as P2K and N2KL.

639.   Consistent with al-Qaeda and Taliban practice, and the Ahmed Cell's purpose, the Ahmed Cell ordinarily transferred ten percent (10%) or more of the Cell's profit from every fraudulent transaction executed with the aid of Deutsche Bank back to their al-Qaeda and Taliban (including Haqqani Network) confederates in Afghanistan and Pakistan to support attacks against Americans in Afghanistan.

640.   The nexus between Deutsche Bank's conduct and terrorist attacks committed by joint Syndicate cells against Americans in Afghanistan was tight.  In 2015, the *Independent* reported that the "proceeds" generated by Deutsche Bank's "carbon fraud"—which applies to both Ahmed, at least, in value to al-Qaeda, and Azizi —flowed through "to Middle-Eastern terror groups" as a direct "consequence[]" of Deutsche Bank's conduct and transactions, and "seven

Deutsche Bank employees" who had "been indicted in Germany for their alleged part in a carbon credit carousel," *i.e.*, the Syndicate's VAT Finance Scheme.[514]

641.428.    Noting that "Deutsche has already paid fines of $2.5bn (£1.6bn) in association with the Libor-rigging investigation," the *Independent* ruefully observed that news of Deutsche Bank's direct financial assistance to al-Qaeda and Taliban (including Haqqani Network) terrorists operating out of caves in al-Qaeda's sanctuary on the Afghanistan-Pakistan border was just the latest financial crime by Deutsche because, given and the Azizi Cell appear to have been one of its most prolific fundraisers in recent history, "it was *only a matter of time before banks started dipping their beaks*."[515].

642.    Deutsche Bank knew that Ahmed was using DB London, DB Frankfurt, and DB New York (including DBTCA) to operationalize a sophisticated, and criminal, VAT fraud scheme through which Deutsche Bank's own role in the fraud was enabling Ahmed to: (1) regularly extract millions of euros, through DB Frankfurt, which (2) Azizi then caused to be converted into U.S. Dollars through transactions routed through DB London and DB New York (including DBTCA) and ultimately returning to Ahmed, after which (3) Ahmed contributed a substantial percentage to the Syndicate for operations against Americans in Afghanistan in accordance with Ahmed's status as a member of al-Qaeda and the Taliban (including its Haqqani Network).

---

[514] Jim Armitage, *Life Is A Carousel Of Fraud And The People Involved Can Be Clever And Very Dangerous*, Independent (Aug. 14, 2015), 2015 WLNR 24079306.

[515] *Id.*  In context, "dipping their beaks" was an obvious parallel between Deutsche Bank's mafioso conduct and that of Don Fanucci, the local Italian mafia boss in *The Godfather Part Two*, who thrice implores an up-and-coming gangster, Vito Corleone, to let the Don "dip my beak" or "wet my beak" "just a little," meaning, the regional organized crime boss (in the movie, Don Fanucci, here Deutsche Bank) was extracting profit from the organized criminal activities of an up-and-coming criminal linked to violence (in the movie, Vito Corleone; here, Azizi).

643.   Deutsche Bank's employees also knowingly ignored direct warnings that Deutsche Bank was aiding an obvious VAT fraud scheme being carried out by Ahmed.

429.   "Early on," according to Mr. Enrich, a financial crimes investigator "warned Deutsche in writing that its traders appeared to be partaking in tax fraud.  But the Deutsche traders … kept doing it."[516]  "In November 2009," Mr. Enrich reported, the same investigator "marched into [DB London's] offices and told its lawyers that Deutsche had already been put on written notice that it was likely engaged in fraud and that the consequences for the continued misbehavior could be severe."[517]  "[T]he following month," according to Mr. Enrich, the same investigator "paid another visit … and read [Deutsche Bank's] lawyer the riot act. … When a Deutsche employee asked a colleague why [Deutsche Bank] was willing to take such a large legal risk, the response came back:  'Because we're that greedy.'"[518]Western law enforcement has no doubt that Samir Azizi and the Azizi Cell did exactly what Plaintiffs allege – VAT fraud on an industrial scale, which flowed back to al-Qaeda and the Haqqani Network and funded Syndicate attacks against Americans in Afghanistan.  The Final Azizi Memo confirms that one or more members of the Azizi Cell "generally confessed" and "cooperat[ed] with the investigation."

430.   On information and belief, from 2009 through 2015, Deutsche Bank, DBTCA, DB London, and DB Dubai directly facilitated Azizi Cell VAT fraud trades that caused the transfer of at least $10 million in USD value from the United States to al-Qaeda and Haqqani Network terrorists in Afghanistan.  These DB Defendants enabled this value transfer, among

---

[516] Enrich, *Dark Towers*, at 150.

[517] *Id.* at 150-151.

[518] *Id.* at 151.

other ways, though their facilitation of the Azizi Cell's transactions supporting the VAT fraud, and transferring the funds and cell phones to Afghanistan, which directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists throughout Afghanistan, including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, and while acting as the Kabul Attack Network.

### 644.   ii.   Imran Yakub Ahmed and the Ahmed Cell

645.431.   On information and belief, the U.S. government also concluded that Deutsche Bank knowingly aided the transactions with Ahmed and the Ahmed Cell that enabled the Syndicate's VAT Finance Scheme.

### 3.   Iran's Terrorist Sponsors

432.   On information and belief, the U.S. government concluded that Deutsche Bank, DB Dubai, DB London, and Ahmed understood that the Syndicate's VAT Finance Scheme depended onDBTCA, regularly facilitated NIOC and NITC transactions flowingin the same manner as the SCB Defendants, including through supporting illicit transactions that facilitated NIOC and NITC activities, from 2001 through at least 2012.

646.   Deutsche Bank.

647.   From the face of the transaction data before Deutsche Bank alone, Deutsche Bank knew that Ahmed was likely engaged in terrorist finance and money laundering for reasons including, but not limited to: (1) substantial indicia of terrorist finance on the face of the transaction, *e.g.*., financial activity that was inconceivable given the purported businesses; (2) Ahmed's biographical, personal and professional history, including his status as a Pakistani citizen, which placed him in an elevated risk category; (3) the nature of the scheme, which tracked warnings of potential Syndicate strategies to raise money through fraud; and (4)

Ahmed's course of dealings throughout the scheme, which underscored the criminal nature of the activities that Deutsche Bank was enabling.

648.    On information and belief, Deutsche Bank also knew that Ahmed was the subject of one or more law enforcement investigations, and that law enforcement had "[l]ong-held concerns" about Ahmed given his notorious reputation for brazen financial crime from the late 1990s until 2017.[519]

649.433.    Deutsche Bank also knew that the U.S. government had long been suspicious of the Bank's long history of recklessly enabling the tax-related crimes of the Bank's customers which was "one of the reasons why the US authorities ha[d] been after the US subsidiary of Deutsche Bank since the late 1990s."[520]  "Despite the investigations," however, "and even though the US Senate intervened, Deutsche Bank never completely ceased" the Bank's pursuit of profits through assistance to its clients' tax crimes.[521], DB Dubai, DB London, and DBTCA knew that NIOC and NITC served as a front for Iranian terrorism through the IRGC's Hezbollah Division and Qods Force.  Among other reasons, Deutsche Bank, DB Dubai, DB London, and DBTCA knew they were helping Iran-backed terrorists and simply did not care

650.    On information and belief, Deutsche Bank managers, employees, and agents, including but not limited to, those at DB London, DB Frankfurt, and DB New York (including DBTCA), identified Ahmed as a "priority" client based upon the volume of business Ahmed sent

---

[519] Mark Ford, *European Investigators Too Slow to Spot Carbon Credit Trading Scam*, Coastline Solutions: Trade Based Financial Crime News From Around The Globe (June 28, 2019), https://amlnewsflow.coastlinesolutions.com/2019/06/28/european-investigators-too-slow-to-spot-carbon-credit-trading-scam/.

[520] Laabs, *Bad Bank*, at 380 (translated by Plaintiffs).

[521] *Id.* (translated by Plaintiffs).

to Deutsche Bank and, as such a "prioritized client," Deutsche Bank affirmatively sought to ease the Ahmed Cell's transactions.

651.434.      On information and belief, from the mid-2000s through 2010, Ahmed and the Ahmed Cell converted millions of Euros obtained through the Ahmed VAT Scheme into U.S. Dollars through transactions processed through DB London, DB Frankfurt, and DB New York (including DBTCA), which repatriated millions of from 2001 through 2012, Deutsche Bank, DB Dubai, DB London, and DBTCA caused tens of millions in U.S. Dollars each year, to flow through illicit transactions with NIOC and at least several hundred thousand dollars per month, from EuropeNITC, into SyndicateHezbollah and Qods Force accounts in Afghanistan, Pakistan,, which funded al-Qaeda's and the U.A.E. to support attacksTaliban's terrorist campaign against Americans in Afghanistan, and such repatriated VAT monies did, in fact, support such attacks. from 2006 through 2016.

### 4.      Mamoun Darkazanli and the Hamburg Cell

652.435.      Mamoun Darkazanli ("Darkazanli") and Mamdouh Mahmud Salim ("Salim") were al-Qaeda supporters, operatives, and fundraisers who were each a member of al-Qaeda's notorious cell in Hamburg, Germany.

653.436.      On March 6, 1995, Darkazanli and Salim jointly traveled to a Hamburg branch of Deutsche Bank and opened an account in a manner that raised substantial red flags for terrorist finance even under pre-9/11 practices. This included, but were not limited to, indicia that Darkazanli and Salim: (1) were involved in transnational financial crime; (2) engaged in a pattern of transactions and travel that lacked a legitimate business purpose; (3) expressed hostility towards modernity (*e.g.*, refusing to shake the hands of a woman); and (4) had substantial connections to, and financial interests in, ultra-high-risk geographies for terrorist

finance. Deutsche Bank, DB New York, and DB Frankfurt ignored these red flags because they did not care about such risks.

654.437.    From 1995 through at least 2001, Deutsche Bank, including DB Frankfurt and DB New York (including DBTCA), provided financial services to al-Qaeda's Hamburg Cell through its services to Darkazanli and Salim. On information and belief, Deutsche Bank, through these branches, facilitated more than $100,000 in U.S. Dollar-related financing activities for al-Qaeda each year from June 1995 through at least September 2003, and such Deutsche Bank-enabled transactions permitted the Hamburg Cell to repatriate hundreds of thousands of U.S. Dollars even while raising clear red flags for terrorist finance even under pre-9/11 standards.

655.438.    For example, between 1994 and 1998, Deutsche Bank, DB Frankfurt, and DB London processed more than $600,000 into Darkazanli-controlled accounts through transactions that, on their face, raised obvious terrorist finance red flags, including, but not limited to, the red flags raised by: (1) transactions with a radical Islamist preacher who called for attacks against America; (2) transactions with a bank known to be owned by Middle Eastern nationals suspected of being directly linked to terrorist groups; and (3) transactions with a company that had already been publicly linked to al-Qaeda operations in Europe before 9/11.

656.439.    On information and belief, Deutsche Bank facilitated at least $370,585 in other U.S. Dollar-denominated transactions, which benefited the Hamburg Cell, including, but not limited to, Syndicate-related transactions enabled by Deutsche Bank that included transactions in the exact amounts of $171,085, $100,000, $57,000, $30,000, $10,000, $1,700, and $800.

657.440.     In September 1998, global media outlets reported that German authorities in Bavaria had arrested Salim to extradite him to the U.S. on terrorism charges.[522]

658.441.     Thereafter, Deutsche Bank continued providing financial services to al-Qaeda's Hamburg Cell even after one of its members, Salim, was publicly reported to have been arrested by German authorities in order to be extradited to the United States on terrorism charges – one of the reddest possible red flags imaginable for Deutsche Bank when it came to the Bank's continued services to Darkazanli. Deutsche Bank knew that Salim and Darkazanli were, in effect, partners, and Deutsche Bank knew that Darkazanli was likely an al-Qaeda operative after his co-account holder (Salim) was arrested.

659.442.     After Deutsche Bank closed the Bankers Trust acquisition in June 1999, the Bank's financial services to al-Qaeda's Hamburg cell, through Darkazanli and Salim, began involving DBTCA. On information and belief, DB Frankfurt and DB London served as an agent for DB New York (including DBTCA), under the Bank's "hub-and-spokes model," and drove substantial U.S. Dollar-denominated transaction business relating to the Hamburg Cell after June 1999 through at least September 2003.

660.443.     On information and belief, from 1995 through at least September 2003, al-Qaeda routed more than one million U.S. Dollars (inclusive of transactions in other currencies) to the Hamburg cell through financial transactions with Darkazanli and/or Salim, routing more than $100,000 to the Hamburg Cell each year from 1995 through 2002.

---

[522] *See*, *e.g.*, Reuters, *Press Digest – Germany – September 21, 1998* (Sept. 21, 1998) ("main stories from [previous day's] German newspapers" included *Sueddutsche Zeitung*'s story that "Bavarian authorities [said] they aim[ed] to get suspected Bin Laden associate Mamdouh Mahmud Salim deported to the United States as quickly as possible following his arrest by German police.").

## B.     Standard Chartered Bank Enabled Syndicate Terrorist Finance

661.444.        While "Deutsche might have been the industry's worst offender," according to Mr. Enrich, "it was hardly the only criminal entity. Just about every scandal that engulfed [Deutsche Bank] during the past two decades *also* swept over *at least one or two other rivals*."[523] Such is the case here: Standard Chartered Bank (alongside Danske Bank, *infra*) joined Deutsche Bank as global financial institutions that consciously chose to operate Laundromats for al-Qaeda, Haqqani Network, and Lashkar-e-TaibaSyndicate agents, operatives, fronts, and partners Fromfrom 2001 through 2016.

662.445.        From 2001 through 2016, Standard Chartered Bank knowingly and directly transmitted at least $13,066,300 to al-Qaeda, Haqqani Network, and Lashkar-e-TaibaSyndicate agents and operatives. Indeed, duringDuring this timeframe, the Standard Chartered Bank Defendants knowingly transmitted at least $5,350,000 to Khanani and the Khanani MLO, $116,300 to Mustafa Ahmed al-Hisawi, at least $2,600,000 to Abdul Baqi Bari, and at least $5,000,000 to Fatima and Pakarab. *See* Table *supra* [p. 9-10]. Even this, however, is just the tip of the iceberg, as discovery is likely to reveal Standard Chartered Bank facilitated more than $100 million of al-Qaeda, Haqqani Network, and Lashkar-e-TaibaSyndicate-related terrorist finance, which funded attacks by those groups and their Syndicate allies, including the Taliban.

446.     The table below summarizes Plaintiffs' allegations concerning Standard Chartered Bank's direct financial aid to the Syndicate through a litany of long-term relationships with notorious Syndicate fronts, shell companies, operatives, agents, or business partners.

---

[523] Enrich, *Dark Towers*, at 360.

| Syndicate Operative, Front, Agent, or Partner | Timeframe | Terrorist Finance (USD) | SCB Defendants Aiding Syndicate Operative, Front, Agent, or Partner |
|---|---|---|---|
| Altaf Khanani and the Khanani Money Laundering Organization | 2009-2016 | $5,350,000 minimum (likely at least $100,000,000) | Standard Chartered Bank<br>SCB New York<br>SCB London<br>SCB Dubai<br>SCB Pakistan |
| Mustafa Ahmed al-Hisawi | 2000-2001 | $116,300 | Standard Chartered Bank<br>SCB Dubai<br>SCB London<br>SCB New York |
| Victor Bout | 1999-2008 | Likely at least $18,000,000 | Standard Chartered Bank<br>SCB Dubai<br>SCB New York |
| Abdul Baqi Bari | 2000-2006 | $2,600,000 minimum (likely at least $3,000,000) | Standard Chartered Bank<br>SCB Dubai<br>SCB London<br>SCB Pakistan<br>SCB New York |
| Hikmatullah Shadman | 2008-2013 | Likely at least $1,200,000 | Standard Chartered Bank<br>SCB Dubai<br>SCB Afghanistan<br>SCB New York |
| Fatima Fertilizer Co. & Pakarab Fertilizers Ltd. | 2008-2014 | $5,000,000 minimum (likely at least $10,000,000) | Standard Chartered Bank<br>SCB London<br>SCB Dubai<br>SCB Pakistan<br>SCB New York |
| TOTAL | | $13,066,300 minimum (likely more than $130,000,000) | |

663.447.    The Standard Chartered Bank Defendants maintained a general policy of knowingly or recklessly providing USD financial services to suspected fronts for terrorist groups, money laundering enterprises, and criminal syndicates, while refusing to cooperate with

most U.S. government terrorism-related requests if doing so would reduce Standard Chartered Bank's profits from a customer relationship.  That policy applied to each of the transactions between the U.S., Pakistan, and the U.A.E. pursued by Defendants.  Standard Chartered Bank's practice was to commit egregious violations of U.S. counter-terrorist finance laws, regulations, and norms if it thought it could avoid detection.  Plaintiffs refer to this practice as Standard Chartered Bank's "Laundromat Strategy" or "Laundromat."

664.1.  In 2012, NYDFS confirmed Standard Chartered Bank's Laundromat status when it publicly concluded that  "Standard Chartered Bank operated as a rogue institution" that "*left the U.S. financial system vulnerable to terrorists*" through its "programmatic[]" "misconduct" that lasted "nearly a decade" and "move[d] at least $250 billion through [SCB New York]."[524]

665.448.       Standard Chartered Bank operated its Laundromat for terrorist financiers to maximize the Bank's profits, including those of SCB New York, by winning as much business as possible in high-volume USD-denominated financial services "dirty money" markets.  Each Standard Chartered Bank Defendant knew these markets necessarily included vast amounts of terrorist finance flowing to al–Qaeda, the Haqqani Network, and their allies.  Standard Chartered Bank thus knowingly or recklessly enabled terrorist finance activity.  As one Standard Chartered Bank executive has explained, Standard Chartered Bank's philosophy in conflict zones can be summed up as: "We make money *because of* the risk."[525]

449.    In 2012, NYDFS confirmed Standard Chartered Bank's Laundromat status when it publicly concluded that "Standard Chartered Bank operated as a rogue institution" that "*left*

---

[524] 2012 Consent Order at 1, 2, 4 (emphasis added).

[525] Chris Cockerill, *Big Risk, Big Profit*, Euromoney (Sept. 1, 2000) (emphasis added), 2000 WLNR 10574765.

*the U.S. financial system vulnerable to terrorists*" through its "programmatic[]" "misconduct" that lasted "nearly a decade" and "move[d] at least $250 billion through [SCB New York]."[526]

666.    When Standard Chartered Bank directed its Laundromat towards Afghanistan, Pakistan, and the U.A.E. after 9/11, each Standard Chartered Bank Defendant knew, or was generally aware, that it would play a key operational role in al-Qaeda's and the Haqqani Network's transnational terrorist finance and logistics enterprises, which the SCB Defendants knew was oriented towards one objective above all:  detonating al-Qaeda-designed and -built CAN fertilizer bombs against Americans in Afghanistan.

667.    From 2001 through 2016, Standard Chartered Bank provided essential USD-related terrorist finance services to al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba and, through those groups, the Taliban.  Standard Chartered Bank's assistance to the Syndicate's terrorist enterprise was accomplished through both their facilitation of Fatima and Pakarab transactions and by the SCB Defendants' own independent facilitation of Syndicate bomb logistics and/or fundraising transactions.  In all instances, al-Qaeda's CAN fertilizer bomb campaign was the intended beneficiary of the transactions at issue, which facilitated bomb attacks against Americans in Afghanistan from 2008 through 2016, including Plaintiffs.

668.    With knowledge that they were helping anti-American terrorists, the Standard Chartered Bank Defendants relied upon SCB New York to:  (1) facilitate the Haqqani Network's CAN fertilizer bomb logistics by providing the U.S. Dollars that lubricated illicit Fatima and Pakarab transactions related to Fatima Group CAN Fertilizer, with al-Qaeda and Taliban (including Haqqani Network) fronts, operatives, or agents from 2009 through 2016; and (2) facilitate al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, and their Syndicate

[526] 2012 Consent Order at 1, 2, 4 (emphasis added).

allies' terrorist finance, by enabling the laundering of tens of millions USD in overseas al-Qaeda and Taliban (including Haqqani Network) income, and repatriation of this money back into al-Qaeda and Taliban (including Haqqani Network) accounts to fund the Syndicate's terrorist attacks against Americans in Afghanistan, including al-Qaeda's CAN fertilizer bombing campaign, from 2001 through 2016.  Simply put, while knowingly helping provide the terrorists their deadliest, most reliable, and most-used, explosive, Standard Chartered Bank also helped launder the Syndicate's funds to pay for attacks which used the materials Standard Chartered Bank helped them acquire.  Every Plaintiff in this case was killed or injured by Syndicate CAN fertilizer bombs, for which the Standard Chartered Bank Defendants were both a but-for and proximate cause.

669.    During only a few months in 2012, Standard Chartered Bank, including SCB New York, facilitated approximately $2 million in suspicious Pakistan-related transactions involving SCB Dubai, SCB Pakistan, or a third-party bank, which transactions, SCB New York, SCB Pakistan, and SCB Dubai knew would likely benefit the Syndicate's terrorist campaign targeting Americans in Afghanistan.  These transactions did, in fact, benefit the Syndicate by helping it source and pay for bomb components.

670.    This example above was not a "one-off" instance of Syndicate operatives slipping through the cracks of a bank's otherwise rigorous counter-terrorist finance practices.  Rather, they were symptoms of pervasive terrorist fundraising and terrorist finance tolerated by SCB Dubai, and facilitated by SCB London, SCB New York, and SCB Pakistan when the customer relationships were sufficiently lucrative.

671.    Given American regulators' findings concerning Standard Chartered Bank's systemic misconduct, Plaintiffs' allegations concerning Standard Chartered Bank's facilitation of

Syndicate finance and logistics are most likely the "tip of the iceberg," and discovery would identify additional relationships between Standard Chartered Bank, including each SCB Defendant, and other Syndicate financiers or logisticians from 2001 through 2016 in addition to those set forth herein.

672. From 2001 through 2016, the Standard Chartered Bank Defendants knowingly or recklessly: (1) pursued a general policy of providing financial services to customers in Afghanistan, Pakistan, and the U.A.E. who posed a high risk for terrorist logistics, fundraising, and/or finance in most instances; (2) enabled Syndicate CAN fertilizer bomb logistics flow through their facilitation of USD-denominated Fatima and Pakarab transactions relating to Fatima Group CAN Fertilizer; and (3) facilitated transactions involving known or suspected Syndicate fronts, operatives, and/or agents in Afghanistan, Pakistan, or the U.A.E. to facilitate Syndicate terrorist logistics, terrorist finance, or terrorist fundraising.

673.450. Although they used different verbiage, NYDFS and DOJ both concluded, in effect, that Standard Chartered Bank operated as a Laundromat that willingly serviced terrorist financiers. NYDFS concluded that Standard Chartered Bank was a "rogue institution" and U.S. Attorney Liu concluded that the SCB Defendants were "repeat corporate offenders."

674.451. Regardless of the nomenclature – "rogue institution," "repeat corporate offender[]," or Laundromat – a broad consensus of independent observers concludedis that Standard Chartered Bank's conduct was deliberate: (1) *Daily Mail*: "[SCB] showed an astonishing lack of scruples about who it did business with"; (2) Professor of Law and Economics Scholar;: "Standard Chartered was a massive money launderer," and "[l]ike fish, Standard Chartered rotted from the head"; (3) Global Financial Integrity (watchdog group): the "Standard Chartered allegations" were "emblematic of systemic money laundering" and

"demonstrate[d] a systemic, widespread pattern of disregard for anti-money laundering policies at one of the world's biggest banks"; (4) *Finanser*: "Standard Chartered's Money Laundering [was] Standard Bank Business"; (5) *DealBreaker*: "StanChart's time honored money-laundering tradition"; (6) *Sense on Cents*: "the Standard Chartered laundromat" "launder[ed] money for entities" "engaged in international terrorist activities," "the laundromat operated by Standard Chartered" "[constituted] years of racketeering" and made SCB an "institution that pretended to be a bank but was really running a laundromat" that aided terrorism as "a cost of doing business," and "the ongoing 'wash, rinse, repeat' cycle of money laundering activities at the laundromat heretofore known as Standard Chartered Bank" "indicate[d] that the Standard Chartered Laundromat has been open 24/7/365"; (7) *Reuters*: "a Moldovan 'Laundromat' probe into an alleged Russian-led money laundering scheme" began "after newspaper reports said that UK banks including" "Standard Chartered were named as being among those that did not turn away suspicious money transfers"[527]

---

[527] James Salmon, *Greed Was Not Good For UK banks; Britain's Masters of Disaster Have Been Forced to Hand Over Billions in Retribution*, Daily Mail (UK), (Jan. 8, 2013), 2013 WLNR 517581; Yves Smith, *Bill Black: How Dare DOJ Insult HSBC's Crooks as Less "Professional" than Liberty Reserve's Crooks?*, Naked Capitalism (Oct. 6, 2014), 2013 WLNR 13316090; Global Financial Integrity, Press Release, *Standard Chartered Allegations Emblematic of Systemic Money Laundering Orchestrated by International Banking Community* (Aug. 7, 2012); Chris Skinner, *Standard Chartered's Money Laundering is Standard Bank Business*, Finanser by Chris Skinner (Blog) (Aug. 7, 2012), 2012 WLNR 16599095; Bess Levin, *Standard Chartered CEO's Crack Down On Badly Behaving Bankers Has Reached Hashtag-Level Serious*, DealBreaker (June 13, 2016) (emphasis added), 2016 WLNR 18187600; Larry Doyle, *Standard Chartered Scandal: "Asian Regulators Had Lost Faith in American Regulators"*, Sense on Cents (Aug. 13, 2012), 2012 WLNR 17161569 (emphasis added); Larry Doyle, *LIBOR Scandal: NY AG Takes Center Stage*, Sense on Cents (Aug. 16, 2012), 2012 WLNR 17353304 (emphasis added); Larry Doyle, *HSBC Money Laundering Scandal: More Racketeering*, Sense on Cents (Dec. 11, 2012), 2012 WLNR 26330270 (emphasis added); Larry Doyle, *Standard Chartered Money Laundering: Wash, Rinse, Repeat*, Sense on Cents (Oct. 6, 2014), 2014 WLNR 22786177 (emphasis added); Reuters News, *UPDATE 2-UK To Investigate Any UK Banking Involvement In "Laundromat" Case* (Mar. 21, 2017) (emphasis added).

675.452.    Indeed, as the *Daily Mail* observed in 2012, allegations that U.K. banks

engaged in flagrant financial misconduct were plausible even at the time:

> A detailed review in the summer of 2011 by the Financial Services Authority
> found that around a ***third of banks appeared willing to accept very high levels of
> money laundering risk if the price was right***. … So it is not as though the idea
> London banks ***double up as laundromats is entirely without foundation***. … Peter
> Sands, Standard Chartered's chief executive, … argues his bank's dealings were
> an ***innocent matter of enabling Tehran cashew nut salesmen to sell their wares***
> to overseas clients … It all sounds very plausible, until you reflect that the banks
> have hair-splitting, side-tracking and ***bamboozling down to a fine art***.[528]

676.453.    In addition to NYDFS and DOJ, thirdThird party observers also concluded

that Standard Chartered Bank's operation as a "rogue institution" continued through at least

2016. Examples include when a former federal prosecutor explained that Standard Chartered

Bank was "[a]t the top of the heap" of "[g]lobal banks" that "[were] the poster children" for "the

importance of [] compliance"[529]; an analyst noted that "[i]t wasn't just the reputational hit of

having broken rules; it was the garishness of the details" which shocked even those who "[felt]

the US over-reache[d] in its penalties…, [] [SCB]'s conduct frequently appeared brazen"[530]; and

a third headline proclaimed that "[SCB] let a customer open a bank account using a suitcase

stuffed with … cash in a shocking money laundering breach."[531]

677.454.    From 2001 through 2016, Standard Chartered Bank regularly, and

knowingly or recklessly, facilitated al-Qaeda, Taliban, and Haqqani NetworkSyndicate terrorist

---

[528] Ruth Sunderland, *Spin Cycle*, Daily Mail (Aug. 11, 2012), 2012 WLNR 17042212 (emphasis added).

[529] Michael Volkov, *Standard Chartered Pays Over $1 Billion for Continuing Sanctions Violations (Part I of III)*, JD Supra (Blog) (Apr. 16, 2019), 2019 WLNR 11911799.

[530] Chris Wright, *Standard Chartered's $1 Billion Fine Draws Line Under Iran Breaches*, Euromoney (Apr. 10, 2019), 2019 WLNR 13256728.

[531] James Burton, *Standard Chartered Fined for Breaking Iran Sanctions After Letting a Customer Open an Account with Suitcase of Cash*, Daily Mail Online (UK) (Apr. 9, 2019).

finance and fundraising activities, indeed millions in USD activity through SCB accounts each year, that were operated by agents or operatives for al-Qaeda, the Haqqani Network, and Lashkar-e-TaibaLT, among other Syndicate members.

678.  From 2001 through 2016, Standard Chartered Bank was willfully blind to counter-terrorist finance standards when USD transactions involving any SCB Defendant was at issue.  At all times, the SCB Defendants knew that their policy would directly facilitate attacks that were committed by al-Qaeda, the Haqqani Network, and their Syndicate allies given the central roles that: (1) the U.S. Dollar played to the terrorist finance needs of al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and others; and (2) Afghanistan, Pakistan, the U.A.E., Russia, Cyprus, and Germany, among other locations, played a key role the Syndicate's fundraising and operational networks that supported attacks against Americans in Afghanistan. Defendants' policy of willful blindness towards *all* counter-terrorism risk was documented by the NYDFS in 2019.  This policy was a core component of Standard Chartered Bank's Laundromat Strategy, as SCB London deliberately designed a system to create "plausible deniability" for SCB London and SCB New York by offloading the terrorist finance risk to SCB's overseas outposts, like SCB Dubai, SCB Pakistan, and, before it was sold in September 2012, SCB Afghanistan.

679.455.  Keeping with its practice, Standard Chartered Bank also knowingly, or recklessly, facilitated terrorist finance activities by the Syndicate's known agents, operatives, and fronts.  SCB New York, SCB Dubai, and SCB Pakistan regularly processed transactions on behalf of fronts, operatives or agents of the Syndicate, including the Taliban and the Haqqani Network, which were ordinarily routed through SCB New York because the transactions were either USD-denominated or USD-backstopped under a currency pairing.

680.456.        The Standard Chartered Bank Defendants thus collectively enabled, from 2001 through 2016, more than $100 million in al-Qaeda, Haqqani Network, and other Syndicate allies' illicit transactions that directly or indirectly facilitated the logistics or financial efforts of its fronts, operatives, and/or agents. On information and belief, each Standard Chartered Bank Defendant individually directly facilitated millions of U.S. Dollars of Syndicate finance.

681.    Standard Chartered Bank's operations under the U.K.'s combined anti-money-laundering/counter-terrorist-finance scheme, which the U.K. government collectively describes as the U.K.'s "financial crime controls," were critical because SCB operated in the most important global hubs for financial crime, most of all, terrorist finance. As a result of SCB's geography and its focus on facilitating transactions in the gold standard currency for terrorists worldwide (the U.S. Dollar), Standard Chartered Bank knew that its operation as a Laundromat would be emulated by every SCB branch. When they did so, SCB New York, SCB London, SCB Dubai, SCB Pakistan, and SCB Afghanistan were all simply helping Standard Chartered Bank operate its Laundromat as "One Bank."

682.    One of the common threads tying all the Standard Chartered Bank Defendants' terrorist finance was their pursuit of a "One Bank approach" that emphasized a business model centered on the knowing or reckless facilitation of USD-related financial crimes in "emerging markets" often posing a high-risk for terrorist finance. It was not a coincidence that al-Qaeda and Taliban (including Haqqani Network) agents, operatives, and fronts turned to Standard Chartered Bank branches again and again, in country after country, to satisfy their USD-related terrorist finance needs. The Syndicate's repeat business was the foreseeable, inevitable result of Standard Chartered Bank's deliberate strategy to maximize profits by recklessly facilitating illicit

USD-denominated transactions in high terrorist finance risk jurisdictions like Afghanistan, Pakistan, and the U.A.E.

683.    In addition to specific customer-related red flags for each customer below, *infra*, each SCB Defendant also knew al-Qaeda- and Haqqani Network-specific terrorist finance risks attendant to their transaction activity.  Each SCB Defendant regularly participated in international conferences and symposia concerning anti-counter-terrorist finance, which routinely discussed the same risk criteria and were held for the purpose of sharing information between regulators and market participants, like Standard Chartered Bank. As part of their scheme to maintain their image as responsible corporate citizens, the SCB Defendants sometimes organized and hosted conferences and workshops concerning counter-terrorist finance.  For example, in September 2009 and September 2010, SCB Dubai hosted an annual "Thought Leadership MENA Bankers Conference" in Beirut, Lebanon, attended by more than 75 senior bankers from Pakistan, Morocco, Algeria, Egypt, Lebanon, Jordan, and Gulf countries.[532]

684.457.      Plaintiffs' allegations concerning Standard Chartered Bank's facilitation of al-Qaeda, Haqqani Network, and Lashkar-e-Taiba terrorist finance and logistics directly supporting Syndicate attacks in Afghanistan are most likely the "tip of the iceberg," and discovery would identify additional relationships between Standard Chartered Bank and other al-Qaeda, Haqqani Network, and Lashkar-e-Taiba terrorist agents, operatives, fronts, or partners from 2001 through 2016 in addition to those set forth herein.

---

[532] SCB, Press Release, *Standard Chartered to Hold Thought Leadership MENA Bankers Conference*, Islamic Finance News (Sept. 20, 2010), 2010 WLNR 18711281.

1.      ~~Altaf Khanani and the~~The **Khanani MLO**

~~685.~~458.       From 2008 through 2016, and probably since 2001, Standard Chartered Bank provided financial services to ~~Khanani, who used~~Khanani's companies ~~in the U.A.E.,~~, including Al Zarooni Exchange and Mazaka General Trading, to launder at least hundreds of millions annually for al‑Qaeda, the Haqqani Network, Lashkar-e-Taiba, and their Syndicate allies to pay for the Syndicate's terrorist campaign against Americans in Afghanistan.

~~686.~~459.       On information and belief, Khanani ~~used~~banked with Standard Chartered Bank, including SCB London, SCB New York, SCB Dubai, and SCB Pakistan, collectively, for most of the "30 years" in the terrorist finance "market" that Khanani described during a secretly recorded call.

~~687.      Each Standard Chartered Bank Defendant knew that Khanani was a Syndicate operative (through Khanani's relationship with D-Company) who also served as an agent for every constituent member of the Syndicate (for whom Khanani laundered much of their overseas income, including their narcotics income).  *Supra* Part V.F.~~

~~688.      Each Standard Chartered Bank Defendant knew that Khanani's reputation specifically, and inextricably, concerned terrorist finance and fundraising activities, including activities specifically on behalf of al-Qaeda, the Haqqani Network, and other members of the Syndicate.  *Infra* Part V.F.~~

~~689.~~460.       Khanani used accounts at SCB New York and SCB Dubai on behalf of Al Zarooni Exchange, a notorious Khanani-affiliated money changer based in Dubai, to conduct transactions on behalf of al‑Qaeda, the Haqqani Network, and their allies repatriating money back to accounts controlled by al‑Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

690.461.    On information and belief, Khanani also maintained one or more accounts at SCB London and SCB Pakistan, including but not limited to, one or more accounts on behalf of, or used to facilitate USD-denominated transactions by, Al Zarooni Exchange, enabling it to access U.S. Dollars through SCB New York via SCB London or SCB Pakistan.

691.462.    Khanani also maintained accounts at SCB New York and SCB Dubai on behalf of Mazaka General Trading, which was another notorious Khanani-affiliated laundering front in Dubai, to conduct transactions on behalf of al-Qaeda, the Haqqani Network, and their allies repatriating money back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan. On information and belief, SCB London and SCB Pakistan also maintained one or more accounts for Mazaka General Trading, and/or facilitated one or more USD-denominated transactions between Mazaka General Trading and SCB New York or SCB Dubai.

692.463.    Each Standard Chartered Bank Defendant's officers, employees, and agents understood that Standard Chartered Bank was helping Khanani regularly launder money between 2008 and 2016, and most likely going back to 2001. Data available to SCB London, SCB New York, SCB Dubai, and SCB Pakistan regularly revealed suspicious USD-denominated transactions involving Pakistan, Afghanistan, and/or the U.A.E. Due to the number, frequency, and volume of Khanani's transactions, his laundering activities, due toand the associated profits, Khanani would have been widely known throughout Standard Chartered Bank. Khanani's use of Standard Chartered Bank would also have been widely known throughout Standard Chartered Bank due to its "One Bank" policy.

693.464.    By 2008, the Standard Chartered Bank Defendants understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who

worked for al-Qaeda and the Taliban (including its Haqqani Network). This was based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regular reporting by major media outlets. *Infra* Part V.F. At all relevant times, the Standard Chartered Bank Defendants knew that because Khanani was an agent of al-Qaeda and the Haqqani Network, and was laundering their money, transactions associated with the Al Zarooni Exchange or Mazaka General Trading were likely related to Syndicate terrorist logistics or finance.

694.465.    Khanani was subject to one or more arrest warrants, "red notices," and/or similar indicia of law enforcement interest from the U.S., Pakistan, the U.A.E., Afghanistan, and/or Australia, between 2008 and 2015. This was known to the Standard Chartered Bank Defendants, so they knew or were generally aware that Khanani was a terrorist financier.

695.466.    For example, in 2012, a senior compliance employee at SCB Dubai ("SCB Dubai Employee 1") learned that SCB Dubai had been using SCB New York to carry out USD money-laundering transactions for the Khanani MLO. SCB Dubai Employee 1 further understood that Khanani was a suspected agent of terrorist organizations, such as al-Qaeda and the Haqqani Network because he/she uncovered Standard Chartered Bank's provision of financial services to Khanani during the course of a terrorism-related audit concerning suspected terrorist finance activity facilitated by SCB Dubai. By the spring 2013, SCB Dubai Employee 1 had determined that:

- SCB New York and SCB Dubai had been facilitating significant transactions with one or more known Khanani fronts;

- Khanani was a suspected terrorist money launderer who laundered overseas funds on behalf of anti-American terrorist groups;

- Revenues derived from SCB New York's and SCB Dubai's scheme contributed to funds used to support terrorist activities that killed and wounded American service members;

- SCB New York played an important role in the terrorist finance scheme, because some transactions were USD-denominated and/or used U.S. Dollars in currency-pairing, and that the transactions likely violated American law; and

- SCB Dubai's activity was part of a much broader practice of SCB New York and SCB Dubai facilitating high-terrorist-finance-risk USD-denominated transactions.

696.467.     SCB Dubai Employee 1 rightfully concluded that Standard Chartered Bank's relationship with Khanani risked terrorism because the SCB Defendants' provision of financial services to Khanani did, in fact, fund Syndicate terrorists in Afghanistan and Pakistan through 2016, and likely had been doing so since 2001. When it sanctioned him in 2015, the Treasury Department found that Khanani "laundered funds for designated terrorist organizations," was "involved in the movement of funds for the Taliban," and maintained "relationships with Lashkar-e-Tayyiba, Dawood Ibrahim, al-Qa'ida, and Jaish-e-Mohammed,"[533] each of whom is a also a member of the Syndicate.

697.468.     Even though each Standard Chartered Bank Defendant knew of SCB's role in facilitating Syndicate terrorist finance by providing financial services to Syndicate agents, operatives, and fronts such as Khanani by no later than 2008, and SCB Dubai had actual knowledge of the same when SCB Dubai Employee 1 uncovered SCB Dubai's role in fall 2012, SCB allowed Khanani to continue using SCB accounts, including those at SCB New York, to launder at least tens of millions of USD annually on behalf of al-Qaeda and the Haqqani Network until Khanani was arrested in 2015 At that time, SCB had facilitated Khanani's terror finance for approximately a decade.

---

[533] U.S. Department of the Treasury, Press Center, *Treasury Sanctions The Khanani Money Laundering Organization* (Nov. 12, 2015), https://www.treasury.gov/press-center/press-releases/Pages/jl0265.aspx.

698.469.      Rather than stop Khanani's money laundering, Standard Chartered Bank attempted to punish people who raised concerns about Standard Chartered Bank's reckless practices.  SCB Dubai, for example, retaliated against one or more persons who questioned the foreseeable terrorism risks raised by SCB Dubai's and SCB New York's practices.

699.470.      On information and belief, Khanani did not have any "legitimate" Standard Chartered Bank customers and/or accounts.

700.471.      From 2008, and most likely since 2001, and through 2016, Khanani and the Khanani MLO, actingacted as al-Qaeda's and the Haqqani Network's agent, regularly laundering the Syndicate's overseas income. To do this, Khanani used Standard Chartered Bank, SCB Dubai, SCB Pakistan, and SCB New York accounts to repatriate more than $1 million per month in laundered Syndicate U.S. Dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan, through USD-denominated transactions that originated in Europe, Russia, the Middle East, Hong Kong, Australia, and the U.S., but were ordinarily routed through SCB New York accounts held in the name of Al Zarooni Exchange, Mazaka General Trading, or other Khanani-related accounts.

701.    From 2008, and most likely since 2001, and through 2016, each Standard Chartered Bank Defendant knew that Standard Chartered Bank was facilitating money laundering by Khanani and the Khanani MLO that benefited, among others, al-Qaeda and the Taliban (including its Haqqani Network), but took no meaningful steps to interdict al-Qaeda and the Haqqani Network's recycling of overseas profits back into terrorist operations through SCB accounts, including at SCB London, SCB New York, SCB Dubai, and SCB Pakistan.

702.    Each Standard Chartered Bank Defendant knew that Khanani's account activity at the Defendants, including but not limited to, activity by Al Zarooni Exchange and Mazaka General Trading, manifested clear "red flags" of terrorist finance including, but not limited to: (1) substantial, regular USD-denominated cash transfers between and amongst Afghanistan, Pakistan, the U.S., and/or the U.A.E.; (2) direct or indirect affiliations with Khanani; (3) strong indicia of Taliban narcotics-related laundering activity, including the large volume of cash, and geographies, associated with Syndicate narcotics trafficking; (4) the use of obvious terrorist finance strategies, such as "mirror trading," which would have triggered red flags under ordinary Standard Chartered Bank diligence standards; and (5) an inability to explain the enormous volume of activity for any legitimate business purpose.

703.    Each Standard Chartered Bank Defendant knew there was no plausible explanation for the scope and scale of Khanani's financial activity and therefore knew that Khanani's entities were likely laundering money for terrorists.

704.472.    On information and belief, by 2013, each SCB Defendant knew that one or more current or former Standard Chartered Bank managers, employees, or agents had become a whistleblower and had raised concerns that, in sum and substance, SCB London, SCB New York, SCB Dubai, and/or SCB Pakistan had facilitated terrorist finance activity by Khanani, whom each SCB Defendant knew to be a notorious terrorist financier for al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and other anti-American terrorists. Among other things, each SCB Defendant knew, in sum and substance, that: (1) a whistleblower determined that Standard Chartered Bank "ha[d] blood on its hands" and that "based on SCB's own records[,] … there were many SCB transactions post-2008 on behalf of … Al Zarooni Exchange," which was a Khanani front used to repatriate overseas al-Qaeda and Taliban income back to accounts

controlled by al- Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan; and (2) another whistleblower concluded that Standard Chartered Bank's reckless banking practices "contributed to funds … ultimately used to support terrorist activities that killed and wounded [American] soldiers."

705.   Each Standard Chartered Bank Defendant also knew of the violent consequences of SCB's provision of banking services to agents, operatives, or fronts for al-Qaeda and the Haqqani Network on behalf of the Syndicate because Standard Chartered Bank was charged with, and admitted to, knowledge of United States laws that prohibited material support to, aiding and abetting of, and conspiracy with terrorist groups.  In September 2016, Standard Chartered Bank submitted responses to a questionnaire from the Wolfsberg Group and represented that SCB's anti-money laundering "policies and practices" were "being applied to all branches and subsidiaries of [SCB] both in the home country and in locations outside of that jurisdiction." Each SCB Defendant knew such rules and regulations in order to comply with them. Accordingly, the SCB Defendants, including SCB New York, should be charged with knowledge of U.S. banking rules and regulations in connection with each Defendants' involvement of SCB New York in any transactions.

706.   Standard Chartered Bank, including SCB New York, SCB London, SCB Dubai, and SCB Pakistan, also knew that highly suspicious cash activity involving hundreds of millions of U.S. Dollars (or equivalent value in other currency) flowed through banks in Haqqani Network-controlled geographies in Pakistan from 2009 through 2012, which each SCB Defendant knew strongly indicated that al-Qaeda and the Haqqani Network were using banks to illicitly transfer funds from al-Qaeda and/or Haqqani Network cells in Europe, the Former Soviet

Union, the Middle East, and Pakistan to fund al-Qaeda, Haqqani Network, and Taliban attacks against Americans in Afghanistan.[534]

707.    On information and belief, from 2009 through 2012, a substantial volume of the activity was routed through SCB Pakistan, and/or involved correspondent services provided by SCB New York, and SCB Pakistan, and SCB New York knew that the large, unexplained, cash transactions they regularly processed in and out of Pakistan accounts at branches in Haqqani-controlled and contested geographies in Pakistan were likely related to al-Qaeda and Haqqani Network finance.

708.    Each SCB Defendant knew that there was no other plausible explanation for this volume of financial activity other than illicit activity, which, the Haqqani Network monopolized in the geographies they controlled or contested to benefit themselves as well as al-Qaeda, the Taliban, and other Syndicate affiliates.  As Haqqani expert Gretchen Peters documented in 2012,

> Pakistani bankers and regulatory authorities have [] quietly begun to investigate large and unexplained cash deposits that are entering Pakistani banks and financial institutions and which likely relate to the enormous illicit trade in narcotics and other smuggled goods coming in and out of Afghanistan.  While not all of the money moving through the banks is related to the Haqqani network, several banking and regulatory officials in Pakistan described accounts in Miran Shah that were receiving routine and large cash deposits, most but not all of which derived from Saudi Arabia.  Five bank accounts in Mir Ali and 11 accounts in Miran Shah, which are believed to be connected to the network, had total transactions in the past four years that totaled more than $27 Billion Pakistani Rupees, or about $300 million.[535]

---

[534] At all relevant times, al-Qaeda and the Haqqani Network's cells and operations were routinely integrated into a single command structure (with al-Qaeda in charge).  Examples of al-Qaeda's and the Haqqani Network's fusion approach include, but are not limited to, in Pakistan (*e.g.*, their joint training camps and IED production factories), Afghanistan (*e.g.*, their joint cells in P2K), Dubai (*e.g.*, dual-hatted fundraisers and joint front companies), and Europe (*e.g.*, dual-hatted VAT fraudsters).

[535] Peters, *Haqqani Network Financing*, at 32.

On information and belief, many of these transactions (1) related to monies that Khanani repatriated to al-Qaeda and the Haqqani Network, including the sums Khanani owed other Syndicate fronts, operatives, or agents; and (2) were processed, directly or indirectly, by SCB London, SCB New York, SCB Dubai, and/or SCB Pakistan.

709. Regardless of whether Standard Chartered Bank knew that a particular customer was a known or suspected Haqqani Network operative, the Bank *also* knew that their transactions would foreseeably aid the Haqqani Network because the Bank processed transactions that bore the collective characteristics of Haqqani Network activity, regardless of the customer identity. In 2011, Gretchen Peters confirmed the existence of a massive Haqqani Network financial operation in Pakistan, Afghanistan, the U.A.E., and elsewhere based on far less information than that which was available to Standard Chartered Bank. Even from her limited data, it was clear to Ms. Peters in 2011 (as she memorialized one year later) that "[i]t [was] apparent that the [Haqqani] [N]etwork [was] taking the trouble to disguise the movement of large sums of cash in its area of operations, and this laundering activity suggest[ed] it [was] destined for the global financial system."[536] According to Ms. Peters, "[d]ata" regarding "the Haqqani [N]etwork's financial empire" and the banks who serviced it, was vital to "commanders and intelligence analysts" responsible for protecting the lives of Americans in future "engagements" in Afghanistan because they needed to "develop an understanding of the economic terrain—alongside the physical and human terrain—in the region where they are deployed[,]" *e.g.*., the Haqqani Network stronghold known as "P2K."[537]

---

[536] *Id.* at 13.

[537] Peters, *Haqqani Network Financing*, at 13-14.

710.   Khanani's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB London's, SCB Dubai's, SCB Pakistan's, and SCB New York's embrace of Standard Chartered Bank's Laundromat Strategy, and Khanani would not have been able to use SCB London, SCB New York, SCB Dubai, and SCB Pakistan accounts to support Syndicate operations if the Defendants had not facilitated SCB Dubai's practice of the Strategy.

711.   On information and belief, SCB Dubai only stopped providing financial services to Al Zarooni Exchange after the UAE's Central Bank revoked its license in 2016.

2.   Mustafa Ahmed al-Hisawi

712.   Hisawi served as al-Qaeda's paymaster and key financial planner.  *Supra* Part III.D.  Hisawi chose Standard Chartered Bank as his banking partner and relied upon his SCB Dubai account to distribute funds for 9/11 through SCB New York.  As the *Independent* put it, "Standard Chartered [was] used to finance [the] 11 September attacks."[538]

Hisawi's choice of Standard Chartered Bank is a telling indicator of the potency of the Bank's Laundromat.  As "[a]l Qaeda's Money Man," "[f]ew people kn[e]w more about the cash end of the business than al-Hawsawi."[539]  The fact that Hisawi surveyed the financial universe in Dubai—with its dozens of banking options—and choose **2.   VAT Fraud Cells**

713.1.  Standard Chartered Bank demonstrates al-Qaeda financiers' perception of the value offered by SCB's Laundromat.

714.1.  SCB Dubai knew of the terrorist finance-related "red flags" associated with Hisawi's transactions. While nothing the 9/11 hijackers did in their interactions with American

---

[538] Chris Hughes, *Standard Chartered 'Used to Finance 11 September Attacks'*, Independent (Dec. 14, 2001), 2001 WLNR 7397401.

[539] Newsweek, *Al Qaeda's Money Man* (Mar. 24, 2003), 2003 WLNR 10694399.

~~banks inside the United States would have led the banks to suspect criminal behavior, the same cannot be said for Hisawi's interactions with SCB Dubai.  As Hisawi helped plot 9/11, SCB Dubai recklessly provided banking services to him while disregarding multiple obvious "red flags" even under pre-9/11 standards.  *First*, SCB Dubai recklessly permitted Hisawi to open an account in the first instance while knowing that Hisawi had supplied a fictitious employer in his SCB Dubai account application, using a fake, non-existent company called Al Khata Alumi.  *Second*, SCB Dubai permitted Hisawi to use a pseudonym, Hashim Abdulrahman, instead of his real name.  *Third*, in the context of these red flags, SCB Dubai ignored the terrorist finance risk associated with round-figure USD transfers from the U.A.E. to the United States, when Hisawi initiated one or more transfers of totaling $16,500 to Ramzi Binalshibh before 9/11.~~

~~715.    Hisawi used his account at SCB Dubai to facilitate more than $100,000 in USD transfers from Hisawi to 9/11 hijackers, including Marwan al-Shehhi and Mohammad Atta, which transactions were routed through SCB New York.~~

~~716.~~473.        ~~After 9/11, al-Qaeda desperately needed to move its money and, once more, it relied on Hisawi's SCB Dubai account, which Hisawi used to receive about $16,300 of unused funds from the 9/11 hijackers, returned to him through SCB New York, to be shared with al-Qaeda leadership to help the group survive after 9/11.~~  intentionally aided the Azizi Cell's terrorist financing VAT fraud schemes.   Indeed, Plaintiffs' allegations against Deutsche Bank, *infra* § II.B.2, on their own, show Standard Chartered Bank's key aid al-Qaeda and the Haqqani Network through SCB's facilitation of the Syndicate's VAT fraud terrorist finance pipeline.

~~717.~~474.        On information and belief, ~~Hisawi used his~~from 2008 through 2015, Standard Chartered Bank ~~accounts to repatriate at least $100,000 back~~, through SCB New York, SCB Dubai, and SCB London, facilitated more than $10 million per year in value transfers from

the Azizi Cell to al-Qaeda and the Haqqani Network, including senior leadership from after 9/11 through his detention in 2003. elements in both organizations.

718.   Hisawi's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB New York's and SCB Dubai's embrace of Standard Chartered Bank's Laundromat Strategy, and Hisawi would not have been able to use Standard Chartered Bank accounts to support Syndicate operations if SCB London and SCB New York had not facilitated SCB Dubai's practice of the Strategy.

### 3.   Viktor Bout

719.   From the 1990s through his detention in 2008, Viktor Bout, was an internationally notorious terrorist financier, nicknamed the "Merchant of Death," and specifically known by reputation to be a long-standing agent for al-Qaeda and the Taliban.

720.1.   "Standard Chartered … had [a] relationship[] with a company controlled by notorious Russian arms dealer Victor Bout."[540]

721.   From the late 1990s through his capture in 2008, Bout was aided by the SCB Defendants' reckless commercial practices, including but not limited to, SCB Dubai's and SCB New York's provision of financial services to Bout and/or fronts that SCB Dubai and SCB New York knew were linked to Bout, including but not limited to SAGT.[541] These services aided Bout's ability to run guns, bombs, gold, cash, and drugs for al-Qaeda and the Taliban, which directly aided the terrorists' ability to regroup from 9/11 through 2008.

---

[540] Jason Nisse, *UK Banks Admit to Links with Russian Gun Runner*, Independent on Sunday (UK) (Oct. 5, 2003), 2003 WLNR 13909331.

[541] In November 2002, the U.A.E. government kicked Bout and his operation out of the Emirates. On information and belief, Bout and/or one or more front companies associated with Bout continued using one or more SCB accounts to support Bout's operations on behalf of al-Qaeda and/or the Taliban after Bout's exit from the U.A.E. until Bout was arrested in 2008.

475.    ~~Each~~Like Deutsche Bank, Standard Chartered ~~Bank Defendant knew that Bout's~~ ~~and/or Bout's front~~Bank's personnel worked closely with Azizi and members of the Azizi Cell to facilitate every aspect of the VAT fraud carousel and performed the same functions in the VAT fraud scheme as did their similarly-situated Deutsche Bank colleagues, and relied upon the same fraud tactic as did Deutsche Bank.

476.    Indeed, as memorialized by the Final Azizi Memo, Samir Azizi directly implicated Standard Chartered Bank his VAT fraud scheme when interviewed by law enforcement when he stated (as memorialized by law enforcement) that "Standard Chartered Bank 'made available' the company ~~account activities, including but not limited to SAGT~~ ~~activity, manifested clear "red flags" of terrorist finance~~Fairfax Partners Ltd.," which was one of the vital cogs that facilitated the entire value chain at issue.

477.    Standard Chartered Bank's illicit transactions with the Azizi Cell depended upon SCB New York to regularly supply the millions of U.S. Dollars necessary to, among other things, pay for the thousands of untraceable cell phones, which Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai all directly facilitated by virtue of the manner in which each participated in, enabled, and concealed, the Azizi Cell's VAT fraud.

478.    Through their involvement in the Azizi Cell's VAT fraud trades, Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai directly facilitated the transfer of millions of U.S. Dollars' worth of value in U.S. Dollars and ~~terrorist logistics including, but~~ ~~not limited to:  (1) substantial, regular USD-denominated cash transfers between~~illicit cell phones each year and ~~amongst~~directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists that operated throughout Afghanistan,~~ Pakistan,~~ from 2009 through 2015,

including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, as well as those that supported attacks committed by the Kabul Attack Network.

479.    On information and belief, from 2009 through 2015, Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai directly facilitated Azizi Cell VAT fraud trades that caused the transfer of at least $10 million in USD value from the United States, and/or the U.A.E.; ( to al-Qaeda and Haqqani Network terrorists in Afghanistan.  These SCB Defendants enabled this value transfer, among other ways, though their facilitation of the Azizi Cell's transactions supporting the VAT fraud, and transferring the funds and cell phones to Afghanistan, which directly funded and supplied joint cells of al-Qaeda and Haqqani Network terrorists throughout Afghanistan, including, but not limited to, the Joint Cells that committed attacks in the P2K and N2KL regions, and while acting as the Kabul Attack Network.

722.    2) potential Taliban and Haqqani Network-related parties and counterparties whom Standard Chartered Bank could not identify; (3) round lump sum transactions; and (4) highly irregular SAGT commercial and flight activity in the months after 9/11 consistent with supply efforts for al-Qaeda and the Taliban.  With respect to the latter, U.S. government intelligence reports—based upon publicly available data of the sort also available to Defendants, including but not limited to data relating to Bout and the travel activities of SAGT-related aircraft—caused the U.S. government to conclude that Bout (including SAGT) was likely providing arms to al-Qaeda and the Taliban before and after 9/11.  SCB Dubai knew similar public data concerning Bout (including SAGT) based on SCB Dubai's own diligence regarding Bout and/or SAGT.

723.    Standard Chartered Bank, including SCB Dubai and SCB New York, knew of, Bout's (including SAGT's) terrorist finance red flags after 9/11 due to the increased global attention devoted to aircraft flights, logistics, and terrorism after 9/11.

724.    Bout's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB's embrace of SCB's Laundromat Strategy, and Bout would not have been able to use SCB accounts to support Syndicate operations if SCB London and SCB New York had not facilitated SCB Dubai's practice of the Strategy.

725.    On information and belief, from the late 1990s through 2008, Standard Chartered Bank, SCB Dubai, and SCB New York collectively directly or indirectly facilitated activity by Bout that resulted in at least several million dollars per year in value transfer to the Syndicate, which the Syndicate used to fund and arm terrorists targeting Americans in Afghanistan.

### 4.    Abdul Baqi Bari

726.    Abdul Baqi Bari was a dual-hatted al-Qaeda/Haqqani Network terrorist who, among other roles, served as the "right hand" of Jalaluddin Haqqani.  *Supra* Part III.G.  He was also a Standard Chartered Bank customer for years.

727.1.   Bari maintained accounts at Standard Chartered Bank for specific purpose of funding Haqqani Network operations, including Jalaluddin's leadership activities.  Jalaluddin was also the beneficiary of accounts maintained by Bari at SCB Pakistan after 9/11 through at least 2006.

728.1.   On February 27, 2006, Pakistan's FIA froze one or more SCB Pakistan USD-related accounts controlled by Bari (or an entity he controlled) as part of an attempt to interdict Haqqani Network efforts to use Pakistani banks to transfer overseas funds from accounts in Dubai and elsewhere into terrorist accounts in Pakistan to use against Americans.

729.1.  Bari's frozen Standard Chartered Bank accounts included, but were not limited to, accounts at SCB Pakistan's branch in Peshawar, a notorious Syndicate stronghold.  The accounts were in Bari's name and/or companies traced to Bari's name and contained at least several hundred thousand USD that Bari used to fund Jalaluddin Haqqani's terrorist enterprise.  The FIA account freezes related to several million dollars in total account activity including more than $2 million in USD-related transfers to Syndicate operatives enabled by SCB Pakistan and SCB New York.

730.    When the Treasury Department imposed sanctions on Bari on May 17, 2012, *supra* Part III.G, Bari-controlled accounts at Standard Chartered Bank, including on information and belief SCB Pakistan, SCB London, SCB Dubai, and SCB New York, were among the "bank accounts" referenced by the Treasury Department.

731.    Bari's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB London's, SCB New York's, SCB Dubai's, and SCB Pakistan's embrace of Standard Chartered Bank's Laundromat Strategy.  Bari would not have been able to use SCB accounts to support Syndicate operations if SCB London had not facilitated SCB New York's, SCB Dubai's and SCB Pakistan's practice of the Strategy.

732.    Each Standard Chartered Bank Defendant knew that Bari's account activity at the Bank manifested clear "red flags" of terrorist finance including, but not limited to:  (1) substantial, regular USD-denominated cash transfers between and amongst Afghanistan, Pakistan, the United States, and/or the U.A.E.; (2) Taliban- and Haqqani Network-related parties as well as counterparties whom Standard Chartered Bank could not identify; (3) round lump sum transactions; and (4) demonstrable links between Standard Chartered Bank's customer and known Taliban- and Haqqani Network operatives, including Mullah Omar.

733.     From after 9/11 through at least February 2006, Bari used Standard Chartered Bank, including SCB London, SCB Dubai, and/or SCB Pakistan accounts, to access U.S. Dollars through SCB New York to transfer at least several million USD to operatives from al-Qaeda and the Taliban, including its Haqqani Network, in Pakistan and Afghanistan to support Syndicate terrorist attacks against Americans.

### 5. Hikmatullah Shadman

734.480.     From the 2000s through at least 2013, Hikmatullah Shadman was a notorious Haqqani Network-aligned warlord in Afghanistan who had a specific reputation, known to the SCB Defendants, of providing financial and logistical support to the Haqqani Network. *Supra Infra* Part III.H.  While Shadman funded the Taliban (including Haqqani Network), whose attacks he was known for supporting, Standard Chartered Bank provided him the bundles of U.S. DollarsUSD he passed along to the terrorists.

735.481.     From 2008 through November 2012, Shadman used SCB New York, SCB Afghanistan, and SCB Pakistan accounts in furtherance of his criminal enterprise in Afghanistan and related Syndicate finance activities.

736.482.     Shadman used SCB New York accounts to facilitate at least several hundred thousand USD, annually, in cash payments to the Taliban, including its Haqqani Network.

737.483.     After the U.S. government determined that Shadman had aided the Syndicate, *supra* Part III.H, it instituted proceedings against Shadman's account on November 20, 2012. One of the motivations that compelled the U.S. government to seize Shadman's correspondent bank accounts at SCB New York, through AIB (which acquired SCB Afghanistan earlier in 2012), was its finding that Shadman aided Haqqani Network attacks.

738.484.      The U.S. government initiated the asset seizure against Shadman for more than $10,100,000 at a correspondent USD account at SCB New York maintained in connection with a Shadman-related USD account at AIB. Shadman's AIB account had been at SCB Afghanistan from 2009 through September 2012, when AIB acquired SCB Afghanistan and its Shadman customer relationship. Shadman's SCB New York's accounts included, but were not limited to, account numbers 050210000527810, 050210001288613, and 05021020014251115.

739.485.      Seven years later, the matter settled with the U.S. government imposing a fine and retaining a substantial amount of the money.[542]

740.   Shadman's use of SCB New York accounts to support Syndicate operations was a foreseeable consequence of SCB Dubai's and SCB Afghanistan's embrace of SCB's Laundromat Strategy.  Shadman would not have been able to use Standard Chartered Bank accounts to support Syndicate operations if SCB London and SCB New York had not facilitated SCB Dubai's and SCB Afghanistan's practice of the Strategy.

741.   Each Standard Chartered Bank Defendant knew that Shadman's account activity at Standard Chartered Bank manifested clear "red flags" of terrorist finance including, but not limited to:  (1) substantial, regular, and highly suspicious USD-denominated cash transfers between and amongst Afghanistan, Pakistan, the United States, and/or the U.A.E.; (2) Taliban- and Haqqani Network-related parties and counterparties whom Standard Chartered Bank could not identify; and (3) Shadman's status as a Politically Exposed Person, which mandated Enhanced Due Diligence under normal Standard Chartered Bank policy, through which Standard Chartered Bank could not "clear" Shadman.

---

[542] *See* Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah (Feb. 22, 2019).

742.486.	From 2009 through at least 2012, Shadman used SCB New York accounts to facilitate regular bulk cash USD payments, denominated in $100 bills, as "taxes" paid to the Taliban and Haqqani Network, with each such regular payment totaling tens thousands of dollars per payment. On information and belief, Shadman used SCB New York accounts to facilitate the transfer hundreds of thousands of U.S. Dollars per year to the Taliban (including its Haqqani Network), and, collectively, at least several million U.S. Dollars to the Taliban and Haqqani Network from 2008 through 2012.

743.487.	From 2008 through at least 2012, Shadman used Standard Chartered Bank accounts, including accounts at SCB New York, to facilitate USD-denominated laundering activities in support of Syndicate suicide bombings. Among other things, Shadman used Standard Chartered Bank accounts to process at least several hundred thousand dollars of funding for the Syndicate's suicide bombing network targeting Americans in Afghanistan.

### 3.	Iran's Terrorist Sponsors – NIOC and NITC

488.	The SCB Defendants knew that NIOC and NITC served as a front for Iranian terrorism through the IRGC's Hezbollah Division and Qods Force. Among other reasons, SCB Dubai personnel have admitted it, SCB Dubai whistleblowers have confirmed it, and the Department of Justice has prosecuted SCB because of it.

489.	On information and belief, from 2006 through 2016, Standard Chartered Bank, SCB Dubai, and SCB New York caused tens of millions in U.S. Dollars each year to flow through illicit transactions with NIOC and NITC, into Hezbollah and Qods Force accounts, which funded al-Qaeda's and the Taliban's terrorist campaign against Americans in Afghanistan from 2006 through 2016.

490.    The Department of Justice confirmed the plausibility of Plaintiffs' allegations against Standard Chartered Bank when it prosecuted SCB, yet again, for the same SCB Dubai-related transactions identified by Plaintiffs.

### 4.    Mustafa Ahmed al-Hisawi

491.    Hisawi served as al-Qaeda's paymaster and key financial planner. Hisawi chose Standard Chartered Bank as his banking partner and relied upon his SCB Dubai account to distribute funds for 9/11 through SCB New York. As the *Independent* put it, "Standard Chartered [was] used to finance [the] 11 September attacks."[543]

492.    Hisawi's choice of Standard Chartered Bank is a telling indicator of the potency of the bank's Laundromat. As "[a]ll Qaeda's Money Man," "[f]ew people kn[e]w more about the cash end of the business than al-Hawsawi."[544] The fact that Hisawi surveyed the financial universe in Dubai – with its dozens of banking options – and choose Standard Chartered Bank demonstrates al-Qaeda financiers' perception of the value offered by SCB's Laundromat.

493.    SCB Dubai knew of the terrorist finance-related "red flags" associated with Hisawi's transactions. While nothing the 9/11 hijackers did in their interactions with American banks inside the United States would have led the banks to suspect criminal behavior, the same cannot be said for Hisawi's interactions with SCB Dubai. As Hisawi helped plot 9/11, SCB Dubai recklessly provided banking services to him while disregarding multiple obvious "red flags" even under pre-9/11 standards. *First*, SCB Dubai recklessly permitted Hisawi to open an account in the first instance while knowing that Hisawi had supplied a fictitious employer in his SCB Dubai account application, using a fake, non-existent company called Al Khata Alumi.

---

[543] Chris Hughes, *Standard Chartered 'Used to Finance 11 September Attacks'*, Independent (Dec. 14, 2001), 2001 WLNR 7397401.

[544] Newsweek, *Al Qaeda's Money Man* (Mar. 24, 2003), 2003 WLNR 10694399.

*Second*, SCB Dubai permitted Hisawi to use a pseudonym, Hashim Abdulrahman, instead of his real name. *Third*, in the context of these red flags, SCB Dubai ignored the terrorist finance risk associated with round-figure USD transfers from the U.A.E. to the United States, when Hisawi initiated one or more transfers of totaling $16,500 to Ramzi Binalshibh before 9/11.

494.   Hisawi used his account at SCB Dubai to facilitate more than $100,000 in USD transfers from Hisawi to 9/11 hijackers, including Marwan al-Shehhi and Mohammad Atta, which transactions were routed through SCB New York.

495.   After 9/11, al-Qaeda desperately needed to move its money and, once more, it relied on Hisawi's SCB Dubai account, which Hisawi used to receive about $16,300 of unused funds from the 9/11 hijackers, returned to him through SCB New York, to be shared with al-Qaeda leadership to help the group survive after 9/11.

496.   On information and belief, Hisawi used his Standard Chartered Bank accounts to repatriate at least $100,000 back to al-Qaeda leadership from after 9/11 through his detention in 2003.

497.   Hisawi's use of Standard Chartered Bank accounts to support Syndicate operations was a foreseeable consequence of SCB New York's and SCB Dubai's embrace of Standard Chartered Bank's Laundromat Strategy, and Hisawi would not have been able to use Standard Chartered Bank accounts to support Syndicate operations if SCB London and SCB New York had not facilitated SCB Dubai's practice of the Strategy.

### 5.      Viktor Bout

498.    "Standard Chartered … had [a] relationship[] with a company controlled by notorious Russian arms dealer Victor Bout."[545]

499.    From the late 1990s through his capture in 2008, Bout was aided by the SCB Defendants' reckless commercial practices, including but not limited to, SCB Dubai's and SCB New York's provision of financial services to Bout and/or fronts that SCB Dubai and SCB New York knew were linked to Bout, including but not limited to SAGT.[546] These services aided Bout's ability to run guns, bombs, gold, cash, and drugs for al-Qaeda and the Taliban, which directly aided the terrorists' ability to regroup from 9/11 through 2008.

### 6.      Abdul Baqi Bari

500.    Abdul Baqi Bari was a dual-hatted al-Qaeda/Haqqani Network terrorist who, among other roles, served as the "right hand" of Jalaluddin Haqqani. He was also a Standard Chartered Bank customer for years.

501.    Bari maintained accounts at Standard Chartered Bank for the specific purpose of funding Haqqani Network operations, including Jalaluddin's leadership activities. Jalaluddin was also the beneficiary of accounts maintained by Bari at SCB Pakistan after 9/11 through at least 2006.

502.    On February 27, 2006, Pakistan's FIA froze one or more SCB Pakistan USD-related accounts controlled by Bari (or an entity he controlled) as part of an attempt to interdict

---

[545] Jason Nisse, *UK Banks Admit to Links with Russian Gun Runner*, Independent on Sunday (UK) (Oct. 5, 2003), 2003 WLNR 13909331.

[546] In November 2002, the U.A.E. government kicked Bout and his operation out of the Emirates. On information and belief, Bout and/or one or more front companies associated with Bout continued using one or more SCB accounts to support Bout's operations on behalf of al--Qaeda and/or the Taliban after Bout's exit from the U.A.E. until Bout was arrested in 2008.

Haqqani Network efforts to use Pakistani banks to transfer overseas funds from accounts in Dubai and elsewhere into terrorist accounts in Pakistan to use against Americans.

503.   Bari's frozen Standard Chartered Bank accounts included, but were not limited to, accounts at SCB Pakistan's branch in Peshawar, a notorious Syndicate stronghold. The accounts were in Bari's name and/or companies traced to Bari's name and contained at least several hundred thousand USD that Bari used to fund Jalaluddin Haqqani's terrorist enterprise. The FIA account freezes related to several million dollars in total account activity including more than $2 million in USD-related transfers to Syndicate operatives enabled by SCB Pakistan and SCB New York.

504.   When the Treasury Department imposed sanctions on Bari on May 17, 2012, Bari-controlled accounts at Standard Chartered Bank, including on information and belief SCB Pakistan, SCB London, SCB Dubai, and SCB New York, were among the "bank accounts" referenced by the Treasury Department.

**C.      Standard Chartered Bank Enabled Syndicate CAN Fertilizer Bomb Logistics**

744.1.   In addition to its ~~systemic~~role in terrorist finance, Standard Chartered Bank also knowingly assumed an operational role in the al ~~Qaeda's CAN fertilizer bomb campaign, including its~~ Haqqani Network's related logistics pipeline.

~~745.1.   Each Standard Chartered Bank Defendant facilitated Fatima's and Pakarab's USD-denominated commercial sales, operations, and financing, and thereby enabled Fatima's and Pakarab's unlimited supply of Fatima Group CAN Fertilizer to the Haqqani Network.~~

746.    Fatima has publicly identified "Standard Chartered Bank" as one of the "**MAJOR BANKERS OF THE COMPANY**,"[547] and Fatima and Pakarab ordinarily follow the same practices, *supra* Part II.D.2.  Each SCB Defendant, by providing financial services to Fatima and Pakarab while knowing that Fatima and Pakarab were supplying the Haqqani Network Fatima Group CAN Fertilizer—which was used to cause ninety percent (90%) of all American casualties in Afghanistan, *supra* Part II.D.1—each Defendant assumed a role in al-Qaeda's CAN fertilizer bomb campaign and the Haqqani Network's. Some background about that campaign is in order. But to avoid burying the lede, Standard Chartered Bank knowingly provided foreign exchange and export finance services to two Pakistani fertilizer companies that produced the overwhelming majority of CAN fertilizer bomb pipeline.

747.    Standard Chartered Bank's financial services to Fatima and Pakarab directly supported Fatima's and/or Pakarab's use of SCB New York's USD-denominated foreign exchange, correspondent account, and letter-of-credit services in connection with the sale of Fatima Group CAN Fertilizer.  This is because: (1) Fatima and Pakarab regularly engaged in cross-border transactions in which the use of USD accounts at SCB New York was involved, directly or indirectly, in enabling the transaction to occur; and (2) Fatima and Pakarab ordinarily priced their goods in U.S. Dollars, and, as a consequence, needed a robust USD facility with SCB New York to hedge their credit risk and enable the smooth operation—and regular supply to the Syndicate—of Fatima Group CAN Fertilizer manufacturing and sales.

748.505.    Each Defendant regularly processed suspicious transactions involving Fatima and/or Pakarab, and other customers in Pakistan, Afghanistan, and the U.A.E., while

---

[547] Fatima Fertilizer Company Ltd., *Prospectus* at 67 (Jan. 18, 2010) (emphasis in original).  Fatima and Pakarab generally follow the same practices.  *Supra* Part II(D)(2).

knowing of "red flags" indicating a high risk of Syndicate terrorist bomb logistics activity, including, but not limited to instances when the transaction:  (1) related to known bomb components, CANused in Syndicate bombs. It did so despite years of press coverage and government statements linking that fertilizer, and other weapons; (2) contained obscured, incomplete, incredible, or anonymous party information; and (3) involved the transfer of money between one or more legs of to bombs and noting that the companies were not taking action to stop it. Indeed, Standard Chartered did so even after Lieutenant General Mike Barbero, the head of the Department of Defense's Joint IED Defeat Unit ("JIEDDO"), personally visited Standard Chartered's New York office in January 2013 and told the bank that its clients were facilitating the killing and maiming of American troops. LTG Barbero subsequently declared that Standard Chartered was "utterly useless" in taking action to disrupt the supply chain.[548] Instead, the bank continued to reap profits from these Syndicate-aligned fertilizer companies, and in the process supported the Syndicate's hubs in Pakistan, Afghanistan, and the U.A.E. (in any direction involving any combination of the three), involved a large volume of cash, and/or was otherwise suspicious based on amount, pattern, timing, or history. bombmaking enterprise.

749.   At all relevant times, CAN fertilizer was well-known as a component that terrorists used to make massive bombs.  For example, domestic terrorist Timothy McVeigh—to build a massive truck bomb, which he used to attack the Alfred P. Murrah Federal Building in Oklahoma City on April 19, 1995, killing 168 Americans in the deadliest terrorist attack on U.S. soil prior to 9/11.

---

[548] Adam Luck, *US General Claims He Told Standard Chartered Its Client Helped the Taliban—But the Bank Did Nothing*, Daily Mail.com (Dec. 7, 2019), https://www.dailymail.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

750.    In the fifteen years after Oklahoma City, a broad international consensus emerged that recognized the need for strict safeguards and controls in connection with any manufacture, sale, or distribution of CAN fertilizer given CAN's inherent danger of being converted into terrorist bombs.  As the *AP* reported in 1998, because "[a] practical means of removing the explosive potential from [CAN fertilizer] … has not been found," it was important to "toughen controls on the sale and distribution of … [CAN fertilizer]," including requiring "[p]eople buying [CAN] fertilizers in bulk … to produce identification" and "keep[ing] sales records."[549]

751.    In recognition of the significant risk that terrorists could repurpose CAN fertilizer into CAN fertilizer bombs, governments around the world ordinarily heavily regulate—and sometimes flatly prohibit—the sale of CAN fertilizer.  After Oklahoma City, for example, the U.S. government instituted an array of regulations designed to prevent terrorist production of fertilizer-based bombs.  Then, after 9/11, Congress authorized the Department of Homeland Security to oversee the sale and transfer of high-risk fertilizers.

752.    At all relevant times, there was "a worldwide effort to ban the use of pure [CAN] in fertilizer" that some companies, like Fatima and Pakarab, ignored even though "the Department of Defense encourage[d] foreign governments to police their fertilizer products after [CAN from Pakistan's Fatima Group [was] found in [IEDs] in Iraq."[550]

753.506.    ByIn 2008, the Syndicate began dramatically increasing its emphasis on the use of ammonium nitrate bombs derived from CAN fertilizer, often called "CAN fertilizer

---

[549] Paul Recer, *Tough Regulations Best Protection From Illegal Bombs, Report Says*, AP Online (Mar. 5, 1998).

[550] Gregg P. Macey, *The Slow-Moving Aftermath*, PrawfsBlawg (Blog) (July 19, 2013), 2013 WLNR 17668282.

bombs," which is a long-standing signature al-Qaeda bomb design.[551] Indeed, by 2007, it was widely recognized around the world that CAN was regularly "used to kill, to mass murder" and was "one of the weapons of choice for Al Qaida."[552] While associated with suicide truck bombs, al-Qaeda also used CAN fertilizer to make large anti-armor IEDs, small anti-personnel IEDs, suicide vests, and all other manners of suicide VBIEDs.

507.    This shift to the use of fertilizer bombs transformed the conflict. When "American military fatalities in Afghanistan doubled in 2009" "perhaps the strongest force driving the Taliban's ability to inflict mounting casualties" "[was] its use of crude but powerful roadside bombs" "made of [CAN] -- fertilizer bombs, in essence, but of a size unseen before 2009, and now commonly ranging up to 1,000 pounds, big enough to flip a heavy armored vehicle like a toy."[553] "[T]hese" CAN fertilizer bombs "proved to be 'the surface-to-air missile of this war,' as a senior intelligence official" explained, "a rueful reference to the weapon that helped" the "mujahedin" "drive the Soviet military out of Afghanistan in 1989."[554]

508.    It would have been apparent to anybody looking that the CAN fertilizer bombs being deployed by Syndicate terrorists in Afghanistan were made of fertilizer being obtained from Pakistan, and specifically from two related companies: Fatima Fertilizer Company Limited, and Pakarab Fertilizers Limited. This was so for two reasons. First, these companies had a

---

[551] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, PA News (Apr. 30, 2007).

[552] Rep. Bennie Thompson, *quoted in* CQ-RollCall Political Transcriptions, *Rep. Bennie Thompson Holds a Markup of H.R. 1680, the Secure Handling of Ammonium Nitrate Act of 2007* (Apr. 18, 2007), 2007 WLNR 30462827.

[553] Laura King, *War Toll Likely to Get Even Worse; U.S. Troop Fatalities in Afghanistan Doubled to 318 Last Year. The Taliban's Bomb Tactics were a Big Factor*, L.A. Times (Jan. 1, 2010), 2010 WLNR 32019.  CAN is sometimes referred to simply as "ammonium nitrate" and Plaintiffs refer to ammonium nitrate as "CAN" for efficiency's sake.

[554] *Id.*

monopoly or near-monopoly on the production of CAN fertilizer in Pakistan—and much of the CAN fertilizer flowing into Afghanistan was coming from Pakistan. Second, Coalition forces were frequently seizing large stashes of CAN fertilizer, often in the original packaging bearing Fatima or Pakarab's name, from terrorists.[555]

509.    CAN fertilizer bombs derived from Fatima and Pakarab CAN fertilizer were the Syndicate's single most effective weapon for killing and maiming Americans in Afghanistan and countering the most advanced American armored vehicles. JIEDDO concluded that "[a] 110-pound bag of [CAN], a common fertilizer produced in Pakistan," exclusively made and sold by Fatima and Pakarab, "can produce 82 pounds of explosives, enough to destroy an armored truck or 10 smaller bombs targeting troops on foot."[556] As one analyst observed:

> None of the existing technology, to the chagrin of U.S. commanders, has been able to crack the toughest nut of the war on IEDs: bombs made of [CAN] fertilizer. Lacking enough metal content to make them detectable by traditional sensors, these explosives have been the bane of U.S. forces. Soldiers have dubbed these large bombs 'Buffalo killers' because they can destroy a heavily armored Buffalo mine-protected truck [also known as an "MRAP"].[557]

754.   That explosive capability meant that by 2009, "*[a]mmonium nitrate fertilizer bombs* [had] become the deadliest weapons used by" Syndicate terrorists to attack Americans.[558] By 2011, "[t]he use of roadside bombs in Afghanistan" "ha[d] reached record highs, with US

---

[555] Associated Press, *NATO: Huge Cache of Bomb Material Seized* (Nov. 10, 2009), https://www.nbcnews.com/id/wbna33820786; Asian News International, *US Look to Crackdown Source of Pakistani Fertilizer CAN Explosive* (Jan. 11, 2012), 2012 WLNR 665399.

[556] Tom Vanden Brook, *Drones Fight IEDs in Afghanistan*, USA Today (July 15, 2012).

[557] Sandra I. Erwin, *Buried Bombs Can Be Destroyed, But Not Defeated*, National Defense, Volume 96; Issue 698 (Jan. 2012), 2012 WLNR 30107637.

[558] UPI NewsTrack, *Huge Bomb-Making Operation Found* (Nov. 11, 2009).

forces struggling to cut off the flow of Pakistani fertilizer used to build them."[559] As JIEDDO explained, "[d]uring the last 12 months, an unending supply of [CAN], originating almost exclusively from Pakistan, has been used to produce IEDs in Afghanistan despite a countrywide ban" on importing CAN fertilizer.[560] On December 27, 2007, the 2008 Consolidated Appropriations Act, Public Law 110-161, was signed into law; Section 563 enacted the Secure Handling of Ammonium Nitrate Act (as an amendment) to require the Department of Homeland Security ("DHS") to "regulate the sale and transfer of ammonium nitrate by an ammonium nitrate facility … [and] to prevent the misappropriation or use of ammonium nitrate in an act of terrorism," which DHS has done ever since. In so doing, the U.S. government statutorily recognized the close, direct, and foreseeable risk that the unregulated "sale and transfer" of "ammonium nitrate" could cause "an act of terrorism" directed against Americans.[561] Additionally, the act signaled the U.S. government's consensus view that CAN fertilizer sales inherently risk terrorist diversion if the "ammonium nitrate facility" does not "record the sale and transfer of possession of ammonium nitrate" and is not subject to strong "oversight of the ammonium nitrate transactions to ensure that this product *stays out of the hands of terrorists*."[562] On information and belief, Defendants knew of these changes through media monitoring efforts.

---

[559] Mathieu Rabechault, *In Afghanistan, More and More Roadside Bombs*, Agence France Presse English Wire (Aug. 7, 2011).

[560] *Id.*

[561] Section 563 of the 2008 Consolidated Appropriations Act, Public Law 110-161.

[562] Paul Recer, *Tough Regulations Best Protection From Illegal Bombs, Report Says*, AP Online (Mar. 5, 1998) (emphasis added).

510.    ~~In~~As *UPI* reported the views of JIEDDO, "***Afghan insurgents rel[ied] on fertilizer bombs***," with Fatima and Pakarab CAN fertilizer being "***the low-cost choice for [IED] makers in Afghanistan***."[563]

~~755.~~511.        The problem grew so bad that in November 2009, the Afghan Government, along with Coalition forces, adopted a new policy towards CAN fertilizer. Under this policy, American service members, Afghan police and military, and other Coalition members, were entitled to presume that all CAN fertilizer was potentially aiding and abetting al-Qaeda's CAN fertilizer bomb campaign in Afghanistan, and to seize ***all*** CAN fertilizer – regardless of the owner's identity or explanation for possessing the product. Simply put, the U.S. military concluded that CAN fertilizer in the region posed an inherent risk to American lives given the probability of its use by al-Qaeda, the Haqqani Network, and their allies. After the announcement, the U.S. government publicly and privately communicated its new "zero tolerance" CAN fertilizer policy to participants in the Afghanistan and Pakistan marketplace. Among other techniques, U.S. government officials helped raise awareness of the new policy through a series of interviews in international news outlets, like the *New York Times*~~, that Defendants closely monitored.~~. For example, on November 12, 2009, the *Times*' award-winning war correspondent, Dexter Filkins, reported that the new policy was "aimed at taking the fertilizer out of the hands of Taliban insurgents," and permitted NATO forces to seize fertilizer "regardless" of the specific on-paper connection between the owner and insurgents.[564]

---

[563] UPI NewsTrack, *Afghan Insurgents Rely on Fertlizer Bombs* (Nov. 26, 2011) (emphasis added).

[564] Dexter Filkins, *Afghan Bomb Cache Found; Huge Stash of Fertilizer had Potential to Create Thousands of Explosives*, N.Y. Times (Nov. 12, 2009), 2009 WLNR 22615622.

756.512.　　In January 2010, Afghan President Hamid Karzai banned possession, production, and importation of CAN fertilizer in Afghanistan because of its demonstrated, and critical, role in the production of IEDs and suicide bombs used to perpetrate attacks in Afghanistan by al-Qaeda and its Taliban ally.

757.　On information and belief, each Defendant knew the U.S. and Afghanistan governments' viewpoints, communicated no later than November 2009 and January 2010, respectively, that CAN fertilizer sales in the Afghanistan/Pakistan theater carried such a high risk of use in al-Qaeda CAN fertilizer bombs as to be inherently dangerous and worthy of prohibition.

758.　In September 2010, the European Union ("E.U.") announced its intent to "crack down on terrorists" by "limit[ing] access to chemicals which can be used to develop home-made bombs, … [including CAN] fertilizer," which had "featured in a string of terrorist plots."[565] As later adopted, the EU's regulation "ban[ned] members of the general public from acquiring, possessing or using high concentrations" of CAN fertilizer and was "a measure meant to curb terrorism."[566] On information and belief, Defendants knew of the E.U.'s perspective on CAN fertilizer based on their own media monitoring and market analysis efforts.

513.　In December 2011, a high-profile bipartisan Congressional effort pressured Notwithstanding these actions, CAN fertilizer was continuously purchased in Pakistan and smuggled across the border into Afghanistan, where it was used to make homemade bombs.

---

[565] Deutsche Presse-Agentur, *Brussels Looks to Crack Down on Bomb-Making Ingredients* (Sept. 20, 2010).

[566] Alexandra Mayer-Hohdahl, *EU Tightens Access to Bomb-Making Ingredients*, Deutsche Presse-Agentur International Services in English (Dec. 11, 2012).

759.    Fatima and Pakarab to do more to interdict the CAN fertilizer bombs targeting Americans in Afghanistan and deliberately supplied to the Syndicate by Fatima and Pakarab.

760.    At all relevant times, as sophisticated corporations and banks doing business in the Afghani and Pakistani markets, each Standard Chartered Bank Defendant understood that al-Qaeda affiliates, including the Taliban and Haqqani Network, regularly used fronts in Afghanistan and Pakistan to purchase bomb components, including CAN fertilizer.

761.    By 2010, each Standard Chartered Bank Defendant knew that it was providing essential financial services to Fatima and Pakarab, which directly facilitated Fatima's and Pakarab's supply of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts. Therefore, each Standard Chartered Defendant was playing an ongoing, key role in enabling the Syndicate's CAN fertilizer bomb campaign, which was targeting Americans in Afghanistan. Each SCB Defendant knew this based upon a consistent stream of international media coverage beginning no later than 2010. Each SCB Defendant was aware of media stories from 2010 through 2016 discussing: (bombmaking knowledge was a matter of widespread public knowledge no later than September 1) the CAN fertilizer bomb threat in Afghanistan, including the role played by Fatima and Pakarab, *supra* Part II.D; (2) endemic terrorist finance and logistics risk in all the geographies in Afghanistan, Pakistan, the U.A.E., and other geographies in which the Haqqani Network financed or logistically supported the CAN fertilizer bomb campaign, such as by routing a significant Fatima Group CAN Fertilizer purchase through a Haqqani Network front company in the U.A.E. or Europe *supra* Part II.B.; (3) the specific extreme terrorist diversion risk by the Haqqani Network in the Pakistani geographies in which Fatima and Pakarab did business *supra* Part II.B.1.ii.; and (4) the U.S. government's campaign to

highlight these issues and reduce the Syndicate's ability to raise money and buy components to build explosives.  *Supra* Part II.D.2.

762.514.         On September 1, 2011, when the *Associated Press* published a long report regarding Fatima's and Pakarab's key role in the Syndicate's fertilizer bomb campaign ("*AP Report*"):

> The **main ingredient in most of the homemade bombs** that have killed hundreds of American troops … is fertilizer produced by a **single company in Pakistan** … Enough [CAN] fertilizer for at least **140,000 bombs** was legally produced **last year by Pakarab Fertilizers Ltd.**, then smuggled by militants and their suppliers across the porous border into … Afghanistan, according to U.S. officials. The U.S. military says around **80 percent of Afghan bombs are made with the fertilizer** … The [U.S.] began talks a year and a half ago with Pakistani officials and Pakarab … But there is still no regulation of distribution and sale of [CAN] fertilizer. … Around Multan, dealers … say they are aware [CAN] can be used as an explosive, but **none has been told to report suspicious purchases**.
>
> Pakistani fertilizer producers are not permitted to export to Afghanistan … But the **low price of fertilizer in Pakistan … has meant that smuggling has long been rife**. The chemical, known as CAN, is often trucked into southern Afghanistan … One dealer … told [the *AP*] **wealthy people with links to the insurgents placed orders for all three fertilizers produced by Pakarab**. They sold the two safer varieties domestically, then trucked the [CAN] across the border. …
>
> Explosives can be made from a range of fertilizers, **but it is easy to turn CAN into a bomb**. … The fertilizer is sold in 110-pound [] sacks, which can be used to make between two and four bombs depending on whether they are targeting vehicles or foot patrols, said … an expert at [JIEDDO], who visited the Multan factory… Such bombs …have killed more than 719 Americans … since the conflict began … Last year's U.S. death toll – 252 – was as high as the two previous years combined, and 2011 is shaping up to be just as bloody.[567]

763.   On information and belief, each Standard Chartered Bank Defendant reviewed the AP Report, which: (1) made major international news, including in the United States, United Kingdom, Pakistan, and other South Asian media outlets, that no Defendant could have missed; and (2) was sufficiently detailed and specific such that each would be discovered in ordinary

---

[567] Chris Brummitt, AP Asia, *AP Impact: Pakistani Fertilizer Fuels Afghan Bombs* (Sept. 1, 2011) (emphasis added).

customer due diligence or risk analysis by each Defendant, including SCB New York and SCB Dubai.

764.    By 2011, each Standard Chartered Bank Defendant knew that Fatima and Pakarab had joined the Taliban's terrorist conspiracy targeting Americans in Afghanistan.  Each Defendant had such knowledge based upon an array of data sources including, but not limited to, extensive coverage of the issue in local, regional, and national media coverage, Standard Chartered Bank's own customer due diligence, and SCB Pakistan's on-the-ground knowledge, which, on information and belief, was shared with every Defendant under Standard Chartered Bank's "One Bank approach."

765.    On information and belief, each SCB Defendant was aware of these reports or similar ones, and their substance, which documented how terrorist finance activities facilitated by banks and corporations in Pakistan enabled the Syndicate's terrorist attacks.  Defendants are sophisticated companies with a long-standing presence on the ground in Pakistan.

766.    It was widely understood that Afghanistan's and Pakistan's well-known permissive environment for the Syndicate's CAN fertilizer bomb infrastructure was essential to the Syndicate's access to this prized bombmaking ingredient.  This ensured that market participants, including Defendants, understood that they were playing a role in carrying out the Syndicate's bomb attacks.  As one complicit Pakistani admitted in an interview, ***"I know that it's used to kill American soldiers*** … [b]ut people in the tribal areas [in Pakistan] don't have any choice" other than deliberately sell CAN fertilizer to terrorists.[568]

---

[568] Alex Rodriguez, *Bribes Keep Taliban Flush with Explosives*, L.A. Times (May 8, 2010) (emphasis added), 2010 WLNR 9039604.

767.    By 2011, each Defendant also specifically knew that:  (1) JIEDDO and other western counter-IED experts had concluded that the insertion of a colorful dye into Fatima Group CAN Fertilizer was critical to preventing its conversion by the Syndicate into CAN fertilizer bombs; (2) JIEDDO had repeatedly asked Fatima and Pakarab to change their practices relating to Fatima Group CAN Fertilizer; (3) Fatima and Pakarab had repeatedly refused; and (4) JIEDDO believed Fatima's and Pakarab's practices were deliberately endangering American lives, and that Fatima and Pakarab "can and must do more."  The dye-related dispute involving JIEDDO, Fatima, and Pakarab was the subject of significant media scrutiny from 2011 through 2016, including, but not limited to:

- *Inside the Army*, September 2012:  "Barbero told lawmakers that in order to better track the flow of [CAN] across the border into Afghanistan, ***JIEDDO has offered to pay to dye the factories' fertilizer. However, PakArab … has refused JIEDDO's offer***.  The dye would help to more easily identify what is normally a nondescript, white powder… When smuggled it is often repackaged to resemble … detergents, which makes it especially hard for sometimes illiterate border guards to detect… [A] government official [stated that]… [Pakarab] did not want JIEDDO to dye its [Fatima Group CAN Fertilizer] because it ***didn't want to be singled out***."[569]

- *Washington Times/National Herald Tribune (Pakistan)*, February 2013:  "Gen. Barbero … testified that he had asked a Fatima official to ***begin dyeing its [CAN]*** so it could be picked out at border crossings. He said smugglers mask the compound as detergent. … The general called Fatima 'less than cooperative.'  '***We've been told 'no' on the dye.***  I believe Pakistani-based [CAN] ***producers can and must do more***,' he testified."[570]

515.    U.S. officials concluded that the Syndicate's CAN fertilizer bomb infrastructure relied upon dependable commercial arrangements with American entities who facilitate the sale of Fatima Group CAN Fertilizer, since sales regularly required USD transactions to execute the purchases by Syndicate agents, operatives, and fronts.  Thus, U.S. officials determined that

[569] Jen Judson, *U.S. Frustrated by Pakistan's Lack of Help in Combating Fertilizer Smuggling*, Inside the Army (Sept. 24, 2012) (emphasis added), 2012 WLNR 20303217.

[570] Rowan Scarborough, *Indiana Governor Halts Deal with Bomb Supplier in Pakistan*, National Herald Tribune (Pakistan) (Feb. 2, 2013) (emphasis added), 2013 WLNR 2710202.

"stop[ping] U.S. companies"—including SCB New York—"Senior government officials also made clear statements about the risks of CAN fertilizer bombs. The head of JIEDDO, LTG Barbero, gave a 2011 speech to the Institute of Land Warfare, amplifying the U.S. government's concerns and stated, among other things, that JIEDDO had concluded that: (1) about "80 percent of IEDs in Afghanistan [were] made from [CAN] coming from fertilizer plants in Pakistan, specifically, two factories in Pakistan" (alluding to Fatima and Pakarab), where "[e]ach factory produce[d] as much as 400,000 metric tons of the material each year"; (2) under Fatima's and Pakarab's practices, "about one percent" of their CAN fertilizer was transferred "to insurgents," who "easily turned" the CAN fertilizer "into inexpensive explosives"; and (3) about "*90 percent* of [U.S.] casualties in Afghanistan" came "from ammonium nitrate explosive" derived from Fatima and Pakarab CAN fertilizer.[571]

516.    The U.S. government attempted to stop the illicit flow of CAN fertilizer at the source, approaching Fatima and Pakarab about ways to prevent terrorists from obtaining CAN fertilizer, and to prevent it from being smuggled unlawfully over the border into Afghanistan. But the companies refused to provide any assistance whatsoever. After an international incident between the United States and Pakistan toward the end of 2011, the companies essentially broke off contact with the U.S. government, even though they had known for years that their products were being weaponized in bulk to create thousands of deadly bombs.

---

[571] C. Todd Lopez, *JIEDDO Working to Reverse Trend for Larger IEDs in Afghanistan*, Army News Service (Nov. 10, 2011) (emphasis added). The casualty percentage (90%) is higher than the IED percentage (80%) because fertilizer bombs derived from CAN fertilizer were the most devastating weapon in the Syndicate's arsenal, and uniquely capable of countering American protective measures, even the most heavily armored U.S. vehicles.

768.517.      U.S. officials also determined that "stop[ping] U.S. companies from trading with IED-connected entities" was an essential part of the American strategy of "going after these nefarious actors and effectively countering the networks that use IEDs."[572]

769.    By 2012, U.S. officials had concluded that Fatima and Pakarab were no longer good corporate citizens but, rather, had become deliberate enablers of the Syndicate's CAN fertilizer bomb campaign against Americans in Afghanistan.  Among other things, U.S. officials specifically concluded that rogue ISI elements had "gotten to" Fatima and Pakarab, and persuaded Fatima and Pakarab to continue producing large quantities of fertilizer in a color and texture format that would continue to facilitate diversion by Syndicate terrorists into CAN fertilizer bombs.  *Supra* Part II.C.2.  Each Defendant was aware of the U.S. government's view that the Fatima and Pakarab had been "gotten to" by rogue ISI and were therefore complicit in rogue ISI's support of the Taliban and the Haqqani Network.  Among other sources, the U.S. government's views concerning rogue ISI's involvement were broadly reported in international media outlets, which Defendants could not have ignored in good faith.

518.    Around the same time, it became apparent that rogue elements within the Pakistani ISI (an intelligence agency) were likely involved in efforts to keep the supply of CAN fertilizer flowing to terrorists. The ISI favors certain terrorist groups that threaten to destabilize what it perceives as Pakistan's geopolitical rivals, including India, Afghanistan, and the United States. Thus, the ISI has frequently been accused of conspiring with terrorist groups, providing support to such groups, and protecting them from reprisals by governments.

---

[572] Rowan Scarborough, *Army's Vehicles Not Enough; Taliban Just Build Bigger Bombs*, Washington Times (Aug. 6, 2012), 2012 WLNR 16538203.

Formatte

519.    For example, a September 21, 2012 exchange between LTG Barbero and a Member of Congress reflected the widespread U.S. government view at the time that Fatima and Pakarab had joined rogue ISI's conspiracy with the Haqqani Network to support CAN fertilizer bomb attacks against Americans in Afghanistan, including the specific view that Fatima's and Pakarab's refusal to dye their Fatima Group CAN Fertilizer was the give-away that Fatima and Pakarab intended to support rogue ISI's conspiracy to aid Haqqani Network CAN fertilizer bomb attacks:

> MEMBER: … [W]e're all extremely frustrated … this has been going on for years… we [] keep going back to Pakistan, our supposed ally …what kind of ally would allow for this type of activity to continue? … [I]f we had two major fertilizer plants in Mexico and people were smuggling across … a small amount of fertilizer and killing five U.S. citizens a week, … we'd do something about it pretty quickly. And here we are today losing approximately five U.S. servicemen a week or having horrific injuries, and it seems that we're unable to do anything with our supposed ally in Pakistan. … ***The Haqqani Network continues to operate with impunity*** … especially in some of the border regions … Without any assistance with the Pakistanis at all, how are we going to deal with this?
>
> BARBERO: ***Congressman, I can't argue with anything you said.*** …
>
> MEMBER: … [A]ny aid and assistance that we have to Pakistan should be directly tied to their assistance to us to help us deal with these fertilizer plants in Pakistan and ***especially something as simple as adding a color or an odor to the production of this fertilizer.*** And I know those offers have been made. Those offers have been made to cover the cost of it and ***they're not interested in doing it because I'm sure the ISI finds it convenient to continue to be able to work with the Haqqani Network to smuggle this*** across the border. ***Let's just call it the way it is.*** They ***like to destabilize*** the Afghan government, destabilize the NATO allies. ***They're fighting in Afghanistan and the Pakistanis continue to deal with these people […] to kill American soldier[s] every day.***[573]

520.    Terrorism experts also noted the nexus between rogue ISI hostility towards the United States and Fatima's and Pakarab's refusal to change their intentional practices relating to Fatima Group CAN Fertilizer. For example, in September 2012, Daniel Goure of the Lexington

---

[573] *Rep. C.W. Bill Young Holds a Hearing on Joint IED Defeat Organization*, CQ-RollCall Political Transcriptions (Sept. 21, 2012) (emphasis added), 2012 WLNR 30213606.

Institute, explained that the "green on blue problem" – *i.e.*, a terrorist threat from an ally – involves not just individuals or small groups but also rogue actors of national governments, which was a "problem that has confronted the U.S. vis-à-vis Pakistan for most of the last decade," and had been demonstrated by the fact, among other things, that "[m]ost of the [CAN] that goes into Taliban IEDs that kill Americans in Afghanistan comes from two Pakistani [*i.e.*, Fatima- and Pakarab-owned] factories."[574]

521.     Prominent retired American general officers have reached the same conclusion about Fatima's and Pakarab's willingness to conspire with rogue ISI to provide direct operational support for the Taliban, including the Haqqani Network. For example, in 2020, former Vice Chief of Staff of the U.S. Army General Jack Keane publicly stated, in sum and substance, that rogue ISI supported the Taliban and had "built two chemical fertilizer factories for them," referencing the Fatima and Pakarab factories that supplied Fatima Group CAN Fertilizer to the Syndicate. In the same statement, GEN Keane identified rogue ISI's relationship with Fatima and Pakarab, and the resulting supply of Fatima Group CAN Fertilizer to Syndicate terrorists targeting Americans in Afghanistan, as an example of "support" for the Taliban.

522.     Similarly, on January 27, 2013, the *Washington Times* reported that Fatima was seeking to "expand in [the] U.S., but balk[ing] on controlling bomb materials":

> ***Fatima's fertilizer components are used by terrorists in Pakistan and Afghanistan to build homemade bombs*** -- the No. 1 killer of American service members in Afghanistan. ***Fatima's corporate leaders know this is happening***, based on communications with [] administration officials and military leaders, ***but they have refused pleas to control the flow***, according to [Barbero].[575]

---

[574] Daniel Goure, Ph.D., Lexington Institute, *What are the Rules of Engagement in a World of Green on Blue Violence?*, States News Service (Sept. 24, 2012).

[575] Rowan Scarborough, *Pakistani Fertilizer Firm to Expand in U.S., But Balks on Controlling Bomb Materials*, Washington Times (Jan. 27, 2013) (emphasis added), 2013 WLNR 2165350.

In the same article, the *Washington Times* reported that, "[a]s Fatima stiff-arm[ed] the U.S. military, it [was] eyeing a chunk of the American fertilizer market," and simultaneously planned a new investment in an American fertilizer plant in Indiana through a new Fatima Group subsidiary called Midwest Fertilizer Corporation.[576]

523.    On January 29, 2013, the *Washington Times* reported that American officials who focused on the IED threat had concluded that: (1) Fatima's and Pakarab's deliberate practices relating to Fatima Group CAN Fertilizer were indispensable to the Haqqani Network's ability to commit CAN fertilizer bomb attacks at scale against Americans in Afghanistan; and (2) Fatima and Pakarab were intentionally aiding the Haqqani Network by obstructing U.S. efforts to reduce the CAN fertilizer bomb threat in order to side with rogue ISI, who opposed any changes to Fatima's and Pakarab's CAN fertilizer practices:

> [Former Congressman Duncan Hunter] served as Marine officer in Iraq and Afghanistan says ***"it's crazy"*** that [Fatima] is being allowed to build a plant in the U.S. while it rejects Pentagon pleas to control its products that end up in homemade bombs that kill American troops, adding that ***Fatima was a "pseudo-terrorist organization that won't comply with any of our requests."***
> "We're not asking them to curtail production," said Mr. Hunter, who has been a leading voice in Congress in urging the Pentagon to come up with ways to defeat homemade bombs. "At the very least, they should have to comply with our requests for them to manage their [CAN] better. Fatima controls it all," Mr. Hunter said, adding that Fatima's assistance could drastically reduce the number of homemade bombs in Afghanistan. … Mr. Hunter also said that ***Fatima is influenced by "bad actors in Pakistan who want to create havoc and chaos in Afghanistan and thwart the U.S. efforts there***…"[577]

524.    The *Washington Times* corroborated Congressman Hunter's Fatima allegations and reported that "a government source who was informed of the congressman's comments said

---

[576] *Id.*

[577] Rowen Scarborough, *Subsidy for Fertilizer Company 'Crazy'; Marine Vet Can't Fathom a Deal with Pakistanis Tied to Roadside Bombs*, Washington Times (Jan. 29, 2013) (emphasis added), 2013 WLNR 2278333.

there is evidence that Pakistan's [ISI] is influencing Fatima," "[e]lements of ISI helped establish the Taliban in Afghanistan as an ally on its western front, and U.S. intelligence sources say ISI continues to help the insurgents to this day in their war with the elected government in Kabul," and that American efforts to get Fatima to reduce the Syndicate's CAN fertilizer bomb supply had been "cut off by the Pakistan government."[578]

525.    Each Standard Chartered Bank Defendant facilitated Fatima's and Pakarab's USD-denominated commercial sales, operations, and financing, and thereby enabled Fatima's and Pakarab's unlimited supply of Fatima Group CAN Fertilizer to the Haqqani Network.

526.    Fatima has publicly identified "Standard Chartered Bank" as one of the "**MAJOR BANKERS OF THE COMPANY**,"[579] and Fatima and Pakarab ordinarily follow the same practices. Each SCB Defendant, by providing financial services to Fatima and Pakarab while knowing that Fatima and Pakarab were supplying the Haqqani Network Fatima Group CAN Fertilizer – which was used to cause ninety percent (90%) of all American casualties in Afghanistan – assumed a role in al-Qaeda's CAN fertilizer bomb campaign and the Haqqani Network's CAN fertilizer bomb pipeline.

527.    Standard Chartered Bank's financial services to Fatima and Pakarab directly supported Fatima's and/or Pakarab's use of SCB New York's USD-denominated foreign exchange, correspondent account, and letter-of-credit services in connection with the sale of Fatima Group CAN Fertilizer. This is because: (1) Fatima and Pakarab regularly engaged in cross-border transactions in which the use of USD accounts at SCB New York was involved, directly or indirectly, in enabling the transaction to occur; and (2) Fatima and Pakarab ordinarily

---

[578] *Id.*

[579] Fatima Fertilizer Company Ltd., *Prospectus* at 67 (Jan. 18, 2010) (emphasis in original). Fatima and Pakarab generally follow the same practices.  *Supra* Part II(D)(2).

priced their goods in USD, and, as a consequence, needed a robust USD facility with SCB New York to hedge their credit risk and enable the smooth operation – and regular supply to the Syndicate – of Fatima Group CAN Fertilizer manufacturing and sales.

770.528.    In fall of 2012, JIEDDO leadership, including LTG Barbero, began an effort to complement their attempts to persuade Fatima and Pakarab to cease supplying the Syndicate with easy-to-divert fertilizer by identifying corporations and banks that, directly or indirectly, facilitated the Syndicate's CAN fertilizer bomb pipeline through Fatima and Pakarab. Once identified, senior JIEDDO personnel, including but not limited to LTG Barbero, contacted the identified complicit entity to encourage them to change their practices in order to interdict the flow of Fatima and Pakarab fertilizer to Syndicate terrorists to save American lives.

771.    In January 2013, JIEDDO leadership, led by LTG Barbero, met in person with senior executives at SCB New York's office ("New York Meeting"). The purpose of the New York Meeting was for LTG Barbero to communicate to Standard Chartered Bank's "One Bank," through the assembled SCB New York executives, how the SCB Defendants were directly facilitating CAN fertilizer bomb attacks against Americans in Afghanistan.

772.529.    During the New York Meeting:

(i)     LTG Barbero told SCB executives that Fatima and Pakarab were the exclusive source of the CAN fertilizer which was a vital ingredient in the CAN fertilizer bombs that accounted for approximately 80% of all American bomb casualties in Afghanistan.

(ii)     LTG Barbero presented SCB executives detailed data showing the key role that Fatima and Pakarab supply of Fatima Group CAN Fertilizer played in enabling anti-American terrorism in Afghanistan, including, but not limited to, charts and quotes concerning the same.

(iii)     LTG Barbero explained to SCB executives that Fatima and Pakarab had repeatedly refused to cooperate with American efforts to stop, or even reduce, the unfettered flow of Fatima Group CAN Fertilizer into Afghanistan for use by al-Qaeda affiliated terrorists by doing things such as applying a colorful dye to the fertilizer so that it would be harder for Haqqani Network operatives to smuggle.

(iv)     LTG Barbero showed SCB executives detailed American casualty figures from Afghanistan – including specific categories of injuries, such as death or loss of limb – that LTG Barbero believed were attributable to the Fatima and Pakarab transactions relating to Fatima Group CAN Fertilizer that were facilitated by SCB New York's provision of financial services to Fatima and Pakarab.

(v)      LTG Barbero showed SCB executives a map of the state-of-the-art facilities that Fatima and Pakarab used to manufacture Fatima Group CAN Fertilizer as they relate to the Haqqani Network's logistics ratlines, to further show the key, and unique, geographic role that Fatima and Pakarab supply of Fatima Group CAN Fertilizer played in the Haqqani Network's CAN fertilizer bomb logistics infrastructure.

(vi)     LTG Barbero showed SCB executives photos of evidence derived from terrorist detentions in Afghanistan, which showed bags of Fatima Group CAN Fertilizer that had been seized from Taliban (including Haqqani Network) terrorists.

(vii)    LTG Barbero told SCB executives that SCB New York provided irreplaceable foreign exchange and export finance services to Fatima and Pakarab, that Fatima and Pakarab would not be able to supply terrorists in Afghanistan with Fatima Group CAN Fertilizer at the scale necessary to sustain the Syndicate's nationwide CAN fertilizer bomb campaign without SCB New York's provision of financial services to Fatima and Pakarab, and that JIEDDO was urging SCB New York to cease its provision of financial services to Fatima and Pakarab to save American lives by preventing future CAN fertilizer bomb attacks against Americans in Afghanistan.

(viii)   Alluding to Standard Chartered Bank's notorious reputation for deliberately facilitating Iranian proxy-related terrorist finance (which had been in the news only about a month prior), LTG Barbero told Standard Chartered Bank executives that SCB's track record was cause for additional concern, and LTG Barbero implored SCB New York to change its practices and end relationships, like those with Fatima and Pakarab, that played a role in aiding terrorist attacks against Americans.

(ix)     SCB New York communicated to LTG Barbero, in sum and substance, that Standard Chartered Bank would consider the points made by LTG Barbero during the meeting, falsely implying that SCB took JIEDDO's terrorism-related concerns seriously.

773.    Each Standard Chartered Bank Defendant already knew the key role its provision of financial services to Fatima and Pakarab played in the Syndicate's CAN fertilizer bomb campaign prior to the New York Meeting, no later than September 1, 2011, when the Associated Press broadly published the *AP* Report.  Additionally, each Defendant also directly learned of the sum and substance of LTG Barbero's points as presented to Standard Chartered Bank, including

416

SCB New York, soon after the New York Meeting. Plaintiffs' belief is based upon, among other things, Defendants' closely integrated banking operations and "One Bank approach," the unusual nature of the meeting between LTG Barbero and Standard Chartered Bank executives, the gravity of LTG Barbero's allegations at the meeting, and each Defendants' pre-existing compliance and terrorist finance risk profile. On information and belief, each Defendant was a "target" and/or "subject" in one or more then-ongoing federal or state law enforcement investigations in the United States concerning potential terrorist finance-related violations, and information like that relayed in the New York Meeting would ordinarily be shared with relevant branches and subsidiaries under Standard Chartered Bank's "One Bank approach."

774.530.    Standard Chartered Bank never followed up with LTG Barbero or did anything positive – they blew JIEDDO off. Standard Chartered Bank's deliberate silence reflected its consciousness of guilt and awareness, by each SCB Defendant, that Standard Chartered Bank had enabled terrorist violence against Americans in Afghanistan.

775.531.    Rather than ending their role in the Syndicate's CAN fertilizer bomb campaign in Afghanistan and exiting the terrorist enterprise, each Standard Chartered Bank Defendant continued providing financial services to Fatima and Pakarab until at least 2015.

776.    It was widely understood that Afghanistan's and Pakistan's well-known permissive environment for the Syndicate's CAN fertilizer bomb infrastructure was essential to the Syndicate's access to this prized bombmaking ingredient. This ensured that market participants, including Defendants, understood that they were playing a role in carrying out the Syndicate's bomb attacks. As one complicit Pakistani admitted in an interview, *"I know that it's used to kill American soldiers* … [b]ut people in the tribal areas [in Pakistan] don't have any

choice" other than deliberately sell CAN fertilizer to terrorists.[580] LTG Barbero's conclusion – that Fatima's and Pakarab's commercial transactions were suspicious enough, and their support of the Haqqani Network open enough, that Standard Chartered Bank's transactions with Fatima and Pakarab foreseeably and directly aided the Haqqani Network's CAN fertilizer bomb pipeline – forecloses any suggestion that Standard Chartered Bank did not fully appreciate SCB's role in the then-FTO-designated Haqqani Network's fertilizer bomb pipeline when SCB executives met with LTG Barbero in 2013.

777.  LTG Barbero lacked Standard Chartered Bank's transaction data, customer due diligence, and related materials and yet he was still able to identify SCB's assistance to the Haqqani Network's CAN fertilizer bomb supply chain.  With complete access to the account data, SCB Defendants had far greater real-time and historic visibility into the transaction data than did LTG Barbero and JIEDDO.  If the U.S. government could figure out, lacking that key information, the Haqqani Network terrorist finance and diversion risks attendant to SCB's financial services to an then-open co-conspirator of the Haqqani Network, the Standard Chartered Defendants of course knew their transactions with Fatima and Pakarab directly facilitated the Haqqani Network's CAN fertilizer bomb pipeline.

778.  Indeed, on February 2, 2013, the Indiana Economic Development Corporation ("IEDC") publicly concluded that Fatima's and Pakarab's CAN fertilizer practices "***sent up red flags***" that Fatima and Pakarab were facilitating anti-American terrorists' supplies of CAN fertilizers to be used in CAN fertilizer bomb attacks against Americans in Afghanistan.  This conclusion was published agents, operatives, and fronts by an Indiana newspaper headline.[581]

---

[580] Alex Rodriguez, *Bribes Keep Taliban Flush with Explosives*, L.A. Times (May 8, 2010) (emphasis added), 2010 WLNR 9039604.

[581] *Id.*

Notably, the IEDC acted "after Pentagon officials flagged [Fatima] in December."[582]  Explaining the common sense rationale that Defendants ignored:  while "this would be a lucrative project for Posey County,… for now, and especially given the sensitivity of Americans to the violence done with IEDs to our military personnel, the correct course is to continue holding up this project until all are satisfied that the dots do not connect."[583]

779.   On May 17, 2013, then-Governor Mike Pence terminated the potential IEDC-Fatima deal because Fatima's CAN fertilizer had been reported to be used by "the enemy in Afghanistan" and therefore he could not "in good conscience tell our soldiers and their families that this deal should move forward."

780.   On information and belief, each Standard Chartered Bank Defendant knew of the IEDC's and then-Governor Pence's announcements in February 2013 and May 2013, respectively, and was presented with the same information as the IEDC.

781.   From 2008 through 2016, Standard Chartered Bank compliance personnel raised terrorist finance and/or logistics "red flags" concerning Fatima- and/or Pakarab -related transactions routed through SCB New York, believing they were suspicious under Standard Chartered Bank's customer due diligence ("CDD") and know your customer ("KYC") rules.

782.   Standard Chartered Bank's CDD and KYC rules, including its enhanced due diligence and ongoing customer monitoring measures, were specifically designed to reduce the risk that Standard Chartered Bank, or an SCB branch like the other SCB Defendants, would transact business with terrorists.

---

[582] *Id.*

[583] Evansville Courier & Press, *State Justified in Suspending Fertilizer Deal* (February 6, 2013), 2013 WLNR 33587382.

783. On information and belief, the "red flags" raised by SCB New York personnel included open and obvious terrorist finance and/or terrorist logistics risks based upon the transaction-related data for each such suspicious transaction, through which Standard Chartered Bank knew that SCB New York was likely facilitating: (1) the bulk purchase (suspicious amount) of Fatima Group CAN Fertilizer (since after Oklahoma City, CAN fertilizer was known as an extremely high risk product for terrorist bomb logistics) that was (2) being bought by an unidentifiable shell company (suspicious counterparty) (3) in a known Taliban fund-raising center such as Afghanistan, Pakistan, or the U.A.E. (ultra-high-risk geographies, all). Therefore, Standard Chartered Bank personnel knew that such Fatima Group CAN Fertilizer-related transaction activity raised serious terrorism red flags indicating a high probability that one party to the purchase was most likely a Syndicate front, operative, or agent acquiring bomb-making materials, rather than a legitimate customer.

784. On information and belief, by 2013, each SCB Defendant also knew that one or more current or former Standard Chartered Bank managers, employees, or agents had become a whistleblower and had raised concerns that, in sum and substance, SCB London, SCB New York, SCB Dubai, and/or SCB Pakistan had facilitated a deliberate supply of CAN fertilizer by Fatima and Pakarab to al-Qaeda and Haqqani Network agents, operatives, or fronts for use in CAN fertilizer bomb attacks against Americans.

785. By 2013, Standard Chartered Bank knew, in sum and substance, that one or more whistleblowers had raised credible terrorist finance and terrorist logistics concerns regarding USD-related practices pursued by SCB London, SCB New York, and SCB Dubai that could specifically endanger American lives. Among other things, each SCB Defendant knew, in sum and substance, that at least three people had blown the whistle on Standard Chartered Bank's

assistance to al-Qaeda and the Haqqani Network, including through its services to the Khanani MLO as well as to Fatima and Pakarab. On information and belief, by the beginning of 2013, each SCB Defendant knew that:

(i)     a whistleblower concluded that Standard Chartered Bank's illicit banking practices contributed to funds which were ultimately used to support terrorist activities that killed and wounded American service members;

(ii)    a second whistleblower concluded that Standard Chartered Bank's misconduct generated cash flow to finance terrorist activities that were killing and injuring American service members; and

(iii)   a third whistleblower concluded that Standard Chartered Bank had blood on its hands because it had enabled terrorist finance, including U.S. Dollar related terrorist finance transactions executed by Al Zarooni Exchange, which Standard Chartered Bank knew at the time to be a notorious Khanani MLO-related terrorist finance vehicle used by anti-American terrorists to finance their operations.

786.    The SCB Defendants, including SCB New York, enabled at least several million dollars of Fatima and Pakarab fertilizer sales to al-Qaeda and Haqqani Network agents, operatives, and fronts during the period *after* the IEDC paused its own financial relationship with Fatima Group in February 2013. As a result, the SCB Defendants, including SCB New York, played a direct role in the Syndicate's CAN fertilizer bombmaking enterprise even after knowing that another similarly-situated American financial services market participant had withdrawn from a financial services arrangement with the same customer based on the direct risk that the commercial relationship could aid terrorist attacks against Americans.

787.    In the years since 2014, LTG Barbero continued to monitor Fatima's and Pakarab's corporate and financial relationships, and LTG Barbero did not become aware of any fact suggesting that any SCB Defendants took any meaningful action to disrupt the Syndicate's CAN fertilizer bomb supply chain even after he had personally told Standard Chartered Bank executives at the New York Meeting that the terrorist's supply chain depended upon Standard

Chartered Bank's provision of financial services to Fatima and Pakarab.  In 2019, LTG Barbero reflected upon the tragic consequences of Defendants' decision to prioritize their profits above Coalition lives and stated that SCB was "utterly useless" in the U.S. military's desperate effort to prevent Syndicate terrorists from converting Fatima and Pakarab fertilizer into bombs to kill and maim Americans in Afghanistan.  Referring to Standard Chartered Bank, he concluded:

> Anybody wounded or who lost a relative as a result of IEDs in Afghanistan ***should be angry*** especially with any British or US entity that ***enabled*** or at least ***looked the other way*** and did not care enough when presented with the evidence. ***It is shameful.***[584]

788.    At all relevant times from 2009 through 2016, the Standard Chartered Bank Defendants' transactions, including USD-denominated transactions routed through or backstopped by SCB New York, did, in fact, help the Syndicate directly source millions of dollars worth of Fatima Group CAN Fertilizer per year for use in the Syndicate's bomb campaign targeting Americans in Afghanistan.  Standard Chartered Bank, through SCB New York, directly processed at least more than $5 million in Syndicate-related purchases, and on information and belief discovery will reveal the full number is much greater.

789.    From 2009 through 2016, Standard Chartered Bank knew that by providing accounts to, and performing financial transactions for, the Syndicate's CAN fertilizer bomb campaign, including Fatima Group CAN Fertilizer, it was playing a substantial role in their terrorist activities.  Defendants, including SCB New York, maintained a general policy of willfully financing known terrorist fronts while refusing to cooperate with any counter-terrorism-related requests by the U.S. government if doing so would prevent Standard Chartered Bank

---

[584] Adam Luck, *US General Claims He Told Standard Chartered its Client Helped the Taliban - But the Bank Did Nothing*, Mail on Sunday (Dec. 7, 2019), https://www.thisismoney.co.uk/money/news/article-7767683/US-general-told-Standard-Chartered-client-helped-Taliban-did-nothing.html.

from profiting from a customer relationship. *Supra* Part IV.B. That policy applied to each of the Fatima and Pakarab transactions enabled by Defendants and was consistent with Standard Chartered Bank's willingness to commit egregious violations of U.S. terrorist finance laws if SCB thought it could get away with it.

790. Standard Chartered Bank's (and each Defendant's) participation in the Syndicate's bombmaking logistics and enterprise was a manifestation of their reckless approach to risky terrorist-related transactions more generally. In following that standard practice, each year from 2009 through 2016, Standard Chartered Bank, including SCB New York, facilitated transactions that caused Fatima and Pakarab fertilizer sales, including sales of Fatima Group CAN Fertilizer, to Syndicate agents, operatives, and fronts totaling at least one hundred thousand dollars per month, and at least $1 million or more each year, every year. Defendants processed these transactions under circumstances making it clear to Standard Chartered Bank that the transactions in question were likely directly or indirectly related to Syndicate terrorist finance or logistics.

791. As a result, from 2009 through 2016, the SCB Defendants collectively facilitated at least several million in USD transactions routed through SCB New York that directly enabled the Syndicate's regular logistics flow of Fatima Group CAN Fertilizer through transactions involving Fatima and/or Pakarab. By doing so, each Defendant assumed a key operational role in the Syndicate's CAN fertilizer bomb campaign from 2009 through 2016 and supported the acquisition of Fatima Group CAN Fertilizer to kill or injure every Plaintiff in this case.

792. Plaintiffs' belief is supported by, among other things: (1) Standard Chartered Bank's key role underwriting and facilitating Fatima and Pakarab dollar transfers, letters of credit, and sales; (2) the U.S. government's conclusion that Syndicate fronts acquired, directly

and indirectly, approximately one percent (1%) of all Fatima and Pakarab fertilizer sold for conversion into bombs; (3) historical Fatima and Pakarab Group sales, manufacturing, and financial data; and (4) Standard Chartered Bank transaction data.

793.   Defendants profited from their substantial assistance to the Syndicate's CAN fertilizer bomb campaign.  Defendants' commercial relationships with Fatima and Pakarab, as well as the Syndicate fronts who bought Fatima Group CAN Fertilizer, were highly lucrative. Defendants collectively earned millions USD in fees based upon their long-standing provision of financial services to Fatima and Pakarab, including millions in fees after learning, by no later than September 2011, of the role Standard Chartered Bank played in facilitating the Syndicate's CAN fertilizer bomb network.

794.   Standard Chartered Bank's (and each Defendant's) assistance to the Syndicate's CAN fertilizer bomb logistics extended beyond Standard Chartered Bank's financial services to Fatima and Pakarab.  From 2001 through 2016, Defendants regularly, and knowingly or recklessly, facilitated Syndicate bomb logistics, including through sales to al-Qaeda, Taliban, and Haqqani Network purchasers of bomb components (including Fatima Group CAN Fertilizer), and movement of funds so Syndicate operatives could make the purchases.  Plaintiffs' belief is also based upon, among other things, more than a dozen enforcement actions brought by American, Pakistani, and other regulators, media reports, and statements by Standard Chartered Bank employees.  These sources identify at least several occasions that contain clear red flags, considering the transaction data and public data of which the SCB Defendants knew, indicating likely Taliban and/or Haqqani Network terrorist finance or bomb-related acquisition or laundering activity through Standard Chartered Bank accounts.

795.    SCB New York regularly processed USD transactions on behalf of SCB Pakistan, SCB Dubai, or another non-SCB bank in Pakistan or Dubai, where the face of the transaction itself contained substantial indicia that the transaction was related to logistical support for al-Qaeda and the Haqqani Network's bomb pipeline, such as the acquisition of chemical precursors for bombs by a Haqqani Network agent in the U.A.E.

796.    Between 2009 and 2016, SCB New York, SCB Dubai, and SCB Pakistan regularly processed transactions on behalf of Syndicate fronts, operatives, or agents in which the surface information available to Standard Chartered Bank, and each SCB Defendants, on its own raised extreme terrorist finance or logistics risk.

797.    Examples include, but are not limited to, Standard Chartered Bank's Pakistan-and Dubai-linked transactions, routed through SCB New York, on behalf of obvious terrorist fronts for transactions such as:  (1) the "purchase of seismic explosives"; (2) regular large transactions involving Fatima and Pakarab with unidentifiable counterparties in circumstances raising an overwhelming inference of Syndicate logistical activity (*i.e.*, a Syndicate front, operative, or agent making a large purchase of Fatima or Pakarab CAN fertilizer); and (3) transactions with a Syndicate front companies, including one or more companies controlled by the Haqqani Network, which had publicly-reported links to smuggling activities that were known to, and disregarded by, SCB New York, SCB Pakistan, and SCB Dubai.

798.    SCB New York served as the correspondent bank that recklessly processed each suspicious Pakistan-related USD-denominated transaction described above, which collectively totaled millions of dollars between 2009 and 2016.  On information and belief, SCB New York facilitated each transaction with a counterparty that was a front, operative, and/or agent for the Taliban, including its Haqqani Network, while knowing of the transaction's high terrorist finance

and/or logistics risk, and each transaction aided the Syndicate's CAN fertilizer bomb campaign against Americans.

799.    By the middle of 2011, "90 percent of casualties in Afghanistan [came] from ammonium nitrate explosive,"[585] which the Syndicate sourced from Fatima and Pakarab sales of Fatima Group CAN Fertilizer.  *Supra* Part II.D.1.  Additionally, Fatima Group CAN Fertilizer accounted for more than 95 percent of all American casualties that were specifically related to Syndicate IED- and suicide bomb-attacks, and Fatima's and Pakarab's intentional transfer of Fatima Group CAN Fertilizer to the Haqqani Network ensured that these casualty percentages persisted each year from 201 through 2016.

800.    In Afghanistan and Pakistan, al-Qaeda and the Taliban (including its Haqqani Network) sourced one hundred percent (100%) of their CAN fertilizer from Fatima and Pakarab sales of Fatima Group CAN Fertilizer between 2011 and 2016, and sourced nearly all of their CAN fertilizer from Pakarab sales before then as well.  From 2011 through 2016, every CAN fertilizer bomb that the Syndicate detonated to kill or injure Americans in Afghanistan was directly or indirectly sourced from Fatima Group CAN Fertilizer sold by Fatima or Pakarab.

801.    From 2011 through 2016, Fatima Group CAN Fertilizer accounted for approximately eighty percent (80%) of all IED and suicide bomb attacks, and approximately ninety percent (90%) of all American casualties, in Afghanistan.  Thousands of Americans, including Plaintiffs, were killed or maimed as a direct result.

---

[585] *Id.*  The casualty percentage (90%) is higher than the IED percentage (80%) because fertilizer bombs derived from CAN fertilizer were the most devastating weapon in the Syndicate's arsenal, and were uniquely capable of countering American protective measures, including even the most heavily armored U.S. vehicles.  *Supra* Part II.D.1.

802.    JIEDDO concluded that, in 2011 alone, Syndicate bombs derived from Fatima Group CAN Fertilizer killed or injured 10,840 Americans serving in Afghanistan.

803.    From 2010 through 2016, al-Qaeda bombmakers required about eight pounds of Fatima Group CAN Fertilizer to produce an IED capable of killing Americans in Afghanistan. Given how efficiently al-Qaeda bombmakers could convert Fatima Group CAN Fertilizer into ammonium nitrate, on information and belief, al-Qaeda bombmakers could—and did—convert a standard 110-pound bag of Fatima Group CAN Fertilizer into approximately 2-4 powerful IEDs, several suicide vests, or a single suicide VBIED, depending upon the bomb design.

804.    Between 2011 and 2016—when every attack in this case transpired—nothing was more important to al-Qaeda's CAN fertilizer bomb attack tempo than the Haqqani Network's well-established Fatima Group CAN Fertilizer supply chain, in which each Standard Chartered Bank Defendant played a key operational role.  Specifically, each SCB Defendant ensured the Haqqani Network could regularly purchase what it needed to supply the al-Qaeda bombmakers who, at the al-Qaeda/Haqqani Network camps in Pakistan, were key to the industrial supply of CAN fertilizer bombs to every member of the Syndicate.

805.    Terrorism experts who studied the Syndicate's CAN fertilizer bomb infrastructure confirmed the close nexus between acts that facilitate Syndicate acquisition of Fatima Group CAN Fertilizer, on the one hand, and CAN fertilizer bomb attacks targeting Americans in Afghanistan, on the other.  For example, Dr. Daniel Goure, of the Lexington Institute, has explained that, because "IED's in Afghanistan are relatively simple devices made from [CAN] fertilizer with few metal parts and simple triggers,"

> [t]he real key to truly defeating the IED threat in Afghanistan rest[ed] …ultimately on the effort to dismantle the network. This network consist[ed] of suppliers of bomb-making materials, financiers, bomb-designers, Taliban commanders, and local bomb-emplacement teams. This involve[d], in part,

exquisite intelligence to identify and take out Taliban commanders and senior leaders that enable[d] the IED networks. But it also involve[d] interdicting the flow of materials and money coming across the border from Pakistan. In this respect, the battle against the IED network resemble[d] this nation's war on drugs. Rather than busting drug dealers on the street corners of American cities, winning the war on drugs must successfully interdict the movement of drugs into the country as well as the sources of supply. Fortunately, unlike fighting the drug trade, demand play[ed] less of a role in the overall dynamics of the IED network. Thus, interdicting supply [could] have a decisive effect … against IEDs.[586]

806.   The Syndicate's use of CAN fertilizer bombs sourced from Fatima and Pakarab products was also key to its ability to maximize the lethality of its bombing campaign and the attendant carnage inflicted upon Americans in Afghanistan.  By 2009, the Syndicate's ability to create bombs from legacy munitions discovered from earlier, had essentially ended.  For example, as the *Daily Telegraph* reported in July 2009:

As the supply of military explosives dries up, the Taliban are building large fertiliser vehicle bombs to attack members of the US-led International Security Assistance Force.  Fertiliser is the explosive of choice for terrorists seeking maximum impact.  Senior coalition sources based in the Middle East told The Daily Telegraph the Afghan insurgents were rapidly running out of ordnance such as land mines and artillery shells left behind by Russians in the 1980s. Bigger bombs uncovered by forces are now being made using up to 250kg of fertilizer.[587]

807.   As a result, the Taliban needed to purchase, build for itself, or receive from a terrorist ally (*e.g.*., al-Qaeda), most of the explosives it used to attack Americans between 2009 and 2016.  This trend was particularly pronounced by 2011, when the U.S. military "Surge" had largely routed the Taliban's indigenous weapons-creation capabilities, and the terrorists depended upon external bomb logistics pipelines.  For their CAN fertilizer bomb infrastructure, that pipeline depended on Fatima's and Pakarab's choice to join the Syndicate's conspiracy.  No

---

[586] Daniel Goure, Ph.D., Lexington Institute, *Comprehensive Approach Needed to Stem Flow of IED Material*, States New Service (May 26, 2011).

[587] Ian McPhedran, *Maximum Carnage—Taliban Switches Tactics to Bali-Style Booby Traps*, Daily Telegraph (Sydney, Australia) (July 29, 2009), 2009 WLNR 14485302.

other explosives precursor was supported by such a ready-made industrial support base as that behind Fatima Fertilizers and Pakarab, and if the Syndicate had been forced to rely on materials other than Fatima Group CAN Fertilizer, the Taliban's effective attack rate, and the lethality of its bombs, would have both dramatically declined, and Plaintiffs likely would have been spared.

808.    If Standard Chartered Bank had chosen to heed the U.S. government requests in 2007/2008, 2009/2010 and 2013, the Syndicate's CAN fertilizer bomb supply chain would have collapsed, and its ability to conduct al-Qaeda's CAN fertilizer bomb campaign against Americans in Afghanistan would have been vastly diminished.

809.    Moreover, a nationwide bombing campaign seeking to cause hundreds of thousands of potentially lethal explosions every year is only as good as the logistics chain behind it.  Only Standard Chartered Bank, through its deliberate facilitation of the Fatima and Pakarab pipeline via sales of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts, offered the Syndicate a viable, fully built-out, large, industrial-scale explosive component manufacturing and distribution infrastructure in Pakistan.  No other company—aside from Fatima and Pakarab—and no other precursor ingredient—aside from Fatima Group CAN Fertilizer—would have been nearly as effective as an explosive ingredient for widespread application by the insurgency, or as easy to smuggle over the border.  Fatima Group CAN Fertilizer made and sold by Fatima and Pakarab therefore played a unique and irreplaceable role in Syndicate CAN fertilizer bomb attacks against Americans in Afghanistan from 2011 through 2016.

810.    It was this recognition of the unique—and irreplaceable—role played by Standard Chartered Bank in the Syndicate's CAN fertilizer bomb infrastructure that compelled JIEDDO leadership to pressure Standard Chartered Bank to stop aiding the Syndicate.  JIEDDO

leadership was seasoned, intelligent, experienced, and motivated by a desire to save American lives. It is not plausible JIEDDO would have devoted so much time and attention relating to Standard Chartered Bank on this issue unless doing so plausibly save American lives. Describing urgent need to interfere with the terrorists' CAN fertilizer pipeline, one journalist explained: "[m]ilitary commanders are convinced that if the insurgents are robbed of one of their main bomb-making tools, the death toll will drop."[588]

811. For these reasons, LTG Barbero concluded that the best way to reduce American deaths from al-Qaeda CAN fertilizer bombs was to make it more difficult for the Haqqani Network to obtain the Fatima and Pakarab fertilizer that was required by al-Qaeda's bombmakers. America's coalition partners concurred. As one former British Army officer explained, "[a]mmonia nitrate [was] the key component of the fertiliser bombs … in Afghanistan [] favoured by the Taliban and other terrorist groups."[589]

812. American military strategy during the "Surge" confirmed the foreseeably close nexus between the Syndicate's CAN fertilizer bomb infrastructure and bomb attacks targeting Americans in Afghanistan. For example, in October 2010, two General Officers acting at the request of General David H. Petraeus, who commanded NATO forces in Afghanistan at the time, traveled to Pakistan to share U.S. government intelligence concerning the Syndicate's CAN fertilizer bomb infrastructure pipeline with Pakistani military and civilian leadership. On information and belief, this information included detailed information concerning the Haqqani

---

[588] Sonia Verma, *Farmers Resent Fertilizer Ban to Thwart Taliban Bombmaking*, Globe and Mail (Jan. 27, 2010), 2010 WLNR 1701673.

[589] Simon Speakman Cordall, *Failed London Bomb Plot Exposes Hezbollah's Criminal Activities in Europe*, Al Arab (June 16, 2019), 2019 WLNR 18446600.

Network's strategies for acquiring and distributing Fatima Group CAN Fertilizer for use in CAN fertilizer bombs targeting Americans in Afghanistan.

813.    Standard Chartered Bank's reckless support for Fatima's and Pakarab's continued supply of the Haqqani Network's CAN fertilizer bomb pipeline occurred in a context in which it was foreseeable, and inevitable, that the SCB Defendants' practices would facilitate al-Qaeda and Haqqani Network-related CAN fertilizer logistics and fundraising for at least two reasons. *First*, al-Qaeda, the Taliban, and the Haqqani Network had intertwined funding and logistics streams under which their money moved between key network actors connecting them, *e.g.*., Sirajuddin Haqqani. *Supra* Part II.A. *Second*, in high-risk terrorist finance geographies, a bank's widespread facilitation of money laundering inevitably results in significant terrorist finance. *Infra* Part II.B.

814.    Defendants' provision of financial services to Fatima, Pakarab, and Syndicate agents, operatives, and fronts, was essential to the Syndicate's ability to maintain the massive supply of CAN fertilizer bombs necessary to wage its nationwide terrorist campaign against Americans in Afghanistan from 2010 through 2016. Standard Chartered Bank was the only major bank that had a history of doing business in Afghanistan supported by branches in the United States, China, Pakistan, the U.A.E., Qatar, and the former Soviet Union. While certain other banks in the financial services marketplace overlapped with some of these geographies, *only* Standard Chartered Bank offered full spectrum financial services in *all* of them and Standard Chartered Bank's presence in all those markets was necessary for the Syndicate to leverage all its foreign funding sources to regularly purchase significant volumes of fertilizer from Fatima and Pakarab.

815.    Like other customers who received financial services through Standard Chartered Bank, al-Qaeda and the Haqqani Network derived unique operational benefits for their terrorist enterprises (and the Syndicate) from being able to rely upon Standard Chartered Bank's global financial network, which al-Qaeda and the Haqqani Network accessed through SCB London, SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan.  Standard Chartered Bank's CEO's own statements about the unique value-add provided by Standard Chartered Bank's banking services throughout the developing world show as much.  As *Euromoney* declared when naming Standard Chartered Bank its "Best Emerging Markets Bank" in 2007:

> [Standard Chartered Bank] claims a ***unique focus on Asia … and the Middle East***.  It's a ***justified boast***, particularly now that the bank is exploring linkages between these regions as well as expanding in individual countries.  Almost every leading bank in the world ***claims*** to have a big presence in the emerging markets.  In truth *few actually do*.  But *one bank* whose emerging markets credentials ***cannot be questioned is [SCB]***.  [SCB] is headquartered in the UK but its ***heart lies very much in the developing world***, specifically … Asia and the Middle East.  …For [the] chief executive of [SCB], the bank's success lies in what he claims is its ***unique*** character. "***No other bank is as focused on Asia … and the Middle East in the way that we are***…"[590]

816.    SCB Pakistan's CEO has also publicly touted how Standard Chartered Bank was unique amongst global financial institutions in having a long-standing presence in Pakistan.  For example, SCB Pakistan's CEO stated in 2013 that Standard Chartered Bank's "bond with the Indo-Pak subcontinent is 150 years old," that "we fully understand how banking plays a crucial role in the functioning of the economy," and "[w]e are aware of our responsibility towards the community" in Pakistan.[591]  Standard Chartered Bank's unique platforms and capabilities helped the Syndicate's agents, operatives, and fronts better supervise their various financial activities,

---

[590] Euromoney, *Best Emerging Markets Bank: Standard Chartered* (July 1, 2007) (emphasis added), 2007 WLNR 28153615.

[591] Pakistan and Gulf Economist, *Standard Chartered Launches 2012 Pakistan Sustainability Review*, Volume 32; Issue 21 (May 26, 2013), 2013 WLNR 13006660.

becoming more efficient and therefore repatriating more money back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.  Indeed, this was a core benefit SCB Pakistan itself touted.  As one senior SCB Pakistan executive stated in 2016, "[a]t Standard Chartered, we bring world class working capital solutions for our clients that helps them achieve optimal efficiency, by providing better control, transparency and visibility to their transactions."[592]

817.    Even after being confronted with clear basis for actual knowledge of its role in the terrorist enterprise, the SCB Defendants continued providing the same financial services to Fatima and Pakarab for at least two years after the January 2013 meeting with JIEDDO leadership, doing so through 2016.  On information and belief, SCB New York processed at least several million dollars of Fatima and Pakarab fertilizer sales that deliberately benefited al-Qaeda's and the Haqqani Network's pipeline during the period from January 2013 through December 2014, and these transactions enabled the Syndicate to create thousands of IEDs and/or suicide bombs from ammonium nitrate derived from Fatima Group CAN Fertilizer purchased from Fatima or Pakarab during these 24 months.  On information and belief, each primary victim who was killed or injured by an al-Qaeda CAN fertilizer bomb during this period was specifically killed or injured due to the explosion caused by a CAN fertilizer bomb prepared specifically with Fatima Group CAN Fertilizer purchased by al-Qaeda and/or Haqqani Network fronts, operatives, or agents from Fatima or Pakarab between January 2013 and December 2014.

818.    Standard Chartered Bank's continued provision of financial services to Fatima and Pakarab after SCB's New York Meeting in January 2013 with JIEDDO leadership facilitated

---

[592] Pakistan Observer, *Standard Chartered Showcases Transaction Banking Capabilities* (Feb. 26, 2015), 2015 WLNR 5797818.

Fatima's and Pakarab's continued deliberate supply of at least several million dollars of Fatima Group CAN Fertilizer to al-Qaeda and the Haqqani Network from January 2013 through, at least, December 2014.  As a result, Standard Chartered Bank, SCB New York, SCB Dubai, and SCB Pakistan directly aided al-Qaeda's CAN fertilizer bomb campaign by knowingly enabling enough Fatima and Pakarab sourcing of Fatima Group CAN Fertilizer to the Haqqani Network's to create tens of thousands of CAN fertilizer bombs each year.

819.    Conversely, if each SCB Defendant had stopped providing financial services to Fatima and Pakarab after JIEDDO leadership implored Standard Chartered Bank to do so during their New York Meeting in January 2013, the Syndicate's bombmaking campaign would have been substantially degraded, thousands fewer bombs would have been created, and thousands of Americans would have been spared injury or death, including Plaintiffs.  Indeed, the critical nexus between SCB New York and the Syndicate's CAN fertilizer bombmaking infrastructure was *the reason* why JIEDDO leadership attempted to persuade SCB New York to stop facilitating Fatima and Pakarab sales in the first instance.

820.    Fatima's and Pakarab's sales of Fatima Group CAN Fertilizer via Standard Chartered Bank accounts, including SCB New York, were significant enough, and close enough in time to the attacks on Plaintiffs, to have been a substantial factor in both strengthening the Syndicate's terrorist enterprise and causing (factually and legally) the attacks on Plaintiffs.

821.    On information and belief, the Syndicate executed every IED and suicide bomb attack in this case by detonating an CAN fertilizer bomb that was sourced from Fatima Group CAN Fertilizer, planted by the Taliban (including its Haqqani Network), and derived from al-Qaeda schematics and training.  This belief is based on, among other things, government

statements and records concerning the specific attacks, media accounts and witness descriptions of the attacks, and Plaintiffs' own recollections.

822.   On information and belief, SCB New York directly facilitated at least several million dollars per year in sales of Fatima Group CAN Fertilizer to al-Qaeda, Taliban, and Haqqani Network fronts, operatives, and/or agents, and supplied the Syndicate with the key precursor ingredient—ammonium nitrate via Fatima Group CAN Fertilizer—to manufacture thousands of CAN fertilizer bombs per year, including the bombs used to attack Plaintiffs.

823.   Further, Defendants lent their good names, legitimacy, and financial services to a specific and deadly component of the Syndicate's CAN fertilizer bomb enterprise, by using accounts controlled by the Defendants, including SCB New York, to facilitate sales of Fatima Group CAN Fertilizer by Fatima and Pakarab, knowing that such sales played an essential, and irreplaceable, role in the Syndicate's CAN fertilizer bomb attack campaign targeting Americans in Afghanistan.  The legitimacy afforded by the Defendants' willingness to facilitate Fatima and Pakarab sales strengthened the effectiveness of the Syndicate's CAN fertilizer bomb campaign by providing the "cover" of a purportedly reputable international bank, Standard Chartered Bank.

824.   Al-Qaeda's and the Haqqani Network's agents', operatives', and fronts' purchases of bombmaking components via Standard Chartered Bank accounts, including SCB New York, were significant enough, and close enough in time to the attacks on Plaintiffs, to have been a substantial factor in both strengthening al-Qaeda's and the Haqqani Network's terrorist enterprise, and causing (factually and legally) the attacks on Plaintiffs.

825.   Because the Haqqani Network was a part of the Taliban and sourced all the Fatima Group CAN Fertilizer for al-Qaeda and the Taliban both, the Standard Chartered Bank

Defendants' transactions were a substantial factor in strengthening the Taliban's terrorist enterprise and causing (factually and legally) the Taliban's attacks on Plaintiffs.

826.   By knowingly engaging in transactions for, and providing financial services to, Fatima and/or Pakarab while knowing that Fatima and/or Pakarab were deliberately facilitating al-Qaeda's and the Haqqani Network's (and through them, the Taliban's) CAN fertilizer bomb attacks against Americans in Afghanistan, the Standard Chartered Bank Defendants provided substantial assistance to those groups and caused the terror attacks that injured Plaintiffs.

532.

**D.      Danske Bank Enabled Syndicate Terrorist Finance**

827.533.      Danske Bank directly routed millions of U.S. DollarsUSD to al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company. Among its other terrorist finance schemes, Danske Bank: (1) operated its own Laundromat that was also purpose-built, like the Russian Laundromat, to enable narcotics-related terrorist finance, including al-Qaeda and Haqqani Network finance; and (2) facilitated large-scale VAT fraud by al-Qaeda operatives in Europe. Both schemes routed millions of U.S. DollarsUSD to terrorist agents, operatives, and fronts acting for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company. the Syndicate. Plaintiffs outline each below.

1.      **Danske Bank Enabled Syndicate Terrorist Finance Through Its Laundromat**

~~828.~~534.        From 2007 through 2016, Danske Bank operated a laundromat out of its Estonia branch, and laundered substantial sums for Khanani, the Russian ~~Mob~~Mafia, the leadership of Azerbaijan, the Syndicate, and others.[593]

~~829.~~535.        Reportedly, Danske Bank's Estonian laundromat made over $233 billion dollars in suspicious transactions during that time period. Danske Bank's laundromat has been called the "Global Laundromat" due to its magnitude and geographic reach.

~~830.~~536.        A ~~huge~~large proportion of the money that transferred via these transactions ~~were~~was denominated in ~~U.S. Dollars~~USD.

~~831.~~537.        It was reported in 2017 that Danske Bank's violation of money-laundering rules, failure to monitor transactions, and failure to adequately identify clients had been "extensive and systematic and took place over a long time." Larse Krull of the Danish Aalborg University was quoted as saying: "It concerns transactions to such a degree that all the alarm bells should go off in the banks."[594]

~~832.    Danske Bank's now-defunct Estonian branch moved funds to a company belonging to a network linked to Khanani.~~

~~833.~~538.        Khanani was able to "exchange large and suspicious amounts for accounts in [Danske Bank's] name."[595] A customer of Danske Bank's Estonia branch, which purportedly

---

[593] SNL European Financials Daily, *Danske Bank expands Estonia branch probe over potential money laundering* (September 25, 2017), 2017 WLNR 29604102.

[594] Arutz Sheva (Israel), *Danish Anti-Israel Moralizers in Huge Corruption Scandal* (Sept. 8, 2017), 2017 WLNR 27750168.

[595] Pak Revenue, *Pakistan's Altaf Khanani Got Huge Sums from Account in Danske Bank* (Sept. 22, 2020), http://pakrevenue.com/pakistans-altaf-khanani-got-huge-sums-from-account-in-danske-bank/.

had "hidden owners," exchanged millions with the Dubai-registered company Mazaka General Trading, an entity notoriously linked to Khanani.

834.539.       On information and belief, the Khanani MLO used Danske Bank's Laundromat to source millions of U.S. DollarsUSD for al-Qaeda and the Haqqani Network. For example, during a single four-month period on 2014, the Khanani MLO obtained more than $700,000 through Danske's Global Laundromat. Since Danske did not have a U.S. branch, Deutsche Bank's branch in New York (DBTCA) worked with Danske to complete the transaction.

835.540.       Investigative reports by respected media outlets confirmed that Danske Bank likely financed al-Qaeda and its allies through the Khanani MLO. For example, the German newspaper *Süddeutsche Zeitung* reported that Danske enabled U.S. DollarUSD cash flow to the Khanani MLO through its front, Mazaka General Trading, and reported: (1) "Mazaka was a company used by one of the most wanted money launderers at the time, Pakistani Altaf Khanani," (2) Mazaka's "customers" included "[t]errorist organizations such as al-Qaeda" "and the Taliban"; and (3) "[b]etween April and August 2014" "a total of $720,000 flowed into [Mazaka's] account at Danske Bank."[596]

836.541.       Richard Grant, the former head of the Australian intelligence service was quoted as saying "[t]here can only be one reason why money has been moved out of Danske Bank and into [Khanani's] trading companies - and that is money laundering. Because that was the only thing that happened in those companies."[597]

---

[596] Frederik Obermaier, Mauritius Much, Hannes Munzinger, Meike Schreiber, *Dänische Waschmaschine*, Süddeutsche Zeitung (Sept. 23, 2020), https://www.sueddeutsche.de/wirtschaft/finanzskandal-daenische-waschmaschine-1.5042107.

[597] Business Recorder, *FinCEN Files: Pakistan'sPakistan's Altaf Khanani got huge sums from account in Danske Bank* (September 21, 2020), https://www.brecorder.com/news/40020006.

837.542.        As the Economist pointed out in 2018, "Danske missed chance after

chance to stop the sluice."[598] It was not until 2015 that Danske Bank began addressing the issue,

and not until 2016 that the subject accounts at the Estonia branch were all finally closed.

838.543.        After its Global Laundromat was exposed, Danske Bank conducted its

own internal investigation which found "major deficiencies in controls and governance that made

it possible to use Danske Bank's branch in Estonia for criminal activities such as money

laundering." The CEO of Danske Bank then resigned, reportedly due to the scandal related to

uncovering the Danske Bank laundromat.

839.544.        Danske Bank publicly stated that it has "taken a number of measures

against current and former employees" "in the form … of warnings, dismissals, loss of bonus

payments and reporting to the authorities," in response to its own investigation of its

Laundromat.

840.545.        The Organized Crime and Corruption Reporting Project concluded that

Danske Bank had violated at least 47 different anti-money laundering regulations. Danske Bank

was subject to a control action in 2015 concerning compliance with measures of anti-money

laundering and terrorist financing prevention, due to these money-laundering financial

transactions. Danske Bank recently announced that "Danske Bank has been preliminarily

charged by the Danish State Prosecutor for Serious Economic and International Crime with

violating the Danish Anti-Money Laundering Act on four counts all relating to Danske Bank's

---

[598] The Economist, *Money-laundering: Questionable shape* (September 22, 2018), 2018 WLNR
29196326.

Estonian branch in the period from 1 February 2007 to the end of January 2016."[599] -U.S.

financial crime authorities continue to investigate.

### 2.   Danske Bank Enabled Syndicate Terrorist Finance Through Its VAT Fraud Schemes

841.546.        It has been reported that in 2009 and 2010, the treasuries of Germany,

Italy, and Spain were victims of VAT fraud, which was perpetrated using a Danske Bank

account in the name of a company called Swefin.

842.547.        Finans and the daily newspaper *Information* gained access to documents

via the German research organization Correctiv showing that Danske Bank set up an account for

other later convicted VAT fraudsters at a time when several major European banks had dropped

trading in CO2 quotas—the scheme here—due to revelations of extensive fraud in the area.[600]

843.548.        In 2009, Danske Bank, via one of its branches in Denmark, allowed

accounts controlled by the Danish-owned company Swefin to conduct VAT fraud of over $100

million.

844.549.        Over the course of five months in 2009, a fraudster named Mohammad

Safdar Gohir, along with others, sent DKK 830 million through the Danske Bank account in

Hørsholm, via an account which belonged to Swefin.

845.550.        Swefin was a payment platform, but it operated as a way to avoid

regulation for criminal enterprises, and allowed VAT fraudsters to hide their cash flows from the

authorities.

---

[599] Professional Wealth Management (PWM), *Danske Scandal Should Lead to Renewed Scrutiny of New Clients* (Feb. 27, 2019), 2019 WLNR 6352499.

[600] Jette Aagaard, Niels Sandøe, and Matias Seidelin, *1 Mia. Kr Fra Svindelsager i Flere Europæiske Lande Kørte Gennem Danske Bank*, Finans.dk (May 26, 2019) (translated by Plaintiffs), https://finans.dk/finans2/ECE11392127/1-mia-kr-fra-svindelsager-i-flere-europaeiske-lande-koerte-gennem-danske-bank/?ctxref=ext.

846.551.      Danske Bank thereby became a tool to hide the cash flows from the perpetrators' crime.

847.552.      Richard Ainsworth, adjunct professor at Boston University and a lawyer, explained that "[g]etting the money transferred to Swefin is like going through the gateway to the legitimate banking world. Then Swefin moved the money through several banks before they eventually ended up in a personally owned account or were simply reinvested in a new trip around a VAT carousel in the EU.

848.553.      In 2010 the same account in Danske Bank was used in another case of VAT fraud. This time, Spain was defrauded of approximately $40 million. Here, again, the Swefin account was used. It was reported by the Italian daily *Corriere Della Sera* that this VAT fraud had been used, among other things, to finance al-Qaeda in Afghanistan.

849.554.      According to the newspaper, the Italian authorities were warned by the United States after U.S. and British troops found documents from the scam during an operation in the mountains between Afghanistan and Pakistan in 2010.

850.555.      Again, in 2016, while Danske Bank was dealing with the fallout from the Estonia branch money laundering fraud, millions of kroner flowed from suspected VAT fraud through a director's company account at Danske Bank in Denmark.

851.556.      Danske Bank, who allowed a 23-year-old Lithuanian man set up the account without ever showing up at the bank, has been criterizedcriticized for its lack of control, particularly where management of the bank resides at its main branches in Denmark.

852.557.      Finanswatch reported on the fraud scheme in 2019:

> After its money laundering scandal in Estonia, Danske Bank is now criticised for connections to a suspected VAT fraud after DKK 51mn (EUR 6.83mn USD 7.88mn) was moved through a Lithuanian director's Danish Danske Bank account. The account had been created without the account's owner ever having

appeared at the bank. The money went from the account to an exchange agency and disappeared thereafter. The company, to which the Lithuanian director is connected, has become part of Operation Greed, which has so far led to appeals against 17 people for extensive VAT fraud. Independent consultant Graham Barrow said that Danske Bank should have noticed the suspicious transactions, while he added that it nonsense to claim that money laundering was an issue only in Estonia when suspicious transactions have taken place in the company's homeland Denmark.[601]

853.558.    These types of VAT fraud schemes have been linked to terrorist finance. For example it has been reported that Abdessamad Fateh, also known as Abu Hamzah, a Specially Designated Global Terrorist, pursued these VAT-fraud enterprises in Denmark. Fateh is known to have ties to al-Qaeda.

854.559.    The proceeds from VAT fraud are diverted, typically through a series of shell companies, to fund terrorism, including by al-Qaeda.

855.560.    Published reports indicate that VAT fraud in Denmark accounted for approximately $12 million in terrorist finance.

856.561.    In 2019, it was reported that fourteen businessmen had defrauded the Danish Treasury for years, raking in some $120 million through VAT fraud. Two of the businessmen were reported to be suspected of direct ties with the Islamic State and al-Qaeda. At the time, money laundering expert and senior adviser at Aalborg University, Lars Krull, reportedly commented that he feared that part of the money was used to finance terrorism.

### E.    Placid Express Enabled Syndicate Terrorist Finance

857.562.    Defendant Placid Express is an international money remitter.

---

[601] Finanswatch (via M-Brain Industry Insight (Denmark)), *Denmark: Danske Bank Criticised for Connections to Suspected VAT Fraud* (May 27, 2019).

858.563. Placid Express knowingly assumed a role in the Syndicate's terrorist fundraising and finance activities by directly aiding al-Qaeda's and the Haqqani Network's terrorist finance activities supporting attacks against Americans in Afghanistan.

859. From 2001 through 2016, Placid Express knew, or was generally aware, that it was reckless to allow hundreds of thousands of U.S. Dollars in terrorist transactions by or on behalf of agents or operatives of al-Qaeda and the Haqqani Network—and did so anyway.

860. Placid Express allowed Altaf Khanani, the Syndicate's leading money launderer and financier, who was at all relevant times the world's most notorious terrorist controller, to transfer funds using Placed Express's facilities.

861. Placid Express knew the widespread view, prevalent throughout the financial services industry between 2001 and 2016, that "real estate projects" regularly served as "Laundromats for illicit funds," and the reputation that "[e]veryone in the real estate business was involved in 'flight capital.'"[602]

564. Al Zarooni Exchange, which is one of Altaf Khanani's principal money laundering vehicles for the Syndicate, claimed a relationship with Placid Express.[603]

565. A currency remitter called Prime Currency Exchange Ltd.—owned and operated by Javed Khanani and then by another Khanani associate—remitted over $100 million to Pakistan using Placid Express and other unnamed money changers between 2009 and 2013. Prime Currency reported that it had "an agency agreement with Placid Express" to remit those funds to Pakistan. The relationship appeared active through at least 2016.[604]

---

[602] Enrich, *Dark Towers*, at 118.

[603] C4ADS, *Sandcastles: Tracing Sanctions Evasion Through Dubai's Luxury Real Estate Market* 28 (2018).

[604] All statements in this paragraph appeared *id*. at 28.

862.566.        Placid Express ~~laundered money for Khanani through his Khanani money laundering organization.  Khanani's organization used~~also has a partner company, Placid Express ~~to transfer funds as part of its money laundering operations.~~Middle East LLC, which shares multiple phone numbers with a U.S.-sanctioned company directly owned by multiple Khanani family members.[605]

~~863.    At all relevant times, Khanani laundered money for the Syndicate.  On information and belief, Khanani laundered hundreds of millions if not billions of dollars for the Syndicate each year, including the years preceding the attacks at issue in this Complaint.~~

567.    Based on these facts, Plaintiffs allege that Placid Express knowingly remitted millions of dollars for the Khanani MLO during the relevant time period.

864.568.        On information and belief, Placid Express at all relevant times facilitated transactions involving known or suspected Syndicate fronts, operatives, and/or agents in Afghanistan, Pakistan, or the U.A.E., which in turn facilitated Syndicate terrorist logistics, terrorist finance, or terrorist fundraising.

865.569.        When Placid Express helped Khanani wash and transfer hundreds of thousands of U.S. Dollars to the Syndicate, Placid Express assumed a role in al-Qaeda and its Syndicate affiliates' operations.

866.570.        Placid Express knowingly provided substantial assistance to the Syndicate, by allowing the Khanani MLO to transfer and wash ~~U.S. Dollars~~USD for the Syndicate's benefit. Placid Express knew it was facilitating criminal activity by allowing the Khanani MLO to use Placid Express to transfer ~~U.S. Dollars~~USD worldwide, and Placid Express knew that the Syndicate and the Syndicate's terrorist acts would benefit thereby.

---

[605] *Id.*

444

867. ~~The Syndicate went on to commit wrongful acts, including the attacks outlined in this Complaint, in part facilitated and aided by Placid Express allowing the Khanani MLO to transfer U.S. Dollars.~~

868. ~~The funds that Placid Express transferred for the Khanani MLO went to the Syndicate and were used to perpetrate terrorist acts.~~

869. ~~Placid Express knew that the money transferred via its facilities would be received by the Syndicate and used to perpetrate terrorist acts.~~

870. ~~Placid Express thereby accepted fees and facilitated vast sums of terrorist finance through transfers to Syndicate agents, operatives, and fronts.~~

871. ~~Placid Express's unlawful acts were not "one-off" instances of Khanani and Syndicate operatives slipping through the cracks of Placid Express's otherwise rigorous counter-terrorist finance practices.  Rather, the nature, counterparties, and sheer volume of transactions Placid Express allowed The Khanani MLO to execute demonstrate that Placid Express pursued this business because it was lucrative.~~

~~872.~~571.     Discovery will likely reveal significant additional relationships between Placid Express, ~~on the one hand,~~ and Khanani, the Khanani ~~money laundering organization~~MLO, and the Syndicate, ~~on the other~~.

### F.     Wall Street Exchange Enabled Syndicate Terrorist Finance

~~873.~~572.     Defendant Wall Street Exchange knowingly assumed a role in the Syndicate's terrorist fundraising and finance activities by directly aiding the Syndicate's efforts to repatriate illicit ~~U.S. Dollars~~USD back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

~~874.~~573.     Wall Street Exchange is one of the largest remitters in the Middle East and wholly owned by the UAE government and headquartered in Dubai.  A money remitter is a

payment service provider that accepts funds from a payer for the purpose of making them available to a payee, without necessarily maintaining an account relationship with the payer or payee.

875.574.    Wall Street Exchange provided essential financial services whichthat directly benefited the Syndicate from at least 1995 through 2016. Wall Street Exchange substantially assisted the Syndicate's terrorist enterprise by facilitating a massive number and total amount of U.S. DollarUSD fund transfers. This is why Wall Street Exchange has been identified by law enforcement agencies as a conduit for money laundering and financial transactions related to illicit, illegal, and terrorist acts.

876.    Wall Street Exchange knew that it was reckless to allow millions if not billions of U.S. Dollars in terrorist transactions for the Syndicate—and did so anyway.

877.575.    Wall Street Exchange allowed Altaf Khanani, the Syndicate's leading money launderer and financier, who was at all relevant times the world's most notorious terrorist controller, to transfer funds using Wall Street Exchange's facilities.

878.576.    Wall Street Exchange laundered money for Khanani through his Khanani money laundering organization. Khanani's organization used Wall Street Exchange to transfer funds as part of its money laundering operations. Wall Street Exchange has been reported to be a "key conduit" for the billion-dollar money laundering operation run by Khanani.

879.577.    At all relevant times, and on information and belief from 1995 through 2015, the Khanani network laundered between $14 billion and $16 billion per year for organized crime syndicates across the world. At all relevant times, Khanani laundered money for the Syndicate. On information and belief, Khanani laundered hundreds of millions if not billions of

dollars for the Syndicate each year, including the years preceding the attacks at issue in this Complaint.

880.578.    On information and belief, Wall Street Exchange at all relevant times facilitated transactions involving known or suspected Syndicate fronts, operatives, and/or agents in Afghanistan, Pakistan, or the U.A.E., which in turn facilitated Syndicate terrorist logistics, terrorist finance, or terrorist fundraising.

881.579.    An Assistant Commissioner of the Australian Federal Police told an Australian investigative journalism television program that Khanani's money laundering operation was run through currency exchanges, and Wall Street Exchange was one that Khanani used for that purpose.

882.580.    That same government official told reporters that Wall Street Exchange knew it was evading anti-money laundering rules and supporting illicit groups, stating that the Khanani network was laundering between $14 billion and $16 billion a year for organized crime syndicates across the world.

883.581.    When Wall Street Exchange helped Khanani wash and transfer millions if not billions of U.S. Dollars to the Syndicate, Wall Street Exchange assumed a role in al-Qaeda and its Syndicate affiliates' operations.

884.582.    Wall Street Exchange knowingly provided substantial assistance to the Syndicate, by allowing the Khanani MLO to transfer and wash U.S. Dollars for the Syndicate's benefit. Wall Street Exchange knew it was facilitating criminal activity by allowing the Khanani MLO to use Wall Street Exchange to transfer U.S. Dollars worldwide, and Wall Street Exchange knew that the Syndicate and the Syndicate's terrorist acts would benefit thereby.

885.583.　　　The Syndicate went on to commit wrongful acts, including the attacks outlined in this Complaint, in part facilitated and aided by Wall Street Exchange allowing the Khanani MLO to transfer U.S. Dollars.

886.584.　　　By 2008, Wall Street Exchange understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al–Qaeda and the Taliban based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regularly reported on by major media outlets.

887.585.　　　The amount and longevity of Wall Street Exchange's assistance to the Syndicate cannot be overstated. Over the course of years, Wall Street Exchange allowed the Khanani MLO to transfer funds hundreds if not thousands of times, in amounts that total hundreds of millions if not billions of U.S. Dollars.

888.586.　　　The funds that Wall Street Exchange transferred for the Khanani MLO went to the Syndicate and were used to perpetrate terrorist acts.

889.587.　　　Wall Street Exchange knew that the money transferred via its facilities would be received by the Syndicate and used to perpetrate terrorist acts.

890.588.　　　Wall Street Exchange thereby accepted fees and facilitated vast sums of terrorist finance through transfers to Syndicate agents, operatives, and fronts.

891.589.　　　Wall Street Exchange's unlawful acts were not "one-off" instances of Khanani and Syndicate operatives slipping through the cracks of Wall Street Exchange's otherwise rigorous counter-terrorist finance practices. Rather, the nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to execute demonstrate that Wall Street Exchange pursued this business because it was lucrative.

892.590.      Discovery will likely reveal significant additional relationships between Wall Street Exchange, on the one hand, and Khanani, the Khanani money laundering organization, and the Syndicate, on the other.

**VIII. DEFENDANTS WERE GENERALLY AWARE ~~OF THE~~THAT THEY WERE PLAYING A ROLE ~~THEY PLAYED~~ IN ILLEGAL ACTIVITY ~~BECAUSE ANY REASONABLE FINANCIAL INSTITUTION WOULD KNOW ITS CONDUCT WAS ADVANCING AL-QAEDA'S AND THE HAQQANI NETWORK'S~~FROM WHICH TERRORIST ~~CAMPAIGN TARGETING AMERICANS IN AFGHANISTAN~~VIOLENCE WAS A FORESEEABLE RISK**

~~893.      At all relevant times, the Syndicate's terrorist campaign, including its CAN fertilizer bomb strategy, was one of the most pervasive examples of the fusion between illicit finance, cross-border money laundering, and terrorist attacks against Americas in Afghanistan because it depended upon the willingness of complicit banks and remitters to serve as Laundromats for al-Qaeda and Haqqani Network agents, operatives, and fronts, who were Syndicate operations, purchasing  acquiring bomb components, or moving money to Syndicate terrorist operatives overseeing its CAN fertilizer bomb network.  Such illicit financial and commercial relationships helped the Syndicate acquire the resources and weapons, including CAN fertilizer bomb precursor ingredients; recruit and pay al-Qaeda and the Haqqani Network's terrorist bombmakers, trainers, and smugglers; and maintain the vast infrastructure in Afghanistan and Pakistan needed to maintain the CAN fertilizer bombing campaign.~~

591.      ~~Defendants' conduct aided the Syndicate's terrorist enterprise.  Given the interlocking, transnational nature of al-Qaeda's and the Haqqani Network's terrorist enterprises, the very nature of facilitating terrorist finance activities by cells of al-Qaeda and Haqqani Network agents, operatives, and fronts in Afghanistan, Pakistan, the U.A.E., Russia, and Europe ensured a close connection between the transactions and subsequent Syndicate attacks on American forces in Afghanistan because al-Qaeda and the Haqqani Network organized their~~

449

entire transnational infrastructure to support their jihad against America which, from 2008 through 2016, centered on attacking Americans in Afghanistan.  Such attacks were a necessary consequence of Defendants' transactions.  When they knowingly transferred, stored, laundered, or converted funds for al-Qaeda, Taliban (including its Haqqani Network), Lashkar-e-Taiba, and D-Company agents, operatives, and fronts, Defendants were assuming a role in their terrorist enterprise and enabling the Syndicate's attacks throughout Afghanistan by enabling al-Qaeda and Haqqani Network terrorist finance and logistics.  None of the transactions or business relationships described in the preceding Part was above-board. All were instead marked by bright red flags of criminality that made Defendants aware that by participating, they were playing a role in illegal activity.

894.592.    Terrorism was also a foreseeable consequence of those transactions. By doing business with Syndicate affiliates like the Khanani MLO, Russian Mafia, Syndicate VAT fraud cells, Hikmatullah Shadman, Fatima and Pakarab, and the other Syndicate agents and operatives, Defendants took part in activities that carry a high risk of sending money to terrorist organizations—and terrorist organizations spend their money to perpetrate acts of terror. As explained above and in greater detail below, the connections between these sorts of criminal transactions and Syndicate violence have been well-established since well before the first attacks at issue in this case. Thus, at all relevant times, Defendants could foresee that their unlawful activity would facilitate terrorist attacks against American in Afghanistan.

895.593.    The Syndicate, including the Taliban and its affiliates, institutionalized control of its laundered revenue to ensure that such monies were recycled into the terrorist campaign against Americans. The laundering of money occurred via a highly regulated process designed to ensure that such efforts would benefit the broader insurgency. The Taliban's 2009

Code of Conduct, for example, contained extensive regulations governing the distribution of illicit funds. As Ms. Peters explained, those regulations "literally institutionaliz[ed] how profits earned from organized crime are to be distributed within the command chain."[606] The money flowed both ways – from local commanders up to the Financial Commission for use by the Taliban's central leadership, and conversely from the leadership back down to local commanders for use in the field. In all cases, the Quetta Shura maintained the last word on all matters concerning the disposition of criminal earnings and laundered Taliban funds. That discipline allowed overseas terrorist finance to be effectively recycled back to the Taliban's leadership to finance the Taliban's terrorist machine around the country.

896.594.     The terrorist finance and logistical support that Defendants routed to the Haqqani Network also funded Taliban attacks, and vice versa. The Haqqani Network was part of the Taliban and operationally intertwined with Taliban leadership. *See infra* Part I.A.2. For that reason, according to a declassified 2009 DIA cable, "a large majority of the Haqqani Network (HQN) funding comes from the Quetta . . . , Pakistan-based Taliban leadership."[607] As Ms. Peters concluded, the Haqqani Network relied on the Taliban organization to "cover operational costs," with the amount of financing depending on "the funding capacity of the Taliban leadership."[608] The financial and logistical flow went both ways: funding for the Taliban supported Haqqani attacks, and funding for the Haqqani Network supported Taliban attacks;

---

[606] Gretchen Peters, *Crime & Insurgency In The Tribal Areas Of Afghanistan & Pakistan* at 16, Combatting Terrorism Ctr. (Oct. 15, 2010) ("Peters, *Crime & Insurgency*").

[607] Def. Intelligence Agency, *Afghanistan – Haqqani Network Finances* (Sept. 24, 2009).

[608] Peters, *Haqqani Network Financing*, at 23.

similarly, explosives obtained by the Haqqanis supported Taliban attacks, and explosives

obtained by the Taliban supported Haqqani Network attacks.[609]

897.    The Taliban's top-down organizational hierarchy ensured that recycled criminal

proceeds from its terrorist finance operations collected in one province, or by Syndicate

leadership, helped to finance Taliban operations throughout Afghanistan—including in provinces

miles away from the site of the criminal activity.

898.    Defendants knew that their transactions aided and abetted Syndicate terrorist

attacks against Americans in Afghanistan.  In this section Plaintiffs outline scienter allegations

common to all Defendants.

899.595.    On information and belief, Defendants knew of all the publicly

availablepublic information cited herein promptly upon publication of such information given,

among other things, Defendants' approach to information sharing, media monitoring and

strategic communications efforts, and collective knowledge imputed to it by the thousands of

employees and agents who work for every Defendant (other than Placid Express).[610]

### A.    Defendants Knew That Their Provision Of U.S.-Linked Financial Services To Syndicate Fronts, Operatives, Agents, And Partners Had A Close Link To Syndicate Terrorism

900.596.    Defendants knew that their provision of financial or money remitter

services to Syndicate operatives, agents, fronts, and partners had a foreseeably close link to

enabling terrorist attacks.

---

[609] Peters, *Crime & Insurgency*, at 33 (Quetta Shura agreed with the Haqqani Network "to operate alongside each other and to divide the proceeds they earn in some zones where more than one faction operates.").

[610] For purpose of efficiency, this allegation applies to every public document cited herein. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 862-63 (2d Cir. 2021) (plaintiffs are permitted to allege bank's awareness of media reportspublic sources on information and belief).

901.597.      In "the post 9/11 world," "banks" universally understood that the U.S. strategy to protect Americans from al-Qaeda and Taliban terrorist attacks after 9/11 was premised upon "[r]eliance on the anti-money-laundering regime" and an "all-out campaign" to promote counter-terrorism "to ensure that funds intended for terrorist groups, such as Al Qaeda, were not coursing through the veins of the international financial system."[611] "This focus reshaped the international landscape forever," according to Mr. Zarate, and "governments implemented and expanded global anti-money-laundering regulations and practices based on principles of financial transparency, information sharing, and due diligence" which reduced the threat from al-Qaeda and Taliban terrorist finance "by focusing squarely on the behavior of financial institutions."[612]

902.598.      After 9/11, the Financial Action Task Force promulgated terrorist finance best practices that served as the starting point for any bank's analysis of the potential red flags before it. According to Professor Gurulé, "The [FATF] Nine Special Recommendations on Terrorist Financing, combined with the Forty Recommendations on Money Laundering, represent the international standard for preventing and suppressing the financing of terrorism."[613] Moreover, "[i]mplementation of the Nine Special Recommendations is essential to establishing an effective counter-terrorist financing regime."[614] By 2011, according to Dr. Jodi Vittori, "international financial institutions" had "endorsed" "international regimes" like the "standards proposed by the Financial Action Task Force," and understood that the FATF's terrorist finance

---

[611] Zarate, *Treasury's War*, at 8.

[612] *Id.*

[613] Gurulé, *Unfunding Terror*, at 155.

[614] *Id.*

rules "play" "an important role": -"[b]y setting common standards and best practices, they put 'sand in the wheels' of terrorist organizations."[615]

903.599.     Defendants knew that counter-terrorist finance strategies that were necessary to degrade al-Qaeda's economic infrastructure were an important preventative tool for keeping Americans safe, and therefore that their own conduct put American lives in danger. According to Professor Gurulé, "Attacking the financial infrastructure of al Qaeda is fundamentally a preventative strategy. -That is, starving the terrorists of funding worldwide is critical to preventing terrorist acts.- The ultimate goal is to save lives by preventing the use of funds to fuel terrorist attacks."[616]

600.   Defendants knew enough to pay lip service to the need for strong Anti-Money Laundering and Counter-Terrorist Finance policies. For example, Deutsche Bank submitted responses to a questionnaire from the Wolfsberg Group representing that DB maintained "documented policies and procedures consistent with applicable AML [anti-money laundering], CTF [counter-terrorist finance] & Sanctions regulations to reasonably prevent, detect, and report: Money laundering[;] Terrorist financing[;] [and] "Sanctions violations." (or "CTF"), and "policies and practices" were "being applied to all branches and subsidiaries of [Deutsche Bank] both in the home country and in locations outside of that jurisdiction." of

904.601.     Defendants knew the key role they played in helping transnational criminal organizations – like the Syndicate and its joint venture partner, the Russian Mafia – effectively conduct the finance activities necessary to sustain and grow their organizations.- As one analyst explained the landscape, "[f]or [] master[s] of money laundering," "banks were

---

[615] Vittori, *Terrorist Financing*, at 165.

[616] Gurulé, *Unfunding Terror*, at 21.

essential" because transnational criminal organizations that required large amounts of U.S. Dollars – like the Syndicate and JV partner, the Russian Mafia – could only avail themselves of regular and reliable access to American currency and U.S.-backed financial instruments and trades through "corporate world" "bankers" in the U.S. and Europe, "who made it possible to launder money on a multibillion-dollar level on an ongoing basis."[617]

905.602.     Defendants knew that the financial services they provided to terrorists were tantamount to arming them. For example, Professor Mark Pieth, who served in multiple international bodies dedicated to rooting out terrorist finance, explained (as quoted and paraphrased by Ms. Van Vuuren), that banks understood that "[f]or a bank to be one of the cornerstones of undermining the sanctions" designed to prevent a violent actor from acquiring funds or moving money, "such behavior [was] tantamount to the sale of weapons."[618]

906.603.     Defendants also knew that from the 1990s through present, the U.S. Dollar has been the "gold standard" currency of choice for al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, D-Company, and the Russian Mafia, therefore that their regular provision of U.S. Dollar-related services to such groups improved their purchasing power and allowed them to kill more Americans.[619]

---

[617] Unger at 87-87.

[618] Hennie Van Vuuren, *Apartheid Guns and Money: A Tale of Profit* 201-02 (Hurst & Co. 2018).

[619] These terrorist groups' decades-long reliance on the U.S. Dollar as the currency of choice to finance their illicit transactions was the result of a number of factors including, but not limited to: (1) the primacy of the U.S. Dollar as the world's reserve currency, which affords the terrorists the same purchasing power as any other commercial enterprise; (2) the specific economic contexts of the geographies in which the groups operates, all of which had a long-standing history of prioritizing dollars as the currency of choice for criminal transactions; and (3) the nearly-universal reliance on the U.S. Dollar in countries in which the United States has deployed large numbers of personnel who are being attacked by a terrorist campaign, such as Afghanistan and Iraq.

907.604.        As former assistant secretary of the Treasury for terrorist finance Mr. Zarate explained in 2013, "[t]he United States has remained the world's primary financial hub, with inherent value embedded in access to and the imprimatur from the American financial system."[620] According to Mr. Zarate, because "[t]he dollar serves as the global reserve currency and the currency of choice for international trade, and New York has remained a core financial capital and hub for dollar-clearing transactions," al‑Qaeda and the Taliban's ability to "access American markets, American banks, and American dollars" operated "as *financial weapons*" in the struggle between the Syndicate and the United States.[621]

908.605.        Defendants knew that Brigadier General Phillip E. McGhee, Director of Resource Management for U.S. Army Forces, U.S. Central Command, stated that al‑Qaeda and Taliban terrorists in Afghanistan and Pakistan "especially" "like[d] to work with … American currency" because "U.S. currency [was] the currency of choice for Al‑Qaeda and [Syndicate] insurgents because [Syndicate terrorists could] use those U.S. Dollars anywhere in the world."[622] Thus, Defendants knew that the U.S. military prioritized reducing the flow of U.S. Dollars to Afghanistan as one strategy to weaken the Syndicate by "reducing that source of funds," *i.e.*, access to U.S. Dollars, "for Al‑Qaeda."[623]

909.606.        From 2001 through 2016, Defendants knew that the Syndicate's leadership specifically believed (correctly) that al‑Qaeda's ability to access U.S. currency itself foreseeably risked terrorist violence against Americans in Afghanistan. As the *Army News Service* reported

---

[620] Zarate, *Treasury's War*, at 9.

[621] *Id.*

[622] C. Todd Lopez, *Army Aims to Stop Flow of Paper Money to Iraq, Afghanistan*, Army News Service, Defense Department Documents (Aug. 25, 2009), 2009 WLNR 16658037.

[623] *Id.*

in 2009, "U.S. currency floating around" Afghanistan risked "providing cash to *facilitate insurgent operations*" because "*U.S. currency is the currency of choice for Al--Qaeda and insurgents because you can use those U.S. dollars anywhere in the world.* We are reducing that source of funds for Al--Qaeda.'"[624]

910.607.    Defendants also knew that the U.S. Dollar was ~~specifically~~ the currency of choice for narco-terrorists around the world, including~~,~~ but not limited to~~,~~ each member of the Syndicate as well as the Russian Mafia. ~~As one analyst noted, "[a]ccording~~ "According to the Financial Crimes Enforcement Network, the U.S. dollar in cash is the preferred currency of transaction for drug traffickers and terrorists globally" and "[m]ore than $100 billion a year in drug trafficking cash moves through the U.S. financial system alone."[625]

911.608.    Defendants knew that from 2000 through present, the media regularly reported on the broad preference for U.S. Dollars shared by nearly all actors in Afghanistan, Pakistan, Russia, and the U.A.E. – the Syndicate's four most important points of entry to the U.S. financial system since 9/11.

912.    Defendants knew of statements by Members of Congress from both political parties that further alerted Defendants to the key role that access to the U.S. financial system and U.S. shell companies ordinarily played in complex trans-national Laundromats. For example, Senator Sheldon Whitehouse explained that "[t]he Azerbaijani Laundromat [was] *not a unique scheme*" and merely "exposed what many" "*already knew*: that … *terrorists*" "*routinely use[d] shell companies to hide assets and obscure illegal activities*" and that "the United States" was

---

[624] *Id.* (emphasis added).

[625] Alon Goren, *Brad Sherman Is Wrong About Bitcoin*, San Fernando Valley Business Journal (Aug. 6, 2018), 2018 WLNR 25445188.

"a favorite destination for money laundering."[626]  He concluded: "***Make no mistake, we [were] a facilitator, as well as a target, in this racket***."[627]

913.   Nick Kochan studied how al-Qaeda and its allies used agents to finance and arm their operations through transactions with complicit banks, money remitters and corporations.  In his 2005 book, Mr. Kochan explained that "[t]here [were] four key groups" "in our society who close[d] their eyes to" terrorist finance:  "They are global corporations engaged in fraud; corrupt governments; organized criminals who trade in drugs; and terrorists."[628]

**B.    Defendants Knew That Operating Laundromats For Customers In High-Risk Terrorist Finance Jurisdictions Foreseeably Aided Terrorism**

914.609.   Each Defendant chose to serve as a "Laundromat" for Syndicate terrorist financiers and money launderers.  When doing so, Defendants were not acting as responsible global financial institutions or money remitters, but rather, aiderswilling participants in unlawful schemes designed and abettors of terror.  intended to fund terrorist activity.

915.610.   The basic divide between legitimate banks, on the one hand, and "Laundromats," on the other, has been well-recognized for decades, and industry participants, including Defendants, understood that any financial institution or money remitter who served as a "Laundromat" would inevitably route substantial sums of U.S. Dollars to terrorist financiers seeking to raise and move money to support anti-American terrorist attacks.  This "Laundromat" concept – criminal terrorists using commercial activities to cleanse their money and fund their violent operations – first began with Al Capone.

---

[626] Sen. Sheldon Whitehouse, *Whitehouse Leads Helsinki Commission Hearing On Shell Corporations And Authoritarian Regimes*, States News Service (Oct. 3, 2017) (emphasis added).

[627] *Id.*

[628] Nick Kochan, *The Washing Machine: How Money Laundering and Terrorist Financing Soils Us* ix (Thomson 2005) ("Kochan, *The Washing Machine*").

916.611.    Beginning in the 1980s, and continuing ever since, financial industry and money remitter professionals, law enforcement officials, and media around the world have documented the regular pattern whereby some large financial institutions and money remitters evolve into Laundromats purpose-built to serve terrorist financiers, fundraisers, and logisticians, including, but not limited to, those associated with notorious designated international terrorist groups, recognized terrorist/crime "fusion" groups, and narco-terrorist groups, and such terrorists, in turn, use their financial partner's services to enable terrorist attacks.  U.S. and European officials have also publicly echoed the same warnings.

917.612.    Defendants knew that their Laundromat was wrongful because Defendants understood that the "[f]low of illicit funds" accomplished through their transactions "[were] illegal movements of money or capital from one country to another, *usually associated* with money laundering and financing of terrorism."[629]  Simply put, Defendants knew, or were generally aware, that their Laundromat-related transactions ordinarily aided and abetted money laundering and terrorist finance, which was the point of the transaction in the first place.Given all the public sources drawing connections between organized crime, money laundering, and terrorism, no reasonable financial institution could have believed that acting as Laundromat for organized crime groups had no foreseeable link to terrorism.

918.613.    As a result, Defendants were doing the exact opposite of what they needed to do after 9/11 – instead of serving as the "first line of defense" in a "quasi-law enforcement role," Defendants helped the terrorists defeat law enforcement.[630]

---

[629] Raymon Ram, *Unmasking Beneficiaries in Corporate World*, New Straits Times (March 2, 2021), 2021 WLNR 6812142.

[630] According to Professor Gurulé, "the FATF Special Recommendations recognize that financial institutions represent the first line of defense to prevent funds being used by terrorist money

919.614.    Defendants knew that al-Qaeda and the Taliban managed a sophisticated international network of terrorist financiers, who were constantly on the hunt for the next potential Laundromat in which to wash their "dirty" opium rubles and convert them into "clean" U.S. Dollars that could be used – and were used – to fund Syndicate attacks against Americans in Afghanistan. Thus, Defendants knew that when a bank or money remitter with access to the U.S. financial system operated as a Laundromat in any high-terrorist-finance risk jurisdiction, suchthat choice reflected the most culpable and blameworthy intent possible for any bank or money remitter other than that entity being a direct participant inwas tantamount to doing business with the terrorist attack itself.organizations themselves. Defendants knew that any bank or money remitter that understood it was acting as a Laundromat also necessarily understood – and ***accepted as the cost of doing business*** – that a vast sum of U.S. DollarUSD-denominated terrorist finance would inevitably flow through U.S.-based accounts to overseas accounts foreseeably controlled by al-Qaeda and the Haqqani Network.

920.615.    Defendants' motivation to grow and sustain their Laundromat was rooted, in substantial part, in their specific desire to directly or indirectly profit from hundreds of millions of dirty money – mostly U.S. Dollars – that they knew was flowing out of Afghanistan, Pakistan, the U.A.E., and Russia after 9/11 through 2016 as a result of the Syndicate's booming transnational criminal activities, including but not limited to, its need to wash the enormous cash

---

transfers. Domestic laws and regulations have been adopted by States to comply with the legal obligations imposed by the Terrorist Financing Convention and international anti-terrorist financing standards. These new measures have forced financial institutions to assume quasi-law enforcement responsibilities to prevent terrorist financing … Almost seven years after the September 11, 2001 terrorist attacks, al Qaeda, the Taliban, and their terrorist affiliates continue to pose a serious threat to international peace and security. … As long as the threat of terrorism persists, the quasi-law enforcement role financial institutions have been forced to play since 9/11 is likely to continue." Gurulé, *Unfunding Terror*, at 181.

flows resulting from its protection money rackets, profits from the Afghanistan-to-Russia Opium

Pipeline, and other income sources. According to a *Credit Control* report in May 2006:

> It [was] plain from studying the statistics of significant fraud and corruption that the geographic scale and limitations [] changed dramatically [in the years following 9/11]. This [was] the 'flip-side' … of globalisation, instantaneous communication, uninterrupted market activity and … ever quicker travel. Offshore havens and Special Purpose Entities (SPEs), urgent calls for dirty money (and for laundering it) for *Islam extremists*, poppy farmers in *Afghanistan* … have **added to the motives for corruption and provided a monster Laundromat for circulating and bleaching it.** Not only that: … conflicts over extradition and money-laundering rules, regulatory arbitrage and political indignation **kick up thick dust-clouds** behind which it has proved **increasingly easy to hide money**, *identities*, *Semtex* [*i.e.*, explosives], cadavers, tracks and trails.[631]

~~921.~~616.        Defendants knew that a bank's or money remitter's operation as a

Laundromat in a high-risk terrorist finance jurisdiction will inevitably cause terrorist violence

because transnational terrorist networks are smart, communicate with one another, and have

historically flocked to Laundromats when they learn of them, as Defendants knew they

inevitably would. For example, on February 5, 2013, E.C. Commissioner Cecilia Malmström

stated that "banks should never function as laundromats" because deliberately helping move

"[d]irty money" in the markets in which large European banks ordinarily competed foreseeably

helped "organised crime or [al–Qaeda or Taliban] terrorists to slip through" the post-9/11

counter-terrorist-finance safeguards that were specifically designed to prevent efforts to

"launder" money or "enable the funding of [al–Qaeda and Taliban] terrorism."

~~922.~~617.        Defendants knew that their deliberate decision to disregard core counter-

terrorist-finance norms in high-risk terrorist finance jurisdictions would inevitably result in

Defendants becoming Laundromats for terrorist financiers. As Giles Edwards, a credit analyst at

---

[631] Jamie Stewart, *White Collar Crime: Fraud, Bribery And Corruption - All Alive And Well?*, Credit Control, Volume 27; Issue 4/5 (May 20, 2006), 2006 WLNR 27626635 (emphasis added).

S&P, explained, "when it comes to financial crime risk" (meaning risk that a bank's or money remitter's financial services will enable terrorism finance, money laundering, and organized crime activity), "a business model based on servicing clients that other banks will not touch" – like that practiced by all Defendants under their New York Laundromat Strategies – "is not a business model," and is contrary to the core rule of counter-terrorist finance that "places the onus on credit and financial institutions to have anti-money laundering and countering financing of terrorism preventive measures in place, including policies, procedures and processes."[632] Alluding to, among others, Deutsche Bank, Mr. Edwards further noted that "[m]any of the companies involved in the various identified Laundromat cases are domiciled far from the original locations of the funds: in offshore centres, but also in key European financial centres, such as the UK, particularly when they allow opaque beneficial ownership structures."[633]

923.618.     Defendants knew that Defendants' terrorist finance services were provided to the Syndicate on a bespoke basis, routed through purpose-built Laundromats each Defendant operated for the express purpose of profiting from terrorist finance and money laundering.

924.619.     Defendants knew that financial institutions and money remitters around the world, including in the U.S., were often willing to deliberately service suspected terrorist agents, operatives, and fronts. For example, terrorist finance expert Raymond Baker conducted a broad study of the attitude of global financial institutions towards terrorist finance and money laundering.[634] Thereafter, he publicly explained the basic knowledge and approach taken by

---

[632] David Chance, *Banks Face Rising Threat Over Links To Financial Crime*, Irish Independent (Apr. 22, 2019), 2019 WLNR 12537413.

[633] *Id.*

[634] Harvard Business School, *Q&A – Dirty Money: Raymond Baker Explores the Free Market's Demimonde* (Feb. 1, 2001) ([Q:] What evidence do you have for your observations? [A:] In the course of investigating the mispricing of trade as a means of moving tax-evading money across

unethical financial institutions with branches in the U.S., like Defendants, to profit from

providing banking services that enabled terrorist finance and violent crime:

> Whether the individual behind these ill-gotten gains is a murderous "godfather," a corrupt government official, or a tax-evading but respectable executive, it's important to understand that ***they all use the same process to launder their money***. … When it comes to large deposits from overseas, ***far too often American banks assume a "don't ask, don't tell" philosophy***. In fact, the Treasury Department estimates that 99.9 percent of the criminal money presented for deposit in the United States is accepted into secure accounts. It's a sad fact, but American banks … ***will accept money from overseas even if they suspect that it has been illegally obtained***. Outside the financial institutions, recent cases involving a range of products — such as appliances, helicopters, and gems — demonstrate that a variety of companies aren't vigilant enough when dirty money is used to purchase legitimate merchandise, ***even though suspicious buying-patterns should set off alarms***.[635]

While most American-headquartered financial institutions greatly improved their conduct after

9/11, Mr. Baker's above-description accurately described the attitude of each Defendant as it

executed its Laundromat from 2001 through 2016.

925.620.          Defendants knew that the Syndicate-related funds (including those

managed by the Russian Mafia) that moved through Defendants' Laundromats directly funded

terrorist attacks. At all times, it has been widely recognized that "money laundering linked to

---

borders, I conducted a highly structured research project involving 550 business owners and managers in 12 countries. Later, when I came to the Brookings Institution, I traveled to 23 countries and talked with bankers, economists, lawyers, sociologists, and law-enforcement personnel about criminal, corrupt, and commercially tax-evading flows. U.S. and international agencies, such as the World Bank and the United Nations, are also important sources of information on these matters, as are a number of private and nonprofit organizations.").

[635] Harvard Business School, *Q&A – Dirty Money: Raymond Baker Explores the Free Market's Demimonde* (Feb. 1, 2001).

UK companies … [was] used by … terrorists to move funds and pay for assets … [through] services paid for with 'laundromat' money."[636]

926.621.    Defendants knew that the "open door approach" followed by the British branches of global financial institutions and money remitters were the ideal vehicle for Laundromat activities. On July 21, 2020, for example, the Intelligence and Security Committee of the U.K. Parliament published the *Russia Report*, which detailed Russian activities in the United Kingdom and concluded, among other things, that the "open door approach," followed by certain Defendants and others like them, "provided ***ideal mechanisms by which illicit finance could be recycled through the London 'laundromat.'***"[637]

927.622.    Plaintiffs' allegations focusing on the combination of red flags raised by Defendants' processes, transaction types, transaction geographies, and other "red flags" separate from customer identity comports with core post-9/11 counter-terrorist finance principles, which always emphasized the need to carefully consider whether the transaction raises financial crime concerns while overlayed against a high-terrorist-finance risk geography, rather than a pre-9/11-style "check-the-box" exercise that focuses primarily on the identity of the customer, whereby the bank or money remitter simply confirmed the customer's purported identity was not on a watch list and, if not, rubber-stamped the transaction without anything more. For example, Heather A. Conley, formerly the Deputy Assistant Secretary of State for Eurasian Affairs, emphasized that FinCEN's post-9/11 counter-terrorist-finance doctrine treating "terrorism

---

[636] Michael Goodier, *Laundromat Britain; The Billions of Pounds of Dirty Money that has Made Its Way Into the UK Economy*, Huddersfield Daily Examiner (Nov. 7, 2019), 2019 WLNR 33610453.

[637] U.K. Parliament, Intelligence and Security Committee of Parliament, *Russia Report* at 3 (July 21, 2020) (emphasis added), https://isc.independent.gov.uk/wp-content/uploads/2021/01/20200721_Russia_Press_Notice.pdf.

financing as illicit financing" – *i.e.*, the post-9/11 approach described in this paragraph – was key to reducing the terrorist threat posed by "the Russian laundromat and its affiliated enabling services that operate[d] within and outside the U.S. financial system."[638]

~~928.~~623.	Overall, Plaintiffs' Laundromat allegations accord with the mine run of recent scandals involving European banks, nearly all of which involved ~~Defendants~~ Deutsche Bank and Standard Chartered Bank. As *Euromoney* ruefully noted in 2020, the most recent scandal at the time was "just the latest in a long and sorry list of mirror trades and laundromats."[639]

~~929.~~624.	Defendants knew that post-9/11 banking and money remitter industry participants have universally understood that the deliberate failure to operate an effective counter-terrorist-finance policy is, *itself*, an *affirmative choice* to aid terrorists because such groups are dynamic, seek out weaknesses in the financial system, and can be expected to take advantage, and do take advantage, of any financial institutions that lack effective AML/CTF policies and procedures. For example, according to Timur Mussin, the Chief Compliance Officer of a bank, the prevalence of terrorist finance risk after 9/11 meant that any bank or money remitter that chose to "[b]ecom[e] a 'Laundromat'" assumed a role in the terrorist enterprise at great peril to the public:

> [9/11] marked the beginning of global efforts to counter and prevent … money laundering and the financing of terrorism. International organizations and lawmakers … have been tightening their policies on AML/CFT issues. … The *absence* of effective processes can *introduce criminals to the organization's client base* – and with that, *all the ensuing negative consequences, including the*

---

[638] Testimony of Heather A. Conley, Former Deputy Assistant Secretary of State for Eurasian Affairs and Senior Vice President for Europe and Eurasia in the Center for Strategic and International Studies, *Senate Banking, Housing and Urban Affairs Committee Hearing on Russia Sanctions*, Financial Markets Regulation Wire (Sept. 6, 2018).

[639] Peter Lee, *Santander Uses ThetaRay's Artificial Intuition to Bolster its AML Defences*, Euromoney (June 16, 2020), 2020 WLNR 18728434.

***organization becoming part of "the laundromat."*** The same applies to counterparties of the organization.[640]

~~930.~~625.    Defendants also knew that their failure to rigorously follow universally practiced post-9/11 counter-terrorist-finance norms itself directly aided the Syndicate's efforts to infiltrate the U.S. financial system after 9/11. As former assistant secretary of the Treasury for terrorist financing Mr. Zarate explained, stakeholders like Defendants "knew the effectiveness of Treasury tools depended first and foremost on the ability of the private sector—most importantly, the banks—to serve as the gatekeepers of the financial system."[641] "It was ***not*** enough," according to Mr. Zarate, "for American or Western European banks to have compliance systems and enhanced due diligence procedures" – such banks needed to practice "good corporate citizenship" and be "willing to protect the system."[642]

~~931.~~626.    Defendants knew that transnational criminal organizations, including the Syndicate and its JV partner, the Russian Mafia, actively sought to partner with corrupt financial institutions, rather than merely "trick" them. According to Jeffrey Robinson, an author who specializes in financial crime, a customer like Semyon Mogilevich – the Russian Mafia leader whose organization served as an agent for al-Qaeda and the Taliban ~~(including its Haqqani Network)~~ and was known, for decades, to help conduct al-Qaeda's and its affiliates' transnational narcotics laundering activities (*supra* Part II.B.2.i), – "typifie[d] the new global criminal" who relied upon Defendants: "These men [did not] rob banks. They [bought] them."[643]

---

[640] Timur Mussin, *The Trouble with Weak AML & CFT Compliance Programs*, Corporate Compliance Insights (Dec. 1, 2020), 2020 WLNR 34238484.

[641] Zarate, *Treasury's War*, at 165.

[642] *Id.*

[643] Unger at 56.

932.627.     Syndicate agents, operatives, and fronts did so by leveraging corrupt relationships with criminal financial institutions – like Defendants – to "tak[e] full advantage of ill-equipped law enforcement and lax money laundering laws" and the resulting stream of dirty money that flowed through the financial institutions like Defendants was so severe that, by the early 2000s, it "ha[d] become, the FBI [said], a strategic level threat on the geopolitical playing field."[644]

933.628.     Defendants also knew that "[f]or cartels," including the Syndicate and the Russian Mafia, "countries with weak institutions make ideal places to set up shop" and, in this context, Defendants also understood that narco-terrorists proactively assess the corporate landscape in the countries in which they do business seeking to determine whom in "the business community" will be willing to "launder their cash."[645]

934.629.     Defendants knew that the Russian Mafia always "maintained" the ability to "move money through Russian banks" with ease.[646]

935.630.     Defendants knew that the U.K. had a long-standing problem with terrorist finance associated with a range of transnational criminal groups, including but not limited to, the Russian Mafia.  Surveying the wreckage in 2020, Anupreet Amole analyzed the prevalence of Laundromat activity in the U.K. and explained that the U.K. "parliamentary report on Russian influence note[d] the gradual development of 'the London laundromat,'" which only confirmed what "many legal and compliance professionals knew already," including the managers,

---

[644] *Id.*

[645] Tom Wainwright, *Narco-Nomics: How to Run a Drug Cartel* 118-19 (Public Affairs Press 2016).

[646] Zarate, *Treasury's War*, at 161.

employees, and agents of Defendants, that "the UK has a long-standing problem with illicit finance, whether or not connected to Russia."[647]

936.631.    Defendants knew of the terrorist finance scandal surrounding the 1991 collapse of the Bank of Credit & Commerce International ("BCCI"), which informed Defendants' own history, as well as Defendants' understanding of the inherent risks of operating a Laundromat in connection with high-terrorist-finance-risk jurisdictions. "'BCCI did *dirty work for every major terrorist service in the world*,' said Jack Blum," "who" "investigated the case."[648]

937.632.    Defendants knew that their decision to serve as Laundromats in the same markets in which BCCI had previously done so would inevitably result in vast flows of terrorist finance flowing from the United States to al-Qaeda and the Taliban (including its Haqqani Network) in Afghanistan, Pakistan, the U.A.E., and Russia, given that BCCI's prior Laundromat focusing on the Middle East and Central Asia was also specifically, and widely, known to have been used by both terrorist groups.

938.633.    Defendants knew that the core lesson that observers, including banks and money remitters, learned from BCCI's own Laundromat for terrorists was that Islamist terrorists specifically, and most of all those focusing on Afghanistan, were keenly aware of the nuances of the global financial and money remitting system, understood the reputations of the industry participants, paid attention to trends, and acted like any other rational actor in their shoes would be expected to once they learned BCCI was open for business as a Laundromat—they flocked to BCCI and used it to finance their terrorist operations. Defendants intended to achieve the same

---

[647] Anupreet Amole, *Trying to End the Illicit Laundromat Cycle*, FTAdviser.com (August 6, 2020), 2020 WLNR 22850806.

[648] *Id*. (emphasis added).

profit through their own Laundromats that BCCI obtained, albeit in a more careful manner designed to avoid a repeat of BCCI's fate.

939.634.    Defendants knew that their conduct, including that relating to Khanani, modeled the key themes of the BCCI scandal. –As the Pakistani media noted, "[w]hat reflect[ed] poorly on Pakistan [was] that Khanani's entire organisation had been shut down and its key players had been arrested in 2008," and yet the scheme continued.[649] -In sum, "[t]he entire [Khanani] affair [was] a reminder of the 1991 BCCI scandal," and "[i]t seem[ed] we [had not] learn[ed] much since that time."[650]

940.635.    Defendants knew that robust anti-money-laundering compliance by financial institutions serving high-terrorist-finance-risk customers was essential to protecting Americans specifically from al–Qaeda and Taliban attacks after 9/11.- Mr. Zarate, the first assistant secretary of the Treasury dedicated to terrorist finance, recalled that "the classic financial weaponry of anti-money-laundering strategies" formed the core "set of tools that could disrupt Al Qaeda's operations" and keyed Treasury's "campaign to combat terrorist financing" after 9/11.[651]

941.636.    Defendants knew that any distinction between "money laundering" risk and "terrorist finance" risk was obliterated after 9/11 when analyzing terrorist finance risk attendant to the provision of financial or money remitter services to persons, entities, or accounts related to a high-risk terrorist finance jurisdiction.

---

[649] The News Int'l (Pakistan), *The Khanani Affair* (April 9, 2017), 2017 WLNR 11090249.

[650] *Id.*

[651] Zarate, *Treasury's War*, at 21.

942.637.      Defendants knew that after 9/11, there was broad international consensus that terrorist financing shared the identical methods as money laundering and therefore that AML violations relating to transactions connected to high-risk terrorist finance jurisdictions – without more – demonstrated significant terrorist finance risk.

943.638.      Defendants knew that U.S. and European financial institutions, including each Defendant, consistently pursued a unified anti-money-laundering/counter-terrorist-finance agenda – often abbreviated "AML/CTF" – after 9/11.

944.639.      Defendants knew that the post-9/11 counter-terrorist-finance regime rejected attempts by banks and money remitters to categorize suspected financial crimes in high-terrorist-finance-risk jurisdictions as merely presenting "money laundering" concern generally rather than "terrorist finance" risk specifically. Instead, the universally recognized counter-terrorist-finance best practice after 9/11 recognized that, with respect to transactions relating to a high-terrorist-finance-risk jurisdiction, terrorist financiers often laundered money and therefore, *ex ante* from the view of a responsible bank or money remitter, when customer activity raised money laundering "red flags" in a high-risk jurisdiction for terrorist-finance, that same conduct also necessarily raised "red flags" for terrorist finance risk.

945.640.      Defendants knew that at all relevant times, banks and money remitters in the U.S. and Europe followed the same unified approach to anti-money-laundering and counter-terrorist-finance. Thus, Defendants knew that a bank's or money remitter's deliberate financial crime activities in high-risk terrorist finance jurisdictions definitionally enabled terrorist finance and inevitably caused terrorist finance to flow through the bank or money remitter, because illicit actors use the same mechanisms to accomplish both money laundering and terrorist finance.

946.641.    Defendants knew that the European Union officially extended the ordinary scope of anti-money-laundering (or "AML") to include counter-terrorist-finance (or "CTF") in 2005, and in so doing, adopted a risk-based approach that assumed the worst if a transaction, customer, or counterparty raised financial-crime-related red flags in a geographic, industry, or customer context that also carried elevated terrorist finance risk, *e.g.*., a transaction involving a company in Pakistan that included indicators of money laundering. –According to Dr. Thomas Voller, Esq. and Matthew Wales, Esq., "[w]ithin the European Union, the fight against money laundering and terrorist financing is more or less unified."[652]

947.642.    Defendants knew that their Laundromats – by design – fostered a complete overlap between AML and CTF violations, and that such intentional opacity only magnified their malign intent given the Laundromat setting. -According to Michelle Thorp, CEO of a financial services association, "reports that three key European banks" (including Deutsche Bank) "fac[ed] allegations over handling suspicious money" which came "after the 2010-2014 Global Laundromat scheme" reinforced the importance of banks following the universal understanding in the financial services that "AML compliance extend[ed] to terrorist financing, which [was] facilitated through money laundering."[653]

948.643.    Defendants' awareness of the extreme terrorist finance risks attendant to the operation of their Laundromats was heightened by their related knowledge concerning the elevated terrorist finance risks of their customers' geographies. -Defendants were sophisticated financial institutions and/or money remitters. -As such, Defendants knew:- (a) that geography-

---

[652] Dr. Thomas Voller, Esq. and Matthew Wales, Esq., *Prevention of Money Laundering: European Approach*, Business Credit, Volume 120; Issue 5 (May 1, 2018), 2018 WLNR 14325050.

[653] Michelle Thorp, *Dirty Laundry*, Credit Management (Nov. 1, 2019), 2019 WLNR 34501789.

related "red flags" were critical to the effectiveness of counter-terrorist-finance practices at banks and money remitters like them; and (b) that Afghanistan, Pakistan, the U.A.E., and Russia were "high risk" terrorist finance jurisdictions for al~~-~~Qaeda, the Taliban ~~(including its Haqqani Network),~~, Lashkar-e-Taiba, Jaish-e-Mohammed, and D~~-~~Company, which Defendants all knew relied upon all four geographies as the main arteries of their terrorist fundraising, finance, and logistics activities in support of Syndicate terrorist attacks against Americans in Afghanistan.

~~949.~~644.    Defendants knew that al~~-~~Qaeda had a significant presence throughout Europe, and that, according to Professor Gurulé, "Al Qaeda has been extremely active in Italy and Germany."[654] Moreover, "Al Qaeda considers Europe a central arena for the promotion of global jihad and the realization of its vision of an Islamic caliphate."[655]

~~950.~~645.    Defendants knew of regular, and substantial, U.S. Dollar-related cash flows between and among the U.S., U.K. and/or European countries, on the one hand, and Afghanistan, Pakistan, the U.A.E., and/or Russia, on the other, were often, on their own, powerful indicia of terrorist finance given Defendants' knowledge of the Syndicate's widely reported financial strategies (*e.g.*., the Joint Venture). According to Dr. Rollie Lal, banks and money remitters understood that "[i]llicit activities of both the criminal and terrorist type require access to financial support"; as a result, Defendants knew how to track "the flow of money through both legal and illegal means into terrorist-held territory [such as Afghanistan and Pakistan], and out of countries that have a historical or political connection with [Syndicate

---

[654] Gurulé, *Unfunding Terror*, at 79.

[655] *Id.* at 77.

terrorist] groups [such as Russia and the U.A.E.],"[656] which Defendants knew raised red flags for Syndicate activity.

~~951.~~646.      By no later than 2002, Defendants knew that responsible global financial institutions and money remitters terminated customer relationships, or even withdrew entirely from geographies, if the bank or money remitter could not regularly and reliably review and assess the terrorist finance risk posed by their customers. As Mr. Zarate recalled, Citibank famously changed the scope of its customer relationship to eliminate the identified terrorist finance risk.[657]

~~952.~~647.      Defendants knew that the Financial Action Task Force deemed Pakistan to pose the highest possible risk of terrorist finance when it deemed Pakistan both "high-risk and noncooperative" in February 2012, and that Pakistan was specifically identified for its extreme "terrorist finance" risk.

~~953.~~648.      Defendants knew that there was a widespread negative "perception" of the Pakistani financial services industry in the international business community that was "rooted in the international reputation that Pakistan … ha[d] as a country with … widespread money laundering practices."[658] Moreover, "[t]his [was] not just an anecdotal perspective," because "[t]he global money laundering and terrorist financing watchdog," the FATF, "publicised the shortcomings of the Pakistan anti-money laundering regime."[659]

---

[656] Lal, *Terrorist Criminal Enterprises*, at 191-92.

[657] Zarate, *Treasury's War*, at 87-89.

[658] Business Recorder, *Why is Pakistan's Money Laundering Problem so Persistent?*, (Jan. 2, 2021), 2021 WLNR 89674.

[659] Business Recorder, *Why is Pakistan's Money Laundering Problem so Persistent?*, (Jan. 2, 2021), 2021 WLNR 89674.

954.649.        Based upon their branches and employees' connections to Afghan- and Pakistani-diaspora communities across Europe and Asia, Defendants knew that al–Qaeda and the Haqqani Network used transnational criminal activities in Europe, the Middle East, and Asia to directly support attacks against Americans in Afghanistan.  For example, according to Dr. Rollie Lal, "in diaspora communities across Europe and Asia" – precisely the communities in which each Defendant focused much of its U.S. Dollar-related business and from which Defendants drew much of their employee pools – "it [was] clear that terrorist criminal enterprise [was] a venture for" "extensive" transnational activities by al–Qaeda and the Taliban, including its Haqqani Network, to sustain the terrorists' own surge in Afghanistan by using the opportunities afforded by "globalization" to create and sustain a network of cells in Europe, Asia, and the Middle East to fund, finance, and arm terrorists to attack Americans in Afghanistan.[660]

955.650.        Defendants knew that otherwise suspicious financial transactions involving members of the Pakistani diaspora in Europe, the Middle East, Russia, and Asia after 9/11 bore an extreme risk of terrorist fundraising, finance, and logistics activity.  When Defendants processed suspicious transactions that already raised financial crime red-flags, Defendants' additional knowledge that their customers were Pakistani nationals living or conducting suspicious transactions outside of Pakistan was an additional red flag that Defendants knew indicated the suspicious transaction in question foreseeably aided Syndicate terrorist finance, fundraising, and logistics, and Defendants.

---

[660] Dr. RollieThachk and Dr. Lal, *Terrorist Criminal Enterprises: Financing Terrorism through Organized Crime* at 193 (Praeger 2018; Kimberly L. Thachuk and Rollie Lal, eds.)..

956.651.        As sophisticated, long-time participants in the Afghanistan and Pakistan economies, Defendant knew that Afghanistan- and Pakistan-related transactions from 2001 through 2016 that raised suspicion of, or appeared related to, front company activity, money laundering, narcotics trafficking, terrorist logistics, or other indicia of criminal activity was likely to aid, and did in fact regularly aid, Syndicate attacks against Americans in Afghanistan by financing al-Qaeda, Taliban, and/or Haqqani Network activities.

957.652.        From 2001 through 2016, Defendants knew that regular public reports alerted banks and money remitters to the fact that companies, banks, and money remitters linked to Afghanistan, Pakistan, the U.A.E., and Russia were regularly funneling funding and bombmaking supply to the Syndicate through terrorist finance activities and illicit transactions related to criminal activity in Afghanistan, Pakistan, the U.A.E., Russia, and Europe and that the Syndicate was using such activities to support Syndicate attacks against Americans in Afghanistan.

### C.     Defendants Knew The U.S. and U.K. Governments Opposed Conduct Like Their Own

958.653.        Defendants knew of the potential terrorist finance risk created by their reckless practices based upon direct communications from the U.S. government. From 2007 through 2010, the Treasury Department's Undersecretary for Terrorism and Financial Intelligence, Stuart Levey, visited with financial institutions, money remitters, and corporations around the world in order to inform them about the terrorist finance risks associated with permissive financial and commercial practices, including, but not limited to, the risks that al-Qaeda, Taliban, Haqqani Network, and IRGC fronts were using, or could use, the financial, money remitter, or commercial system to support anti-American terrorist attacks. On information and belief, in 2007 and/or 2008, and again in 2009 and/or 2010, Undersecretary

Levey specifically provided such warnings concerning al–Qaeda, Taliban, and Haqqani Network fronts' use of banks to one or more executives, managers, employees, or agents representing each Defendant.

959.654.        Defendants knew of the potential terrorist finance risk created by their reckless practices based upon direct communications from the U.K. government. In 2006, the U.K. government prepared a list of thousands of suspected terrorist operatives, agents, fronts, and partners, which it then widely shared with financial institutions operating in the United Kingdom including, on information and belief, with one or more representatives of each Defendant's U.K. branch (the "2006 U.K. Government Terrorist Suspects List"). On information and belief: (1) a substantial number of the terrorists named in this Complaint were also identified in the 2006 U.K. Government Terrorist Suspects List shared with Defendants and reviewed by Defendants, including, but not limited to: (a) Khanani; (b) Darkazanli; (c) Bari; (d) Bout; and (e) Mogilevich; and (2) on or after 2006, the U.K. government provided the 2006 U.K. Government Terrorist Suspects List, and issued a warning concerning al–Qaeda, Taliban, and Haqqani Network fronts' use of banks, money remitters, and corporations, to one or more executives, managers, employees, or agents representing each Defendant.

**D.      Defendants Possessed Sufficient Data To Prevent The Syndicate From Using Their Services For Terrorist Fundraising, Finance, and Logistics Operations**

960.655.        Defendants' customer diligence was both like and unlike the diligence conducted by responsible banks and remitters. Defendants' own diligence was similar in that Defendants ordinarily acquired the information necessary to know the identity of their counterparties and to know the terrorist finance risk. As a result, Defendants knew of enough merely from their "window-dressing" diligence to know that their transactions foreseeably aided terrorists—Defendants just did not care. As one economic analyst reported, for example, "[t]he

level of due diligence by [Standard Chartered Bank and Deutsche Bank] is already high in … Pakistan."[661] "Since 9/11," according to Professor Gurulé, "a significant shift has taken place in banks and other financial institutions with respect to monitoring financial transactions. Banks are now scrutinizing accounts and transactions for possible links to terrorists and terrorist organizations, making it more difficult for terrorists to move money through the financial sector.'"[662]

961.656.      At all relevant times, Defendants' sophisticated software proactively identified the sorts of financial crimes executed by the Syndicate's agents. By 2005, Mr. Kochan documented at the time, global financial institutions and money remitters, like Defendants, operated the equivalent of "Computerized Sherlock Holmes" platforms that identified ongoing financial crimes at their branches "each business day":

> Banks have used artificial intelligence as fraud detectives since the mid-1980's when credit card fraud losses started to escalate. Computerized fraud detection systems take in huge volumes of transaction data and look for tell-tale patterns to identify possible cases of fraud.
>
> The latest advance involves developing high tech "transaction sniffing systems" that make use of a body of rules that define the way that money launderers typically carry out their activities. These rules are founded on the three "Vs" of profiling – the volume, value, and velocity (timing) of transactions. If the rules are triggered, then the activity can be deemed "suspicious" and worthy of further investigation.
>
> David Porter, director for risk at the Detica consultancy, says: "They work in the same way that we pick out constellations in a starry sky. These technologies sift through a huge amount of data to work out for themselves what is suspicious without having to refer to a checklist of rules."[663]

---

[661] Dipanjan Roy Chaudhury, *FATF Grey Listing to Take its Toll on Pak Economy*, Economic Times (Feb. 26, 2018), 2018 WLNR 5894450.

[662] Gurulé, *Unfunding Terror*, at 376.

[663] Kochan, *The Washing Machine*, at 280-81.

962.657.     Each Defendant was keenly aware of the foreseeable risk that their facilitation of USD-denominated transactions for terrorist operatives, agents, fronts, or partners foreseeably risked terrorist violence against Americans because each Defendant was a member of an integrated global bank or money remitter subject to common rules relating to anti-money-laundering/counter-terrorist finance (or "AML-CTF"), including know-your-customer ("KYC") and customer due diligence ("CDD") requirements, and each Defendant operated under policies and procedures that alerted them to the extreme terrorist finance risks posed by their transactions and customer relationships.

963.658.     Each Defendant used sophisticated compliance, anti-money laundering, and counter-terrorist financeAML, and CTF software designed to monitor, in real-time, sanctions lists, watch lists, transaction data, media reports, enforcement actions, and more, for the understood purpose of identifying and preventing suspicious transactions that foreseeably could aid terrorists. Plaintiffs do not allege that Defendants did not *know* about Syndicate terrorist finance risks; Plaintiffs allege that Defendants did not *care* about Syndicate terrorist finance risks.

964.659.     From here, however, Defendants'sDefendants' diligence practices sharply diverged from those of law-abiding banks and remitters: when Defendants conducted their diligence, the point of the exercise was to ***conceal*** their terrorist clients' and potential terrorist clients' terrorist finance through the "window dressing" afforded by their diligence—the exact opposite purpose of diligence when conducted by ethical banks and remitters, which is to ***reveal*** potential financial crimes as part of the banks' and remitters' widely-recognized post-9/11 role as America's first, and most important, line of defense against terror by al-Qaeda and its affiliates.

965.660.    As sophisticated banks and money remitters, each Defendant knew the purpose of the criminal law prohibitions on material support to terrorists. As the U.S. Supreme Court has explained, "Congress has prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. 18 U.S.C. § 2339B(a)(1). That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.' Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), §301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)."[664] Accordingly, Defendants understood that "any contribution" it made to members of the Syndicate would illegally facilitate their terrorist activity, and Defendants further understood that this prohibition against such contributions extended to the agents, operatives, and fronts of al-Qaeda, the Taliban, and the Haqqani Network.

966.661.    Defendants knew that ~~Defendants~~they regularly processed suspicious transactions ~~while~~ knowing of "red flags" indicating a high risk of Syndicate terrorist finance operations, including, but not limited to, instances when the transaction: (1) was on behalf of a suspected terrorist financier; (2) related to violent actors or criminal behavior like money laundering that Defendants understood to be directly correlated with terrorist finance risk; (3) had the effect of moving a large amount of U.S. Dollars from the Europe and the former Soviet Union, including Russia, to the Middle East, which Defendants understood to be a significant terrorist finance red flag; and/or (4) involved the transfer of large amounts of money between one or more legs of the Syndicate's hubs in Pakistan and/or the U.A.E. (in any direction

---

[664] *Holder v. Humanitarian Law Project*, 561 U.S. 1, 7 (2010).

involving any combination of the three), involved a large volume of cash, or was otherwise suspicious based on amount, pattern, timing, or history.

967.662. At all relevant times, each Defendant acted while knowing of the risk that one, several, or all the Afghanistan-, Pakistan-, U.A.E.-, Russia-, or Cyprus-related parties to their transactions, as applicable, were Syndicate agents, operatives, and/or fronts, and that the deal was in fact part of the Syndicate's terrorist finance activities and repatriation of overseas profits. A rule of thumb in Afghanistan, Pakistan, the U.A.E., and Russia since 9/11 has been: if it was dirty money, it foreseeably benefited al-Qaeda, the Taliban, and the Haqqani Network's logistical or financial efforts, and a responsible bank, money remitter, or corporation exits the transaction. As long-standing, and sophisticated, participants in the Afghanistan, Pakistan, U.A.E., Russia, and Cyprus markets, each Defendant knew of this reality at all relevant times.

968.663. Defendants knew of the terrorist finance risks attendant to their transaction activity relating to Khanani, Darkazanli, Azizi, Ahmed, and the Russian Mafia because Defendants regularly participated in international conferences and symposia concerning anti-money-laundering/counter-terrorist-finance that routinely shared information that alerted Defendants to the Syndicate's terrorist finance schemes alleged herein.

**E.  Defendants Knew Transactions In High-Terrorist-Finance-Risk Jurisdictions That Used "Buffers," "Shell Companies," Or "Intermediaries" Foreseeably Aided Syndicate Terrorist Fundraising, Finance, And Logistics Operations**

969.664. Defendants knew that their reliance on "buffers," "shell companies," "intermediaries," and the opacity created by transactions that involve multiple links in chain intentionally made it harder for their own financial professionals, as well as those of U.S. and European regulators, to prevent transactions that could aid terrorists. Indeed, a core theme of nearly every Laundromat in the past has been that the accused bank or money remitter – once caught – proclaimed that their transactions were incredibly complicated, the opacity and

insufficient paperwork, while regrettable, proves they could not have known, and the existence of the multiple links, buffers, intermediaries or other similar artifices – which the bank or money remitter itself often created or improved – absolved the accused of responsibility for the terrorist finance that flowed through their Laundromat.

970.665.      Moreover, Defendants also knew that a substantial percentage of their executives, officers, employees, and agents recklessly disregarded obvious terrorist finance risk because the money pouring in was too great, and therefore were more likely to potentially attempt to conceal their terrorist finance by relying on such buffers, intermediaries, and the like. After 2007, according to Ms. Belton, "Western bankers" had "been blinded by the flood of cash flowing into the City of London from the former Soviet Union, and increasingly they'd come to depend on it, especially as the Western banking system hurtled towards the 2008 financial crisis."[665] Each Defendant promoted the use of buffers, intermediaries, layers, and multi-link-transaction-chains precisely because doing so would afford them plausible deniability if their conduct was ever exposed. This strategy only magnified Defendants' culpability.

971.666.      Defendants' practices of knowingly facilitating al-Qaeda and Taliban (including Haqqani Network) transactions through their Laundromats, only heightens their culpability. Defendants intentionally used the opaque financing process with an actual understanding that the al-Qaeda and its allies relied on such opacity to enable their terrorist finance strategies. Defendants' terrorist finance may have been routed to al-Qaeda through an agent, like the Khanani MLO, and the SCB-supplied CAN fertilizer bomb components may have been refined after Standard Chartered Bank enabled the sale, but in every instance, Defendants

---

[665] Belton at 363.

knew they were occurring and purposefully orchestrated them. That is because Defendants made it a business to earn money from illicit enterprise.

972.667.    Defendants knew that suspicious transactions in high-risk jurisdictions that relied on front companies or shell companies and raised concerns about "Mafia"-like activity were a known red flag for al-Qaeda specifically because bin Laden consciously emulated many organized crime finance strategies. Thus, any bank or money remitter's transaction in a high-risk jurisdiction that "relied on front companies—much like the Mafia" raised specific red flags for "Al Qaeda" involvement."[666]

### F.    Defendants Knew Altaf Khanani Was A Notorious Terrorist Financier Of, And Agent For, Al-Qaeda, The Taliban, The Haqqani Network, Lashkar-E-Taiba, Jaish-E-Mohammed, And D-Company

973.668.    From 2001 through 2016, Defendants knew that Altaf Khanani – through the Khanani MLO and associated fronts like Al Zarooni Exchange and Mazaka General Trading – was notorious as "a key financier for terrorists" who "king pinned a flourishing money laundering network involving … terror organizations like al-Qaeda, Hezbollah, and even the Taliban."[667] Defendants knew that Khanani was always notorious specifically for helping the Syndicate to launder money in support of terrorist operations targeting Americans in Afghanistan and Pakistan.

974.669.    Defendants knew that Khanani's decades-long practice – and al-Qaeda-and Taliban-specific reputation – centered upon his role helping terrorists move their drug

---

[666] Zarate, *Treasury's War*, at 36.

[667] The World is One News (Indian TV News Show), *Pak National Altaf Khanani's Financial Relationship with Terror Organisations* (Sept. 21, 2020), https://www.youtube.com/watch?v=BHqa05FUbT4.

money, especially terrorists moving opium-related money in and/or out of Afghanistan, Pakistan, the U.A.E., and Russia, to name four of Khanani's most important Syndicate-related markets.

670.   Defendants knew that even before 9/11, Khanani was a and his family were long-standing, notorious money launderer launderers in Karachi, Pakistan. "[I]n Karachi," where he was Khanani, his family, and the Khanani MLO were all based before 2008, Khanani and his family had long been.

671.   From 2008 through 2017, Defendants knew that Altaf Khanani, and nearly every other member of Khanani's family, served as financiers for al-Qaeda and its allies based upon, among other things, Defendants' knowledge of such persons': (i) decades-long specific reputation as al-Qaeda and Taliban financiers; and (ii) open and notorious for money laundering. association with the fronts used by the Khanani MLO, including but not limited to: Mazaka General Trading, Al-Zarooni Exchange, and other Khanani-owned and/or controlled entities.

975. 672.     Unsurprisingly, within weeks of 9/11, major media reports directly connected Khanani to suspected al- Qaeda and Taliban terrorist finance. Ever since, consistent media coverage alerted Defendants to widespread global suspicions that Khanani, his family, and their associated entities, *i.e.*, the Khanani MLO, financed terrorist attacks by al-Qaeda and its allies against Americans, including, but not limited to, attacks against Americans committed or facilitated by Syndicate members al-Qaeda, the Taliban (including its Haqqani Network), Jaish-e-Mohammed, D-Company, Lashkar-e-Taiba, as well as Syndicate ally Hezbollah. Examples of such media coverage include, but are not limited to:

976.   Defendants knew that on September 30, 2001, *USA Today* identified Khanani and his company called Khanani & Khalia International ("KKI"), as an example of a Pakistani money changer suspected of aiding al-Qaeda and Taliban finance.[668]

(i)      Defendants knew that similar reports followed.  On October 5, 2003, *The USA Today,* September 2001:  "The worldwide hunt for [al-Qaeda's] finances … could [] dead-end in a place like [the Khanani & Kalia currency exchange], one of [Pakistan's] ubiquitous currency exchanges.  Most of Pakistan's 600 currency dealers [ran] illicit money-transfer operations that [were] linked informally to a vast network of similar operations around the globe … [In Pakistan,] the business [was] dominated by Pakistan's Pashtun minority, who [were] kinsmen of Afghanistan's largest ethnic group. Most members of the repressive Taliban regime in Afghanistan are Pashtun. … U.S. authorities [were] looking at the hundi network 'because [it was] a great way to move a lot of money around while preserving anonymity,' [said] Neil Livingstone, CEO of … an international investigative firm … [T]he hundi network [was] the subject of international scrutiny [and was] singled out by the 30-nation Organization For Economic Cooperation and Development and other international institutions as a prime tool for money launderers. The possibility that al-Qa'eda and other terrorist groups [] moved money through the hundi network [was] 'more than remote,' [said] *Money Laundering Alert*."[669]

977.   *New York Times* reported that Khanani's then-company, KKI, was under investigation for transferring funds to al-Qaeda affiliated terrorists in Afghanistan and Pakistan.

(ii)     ", October 2003:  "'*Hawalas* are the 1,000-pound beasts in this whole terrorist financial system,',' said a senior American counterterrorism official []. … Dubai, along with Pakistan and India, forms the backbone of a system that abets terrorism. … "It's convenient and cheap for [] bin Laden to transfer cash from accounts in Pakistan and southwest Asia through Dubai," said Moyara Ruehsen, an international policy professor … One of the largest exchange houses and *hawala* dealers in the Muslim world, [Khanani & Kalia International (or "KKI … is"), *i.e.*, the Khanani MLO ] … [was] now being investigated … on suspicion of having transferred money to militant groups, American and Pakistani officials said. The authorities in the [U.A.E.] also investigated [KKI] …[670]

(iii)    Defendants knew that in November 2008, Pakistan's Federal Investigation Agency ("FIA") "raided the offices of money-changers and … arrested [] top [foreign exchange] trader Altaf Khanani," as part of what the Pakistani media reported was the FIA's

---

[668] James Cox, *'Hundi' System May Foil Investigators*, USA Today (Sept. 30, 2001).

[669] James Cox, *'Hundi' System May Foil Investigators*, USA Today (Sept. 30, 2001).

[670] Timothy L. O'Brien, *U.S. Focusing on Dubai as a Terrorist Financial Center*, New York Times (Oct. 5, 2003).

"intensified crackdown against money-changers" involved in the "scam of money laundering."[671] The FIA's investigation of *The Nation (Pakistan)*, November 2008: "[Pakistan's] Federal Investigation Agency (FIA) has intensified [its] crackdown against money-changers as its agents …arrested another top forex trader Altaf Khanani … [The] National Research Cyber Crime Cell of FIA raided the office of Khanani and Kalia International (KKI) situated at Sima Trade Centre … to probe the scam of money laundering. … [Khanani] was running a foreign exchange company in the name of KKI [and] was arrested … by FIA Crime Wing on charges of being involved in the illegal transaction of foreign currency … An employee of a dealer standing outside the closed market seeking anonymity said that these money changers had become rich overnight; FIA should have taken their record into custody to probe into their transactions to the various countries. 'Bomb blasts can be stopped if the illegal business of Hundi and Hawala is controlled or stopped' he claimed. 'Financial help is being extended to the militants through this business' he further commented. … … [A Pakistani] TV channel reported that Altaf Khanani [] escaped abroad after deceiving authorities at" "Allama Iqbal International Airport [in Lahore, Pakistan]."[672]

978.673.    The FIA's arrest, investigation of, and failure to successfully prosecute,

Khanani in 2008 prompted another wave of media coverage documenting his suspected

laundering for terrorists. For example, on November 10, 2008, the Pakistani news outlet *Ummat*

reported that "[t]he American officials are keeping an eye on the Pakistan's biggest foreign

currency scandal. … Khanani … Sources to a private TV channel have disclosed that American

officials suspected that foreign money changers companies may have provided money to

extremist militant groups."

979.674.    Defendants knew that Khanani also had an (accurate) reputation for

laundering funds for Sirajuddin Haqqani and other members of the Haqqani family to support

Haqqani Network operations in Pakistan and Afghanistan. For example, as one analyst

explained, "Sirajuddin Haqqani, who in 2016 was appointed as deputy leader of the Taliban, was

designated as a terrorist by the U.S. for his role as leader of the Haqqani network. The network

---

[671] Mansoor Khan and Amraiz Khan, *FIA Intensifies Crackdown*, The Nation (Pakistan) (Nov. 10, 2008).

[672] Mansoor Khan and Amraiz Khan, *FIA Intensifies Crackdown*, The Nation (Pakistan) (Nov. 10, 2008).

… *has been known* to work closely with transnational criminal organizations like … the Altaf Khanani [Money Laundering Organization]. Given that these groups have been known to funnel billions of dollars through the global financial system … the financial community will likely *exercise extreme caution* in order to manage exposure to activities with a nexus to illicit finance."[673]

980.675.    From 2008 until 2015, Defendants knew that Khanani was a wanted man who was notorious around the world for laundering massive amounts of U.S. Dollars for the world's worst terrorist groups, including al-Qaeda, the Taliban (including its Haqqani Network, Lashkar-e-Taiba, Jaish-e-Mohammed, D-Company, and Lebanese Hezbollah.

981.676.    Defendants knew that Khanani was a criminal terrorist – not a legitimate businessman – who had the reputation since 9/11 as a transnational criminal and terrorist who ran a "major international money-laundering organisation [*i.e.*, the Khanani MLO] that count[ed], al-Qa'ida, Hezbollah, [and] the Taliban" amongst "its customers" and "used major international banks to 'wash' illicit funds" for its Syndicate customers.[674]

677.    Defendants knew that Khanani's and the Khanani MLO's cross-border money laundering operations were most plausibly understood to ordinarily finance al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, and D-Company, rather than routing value for some other non-Syndicate terror group. As Pakistani banking analyst Farooq Tirmizi explained in 2018, banks and remitters doing business in Pakistan knew "that *the reason* Pakistan was placed on the grey list" was "due to [Pakistan's] failure to take sufficient steps to curb terrorist financing, *not*

---

[673] Hamad Alhelal, Sigma Ratings, *Kabul via Khartoum* (Mar. 6, 2020) (emphasis added), https://www.sigmaratings.com/knowledge-center/insights/kabul-via-khartoum-11180.

[674] Mark Schliebs, *Launderer for Terror Cartels at Work Here*, Australian (Jan. 25, 2016), 2016 WLNR 231.7203.

specifically anti-money laundering."[675]  Indeed, Mr. Mr. Tirmizi explained, anyone familiar with Pakistan's financial system – like Defendants – understood necessarily understood one simple universal rule: transnational criminal organizations are loathe to move any illicit income from the U.S., E.U., and U.A.E. – where it is safe and denominated in Dollars – into Pakistan – where it is unsafe, and denominated in an unstable currency; FTOs have the exact opposite reaction:

> ***No international criminal gangs use Pakistani banks to launder their money***, certainly not the kind that the rest of the world would care about. ***But funds for terrorism do flow through Pakistani banks.***[676]

982.678.      Defendants knew about Khanani's identity, including the connections between Khanani, Khanani's family members, and Khanani MLO entities like Mazaka General Trading and Al-Zarooni Exchange.  Among other reasons, when Defendants' implicated executives, managers, employees, and agents consciously serviced the "dirty money" needs of suspicious customers from the countries that they understood to be the most important markets for the river of dirty money flowing out of al-Qaeda, the Taliban, and their Russian Mafia Opium JV partner, they inverted the normal incentive structure that compels criminals to be willfully blind. The reason is simple: any banker who considered moving dirty money for the Russian Mafia at scale could ordinarily be expected to insist – for personal safety reasons – on knowing the identity of the true beneficiary and such person's associated murderous group because it was widely understoodknown that the Russian Mafia controlled the money laundering business in, and relating to, Russia.

---

[675] Farooq Tirmizi, *The FATF 'Grey List' Means More Trouble For Pakistan Than You Think*, Daily Pakistan Today (Mar. 5, 2018) (emphasis added), 2018 WLNR 6953120. (emphasis added).

[676] Farooq Tirmizi, *The FATF 'Grey List' Means More Trouble For Pakistan Than You Think*, Daily Pakistan Today (Mar. 5, 2018) (emphasis added), 2018 WLNR 6953120. (emphasis added).

983.679.    Defendants knew that an attack in London in March 2012 reinforced the importance to always know one's customers if there was any chance they could include members of the Russian Mafia and that gunmen shot German Gorbuntsov, a Russian banker who had been involved in the "Moldovan Laundromat" and gotten himself "caught in the crossfire" involving "organised-crime groups warring over cash."[677]

984.680.    Defendants and their personnel knew that the attack on Mr. Gorbuntsov highlighted the extreme risks taken by bankers and money remitters who operated Laundromats that could potentially implicate the Russian Mafia's "dirty money," and Defendants and their personnel knew that the attack on Mr. Gorbuntsov highlighted the personal safety reasons necessitating that bankers and money remitters in their position know the precise identities of their customers in order to avoid Mr. Gorbuntsov's fate.

985.681.    Defendants knew that Khanani did not "trick" any Laundromat that serviced the Syndicate through him. With respect to Khanani's business bona fides, Defendants knew that: (1) Khanani was an internationally notorious terrorist financier, not a legitimate businessman who sometimes dabbled in terrorist finance; (2) Khanani and the entities he controlled had a singular purpose of laundering narcotics proceeds for terrorist groups; (3) everything Khanani and his entities did was designed to enable terrorists to profit from drug sales; and (4) Khanani and his entities did not engage in any "legitimate" business.

986.682.    With respect to Al Zarooni Exchange, Mazaka General Trading, and the other Khanani MLO entities, Defendants knew that:- (1) each such entity was controlled by Khanani and used exclusively for terrorist finance; (2) each such entity did not conduct any legitimate business; (3) each such entity was a shell company that did not have a real corporate

---

[677] Belton at 402.

presence anywhere and raised a litany of obvious counter-terrorist finance red flags; and (4) the trading history of each such entity strongly indicated it was engaged in capital flight, laundering, or other financial crimes in high-risk-terrorist-finance jurisdictions, and thus that such transactions foreseeably risked aiding terrorists. Moreover, Defendants' knowledge of Khanani's affiliation with, and control of, the shell companies used by the Khanani MLO, was amply demonstrated by how quickly each Defendant was able to determine that it had committed serious crimes when it dealt with Khanani specifically once people began asking questions.

987.683.     After 9/11, and by no later than 2003 at the latest, Defendants knew that Khanani and the Khanani MLO were internationally notorious as a suspected financier and fundraiser for al-Qaeda and the Taliban. As the *Australian* explained in 2016, "Khanani was a partner in a Karachi-based foreign exchange company," which "had long been suspected of ties to terrorist groups, with investigations … as long ago as 2003."[678]

988.684.     Defendants knew that Khanani was a notorious Pakistani terrorist financier who had evaded capture for decades. From 2008 through 2015, Khanani was also subject to one or more arrest warrants, "red notices," and/or similar indicia of law enforcement interest from the U.S., Pakistan, the U.A.E., Afghanistan, and/or Australia that were known to the Defendants.

989.685.     Defendants knew that Khanani's reputation for laundering money for al-Qaeda and the Taliban never changed because he never stopped representing them. By 2009, Defendants knew that Khanani had achieved a "James Bond Villain" level of global infamy as

---

[678] Mark Schliebs, *Launderer for Terror Cartels at Work Here*, Australian (Jan. 25, 2016), 2016 WLNR 231.7203.

one of the world's most notorious terrorist financiers. According to Robert Cassita, a DEA agent who investigated Khanani:

> [J]ust by the sheer … amount of money he was able to move, the network that he built on six different continents, created an air … that he was an untouchable … I always [] likened him to a James Bond villain. He fit[] the mold. He ha[d] a worldwide network. Move[d] billions of dollars, … [led] a transnational organization, and [was] someone that the world look[ed] [at] as a target.

According to David Stewart, of the Australian Federal Police, who also investigated Khanani, with respect to "high volume, very serious, transnational organized crime networks. … Khanani was the number 1 international controller as far as … terrorist funding was in the world and … was causing a significant impact on multiple countries throughout the world."

990.686.   Defendants' understanding was cemented in the seven years from 9/11 through 2008, when Khanani was the subject of regular international media coverage concerning his fusion with al-Qaeda, the Taliban, and other extremists in Pakistan, and locked in Khanani's reputation as a suspected money launderer and terrorist amongst banks and money remitters around the world, as well as in the media and in government circles.

991.687.   Defendants knew that Khanani also served as a personal agent for Sirajuddin Haqqani (designated as an SDGT in 2008) and the Haqqani Network (designated as an FTO in 2012). For example, as one regional analyst explained, that "Sirajuddin Haqqani" and the "Haqqani [N]etwork" have "***been known*** to work closely with" "the Altaf Khanani [MLO]" and, "[g]iven that these groups have been known to funnel billions of dollars through the global financial system," banks and money remitters needed to "***exercise extreme caution***" "to manage

exposure to activities with a nexus to illicit finance," *i.e*., Syndicate terrorism funded by Laundromats like Defendants.[679]

992.688.   Defendants knew that Khanani's relationships with his shell companies were open and notorious to the banks and money remitters that services the Syndicate through Khanani. Defendants knew that Al Zarooni Exchange and Mazaka General Trading were controlled by Khanani and used by Khanani for the specific purpose of executing illicit transactions designed to support the terrorist attacks of his terrorist clients, al-Qaeda, the Taliban (including its Haqqani Network),. Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company, by helping them finance their networks, including by converting their illicit income into usable U.S. Dollars and repatriating such freshly laundered U.S. Dollars back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

993.689.   Defendants knew that Khanani did not have any legitimate business and therefore that they had to end ***all*** their relationships with him, which, on information and belief, most Defendants did not do even once they started reviewing their Khanani-related transactions. According to Professor Gurulé, "[t]errorist organisations' diverse requirement for financing creates a strong logic for seeking to disrupt terrorism by choking off funding flows to all terrorist-linked activities."[680]

---

[679] Hamad Alhelal, Sigma Ratings, *Kabul via Khartoum* (Mar. 6, 2020) (emphasis added), https://www.sigmaratings.com/knowledge-center/insights/kabul-via-khartoum-11180.

[680] Gurulé, *Unfunding Terror*, at 21.

### G.   Defendants Knew Terrorists Regularly Used Tax Fraud, Including VAT Fraud, Schemes To Finance Attacks

~~994.~~690.        By no later than 2005, each Defendant knew that organized financial crime activities in Europe were red flags for terrorist finance. As Mr. Kochan documented at the time:

> Western governments and multilateral bodies have understood these dangers and sought to introduce some standards into bank's relationships… [I]n recent years, the financial police have turned their attention to … Financial police – tax officials, police detectives, customs agents, bank money laundering reporting officers and the like – have been charged with examining suspicious money movements for terrorist links. This new dimension has dramatically raised the profile of economic crime and investigation… Money laundering rules are their constant concern. … The trail between a terrorist and his backer may be cracked by investigation of a company involved in commercial illegality, such as tax evasion…may reveal links to terrorists. When organized crime groups involved in the Colombian drugs trade…links to terrorist groups have been unearthed.[681]

~~995.~~691.        Defendants knew that because: (a) substantial numbers of al-Qaeda cells were present all throughout Europe, including Germany, Italy, Spain, the U.K., and elsewhere; and (b) terrorist cells in Europe had, for decades-long, relied upon large-scale tax fraud schemes, including VAT fraud schemes, as a powerful form of terrorist finance, then necessarily (c) any red flags suggesting large-scale VAT fraud aided by a bank foreseeably suggested the possibility of al-Qaeda activity.

~~996.~~692.        According to Dr. Jodi Vittori, Europe's thicket of tax laws has long made tax-related issues attractive to terrorist financiers operating there, who have long recognized that "[d]efrauding governments" on funds flowing from things like "tax exemption certificates" were examples of "lucrative" "schemes" operated by the cells of "terrorist organizations" in Europe.[682]

---

[681] Kochan, *The Washing Machine*, at xvi, 66.

[682] Vittori, *Terrorist Financing*, at 33.

997.693.          Defendants knew that Syndicate fundraising, finance, and logistics cells regularly used tax fraud schemes, including VAT fraud schemes, to fund Syndicate operations, and that such techniques were a time-honored tool of terrorist finance. In 2003, Steven Emerson testified that "[a] familiar pattern among fundraisers for terrorism [was] their sophisticated use of tax laws to maximize funds for terrorist operations."[683]

998.694.          Defendants knew that large-scale VAT fraud, in particular, was a screaming red flag that specifically indicated foreseeable al-Qaeda and Taliban (including Haqqani Network) terrorist finance and fundraising activity because both groups were known for being early adopters of VAT fraud as a funding strategy, befitting their demonstrated business acumen and transnational terrorist finance orientation.

999.695.          Defendants knew that in 2005, the FATF, a leading global organization designed to prevent money laundering, publicly warned financial institutions that VATrelated frauds in the EU could foreseeably finance terrorists and published several "case examples" that documented how EU-based VAT fraud schemes had funded terror.

1000.696.          By 2007, two additional public events alerted Defendants to the extreme risk that European tax frauds, most of all VAT frauds, were "red flags" specifically denoting foreseeable al-Qaeda and/or Taliban (including Haqqani Network) terrorist finance activity. *First*, on February 23, 2007, the Financial Action Task Force publicly issued its report, *Laundering the Proceeds of VAT Carousel Fraud*, which warned Defendants, among other things, that:

- "VAT carousel fraud involves organised [] groups attacking tax systems to generate substantial profit … as a vehicle to launder and raise funds … to fund terrorism";

---

[683] *Quoted in* D'Souza, *Terrorist Financing*, at 44.

- "[T]o prevent … this [VAT] fraud, it [was] imperative that financial institutions fulfil[led] their obligations under the FATF recommendations to know their customers, and operate[d] due diligence," which "idea [was] supported in the FATF's Money Laundering and Terrorist Financing Typologies 2004-2005 report, which note[d] … VAT carousel fraud that uses an Alternative Remittance System to move funds"; and

- "There need[ed] to be an increase[ed] global awareness of the use of carousel style frauds as a vehicle for raising funds for … terrorism," and was "a serious crime.[684]

1001.697.    Defendants knew that the FATF was an unquestioned, universally recognized standard setter for the combined world of ~~anti-money laundering/counter-terrorist finance (or "~~AML/CTF~~")~~ around the world. Defendants, including their executives, managers, and employee in the U.S., U.K., Germany, Russia, U.A.E., Pakistan, Afghanistan, and elsewhere, knew that FATF guidance was an authoritative source and that deliberately departing from FATF practices foreseeably aided terrorist finance. The FATF's 2005 and 2007 reports were circulated widely amongst each Defendant's executives, officers, employees, and agents, including, on information and belief, each Defendant's specific personnel responsible for managing Defendants' customer relationships, legal, compliance, marketing, sales, finance, and accounting.

1002.698.    *Second*, beginning in the summer of 2007, Imran Hussain, a Scottish-Pakistani Syndicate operative who raised millions for al-Qaeda, was the subject of international media coverage for the carousel fraud that he masterminded to execute a massive VAT scam that generated hundreds of millions in profits.

1003.699.    Defendants knew that tax frauds in Europe were a decades-long, notorious, red flag for terrorist finance based on a constant stream of reports since the 1980s, which alerted Defendants to the widespread strategy of terrorist groups around the world,

---

[684] FATF, *Laundering the Proceeds of VAT Carousel Fraud*, at 2, 8, and 19 (Feb. 23, 2007).

including the Syndicate, to fund operations through tax fraud schemes, often European VAT fraud schemes specifically.  Such reports included, but were not limited to:

(i)   *Associated Press*, February 1987:  "[Irish] Judge James Nicholson" "said [] that terrorist groups in Northern Ireland are financed by funds they obtain by … tax fraud … at the end of a trial that convicted three men of funnelling tax fraud money to the outlawed Irish National Liberation Army."[685]

(ii)  *EurActiv*, October 2006:- "Interior ministers from Germany, France, Spain, Italy and Poland … attended a two-day UK meeting … [and] were told by UK Home Secretary and MI5 chief John Reid that terrorism [was] the 'biggest threat to all European nations' [and that] … Reid want[ed] Europe to fight VAT fraud linked to terror funds."[686]

(iii) Financial Action Task Force, February 2007:- "VAT carousel fraud" "generate[d] substantial profit [for terrorist groups]" "as a vehicle to launder and raise funds … to fund terrorism" … "[T]o prevent … this[,] [it was] imperative that financial institutions fulfil[led] their obligations under the FATF recommendations to know their customers, and operate[d] due diligence" …"[T]he use of carousel style frauds [was] a vehicle for raising funds for … terrorism … [and was] a serious crime."[687]

(iv) *El Pais*, January 2009:- "Police in Barcelona … arrested six Pakistani citizens on tax fraud charges amid suspicions that the group may have been sending money abroad to finance Islamist terrorism. … According to investigators, the group ran legitimate telephone call shops and internet cafes, but had failed to pay the correct amounts of VAT. … investigators suspect that the six Pakistanis may have been using their businesses and their illicit gains from tax fraud to raise funds to finance terrorism in Pakistan and other countries."[688]

(v)  *Tampa Tribune*, September 2011:- "[D]ollars investigators [said were] being stolen through tax fraud might [have been] funneled to terrorists who [used] taxpayer money to hurt American troops or allies. …. 'When you look[ed] at the dollars and how [they were] being money-laundered, … it [brought] up another concern, particularly when you hear[d] about the businesses that [were] doing the money laundering and the folks that [were] behind it. You ha[d] to wonder where [was] that money going besides to a criminal enterprise,' [Rep. Rich] Nugen [stated]. … 'Here [we were] fighting terrorism

---

[685] AP Online, *Judge Says Tax Fraud Finances Terrorism* (Feb. 11, 1987).

[686] EurActiv (English), *Security & Defence - Call For G6 To Unite Against Terror* (Oct. 26, 2006).

[687] FATF, *Laundering the Proceeds of VAT Carousel Fraud*, at 2, 8 and X (Feb. 23, 2007).

[688] EurActiv (English), *EU Targets Terror Financing with VAT Fraud Crackdown* (June 12, 2017).

across the board, we ha[d] troops engaged, and here we ha[d] a very profitable crime [that was] going on,' he said."[689]

(vi)  Jayesh D'Souza, 2012: "Tax evasion is related to terrorist financing … The government and the courts have attempted to clamp down on" "Tax Evasion/Fraud" "schemes used to support terrorist networks. …In the United States, a number of branches of the [IRS] are assigned to counter tax evasion related to terrorist financing and money laundering."[690]

## H.  Defendants Knew Terrorists Regularly Used Capital Flight Schemes To Finance Attacks

~~1004.~~700.    Defendants also knew that they were aiding Syndicate terrorism when they facilitated unlawful capital flight from customers posing a high risk of terrorist finance, especially when connected to Afghanistan, Pakistan, the U.A.E., or Russia. Deutsche Bank's "mirror trades," for example, were a form of capital flight.

~~1005.~~701.    According to Raymond Baker, whenever a "European" or "North American" "bank[]" or "corporation[]" "aggressively compet[ed] to service illegal capital flight," it confirmed the "widespread" "perception" that "the West [was] not serious about its anti-money laundering programs, preferring instead to" "profit from the combined flows" of dirty money cycling through it.[691] "Thus," according to Mr. Baker, "illegal capital flight" aided by European and American banks or money remitters "remove[d] anti-money-laundering efforts as an effective instrument in the fight against … terrorism" and "thereby weaken[ed] the ability to prevail" against the "perilous threat[]" posted by terrorism "to our societies."[692]

---

[689] Elaine Silvestrini, *Tax Fraud Loot Funds Terrorism?*, Tampa Tribune (Sept. 20, 2011), 2011 WLNR 19580302.

[690] D'Souza, *Terrorist Financing*, at 41-43.

[691] Raymond W. Baker, *Illegal Flight Capital Dangers for Global Stability*, International Politik, no. 6 (2000), *translated and quoted in* D'Souza, *Terrorist Financing*, at 42.

[692] *Id.*

## I.     Defendants Knew Of The Close Link Between Narcotics-Related Transactions And Syndicate Violence

1006.702.     Based on all the media reports cited herein, Defendants knew of the close linkage between their narcotics-related transactions and Syndicate violence.

1007.703.     Defendants knew that Congress statutorily codified its recognition of the close linkage between narco-trafficking and terrorism committed by al-Qaeda in 2006, when Congress amended the PatriotUSA PATRIOT Act to create a new felony offense for aiding the narcotics trafficking activities of an FTO.[693]

1008.704.     Moreover, in February 2011, the U.S. government publicly announced that the terrorist organization Lebanese Hezbollah had masterminded a long-term money laundering scheme that leveraged a foreign bank (Lebanese Canadian Bank) that used its New York branch to help a terrorist group launder drug money to support terrorist operations in the Middle East. This garnered major international media coverage and further alerted each Defendant to the foreseeable link between their provision of U.S.-linked financial services to a narco-terrorist and anti-American violence.

1009.705.     The Russian Mafia nexus further alerted Defendants to the violent nature for the crimes they were aiding. Defendants knew of the widespread understanding in the business, financial, diplomatic, media, and academic communities, of the fusion between illicit activities in the Russian financial services marketplace and Syndicate terrorist attacks against Americans in Afghanistan. For example, as Ms. Belton recounted, "in the wake of the [9/11] attacks, the focus was on counter-terrorism[,] … especially now that Russia [began] to convince the West of the links between Chechen rebels and [al-Qaeda]," which highlighted the fusion

---

[693] USA PATRIOT Improvement and Reauthorization Act of 2005 § 122, 21 U.S.C. § 960a (2006).

between Russian-related "counter-terrorism" and the Syndicate terrorist threat to Americans "in Afghanistan."[694]

1010.706.    From 2001 through 2016, Defendants knew that widely reported public statements by Pakistani and Russian officials confirmed the inseparable link between transnational crime, including the Afghanistan-to-Russia opium pipeline, and terrorist attacks.

1011.707.    From the late 1990s through 2016, Defendants knew that the Russian Mafia were notorious for their opium joint venture with, and weapons sales to, al-Qaeda and the Taliban (including its Haqqani Network).. For example, Defendants knew that a member of the Russian Duma publicly accused Mogilevich of selling tanks, armored personnel carriers, and light aircraft to Taliban terrorists in Afghanistan and al-Qaeda terrorists in Chechnya, which generated a wave of media coverage a few months after 9/11. Similarly, Defendants knew that Mogilevich and the Russian Mafia organized and hosted a secret summit in 2004 with al-Qaeda in eastern Europe, which leaked to the media and produced another wave of stories documenting al-Qaeda's close partnership with the Russian Mafia.

1012.708.    When Defendants deliberately enabled transactions that they knew directly or indirectly aided the Syndicate-Russian Mafia Opium Joint Venture, Defendants assumed a role in an enterprise they understood to be laced with violence. As Tom Wainwright explained in his book analyzing narco-terrorist cartel theory and practice, because cartels like the Syndicate and Russian Mafia cannot take their breach of contract claims to court, "[t]he one way that criminal organizations can enforce contracts is with violence, which is why a capacity to intimidate and kill is at the heart of any drug cartel's success."[695] Defendants therefore knew

---

[694] Belton at 278.

[695] Tom Wainwright, *Narco-Nomics: How to Run a Drug Cartel* 55 (Public Affairs Press 2016).

that the narcotics-related transactions they directly or indirectly aided went "hand in hand" with "violence" "because the use of force, or at least the threat of it, is the only way that drug cartels have of enforcing contracts."[696]

### J.    Defendants Knew Of Al-Qaeda's, The Haqqani Network's, Hezbollah's, And The Qods Force's Role

~~1013.~~709.    In addition to Defendants' general knowledge that al-Qaeda sponsored CAN fertilizer bomb attacks against Americans, Defendants also knew of al-Qaeda's, the Haqqani Network's, and the IRGC's (including the IRGC's Hezbollah Division's and Qods Force's) role in al-Qaeda and Taliban (including Haqqani Network) attacks in Afghanistan, given the topic's wide coverage in mainstream media outlets. For example:

- On September 26, 2005, *Newsweek* reported that al-Qaeda was bringing instructors from Iraq to train the Taliban how to commit terrorist attacks against Americans.[697]

- On November 29, 2009, the *Associated Press* reported that a Pakistani official believed that al-Qaeda was likely providing the Taliban with "[t]he training to make, place and detonate" IEDs used to kill U.S. troops.[698]

- On April 30, 2012, the *Guardian* reported: "Anyone who follows the wars in Afghanistan and Pakistan closely knows that, despite the talk of diminished al-Qaida numbers on the ground, its activists and affiliates are heavily involved in the Taliban military campaign."[699]

~~1014.~~710.    Given Defendants' sophistication, they were aware of reports like these, and their substance, which documented that the Taliban (including Haqqani Network) attacks Defendants were funding was supported in substantial part by al-Qaeda.

---

[696] ~~Tom Wainwright, *Narco-Nomics: How to Run a Drug Cartel* 70 (Public Affairs Press 2016).~~ *Id.* at 70.

[697] *Unholy Allies*.

[698] Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

[699] Michael Semple, *The Taliban Need Help to Break Their Al-Qaida Ties*, The Guardian (Apr. 30, 2012).

~~VII~~K.   **Defendants Knew That Their Transactions Were Not Routine**

711.    Defendants also knew that al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force were FTOs subject to the harshest criminal and financial sanctions possible under U.S. law and, given these FTOs' status, that any Defendant transaction that directly or indirectly aided al-Qaeda, the Haqqani Network, Hezbollah, and/or the Qods Force was, by definition, not a regular, routine, or ordinary financial transaction.

712.    It would be improper to suggest that Defendants believed that their transactions with the terrorists identified in this Complaint were "routine" or "ordinary" because Defendants knew that FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force derived vital financial, logistical, and operational value from purportedly "regular" transactions. Defendants knew that it was impossible for them to engage in any "routine" transaction with a front, agent, cut-out, or partner of al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force for numerous reasons including, among other things:

(i)      Defendants knew that the **unique legal posture of FTOs** under the array of U.S. laws that criminalized nearly all transactions with FTOs meant that any transaction with a customer associated with such FTOs that Defendants facilitated while Defendants knew that value would flow, directly or indirectly, from the customer to an FTO was criminalized under U.S. law and therefore not a "routine" financial transaction;

(ii)     Defendants knew that FTO-focused **counter-terrorism professionals and organizations**, like Treasury officials and the Financial Action Task Force, regularly emphasized that any transactions with FTOs, regardless of their nature, that facilitated the flow of U.S. Dollars or other value to FTOs after 9/11 were inherently dangerous and therefore not routine; and

(iii)    Defendants knew that **al-Qaeda's and the Taliban's post-9/11 notoriety**, as the two terrorist groups known to be responsible for the attack, meant that Defendants knew that even ordinary transactions with such FTOs were dangerous and therefore Defendants knew that any transactions that Defendants facilitated that directly or indirectly aided such FTOs were, by definition, not "routine".

713.    Plaintiffs' allegations comports with the broad post-9/11 consensus amongst counter-terror finance scholars and law enforcement personnel, who ordinarily concluded, from

2001 through the present, that when a bank or money remitter regularly processed transactions for an al-Qaeda,  Haqqani Network, Hezbollah, and/or Qods Force front, operative, agent, cut-out, partner, financer, or logistician, after 9/11, the bank or money remitter was not engaged in any "normal," "regular," or "routine" financial transaction.

### L.      Defendants Knew That Even If Their Transactions Were Ostensibly Routine, Such Transactions Still Aided Terrorist Attacks

714.    Defendants also knew that FTOs, including but not limited to, al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, derived enormous financial, logistical, and operational value from ordinary, routine, and regular transactions, with the FTOs attaching the greatest value to U.S. Dollars, technologies, and services sourced through U.S. markets.  Indeed, according to Professor Gurulé, "[t]he major methods used to move terror money" after 9/11 usually depended upon ostensibly routine transactions that flowed through "the traditional banking system, alternative remittance systems, such as *hawala*, and bulk cash couriers." [700]

715.    Defendants also knew that even routine transactions aided al-Qaeda, the Haqqani Network, Hezbollah, the Qods Force, and the other FTOs who participated in Syndicate attacks against Americans in Afghanistan, because every such FTO heavily prioritized obtaining and using U.S. Dollars, goods, technologies, and services, to enable attacks.  Defendants therefore knew that even "routine" transactions that facilitated value transfer from inside of America to the

---

[700] Gurulé, *Unfunding Terror*, at 151.  "Contrary to popular belief, terrorists use banks and other financial institutions to transfer funds.  Deposit-taking institutions are particularly attractive because they provide an extensive range of financial services.  Also, banks provide wide geographic availability either through their foreign branch offices or through correspondent accounts with foreign banks.  Finally, large sums of money can be transferred instantaneously from a bank located in the United States, through bank accounts in the Middle East, to an offshore account in some other foreign country with the push of a button."  *Id.*

FTO's operatives overseas aided attacks because of the outsized importance of the U.S. to such FTOs' financial and logistical chains:

(i)     Defendants knew that strengthening al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's U.S. Dollar strategies aided the terrorists' purchasing power;

(ii)    Defendants knew that improving al-Qaeda's, the Haqqani Network's, Hezbollah's, and the Qods Force's selection of U.S. goods and services through even routine services bolstered each FTO's supply chain; and

(iii)   Defendants knew that enhancing each FTO's operatives' cover and concealment, through the credibility that each Defendant knew, and believed to be, would result from the Defendant's American branch's facilitation of the FTO's U.S.-related financial transactions that leveraged American markets, banks, remitters, corporations, personnel, and/or service providers, *e.g.*, DBTCA's facilitation of Azizi's VAT fraud transfers to al-Qaeda and the Haqqani Network, SCB New York's facilitation of Haqqani Network purchases of explosives through Fatima Fertilizer, and Danske New York's facilitation of Khanani's transfers to al-Qaeda and its allies.

716.    It would be improper to suggest that Defendants did not know that routine financial transactions foreseeably aided terrorist attacks against Americans in Afghanistan and Iraq by al-Qaeda and its allies because Defendants knew that FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force derived vital financial, logistical, and operational value from purportedly "regular" transactions because, among other reasons:

(iv)    Defendants knew that the **history of FTO attacks** against Americans before and after 9/11 involving al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force were materially aided by, among other things, routine transactions;

(v)     Defendants knew that the **shared post-9/11 FTO terrorist tradecraft** practiced by al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, ordinarily emphasized, among other things, that each FTO's operatives facilitate financial and logistical transactions through ordinary commercial and financial transactions wherever possible; and

(vi)    Defendants knew that the **extreme financial isolation of FTOs** meant even "routine" transactions provided outsized aid to al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, because FTOs were subject to the harshest sanctions possible and therefore derived key financial, tactical, and operational value from even ordinary transactions.

### M.      Defendants Knew That They Served Terrorists Who Did Not "Trick" Them

717.    Defendants knew that, when Defendants provided financial services to the terrorist operatives, agents, fronts, cut-outs and/or partners identified in this Complaint, Defendants intended to provide aid to persons whom Defendants knew were acting on behalf of al-Qaeda, the Haqqani Network, Hezbollah, the Qods Force (and each of these four FTOs' Syndicate allies and partners), and Defendants knew that no such FTOs' customers identified in this Complaint "tricked" Defendants when Defendants aided the FTOs through such customers.

718.    Defendants knew that FTOs' emphasis on cooperation, rather than conflict, accorded with the leadership strategies emphasized by nearly every relevant terror head, including Bin Laden, Sirajuddin Haqqani, Hassan Nasrallah, and Qassem Soleimani, and also their agents and financiers like Altaf Khanani and the Russian Mafia, all of whom understood that while most global financial institutions and money remitters with American ties were no longer open for business to al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, there would always be outlier western banks and remitters that criminally deviated and tried to profit by "breaking bad" and facilitating financial crime as a business model.

719.    Defendants knew that the transactions Defendants facilitated on behalf of the customers affiliated with al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force set forth in this Complaint confirmed each Defendant's long-standing tacit deal with such FTOs— *not* that Defendants were "tricked" by persons acting on behalf of such FTOs.  This allegation accords with the broad consensus of counter-terror finance scholars and law enforcement personnel whom have concluded that when a bank or money remitter regularly processed transactions for al-Qaeda,  Haqqani Network, Hezbollah, and Qods Force fronts, operatives, agents, cut-outs, financers, or logisticians between 2002 and 2020, that bank or remitter was

unlikely to have been "tricked" by an FTO and more likely to simply have maintained a tacit deal with the FTO that profited both the bank/remitter and the FTO.

720.    *First*, former **U.S. counter-terrorist finance leaders in Afghanistan** also confirm that when a bank or remitter routinely flowed U.S. Dollars or other valuable American goods or services through to terrorist fronts, operatives, and agents relating to al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, American counter-terror professionals ordinarily determined that it was more plausible that the bank or remitter in question intended to aid anti-American FTO terrorists targeting U.S. persons in Afghanistan than that the bank or remitter was routinely tricked by FTOs.  For example, while Thomas Creal "served in Afghanistan" "as the lead forensic accountant" for Task Force 2010, he "saw up close the start of dirty money and subsequently how it was moved around the world, using banks" and thus:

> The money movers [were] critical as Al Capone witnessed [and could] be banks, very large banks, as seen by recent billion dollar settlements by … ***Deutsche Bank***, … and others. But the funds were dirty as they entered the bank[s] …  I suggest a refocus on black money, the banks, hawalas and money movers. The amounts will be billions of dollars and as [] a tactic…, if you bankrupt the enemy you will win the war.[701]

721.    *Second*, retired **federal undercover officers** confirm that each Defendant's Laundromat services were most plausibly explained as being the product of tacit deals between Defendants and al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force, rather than terrorist trickery.  For example, as retired federal agent Robert Mazur, who conducted undercover terrorist finance- and narcotics-related investigations, explained in 2013:

> [S]ince 2006 more than a dozen banks [settled] with [DOJ] regarding violations related to money laundering[,] … [including] Standard Chartered.  All admitted to criminal offenses; all were handed … traffic tickets.  This has been the U.S. government's playbook in fighting terrorism … For make no mistake: Without

---

[701] Thomas Creal, *A Re-Focus on Black Money*, PR NewsChannel (Apr. 20, 2017) (emphasis added), 2017 WLNR 12209363.

the ability to "wash" billions of dollars from illicit sources each year, these criminal enterprises would falter. … I have seen this firsthand.  I was a federal agent for 27 years and worked undercover as a money launderer within this murky realm for five of them. … The largest and most sophisticated of these criminal enterprises ***don't trick banks*** into laundering their money; ***rather, they partner with that small segment of the international banking … community that recirculates drug profits and cash from other illicit trades, like black-market arms dealing***.  The only way to stop the flow of this dirty money is to get ***tough on the bankers who help mask and transfer it around the world***. … The stakes are simply too high … [A]s long as terrorists can move their cash freely around the world, we'll have no chance to halt their deadly trades.[702]

722.    *Third*, former **Treasury counter-terrorism personnel** also concluded that one may ordinarily assume that a bank or remitter that routinely moves money for terrorist fronts, operatives, and agents intended to do so rather than being tricked.  "Unfortunately," Mr. Zarate explained in 2013, "when there [was] money to be made" and a "staggering" "magnitude" of "illicit transactions" from which a bank could profit if it operated a Laundromat, a subset of global financial institutions, money remitters and corporations determined – even after 9/11 – their "[c]rime" would "pay" because Treasury officials knew from their experience that "[w]here there [was] money to be made and moved, financial institutions [would] be implicated":

Banks and financial intermediaries will continue to ***weigh the balance between making significant amounts of money while doing business with suspect customers*** and the need to apply the most stringent financial controls and standards on money flowing through their systems.  ***We have seen this over and over with multinational banks***, including, most recently, ***HSBC and Standard Chartered***.  There is little mercy for those … [i]nstitutions that attempt to evade sanctions and scrutiny in order to tap lucrative business lines or markets.[703]

723.    Treasury's long experience confirms that even in a well-functioning financial system, a small minority of "bad banks" must be expected to regularly, and consciously, embrace enormous criminal risks to profit from serving the terrorist financiers who could not do business

---

[702] Robert Mazur, *How To Halt The Terrorist Money Train*, International Herald Tribune (Jan. 4, 2013) (emphasis added), 2013 WLNR 184047.

[703] *Id.* at 370.

with responsible banks, and therefore, Treasury's leaders have believed that "bad banks" should

"be our target" as a key part of the post-9/11 U.S. strategy to protect Americans from terrorist

attacks by FTOs like al-Qaeda, the Haqqani Network, Hezbollah, and the Qods Force:

> There [were] *always banks engaged in fraudulent and criminal activity someplace in the world* [and] … serving … terrorist networks.  They not only provide[d] criminals access to banking services, but also allow[ed] for illicit financial activity to be hidden from the view of regulators, law enforcement, and intelligence services. …[B]anks around the world … *serv[ed] as nodes of illicit financing* … [in which] the dirty money of suspect actors mixed to access the international financial system.  For any … terrorist enterprise to have global and sustained reach, it must have a financial infrastructure to raise, hide, and move money to its operatives and operations.  Banks [were] the most convenient and important of these nodes … and [were] *critical to nefarious networks*.  Where there [was] a *transnational network of concern, there [was] likely also a bank or family of banks serving as a facilitator of that activity*.[704]

724.     *Fourth*, **terrorism scholars** confirm that Defendants knew that their Laundromat

services reflected tacit deals with al-Qaeda, the Haqqani Network, Hezbollah, and the Qods

Force, not terrorist trickery.  Nick Kochan, for example, studied how al-Qaeda and its allies used

agents to fund attacks and arm their fighters through transactions with complicit banks and

money remitters and explained, in his 2005 book, that "[t]here [were] four key groups" "in our

society who close[d] their eyes to" terrorist finance: "They are global corporations engaged in

fraud; corrupt governments; organized criminals who trade in drugs; and terrorists."[705] He

concluded that "terrorists [] waged wars on the financial system to fund their outrages" after 9/11

"and companies [] made themselves available" to terrorists "in a Faustian laundering pact"[706]:

> Criminals [in developing countries] need [] services provided by global corporations … to move and clean their money … [and such] [c]riminals *… look to Western banks for a huge array of devices* that include offshore companies

---

[704] Zarate, *Treasury's War*, at 8 (emphasis added).

[705] Nick Kochan, *The Washing Machine: How Money Laundering and Terrorist Financing Soils Us* ix (Thomson 2005) ("Kochan, *The Washing Machine*").

[706] *Id.*

and tax structures, false names for their bank accounts, and lawyers and accountants for their complex financial structures.  ***Some banks will provide them willingly, satisfying the authorities with the formalities of due diligence*** that have increased in volume in recent years in response to the perceived terrorist threat … [H]owever it comes about, … [t]he maker of the corrupt or fraudulent money ***and the financial institution who helps move it*** are ***equally complicit*** in a process, where both are conspirators, in both parts of the activity.[707]

725.    Similarly, Dr. Jodi Vittori concluded that terrorists like "Al Qaeda understood the limits due to the regulations of the banking business" and were "particularly adept at manipulating the international banking system" to conduct transactions through corrupt banks, remitters, corporations, and lawyers worldwide.[708]

### N.    Defendants Knew That Their Transactions With Fronts, Operatives, Cut-Outs, Agents, Or Orbits Of The IRGC, Including Hezbollah And The Qods Force, Foreseeably Aided The Syndicate's Terrorist Attacks Against Americans In Afghanistan

726.    Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Afghanistan.  As Treasury official Sigal Mandelker noted in 2018, companies, banks, and remitters doing business in the U.S., Europe, and the Middle East have long known that the IRGC, including Hezbollah and the Qods Force, relied upon "'deceptive' Iranian transactions that ultimately channel[ed] money to terrorists" because IRGC tradecraft "'use[d] shell and front

---

[707] Kochan, *The Washing Machine*, at x.

[708] Vittori, *Terrorist Financing*, at 150-51 ("Bin Laden once remarked to a Pakistani journalist that his financial backers 'are as aware of the cracks inside the Western financial system as they are of the lines in their hands.'  It used the international banking system regularly, and millions of dollars in accounts suspected connected with al Qaeda have been frozen.  Al Qaeda understood the limits due to the regulations of the banking business, and it allegedly used the regional banking systems of the Middle East, including the United Arab Emirates, Kuwait, Bahrain, and Lebanon, as they had been notoriously underregulated.  While in Afghanistan, Pakistani banks were frequently used for the same reason.").

companies to conceal [the IRGC's] tracks' as part of an elaborate scheme designed to procure cash for the Quds Force."[709]

727.    Defendants knew that the IRGC's terrorist tradecraft, including that of its Hezbollah Division and Qods Force, has long – and notoriously – emphasized the use of fronts, operatives, agents, cut-outs, and Orbits, to enable the IRGC's supply of funding, weapons, and operational support through illicit commercial schemes designed by the IRGC, and executed outside of Iran by Hezbollah and the Qods Force, to facilitate the IRGC's movement of hundreds of millions of U.S. Dollars, weapons, and key American communications technologies (*e.g.*, secure, untraceable smartphones), through the IRGC's global logistical network, in order to facilitate the IRGC's aid to the IRGC's Syndicate terrorist proxies in Afghanistan.

728.    Defendants knew that Hezbollah and the Qods Force purpose-built the IRGC's global terror infrastructure after 9/11 primarily to facilitate two terrorist attack campaigns designed to drive the United States out of the Middle East:  (i) a terror campaign in Afghanistan led by al-Qaeda and the Taliban, including its Haqqani Network; and (ii) a terror campaign in Iraq involving both al-Qaeda (including its local Iraqi allies) and Jaysh al-Mahdi (the IRGC's local Shiite terrorist proxy in Iraq).

729.    Defendants knew that the IRGC, including Hezbollah and the Qods Force, routinely used commercial transactions involving the U.S., Europe, and the U.A.E. that terminated in Dubai and were designed to facilitate the movement of funds, arms, equipment, and personnel to aid the IRGC's support for Iran's terrorist proxies in Afghanistan and Iraq through Hezbollah and the Qods Force.  For example, in 2008, President Bush gave a speech in

---

[709] Sigal Mandelker, *quoted in* Guy Taylor, *Obama Hid Efforts To Aid Iran's Windfall*, Washington Times (June 6, 2018).

the U.A.E. that was widely covered in the media in which the President emphasized that the U.S. government sought "to enforce US sanctions against" "the Quds Force" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the [Bush] [A]dministration want[ed] to restrict."[710]

730.    Defendants know that the IRGC's reliance on Dubai as a central hub to support Hezbollah's and the Qods Force's facilitation of anti-American terror in Afghanistan continued without interruption from 9/11 through the present.  For example, as a regional studies professor explained in 2020, "Dubai" "maintain[ed] crucial avenues for the IRGC" "to generate money" and was "the gate to the world for" Hezbollah and Qods Force front company activities.[711]

731.    Defendants knew that as the U.S. intensified its IRGC terrorism-related sanctions campaign between 2009 and 2012, the IRGC, including Hezbollah Division and the Qods Force, responded by using Hezbollah and Qods Force front companies, agents, cut-outs, partners, and Orbits from an interconnected global cell network that stretched from the United States to Singapore, and included the U.A.E., Iraq, Germany, South Africa, and elsewhere, to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and source key arms and state-of-the-art U.S.-manufactured technologies necessary to continue to prosecute a terrorist campaign against Americans in Afghanistan and elsewhere.

732.    Defendants knew that, "[a]s the U.S. and EU sanctions on Iran's oil and finance sectors in 2012 started to bite," the IRGC "responded by setting up complex operations involving the likes of Dubai" in which "[t]he IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies," and the IRGC "partnered with some foreign companies to

---

[710] *Id.*

[711] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

bypass sanctions" in which "[m]ost of the time cash" (*i.e.*, U.S. Dollars) "was delivered to a foreign account in a neighbouring country."[712]

733.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC, including Hezbollah and the Qods Force.  Each Defendant generally maintained a corporate security group responsible for supervising their financial transactions, doing counterparty diligence, and preventing terrorist finance and money laundering.  As part of such efforts, Defendants' standard practice would have been to conduct basic open-source research on the IRGC, including Hezbollah and Qods Force, front activities in Dubai and Europe – even a modicum of which would have uncovered the reports discussing the IRGC front entities' terrorist strategy and ties set forth above.[713]

734.    After 2005, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with their counterparties controlled by the IRGC, including Hezbollah and the Qods Force.  Defendants also knew or recklessly disregarded the IRGC's, including Hezbollah's and the Qods Force's, control of their business partners based upon the statements set forth in prominent due diligence materials concerning Iran.

735.    From 9/11 through 2017, U.S. government statements regularly alerted Defendants to the fact that their illicit transactions with fronts, operatives, agents, and cut-outs

---

[712] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016).

[713] This allegation applies to all Defendants except MTN Irancell.  Plaintiffs allege that MTN Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC, including the Qods Force.

acting for the IRGC, including its Hezbollah Division and Qods Force, fronts foreseeably aided

Syndicate attacks against Americans, including in Afghanistan, including, but not limited to:

(i)     State Department, October 2007: "The U.S. Government is taking [] major actions today to counter Iran's … support for terrorism by exposing Iranian … companies and individuals that have been involved in these dangerous activities and by cutting them off from the U.S. financial system. … The Treasury Department [] designated the IRGC-Qods Force (IRGC-QF) under E.O. 13224 for providing material support to … terrorist organizations… Last week, the Treasury Department issued a warning to U.S. banks setting forth the risks posed by Iran. … [the Qods Force's SDGT designation is] consistent with this warning, and provide[s] additional information to help [] institutions protect themselves from deceptive [] practices by Iranian entities and individuals engaged in or supporting … terrorism [and] also notif[ies] the international private sector of the dangers of doing business with … the many IRGC-affiliated companies that pervade several basic Iranian industries."

(ii)    President George W. Bush, January 2008:  In a widely-reported speech to U.A.E. government and business leaders, President Bush called Iran "the world's leading sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's, including the Qods Force's, ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[714]

(iii)   Treasury Department, May 2009: "The U.S. Department of the Treasury [] designated … two Africa-based supporters of the Hizballah terrorist organization, under E.O. 13224. E.O. 13224 targets terrorists and those providing support to terrorists or acts of terrorism by … prohibiting U.S. persons from engaging in any transactions with them.  'We will continue to take steps to protect the financial system from the threat posed by Hizballah and those who support it,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey." "Iran" "provide[s] significant support to Hizballah, giving money, weapons and training to the terrorist organization.  In turn, Hizballah is closely allied with and has an allegiance to [Iran].  Iran is Hizballah's main source of weapons and uses its Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon and Iran. Iran provides hundreds of millions of dollars per year to Hizballah."[715]

(iv)    Treasury Department, February 2010: "Treasury" "implement[ed] existing U.S. sanctions against Iran's [IRGC] by designating an individual and four companies affiliated with the IRGC … 'As the IRGC consolidates control over broad swaths of the Iranian economy,

---

[714] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.  In its coverage, the media noted that President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."  *Id.*

[715] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27, 2009) (emphases added).

… it is hiding behind companies … to maintain vital ties to the outside world,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey.  'Today's action … will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.' …  The U.S. has previously acted against the … IRGC-Qods Force for [its] involvement in … terrorism support activities."[716]

(v)　Treasury Department, August 2010: "The U.S. Department of the Treasury announced [] a set of designations targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah … Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism. Today's designations expose Iran's use of its state apparatus – including the Islamic Revolutionary Guard Corps-Qods Force – and state-run social service organizations to support terrorism under the guise of … economic development … The IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia. It was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism. … The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, seemingly legitimate activities that provide cover for intelligence operations and support to terrorist and insurgent groups. These activities include economic investment … implemented by companies and institutions that act for or on behalf of, or are owned or controlled by the IRGC and the Iranian government."[717]

(vi)　Treasury Department, December 2010: "The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior. … '[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions. We will therefore continue to target and expose [its] networks,' said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism ….  The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct. … Treasury has designated 14 IRGC-affiliated

---

[716] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

[717] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism."[718]

(vii)    Treasury Department, June 2011: "Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism." "Today," "Treasury" "designate[d] … Iranian commercial entities" "owned by [IRGC, which]" "continue[d] to be a primary focus of U.S. and international sanctions against Iran because of the central role [the IRGC] play[ed] in all forms of" "Iran's" "support for terrorism." "As Iran's isolation [] increased, the IRGC [] expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – to generate revenue and conduct business in support of Iran's illicit activities. Today's actions target[ed] core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its" "illicit conduct." "The IRGC ha[d] a growing presence in Iran's financial and commercial sectors" and "control[ed] billions of dollars in corporate business." "Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct."[719]

---

[718] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

[719] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

**IV.**   **EACH DEFENDANT KNEW THEY WERE AIDING THE SYNDICATE'S CAMPAIGN OF TERROR IN AFGHANISTAN**

    **A.**    **Deutsche Bank Knew It Was Aiding Terrorists**

        **1.**    **Deutsche Bank Knew It Operated As A Criminal Enterprise And Laundromat Until 2016**

~~1015.~~736.   Deutsche Bank committed financial crime, facilitated terrorist finance, and laundered money consistently from the late 1980s through 2017. As Dr. Louise Shelley, the Director of the Terrorism, Transnational Crime and Corruption Center at George Mason University, testified before Congress in 2016:

> We [] need to ***focus on legitimate banks*** that can help facilitate the storing and transport of money for terrorists. Recent investigations reveal that ***legitimate large banks such as Deutsche Bank***, in violation of international regulations, ***receive funds that are associated with terrorists*** and criminals ***as this helps increase profits***. Officials at Deutsche Bank, in a significant number of suspicious files examined by auditors, revealed that officials were ***told to avoid warning signs or not to commit due diligence on what should be suspicious clients***.[720]

737.   David Enrich concluded that Deutsche Bank operated as "[a] criminal enterprise," whose Laundromat that systematically facilitated terrorist finance was "not the work of an isolated crew of rogue Deutsche employees;" indeed, "[m]anagers knew. Their bosses knew. American regulators … [found] evidence that at least one member of the bank's *vorstand*—[] one of Deutsche's most senior executives—knew about and approved of the scheme."[721]

Deutsche Bank spent "decades" always making "expedient, easy choices with the single-minded purpose of maximizing immediate profits":[722]

---

[720] Statement of Dr. Louise Shelley Director, Terrorism, Transnational Crime and Corruption Center George Mason University, *Current Terrorist Financing Trends, Hearing Before the U.S. House of Representatives Committee on Homeland Security, Subcommittee on Counterterrorism and Intelligence*, Congressional Testimony via FDCH (May 12, 2016), 2016 WLNR 14564170.

[721] David Enrich, *Dark Towers: Deutsche Bank, Donald Trump, and an Epic Trail of Destruction*, at 7, 16, 105 (Custom House 2020) ("Enrich, *Dark Towers*")..

[722] *Id.* at 7.

[Deutsche Bank's] ascent [was] fueled by ***greed, sloppiness, hubris, and criminality***, and when the reckoning came, it was brutal. Deutsche's risk-taking—the product of years of make-money-at-all-costs mismanagement—was ***out of control***. … Managers were incentivized to shirk responsibilities. … Deutsche exhibited a ***jarring lack of interest in its clients' reputations***. It would soon become enveloped in scandals relating to money laundering, tax evasion, manipulating interest rates, manipulating the prices of previous metals, manipulating the currencies markets, bribing foreign officials, accounting fraud, violating international sanctions, ripping off customers, and ripping off the German, British, and United States governments. (***The list went on.***)[723]

738.    Deutsche Bank insiders concurred. For example, Eric Ben-Artzi, a former Deutsche Bank risk analyst, stated in an on-the-record interview with *The New Yorker*, "There was cultural criminality. Deutsche Bank was structurally designed by management to allow corrupt individuals to commit fraud."[724]

~~1016.~~739.    Former Deutsche Bank bankers have confirmed Deutsche Bank's deliberate, massive criminality at the heart of the Bank's "Russian Laundromat." For example, "former Deutsche banker Roman Borisovich" stated on-the-record that Deutsche Bank's Laundromat "was an industrial-scale operation."[725] The former Deutsche Bank banker said that Deutsche Bank's financial services were designed for criminal use:

> To the former senior Deutsche banker, the mirror-trade scheme … did not look like an operation aimed at avoiding taxes or customs, but like a scheme to create stashes of black cash … By means of a process known as *obnalichivaniye*, cash from company books was converted into untraceable black cash. … [S]aid the [former Deutsche] banker, '*obnalichivaniye* … is only needed by criminals …[726]

---

[723] *Id.* at 8-9 (emphasis added).

[724] Ed Caesar, *The Moscow Laundromat: Deutsche Bank's $10-Billion Scandal*, The New Yorker (Aug. 29, 2016) ("Caesar, *The Moscow Laundromat*").

[725] Belton at 407.

[726] *Id.* at 407-08.

740.    Deutsche Bank further evidenced it knew about the terrorist finance by charging premium rates for it. As one journalist reported, colleagues at Deutsche Bank "understood that [DB Moscow Head Equities Trader Tim Wiswell] had the blessings of his superiors, who on occasion pushed him to charge higher fees for this unique offering."

741.    Deutsche Bank also acted with actual knowledge of the VAT frauds committed by the Azizi Cell and the Ahmed Cell. Early on, a Deutsche Bank employee emailed a Deutsche Bank compliance colleague and informed Deutsche Bank's compliance department that "[t]he CO2 market" that Deutsche Bank was orchestrating for Azizi and Ahmed "[was] *showing typical characteristics of a sales tax carousel*," referring to a universally recognized red flag for terrorist finance generally and especially for al-Qaeda and the Haqqani Network finance activities. Protecting Deutsche Bank's Laundromat, the compliance officer responded, in effect, that there was nothing to worry about with respect to the potential terrorist finance risk that had been identified because "[t]he measures taken [were] *sufficient to document our duty of care in the event of a claim*." Thereafter, millions of U.S. Dollars poured into al-Qaeda's and the Haqqani Networks' coffers in Afghanistan, financing their devastating terrorist campaign there.

1017.742.    "Deutsche Bank is a symbol of corporate recidivism: It has paid more than $9 billion in fines since 2008 related to a litany of alleged and admitted financial crimes and other transgressions, including manipulating interest rates, failing to prevent money laundering, evading sanctions on Iran … and engaging in fraud in the run-up to the financial crisis."[727]

743.    Mr. Enrich concluded that "Deutsche's mile-long rap sheet" "reflect[ed]" "on the institution and" "its endless cutting of corners and hostility to the rule of law."[728] Since 2010:

---

[727] James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, International New York Times (July 20, 2020), 2020 WLNR 20112125.

[728] Enrich, *Dark Towers*, at 360.

1018.

| Date | Regulator | DB Payment | Quote from Regulator |
|------|-----------|------------|----------------------|
| 1/8/2021 | DOJ | $130M | "Deutsche Bank *engaged in a criminal scheme to conceal payments*[729] to so-called consultants worldwide who served as *conduits* for bribes to foreign officials … so that they could unfairly obtain and retain lucrative business projects[.]" |
| 1/8/2021 | SEC | $120M | "Deutsche Bank [made]" "approximately *$7 million in bribe payments* or payments for unknown, undocumented, or unauthorized services" "[that] involved invoices and *documentation falsified by Deutsche Bank employees*." |
| 9/9/2020 | OFAC | $583,100 | "DBTCA" "agreed to pay $157,500 for processing a large payment ... through the United States that involved a property interest of a designated oil company in Cyprus" and" "agreed to remit $425,600 for *processing payments destined for accounts at a designated financial institution*." |
| 7/7/2020 | NYDFS | $150M | "Deutsche Bank failed to adequately monitor the activity of customers *that the Bank itself deemed to be high risk*. In the case of Jeffrey Epstein in particular, *despite knowing* Mr. Epstein's terrible criminal history, the Bank *inexcusably failed to detect or prevent millions of dollars of suspicious transactions.*" |
| 8/22/2019 | SEC | $16M | "*Deutsche Bank employees created false books and records that concealed corrupt hiring practices* and failed to accurately document and record certain related expenses." |
| 6/20/2018 | NYDFS | $205M | "[I]n some instances, [Deutsche Bank] *supervisors* engag[ed] in improper activity, [and] certain traders and salespeople repeatedly abused the trust of their customers and *violated New York State law over the course of many years*[.]" |

---

[729] All emphases in this table are supplied.

| Date | Regulator | DB Payment | Quote from Regulator |
|------|-----------|-----------|----------------------|
| 5/26/2017 | Federal Reserve | $41M | "Deficiencies in [DBTCA's] transaction monitoring capabilities *prevented DBTCA from properly assessing BSA/AML risk for billions of dollars in potentially suspicious transactions* processed between 2011 and 2015 for certain DBTCA affiliates in Europe for which the affiliates failed to provide sufficiently accurate and complete information." |
| 1/30/2017 | NYDFS | $425M | "The evidence is *clear* that DB-Moscow traders *knowingly* and *actively* facilitated both of these [*i.e.*, "mirror trade" and "one-legged trade"] trading schemes." |
| 1/17/2017 | DOJ | $7.2B | "Deutsche Bank did not merely mislead investors: it *contributed directly to an international financial crisis*." |
| 1/4/2017 | DOJ | $95M | "Using *a web of shell companies* and series of calculated transactions, Deutsche Bank sought to escape liability for tens of millions of dollars in taxes." |
| 10/12/2016 | SEC | $9.5M | "Deutsche Bank … *failed to properly preserve and provide certain electronic records* sought by the SEC during its investigation." |
| 11/24/2015 | DOJ | $31M | "Deutsche Bank Suisse offered a variety of services and permitted some practices that *it knew* could and did assist U.S. taxpayers in *concealing assets* and income from the IRS." |
| 11/4/2015 | Federal Reserve | $58M | "[Deutsche Bank AG] did not have sufficient policies and procedures to ensure that activities conducted at its offices outside of the United States *complied with U.S. sanctions laws*." |
| 11/4/2015 | NYDFS | $258M | "Deutsche Bank used *non-transparent methods and practices* to conduct more than 27,200 U.S. dollar clearing transactions valued at *over $10.86 billion* on behalf of Iranian, Libyan, Syrian, Burmese, and Sudanese financial institutions and other entities *subject to U.S. economic sanctions*, including entities on the [SDN List]." |
| 4/23/2015 | CFTC | $800M | "Deutsche Bank *routinely engaged* in acts of … attempted manipulation and, at times, succeeded in manipulating" "interest rate benchmarks critical to the U.S. and global financial markets." |

| Date | Regulator | DB Payment | Quote from Regulator |
|------|-----------|-----------|----------------------|
| 4/23/2015 | DOJ | $775M | "Deutsche Bank [...] admitted its role in *manipulating LIBOR and participating in a price-fixing conspiracy* … by rigging [] LIBOR contributions with other banks." |
| 12/21/2010 | DOJ | $550M | "Deutsche Bank AG "*admitted criminal wrongdoing* [and] its participation in financial transactions which furthered fraudulent tax shelters that generated billions of dollars in U.S. tax losses." |

~~1019.~~744.     Indeed, in 2017 NYDFS entered a Consent Order which noted Deutsche Bank's "substantial history of regulatory violations over the last decade - one that placed it squarely on notice of the need to address potential compliance issues" and stated that Deutsche Bank's then-relevant criminal acts from 2011 to 2015, "occurred after the Bank was *on clear notice of serious and widespread compliance issues dating back a decade*."[730]

~~1020.~~745.     On or about February 2019, two FBI agents met with a witness in DOJ's ongoing criminal investigation of Deutsche Bank. As recounted by Mr. Enrich,

> [The FBI] … had started out investigating Deutsche's money laundering in Russia—the notorious mirror trades—but they had widened their scope to focus on an *array of potential criminality at the bank*. … The [FBI] agents didn't think the crimes that occurred throughout the bank were the work of lone low-level employees—*they suspected that this was a product of a culture of criminality that pervaded Deutsche*. Tim Wiswell—Wiz, the supposed mastermind of the mirror trades—appeared to be a "fall guy," a "scapegoat," they explained. … "What we've been up against is stonewalling," [an agent told the witness]. "Clearly things went on in Deutsche Bank which weren't kosher. What we're up against is all those bad acts are being pushed down on the little people on the bottom." … "And the larger bank in its entirety is claiming ignorance and that it's one bad player. But we know what we've seen, it's a culture. …"[731]

---

[730] NYDFS 2017 Consent Order ¶¶ 61, 65 (emphasis supplied)

[731] Enrich, *Dark Towers*, at 358-59 (emphasis added).

On information and belief, the FBI concluded that Deutsche Bank had engaged in pervasive criminality, enabled by a culture of willful blindness and criminality throughout all elements of the institution, including its leadership ranks.

1021.746.    On information and belief, the Department of Justice's criminal investigation of Deutsche Bank remains ongoing and has expanded far beyond the Bank's "Russian Laundromat" to include a broader investigation of Deutsche Bank's programmatic terrorist finance and money laundering, among other crimes.

1022.747.    Deutsche Bank knew, as it is commonly understood, that a financial institution could not serve as a Laundromat without inevitably enabling terrorist finance. As Deutsche Bank's former CEO, Josef Ackermann, previously admitted, the Bank understood at all relevant times that "[i]f we even begin to allow gray zones" – *e.g.*, by providing Laundromat services in high-terrorist-finance-risk jurisdictions – the consequences from the foreseeable crimes that would follow, *e.g.*, Syndicate terrorist finance, would "all become[] uncontrollable."

1023.748.    Deutsche Bank and DB Moscow reportedly used corrupt means to win business after its revenues dropped in the aftermath of the 2008 financial crisis. Corrupt practices were at times "blessed by top executives in Moscow and London."[732]

1024.749.    In a stark admission, as the term itself connotes criminality in the financial services industry, Deutsche Bank has described its practices as a "Laundromat" and a "Russian Laundromat." A broad array of independent observers agreed with Deutsche Bank's self-evaluation.

1025.    On or about February 2019, two FBI agents met with a witness in DOJ's ongoing criminal investigation of Deutsche Bank. As recounted by Mr. Enrich,

---

[732] Enrich, *Dark Towers*, at 196.

> [The FBI] … had started out investigating Deutsche's money laundering in Russia—the notorious mirror trades—but they had widened their scope to focus on an *array of potential criminality at the bank*. … The [FBI] agents didn't think the crimes that occurred throughout the bank were the work of lone low-level employees—*they suspected that this was a product of a culture of criminality that pervaded Deutsche*. Tim Wiswell—Wiz, the supposed mastermind of the mirror trades—appeared to be a "fall guy," a "scapegoat," they explained. … "What we've been up against is stonewalling," [an agent told the witness]. "Clearly things went on in Deutsche Bank which weren't kosher. What we're up against is all those bad acts are being pushed down on the little people on the bottom." … "And the larger bank in its entirety is claiming ignorance and that it's one bad player. But we know what we've seen, it's a culture. …"[733]

On information and belief, the FBI concluded that Deutsche Bank had engaged in pervasive criminality, enabled by a culture of willful blindness and criminality throughout all elements of the institution, including its leadership ranks.

1026. On information and belief, the Department of Justice's criminal investigation of Deutsche Bank remains ongoing and has expanded far beyond the Bank's "Russian Laundromat," to include a broader investigation of Deutsche Bank's programmatic terrorist finance and money laundering, among other crimes.

1027. Deutsche Bank knew, as it is commonly understood, that a financial institution could not serve as a Laundromat without inevitably enabling terrorist finance. As Deutsche Bank's former CEO, Josef Ackermann, previously admitted, the Bank understood at all relevant times that "[i]f we even begin to allow gray zones"—*e.g.*, by providing Laundromat services in high-terrorist-finance-risk jurisdictions—the consequences from the foreseeable crimes that would follow, *e.g.*, Syndicate terrorist finance, would "all become[] uncontrollable."

---

[733] Enrich, *Dark Towers*, at 358-59 (emphasis added).

1028.750.     Deutsche Bank and DB Moscow reportedly used corrupt means to win business after its revenues dropped in the aftermath of the 2008 financial crisis. Corrupt practices were at times "blessed by top executives in Moscow and London."[734]

1029.751.     In a stark admission, as the term itself connotes criminality in the financial services industry, Deutsche Bank has described its practices as a "Laundromat" and a "Russian Laundromat." An array of independent observers agree with Deutsche Bank's self-evaluation.

1030.752.     Deutsche Bank also regularly acted in a manner consistent with its illicit Laundromat scheme. Deutsche Bank therefore consciously chose to serve as a Laundromat for terrorist financiers and money launderers and knew that it played that role for terrorists.

1031.753.     **Deutsche Bank's Strategy to Solicit "Damaged Clients."** Deutsche Bank historically solicited business from clients that it believed to pose an elevated risk of financial crime, including terrorist finance. It therefore consciously chose to serve a Laundromat to such customers. "To differentiate itself from a crowded field of competitors," Mr. Enrich reported, "Deutsche planned to do deals that were ***too risky … for rival banks to stomach. 'Deutsche needs damaged clients,'*** one [Bank employee] would explain."[735]

1032.754.     On information and belief, Deutsche Bank rarely, if ever, proactively terminated any then-existing lucrative customer relationship – even for its "damaged clients" – based on terrorist finance and money laundering risk at any point in time without some external prompt from a government or the media prior to on or about 2016. Simply put, before 2016, Deutsche Bank would deliberately bank with anyone and everyone – including terrorists – and

---

[734] Enrich, *Dark Towers*, at 196.

[735] Enrich, *Dark Towers*, at 170 (emphasis added).

continue doing so until they got caught, after which time the Bank would cut ties, feign ignorance, and thereby sustain its Laundromat scheme.

1033.755.    **Deutsche Bank's Correspondent Account Revenue Decline.** After every Plaintiff was injured, Deutsche Bank started taking counter-terrorist finance seriously, and its correspondent account business rapidly fell apart, plunging by approximately forty percent (40%) over only a few years. Prior to 2016, a substantial portion of Deutsche Bank's correspondent banking services was used by criminals and money launderers and facilitated terrorist finance. Once Deutsche Bank began ending customer relationships with suspected terrorist financiers and money launderers, it became substantially less profitable – which demonstrates what Deutsche Bank was profiting from previously. Deutsche Bank knows why the revenue declined once they acted responsibly and knew it would so decline. Like an inside trader whose portfolio plummeted once he decides to play by the rules, one may infer from the change that a large percentage of Deutsche Bank's customers were suspect. While that 40% figure would be shocking for a respectable global financial institution, for a Laundromat like Deutsche Bank, it merely reflected that it had washed money well for a very long time.

1034.756.    **Deutsche Bank's Coordination with VTB.** The "frequent consultations" between Deutsche Bank's CEO and the Russian financial institution VTB's CEO from the early 2000s through at least 2012 is another strong indicator that Deutsche Bank operated as a Laundromat rather than a responsible global financial institution. According to Ms. Belton, by 2011, "Mr. Ackermann, "the then Deutsche Bank chief," "frequently consulted" the CEO of VTB.[736] VTB was, and is, an infamous front for terrorist finance and money laundering, and

---

[736] Belton, *Putin's People*, at 479.

"VTB's Cyprus subsidiary was notorious among bankers for being a funnel for kickbacks."[737] VTB's reputation," however, "did little to dampen" Deutsche Bank's "enthusiasm" for doing business with it because Deutsche Bank was "[e]nticed by the billions of dollars in deals that were sloshing around … [in] Moscow."[738] Deutsche Bank knew what it was doing: It was operating a Laundromat. And consultations with VTB were just part and parcel to that business.

### ~~1035.~~757.   Deutsche Bank Routinely Retaliated Against Whistleblowers.

Deutsche Bank's pattern and practice of using intimidation and retaliation tactics to deter and defeat whistleblowers is further indication of its status as a Laundromat, not a responsible global financial institution, and that Deutsche Bank understood its role in transnational crime. For example, on or about 2016, Deutsche Bank retaliated against a DBTCA employee who raised compliance concerns relating to a transaction involving Russians ("Deutsche Bank Whistleblower 1"). Deutsche Bank retaliated against Deutsche Bank Whistleblower 1 and ignored the (correct) compliance advice she/he had provided.

~~1036.~~758.   Deutsche Bank's pervasive retaliation against terrorist finance whistleblowers is a powerful indicator of its deliberate and knowing aid to terrorist financiers like Altaf Khanani. For example, in a 2019 report, the European Parliament stated that "[t]he European Parliament … [w]orrie[d] that whistle-blowers [were] often discouraged from reporting their [terrorist finance] concerns for fear of retaliation and that if retaliation [was] not discouraged and remain[ed] unpunished, potential whistle-blowers [could] be dissuaded from

---

[737] Belton, *Putin's People*, at 398.

[738] Belton, *Putin's People*, at 360.

reporting their … suspicions of money laundering or terrorist financing internally within the company or to [relevant financial crime law enforcement regulator]."[739]

~~1037.~~759.        **Deutsche Bank's Efforts to Deter Frank Discussions in Writing**. The evidence that Deutsche Bank tried to intimidate employees into not memorializing certain of their business practices further evidences that Deutsche Bank knew it was operating a Laundromat rather than a legitimate global financial institution. For example, in May 2014, Deutsche Bank executive Colin Fan filmed a video,[740] that offered an "implicit admission that misconduct was rampant inside [Deutsche Bank]."[741] In the video, Mr. Fan stated:

> This is an important message. You need to pay close attention. It's about how you communicate in this company. You may not realize it, but right now, because of regulatory scrutiny, all your communications may be reviewed. This includes your emails, your conversations and your conduct. All of this is open to scrutiny. [After the camera zoomed in for a tighter shot of Mr. Fan's face and shoulders] Some of you are falling waaaaaaay short of our established standards. Let's be clear: Our reputation is everything. Being boastful, indiscreet, and vulgar is not okay. It will have serious consequences for your career. And I have lost patience on this issue. Communications that run even a small risk of being seen as unprofessional must stop. Right now. I need you to exercise good sense and sound judgment. Think carefully about what you say and how you say it. If not, it will have serious consequences for you personally.[742]

~~1038.~~760.        Mr. Fan's video was an attempt by Deutsche Bank to protect its Laundromat which, because it was used by criminals for money laundering and assisted those who wanted to commit financial crimes, Deutsche Bank knew and understood required secrecy.

---

[739] European Parliament Report.

[740] The video remains online at https://www.mirror.co.uk/news/world-news/video-watch-top-bank-boss-3551810.

[741] Enrich, *Dark Towers*, at 239-40.

[742] Enrich, *Dark Towers*, at 239-40.

As Mr. Enrich reported, the most plausible interpretation of Mr. Fan's message is that he wanted his subordinates to stop memorializing Deutsche Bank's Laundromat activities in writing.[743]

1039.761.  **Deutsche Bank's Built-to-Fail Compliance System.** Deutsche Bank's deliberately "built-to-fail" compliance system further corroborates its operation as a Laundromat rather than a legitimate global bank, and Deutsche Bank's knowledge that it was doing so. As Mr. Enrich noted, "[a] German judge would later find that" financial crimes at Deutsche Bank were "enabled by the 'risk-affirming climate' that dominated Deutsche. *Internal safeguards*, such as a tough compliance squad … *were strangely absent*."[744]

1040.762.  Indeed, Deutsche Bank regularly instructed its American compliance personnel in Jacksonville to stop highlighting obvious instances of potential terrorist finance and money laundering. As Mr. Enrich recounted, "[o]ne employee would recount how she was instructed to stop highlighting transactions involving companies exposed in the massive leak known as the Panama Papers. Another was told to pipe down when protesting a transaction in which money was wired to a prominent sanctioned Russian."[745] Because Deutsche Bank minimized if not avoided compliance, it knew it was operating an illicit Laundromat, and it knew that it was laundering money for criminals and terrorists.

1041.  **Deutsche Bank's Practice of Obstruction.** To further conceal its Laundromat activities, Deutsche Bank and its personnel regularly followed the same obstruction playbook, even when Bank personnel were "considered incriminated," such as the notorious time that a

---

[743] Enrich, *Dark Towers*, at 239-40. Moreover, as Mr. Enrich recounted, Mr. Fan's "deadpan delivery" was notable, it appeared he was "barely managing to suppress a smirk," and his "focus on addressing communications about bad behavior, rather than the bad behavior itself," was also highly telling. *Id.* at 240.

[744] *Id.* at 151 (emphasis added).

[745] *Id.* at 341.

senior Bank executive, when being interviewed by German regulators, "did not deviate an inch from the line that Anshu Jain and all the others had toed for years: if there was trouble with authorities, do not admit to anything, and if in doubt, do not remember anything."

~~1042.~~763.     ~~**Deutsche Bank's Practice of Obstruction.**  To further conceal its Laundromat activities, Deutsche Bank and its personnel regularly followed the same obstruction playbook, even when Bank personnel were "considered incriminated," such as the notorious time that a senior Bank executive, when being interviewed by German regulators, "did not deviate an inch from the line that Anshu Jain and all the others had toed for years: if there was trouble with authorities, do not admit to anything, and if in doubt, do not remember anything."~~[746] [747] Under this coached strategy of obstruction, according to Mr. Laabs, Deutsche Bank and its personnel could always claim that "[t]here would be a lot to do, a lot to read, a lot to write, one was too important to take care of every detail, and so on and so forth" as a means of creating the plausible deniability that facilitated the operation of the Laundromat in the first instance.[748]

> **2.     Deutsche Bank Knew Terrorists Could Foreseeably Benefit From Its Russian Laundromat Because It Knew The Laundromat Was Designed By The Same Russian Mafia Organization That Notoriously Laundered Opium Money For Al‑Qaeda And Its Allies**

~~1043.~~764.     While it was "based in Germany, … Deutsche Bank" had substantial "ties to" "the Russian mob."[749] Deutsche Bank knew both that it serviced the Russian Mafia and that it was known for doing so. Deutsche Bank shared the Russian Mafia's view that their partnership was financially worthwhile and has knowingly, or with general awareness, served as

---

[746] ~~Laabs, *Bad Bank*, at 506 (translated by Plaintiffs) (emphasis added).~~

[747] Laabs, *Bad Bank*, at 506 (translated by Plaintiffs) (emphasis added).

[748] *Id.* (translated by Plaintiffs) (emphasis added).

[749] Wade Sikorski, *Guest Post: Making Russia Great Again*, Montana Post (Feb. 12, 2017), 2017 WLNR 4537693.

the Russian Mafia's preferred global financial institution for decades, doing so until on or about 2018, when Deutsche Bank finally committed to abandoning its Laundromat model and willingness to serve suspected Russian Mafia-affiliated customers.

~~1044.~~765.    In February 2011, Russian police raided DB Moscow's offices based upon information that DB Moscow facilitated Russian-Mafia-related transactions. This didn't deter Deutsche Bank. By 2011, Deutsche Bank's criminal partnership with the Russian Mafia was in full bloom: within weeks of the Russian police raid on DB Moscow's office on suspicions it was serving the Russian Mafia, events proved them correct. At an in-person meeting, DB Moscow, through Mr. Wiswell, planned the Russian Laundromat with two or more persons whom DB Moscow knew, or was generally aware, attended in their capacities as operatives and/or agent for Semyon Mogilevich and the Russian Mafia;[750] DB Moscow also knew, or was generally aware, that Mogilevich and his Russian Mafia organization were responsible for executing an infamous prior $10 billion U.S. Dollar Laundromat scheme that the Russian Mafia and the BNY jointly operated in the late 1990s. Plaintiffs refer to this as the "2011 Meeting."

~~1045.~~766.    During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that a group of Russian businessmen – whom Deutsche Bank, through Mr. Wiswell, knew to be associated with the Russian Mafia – wanted to use Deutsche Bank to execute so-called "envelope" trades, sometimes called "*Konvert*" trades in Russian, which was a form of "mirror trade" and would become the root of Deutsche Bank's Russian Laundromat.

---

[750] According to Ms. Belton, the Russian "shadow bankers" who "invented the Moldovan Laundromat and [Deutsche Bank's] mirror trade schemes" were "linked to the same [Russian] mob" network that was behind the Bank of New York Laundromat, *i.e.*, Semyon Mogilevich. Belton at 459. According to Juan C. Zarate, "[t]he business of money was a serious and dangerous game in Russia, and it needed to be handled by someone with access and credibility." Zarate, *Treasury's War*, at 160.

1046.767.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that the purpose of the proposed scheme was criminal in nature, as the scheme was purpose-built to appeal to Russian customers – whom Deutsche Bank knew already posed an exceptional terrorist finance risk – who sought to evade the then-recent Russian government crackdown on money launderers by moving income earned inside of Russia out of the country, usually changing the currency to U.S. Dollars, through "mirror trades."

1047.768.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that the Bank could seize an enormous new, and lucrative, market in Russia by servicing Russian money launderer customers who sought to illicitly move money outside of Russia through "mirror trades" in response to the new market for such services that was created by the Russian government's crackdown.

1048.769.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank that its proposed scheme was based on a similar approach the Russian Mafia had used in the past with Bank of New York and other financial institutions and represented a "well established" financial crime strategy that had "proven itself over the years."

1049.770.     During the 2011 Meeting, the Russian Mafia advised Deutsche Bank, through Mr. Wiswell, that it would be preferable if DB Moscow could serve as an agent for DB New York (including DBTCA) and DB London, to execute U.S.-linked "mirror trades" pursuant to the scheme and ensure Deutsche Bank's full support through every necessary international branch, including in the United States.

1050.771.     During the 2011 Meeting, Deutsche Bank (via Mr. Wiswell) advised the Russian Mafia that Deutsche Bank agreed to provide the services requested by the Russian

Mafia, including the "mirror trade" outlined in the meeting, and including using DB Moscow as an agent to complete the trades and route them through DBTCA and DB London.

1051.772.    After the 2011 Meeting, Deutsche Bank, led by DB Moscow and Mr. Wiswell, created and deployed the Russian Laundromat, per the directions of the Russian Mafia. When Deutsche Bank dealt with the Russian Mafia and built and deployed the Russian Laundromat, it knew that it was participating in a criminal enterprise. Deutsche Bank also knew it was aiding terrorists because it knew the Russian Mafia laundered money for al-Qaeda and its Syndicate, and because it knew laundering money on massive scale will inevitably finance terrorism.

1052.773.    Deutsche Bank, DBTCA, and DB London, through DB Moscow as their agent, also provided the Russian Mafia information concerning Deutsche Bank's anti-money-laundering and counter-terrorist-finance controls. This was done to enable terrorists to better conceal the millions of U.S. Dollar-denominated terrorist funds Syndicate operatives and agents, including Khanani and the Russian Mafia, transferred via Deutsche Bank's Laundromat from New York to Syndicate-controlled accounts.

1053.774.    During the 2011 Meeting, DB Moscow represented Deutsche Bank, DB London, and DB New York (including DBTCA) as their agent. As agent, DB Moscow's actions and knowledge were imputed to Deutsche Bank, DB London, and DB New York (including DBTCA), which were at all times the principal in their relationship with DB Moscow.

1054.775.    After the 2011 Meeting, DB Moscow continued representing Deutsche Bank, DB London, and DB New York (including DBTCA) as their agent and executed every Syndicate terrorist finance transaction through Deutsche Bank's "Russian Laundromat."

1055.776.    DB Moscow served as an agent for each identified Deutsche Bank entity and had the authority to execute agreements and trades on behalf of each of them. Mr. Wiswell's conduct, though criminal and wrongful, was entirely consistent with what Deutsche Bank wanted and expected from Mr. Wiswell, and they encouraged him because Mr. Wiswell generated enormous profits for Deutsche Bank through the criminal scheme. Deutsche Bank only had a problem with Mr. Wiswell after the Bank's "Russian Laundromat" was exposed and it could no longer deny or downplay the potential transnational criminal investigation and liability for it and its executives and employees.

1056.777.    NYDFS concluded that DB Moscow was Deutsche Bank's agent. NYDFS concluded that the Deutsche Bank traders who operated the Bank's Russian Laundromat had been authorized by DB London and DB New York (including DBTCA) to use a Deutsche Bank's "remote booking" function to execute the mirror trades on behalf of DB London and DB New York (including DBTCA) and "[t]he evidence is clear that DB-Moscow traders knowingly and actively facilitated both of these trading schemes:"[751]

> [M]ost of the subject trades were placed by a single trader representing both sides of the transaction. The DB-Moscow trader would execute the sell side of the trade, helping the suspicious Russian counterparty acquire Russian securities, settled in rubles. The same DB-Moscow trader then would buy the identical quantity of the same stock from DB-London's customer as an over-the-counter trade, settled in U.S. dollars. The DB-Moscow trader would directly book the trade to the DB-London trading book via a remote booking function. This "remote-booking" feature was central to the scheme, permitting the Moscow traders to carry out the mirror trades without any effective supervision or compliance review in London. This way, the scheme stayed under the radar.[752]

1057.778.    Deutsche Bank was the but-for and proximate cause of the Russian Laundromat and all the resulting terrorist finance that coursed through Deutsche Bank's Russian

---

[751] 2017 Consent Order ¶ 20.

[752] *Id.* ¶¶ 20-24.

Laundromat to its Syndicate clients through their agents, including, but not limited to, Khanani and the Russian Mafia. As Mr. Enrich reported, Deutsche Bank, through DB Moscow, knew that "Deutsche was a crucial cog in the Laundromat."[753]

1058.779.     While they were executing the trades that routed tens of millions of U.S. Dollars to al–Qaeda and the Taliban, through their agents (Khanani and the Russian Mafia), Deutsche Bank's personnel internally described their terrorist finance scheme with the Russian Mafia as the Bank's "Russian Laundromat" or its "Laundromat."

1059.780.     While Deutsche Bank operated its Russian Laundromat, through DB Moscow, and permitted the Russian Mafia to capture a branch of a large global financial institution for years, "[O]rganized crime elements in Russia [] compromise[d] Deutsche Bank," even though the Bank was "one of the largest financial institutions in the world."[754] When that happened, Deutsche Bank and DB Moscow transformed into a "sympathetic financial institution" – a terrorist finance concept referring to when a "financial institution" "[was] owned and operated by the terrorist organization or its closest supporters," and was therefore "considered a form of internal resourcing" for the terrorists and/or their closest supporters. [755] Deutsche Bank knew it was a "sympathetic financial institution," and knew that meant that its facilities were being used to launder money for terrorists and other criminals.

---

[753] Enrich, *Dark Towers*, at 197. Deutsche Bank pursued a Laundromat strategy, in which it willingly operated as a Laundromat for terrorist financiers. Deutsche Bank also purpose-built the Russian Laundromat, while serving as one of the key global financial institutions in every other Russian Mafia-related Laundromat, *e.g.*., the "Global Laundromat."

[754] Leon Wolf, quoted in *ALL IN for July 19, 2017, MSNBC*, MSNBC: All In with Chris Hayes (July 20, 2017), 2017 WLNR 22092010.

[755] Vittori, *Terrorist Financing*, at 42.

1060.781.	After the 2011 Meeting, DB Moscow continued to work closely with notorious Russian organized crime figures as they collaborated to it operationalize their shared "Russian Laundromat." According to Ms. Belton, Ivan Myazin, a notorious Russian organized crime figure, "was the real mastermind of both the Moldovan Laundromat and the Deutsche Bank mirror-trading scheme. … Behind Myazin, however, there was another level that went" "to the top of … Russian organized crime," *i.e.*, Mogilevich and the Russian Mafia.[756]

1061.782.	Witnesses who attempted to expose Deutsche Bank's "Russian Laundromat" were murdered. As Ms. Belton reported, "[t]he number of common denominators between all the schemes – [including] the Moldovan Laundromat and the mirror trades – were astonishing, and for one banker in the middle of it, they proved deadly. Alexander Perepelichny was [related to] a large placer of orders with Deutsche Bank Moscow in the mirror-trade scam. After he began sharing information with investigators about some of the transfers …, which he'd also participated in, he died of a heart attack in suspicious circumstances while jogging in a park near London."[757] On information and belief, Mr. Perepelichny was murdered to obstruct investigations seeking to expose Deutsche Bank's "Russian Laundromat."

1062.783.	From the moment Deutsche Bank, through DB Moscow, first co-designed the Russian Laundromat alongside its Russian Mafia customers, Deutsche Bank knew that vast Russian Mafia-related financial crime was afoot through Deutsche's Russian Laundromat, and necessarily, terrorist finance would flood through the Russian Mafia to its clients and decades-long Joint Venture partners: al-Qaeda and the Taliban.

---

[756] Belton at 408.

[757] *Id.* at 411.

1063.784.    When it operated its Russian Laundromat from 2011 through 2016, Deutsche Bank replicated substantial aspects of the same terrorist finance and money laundering scheme that the same Russian Mafia actors executed through Bank of New York in the late 1990s, which, on information and belief, also helped launder al‑Qaeda and/or Taliban money.

1064.785.    As Mr. Laabs recounted, "[t]he two largest financial hubs in the West – New York and London – played an important role in the flow of [dirty] money [outside of Russia]."[758] "At the end of the 1990s, the Bank of New York … was one of the main channels" for flowing dirty money out of Russia.[759] "From 2011 onwards, its neighbors, Deutsche Bank" "and its subsidiary Deutsche Bank Trust Company Americas, took over this task and pumped laundered, Russian money into the international financial cycle."[760]

1065.786.    Semyon Mogilevich and the Russian Mafia have served as notorious agents for al‑Qaeda and the Taliban since the 1990s. During that time, Mogilevich and the Russian Mafia helped to manage the financial system for the Syndicate and helped to launder al‑Qaeda's heroin revenue. Al‑Qaeda and the Syndicate, in turn, used the much-needed U.S. Dollars laundered through Mogilevich and the Russian Mafia's to commit acts of terrorism. *Supra* Part II.B.2.

1066.787.    Deutsche Bank and its personnel knew: (1) how money laundering schemes worked in general; (2) how the Russian Mafia's laundering schemes worked in particular; and (3) the Russian Mafia's general reputed relationships and sources of income— plainly, Deutsche Bank knew that the Russian Mafia partnered with al‑Qaeda and the Taliban.

---

[758] Laabs, *Bad Bank*, at 462 (translated by Plaintiffs) (emphasis added).

[759] *Id.* (translated by Plaintiffs) (emphasis added).

[760] *Id.* (translated by Plaintiffs) (emphasis added).

Indeed, according to the *Independent* in 2008, "Taliban drug lords [were] using cash from Afghanistan's bumper heroin crop to … to buy better anti-aircraft weapons" from "mafia networks in Russia" "to undermine [NATO's] military advantage."[761]

1067.788.	Deutsche Bank knew that the Russian Mafia would ordinarily integrate all the "dirty money" into common pools to make the scheme easier to execute, and as a consequence, Deutsche Bank knew that whenever it helped the Russian Mafia launder money, move money outside of Russia, or convert currency from Rubles to Dollars, it was directly doing the same for the Syndicate, because the Russian Mafia was acting as the Syndicate's agent and was laundering the Syndicate's money.

1068.789.	On information and belief, an internal Deutsche Bank report concluded, among other things, that: (1) Deutsche Bank operated as a "Laundromat" while servicing Russian Mafia, including Semyon Mogilevich, between 2011 and 2014; and (2) Deutsche Bank processed "at least €175 million" of "dirty money" for customers specifically affiliated with Semyon Mogilevich and/or the Russian Mafia between 2011 and 2014.

### 3.	Deutsche Bank Knew Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Deutsche Bank Knew Were Red Flags For Terrorist Finance

1069.790.	Deutsche Bank knew its clients were engaged conduct that raised terrorist finance red flags because Deutsche Bank knew that its clients were engaged in in money laundering, VAT fraud, and capital flight, while operating out of, or otherwise related to, one or more jurisdictions that Deutsche Bank knew to be a high risk for al-Qaeda and/or Haqqani Network terrorist finance activity.

---

[761] Jerome Starkey, *Warlords Using Heroin Cash To Buy Surface-To-Air Missiles*, Independent (April 4, 2008), 2008 WLNR 6353571.

### i.   **Deutsche ~~Bank's~~Bank Knew About The VAT Frauds**

~~1070.~~791.   Deutsche Bank knew that potential terrorist finance was afoot when it executed Azizi's and Ahmed's VAT fraud schemes. When a Deutsche Bank employee emailed a compliance officer to alert the Bank that its "[t]he CO2 market" "[was] *showing typical characteristics of a sales tax carousel*," a bright red flag for al–Qaeda and Haqqani Network terrorist finance. When Deutsche Bank's compliance officer replied that "[t]he measures taken" to paper over the trades were "*sufficient to document our duty of care in the event of a claim*."

792.   Plaintiffs' Azizi Cell-related allegations against Deutsche Bank apply equally to Standard Chartered Bank and, conversely, Plaintiffs' Azizi Cell-related allegations against Standard Chartered Bank, *infra*, apply equally to Deutsche Bank.

793.   When Azizi executed al-Qaeda's VAT fraud scheme, Azizi and the other members of the Azizi Cell followed the core principles of al-Qaeda and Haqqani Network tradecraft when running a VAT fraud, namely, to use the same shell companies and cycle transactions through a handful of dirty banks.  This matters because al-Qaeda and Haqqani Network's VAT fraud tradecraft meant Standard Chartered Bank and Deutche Bank both alerted one another throughout their shared operation of the same VAT fraud scheme executed by the Azizi Cell on behalf of al-Qaeda and the Haqqani Network.

794.   Under al-Qaeda's and the Haqqani Network's tradecraft for operationalizing VAT to fund al-Qaeda and Taliban attacks against Americans in Afghanistan, al-Qaeda and the Haqqani Network regularly trained and deployed VAT fraud cells under a Syndicate terrorist finance doctrine that that emphasized scale (lots of cells) and leverage (easy to create cells). Thus, the Syndicate knew that it could count on a continuing supply of new VAT fraud cells, and therefore they could go for massive scale (through a simplified fraud menu).

795.    This approach helped the Syndicate conceal its VAT fraud scheme by making it (mostly) harder to detect, but it came with a hitch:  it required the willing involvement of corrupt western banks, since VAT fraud, unlike many other modes of terrorist finance that flows through banks, requires a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do).  Simply put, VAT fraud as practiced by al-Qaeda was one of the simplest of all terrorist finance schemes for banks to detect.

796.    For that reason, Osama bin Laden and, later, Sirajuddin Haqqani knew that al-Qaeda's VAT fraud scheme could not succeed without the willing participation of at least one, preferably two, notoriously criminal global financial institutions with access to key markets.

(i)      Access to banks with **branches in Germany and the U.K.** were two of the Syndicate's top VAT fraud targets based on al-Qaeda's perceptive observations that, until recently, the U.K. and German governments did not devote the prosecutorial resources commonly seen in the U.S.

(ii)     Access to banks with **branches in the United States or another reliable means to access U.S. Dollars** was essential to the al-Qaeda's ability to convert euros (not useful in Afghanistan or Pakistan) into every terrorists' gold standard: the U.S. Dollar.

(iii)    Access too banks with branches in **the U.A.E.** was vital as an (a) logistical hub from which al-Qaeda directly funded and armed the terrorists targeting Americans in Afghanistan through its VAT fraud, and (b) inducement for al-Qaeda's and the Haqqani Network's VAT fraudsters to work harder (in Europe and the U.S.), so they could play harder (in Dubai) while the terrorists used the funds their VAT scheme to fight harder (in Afghanistan).[762]

(iv)    Access with banks in **Afghanistan and Pakistan** also aided al-Qaeda's ability to operationalize its European VAT fraud schemes into U.S. dollars to purchase weapons and fund fighters in the Middle East.  Al-Qaeda and the Haqqani Network did not, however, require such access as long as they had a reliable banking partner in

---

[762] Some (but not all) of whom enjoyed spending significant amounts of money on lavish goods and entertainment, which Sirajuddin Haqqani (like bin Laden before him) pragmatically tolerated as an acceptable price the Syndicae had to pay to expand its VAT fraud labor pool and achieve the fundraising scale necessary for its VAT fraud pipeline to serve its intended purpose:  a low-cost, reliable, and sustainable method for the Syndicate to source at least tens of millions of U.S. dollars each year to fund its attacks against America s in Afghanistan.

Dubai, because both organizations routinely engaged in large bulk cash smuggling operations from the UAE to Afghanistan (through Pakistan) – a skill set that nearly every terrorist group in the Middle East mastered, including, but not limited to, al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, Hezbollah, and the Qods Force. Indeed, such operations are a classic example showing how such groups improved the lethality of their terror campaign against Americna in Afghanistan by working with one another.

797.    When al-Qaeda settled on VAT fraud as one of its core strategies to source U.S. dollars through American banks, it found an ingenious technique that only posed one risk: everything that made the strategy so effective also made it so obvious to any bank that was not affirmatively "in" on the VAT fraud scheme.

798.    In particular, the "carousel" nature of VAT frauds as practiced by al-Qaeda would quickly be discovered if an al-Qaeda-trained VAT fraudster attempted the scheme at an ethical bank for the exact reason why Deutsche Bank's VAT fraud transactions alerted SCB, and vice versa:  because al-Qaeda tradecraft prioritized scale and simplicity, which meant that its VAT fraudsters usually copied-and-pasted (or close to it) the same schemes, entities, and everything.

799.    To maximize the lethality of their VAT fraud scheme, al-Qaeda and the Haqqani Network needed *at least two* large global banks that could facilitate their access to all or nearly all of these markets because the Syndicate could achieve powerful and dynamic network effects for its terrorist finance scheme through the inclusion of two willing criminal bank partners. Simply put, under the terrorist math practiced by the Syndicate's VAT fraud operatives, one (SCB) plus one (DB) equaled a lot more than two.

800.    Al-Qaeda's leaders understood that a minority of "bad banks" would always be willing to work with terrorists for profit and coupled that insight with al-Qaeda's knowledge, based on decades on the ground in every country in Europe, that European governments have

historically struggled to root out VAT fraud schemes due to a lack of resources that fundamentally distinguishes the U.S. and European approaches.

801.    As a result of the foregoing, the key glue binding the entire scheme was Deutsche Bank's and Standard Chartered Bank's affirmative, willing participation.  Each Bank's involvement magnified the potency of the other, and vice versa.

802.    For example, when SCB and DB, respectively, affixed their legitimacy to the Azizi Cells' transactions, SCB and DB each aided the Azizi Cell's ability, in turn, to deploy the imprimatur of one bank to aid the other bank's fraud, producing a win/win/win for all al-Qaeda, Deutsche Bank, and Standard Chartered Bank:  better concealment for all, and therefore more money for all.  This alone provided impossible-to-overstate value for the Syndicate by maintaining an al-Qaeda VAT fraudster's operational imperative: concealment.

803.    Similarly, the Azizi Cell could leverage its fraud strategies, and associated deal terms, which it learned that it learned from DB and apply it to SCB, or vice versa, like how a prosecutor's skills at fraud detection can grow over time based on work investigating similar financial crime schemes.

804.    Because the Azizi Cell used the same scheme, entities, and personnel in its transactions with Standard Chartered Bank and Deutsche Bank alike, the SCB Defendants knew that SCB, including SCB New York, was fueling al-Qaeda and Taliban violence through SCB's services to the Azizi Cell the same way that the DB Defendants knew that DBTCA was fueling al-Qaeda through their shared execution of the same scheme.

805.    This matters because when the Azizi Cell operated al-Qaeda's VAT fraud scheme, Standard Chartered Bank was alerted by two independent – and equally potent –

channels of communication, which involved different transactions, personnel, and entities, which ensured that each SCB Defendant below knew what it was doing – and aided al-Qaeda anyways.

806.     *First*, the same sorts of **internal operations data** that alerted certain Deutsche Bank insiders to the VAT fraud also alerted Standard Chartered Bank, including each SCB Defendant identified below.  As a result, DB and SCB each knew, and disregarded, a litany of crimson red flags for al-Qaeda terrorist finance raised by the internal operations data generated by Azizi Cell-related transactions at both SCB and DB, including, but not limited to, the:  (1) types of deals being pursued by the Azizi Cell; (2) biographies of the key members of the Azizi Cell; (3) virtually non-existent public record of the Azizi Cell's companies; (4) obviously suspicious nature of the business records and papers furnished by members of the Azizi cell to Deutsche's Bank; and (5) each Bank's direct communication with Azizi Cell members.

807.     *Second*, the same sorts of **external transaction data** that alerted Deutsche Bank insiders to the VAT fraud also alerted SCB insiders, and vice versa.  Following al-Qaeda's VAT fraud playbook, the Azizi Cell deployed the same shell companies, strategies, tactics, modes of communication, payment, bank accounts, industry focuses, geographies—***nearly everything***—in its VAT fraud schemes with both SCB and DB.  As a result, the Azizi Cell applied common transaction patterns and terrorist tradecraft, which were detected by at least several people inside and outside of Deutsche Bank.

808.     On information and belief, SCB personnel knew of the bright red al-Qaeda finance red flags that attached to the obvious VAT fraud SCB was enabling:  SCB personnel received similar information as their DB counterparts, which SCB personnel assessed after similar VAT fraud and terror finance training as their DB counterparts,  which SCB personnel

then similarly disregarded like their DB counterparts while similarly knowing that they worked at a bank that embraced a Laundromat business model.

809.    Accordingly, SCB's and DB's own willful blindness regarding the easily detectable and tell-tale indicia of *the other's* "carousel" activity flowing from the "front-of-the-envelope" transaction data available to all therefore materially assisted al-Qaeda's trade, and improved the effectiveness of the  scheme, allowing more money to flow to Afghanistan to kill the Americans working there, because each DB's terrorist finance scheme amplified the potency of SCB's – and vice versa, not only DB and SCB, but, more importantly, for al-Qaeda.

### ii.    Deutsche Bank Knew About the Russian Laundromat

~~1071.~~810.    Many Deutsche Bank executives and employees, including personnel at DB London and DB New York (including DBTCA) knew that Deutsche Bank's Russian Laundromat executed many transactions that made no economic sense, which is a terrorist finance red flag. As Mr. Laabs recounted, "[i]n principle," "the transactions were not illegal, provided they served an economic purpose and the customers had a sound reputation."[763]

> But the men who had approached Tim Wiswell made a small loss on every transaction, as they had to pay a fee to the bank for buying and selling shares. Consequently, the deal made no economic sense. In addition, the new customers did not correspond at all to what a bank generally imagines a solid business partner to be. At the Moscow branch, Wiswell was tasked with overseeing the stock deals of the unusual customers, keeping his superiors happy, and *making sure that, on paper, it seemed like the new Russian customers had been thoroughly scrutinized.*[764]

~~1072.~~811.    Chris Barter served as the CEO of Goldman Sachs Moscow when Deutsche Bank operated its Russian Laundromat and publicly confirmed Deutsche Bank's prior

---

[763] Laabs, *Bad Bank*, at 464 (translated by Plaintiffs) (emphasis added).

[764] *Id.* (translated by Plaintiffs) (emphasis added).

knowledge of likely criminal activity when Deutsche Bank partnered with the Russian Mafia to create the Russian Laundromat. As investigative journalist Luke Harding summarized:

> Barter recalled how he was approached by "broker types, not very senior," seeking to do large, unexplained volumes of trade with Goldman Sachs. These were on behalf of major Russian clients. The brokers declined to identify their counterparties. Their names were concealed beneath "shell company after shell company," Barter said, making a due diligence process impossible. He turned this business down "in five seconds." Seemingly, the same entities approached Wiswell. There they got better results.[765]

~~1073.~~812.      Mr. Barter's experience as CEO of Goldman Sachs Moscow also confirmed that Deutsche Bank, DB London, and DB New York (including DBTCA) knew, or were generally aware, that crime was afoot at DB Moscow. As Mr. Barter recalled of DB Moscow, it was clear at the time, even from Goldman's outsider view, that: (1) "[DB Moscow traders] were doing some very curious things"; (2) "[n]obody could make sense of their business"; and (3) from this information, Mr. Barter concluded that "'something nefarious' was going on at Deutsche Bank during the Wiswell period" when Deutsche Bank operated its Russian Laundromat.[766]

~~1074.~~813.      On or about January 2014, DB Moscow personnel confronted another threat to Deutsche Bank's scheme: another Cypriot bank, Hellenic Bank, sent a Request for Assistance ("RFA") to DB London based on the Hellenic Bank's perception that a pattern of transactions from Deutsche Bank suggested potential terrorist finance and money laundering activity by Deutsche Bank. This was notable because, as Mr. Enrich recounted, Cyprus's financial system was, "[b]y design, … a go-to destination for Russians and others searching for somewhere to hide ill-gotten cash. … [T]he laxity of its financial system" was among "Cyprus's

---

[765] Harding at 312-13.

[766] *Id.* at 311.

biggest selling points." ˍAs a result, "[i]t took a lot to make a Cypriot banker queasy, but [the] nearly $700 million [that] had flooded into [Hellenic Bank accounts]" through DB Moscow's mirror trading scheme "did the trick."[767]

~~1075.~~814.    Seeking more information, Hellenic Bank "specifically asked whether DB-London had '*any reason to believe that the transactions [with Counterparty B] are in any way of a suspicious nature.*'"[768]

~~1076.~~815.    "Eventually," Mr. Wiswell, "responded by reassuring the European Bank that Counterparty B *'ha[s] passed through our KYC [know-your-customer] procedures' and that Deutsche Bank 'see[s] no reason for concern here.'*"[769] ˍDB Moscow's statement was a lie told to conceal and sustain Deutsche Bank's mirror trading scheme and the Russian Laundromat. "Not a single Deutsche Bank compliance staffer was ever involved in the response to this [Request For Assistance] provided by the corrupt supervisor," on information and belief, "The Wiz," Tim Wiswell.[770]

~~1077.~~816.    Even this limited window into how the Russian Laundromat worked made clear the link and the use of the U.S. financial system. ˍAs Mr. Enrich reported:

> *Wiz knew all about these transactions*.ˍ The Russian customer was participating in mirror trades with Deutsche to extract rubles from Russia and *convert them into dollars, using Deutsche's U.S. Operations—DBTCA—as a Laundromat*. Then the dollars were being zapped over to Cyprus, where the Russian beneficiary could do with the money as he pleased.[771]

---

[767] Enrich, *Dark Towers*, at 231.

[768] 2017 Consent Order ¶ 38 (emphasis in original).

[769] *Id.* ¶ 39 (emphasis in original).

[770] *Id.* ¶ 39.

[771] Enrich, *Dark Towers*, at 232 (emphasis added).

1078.817.    When Hellenic Bank escalated its inquiry to a senior Anti-Financial Crime employee at DBTCA who supervised special investigations, in an attempt to reconcile these concerns, the "senior [DBTCA] compliance employee [in New York] never responded to [Hellenic Bank]. Nor did the employee take any steps to investigate the basis for [Hellenic Bank's] inquiry, later explaining this omission on the ground that ***the employee had 'too many jobs' and 'had to deal with many things and had to prioritize.*'"[772]

1079.818.    The senior DBTCA compliance employee's explanation was a false attempt to exculpate the senior employee and DBTCA. Rather, the DBTCA employee declined to review the financial crime red flags raised by Hellenic Bank because the employee understood that his/her role at DBTCA was to facilitate its activities as a Laundromat, which necessarily entailed ignoring information requests that could expose the pervasive laundering happening throughout Deutsche Bank branches.

1080.819.    Deutsche Bank did not merely confine its Syndicate-related financial services to the helping launder the terrorists' money. Deutsche Bank personnel, consistent with their activities as a Laundromat, leaked terrorist finance-related inquiries on one or more occasions to criminal suspects whom Deutsche Bank knew were connected to violence. According to NYDFS, Deutsche Bank committed a "serious breach of anti-money laundering and corruption policies and practices," when Deutsche Bank told its likely criminal client that Hellenic Bank had sought information about the client. And, even more troubling, "when the leak came to the attention of senior DB-Moscow management, no action to investigate the leak was taken."[773]

---

[772] *Id.* (emphasis in original).

[773] 2017 Consent Order ¶ 42.

1081.820.    NYDFS noted that in another instance, "despite the emergence of an unmistakable pattern of suspicious trading at the securities desk at DB-Moscow," Deutsche Bank apparently did not investigate.[774] Deutsche Bank knew that its clients were engaging in financial crimes, and it helped facilitate those crimes and, when confronted with evidence that the crime was occurring, Deutsche Bank did not investigate.

1082.821.    According to NYDFS, Deutsche Bank's "onboarding staff experienced hostility and threats from the [DB Moscow] supervisor," on information and belief Mr. Wiswell, "on several occasions when it appeared they had not moved quickly enough to facilitate transactions."[775] Each time this happened, DB Moscow, through Mr. Wiswell, deliberately facilitated transactions that it knew could finance terrorists, including specifically with Khanani.

1083.822.    "Distressingly," according to NYDFS, "this was a fact about which senior management at DB-Moscow was aware, yet management's response was inadequate. Indeed, although deficiencies in KYC policies and procedures were well known for many years, Deutsche Bank did not take sufficient action to implement genuine reform until 2016."[776]

1084.823.    According to NYDFS, Deutsche Bank's approach recklessly deviated from how responsible global financial institutions dealt with Russia, which was universally viewed as "high risk" by essentially everyone else but Deutsche Bank.[777]

1085.824.    NYDFS determined that DB Moscow often refused to even near universal counter-terrorist-finance practices, such as when Deutsche Bank refused to treat Russian-related clients as "high-risk" even though all its peers did for obvious reasons. DB Moscow even

---

[774] *Id.* ¶ 43.

[775] *Id.*

[776] *Id.*

[777] *Id.* ¶ 50.

refused to do this because DB Moscow knew that if it chose to do so, most of its clients would be reclassified as high risk (whom DB Moscow knew to be terrorists and mobsters) and DB Moscow would have to end its enormously profitable mirror trade and one-legged trade scheme. Prior to 2016, DB Moscow refused to do anything that could stop terrorist financiers like Altaf Khanani executing terrorist finance transaction through DB Moscow and DB London, including obtaining U.S. Dollars through DBTCA via DB Moscow's criminal schemes.

1086.825.    Rather than punish Mr. Wiswell, as NYDFS observed, Deutsche Bank praised him and –thereby created "the pernicious culture that gave rise to the improper trading scheme and permitted it to continue uninterrupted for a five-year stretch."[778]

1087.826.    In 2015, the Russian authorities began investigating Deutsche Bank's Russian Laundromat.[779]

1088.827.    Soon thereafter, Deutsche Bank placed Mr. Wiswell on leave while it "investigated" Deutsche Bank's "Russian Laundromat." On information and belief, Mr. Wiswell left Deutsche Bank on or about August 2015.

1089.828.    Even after Mr. Wiswell left, however, Deutsche Bank continued laundering money through DB Moscow, DB London, and DB New York (including DBTCA) for the Russian Mafia and Khanani through, among others, the Moldovan Laundromat.

1090.829.    Deutsche Bank's attempt, through its 2015 internal investigation, to pin the blame on Mr. Wiswell was factually wrong, and only proved the Bank remained committed to its Laundromat ways. As Ms. Beltron reported,

> Some of Wiswell's colleagues were aghast [at the Bank's attempt to blame him]. Of course more senior executives had been aware of the trades. "You can't just move $10 billion offshore without someone knowing it was going on. And over

---

[778] *Id.* ¶ 60.

[779] Belton at 406-07.

four years," said one. "Tim had plenty of conversations about these guys [*i.e.*, the people benefiting from Deutsche Bank's Russian Laundromat] with London [*i.e.*, DB London]. Everyone knew these guys would call, and they would buy and sell every day for four years. It's pretty hard to keep that a secret. The guy in [DB London] – even if he claims to know nothing about it – had to know who the clients were when for four years they were a top-five client."[780]

~~1091.~~830.    NYDFS squarely rejected Deutsche Bank's attempt to paint Mr. Wiswell as a rogue employee. "In short," NYDFS concluded, "Deutsche Bank's [anti-money-laundering and counter-terrorist finance] control failures were longstanding and ***enterprise-wide***, enabling the mirror trade scheme to ***flourish and persist***."[781]

~~1092.~~831.    Moreover, on or about October 2015, Mr. Wiswell issued public statements, through Russian counsel, in which Mr. Wiswell declared that: (1) Mr. Wiswell believed that Deutsche Bank's "compliance department" "must have known" about the illegal mirror trades that he conducted – including, but not limited to, those for the Syndicate through Khanani and the Russian Mafia – when operating the Bank's "Russian Laundromat"; (2) Mr. Wiswell believed that he "simply followed" Deutsche Bank's "instructions" and the Bank knew of, and approved, all the trades he executed while operating its "Russian Laundromat"; and (3) Mr. Wiswell informed, and received approvals and ratification from, at least twenty Deutsche Bank colleagues, including two senior Deutsche Bank managers at DB London, and based upon such discussions, Mr. Wiswell believed that the foregoing Deutsche Bank managers and employees knew of, approved, and ratified, DB Moscow's operation of the Russian Laundromat on behalf of DB London and DB New York (including DBTCA).

---

[780] Belton at 407. As Ms. Belton reported, "[w]hen Moscow regulators finally clamped down on [Deutsche Bank's "Russian Laundromat"] scheme, they too settled on lower-level players." *Id.*

[781] 2017 Consent Order ¶ 60 (emphasis added).

1093.832.    Mr. Wiswell's claim to have informed DB London management is plausible. ~Among other reasons, DB London, and DB New York (including DBTCA) were making enormous profits from the Russian Laundromat, which Deutsche Bank management known for their obsession over profits noticed. ~Indeed, as investigative journalist Luke Harding reported, "Deutsche Bank's London and New York divisions were economic beneficiaries of this [Russian Laundromat] arrangement" that "captured Deutsche Bank's Moscow outpost."[782] Deutsche Bank knew they operated the Russian Laundromat, and it therefore knew that its clients were engaged in financial crime, including laundering money for criminals and terrorists.

### 4. Deutsche Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions

1094.833.    According to Mr. Laabs, "Deutsche Bank had everything to offer that facilitated a money launderer's work: ~lousy internal controls, *a company culture in which everything seemed to be allowed, ruthless employees, and sufficient opportunity*, despite numerous warnings, to do business in controversial places around the world."[783]

1095.834.    From 2001 through 2017, Deutsche Bank regularly facilitated transactions for anti-American terrorists around the world, supporting terrorists or other criminal syndicates that deployed violence at scale, doing so on multiple continents and often being fined by governments in response:

- **Palestinian Terrorists in Israel.**~ On information and belief, Deutsche Bank knowingly or recklessly operated bank accounts for years on behalf of U.S. government-designated Palestinian terrorist groups, and such conduct remains under investigation by NYDFS.

- **Russian Narco-Terrorists in Europe and the Former Soviet Union.** ~Deutsche Bank facilitated the terrorist finance and fundraising efforts of Russian terrorists operating in Ukraine by providing banking services to them.

---

[782] Harding at 316.

[783] Laabs, *Bad Bank*, at 462 (translated by Plaintiffs) (emphasis added).

- **Italian Mafia Narco-Terrorists in Europe.** Deutsche Bank has a long history of knowingly, or recklessly, providing financial services to violent Italian mafia families operating throughout Europe. For example, Deutsche Bank provided 900 million euros in loans to an Italian confectioner owned by the business partner of a reputed member of the Italian mafia,[784] while knowing, and not caring, that its counterparty, as Mr. Laabs put it, "had a sketchy past, present, and possibly future" in connection with its potential connection to the Italian mafia's money laundering activities, and the consequences of the deal did not matter to Deutsche Bank's personnel "because they received their bonus when the deal was closed."[785]

- **Jeffrey Epstein Sex Trafficking Organization Rapists in the U.S.** Deutsche Bank directly enabled Jeffrey Epstein's sex trafficking.[786] "Compliance officers reportedly flagged the transactions of Epstein's company at one point, but bank managers are said to have dismissed their concerns because nothing illegal happened and he was a 'lucrative client.'"[787] As a *New York Times* columnist explained, "Jeffrey Epstein … didn't act alone. Now we know in vivid detail who some of his financial enablers were: executives and bankers at Deutsche Bank."[788]

~~1096.~~835.    Deutsche Bank's deliberate processing of transactions on behalf of known or suspected Iranian terrorist agents, operatives, and fronts illustrates DB's institutional effort to profit from anti-American terrorist finance. As previously described, the DB Defendants flouted the U.S. government's requests that they avoid doing business with Syndicate fronts. They also, however, flouted a similar U.S. request concerning business with IRGC fronts that advanced the Iranian terrorist project through the IRGC-QF and Iranian terrorist proxies like Lebanese Hezbollah, which was designated as an FTO in 1997. Through its Iran-related misbehavior from 2001 through 2016, Deutsche Bank reveals how far its senior management was willing to go to

---

[784] Laabs, *Bad Bank*, at 236-38 (translated by Plaintiffs).

[785] *Id.* (translated by Plaintiffs).

[786] Paul Campos, *Massage at Epstein's*, Lawyers, Guns, and Money (Blog) (July 11, 2019), 2019 WLNR 21287461.

[787] *Id.*

[788] James B. Stewart, *These Are the Deutsche Bank Executives Responsible for Serving Jeffrey Epstein*, International New York Times (July 20, 2020), 2020 WLNR 20112125.

maximize DB profits from USD services to the highest-risk customers in the Former Soviet Union and the Middle East, regardless of the terrorist finance risk.

1097.836.    "By 2006," according to Mr. Enrich, "Deutsche had zapped nearly $1.1 billion into Iran, Burma, Syria, Libya, and the Sudan, providing desperately needed hard currency to the world's outlaw regimes and single-handedly eroding the effectiveness of peaceful efforts to defuse international crises," and as a result:

> The hundreds of millions of dollars that Deutsche wired to Iranian banks provided vital funding … to pay for its terrorism. Soon Iraq was being ripped apart by violence. Roadside bombs detonated all over the country, targeting … the U.S. military forces that were trying to keep the peace. Much of the violence was the work of a terrorist group, Jaysh al-Mahdi, which had been armed and trained by Hezbollah, which had been bankrolled by Iran's Revolutionary Guard, which had been financed by Deutsche.[789]

1098.837.    Each Deutsche Bank Defendant had the same knowledge of the nexus between Iranian activity in Dubai and anti-American terror that was known to the DB Defendants, and therefore, Deutsche Bank's long-standing support for IRGC terrorist strategy is revealing because Deutsche Bank aided the IRGC and IRGC-QF despite knowing the above context and that the IRGC and IRGC-QF were at all times described (correctly) by the U.S. government as the world's worst sponsor of anti-American terrorism.

**B.    Standard Chartered Bank Knew It Was Aiding Terrorists**

**1.    Standard Chartered Bank Knew That It Operated As A Criminal Enterprise And Laundromat Until 2016**

1099.1.    Since the 1980s, Standard Chartered Bank's core business model has been to serve as the correspondent bank and clearing bank for USD-denominated transactions in high-risk emerging markets, with a particular emphasis on facilitating cross-border transactions in the

---

[789] Enrich, *Dark Towers*, at 104-105.

Middle East and Asia.  As the Economist explained in 2012, "[a]lthough its purely American operations are negligible, Standard Chartered's wholesale franchise rests on providing a financial bridge between the 70 countries in which it does operate, much of it denominated in dollars that must pass through America's financial system."[790]

1100.   This business strategy required that Standard Chartered Bank branches, subsidiaries, and affiliates work closely with, and ordinarily seek to route transactions through, SCB New York.  Standard Chartered Bank specialized as a USD-focused bank that emphasizes cross-border trade finance[791] work in "emerging markets" in the Middle East and Asia.  As an "emerging-markets specialist" bank, Standard Chartered Bank's core business is processing USD-denominated transactions because the U.S. Dollar is the currency of choice, or otherwise used to backstop transactions, in most emerging markets around the world, most of all those in the Middle East and Asia with a long history of trade in goods where the markets are traditionally USD-denominated, e.g., petroleum-based products.

1101.838.      Since the 1980s, Standard Chartered Bank viewed conflict zones as business opportunities for its business model, which differentiated the Bank from nearly every other global financial institution.  For example, Standard Chartered Bank was willing to operate in Sierra Leone.  As *Euromoney* put it:  "Courage is definitely called for when operating in some countries. [Standard Chartered Bank] in Sierra Leone is a good example. It is the only

---

[790] Economist, *Standard Chartered: My Dollar, My Rules* (Aug. 11, 2012) (emphasis added), 2012 WLNR 16987066.

[791] "Trade finance" refers to products and financial instruments offered by banks that companies use to support international trade and commerce, which enable importers and exporters to conduct business through trade by making transactions feasible.  The role of trade finance is to introduce a third-party, like SCB, to a transaction to eliminate the payment risk and supply risk.

international bank there and adds positively to the group's bottom line."[792] A Standard Chartered Bank executive explained that SCB makes money *because of* risky environments:

> "***We make money because of the risk***," explain[ed the SCB executive] – that's risk with a capital R, "We used to have 13 branches, now we've only one left. Twelve have been bombed and shot to pieces and are of no use to anyone, but that's the cost we've taken on board. We're still on the ground. With a quick lick of paint, people put money with us and we make a profit."[793]

~~1102.~~839.      As one industry observer explained, Standard Chartered Bank's "considerable interest" in "searching out opportunities in Afghanistan" accords with SCB's "history of showing interest in countries that are experiencing upheaval and reconstruction" as shown by its status as "the only foreign bank to continue operations in Sierra Leone throughout its civil war."[794] At all relevant times, Standard Chartered Bank has viewed conflict zones as uniquely strong market opportunities, since the U.S. Dollar is typically the currency of choice in conflict zones, and SCB is the world leader in facilitating USD-denominated transactions in such environments.

~~1103.~~840.      According to Dr. Kimberley L. Thachuk, "[c]onflict and postconflict zones [] serve as locales for the cross-pollination of extremist groups and organized crime."[795] Thus, "[i]t is no coincidence that a wide range of terrorist sympathizers, criminals, veterans of conflicts, and adventure seekers flock to conflict zones" such as "Afghanistan and Iraq" to seek

---

[792] Chris Cockerill, *Big Risk, Big Profit*, Euromoney (Sept. 1, 2000), 2000 WLNR 10574765.

[793] *Id.* (emphasis added).

[794] Fiona Haddock, *The Central Banker with a US$300 Budget*, Asiamoney (May 2, 2003), 2003 WLNR 18368142. In 1998, the Sierra Leone government seized the accounts of certain foreigners who had provided critical support to the prior military *junta*, some at SCB. *See* Reuters, *S. Leone Freezes Bank Accounts of "Collaborators"* (Apr. 21, 1998).

[795] Thachuk, *Terrorist Criminal Enterprises*, at 15.

to profit from "booming war economies" often controlled by "nimble strongmen" and "[i]nfamous gangsters such as … Sirajuddin [Haqqani]."[796]

1104.841.    From the late 1980s through 2016, under Standard Chartered Bank's strategy to facilitate bulk USD activity regardless of the terrorist finance risk, SCB's constant proximity to reckless financial transactions was not a fortuity; it was the entire point. As each SCB Defendant knew, and the World Bank noted in 2009, it was an elementary fact of the global financial system that "[b]ecause of their crucial role in the financial system, any banks not having effective [counter-terrorist finance] programs are the ones most likely to be exposed to [terrorist finance] risks and hence can most easily be exploited by domestic and international criminals."[797] By recklessly providing essentially unregulated bulk U.S. Dollar services in terrorist hot zones around the world, often being in a near monopoly in such role, while deliberately taking steps to make life easier for money launderers, each Standard Chartered Bank Defendant knew its conduct would cause SCB accounts to regularly be used by money launderers working for terrorist organizations seeking to kill and maim. Standard Chartered Bank knew this risk and, until 2016, did not care. Plaintiffs suffered for their indifference.

1105.842.    Standard Chartered Bank's enforcement history demonstrates its long-standing practice of operating as a Laundromat for anti-American terrorist financiers and logisticians. On December 10, 2012, Standard Chartered Bank entered a deferred prosecution agreement (or "DPA") with the United States Attorney's Office for the District of Columbia in connection with SCB's admitted terrorist finance activities in support of known and suspected

---

[796] *Id.*

[797] Pierre-Laurent Chatain, John McDowell, Cèdric Mousset, Paul Allan Schott, & Emile van der Does de Willebois, The World Bank, *Preventing Money Laundering and Terrorist Financing; A Practical Guide for Bank Supervisors* at 7 (2009).

fronts for Iranian terrorist groups such as Hezbollah and the IRGC-QF. Standard Chartered Bank did so as part of a global resolution that also resolved potential charges brought by New York regulators.

843.   Also in 2012, the New York Department of Financial Services ("NYDFS") entered a Consent Order which labeled Standard Chartered Bank as a "rogue institution," and made clear that for "nearly a decade," Standard Chartered Bank "programmatically engaged in deceptive and fraudulent misconduct [] to move at least $250 billion … then covered up its transgressions." NYDFS concluded that "[Standard Chartered Bank's] actions left the U.S. financial system vulnerable to terrorists."[798] NYDFS determined that SCB London, SCB Dubai, and SCB New York, helped "finance terrorist groups"[799] and had "indisputably helped sustain a global threat to peace and stability."[800]

1106.844.   NYDFS concluded that Standard Chartered Bank's identity as a "rogue institution" directly reflected the views of its leadership, which was openly contemptuous of the U.S. government's efforts to prevent terrorist finance:

> In short, [Standard Chartered Bank] operated as a ***rogue institution***. By 2006, even the New York branch was acutely concerned about the bank's [misconduct]. In October 2006, SCB's CEO for the Americas sent a panicked message to the Group Executive Director in London. "Firstly," he wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are ... still commensurate with the potential to cause very serious or even catastrophic reputational damage to the Group." His plea to the home office continued: "[s]econdly, there is equally importantly potential of risk of subjecting management in US and London (*e.g.*. you and I) and elsewhere to personal reputational damages and/or serious criminal liability."

---

[798] NYDFS, *In re Standard Chartered Bank, New York Branch*, Consent Order, at 1, 2, 4 (Aug. 6, 2012) ("2012 Consent Order").

[799] *Id.* at 8.

[800] *Id.* at 22.

Lest there be any doubt, ***SCB's obvious contempt for U.S. banking regulations*** was succinctly and unambiguously communicated by SCB's Group Executive Director in response. As quoted by an SCB New York branch officer, the Group Director caustically replied: -***"You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."***[801]

~~1107.~~845.     Standard Chartered Bank's Group Executive Director was a long-standing key player at SCB, having served as SCB's head of Finance, Corporate Treasury and Corporate Development, Head of Growth and Governance across Africa, Middle East, Pakistan, United Kingdom, Europe and the Americas, as well as SCB's Head of Risk, Group Special Asset Management, Legal and Compliance.  From 2001 through 2016, SCB's "You F---ing Americans" mentality reflected the views of SCB management responsible for U.S., U.K., U.A.E., and Pakistan, and explained SCB's willingness to deal with other known enablers of anti-American terror, like the al- -Qaeda, Haqqani Network, and Lashkar-e-Taiba agents and operatives favored by the Syndicate.

~~1108.~~846.     Observers concluded that the "regulatory investigations" in 2012 collectively showed that "Standard Chartered [had] financed terrorism and laundered money."[802] NYDFS agreed:- as recounted by its head two years later, when NYDFS fined Standard Chartered Bank the second of several times:

"Money is the oxygen feeding the fire that is terrorism … ***Without moving massive amounts of money around the globe, international terrorism cannot thrive***," [Lawsky said.] -Yet … some banks don't take monitoring of financial transactions seriously.- Indeed, Lawsky accused [SCB] … of ***ignoring money laundering***, and [] the bank agreed to pay more than $300 million.[803]

---

[801] *Id.* at 4-5 (emphasis added).

[802] Jonathan Shapiro, *Wall Street Deserves Some Slack*, Financial Review Capital (Aug. 8, 2012), 2012 WLNR 16603546.

[803] Kaja Whitehouse, *Banks May Pay Price for Hacks*, The Post-Crescent (May 23, 2015) (emphasis added), 2015 WLNR 15349257.

1109.847.     In 2019, Standard Chartered Bank admitted, in effect, that it was a terrorist finance recidivist when it resolved additional parallel charges brought by the Justice Department, NYDFS, and the Manhattan DA.  As summarized by Treasury, "[f]rom June 2009 until May 2014, SCB processed 9,335 transactions totaling $437,553,380 that were processed to or through the United States," "[a]ll of these transactions involved persons or countries subject to comprehensive sanctions programs administered by" OFAC, and "SCB Dubai processed USD transactions to or through [SCB New York] or other U.S. financial institutions on behalf of customers that sent payment instructions to SCB Dubai."[804]  To resolve these allegations, Standard Chartered Bank paid $639 million as part of a federal settlement,[805] and $463.4 million as part of a parallel settlement with New York regulators,[806] or approximately $1.1 billion total.

1110.848.     U.S. Attorney Jessie K. Liu of the District of Columbia announced the resolution with the United States, and publicly stated that:  (1)"SCB undermined the integrity of our financial system and harmed our national security by deliberately providing" anti-American terrorist funders and supporters "with coveted access to the U.S. economy"; and (2) there was "no doubt" that Standard Chartered Bank, SCB New York, SCB London, and SCB Dubai were "repeat corporate offenders with deficient compliance programs" that "subvert[ed] our national security" and deserved to pay the "steep price" represented by "[t]he financial penalty" against SCB of "[m]ore [t]han $1 Billion."

---

[804] U.S. Department of the Treasury, Press Release, *U.S. Treasury Department Announces Settlement with Standard Chartered Bank* (Apr. 9, 2019).

[805] *Id.*

[806] NYDFS, Press Release, *Department of Financial Services and Manhattan District Attorney Fine Standard Chartered $463.4 Million for U.S. Sanctions Violations* (Apr. 9, 2019) ("2019 NYDFS Press Release").

1111.849.    When Standard Chartered Bank did the business that was eventually prosecuted in these regulatory actions, Standard Chartered Bank knew it was aiding fronts and operatives supporting Iran's Shiite terrorist proxies in Iraq, and Standard Chartered Bank knew it was aiding similar agents and fronts who acted on behalf of al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba.

1112.850.    In 2019, NYDFS concluded that the practices pursued by SCB New York, SCB London, and SCB Dubai foreseeably risked Standard Chartered Bank assuming a role in terrorist finance activities by terrorist organizations.[807] Standard Chartered Bank therefore knew, at the time, that its actions risked assuming a role in terrorist finance activities.

1113.851.    NYDFS also found that the SCB London, SCB Dubai, and SCB New York followed reckless counter-terrorist finance compliance and risk management practices relating to USD-denominated transactions carried out in Dubai or on behalf of companies in Dubai.[808]

1114.852.    NYDFS also found that numerous SCB Dubai personnel knowingly undertook reckless financial practices while knowing that the transactions risked financing terrorism and did, in fact, potentially help terrorists. NYDFS found that SCB Dubai employees regularly helped customers process financial transactions even while the SCB Dubai employees

---

[807] See, e.g., id. (NYDFS criticized SCB's "egregious activities," that "concealed illegal financial transactions," and stated that "[g]lobal financial institutions serve as the first line of defense against … the financing of terrorist activities and those that fail to foster a strong compliance culture [like SCB New York and SCB Dubai] will be held accountable").

[808] See, e.g., id. (NYDFS found that their "investigation further revealed that the bank's compliance infrastructure in the UAE region was woefully inadequate" and "[c]ompliance staff were … unconcerned with U.S. sanctions regulations").

knew the customers were engaged in criminal activities and using their Standard Chartered Bank accounts to further their criminal enterprise. [809]

~~1115.~~853.      NYDFS found further that Standard Chartered Bank continued to pursue its reckless provision of financial services through SCB Dubai even after regularly learning of specific counter-terrorist finance "red flags" between 2009 and 2014. Instead of rigorously investigating the counter-terrorist finance implications, Standard Chartered Bank did nothing other than try to punish people who raised concerns about its ongoing crimes.

~~1116.~~854.      By the 1980s, Standard Chartered Bank was a notorious Laundromat for terrorist financiers and logisticians, which reputation the Bank retained through 2016. Standard Chartered Bank knew it had this reputation.

~~1117.~~855.      From the late 1980s through 2016, Standard Chartered Bank and its subsidiaries and affiliates ordinarily disregarded red flags and provided financial services to customers, including obvious shell companies, as long as: (1) the customer initially routed their relationship through SCB Dubai, SCB Pakistan, or SCB Afghanistan; (2) the product offering concerned USD-denominated financial services to be provided from SCB New York under from SCB's commercial banking, wholesale banking, trade finance, correspondent banking, or other offerings; (3) Standard Chartered Bank had any way to maintain plausible deniability; and (4) the American, British, Emirati, and Pakistani government had not specifically instructed Standard Chartered Bank to end its relationship with the specific customer at issue (even then, SCB often refused to comply).

---

[809] *Id.* (NYDFS and Manhattan DA found that a "manager in [SCB] … advised [a] front company located in Dubai how to evade detection by changing its corporate name and then opening a new account").

1118.856.      On information and belief, prior to at least 2016, Standard Chartered Bank never once ended any financial relationship with any al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, or D-Company operative on its own accord based on terrorist finance risk without prompting from a government first.

1119.857.      When the Bank of Credit and Commerce International ("BCCI") was publicly exposed in 1991 for operating a Laundromat catering to terrorist finance, and subsequently collapsed, "Standard Chartered Bank" was among the "international banks," who – "while stunned at the seizure of [BCCI]" – quickly began "eyeballing its carcass" less than one month later "as a chance to strengthen their own positions."[810]

1120.858.      As a self-proclaimed heir to BCCI's business and customer base in the Middle East,[811] Standard Chartered Bank, like BCCI, focused its laundering activities on emerging markets like Pakistan and the U.A.E., and committed much of the worst behavior in Dubai through its local branch, SCB Dubai. Indeed, this is another indication of SCB's operation as a Laundromat, as it assumed the mantle from BCCI, which had been notorious for, as the *Economist* put it, being the "laundromat of choice for" "terrorists" "for years."[812]

1121.859.      As Standard Chartered Bank expanded its international operations throughout the 1990s, it consciously emulated BCCI's strategies as it sought to win as much U.S. Dollar-related business as possible from BCCI's customers even though Standard Chartered Bank understood that many of BCCI's customers were terrorists.

---

[810] Cotten Timberlake, Associated Press, *Banks Go After BCCI's Market Share*, Daily News (Aug. 2, 1991), 1991 WLNR 1152558 ("Timberlake, *Banks Go After BCCI's Market Share*").

[811] *Id.*

[812] The Economist, *Robert Morgenthau: The Long Arm of the Law* (Aug. 3, 2019), 2019 WLNR 23554946 ("Economist, *Robert Morgenthau*").

1122.860.     In the early 2000s, Standard Chartered Bank intensified its commitment to acting as a U.S. Dollar Laundromat. While most global financial institutions with a significant presence in the U.S. – even the ones that had previously looked the other way towards suspicious activity – changed their ways and adopted rigorous measures to prevent terrorist finance from flowing through their accounts after 9/11, Standard Chartered Bank took a very different course. Even as most of their peers with large American presences had largely at least committed (in principle) to cleaning up their acts by 2009, Standard Chartered Bank's enforcement history shows that SCB calculated that the general trend towards better counter-terrorist finance at large global banks offered a business *opportunity* for SCB to seize more USD market share by doubling-down on its Laundromat Strategy.

1123.861.     Standard Chartered Bank brazenly broke the law even while publicly lecturing other companies on the importance of ethics. After Enron collapsed in 2002, for example, Standards Chartered Bank's "[G]roup [CEO] … [stated] there are moral lessons to be learned. 'Basically, you must ensure that your values and ethics are clear and stick to them even when you are under revenue pressure.'"[813]

1124.862.     From the late 1980s through 2016, Standard Chartered Bank pursued an integrated global business model consistent with its "One Bank" operational strategy. As Standard Chartered Bank itself touted in its 2012 Annual Report, "[w]e think and operate as 'One Bank', supporting clients and customers by collaborating and creating synergies across our international network, businesses and functions."[814] As part of this approach Standard Chartered

---

[813] Karina Robinson, *Cover Story: The Importance Of Being Good - The Enron Scandal Has Put The Spotlight Back On Ethics. Banks Can No Longer Ignore The Issue Of Social Responsibility And Those Which Do May Not Survive*, The Banker (Apr. 1, 2002), 2002 WLNR 4160010.

[814] SCB Annual Report 2012 at 4.

Bank "provide[d] seamless international service and offer[ed] a full suite of products" to corporate clients and SCB's "One Bank approach" was able to "draw[] on the full complement of [SCB's global] resources and capabilities."[815]

~~1125.~~863.    "[T]hink[ing] and operat[ing] as 'One Bank,'"[816] SCB London worked intimately with regional headquarters – like SCB Dubai for Pakistan, Afghanistan and the Middle East – and direct local branches, like SCB New York, or subsidiaries, like SCB Pakistan. At all times SCB London's strategy, as pursued by SCB Dubai, SCB Pakistan, SCB Afghanistan, and SCB New York, was to drive USD-denominated business activity towards SCB New York.

~~1126.~~864.    Standard Chartered Bank pursued the Laundromat Strategy led by SCB's management in SCB London, but also vigorously supported and followed by SCB New York, SCB Dubai, SCB Pakistan and SCB Afghanistan. In doing so, it was following its "One Bank" approach, under which SCB made foreign branches of SCB, including SCB Dubai, SCB Pakistan, and SCB Afghanistan, follow the same set of global rules.

~~1127.~~865.    Standard Chartered Bank's "One Bank approach" extended to their compliance and regulatory commitments. On October 7, 2004, Standard Chartered PLC, SCB London, and SCB New York executed a written agreement with the Federal Reserve Bank of New York (the "Reserve") and the New York State Banking Department (which subsequently became NYDFS),[817] "which identified several compliance and risk management deficiencies in

---

[815] *Id.*

[816] *Id.*

[817] Written Agreement by and among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004), https://www.federalreserve.gov/boarddocs/press/enforcement/2004/20041008/attachment.pdf.

the anti-money laundering and Bank Secrecy Act controls at SCB's New York Branch."[818] -"The agreement required SCB to complete certain remedial actions, among them retaining a qualified independent consulting firm acceptable to the Reserve and [NYDFS] to conduct an historical review of account and transaction activity."[819] -"The purpose of the review was to determine whether suspicious activity involving accounts or transactions at, by, or through [SCB New York] was properly identified and reported in accordance with applicable suspicious activity reporting regulations ("Transaction Review")."[820]

1128.866.    From the late 1980s through 2016, Standard Chartered Bank's deliberate support of terrorist finance relied upon the various Standard Chartered Bank branches, subsidiaries, and affiliates generally following the same deliberately deficient Standard Chartered Bank policies and procedures with respect to combatting terrorist finance, and similar financial crime risks.

1129.867.    Because Standard Chartered Bank's anti-money-laundering/counter-terrorist-finance controls in the United Kingdom set global standards across all of Standard Chartered Bank, including SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan, deliberate facilitation of terrorist finance and money laundering by through the conscious creation of SCB's Laundromat by the U.K. caused SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan to fall in line and knowingly or recklessly assume a role in the terrorist finance scheme at Standard Chartered Bank. And they did.

---

[818] NYDFS, *In re Deloitte Financial Advisory Services LLP*, Agreement, Factual Background ¶ 1 (June 18, 2013).

[819] *Id.*

[820] *Id.*

1130.868.    From the late 1980s through 2016, Standard Chartered Bank's deliberate support of terrorist finance relied upon the use of local Standard Chartered Bank branches in high-risk jurisdictions, like SCB Dubai, SCB Pakistan, and SCB Afghanistan, serving as Standard Chartered Bank's point of entry for most high-risk customer relationships. This enhanced the plausible deniability for all Standard Chartered Bank parties, most importantly SCB London and SCB New York, by leveraging the intentionally deficient Standard Chartered Bank practices in local branches, most of all, at SCB Dubai, which at all relevant times served as Standard Chartered Bank's regional headquarters for the Middle East, Africa, and South Asia, including the U.A.E., Pakistan, and Afghanistan.

1131.869.    From the late 1980s through 2016, Standard Chartered Bank's scheme would not have been successful without the willing participation of SCB London and SCB New York. As set forth below, SCB London and SCB New York management and personnel regularly enabled obvious terrorist finance activities, and their failures – and practice of disregarding clear red flags – were the "secret sauce" to keeping the Strategy effective until 2016.

1132.870.    At all relevant times, Standard Chartered Bank's senior management regularly complained about the supposed burden imposed by even Standard Chartered Bank's then-minimal window-dressing counter-terrorist finance efforts. For example, nearly two years *after* Standard Chartered Bank admitted it had engaged in serial criminal behavior that aided America's enemies, on August 6, 2014, the Bank's Asia CEO revealed Standard Chartered Bank's true attitude towards counter-terrorist finance in an interview with *Reuters*, complaining about the burden that counter-terrorist finance imposed on Standard Chartered Bank:

> Banks have been asked to play the role of policing anti money laundering. That's the real purpose of all these sanctions and surveillance systems and all that … We

are supposed to police that our counterparties and clients are not money laundering, and if when we are policing we have a lapse, we don't get treated like a policeman who's had a lapse, we are treated like a criminal.[821]

~~1133.~~871.     Standard Chartered Bank was "treated like a criminal" because it *was a criminal*. From the late 1980s through 2016, Standard Chartered Bank was a "rogue institution" that engaged in "programmatic[]" crimes (as NYDFS said in 2012) and a "repeat corporate offender" (as DOJ said in 2019)—not a good corporate citizen or a responsible global bank.

~~1134.~~872.     Given Standard Chartered Bank's history as a "recidivist rule-breaker,"[822] one may infer that SCB concluded it was profitable to continue enabling terrorist finance through 2016, even after being partially exposed in 2012. As an industry analyst following Standard Chartered Bank concluded, "CRIME PAYS":

> There are [] $250 billion worth of transactions … in this [SCB] scandal. A slap on the wrist of $700 million would equate to less than .3 of 1% (.003) for dealing with the crowd that would like to see Israel obliterated. Are you kidding me? Is this a joke or what? What do you think the profit margins were in the business transacted by [SCB] with their friends in Iran? Certainly a LOT more than .003.[823]

~~1135.~~873.     Each of the SCB Defendants therefore knew that they operated a Laundromat, that they were facilitating criminal activity, and that terrorist finance was a likely result.

---

[821] Lawrence White, Edwina Gibbs, Tom Pfeiffer, & Steve Slate, Reuters News, *UPDATE 1-StanChart Exec: Banks Treated like 'Criminals' for Anti-Money Laundering Lapses* (Aug. 7, 2014). Though SCB subsequently attempted to clean up the SCB Asia CEO's statement, the original statement accurately reflects each SCB Defendant's attitude towards counter-terrorist finance at all relevant times.

[822] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can \*Gasp\* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

[823] Larry Doyle, *Standard Chartered Scandal: Crime Pays*, Sense on Cents (Aug. 8, 2012), 2012 WLNR 16791952.

1136.874.    **SCB Pakistan.** From 2001 through 2016, SCB Pakistan's core line of business was facilitating USD-denominated transactions involving parties in Pakistan and/or the U.A.E., as backstopped by the USD clearing services provided by SCB New York. SCB Pakistan did so through both traditional conventional commercial banking as well as Islamic banking to offer Sharia-complaint products. During this time, SCB Pakistan occupied a dominant position in the Pakistani financial marketplace with respect to clearing USD transactions with "correspondent accounts" and other financial vehicles, by leveraging its relationship with the other Defendants, including SCB New York, and its self-proclaimed (and correct) status as Pakistan's one *only 'local foreign' bank*."[824]

1137.875.    Consistent with Pakistan's status as a key emerging market for Standard Chartered Bank, in 2006, Standard Chartered Bank acquired control of Union Bank, which was one of Pakistan's largest commercial banks at the time. Union Bank shared similar ownership as the notorious international money launderer bank, BCCI, and on information and belief, followed BCCI-like practices when SCB Pakistan acquired it. After its purchase of Union Bank, Standard Chartered Bank became "Pakistan's sixth largest banking group,"[825] and cemented its role as the dominant player in facilitating USD-denominated transactions and/or deals underpinned by a USD-denominated currency pair. Thereafter, SCB Pakistan became SCB's "10th largest profit contributor."[826]

---

[824] Farooq Tirmizi and Farooq Baloch, *The Cluelessness of Standard Chartered's Pakistan Strategy*, Daily Pakistan Today (Oct. 9, 2017) (emphasis added), 2017 WLNR 31097483.

[825] Daily Mail (UK), *Standard's Union* (Aug. 10, 2006), 2006 WLNR 13818473.

[826] The Banker, *Standard Chartered Bank: The World's Most Desirable Player?* (Sept. 1, 2006), 2006 WLNR 16731979.

1138.876.     By 2008, SCB Pakistan had 174 branches in 39 cities, having grown from 115 branches in 22 cities the year prior. As a result, SCB Pakistan branded itself, and was known in the Pakistani marketplace, as "the country's only 'local foreign' bank."[827] By 2012, as Pakistan's *The Nation* declared that, "[a]s the largest international bank in the country," "Standard Chartered [was] now truly a part of the social fabric of [Pakistan]."[828]

1139.877.     SCB Dubai controlled SCB Pakistan. As two analysts explained, in Pakistan, "[t]he central problem with [SCB's "One Bank"] approach [was] that even as it market[ed] itself as the 'local' global bank in the markets it serves in, it appear[ed] to have shied away from developing a truly localized institutional infrastructure."[829] "In Pakistan," Standard Chartered Bank's "One Bank approach" was "most sharply visible through what can only be described as the 'Dubai problem' … Instead of allowing each individual country division to do their own risk management, [SCB] adhere[d] to a single global set of risk management rules that - by definition – rel[ied] on a macroscopic view of the world that, too often, [did] not allow much room for discretion."[830] As a consequence, local decisions in one Standard Chartered Bank branch, *e.g.*, SCB Pakistan, often went "to the company's regional headquarters in Dubai for approval."[831]

1140.878.     SCB Pakistan management and employees were keenly aware of the potential terrorist finance risk related to the USD transactions they facilitated, and often

---

[827] Farooq Tirmizi and Farooq Baloch, *The Cluelessness of Standard Chartered's Pakistan Strategy*, Daily Pakistan Today (Oct. 9, 2017), 2017 WLNR 31097483 ("Tirmizi and Baloch").

[828] The Nation (Pakistan), *SCB Part of Country's Social Fabric* (Aug. 1, 2012), 2012 WLNR 16156614.

[829] Tirmizi and Baloch.

[830] *Id.*

[831] *Id.*

discussed it amongst themselves and with third parties. In early 2008, SCB Pakistan representatives attended a business conference in Karachi that was attended by U.S. government officials and representatives of other companies, where the group discussed the need for corporations to work with each other and the U.S. and Pakistani governments to reduce the risk of violence being aided by banks.

1141.879.   On information and belief, from 2001 through 2016, SCB Pakistan also regularly conducted "sustainability reviews," in which SCB Pakistan closely examined the social, economic, and political trends impacting Pakistan. As part of this review process, SCB Pakistan regularly learned of the threat posed by Syndicate terrorist finance and logistics.

1142.880.   From 2001 through 2016, SCB Pakistan consistently maintained branches and offered the full complement of Standard Chartered Bank financial services to customers throughout Syndicate-controlled and contested areas of Pakistan, including Syndicate strongholds like Peshawar, Multan, Quetta, and Rawalpindi. SCB Pakistan's presence throughout Pakistan gave the Defendants the benefit of deep local knowledge on-the-ground in Pakistan combined with Standard Chartered Bank's capabilities and expertise as a global bank. According to SCB Pakistan, Standard Chartered Bank offered a unique value proposition that no other bank in Pakistan could match: SCB Pakistan's "nationwide" footprint effectively "combine[d] the Bank's deep local knowledge with its global expertise" to give Standard Chartered Bank an advantage over its competitors in Pakistan's financial services market.[832]

1143.881.   Standard Chartered Bank relied upon its "deep local knowledge" of Pakistan to regularly issue reports concerning the effects of Syndicate activities on the Pakistani

---

[832] Standard Chartered Bank (Pakistan) Limited, Press Release, *Pakistan Business News, Standard Chartered Saadiq Wins Islamic Bank of the Year in Pakistan Award by The Banker, an Affiliate of Financial Times - Press Release* (June 19, 2013).

economy, including the ongoing threat of terrorist violence. For example, in July 2009, SCB Pakistan issued a public report that stated, in sum and substance, that the conflict with the Taliban had had a "devastating impact" on parts of Pakistan, and in May 2010, Standard Chartered PLC issued a report stating, in sum and substance, that foreign investment would decline in Pakistan because of the deteriorating security situation caused by the Taliban.

1144.882.    SCB Pakistan also differentiated itself as the only global financial institution that offered Sharia-compliant banking services in the Pakistani market. As SCB Pakistan's CEO touted in 2013, "[SCB] Saadiq has retained a leadership position since 2004, as the only foreign bank in Pakistan that offers … sharia- compliant Islamic banking … services."[833] Because SCB Pakistan employed Sharia law Pakistani expert employees, SCB Pakistan had a detailed understanding of the Syndicate, al-Qaeda, and the Taliban, including its Haqqani Network.

1145.883.    SCB Pakistan knew that it and Standard Chartered Bank were operating a laundromat that was facilitating terrorist finance.

1146.884.    **SCB Dubai.** In 2006, the head of SCB Dubai's Compliance Office told a senior U.S. official in the U.A.E. that Standard Chartered Bank's compliance office vigorously reviews of all SCB Dubai transactions in the U.A.E. SCB Dubai thus facilitated Syndicate financial activity even though Standard Chartered Bank's personnel in the U.A.E. were keenly aware of the elevated terrorist finance risk in the U.A.E.

1147.885.    In 2019, American and British regulators documented SCB Dubai's reckless counter-terrorist finance practices through 2016 when they announced a new round of penalties against Standard Chartered Bank. As NYDFS found, "[i]n light of these supposed

---

[833] *Id.*

568

enhancements [to SCB's compliance policies], the Bank determined that it would continue servicing customers in jurisdictions that posed ***substantial risks*** for ensuring compliance with U.S. sanctions laws, including the UAE."[834] Standard Chartered Bank did so, even though, "as a general matter, the Bank's ***compliance infrastructure in the UAE region was woefully inadequate***."[835] "Client-facing and compliance staff were … ***unconcerned with complex U.S. sanctions regulations***."[836] "Thus, the Bank's [] ***controls at the Dubai branch were no match for even unsophisticated evasion efforts***."[837]

~~1148.~~886.     Standard Chartered Bank paid lip service to counter-terrorist finance practices while continuing "business as usual" at SCB Dubai. As NYDFS determined, "[a]dditional investigation undertaken by [NYDFS] since 2013 … has determined that, from 2008 through 2014, a still notably inadequate [] compliance function, both at the Bank's Home Office and its Dubai branch, allowed for the processing of an additional $600 million in USD payments that violated regulations issued by" the Treasury Department's Office of Foreign Assets Control ("OFAC"), "and thus resulted in violations of New York laws and regulations as well."[838] NYDFS's investigation showed that "[a] ***large majority*** of these $600 million in ***illegal USD payments transited through the New York Branch*** – several dozen occurring as late as 2014."[839]

---

[834] NYDFS, *In re Standard Chartered Bank, and Standard Chartered Bank, New York Branch, Consent Order Under New York Banking Law §§ 39 and 44*, at ¶ 41 (Apr. 9, 2019) (emphasis added) ("2019 Consent Order").

[835] *Id.* at ¶ 42 (emphasis added).

[836] *Id.* (emphasis added).

[837] *Id.* at ¶ 43 (emphasis added).

[838] *Id.* at ¶ 5.

[839] *Id.* at ¶ 6 (emphasis added).

1149.887.    SCB Dubai managers, employees, and agents regularly colluded with terrorist financiers, including on information and belief one or more of the Syndicate fronts, operatives, or agents identified in this Complaint, to help terrorist financiers evade U.S. and U.K. anti-money-laundering/counter-terrorist-finance controls in order to specifically route U.S. Dollars from SCB New York to terrorists through SCB Dubai and SCB Pakistan through transaction that were specifically designed to enable U.S. Dollars to flow from SCB New York to known or suspected terrorist agents, operatives, and fronts without detection by U.S. and U.K. investigators.

1150.888.    SCB Dubai's systemic terrorist finance was directly enabled by the knowing or reckless conduct of Standard Chartered Bank, including SCB London and SCB New York, both of which knew of, or were willfully blind to, years of obviously suspect transactions flowing through SCB Dubai and yet continued to process SCB Dubai's transactions for terrorists.

1151.889.    Standard Chartered Bank, including SCB New York and SCB London, enabled SCB Dubai's systemic, and vast, terrorist finance activities through 2015 with actual knowledge of what was happening at SCB Dubai. For example, from 2009 through 2015, Standard Chartered Bank's own compliance monitoring reviews of SCB Dubai repeatedly flagged the extreme terrorist finance risk posed by SCB Dubai's activities.

1152.890.    Consistent with their status as "repeat corporate offenders" who were part of a "rogue institution," Standard Chartered Bank entities, including nearly all the SCB Defendants, played a role in many of the largest laundering and financial scandals:

- **DOJ (Swiss Bank Tax Scandal)**. In 2015, DOJ settled with Standard Chartered Bank (Switzerland) SA in connection with DOJ's Swiss Bank Program; SCB Switzerland "agree[d] to pay the sum of $6,337,000 as a penalty to [DOJ]" based on DOJ's findings that "[b]y establishing and maintaining [] accounts, [SCB] provided assistance to certain U.S. Persons in evading their U.S. tax obligations," and "provided account statements

and other documentation to the account holder which contained only the account number in order to further insure the secrecy of the identity of the account holder."

- **NYDFS (ForEx Scandal).**- In 2019, NYDFS "fined [SCB] $40 million for attempting to rig transactions in foreign exchange markets between 2007 and 2013"; "the investigation by [NYDFS], as well as an internal review by [SCB], found that bank traders used a range of illegal tactics to maximize profits," and "[SCB] admitted that it failed to implement effective controls over its foreign exchange business, which is conducted at [SCB London] and in other global financial centers, including at [SCB New York]."[840]

- **India.** -In 1994, India fined SCB 342 million rupees (about $11 million then), for its involvement in a money laundering scheme that was the then-largest financial scandal in Indian history; one observer called SCB's misconduct "reckless in the extreme."[841] -In 2020, "India's anti-money laundering [] agency Enforcement Directorate (ED) … fined [SCB] INR1bn ($13.6m) for foreign exchange rule breaches during a local bank deal,"[842] which "mark[ed] one of the [India's] biggest penalties slapped on an overseas lender."[843]

- **Japan.**- In 2004, Japan's Financial Services Agency ("FSA") announced that it would "punish [SCB's] Tokyo branch for Banking Law violations that helped a criminal group launder funds" by SCB's failure "to properly check customer identification and to produce transaction records," and the FSA found that SCB "management did not respond appropriately to voluntarily improve compliance."[844]

- **Singapore.** -In 2017, Singapore fined SCB's Singapore branch $5.2 million for playing a key role in facilitating the money laundering at issue in the 1MDB scandal, which was the largest financial scandal in Malaysian and Singaporean history and one of the largest criminal money laundering scandal in world history.

- **Nigeria.**- In 2018, Nigeria's central bank fined [SCB] 2.4 billion naira ($7.8 million) in connection with SCB's role in a disputed $8.1 billion on behalf of the notorious South African telecom company, MTN Group, which was recklessly aiding the Nigerian terrorist group Boko Haram while SCB was helping MTN.

---

[840] NYDFS, Press Release, *DFS Fines Standard Chartered Bank $40 Million For Attempting To Rig Foreign Exchange Transactions* (Jan. 29, 2019).

[841] Swamy Aiyar, *How Greedy Bankers Fuelled a Bull Run that Couldn't Last*, Australian Financial Review (June 9, 1992), 1992 WLNR 5461605.

[842] Retail Banker International, *Standard Chartered Hit with $13.6m Fine for Lapses in 2007 India Deal* (Sept. 9, 2020).

[843] United News of India, *ED Slaps Rs 100 Fine on Standard Chartered Bank for FEMA Violations* (Sept. 11, 2020).

[844] Xinhua Economic News, *Japan to Punish Standard Chartered for Involvement in Money Laundering* (Feb. 20, 2004).

- **Kenya.** -In 2019, Kenya announced that SCB was under investigation for helping aid the laundering of at least $10 million that was looted from Kenya's National Youth Service over a two-year period. -As was reported at the time, Kenyan investigators "believe[d] senior officials at [SCB] … quietly allowed some of the key suspects in the … looting … to move large sums of money undetected."[845] -In February 2020, SCB resolved the matter and paid a fine to the Kenyan government.

    1153.891.    Moreover, Standard Chartered Bank is also directly involved in several of

the other largest "dirty money" cases ever, continuing SCB's pattern of being close to nearly

every major USD-related financial scandal in emerging markets since the 1990s, including:

- **Angolan Kleptocracy.** -In the 1990s and 2000s corrupt leaders of the Angolan government looted billions from the Angolan treasury, behavior for which "Standard Chartered [was] making itself part of the problem" by "helping the notoriously corrupt Angolan government," and being "complicit[] in corruption."[846]

- **Odebrecht.** -Standard Chartered Bank played a central role in facilitating the money laundering activity at the heart of the Odebrecht scandal, which DOJ called "the largest foreign bribery case in history." -In the scandal, criminals used foreign bank accounts, including SCB accounts, to move hundreds of millions of dollars to pay bribes to government officials on behalf of the Brazilian construction company Odebrecht.

- **World Cup.**- In 2015, the U.S. government alleged that Standard Chartered Bank accounts were used to launder some of the key bribes paid in connection with the FIFA bribery scandal concerning the World Cup, the largest scandal in sports history.

- **Gupta.** -On information and belief, Standard Chartered Bank is currently under investigation relating to the Gupta money laundering and bribery scandal in South Africa, one of the largest financial scandals in South African history, in which SCB accounts were used, in part, to help facilitate hundreds of millions of alleged bribes to South African officials by a family of oligarchs, the Guptas. -In 2019, U.K. lawmaker Lord Peter Hain alleged that Standard Chartered Bank is "directly culpable" for helping the Guptas conceal their illicit activities through a network of bank accounts and shell companies, stated that SCB is "up to their neck in this," and explained that SCB facilitated Gupta's money laundering scheme "because of course the corporates

---

[845] Brian Wasuna, *How Five Banks in Kenya Cleaned Dirty Money*, East African (Kenya) (Feb. 8, 2019), 2019 WLNR 4105196.

[846] David Pallister, *Alarm Bells Sound Over Massive Loans Bankrolling Oil-Rich, Graft-Tainted Angola; UK's Standard Chartered Bank Criticised for its Leading Role in $2.35bn Deal*, Guardian (June 1, 2005), 2005 WLNR 27534760.

concerned, including the banks, were making money out of it."[847] Like it did with the Syndicate terrorists, SCB helped administer a "laundromat" for Gupta.[848]

~~1154.~~892.    Like most of the al–Qaeda- and Haqqani Network-related transactions here, the scandals at issue in the preceding paragraphs often involved the same SCB London, SCB Dubai, and/or SCB New York management teams, whom in nearly all instances enabled massive criminal schemes involving hundreds of millions, if not billions, of U.S. Dollars being moved in an open and egregious manner that would have been obvious to Standard Chartered Bank with the account data to which it had access. Simply put, the pattern is indicative of Standard Chartered Bank's Laundromat Strategy.

~~1155.~~893.    Standard Chartered Bank has regularly acted in a manner consistent with its Laundromat scheme. The totality of Standard Chartered Bank's conduct compels the conclusion that SCB consciously chose to serve as a Laundromat for terrorist financiers. In addition to the allegations above, Plaintiffs offer the following cross-cutting examples that corroborate activity as a Laundromat rather than a responsible financial institution:

~~1156.~~894.    **SCB's Enforcement History.** A litany of terrorist finance-related enforcement matters resulted in Standard Chartered Bank paying nearly $3 billion to regulators on several continents. Such matters include, but are not limited to, those in the chart below and show that SCB's "One Bank approach" included a decades-long institutional commitment to facilitating terrorist finance as a part of the Standard Chartered Bank business model:

---

[847] BBC, *Banks Facilitated South Africa Corruption Under Zuma, Says Peter Hain* (Nov. 18, 2019).

[848] Financial Mail (South Africa), *The Enablers* (Feb. 6, 2020), 2020 WLNR 3665081.

| Date | Regulator | SCB Payment | Quote from Regulator |
|---|---|---|---|
| 8/6/2012 - 8/14/2012 | NYDFS | $340M | "[SCB's] willful and egregious violations of the law … left the U.S. financial system *vulnerable to terrorists*.[849] … For nearly a decade, SCB *programmatically engaged in deceptive and fraudulent misconduct* in order to move at least $250 billion *through its New York branch*… Motivated by greed, SCB acted for at least ten years without any regard for the legal … and *national security consequences* of its … actions." |
| 12/10/2012 | DOJ, FBI | $227M | "For years, [SCB] *deliberately violated U.S. laws*. The [U.S.] expects a *minimum standard* of behavior from all … that enjoy the benefits of the U.S. financial system. -[SCB]'s conduct was *flagrant and unacceptable*." |
| 12/10/2012 | OFAC | $132M | "We remain committed to … ensur[ing] that the U.S. financial system is protected from … this type of *illicit financial behavior*." |
| 12/10/2012 | Federal Reserve | $100M | "The orders address *unsafe and unsound practices* … as well as insufficient oversight of its compliance program…." |
| 12/10/2012 | Manhattan DA | $113.5M | "[SCB's] case[] … send[s] a strong message about the need for transparency in international banking, and ultimately contribute to the *fight against … terror financing*." |
| 8/19/2014 | NYDFS | $300M | "If a bank fails to live up to its commitments, there should be consequences.- That is particularly true in an area as *serious as anti-money-laundering compliance, which is vital to helping prevent terrorism*." |
| 8/5/2016 | South African Central Bank | R30 million, equal to $220,000 | "Spot inspections revealed *weak measures to combat money laundering and the financing of terrorism*." |
| 3/19/2018 | Monetary Authority of Singapore | S$5.2 million, equal to $3.95M | "The penalties were for breaches of MAS' anti-money laundering and *countering the financing of terrorism* (AML/CFT) requirements." |
| 4/9/2019 | NYDFS | $180M | "Global financial institutions serve as the first line of defense against … the *financing of terrorist* |

---

[849] All emphases in this table are supplied.

Formatte

| Date | Regulator | SCB Payment | Quote from Regulator |
|------|-----------|-------------|----------------------|
| | | | *activities* and those that *fail to foster a strong compliance culture* will be held accountable." |
| 4/9/2019 | Manhattan DA | $292M | "The investigation … showed that *high-level SCB officials knew* of specific compliance deficiencies and risks that allowed the criminal conduct to occur, but were slow to address these issues." |
| 4/9/2019 | OFAC | $639M | "Today's settlement resolves OFAC's investigation into apparent violations of a number of U.S sanctions programs, including those relating to *Burma, Cuba, Iran, Sudan, and Syria*." |
| 4/9/2019 | DOJ, FBI | $292M | "SCB and the individuals whose charges were unsealed today undermined the integrity of our financial system and *harmed our national security*. … The financial penalty announced today leaves no doubt that *repeat corporate offenders* with deficient compliance programs will pay a steep price. When bank employees and customers conspire to … *subvert our national security*, we will bring them to justice no matter where they reside or operate." |
| 4/9/2019 | Federal Reserve | $164M | "[F]rom December 2012 to December 2014, while subject to the [Reserve's] Orders, [SCB] personnel engaged in *unsafe and unsound practices*." |

~~1157.~~895.      "But for a bank, regulatory fines are simply a cost of doing business."[850]

"If the anticipated profits exceed the likely costs, the bank will continue to break the rules."[851]

"And this is exactly what SCB has done."[852]

~~1158.~~896.      Standard Chartered Bank's 2012 resolutions with NYDFS, DOJ, and the Manhattan DA were widely understood as being a response to SCB's deliberate facilitation of terrorist finance. As one British financial publication described, Standard Chartered Bank was

---

[850] Frances Coppola, *Standard Chartered Bank's Long History Of Financial Crime*, Forbes (Apr. 10, 2019).

[851] *Id.*

[852] *Id.*

"accused by US authorities of breaking money laundering rules … [relating to] Iranian 'terrorists.'"[853] The *Telegraph* reported with the two-part headline: "Standard Chartered was 'Rogue Bank that Aided Terrorism'" and "Shock Money-Laundering Allegation by US Regulator Involves $250bn for Iran."[854] The *Daily Mail* concurred with the headline: "*British Bank's Links to Global Terror; US Accuses Standard Chartered of Laundering Billions for Iran and Hezbollah*" and reported that "US authorities suspect the Iranian banks [aided by Standard Chartered Bank] also funded terrorist and militant groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad."[855]

~~1159.~~897.     Indeed, Standard Chartered Bank's anti-American intent was so blatant that when an SCB executive later asserted that it "had no willful act to avoid sanctions," DOJ forced Standard Chartered Bank to confirm, again, that it had willfully committed crimes, and SCB apologized for the executive's contrary statement.

~~1160.~~898.     **SCB's Disregard of Treasury Department Warnings.**  Standard Chartered Bank operated its Laundromat from 9/11 through at least 2016 even while knowing that the U.S. government was concerned that SCB's reckless practices could enable anti-American terrorists, including al-Qaeda, the Taliban, and the Haqqani Network. A few weeks after 9/11, the *Daily Mail* reported that "[a]ccounts at British bank[] … Standard Chartered

---

[853] Jonathan Russell, *'The City Welcomes Foreign Investment Like No Other Place on Earth. Unfortunately, It is Also Threatening to Bring London Down'*, Financial Management (London, UK) (Oct. 1, 2012), 2012 WLNR 23156178.

[854] Louise Armitstead, *Standard Chartered was 'Rogue Bank that Aided Terrorism'; Shock Money-Laundering Allegation by US Regulator Involves $250bn for Iran*, Telegraph Online (UK) (Aug. 13, 2012), 2012 WLNR 18261654.

[855] James Salmon, *British Bank's Links to Global Terror; US Accuses Standard Chartered of Laundering Billions for Iran and Hezbollah*, Daily Mail (UK) (Aug. 7, 2012), 2012 WLNR 16714292.

[were] believed to be coming under scrutiny by US authorities for possible links to Osama Bin Laden and other terrorists."[856]

1161.899.     From 2007 through 2010, the Treasury Department's Undersecretary for Terrorism and Financial Intelligence, Stuart Levey, visited with global financial institutions to inform them about the terrorist finance risks associated with permissive banking practices.  On information and belief, in 2007 and/or 2008, and again in 2009 and/or 2010, Undersecretary Levey advised Defendants, including but not limited to, SCB New York, SCB London, and SCB Dubai, of the risk that agents, operatives, and/or fronts acting on behalf of al‑Qaeda, the Haqqani Network, and other al‑Qaeda affiliate members of the Syndicate were using, or could use, banks to support anti-American terrorist attacks.

1162.900.     **SCB's Implicated In-House Attorneys and Compliance Officers.** From 2001 through 2016, Standard Chartered Bank's systemic terrorist finance was enabled by crooked in-house attorneys and compliance officers at SCB London, SCB New York, and SCB Dubai.  As one law professor wrote, Standard Chartered Bank's behavior represented "[y]et another Shakespearean banking tragedy opened [], with [SCB] starring … as the villainous rogue," in which NYDFS's "order put[] [SCB]'s senior attorneys and compliance officers at the heart of the … scheme, even when outside counsel advised otherwise."[857]

1163.901.     At global banks, "today's in-house counsel are often profit centres, fonts of wisdom on how to avoid accounting rules, cut taxes and maintain the secrecy of dubious practices. One reason for the recent wave of abuses at big banks is that their in-house lawyers

---

[856] Daily Mail, *Bush Terror Cash Probe Includes UK Banks* (Sept. 25, 2001), 2001 WLNR 2648143.

[857] Frank Partnoy (Professor of Law and Finance at the University of San Diego), *True Villains of the StanChart Tragedy*, Business Spectator (Aug. 9, 2012).

have been more focused on speed and profit than on right and wrong."[858] "As recent debacles at … [Standard Chartered Bank] demonstrate, employees of big global banks increasingly lack a moral compass. Some general counsels and compliance officers do provide ethical guidance. But many are facilitators or loophole instructors, there to show employees the best way to avoid the law. *Not even mafia lawyers go that far*; unlike many bankers, mobsters understand the value of an impartial consigliere who will tell them when to stop."[859]

1164.902.    **SCB's Intentionally Deficient Counter-Terrorist-Finance Compliance Policies and Programs.** As a global bank headquartered in the United Kingdom, Standard Chartered Bank was required under U.K. law to establish and maintain appropriate and risk sensitive policies to minimize the risk of SCB being used by those seeking to finance terrorism or launder money.

1165.903.    From 2001 through 2016, under Standard Chartered Bank's Laundromat Strategy, SCB London deliberately designed SCB's anti-money laundering (or "AML") and counter-terrorist finance (or "CTF") policies to promote the reckless processing of USD transactions in most instances regardless of the terrorist finance risk. SCB London enabled the Strategy by setting all AML and CTF policy for every Standard Chartered Bank branch, affiliate, and subsidiary, including SCB Dubai, SCB New York, SCB Pakistan, and SCB Afghanistan, and by regularly causing practices, decisions, and relationships that facilitated laundering.

1166.904.    SCB London has previously admitted that it is responsible for the terrorist finance violations at, among other places, SCB New York and SCB Dubai. For example, after NYDFS fined Standard Chartered Bank the second of four times (in August 2014), SCB London

---

[858] *Id.*

[859] *Id.* (emphasis added).

admitted that it "accept[ed] responsibility for and regret[ted] the deficiencies in the anti-money laundering transaction surveillance system at its New York branch" and its "high-risk small- and medium-business clients in its UAE divisions."[860]

1167.905.    **SCB's Practice of Ignoring, and Retaliating Against, Terrorist Finance Whistleblowers.** From 2012 through 2016, Standard Chartered Bank was also aware of credible terrorist finance allegations by whistleblowers, which further alerted each SCB Defendant to its role in al–Qaeda's and the Haqqani Network's transnational terrorist enterprises, and their response pattern corroborates the SCB Defendants' continued operation as a Laundromat for terrorist financiers through 2016.

1168.906.    The Standard Chartered Bank Defendants shared any terrorism-related allegations brought by any such whistleblowers amongst each other pursuant to SCB's "One Bank approach," and, by 2013, the SCB Defendants shared information with one another concerning of one or more whistleblowers whom: (1) were current and/or former SCB executives, managers, employees, or agents; and (2) had raised one or more concerns that SCB's practices risked enabling anti-American terrorism.

1169.907.    Standard Chartered Bank had a policy of punishing those who raised questions and retaliating against anyone who was undeterred by such tactics, and employees of the SCB Defendants were threatened, harassed, and subjected to adverse employment consequences, including termination, when they raised concerns about potential terrorist finance at the bank. In at least several instances, one or more SCB Defendants retaliated against an SCB employee or agent who had raised terrorist finance concerns. In both instances, Standard

---

[860] Ben Protess and Chad Bray, *Caught Backsliding, British Bank is Fined; Standard Chartered Faces $300 Million Penalty for Falling Foul of 2012 Deal*, International New York Times (Aug. 20, 2014), 2014 WLNR 22902512.

Chartered Bank failed to act on the terrorist finance concern but did punish the person asking questions.

1170.908.    **SCB's Use of Promontory to Conceal its Laundromat.** As further indication of the egregious nature of Standard Chartered Bank's misconduct, SCB even implicated Promontory Financial Group, LLC ("Promontory") in SCB's misconduct through acts that were designed to further conceal the operation of its Laundromat at SCB Dubai.

1171.909.    On August 3, 2015, NYDFS issued a scathing report concerning its investigation of Promontory Financial Group, LLC ("Promontory"), a supposedly independent consultant retained by Standard Chartered Bank purportedly to help SCB reduce the risk of terrorist finance.[861] Among other things, NYDFS's investigation found that:

- "Promontory exhibited a lack of independent judgment in the preparation and submission of certain reports [relating to SCB] to [NYDFS] in 2010-2011."[862]

- A Senior Analyst at Promontory wrote that "[t]he most important thing is that we get to the end of the project without jeopardizing our relationship with [SCB] as a whole."[863]

- "There [were] numerous instances where Promontory, at the direction of [SCB] or its counsel, or at its own initiative, made changes to 'soften' and 'tone down' the language used in its reports, avoid additional questions from regulators, omit red flag terms, or otherwise make the reports more favorable to [SCB]," and more than one "instance of Promontory's efforts to remove red flags highlighting [SCB's] misconduct."[864]

- Promontory selectively emphasized a timeline that misleadingly suggested a trend of declining violations over time, while understanding that doing so makes it "appear[] to be a positive trend over time," which would "not be true with Dubai," and Promontory suspected that Standard Chartered Bank would "not want to show the timelines for Dubai," as SCB and SCB's counsel would view it as "painful information" for which Promontory could "expect strong pushback" from SCB and its counsel.[865]

---

[861] NYDFS, *Report on Investigation of Promontory Financial Group, LLC* (Aug. 3, 2015).

[862] *Id.* at 15.

[863] *Id.* at 6.

[864] *Id.* at 6-7.

[865] *Id.* at 9.

- Standard Chartered Bank and Promontory took a cavalier view throughout, with Promontory personnel plotting to "make[] the Bank's case look better" in one instance, looking for "[b]ig wins" for SCB in another, working to "[s]often the language a bit" in another, and, when yielding to another substantive edit from SCB, "ultimately decided, '[l]et's do it. We've come this far, we might as well go for the three pointer.'"[866]

1172.910.    On August 18, 2015, Promontory resolved the matter with NYDFS.[867]

Under the agreement, Promontory: (1) acknowledged that "Promontory's actions in [its engagement for SCB] did not meet [NYDFS's] current requirements for consultants performing regulatory compliance work"; (2) made a $15 million "monetary payment" to NYDFS; and (3) promised to voluntarily abstain for six months from "any new engagements" that would require NYDFS to authorize the disclosure of certain confidential information.[868]

### 2.    Standard Chartered Bank Knew That Its Clients Were Engaged In VAT Fraud, Money Laundering, And Contributing To Bombmaking

1173.911.    No later than the mid-2000s, Standard Chartered Bank knew its clients were engaged in money laundering. For example, SCB Dubai personnel affirmatively helped clients defeat anti-money-laundering safeguards designed to prevent terrorist finance. *Supra* Part IV.B.

912.    From 2009 through 2016, like Deutsche Bank, *supra* § IV.A.3, Standard Chartered Bank knew about the Azizi Cell's VAT fraud and understood that it aided al-Qaeda.

1174.913.    As explained above, no later than 2011, Standard Chartered Bank knew Fatima and Pakarab supplied CAN fertilizer to the Haqqani Network for its bomb pipeline and relied upon SCB accounts to do so. *Supra* Part IV.C.

---

[866] *Id.* at 11-13.

[867] *See generally* NYDFS, *In re Promontory Financial Group, LLC*, Agreement (Aug. 18, 2015).

[868] *See generally id*.

3. **Standard Chartered Bank Knew It Was A Preferred Bank For Terrorist Financiers Based On Its History Of Enabling "Dirty Money" Transactions**

~~1175.~~914.    Standard Chartered Bank's knowing terrorist finance and facilitation of al–Qaeda's and the Haqqani Network's CAN fertilizer bomb campaign comports with similar decisions made by the same SCB global leadership, regional and country managers during the same time at issue in this case. As NYDFS concluded in 2012, through its "programmatic" misconduct, "[i]n short, Standard Chartered Bank *operated as a rogue institution*," and "left the U.S. financial system vulnerable to terrorists." Seven years later, U.S. Attorney Liu branded the SCB Defendants "repeat corporate offenders."

~~1176.~~915.    Consistent with Standard Chartered Bank's "You F----ing Americans" attitude towards counter-terrorist finance from 2001 through 2016, Standard Chartered Bank executives prioritized Standard Chartered Bank's profits over all else and pursued revenue regardless of terrorist finance risk and routinely facilitated anti-American terrorists' transactions worldwide since the 1990s, and aided terrorists on four continents:

- **The Americas.** Standard Chartered Bank International (Americas) Ltd. and StanChart Securities International Inc. provided substantial financial services to key narcoterrorist operatives acting on behalf of the designated Colombian terrorist group, the "FARC."[869]

- **Europe/Former Soviet Union.** Standard Chartered Bank facilitated transactions with Russian bank Sberbank, doing so even after Ukraine credibly accused Sberbank of "funding terrorism in … Ukraine" based upon "evidence for the accusation of sponsoring terrorism [that was] convincing," including that Sberbank had "launder[ed] money for separatists."[870] In 2020, the U.K. "Office of Financial Sanctions [] imposed on [SCB] its largest ever fine of £20.4 million in a 'most serious case'" based upon Standard

---

[869] *See generally Stansell et al. v. Revolutionary Armed Forces of Colombia (FARC), et al.*, No.: 8:09–CV–2308–RAL–MAP, 2011 WL 13176719 (M.D. Fla. Sept. 19, 2011) (order permitting ATA plaintiffs who were injured in terrorist attacks by FARC to collect on FARC assets in accounts at the identified SCB entities).

[870] Martin Nunn, *Could the City Become an Unwitting Funder of Putin's Terror?*, Independent Online (UK) (Apr. 18, 2014), 2014 WLNR 10524602.

Chartered Bank's violations of Russian sanctions over "an extended period of time, leading to [SCB] repeatedly" breaking U.K. law.

- **Africa.** In 2016, South Africa's central bank fined Standard Chartered Bank's branch in South Africa "after spot inspections revealed weak measures to combat … the financing of terrorism."[871]

- **The Middle East.** In at least thirteen (13) separate instances, American or British regulators and/or prosecutors determined that SCB London, SCB New York, and/or SCB Dubai engaged in misconduct that facilitated terrorist finance activities in the Middle East, collectively fining Standard Chartered Bank nearly $3 billion.

- **South Asia.** Standard Chartered Bank accounts were used in 2006 earthquake relief fundraising by al–Qaeda affiliate, Lashkar-e-Taiba ("LT"), and on information and belief, SCB Pakistan and SCB London transacted more than $10,000 in USD currency exchanges on behalf of a sham charity established by LT.

- **Southeast Asia.** The Monetary Authority of Singapore ("MAS") fined Standard Chartered Bank's Singapore branch about $4 million, in March 2018, "for breaking … terrorism financing rules."[872]

1177.916.   Standard Chartered Bank's knowing and deliberate processing of transactions on behalf of known or suspected Iranian terrorist agents, operatives, and fronts illustrates Standard Chartered Bank's institutional effort to profit from anti-American terrorist finance. For example, then-Representative (now Senator) Chris Van Hollen stated that "Standard Chartered Bank" was a global "financial institution[] that knowingly facilitate[d] transactions for the terror group Hezbollah" and had "knowingly help[ed] Hezbollah fund its terror operations by concealing billions of dollars in transactions with its Iranian sponsor."[873]

---

[871] Reuters, *UPDATE 1-South Africa's Central Bank Fines Banks $2.5 Mln for Weak Anti-Laundering Measures* (Aug. 5, 2016).

[872] James Booth, *Standard Chartered Fined Over Terror Finance Breach*, City AM (Mar. 20, 2018), 2018 WLNR 8605412.

[873] Robert Tilford, *"Some of the World's Most Powerful Banks are Knowingly Helping Hezbollah Fund its Terror Operations" Says Rep. Van Hollen*, Ground Report (May 18, 2015), 2015 WLNR 14539788.

1178.917.    Moreover, in providing USD services to Iranian terrorist fronts, including IRGC-QF and Hezbollah, "recidivist rule-breaker [SCB] … persisted … against the stern warnings of its outside counsel."[874] As an example of Standard Chartered Bank's duplicity, NYDFS and the Manhattan DA found that SCB Dubai – enabled by other SCB London and SCB New York – continued egregious banking practices that facilitated terrorist finance through 2014. In so doing, NYDFS and the Manhattan DA "found that both a senior U.S. sanctions compliance officer, and a senior U.K. sanctions compliance officer utterly failed to take steps to ensure that transactions from Iran were blocked after bank staff discovered dozens of clients … Instead, the two executives proceeded in a 'business-as-usual fashion.'"[875]

4.    **Standard Chartered Bank Knew It Regularly Disregarded Terrorist Finance Red Flags Recognized By Others**

1179.918.    Standard Chartered Bank's knowing intent to process transactions that it knew posed an extreme risk of routing terrorist finance or supplies to al-Qaeda and the Haqqani Network is demonstrated by its history of disregarding terrorism red flags noted by others.

1180.919.    Standard Chartered Bank also regularly facilitated USD transactions for high-terrorist-finance risk customers or counterparties even ***after***: (1) the U.S. government asked Standard Chartered Bank to end its relationship; (2) an American jury determined the customer aided terrorist finance; and/or (3) Standard Chartered Bank learned that others in the financial services marketplace had ceased doing business with the same person based upon concern that the provision of financial services to the person could aid the person's terrorist agenda:

- **National Iranian Tanker Company.** On information and belief, in 2007 or 2008, Undersecretary Levey specifically warned the Defendants not to provide financial services to potential IRGC fronts involved in the movement of supplies, dual-use goods,

---

[874] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can *Gasp* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

[875] 2019 NYDFS Press Release.

and petroleum products, including the National Iranian Tanker Company ("NITC"), which was at all times an IRGC-QF front. Even after the U.S. asked Standard Chartered Bank in 2007 or 2008 and SCB admitted wrongdoing in 2012, however, SCB Dubai continued to provide USD services to NITC through at least 2014, on information and belief processing millions in USD-denominated transactions for the IRGC-QF's benefit through its front, NITC. On information and belief, when the U.S. designated the IRGC as an FTO in April 2019, NITC's activities formed a substantial basis for the IRGC's designation, as the U.S. government has concluded that "NITC has [] played a significant role in oil deals used to generate revenue for the IRGC-QF and Hizballah."[876]

- **Arab Bank.** Even though SCB promised to stop doing business with high-risk terrorist finance customers, it continued processing tens of millions of dollars in Arab Bank transactions through 2014. Even after a federal jury in this District ruled for plaintiffs in their landmark ATA trial victory against Arab Bank, SCB continued funding millions of dollars' worth of transactions with wire references including classic red flags raised in the trial such as "charities," "donations," "support" or "gifts." In so doing, Standard Chartered Bank knew, as SCB itself documented, that terrorists' "illicit activities" were foreseeably being financed "under the guise of charity."

~~1181.~~920.    Just like with Fatima, with National Iranian Tanker Company and Arab Bank, Standard Chartered Bank was told one of its competitors declined a financial relationship with an SCB customer based upon terrorism red flags and SCB continued the suspect relationship.

### C.    Danske Bank Knew It Was Aiding Terrorists

#### 1.    Danske Bank Knew That It Operated As A Criminal Enterprise And Laundromat Until 2017

~~1182.~~921.    Danske Bank knew in 2007 that the Estonia branch was a laundromat. It was pointed out to Danske Bank by regulators, and Danske Bank investigated. Danske Bank chose to keep operating the laundromat, and to aggressively grow the laundromat, rather than to reform, in the face of being confronted with the evidence of its own ongoing bad acts.

---

[876] U.S. Department of the Treasury, Press Release, *Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force* (Oct. 26, 2020).

1183.922.     Danske Bank knew it was operating a laundromat because the amount of money it laundered in Estonia was nearly 10 times Estonia's gross domestic product.

1184.923.     Danske Bank knowingly operated the laundromat, and it knew that its banking practices in Estonia, and therefore its own banking practices there, were designed to facilitate financial crime and money laundering.

1185.924.     At all relevant times, when Danske Bank knowingly operated its laundromat, Danske Bank did so while knowing that criminals and terrorists would use the Danske Bank laundromat to perpetrate financial crime and to finance terrorism.

### 2. Danske Bank Knew That Its Clients Were Engaged In Money Laundering, VAT Fraud, And Capital Flight, Which Danske Bank Knew Were Red Flags For Terrorist Finance

1186.925.     Danske Bank set up its Estonia branch to be separate from the rest of the bank, so that the Estonia branch would not receive adequate oversight. This was designed to provide Danske Bank plausible deniability with regard to Danske Bank Estonia's actions.

1187.926.     But Danske Bank still knew that Danske Bank Estonia was criminally laundering money because (1) in 2007, the Russian Central Bank told the Danish Financial Services Authority that Danske Bank Estonia was facilitating crime and money laundering with significant magnitude and regularity, and the Danish authorities passed that message on to Danske Bank; (2) throughout the scheme, the Estonia branch had many of nonresident customers who carried out such large volumes of transactions that it should have flagged the problem for Danske Bank's headquarters; (3) in 2012 Estonian regulator told Danske Bank "the relatively big concentration of the business relationships from risk countries in [the Estonia branch] is not accidental," and Danske Bank's board said that although the bank recognized there were "a

number of high risk customers" the bank was confident in its controls;[877] (4) in 2013, Danske Bank's compliance group identified some of the Estonia branch clients as "our black-listed Russian customers;" (5) in 2013 a correspondence bank clearing dollar transactions for the Estonia branch ended its relationship with the branch; (6) in 2013, a whistleblower, an employee at the Estonia branch, reported to Danske Bank that Danske Bank knowingly continued to deal with a company that it knew had committed crime; (7) in 2014 Danske Bank's own internal auditors had found branch staff to have deliberately concealed the identities of suspicious clients from local authorities; (8) the massive profits Danske Bank generated out of the Estonia branch—10.7 percent of the overall Danske Bank profit—were not explainable, particularly in comparison to the overall allocation of assets to that branch—approximately 1 percent; and (9) throughout the scheme, the sheer number and volume of U.S. Dollar transactions flowing through Danske Bank New York should have raised red flags.

1188.927.   Danske Bank has admitted that it believes employees of the Estonia branch assisted clients circumvent money-laundering controls.

1189.928.   Additionally, a report by the firm hired by Danske Bank's board disclosed that Danske Bank ignored years of signals about problematic transactions at its Estonia branch, including a warning in 2007 about criminal activity involving substantial sums on a monthly basis. Nienke Palstra, an anti-money-laundering campaigner for Global Witness, a London-based nonprofit organization was reported to have said "[t]here is no way that senior management would not have noticed" the "sheer volume of the transactions" which "should have sounded alarm bells."[878]

---

[877] Professional Wealth Management (PWM), *Danske scandal should lead to renewed scrutiny of new clients* (February 27, 2019), 2019 WLNR 6352499.

[878] Wash. Post, *CEO of Danish Bank Quits Amid Investigation* (Sept. 20, 2018).

1190.929.    When the Estonia employee of Danske Bank blew the whistle on Danske Bank, he said, in relevant part, that "[t]he bank may itself have committed a criminal offence; The bank can be seen as having aided a company that turned out to be doing suspicious transactions (helping to launder money?); The bank has likely breached numerous regulatory requirements. The bank has behaved unethically; and There has been a near total process failure."

1191.930.    It has been reported that Kilvar Kessler, the head of the Finantsinspektsioon, or Estonian Financial Supervision Authority (FSA), met with Danske Bank Estonia's CEO, Aivar Rehe, and when asked if Danske Bank's management in Denmark knew of the Estonia branch's facilitation of crime and money laundering, Rehe said "[o]f course they knew."[879] Rehe committed suicide in 2019.

### D.    Placid Express Knew It Was Aiding Terrorists

1192.931.    It is widely known, including, on information and belief, by Placid Express, that Khanani for over two decades laundered money for multiple terror and organized crime groups.

1193.932.    At all relevant times, Placid Express knowingly allowed the Khanani MLO to transfer hundreds of thousands of dollars using Placid Express's facilities.

1194.933.    At all relevant times, when Placid Express knowingly allowed the Khanani MLO to launder money, Placid Express did so while knowing that the Khanani MLO was assisting and providing resources to the Syndicate.

---

[879] Organized Crime and Corruption Reporting Project, *Newly Obtained Audit Report Details How Shady Clients from Around the World Moved Billions Through Estonia* (March 12, 2021).

1195.934.    By 2008, Placid Express understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al‑Qaeda and the Taliban based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regularly reported on by major media outlets.

1196.935.    The nature, counterparties, and sheer volume of transactions Placid Express allowed the Khanani MLO to complete provided Placid Express general awareness that Placid Express was playing a role in overall illegal or tortious activity at the time.

1197.936.    For example, the Khanani MLOs' transfers of U.S. Dollars using Placid Express were inherently illegal in and of themselves, so Placid Express knew of its role in an illegal activity.

1198.937.    The nature, counterparties, and sheer volume of transactions Placid Express allowed the Khanani MLO to complete provided Placid Express general awareness that its customers were part of the Khanani money laundering organization.

1199.938.    On information and belief, Placid Express executives and middle management knew that Placid Express processed transactions that represented money laundering by fronts, operatives, or agents of the Syndicate.

1200.939.    Because Placid Express allowed notorious money launderers to use Placid Express to launder U.S. Dollars, it was foreseeable to Placid Express that Khanani would do so on behalf of and for the benefit of the Syndicate.

1201.940.    Because Placid Express allowed the Khanani money laundering organization to launder U.S. Dollars using Placid Express, and it was widely known that Khanani

acted for the benefit of the Syndicate, Placid Express was generally aware of its role in an overall illegal activity from which acts of international terrorist was a foreseeable risk.

~~1202.~~941.    Khanani and the Khanani money laundering organization are closely intertwined with the Syndicate's violent terrorist activities. ~~As~~ such, Placid Express was generally aware that by providing U.S. Dollar transfer services to Khanani and the Khanani money laundering organization Placid Express was playing a role in unlawful activities from which the Syndicate's attacks were foreseeable.

~~1203.~~942.    Placid Express knew its customers, and therefore it knew that it was giving assistance, not in an innocent or inadvertent way, to Khanani and the Khanani MLO, which were in turn working as agents for the Syndicate.

~~1204.~~943.    At all relevant times, Placid Express knew, or was generally aware, that Khanani was a known agent of, and widely understood to launder money for, al~~-~~Qaeda, the Taliban, and the Haqqani Network.

~~1205.~~944.    At all relevant times, Placid Express knew, or was generally aware, that Khanani's activities were likely related to Syndicate terrorist logistics or finance activity.

~~1206.~~945.    The nature, counterparties, and sheer volume of transactions Placid Express allowed the Khanani MLO to complete gave Placid Express knowledge that its clients were engaged in illegal activity, including but not limited to the illicit transfer of funds.

### E.    Wall Street Exchange Knew It Was Aiding Terrorists

~~1207.~~946.    It is widely known, including, on information and belief, by Wall Street Exchange, that Khanani for over two decades laundered money for al~~-~~Qaeda, the Taliban ~~(including its Haqqani Network),~~, and other terrorist groups, by helping them conduct terrorist finance-related transactions that moved their money and financed their operations.

1208.947.     In just one example, Farzam Mehdizadeh, a Canadian agent of Khanani and Khanani's money-laundering organization, was arrested in 2016 by the Royal Canadian Mounted Police after a search of his car found hidden therein $1.3 million in cash. Thereafter, the authorities searched Mehdizadeh's house and found evidence of international wire transfers via Wall Street Exchange. Mehdizadeh was charged in 2017 on accusations he laundered $100 million in one year.

1209.948.     Prior to April 2016, the Royal Canadian Mounted Police tracked Mehdizedeh as he traveled from Toronto to Montreal eighty-one times. On information and belief, each of those trips was done to launder money for Khanani and Khanani's money-laundering organization.

1210.949.     Wall Street Exchange knew that Mehdizedeh was laundering money, and used Wall Street Exchange to do so, for Khanani and the Khanani MLO.

1211.950.     Wall Street Exchange therefore intentionally facilitated money laundering, including for Khanani. A large volume of the money that Khanani was moving around the world was being run through Wall Street Exchange.

1212.951.     At all relevant times, Wall Street Exchange knowingly allowed the Khanani MLO to transfer millions if not billions of dollars using Wall Street Exchange's facilities.

1213.952.     At all relevant times, when Wall Street Exchange knowingly allowed the Khanani MLO to launder money, Wall Street Exchange did so while knowing that the Khanani MLO was assisting and providing resources to the Syndicate.

1214.953.     The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete provided Wall Street Exchange general

awareness that Wall Street Exchange was playing a role in overall illegal or tortious activity at the time.

1215.954.    For example, the Khanani MLO's transfers of U.S. Dollars using Wall Street Exchange were inherently illegal in and of themselves, so Wall Street Exchange knew of its role in an illegal activity.

1216.955.    The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete provided Wall Street Exchange general awareness that its customers were part of the Khanani MLO.

1217.956.    On information and belief, Wall Street Exchange executives and middle management knew that Wall Street Exchange processed transactions that represented money laundering by fronts, operatives, or agents of the Syndicate.

1218.957.    Because Wall Street Exchange allowed notorious money launderers to use Wall Street Exchange to launder U.S. Dollars, it was foreseeable to Wall Street Exchange that Khanani would do so on behalf of and for the benefit of the Syndicate.

1219.958.    Because Wall Street Exchange allowed the Khanani money laundering organization to launder U.S. Dollars using Wall Street Exchange, and it was widely known that Khanani acted for the benefit of the Syndicate, Wall Street Exchange was generally aware of its role in an overall illegal activity from which acts of international terrorist was a foreseeable risk.

1220.959.    Khanani and the Khanani money laundering organization are closely intertwined with the Syndicate's violent terrorist activities. As such, Wall Street Exchange was generally aware that by providing U.S. Dollar transfer services to Khanani and the Khanani money laundering organization Wall Street Exchange was playing a role in unlawful activities from which the Syndicate's attacks were foreseeable.

1221.960.     Wall Street Exchange knew its customers, and therefore it knew that it was giving assistance, not in an innocent or inadvertent way, to Khanani and the Khanani MLO, which were in turn working as agents for the Syndicate.

1222.961.     At all relevant times, Wall Street Exchange knew, or were generally aware, that Khanani was a known agent of, and widely understood to launder money for, al-Qaeda, the Taliban, and the Haqqani Network.

1223.962.     At all relevant times, Wall Street Exchange knew, or were generally aware, that Khanani's activities were likely related to Syndicate terrorist logistics or finance activity.

1224.963.     The nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to complete gave Wall Street Exchange knowledge that its clients were engaged in illegal activity, including but not limited to the illicit transfer of funds.

## VIIV.  DEFENDANTS' FINANCIAL AND LOGISTICAL ASSISTANCE TO AL-QAEDA, THE HAQQANI NETWORK, AND THEIR ALLIES WAS SUBSTANTIAL, AND AIDED TERRORIST ATTACKS AGAINST AMERICANS IN AFGHANISTAN BETWEEN 2011 AND 2016

1225.964.     As set forth below, Defendants' bombmaking assistance to the Syndicate was substantial and caused terror attacks. Defendants enabled al-Qaeda's and the Haqqani Network's transnational terrorist finance, and Standard Chartered Bank also aided the Haqqani Network's sourcing of the al-Qaeda's CAN fertilizer bomb supply pipeline. By aiding customers who were active terrorist operatives, agents, or fronts for al-Qaeda, the Haqqani Network, or another Syndicate member, Defendants supplied al-Qaeda, the Taliban (including its Haqqani Network), and Lashkar-e-Taiba financial and explosive resources that enabled Syndicate terrorists to conduct thousands of CAN fertilizer bomb attacks against Americans in Afghanistan each year from 2011 through 2016.

## A.      Defendants Provided Support Tailored To The Violence At Issue Here

1226.965.      Defendants' assistance was tailored to the specific violence at issue: Defendants provided U.S. Dollars which al-Qaeda and the Haqqani Network required to finance their terrorist campaign in Afghanistan.

1227.966.      In addition to the above, Standard Chartered Bank also provided tailored aid to al-Qaeda and the Haqqani Network through the CAN fertilizer it helped them source.

1228.967.      Defendants' Laundromat services were vital to enabling al-Qaeda and the Haqqani Network to convert their narcotics income into useable terrorist finance. For example, Rhoda Weeks-Brown, general counsel of the International Monetary Fund, explained the long-standing global recognition of the direct link between Laundromat activities in high-risk terrorist finance jurisdictions and "terrorism financing" needed for al-Qaeda to commit terrorist attacks:

> Money laundering is what **_enables criminals to reap the benefits_** of their crimes … dirty money … may be a **_source of funding for terrorism_** … Terrorist groups need money, lots of it, to compensate fighters and their families; buy weapons, food, and fuel; and bribe crooked officials … The IMF is committed to helping its members identify today's **_dirty money laundromats_**—and close them down. The stakes have never been higher.[880]

1229.968.      Defendants' assistance also provided the terrorists with critical diversification advantages. Money laundering and the use of a network of fronts, agents, and operatives also strengthened al-Qaeda and Haqqani Network (and, through it, the Taliban) by allowing each group to diversify its income. For terrorists subject to crippling international sanctions, diversification was critical: it offered each group a degree of financial resiliency that made it less susceptible to American counter-terrorist-finance and counterinsurgency efforts.

---

[880] Rhoda Weeks-Brown, *Cleaning Up*, Business and Financial Times (Ghana) (June 11, 2019), 2019 WLNR 17821676 (emphasis added).

1230.969.      Defendants' provision of banking and remitter services to agents, operatives, and fronts for al‑Qaeda, the Taliban (including its Haqqani Network),, Lashkar-e-Taiba, Jaish-e-Mohammed, and D‑Company enabled the efficient operation of their shared transnational terrorist enterprise as a firm as bin Laden had always envisioned. By doing so, Defendants helped each member of the Syndicate unlock the "firm"-related efficiency advantages made classic by Ronald Coase's theory of the firm. In their book, *The Future of Terrorism*, Walter Laquer and Christopher Wall explained:

> For terrorism to be a viable tactic, there needs to be an ***industrial effort*** behind the planning, recruiting, training, procurement of supplies and actual execution. This reality means that in many ways, groups like … [al‑Qaeda] fall within the bounds of Ronald Coase's theory of the firm. Coase's theory, at its most basic level, argues that pricing in open markets rarely takes into account such transaction costs as information costs, trade, and enforcement of contracts that inflate the costs of trade. Coase argues that an entrepreneur who could organize a firm could ***reduce these costs***. Terrorist organizations have an incentive for organizing along these lines for the reasons outlined above, with the added caveat that they ***manufacture political violence***.[881]

1231.970.      The litany of U.S. government designations related to the terrorists in this Complaint also confirm that every transaction that Defendants has with such persons necessarily aided the Syndicate because every U.S. government designation of a Syndicate-related terrorist reflected the U.S. government's official judgment that any transactions with the person aided the Syndicate's terrorist enterprise, and it was therefore impossible to separate the "good" money from the "bad" money.

1232.971.      To ensure that al‑Qaeda's CAN fertilizer bombing campaign could be pursued at a nationwide scale, and aggressive attack tempo, the Syndicate sought to maximize its financial resources through every available channel. Transnational terrorist finance was a key

---

[881] Laquer and Wall, *Future of Terrorism*, at 209-210.

financial force multiplier for the Syndicate, as it allowed Syndicate members to more efficiently, timely, and predictably move and redistribute the vast cash flows from the criminal proceeds amongst themselves.  By strengthening the Syndicate's financial logistics chain, terrorist finance activities directly supported a greater pace of successful attacks against Americans.

1233.972.    Defendants' Laundromat transactions with the Syndicate enabled an especially potent form of terrorist finance for it because Defendants facilitated a stream of terrorist finance that was entirely amongst criminals – Defendants, Khanani, and their counterparties – and therefore was easier to conceal, which is a core objective of any terrorist finance scheme.  In 1999, Yossef Bodansky explained the enormous operational advantages such an outcome affords to Islamist terrorists like al-Qaeda and the Taliban:

> [al-Qaeda] networks locally obtain operational funds by selling drugs, [and] laundering money … The operations of these networks take place with extremely deep cover within the tangled web of organized crime, an environment that already goes out of its way to shield its activities from law enforcement [].  This multiple-layered security significantly increases the likelihood that [al-Qaeda] will achieve surprise when they launch a … terrorist operation …[882]

1234.973.    The Syndicate's ability to count on regular and predictable cash flow, as a result of its terrorist finance activities, increased the lethality of the CAN fertilizer bomb campaign.  By ensuring the Syndicate's ability to regularly pay fighters who joined for financial rather than ideological reasons, predictable cash flows from terrorist finance allowed the Syndicate to maintain the large numbers of fighters, smugglers, and factory workers necessary to the entire CAN fertilizer bomb campaign.  Moreover, regularized cash flows from criminal activities and money laundering helped ensure that al-Qaeda, the Taliban, and the Haqqani Network could keep the peace amongst their affiliates, and each other, so they could all

---

[882] Bodansky, *Bin Laden*, at 322.

concentrate on their shared jihad against the United States. By preventing fissures amongst the members of the terrorist mafia cartel that is the Syndicate, which could threaten the viability of al-Qaeda's joint venture in the first instance, terrorist finance activities were core to the Syndicate's ability to function smoothly and without rancor.

1235.974.    The fusion of the Syndicate's opium revenue recycling with its terrorist campaign was complete. In 2004, "the outgoing CIA station chief in Kabul dispatched a message home warning of the growing link between the Taliban and the drug trade. 'His cable said there was a ***direct causal link*** between insurgent funding and the opium trade,' according to a U.S. official who saw the document. 'If we do not do something about this, he wrote, we will win the battle and lose the war.'"[883] As Senator Mark Warner explained in 2008, "the revenues from … poppy" "are recycled directly to the Taliban," who "then invests them in weapons and uses those weapons against our forces."[884]

1236.975.    By 2009, there was a "consensus within the Pentagon and the US law enforcement community that fighting the opium trade would be critical to turning the tide in Afghanistan."[885] On February 3, 2009, Pentagon and NATO officials publicly recognized the fusion of terrorist finance, Taliban narcotics activity, and Syndicate attacks.[886]

---

[883] Peters, *Seeds of Terror*, at 191 (emphasis added).

[884] CQ-RollCall Political Transcriptions, *Senate Armed Services Committee Hearing on the Defense Authorization Request for Fiscal Year 2009* (Feb. 6, 2008), 2008 WLNR 32061678.

[885] Peters, *Seeds of Terror*, at 236.

[886] Gerry J. Gilmore, *Afghan Drug Operations Come Under Intensified Scrutiny, Spokesman Says*, American Forces Press Service (Feb. 3, 2009).

1237.976.    Similarly, a Pakistani columnist explained, "[i]ndividuals and companies involved in the schemes like the Russian and Azerbaijani Laundromats" "relied on European banks to" "transfer illicit funds," which likely enabled "serious crimes, including terrorism."[887]

1238.977.    Former U.S. government officials also publicly testified as to the fusion of Russian Mafia-related Laundromat activities with anti-American terror. For example, Heather A. Conley, formerly the Deputy Assistant Secretary of State for Eurasian Affairs, testified that "anti-money laundering measures" with a "specific focus on Russia" were linked to the prevention of "terrorism financing," and for that reason, "[i]t [was] time for the United States to close the Russian laundromat and its affiliated enabling services that operates within and outside the U.S. financial system."[888]

1239.978.    In 2019, the European Parliament reiterated the widespread understanding in Europe that a bank's decision to deliberately facilitate money laundering inextricably enables terrorist finance. Among other things, the "European Parliament … stresse[d] that":

- "money laundering … assume[d] various forms, and that the money laundered [could] have its origin in various illicit activities, such as corruption, arms and human trafficking, drug dealing, tax evasion and fraud, and [could] be used to finance terrorism";

- AML rules governing financial institutions directly "combat[ted] the laundering of money … to counter the financing of terrorist activities" and "note[d] that the [EU's] AML framework chiefly relie[d] on a preventive approach to money laundering, with a focus on the detection and the reporting of suspicious transactions";

- "tax haven regimes" that enabled terrorist finance "[were] also present in developing countries"; and

---

[887] Columnists from India and Pakistan, *World's Biggest Money Laundering Market* (Mar. 4, 2019).

[888] Testimony of Heather A. Conley, Former Deputy Assistant Secretary of State for Eurasian Affairs and Senior Vice President for Europe and Eurasia in the Center for Strategic and International Studies, *Senate Banking, Housing and Urban Affairs Committee Hearing on Russia Sanctions*, Financial Markets Regulation Wire (Sept. 6, 2018).

- the European Parliament "[r]eiterate[d] that intermediaries play[ed] a crucial role in facilitating … the financing of terrorism."[889]

~~1240.~~

**B.      The Amount Of Money, And Concealment Of The Same, Were Both Significant**

~~1241.~~979.      ~~Al-Qaeda's CAN fertilizer bomb campaign cost a substantial amount of~~ As explained above, money~~, and illicit streams of income from its global terrorist finance enterprise played a key role in funding every aspect of al-Qaeda's overall bombing campaign, including~~ is the ~~Haqqani Network's CAN fertilizer bomb pipeline.  Whenever the Syndicate killed or injured an American in Afghanistan by exploding a CAN fertilizer bomb, every part of that single attack chain cost~~ lifeblood of terrorism—especially for al-Qaeda and its Syndicate allies~~ money:  purchasing Fatima Group CAN Fertilizer and associated bomb component parts, converting Fatima Group CAN Fertilizer into ammonium nitrate in an al-Qaeda lab, turning the resulting ammonium nitrate into a CAN fertilizer bomb through an al-Qaeda bombmaker, smuggling the CAN fertilizer bomb to the relevant Syndicate attack cell, supporting that attack cell during the pendency of the attack, and providing specialized training for the attackers, including suicide bombers.  As~~. And as the United States explained in ~~one~~a criminal case targeting a member of the Syndicate, "[n]etworks of violence and terror do not just require people willing to commit suicide attacks. ~~T~~hey need people to provide money."[890]

~~1242.~~980.      Each Defendant routed at least several million dollars in terrorist finance to al-~~ ~~Qaeda, the Haqqani Network, and other Syndicate members from 2008 through 2016.

---

[889] European Parliament Report.

[890] Tr. of Arraignment, *United States v. Khan*, No. 11-cr-20331, Doc. 31, at 19 (S.D. Fl. 2011).

1243.981.    Danske Bank likely routed tens of millions of U.S. Dollars to the Syndicate.

1244.982.    Deutsche Bank and Standard Chartered Bank each routed, at least, tens of millions of U.S. Dollars to the Syndicate, and each likely routed more than $100 million to the Syndicate.

1245.983.    Although al-Qaeda needed a large amount of money to sustain its terrorist campaign, even relatively small transactions had an outsized effect on the Syndicate's terrorist capabilities. as a whole, each individual attack required less. Although estimates vary, the Taliban paid many of its rank-and-file fighters about $100 per month, while mid-level commanders made upwards of $350 per month. As for many of the IEDs that the Syndicate used against Coalition troops, a Pakistani security official estimated that they cost a mere $100 to make.[891]

1246.984.    At those rates, even a single transaction that recycled $2,000 in laundered funds back to al-Qaeda or the Taliban (including its Haqqani Network) could finance substantial insurgent violence: it could put ten fighters and a commander in the field for a month, and supply them with five IEDs. Or the Haqqani Network could spend its $2,000 to purchase about 65 bags of Fatima Group CAN Fertilizer, from which al-Qaeda bombmakers could convert enough of the fertilizer into ammonium nitrate to provide the explosive materials necessary for approximately 260 large CAN fertilizer bombs (designed by al-Qaeda to defeat an American armored vehicle) or 650 smaller CAN fertilizer bombs (designed by al-Qaeda to defeat American body armor). And Defendants regularly facilitated deals that were many orders of

---

[891] *See* Kathy Gannon, *Taliban Gains Money, al-Qaida Finances Recovering*, Assoc. Press (June 20, 2009).

magnitude higher, including deals for Fatima Group CAN Fertilizer.  Those payments materially strengthened the ability of al- Qaeda and the Taliban (including its Haqqani Network) to finance and execute the attacks that killed and injured Plaintiffs.

1247.985.    From 2010 through 2016, the average cost of a Fatima- or Pakarab-based CAN fertilizer bomb IED was approximately $40, and the average cost of a suicide bomber detonating a CAN fertilizer bomb ranged from $100 to $2,000-$3,000 for the largest suicide VBIEDs.  At such price points, the Defendants' annual facilitation of al- Qaeda, Taliban, and Haqqani Network terrorist finance activities through SCB New York accounts would have funded every bomb used to attack Plaintiffs in this case many times over.

1248.986.    Aside from the amount of money transmitted to al- Qaeda and its allies, Defendants' involvements in their respective Laundromats also secured al- Qaeda's terrorist finance scheme by legitimating the Laundromat transactions and thereby better concealing the schemes from detection.  For example, Deutsche Bank's involvement ensured that its Russian Laundromat achieved scale and was concealed by the cover made possible by the Bank's size and global presence.  As Catherine Belton, an investigative correspondent for *Reuters*, explained: "These funds were funneled through what must have seemed the perfect cover: one of the West's biggest financial institutions, Deutsche Bank."[892]  Indeed, Deutsche Bank's core value proposition to its Russian Laundromat-related customers, including the Syndicate, was the recognition by all to the transaction that the use of a "syndicate of banks led by Germany's Deutsche Bank" to conduct Russia-related financial transactions was an "attempt[] lend" the transaction "legitimacy through the participation of Western institutions."[893]

---

[892] Belton at 405.

[893] *Id.* at 289.

1249.987.        Defendants' massive money laundering operations also aided al-Qaeda and the Haqqani Network by obscuring their terrorist finance schemes. Simply put, Defendants engaged in so much financial crime, for so many criminals, that it made it harder for U.S. and European law enforcement to monitor the terrorist finance flowing through their Laundromats. As Mr. Kochan documented in 2005, a financial institution's Laundromat reflected "economics" that "exist[ed] in a universe without morals" that created a "free-for-all" in which "[t]errorism has thrived."[894] He explained:

> The seeds of terrorism are to be found in the black markets where terrorists trade their wares. … Banks are equally dubious policemen of the systems of markets and cash transmission. They pursue bottom lines of profit, often teaming up with criminal and corrupt elements in developing countries. It is extraordinary that governments ask these institutions to manage 'anti-money laundering systems' when the movement of money is a key profit center. …[895]

## C.        Defendants Had Culpable Mental States

1250.988.        DefendantsDefendants' behavior was especially culpable because Defendants occupied a sophisticated position in the international financial system and well knew that their operation as a Laundromat would attract terrorist financiers, including al-Qaeda agents, operatives, and fronts, as well as the Russian Mafia (which Defendants knew served as al-Qaeda's agent for money laundering purposes). According to Ms. Belton, it was widely known in the banking industry that "organised-crime money men worked in loose affiliation: they created the schemes, and then they promoted it to everyone. 'Once you have such a vehicle you market it,' said Mark Galeotti, an expert on Russian black-cash schemes."[896]

---

[894] Kochan, *The Washing Machine*, at 285-86.

[895] Kochan, *The Washing Machine*, at 285-86. *Id.*

[896] Belton at 415.

~~1251.~~989.    In 2019, the European Parliament issued a public report that "deplore[d] the fact that some [European] financial institutions and their related business models" – a direct reference to Defendants – "have actively facilitated money laundering" even though such European banks knew that the transactions contrary to the EU's rules against money laundering could foreseeably directly aid the "financing of terrorist activities."[897]

### 1. Deutsche Bank Had A Culpable Mental State

~~1252.~~990.    In a rare instance of widespread honesty at Deutsche Bank, the Bank's managers, employees, and agents regularly described DB Moscow's activities as Deutsche Bank's "Russian Laundromat" or Deutsche Bank's "Laundromat." For example, as reported by Mr. Enrich, when Deutsche Bank renewed its New York Laundromat in Russia in early 2011, "[p]articipants had uncreatively ***dubbed the latest arrangement the Laundromat***, and Russian criminals … used it to wash their looted money out of Russia and into the European financial system."[898]

~~1253.~~991.    One can draw a direct line between Deutsche Bank's criminal Laundromat culture and Deutsche Bank's mirror trades with Khanani that enabled Syndicate terrorist finance and logistics. As Ms. Belton reported: "The equities traders had ***few qualms … about carrying out the mirror trades.*** 'Half of the daily trading volume was on the mirror trades,' said one trader … ***'It wasn't a big deal. It was something they openly talked about.'***"[899]

~~1254.~~992.    Moreover, according to testimony in a Russian proceeding (as paraphrased by a journalist), "executives at Deutsche Bank in Moscow," including on information and belief

---

[897] *Id.*

[898] Enrich, *Dark Towers*, at 197.

[899] Belton at 406 (emphasis added).

Mr. Wiswell, met with co-conspirators in the Russian Laundromat, including but not limited to, owners of Promsberbank, and agreed to "continue the [Laundromat] schemes"—doubling down on terrorist finance—even after its "Russian Laundromat" had come under scrutiny.[900]

1255.993.     Indeed, NYDFS Superintendent Maria T. Vullo determined that Deutsche Bank's conduct was especially culpable considering, among other things:

- "In today's interconnected financial network, global financial institutions must be ever vigilant in the war against money laundering and other activities that can contribute to" "international terrorism."

- "[Deutsche Bank's] Russian mirror-trading scheme occurred while [the Bank] was on clear notice of serious and widespread compliance issues dating back a decade. The offsetting trades here lacked economic purpose and could have been used to facilitate money laundering or enable other illicit conduct. …"

- "[DB Moscow and DB London] trades were routinely cleared through [DBTCA]. The selling counterparty was typically registered in an offshore territory and would be paid for its shares in U.S. dollars. At least 12 entities were involved, and none of the trades demonstrated any legitimate economic rationale."[901]

1256.994.     Deutsche Bank admitted it acted with a culpable mental state. For example, Deutsche Bank's CEO admitted the Bank's mirror trading conduct was wrongful. Among other things, he stated he would (paraphrased) personally oversee the Bank's efforts to resolve the legal issues raised by the mirror trading scandal, and admitted, with respect to the mirror trading scandal: "It's not our finest hour. We've clearly had a systems and control failure."

1257.995.     The heavy involvement of Deutsche Bank's top management throughout the Laundromat magnifies Deutsche Bank's culpable mental state. Josef Ackermann, Hugo

---

[900] Belton at 406.

[901] NYDFS, Press Release, *DFS Fines Deutsche Bank $425 Million for Russian Mirror-Trading Scheme; The Bank Allowed Traders to Engage in a Money-Laundering Scheme Using "Mirror Trades" That Improperly Shifted $10 Billion Out of Russia* (Jan. 30, 2017).

Bänziger, and Anshu Jain each played central roles in the development of, and operation of, Deutsche Bank's various criminal schemes. For example, Mr. Jain played an important role enabling the Russian Laundromat. From the late 1990s through 2015, Deutsche Bank's executive team led by Mr. Ackermann, Mr. Bänziger, and Mr. Jain followed mafia-like communications strategies that reflected their consciousness of guilt.

1258.996.    Multiple third parties who extensively investigated Deutsche Bank, including Mr. Enrich and Mr. Laabs, concluded that Deutsche Bank programmatically embraced a strategy to serve high-risk customers regardless of the terrorist finance risk during the Ackermann/ Bänziger/Jain era from the late 1990s until 2015, when they encouraged knowing terrorist finance if the Bank's executives, managers, and employees believed Deutsche Bank could: (a) earn a profit and (b) keep their terrorist finance a secret. According to Mr. Laabs, these Deutsche Bank executives promoted an excessive, "downright cult of risk" that "[u]ltimately" "was all about making a profit, [and] never letting a business opportunity go by."[902]

1259.997.    **Josef Ackermann** assumed a leadership position at Deutsche Bank in the late 1990s, as did two of his lieutenants, Mr. Bänziger and Mr. Jain. Working together, they formed an "iron triangle" of executive-level protection for the Laundromats terrorist financier customers, which facilitated the Laundromat's explosive growth beginning in the late 1990s.

**[APPENDIX]**

---

[902] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 108 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

~~1260.~~998.     Indeed, throughout his time in the leadership ranks of Deutsche Bank, Mr. Ackermann adopted communications strategies more commonly associated with the Boss of a crime family than the CEO of a purportedly responsible good corporate citizen.  Consider:

- Mr. Ackermann was notorious for what Deutsche Bank colleagues derisively called his "personal risk management" strategy, whereby he consciously avoided creating any contemporaneous written or electronic records of his conduct, decision-making, or communications, unless they were tightly scripted in a manner that permitted him to conceal what he wanted or delivered in a medium that he believed was not permanent (like a text message on his personal phone).

- Mr. Ackermann instructed his Deutsche Bank lieutenants that email discussions or other written memorialization of the Bank's risky schemes were, in Mr. Ackermann's words, "taboo," and that they should emulate his personal practice of communicating "virtually nothing" in writing, instead insisting that nearly all communications be oral or in-person.

- On the rare occasions when circumstances required him to memorialize his communications in real time (which he viewed as a threat), Mr. Ackermann followed a carefully calibrated strategy of that relied upon cryptic text messages (the content of which, by remaining cryptic, afforded plausible deniability), which he ordinarily sent on his personal phone (which allowed Mr. Ackermann to delete incriminating messages believing they would not be backed up on any Deutsche Bank system while also reducing the chance he lost control of his incriminating messages (*e.g.*., through a nosy Deutsche Bank whistleblower poking around a server).

- Mr. Ackermann touted an upside-down "don't shoot the messenger" policy to his lieutenants, which he made plain was ***not*** about constructively dealing with problems or rooting out wrongdoing, but instead, about giving Mr. Ackermann – who, by reputation, believed he could talk his way out of anything – enough information so that he could provide at least a "plausible" explanation and talk his way out of whichever scandal happened to be Deutsche Bank's latest.

- Mr. Ackermann aggressively promoted the financial institution equivalent of "might makes right" to financial crime and corporate governance issues, which lesson he and his lieutenants drew from Mr. Ackermann's own experience beating criminal charges as an individual defendant.  As Mr. Ackermann stated at the time, "money means security and independence," and gives a person – or an organization like Deutsche Bank – "an unbelievable amount of autonomy" to do whatever they want to do.

- Mr. Ackermann "promoted" and "exemplified" a "culture" throughout Deutsche Bank, according to Mr. Laabs, in which its executives were encouraged to actively "sh[y] away from taking on more responsibility" when they understood that crimes like terrorist finance were afoot, thereby "drawing a protective wall between [the executive] himself,

the [potentially illegal] trades, and the decisions," in order to leave "as few fingerprints as possible" "so as to not be held responsible in the end."[903]

- Mr. Ackermann and Mr. Jain, his lieutenant (and later co-CEO), sometimes acknowledged the illicit nature of Deutsche Bank's schemes through the euphemisms and nicknames they used. For example, in discussions involving Mr. Ackermann, Mr. Jain, and one or more other Deutsche Bank personnel, the group referred to one or more Deutsche Bank personnel engaged in financial crime as a "guaranteed money maker" who needed to be "allowed to continue doing his or her work" during Deutsche Bank's "fight for survival" era from 2007 through 2012,[904] the same period when Deutsche Bank provided much of its substantial assistance to the Syndicate.

- While led by Mr. Ackermann (and later Mr. Jain) from 2000 through 2015, according to Mr. Laabs, Deutsche Bank "was only concerned with exhausting the rules" and developed an institutional practice of enabling and then concealing its rampant financial crime under Mr. Ackermann's simple embrace of willful blindness and corporate cover-up as a basic leadership strategy, in sum and substance: "If it was relatively easy to postpone problems … or to ***cover them up entirely***, then that's what was done."[905]

~~1261.~~999.    Mr. Ackermann's willingness to flaunt his tolerance for criminal risk was later demonstrated in 2002 – ironically in Germany and throughout the financial world – when Germany prosecutors charged him for criminal offenses relating to allegations that he approved bribes while serving on the supervisory board of a separate German company, Mannesmann (doing so less than a year after Deutsche Bank elevated Mr. Ackermann to CEO). "The case proved to be a public relations disaster for the bank and for Ackermann," Deutsche Bank admitted (emphasis added), and "confirmed the German public's suspicion of [him] as an arrogant foreigner when he ***flashed a two-finger Victory sign at the start of [his criminal] trial***":

---

[903] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 135 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

[904] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 410 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

[905] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 107 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs) (emphasis added).



1262.1000.    Mr. Ackermann beat his first trial, but that does not mean he was innocent. German prosecutors had a good faith basis to charge Mr. Ackermann for bribery and would not have done so unless there was substantial evidence he had aided and abetted financial crimes. Indeed, in his second trial, Mr. Ackermann once again adamantly insisted he had done nothing wrong. "However," as Mr. Laabs noted, "when a witness who had previously supported the defendants began to falter, Ackermann and the others changed their minds," "pulled the ripcord," and "made an offer to the public prosecutor" to immediately settle the proceedings for a total of almost six million euros.[906] After prosecutors agreed, Mr. Ackermann's criminal case ended.

1263.1001.    As Mr. Laabs reported, Deutsche Bank, Mr. Ackermann, and his lieutenants learned a powerful lesson from Mr. Ackermann's criminal litigation history, which they later "follow[ed] … many, many times" thereafter: pursue a lucrative, but illegal, scheme for as long as possible, protect the scheme by silencing whistleblowers and intimidating internal and external critics, deny any wrongdoing once allegations emerge, and continue doing so unless and until the evidence became so incontrovertible as to assure a likely disaster, when it would

---

[906] Dirk Laabs, *Bad Bank: Aufstieg und Fall der Deutschen Bank* 272-73 (Deutsche Verlags-Anstalt, German Kindle ed. 2018) (translated by Plaintiffs).

then guard maintain its overall Laundromat business model by simply "[p]aying a lot of money, making settlements, avoiding an admission of guilt" and moving onto the next scheme.[907]

1264.1002.    **Hugo Bänziger** was a lieutenant of Mr. Ackermann's who originally came over with him from Credit Suisse and served as Deutsche Bank's Chief Risk Officer until March 19, 2012. In that role, Mr. Bänziger had an exacting understanding of Deutsche Bank's terrorist finance risks. His function at Deutsche Bank, however, was to protect the Laundromat(s) – and enable terrorism – by preventing ethical Bank personnel from discovering or disclosing its terrorist finance to outsiders—***not*** to prevent terrorism by stopping the Bank's personnel from serving terrorist customers in the first instance.

1265.1003.    One way Mr. Bänziger operationalized Deutsche Bank's Laundromat was by conducting a bizarre and cultish training program designed to break down the Bank's compliance personnel and habituate them to being abused and following any command from their leaders (*i.e.*, Mr. Bänziger and, ultimately, Mr. Ackermann), all for the purpose of enabling those engaging in misconduct at the Bank to run roughshod over any attempts to shut them down. For example, as Mr. Enrich's investigation revealed,

> Bänziger was a risk expert, but he was out of control with his employees. Every executive who was in the running to become a managing director—a title awarded to thousands of employees—had to attend a weeklong Risk Academy, often held in dormitories in the German countryside. The goal was to instill military-style discipline … and it metastasized into a hazing ritual. … Attendees were subjected to sleep deprivation. Exercises were crafted to create *informationsflut*, or information overload, as Bänziger put it. One guest speaker arrived at a Risk Academy dinner expecting to encounter the testosterone-fueled antics of a typical banking retreat. Instead he saw row after row of sunken-eyed lawyers and risk managers. In many academy classes, pupils were reduced to tears. "We want people who can stand up and take abuse," Bänziger explained to a colleague.[908]

---

[907] *Id.* (translated by Plaintiffs).

[908] Enrich, *Dark Towers*, at 107.

1266.1004.    Mr. Bänziger ran Deutsche Bank's "hazing" program to "abuse" the members of his compliance department not because he was sincerely trying (albeit through wildly improper means) to strengthen compliance at Deutsche Bank. Rather, Mr. Bänziger was using a classic strategy that is used by military organizations around the world to establish and enforce a chain of command – to "instill military-style discipline." While chains-of-command are ideal for a military, they are antithetical to a functioning corporate compliance department, the entire point of which is to encourage people with concerns to escalate them, ordinarily going *outside* the chain of command in doing so.

1267.1005.    **Anshu Jain** was a lieutenant of Mr. Ackermann who led a key division (Global Markets). Mr. Jain has admitted that Deutsche Bank had engaged in rampant misconduct while at the same time trying to deflect personal responsibility for the crimes that occurred at Deutsche Bank. For example, he said, in sum and substance, that he did not have anything to do with any of Deutsche Bank's crimes, which he attempted to dismiss as the actions of a few rogue actors executing bad deals on Deutsche Bank's "lower decks."

1268.1006.    Throughout his tenure, first as Mr. Ackermann's lieutenant, then as co-CEO, Mr. Jain "simultaneously demanded more and more from the traders – more sales, more profit, more margin. That was hammered into them in meetings, at lectures, at weekend seminars."[909] "However," as Mr. Laabs explained, "more margin and more turnover [] also meant always more risk with riskier products in riskier markets - in Russia, for example."[910]

1269.1007.    As a leader, Mr. Jain followed a deliberate strategy of being willfully blind to all financial crime risk, including terrorist finance. "Above all else," according to Mr. Laabs,

---

[909] *Id.* at 167-68 (translated by Plaintiffs).

[910] *Id.* (translated by Plaintiffs).

"[Mr.] Jain was a shrewd politician, so it's likely that he simply kept the inconvenient truth" of Deutsche Bank's financial crimes "away from himself. [Mr. Jain] deliberately didn't care about the details, because that's what ends up causing the most trouble."[911]

1270.1008.    German regulators also confirmed Deutsche Bank's culpable state of mind. On May 23, 2015, Frauke Menke, a top official at Germany's lead financial regulator, BaFin, sent a letter to Deutsche Bank's Management Board in which she castigated the Bank. BaFin's investigation was prompted by, among other things Deutsche Bank's VAT fraud and mirror trade schemes, and Ms. Menke wrote to Deutsche Bank to providing written confirmation of BaFin's conclusion that Deutsche Bank (including Mr. Jain personally) deliberately presided over a built-to-fail compliance system that was designed to facilitate financial crime (the "May 23, 2015, BaFin Letter"). In the May 23, 2015, BaFin Letter, Ms. Menke informed Deutsche Bank:

- "[O]verall, the [Ernst & Young] report disclose[d] major misconduct by various traders of Deutsch Bank, and by at least one member of the management of [DB London], [and] … major failures by members of the Management Board or Group Executive Committee";

- Deutsche Bank's financial crimes were the direct result of "a business and organizational environment" at Deutsche Bank "which was favourable to [financial crimes] or even made [financial crimes] possible in the first place";

- "[i]t appear[ed]," "that [Deutsche Bank's misconduct was] a manifestation of part of the culture that [was] possibly still characteristic to [the Bank], *i.e.* to prefer hiding, covering up, or entirely negating problems instead of addressing them openly and actively in order to prevent similar issues in the future";

- financial crimes regularly occurred at a Deutsche Bank division because "[t]he focus in the [] division was clearly on the business figures and not on compliance by the employees" and Deutsche Bank's executives, including its co-CEO, "Mr. Jain," "were aware of and tolerated the fact that [a Deutsche Bank trader] regularly" broke banking industry rules designed to prevent financial crimes;

---

[911] *Id*. at 260-61 (translated by Plaintiffs).

- "the failures with which Mr. Jain [was] charged to be serious" because "[t]hey display[ed] improper management and organization of the business;"

- "two internal investigations" at Deutsche Bank that had been conducted by Bill Broeksmit and Deutsche Bank's Business Integrity Review Group ("BIRG"), "were not completely independent, not comprehensive and did not go deep enough," and that the "BIRG found nothing" even though it "was supposed to look for fraud" and there was fraud to be found anywhere one looked; and

- Deutsche Bank's misconduct was long-standing and noted a June 2008 phone call between Mr. Ackermann (then-CEO) and Mr. Jain (then-head of Global Markets), in which Mr. Ackermann expressed "his anger about 'cultural deficits' in [Deutsche Bank's Global Markets] divisions which he said he would no longer tolerate because this unnecessarily endangered the reputation of the bank."

1271.1009.   Deutsche Bank's efforts to spin the media surrounding Ms. Menke's investigation also showed their culpability. In her letter, Ms. Menke was also "enraged," according to Mr. Laabs, by Deutsche Bank's suggestion to the German press that the German investigations of the Bank had been completed and that BaFin had cleared the Bank's management.[912] As Mr. Laabs recounted: "That was a typical chess move by Deutsche Bank: control the narrative in the media, regardless of what the truth really looks like."[913]

## 2.   Standard Chartered Bank Had A Culpable Mental State

1272.1010.   Standard Chartered Bank had a culpable mental state. Among other things, Standard Chartered Bank acted as a "rogue institution," got caught, and then broke the law for years thereafter, earning it the moniker of a "repeat corporate offender[]" by U.S. Attorney Liu.

1273.1011.   Standard Charted Bank's retaliation against whistleblowers also demonstrated its intent to seek profit rather than prevent terrorist finance or even follow basic compliance norms.

---

[912] *Id.* at 510 (translated by Plaintiffs).

[913] *Id.* (translated by Plaintiffs).

### 3.      Danske Bank Had A Culpable Mental State

1274.1012.      Danske Bank had a culpable mental state because Danske Bank was told directly that its Estonian Laundromat was facilitating criminal activity, including money laundering, in 2007, and rather than shut the Laundromat down, Danske Bank laundered at least another $233 billion over the next nine years.  The sheer magnitude of that money laundering leads to the inference that Danske Bank knew it was participating in criminal activity.

1275.1013.      Danske Bank's employees knew and participated in the criminal activity, including by helping criminal clients evade anti-money laundering and know your customer laws and regulations.  Danske Bank thereby had a culpable mental state.

1276.1014.      Because Danske Bank was told time and again, even after 2007, via regulators and whistleblowers, that it was facilitating and participating directly in financial crime, and because Danske Bank knew that facilitating money laundering on the scale that it did, over the time period that it did, and in the geographic areas in which it did, made it inevitable that Danske Bank was facilitating terrorist finance, leads to the inference that Danske Bank had a culpable mental state.

### 4.      Placid Express Had A Culpable Mental State

1277.1015.      Placid Express had a culpable mental state because it knew that Khaani and the Khanani MLO was using Placid Express facilities to launder money, including for the Syndicate, and it allowed him to do so on a large scale and over a long period of time.  Because Placid Express knew that it was facilitating money laundering, and deliberately did so anyway, it had a culpable mental state.time.

### 5.      Wall Street Exchange Chartered Bank Had A Culpable Mental State

1278.1016.      Wall Street Exchange had a culpable mental state because it knew that Khaani and the Khanani MLO was using Wall Street Exchange facilities to launder money,

including for the Syndicate, and it allowed him to do so on a massive scale and over a long period of time.  ~~Because Wall Street Exchange knew that it was facilitating money laundering, and deliberately did so anyway, it had a culpable mental state.~~

### D.    Defendants Had A Close Relationship To The Tortfeasors

~~1279.~~1017.    Each Defendant had close customer relationships to the relevant tortfeasors.

~~1280.~~1018.    Deutsche Bank, through DB Moscow, went even further and affirmatively helped its criminal customers set up their own bespoke terrorist finance/money laundering facilities, such as Deutsche Bank's Russian Laundromat.

~~1281.~~1019.    Standard Chartered also went even further and played an active role in the same logistical pipeline as the tortfeasor (*i.e.*, the Haqqani Network's CAN fertilizer sourcing).

### E.    The Duration Of Support Was Long

~~1282.~~1020.    Deutsche Bank aided al–Qaeda, the Taliban ~~(including its Haqqani Network),~~ Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company for more than a decade.

~~1283.~~1021.    Standard Chartered Bank aided al–Qaeda, the Taliban ~~(including its Haqqani Network),~~ Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company for nearly two decades.

~~1284.~~1022.    Danske Bank aided al–Qaeda, the Taliban ~~(including its Haqqani Network),~~ Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company for nearly a decade.

~~1285.~~1023.    Placid Express aided al–Qaeda, the Taliban ~~(including its Haqqani Network),~~ Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company since at least 2008.

~~1286.~~1024.    Wall Street Exchange aided al–Qaeda, the Taliban ~~(including its Haqqani Network),~~ Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company since at least 2008.

~~1287.~~1025.     In Russia, Afghanistan, and Pakistan, there was no meaningful distinction between organized crime activities and Syndicate funding. For example, in 2017, Professor Rob McCusker, who previously consulted with the FBI, explained (as paraphrased in a press release) that Russian organized crime groups and Syndicate terrorists shared "the functional interconnection" between them "in service of terrorism by engaging in criminal activity and financing terrorism from proceeds of organised crime in which convergence [was] facilitated by similar logistical and operational requirements and synergies produced by sharing common infrastructure, logistical corridors, safe havens and financial and money laundering networks."[914]

~~1288.~~1026.     Professor McCusker explained the close partnership between every Syndicate member and the Russian Mafia ensure a robust opium/terrorist finance pipeline flowing between Russia and Afghanistan, and emphasized that the "nexus between terrorism and organised crime flourish[ed] in failed states."[915] Alluding to the Taliban's partnership with the Russian Mafia, he added there were "reports which indicate[d] how the Taliban maintain[ed] engagements in heroin trade for arms trade with members of the Russian organised crime," including through "Haqqani Network … involve[ment] in [the] procurement of precursor chemicals [for opium manufacturing]."[916]

---

[914] European Foundation for S. Asian Studies, *EFSAS Attends Side-Event on "Terrorism in South Asia" at UN HRC in Geneva*, Kashmir News Service (India) (Sept. 20, 2017).

[915] *Id.*

[916] *Id.*

## VIIIVI. DEFENDANTS' ASSISTANCE TO THE SYNDICATE HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES

### A. Deutsche Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States

1289.1027.    The Deutsche Bank Defendants' assistance to the Syndicate had a substantial nexus to the United States for at least two reasons:  (1) the DB Defendants' conduct involved sending dollars from or through DB New York to Deutsche Bank accounts in Germany, Russia, Pakistan, or Dubai, or USD-linked currency exchanges at DB New York, to facilitate Syndicate logistics flow or terrorist finance; and (2) the DB Defendants' own acts were directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

1290.1028.    With respect to the first nexus to the United States, every Deutsche Bank Defendant relied upon DB New York to facilitate its illegal conduct, and no DB Defendant could have supported the Syndicate without the close involvement of, and millions in USD-denominated transactions each year by, DB New York.

1291.1029.    Deutsche Bank was, and is, a tightly integrated global financial institution in which the various branches functionally serve the same role:  promote U.S. Dollar transactions through DBTCA.

1292.1030.    According to Deutsche Bank, the Bank operated under a "one firm concept" under which it promoted a "single culture" focused around an "investment banking ethos," and the Bank followed a "matrix managerial structure" that was "deliberately built with overlapping constituencies and responsibilities with cross-cutting lines of business and control on a regional as well as functional basis."

**1.      Deutsche Bank's Laundromat Terrorist Finance Transactions For Al-Qaeda, The Haqqani Network, Lashkar-E-Taiba, And D-Company Had A Substantial Nexus To The United States**

~~1293.~~1031.    Deutsche Bank's nexus to America keyed the operation of each Deutsche Bank Laundromat, including, but not limited to, its Russian Laundromat, Moldovan Laundromat, German Laundromat, Azeri Laundromat, and so on. Deutsche Bank and the Syndicate benefited from DBTCA's special leverage based upon its status as an American bank, connection to the U.S. financial system, strength of the U.S. Dollar, and use of U.S. personnel, entities, and functions, which maximized the terrorist finance that flowed to the Syndicate through Deutsche Bank's Laundromat transactions with Khanani and the Russian Mafia.

(i)      DBTCA converted the Syndicate's opium rubles into the U.S. Dollars, which aided the Syndicate networks that supported attacks against Americans in Afghanistan by equipping them with the "gold standard" of Syndicate terrorist finance, which enhanced the Syndicate's ability to conduct more attacks and kill more Americans.

(ii)     DBTCA simplified the Russian Laundromat scheme by leveraging the unique-to-U.S. benefit of currency pairing arrangements made possible only through the U.S. Dollar's status as the world' reserve currency, which facilitated the Syndicate's movement of its terrorist finance between cells and provided critical operational and logistical benefits that directly caused more terrorist attacks.

(iii)    DBTCA's connection to the U.S. financial system imbued the Syndicate's terrorist finance transactions through the Laundromat with the legitimacy of an American financial institution, which aided the Syndicate's ability to subsequently move its money through the financial system by, in effect, affixing a Deutsche Bank "seal of approval" on the U.S. Dollars that the Syndicate sources through Deutsche Bank's Laundromats.

(iv)     DBTCA cleared the "good commission" payments upon which Deutsche Bank, through DB Moscow, relied to incentivize the Deutsche Bank traders whose enthusiasm bore a direct, linear relationship with Syndicate terrorist finance—the more mirror trades through the Russian Laundromat, the more Syndicate terrorist finance and the more profit for Deutsche Bank.

Each U.S. link intensified the capabilities of al-Qaeda and its affiliates and aided the Syndicate's terrorist campaign against Americans in Afghanistan.

617

1294.1033.     *First*, Deutsche Bank relied upon DBTCA's connection to New York to help the Syndicate (through Khanani and the Russian Mafia) illicitly transfer its Russian rubles outside of Russia, so that DBTCA could then upgrade the Syndicate's terrorist finance from Russian Rubles to U.S. Dollars. The Syndicate's ability to source precious U.S. Dollars from New York through DBTCA was the necessary step before the Syndicate could convert any of its Russian rubles into the U.S. Dollars it needed to fund its attacks in Afghanistan, as well as the transnational logistical and financial infrastructure and pipeline vital to the entire enterprise. DBTCA was essential to Deutsche Bank's Laundromat, according to Mr. Enrich, because it served as the "crucial holding company, through which almost all of [Deutsche Bank's] American businesses channeled their transactions."[917]

1295.1033.     One hundred percent (100%) of Deutsche Bank's U.S. Dollar-denominated mirror trades and one-legged trades were routed through DBTCA in New York. No such trades could have occurred without DB Moscow or DB London reaching into the United States, through DBTCA, to extract the U.S. Dollars whose acquisition by Khanani and others like him was the whole point of Deutsche Bank's criminal scheme in the first instance. As NYDFS concluded:

> ***Every single one of the U.S. dollar payments*** involved in the mirror trading and one-legged trading activity discussed above ***flowed through DBTCA***. In total, payments exceeding ***$10 billion were transmitted from London and through New York*** as a result of the trading conduct facilitated by the scheme. Deutsche Bank thus caused ***New York State to become a key conduit in a long-running artifice involving highly suspicious financial activity***. Deutsche Bank has represented that it has been unable to identify the actual purpose behind this scheme. It is ***obvious***, though, that the scheme could have facilitated … potentially illegal objectives.[918]

---

[917] Enrich, *Dark Towers*, at 187.

[918] 2017 Consent Order ¶¶ 31-32 (emphases altered).

~~1296.~~1034.     Deutsche Bank's ability to access the U.S. Dollar through DB New York was essential to the operation of the Laundromat, including, but not limited to, every mirror trade scheme and every mirror trade made by Deutsche Bank, including, but not limited to, every Khanani-related mirror trade. Indeed, the entire point of the scheme was to acquire U.S. Dollars. As one commentator quipped, correctly, Deutsche Bank could have accurately advertised itself with the slogan: "Deutsche Bank Laundromat—Scrubbing Rubles Into Greenbacks."[919]

~~1297.~~1035.     Indeed, Deutsche Bank specifically understood – and publicly touted – that the U.S. Dollar was the proverbial "gold standard" currency for global financial transactions in uncertain times, including those relating to Russia. The *Journal of Commerce*, for example, reported on this recognized feature of the currency market, sourcing it to a senior currency analyst for Deutsche Bank Securities in New York.[920] Deutsche Bank was also correct: the U.S. Dollar was always the world's reserve currency and the preferred currency during unstable times.

~~1298.~~1036.     Moreover, when a wave of currency crises swept across the globe in the late 1990s, Deutsche Bank's chief economist, Dr. Ken Courtis, publicly lectured the American public (among other audiences) regarding how the U.S. financial system, U.S. Dollar, and perception of intrinsic American economic might was the key lubricant for financial transactions worldwide, telling the audience that the U.S. government – not Deutsche Bank – needed to start

---

[919] Howie Klein, *You Have To Go To A Dead Language To Find The Best Definition Of Trumpism*, DownWithTyranny (July 31, 2017), 2017 WLNR 23572358.

[920] Gordon Platt, *Dollar to Take "Safe Haven" Role as Confidence in World Economies Dips*, Journal of Commerce (August 24, 1998) ("With [] Russia's financial meltdown spreading to markets around the world …, analysts say the U.S. dollar will assume its traditional role as a 'safe haven' currency. … [A] senior currency analyst for Deutsche Bank Securities in New York, said the most clear indication of the dollar's safe-haven role was Friday's inversion of the yield curve …'It shows the attractiveness of U.S. asset markets as being a refuge from the international environment, and the dollar benefits from this,' [the Deutsche Bank currency analyst] said. 'Investors are attracted to the depth, breadth and safety of the U.S. markets[,]' [he added.]"), 1998 WLNR 1029946.

acting like a responsible stakeholder in the global community, and proclaimed that: "***It [was] time for the Americans to stop telling us they [were] a superpower and start acting like one.***"[921]

1299.1037.    *Second*, DBTCA's presence greatly simplified the Syndicate's terrorist finance scheme. According to NYDFS, Deutsche Bank's "'mirror trading' scheme" "was simple and effective" – "Deutsche Bank Trust Company of the Americas" "was the ***entity through which the U.S. dollar payments flowed to the suspicious entities*** involved here,"[922] *i.e.*, the Khanani MLO and the Russian Mafia. By simplifying the Syndicate's terrorist finance scheme, Deutsche Bank concealed the Syndicate's terrorist finance (a vital goal for terrorist financiers) while simultaneously increasing the overall economic power of the Syndicate through the efficiency gains promoted by DBTCA's involvement. Both amplified the Syndicate's terrorist might.

1300.1038.    *Third*, Deutsche Bank personnel and functions in the United States, including but not limited to, in New York City and Jacksonville, Florida, played a role in providing the deficient compliance approvals that permitted the Syndicate's terrorist finance to flow unimpeded for years. Under Deutsche Bank policies and procedures, DB New York, including DBTCA, was responsible for independently verifying the bona fides of any transaction in which DB New York plays a role. On information and belief, from 2009 through 2016, DB New York personnel knew of terrorist finance "red flags" relating to Khanani, the Khanani MLO, Ahmed, the Ahmed Cell, Azizi, the Azizi Cell, and Russian Mafia-related transactions, and/or other activity by known or suspected fronts, agents, or operatives of al-Qaeda, the

---

[921] *Quoted in* Peter Hartcher, *Who's In Charge Around Here?*, Australian Financial Review (Sept. 12, 1998) (emphasis added), 1998 WLNR 8230324.

[922] 2017 Consent Order ¶ 9. Khanani and the Khanani-related entities were one of the "suspicious entities" referenced in paragraph 9.

Taliban, the Haqqani Network, or their affiliates. Thus, DB New York not only facilitated the Fatima and Pakarab transactions and accounts for Syndicate agents, operatives, and fronts, which funded the Syndicate's terrorist campaign, DB New York also subjected each transaction to scrutiny based on DB policy and procedure, New York, and federal law, including OFAC regulations and U.S. terrorist designations. DB New York therefore played an essential role in both triggering the red flags these transactions raised and knowingly ignoring them to allow the transactions to proceed.

~~1301.~~1039.   On information and belief, every transaction described above was reviewed and approved by Deutsche Bank compliance personnel in Jacksonville, Florida. For example, "[Deutsche Bank] had assembled an army of not-very-well-paid employees and contractors to sift through thousands of transactions a day that the bank was doing for clients all over the world. The job of the workers was to sniff out potential money laundering or other financial crimes," including terrorist finance.[923] As Mr. Enrich recounted:

> Teams churned through dozens or case files a day, cross-checking client names against a series of databases to see if any obvious legal or reputational problems jumped out. Many did. "We had a ton of stuff that we knew was Russian," one employee recalls. "They'd be incorporated in one country and banking in another, but their address would be Russian. It was crazy." [Deutsche Bank] was moving many millions of dollars a day for these Russians, often via untraceable shell companies. … [M]any of Deutsche's Jacksonville employees and contractors were young, often a year or two out of local colleges, and [had] received scant training. …
>
>       There were a couple of ways to handle [requests for the Jacksonville compliance department to approve transactions with a "risky client"]. One was to blacklist just about every murky client and to file a "suspicious activity report" with the Financial Crimes Enforcement Network, or FinCEN. That had the benefit of partly covering [Deutsche Bank's] backside, but it didn't stop the transactions from going through. Inside the Jacksonville offices' cubicle farms, some teams filed dozens of reports every day. Then a month or two later, another transaction would land on an employee's desk involving the same Russian-linked

---

[923] Enrich, *Dark Towers*, at 200.

shell companies, and the employees would again file a suspicious activity report, and again nothing would happen. It was disheartening and confusing—why didn't Deutsche just stop doing business with these shady clients? (The answer, employees recognized, was that handling the transactions was profitable.)

That was one approach. Other teams inside the Jacksonville complex adopted a different, simpler tactic: just wave everything through. That had the advantage of making it easier to meet the weekly and monthly quotas for clearing transactions through Deutsche's pipes. "The culture was to just close [complete] the transaction," another former employee explains.[924]

1302.1040.    Deutsche Bank's ability to effectively function as a Laundromat depended upon the regular support provided by Deutsche Bank managers, employees, agents, and lawyers who supported Deutsche Bank's Laundromat from inside the United States. For example, Mr. Enrich concluded that Deutsche Bank's activities in Jacksonville enabled the mirror scheme because the approaches taken by the Jacksonville office, as described above, "meant there were few restraints on ambitious envelope-pushing traders like Wiswell."[925]

1303.1041.    Similarly, Deutsche Bank maintained an internal committee that was designed not to actually interdict terrorist finance and money laundering, but instead, to evaluate proposed transactions from a reputational risk-oriented perspective (hereinafter, the "Reputational Risk Committee"). Deutsche Bank's Reputational Risk Committee met every few weeks and consisted of Deutsche Bank executives, risk managers, and lawyers in the United States.

1304.1042.    Senior Deutsche Bank executives based in the U.S. played a vital role throughout Deutsche Bank's provision of financial services to the Syndicate while Deutsche Bank was acting as a Laundromat for terrorist financiers. For example, senior DB New York and DBTCA executives regularly coordinated customer and market strategies with Deutsche

---

[924] *Id.* at 200-01.

[925] *Id.* at 201-02.

Bank branches around the world by traveling to visit and direct customer-related decisions at local branches, including on information and belief, DB London, DB Moscow, and DB Dubai.

1305.1043.    Close cooperation between DB New York, on the one hand, and Deutsche Bank, DB Dubai, and DB Moscow, on the other, was essential to the Syndicate's ability to use Deutsche Bank accounts to repatriate tens of millions in USD-related illicit income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1306.1044.    At all relevant times, Deutsche Bank was one of the only global financial institutions that offered USD-denominated financial services to customers in Russia and throughout the Former Soviet Union, as well as to those in the U.A.E. As a result of Deutsche Bank's unique geographical footprint amongst global financial institutions, from 2001 through 2016, it was only through DB New York (including DBTCA) that DB Moscow (and by extension, terrorist financiers like Khanani who needed to move money out of Russia) played an essential role in the Syndicate's terrorist finance strategy, as Deutsche Bank was the Syndicate's primary global financial institution partner for purposes of repatriating illicit income in the Former Soviet Union back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1307.1045.    *Fourth*, DBTCA's connection to the U.S. financial system and status as a Wall Street bank imbued the Syndicate's Laundromat terrorist finance schemes with greater legitimacy, which made them more lethal. Deutsche Bank's connection to New York was essential to signifying its status as a major global player and thereby providing the legitimacy necessary to facilitate the terrorist finance in this case through DB New York's invocation of the credibility lent by the U.S. financial system.

1308.1046.    *Fifth*, the U.S. nexus was essential to Deutsche Bank's ability to pay the "good commissions" that Deutsche Bank specifically intended to substantially increase the U.S. Dollar-denominated terrorist finance (and Deutsche Bank's associated profits) that flowed from DBTCA in New York to the Syndicate in Afghanistan, Pakistan, and the U.A.E. through transactions with Syndicate agents like Khanani and the Russian Mafia that were routed through Deutsche Bank's Russian Laundromat. Deutsche Bank relied upon DBTCA accounts in New York to clear the "good commissions" needed to incentivize its traders to maximize the volume of Syndicate terrorist finance coursing through the Laundromat. According to NYDFS, "[t]hese suspicious payments, too, were cleared through DBTCA in New York."[926]

> **2.    Deutsche Bank's VAT-Fraud Terrorist Finance Transactions For Al-Qaeda And The Haqqani Network Had A Substantial Nexus To The United States**

1309.1047.    **The Azizi Cell and the Ahmed Cell.** Deutsche Bank's operation of its New York Laundromat was equally vital to the Syndicate's ability to maximize the value its terrorists obtained through the terrorist finance generated by the Ahmed Cell and the Azizi Cell.

(i)    DBTCA converted the hundreds of millions of euros that the Syndicate stole from European governments through its VAT finance scheme U.S. Dollars, which aided the Syndicate networks that supported attacks against Americans in Afghanistan by equipping them with the "gold standard" of Syndicate terrorist finance, which enhanced the Syndicate's ability to conduct more attacks and kill more Americans.

(ii)    DBTCA's connection to the U.S. financial system imbued the Syndicate's terrorist finance transactions conducted through the Azizi Cell and the Ahmed Cell with the legitimacy of an American financial institution, which aided the Syndicate's ability to subsequently move its money through the financial system by, in effect, affixing a Deutsche Bank "seal of approval" on the U.S. Dollars that the Syndicate sources through Deutsche Bank's Laundromats.

(iii)    Deutsche Bank, the Azizi Cell, and the Ahmed Cell, repeatedly reached into the United States to advance the Syndicate's VAT fraud terrorist finance schemes.

---

[926] 2017 Consent Order ¶ 28.

Each U.S. link intensified the capabilities of al--Qaeda and its affiliates and aided the Syndicate's terrorist campaign against Americans in Afghanistan.

1310.1048.    *First*, DBTCA was key to the Syndicate's ability to convert the VAT fraud-related euros stolen from European governments by the Azizi Cell and Ahmed Cell, into the U.S. Dollars that al--Qaeda and the Taliban (including its Haqqani Network) demanded from their transnational fundraising to maximize the lethality of the Syndicate's terrorist campaign. The Azizi Cell and the Ahmed Cell both maximized the Syndicate's purchasing power by specifically, and exclusively, choosing to use U.S. Dollars – obtained from New York and routed through DBTCA – as the currency of choice for their value transfers from Europe, the Middle East, and Asia back to the Syndicate to support attacks against Americans in Afghanistan. Azizi, for example, has directly admitted that his ability to access U.S. Dollars, which he did through DBTCA, was crucial to the Syndicate's VAT Finance Scheme. In an interview with law enforcement, Azizi specifically admitted that the Azizi Cell accomplished its "sharing" of "all amounts" of "the loot" through "transfer[s] in [U.S. dollars]" while, in contrast, "the amounts transferred in [British pounds] or [euros] were amounts that flow[ed] back into the fraud chain," *e.g.*., the funds needed to keep doing things like making the purchases in Europe that sustained the scheme.

1311.1049.    *Second*, as with Deutsche Bank's Laundromats, DBTCA's U.S. nexus imbued the resulting U.S. Dollar transfers from Deutsche Bank to the Azizi Cell and Ahmed Cell with the legitimacy of an American financial institution, which enabled Syndicate terrorist finance by making it easier for Syndicate operatives to repatriate the U.S. Dollars that Deutsche Bank helped them source back to the Syndicate to use to attack Americans in Afghanistan.

1312.1050.   *Third*, the Azizi Cell and the Ahmed Cell depended on the United States because both Cells used U.S. entities, persons, and official records to conceal the fraud and thereby enable them to obtain more reliably, and transfer to the Syndicate, the funds secured through Deutsche Bank's aid. In furtherance of the Syndicate's VAT finance efforts, Deutsche Bank, the Ahmed Cell, and the Azizi Cell reached into the United States to obtain additional aid for the Syndicate's VAT Finance Scheme beyond the U.S. Dollars routed to the Syndicate through DBTCA, including, but not limited to, one or more instances when Deutsche Bank personnel in London and/or Germany and one or both Cells:

- leveraged one or more U.S. residents, including but not limited to, a resident of California, in order to provide legitimacy to the scheme by acting as a "stand-in" (for Azizi and/or Ahmed) during legs of the carousel, which achieved the intended effect by helping cloak the fraud with the sophistication suggested by having a trans-Atlantic counterparty;

- leveraged one or more U.S. corporate entities, including but not limited to, Zenith Ltd. USA, in order to imbue the transactions with the legitimacy attached to American companies overseas, which achieved the affect Cells intended by helping cloak their fraud with the legitimacy of the U.S. financial and legal system; and

- regularly sent and received communications to and from the United States, including, but not limited to, one or more occasions when he communicated with persons inside the United States to instruct such person send a mailing from within the United States to outside the United States, in order to execute transactions necessary to facilitate the Syndicate's VAT Finance Scheme, which achieved the intended effect by allowing Azizi and/or Ahmed to execute the transactions necessary to the scheme.

1313.1051.   Accordingly, the Deutsche Bank Defendants, through their use of DB New York, have purposefully availed themselves of (1) the United States' dependable and transparent banking system (which allows the Syndicate to transfer funds without fear of loss); (2) the U.S. Dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising and terrorist finance); and (3) the predictable jurisdictional and commercial law of New York and the United States.

1314.1052.    The second substantial nexus between Deutsche Bank's actions relevant to the claims herein and the United States is that the DB Defendants knew their actions targeted the United States by directly undermining U.S. foreign-policy interests in Afghanistan and jeopardizing the safety of American service members deployed there.  When they decided to assist the Syndicate in repatriating millions of dollars in illicit criminal profits back to accounts controlled by al- Qaeda and Haqqani Network agents and operatives, or lend Syndicate agents, operatives, and fronts Deutsche Bank's good name and legitimacy, the DB Defendants knew they were helping al- Qaeda, the Taliban, and the Haqqani Network conduct attacks designed specifically to influence U.S. policy by targeting American personnel.

1315.1053.    By knowingly engaging in transactions for, and providing financial services to, members of the al- Qaeda Terror Syndicate, including the Taliban and the Haqqani Network, the Deutsche Bank Defendants provided substantial assistance to those groups, and caused the terror attacks that injured Plaintiffs.

**B.    Standard Chartered Bank's Terrorist Finance Routed To Al- Qaeda, The Haqqani Network, Lashkar-e-Taiba, and D- Company Through Its Laundromat Had A Substantial Nexus To The United States**

1316.1054.    Defendants' support for the Syndicate relied on significant contacts with the United States.  Most of the Syndicate's illicit activity, like the narcotics trade, was either USD-denominated, or dependent upon transactions backstopped by the U.S. Dollar as a currency pair or through a correspondent USD account.  Thus, when the Syndicate made a concerted push to increase its use of sophisticated transnational terrorist finance strategies to fund its CAN fertilizer bombing campaign against Americans in Afghanistan, it required the willing support of a global financial institution with branches around the world and a demonstrated willingness to flout America's anti-terrorism agenda.  Enter, Standard Chartered Bank.

1317.1055.    Defendants' assistance to the Syndicate had a substantial nexus to the United States for at least two reasons:  (1) the Defendants' conduct involved sending dollars from or through SCB New York to Standard Chartered Bank (or another bank's) accounts in Pakistan, Dubai, or Afghanistan, or USD-linked currency exchanges at SCB New York, to facilitate Syndicate logistics flow or terrorist finance; and (2) the Defendants' own acts were directed at the U.S. because they knew that their material support would aid terrorists targeting Americans.

1318.1056.    With respect to the first nexus to the United States, every Defendant relied upon SCB New York to facilitate its illegal conduct, and no Defendant could have supported the Syndicate without the close involvement of, and millions in USD-denominated transactions each year by, SCB New York.

1319.1057.    Standard Chartered Bank's official accounting currency was, and is, U.S. Dollars because most SCB business was, and is, USD-denominated and/or USD-linked.

1320.1058.    Standard Chartered Bank's policies and procedures in place from at least 2001 through 2016, including those of SCB London, SCB New York, SCB Dubai, SCB Pakistan, and SCB Afghanistan, required that Standard Chartered Bank branches, subsidiaries, and affiliates route USD-denominated transaction through SCB New York in most instances. Plaintiffs' belief is based upon, among other things: (1) Standard Chartered Bank documents that repeatedly reference routing business to SCB New York; (2) the standard practice in the financial services industry of routing USD-denominated transactions to the relevant bank's U.S. branch to capture the related transaction fees; and (3) Standard Chartered Bank' documented practice from 2001 through 2016 of processing billions of USD-denominated transactions through SCB New York that directly or indirectly benefited Iranian terrorist fronts, and the

Defendants were consistently unable to avoid using their New York branch during the terrorist finance scheme given the centrality of U.S. Dollars.

1321.1059.    Under Standard Chartered Bank policies and procedures, SCB New York was responsible for independently verifying the bona fides of any transaction in which SCB New York plays a role.  On information and belief, from 2009 through 2016, SCB New York personnel knew of terrorist finance "red flags" relating to Fatima, Pakarab, Hisawi, Bout, Khanani, Bari, and Shadman, and/or other activity by known or suspected fronts, agents, or operatives of al–Qaeda, the Taliban, the Haqqani Network, or their affiliates.  Thus, SCB New York not only facilitated the Fatima and Pakarab transactions and accounts for Syndicate agents, operatives, and fronts, which armed and funded the Syndicate's CAN fertilizer bomb campaign, SCB New York also subjected each transaction to scrutiny based on Standard Chartered Bank policy and procedure, New York, and federal law, including OFAC regulations and U.S. terrorist designations.  SCB New York therefore played an essential role in both triggering the red flags these transactions raised and knowingly ignoring them to allow the transactions to proceed.

1322.1060.    Regulators have concurred with this conclusion.  For example, the "Hong Kong Monetary Authority [] blamed [SCB's] anti-money laundering failures on the bank's operations in New York," and observed the NYDFS's August 2014 Consent Order "reflect[ed] [SCB New York]'s failure in fully meeting the requirements imposed by the US authorities over transaction monitoring systems in the US."[927]

1323.1061.    Each Defendant outside of New York also regularly depended upon U.S. relationships to provide the infrastructure necessary to process Standard Chartered Bank

---

[927] Global Banking News, *Hong Kong Monetary Authority Blames Standard Chartered's Anti-Money Laundering Failures on NY Unit* (Aug. 21, 2014).

transactions. For example, SCB Pakistan and SCB Dubai have relied upon cloud-based services in the U.S. from Google and other providers to conduct their day-to-day activities.

### 1.      Standard Chartered Bank's Terrorist Finance Had A Substantial Nexus To The United States

1324.1062.    Standard Chartered Bank's knowing or reckless support for the Syndicate's terrorist finance activities bore an equally strong nexus to the U.S. Like its facilitation of the Syndicate's CAN fertilizer bomb logistics, Standard Chartered Bank's support for Syndicate terrorist finance depended upon the close involvement of SCB New York, which regularly facilitated USD-denominated transactions in support of each Defendant's provision of financial services to, among other Syndicate assets, the world's most notorious terrorist arms dealer (the "Merchant of Death" Victor Bout), al-Qaeda's paymaster and 9/11 plotter (Mustafa Ahmed al-Hisawi), the "bank" for key Haqqani Network and Taliban leadership (Abdul Baqi Bari), a notorious Afghan warlord who was known for funding the Haqqani Network (Hikmatullah Shadman), and the Syndicate's Number 1 USD financier, a "James Bond Villain" whom law enforcement considered "the number 1 international controller" for "terrorist funding … in the world" at the time (Altaf Khanani).

1325.1063.    Standard Chartered Bank's ability – including that of each SCB Defendant – to leverage the U.S. nexus afforded by SCB New York was key to maximizing the potency of al-Qaeda and the Haqqani Network's transnational schemes to finance attacks against Americans because both groups' access to New York banks was essential to their agents' and operatives' abilities to clean illicit overseas terrorist income, *e.g.*., Taliban profits in Europe, so the money could be repatriated back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1326.1064.    Standard Chartered Bank's connection to New York was essential to signifying its status as a major global player and thereby providing the legitimacy necessary to facilitate the terrorist finance in this case through SCB New York's invocation of the credibility lent by the U.S. financial system. As one industry analyst explained, in the context of NYDFS's 2012 interactions with Standard Chartered Bank, "[NYDFS] filed a blistering order … and threatened yanking [SCB's] New York license. That was a huge threat, since that would also mean [SCB] would lose direct access to dollar clearing services. It could in theory go through correspondents, but that would signal its end as an international player."[928]

1327.1065.    Close cooperation between SCB New York, on the one hand, and SCB London, SCB Dubai, SCB Pakistan, and SCB Afghanistan, on the other, was essential to al-Qaeda and the Haqqani Network's ability to use Standard Chartered Bank accounts to repatriate tens of millions in USD-related overseas income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

1328.1066.    Even after Standard Chartered Bank exited Afghanistan in 2012, SCB New York continued to be the leading gateway for USD-denominated transactions in Afghanistan through SCB New York's provision of USD correspondent services to SCB Afghanistan's successor (AIB), and SCB Pakistan continued to service customers in the Afghan market, while Standard Chartered Bank retained its status as the only global bank with a robust presence in Pakistan, a status which SCB retains to this day.

---

[928] Yves Smith, *New York's Benjamin Lawsky Collects Scalps, Showing Regulators Can \*Gasp\* Regulate*, Naked Capitalism (October 7, 2014), 2013 WLNR 15172530.

1329.1067.    Standard Chartered Bank management practices show the close connection between SCB New York and other Standard Chartered Bank branches in Standard Chartered Bank's Laundromat Strategy. For example, on May 28, 2006, SCB Dubai announced the appointment of a new Senior Executive Officer for SCB Dubai, who had previously been "the Senior Group Representative at [SCB New York], where he was responsible for overseeing anti-money laundering strategy as [SCB] is a major USD clearer."[929]

1330.1068.    SCB New York played a key – and illegal – role in both facilitating the illegal USD transactions at issue and covering up the broader programmatic terrorist finance scheme. SCB New York's interactions with Deloitte offer one example. After Standard Chartered Bank agreed with the Federal Reserve in 2004 to review its suspicious transactions, "[o]n October 27, 2004, Standard Chartered Bank formally engaged the predecessor entity of Deloitte FAS as its qualified independent consulting firm to conduct the Transaction Review."[930] "In early October 2005, Deloitte FAS finalized the draft Transaction Review report."[931] "One or more drafts of the Transaction Review report included a recommendation generally explaining how certain wire messages or 'cover payments' used by the Society for Worldwide Interbank Financial Telecommunication [SWIFT] message system could be manipulated by banks to evade money laundering controls on USD clearing activities and suggesting the elimination or restriction of such payments."[932] "**Based primarily on SCB's objection**, Deloitte FAS removed

---

[929] AME Info - Company News, *Standard Chartered Appoints Senior Executive Officer for Dubai International Financial Centre* (May 28, 2006).

[930] NYDFS, *In re Deloitte Financial Advisory Services LLP*, Agreement, Factual Background ¶ 2 (June 18, 2013).

[931] *Id.* at ¶ 7.

[932] *Id.*

the recommendation from the written final report before the written report was submitted to [NYDFS]."[933]

~~1331.~~1069.    Accordingly, the Defendants, through their use of SCB New York, have purposefully availed themselves of (1) the United States' dependable and transparent banking system (which allows the Syndicate to transfer funds without fear of loss); (2) the U.S. Dollar as a stable and fungible currency (which permits the exchange of currencies essential to terrorist fundraising, terrorist finance, and logistics purchases, including Fatima Group CAN Fertilizer); and (3) the predictable jurisdictional and commercial law of New York and the United States.

### 2.     Standard Chartered Bank's CAN Fertilizer Bomb Logistical Support For The Syndicate Had A Substantial Nexus To The United States

~~1332.~~1070.    From 2009 through 2016, Fatima and Pakarab depended upon their relationship with the Defendants, including SCB New York, to reliably access U.S. Dollar markets in New York to facilitate their operations and international transactions, such as when a U.A.E. company contracts with Fatima or Pakarab for a 6- or 7-figure bulk purchase of Fatima Group CAN Fertilizer.

~~1333.~~1071.    On information and belief, Fatima and Pakarab regularly denominated their Fatima Group CAN Fertilizer-related transactions in U.S. Dollars from 2001 through 2016.[934]

---

[933] *Id.* at ¶ 8 (emphasis added).

[934] Plaintiffs' belief is based upon, among other things, that: (1) one or more Fatima documents shared with prospective investors in 2010 represented that the price of certain Fatima products was "fixed" at a certain USD ratio; (2) fertilizer prices worldwide, and in Pakistan, are ordinarily pegged to the U.S. Dollar because of fertilizer's heritage in the petrochemicals family, which were ordinarily USD-denominated; and (3) Fatima and Pakarab specifically sourced their two greatest inputs – petrochemicals to convert into fertilizer, and natural gas to power their state-of-the-art facilities – in U.S. Dollars.

1334.1072.    Fatima's and Pakarab's ability to price Fatima Group CAN Fertilizer in U.S. Dollars improved the effectiveness of the Syndicate's CAN fertilizer bomb campaign by ensuring price stability and avoiding wild price fluctuations that would otherwise occur if Fatima and Pakarab were forced to rely on another currency because, in Pakistan, petrochemical-related transactions were traditionally USD-denominated, as were natural gas sales. At all relevant times, petrochemical inputs and natural gas supplies were two of the most important elements to Fatima's and Pakarab's CAN fertilizer pricing, and therefore Fatima and Pakarab had an overwhelming economic interest in pricing Fatima Group CAN Fertilizer, directly or indirectly, based upon the U.S. Dollar to de-risk the cost of two of their most important inputs. From 2008 through 2016, the Syndicate was able to engage in "widespread smuggling" of the "Pakarab … fertilizer" for use in CAN fertilizer bombs "***because of the low price*** of [Pakarab] fertilizer in Pakistan."[935] If Fatima and Pakarab had been unable to rely on the U.S. financial system, they could not have maintained their stable low-cost prices, and the Syndicate could not have acquired, smuggled, and detonated as many CAN fertilizer bombs against Americans.

1335.1073.    From 2009 through 2016, Fatima and Pakarab depended upon access to the USD markets in New York to facilitate their cross-border transactions, such as when a U.A.E. purchaser contracts with Fatima or Pakarab to purchase $1 million of CAN fertilizer in bulk. During this time, Syndicate fronts, agents, and/or operatives regularly acquired Fatima Group CAN Fertilizer, directly or indirectly, through transactions facilitated by SCB New York.

1336.1074.    On information and belief, Fatima and Pakarab each maintained an 8-figure USD facility through Standard Chartered Bank, which was serviced by SCB New York

---

[935] PTI - The Press Trust of India Ltd., *Pak Accepts US Proposal to Dye Fertiliser Used in Making Bombs* (Oct. 6, 2011) (emphasis added).

from 2009 through 2016. In January 2010, Fatima disclosed that it had an outstanding loan valued at 1.4 billion Pakistani Rupees with "Standard Chartered," which was approximately $16.5 million at then-existing exchange rates. On information and belief, this was a reference to Fatima and Pakarab accounts with SCB Pakistan, SCB Dubai, SCB London, and SCB New York, which Fatima and Pakarab maintained to facilitate USD-denominated transactions relating to Fatima Group CAN Fertilizer.

1337.1075.    To facilitate Fatima's and Pakarab's deliberate supply of CAN fertilizer to Syndicate agents, operatives, and fronts from 2009 through 2016, Fatima and Pakarab depended upon USD correspondent accounts maintained by SCB New York to facilitate such purchases, including, but not limited to, foreign exchange and export finance. On information and belief, during this period, SCB New York facilitated at least $100,000 per month, and more than $1 million per year, in Fatima and Pakarab fertilizer sales to Syndicate agents, operatives, and fronts. On information and belief, most of these transactions were either processed directly through SCB New York or, alternatively, relied upon SCB New York to provide U.S. Dollars in the context of currency pairing between another bank and SCB Pakistan or SCB Dubai.

1338.1076.    On information and belief, Fatima and Pakarab also relied upon SCB New York to facilitate the USD-denominated letters of credit that were necessary to ensure the smooth operation of Fatima's and Pakarab's fertilizer sales. SCB New York, SCB Dubai, and SCB Pakistan regularly facilitated letters of credit that enabled Taliban and Haqqani Network purchases of Fatima Group CAN Fertilizer from 2008 through 2016.

1339.1077.    Fatima and Pakarab would not have been able to support the "unending supply" of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts, without the reliable and dependable USD-denominated banking services provided by SCB New York, as

facilitated by SCB London, SCB Dubai, and SCB Pakistan through "currency pairs" that relied upon the stable USD banking services provided by SCB New York. Commercial banks transacting in currency pairs—*i.e.*, accepting funds in one currency and depositing them in another—typically choose a central currency to exchange into and out of. As Stanford Economics Professor Ronald McKinnon explained, "choosing one currency like the dollar to be the intermediary currency is the most natural way of economizing on foreign exchange transacting.[936] That is because it is far easier and less expensive to use a single central currency than it is to set up bilateral currency exchange markets for every possible currency pair (the example Professor McKinnon gives is that if a bank wished to trade 150 currencies all against each other, it could set up 149 markets if it used a central currency, as opposed to 11,175 markets if it created a separate market for each currency pair). The U.S. Dollar is by far the most common central currency.

1340.1078.    Because the U.S. Dollar is by far the most common central currency, many Standard Chartered Bank transactions on behalf of Fatima, Pakarab, and al-Qaeda or Taliban (including Haqqani Network) fronts, agents and operatives, involved USD transactions routed through SCB New York, even when the underlying transaction did not have any other currency or geographic nexus to the United States.

1341.1079.    When Syndicate fronts, agents, and/or operatives acquired Fatima Group CAN Fertilizer, directly or indirectly, through transactions with Fatima and/or Pakarab that were facilitated by the Defendants, SCB New York's personnel, accounts, and funds were essential to

---

[936] Ronald McKinnon, *The World Dollar Standard and Globalization: New Rules for the Game?*, Stanford Ctr. for Int'l Dev., at 8-9 (Sept. 2003).

the Defendants' ability to service Fatima and Pakarab business and therefore, to the Syndicate's continued operation of its CAN fertilizer bomb network.

1342.1080.    From 2009 through 2016, SCB New York facilitated at least several million USD, per year, in Fatima and Pakarab sales of Fatima Group CAN Fertilizer to Syndicate fronts, operatives, and/or agents, which sales supplied the explosives for thousands of Syndicate CAN fertilizer bombs that were detonated in attacks against Americans in Afghanistan each year. Most of these transactions were either processed directly through SCB New York or, alternatively, relied upon SCB New York to provide U.S. Dollars in the context of currency pairing between another bank and SCB London, SCB Dubai, or SCB Pakistan.

1343.1081.    From 2009 through 2016, SCB New York facilitated the USD-denominated letters of credit that were necessary to ensure the smooth operation of Fatima's and Pakarab's sales of Fatima Group CAN Fertilizer to Syndicate agents, operatives, and fronts.  On information and belief, SCB New York regularly facilitated letters of credit that enabled Taliban and Haqqani Network purchases of Fatima Group CAN Fertilizer from Fatima and Pakarab.

1344.1082.    Fatima and Pakarab would not have been able to serve as a reliable explosives supplier to the Syndicate or sell nearly as much Fatima Group CAN Fertilizer for as cheaply as it did to Syndicate agents, operatives, and fronts, without the reliable and dependable USD services provided by SCB New York, as facilitated by the other Defendants.  By substantially reducing Fatima's and Pakarab's costs, access to SCB New York's USD accounts allowed Fatima and Pakarab to maintain ultra-low Fatima Group CAN Fertilizer prices, causing more Syndicate CAN fertilizer bomb attacks against Americans.

1345.1083.    The second substantial nexus between Standard Chartered Bank's actions relevant to the claims herein and the United States is that the Defendants knew their actions

targeted the United States by directly undermining U.S. foreign-policy interests in Afghanistan and jeopardizing the safety of American service members deployed there. When they decided to enable the Haqqani Network's CAN fertilizer bomb logistics flow, permit the Haqqani Network's corporate co-conspirators Fatima and Pakarab to continue to enable attacks, assist al-Qaeda in repatriating millions of dollars in illicit criminal profits back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives and used to finance attacks against Americans in Afghanistan, or lend Fatima, Pakarab, and Haqqani Network agents, operatives, and fronts Standard Chartered Bank's good name and legitimacy, the SCB Defendants knew they were helping al-Qaeda, the Haqqani Network, and their allies conduct attacks to influence U.S. policy by killing and injuring American personnel.

1346.1084.   By knowingly engaging in transactions for, and providing financial services to, members of the al-Qaeda Terror Syndicate, including the Taliban and the Haqqani Network, the Defendants provided substantial assistance to those groups, and caused the terror attacks that injured Plaintiffs.

### C.    Danske Bank's Assistance To The Syndicate Had A Substantial Nexus To The United States

1347.1085.   Almost all of the money that was laundered through the Danske Bank laundromat ended up denominated in dollars, via transactions with U.S. correspondence bank accounts.

1348.1086.   Danske Bank used the United States financial system to transact in U.S. Dollars and to facilitate cross-border transactions, including the transactions that facilitated the money laundering done by the Danske Bank laundromat.

1349.1087.   Danske Bank has a wholly-owned subsidiary in New York, Danske Bank New York, which acts as Danske Bank's agent for foreign exchange transactions with non-U.S.

customers of Danske Bank. Danske Bank New York maintains offices in New York, does business there, and did business there related to the Danske Bank laundromat, including helping Danske Bank Estonia launder money.

1350.1088.    Close cooperation between Danske Bank New York, on the one hand, and Danske Bank Estonia, on the other, was essential to the Syndicate's ability to use Danske Bank accounts to repatriate tens if not hundreds of millions in USD-related illicit income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan from 2001 through 2016.

1351.1089.    For transactions that were not fulfilled by Danske Bank New York, Danske Bank and Danske Banke Estonia both reached into the United States to transact illicit money laundering with other correspondent banks in the United States.

1352.1090.    The Danske Bank Defendants' assistance to the Syndicate had a substantial nexus to the United States because their acts to launder funds, which facilitated terrorist finance, were directed at the U.S because they knew that their material support would aid terrorists targeting Americans.

1353.1091.    Employees from Danske Bank's Estonia branch met in New York with Deutsche Bank employees regarding anti-money laundering issues. Danske Bank Estonia assured Deutsche Bank that it would be de-emphasizing its business with non-resident clients.

### D.    Placid Express's Assistance To The Syndicate Had A Substantial Nexus To The United States

1354.1092.    Placid Express's support for the Syndicate relied on significant contacts with the United States, including but not limited to the fact that most if not all transactions at issue were USD-denominated, or dependent upon transactions backstopped by the U.S. Dollar as a currency pair or through a correspondent USD account.

1355.1093.    Placid Express's conduct involved sending dollars from or through Placid

Express's facilities in New York, so that U.S. Dollars could be sent to Placid Express's

customers abroad.

1356.1094.    Placid Express's acts were also directed at the U.S. because they knew that

their material support would aid terrorists targeting Americans.

### E.    Wall Street Exchange's Assistance To The Syndicate Had A Substantial Nexus To The United States

1357.1095.    Wall Street Exchange's support for the Syndicate relied on significant

contacts with the United States, including but not limited to the fact that most if not all

transactions at issue were USD-denominated, or dependent upon transactions backstopped by the

U.S. Dollar as a currency pair or through a correspondent USD account.

1358.1096.    Wall Street Exchange's conduct involved sending dollars from or through

Wall Street Exchange's facilities in New York, so that U.S. Dollars could be sent to Wall Street

Exchange's customers in Dubai.

1359.1097.    Wall Street Exchange's acts were also directed at the U.S. because they

knew that their material support would aid terrorists targeting Americans.

## IXVII. THE SYNDICATE USED DEFENDANTS' ASSISTANCE TO COMMIT ATTACKS THAT KILLED AND INJURED PLAINTIFFS THROUGH ACTS OF INTERNATIONAL TERRORISM THAT WERE COMMITTED, PLANNED, AND AUTHORIZED BY AL-QAEDA AND/OR THE HAQQANI NETWORK

1360.1098.    The Syndicate's terrorist campaign, for which Defendants provided

material support, killed and injured Plaintiffs and their family members. Each of the acts of

international terrorism described below was committed by the Taliban, including its Haqqani

Network, or jointly committed by the Taliban and al-Qaeda. The express purpose of that

terrorist campaign was to target U.S. citizens, like Plaintiffs and their deceased family members,

to inflict injury felt in the United States and effect a change in U.S policy. In addition, al-Qaeda

– a designated FTO at all relevant times – planned and authorized each of these attacks. *See supra* Part V.B.

1361.1099.    The attacks that injured or killed Plaintiffs would have violated the laws of war if these terrorist groups were subject to it. The terrorists did not wear uniforms or otherwise distinguish themselves from civilians, conscripted children into committing attacks, targeted humanitarian workers, and engaged in widespread kidnapping and torture in order to intimidate their enemies.

1362.1100.    A full list of the Plaintiffs, their nationality, and relationship to the injured persons below is attached hereto as Exhibit A. For those Plaintiffs below with family members who were injured or died as a result, each Plaintiff has experienced severe mental anguish, emotional pain and suffering, and the loss of their family member's society, companionship, and counsel.

**The Joshua Ashley Family**

1363.1101.    Sergeant Joshua Ashley served in Afghanistan as a member of the U.S. Marine Corps. On July 19, 2012, Sgt Ashley was injured in an IED attack in Helmand Province, Afghanistan. Sgt Ashley died on July 19, 2012 as a result of injuries sustained during the attack.

1364.1102.    The attack was committed by the Taliban.

1365.1103.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1366.1104.    Sgt Ashley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1367.1105.    Sgt Ashley was a national of the United States at the time of the attack and his death.

1368.1106.    As a result of the July 19, 2012 attack, Sgt Ashley was injured in his person and/or property. The Plaintiff members of the Ashley Family are the survivors and/or heirs of Sgt Ashley and are entitled to recover for the damages Sgt Ashley sustained.

**The Bradley Atwell Family**

1369.1107.    Sergeant Bradley Atwell served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2012, Sgt Atwell was injured in a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan. Sgt Atwell died on September 15, 2012 as a result of injuries sustained during the attack.

1370.1108.    The attack was committed by the Taliban.

1371.1109.    Sgt Atwell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1372.1110.    Sgt Atwell was a national of the United States at the time of the attack and his death.

1373.1111.    As a result of the September 15, 2012 attack, Sgt Atwell was injured in his person and/or property. The Plaintiff members of the Atwell Family are the survivors and/or heirs of Sgt Atwell and are entitled to recover for the damages Sgt Atwell sustained.

**The Thomas Baysore Jr. Family**

1374.1112.    Staff Sergeant Thomas Baysore Jr. served in Afghanistan as a member of the U.S. Army. On September 26, 2013, SSG Baysore was injured in an insider attack in Paktia Province, Afghanistan. SSG Baysore died on September 26, 2013 as a result of injuries sustained during the attack.

1375.1113.    The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al–Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1376.1114.    SSG Baysore's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1377.1115.    SSG Baysore was a national of the United States at the time of the attack and his death.

1378.1116.    As a result of the September 26, 2013 attack, SSG Baysore was injured in his person and/or property. The Plaintiff members of the Baysore Family are the survivors and/or heirs of SSG Baysore and are entitled to recover for the damages SSG Baysore sustained.

**The Vincent Bell Family**

1379.1117.    Staff Sergeant Vincent Bell served in Afghanistan as a member of the U.S. Marine Corps. On November 30, 2011, SSgt Bell was injured in an IED attack in Helmand Province, Afghanistan. SSgt Bell died on November 30, 2011 as a result of injuries sustained during the attack.

1380.1118.    The attack was committed by the Taliban.

1381.1119.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1382.1120.    SSgt Bell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1383.1121.    SSgt Bell was a national of the United States at the time of the attack and his death.

1384.1122.    As a result of the November 30, 2011 attack, SSgt Bell was injured in his person and/or property.- The Plaintiff members of the Bell Family are the survivors and/or heirs of SSgt Bell and are entitled to recover for the damages SSgt Bell sustained.

**The Darrik Benson Family**

1385.1123.    Chief Petty Officer Darrik Benson served in Afghanistan as a member of the U.S. Navy. -On August 6, 2011, SOC (SEAL) Benson was injured in an attack on a helicopter in Wardak Province, Afghanistan. -SOC (SEAL) Benson died on August 6, 2011 as a result of injuries sustained during the attack.

1386.1124.    The attack was committed by the Haqqani Network (a part of the Taliban) and al--Qaeda (a designated FTO at the time of the attack) acting together in a joint al--Qaeda-Taliban cell.

1387.1125.    SOC (SEAL) Benson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1388.1126.    SOC (SEAL) Benson was a national of the United States at the time of the attack and his death.

1389.1127.    As a result of the August 6, 2011 attack, SOC (SEAL) Benson was injured in his person and/or property. -The Plaintiff members of the Benson Family are the survivors and/or heirs of SOC (SEAL) Benson and are entitled to recover for the damages SOC (SEAL) Benson sustained.

**Maggie Bilyeu**

1390.1128.    Plaintiff Specialist Maggie Bilyeu served in Afghanistan as a member of the U.S. Army.  On November 12, 2016, SPC Bilyeu was injured in a suicide bombing attack in Parwan Province, Afghanistan.  The attack severely wounded SPC Bilyeu, who suffers from injuries from shrapnel requiring 22 surgeries to her legs, breast and abdomen, an amputated left leg, and hearing loss requiring a hearing aid. As a result of the November 12, 2016 attack and her injuries, SPC Bilyeu has experienced severe physical and emotional pain and suffering.

1391.1129.    The attack was committed by the Taliban and al–Qaeda (a designated FTO at the time of the attack) acting together in a joint al–Qaeda-Taliban cell with al–Qaeda providing and training the suicide bomber.

1130.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1392.1131.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1393.1132.     The attack that injured SPC Bilyeu would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1394.1133.     SPC Bilyeu was a national of the United States at the time of the attack, and remains one to this day.

**The Jeremie Border Family**

1395.1134.     Staff Sergeant Jeremie Border served in Afghanistan as a member of the U.S. Army.  On September 1, 2012, SSG Border was injured in a complex attack involving small arms fire and grenades in Ghazni Province, Afghanistan.  SSG Border died on September 1, 2012 as a result of injuries sustained during the attack.

1396.1135.     The attack was committed by the Taliban (including its Haqqani Network,) and al-Qaeda (a partdesignated FTO at the time of the Taliban.attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1397.1136.     SSG Border's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1398.1137.     SSG Border was a national of the United States at the time of the attack and his death.

1399.1138.     As a result of the September 1, 2012 attack, SSG Border was injured in his person and/or property. The Plaintiff members of the Border Family are the survivors and/or heirs of SSG Border and are entitled to recover for the damages SSG Border sustained.

### The Francisco Briseño-Alvarez Jr. Family

1400.1139.     Specialist Francisco Briseño-Alvarez Jr. served in Afghanistan as a member of the U.S. Army National Guard. On September 25, 2011, SPC Briseño-Alvarez was injured in an IED attack in Laghman Province, Afghanistan. SPC Briseño-Alvarez died on September 25, 2011 as a result of injuries sustained during the attack.

1401.1140.     The attack was committed by the the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1402.1141.     On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromat one of al-Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit thejoint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1403.1142.    SPC Briseño-Alvarez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1404.1143.    SPC Briseño-Alvarez was a member of the U.S. Armed Forces at the time of the attack and his death.

1405.1144.    As a result of the September 25, 2011 attack, SPC Briseño-Alvarez was injured in his person and/or property. The Plaintiff members of the Briseño-Alvarez Family are the survivors and/or heirs of SPC Briseño-Alvarez and are entitled to recover for the damages SPC Briseño-Alvarez sustained.

**The Allan Brown Family**

1406.1145.    Sergeant First Class Allan Brown served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SFC Brown was injured in a suicide bombing attack in Parwan Province, Afghanistan. SFC Brown died on December 6, 2016 as a result of injuries sustained during the attack.

1407.1146.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1147.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1408.1148.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1409.1149.   SFC Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1410.1150.    SFC Brown was a national of the United States at the time of the attack and his death.

1411.1151.    As a result of the attack, SFC Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SFC Brown and are entitled to recover for the damages SFC Brown sustained.

1412.1152.    As a result of the November 12, 2016 attack and SFC Brown's injuries and death, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SFC Brown's society, companionship, and counsel.

**The Christopher Brown Family**

1413.1153.    Staff Sergeant Christopher Brown served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SSG Brown was injured in an IED attack in Kunar Province, Afghanistan. SSG Brown died on April 3, 2012 as a result of injuries sustained during the attack.

1414.1154.    The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1415.1155.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromat one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii)

designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit thejoint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1416.1156.    SSG Brown's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1417.1157.    SSG Brown was a national of the United States at the time of the attack and his death.

1418.1158.    As a result of the April 3, 2012 attack, SSG Brown was injured in his person and/or property. The Plaintiff members of the Brown Family are the survivors and/or heirs of SSG Brown and are entitled to recover for the damages SSG Brown sustained.

**The Daniel Brown Family**

1419.1159.    Plaintiff Hospitalman Daniel Brown served in Afghanistan as a member of the U.S. Navy. On March 9, 2012, HM1 Brown was injured in an grenade launcher attack in Helmand Province, Afghanistan. The attack severely wounded HM1 Brown, who suffers from neurological issues causing difficulty breathing and a decrease in cognitive functions. As a result of the March 9, 2012 attack and his injuries, HM1 Brown has experienced severe physical and emotional pain and suffering.

1420.1160.    The attack was committed by the Taliban.

1421.1161.    The attack that injured HM1 Brown would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~1422.~~1162.     HM1 Brown was a national of the United States at the time of the attack, and remains one to this day.

~~1423.~~1163.     As a result of the March 9, 2012 attack and HM1 Brown's injuries, each member of the Brown Family has experienced severe mental anguish, emotional pain and suffering.

### The Nicholas Burley Family

~~1424.~~1164.     Specialist Nicholas Burley served in Afghanistan as a member of the U.S. Army.  On July 30, 2013, SPC Burley was injured in an indirect fire attack in Logar Province, Afghanistan.  SPC Burley died on July 30, 2013 as a result of injuries sustained during the attack.

~~1425.~~1165.     The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

~~1426.~~1166.     SPC Burley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

~~1427.~~1167.     SPC Burley was a national of the United States at the time of the attack and his death.

~~1428.~~1168.     As a result of the July 30, 2013 attack, SPC Burley was injured in his person and/or property.  The Plaintiff members of the Burley Family are the survivors and/or heirs of SPC Burley and are entitled to recover for the damages SPC Burley sustained.

**The David Cabrera Family**

1429.1169.   Lieutenant Colonel David Cabrera served in Afghanistan as a member of the U.S. Army.  On October 29, 2011, LTC Cabrera was injured in a suicide bombing attack in Kabul Province, Afghanistan.  LTC Cabrera died on October 29, 2011 as a result of injuries sustained during the attack.

1430.1170.   The attack was committed by the Taliban (including theits Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1171.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1172.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack

654

Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1431.1173.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1432.1174.    LTC Cabrera's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1433.1175.    LTC Cabrera was a national of the United States at the time of the attack and his death.

1434.1176.    As a result of the October 29, 2011 attack, LTC Cabrera was injured in his person and/or property. The Plaintiff members of the Cabrera Family are the survivors and/or heirs of LTC Cabrera and are entitled to recover for the damages LTC Cabrera sustained.

**The Christopher Campbell Family**

1435.1177.    Chief Petty Officer Christopher Campbell served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Campbell was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Campbell died on August 6, 2011 as a result of injuries sustained during the attack.

1436.1178.    The attack was committed by the Haqqani Network (a part of the Taliban) and al‑Qaeda (a designated FTO at the time of the attack) acting together in a joint al‑Qaeda-Taliban cell.

1437.1179.    CPO Campbell's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1438.1180.    CPO Campbell was a national of the United States at the time of the attack and his death.

1439.1181.    As a result of the August 6, 2011 attack, CPO Campbell was injured in his person and/or property. The Plaintiff members of the Campbell Family are the survivors and/or heirs of CPO Campbell and are entitled to recover for the damages CPO Campbell sustained.

**The Kevin Cardoza Family**

1440.1182.    Specialist Kevin Cardoza served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Cardoza was injured in an IED attack in Kandahar Province, Afghanistan. SPC Cardoza died on May 4, 2013 as a result of injuries sustained during the attack.

1441.1183.    The attack was committed by the Taliban.

1442.1184.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who

converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1443.1185.    SPC Cardoza's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1444.1186.    SPC Cardoza was a national of the United States at the time of the attack and his death.

1445.1187.    As a result of the May 4, 2013 attack, SPC Cardoza was injured in his person and/or property. The Plaintiff members of the Cardoza Family are the survivors and/or heirs of SPC Cardoza and are entitled to recover for the damages SPC Cardoza sustained.

**The Timothy Carner Family**

1446.1188.    Plaintiff Specialist Timothy Carner served in Afghanistan as a member of the U.S. Army. On December 13, 2011, SPC Carner was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Carner, who suffers from an amputation of his left leg below the knee, right thigh injuries, a concussion, traumatic brain injury, and post-traumatic stress disorder. As a result of the December 13, 2011 attack and his injuries, SPC Carner has experienced severe physical and emotional pain and suffering.

1447.1189.    The attack was committed by the Taliban.

1448.1190.   On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1449.1191.   The attack that injured SPC Carner would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1450.1192.   SPC Carner was a national of the United States at the time of the attack, and remains one to this day.

1451.1193.   As a result of the December 13, 2011 attack and SPC Carner's injuries, each member of the Carner Family has experienced severe mental anguish, emotional pain and suffering.

**The Chazray Clark Family**

1452.1194.   Specialist Chazray Clark served in Afghanistan as a member of the U.S. Army. On September 18, 2011, SPC Clark was injured in an IED attack in Kandahar Province,

Afghanistan. ~SPC Clark died on September 18, 2011 as a result of injuries sustained during the attack.

~~1453.~~1195.      The attack was committed by the Taliban.

~~1454.~~1196.      On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1455.~~1197.      SPC Clark's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1456.~~1198.      SPC Clark was a national of the United States at the time of the attack and his death.

~~1457.~~1199.      As a result of the September 18, 2011 attack, SPC Clark was injured in his person and/or property. ~The Plaintiff members of the Clark Family are the survivors and/or heirs of SPC Clark and are entitled to recover for the damages SPC Clark sustained.

**The Jonathan Cleary Family**

1458.1200.    Plaintiff Corporal Jonathan Cleary served in Afghanistan as a member of the U.S. Army.  On May 6, 2012, CPL Cleary was injured in an IED attack in Paktia Province, Afghanistan.  The attack severely wounded CPL Cleary, who suffers from an amputation of his right leg below the knee.  As a result of the May 6, 2012 attack and his injuries, CPL Cleary has experienced severe physical and emotional pain and suffering.

1459.1201.    The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1460.1202.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1461.1203.    The attack that injured CPL Cleary would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1462.1204.    CPL Cleary was a national of the United States at the time of the attack, and remains one to this day.

1463.1205.    As a result of the May 6, 2012 attack and CPL Cleary's injuries, each member of the Cleary Family has experienced severe mental anguish, emotional pain and suffering.

**The Timothy Conrad Jr. Family**

1464.1206.    Sergeant Timothy Conrad Jr. served in Afghanistan as a member of the U.S. Army. On February 23, 2012, SGT Conrad was injured in an insider attack in Nangarhar Province, Afghanistan. SGT Conrad died on February 23, 2012 as a result of injuries sustained during the attack.

1465.1207.    The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1466.1208.    SGT Conrad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1467.1209.    SGT Conrad was a national of the United States at the time of the attack and his death.

1468.1210.    As a result of the February 23, 2012 attack, SGT Conrad was injured in his person and/or property. The Plaintiff members of the Conrad Family are the survivors and/or heirs of SGT Conrad and are entitled to recover for the damages SGT Conrad sustained.

**The Ross Cox Family**

1469.1211.	Plaintiff Staff Sergeant Ross Cox served in Afghanistan as a member of the U.S. Army. On November 15, 2011, SSG Cox was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Cox, who suffers from loss of his left leg and suffered a serious right leg injury, left arm nerve damage, and hearing loss. As a result of the November 15, 2011 attack and his injuries, SSG Cox has experienced severe physical and emotional pain and suffering.

1470.1212.	The attack was committed by the Taliban.

1471.1213.	On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1472.1214.	The attack that injured SSG Cox would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1473.1215.	SSG Cox was a national of the United States at the time of the attack, and remains one to this day.

~~1474.~~1216.      As a result of the November 15, 2011 attack and SSG Cox's injuries, each member of the Cox Family has experienced severe mental anguish, emotional pain and suffering.

**<u>The Mitchell Daehling Family</u>**

~~1475.~~1217.      Specialist Mitchell Daehling served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SPC Daehling was injured in an IED attack in Kandahar Province, Afghanistan. SPC Daehling died on May 14, 2013 as a result of injuries sustained during the attack.

~~1476.~~1218.      The attack was committed by the Taliban.

~~1477.~~1219.      On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1478.~~1220.      SPC Daehling's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1479.1221.    SPC Daehling was a national of the United States at the time of the attack and his death.

1480.1222.    As a result of the May 14, 2013 attack, SPC Daehling was injured in his person and/or property. The Plaintiff members of the Daehling Family are the survivors and/or heirs of SPC Daehling and are entitled to recover for the damages SPC Daehling sustained.

**The Devin Daniels Family**

1481.1223.    Sergeant Devin Daniels served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Daniels was injured in an IED attack in Helmand Province, Afghanistan. SGT Daniels died on August 25, 2011 as a result of injuries sustained during the attack.

1482.1224.    The attack was committed by the Taliban.

1483.1225.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1484.1226.    SGT Daniels's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1485.~~1227.    SGT Daniels was a national of the United States at the time of the attack and his death.

~~1486.~~1228.    As a result of the August 25, 2011 attack, SGT Daniels was injured in his person and/or property.~~.~~ The Plaintiff members of the Daniels Family are the survivors and/or heirs of SGT Daniels and are entitled to recover for the damages SGT Daniels sustained.

### The James Darrough Family

~~1487.~~1229.    Sergeant James Darrough served in Afghanistan as a member of the U.S. Army. ~~~~On October 29, 2011, SGT Darrough was injured in a suicide bombing attack in Kabul Province, Afghanistan. ~~~~SGT Darrough died on October 29, 2011 as a result of injuries sustained during the attack.

~~1488.~~1230.    The attack was committed by the Taliban (including ~~the~~its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1231.    ~~On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-

Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1232.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1489.1233.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1490.1234.   SGT Darrough's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1491.1235.   SGT Darrough was a national of the United States at the time of the attack and his death.

1492.1236.   As a result of the October 29, 2011 attack, SGT Darrough was injured in his person and/or property.  The Plaintiff members of the Darrough Family are the survivors and/or heirs of SGT Darrough and are entitled to recover for the damages SGT Darrough sustained.

**The Joseph D'Augustine Family**

1493.1237.   Staff Sergeant Joseph D'Augustine served in Afghanistan as a member of the U.S. Marine Corps.  On March 27, 2012, SSgt D'Augustine was injured in an IED attack in Helmand Province, Afghanistan.  SSgt D'Augustine died on March 27, 2012 as a result of injuries sustained during the attack.

1494.1238.   The attack was committed by the Taliban.

1495.1239.   On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1496.1240.   SSgt D'Augustine's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1497.1241.     SSgt D'Augustine was a national of the United States at the time of the attack and his death.

1498.1242.     As a result of the March 27, 2012 attack, SSgt D'Augustine was injured in his person and/or property. The Plaintiff members of the D'Augustine Family are the survivors and/or heirs of SSgt D'Augustine and are entitled to recover for the damages SSgt D'Augustine sustained.

**The Jonathan Davis Family**

1499.1243.     Staff Sergeant Jonathan Davis served in Afghanistan as a member of the U.S. Marine Corps. On February 22, 2013, SSgt Davis was injured in an IED attack in Helmand Province, Afghanistan. SSgt Davis died on February 22, 2013 as a result of injuries sustained during the attack.

1500.1244.     The attack was committed by the Taliban.

1501.1245.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which

the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1502.1246.    SSgt Davis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1503.1247.    SSgt Davis was a national of the United States at the time of the attack and his death.

1504.1248.    As a result of the February 22, 2013 attack, SSgt Davis was injured in his person and/or property. The Plaintiff members of the Davis Family are the survivors and/or heirs of SSgt Davis and are entitled to recover for the damages SSgt Davis sustained.

**The Joseph Deslauriers Family**

1505.1249.    Plaintiff Master Sergeant Joseph Deslauriers served in Afghanistan as a member of the U.S. Air Force. On September 23, 2011, MSgt Deslauriers was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded MSgt Deslauriers, who suffers from the loss of both his legs above the knee and his left arm below the elbow. As a result of the September 23, 2011 attack and his injuries, MSgt Deslauriers has experienced severe physical and emotional pain and suffering.

1506.1250.    The attack was committed by the Taliban.

1507.1251.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers

operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1508.1252.    The attack that injured MSgt Deslauriers would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1509.1253.    MSgt Deslauriers was a national of the United States at the time of the attack, and remains one to this day.

1510.1254.    As a result of the September 23, 2011 attack and MSgt Deslauriers's injuries, each member of the Deslauriers Family has experienced severe mental anguish, emotional pain and suffering.

**The Alberto Diaz Family**

1511.1255.    Specialist Alberto Diaz served in Afghanistan as a member of the U.S. Army.  On August 12, 2014, SPC Diaz was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Diaz, who suffered severe brain injuries and facial damage requiring complete right-side facial reconstruction, and also suffers from post-traumatic stress disorder, chronic fatigue syndrome, chronic pain, social anxiety, panic attacks, hearing loss and tremors. As a result of the August 12, 2014 attack and his injuries, SPC Diaz has experienced severe physical and emotional pain and suffering.

1512.1256.     The attack was committed by the Taliban.

1513.1257.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1514.1258.     The attack that injured SPC Diaz would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1515.1259.     SPC Diaz was a national of the United States at the time of the attack, and remains one to this day.

1516.1260.     As a result of the August 12, 2014 attack and SPC Diaz's injuries, each member of the Diaz Family has experienced severe mental anguish, emotional pain and suffering.

**The Corey Dodge Family**

1517.1261.     Mr. Corey Dodge served in Afghanistan as a civilian government contractor working for DynCorp Free Zone. On August 22, 2015, Mr. Dodge was injured in a

suicide bombing attack in Kabul Province, Afghanistan. Mr. Dodge died on August 22, 2015 as a result of injuries sustained during the attack.

1262.   The attack was committed by the Taliban (including ~~the~~its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

~~1518.~~1263.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1264.   On information and belief, the ~~explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1519.1265.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1520.1266.     Mr. Dodge's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1521.1267.     Mr. Dodge was a national of the United States at the time of the attack and his death.

1522.1268.     As a result of the August 22, 2015 attack, Mr. Dodge was injured in his person and/or property. The Plaintiff members of the Dodge Family are the survivors and/or heirs of Mr. Dodge and are entitled to recover for the damages Mr. Dodge sustained.

**The John Douangdara Family**

1523.1269.     Petty Officer 1st Class John Douangdara served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Douangdara was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Douangdara died on August 6, 2011 as a result of injuries sustained during the attack.

1524.1270.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1525.1271.    PO1 Douangdara's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1526.1272.    PO1 Douangdara was a national of the United States at the time of the attack and his death.

1527.1273.    As a result of the August 6, 2011 attack, PO1 Douangdara was injured in his person and/or property. The Plaintiff members of the Douangdara Family are the survivors and/or heirs of PO1 Douangdara and are entitled to recover for the damages PO1 Douangdara sustained.

**Robert Dove**

1528.1274.    Plaintiff Staff Sergeant Robert Dove served in Afghanistan as a member of the U.S. Army. On June 9, 2012, SSG Dove was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Dove, who lost his right arm below the elbow and right leg above knee, and suffered a traumatic brain injury, crushed pelvis, numerous soft tissue and shrapnel injuries, hearing loss, and multiple fractures of the left hand requiring 38 surgeries. As a result of the June 9, 2012 attack and his injuries, SSG Dove has experienced severe physical and emotional pain and suffering.

1529.1275.    The attack was committed by the Taliban.

~~1530.~~1276.   On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1531.~~1277.   The attack that injured SSG Dove would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

~~1532.~~1278.   SSG Dove was a national of the United States at the time of the attack, and remains one to this day.

**The Curtis Duarte Family**

~~1533.~~1279.   Lance Corporal Curtis Duarte served in Afghanistan as a member of the U.S. Marine Corps. On August 1, 2012, LCpl Duarte was injured in an IED attack in Helmand Province, Afghanistan. LCpl Duarte died on August 1, 2012 as a result of injuries sustained during the attack.

~~1534.~~1280.   The attack was committed by the Taliban.

1535.1281.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1536.1282.    LCpl Duarte's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1537.1283.    LCpl Duarte was a national of the United States at the time of the attack and his death.

1538.1284.    As a result of the August 1, 2012 attack, LCpl Duarte was injured in his person and/or property. The Plaintiff members of the Duarte Family are the survivors and/or heirs of LCpl Duarte and are entitled to recover for the damages LCpl Duarte sustained.

**The Stephen Dunning Family**

1539.1285.    Staff Sergeant Stephen Dunning served in Afghanistan as a member of the U.S. Marine Corps. On October 27, 2011, SSgt Dunning was injured in an IED attack in

Helmand Province, Afghanistan. SSgt Dunning died on October 27, 2011 as a result of injuries sustained during the attack.

~~1540.~~1286.    The attack was committed by the Taliban.

~~1541.~~1287.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~ chemists; and (iv) provided to the ~~cell that helped commit the~~ Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1542.~~1288.    SSgt Dunning's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1543.~~1289.    SSgt Dunning was a national of the United States at the time of the attack and his death.

~~1544.~~1290.    As a result of the October 27, 2011 attack, SSgt Dunning was injured in his person and/or property. The Plaintiff members of the Dunning Family are the survivors and/or heirs of SSgt Dunning and are entitled to recover for the damages SSgt Dunning sustained.

677

**Carey DuVal**

~~1545.~~1291.     Plaintiff Captain Carey DuVal served in Afghanistan as a member of the U.S. Army. On August 24, 2014, CPT DuVal was injured in a suicide bombing IED attack in Nangarhar Province, Afghanistan. The attack severely wounded CPT DuVal, who suffered an amputation of his right hand, a broken right ulna, elbow, and humerus, a broken right femur, and loss of 20 percent of his right quadricep. As a result of the August 24, 2014 attack and his injuries, CPT DuVal has experienced severe physical and emotional pain and suffering.

~~1546.~~1292.     The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1293.     ~~On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1547.1294.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1548.1295.    The attack that injured CPT DuVal would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk.

1549.1296.    CPT DuVal was a national of the United States at the time of the attack, and remains one to this day.

**The Erich Ellis Family**

1550.1297.    Plaintiff Sergeant Erich Ellis served in Afghanistan as a member of the U.S. Marine Corps.  On June 12, 2012, Sgt Ellis was injured in an IED attack in Helmand Province, Afghanistan.  The attack severely wounded Sgt Ellis, who lost his right leg and suffered extensive, permanent damage to his left leg, right arm, and upper right leg as well as a traumatic brain injury.  As a result of the June 12, 2012 attack and his injuries, Sgt Ellis has experienced severe physical and emotional pain and suffering.

1551.1298.    The attack was committed by the Taliban.

1552.1299.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-

Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who~~ ~~converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~ ~~the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit~~ ~~the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1553.~~1300.    The attack that injured Sgt Ellis would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

~~1554.~~1301.    Sgt Ellis was a national of the United States at the time of the attack, and remains one to this day.

~~1555.~~1302.    As a result of the June 12, 2012 attack and Sgt Ellis's injuries, each member of the Ellis Family has experienced severe mental anguish, emotional pain and suffering.

### The Robert Ellis Family

~~1556.~~1303.    Specialist Robert Ellis served in Afghanistan as a member of the U.S. Army.  On June 18, 2013, SPC Ellis was injured in a rocket attack in Parwan Province, Afghanistan.  SPC Ellis died on June 18, 2013 as a result of injuries sustained during the attack.

~~1557.~~1304.    The attack was committed by the Taliban.

1558.1305.    SPC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1559.1306.    SPC Ellis was a national of the United States at the time of the attack and his death.

1560.1307.    As a result of the June 18, 2013 attack, SPC Ellis was injured in his person and/or property. The Plaintiff members of the Ellis Family are the survivors and/or heirs of SPC Ellis and are entitled to recover for the damages SPC Ellis sustained.

**The Vincent Ellis Family**

1561.1308.    Private First Class Vincent Ellis served in Afghanistan as a member of the U.S. Army. On June 1, 2012, PFC Ellis was injured in a complex attack involving a suicide truck bomb, small arms fire, and rocket propelled and fragmentation grenades in Khost Province, Afghanistan. PFC Ellis died on June 4, 2012 as a result of injuries sustained during the attack.

1562.1309.    The attack was committed by the Haqqani Network (a part of the Taliban), al–Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1310.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding

the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1563.1311.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1564.1312.    PFC Ellis's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1565.1313.    PFC Ellis was a national of the United States at the time of the attack and his death.

1566.1314.    As a result of the June 1, 2012 attack, PFC Ellis was injured in his person and/or property.  The Plaintiff members of the Ellis Family are the survivors and/or heirs of PFC Ellis and are entitled to recover for the damages PFC Ellis sustained.

**<u>The Michael Elm Family</u>**

1567.1315.    Specialist Michael Elm served in Afghanistan as a member of the U.S. Army.  On October 14, 2011, SPC Elm was injured in an IED attack in Khost Province,

Afghanistan. SPC Elm died on October 14, 2011 as a result of injuries sustained during the attack.

~~1568.~~1316.    The attack was committed by the Haqqani Network (a part of the Taliban), al- Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

~~1569.~~1317.    On information and belief, the ~~explosive used in~~ bomb that the joint cell detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from~~at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~1570.~~1318.    SPC Elm's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1571.~~1319.    SPC Elm was a national of the United States at the time of the attack and his death.

1572.1320.    As a result of the October 14, 2011 attack, SPC Elm was injured in his person and/or property. The Plaintiff members of the Elm Family are the survivors and/or heirs of SPC Elm and are entitled to recover for the damages SPC Elm sustained.

**The Richard Essex Family**

1573.1321.    Sergeant Richard Essex served in Afghanistan as a member of the U.S. Army. On August 16, 2012, SGT Essex was injured in an attack on a helicopter in Kandahar Province, Afghanistan. SGT Essex died on August 16, 2012 as a result of injuries sustained during the attack.

1574.1322.    The attack was committed by the Taliban.

1575.1323.    SGT Essex's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1576.1324.    SGT Essex was a national of the United States at the time of the attack and his death.

1577.1325.    As a result of the August 16, 2012 attack, SGT Essex was injured in his person and/or property. The Plaintiff members of the Essex Family are the survivors and/or heirs of SGT Essex and are entitled to recover for the damages SGT Essex sustained.

**The Garrett Fant Family**

1578.1326.    Specialist Garrett Fant served in Afghanistan as a member of the U.S. Army. On September 26, 2011, SPC Fant was injured in an IED attack in Helmand Province, Afghanistan. SPC Fant died on September 26, 2011 as a result of injuries sustained during the attack.

1579.1327.    The attack was committed by the Taliban.

~~1580.~~1328.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1581.~~1329.    SPC Fant's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1582.~~1330.    SPC Fant was a national of the United States at the time of the attack and his death.

~~1583.~~1331.    As a result of the September 26, 2011 attack, SPC Fant was injured in his person and/or property. The Plaintiff members of the Fant Family are the survivors and/or heirs of SPC Fant and are entitled to recover for the damages SPC Fant sustained.

**The Thomas Fogarty Family**

~~1584.~~1332.    Staff Sergeant Thomas Fogarty served in Afghanistan as a member of the U.S. Army. On May 6, 2012, SSG Fogarty was injured in an IED attack in Paktia Province,

Afghanistan. SSG Fogarty died on May 6, 2012 as a result of injuries sustained during the attack.

1585.1333.    The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1586.1334.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromat one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit thejoint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1587.1335.    SSG Fogarty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1588.1336.    SSG Fogarty was a national of the United States at the time of the attack and his death.

1589.1337.     As a result of the May 6, 2012 attack, SSG Fogarty was injured in his person and/or property. The Plaintiff members of the Fogarty Family are the survivors and/or heirs of SSG Fogarty and are entitled to recover for the damages SSG Fogarty sustained.

**The Michael Fox Family**

1590.1338.    Plaintiff Corporal Michael Fox served in Afghanistan as a member of the U.S. Marine Corps. On November 15, 2011, Cpl Fox was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Fox, who suffered an amputation below the left knee, an amputation of the right leg through the knee, left arm, wrist, and hand fractures, and a perforated eardrum. As a result of the November 15, 2011 attack and his injuries, Cpl Fox has experienced severe physical and emotional pain and suffering.

1591.1339.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into anal-Qaeda's IED manufacturing sites managed and funded by al-Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1592.1340.    The attack was committed by the Taliban.

1593.1341.    The attack that injured Cpl Fox would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1594.~~1342.    Cpl Fox was a national of the United States at the time of the attack, and remains one to this day.

~~1595.~~1343.    As a result of the November 15, 2011 attack and Cpl Fox's injuries, each member of the Fox Family has experienced severe mental anguish, emotional pain and suffering.

**The Jason Gibson Family**

~~1596.~~1344.    Plaintiff Staff Sergeant Jason Gibson served in Afghanistan as a member of the U.S. Army. On May 30, 2012, SSG Gibson was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Gibson, who suffered an amputation of the right index finger, a skin graft on the right forearm, and a bilateral hip disarticulation (amputated at hip on both sides lacking femurs). As a result of the May 30, 2012 attack and his injuries, SSG Gibson has experienced severe physical and emotional pain and suffering.

~~1597.~~1345.    The attack was committed by the Taliban.

~~1598.~~1346.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~

the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1599.1347.    The attack that injured SSG Gibson would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1600.1348.    SSG Gibson was a national of the United States at the time of the attack, and remains one to this day.

1601.1349.    As a result of the May 30, 2012 attack and SSG Gibson's injuries, each member of the Gibson Family has experienced severe mental anguish, emotional pain and suffering.

**The William Gilbert Family**

1602.1350.    Specialist William Gilbert served in Afghanistan as a member of the U.S. Army.  On May 14, 2013, SPC Gilbert was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Gilbert died on May 14, 2013 as a result of injuries sustained during the attack.

1603.1351.    The attack was committed by the Taliban.

1604.1352.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1605.1353.   SPC Gilbert's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1606.1354.   SPC Gilbert was a national of the United States at the time of the attack and his death.

1607.1355.   As a result of the May 14, 2013 attack, SPC Gilbert was injured in his person and/or property. The Plaintiff members of the Gilbert Family are the survivors and/or heirs of SPC Gilbert and are entitled to recover for the damages SPC Gilbert sustained.

**The Paul Goins Jr. Family**

1608.1356.   Mr. Paul Goins Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Goins was injured in an IED attack in Kabul Province, Afghanistan. Mr. Goins died on February 10, 2014 as a result of injuries sustained during the attack.

1609.1357.   The attack was committed by the Taliban (including the its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1358.   ~~On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~ The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

~~1610.~~1359.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~1611.~~1360.   Mr. Goins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1612.~~1361.   Mr. Goins was a national of the United States at the time of the attack and his death.

1613.1362.    As a result of the February 10, 2014 attack, Mr. Goins was injured in his person and/or property. The Plaintiff members of the Goins Family are the survivors and/or heirs of Mr. Goins and are entitled to recover for the damages Mr. Goins sustained.

**The Jonathan Gollnitz Family**

1614.1363.    Sergeant Jonathan Gollnitz served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SGT Gollnitz was injured in a suicide bombing attack in Logar Province, Afghanistan. SGT Gollnitz died on September 26, 2012 as a result of injuries sustained during the attack.

1615.1364.    The attack was committed by the Taliban (including theits Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1365.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training

procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1616.1366.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1617.1367.    SGT Gollnitz's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1618.1368.    SGT Gollnitz was a national of the United States at the time of the attack and his death.

1619.1369.    As a result of the September 26, 2012 attack, SGT Gollnitz was injured in his person and/or property.  The Plaintiff members of the Gollnitz Family are the survivors and/or heirs of SGT Gollnitz and are entitled to recover for the damages SGT Gollnitz sustained.

**The Brittany Gordon Family**

1620.1370.    Specialist Brittany Gordon served in Afghanistan as a member of the U.S. Army.  On October 13, 2012, SPC Gordon was injured in an IED attack in Zabul Province, Afghanistan.  SPC Gordon died on October 13, 2012 as a result of injuries sustained during the attack.

1621.1371.    The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1622.1372.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which that the Haqqani Network purchased from Fatima or Pakarabdetonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into anal-Qaeda's IED manufacturing sites managed and funded by al-Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, whichchemists; and (iv) provided to the Haqqani Network then distributed to the cell that helped commit theby al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

1623.1373.    SPC Gordon's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1624.1374.    SPC Gordon was a national of the United States at the time of the attack and her death.

1625.1375.    As a result of the October 13, 2012 attack, SPC Gordon was injured in her person and/or property. The Plaintiff members of the Gordon Family are the survivors and/or heirs of SPC Gordon and are entitled to recover for the damages SPC Gordon sustained.

**The Douglas Green Family**

1626.1376.　　Specialist Douglas Green served in Afghanistan as a member of the U.S. Army. On August 28, 2011, SPC Green was injured in an IED attack in Kandahar Province, Afghanistan. SPC Green died on August 28, 2011 as a result of injuries sustained during the attack.

1627.1377.　　The attack was committed by the Taliban.

1628.1378.　　On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1629.1379.　　SPC Green's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1630.1380.　　SPC Green was a national of the United States at the time of the attack and his death.

1631.1381.    As a result of the August 28, 2011 attack, SPC Green was injured in his person and/or property. The Plaintiff members of the Green Family are the survivors and/or heirs of SPC Green and are entitled to recover for the damages SPC Green sustained.

**The Travis Green Family**

1632.1382.    Plaintiff Gunnery Sergeant Travis Green served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2011, GySgt Green was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded GySgt Green, who lost both of his legs, suffered a traumatic brain injury and micro bleeds, and suffers from post-traumatic stress disorder. As a result of the September 15, 2011 attack and his injuries, GySgt Green has experienced severe physical and emotional pain and suffering.

1633.1383.    The attack was committed by the Taliban.

1634.1384.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1635.1385.    The attack that injured GySgt Green would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1636.1386.    GySgt Green was a national of the United States at the time of the attack, and remains one to this day.

1637.1387.    As a result of the September 15, 2011 attack and GySgt Green's injuries, each member of the Green Family has experienced severe mental anguish, emotional pain and suffering.

**The Kevin Griffin Family**

1638.1388.    Command Sergeant Major Kevin Griffin served in Afghanistan as a member of the U.S. Army. On August 8, 2012, CSM Griffin was injured in a suicide bombing attack in Kunar Province, Afghanistan. CSM Griffin died on August 8, 2012 as a result of injuries sustained during the attack.

1639.1389.    The attack was committed by the the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1390.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding

al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1640.1391.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1641.1392.    CSM Griffin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1642.1393.    CSM Griffin was a national of the United States at the time of the attack and his death.

1643.1394.    As a result of the August 8, 2012 attack, CSM Griffin was injured in his person and/or property. The Plaintiff members of the Griffin Family are the survivors and/or heirs of CSM Griffin and are entitled to recover for the damages CSM Griffin sustained.

**The Jeremy Hardison Family**

1644.1395.    Sergeant Jeremy Hardison served in Afghanistan as a member of the U.S. Army National Guard. On October 1, 2012, SGT Hardison was injured in a suicide bombing

attack by an individual wearing an Afghan police uniform in Khost Province, Afghanistan.  SGT Hardison died on October 1, 2012 as a result of injuries sustained during the attack.

1645.1396.    The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al- Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1397.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1646.1398.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1647.1399.    SGT Hardison's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was improperly wearing the uniform of his enemy, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public market.

1648.1400.    SGT Hardison was a national of the United States at the time of the attack and his death.

1649.1401.    As a result of the October 1, 2012 attack, SGT Hardison was injured in his person and/or property. The Plaintiff members of the Hardison Family are the survivors and/or heirs of SGT Hardison and are entitled to recover for the damages SGT Hardison sustained.

**The Scott Harper Family**

1650.1402.    Lance Corporal Scott Harper served in Afghanistan as a member of the U.S. Marine Corps. On October 13, 2011, LCpl Harper was injured in an IED attack in Helmand Province, Afghanistan. LCpl Harper died on October 13, 2011 as a result of injuries sustained during the attack.

1651.1403.    The attack was committed by the Taliban.

1652.1404.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1653.1405.    LCpl Harper's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1654.1406.    LCpl Harper was a national of the United States at the time of the attack and his death.

1655.1407.    As a result of the October 13, 2011 attack, LCpl Harper was injured in his person and/or property. The Plaintiff members of the Harper Family are the survivors and/or heirs of LCpl Harper and are entitled to recover for the damages LCpl Harper sustained.

**Adam Hartswick**

1656.1408.    Plaintiff Sergeant Adam Hartswick served in Afghanistan as a member of the U.S. Army. On May 14, 2013, SGT Hartswick was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Hartswick, who suffered a double amputation above the knee, a traumatic brain injury, perforated eardrums, a broken hip, an amputation of his right index finger, a partial amputation of his right thumb, and muscle avulsion of the right forearm. As a result of the May 14, 2013 attack and his injuries, SGT Hartswick has experienced severe physical and emotional pain and suffering.

1657.1409.    The attack was committed by the Taliban.

701

1658.1410.     On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~ chemists; and (iv) provided to the ~~cell that helped commit the~~ Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1659.1411.     The attack that injured SGT Hartswick would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1660.1412.     SGT Hartswick was a national of the United States at the time of the attack, and remains one to this day.

**The Jay Henigan Family**

1661.1413.     Mr. Jay Henigan served in Afghanistan as a civilian government contractor working for the CIA. On September 25, 2011, Mr. Henigan was injured in an insider attack in Kabul Province, Afghanistan. Mr. Henigan died on September 25, 2011 as a result of injuries sustained during the attack.

1662.1414.     The attack was committed by the Taliban (including ~~the~~ its Haqqani Network~~, a designated FTO at the time of the attack~~), al-Qaeda (a designated FTO at the time of

702

the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1415.    The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1663.1416.    Mr. Henigan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1664.1417.    Mr. Henigan was a national of the United States at the time of the attack and his death.

1665.1418.    As a result of the attack, Mr. Henigan was injured in his person and/or property. The Plaintiff members of the Henigan Family are the survivors and/or heirs of Mr. Henigan and are entitled to recover for the damages Mr. Henigan sustained.

1666.1419.    As a result of the September 25, 2011 attack and Mr. Henigan's injuries and death, each member of the Henigan Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Henigan's society, companionship, and counsel.

**Kevin Honaker**

~~1667.~~1420.   Plaintiff Lance Corporal Kevin Honaker served in Afghanistan as a member of the U.S. Marine Corps. On September 13, 2011, LCpl Honaker was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded LCpl Honaker, who lost his left leg above the knee, his right leg below the knee, and a finger on his left hand. As a result of the September 13, 2011 attack and his injuries, LCpl Honaker has experienced severe physical and emotional pain and suffering.

~~1668.~~1421.   The attack was committed by the Taliban.

~~1669.~~1422.   On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1670.~~1423.   The attack that injured LCpl Honaker would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1671.1424.    LCpl Honaker was a national of the United States at the time of the attack, and remains one to this day.

**The Christopher Horns Family**

1672.1425.    Private First Class Christopher Horns served in Afghanistan as a member of the U.S. Army. On October 22, 2011, PFC Horns was injured in an IED attack in Kandahar Province, Afghanistan. PFC Horns died on October 22, 2011 as a result of injuries sustained during the attack.

1673.1426.    The attack was committed by the Taliban.

1674.1427.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1675.1428.    PFC Horns's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1676.1429.    PFC Horns was a national of the United States at the time of the attack and his death.

1677.1430.    As a result of the October 22, 2011 attack, PFC Horns was injured in his person and/or property. The Plaintiff members of the Horns Family are the survivors and/or heirs of PFC Horns and are entitled to recover for the damages PFC Horns sustained.

**The Justin Horsley Family**

1678.1431.    Specialist Justin Horsley served in Afghanistan as a member of the U.S. Army. On July 22, 2012, SPC Horsley was injured in an IED attack in Logar Province, Afghanistan. SPC Horsley died on July 22, 2012 as a result of injuries sustained during the attack.

1679.1432.    The attack was committed by the Haqqani Network, a part of the Taliban.

1680.1433.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1681.1434.    SPC Horsley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1682.1435.    SPC Horsley was a national of the United States at the time of the attack and his death.

1683.1436.    As a result of the July 22, 2012 attack, SPC Horsley was injured in his person and/or property. The Plaintiff members of the Horsley Family are the survivors and/or heirs of SPC Horsley and are entitled to recover for the damages SPC Horsley sustained.

**The Michael Hughes Family**

1684.1437.    Mr. Michael Hughes served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On February 10, 2014, Mr. Hughes was injured in an IED attack in Kabul Province, Afghanistan. Mr. Hughes died on February 10, 2014 as a result of injuries sustained during the attack.

1685.1438.    The attack was committed by the Taliban (including theits Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1686.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.

1439.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1440.   On information and belief, the bomb that the Taliban detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1687.1441.   Mr. Hughes's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1688.1442.   Mr. Hughes was a national of the United States at the time of the attack and his death.

1689.1443.   As a result of the 10, 2014 attack, Mr. Hughes was injured in his person and/or property. The Plaintiff members of the Hughes Family are the survivors and/or heirs of Mr. Hughes and are entitled to recover for the damages Mr. Hughes sustained.

**The Eric Hunter Family**

~~1690.~~1444.    Plaintiff Sergeant Eric Hunter served in Afghanistan as a member of the U.S. Army. On May 31, 2012, SGT Hunter was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SGT Hunter, who lost his right leg and suffered from a severely injured left leg, post-traumatic stress disorder, and a traumatic brain injury. As a result of the May 31, 2012 attack and his injuries, SGT Hunter has experienced severe physical and emotional pain and suffering.

~~1691.~~1445.    The attack was committed by the Taliban.

~~1692.~~1446.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1693.~~1447.    The attack that injured SGT Hunter would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk

~~1694.~~1448.    SGT Hunter was a national of the United States at the time of the attack, and remains one to this day.

1695.1449.   As a result of the May 31, 2012 attack and SGT Hunter's injuries, each member of the Hunter Family has experienced severe mental anguish, emotional pain and suffering.

### The Tyler Iubelt Family

1696.1450.   Private First Class Tyler Iubelt served in Afghanistan as a member of the U.S. Army. On November 12, 2016, PFC Iubelt was injured in a suicide bombing attack in Parwan Province, Afghanistan. PFC Iubelt died on November 12, 2016 as a result of injuries sustained during the attack.

1697.1451.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1452.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1698.1453.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1699.1454.     PFC Iubelt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack were unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1700.1455.     PFC Iubelt was a national of the United States at the time of the attack and his death.

1701.1456.     As a result of the November 12, 2016 attack, PFC Iubelt was injured in his person and/or property. The Plaintiff members of the Iubelt Family are the survivors and/or heirs of PFC Iubelt and are entitled to recover for the damages PFC Iubelt sustained.

**Bradley Ivanchan**

1702.1457.     Plaintiff Corporal Bradley Ivanchan served in Afghanistan as a member of the U.S. Marine Corps. On June 13, 2012, Cpl Ivanchan was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Ivanchan, who suffers from bilateral amputation of both legs, traumatic brain injury, damage to his left hand, and other severe injuries. As a result of the June 13, 2012 attack and his injuries, Cpl Ivanchan has experienced severe physical and emotional pain and suffering.

1703.1458.    The attack was committed by the Taliban.

1704.1459.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1705.1460.    The attack that injured Cpl Ivanchan would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1706.1461.    Cpl Ivanchan was a national of the United States at the time of the attack, and remains one to this day.

**The Ryan Jayne Family**

1707.1462.    Specialist Ryan Jayne served in Afghanistan as a member of the U.S. Army Reserve. On November 3, 2012, SPC Jayne was injured in an IED attack in Paktia Province, Afghanistan. SPC Jayne died on November 3, 2012 as a result of injuries sustained during the attack.

1708.1463.   The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1709.1464.   On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromat one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit thejoint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1710.1465.   SPC Jayne's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1711.1466.   SPC Jayne was a national of the United States at the time of the attack and his death.

1712.1467.   As a result of the November 3, 2012 attack, SPC Jayne was injured in his person and/or property. The Plaintiff members of the Jayne Family are the survivors and/or heirs of SPC Jayne and are entitled to recover for the damages SPC Jayne sustained.

**Brian Jergens**

~~1713.~~1468.    Plaintiff Sergeant Brian Jergens served in Afghanistan as a member of the U.S. Army. On August 7, 2011, SGT Jergens was injured in an IED attack in Uruzgan Province, Afghanistan. The attack severely wounded SGT Jergens, who suffered from the loss of both legs below the knee, the removal of his spleen, abdominal injuries, a cracked vertebra, a broken arm, and the loss of his ring finger on his left hand. As a result of the August 7, 2011 attack and his injuries, SGT Jergens has experienced severe physical and emotional pain and suffering.

~~1714.~~1469.    The attack was committed by the Taliban.

~~1715.~~1470.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1716.~~1471.    The attack that injured SGT Jergens would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~1717.~~1472.    SGT Jergens was a national of the United States at the time of the attack, and remains one to this day.

**Terence Jones**

~~1718.~~1473.    Plaintiff Specialist Terence Jones served in Afghanistan as a member of the U.S. Army. On February 7, 2012, SPC Jones was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Jones, who suffered the loss of both legs, the partial loss of use of his left arm, and a partial penial amputation. As a result of the February 7, 2012 attack and his injuries, SPC Jones has experienced severe physical and emotional pain and suffering.

~~1719.~~1474.    The attack was committed by the Taliban.

~~1720.~~1475.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1721.~~1476.    The attack that injured SPC Jones would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~1722.~~1477.    SPC Jones was a national of the United States at the time of the attack, and remains one to this day.

**The Alexis Kamerman Family**

~~1723.~~1478.    Ms. Alexis Leigh Kamerman served in Afghanistan as a civilian educator with American University of Afghanistan.  On January 17, 2014, Ms. Kamerman was injured in a complex attack involving a suicide bomber and gunmen in Kabul Province, Afghanistan.  Ms. Kamerman died on January 17, 2014 as a result of injuries sustained during the attack.

~~1724.~~1479.    The attack was committed by the Taliban (including ~~the~~its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

~~1725.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~

1480.   ~~Ms.~~ The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and

weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1481.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1482.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1726.1483.    Ms. Kamerman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian not taking part in hostilities and was killed while eating at a restaurant.

1727.1484.    Ms. Kamerman was a national of the United States at the time of the attack and her death.

1728.1485.    As a result of the attack, Ms. Kamerman was injured in her person and/or property. The Plaintiff members of the Kamerman Family are the survivors and/or heirs of Ms. Kamerman and are entitled to recover for the damages Ms. Kamerman sustained.

1729.1486.    As a result of the January 17, 2014 attack and Ms. Kamerman's injuries and death, each member of the Kamerman Family has experienced severe mental anguish, emotional pain and suffering, and the loss of Ms. Kamerman's society, companionship, and counsel.

**The Kevin King Family**

1730.1487.    Plaintiff Mr. Kevin King served in Afghanistan as a civilian professor teaching at American University of AFG. On August 7, 2016, Mr. King was kidnapped at gunpoint just outside the front gates of American University of Afghanistan. Mr. King was held hostage under deplorable conditions, beaten frequently, and denied adequate medical care for over three years before being released in a prisoner exchange on November 19, 2019. The attack severely wounded Mr. King, and he has suffered from severe caloric malnutrition, muscle atrophy, peripheral neuropathy, hypocalcemia, vitamin D deficiency, low bone mineral density, hyperparathyroidism, frostbite on feet and ankles, a weak bladder, and other physical injuries due to repeated beatings. As a result of the August 7, 2016 attack and his injuries, Mr. King has experienced severe physical and emotional pain and suffering.

1488.   The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

1731.1489.    On information and belief, the attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Syndicate's kidnapping operations in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.  Among other motivations, Sirajuddin Haqqani sought to kidnap Americans so that he would have a hostage to trade for key Haqqani Network

leaders who were in U.S. custody, including, but not limited to, one or more members of the Haqqani family.

1732.1490.    The attack that injured Mr. King would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian college professor not taking part in hostilities and was tortured during captivity, and the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1733.1491.    Mr. King was a national of the United States at the time of the attack, and remains one to this day.

1734.1492.    As a result of the August 7, 2016 attack and Mr. King's injuries, each member of the King Family has experienced severe mental anguish, emotional pain and suffering.

**The Edward Klein Family**

1735.1493.    Plaintiff Major Edward Klein served in Afghanistan as a member of the U.S. Army. On October 22, 2012, MAJ Klein was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded MAJ Klein, who lost both legs above the knee, his right arm, and three fingers on his left hand. As a result of the October 22, 2012 attack and his injuries, MAJ Klein has experienced severe physical and emotional pain and suffering.

1736.1494.    The attack was committed by the Taliban.

1737.1495.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers

operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1738.1496.    The attack that injured MAJ Klein would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1739.1497.    MAJ Klein was a national of the United States at the time of the attack, and remains one to this day.

1740.1498.    As a result of the October 22, 2012 attack and MAJ Klein's injuries, each member of the Klein Family has experienced severe mental anguish, emotional pain and suffering.

**The Michael Knapp Family**

1741.1499.    Sergeant Michael Knapp served in Afghanistan as a member of the U.S. Army. On May 18, 2012, SGT Knapp was injured in an indirect fire attack in Kunar Province, Afghanistan. SGT Knapp died on May 18, 2012 as a result of injuries sustained during the attack.

1742.1500.    The attack was committed by the the Taliban, al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1743.1501.    SGT Knapp's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

1744.1502.    SGT Knapp was a national of the United States at the time of the attack and his death.

1745.1503.    As a result of the May 18, 2012 attack, SGT Knapp was injured in his person and/or property. The Plaintiff members of the Knapp Family are the survivors and/or heirs of SGT Knapp and are entitled to recover for the damages SGT Knapp sustained.

**Brandon Korona**

1746.1504.    Plaintiff Sergeant Brandon Korona served in Afghanistan as a member of the U.S. Army. On June 23, 2013, SGT Korona was injured in an IED attack in Paktika Province, Afghanistan. The attack severely wounded SGT Korona, who suffered from significant injuries to his left leg requiring a below-knee amputation in 2017, a fractured right ankle, and a traumatic brain injury. As a result of the June 23, 2013 attack and his injuries, SGT Korona has experienced severe physical and emotional pain and suffering.

1747.1505.    The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al–Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1748.1506.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-

721

Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1749. 1507.    The attack that injured SGT Korona would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1750. 1508.    SGT Korona was a national of the United States at the time of the attack, and remains one to this day.

**The Todd Lambka Family**

1751. 1509.    First Lieutenant Todd Lambka served in Afghanistan as a member of the U.S. Army. On August 1, 2012, 1LT Lambka was injured in an IED attack in Paktika Province, Afghanistan. 1LT Lambka died on August 1, 2012 as a result of injuries sustained during the attack.

1752. 1510.    The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1753. 1511.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group

CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1754. 1512.    1LT Lambka's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk

1755. 1513.    1LT Lambka was a national of the United States at the time of the attack and his death.

1756. 1514.    As a result of the August 1, 2012 attack, 1LT Lambka was injured in his person and/or property. The Plaintiff members of the Lambka Family are the survivors and/or heirs of 1LT Lambka and are entitled to recover for the damages 1LT Lambka sustained.

**The Jason Landphair Family**

1757. 1515.    Mr. Jason Landphair served in Afghanistan as a civilian government contractor working for Praetorian Standard Inc. On January 29, 2015, Mr. Landphair was injured in an insider attack in Kabul Province, Afghanistan. Mr. Landphair died on January 29, 2015 as a result of injuries sustained during the attack.

1758.1516.    The attack was committed by the Taliban (including theirits Haqqani

Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of

the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a

joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack

Network.

1517.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack),

including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who

personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons

supply in his capacity as a member of al-Qaeda's military council, and helped choose the general

time and target for the attack.

1759.1518.    Mr. Landphair's murder would have violated the laws of war if these

terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy

combatants.

1760.1519.    Mr. Landphair was a national of the United States at the time of the attack

and his death.

1761.1520.    As a result of the January 29, 2015 attack, Mr. Landphair was injured in

his person and/or property.  The Plaintiff members of the Landphair Family are the survivors

and/or heirs of Mr. Landphair and are entitled to recover for the damages Mr. Landphair

sustained.

**The Brandon Landrum Family**

1762.1521.    First Lieutenant Brandon Landrum served in Afghanistan as a member of

the U.S. Army.  On May 4, 2013, 1LT Landrum was injured in an IED attack in Kandahar

Province, Afghanistan. 1LT Landrum died on May 4, 2013 as a result of injuries sustained during the attack.

1763.1522.    The attack was committed by the Taliban.

1764.1523.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1765.1524.    1LT Landrum's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1766.1525.    1LT Landrum was a national of the United States at the time of the attack and his death.

1767.1526.    As a result of the May 4, 2013 attack, 1LT Landrum was injured in his person and/or property. The Plaintiff members of the Landrum Family are the survivors and/or heirs of 1LT Landrum and are entitled to recover for the damages 1LT Landrum sustained.

**The David Lau Family**

1768.1527.    Plaintiff Sergeant First Class David Lau served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, SFC Lau was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded SFC Lau, who suffered severe injuries to both his legs requiring three years in a limb salvage program, extensive injuries to his dominant hand including the loss of a finger resulting in diminished function, severe injuries to shoulders and bicep, limb atrophy, dental injuries, loss of hearing, burns, and embedded toxic ball bearings. As a result of the April 4, 2012 attack and his injuries, SFC Lau has experienced severe physical and emotional pain and suffering.

1769.  The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1528.   t On information and belief, the explosive used in suicide bomber who detonated the bomb during the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which: (i) indoctrinated by al-Qaeda regarding the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return. raining the suicide bomber.

1770.1529.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1771.1530.     The attack that injured SFC Lau would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1772.1531.     SFC Lau was a national of the United States at the time of the attack, and remains one to this day.

1773.1532.     As a result of the April 4, 2012 attack and SFC Lau's injuries, each member of the Lau Family has experienced severe mental anguish, emotional pain and suffering.

**Eric Lund**

1774.1533.     Plaintiff Sergeant Eric Lund served in Afghanistan as a member of the U.S. Army National Guard.  On May 20, 2012, SGT Lund was injured in a complex attack involving two IEDs followed by small arms fire and rocket propelled grenades in Kandahar Province, Afghanistan.  The attack severely wounded SGT Lund, who lost both of his arms above the elbow, fractured his skull, broke his femur resulting in the loss of one inch of bone, broke his tibia, broke his back, and sustained a traumatic brain injury.  As a result of the May 20, 2012 attack and his injuries, SGT Lund has experienced severe physical and emotional pain and suffering.

1775.1534.    The attack was committed by the Taliban.

1776.1535.    The attack that injured SGT Lund would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and indiscriminately placed civilians at risk.

1777.1536.    SGT Lund was a national of the United States at the time of the attack, and remains one to this day.

### The Chase Marta Family

1778.1537.    Specialist Chase Marta served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SPC Marta was injured in an IED attack in Ghazni Province, Afghanistan. SPC Marta died on May 7, 2012 as a result of injuries sustained during the attack.

1779.1538.    The attack was committed by the Haqqani Network, a part of the Taliban Taliban (including its Haqqani Network) and al-Qaeda (a designated FTO at the time of the attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1780.1539.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which

the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit thejoint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1781.1540.    SPC Marta's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1782.1541.    SPC Marta was a national of the United States at the time of the attack and his death.

1783.1542.    As a result of the May 7, 2012 attack, SPC Marta was injured in his person and/or property.  The Plaintiff members of the Marta Family are the survivors and/or heirs of SPC Marta and are entitled to recover for the damages SPC Marta sustained.

**The Ethan Martin Family**

1784.1543.    Corporal Ethan Martin served in Afghanistan as a member of the U.S. Army.  On August 7, 2012, CPL Martin was injured in an insider attack in Paktia Province, Afghanistan.  CPL Martin died on August 7, 2012 as a result of injuries sustained during the attack.

1785.1544.    The attack was committed by the Haqqani Network (a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1786.1545.    CPL Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1787.1546.   CPL Martin was a national of the United States at the time of the attack and his death.

1788.1547.   As a result of the August 7, 2012 attack, CPL Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of CPL Martin and are entitled to recover for the damages CPL Martin sustained.

**The Wyatt Martin Family**

1789.1548.   Specialist Wyatt Martin served in Afghanistan as a member of the U.S. Army. On December 12, 2014, SPC Martin was injured in an IED attack in Parwan Province, Afghanistan. SPC Martin died on December 12, 2014 as a result of injuries sustained during the attack.

1790.1549.   The attack was committed by the Taliban.

1791.1550.   On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1792.1551.     SPC Martin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1793.1552.     SPC Martin was a national of the United States at the time of the attack and his death.

1794.1553.     As a result of the December 12, 2014 attack, SPC Martin was injured in his person and/or property. The Plaintiff members of the Martin Family are the survivors and/or heirs of SPC Martin and are entitled to recover for the damages SPC Martin sustained.

**The Jose Martinez Hernandez Family**

1795.1554.     Plaintiff Specialist Jose Martinez Hernandez served in Afghanistan as a member of the U.S. Army. On March 3, 2012, SPC Martinez Hernandez was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SPC Martinez Hernandez, who suffered from the loss of both of his legs, the loss of his right arm, and a partial amputation of his left hand. As a result of the March 3, 2012 attack and his injuries, SPC Martinez Hernandez has experienced severe physical and emotional pain and suffering.

1796.1555.     The attack was committed by the Taliban.

1797.1556.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii)

designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1798.1557.    The attack that injured SPC Martinez Hernandez would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1799.1558.    SPC Martinez Hernandez was a national of the United States at the time of the attack, and remains one to this day.

1800.1559.    As a result of the March 3, 2012 attack and SPC Martinez Hernandez's injuries, each member of the Martinez Hernandez Family has experienced severe mental anguish, emotional pain and suffering.

**The Chester McBride III Family**

1801.1560.    Staff Sergeant Chester McBride III served in Afghanistan as a member of the U.S. Air Force. On December 21, 2015, SSgt McBride was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSgt McBride died on December 21, 2015 as a result of injuries sustained during the attack.

1802.1561.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1562.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-

Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1803.1563.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1804.1564.    SSgt McBride's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1805.1565.    SSgt McBride was a national of the United States at the time of the attack and his death.

1806.1566.    As a result of the 21, 2015 attack, SSgt McBride was injured in his person and/or property. The Plaintiff members of the McBride Family are the survivors and/or heirs of SSgt McBride and are entitled to recover for the damages SSgt McBride sustained.

**The Matthew McClintock Family**

1807.1567.    Sergeant First Class Matthew McClintock served in Afghanistan as a member of the U.S. Army National Guard. On January 5, 2016, SFC McClintock was injured in a complex attack involving small arms fire in Helmand Province, Afghanistan. SFC McClintock died on January 5, 2016 as a result of injuries sustained during the attack.

1808.1568.    The attack was committed by the Taliban.

1809.1569.    SFC McClintock's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1810.1570.    SFC McClintock was a national of the United States at the time of the attack and his death.

1811.1571.    As a result of the January 5, 2016 attack, SFC McClintock was injured in his person and/or property. The Plaintiff members of the McClintock Family are the survivors and/or heirs of SFC McClintock and are entitled to recover for the damages SFC McClintock sustained.

**The Richard McEvoy Family**

1812.1572.    Mr. Richard McEvoy served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On August 22, 2015, Mr. McEvoy was injured in a

suicide bombing attack in Kabul Province, Afghanistan. Mr. McEvoy died on August 22, 2015 as a result of injuries sustained during the attack.

1813.1573.    The attack was committed by the Taliban (including theits Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1814.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.

1574.   Mr. The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1575.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack

Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1576.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1815.1577.   Mr. McEvoy's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

1816.1578.   Mr. McEvoy was a national of the United States at the time of the attack and his death.

1817.1579.   As a result of the August 22, 2015 attack, Mr. McEvoy was injured in his person and/or property. The Plaintiff members of the McEvoy Family are the survivors and/or heirs of Mr. McEvoy and are entitled to recover for the damages Mr. McEvoy sustained.

**The Richard McNulty III Family**

1818.1580.   Private First Class Richard McNulty III served in Afghanistan as a member of the U.S. Army. On May 13, 2012, PFC McNulty was injured in an IED attack in

Khost Province, Afghanistan. ~~PFC McNulty died on May 13, 2012 as a result of injuries sustained during the attack.

~~1819.~~1581.     The attack was committed by the Haqqani Network (a part of the Taliban), al-~~ ~~Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

~~1820.~~1582.     On information and belief, the ~~explosive used in~~ bomb that the joint cell detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from~~at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~1821.~~1583.     PFC McNulty's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

~~1822.~~1584.     PFC McNulty was a national of the United States at the time of the attack and his death.

737

~~1823.~~1585.	As a result of the May 13, 2012 attack, PFC McNulty was injured in his person and/or property.~~ ~~The Plaintiff members of the McNulty Family are the survivors and/or heirs of PFC McNulty and are entitled to recover for the damages PFC McNulty sustained.

**The Dale Means Family**

~~1824.~~1586.	Lance Corporal Dale Means served in Afghanistan as a member of the U.S. Marine Corps. ~~ ~~On November 18, 2012, LCpl Means was injured in an IED attack in Helmand Province, Afghanistan. ~~ ~~LCpl Means died on November 18, 2012 as a result of injuries sustained during the attack.

~~1825.~~1587.	The attack was committed by the Taliban.

~~1826.~~1588.	On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1827.~~1589.	LCpl Means's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1828.1590.    LCpl Means was a national of the United States at the time of the attack and his death.

1829.1591.    As a result of the November 18, 2012 attack, LCpl Means was injured in his person and/or property. The Plaintiff members of the Means Family are the survivors and/or heirs of LCpl Means and are entitled to recover for the damages LCpl Means sustained.

**The Michael Metcalf Family**

1830.1592.    Private First Class Michael Metcalf served in Afghanistan as a member of the U.S. Army. On April 22, 2012, PFC Metcalf was injured in an IED attack in Ghazni Province, Afghanistan. PFC Metcalf died on April 22, 2012 as a result of injuries sustained during the attack.

1831.1593.    The attack was committed by the Taliban (including its Haqqani Network,) and al-Qaeda (a partdesignated FTO at the time of the Taliban.attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1832.1594.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. bomb that the joint cell detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor

ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~1833.~~1595.      PFC Metcalf's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1834.~~1596.      PFC Metcalf was a national of the United States at the time of the attack and his death.

~~1835.~~1597.      As a result of the April 22, 2012 attack, PFC Metcalf was injured in his person and/or property. The Plaintiff members of the Metcalf Family are the survivors and/or heirs of PFC Metcalf and are entitled to recover for the damages PFC Metcalf sustained.

**The Jonathan Metzger Family**

~~1836.~~1598.      Staff Sergeant Jonathan Metzger served in Afghanistan as a member of the U.S. Army National Guard. On January 6, 2012, SSG Metzger was injured in an IED attack in Kandahar Province, Afghanistan. SSG Metzger died on January 6, 2012 as a result of injuries sustained during the attack.

~~1837.~~1599.      The attack was committed by the Taliban.

~~1838.~~1600.      On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1839.1601.    SSG Metzger's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1840.1602.    SSG Metzger was a national of the United States at the time of the attack and his death.

1841.1603.    As a result of the January 6, 2012 attack, SSG Metzger was injured in his person and/or property. The Plaintiff members of the Metzger Family are the survivors and/or heirs of SSG Metzger and are entitled to recover for the damages SSG Metzger sustained.

**The Eugene Mills III Family**

1842.1604.    Lance Corporal Eugene Mills III served in Afghanistan as a member of the U.S. Marine Corps. On June 22, 2012, LCpl Mills was injured in a sniper attack in Helmand Province, Afghanistan. LCpl Mills died on June 22, 2012 as a result of injuries sustained during the attack.

1843.1605.    The attack was committed by the Taliban.

1844.1606.    LCpl Mills's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1845.1607.    LCpl Mills was a national of the United States at the time of the attack and his death.

1846.1608.    As a result of the June 22, 2012 attack, LCpl Mills was injured in his person and/or property. The Plaintiff members of the Mills Family are the survivors and/or heirs of LCpl Mills and are entitled to recover for the damages LCpl Mills sustained.

**The Travis Morgado Family**

1847.1609.    Second Lieutenant Travis Morgado served in Afghanistan as a member of the U.S. Army. On May 23, 2012, 2LT Morgado was injured in an IED attack in Kandahar Province, Afghanistan. 2LT Morgado died on May 23, 2012 as a result of injuries sustained during the attack.

1848.1610.    The attack was committed by the Taliban.

1849.1611.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1850.1612.    2LT Morgado's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1851.1613.    2LT Morgado was a national of the United States at the time of the attack and his death.

1852.1614.    As a result of the May 23, 2012 attack, 2LT Morgado was injured in his person and/or property. The Plaintiff members of the Morgado Family are the survivors and/or heirs of 2LT Morgado and are entitled to recover for the damages 2LT Morgado sustained.

**The Jedidiah Morgan Family**

1853.1615.    Plaintiff Corporal Jedidiah Morgan served in Afghanistan as a member of the U.S. Marine Corps. On June 20, 2012, Cpl Morgan was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Morgan, who suffered the loss of both legs above the knee and the loss of the use of his right hand (due to the loss of muscle and nerves which makes him unable to open it). As a result of the June 20, 2012 attack and his injuries, Cpl Morgan has experienced severe physical and emotional pain and suffering.

1854.1616.    The attack was committed by the Taliban.

1855.1617.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which

the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1856.1618.    The attack that injured Cpl Morgan would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1857.1619.    Cpl Morgan was a national of the United States at the time of the attack, and remains one to this day.

1858.1620.    As a result of the June 20, 2012 attack and Cpl Morgan's injuries, each member of the Morgan Family has experienced severe mental anguish, emotional pain and suffering.

**The Sean Mullen Family**

1859.1621.    Warrant Officer Sean Mullen served in Afghanistan as a member of the U.S. Army. On June 2, 2013, WO1 Mullen was injured in an IED attack in Helmand Province, Afghanistan. WO1 Mullen died on June 2, 2013 as a result of injuries sustained during the attack.

1860.1622.    The attack was committed by the Taliban.

1861.1623.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED

manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1862.1624.    WO1 Mullen's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1863.1625.    WO1 Mullen was a national of the United States at the time of the attack and his death.

1864.1626.    As a result of the June 2, 2013 attack, WO1 Mullen was injured in his person and/or property. The Plaintiff members of the Mullen Family are the survivors and/or heirs of WO1 Mullen and are entitled to recover for the damages WO1 Mullen sustained.

**The Brandon Mullins Family**

1865.1627.    Specialist Brandon Mullins served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SPC Mullins was injured in an IED attack in Kandahar Province, Afghanistan. SPC Mullins died on August 25, 2011 as a result of injuries sustained during the attack.

1866.1628.    The attack was committed by the Taliban.

1867.1629.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers

operating out~~at one~~ of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who~~ ~~converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~ ~~the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1868.~~1630.     SPC Mullins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1869.~~1631.     SPC Mullins was a national of the United States at the time of the attack and his death.

~~1870.~~1632.     As a result of the August 25, 2011 attack, SPC Mullins was injured in his person and/or property. The Plaintiff members of the Mullins Family are the survivors and/or heirs of SPC Mullins and are entitled to recover for the damages SPC Mullins sustained.

**The Thomas Murach Family**

~~1871.~~1633.     Specialist Thomas Murach served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Murach was injured in an IED attack in Kandahar Province, Afghanistan. SPC Murach died on May 4, 2013 as a result of injuries sustained during the attack.

~~1872.~~1634.     The attack was committed by the Taliban.

~~1873.~~1635.     On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group~~

746

~~CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1874.~~1636.　　SPC Murach's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~1875.~~1637.　　SPC Murach was a national of the United States at the time of the attack and his death.

~~1876.~~1638.　　As a result of the May 4, 2013 attack, SPC Murach was injured in his person and/or property. The Plaintiff members of the Murach Family are the survivors and/or heirs of SPC Murach and are entitled to recover for the damages SPC Murach sustained.

**The Liam Nevins Family**

~~1877.~~1639.　　Sergeant First Class Liam Nevins served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SFC Nevins was injured in an insider attack in Paktia Province, Afghanistan. SFC Nevins died on September 21, 2013 as a result of injuries sustained during the attack.

~~1878.~~1640.　　The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the

attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

~~1879.~~1641.    SFC Nevins's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was lawfully wearing the uniform of his enemy.

~~1880.~~1642.    SFC Nevins was a national of the United States at the time of the attack and his death.

~~1881.~~1643.    As a result of the September 21, 2013 attack, SFC Nevins was injured in his person and/or property. The Plaintiff members of the Nevins Family are the survivors and/or heirs of SFC Nevins and are entitled to recover for the damages SFC Nevins sustained.

**The Christopher Newman Family**

~~1882.~~1644.    Staff Sergeant Christopher Newman served in Afghanistan as a member of the U.S. Army. On October 29, 2011, SSG Newman was injured in a suicide bombing attack in Kabul Province, Afghanistan. SSG Newman died on October 29, 2011 as a result of injuries sustained during the attack.

~~1883.~~1645.    The attack was committed by the Taliban (including ~~the~~its Haqqani Network), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1646.   ~~On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-~~

Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1647.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1884.1648.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1885.1649.   SSG Newman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a busy road near a university.

1886.1650.    SSG Newman was a national of the United States at the time of the attack and his death.

1887.1651.    As a result of the October 29, 2011 attack, SSG Newman was injured in his person and/or property. The Plaintiff members of the Newman Family are the survivors and/or heirs of SSG Newman and are entitled to recover for the damages SSG Newman sustained.

**The Bryan Nichols Family**

1888.1652.    Chief Warrant Officer 2 Bryan Nichols served in Afghanistan as a member of the U.S. Army Reserve. On August 6, 2011, CW2 Nichols was injured in an attack on a helicopter in Wardak Province, Afghanistan. CW2 Nichols died on August 6, 2011 as a result of injuries sustained during the attack.

1889.1653.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1890.1654.    CW2 Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1891.1655.    CW2 Nichols was a national of the United States at the time of the attack and his death.

1892.1656.    As a result of the August 6, 2011 attack, CW2 Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of CW2 Nichols and are entitled to recover for the damages CW2 Nichols sustained.

**The Rob Nichols Family**

~~1893.~~1657.     Specialist Rob Nichols served in Afghanistan as a member of the U.S. Army.  On July 23, 2013, SPC Nichols was injured in an IED attack in Wardak Province, Afghanistan.  SPC Nichols died on July 23, 2013 as a result of injuries sustained during the attack.

~~1894.~~1658.     The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

~~1895.~~1659.     On information and belief, the ~~explosive used in the attack was a CAN fertilizer~~ bomb ~~sourced from Fatima Group CAN Fertilizer, which~~ that the Haqqani Network ~~purchased from Fatima or Pakarab~~detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda ~~CAN fertilizer bomb derived from~~/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~chemists; and (iv) provided to the Haqqani Network ~~then distributed to the cell that helped commit the~~by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

~~1896.~~1660.     SPC Nichols's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk

~~1897.~~1661.     SPC Nichols was a national of the United States at the time of the attack and his death.

1898.1662.     As a result of the July 23, 2013 attack, SPC Nichols was injured in his person and/or property. The Plaintiff members of the Nichols Family are the survivors and/or heirs of SPC Nichols and are entitled to recover for the damages SPC Nichols sustained.

**The Nicholas Olivas Family**

1899.1663.     Corporal Nicholas Olivas served in Afghanistan as a member of the U.S. Army. On May 30, 2012, CPL Olivas was injured in an IED attack in Kandahar Province, Afghanistan. CPL Olivas died on May 30, 2012 as a result of injuries sustained during the attack.

1900.1664.     The attack was committed by the Taliban.

1901.1665.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1902.1666.     CPL Olivas's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

1903.1667.    CPL Olivas was a national of the United States at the time of the attack and his death.

1904.1668.    As a result of the May 30, 2012 attack, CPL Olivas was injured in his person and/or property. The Plaintiff members of the Olivas Family are the survivors and/or heirs of CPL Olivas and are entitled to recover for the damages CPL Olivas sustained.

### The Kyle Osborn Family

1905.1669.    Sergeant Kyle Osborn served in Afghanistan as a member of the U.S. Army. On September 13, 2012, SGT Osborn was injured in a rocket propelled grenade attack in Ghazni Province, Afghanistan. SGT Osborn died on September 13, 2012 as a result of injuries sustained during the attack.

1906.1670.    The attack was committed by the Taliban (including its Haqqani Network, ), al-Qaeda (a part designated FTO at the time of the Taliban attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1907.1671.    SGT Osborn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1908.1672.    SGT Osborn was a national of the United States at the time of the attack and his death.

1909.1673.    As a result of the September 13, 2012 attack, SGT Osborn was injured in his person and/or property. The Plaintiff members of the Osborn Family are the survivors and/or heirs of SGT Osborn and are entitled to recover for the damages SGT Osborn sustained.

**The Nicholas Ott Family**

1910.1674.	Corporal Nicholas Ott served in Afghanistan as a member of the U.S. Marine Corps. On August 10, 2011, Cpl Ott was injured in an IED attack in Helmand Province, Afghanistan. Cpl Ott died on August 10, 2011 as a result of injuries sustained during the attack.

1911.1675.	The attack was committed by the Taliban.

1912.1676.	On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1913.1677.	Cpl Ott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1914.1678.	Cpl Ott was a national of the United States at the time of the attack and his death.

1915.1679.    As a result of the August 10, 2011 attack, Cpl Ott was injured in his person and/or property. The Plaintiff members of the Ott Family are the survivors and/or heirs of Cpl Ott and are entitled to recover for the damages Cpl Ott sustained.

**The Cody Patterson Family**

1916.1680.    Specialist Cody Patterson served in Afghanistan as a member of the U.S. Army. On October 6, 2013, SPC Patterson was injured in an IED attack in Kandahar Province, Afghanistan. SPC Patterson died on October 6, 2013 as a result of injuries sustained during the attack.

1917.1681.    The attack was committed by the Taliban.

1918.1682.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1919.1683.    SPC Patterson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1920.1684.    SPC Patterson was a national of the United States at the time of the attack and his death.

1921.1685.    As a result of the October 6, 2013 attack, SPC Patterson was injured in his person and/or property. The Plaintiff members of the Patterson Family are the survivors and/or heirs of SPC Patterson and are entitled to recover for the damages SPC Patterson sustained.

### The Joseph Perez Family

1922.1686.    Mr. Joseph Perez served in Afghanistan as a civilian government contractor working for FedSys. On July 22, 2012, Mr. Perez was injured in an insider attack in Herat Province, Afghanistan. Mr. Perez died on July 22, 2012 as a result of injuries sustained during the attack.

1923.1687.    The attack was committed by the Taliban.

1924.1688.    Mr. Perez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, and the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

1925.1689.    Mr. Perez was a national of the United States at the time of the attack and his death.

1926.1690.    As a result of the July 22, 2012 attack, Mr. Perez was injured in his person and/or property. The Plaintiff members of the Perez Family are the survivors and/or heirs of Mr. Perez and are entitled to recover for the damages Mr. Perez sustained.

### The Ricardo PerezRamos Family

1927.1691.    Plaintiff Sergeant Ricardo PerezRamos served in Afghanistan as a member of the U.S. Army. On November 20, 2011, SGT PerezRamos was injured in an IED

attack in Kandahar Province, Afghanistan. The attack severely wounded SGT PerezRamos, who suffered the immediate loss of his left leg in the blast, a spinal cord injury, severe burn, embedded shrapnel, and a broken pelvis. As a result of the November 20, 2011 attack and his injuries, SGT PerezRamos has experienced severe physical and emotional pain and suffering.

~~1928.~~1692.   The attack was committed by the Taliban.

~~1929.~~1693.   On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1930.~~1694.   The attack that injured SGT PerezRamos would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1931.~~1695.   SGT PerezRamos was a national of the United States at the time of the attack, and remains one to this day.

1932.1696.   As a result of the November 20, 2011 attack and SGT PerezRamos's injuries, each member of the PerezRamos Family has experienced severe mental anguish, emotional pain and suffering.

**The John Perry Family**

1933.1697.   Staff Sergeant John Perry served in Afghanistan as a member of the U.S. Army. On November 12, 2016, SSG Perry was injured in a suicide bombing attack in Parwan Province, Afghanistan. SSG Perry died on November 12, 2016 as a result of injuries sustained during the attack.

1934.1698.   The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1699.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1935.1700.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1936.1701.    SSG Perry's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1937.1702.    SSG Perry was a national of the United States at the time of the attack and his death.

1938.1703.    As a result of the November 12, 2016 attack, SSG Perry was injured in his person and/or property. The Plaintiff members of the Perry Family are the survivors and/or heirs of SSG Perry and are entitled to recover for the damages SSG Perry sustained.

**The Joseph Peters Family**

1939.1704.    Sergeant Joseph Peters served in Afghanistan as a member of the U.S. Army. On October 6, 2013, SGT Peters was injured in an IED attack in Kandahar Province, Afghanistan. SGT Peters died on October 6, 2013 as a result of injuries sustained during the attack.

1940.1705.    The attack was committed by the Taliban.

1941.1706.   On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1942.1707.   SGT Peters's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1943.1708.   SGT Peters was a national of the United States at the time of the attack and his death.

1944.1709.   As a result of the October 6, 2013 attack, SGT Peters was injured in his person and/or property. The Plaintiff members of the Peters Family are the survivors and/or heirs of SGT Peters and are entitled to recover for the damages SGT Peters sustained.

**The Francis Phillips IV Family**

1945.1710.   Staff Sergeant Francis Phillips IV served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SSG Phillips was injured in an IED attack in Kandahar

Province, Afghanistan. ~~SSG~~ Phillips died on May 4, 2013 as a result of injuries sustained during the attack.

~~1946.~~1711.    The attack was committed by the Taliban.

~~1947.~~1712.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1948.~~1713.    SSG Phillips's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1949.~~1714.    SSG Phillips was a national of the United States at the time of the attack and his death.

~~1950.~~1715.    As a result of the May 4, 2013 attack, SSG Phillips was injured in his person and/or property.~~ ~~The Plaintiff members of the Phillips Family are the survivors and/or heirs of SSG Phillips and are entitled to recover for the damages SSG Phillips sustained.

### The Trevor Pinnick Family

~~1951.~~1716.      Specialist Trevor Pinnick served in Afghanistan as a member of the U.S. Army.  On June 12, 2012, SPC Pinnick was injured in an IED attack in Kandahar Province, Afghanistan.  SPC Pinnick died on June 12, 2012 as a result of injuries sustained during the attack.

~~1952.~~1717.      The attack was committed by the Taliban.

~~1953.~~1718.      SPC Pinnick's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1954.~~1719.      SPC Pinnick was a national of the United States at the time of the attack and his death.

~~1955.~~1720.      On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda ~~CAN fertilizer bomb derived from/~~Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1956.1721.    As a result of the June 12, 2012 attack, SPC Pinnick was injured in his person and/or property. The Plaintiff members of the Pinnick Family are the survivors and/or heirs of SPC Pinnick and are entitled to recover for the damages SPC Pinnick sustained.

**The Jesse Pittman Family**

1957.1722.    Petty Officer 1st Class Jesse Pittman served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Pittman was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Pittman died on August 6, 2011 as a result of injuries sustained during the attack.

1958.1723.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1959.1724.    PO1 Pittman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1960.1725.    PO1 Pittman was a national of the United States at the time of the attack and his death.

1961.1726.    As a result of the August 6, 2011 attack, PO1 Pittman was injured in his person and/or property. The Plaintiff members of the Pittman Family are the survivors and/or heirs of PO1 Pittman and are entitled to recover for the damages PO1 Pittman sustained.

**The Brandon Prescott Family**

1962.1727.    Specialist Brandon Prescott served in Afghanistan as a member of the U.S. Army. On May 4, 2013, SPC Prescott was injured in an IED attack in Kandahar Province,

Afghanistan. SPC Prescott died on May 4, 2013 as a result of injuries sustained during the attack.

1963.1728.     The attack was committed by the Taliban.

1964.1729.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

1965.1730.     SPC Prescott's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

1966.1731.     SPC Prescott was a national of the United States at the time of the attack and his death.

1967.1732.     As a result of the May 4, 2013 attack, SPC Prescott was injured in his person and/or property. The Plaintiff members of the Prescott Family are the survivors and/or heirs of SPC Prescott and are entitled to recover for the damages SPC Prescott sustained.

**The Peter Provost Family**

1968.1733.    Mr. Peter Provost served in Afghanistan as a civilian contractor working for Fluor Corporation.  On November 12, 2016, Mr. Provost was injured in a suicide bombing attack in Parwan Province, Afghanistan.  Mr. Provost died on November 12, 2016 as a result of injuries sustained during the attack.

1969.1734.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1735.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1970.1736.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1971.1737.    Mr. Provost's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1972.1738.    Mr. Provost was a national of the United States at the time of the attack and his death.

1973.1739.    As a result of the November 12, 2016 attack, Mr. Provost was injured in his person and/or property. The Plaintiff members of the Provost Family are the survivors and/or heirs of Mr. Provost and are entitled to recover for the damages Mr. Provost sustained.

**The Christopher Raible Family**

1974.1740.    Lieutenant Colonel Christopher Raible served in Afghanistan as a member of the U.S. Marine Corps. On September 15, 2012, LtCol Raible was injured in a complex attack involving small arms fire and rocket propelled grenades in Helmand Province, Afghanistan. LtCol Raible died on September 15, 2012 as a result of injuries sustained during the attack.

1975.1741.    The attack was committed by the Taliban.

1976.1742.    LtCol Raible's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack was unlawfully wearing the uniform of his enemy.

1977.1743.    LtCol Raible was a national of the United States at the time of the attack and his death.

1978.1744.    As a result of the September 15, 2012 attack, LtCol Raible was injured in his person and/or property. The Plaintiff members of the Raible Family are the survivors and/or heirs of LtCol Raible and are entitled to recover for the damages LtCol Raible sustained.

**The Thomas Ratzlaff Family**

1979.1745.    Senior Chief Petty Officer (SEAL) Thomas Ratzlaff served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO (SEAL) Ratzlaff was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO (SEAL) Ratzlaff died on August 6, 2011 as a result of injuries sustained during the attack.

1980.1746.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

1981.1747.    SCPO (SEAL) Ratzlaff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1982.1748.    SCPO (SEAL) Ratzlaff was a national of the United States at the time of the attack and his death.

1983.1749.    As a result of the August 6, 2011 attack, SCPO (SEAL) Ratzlaff was injured in his person and/or property. The Plaintiff members of the Ratzlaff Family are the survivors and/or heirs of SCPO (SEAL) Ratzlaff and are entitled to recover for the damages SCPO (SEAL) Ratzlaff sustained.

**The Jarrold Reeves Jr. Family**

~~1984.~~1750.    Colonel (Ret.) Jarrold Reeves Jr. served in Afghanistan as a civilian contractor working for Fluor Corporation.  On November 12, 2016, COL (R) Reeves was injured in a suicide bombing attack in Parwan Province, Afghanistan.  COL (R) Reeves died on November 12, 2016 as a result of injuries sustained during the attack.

~~1985.~~1751.    The attack was committed by al‑Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al‑Qaeda-Taliban cell with al‑Qaeda providing and training the suicide bomber.

1752.   On information and belief, the ~~explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

~~1986.~~1753.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-

768

Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1987.1754.    COL (R) Reeves's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of a base employee in order to gain access to the base and the attack indiscriminately placed civilians at risk, killing American contractors, because it occurred on a large base with civilians working there.

1988.1755.    COL (R) Reeves was a national of the United States at the time of the attack and his death.

1989.1756.    As a result of the November 12, 2016 attack, COL (R) Reeves was injured in his person and/or property. The Plaintiff members of the Reeves Family are the survivors and/or heirs of COL (R) Reeves and are entitled to recover for the damages COL (R) Reeves sustained.

**The Chad Regelin Family**

1990.1757.    Petty Officer First Class Chad Regelin served in Afghanistan as a member of the U.S. Navy. On January 2, 2012, PO1 Regelin was injured in an IED attack in Helmand Province, Afghanistan. PO1 Regelin died on January 2, 2012 as a result of injuries sustained during the attack.

1991.1758.    The attack was committed by the Taliban.

1992.1759.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-

Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who~~ ~~converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~ ~~the Haqqani Network then distributed~~ chemists; and (iv) provided to the ~~cell that helped commit~~ ~~the~~ Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~1993.~~ 1760.    PO1 Regelin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~1994.~~ 1761.    PO1 Regelin was a national of the United States at the time of the attack and his death.

~~1995.~~ 1762.    As a result of the January 2, 2012 attack, PO1 Regelin was injured in his person and/or property. The Plaintiff members of the Regelin Family are the survivors and/or heirs of PO1 Regelin and are entitled to recover for the damages PO1 Regelin sustained.

**The Joseph Richardson Family**

~~1996.~~ 1763.    Sergeant Joseph Richardson served in Afghanistan as a member of the U.S. Army. On November 16, 2012, SGT Richardson was injured in a complex attack involving an IED and small arms fire in Paktika Province, Afghanistan. SGT Richardson died on November 16, 2012 as a result of injuries sustained during the attack.

~~1997.~~ 1764.    The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the

attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

1998.1765.    On information and belief, the explosive used in bomb that the joint cell detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

1999.1766.    SGT Richardson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2000.1767.    SGT Richardson was a national of the United States at the time of the attack and his death.

2001.1768.    As a result of the November 16, 2012 attack, SGT Richardson was injured in his person and/or property. The Plaintiff members of the Richardson Family are the survivors and/or heirs of SGT Richardson and are entitled to recover for the damages SGT Richardson sustained.

**The Colby Richmond Family**

2002.1769.     Sergeant Colby Richmond served in Afghanistan as a member of the U.S. Army. On August 25, 2011, SGT Richmond was injured in an IED attack in Helmand Province, Afghanistan. SGT Richmond died on August 25, 2011 as a result of injuries sustained during the attack.

2003.1770.     The attack was committed by the Taliban.

2004.1771.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2005.1772.     SGT Richmond's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2006.1773.     SGT Richmond was a national of the United States at the time of the attack and his death.

2007.1774.     As a result of the August 25, 2011 attack, SGT Richmond was injured in his person and/or property. The Plaintiff members of the Richmond Family are the survivors

and/or heirs of SGT Richmond and are entitled to recover for the damages SGT Richmond sustained.

**The Joseph Riley Family**

~~2008.~~1775.   Specialist Joseph Riley served in Afghanistan as a member of the U.S. Army.  On November 24, 2014, SPC Riley was injured in a vehicle-born IED attack in Kabul Province, Afghanistan.  SPC Riley died on November 24, 2014 as a result of injuries sustained during the attack.

1776.   The attack was committed by the Taliban (including ~~the~~its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

~~2009.~~1777.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1778.   On information and belief, the ~~explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious

justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

2010.1779.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2011.1780.   SPC Riley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the detonation of a vehicle indiscriminately placed civilians at risk.

2012.1781.   SPC Riley was a national of the United States at the time of the attack and his death.

2013.1782.   As a result of the November 24, 2014 attack, SPC Riley was injured in his person and/or property. The Plaintiff members of the Riley Family are the survivors and/or heirs of SPC Riley and are entitled to recover for the damages SPC Riley sustained.

**The Nathan Rimpf Family**

2014.1783.   Plaintiff First Lieutenant Nathan Rimpf served in Afghanistan as a member of the U.S. Army. On July 8, 2012, 1LT Rimpf was injured in an IED attack in Ghazni

Province, Afghanistan. The attack severely wounded 1LT Rimpf, who suffered the loss of his left leg below the knee, the loss of his right leg above the knee, and partial paralysis of his right scapula. As a result of the July 8, 2012 attack and his injuries, 1LT Rimpf has experienced severe physical and emotional pain and suffering.

2015.1784.    The attack was committed by the Taliban (including its Haqqani Network,) and al-Qaeda (a partdesignated FTO at the time of the Taliban.attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

2016.1785.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.  bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2017.1786.    The attack that injured 1LT Rimpf would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2018.1787.    1LT Rimpf was a national of the United States at the time of the attack, and remains one to this day.

2019.1788.    As a result of the July 8, 2012 attack and 1LT Rimpf's injuries, each member of the Rimpf Family has experienced severe mental anguish, emotional pain and suffering.

**The Michael Ristau Family**

2020.1789.    Sergeant Michael Ristau served in Afghanistan as a member of the U.S. Army.  On July 13, 2012, SGT Ristau was injured in an IED attack in Zabul Province, Afghanistan.  SGT Ristau died on July 13, 2012 as a result of injuries sustained during the attack.

2021.1790.    The attack was committed by the Haqqani Network, a part of the Taliban.

2022.1791.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which that the Haqqani Network purchased from Fatima or Pakarabdetonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into anal-Qaeda's IED manufacturing sites managed and funded by al-Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, whichchemists; and (iv) provided to the Haqqani Network then distributed to the cell that helped commit theby al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

2023.1792.    SGT Ristau's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED

neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2024.1793.    SGT Ristau was a national of the United States at the time of the attack and his death.

2025.1794.    As a result of the July 13, 2012 attack, SGT Ristau was injured in his person and/or property. The Plaintiff members of the Ristau Family are the survivors and/or heirs of SGT Ristau and are entitled to recover for the damages SGT Ristau sustained.

**The Heath Robinson Family**

2026.1795.    Senior Chief Petty Officer Heath Robinson served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Robinson was injured in an attack on a helicopter in Wardak Province, Afghanistan. SCPO Robinson died on August 6, 2011 as a result of injuries sustained during the attack.

2027.1796.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2028.1797.    SCPO Robinson's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2029.1798.    SCPO Robinson was a national of the United States at the time of the attack and his death.

2030.1799.    As a result of the August 6, 2011 attack, SCPO Robinson was injured in his person and/or property. The Plaintiff members of the Robinson Family are the survivors

and/or heirs of SCPO Robinson and are entitled to recover for the damages SCPO Robinson sustained.

### **The Rodolfo Rodriguez Family**

~~2031.~~1800.    Sergeant Rodolfo Rodriguez Jr. served in Afghanistan as a member of the U.S. Army. On September 14, 2011, SGT Rodriguez was injured in an IED attack in Kandahar Province, Afghanistan. SGT Rodriguez died on September 14, 2011 as a result of injuries sustained during the attack.

~~2032.~~1801.    The attack was committed by the Taliban.

~~2033.~~1802.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~2034.~~1803.    SGT Rodriguez's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2035.1804.    SGT Rodriguez was a national of the United States at the time of the attack and his death.

2036.1805.    As a result of the September 14, 2011 attack, SGT Rodriguez was injured in his person and/or property. The Plaintiff members of the Rodriguez Family are the survivors and/or heirs of SGT Rodriguez and are entitled to recover for the damages SGT Rodriguez sustained.

**The Matthew Roland Family**

2037.1806.    Captain Matthew Roland served in Afghanistan as a member of the U.S. Air Force. On August 26, 2015, Capt Roland was injured in an insider attack in Helmand Province, Afghanistan. Capt Roland died on August 26, 2015 as a result of injuries sustained during the attack.

2038.1807.    The attack was committed by the Taliban.

2039.1808.    Capt Roland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2040.1809.    Capt Roland was a national of the United States at the time of the attack and his death.

2041.1810.    As a result of the August 26, 2015 attack, Capt Roland was injured in his person and/or property. The Plaintiff members of the Roland Family are the survivors and/or heirs of Capt Roland and are entitled to recover for the damages Capt Roland sustained.

**The Angel Roldan Jr. Family**

2042.1811.    Mr. Angel Roldan Jr. served in Afghanistan as a civilian government contractor working for DynCorp, Int'l. On May 16, 2013, Mr. Roldan was injured in a suicide

bombing attack in Kabul Province, Afghanistan.  Mr. Roldan died on May 16, 2013 as a result of injuries sustained during the attack.

1812.   The attack was committed by the Taliban (including theits Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

2043.1813.      The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

1814.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

2044.1815.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2045.1816.     Mr. Roldan's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road during rush hour.

2046.1817.     Mr. Roldan was a national of the United States at the time of the attack and his death.

2047.1818.     As a result of the May 16, 2013 attack, Mr. Roldan was injured in his person and/or property. The Plaintiff members of the Roldan Family are the survivors and/or heirs of Mr. Roldan and are entitled to recover for the damages Mr. Roldan sustained.

**The Christopher Rosebrock Family**

2048.1819.     Plaintiff Captain Christopher Rosebrock served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rosebrock was injured in a suicide bombing attack in Faryab Province, Afghanistan. The attack severely wounded CPT Rosebrock, who suffers from disfiguring shrapnel wounds, muscular atrophy and reduced mobility in his left arm, a concussion, a traumatic brain injury, and blown eardrums. As a result

of the April 4, 2012 attack and his injuries, CPT Rosebrock has experienced severe physical and emotional pain and suffering.

~~2049.~~1820.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1821.   On information and belief, the ~~explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

~~2050.~~1822.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2051.1823.    The attack that injured CPT Rosebrock would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

2052.1824.    CPT Rosebrock was a national of the United States at the time of the attack, and remains one to this day.

2053.1825.    As a result of the April 4, 2012 attack and CPT Rosebrock's injuries, each member of the Rosebrock Family has experienced severe mental anguish, emotional pain and suffering.

**The Nicholas Rozanski Family**

2054.1826.    Captain Nicholas Rozanski served in Afghanistan as a member of the U.S. Army National Guard. On April 4, 2012, CPT Rozanski was injured in a suicide bombing attack in Faryab Province, Afghanistan. CPT Rozanski died on April 4, 2012 as a result of injuries sustained during the attack.

2055.1827.    The attack was committed by al-Qaeda (a designated FTO at the time of the attack) and the Taliban acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing, indoctrinating, and training the suicide bomber.

1828.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then

~~distributed to the cell that helped commit the attack.~~ suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

~~2056.~~1829.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~2057.~~1830.    CPT Rozanski's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred in a public park.

~~2058.~~1831.    CPT Rozanski was a national of the United States at the time of the attack and his death.

~~2059.~~1832.    As a result of the April 4, 201 attack, CPT Rozanski was injured in his person and/or property. The Plaintiff members of the Rozanski Family are the survivors and/or heirs of CPT Rozanski and are entitled to recover for the damages CPT Rozanski sustained.

**The Joshua Sams Family**

~~2060.~~1833.    Plaintiff Corporal Joshua Sams served in Afghanistan as a member of the U.S. Marine Corps. ~~On~~ January 12, 2012, Cpl Sams was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Sams, who suffered the loss of both legs above the knee, the loss of two fingers on his right hand, and the loss of his right testicle, his anus, his colon, and three feet of intestine, which results in erectile dysfunction, urinary incontinence, and a permanent colostomy. As a result of the January 12, 2012 attack and his injuries, Cpl Sams has experienced severe physical and emotional pain and suffering.

~~2061.~~1834.    The attack was committed by the Taliban.

~~2062.~~1835.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~2063.~~1836.    The attack that injured Cpl Sams would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2064.1837.    Cpl Sams was a national of the United States at the time of the attack, and remains one to this day.

2065.1838.    As a result of the January 12, 2012 attack and Cpl Sams's injuries, each member of the Sams Family has experienced severe mental anguish, emotional pain and suffering.

**The Rex Schad Family**

2066.1839.    Staff Sergeant Rex Schad served in Afghanistan as a member of the U.S. Army. On March 11, 2013, SSG Schad was injured in an insider attack in Wardak Province, Afghanistan. SSG Schad died on March 11, 2013 as a result of injuries sustained during the attack.

2067.1840.    The attack was committed by the Haqqani Network, a part of the Taliban.

2068.1841.    SSG Schad's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2069.1842.    SSG Schad was a national of the United States at the time of the attack and his death.

2070.1843.    As a result of the March 11, 2013 attack, SSG Schad was injured in his person and/or property. The Plaintiff members of the Schad Family are the survivors and/or heirs of SSG Schad and are entitled to recover for the damages SSG Schad sustained.

**The Jonathan Schmidt Family**

2071.1844.    Staff Sergeant Jonathan Schmidt served in Afghanistan as a member of the U.S. Army. On September 1, 2012, SSG Schmidt was injured in a complex attack involving

small arms fire and grenades in Ghazni Province, Afghanistan. SSG Schmidt died on September 1, 2012 as a result of injuries sustained during the attack.

2072.1845.    The attack was committed by the Taliban (including its Haqqani Network, ), al-Qaeda (a partdesignated FTO at the time of the Talibanattack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

2073.1846.    SSG Schmidt's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2074.1847.    SSG Schmidt was a national of the United States at the time of the attack and his death.

2075.1848.    As a result of the September 1, 2012 attack, SSG Schmidt was injured in his person and/or property. The Plaintiff members of the Schmidt Family are the survivors and/or heirs of SSG Schmidt and are entitled to recover for the damages SSG Schmidt sustained.

**The Mark Schoonhoven Family**

2076.1849.    Staff Sergeant Mark Schoonhoven served in Afghanistan as a member of the U.S. Army. On December 15, 2012, SSG Schoonhoven was injured in an IED attack in Kabul Province, Afghanistan. SSG Schoonhoven died on January 20, 2013 as a result of injuries sustained during the attack.

2077.1850.    The attack was committed by the Taliban (including theits Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a

joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1851.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

2078.1852.   On information and belief, the bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2079.1853.   SSG Schoonhoven's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2080.1854.   SSG Schoonhoven was a national of the United States at the time of the attack and his death.

2081.1855.   As a result of the December 15, 2012 attack, SSG Schoonhoven was injured in his person and/or property. The Plaintiff members of the Schoonhoven Family are the survivors and/or heirs of SSG Schoonhoven and are entitled to recover for the damages SSG Schoonhoven sustained.

**The Jacob Schwallie Family**

2082.1856.   Sergeant Jacob Schwallie served in Afghanistan as a member of the U.S. Army. On May 7, 2012, SGT Schwallie was injured in an IED attack in Ghazni Province, Afghanistan. SGT Schwallie died on May 7, 2012 as a result of injuries sustained during the attack.

2083.1857.   The attack was committed by the Taliban (including its Haqqani Network, ) and al-Qaeda (a partdesignated FTO at the time of the Taliban.attack), acting together as a joint cell led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

2084.1858.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. bomb that the joint cell detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and

funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2085.1859.    SGT Schwallie's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2086.1860.    SGT Schwallie was a national of the United States at the time of the attack and his death.

2087.1861.    As a result of the May 7, 2012 attack, SGT Schwallie was injured in his person and/or property. The Plaintiff members of the Schwallie Family are the survivors and/or heirs of SGT Schwallie and are entitled to recover for the damages SGT Schwallie sustained.

**The Samuel Shockley Family**

2088.1862.    Plaintiff Staff Sergeant Samuel Shockley served in Afghanistan as a member of the U.S. Army. On March 17, 2013, SSG Shockley was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SSG Shockley, who suffered the loss of both legs above the knee, the loss of his middle finger and index finger on his right hand, a skin graph on his right arm from his elbow to his wrist, and missing a testicle. As a result of the March 17, 2013 attack and his injuries, SSG Shockley has experienced severe physical and emotional pain and suffering.

2089.1863.    The attack was committed by the Taliban.

2090.1864.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group

CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributed chemists; and (iv) provided to the cell that helped commit the Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2091. 1865.     The attack that injured SSG Shockley would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2092. 1866.     SSG Shockley was a national of the United States at the time of the attack, and remains one to this day.

2093. 1867.     As a result of the March 17, 2013 attack and SSG Shockley's injuries, each member of the Shockley Family has experienced severe mental anguish, emotional pain and suffering.

**The Forrest Sibley Family**

2094. 1868.     Staff Sergeant Forrest Sibley served in Afghanistan as a member of the U.S. Air Force. On August 26, 2015, SSgt Sibley was injured in an insider attack in Helmand Province, Afghanistan. SSgt Sibley died on August 26, 2015 as a result of injuries sustained during the attack.

2095. 1869.     The attack was committed by the Taliban.

2096.1870.   SSgt Sibley's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2097.1871.   SSgt Sibley was a national of the United States at the time of the attack and his death.

2098.1872.   As a result of the August 26, 2015 attack, SSgt Sibley was injured in his person and/or property. The Plaintiff members of the Sibley Family are the survivors and/or heirs of SSgt Sibley and are entitled to recover for the damages SSgt Sibley sustained.

**The Billy Siercks Family**

2099.1873.   First Sergeant Billy Siercks served in Afghanistan as a member of the U.S. Army.  On September 27, 2011, 1SG Siercks was injured in an indirect fire attack in Logar Province, Afghanistan.  1SG Siercks died on September 28, 2011 as a result of injuries sustained during the attack.

2100.1874.   The attack was committed by the Haqqani Network, a part of the Taliban.

2101.1875.   1SG Siercks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and indiscriminately placed civilians at risk.

2102.1876.   1SG Siercks was a national of the United States at the time of the attack and his death.

2103.1877.   As a result of the September 27, 201 attack, 1SG Siercks was injured in his person and/or property.  The Plaintiff members of the Siercks Family are the survivors and/or heirs of 1SG Siercks and are entitled to recover for the damages 1SG Siercks sustained.

**The Anne Smedinghoff Family**

~~2104.~~1878.     Ms. Anne Smedinghoff served in Afghanistan as a U.S. Foreign Service Officer working for the U.S. Department of State. On April 6, 2013, Ms. Smedinghoff was injured in a suicide bombing attack in Zabul Province, Afghanistan. Ms. Smedinghoff died on April 6, 2013 as a result of injuries sustained during the attack.

~~2105.~~1879.     The attack was committed by the Taliban (including the Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell in the Kabul Attack Network.

~~2106.~~1880.     On information and belief, the ~~explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~ suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

1881.   On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda

bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2107.1882.    Ms. Smedinghoff's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, she was a civilian State DépartementDepartment Employee not taking part in hostilities and escorting Afghan journalists covering American officials donating books to a school.

2108.1883.    Ms. Smedinghoff was a national of the United States at the time of the attack and her death.

1884.   As a result of the April 6, 2013 attack, Ms. Smedinghoff was injured in her person and/or property. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

**The Orion Sparks Family**

2109.1.        Staff Sergeant Orion Sparks served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in Logar Province, Afghanistan. The Plaintiff members of the Smedinghoff Family are the survivors and/or heirs of Ms. Smedinghoff and are entitled to recover for the damages Ms. Smedinghoff sustained.

**The Orion Sparks Family**

2110.1885.    Staff Sergeant Orion Sparks served in Afghanistan as a member of the U.S. Army. On September 26, 2012, SSG Sparks was injured in a suicide bombing attack in

~~Logar Province, Afghanistan.~~ SSG Sparks died on September 26, 2012 as a result of injuries sustained during the attack.

~~2111.~~1886.     The attack was committed by the Taliban (including ~~the~~its Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

1887.   ~~On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.~~On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

~~2112.~~1888.     On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2113.1889.    SSG Sparks's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2114.1890.    SSG Sparks was a national of the United States at the time of the attack and his death.

2115.1891.    As a result of the September 26, 2012 attack, SSG Sparks was injured in his person and/or property. The Plaintiff members of the Sparks Family are the survivors and/or heirs of SSG Sparks and are entitled to recover for the damages SSG Sparks sustained.

**The Nicholas Spehar Family**

2116.1892.    Petty Officer 2nd Class Nicholas Spehar served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO2 Spehar was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO2 Spehar died on August 6, 2011 as a result of injuries sustained during the attack.

2117.1893.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2118.1894.    PO2 Spehar's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2119.1895.    PO2 Spehar was a national of the United States at the time of the attack and his death.

2120.1896.     As a result of the August 6, 2011 attack, PO2 Spehar was injured in his person and/or property. The Plaintiff members of the Spehar Family are the survivors and/or heirs of PO2 Spehar and are entitled to recover for the damages PO2 Spehar sustained.

**The Cameron Stambaugh Family**

2121.1897.     Specialist Cameron Stambaugh served in Afghanistan as a member of the U.S. Army.  On July 8, 2012, SPC Stambaugh was injured in an IED attack in Wardak Province, Afghanistan.  SPC Stambaugh died on July 8, 2012 as a result of injuries sustained during the attack.

2122.1898.     The attack was committed by the Haqqani Network, a part of the Taliban.

2123.1899.     On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which that the Haqqani Network purchased from Fatima or Pakarab detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which chemists; and (iv) provided to the Haqqani Network then distributed to the cell that helped commit the by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

2124.1900.     SPC Stambaugh's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~2125.~~1901.     SPC Stambaugh was a national of the United States at the time of the attack and his death.

~~2126.~~1902.     As a result of the July 8, 2012 attack, SPC Stambaugh was injured in his person and/or property. The Plaintiff members of the Stambaugh Family are the survivors and/or heirs of SPC Stambaugh and are entitled to recover for the damages SPC Stambaugh sustained.

**Daniel Stamper Jr.**

~~2127.~~1903.     Plaintiff Sergeant Daniel Stamper Jr. served in Afghanistan as a member of the U.S. Army. On April 26, 2012, SGT Stamper was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Stamper, who suffers from a traumatic brain injury. As a result of the April 26, 2012 attack and his injuries, SGT Stamper has experienced severe physical and emotional pain and suffering.

~~2128.~~1904.     The attack was committed by the Taliban.

~~2129.~~1905.     On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~ signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~ Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~ chemists; and (iv) provided to the ~~cell that helped commit the~~ Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2130.1906.    The attack that injured SGT Stamper would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2131.1907.    SGT Stamper was a national of the United States at the time of the attack, and remains one to this day.

**The Michael Strange Family**

2132.1908.    Petty Officer 1st Class Michael Strange served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, PO1 Strange was injured in an attack on a helicopter in Wardak Province, Afghanistan. PO1 Strange died on August 6, 2011 as a result of injuries sustained during the attack.

2133.1909.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2134.1910.    PO1 Strange's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2135.1911.    PO1 Strange was a national of the United States at the time of the attack and his death.

2136.1912.    As a result of the August 6, 2011 attack, PO1 Strange was injured in his person and/or property. The Plaintiff members of the Strange Family are the survivors and/or heirs of PO1 Strange and are entitled to recover for the damages PO1 Strange sustained.

**The Joshua Strickland Family**

2137.1913.     Sergeant Joshua Strickland served in Afghanistan as a member of the U.S. Army. On September 21, 2013, SGT Strickland was injured in an insider attack in Paktia Province, Afghanistan. SGT Strickland died on September 21, 2013 as a result of injuries sustained during the attack.

2138.1914.     The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

2139.1915.     SGT Strickland's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2140.1916.     SGT Strickland was a national of the United States at the time of the attack and his death.

2141.1917.     As a result of the September 21, 2013 attack, SGT Strickland was injured in his person and/or property. The Plaintiff members of the Strickland Family are the survivors and/or heirs of SGT Strickland and are entitled to recover for the damages SGT Strickland sustained.

**The Cameron Stuart Family**

2142.1918.     Plaintiff Sergeant Cameron Stuart served in Afghanistan as a member of the U.S. Army. On September 30, 2012, SGT Stuart was injured in an IED attack in Kandahar Province, Afghanistan. The attack severely wounded SGT Stuart, who suffers from severe damage to his left leg, which required several reconstructive surgeries. As a result of the

September 30, 2012 attack and his injuries, SGT Stuart has experienced severe physical and emotional pain and suffering.

2143.1919.    The attack was committed by the Taliban.

2144.1920.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating out at one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into anal-Qaeda's IED manufacturing sites managed and funded by al-Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commitTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2145.1921.    The attack that injured SGT Stuart would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2146.1922.    SGT Stuart was a national of the United States at the time of the attack, and remains one to this day.

2147.1923.    As a result of the September 30, 2012 attack and SGT Stuart's injuries, each member of the Stuart Family has experienced severe mental anguish, emotional pain and suffering.

**Joshua Sust**

2148.1924.    Plaintiff Corporal Joshua Sust served in Afghanistan as a member of the U.S. Marine Corps. On November 12, 2011, Cpl Sust was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Sust, who suffered the loss of his left leg below the knee, open fractures to his left arm, a traumatic brain injury, and post-traumatic stress disorder. As a result of the November 12, 2011 attack and his injuries, Cpl Sust has experienced severe physical and emotional pain and suffering.

2149.1925.    The attack was committed by the Taliban.

2150.1926.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2151.1927.    The attack that injured Cpl Sust would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2152.1928.    Cpl Sust was a national of the United States at the time of the attack, and remains one to this day.

**The Barry Sutton Family**

~~2153.~~1929.   Mr. Barry Sutton served in Afghanistan as a civilian government contractor working for DynCorp Free Zone. On August 22, 2015, Mr. Sutton was injured in a suicide bombing attack in Kabul Province, Afghanistan. Mr. Sutton died on August 22, 2015 as a result of injuries sustained during the attack.

1930.   The attack was committed by the Taliban (including ~~theits~~ Haqqani Network, a designated FTO at the time of the attack), al-Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together as a joint cell, led by dual-hatted al-Qaeda/Taliban terrorist Ahmed Jan Wazir, in the Kabul Attack Network.

~~2154.~~1931.   The attack was planned by al-Qaeda (a designated FTO at the time of the attack), including, but not limited to, dual-hatted al-Qaeda/Taliban terrorist Sirajuddin Haqqani, who personally coordinated the Kabul Attack Network's funding, logistics, personnel, and weapons supply in his capacity as a member of al-Qaeda's military council, and helped choose the general time and target for the attack.

~~2155.~~1932.   On information and belief, the ~~explosive used in~~ device that the suicide bomber detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda design; (ii) assembled and ~~then transported to~~tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~al-Qaeda's bombmaking sites managed and funded by al-Qaeda ~~CAN fertilizer bomb derived from~~/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani~~

Network then distributed chemists; and (iv) provided to the joint cell that helped commit the by al-Qaeda operatives in order to facilitate the joint cell's attack.

1933.   On information and belief, the suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

2156.1934.   Mr. Sutton's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, he was a civilian not taking part in hostilities, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk, killing multiple Afghan civilians, because it occurred on a public road in front of a private hospital.

2157.1935.   Mr. Sutton was a national of the United States at the time of the attack and his death.

2158.1936.   As a result of the August 22, 2015 attack, Mr. Sutton was injured in his person and/or property. The Plaintiff members of the Sutton Family are the survivors and/or heirs of Mr. Sutton and are entitled to recover for the damages Mr. Sutton sustained.

**The Ryan Timoney Family**

2159.1937.   Plaintiff Captain Ryan Timoney served in Afghanistan as a member of the U.S. Army. On May 20, 2012, CPT Timoney was injured in a suicide bombing attack in Uruzgan Province, Afghanistan. The attack severely wounded CPT Timoney, who lost his left

leg, suffered shrapnel injuries to his left arm, left chest, left abdomen, and left side of his skull, and also suffers from spinal pain, seizures, physical limitations, and speech, reading and vision difficulty.  As a result of the May 20, 2012 attack and his injuries, CPT Timoney has experienced severe physical and emotional pain and suffering.

2160.1938.    The attack was committed by the Taliban and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell with al-Qaeda providing and training the suicide bomber.

1939.   On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack.suicide bomber who detonated the bomb during the attack was:  (i) indoctrinated by al-Qaeda regarding the purported religious justification that permitted the attack; (ii) trained by al-Qaeda regarding al-Qaeda's tactics, techniques, and procedures for suicide bombers; (iii) deployed by al-Qaeda to Afghanistan in order to attack Americans there; and (iv) a member of al-Qaeda under al-Qaeda training procedures for suicide attackers, as a result of the bomber pledging loyalty to al-Qaeda to create a point of no return.

2161.1940.    On information and belief, the device that the suicide bomber detonated during the attack was:  (i) based on a signature al-Qaeda design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's bombmaking sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that

were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2162.1941.    The attack that injured CPT Timoney would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2163.1942.    CPT Timoney was a national of the United States at the time of the attack, and remains one to this day.

2164.1943.    As a result of the May 20, 2012 attack and CPT Timoney's injuries, each member of the Timoney Family has experienced severe mental anguish, emotional pain and suffering.

**Frederick Tolon**

2165.1944.    Plaintiff Sergeant Frederick Tolon served in Afghanistan as a member of the U.S. Army. On October 10, 2011, SGT Tolon was injured in a complex attack involving small arms fire and indirect fire in Kandahar Province, Afghanistan. The attack severely wounded SGT Tolon, who suffers from severely deforming scarring on his chest with shrapnel pieces remaining in his chest, nerve damage to, and very limited mobility of, the right arm, permanent partial vision loss, traumatic brain injury, tinnitus, post-traumatic stress disorder, and anxiety. As a result of the October 10, 2011 attack and his injuries, SGT Tolon has experienced severe physical and emotional pain and suffering.

2166.1945.    The attack was committed by the Taliban.

2167.1946.    The attack that injured SGT Tolon would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~2168.~~1947.      SGT Tolon was a national of the United States at the time of the attack, and remains one to this day.

**The Aaron Torian Family**

~~2169.~~1948.      Master Sergeant Aaron Torian served in Afghanistan as a member of the U.S. Marine Corps. On February 15, 2014, MSgt Torian was injured in an IED attack in Helmand Province, Afghanistan. MSgt Torian died on February 15, 2014 as a result of injuries sustained during the attack.

~~2170.~~1949.      The attack was committed by the Taliban.

~~2171.~~1950.      On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was: (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~2172.~~1951.      MSgt Torian's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted

the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2173.1952.    MSgt Torian was a national of the United States at the time of the attack and his death.

2174.1953.    As a result of the February 15, 2014 attack, MSgt Torian was injured in his person and/or property. The Plaintiff members of the Torian Family are the survivors and/or heirs of MSgt Torian and are entitled to recover for the damages MSgt Torian sustained.

**The Jon Townsend Family**

2175.1954.    Private First Class Jon Townsend served in Afghanistan as a member of the U.S. Army. On September 16, 2012, PFC Townsend was injured in an insider attack in Zabul Province, Afghanistan. PFC Townsend died on September 16, 2012 as a result of injuries sustained during the attack.

2176.1955.    The attack was committed by the Haqqani Network, a part of the Taliban.

2177.1956.    PFC Townsend's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist who committed the attack was unlawfully wearing the uniform of his enemy.

2178.1957.    PFC Townsend was a national of the United States at the time of the attack and his death.

2179.1958.    As a result of the September 16, 2012 attack, PFC Townsend was injured in his person and/or property. The Plaintiff members of the Townsend Family are the survivors and/or heirs of PFC Townsend and are entitled to recover for the damages PFC Townsend sustained.

**Kevin Trimble**

2180.1959.     Plaintiff Private First Class Kevin Trimble served in Afghanistan as a member of the U.S. Army.  On September 17, 2012, PFC Trimble was injured in an IED attack in Kandahar Province, Afghanistan.  The attack severely wounded PFC Trimble, who lost both legs above the knee, lost his left arm above the elbow, and also suffers from post-traumatic stress disorder and partial hearing loss.  As a result of the September 17, 2012 attack and his injuries, PFC Trimble has experienced severe physical and emotional pain and suffering.

2181.1960.     The attack was committed by the Taliban.

2182.1961.     On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2183.1962.     The attack that injured PFC Trimble would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2184.1963.     PFC Trimble was a national of the United States at the time of the attack, and remains one to this day.

**Christopher Van Etten**

~~2185.~~1964.    Plaintiff Corporal Christopher Van Etten served in Afghanistan as a member of the U.S. Marine Corps. On June 13, 2012, Cpl Van Etten was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded Cpl Van Etten, who suffered the loss of his right leg below the knee, the loss of his left leg above the knee, and a traumatic brain injury. As a result of the June 13, 2012 attack and his injuries, Cpl Van Etten has experienced severe physical and emotional pain and suffering.

~~2186.~~1965.    The attack was committed by the Taliban.

~~2187.~~1966.    On information and belief, the ~~explosive used in~~ bomb that the Taliban detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~2188.~~1967.    The attack that injured Cpl Van Etten would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2189.1968.     Cpl Van Etten was a national of the United States at the time of the attack, and remains one to this day.

**The Aaron Vaughn Family**

2190.1969.     Chief Petty Officer Aaron Vaughn served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, CPO Vaughn was injured in an attack on a helicopter in Wardak Province, Afghanistan. CPO Vaughn died on August 6, 2011 as a result of injuries sustained during the attack.

2191.1970.     The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2192.1971.     CPO Vaughn's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2193.1972.     CPO Vaughn was a national of the United States at the time of the attack and his death.

2194.1973.     As a result of the August 6, 2011 attack, CPO Vaughn was injured in his person and/or property. The Plaintiff members of the Vaughn Family are the survivors and/or heirs of CPO Vaughn and are entitled to recover for the damages CPO Vaughn sustained.

**The Kraig Vickers Family**

2195.1974.     Senior Chief Petty Officer Kraig Vickers served in Afghanistan as a member of the U.S. Navy. On August 6, 2011, SCPO Vickers was injured in an attack on a

helicopter in Wardak Province, Afghanistan. SCPO Vickers died on August 6, 2011 as a result of injuries sustained during the attack.

2196.1975.    The attack was committed by the Haqqani Network (a part of the Taliban) and al-Qaeda (a designated FTO at the time of the attack) acting together in a joint al-Qaeda-Taliban cell.

2197.1976.    SCPO Vickers's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2198.1977.    SCPO Vickers was a national of the United States at the time of the attack and his death.

2199.1978.    As a result of the August 6, 2011 attack, SCPO Vickers was injured in his person and/or property. The Plaintiff members of the Vickers Family are the survivors and/or heirs of SCPO Vickers and are entitled to recover for the damages SCPO Vickers sustained.

**The Seth Wakeling Family**

2200.1979.    Plaintiff Specialist Seth Wakeling served in Afghanistan as a member of the U.S. Army. On September 26, 2013, SPC Wakeling was injured in an IED attack in Wardak Province, Afghanistan. The attack severely wounded SPC Wakeling, who lost his left leg below the knee and sustained other severe injuries. As a result of the September 26, 2013 attack and his injuries, SPC Wakeling has experienced severe physical and emotional pain and suffering.

2201.1980.    The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

~~2202.~~1981.    On information and belief, the ~~explosive used in the attack was a CAN fertilizer~~ bomb ~~sourced from Fatima Group CAN Fertilizer, which~~ that the Haqqani Network ~~purchased from Fatima or Pakarab~~ detonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~ at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda ~~CAN fertilizer bomb derived from~~/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~ chemists; and (iv) provided to the Haqqani Network ~~then distributed to the cell that helped commit the~~ by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

~~2203.~~1982.    The attack that injured SPC Wakeling would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

~~2204.~~1983.    SPC Wakeling was a national of the United States at the time of the attack, and remains one to this day.

~~2205.~~1984.    As a result of the September 26, 2013 attack and SPC Wakeling's injuries, each member of the Wakeling Family has experienced severe mental anguish, emotional pain and suffering.

**The Nickolas Welch Family**

~~2206.~~1985.    Specialist Nickolas Welch served in Afghanistan as a member of the U.S. Army. On July 23, 2013, SPC Welch was injured in an IED attack in Wardak Province,

Afghanistan. SPC Welch died on August 6, 2013 as a result of injuries sustained during the attack.

~~2207.~~1986.    The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

~~2208.~~1987.    On information and belief, the ~~explosive used in the attack was a CAN fertilizer~~ bomb ~~sourced from Fatima Group CAN Fertilizer, which~~ that the Haqqani Network ~~purchased from Fatima or Pakarab~~detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda ~~CAN fertilizer bomb derived from~~/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which~~chemists; and (iv) provided to the Haqqani Network ~~then distributed to the cell that helped commit the~~by al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

~~2209.~~1988.    SPC Welch's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~2210.~~1989.    SPC Welch was a national of the United States at the time of the attack and his death.

~~2211.~~1990.    As a result of the July 23, 2013 attack, SPC Welch was injured in his person and/or property. The Plaintiff members of the Welch Family are the survivors and/or heirs of SPC Welch and are entitled to recover for the damages SPC Welch sustained.

**The Jeffrey White Jr. Family**

~~2212.~~1991.    Specialist Jeffrey White Jr. served in Afghanistan as a member of the U.S. Army. On April 3, 2012, SPC White was injured in an IED attack in Khost Province, Afghanistan. SPC White died on April 3, 2012 as a result of injuries sustained during the attack.

~~2213.~~1992.    The attack was committed by the Haqqani Network (a part of the Taliban), al–Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

~~2214.~~1993.    On information and belief, the ~~explosive used in~~ bomb that the joint cell detonated during the attack was:  (i) based on a ~~CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from~~at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

~~2215.~~1994.    SPC White's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

~~2216.~~1995.    SPC White was a national of the United States at the time of the attack and his death.

2217.1996.    As a result of the April 3, 2012 attack, SPC White was injured in his person and/or property. The Plaintiff members of the White Family are the survivors and/or heirs of SPC White and are entitled to recover for the damages SPC White sustained.

**The James Wickliff Chacin Family**

2218.1997.    Specialist James Wickliff Chacin served in Afghanistan as a member of the U.S. Army. On August 12, 2013, SPC Wickliff Chacin was injured in an IED attack in Logar Province, Afghanistan. SPC Wickliff Chacin died on September 20, 2013 as a result of injuries sustained during the attack.

2219.1998.    The attack was committed by the Haqqani Network, a designated FTO at the time of the attack and part of the Taliban.

2220.1999.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab and then transported to al-Qaeda bombmakers operating out of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived from al-Qaeda schematics, which the Haqqani Network then distributed to the cell that helped commit the attack. bomb that the joint cell detonated during the attack was:  (i) based on a signature al-Qaeda IED design; (ii) assembled and tested by al-Qaeda bombmakers at one of al-Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda chemists; and (iv) provided to the joint cell by al-Qaeda operatives in order to facilitate the joint cell's attack.

2221.2000.    SPC Wickliff-Chacin's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who

planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2222.2001.    SPC Wickliff Chacin was a national of the United States at the time of the attack and his death.

2223.2002.    As a result of the August 12, 2013 attack, SPC Wickliff Chacin was injured in his person and/or property. The Plaintiff members of the Wickliff Chacin Family are the survivors and/or heirs of SPC Wickliff Chacin and are entitled to recover for the damages SPC Wickliff Chacin sustained.

**Brian Williams**

2224.2003.    Plaintiff Staff Sergeant Brian Williams served in Afghanistan as a member of the U.S. Air Force. On April 25, 2012, SSgt Williams was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SSgt Williams, who suffered the immediate loss of his left leg below the knee during the blast, which later had to be amputated higher, the loss of his left testicle due to trauma, a compound fracture of the left arm, ruptured eardrums, missing teeth, soft tissue damage all over his body, and a traumatic brain injury. As a result of the April 25, 2012 attack and his injuries, SSgt Williams has experienced severe physical and emotional pain and suffering.

2225.2004.    The attack was committed by the Taliban.

2226.2005.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was:  (i) based on a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarabsignature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who

converted such fertilizer into an al-Qaeda CAN fertilizer bomb derived fromQaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, which the Haqqani Network then distributedchemists; and (iv) provided to the cell that helped commit theTaliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

2227.2006.    The attack that injured SSgt Williams would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the ID neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

2228.2007.    SSgt Williams was a national of the United States at the time of the attack, and remains one to this day.

**The Clarence Williams III Family**

2229.2008.    Specialist Clarence Williams III served in Afghanistan as a member of the U.S. Army. On July 8, 2012, SPC Williams was injured in an IED attack in Wardak Province, Afghanistan. SPC Williams died on July 8, 2012 as a result of injuries sustained during the attack.

2230.2009.    The attack was committed by the Haqqani Network, a part of the Taliban.

2231.2010.    On information and belief, the explosive used in the attack was a CAN fertilizer bomb sourced from Fatima Group CAN Fertilizer, whichthat the Haqqani Network purchased from Fatima or Pakarabdetonated during the attack was: (i) based on a signature al-Qaeda IED design; (ii) assembled and then transported to tested by al-Qaeda bombmakers operating outat one of joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into anal-Qaeda's IED manufacturing sites managed and funded by al-

Qaeda CAN fertilizer bomb derived from/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda schematics, whichchemists; and (iv) provided to the Haqqani Network then distributed to the cell that helped commit theby al-Qaeda operatives in order to facilitate the Haqqani Network's attack.

2232.2011.    SPC Williams's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants, and the passive detonation system indiscriminately placed civilians at risk.

2233.2012.    SPC Williams was a national of the United States at the time of the attack and his death.

2234.2013.    As a result of the July 8, 2012 attack, SPC Williams was injured in his person and/or property. The Plaintiff members of the Williams Family are the survivors and/or heirs of SPC Williams and are entitled to recover for the damages SPC Williams sustained.

**The Mark Worley Family**

2235.2014.    Plaintiff Sergeant Mark Worley served in Afghanistan as a member of the U.S. Army. On August 11, 2012, SGT Worley was injured in an IED attack in Helmand Province, Afghanistan. The attack severely wounded SGT Worley, who lost his right leg below the knee, and sustained nerve damage in left leg with dropfoot and a deep laceration to his right forearm. As a result of the August 11, 2012 attack and his injuries, SGT Worley has experienced severe physical and emotional pain and suffering.

2236.2015.    The attack was committed by the Taliban.

2237.2016.    On information and belief, the explosive used in bomb that the Taliban detonated during the attack was: (i) based on a CAN fertilizer bomb sourced from Fatima Group

819

~~CAN Fertilizer, which the Haqqani Network purchased from Fatima or Pakarab~~signature al-Qaeda IED design; (ii) assembled and ~~then transported to~~ tested by al-Qaeda bombmakers ~~operating out~~at one of ~~joint al-Qaeda/Haqqani Network bomb factories in Pakistan, who converted such fertilizer into an~~ al-~~Qaeda CAN fertilizer bomb derived from~~Qaeda's IED manufacturing sites managed and funded by al-Qaeda/Taliban terrorist Sirajuddin Haqqani; (iii) designed to detonate precursor ingredients that were "cooked" by al-Qaeda ~~schematics, which the Haqqani Network then distributed~~chemists; and (iv) provided to the ~~cell that helped commit the~~Taliban by al-Qaeda operatives in order to facilitate the Taliban's attack.

~~2238.~~2017.    The attack that injured SGT Worley would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted the IED neither wore uniforms nor otherwise identified themselves as enemy combatants and the passive detonation system indiscriminately placed civilians at risk.

~~2239.~~2018.    SGT Worley was a national of the United States at the time of the attack, and remains one to this day.

~~2240.~~2019.    As a result of the August 11, 2012 attack and SGT Worley's injuries, each member of the Worley Family has experienced severe mental anguish, emotional pain and suffering.

**The Sonny Zimmerman Family**

~~2241.~~2020.    Staff Sergeant Sonny Zimmerman served in Afghanistan as a member of the U.S. Army. On July 15, 2013, SSG Zimmerman was injured in an attack involving a recoilless rifle in Paktia Province, Afghanistan. SSG Zimmerman died on July 16, 2013 as a result of injuries sustained during the attack.

2242.2021.     The attack was committed by the Haqqani Network (a designated FTO at the time of the attack and a part of the Taliban), al–Qaeda (a designated FTO at the time of the attack), and Lashkar-e-Taiba (a designated FTO at the time of the attack) acting together in a joint cell.

2243.2022.     SSG Zimmerman's murder would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

2244.2023.     SSG Zimmerman was a national of the United States at the time of the attack and his death.

2245.2024.     As a result of the July 15, 2013 attack, SSG Zimmerman was injured in his person and/or property. The Plaintiff members of the Zimmerman Family are the survivors and/or heirs of SSG Zimmerman and are entitled to recover for the damages SSG Zimmerman sustained.

## CLAIMS FOR RELIEF

Formatte

## COUNT ONE: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants: Aiding-And-Abetting Liability, Attack Predicate]

2246.2025.   Plaintiffs incorporate their factual allegations above.

2247.2026.   The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by al-Qaeda and the Taliban, including its Haqqani Network.

2248.2027.   The terrorist attacks committed by al-Qaeda and the Taliban, including its Haqqani Network, whichthat killed or injured Plaintiffs and their family members, were acts of international terrorism because they were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States. In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

2249.2028.   Al-Qaeda's and the Taliban's, including its Haqqani Network's, terrorist attacksThe attacks that killed or injured Plaintiffs appear to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation

and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2250.2029.    Al-Qaeda's and the Taliban's, including its Haqqani Network's, terrorist attacks The attacks that injured Plaintiffs occurred primarily outside the territorial jurisdiction of the United States.

2251.   Defendants aided and abetted and knowingly provided substantial assistance to al-Qaeda and the Taliban, including its Haqqani Network—and aided and abetted and knowingly provided substantial assistance to al-Qaeda's and the Taliban's, including the Haqqani Network's, attacks on Plaintiffs—by facilitating al-Qaeda's and the Taliban's, including the Haqqani Network's, unending supply of Fatima Group CAN Fertilizer for use in CAN fertilizer bombs targeting Americans in Afghanistan, and by providing essential U.S. Dollar-related financial services to al-Qaeda and Taliban, including Haqqani Network, agents, operatives, and fronts to facilitate the repatriation of millions in overseas al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and/or D-Company income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

2252.2030.    The al-Qaeda and Taliban, including Haqqani Network,The attacks that killed or injured Plaintiffs and their family members were committed, planned, and/or authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1999, and by the Haqqani Network, which the United States has likewise designated since 2012.

2031.   Defendants provided substantial assistance to the terrorist organizations behind the attacks, thus aiding and abetting the attacks by facilitating al-Qaeda's and the Taliban's, including the Haqqani Network's, unending supply of Fatima Group CAN Fertilizer for use in

CAN fertilizer bombs targeting Americans in Afghanistan, and by providing essential U.S. Dollar-related financial services to al-Qaeda and Taliban, including Haqqani Network, agents, operatives, and fronts to facilitate the repatriation of millions in overseas al-Qaeda, Taliban (including Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and/or D-Company income back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan.

2253.2032.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by al-Qaeda and the Taliban, including its Haqqani Network. described herein. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2254.2033.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

### COUNT TWO: VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants: Aiding-And-Abetting Liability, RICO Predicate]

2255.2034.    Plaintiffs incorporate their factual allegations above.

2256.2035.    From at least 2007 through 2016, terrorists from al-Qaeda conspired with Mullah Omar and others to conduct and maintain the Taliban, including the Haqqani Network, as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan. Throughout that time, the Taliban, including the Haqqani Network, was a group of associated individuals that functioned as a continuing unit, and the Taliban's, including the Haqqani Network's, whose express purpose at all times included violence against, and the expulsion of, Americans in Afghanistan. The Taliban, including the Haqqani Network, engaged in, and its activities affected, foreign commerce.

2257.2036.    From at least 2007 through 2016, Mullah Omar and other terrorists employed by or associated with the Taliban, including the Haqqani Network, and al-Qaeda (including without limitation Sirajuddin Haqqani, Jalaluddin Haqqani, Mullah Baradar, Mawlawi Ahmad Bilal, and other terrorists described herein) have maintained interests in and conducted the affairs of the Taliban, including the Haqqani Network, as an enterprise by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "Taliban-al-Qaeda Campaign").

2258.2037.    Specifically, Mullah Omar, Sirajuddin Haqqani, and other terrorists employed by or associated with the Taliban, including the Haqqani Network, and al-Qaeda conducted and participated in the conduct of the Taliban's, including the Haqqani Network's, affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

2259.2038.    The Taliban-al-Qaeda Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs

through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States. The Taliban-al–Qaeda Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

2260.2039.    The Taliban-al–Qaeda Campaign occurred primarily outside the territorial jurisdiction of the United States.

2261.2040.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the Taliban-al–Qaeda Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Mullah Omar, Sirajuddin Haqqani, and other terrorists associated with the Taliban, including the Haqqani Network, conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of the Taliban, including the Haqqani Network. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the Taliban-al–Qaeda Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

2262.2041.    Defendants aided and abetted and knowingly provided substantial assistance to the Taliban (including the Haqqani Network), its members, and the Taliban-al–Qaeda Campaign. Defendants did so by laundering money for the al–Qaeda, the Taliban, including the Haqqani Network, Lashkar-e-Taiba, Jaish-e-Mohammed, and D–Company, that

financed the Taliban's, including the Haqqani Network's, terrorist attacks, and, in the case of the

Standard Chartered Bank Defendants, by also assuming a role in the Haqqani Network's bomb-

making pipeline by enabling Fatima's and Pakarab's deliberate supply of Fatima Group CAN

Fertilizer to Haqqani Network agents, operatives, and fronts to assist the Haqqani Network's

CAN fertilizer bomb logistics and undermine U.S. counterinsurgency efforts in Afghanistan.

2263.2042.    The Taliban-al-Qaeda Campaign was committed, planned, and/or

authorized by al-Qaeda, which the United States has designated as an FTO under 8 U.S.C.

§ 1189 since 1999, and by the Haqqani Network, which the United States has likewise

designated since 2012.

2264.2043.    As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs

are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

2265.2044.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs

demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

2266.2045.    Plaintiffs request that the Court:

(a)    Enter judgment against Defendants finding them jointly and severally liable under

the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)    Award Plaintiffs compensatory and punitive damages to the maximum extent

permitted by law, and treble any compensatory damages awarded under the Anti-

Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)    Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to

18 U.S.C. § 2333(a);

(d)    Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated: ~~August 5, 2021~~February 15, 2022

Respectfully submitted,

*/s/ ——Ryan R. Sparacino*

Ryan R. Sparacino (*pro hac vice* ~~forthcoming~~)
Eli J. Kay-Oliphant
Sparacino PLLC
1920 L Street, NW, Suite 535
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*