**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUGUST WILDMAN, *et al.*,<br><br>               Plaintiffs,<br><br>     v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT, DEUTSCHE BANK TRUST COMPANY AMERICAS, STANDARD CHARTERED BANK, STANDARD CHARTERED PLC, STANDARD CHARTERED BANK (PAKISTAN) LIMITED, DANSKE BANK A/S, DANSKE MARKETS INC., PLACID NK CORPORATION d/b/a PLACID EXPRESS, and WALL STREET EXCHANGE LLC,<br><br>               Defendants. | **21 Civ. 4400 (KAM) (RML)**<br><br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF THE DANSKE DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Brian T. Frawley
Amanda Shami
Andrew M. Kaufman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
frawleyb@sullcrom.com
shamia@sullcrom.com
kaufmana@sullcrom.com
Telephone: (212) 558-4000

*Attorneys for Defendants Danske Bank A/S and Danske Markets Inc.*

March 18, 2022

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................1

ALLEGATIONS OF THE AMENDED COMPLAINT........................................................3

    A.    The Parties. ..........................................................................................3

    B.    The ATA and the Terrorists....................................................................4

    C.    Allegations Against the Danske Defendants................................................6

ARGUMENT .......................................................................................................9

I.    Plaintiffs Offer No Cognizable or Coherent Theory of Liability ........................9

II.    Plaintiffs Do Not Plead Any Plausible Aiding-and-Abetting Claim
Against the Danske Defendants ...................................................................10

    A.    Plaintiffs Allege No ATA Claim Against DMI ...................................11

    B.    Plaintiffs Fail to State an ATA Claim Against Danske Bank ................11

        1.    Plaintiffs Do Not Establish Any Contemporaneous
Awareness by Danske Bank of Its Supposed Role
in Terrorism .........................................................................11

        2.    Plaintiffs Do Not Establish Any Knowing and
Substantial Assistance by Danske Bank ....................................19

III.    Danske Bank Is Not Amendable to Personal Jurisdiction in This Action .........22

CONCLUSION.....................................................................................................26

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009)..................................................................................10

*Averbach* v. *Cairo Amman Bank*,
    2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) ...........................................18

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007)..................................................................................10

*Bernhardt* v. *Islamic Rep. of Iran*,
    2020 WL 6743066 (D.D.C. Nov. 16, 2020) ...........................................23, 24, 25

*Cabrera* v. *Black & Veatch Special Projects Corps.*,
    2021 WL 3508091 (D.D.C. July 30, 2021)................................................5

*Davis* v. *Anderson*,
    718 Fed. App'x 420 (7th Cir. 2017) .........................................................10

*In re Extradition of Gohir*,
    2015 WL 1266793 (D. Nev. Mar. 19, 2015) ...........................................17

*Freeman* v. *HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019) .......................................................5

*Freeman* v. *HSBC Holdings PLC*,
    465 F. Supp. 3d 220 (E.D.N.Y. 2020) ........................................... *passim*

*Gagnon* v. *Alkermes PLC*,
    368 F. Supp. 3d 750 (S.D.N.Y. 2019)......................................................43

*Grimes* v. *Fremont Gen. Corp.*,
    933 F. Supp. 2d 584 (S.D.N.Y. 2013).......................................................9

*Halberstam* v. *Welch*,
    705 F.2d 472 (D.C. Cir. 1983)...........................................................20, 21

*Honickman* v. *BLOM Bank SAL*,
    432 F. Supp. 3d 253 (E.D.N.Y. 2020) ...............................................14, 20, 21, 22

*Honickman* v. *BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ............................................................ *passim*

*Hussein* v. *Dahabshiil Transfer Servs. Ltd.*,
    230 F. Supp. 3d 167 (S.D.N.Y. 2017) .................................................................15

*Johnson* v. *UBS AG*,
    791 F. App'x 240 (2d Cir. 2019) .......................................................................23

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) ..............................................................................16

*Keren Keyemeth Leisrael-Jewish Nat'l Fund* v.
    *Education for a Just Peace in the Middle East*,
    530 F. Supp. 3d 8 (D.D.C. 2021) ................................................................20, 22

*Komatsu* v. *City of N.Y.*,
    2022 WL 294393 (S.D.N.Y. Feb. 1, 2022) ........................................................10

*Licci* v. *Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012) ................................................................................25

*Linde* v. *Arab Bank, PLC*,
    882 F.3d 314 (2d Cir. 2018) ..........................................................2, 5, 19, 20

*Miller* v. *Arab Bank, PLC*,
    372 F. Supp. 3d 33 (E.D.N.Y. 2019) .................................................................24

*O'Sullivan* v. *Deutsche Bank AG*,
    2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) ....................................................18

*O'Sullivan* v. *Deutsche Bank AG*,
    2020 WL 906153 (S.D.N.Y. Feb. 5, 2020) ........................................................16

*Rothstein* v. *UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ................................................................................10

*Siegel* v. *HSBC N. Am. Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) .................................................................... *passim*

*Singer* v. *Bank of Palestine*,
    2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ....................................................25

*SPV Osus Ltd.* v. *UBS AG*,
    882 F.3d 333 (2d Cir. 2018) ..............................................................................23

*Standard Chartered Bank* v. *Ahmad Hamad Al Gosaibi & Bros. Co.*,
    No. 653506/2011, 2013 WL 5396923
    (Sup. Ct. N.Y. Cnty. Sept. 24, 2013) ................................................................26

*Strauss* v. *Credit Lyonnais, S.A.*,
  175 F. Supp. 3d 3 (E.D.N.Y. 2016) ...................................................26

*In re Terrorist Attacks on Sept. 11, 2001*,
  349 F. Supp. 2d 765 (S.D.N.Y.) ........................................................23

*WAG SPV I, LLC* v. *Fortune Glob. Shipping & Logistics, Ltd.*,
  2020 WL 1489814 (S.D.N.Y. Mar. 27, 2020) .....................................11

*Waldman* v. *Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016)....................................................23, 24, 25

*Weiss* v. *Nat'l Westminster Bank, PLC*,
  993 F.3d 144 (2d Cir. 2021)....................................................14, 15, 21

*Zimmerman* v. *Cornell Outdoor Educ.*,
  2021 WL 75736 (N.D.N.Y. Jan. 8, 2021) ..........................................23

## STATUTES

18 U.S.C. § 2333(d) ................................................................ *passim*

## OTHER AUTHORITIES

80 Fed. Reg. 72147 (Nov. 18, 2015)...........................................................6

81 Fed. Reg. 71199 (Oct. 14, 2016)............................................................7

C.P.L.R. § 302.........................................................................................24

*Foreign Banks and the Federal Reserve*, FED. RES. BANK OF N.Y. (Apr. 1, 2007),
  https://www.newyorkfed.org/aboutthefed/fedpoint/fed26.html .................9

Federal Rule of Civil Procedure 8 .....................................................1, 9, 10

Federal Rule of Civil Procedure 4(k)(2) .....................................................23

Federal Rule of Civil Procedure 12 .................................................. *passim*

Defendants Danske Bank A/S ("Danske Bank") and Danske Markets Inc. ("DMI") (together, the "Danske Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Complaint ("Complaint" or "AC;" ECF No. 38) pursuant to Federal Rules of Civil Procedure 8(a), 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiffs' 595-page, 2,205 paragraph Complaint fails by any measure to set forth "a short and plain statement" of plaintiffs' claims, as Federal Rule of Civil Procedure 8(a) requires. Yet, despite its excessive girth, the blunderbuss Complaint suffers from even more fundamental defects: the few passing references to the Danske Defendants among the more than 170,000 words arranged haphazardly in plaintiffs' Complaint fail entirely to plead each element of their claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. 2333(d), for each plaintiff and for each Danske Defendant, and plaintiffs fail to allege personal jurisdiction as to Danske Bank. The claims against the Danske Defendants should be dismissed.

