**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

AUGUST WILDMAN, *et al.*,

                Plaintiffs,

                -v.-

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

                Defendants.

---

No. 1:21-CV-04400 (KAM) (RML)

# STANDARD CHARTERED DEFENDANTS'
## MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS

Andrew J. Finn (finna@sullcrom.com)
Bradley P. Smith (smithbr@sullcrom.com)
Nicole L. Spaetzel (spaetzeln@sullcrom.com)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004

*Attorneys for Standard Chartered Bank,*
*Standard Chartered PLC, and Standard*
*Chartered Bank (Pakistan) Limited*

March 18, 2022

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 5

      A.     Plaintiffs and the Attacks ........................................................................................ 5

      B.     The SCB Defendants................................................................................................ 6

      C.     The Alleged Banking Transactions Involving the SCB Defendants ...................... 7

ARGUMENT ........................................................................................................................... 12

I.      The Amended Complaint Fails To Meet the Basic Notice Requirements
      of Rule 8 of the Federal Rules of Civil Procedure ............................................................ 12

II.     The Amended Complaint Also Fails To State
      Any Plausible JASTA Claim Against Any SCB Defendant.............................................. 15

      A.     The Amended Complaint Fails To Allege That Any SCB Defendant
            Was Aware It Was Playing a Role in Terrorist Activity in Afghanistan
            by Providing Banking Services to Individuals and Entities
            Around the World ................................................................................................. 16

      B.     The Amended Complaint Fails To Plead That the SCB Defendants
            Knowingly Provided Substantial Assistance to Anyone
            Who Carried Out the Attacks................................................................................ 19

      C.     The Amended Complaint Fails To Allege That the SCB Defendants
            Aided Anyone Who Committed the Terrorist Attacks
            That Caused Plaintiffs' Injuries .......................................................................... 23

III.    The Amended Complaint Fails To Allege Any Plausible Basis
      for Personal Jurisdiction over SC PLC or SCB Pakistan.................................................. 24

CONCLUSION........................................................................................................................ 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..................................................................................15

*Atuahene* v. *City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ...................................................................14

*Bernhart* v. *Islamic Republic of Iran*,
2020 WL 6743066 (D.D.C. Nov. 16, 2020) ...............................................27

*Bowman* v. *HSBC Holdings PLC*,
465 F. Supp. 3d 220 (E.D.N.Y. 2020) ................................................16, 19

*Calder* v. *Jones*,
465 U.S. 783 (1984)..................................................................................24

*Chambers* v. *Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).........................................................................5

*Daimler AG* v. *Bauman*,
571 U.S. 117 (2014)..................................................................................24

*Equinox Gallery Ltd.* v. *Dorfman*,
306 F. Supp. 3d. 560 (S.D.N.Y. 2018).........................................................7

*Glob. Network Commc'ns Inc.* v. *City of N.Y.*,
458 F.3d 150 (2d Cir. 2006).........................................................................9

*Halberstam* v. *Welch*,
705 F.2d 472 (D.C. Cir. 1983) .............................................................2, 19

*Honickman* v. *BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ............................................................... *passim*

*Infanti* v. *Scharpf*,
2008 WL 2397607 (E.D.N.Y. June 10, 2008) ..........................................14

*Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998)...........................................................................9

*Kaplan* v. *Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021).........................................................3, 16, 23

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012)..................................................................25

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)............................................................24, 25

*Linde* v. *Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018)......................................................16, 20, 22

*Miller* v. *Arab Bank, PLC*,
372 F. Supp. 3d. 33 (E.D.N.Y. 2019) .................................................25

*Ochre LLC* v. *Rockwell Architecture Planning & Design, P.C.*,
2012 WL 6082387 (S.D.N.Y. Dec. 3, 2012) ...................................14

*O'Sullivan* v. *Deutsche Bank AG*,
2019 WL 1409446 (S.D.N.Y. Mar. 28, 2019) .................................19

*Penguin Grp. (USA) Inc.* v. *Am. Buddha*,
609 F.3d 30 (2d Cir. 2010).................................................................24

*Pension Benefit Guar. Corp.* v. *Morgan Stanley Inv. Mgmt.*,
712 F.3d 705 (2d Cir. 2013)................................................................15

*Perry* v. *NYSARC, Inc.*,
424 F. App'x 23 (2d Cir. 2011) ............................................................7

*Prezzi* v. *Schelter*,
469 F.2d 691 (2d Cir. 1972)...............................................................14

*Rothstein* v. *UBS AG*,
708 F.3d 82 (2d Cir. 2013)......................................................4, 22, 23

*Salahuddin* v. *Cuomo*,
861 F.2d 40 (2d Cir. 1988).................................................................12

*Siegel* v. *HSBC Holdings, PLC*,
2018 WL 501610 (S.D.N.Y. Jan. 19, 2018) .....................5, 25, 26, 27

*Siegel* v. *HSBC N. Am. Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019)........................................... *passim*

*Stern* v. *State Univ. of N.Y.*,
2018 WL 4863588 (E.D.N.Y. Sept. 30, 2018) ................................10

## <u>TABLE OF AUTHORITIES</u> *(continued)*

<u>Page(s)</u>

*Strauss* v. *Credit Lyonnais, S.A.*,
   175 F. Supp. 3d 3 (E.D.N.Y. 2016) ............................................................24, 25, 26

*Tasaka* v. *Bayview Loan Servicing, LLC*,
   2021 WL 84232 (E.D.N.Y. Jan. 11, 2021) ............................................................12

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 676 (2d Cir. 2013).............................................................5, 24, 26, 27

*Weiss* v. *Nat'l Westminster Bank, PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ...................................................................25

*Weiss* v. *Nat'l Westminster Bank, PLC*,
   993 F.3d 144 (2d Cir. 2021).................................................................................1

**Rules and Statutes**

18 U.S.C. § 2333.............................................................................................1, 4, 15

N.Y. C.P.L.R. § 302..............................................................................................25

Federal Rule of Civil Procedure 8 ......................................................................12, 14

Federal Rule of Civil Procedure Rule 12 ................................................................15

## PRELIMINARY STATEMENT

The prolix original and amended complaints in this case each span nearly 600 pages and primarily describe various global networks of terrorist groups and their attacks on U.S. service members, including those in Afghanistan.  Those attacks are abhorrent and are rightfully condemned.  Through this lawsuit, however, Plaintiffs have sought to stretch aiding and abetting liability under the Antiterrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), to an untenable breadth to obtain a monetary recovery from Standard Chartered Bank ("SCB") and certain affiliates (the "SCB Defendants")[1] for providing U.S. Dollar clearing and other banking services to third parties around the world.  Plaintiffs' claims fail because they do not allege the SCB Defendants had any role in the acts of terrorism that injured Plaintiffs or that the SCB Defendants interacted with anyone who planned, authorized or committed those acts.

The Second Circuit has made clear through recent ATA decisions that aiding and abetting liability does not lie unless there is a sufficiently direct connection between a bank-defendant's customers and the relevant attacks and attackers.  *See Honickman* v. *BLOM Bank SAL*, 6 F.4th 487, 499 (2d Cir. 2021); *see also Weiss* v. *Nat'l Westminster Bank, PLC*, 993 F.3d 144, 164-67 (2d Cir. 2021); *Siegel* v. *HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224-26 (2d Cir. 2019).  To plead a plausible claim, Plaintiffs had to allege facts establishing that (1) each defendant was "'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance' (the 'general awareness' element)"; (2) each defendant engaged in conduct to "'knowingly and substantially assist the principal violation' (the

---

[1]      In addition to SCB, the Amended Complaint names as defendants Standard Chartered PLC ("SC PLC") and Standard Chartered Bank (Pakistan) Limited ("SCB Pakistan" and, collectively with SCB and SC PLC, the "SCB Defendants").

