# Exhibit 2

UNITED STATES OF AMERICA
BEFORE THE
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM
WASHINGTON, D.C.

NEW YORK STATE BANKING DEPARTMENT
NEW YORK, NEW YORK

---

|  |  |
|---|---|
| Written Agreement by and among ) | |
| ) | |
| STANDARD CHARTERED plc ) | Docket Nos. 04-024-WA/RB-FB |
| London, United Kingdom ) | 04-024-WA/RB-FBR |
| ) | |
| STANDARD CHARTERED BANK ) | |
| London, United Kingdom ) | |
| ) | |
| STANDARD CHARTERED ) | |
| NEW YORK BRANCH ) | |
| New York, New York ) | |
| ) | |
| FEDERAL RESERVE BANK OF NEW YORK ) | |
| New York, New York ) | |
| ) | |
| and ) | |
| ) | |
| NEW YORK STATE BANKING DEPARTMENT ) | |
| New York, New York ) | |

---

WHEREAS, Standard Chartered plc, London, United Kingdom, the holding company of Standard Chartered Bank, London, United Kingdom (the "Bank"), a foreign bank as defined in section 1(b)(7) of the International Banking Act (12 U.S.C. 3101(7)), and the New York, New York branch of the Bank (the "New York Branch") are taking steps to address deficiencies relating to compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering ("AML") policies and procedures, including the Currency and Foreign Transactions Reporting Act, 31 U.S.C. 5311 et seq. (the Bank Secrecy Act or "BSA"), as amended by the USA PATRIOT Act; the rules and regulations issued thereunder by the U.S.

Department of the Treasury (31 C.F.R. Part 103); the suspicious activity reporting requirements of Regulation K of the Board of Governors of the Federal Reserve System (the "Board of Governors") (12 C.F.R. 211.24(f)) and those of the New York State Banking Department (the "Department") (3 N.Y.C.R.R. Part 300);

WHEREAS, the New York Branch provides significant services to its correspondent banks, including non-U.S. banks, and also conducts a high volume of U.S. dollar funds transfer clearing business, and examiners have identified compliance and risk management deficiencies at the New York Branch in these operational areas;

WHEREAS, the Bank and the New York Branch are taking steps to enhance due diligence policies and procedures relating to the New York Branch's funds transfer clearing operations and correspondent accounts for non-U.S. banks and are addressing risks associated with these lines of business, including legal and reputational risks, by implementing industry sound practices designed to identify and effectively manage such risks;

WHEREAS, it is the common goal of Standard Chartered plc, the Bank, the New York Branch, the Federal Reserve Bank of New York (the "Reserve Bank"), and the Department to ensure that the Bank and the New York Branch fully address all deficiencies in the New York Branch's AML policies and procedures, customer due diligence practices, risk management processes, and internal control environment; and

WHEREAS, on September 14, 2004, the board of directors of Standard Chartered plc, at a duly constituted meeting, adopted a resolution authorizing and directing Evan Mervyn Davies, Group Chief Executive of Standard Chartered plc and Group Chief Executive of the Bank to enter into this Written Agreement (the "Agreement") on behalf of Standard Chartered plc and the Bank, and James F. McCabe, Chief Executive Officer of The Americas to enter into this

2

Agreement on behalf of the New York Branch, and consenting to compliance by Standard Chartered plc, the Bank, the New York Branch, and their institution-affiliated parties, as defined in sections 3(u) and 8(b)(4) of the Federal Deposit Insurance Act, as amended (12 U.S.C. 1813(u) and 1818(b)(4)), with each and every provision of this Agreement.

NOW, THEREFORE, Standard Chartered plc, the Bank, the New York Branch, the Reserve Bank, and the Department hereby agree as follows:

**Anti-Money Laundering Compliance**

1.  Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written AML program designed to improve the New York Branch's system of internal controls and to ensure compliance with all applicable provisions of the BSA and the rules and regulations issued thereunder. The program shall include provisions for updates on an ongoing basis as necessary to incorporate amendments to the BSA and the rules and regulations issued thereunder. The program shall, at a minimum:

    (a) Improve the New York Branch's system of internal controls, particularly in the area of funds transfer clearing operations, to ensure compliance with all recordkeeping and reporting requirements;

    (b) include controls designed to ensure compliance with all requirements relating to correspondent accounts for non-U.S. persons, including but not limited to the prohibition on correspondent accounts for foreign shell banks (31 C.F.R. 103.177) and due diligence requirements for certain correspondent accounts (31 C.F.R. 103.181);

    (c) provide for the ability to retrieve transaction records to ensure prompt and accurate responses to law enforcement subpoena requests;

(d) provide for thorough assessment of legal and reputational risks associated with correspondent accounts and funds transfer clearing operations, and for regular review of risk tolerance by appropriate members of senior management;

(e) provide for the retention of outside consultant assistance as necessary and appropriate to assess risks associated with particular lines of business and to design and implement controls to manage such risks; and

(f) be designed to ensure identification and verification of the identity of account holders and transactors in accordance with applicable regulations.

