# Exhibit 4

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

FILED

NOV 2 6 2012

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES OF AMERICA, )
Department of Justice, Asset Forfeiture
Plaintiff, Money Laundering )
Section )
1400 New York Ave, N.W. )
v. Washington, D.C. 20530 ) Case No. _____
)
THE SUM OF $70,990,605 HELD IN )
ACCOUNT NUMBER 050210000527810, )
IN THE NAME OF HIKMAT SHADMAN )
LOGISTICS SERVICES COMPANY, )
LOCATED AT AFGHANISTAN )
INTERNATIONAL BANK, )
SHAHR-E-NAW, HAJI YAQOOB )
SQUARE, SHAHABUDIN WATT, )
P.O. BOX 2074, KABUL, AFGHANISTAN, AND )
ALL INTEREST, BENEFITS OR ASSETS )
TRACEABLE THERETO; )
)
and )
)
THE SUM OF $6,930,000 HELD IN )
ACCOUNT NUMBER 050210001288613, )
IN THE NAME OF FAIZY ELHAM )
BROTHERS, LTD., LOCATED AT )
AFGHANISTAN INTERNATIONAL BANK, )
SHAHR-E-NAW, HAJI YAQOOB )
SQUARE, SHAHABUDIN WATT, )
P.O. BOX 2074, KABUL, AFGHANISTAN, AND )
ALL INTEREST, BENEFITS OR ASSETS )
TRACEABLE THERETO; )
)
Defendants. )

Case: 1:12-cv-01905
Assigned To : Roberts, Richard W.
Assign. Date : 11/26/2012
Description: General Civil

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

Comes now the Plaintiff, United States of America, through its undersigned attorneys, and respectfully states as follows:

3

I.  **NATURE OF THE ACTION**

1. This is an action *in rem* for the forfeiture of the named defendant properties pursuant to 18 U.S.C. §§ 981(a)(1)(C), and 984.

2. The defendant properties, approximately $77,920,605 located in Afghanistan, were illegally acquired through a conspiracy orchestrated by Hikmatullah Shadman, an Afghan national, together with other individuals, both known and unknown, to obtain payments from the United States for the transportation of military supplies in Afghanistan through the illegal and fraudulent use of the wires in violation of 18 U.S.C. § 1343, beginning as early as November 2010 and continuing until at least March 2012. Through this wire fraud conspiracy, Hikmatullah and his co-conspirators made bribe payments, fraudulently inflated prices, and caused the United States to be invoiced for and to make payments of $77, 920,605 to the defendant accounts in Afghanistan.

3. The defendant properties are subject to forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(C) as property which constitutes or is derived from proceeds traceable to a violation of any offense constituting a "specified unlawful activity," or a conspiracy to commit such an offense. Pursuant to 18 U.S.C. § 1956(c)(7)(A) and 18 U.S.C. § 1961(a), violations of 18 U.S.C. § 1343 are specified unlawful activities. For any civil forfeiture action in which the defendant property is cash or funds deposited into a financial institution, 18 U.S.C. § 984 provides that the government does not have to identify the specific property involved in the offense that is the basis for the forfeiture. Identical property found in the same account as the property involved in the forfeiture offense is subject to forfeiture; it is no defense that said property has been removed and replaced by identical property. Section 984 applies to civil forfeiture actions commenced within one year from the date of the offense.

## II. JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355(a), and 18 U.S.C. §§ 981(a)(1)(C) and 984.

5. This Court has *in rem* jurisdiction over the named defendant properties pursuant to 28 U.S.C. §§ 1345 and 1355(a).

6. This Court has venue over this action pursuant to 28 U.S.C. §§1355(b)(2) on the basis that the named defendant properties are presently located in a foreign country.

## III. DEFENDANT PROPERTIES

7. The defendant properties alleged to be subject to forfeiture are as follows:

(a) **The sum of $70,990,605 held in bank account number 050210000527810**, in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan, and all interest, benefits or assets traceable thereto; and

(b) **The sum of $6,930,000 held in bank account number 050210001288613**, in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan, and all interest, benefits or assets traceable thereto.