This motion does not at all concern the undeniable tragedies endured by our service women and men who have been killed or wounded serving the United States in Afghanistan, the longest war in our nation's history. Plaintiffs here have filed a series of similar lawsuits against different sets of defendants under the ATA arising out of overlapping groups of terrorist attacks in Afghanistan. By this action, plaintiffs seek to exploit some highly publicized anti-money laundering ("AML") policy lapses at Danske Bank, and transpose those entirely unrelated AML issues over the same terrorism refrain. Plaintiffs do nothing more than note those AML failures alongside the same terrorism narrative plaintiffs have lodged here and elsewhere against unrelated defendants, and proclaim they amount to aiding and abetting terrorism. Yet, plaintiffs plead no temporal, logical or factual connection between the Danske Defendants and plaintiffs'

underlying claims or their injuries.  The ATA claims against the Danske Defendants fail as a matter of law for at least three independent reasons.

*First*, the Complaint does not even attempt to articulate the elements of an aiding-and-abetting claim against either Danske Defendant.  As to DMI, plaintiffs allege literally nothing.  DMI is not alleged to have said or done anything, or to have had any interactions or relations at any time with terrorists or anyone allegedly linked in any manner to terrorists.  The allegations against Danske Bank are equally conclusory, and assert no connection whatsoever between Danske Bank and the 115 underlying terrorist incidents over six years.  The most plaintiffs can allege is that one customer with an account at Danske Bank transferred funds "over a four month period [i]n 2014" to an entity that, ***years later***, was identified to be connected to an individual, Altaf Khanani, who in late 2015 was arrested and charged in the United States with money laundering.  (AC ¶ 539.)  These allegations are entirely untethered to the alleged terrorist attacks (111 (97%) of which occurred *prior to year-end 2015*), and cannot state an ATA claim.

*Second*, plaintiffs do not allege that Danske Bank was generally aware that it was assuming a role in violent or life-threatening acts of terrorism, which is a required element of their aiding-and-abetting claim.  *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 329–30 (2d Cir. 2018).  Nor do they remotely plead that Danske Bank had any contemporaneous knowledge that any of these alleged transactions were connected to terrorist organizations, let alone connected to terrorist activities.  *Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021) (dismissing claim because there were no plausible allegations that bank was "aware of [customers]' ties with Hamas prior to the relevant attacks").  And plaintiffs cannot avoid their pleading obligations by reliance upon Danske Bank's regrettable lapses in AML controls, because that tactic "do[es] not allege plausibly a general awareness that Defendants had assumed a role in a foreign terrorist organization's *act* of international terrorism."  *Freeman* v. *HSBC Holdings PLC*, 465 F. Supp. 3d

220, 230 (E.D.N.Y. 2020) ("*Freeman II*") (quoting *O'Sullivan* v. *Deutsche Bank AG*, 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020)).

*Third*, Plaintiffs do not allege the requisite knowing and substantial assistance.  To be liable for aiding and abetting under the ATA, "the defendant must *knowingly and substantially assist* the principal violation."  *Honickman*, 6 F.4th at 494.  Plaintiffs fail even to allege any assistance at all—they do not contend that any funds moving through customer accounts at a Danske Bank branch ever were destined for—or reached—any terrorist organization responsible for the attacks at issue here.  Beyond this, plaintiffs do not allege that Danske Bank was aware of or encouraged any attack, nor have they alleged any direct connection at all between Danske Bank and any terrorist organization, or that Danske Bank "knowingly assumed a role in . . . terrorist activities or otherwise knowingly or intentionally supported" the referenced criminal organizations.  *Siegel* v. *HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019).  The claim against Danske Bank is entirely deficient.

Finally, Danske Bank is not subject to personal jurisdiction in respect of the claims alleged here.  As a Danish bank with its principal place of business in Copenhagen, Denmark (AC ¶ 69), Danske Bank is not subject to general personal jurisdiction in the United States, and plaintiffs do not allege any sufficient or relevant contacts by Danske Bank with the United States in connection with their claims.

## ALLEGATIONS OF THE AMENDED COMPLAINT[1]

### A.      The Parties.

*Plaintiffs:*  Plaintiffs are approximately 500 American service members and civilians, who were killed or wounded in 115 terrorist attacks while serving in Afghanistan between 2011

---

[1]      On this motion, the Court may consider, in addition to well-pleaded allegations of the Complaint, documents attached to, or referenced in, or integral to the Complaint, or any other document "upon which [Plaintiffs] relied in bringing the suit."  *Gagnon* v. *Alkermes PLC*, 368 F. Supp. 3d 750, 762 (S.D.N.Y.

and 2016, and their families. (AC ¶ 1.) Among those attacks, (a) 27 occurred in 2011, (b) 56 occurred in 2012, (c) 18 occurred in 2013, (d) seven occurred in 2014, (e) four occurred in 2015, and (e) three occurred in 2016. (Frawley Decl., Ex. 1.)

*Danske Bank:* Danske Bank is a large bank in Denmark, with 180 branches in 12 countries. (AC ¶ 61.) Although plaintiffs attempt to bolster their personal jurisdiction allegations by contending that Danske Bank operated "bank branches and/or subsidiaries in New York since 1985" (*id*. ¶ 62), the Complaint concedes that the first clause of that allegation is false: "Danske did not have a U.S. branch." (*Id*. ¶ 539.)

*Danske Markets:* DMI is a registered U.S. broker-dealer and a subsidiary of Danske Bank. (*Id*. ¶ 64.) Despite recognizing that DMI is a broker-dealer, plaintiffs assert "[o]n information and belief" for the first time in their Amended Complaint that DMI "facilitated USD-related transactions" for Danske Bank branches, which they then pronounce, without one shred of support, included funds associated with Khanani. (*Id*. ¶ 65.) Plaintiffs offer this allegation without once explaining how a securities broker-dealer facilitates currency transactions, and despite alleging elsewhere that the very same Khanani funds were converted into dollars through the New York branch of a different defendant "[s]ince Danske Bank did not have a U.S. branch." (*Id*. ¶ 539.)

## B. The ATA and the Terrorists

Under the ATA, as amended in 2016 by the Justice Against Sponsors of Terrorism Act ("JASTA"), liability may be asserted

> for an injury arising from an act of international terrorism
> committed, planned, or authorized by an organization that had
> been designated as a foreign terrorist organization under section

---

2019) (quoting *Kleinman* v. *Elan Corp PLC*, 706 F. 3d 145, 152 (2d Cir. 2013)). Defendants include as Exhibits ("Ex.") to the accompanying Declaration of Brian T. Frawley ("Frawley Decl.") certain publicly-available documents relied upon in the Complaint that the Court may consider on this motion.