'substantial assistance' element)," which under the ATA is an act of international terrorism; and (3) "'the party whom the defendant aids must perform a wrongful act that causes an injury' (the 'aiding party who causes injury' element)," namely the act of international terrorism. *Honickman*, 6 F.4th at 494 (emphasis omitted) (quoting *Halberstam* v. *Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).

The Amended Complaint alleges that al-Qaeda and its affiliates in Afghanistan planned, authorized and committed the attacks that harmed Plaintiffs between 2011 and 2016, but does not link those attacks to anything that any SCB Defendant did.  Rather, Plaintiffs rely on vague and conclusory assertions that one or more of the SCB Defendants provided largely unspecified banking services to:

- two U.A.E. residents and one Russian with whom SCB and SCB Pakistan ceased doing business years before any of the attacks at issue (Am. Compl. ("AC") ¶¶ 496 (Mustafa Ahmed al-Hisawi), 499 (Viktor Bout), 501-02 (Abdul Baqi Bari));

- two U.A.E. companies that provided currency exchange services (*id.* ¶¶ 460-62 (Al Zarooni Exchange and Mazaka General Trading));

- two Pakistani fertilizer manufacturers, a small percentage of whose products allegedly were misused by terrorists (*id.* ¶¶ 525, 527 (Fatima Fertilizer Company Limited and Pakarab Fertilizers Limited); *see also id.* ¶ 381 (page 130)[2]); and

- one Afghan U.S. military subcontractor, whose relationship with the SCB Defendants ended years before allegations of his connection to terrorists were made public (*see id.* ¶ 481 (Hikmatullah Shadman)).

In addition, Plaintiffs make broad allegations about conduct by SCB or its affiliates in other countries with no nexus whatsoever to al-Qaeda or Afghanistan.  This does not plead any plausible aiding and abetting claim under the ATA.

---

[2]     The "corrected" Amended Complaint jumps from numbered paragraph 409 back to paragraph 247, causing duplicate paragraphs numbered 247-409.  For ease of reference, page numbers have been included for citations to paragraphs affected by this error.

*First*, Plaintiffs have not alleged any facts establishing the "general awareness element," which requires a showing that an SCB Defendant's customer "'w[as] so closely intertwined with [the terrorist attacker's] violent terrorist activities that one can reasonably infer that [the bank] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [the terrorist] attacks were foreseeable[,]'" *Honickman*, 6 F.4th at 499 (quoting *Kaplan* v. *Lebanese Canadian Bank, SAL*, 999 F.3d 841, 860-61 (2d Cir. 2021)).  Beyond general allegations of their support for terror groups, the Amended Complaint neither links any customer of an SCB Defendant to any attack that harmed Plaintiffs nor provides factual allegations that any SCB Defendant was aware of any customer's alleged links to al-Qaeda.  Moreover, nothing unlawful can be inferred from the types of banking services any SCB Defendant allegedly provided to identified customers.  In fact, the Amended Complaint does not even specify what banking services any SCB Defendant was allegedly providing to anyone, other than U.S. Dollar clearing for certain individuals, (*see* AC ¶¶ 482, 494, 503), and trade financing for companies in Pakistan, (*id.* ¶ 527).  These allegations are facially insufficient to establish that any SCB Defendant was generally aware of any customer's alleged role in the attacks.

*Second*, the Amended Complaint does not and cannot allege adequately that any SCB Defendant knowingly and substantially assisted the attacks at issue by providing banking services to third parties.  The Amended Complaint does not explain how any transaction involving any SCB Defendant facilitated the persons who committed the attacks.  Instead, the Amended Complaint contends that one or more of the SCB Defendants provided customers with access to U.S. Dollars through the international banking system and that those customers then eventually provided assistance to various terrorist groups, and members of al-Qaeda or its

affiliates carried out the attacks.  This is insufficient as a matter of law to establish the substantial

assistance element.  *See Honickman*, 6 F.4th at 501 (citing *Siegel*, 933 F.3d at 220-21).

Moreover, Plaintiffs' attenuated theory fails to meet even the basic requirements of an ATA

claim that each Plaintiff's injury must be proximately caused by a bank-defendant's transfer of

funds.  *Rothstein* v. *UBS AG*, 708 F.3d 82, 96-97 (2d Cir. 2013) (affirming dismissal where no

"nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS

transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable

to fund the attacks by Hizbollah and Hamas without the cash provided by UBS.")

   *Third*, the Amended Complaint also does not establish any SCB Defendant aided

the "person who committed" the attacks that caused Plaintiffs' injuries.  18 U.S.C. § 2333(d)(2).

Here, there is no factual allegation demonstrating that a customer of any SCB Defendant was

either the person who carried out one of the attacks at issue (al-Qaeda affiliates) or was a direct

intermediary of the person who did so.  At most, Plaintiffs contend that certain customers used

SCB or its affiliates for U.S. Dollar clearing or other legitimate banking services, which gave

those individuals or companies greater access to U.S. Dollars, which may have tangentially

benefited various terrorist groups that those individuals or companies allegedly supported,

including al-Qaeda.

   *Fourth*, Plaintiffs' claims against SC PLC and SCB Pakistan fail for the

independent reason that the Amended Complaint does not establish a prima facie basis for

personal jurisdiction.  SC PLC is a bank holding company based in the UK, and SCB Pakistan is

based in Pakistan.  Neither entity is alleged to have any U.S. presence other than through their

corporate affiliation with SCB, which has a New York branch and provides U.S. Dollar clearing

services.  There are no allegations that SC PLC (which the Amended Complaint sometimes

refers to as "SCB London") or SCB Pakistan maintained accounts or facilitated transactions for any "terrorists that perpetrated the [attacks]" at issue, and mere "[a]llegations that ["SCB London" and SCB Pakistan] provide[d] financial services to clients that associate with [terrorists], thereby aiding [terrorists], are 'not enough for personal jurisdiction purposes.'" *Siegel* v. *HSBC Holdings, PLC*, 2018 WL 501610, at *4 (S.D.N.Y. Jan. 19, 2018) (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676 (2d Cir. 2013)).

Accordingly, the Amended Complaint should be dismissed for failure to state a claim and lack of personal jurisdiction with respect to SC PLC and SCB Pakistan.

## BACKGROUND[3]

### A.   Plaintiffs and the Attacks

Plaintiffs are U.S. service members and/or their family members who were injured or killed in 120 attacks that occurred in Afghanistan between August 6, 2011 and November 12, 2016.  (*See* AC ¶¶ 1101-2024.)  The Amended Complaint contains contradictory allegations as to whether and to what extent a designated Foreign Terrorist Organization ("FTO") authorized, planned and/or committed those attacks.  The Amended Complaint includes one section alleging that al-Qaeda and its affiliates were solely responsible for authorizing, planning and committing the attacks (*id.* Part I.F), while elsewhere alleging that "[e]ach of the acts of international terrorism described below was committed by the Taliban, including its Haqqani Network, or jointly committed by the Taliban and al-Qaeda."  (*Id.* ¶ 1098.)  The Amended Complaint also describes a "Syndicate" of groups consisting of al-Qaeda, the Haqqani Network, the Taliban, as well as other groups called Lashkar-e-Taiba, Jaish-e-Mohammad and

---

[3]      The facts stated herein are taken from the Amended Complaint, documents cited therein or other information of which the Court may take judicial notice.  *See Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) (noting that when deciding a motion to dismiss, courts can consider documents incorporated into the complaint by reference).