**Independent Testing and Audit**

2. Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written plan for enhancing independent testing of the New York Branch's AML compliance. The plan shall include, at a minimum:

(a) Procedures to evaluate the New York Branch's compliance with the BSA, the rules and regulations issued thereunder, and all other applicable AML and suspicious activity reporting requirements;

(b) procedures to evaluate the New York Branch's adherence to industry sound practices relating to AML compliance, customer and correspondent account due diligence, and the reporting of suspicious activities;

(c) procedures for ongoing compliance monitoring covering operations and customer due diligence in the funds transfer and correspondent banking lines of business, including a schedule of compliance reviews to be performed in those areas;

4

(d) regular evaluation of training to ensure that appropriate personnel at the New York Branch possess the requisite knowledge necessary to comply with the BSA;

(e) provisions for independent testing to be performed by qualified parties (which may include internal audit) who are independent of the Bank's and the New York Branch's business lines and compliance function;

(f) procedures for review of independent testing results by senior Bank and New York Branch management and escalation to the board of directors in appropriate circumstances;

(g) procedures to ensure that senior Bank and New York Branch management institute appropriate actions in response to the independent testing results; and

(h) procedures to ensure that independent testing results are communicated to the Reserve Bank and the Department on a regular basis and retained for subsequent supervisory review.

**Training**

3. Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written plan to provide effective training to all appropriate personnel at the New York Branch (including, but not limited to, correspondent account relationship personnel, employees involved in funds transfer clearing operations, and customer contact personnel) in all aspects of regulatory and internal policies and procedures related to the BSA and the identification and reporting of suspicious transactions, and to update the training on a regular basis to reasonably ensure that all personnel are trained in the most current legal requirements and in the organization's risk management processes.

**Suspicious Activity Reporting and Customer Due Diligence**

4.   Within 60 days of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department an acceptable written customer due diligence program designed to reasonably ensure the identification and timely, accurate, and complete reporting of all known or suspected violations of law against or involving the New York Branch and suspicious transactions at the New York Branch to law enforcement and supervisory authorities as required by the suspicious activity reporting provisions of Regulation K of the Board of Governors (12 C.F.R. 211.24(f)) and 3 N.Y.C.R.R. 300.1. At a minimum, the program shall include:

(a)   A methodology for assigning risk levels to the New York Branch's customer base, including correspondent accountholders;

(b)   a risk focused assessment of the New York Branch's customer base to:

(i)   identify the categories of customers whose transactions and banking activities are routine and usual; and

(ii)  determine the appropriate level of enhanced due diligence necessary for those categories of customers that pose a heightened risk of conducting potentially illicit activities at or through the New York Branch;

(c)   for each customer whose transactions require enhanced due diligence, procedures to:

(i)   determine the appropriate documentation necessary to verify the identity and business activities of the customer; and

(ii)  understand the normal and expected transactions of the customer;

6

    (d) for correspondent accounts established, maintained, administered, or managed in the United States for a foreign financial institution, procedures that comport with the industry sound practices that are set forth in available public guidance (e.g., the New York Clearing House Association LLC's "Guidelines for Counter Money Laundering Policies and Procedures in Correspondent Banking" (March 2002) and the Basel Committee on Banking Supervision's "Customer Due Diligence for Banks" (October 2001)), and that include, but are not limited to:

    (i) obtaining appropriate information about the correspondent, its business operations, its customers, and its AML procedures, particularly with regard to its customer relationships that may present a heightened risk of money laundering; and

    (ii) procedures to ensure that correspondent banking services provided by the New York Branch are reviewed and approved by appropriate levels of management, and are subject to appropriate ongoing review; and

    (e) procedures designed to ensure proper identification and reporting of all known or suspected violations of law and suspicious transactions, including but not limited to:

    (i) effective monitoring of customer accounts and transactions, including funds transfers conducted through the New York Branch, consistent with industry sound practices;

    (ii) appropriate participation by New York Branch senior management in the process of identifying, reviewing, and reporting potentially suspicious activity; and

    (iii) adequate referral of information about potentially suspicious activity through appropriate levels of management, including a policy for determining action to

be taken in the event of multiple filings of Suspicious Activity Reports on the same customer or where a correspondent fails to provide due diligence information.

**Transaction Review**

  5. (a) Within 20 days of this Agreement, the Bank and the New York Branch shall jointly engage a qualified independent firm (the "Consultant") acceptable to the Reserve Bank and the Department to conduct a review of account and transaction activity for the time period beginning no later than July 23, 2002 through the present to determine whether suspicious activity involving accounts or transactions at, by, or through the New York Branch was properly identified and reported in accordance with applicable suspicious activity reporting regulations (the "Review").

    (b) Within 10 days of the engagement of the Consultant, but prior to the commencement of the Review, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department for approval an engagement letter that sets forth:

      (i) the scope of the Review, including the types of accounts and transactions to be reviewed;

      (ii) the methodology for conducting the Review, including any sampling procedures to be followed;

      (iii) the expertise and resources to be dedicated to the Review; and

      (iv) the anticipated date of completion of the Review.