8. On November 7, 2012, United States Magistrate Judge Alan Kay of the United States District Court for the District of Columbia issued a seizure warrant, under seal, for each of the defendant properties, finding probable cause that the defendant properties are subject to forfeiture. The seizure warrants were transmitted to Afghanistan for enforcement pursuant to a United Nations Convention Against Corruption mutual legal assistance request. The defendant bank accounts have not yet been restrained.

3

IV.     **STATEMENT OF FACTS**

**Background on NATO Contracting Process in Afghanistan**

9.      As part of its mission in Afghanistan, the United States Government pays contractors and subcontractors through the North Atlantic Treaty Organization (NATO) to resupply military forces operating in the country. The United States Government utilizes local Afghan-owned businesses to transport fuel and bulk quantities of dry cargo (such as food, water, and other supplies) by truck to various locations throughout the country.

10.     The United States Government provides funding in U.S. dollars for all transportation missions conducted to resupply U.S. military units, as alleged herein. This resupply program is administered by NATO in Afghanistan through NATO's own Maintenance and Supply Agency (NAMSA). Each individual transportation mission (which may involve numerous trucks) is awarded by means of a document formally referred to as a Transportation Movement Request or "TMR." Under this arrangement, NAMSA engages prime contractors who, in turn, award individual TMRs to local Afghan subcontractors for each specific transportation job.

11.     TOIFOR Global Life Support Services (TOIFOR), a Hungarian firm located at Kandahar Airfield, Afghanistan, has served as the sole prime contractor to NAMSA under NATO Contract No. 4600001510 (known as the "Jingle Truck" contract) since October 2007.[1]

12.     Under the Jingle Truck contract, and at all times relevant to this complaint, TOIFOR awarded TMRs to subcontractors for truck shipment to various locations within areas designated by the U.S. military command.

---

[1] In 2011 TOIFOR changed its name to "Xeless." To avoid confusion, this Complaint refers to the company as TOIFOR, whether operating under the name TOIFOR or Xeless.

4

13. Each quarter, subcontractors seeking TMRs from TOIFOR would send TOIFOR a price list reflecting the price the subcontractor would charge to deliver shipments along specific routes. TOIFOR, in turn, would submit the price lists to NAMSA.

14. For each transportation movement request TOIFOR received from U.S. military command, TOIFOR would identify all of the subcontractors proposing to make deliveries to the requesting military unit's location and then select four (4) vendors from that group whose offered price was below the maximum price allowed. TOIFOR's operations manager then awarded the TMR to a subcontractor based on several pertinent factors, including price.

15. After selecting the subcontractor, TOIFOR submitted the TMR to U.S. military officials for review and approval. Once the transportation mission was approved, the TMR documents were forwarded to NAMSA by the U.S. military so that TOIFOR could execute the mission. At that point, the subcontractor was authorized by TOIFOR to make the delivery by truck.

16. Following each delivery of supplies, the subcontractor returned the completed TMR form and an invoice to TOIFOR for payment. TOIFOR, in turn, electronically transmitted all TMRs and invoices for each month to NAMSA for payment.

17. NAMSA aggregated the individual invoices and electronically transmitted quarterly invoices to U.S. Forces-Afghanistan for payment under the Jingle Truck contract. This information was then electronically transmitted by the U.S. military to the Defense Finance and Accounting Service (DFAS) office in Rome, New York, with a request that funds be transmitted to NAMSA for payment.

18. DFAS processed each request and authorization for payment and disbursed payment by electronic funds transfer (EFT) from the U.S. Army's account at the U.S. Treasury,

designated as DSSN (Disbursing Station Symbol Number) 5570, to NAMSA's European bank account, number LU120019000050008000, located at Banque et Caisse d'Espargne de l'Etat in Luxembourg.

19. After receiving funds from the United States Treasury account, NAMSA processed the payment to TOIFOR and wired funds by EFT from its bank account in Luxembourg to TOIFOR's bank account at Afghanistan International Bank in Kabul, Afghanistan in U.S. dollars.