> 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as
> of the date on which such act of international terrorism was
> committed, planned, or authorized, liability may be asserted as to
> any person who aids and abets, by knowingly providing substantial
> assistance, or who conspires with the person who committed such
> an act of international terrorism.

18 U.S.C. § 2333(d)(2). A "foreign terrorist organization" ("FTO") is one of several

designations issued by the U.S. Government. The Secretary of State may designate an

organization an FTO, while the U.S. Department of Treasury may designate persons or entities

as having a connection to terrorism with other designations, including a Specially Designated

Terrorist ("SDT"), a Specially Designated Global Terrorist ("SDGT"), or a Specially Designated

National ("SDN"), that do not qualify as principal actors under the ATA. *Freeman* v. *HSBC*

*Holdings PLC*, 413 F. Supp. 3d 67, 96–97 (E.D.N.Y. 2019) ("*Freeman I*").

"[A]iding and abetting focuses on the relationship between the act of international

terrorism and the secondary actor's alleged supportive conduct." *Linde*, 882 F.3d at 331. "Thus,

there are three elements to an aiding-and-abetting claim: (1) an FTO engaged in an act of

international terrorism that caused the plaintiff's injuries, (2) the defendant knowingly and

substantially assisted the principal act of international terrorism, and (3) the defendant was

generally aware of his role in the principal act when he provided the assistance." *Cabrera* v.

*Black & Veatch Special Projects Corps.*, 2021 WL 3508091, at *24 (D.D.C. July 30, 2021).

Here, plaintiffs rely on 115 separate acts allegedly taken by or at the direction of different actors

over a six-year period, including (a) 62 attacks by the Taliban alone, which was never designated

an FTO; (b) 14 attacks by a "joint cell" of the Haqqani Network (before and after designation as

an FTO on September 19, 2012), al-Qaeda (designated an FTO on October 8, 1999), and

Lashkar-e-Taiba (designated an FTO on December 26, 2001); (c) 12 attacks by the Haqqani

Network alone (before and after designation as an FTO); (d) one attack by a "joint cell" of the

Haqqani Network (pre-designation as an FTO) and al-Qaeda; (e) eight attacks by a "joint cell" of

al-Qaeda and the Taliban (with four attacks including the Haqqani Network, pre-designation as an FTO); (f) 12 attacks by a "joint cell" of the Taliban, including its Haqqani Network (before and after designation), al-Qaeda, and Lashkar-e-Taiba; and (g) six attacks by a "joint cell" of the Taliban, al-Qaeda, and Lashkar-e-Taiba. (AC ¶¶ 1101–2024; Frawley Decl., Ex. 1.)

## C. Allegations Against the Danske Defendants

Plaintiffs devote a paltry few of the 170,000 words in their Complaint to the Danske Defendants. Beyond utterly conclusory allegations about the defendants collectively (AC ¶ 6), plaintiffs offer only two specific categories of allegations that pertain to Danske Bank (and none that pertain to DMI), spread over a handful of paragraphs of the Complaint.

Mazaka General Trading ("Mazaka Trading"). Plaintiffs pronounce that Altaf Khanani and associated entities (the Khanani Money Laundering Organization or "Khanani MLO") "used Danske Bank's 'Laundromat' to source millions of USD for al-Qaeda and the Haqqani Network." (*Id.* ¶ 539.) That conclusory statement is supported by nothing, and it is contradicted by plaintiffs' pleading. They do not allege any connection between Danske Bank and al-Qaeda, the Haqqani Network or any person or entity allegedly involved in the terrorist acts. Indeed, plaintiffs do not even allege any connection between Danske Bank and Khanani. Instead, they contend that, during 2014, a "***customer*** of Danske Bank's Estonia branch, ***which purportedly had 'hidden owners***,'" exchanged millions with the Dubai-registered company Mazaka General Trading, an entity notoriously linked to Khanani." (*Id.* ¶ 538 (emphasis added).) In other words, plaintiffs say nothing more than (a) a customer of Danske Bank, (b) of admittedly unknown ownership, (c) transferred funds in 2014 to Mazaka Trading, (d) which entity was "notoriously linked to Khanani," and (e) Khanani laundered funds for al-Qaeda, the Haqqani Network, as well as *a host of other unrelated criminal organizations on different continents*. (*Id.* ¶¶ 261–65.)

Worse still, every one of these connections plaintiffs seek to draw first became publicized years later. Khanani was arrested by U.S. authorities in September 2015. (AC ¶ 265.) The Khanani MLO was first designated an SDN on November 12, 2015 (*id.*; *see also* 80 Fed. Reg. 72147 (Nov. 18, 2015)), over a year after the alleged four-month period in 2014 during which plaintiffs contend transfers were made by a Danske Bank customer to an entity affiliated with Khanani. (AC ¶ 380.) Khanani himself has never been designated an SDT or SDGT. And Mazaka Trading was first designated as an SDN and tied publicly to the Khanani MLO on October 11, **2016**, *see* 81 Fed. Reg. 71199 (Oct. 14, 2016)—***over two years*** after any referenced fund transfers, and ***after*** all but one of the terrorist attacks at issue here.

Unable to allege any relevant facts, plaintiffs resort to relying only upon Danske Bank's acknowledged AML failures at its Estonia branch. (*Id.* ¶¶ 921–24.) Yet, plaintiffs concede these allegations say nothing more than that "employees of the Estonia branch assisted clients [to] circumvent money laundering controls." (*Id.* ¶ 927.) In citing various supposed "red flags" regarding suspicious customers or transactions between 2007 and 2014, plaintiffs do not say suspicions of any sort were raised concerning any connection between the Bank and Khanani, the Taliban, al-Qaeda, the Haqqani Network, Lashkar-e-Taiba, any other FTO, or anyone involved in the terrorist attacks. (*Id.* ¶ 926.) In fact, plaintiffs do not even allege any suspicion or contemporaneous red flags about transactions involving customers with any ties whatsoever to Afghanistan or international terrorism.

Beyond the paucity of allegations tying Danske Bank to any of the relevant persons or events, there are no allegations at all that DMI had anything whatsoever to do with these matters. Although plaintiffs manufacture an allegation that DMI participated in U.S. Dollar clearing in some unexplained manner, they allege expressly that DMI ***was not*** involved in the only U.S. Dollar

transaction pled, instead alleging that another bank's "branch in New York . . . worked with Danske [Bank] to complete the transaction." (*Id*. ¶ 539.)

VAT Fraud. Plaintiffs' second category of allegations against Danske Bank concerns vague and perplexing allegations about Value-Added Tax ("VAT") fraud schemes in 2009, 2010 and 2016 that possibly had some connection to Danske Bank, but are nowhere alleged to have had any connection to terrorism or the terrorist attacks at issue here. (*Id*. ¶¶ 546–61). Plaintiffs first reference two episodes in 2009 and 2010 in which "a company called Swefin," a Swedish payment platform that "allowed VAT fraudsters to hide their cash flows from the authorities," processed payments for its unspecified customers through a Danske Bank account (*id*. ¶¶ 546, 549, 550, 553). And then plaintiffs contend that, in 2016, an unidentified Lithuanian person controlled a Danske Bank account that received or transferred proceeds from a VAT fraud. (*Id*. ¶ 557.)