D-Company, but does not specify those groups' alleged involvement in each attack.  Of these groups, only al-Qaeda, Lashkar-e-Taiba, and Jaish-e-Mohammad were designated FTOs at the time of the attacks.  (*Id.* ¶ 89.)  The Taliban and D-Company have never been designed as FTOs by the United States government,[4] and the Haqqani Network was not designated an FTO until September 2012.  (AC ¶ 89.)

### B.      The SCB Defendants

SCB is incorporated in England and Wales by Royal Charter and is headquartered in London.  SCB operates around the world through branches, including in New York and Dubai.  (AC ¶¶ 40, 43, 45.)  According to the Amended Complaint, SCB's New York branch "offers banking services to corporate and institutional clients only, primarily U.S. Dollar clearing for international wire payments and letters of credit," as well as "corporate lending, project and structured finance, trade finance, cash management, foreign exchange trading, and wire transfer services."  (*Id.* ¶ 43.)

SCB also has affiliates in certain countries, including SCB Pakistan.  According to the Amended Complaint, from 2001 to 2016, SCB Pakistan was one of the largest banks in Pakistan and focused on facilitating transactions for "parties in Pakistan and/or the U.A.E."  (*Id.* ¶¶ 46, 874, 876.)  SC PLC is a publicly traded London-based bank holding company and the ultimate parent of SCB and SCB Pakistan.  (*Id.* ¶ 42.)[5]  Neither SCB Pakistan nor SC PLC is

---

[4]      *See Foreign Terrorist Organizations*, U.S. Dep't State, https://www.state.gov/foreign-terrorist-organizations (Exhibit 1 to Declaration of Andrew J. Finn ("Finn Decl.")).

[5]      The Amended Complaint appears to use the term "SCB London" to refer to both SC PLC, (AC ¶ 42), and SCB's London headquarters (*e.g.*, *id.* ¶ 865), which are not the same.  As acknowledged by one of the documents cited in the Amended Complaint, SC PLC is the holding company of SCB.  Written Agreement by and Among Standard Chartered PLC, Standard Chartered Bank, Standard Chartered Bank New York Branch, Federal Reserve Bank of New York, and New York State Banking Department (Oct. 7, 2004) (Exhibit 2 to Finn Decl.) (cited in

alleged to have any presence in New York or the U.S.  The Amended Complaint contains

conclusory assertions that SCB's New York branch somehow "served as the principal" for SCB,

SCB Pakistan, and SC PLC but provides no explanation or factual predicate other than the fact

that SCB's New York branch is part of SCB.[6]  (*Id.* ¶ 55.)

### C.    The Alleged Banking Transactions Involving the SCB Defendants

There is no allegation that any SCB Defendant engaged in any transaction with

any FTO or anyone who authorized, planned or committed the attacks that harmed Plaintiffs.

The Amended Complaint does not even allege that any transaction involving an SCB Defendant

facilitated in any way the persons who actually committed those attacks.  Instead, the Amended

Complaint provides a series of disjointed allegations about various individuals or companies with

or for whom some SCB branch or affiliate allegedly engaged in financial transactions or

provided banking services.  The transactions fall into four categories:

1.    *Individual Transactions*.  The Amended Complaint alleges that one or

more of the SCB Defendants facilitated unspecified U.S. Dollar transactions for several

individuals in the U.A.E. (AC ¶¶ 491 (Mustafa Ahmed al-Hisawi), 503 (Abdul Baqi Bari)),

Russia (*id.* ¶ 499 (Viktor Bout)), Afghanistan (*id.* ¶ 481 (Hikmatullah Shadman)), and Germany

---

AC ¶ 865 n.563).  The Court need not accept as true allegations that are inconsistent with
documents on which the Amended Complaint relies.  *See Perry* v. *NYSARC, Inc.*, 424 F. App'x
23, 25 (2d Cir. 2011); *see also Equinox Gallery Ltd.* v. *Dorfman*, 306 F. Supp. 3d. 560, 575-56
(S.D.N.Y. 2018) ("[O]n a motion to dismiss, where a document cited in the complaint is
inconsistent with the allegations set forth in the complaint, 'the document, not the allegations,
control, and the court need not accept the allegations in the complaint as true.'" (citation
omitted)).

6       The Amended Complaint erroneously lists "Standard Chartered Bank Ltd." and "SCB
Dubai" as defendants.  (*See* AC ¶¶ 43, 45.)  However, Plaintiffs stipulated to the dismissal of
those defendants because "Standard Chartered Bank Ltd." does not exist and "SCB Dubai" is not
a separate entity but rather a branch of SCB.  (ECF No. 10.)

(*id.* ¶ 474 (Samir Azizi)).  None of these individuals appears to be associated with the others, and the Amended Complaint fails to specify the types of banking services or transactions that any SCB Defendant allegedly provided to these individuals, or how those services or transactions were themselves illegal or improper at the time they occurred.  There also is no allegation that any of these individuals committed or were involved in any way with the attacks at issue here.  Instead, the Amended Complaint makes an amalgam of allegations of how these individuals secretly engaged in either money laundering or other frauds that indirectly benefited various terrorist organizations.  (*See*, *e.g.*, *id.* ¶¶ 288 (page 157), 486, 496, 499, 503.)  There is no factual allegation that any SCB Defendant knew at the time of the alleged transactions that any of these individuals were engaged in any illegal activity, or that they were associated in any way with any terrorist group.

Moreover, to the extent there is any specificity about the types of transactions or services provided, the Amended Complaint makes clear that many of them did not occur around the time of the attacks (which happened from 2011 to 2016).  Specifically, SCB allegedly ceased doing any business with al-Hisawi in 2003 (*id.* ¶ 496); SCB and SCB Pakistan ceased doing business with Bari in approximately 2006 (*id.* ¶¶ 501-02); SCB ceased transactions with Bout in 2008 (*id.* ¶ 499); and SCB and SCB Pakistan ceased doing business with Shadman, a U.S. military subcontractor, in November 2012, years before the Amended Complaint suggests any alleged connection between Mr. Shadman and terrorists became public.[7]  (*Id.* ¶¶ 481, 483.)

---

[7]     There is no allegation suggesting Mr. Shadman's alleged terrorist connections were publicly known until 2015, long after SCB and SCB Pakistan ceased providing banking services to Mr. Shadman.  (AC ¶ 315 (page 166).)  The Amended Complaint misleadingly cites to "November 2012 proceedings" against Shadman, suggesting those proceedings revealed Mr. Shadman's connection to terrorists.  The cited 2012 proceedings, however, concerned Mr. Shadman allegedly defrauding the U.S. government as a military subcontractor by paying

2.      *U.A.E. Money Exchanges*.  The Amended Complaint also alleges that between 2008 and 2016 SCB's New York and Dubai branches, "SCB London," and SCB Pakistan "provided financial services" to two U.A.E. currency exchanges:  Al Zarooni Exchange and Mazaka General Trading.  (AC ¶ 458.)  According to the Amended Complaint, these companies were "front" companies for an individual named Altaf Khanani, who in turn engaged in money laundering that benefited al-Qaeda's and the Haqqani Network's agents.  (*Id.* ¶¶ 277 (page 154), 460-62.)  Again, the Amended Complaint does not specify what financial services any SCB Defendant provided to Al Zarooni Exchange or Mazaka General Trading, or that any of those services were illegal or improper at the time.  Nor does the Amended Complaint contain any factual allegation suggesting any SCB Defendant was aware that either company was a mere "front" for money laundering or that any of the transactions with the SCB Defendants were connected to any terrorist group.