    (c) Upon completion of the Review, the Bank and the New York Branch shall jointly provide to the Reserve Bank and the Department a copy of the Consultant's report detailing the findings of the Review at the same time the report is provided to the Bank and the New York Branch.

(d) Upon completion of the Review, the Bank and the New York Branch shall ensure that all matters or transactions required to be reported that have not previously been reported are reported in accordance with applicable rules and regulations.

**Approval and Progress Reports**

6. The programs, plans, engagement letter, and the identification of the independent consultant required by paragraphs 1, 2, 3, 4, and 5(b) of this Agreement shall be submitted to the Reserve Bank and the Department for review and approval. Acceptable programs, plans, and an acceptable engagement letter shall be submitted to the Reserve Bank and the Department within the time periods set forth in this Agreement and an acceptable independent consultant shall be retained within the time period set forth in paragraph 5(a) of this Agreement. The Bank and the New York Branch shall adopt the approved programs, plans, and engagement letter within 10 days of approval by the Reserve Bank and the Department and then shall fully comply with them. During the term of this Agreement, the approved programs, plans, and engagement letter shall not be amended or rescinded without the prior written approval of the Reserve Bank and the Department.

7. Within 10 days after the end of each month following the date of this Agreement, the Bank and the New York Branch shall jointly submit to the Reserve Bank and the Department, written progress reports detailing the form and manner of all actions taken to secure compliance with the provisions of this Agreement, and the results thereof. Management's responses to any audit reports covering AML matters prepared by internal and external auditors shall be included with the progress report. The Reserve Bank and the Department may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

**Notices**

8.    All communications regarding this Agreement shall be sent to:

    (a)    Mr. Robert A. O'Sullivan
Senior Vice President
Federal Reserve Bank of New York
33 Liberty Street
New York, NY 10045

    (b)    Mr. Michael J. Lesser
Deputy Superintendent
New York State Banking Department
One State Street
New York, NY 10004

    (c)    Mr. Evan Mervyn Davies, CBE
Group Chief Executive
Standard Chartered plc
Group Chief Executive
Standard Chartered Bank
1 Aldermanbury Square
London EC2V7SB
United Kingdom

    (d)    Mr. James F. McCabe
Chief Executive Officer - The Americas
Standard Chartered Bank
1 Madison Ave.
New York, N.Y. 10010

**Miscellaneous**

9.    The provisions of this Agreement shall be binding on Standard Chartered plc, the Bank, the New York Branch, and each of their institution-affiliated parties in their capacities as such, and their successors and assigns.

10.    Each provision of this Agreement shall remain effective and enforceable until stayed, modified, terminated or suspended in writing by the Reserve Bank and the Department.

11. Notwithstanding any provision of this Agreement, the Reserve Bank and the Department may, in their sole discretion, grant written extensions of time to the Bank and the New York Branch to comply with any provision of this Agreement.

12. The provisions of this Agreement shall not bar, estop or otherwise prevent the Board of Governors, the Reserve Bank, the Department, or any federal or state agency from taking any further or other action affecting Standard Chartered plc, the Bank, the New York Branch, or any of their current or former institution-affiliated parties or their successors or assigns.

13. This Agreement is a "written agreement" for the purposes of, and is enforceable by the Board of Governors as an order issued under, section 8 of the Federal Deposit Insurance Act and by the Department pursuant to Section 39 of the New York State Banking Law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of this 7th day of October, 2004.

STANDARD CHARTERED plc

By:_____
Evan Mervyn Davies, CBE
Group Chief Executive

FEDERAL RESERVE BANK OF NEW YORK

By:_____
Robert A. O'Sullivan
Senior Vice President

STANDARD CHARTERED BANK

By:_____
Evan Mervyn Davies, CBE
Group Chief Executive

NEW YORK STATE BANKING DEPARTMENT

By:_____
Michael J. Lesser
Deputy Superintendent

STANDARD CHARTERED BANK
  New York Branch

By:_____
James F. McCabe
Chief Executive Officer, The Americas

13. This Agreement is a "written agreement" for the purposes of, and is enforceable by the Board of Governors as an order issued under, section 8 of the Federal Deposit Insurance Act and by the Department pursuant to Section 39 of the New York State Banking Law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of this 7th day of October, 2004.

STANDARD CHARTERED PLC

By: _____
Evan Mervyn Davies, CBE
Group Chief Executive

FEDERAL RESERVE BANK OF NEW YORK

By: _____
Robert A. O'Sullivan
Senior Vice President

STANDARD CHARTERED BANK

By: _____
Evan Mervyn Davies, CBE
~~Chairman~~ Group Chief Executive

NEW YORK STATE BANKING DEPARTMENT

By: _____
Michael J. Lesser
Deputy Superintendent

STANDARD CHARTERED BANK
New York Branch

By: _____
James F. McCabe
Chief Executive Officer, The Americas

12