20. TOIFOR then disbursed payment for TMRs by EFT in U.S. dollars to the subcontractors' bank accounts.

**Scheme to Defraud the United States**

21. Hikmatullah Shadman ("Hikmatullah"), an Afghan national and owner of Hikmat Shadman Logistics Services Company ("HSLSC") (a/k/a "Hikmat Shadman Supply and Construction Company", "Hikmat Shadman Commerce, Construction & Supply Company", or "Hikmat Shadman Commerce Construction Supplies"), operated as one of TOIFOR's subcontractors for TMRS awarded under the Jingle Truck contract at all times alleged herein.

22. Beginning as early as November 2010, and continuing at least until March 2012, Hikmatullah and other individuals, both known and unknown, engaged in a conspiracy to commit wire fraud which resulted in Hikmatullah and HSLSC being fraudulently awarded at least 5,421 TMRs valued at $77,920,605 to HSLSC under the Jingle Truck contract.

23. The payments for the fraudulently obtained TMRs were made with money transferred from the United States Treasury at the direction of the DFAS, located in Rome, New York, through NAMSA to TOIFOR, which, in turn, made payments to Hikmatullah, as described in further detail below.

6

24. Between November 2010 and March 2012, $77,920,605 in TMR payments was transferred by TOIFOR in fifteen installments (approximately one per month) by electronic funds transfer into **defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

### Bribery and Kickbacks

25. As part of the wire fraud conspiracy discussed herein, and in order to obtain the award of lucrative TMRs, Hikmatullah bribed and paid "kickbacks" to Henry Omonobi-Newton ("Newton"), the TOIFOR operations manager at Kandahar Airfield, and his successor in that position, Paul Hele ("Hele"), including through, but not limited to, the specific examples set forth herein. Hikmatullah engaged in discussions and negotiations to further his fraud scheme without several confidential sources, as detailed below.

  a. In July 2011, Hikmatullah approached a confidential source believed to be reliable ("CS-1"), an HSLSC employee, with a sealed envelope and directed CS-1 to deliver the envelope to Henry Newton.

  b. CS-1 saw Hikmatullah take cash from a vault in his office and put hundred dollar bills in the envelope. Hikmatullah specifically told CS-1 to show the envelope to no one but Newton. CS-X delivered the envelope to Newton, who opened it in CS-1's presence. The envelope contained a large number of hundred dollar bills, and Newton gave two of them to CS-1 to keep for himself.

  c. Another confidential source believed to be reliable ("CS-2") had a conversation with CS-1, during which time CS-1 acknowledged he was about to deliver that same envelope containing a stack of U.S. hundred dollars bills to Newton at Hikmatullah's direction. CS-2,

7

who observed the envelope in CS-1's hands, further stated that the stack of bills appeared to be one and one-half to two inches thick and that all of the bills that were visible were one-hundred dollar bills.

    d. After CS-1 returned from his meeting with Newton, he acknowledged to CS-2 that Newton had given CS-1 money from the stack of bills he delivered to Newton after CS-1 complained about not getting anything back from Newton after all the money he had given Newton.

    e. Another confidential source believed to be reliable, ("CS-3"), has informed law enforcement that Newton received kickbacks from HSLSC for the award of TMRs to that company.

    f. Also in July 2011, Allan Samonte, a TOIFOR employee, told CS-1 that Newton had given Samonte and other TOIFOR employees approximately $500 in cash. Newton told the employees that the money was from Hikmatullah.

    g. On or about October 17, 2011, Paul Hele replaced Newton as TOIFOR operations manager. Hikmatullah continued the conspiracy by paying kickbacks to Paul Hele in return for the award of TMRs.

    h. Neil Patrick James Tendido is employed by HSLSC. Periodically throughout his employment, Tendido was responsible for processing TMR invoices for HSLSC. CS-1 stated to Tendido on multiple occasions that he was delivering cash to Newton and Hele on behalf of HSLSC.

    i. CS-3 also stated to Tendido that money was transferred from an HSLSC bank account to a bank account belonging to Hele in South Africa.