Plaintiffs do not say that *these* VAT frauds involved terrorists or, more importantly, any act of terrorism at issue here. They could not do so, since the referenced frauds occurred in 2009 and 2010—long *before* the first attack on August 6, 2011—and 2016—after at least 112 of the 115 attacks, if not all of them. Their *ipse dixit* pronouncements that "[t]hese *types* of VAT fraud schemes have been linked to terrorist finance" (*id*. ¶ 558 (emphasis added)) is meaningless, and has nothing at all to do with their claims or Danske Bank. Likewise, assertions that "VAT fraud in Denmark accounted for approximately $12 million in terrorist finance" (*id*. ¶ 560) or that persons "defrauded the Danish Treasury for years . . . through VAT fraud" (*id*. ¶ 561) have nothing to do with Danske Bank or DMI, or specific terrorists or the acts of terrorism at issue here.

DMI. Plaintiffs nowhere allege any specific facts concerning DMI. Beyond identifying DMI as a defendant (*id*. ¶¶ 64, 65), the Complaint says nothing relevant about DMI. Plaintiffs invent allegations for the first time in their Amended Complaint that DMI is a branch of Danske Bank (*id*. ¶¶ 210, 218, 231, 238, 245, 273 (p. 152), 1089), but their pleading concedes elsewhere

that Danske Bank had no U.S. branch (*id.* ¶ 539). Indeed, plaintiffs plead affirmatively that DMI "is incorporated in Delaware . . . since at least 2001." (*Id.* ¶ 64.) As a Delaware corporation, DMI is not a branch of Danske Bank, a Danish corporation, but it is a separate entity. *Foreign Banks and the Federal Reserve*, FED. RES. BANK OF N.Y. (Apr. 1, 2007), ("Foreign bank branches and agencies are legal extensions of their parent companies, and not freestanding entities in the United States."), https://www.newyorkfed.org/aboutthefed/fedpoint/fed26.html.

Apart from this, plaintiffs make only a generic reference to DMI as an "agent for foreign exchange transactions with non-U.S. customers of Danske Bank." (AC ¶ 1087.) Yet, plaintiffs nowhere explain how a securities broker-dealer could perform foreign exchange transactions, which plaintiffs elsewhere argue were carried out "via transactions with U.S. corresponden[t] bank accounts." (*Id.* ¶ 1085.)

## ARGUMENT

### I. Plaintiffs Offer No Cognizable or Coherent Theory of Liability.

The prolix Complaint fails by any yardstick (or mile-marker) to set forth "a short and plain statement of the claim," as Rule 8(a) requires. *Grimes* v. *Fremont Gen. Corp.*, 933 F. Supp. 2d 584, 595 (S.D.N.Y. 2013) (dismissing complaint that "is over 300 pages long and contains over 1000 specifically numbered paragraphs"). During the December 7, 2021 pre-motion conference, Your Honor indicated that the previous complaint—590 pages and 2,266 paragraphs—was "on its face almost" a Rule 8 violation and directed that Plaintiffs "shorten the allegations." (Frawley Decl., Ex. 2 at 5:2-3; 15:20-16:3.) Plaintiffs did the opposite. Although they collapsed certain paragraph breaks to lessen the number of paragraphs to 2,205, the pagination of the Complaint—and its word count—only increased. The original complaint was 590 pages and about 171,639 words, while this Complaint spans 595-pages and about 173,603

words.  There is nothing short, or plain, about plaintiffs' approach to pleading.  "[I]t suffers from extreme logorrhea."  *Davis* v. *Anderson*, 718 Fed. App'x 420, 423 (7th Cir. 2017).

Yet, despite its bulk, the Complaint fails in the second, most rudimentary aspect of pleading under Rule 8:  plaintiffs' pleading does not "show[] that the pleader is entitled to relief" against either Danske Defendant.  DMI is not mentioned in any substantive allegation in the Complaint.  And, plaintiffs fail to articulate the elements of their ATA claim in respect of each of the 115 attacks at issue in this action as to either Danske Defendant and, more importantly, how, when or in what manner Danske Bank supposedly aided and abetted the FTO that supposedly committed, planned, or authorized that attack.  This runs afoul of Rule 8.  *Komatsu* v. *City of N.Y.*, 2022 WL 294393, *3 (S.D.N.Y. Feb. 1, 2022) ("Plaintiff's' 251-page complaint does not provide a short and plain statement of his claim.  It is replete with irrelevant and confusing allegations," including "allegations about many incidents . . . [that] makes it difficult to understand his claims.").

## II.  Plaintiffs Do Not Plead Any Plausible Aiding-and-Abetting Claim Against the Danske Defendants.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).  The complaint must "contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  *Id*. at 562 (internal quotation marks omitted).  While well-pled factual allegations are accepted as true, this Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations."  *Rothstein* v. *UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013).  Allegations "that are 'merely consistent with' a defendant's liability" fail to cross that "line between possibility and plausibility of 'entitlement to relief.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662,

678, (2009) (quoting *Twombly*, 550 U.S. at 557). Plaintiffs' allegations here fall miles short of the plausibility line.

**A.      Plaintiffs Allege No ATA Claim Against DMI.**

DMI should be dismissed from this action because plaintiffs' claim against DMI is supported by nothing. The Complaint does not include a single allegation that DMI said or did anything at all pertinent to this action.

Plaintiffs' attempt to conflate Danske Bank and DMI (and/or with other, unidentified and unnamed Danske Bank affiliates) as "collectively" comprising "the Danske Bank Defendants" also fails for two reasons. First, the Complaint does not even attempt to establish the requisite "extraordinary circumstances" that might allow plaintiffs to disregard DMI's separate corporate form. *WAG SPV I, LLC* v. *Fortune Glob. Shipping & Logistics, Ltd.*, 2020 WL 1489814, at *6 (S.D.N.Y. Mar. 27, 2020). Second, plaintiffs fail to provide any specific or meaningful allegations regarding the "Danske Bank Defendants." The term appears ten times in the Complaint, and none of these references include specific allegations of DMI conduct or how they connect to any of the alleged terrorist attacks. Beyond facially implausible and irrelevant allegations that contend DMI had some role generally in U.S. dollar transactions with Danske Bank, plaintiffs do not allege that DMI had any role in any fund transfers at issue in this case. Indeed, they plead the opposite, and contend that the only cited transactions were routed through a U.S. branch of a different bank. (AC ¶ 539.)

**B.      Plaintiffs Fail to State an ATA Claim Against Danske Bank.**

**1.      Plaintiffs Do Not Establish Any Contemporaneous Awareness by Danske Bank of Its Supposed Role in Terrorism.**

"In order to plead adequately the 'general-awareness' element, a plaintiff must plausibly allege that the defendant was 'aware that, by assisting the principal, it is itself assuming a role in terrorist activities.'" *Siegel*, 933 F.3d at 224 (quoting *Linde*, 882 F.3d at 329). In the context of

an ATA aiding-and-abetting claim against a bank, this element "require[s]" factual allegations that plausibly establish that "the bank was generally aware that[, by providing financial services to a client,] it was thereby playing a 'role' in [the] violent or life-endangering activities." *Id.* (brackets in original) (quoting *Linde*, 882 F.3d at 329). Hence, plaintiffs must show that the Bank was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496 (emphasis in original).