In the more than one hundred paragraphs of the Amended Complaint devoted to Mr. Khanani and his activities, there are no factual allegations suggesting that SCB, "SCB London," or SCB Pakistan were aware that Al Zarooni Exchange and Mazaka General Trading had any relationship with Mr. Khanani, let alone to al-Qaeda or its affiliates.  Instead, Plaintiffs

---

kickbacks to service members and charging inflated prices.  (*See id.* ¶ 485 n.319 (citing Stipulation and Settlement Agreement Between the United States of America and Hikmatullah Shadman, Rohullah Faizy, and Najibullah Sadullah, *United States* v. *Sum of $70,990,605*, No. 1:12-cv-01905 (D.D.C. Feb. 22, 2019), ECF No. 345-1 (Exhibit 3 to Finn Decl.)); *see also* Verified Complaint for Forfeiture in Rem, *United States* v. *Sum of $70,990,605*, No. 12-cv-1905 (D.D.C. Nov. 20, 2012), ECF No. 3 (Exhibit 4 to Finn Decl.).)  There is no mention in the cited document of any connection to the Taliban.  The Court may take judicial notice of pleadings in another action in deciding a motion to dismiss.  *See Glob. Network Commc'ns Inc.* v. *City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) (finding that, when deciding a motion to dismiss, "[a] court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))).

cite a single U.S. government press release from 2015 stating that "Khanani . . . and Al Zarooni

Exchange [were] involved in the movement of funds for the Taliban," (AC ¶ 265(iii)

(page 149)), which the Amended Complaint acknowledges was published "[a] few months" *after*

Mr. Khanani was arrested and, therefore, ceased any alleged use of Al Zarooni and Mazaka

General Trading's accounts at SCB's branches and affiliates.  (*See id.* ¶¶ 265, 468.)  The

Amended Complaint also asserts based on unsubstantiated "information and belief" that "by

2013" unspecified persons at "each SCB Defendant" knew about an unidentified whistleblower

who "had raised concerns" about "facilitat[ing] terrorist finance activity by Khanani." (*Id.*

¶ 472.)[8]

> **3.**    ***Fertilizer Manufacturers***.  The Amended Complaint further alleges that

SCB and SCB Pakistan provided routine "foreign exchange and export finance services" and

"letters of credit" that "enabled" two Pakistani fertilizer companies (Fatima Fertilizer Co.

---

[8]    The Amended Complaint purports to quote this whistleblower but does not specify who the whistleblower was or his or her basis for having any relevant knowledge.  "While a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded."  *Stern* v. *State Univ. of N.Y.*, 2018 WL 4863588, at *18 (E.D.N.Y. Sept. 30, 2018) (quoting *CBF Industria de Gusa S/A* v. *AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 645 (S.D.N.Y. 2018) (citations and internal quotation marks omitted))).  The Amended Complaint fails to do so.  In addition, at least some of the material quoted from the purported whistleblower appears to be excerpts from news articles in 2019 and 2020, rather than any contemporaneous statement from anyone associated with the SCB Defendants.  *See* Adam Luck, *Whistleblower Says Bank Has Blood on Its Hands:  RAF Veteran Claims Standard Chartered Helped Iran Terrorists, Ahead of Court Battle*, THIS IS MONEY (Sept. 7, 2019), https://www.thisismoney.co.uk/money/news/article-7438381/Standard-Chartered-faces-allegations-helped-facilitate-deadly-attacks-British-troops.html (Exhibit 5 to Finn Decl.) ("[R]eferring to evidence in court papers . . . filed in the US with details of the allegations, [he] said: 'The bank has blood on its hands.'"); Richard Holmes, et al., *Standard Chartered's Iran Problems Didn't Go Away*, BUZZFEED NEWS (Sept. 21, 2020), https://www.buzzfeednews.com/article/richholmes/standard-chartered-bank-money-iran-fbi (Exhibit 6 to Finn Decl.) (discussing transactions for Al Zarooni Exchange in 2009 and 2010).

("Fatima") and Pakarab Fertilizers Ltd. ("Pakarab")) to do business.  (AC ¶¶ 505, 525, 527,

1076.)  Plaintiffs allege that those companies manufactured calcium ammonium nitrate ("CAN")

fertilizer, and that fertilizer dealers (not Fatima or Pakarab) sold up to 1% of that CAN fertilizer

to persons with "links to [] insurgents" who then "transferred" the fertilizer to "insurgents," who

then "smuggled" the CAN fertilizer "across [Pakistan's] border into Afghanistan," where al-

Qaeda misused that fertilizer to make bombs that were "distribute[d]" to the "relevant Syndicate

terrorist cells throughout Afghanistan."  (*Id.* ¶¶ 392 (page 133), 513-15.)  The Amended

Complaint does not allege that any of the trade financing services SCB Pakistan allegedly

provided to Fatima or Pakarab were illegal or improper, or that SCB Pakistan was aware that

Fatima or Pakarab (either directly or through dealers) were using their accounts for any illegal

activity, let alone to support terrorists or terroristic acts.[9]

       **4.**     ***Iranian Entities.***  The Amended Complaint also alleges that SCB and its

Dubai branch "facilitat[ed]" and "support[ed]" transactions for the National Iranian Oil

Company ("NIOC") and the National Iranian Tanker Company ("NITC"), and that the Iranian

government and the Islamic Revolutionary Guard Corps ("IRGC") used those state-owned

entities to support Hezbollah and other terrorist groups.  (AC ¶¶ 432, 488-89.)  But the Amended

Complaint does not allege that NIOC or NITC were customers of any SCB Defendant, nor does

the Amended Complaint allege what any SCB Defendant did to "facilitate" or "support" any

---

[9]     The Amended Complaint's allegation taken from a 2019 news article that in 2013 a U.S. military official told "senior executives" at SCB's New York branch's office that he believed Fatima and Pakarab's CAN fertilizer was being misused by terrorists fails to suggest any relevant or sufficient knowledge by any SCB Defendant.  There is no allegation that any of the SCB Defendants obtained knowledge from that alleged meeting that Fatima or Pakarab were acting as mere intermediaries for terrorists in Afghanistan.  (*See* AC ¶¶ 505 n.324, 529.)

transaction.  Further, the Amended Complaint does not allege that Hezbollah or any other Iranian

group or entity planned, authorized or committed any of the relevant attacks in Afghanistan.

**ARGUMENT**

**I.      THE AMENDED COMPLAINT FAILS TO MEET THE BASIC NOTICE
REQUIREMENTS OF RULE 8 OF THE FEDERAL RULES OF CIVIL
PROCEDURE.**

Federal Rule of Civil Procedure 8 requires that pleadings contain "a short and

plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).

The purpose of this rule is to "give the adverse party fair notice of the claim asserted so as to

enable him to answer and prepare for trial."  *Salahuddin* v. *Cuomo*, 861 F.2d 40, 42 (2d Cir.