8

j. In or about November 2011, CS-2 saw a bank transfer receipt for the transfer of $10,000 from an HSLSC bank account at Afghanistan International Bank ("AIB") to Hele's personal bank account at AIB. An administrative employee of TOIFOR later admitted that the bank slip was "probably destroyed." CS-2 maintains that it was destroyed because he was not supposed to have seen it, and it could "get them into trouble."

### Fraudulent Subcontract Awards

26. Also as part of this conspiracy, Hele, in cooperation with Hikmatullah, inflated and manipulated bids submitted by subcontractors, including Hikmatullah and HSLSC, for TMR awards under the Jingle Truck Contract.

    a. A fourth confidential source believed to be reliable ("CS-4"), a competitor of HSLSC, approached Hele because his company was not receiving any TMRs from TOIFOR.

    b. On or about January 11, 2012, Hele sent an email to all subcontractors, including CS-4 and Hikmatullah, reminding them that price lists were due by January 12, 2012. In response, CS-4 lowered his prices 60 to 70 percent for all routes before submitting his price list to Hele. Hele, who was required to acknowledge receipt of this price list, failed or refused to do so. CS-4 did in fact lower his prices on the price list he submitted to Hele by January 24, 2012.

    c. On or about January 20, 2012, Hele telephoned CS-4 and requested a meeting with him. They subsequently scheduled a meeting for January 24, 2012.

    d. On January 24, 2012, Hele asked CS-4 why the prices on his list were so low. Hele told CS-3 that because the "Americans have a lot of money," he should keep his prices high. Hele also said that when he submitted CS-4's price list to NAMSA, he intended to remove the prices that CS-4 and other subcontractors listed for high-risk areas so that when

9

NAMSA received the price list there would be no quotes for those locations. Hele told CS-4 that, if asked, he planned to tell NAMSA that these routes were dangerous and required quotes on a case-per-case basis. The price lists that Hele submitted to NAMSA did in fact have CS-4's prices deleted.

e. Hele also solicited CS-4 to participate in a fraud scheme in which Hele said he would rotate the award of TMRs for high-risk areas among CS-4's company, companies affiliated with Hikmatullah, and other companies at prices determined by Hele.

f. When TMRs for these high-risk areas later became available, Hele told CS-4 to submit bids in amounts more than three times higher than CS-4 had proposed on the price list that Hele failed to submit to NAMSA. CS-4 did as Hele instructed, but did not receive a single TMR. Over ninety percent of the low-risk routes, and a majority of the high-risk routes, continued to be awarded to Hikmatullah.

g. In this way, Hele solicited CS-4 to participate in a price-fixing scheme so that Hele could continue to award TMRs to Hikmatullah at an inflated rate. In doing so, Hele was able to ensure that at least one other bidder in the pool from which he picked HSLSC was sufficiently high as to make Hikmatullah and HSLSC's bid appear reasonable. This scheme continued until March 2012 when, as a result of the investigation into Hikmatullah's conduct, HSLSC stopped receiving TMRs.

h. This price-fixing scheme is corroborated by an email that Newton drafted on or about October 18, 2011, to TOIFOR's CEO complaining that Hele, "reversed every price list that contractors submitted, and added his own cut on top of it and forced the contractors to accept the change and he was paid by the contactor every $ that was topped on their price…"

10

       i.    CS-4 also acknowledged hearing Ahmad Baseer, a vice president of TOIFOR, state that Paul Hele received a percentage of the proceeds from TMRs he awarded to companies owned by Hikmatullah.

27.    A review of bank records shows that on November 17, 2011, $19,000 in hundred dollar bills was deposited into Paul Hele's wife's bank account and another $40,000 in hundred dollar bills was deposited into Paul Hele's brother's bank account, both in South Africa. During one of the two deposits, the individual who deposited the money told the bank teller that the cash consisted of salary payments from Afghanistan. However, TOIFOR paid the salaries of its employees, including Hele, by electronic funds transfer, not through cash payments. The cash payments deposited in South Africa are believed to be bribe payments paid by Hikmatullah to Hele, his co-conspirator.