Plaintiffs do not offer any theory, much less plausible allegations, of the requisite awareness. At most, they contend that (1) a Danske Bank Estonia branch customer of unknown ownership transacted in 2014 with Mazaka Trading, which was later revealed to be connected to Altaf Khanani, who laundered money for criminal organizations around the world, including al-Qaeda; (2) Danske Bank had substantially inadequate AML policies and practices; and (3) accounts at Danske Bank were used to transact in the proceeds of VAT fraud, and VAT fraud was sometimes used by terrorist organizations. (AC ¶¶ 925–28, 533, 538.) These allegations are of no help to plaintiffs.

> ### a.   *Plaintiffs do not establish that Danske Bank played a role in terrorist violence through the Mazaka Trading transactions.*

Plaintiffs' attempt to establish some knowing participation by Danske Bank in terrorist violence because a customer transferred funds in 2014 to Mazaka Trading is hopelessly flawed. "They fail to advance any plausible, factual, non-conclusory allegations that [Danske Bank] *knew or intended* that those funds would be sent to [al-Qaeda] or to any other terrorist organizations. *This forecloses their JASTA claim*." *Siegel*, 933 F.3d at 224–25 (emphasis added).

*First*, Mazaka Trading is not alleged to have had any customer relationship with Danske Bank Estonia or any other branch. Instead, plaintiffs allege that an unidentified "customer of Danske Bank's Estonia branch" with "hidden owners" transacted with Mazaka Trading, which

had connections to Khanani, and Khanani transacted with criminal organizations, including alleged terrorists. (AC ¶¶ 538–40.) This chain of alleged connections is deficient on its face. Indeed, in *Siegel*, the Second Circuit rejected aiding-and-abetting claims against a European bank that had a customer that allegedly provided financial services to al-Qaeda—a series of connections even less attenuated than those alleged here. 933 F.3d at 224. The Court ruled that the indirect connection was not supported by "any non-conclusory allegations that [the defendant bank] provided banking services for any transactions relating to the [challenged terrorist] Attacks." *Id.* The same reasoning applies with even more force here.

*Second*, plaintiffs do not plead any knowledge by Danske Bank of any connection whatsoever between Mazaka Trading and the Khanani MLO prior to the 2014 transfers. Despite pronouncing that Mazaka Trading was "notoriously linked to Khanani" (AC ¶ 538) and that all Defendants "knew" that Mazaka Trading "was controlled by Khanani and used exclusively for terrorist financing" (*id.* ¶ 682), plaintiffs do not allege any such knowledge in or prior to 2014, or cite **any source** from which Danske Bank supposedly learned of that connection at that time. As the Second Circuit has ruled, this failure alone defeats plaintiffs' claim. *Honickman*, 6 F.4th at 502 (no general awareness where plaintiffs failed to allege that bank customers' ties to Hamas were public knowledge at the time of transactions).

*Third*, even if plaintiffs had pled awareness pre-2014 of some connection between Mazaka Trading and the Khanani MLO—and, plainly, they have not—they do not plead facts establishing any contemporaneous knowledge of Khanani's connection to terrorism. As the complaint concedes, Khanani was arrested in *September 2015* and first designated by the U.S. Treasury Department in *November 2015*. (AC ¶ 380.) While plaintiffs allege that public sources should have caused a Danish bank to conclude that Khanani had criminal connections before the U.S. government, the vast majority of the sources cited in the Complaint in fact post-date the

2015 designation by the Treasury Department,[2] while others refer generally to the informal banking systems in Pakistan and India in which Khanani and his family were prominent participants (AC ¶ 672) and the *acquittal* of other Khanani family members on charges in Pakistan relating to foreign exchange fraud (*id.* ¶ 673). "Plaintiffs fail plausibly to allege that [Danske Bank] or any of its employees actually knew or should have known of any of the cited sources, or that [Danske Bank] would otherwise have a reason to review or consider those sources in the course of its operations." *Honickman v. BLOM Bank SAL*, 432 F. Supp. 3d 253, 265 (E.D.N.Y. 2020), *aff'd*, 6 F.4th 487. "[P]laintiffs' allegations that [a bank] '*was aware*,' based on 'public reports,' that its banking customer '*was believed by some* to have links to . . . terrorist organizations' 'are insufficient to state a claim for aiding-and-abetting liability under JASTA.'" *Weiss* v. *Nat'l Westminster Bank, PLC*, 993 F.3d 144, 166 (2d Cir. 2021) (citations omitted, emphasis added by Court). The claim here that some reports commented about terrorism links between a counterparty to a Danske Bank customer years after the alleged transactions is doubly insufficient.

*Fourth*, plaintiffs' attempt to infer some knowledge of a connection between Mazaka Trading and terrorists is not the relevant inquiry—they must establish Danske Bank's knowledge of some "closely intertwined" connection between its customer (which is not even identified) and the FTO that was responsible for the attacks. As the Second Circuit explained:

> For the second element, general awareness, the complaint must plausibly allege: (1) as a threshold requirement, that [the bank] was aware of [its customers'] connections with [the FTO] before the relevant attacks; and (2) [its customers] were so closely intertwined with [the FTO's] violent terrorist activities that one can reasonably infer [the bank] was generally aware of its role in

---

[2]     *See, e.g.*, AC ¶¶ 540 n.351 (quoting a September 2020 news article (Frawley Decl., Ex. 4) discussing references to Khanani in the September 2020 leak of FinCEN files), 541 n.352 (news article (Frawley Decl., Ex. 5) regarding September 2020 FinCEN files leak); 674–78 (quoting articles from obscure publications in and after 2016).

unlawful activities from which the attacks were foreseeable while
it was providing financial services to [its customers].

*Honickman*, 6 F.4th at 501.  Plaintiffs here plead no connection at all between Danske Bank's

unnamed customer and any FTO, but instead rely on conclusory connections at least four steps

removed from Danske Bank:  Danske Bank Estonia → unnamed Danske Bank Estonia customer

→ Danske Bank Estonia customer transaction with Mazaka Trading → Mazaka connections to

Khanani → Khanani connections to al-Qaeda.  Each one of these implausible inferential leaps is

supported by no facts.

*Finally*, despite regurgitating press reports about suspicious fund transfers at a

Danske Bank branch, plaintiffs "do[] not advance any non-conclusory allegation that [an FTO]

received any of those funds, or that [Danske Bank] knew or intended that [an FTO] would

receive the funds."  *Siegel*, 933 F.3d at 225.  Under Second Circuit law, this also independently

defeats plaintiffs' claim.  *Id.*; *Weiss*, 993 F.3d at 166 (affirming dismissal where "no evidence

that the charities funded terrorist attacks or recruited persons to carry out such attacks").