1988).  Thus, a complaint must contain factual allegations that "clearly state what each defendant

did or failed to do and why [plaintiff] is entitled to the relief [sought]."  *Tasaka* v. *Bayview Loan*

*Servicing, LLC*, 2021 WL 84232, at *3 (E.D.N.Y. Jan. 11, 2021).  "The statement should be

short because '[u]nnecessary prolixity in a pleading places an unjustified burden on the court and

the party who must respond to it because they are forced to select the relevant material from a

mass of verbiage.'"  *Salahuddin*, 861 F.2d at 42.  The Court may dismiss a complaint that

violates Rule 8 without leave to amend, particularly where, as here, "leave to amend has

previously been given and the successive pleadings remain prolix and unintelligible."  *Id.*

As this Court recognized at a pre-motion conference on December 7, 2021, the

original complaint was "a monster" spanning nearly 600 pages and included "a lot of entities and

names . . . that really don't seem to have a direct connection to any of the defendants or [the]

claims or any of the alleged acts for which [Plaintiffs] seek compensation."  (Tr. of Pre-Motion

Conf. at 5:2-3, 6:22-7:1 (Exhibit 7 to Finn Decl.).)  After the SCB Defendants and other

appearing Defendants filed letters summarizing the grounds on which they anticipated moving to

dismiss, the Court granted Plaintiffs leave to amend, stressing that Plaintiffs should "try very

-12-

hard to shorten the allegations, focus on the factual deficiencies that are identified . . . , add those facts, [and] take out everything that is not absolutely relevant and material to [Plaintiffs'] claim[s]." (*Id.* at 15:21-25.)  In response, Plaintiffs' counsel represented that Plaintiffs expected to add new co-counsel "to come on board and serve as lead counsel," add "additional clients in the complaint," and "spend[] a lot of time to comport the complaint to what [this Court] described." (*Id.* at 9:9-15; 12:13-17.)  The Amended Complaint does none of this.

The Amended Complaint still spans nearly 600 pages with more than 2000 paragraphs of largely irrelevant allegations and assertions about banks and terrorism generally, including material that appears to have been copied and pasted from pleadings in an unrelated ATA case.[10]  And rather than focusing the allegations, the Amended Complaint adds *more* vague and conclusory assertions about persons or entities who have no apparent connection to any of the at-issue attacks that injured Plaintiffs, the FTO that allegedly planned or authorized those attacks (al-Qaeda), or any person who committed them.[11]  Moreover, no new counsel have appeared and no new Plaintiffs have been added.  The Court should not be forced to sift through such a massive and disjointed complaint in search of relevant allegation, nor should the SCB Defendants be forced to respond to it.

---

[10]    *Compare* AC ¶¶ 733-34 & n.463 (mentioning "defendant MTN Irancell," even though there is no such defendant in this action), *with* Amended Complaint, *Zobay* v. *MTN Grp Ltd.*, No. 21-cv-03503, ¶¶ 902-03 & n.438 (E.D.N.Y. Feb. 9, 2022), ECF No. 52 (Exhibit 8 to Finn Decl.). *Compare also* AC ¶¶ 329-30 (page 113) (discussing attacks in Iraq by al-Qaeda-in-Iraq and Ansar al-Islam (irrelevant to attacks in Afghanistan)), *with* Exhibit 8 to Finn Decl. ¶¶ 623-24.

[11]    For example, the Amended Complaint adds pages of irrelevant allegations concerning the IRGC and the NIOC and NITC, (*see*, *e.g.*, AC ¶¶ 246-97 (pages 84-102); 488-90), without providing any factual allegations tying IRGC or the NIOC or NITC to any of the at-issue attacks in Afghanistan.  The Amended Complaint also adds new allegations that SCB and "SCB London" "facilitated" "value transfers" for a German individual (Samir Azizi), (*see*, *e.g.*, *id.* ¶¶ 473-79), but does not specify any transactions that SCB or "SCB London" facilitated let alone how these unspecified transactions related to the attacks in Afghanistan.

Further, the Amended Complaint repeatedly groups separate SCB Defendants together in allegations without specifying any conduct taken by each of the identified SCB Defendants.  (*See*, *e.g.*, AC ¶¶ 463, 472, 525-26.)  This improper group pleading makes it impossible to assess the basis of allegations against any particular SCB Defendant.  *Atuahene* v. *City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (affirming dismissal of complaint that impermissibly "lump[ed] all the defendants together in each claim and provid[ed] no factual basis to distinguish their conduct"); *Ochre LLC* v. *Rockwell Architecture Planning & Design, P.C.*, 2012 WL 6082387, at *6 (S.D.N.Y. Dec. 3, 2012) ("A plaintiff cannot merely 'lump[ ] all the defendants together in each claim and provid[e] no factual basis to distinguish their conduct.'" (*quoting Simmons* v. *Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995)).[12]

Because the Amended Complaint fails to meet the basic requirements of Rule 8, it should be dismissed for this reason alone.  *See*, *e.g.*, *Prezzi* v. *Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (affirming dismissal of amended complaint, which was "equally prolix" as the first complaint, for failing to satisfy Rule 8); *see also Infanti* v. *Scharpf*, 2008 WL 2397607, at *2 (E.D.N.Y. June 10, 2008) (dismissing for failure to comply with Rule 8 a 90-page, 500-paragraph complaint, which included hundreds of paragraphs of "ambling accusations and moral condemnation of Defendants," and "lump[ed] Defendants together without clearly linking specific wrongs to them individually").

---

[12]   Likewise, lumping separate SCB Defendants together in allegations makes it impossible to decipher what specific conduct, if any, is alleged to have been directed at the United States by each SCB Defendant for the purpose of evaluating specific personal jurisdiction.  For example, the Amended Complaint uses the term "SCB London" to refer to both SC PLC and SCB's London headquarters, which are not the same.  (*Supra* pages 6-7 & n.5.)

## II.     THE AMENDED COMPLAINT ALSO FAILS TO STATE ANY PLAUSIBLE JASTA CLAIM AGAINST ANY SCB DEFENDANT.

In any event, the Amended Complaint does not state a viable claim.  To do so under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard requires more than a "sheer possibility," and a complaint cannot cross the threshold from "possibility" to "plausiblility" using alleged "facts that are 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). Moreover, a complaint cannot plead a claim through mere "labels and conclusions", "formulaic recitation[s] of the elements of a cause of action", or "naked assertion[s] devoid of further factual enhancement."  *Pension Benefit Guar. Corp.* v. *Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

Section 2333(d)(2) of the ATA, as amended by JASTA, provides a statutory claim for damages for persons injured by an act of international terrorism "committed, planned, or authorized by an organization that had been designated" as an FTO against "any person who aids and abets, by knowingly providing substantial assistance, . . . the person who committed such an act of international terrorism."  *Id.*  To plead an aiding and abetting claim, a complaint must plead facts establishing that each defendant:  (1) was "'generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance' (the 'general awareness' element)";  (2) engaged in conduct to "'knowingly and substantially assist the principal violation' (the 'substantial assistance' element)," which under the ATA is an act of international terrorism; and (3) "'the party whom the defendant aids must perform a wrongful act

that causes an injury' (the 'aiding party who causes injury' element)," namely the act of international terrorism. *Honickman*, 6 F.4th at 494.

The Amended Complaint fails to plausibly allege any of these elements.

**A. The Amended Complaint Fails To Allege That Any SCB Defendant Was Aware It Was Playing a Role in Terrorist Activity in Afghanistan by Providing Banking Services to Individuals and Entities Around the World.**

To plead the general awareness element of an aiding and abetting claim, the Amended Complaint must allege facts establishing that each SCB Defendant was "aware that, by assisting the principal, it [was] itself assuming a role in terrorist activities" "at the time that [it] provide[d] the assistance." *Linde* v. *Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (internal quotation marks omitted). In the context of a bank, "the relevant inquiry for the general awareness element is: did Plaintiffs 'plausibly allege[ ] the [bank's customers] were so closely intertwined with [the terrorist attacker's] violent terrorist activities that one can reasonably infer that [defendant] was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which [the terrorist] attacks were foreseeable[.]'" *Honickman*, 6 F.4th at 499 (quoting *Kaplan*, 999 F.3d at 860-61). "[A]llegations that a defendant 'knowingly provid[ed] material support to an FTO, without more, does not as a matter of law satisfy the general awareness element.'" *Honickman*, 6 F.4th at 499 (emphasis omitted) (quoting *Kaplan*, 999 F.3d at 860). Thus, the mere "knowledge of the organization's connection to terrorism" is insufficient to meet the general awareness element, and the provision of routine banking services—even to an FTO—does not render a bank liable for aiding and abetting a terrorist attack. *Linde*, 882 F.3d at 329-30.