**TMRs Awarded to HSLSC**

28.    A certified forensic examiner providing a detailed analysis of the TMRs awarded to HSLSC pursuant to the Jingle Truck contract on behalf of the Special Inspector General for Afghanistan Reconstruction found that between November 2010 and October 2011 *at least* 3,999 TMRs worth over $36 million had significant indicia of fraud during one year of the approximately 17 month conspiracy period:

       a.    HSLSC was awarded 2,329 TMRS worth $21,866,357 when it was the *highest* bidder, without sufficient justification.

       b.    HSLSC was awarded 10 TMRS worth $208,000 in instances when it *did not even submit a bid*.

11

c.  HSLSC was awarded 158 TMRs worth $2,151,000 when it was the *only* bidder, despite other subcontractors available to do the transportation mission under the Jingle Truck contract;

d.  HSLSC was awarded 1,355 TMRs worth $11,277,260 in circumstances without explanation where it *did not submit a bid, and no bids were submitted by any other contractor.*

29. U.S. Forces-Afghanistan experts commissioned to address contracting corruption and its negative impact on military strategy conducted a study which corroborated the study done by the certified forensic examiner, referenced above. It showed, based upon a calculation of average pricing (*i.e.*, price per subcontractor by vehicle type for each delivery location), that Hikmatullah illegally overcharged NAMSA (in reality, the United States Government) by at least $31.1 million during the period from October 2010 to September 2011.

30. 5421 TMRs were submitted and resulted in $77,920,605 in payments to Hikmatullah under the Jingle Truck contract.

### Tracing Proceeds to Accounts to be Seized

31. The $77,920,605 paid to Hikmatullah by TOIFOR under the Jingle Truck contract was deposited into the defendant bank accounts as detailed below.

32. TOIFOR invoiced NAMSA for payment on each transportation mission awarded to HSLSC. NAMSA aggregated the individual invoices and electronically transmitted quarterly invoices to U.S. Forces-Afghanistan for payment under the Jingle Truck contract. This information was then electronically transmitted by the U.S. military to the DFAS office in Rome, New York, with a request that funds be transmitted to NAMSA for payment.

33. DFAS processed each request and disbursed payment by EFT from the U.S. Army's account at the U.S. Treasury, designated as DSSN (Disbursing Station Symbol Number) 5570, to NAMSA's European bank account, number LU120019000050008000, located at Banque et Caisse d'Espargne de l'Etat in Luxembourg.

34. After receiving funds from the United States Treasury account, NAMSA processed the payment to TOIFOR and wired funds by EFT from its bank account in Luxembourg to TOIFOR's bank account at Afghanistan International Bank in Kabul, Afghanistan in U.S. dollars.

35. TOIFOR then disbursed payment for the TMRs on an approximately monthly basis by EFT in U.S. dollars to **defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

36. On or about June 19, 2011, Hikmatullah directed Tendido to transfer $4,000,000 of the $77,920,605 to another bank account Hikmatullah controlled, **defendant bank account number 050210001288613**, held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

37. On or about July 30, 2011, Hikmatullah directed Tendido to transfer $2,930,000 of the $77,920,605 he received from TOIFOR into **defendant bank account number 050210001288613**, held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank, Shahr-e-Naw, Haji Yaqoob Square, Shahabudin Watt, P.O. Box 2074, Kabul, Afghanistan.

13

## V.  BASIS FOR FORFEITURE

38.  Plaintiff repeats and re-alleges each and every allegation set forth in paragraphs 1 through 36, above.

39.  Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" or a conspiracy to commit such offense is subject to forfeiture to the United States.

40.  Pursuant to 18 U.S.C. §§1956(c)(7) and 1961(1), the transmission, or causing the transmission, of any writings in interstate or foreign commerce by wire communication for the purpose of executing any scheme or artifice to defraud, or to obtain money by means of false or fraudulent pretenses, representations, or promises (commonly referred to as "wire fraud"), in violation of 18 U.S.C. § 1343, constitutes "specified unlawful activity" for purposes of 18 U.S.C. § 981(a)(1)(C).