### b.   The allegations about AML deficiencies are irrelevant.

Most of plaintiffs' allegations do little more than juxtapose entirely unrelated reports of

AML deficiencies at Danske Bank's branch in Estonia alongside acts of terrorism in

Afghanistan, with no factual, temporal, logical or geographical connection.  But, regardless of

any "'major deficiencies in controls and governance'" (AC ¶ 543), violations of "at least 47

different [AML] regulations" (*id.* ¶ 545), or censures "in 2015 concerning compliance with

measures of [AML] and terrorist financing prevention" (*id.*), AML shortcomings are of no

relevance whatsoever to plaintiffs' claims.  AML defects do not suggest or establish that money

laundering actually occurred or facilitated terrorism.  *Hussein* v. *Dahabshiil Transfer Servs. Ltd.*,

230 F. Supp. 3d 167, 177 (S.D.N.Y. 2017) ("allegations that banks and regulators have criticized

[Defendants'] AML policies are not a substitute for allegations that the Defendants transferred funds knowing or deliberately indifferent to the fact that they were destined" for terrorists).

Indeed, even assertions that money in fact was laundered through accounts at Danske Bank would be of no help to plaintiffs. "[A]llegations that Defendants knowingly violated laws that were designed principally to prevent terrorist activity," such as AML provisions, "do not allege plausibly a general awareness that Defendants had assumed a role in a foreign terrorist organization's act of international terrorism." *Freeman II*, 465 F. Supp. 3d at 230; *see also Siegel*, 933 F.3d at 225–26 (allegation that bank helped its customer "violate banking regulations despite knowing that [it] supported terrorist organizations" insufficient); *O'Sullivan*, 2020 WL 906153, at *6 (same). Even allegations establishing a defendant "knowingly provid[ed] material support to an FTO, without more, does not, as a matter of law, satisfy the general awareness element," because plaintiffs must show that Danske Bank "was generally aware [1] while it was providing banking services to those entities that [2] it was playing a role in unlawful activities [3] from which the . . . attacks were foreseeable." *Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 842, 860–61 (2d Cir. 2021).

### c.      *Plaintiffs' VAT fraud allegations are meritless.*

Plaintiffs' allegations about VAT fraud are divorced entirely from their liability theory and provide no support for their aiding-and-abetting claim against Danske Bank. Rather than support any ATA claim here, these allegations simply serve to confirm that plaintiffs' entire case against Danske Bank is comprised of a collage of random press reports about unrelated corporate traumas that have nothing to do whatsoever—temporally, factually, logically or geographically—to plaintiffs' claims.

Plaintiffs' allegations rely on long after-the-fact "reports" of alleged VAT fraud engaged in by individuals or entities during 2009, 2010 and 2016. The first such report says an individual

named Mohammad Safdar Gohir—a U.K. citizen who is not alleged to have had any connection to Danske Bank, Middle East terrorism or anything to do with this case—engaged in VAT fraud *in Germany **in or before 2009***, some of the proceeds of which ended up in the account of an independent European payment processor, Swefin, held at Danske Bank.  (AC ¶¶ 548–49.)  Mr. Gohir's fraud resulted in the theft of VAT tax proceeds from the German government in connection with exchange-traded carbon credits (AC ¶ 547), but it had nothing to do with al-Qaeda, FTOs or terrorism.  *See In re Extradition of Gohir*, 2015 WL 1266793, at *9 (D. Nev. Mar. 19, 2015).[3]  Nor did Danske Bank shield his crimes (AC ¶ 551); he was indicted in, and extradited to, Germany six years later.  *Id.*  The second such report, supposedly involving a similar carbon trading VAT fraud by unspecified fraudsters **in Spain** during 2010, also allegedly involved some funds of unknown origin or destination that passed through Swefin's account at Danske Bank.  (AC ¶¶ 553–54.)  Not content to confine themselves to their own misuse of these irrelevant facts, plaintiffs say that an Italian newspaper reported—**in September 2014**—that "this VAT fraud" "in Spain" had connections to Pakistan or Afghanistan.  (*Id.* ¶ 553.)  Not so.  That newspaper article concerned "[t]he great VAT fraud in Italy."[4]

Plaintiffs next reference an obviously irrelevant VAT fraud incident in Denmark in 2016. (AC ¶¶ 555–56.)  Here, even plaintiffs cannot bring themselves to contend these allegations are pertinent.  Plaintiffs say that a news report in 2019—three years after the last attack—said that an account at Danske Bank in Denmark controlled by an unnamed Lithuanian with no alleged ties

---

[3]     In broad terms, "VAT fraud" involves a buyer importing goods VAT-free into one EU member state from another, which is then sold onward with VAT included in the price, and the buyer pockets the tax and disappears.  *Id.*  In some iterations, the goods (here, carbon emissions credits) and bought and sold seriatim across EU nations.  *Id.*

[4]     *La grande truffa dell'Iva in Italia per finanziare i gruppi islamici*, Corriere Della Sera (Sept. 24, 2014), https://www.corriere.it/cronache/14_settembre_24/grande-truffa-dell-iva-italia-finanziare-gruppi-islamici-ec394336-43a5-11e4-bbc2-282fa2f68a02.shtml (Frawley Decl., Ex. 3.).

to terrorism, terrorists, or even the Middle East, received or transferred proceeds of some VAT fraud in 2016—after at least 112 but perhaps all 115 attacks. Plaintiffs do not say that those funds were destined for terrorists; they instead say they "disappeared." (AC ¶ 557.)

These allegations are entirely meaningless for a host of reasons:

(1)　Plaintiffs do not even allege that these transactions, or the Danske Bank customer, or that customer's clients, or Danske Bank itself ever in fact played any role in terrorism or the terrorist attacks at issue. The assertion that *some* tax fraud relates to money laundering (while others simply steal money from governments) infers nothing about the particular segment of those activities that allegedly flowed through Danske Bank. *Honickman*, 6 F.4th at 501–02 (that FTOs were funded by charities did not establish ATA claim against bank that serviced charities).

(2)　Plaintiffs do not allege that the proceeds of the VAT fraud that allegedly passed through Danske Bank was destined for, or ever reached, any terrorist organization, much less the FTOs at issue here. Hence, "the Complaint is devoid of any factual allegations from which the Court can properly infer that Defendants knew that the financial services they provided to the various [VAT fraud] entities were destined to aid the FTOs responsible for the attacks that injured Plaintiffs." *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at *6 (S.D.N.Y. Mar. 28, 2019).

(3)　Plaintiffs cannot rely on transactions in 2009 or 2010, years before the first challenged attack in 2011, or in 2016 after at least 97% of the attacks, if not all of them, to allege awareness of participation in terrorism. *Honickman*, 6 F.4th at 502 (no general awareness when only one of many transactions occurred after the customer was designated an SDGT); *Averbach* v. *Cairo Amman Bank*, 2020 WL 486860, at *13 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020) (no "general awareness" when "the first of the Attacks occurred about three months after any of the fund transfers

identified by Plaintiffs.").  Put simply, it is impossible for plaintiffs to establish any "general awareness" on the part of Danske Bank in 2009, 2010 or 2016 that it was "playing a 'role' in . . . violent or life-endangering activities."  *Siegel*, 933 F.3d at 224.