Here, the Amended Complaint does not allege that any SCB Defendant provided any banking services to the alleged FTO that planned, authorized or committed the attacks at issue (al-Qaeda and its affiliates). *See Bowman* v. *HSBC Holdings PLC*, 465 F. Supp. 3d 220,

231 (E.D.N.Y. 2020) (dismissing JASTA claims where complaint lacked "any factual allegations showing a connection between *the bank's services* and the terrorist activity at issue [, which] is fatal to Plaintiffs' aiding and abetting claim" (emphasis added)).  The Amended Complaint also does not allege facts suggesting that any SCB Defendant was aware that any of the individuals or companies with whom it allegedly did business in Pakistan, the U.A.E., Germany, Russia, or Afghanistan were doing anything illegal, let alone that they were involved in terrorist attacks.

Nor does the Amended Complaint contain factual allegations suggesting that any of the individuals or companies that allegedly used bank accounts or services of any SCB Defendant were closely intertwined with al-Qaeda's terrorist activities or that the SCB Defendants were aware of those connections.  To the contrary, the Amended Complaint at most alleges that one or more of the SCB Defendants provided lawful U.S. Dollar clearing or other banking services at various times to (a) two U.A.E individuals and one Russian individual years before any of the attacks at issue here, (AC ¶¶ 496 (Mustafa Ahmed al-Hisawi), 499 (Viktor Bout), 501-02 (Abdul Baqi Bari)), (b) two U.A.E. companies that provided currency exchange services to others, (*id.* ¶¶ 460-62 (Al Zarooni Exchange and Mazaka General Trading)), (c) two Pakistani fertilizer manufacturers, (*see id.* ¶¶ 525, 527 (Fatima and Pakarab)), and (d) one Afghan U.S. military subcontractor, whose relationship with the SCB Defendants ended years before his alleged association with terrorists was made public, (*id.* ¶ 486 (Hikmatullah Shadman)).[13]

---

[13]    The Amended Complaint also contains a vague allegation that Samir Azizi claimed that SCB "'made available' the company Fairfax Partners Ltd.," (AC ¶ 476), without providing any context explaining what "made available" means or how Fairfax Partners Ltd. had anything to do with al-Qaeda's attacks in Afghanistan.  Further, there is no allegation that Samir Azizi was a customer of any of the SCB Defendants, making it impossible to infer any relevant knowledge by an SCB Defendant.  *Honickman*, 6 F.4th at 499.

Moreover, the Amended Complaint states that any banking services provided to or for the benefit of all but one of the identified individuals who allegedly had a connection to one or more SCB Defendant ended *years* before the 2011 to 2016 attacks at issue, (*see supra* pages 7-8), "mak[ing] it implausible under the circumstances that [the SCB Defendants] had knowingly assumed a role in the [a]ttacks." *Siegel*, 933 F.3d at 224. As to the remaining individual, an Afghan U.S. military subcontractor, there is no factual allegation that any SCB Defendant knew that individual had any association with terrorists prior to a report published in 2015, three years after SCB and SCB Pakistan ceased providing banking services to him in 2012 (*see supra* page 8 & n.7). Moreover, the Amended Complaint does not allege that the Pakistani fertilizer manufacturers or the U.A.E. currency exchange companies that received banking services from SCB Pakistan or SCB were entirely terrorist fronts without legitimate business operations. In fact, the Amended Complaint alleges that at most 1% of the fertilizer produced by the Pakistani companies ended up in the hands of terrorist bomb makers, who misused the product. (AC ¶ 515.) *See Siegel*, 933 F.3d at 225 ("[The customer-bank] is a large bank with vast operations, and the plaintiffs do not allege—even conclusorily—that most, or even many, of [defendant-bank's] services to [the customer-bank] assisted terrorism.").

Further, Plaintiffs cannot establish the required knowledge by alleging that some of the individuals or companies also engaged in or facilitated illicit activities like money laundering or fraud that may have benefited al-Qaeda or other terrorist groups. (*E.g.*, AC ¶¶ 277 (page 1154), 429.) There are no factual allegations suggesting that any SCB Defendant was aware of the alleged illicit activities of the individuals or companies at the time any banking services were provided. In addition, the Amended Complaint's contention that the SCB Defendants should have known or expected that some customers or counterparties seeking U.S.

Dollar clearing or engaging in U.S. Dollar transactions in "high-risk terrorist finance jurisdictions" were involved in terrorism, (*id.* ¶ 637), comes nowhere close to establishing the requisite awareness to sustain an aiding and abetting claim.  Indeed, Plaintiffs' claim in this regard rests on the fact that money is fungible and any transaction in these "high-risk terrorist finance jurisdictions" could (directly or indirectly) put money in the hands of terrorists.  (*See id.* ¶ 652.)  The Second Circuit expressly rejected that theory of liability in *Honickman*.  6 F.4th at 498-99.

The Amended Complaint's other scattershot allegations about SCB engaging in financial transactions for the benefit of Iranian state-owned companies that allegedly supported Hezbollah fare no better.  Plaintiffs nowhere allege how any transaction involving those Iranian companies had anything to do with terrorist attacks in Afghanistan.  Courts in this District and the Southern District of New York uniformly have dismissed claims based on nearly identical allegations, in part because the allegations do not suggest that SCB "knew that the financial services they provided to the various Iranian entities were destined to aid the FTOs responsible for the attacks that injured [p]laintiffs."  *O'Sullivan* v. *Deutsche Bank AG*, 2019 WL 1409446, at *10 (S.D.N.Y. Mar. 28, 2019) (dismissing JASTA aiding and abetting claims); *see also Bowman*, 465 F. Supp. 3d at 232 (same).  The same is true here.

B.    **The Amended Complaint Fails To Plead That the SCB Defendants Knowingly Provided Substantial Assistance to Anyone Who Carried Out the Attacks.**

To plead the knowing and substantial assistance element, the Amended Complaint must establish that the "principal violation"—*i.e.*, al-Qaeda's attacks in Afghanistan that injured Plaintiffs—was foreseeable from some unlawful activity that an SCB Defendant assisted. *Honickman*, 6 F.4th at 499 (quoting *Halberstam*, 705 F.2d at 477).  To determine whether the Amended Complaint adequately pleads this element, the Court must consider "(1) the nature of

-19-

the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Honickman*, 6 F.4th at 499-500 (quoting *Linde*, 882 F.3d at 329). The Amended Complaint is devoid of any allegations suggesting the SCB Defendants knowingly or substantially assisted any terrorist attack.