41.  As alleged herein, beginning in November 2010 and continuing until at least March 2012, Hikmatullah and his co-conspirators, having devised or intending to devise a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, used or caused someone to use the wire or radio in interstate or foreign commerce in violation of 18 U.S.C. § 1343.

42.  As further alleged herein, Hikmatullah and his co-conspirators caused the United States Government electronically to transfer at least $77,920,605 to NAMSA as payment to TOIFOR for the fraudulently obtained TMRs and invoices submitted by Hikmatullah, which funds TOIFOR transferred to Hikmatullah's company, HSLSC, by electronic funds transfer into

14

**defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank, Kabul, Afghanistan.

43.     As further alleged herein, between November 2010 and March 2012, Hikmatullah Shadman and/or his co-conspirators transferred $6,930,000 from **defendant bank account number 050210000527810**, held in the name of Hikmat Shadman Logistics Services Company, located at Afghanistan International Bank to **defendant bank account number 050210001288613,** held in the name of Faizy Elham Brothers, Ltd., located at Afghanistan International Bank in Kabul, Afghanistan.

44.     Pursuant to Title 18 U.S.C. § 984, in any forfeiture action in which the defendant property is cash or funds deposited into a financial institution, it is "not necessary for the Government to identify specific property involved in the offense that is the basis for the forfeiture" if the forfeiture action is brought within one year "from the date of the offense." 18 U.S.C. §§ 984(a)(1)(A),(b).

45.     Afghanistan International Bank (AIB) is a "financial institution," as defined under the International Banking Act of 1978, 12 U.S.C. § 3101(b)(7), for purposes of 18 U.S.C. § 984.

46.     Therefore, the defendant properties constitute or are derived from proceeds traceable to a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343 and are subject to forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.

## VI.     PRAYER FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered in its favor and against the defendant properties; that, pursuant to law, notice be provided to all interested parties to appear and show cause why the forfeiture should not be decreed; that the defendant properties be condemned and forfeited to the United States of America and delivered

into its custody for disposition according to law; that the plaintiff be awarded its costs and disbursements in this action; and for such other and further relief as this Court may deem just and proper.

Respectfully submitted,

JAIKUMAR RAMASWAMY, CHIEF
ASSET FORFEITURE AND
   MONEY LAUNDERING SECTION

_____
LINDA M. SAMUEL
Deputy Chief
DANIEL H. CLAMAN
Assistant Deputy Chief
ELIZABETH A. ALOI
Trial Attorney
Asset Forfeiture and Money
   Laundering Section
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., Suite 10100
Washington, D.C. 20530
Telephone: (202) 514-1263

Attorneys for Plaintiff
UNITED STATES OF AMERICA

16

## VERIFICATION

I, Robert D. Doherty, am a Special Agent in the Office of the Special Inspector General for Afghanistan Reconstruction (SIGAR), and the special agent assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint for Forfeiture *In Rem*, and the statements contained therein are true to the best of my knowledge and belief, and I base my knowledge for this verification of the Complaint for Forfeiture *In Rem* on the following:

(a) Information I have learned, or been given by special agents working with the International Contract Corruption Task Force (ICCTF), and other law enforcement officials who have participated in the joint investigation of Hikmatullah Shadman, and other individuals engaged in an illegal fraud scheme involving the award of transportation contracts funded by the United States Government in the Islamic Republic of Afghanistan;

(b) My participation in the interviews of various cooperating witnesses or my knowledge of other such interviews, relating to the investigation of Hikmatullah Shadman, and other individuals engaged in an illegal fraud scheme involving the award of transportation contracts funded by the United States Government in the Islamic Republic of Afghanistan; and

(c) My experience in foreign corruption, fraud and embezzlement investigations, and the experience of other law enforcement officers related to foreign corruption, fraud, and embezzlement investigations.

I declare under penalty of perjury as provided by 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on this 20th day of November, 2012.

*Robert D. Doherty*
ROBERT D. DOHERTY
Special Agent
Office of Special Inspector General for the
Afghanistan Reconstruction

17