(4)      By plaintiffs' own allegations, the fact that these accounts were connected to VAT fraud—but not, even then, any insinuation that they were connected to terrorism—did not become public in any way until ***years*** after the transactions at issue.  (AC ¶ 557 ("Danske Bank *should have noticed*" VAT fraud).)  The 2009 and 2010 VAT fraud was revealed in 2014, and the 2016 VAT fraud was revealed in 2019.  (*Id.* ¶ 557.)  Danske Bank is nowhere alleged to have been aware of some role in the VAT fraud—much less terrorism—"at the time that [the Bank] provide[d] the assistance."  *Linde*, 882 F.3d at 329.

### 2.    Plaintiffs Do Not Establish Any Knowing and Substantial Assistance by Danske Bank.

Plaintiffs likewise allege no facts—none—that plausibly suggest that Danske Bank knowingly or substantially assisted any terrorist organization, much less the specific FTOs at issue here, and much less in connection with any of the 115 identified attacks in Afghanistan.  To be liable for aiding and abetting under JASTA, "the defendant must *knowingly and substantially assist* the principal violation."  *Honickman*, 6 F.4th at 494.  Danske Bank did neither.

Plaintiffs contend any assistance given by Danske Bank was "knowing" solely by reference to reports about AML lapses in Danske Bank's Estonia branch.  (AC ¶¶ 1012–14.)  This theory of knowledge has been rejected repeatedly.  *Freeman II*, 465 F. Supp. 3d at 233 (collecting cases); *Siegel*, 933 F.3d at 225 (plaintiffs "did not advance any non-conclusory allegation that" the bank "knew or intended that" the FTO "would receive the funds").

The substantial assistance element of JASTA requires an analysis of "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of

mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*
v. *Welch*, 705 F.2d 472, 483–84 (D.C. Cir. 1983)).  Plaintiffs do not address each required
element of the substantial assistance prong, or offer any theory of substantial assistance as to
Danske Bank; rather, they simply allege 33 meandering paragraphs of undifferentiated
allegations (AC ¶¶ 964–87) that admittedly apply to any financial institution that transacted in
*any direct or indirect manner* with some entity that then was (or later became) part of "the
Syndicate" (*id.* ¶ 970).  Not one of the substantial assistance factors is present here.

**No Encouragement of Violence**.  First, "the nature of the act encouraged" by Danske
Bank, *Siegel*, 933 F.3d at 225, allegedly was avoiding AML controls, not committing acts of
terrorism.  For this reason, "[t]he plaintiffs here have not plausibly alleged that [Danske Bank]
encouraged the heinous . . . Attacks or provided any funds to [an FTO]." *Id.*

**Any Assistance Was Tangential and Insubstantial.**  The second factor asks whether
the injury-causing act was "heavily dependent" on the assistance provided, or whether the
assistance was "indisputably important" to, or an "essential part" of, the act.  *Halberstam*, 705
F.2d at 488; *Keren Keyemeth Leisrael-Jewish Nat'l Fund* v. *Education for a Just Peace in the
Middle East*, 530 F. Supp. 3d 8, 14 (D.D.C. 2021) (no allegation "that defendants directly
assisted Hamas itself," or that financial support "was useful or used by Hamas in carrying out the
alleged attacks").  Plaintiffs do not advance a single allegation that remotely suggests that
Danske Bank's actions encouraged any violent activities, or actually assisted the terrorist acts
that caused plaintiffs' injuries.  Even if the Court accepts plaintiffs' wild speculation that Danske
Bank knew that some customer had a counterparty with a several-steps-removed connection to
an FTO, "Plaintiffs have not plausibly alleged that [the Bank] encouraged the attacks which
injured Plaintiffs or knowingly provided any funds to [the FTO] for its violent activities."
*Honickman*, 432 F. Supp. 3d at 268.

**No Connection to the FTOs or the Attacks**.  The third and fourth factors weigh heavily against plaintiffs' aiding-and-abetting claims.  Danske Bank (a Danish bank with no presence in the Middle East) was not physically present at the scene of the attacks.  Even if presence is broadly construed, *Honickman*, 432 F. Supp. 3d at 268, Danske Bank simply provided routine banking services to a customer, the only specific aspect of which plaintiffs put at issue here are transactions from that customer to Mazaka Trading over a four-month period during 2014. Danske Bank by any measure was not "present" at the time of the attacks.  *Honickman*, 432 F. Supp. 3d at 269; *Freeman*, 465 F. Supp. 3d at 234.

More importantly, Danske Bank is not alleged to have had any relations with, or provided any assistance to, the perpetrators of the attacks.  The alleged assistance here includes routine banking services, in arms-length transactions, to a customer that, in turn, transacted with an entity (Mazaka Trading) that plaintiffs contend was connected to certain FTOs through Khanani (and Mazaka Trading or Khanani are not themselves the perpetrators of any violence).  This is patently insufficient.  As in *Siegel*, the Complaint does "not advance any non-conclusory allegation that [the FTOs] received any of" the funds processed by Danske Bank or that Danske Bank "knew or intended that [FTOs] would receive the funds."  *Siegel*, 933 F.3d at 225; *see also Honickman*, 432 F. Supp. 3d at 268 ("Plaintiffs make no non-conclusory assertions that any of the funds processed by the Three Customers actually went to Hamas"); *Weiss*, 993 F.3d at 166 (bank not shown to have assisted FTO merely by assisting intermediary).  The sum total of Danske Bank's alleged assistance was precisely zero.

For the same reasons, the duration of the alleged assistance also weighs against any claim of substantial assistance: there was no relevant assistance.  *Siegel*, 933 F.3d at 225 (observing that bank's 25 years of providing banking services to intermediary "certainly bespeaks a lengthy relationship but not necessarily of assistance in terrorism").

**No Intent to Encourage Terrorism**.  Finally, the Complaint does not plausibly allege that Danske Bank's "state of mind" involved an intent to finance or otherwise promote or carry out terrorist acts.  *Keren Kayemeth*, 530 F. Supp. 3d at 15 (rejecting allegations that "do not even suggest defendants were 'one in spirit' with Hamas or that defendants intended to help Hamas or other groups succeed in perpetrating violent attacks").  At most, plaintiffs' "non-conclusory allegations show that [the Estonian branch's] intentions were to profit commercially by assisting [customers] to evade" AML controls.  *Freeman II*, 465 F. Supp. 3d at 234.  And "[p]laintiffs' citation to allegedly public knowledge, without any plausible allegations tying the cited public knowledge to [Danske Bank], is not sufficient to show that [Danske Bank] had a culpable state of mind."  *Honickman*, 432 F. Supp. 3d at 269.

*    *    *

Analyzing these factors individually and collectively, plaintiffs have failed to state a claim, and all of plaintiffs' claims against Danske Bank should be dismissed.[5]

## III.     Danske Bank Is Not Amendable to Personal Jurisdiction in This Action.

Danske Bank, a Danish bank with its principal place of business in Copenhagen, Denmark (AC ¶ 61), is not properly subject to personal jurisdiction in respect of the claim here.

> To exercise personal jurisdiction over a foreign defendant, three requirements must be met.  "First, the plaintiff's service of process upon the defendant must have been procedurally proper.  Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective. . . . Third, the exercise of personal jurisdiction must comport with constitutional due process principles."