The Amended Complaint does not allege that the SCB Defendants encouraged any terrorist activity whatsoever or were present at the time of the attacks in Afghanistan. Moreover, the Amended Complaint does not identify any actual assistance any SCB Defendant provided to any terrorist attack, let alone specify the amount of that assistance. Instead, Plaintiffs simply estimate dollar amounts of financial transactions carried out by persons and companies that allegedly had some connection to SCB or its affiliates. (*See* AC ¶ 446.) But providing routine banking services to a customer (even if that person is allegedly a front for or supporter of terrorist groups) does not equate to substantial assistance *to the principal violation* of the terrorist attacks at issue in this case. *See Honickman*, 6 F.4th at 501 (citing *Siegel*, 933 F.3d at 220-21). Further, as set forth above, (*supra* pages 7-8 and 18), the time periods during which SCB or its affiliates allegedly engaged in many of the alleged transactions are far removed from the relevant attacks.

The Amended Complaint also fails to allege a direct or close relationship between any of the SCB Defendants and the al-Qaeda-affiliated persons or groups that allegedly carried out the attacks. For example, the Amended Complaint alleges that the SCB Defendants provided "foreign exchange and export finance services" and "letters of credit" to two Pakistani fertilizer companies, and "provided financial services" to two U.A.E. money exchanges and a handful of individuals in the U.A.E., Russia, Germany and Afghanistan. At most, the Amended Complaint

alleges that some of those individuals or entities engaged in non-violent or even legitimate business, and that some of those individuals or entities engaged in conduct that may have benefited a variety of terrorist groups, including al-Qaeda.  None of the individuals or companies with whom an SCB Defendant is alleged to have interacted is alleged to have been involved in any of the attacks at issue.  (*See* AC ¶¶ 1101-2024.)

The Second Circuit made clear in *Siegel* that attenuated relationships between a defendant-bank and the principal that committed terrorist attacks do not meet the knowing and substantial assistance element.  *Siegel*, 933 F.3d at 220-21, 225; *see also Honickman*, 6 F.4th at 501.  In *Siegel*, the defendant-bank's "relation to the principal" attackers was "several steps removed:  it allegedly had a commercial relationship with another bank that was linked to various terrorist organizations including the FTO that caused the plaintiffs' injuries." *Honickman*, 6 F.4th at 501 (emphasis omitted) (citing *Siegel*, 933 F.3d at 220–21).

Plaintiffs' only effort to even connect transactions involving the SCB Defendants to an attack in Afghanistan relates to two Pakistani fertilizer manufacturers, and is even more attenuated than the allegations in *Siegel*.  The Amended Complaint alleges SCB, "SCB London," and SCB Pakistan provided trade financing and letters of credit to Fatima and Pakarab, which manufactured and sold legitimate fertilizer products, one of which was called CAN fertilizer. Somehow up to 1% of those companies' CAN fertilizer was allegedly purchased from fertilizer dealers by persons with "links to [] insurgents."  (AC ¶¶ 513-515.)  Those persons then "transferred" the fertilizer to "insurgents," who "smuggled" the CAN fertilizer "across [Pakistan's] border into Afghanistan," where "al-Qaeda's bombmakers . . . cooked down . . . CAN Fertilizer into ammonium nitrate," and then "prepare[d] the ammonium nitrate to be used in . . . bombs."  (*Id.* ¶¶ 392 (page 133), 513-14.)  The bombs then were "distribute[d]" to the

"relevant Syndicate terrorist cells throughout Afghanistan" who in turn committed the attacks in Afghanistan that caused some of Plaintiffs' injuries.  (*Id.* ¶ 392 (page 133).)  Such an attenuated relationship between the SCB Defendants and the attacks fails to support Plaintiffs' aiding and abetting claims under JASTA as a matter of law.  *See Siegel*, 933 F.3d at 220-21; *Honickman*, 6 F.4th at 501.

    With respect to the remaining companies and individuals with or for whom SCB or its affiliates engaged in financial transactions (Mustafa Ahmed al-Hisawi, Abdul Baqi Bari, Viktor Bout, Hikmatullah Shadman, Samir Azizi, Al Zarooni Exchange, Mazaka General Trading, NIOC, and NITC), the Amended Complaint does not even attempt to connect those transactions directly or indirectly to the attacks at issue.  Instead, Plaintiffs rely on vague and insufficient generalizations about providing access to fungible U.S. Dollars.  The Second Circuit and other courts have consistently rejected this hand-waving, finding it insufficient to support a claim under the ATA and JASTA.  *Honickman*, 6 F.4th at 499 ("[A]iding and abetting 'requires more than the provision of material support to a designated terrorist organization[.]'" (quoting *Linde*, 882 F.3d at 329)).

    In addition, Plaintiffs' theory fails to meet even the baseline proximate causation requirements of an ATA claim, as defined by the Second Circuit in *Rothstein* vs. *UBS*.  There, the Court rejected an aiding and abetting claim brought pre-JASTA under the ATA, based on allegations that UBS had provided banking services to Iranian entities that supported terrorist organizations like Hamas and Hezbollah.  The Second Circuit found that plaintiffs had failed to plead proximate causation because there was "no nonconclusory allegation in the Complaint that plausibly shows that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas or that Iran would have been unable to fund the attacks by Hizbollah and Hamas without the cash

provided by UBS." *Rothstein*, 708 F.3d at 96-97.  Here, too, the Amended Complaint fails to allege facts showing that any money that passed through any SCB Defendant was in fact sent to al-Qaeda, or that al-Qaeda would not have been able to fund the attacks at issue without U.S. Dollars provided through an SCB Defendant.

<blockquote>

**C.     The Amended Complaint Fails To Allege That the SCB Defendants Aided Anyone Who Committed the Terrorist Attacks That Caused Plaintiffs' Injuries.**

</blockquote>

To establish that "the party whom the [SCB Defendants] aid[ed]" committed the wrongful act that caused Plaintiffs' injuries, Plaintiffs must allege facts demonstrating a direct link between each SCB Defendant and the person(s) who carried out the attacks in Afghanistan, including by identifying an "'intermediary' of the principal" attacker. *Honickman*, 6 F.4th at 495-96; *see also Kaplan*, 999 F.3d at 849, 856.  Here, however, the Amended Complaint does not allege that any of the SCB Defendants' customers were the principal persons who carried out any of the attacks that caused Plaintiffs' injuries.  Unlike allegations present in *Honickman* and *Kaplan*, the Amended Complaint does not allege that any of the SCB Defendants' customers had a direct relationship with the persons or group who carried out the attacks that caused Plaintiffs' injuries.  Instead, as detailed above, the Amended Complaint alleges (at most) that one or more SCB or SCB Pakistan customers engaged in financial transactions and that some of those customers' independent conduct may have supported various terrorist groups.  *See supra* II.B. For many customers, the Amended Complaint makes no effort to connect the alleged customer and the attacks in any way.  Because the Amended Complaint fails to allege that any SCB Defendant aided the person(s) who carried out the attacks that caused Plaintiffs' injuries, the aiding and abetting claims must be dismissed.

## III.    THE AMENDED COMPLAINT FAILS TO ALLEGE ANY PLAUSIBLE BASIS FOR PERSONAL JURISDICTION OVER SC PLC OR SCB PAKISTAN.

Plaintiffs also name two entirely foreign entities, SC PLC and SCB Pakistan, which have no alleged U.S. presence.  "[T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Penguin Grp. (USA) Inc.* v. *Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (internal quotation marks omitted). The Amended Complaint provides no allegation suggesting SC PLC or SCB Pakistan are "at home" in New York, or anywhere in the United States, such that they could be subject to general jurisdiction here.  *Daimler AG* v. *Bauman*, 571 U.S. 117, 122 (2014) ("A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations . . . when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." (internal quotation marks omitted)); *see also Strauss* v. *Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 17-18 (E.D.N.Y. 2016) (finding no general jurisdiction over non-U.S. entity that was neither incorporated in New York nor had its principal place of business there). Rather, Plaintiffs appear to rely on a specific jurisdiction theory in naming those two foreign entities.  (*See* AC ¶¶ 76, 78.)