---

[5]     Plaintiffs' Complaint asserts two counts.  Both claims are brought under 18 U.S.C. § 2333(d), one captioned as based on an "attack predicate" (AC ¶ 2025), and the other referenced in the caption as based on a "RICO predicate" (*id*. ¶ 2034).  Plaintiffs do not explain their "RICO predicate" claim in their Complaint, and they declined to address this issue in their pre-motion letter.  Plaintiffs do not allege a RICO claim, and alleged RICO violations are not a basis for liability under the ATA.  Nevertheless, since plaintiffs failed to plead the requisite elements of an aiding-and-abetting claim under the ATA, the labels they apply to the supposed predicate acts of terrorism are irrelevant.

*Waldman* v. *Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (*quoting Licci* v.

*Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012)).  Danske Bank lacks

sufficient contacts with the United States to allow either general or specific personal jurisdiction.

Federal Rule of Civil Procedure 4(k)(2) "permits a federal court to exercise jurisdiction

over (1) a claim arising under federal law, (2) against a defendant served by a summons, (3) that

is not subject to the jurisdiction of any single state court, (4) provided that the exercise of federal

jurisdiction is consistent with the Constitution (and laws) of the United States."  *Bernhardt* v.

*Islamic Rep. of Iran*, 2020 WL 6743066, at *2 (D.D.C. Nov. 16, 2020).  Danske Bank waived

service of the summons, it is not subject to jurisdiction in any single state court,[6] and this claim

arises under federal law.  Thus, the relevant inquiry is whether "exercising jurisdiction . . .

comport[s] with due process as guaranteed by the Constitution of the United States."

*Zimmerman*, 2021 WL 75736, at *2.

> To establish that the exercise of personal jurisdiction comports with the due process
> clauses of the Fifth and Fourteenth Amendments, courts must determine both "whether a
> defendant has sufficient minimum contacts with the forum to justify the court's exercise
> of personal jurisdiction over the defendant" and "whether the assertion of personal
> jurisdiction over the defendant comports with traditional notions of fair play and
> substantial justice under the circumstances of the particular case."

*Johnson* v. *UBS AG*, 791 F. App'x 240, 242 (2d Cir. 2019); *see also In re Terrorist Attacks on*

*Sept. 11, 2001*, 349 F. Supp. 2d 765, 810–11 (S.D.N.Y.).

---

[6]     "[A]side from the truly exceptional case, a corporation is at home and subject to general
jurisdiction only in its place of incorporation or principal place of business.  *SPV Osus Ltd.* v. *UBS AG*,
882 F.3d 333, 343 (2d Cir. 2018).  Plaintiffs also assert that Danske Bank is subject to specific
jurisdiction under New York's long-arm statute, CPLR § 302 (AC ¶ 76).  But plaintiffs have failed to
show that Danske Bank "transacted business within the state[,] and [that] the claim asserted . . . arise[s]
from that business activity," as required for CPLR § 302 to apply, and the exercise of jurisdiction under
New York law likewise would lack sufficient minimum contacts under the Fourteenth Amendment.
*Zimmerman* v. *Cornell Outdoor Educ.*, 2021 WL 75736, at *4 (N.D.N.Y. Jan. 8, 2021).

To test the sufficiency of "minimum contacts," the "question in this case is whether the defendants' suit-related conduct—their role in the . . . terror attacks at issue—creates a substantial connection with the forum . . . pursuant to the ATA." *Waldman*, 835 F.3d at 335. "This requires the Court to determine 'if the defendant has purposefully directed his activities at residents of the forum and [if] the litigation results from alleged injuries that arise out of or relate to those activities.'" *Bernhardt*, 2020 WL 6743066, at *3 (quoting *Mwani* v. *bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005)). Plaintiffs offer only scant and deficient allegations of any "suit-related conduct" in the forum.

Plaintiffs' allegations regarding Danske Bank's alleged participation in VAT fraud make *no mention at all* of any transactions in the United States, alleging only that the funds flowed through accounts "at Danske Bank *in Denmark*." (AC ¶ 555 (emphasis added).) Accordingly, these allegations cannot serve as a basis to establish personal jurisdiction. The only Danske Bank activities alleged to be connected to the United States are transfers from a customer account at a Danske Bank branch in Estonia to Mazaka Trading that allegedly were intermediated by a separate New York correspondent bank during a "four-month period in 2014." (*Id*. ¶ 539.)

But the vast majority of plaintiffs allege that their injuries occurred in attacks *prior* to these alleged fund transfers—indeed, 101 were before 2014. This is not a case where Danske Bank is alleged to have engaged in transactions "in close proximity to the time of the terrorist attacks." *Miller* v. *Arab Bank, PLC*, 372 F. Supp. 3d 33, 44 (E.D.N.Y. 2019). Rather, plaintiffs impermissibly attempt to establish jurisdiction based on a small set of attenuated contacts that

lack a demonstrable connection to their injuries.  For plaintiffs injured prior to 2014, the alleged

fund transfers cannot possibly be "suit-related conduct."[7]

Further, for the reasons described above, plaintiffs may not validly rest their ATA claim

on this attenuated series of transactions over a few months in 2014.  The Court must examine the

"supporting facts in the complaint about the quality and the quantity of the alleged transfers to

determine whether defendants allegedly engaged in 'frequent and deliberate use' of New York

banks." *Singer* v. *Bank of Palestine*, 2021 WL 4205176, at \*5 (E.D.N.Y. Apr. 30, 2021).  The

relevant inquiry is whether Danske Bank's supposed "role in the . . . terror attacks at issue . . .

creates a substantial connection with the forum." *Waldman*, 835 F.3d at 335.  It does not.  The

limited correspondent bank transactions do not bear at all on plaintiffs' claims, and they are not

remotely similar to other cases that have found sufficient minimum contacts where "the

correspondent account at issue is alleged to have been used as an instrument to achieve the very

wrong alleged." *Licci*, 732 F.3d at 171.  Instead, the "facts" that supposedly support plaintiffs'

claims—if any—fail to establish any relevant connection to the United States to allow the

assertion of personal jurisdiction over Danske Bank. *Bernhardt*, 2020 WL 6743066, \*3

(plaintiffs "do not show that their injuries, caused by the tragic suicide attack . . ., 'arose out of'

or 'relate to' [the Bank's] contacts with the United States").

---

[7]      *See, e.g.*, *Strauss* v. *Credit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 23 (E.D.N.Y. 2016) (stating in dicta
that if "one of the attacks for which Plaintiffs sought recovery occurred in 1992, five years before the first
[transaction]," then "the nexus between claims arising from the 1992 attack and a series of transfers that
did not even begin to occur until five years later theoretically would be too attenuated to support
jurisdiction under" New York's long-arm statute"); *Standard Chartered Bank* v. *Ahmad Hamad Al
Gosaibi & Bros. Co.*, 2013 WL 5396923, \*2 (Sup. Ct. N.Y. Cnty. Sept. 24, 2013) (nexus required under
New York law absent because 2009 default could not have arisen from business the defendant transacted
in New York in 2010 and thereafter).

## **CONCLUSION**

For the foregoing reasons, Danske Bank and DMI respectfully request that this Court

dismiss the Complaint with prejudice.


Dated:  March 18, 2022

Respectfully submitted,

 /s/  Brian T. Frawley
Brian T. Frawley
Amanda Shami
Andrew M. Kaufman
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000

*Attorneys for Defendants Danske Bank A/S and
Danske Markets Inc.*