Specific personal jurisdiction exists when a suit arises out of or is related to the defendant's "intentional, and allegedly tortious, actions . . . expressly aimed" at the forum. *Calder* v. *Jones*, 465 U.S. 783, 789 (1984); *see also In re Terrorist Attacks on September 11, 2011*, 714 F.3d at 673-74.  In analyzing whether a court has specific personal jurisdiction, courts first "look to the law of the forum state to determine whether personal jurisdiction will lie" and, if "jurisdiction lies, [courts] consider whether the district court's exercise of personal jurisdiction over a foreign defendant comports with due process protections established under the United States Constitution."  *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d

Cir. 2013) ("Licci II").  New York's long-arm statute, C.P.L.R. § 302(a)(1), provides that a court may exercise personal jurisdiction over a foreign company if it (i) "purposefully avail[ed] itself of the privilege of conducting activities within New York . . . thereby invoking the benefits and protections of its laws" (the "purposeful availment prong").  *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 61 (2d Cir. 2012) (internal quotation marks and citations omitted); and (ii) there is "an 'articulable nexus' or 'substantial relationship' between the plaintiff's claim and the defendant's transaction in New York" (the "nexus prong").  *Strauss*, 175 F. Supp. 3d at 19.

   For claims arising under the ATA, courts in the Second Circuit have exercised personal jurisdiction over non-U.S. bank entities that facilitated transfers through New York for a terrorist customer or facilitated transfers from a customer directly to a terrorist group,[14] but have rejected the exercise of personal jurisdiction over foreign bank entities where the entity merely facilitated transfers in New York for customers who in turn aided foreign terrorists abroad.  In other words, no personal jurisdiction lies when the bank had no "direct dealings with the terrorists that perpetrated the [attacks]."  *See Siegel*, 2018 WL 501610, at *4.

   Here, the Amended Complaint has no relevant allegations connecting SC PLC and SCB Pakistan to New York or the U.S., other than purported facilitation of U.S. Dollar transactions around the world.  Without specifying any transactions, including the number or frequency, the Amended Complaint alleges only that SCB Pakistan enabled U.S. Dollar transfers through New York for one U.A.E. individual (Abdul Baqi Bari) whose relationship with SCB

---

[14] *Miller* v. *Arab Bank, PLC*, 372 F. Supp. 3d. 33, 43-44 (E.D.N.Y. 2019) (bank transferred money through New York for account of Hamas leaders); *Licci II*, 732 F.3d at 165, 168-74 (bank transferred money through New York for account of Hizbollah); *Strauss*, 175 F. Supp. 3d at 19 (bank facilitated transactions for a customer directly to a terrorist group); *Weiss* v. *Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264,  271, 280 (E.D.N.Y. 2016) (same).

Pakistan ended in 2006, (AC ¶¶ 501-02), and that "SCB London" and SCB Pakistan enabled access to U.S. Dollars for two U.A.E. currency exchanges and two Pakistani fertilizer companies.  (*See id.* ¶¶ 461-62, 1074-75.)  These are insufficient as a matter of law.

   *First*, there are no allegations that Mr. Bari perpetrated the attacks in Afghanistan or used accounts held with SCB Pakistan to transact directly with anyone who did.  And even so, SCB Pakistan's relationship with him ended in 2006, (*id* ¶¶ 501-02), years before the attacks took place.  Personal jurisdiction over SCB Pakistan cannot rest on allegations that SCB Pakistan enabled unspecified transactions for Mr. Bari before 2006 when the attacks at issue took place between 2011 and 2016.  *Siegel*, 2018 WL 501610, at *4; *see also Strauss*, 175 F. Supp. 3d at 20 ("[The] nexus would be too attenuated if . . . transfers through New York [were] executed . . . at a time far removed from the attacks that caused Plaintiffs' injuries.").

   *Second*, vague allegations that "SCB London" and SCB Pakistan enabled access to U.S. Dollars for two U.A.E. money exchanges and two Pakistani fertilizer companies do not establish purposeful availment or an articulable nexus.  Again, there are no allegations the either the currency exchanges or the two Pakistani fertilizer companies perpetrated the attacks in Afghanistan or used "SCB London" or SCB Pakistan to transfer money directly to the terrorists who did.  And, like *Siegel*, the Amended Complaint's "[a]llegations that ["SCB London" or SCB Pakistan] provide[d] financial services to clients that associate with [terrorists], thereby aiding [terrorists], are 'not enough for personal jurisdiction purposes.'"  *See Siegel*, 2018 WL 501610, at *4 (citing *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 676).  Moreover, to the extent that the Amended Complaint simply lumps SC PLC or SCB Pakistan together with SCB as the "SCB Defendants," those allegations are "insufficiently 'individualized' to make out a prima facie case of personal jurisdiction."  *Charles Schwab Corp.* v. *Bank of Am. Corp.*, 883 F.3d 68,

84 (2d Cir. 2018) (finding it "impossible to determine whether" the court could exercise personal jurisdiction over two distinct defendants, which the complaint grouped together in its allegations).

Even if the Amended Complaint did allege a sufficient nexus between SC PLC and SCB Pakistan's conduct and New York or the U.S.—which it does not—exercising jurisdiction over SC PLC and SCB Pakistan must also comport with due process such that the exercise of jurisdiction "is reasonable under the circumstances."  *Siegel*, 2018 WL 501610, at *3. Exercising jurisdiction over completely foreign entities, one of which is merely a bank holding company, (Exhibit 2 to Finn Decl. (cited in AC ¶ 865 n.563)), and the other which Plaintiffs acknowledge operates solely in a non-U.S. jurisdiction, (*see*, *e.g.*, AC ¶ 874), would be unreasonable and courts have rejected hailing foreign entities into U.S. courts on this basis.  *See Siegel*, 2018 WL 501610, at *4; *see also In re Terrorist Attacks on September 11, 2011*, 714 F.3d at 676-78; *Bernhart* v. *Islamic Republic of Iran*, 2020 WL 6743066, at *3 (D.D.C. Nov. 16, 2020) (collecting cases where courts declined to exercise jurisdiction over non-U.S. entities because of due process concerns).

**CONCLUSION**

For all the foregoing reasons, the Amended Complaint fails to state a claim and, accordingly, must be dismissed in its entirety as a matter of law as to each of the SCB Defendants.

Dated: New York, New York
　　　  March 18, 2022

　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　*/s/ Andrew J. Finn*　　　　　　　
　　　　　　　　　　　　　　　　　　Andrew J. Finn (finna@sullcrom.com)
　　　　　　　　　　　　　　　　　　Bradley P. Smith (smithbr@sullcrom.com)
　　　　　　　　　　　　　　　　　　Nicole L. Spaetzel (spaetzeln@sullcrom.com)
　　　　　　　　　　　　　　　　　　SULLIVAN & CROMWELL LLP
　　　　　　　　　　　　　　　　　　125 Broad Street
　　　　　　　　　　　　　　　　　　New York, New York  10004
　　　　　　　　　　　　　　　　　　Telephone: (212) 558-4000
　　　　　　　　　　　　　　　　　　Facsimile:  (212) 558-3588

　　　　　　　　　　　　　　　　　　*Attorneys for Standard Chartered Bank,*
　　　　　　　　　　　　　　　　　　*Standard Chartered PLC, and Standard*
　　　　　　　　　　　　　　　　　　*Chartered Bank (Pakistan) Limited*