# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

STEPHANIE ZOBAY, individually, and for the estate of STEPHEN S. EVERHART, LINDSAY M. EVERHART, ABDUL GHAFFAR MUGHAL, SITORAI KHASANZOD, KHALID MUGHAL, HAMID MUGHAL, ANGELA MUGHAL, N.M., by and through her next friend Abdul Ghaffar Mughal, M.M., by and through his next friend Abdul Ghaffar Mughal, WAYNE NEWBY, THERESA HART, NATHAN NEWBY, JASON RZEPA, CASSANDRA RZEPA, C.R., by and through his next friend Cassandra Rzepa, K.R., by and through his next friend Adrian Davis, TYLER N. OGDEN, WILLIAM M. CHINN, SEAN M. NIQUETTE, LAUREN NIQUETTE, THOMAS NIQUETTE, MARY NIQUETTE, ED ELLIOTT, BRIAN C. ALLDRIDGE, JOANN ALLDRIDGE, RONALD ALLDRIDGE, DIANNA ALLDRIDGE, TODD JEFFREY ALLDRIDGE, ANDREW MAJOR, ASHLEY MAJOR, ALYSSA MAJOR, MARCUS JAMIL SULLEN, DAVID EUGENE HICKMAN, VERONICA HICKMAN, DEVON F. HICKMAN, TAMMIE FROST, individually, and for the estate of RUSSELL FROST, MADISON FROST, CRYSTAL FROST, AMANDA FROST, WAIEL EL-MAADAWY, BILQIS AIDARA ADJEI, ALEXIS GRANT, MALIK ELMAADAWY, G.E., by and through his next friend Latasha Elmaadawy, GABRIEL ELMAADAWY, ZEINAB EL-MAADAWY, IHAB EL-MAADAWY, TAMER EL-MAADAWY, MOHAMMED EL-MAADAWY, MUSTAFA EL-MAADAWY, AMR MOHAMED, BRENDA MOHAMED, NICOLE KAMALESON, BARCLAY KAMALESON, CADE KAMALESON, CEDRIC PAUL KAMALESON, SUNDERRAJ MARK KAMALESON,GRACE A. KREISCHER, C.L.K., by and through his next friend Grace Kreischer, BRIANNE BARLOW, JASON BARLOW, SHUSHAWNDRA GREGOIRE, J.D.G., by and through his next friend ShuShawndra Gregoire, JOHN GREGOIRE SR., L.R.G., by and through her next friend John Gregoire Sr., ALDENE LEE,

Plaintiffs,

JURY TRIAL DEMANDED

Case No.: 21-cv-3503

v.

MTN GROUP LIMITED, MTN IRANCELL, MTN
DUBAI LIMITED, ZTE CORPORATION, ZTE (USA)
INC., ZTE (TX) INC., HUAWEI TECHNOLOGIES
CO., LTD., HUAWEI TECHNOLOGIES USA INC.,
HUAWEI DEVICE USA INC., FUTUREWEI
TECHNOLOGIES, INC., and SKYCOM TECH CO.,
LTD.,

                 Defendants.

# AMENDED COMPLAINT FOR VIOLATION
# OF THE ANTI-TERRORISM ACT

Ryan R. Sparacino (*pro hac vice*)
Eli J. Kay-Oliphant
 (EDNY Bar No. EK8030)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, DC 20036
Tel: 202.629.3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

## TABLE OF CONTENTS

Page

A.      THE MTN DEFENDANTS.........................................................................19

B.      THE ZTE DEFENDANTS .......................................................................19

C.      THE HUAWEI DEFENDANTS ...............................................................20

I.     THE IRGC SHAREHOLDERS' CONSPIRACY TO ACCOMPLISH THEIR "SECURITY" MISSION OF EXPELLING THE UNITED STATES FROM THE MIDDLE EAST AND FULFILL THE IRGC'S CONSTITUTIONAL DUTY TO PROMOTE TERRORISM TO EXPORT THEIR ISLAMIC REVOLUTION...............25

A.      THE OBJECT OF THE IRGC CONSPIRACY AND ITS LEADERSHIP ..............25

B.      THE PARTIES TO THE CONSPIRACY:  WHEN EACH MEMBER PROVIDED SECURITY AID TO OTHER MEMBERS OF THE CONSPIRACY, SUCH MEMBER DID SO TO AID THE IRAQ TERROR CAMPAIGN AND AFGHANISTAN TERROR CAMPAIGN IN FURTHERANCE OF THE CONSPIRACY. .............................................29

      1.     FTO/SDGT Co-Conspirators.................................................29

      2.     Corporate Front Co-Cortnspirators ......................................30

            i.   MTN Irancell................................................................30

            ii.   MTN Group..................................................................31

            iii.   TCI and MCI................................................................32

            iv.   Exit40 ........................................................................33

      3.     Corporate Supplier and Manufacturer Co-Conspirators .....................33

C.      PLAINTIFFS WERE INJURED BY ATTACKS THAT OCCURRED IN FURTHERANCE OF THE CONSPIRACY .............................................35

      1.     The Iraq Terror Campaign ....................................................36

      2.     The Afghanistan Terror Campaign .......................................39

II.    SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM ..........................41

A.      THE ISLAMIC REVOLUTIONARY GUARD CORPS HAS LONG SUPPORTED ANTI-AMERICAN TERRORISM AS PART OF IRAN'S FOREIGN POLICY .................................................................41

i

1. Islamic Revolutionary Guard Corps .................................................. 42

2. Lebanese Hezbollah ............................................................................ 51

3. Qods Force ......................................................................................... 57

B. THE ISLAMIC REVOLUTIONARY GUARD CORPS, LEBANESE HEZBOLLAH, AND THE QODS FORCE OPERATE AS AN INTEGRATED TRANSNATIONAL TERRORIST ORGANIZATION WITH A COMMON DOCTRINE, STRATEGY, FINANCIAL STRUCTURE, LOGISTICS STRUCTURE, AND COMMAND-AND-CONTROL ........................ 58

1. The IRGC's Transnational Terrorist Strategy, Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of Terrorists Led By Lebanese Hezbollah, Funded And Resourced By The Qods Force, And Supported By Local Iranian Terrorist Proxies ....................................... 58

2. The IRGC, Including Its Hezbollah Division And Qods Force, Follow Common Terrorist Techniques, Tactics, And Procedures And Use The Same Terrorist Tradecraft To Ensure Concealment And Cover Around The World ............................................................................................. 59

i. Concealment ...................................................................... 62

ii. Cover ................................................................................. 66

iii. Slush Funds For "Off-Books" Terrorist Finance .......................................... 67

iv. Corruption As Terrorist Tactic And Tool ................................ 67

v. Required Donations (*Khums*) From All IRGC Members ............................... 68

C. THE TERRORIST TRADECRAFT AND DOCTRINE OF THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, HAS HISTORICALLY RELIED ON FRONTS, OPERATIVES, AGENTS, CUT-OUTS, AND ORBITS TO FUND, ARM, AND OPERATIONALLY SUPPORT IRAN'S ANTI-AMERICAN TERRORIST PROXY ATTACKS AGAINST AMERICANS ............................................................................ 70

III. AFTER 9/11, THE ISLAMIC REVOLUTIONARY GUARD CORPS, LEBANESE HEZBOLLAH, QODS FORCE, JAYSH AL-MAHDI, SYRIAN GOVERNMENT, TALIBAN, AND HAMAS JOINED A CONSPIRACY LED BY IRAN TO DRIVE THE UNITED STATES OUT FROM THE ENTIRE MIDDLE EAST, INCLUDING IRAQ, AFGHANISTAN, SYRIA, AND YEMEN, AND TO SHARE COMMON FUNDING SOURCES, TECHNOLOGIES, AND CORPORATE PARTNERS IN ORDER TO FORM A TERRORIST ALLIANCE THAT COULD COUNTERBALANCE nATO AND DRIVE THE UNITED STATES OUT .......................................................... 73

A.      THE FORMATION OF THE CONSPIRACY ........................................... 73

    1.     After 9/11, The IRGC, Acting Through Its Hezbollah Division And Qods Force, Led A Transnational Terrorist Conspiracy Targeting Americans In Europe, The Middle East, Asia, And Africa To Inflict Pain On "The Great Satan" .................................................................................... 73

    2.     To Maximize The Lethality Of Their Terrorist Conspiracy, The IRGC, Acting Through Its Hezbollah Division And Qods Force, Provided Material Support To Every Other Member of the Conspiracy, Including Funds, Arms, Training, And Logistical Support, Which Their Co-Conspirators Used To Attack Americans in Iraq, Afghanistan, Syria, Yemen, Israel, Africa, And Asia ........................................... 74

        i.   IRGC Shiite Terrorist Proxies ........................................... 75

        ii.  IRGC Sunni Terrorist Proxies ........................................... 76

B.      AFTER IRGC SHIITE TERRORIST PROXIES JOINED THE IRGC'S CONSPIRACY, HEZBOLLAH AND THE QODS FORCE PROVIDED THEM WITH MONEY, WEAPONS, TRAINING, SECURE CELL PHONES, LOGISTICAL SUPPORT, SAFEHOUSES INSIDE IRAN, AND TECHNICAL ASSISTANCE TO FACILITATE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, LEBANON, EUROPE, AND ELSEWHERE ............................................ 78

C.      AFTER IRGC SUNNI TERRORIST PROXIES JOINED THE IRGC'S CONSPIRACY, HEZBOLLAH AND THE QODS FORCE PROVIDED THEM WITH MONEY, WEAPONS, TRAINING, SECURE CELL PHONES, LOGISTICAL SUPPORT, SAFEHOUSES INSIDE IRAN, AND TECHNICAL ASSISTANCE TO FACILITATE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, LEBANON, EUROPE, AND ELSEWHERE ............................................ 79

D.      IN FURTHERANCE OF THE IRGC'S CONSPIRACY, THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, AND JAYSH AL-MAHDI WAGED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN IRAQ, IRAN, SYRIA, YEMEN, AND LEBANON ............................................................................... 80

    1.     Jaysh al-Mahdi .................................................................... 85

    2.     Asaib Ahl Al-Haq, A Jaysh Al-Haq Special Group ......... 89

    3.     Ka'taib Hezbollah, A Jaysh Al-Mahdi Special Group ........ 90

4.  The IRGC's, Including its Hezbollah Division's And Qods Force's, Aid To Jaysh Al-Mahdi To Facilitate Attacks Against Americans In Iraq And Afghanistan .................................................................................. 92

    i.   Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Created Jaysh Al-Mahdi And Jaysh Al-Mahdi Special Groups Asaib Ahl Al-Haq And Ka'taib Hezbollah ..................... 93

    ii.  Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With The Weapons Used To Attack Americans In Iraq ....................................... 101

    iii. Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With Key Training And Logistical Support To Attack Americans In Iraq ......................... 104

    iv.  Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Routed Funds To Jaysh Al-Mahdi To Finance Attacks Against Americans In Iraq ....................................... 109

E.  IN FURTHERANCE OF THE IRGC'S CONSPIRACY, THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, AL-QAEDA, THE TALIBAN, INCLUDING TTS HAQQANI NETWORK, AND THE MEMBERS OF THE AL-QAEDA-TALIBAN TERRORIST SYNDICATE WAGED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN AFGHANISTAN, PAKISTAN, AND EUROPE ..................... 110

1.  Al-Qaeda ............................................................................................. 113

2.  Sirajuddin Haqqani (Al-Qaeda; Taliban; Haqqani Network) ............................ 124

3.  The Taliban, Including Its Haqqani Network ................................................. 129

    i.   The Taliban ..................................................................................... 130

    ii.  The Haqqani Network ......................................................................... 130

4.  The Kabul Attack Network ....................................................................... 134

5.  The IRGC's, Including Its Hezbollah Division's And Qods Force's, Aid To Al-Qaeda, the Taliban, Including Its Haqqani Network, to Facilitate Attacks Against Americans In Afghanistan ........................................ 136

    i.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There ..................................... 136

ii.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban, Including its Haqqani Network, With Weapons, Explosives, And Lethal Substances ............................................................ 145

iii.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation .................................... 150

iv.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban With Financial Support ................................................... 154

v.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support to Al-Qaeda to Facilitate Syndicate Attacks in Afghanistan ............................................................................................. 156

F.   IN FURTHERANCE OF THE IRGC'S CONSPIRACY, THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ANSAR-AL-ISLAM WAGED A DEADLY TERRORIST CAMPAIGN AGAINST AMERICANS IN IRAQ, SYRIA, IRAN, AND EUROPE .................................................................... 160

1.   Al-Qaeda ...................................................................................................... 162

2.   Al-Qaeda-In-Iraq .......................................................................................... 166

3.   Ansar Al-Islam .............................................................................................. 174

4.   The IRGC's, Including Its Hezbollah Division's And Qods Force's, Aid To Al-Qaeda, Al-Qaeda-In-Iraq, And Ansar Al-Islam Facilitated Attacks Against Americans In Iraq .......................................................................... 177

i.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support And Resources To Sunni Terrorists Targeting Americans In Iraq, Including Al-Qaeda, Al-Qaeda-In-Iraq, And Ansar Al-Islam To Undermine The U.S. Mission There .............................................. 180

ii.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support And Resources To Al-Qaeda That Established Al-Qaeda's Capabilities Before 9/11, Prevented Al-Qaeda's Collapse After 9/11, And Ensured Al-Qaeda's Status As An Iranian Sunni Terrorist Proxy In Iraq ............................................................................. 183

iii.   The IRGC, Including Its Hezbollah Division And Qods Force, Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq 192

iv.   The IRGC, Including Its Hezbollah Division And Qods Force, Established Ansar Al-Islam As An Iranian Sunni Terrorist Proxy In Iraq ......... 197

v.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Sunni Terrorist Proxies With Weapons, Explosives, And Lethal Substances.................................................................. 200

vi.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation .................................................................. 204

vii.   The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Financial Support ............. 215

G.   IN FURTHERANCE OF THE IRGC'S CONSPIRACY, THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, MANAGED A TRANSNATIONAL NETWORK OF TERRORIST FINANCE, LOGISTICS, OPERATIONS, AND COMMUNICATIONS CELLS TO FUND, ARM, LOGISTICALLY SUSTAIN, AND FACILITATE TERRORIST ATTACKS AGAINST AMERICANS IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, ISRAEL AND ELSEWHERE .................... 217

1.   United States ........................................................................ 218

i.   American Technologies ................................................ 218

ii.   American Markets........................................................ 218

iii.   American Systems ....................................................... 219

2.   U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan.................. 219

3.   South Africa ........................................................................ 221

4.   Europe ................................................................................ 222

5.   The Americas ..................................................................... 223

6.   Southeast Asia.................................................................... 223

IV.   THE TERRORIST CONSPIRACY DEPENDED UPON ROBUST ACCESS TO U.S. TECHNOLOGY, U.S. DOLLARS, AND U.S. PERSONS TO CARRY OUT ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST ................................ 224

A.   AFTER THE U.S. INVASIONS OF AFGHANISTAN AND IRAQ, THE IRAN-LED CONSPIRATORS CONCLUDED THAT THEY NEEDED TO REVOLUTIONIZE THEIR ACCESS TO U.S. TECHNOLOGIES THROUGH CORRUPT CORPORATE PARTNERS ............................................. 224

B.     THE ISLAMIC REVOLUTIONARY GUARD CORPS, LEBANESE HEZBOLLAH, AND QODS FORCE ADDRESSED THE CONSPIRACY'S FUNDING AND LOGISTICS NEEDS BY MILITARIZING THE IRANIAN TELECOMMUNICATIONS INDUSTRY AND SEIZING CONTROL OF IRAN'S LARGEST TELECOMMUNICATIONS COMPANIES IN ORDER TO ACQUIRE THE COMMUNICATIONS TECHNOLOGIES, CASH FLOW, LOGISTICAL SUPPORT, FINANCIAL MANAGEMENT SUPPORT, OPERATIONAL SUPPORT, MANAGEMENT CONSULTING SUPPORT, AND CRISIS RESPONSE SUPPORT FROM CORPORATE PARTNERS NECESSARY TO SUSTAIN A TWENTY-YEAR TERRORIST CAMPAIGN AGAINST AMERICANS ................................................................ 232

1.     MTN Irancell ................................................................ 233

2.     Telecommunications Company Of Iran (TCI) ................................ 236

V.     DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE ................................ 236

A.     THE BONYAD MOSTAZAFAN ................................................ 237

B.     IRAN ELECTRONICS INDUSTRIES ........................................ 243

C.     MTN IRANCELL ................................................................ 244

D.     TELECOMMUNICATIONS COMPANY OF IRAN (TCI) .................... 245

E.     THE AKBARI FRONT COMPANIES ........................................ 247

VI.     DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT TO TERRORISTS ................................................................ 248

A.     THE IRGC, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, SOURCED WEAPONS, RAISED FUNDS, AND OBTAINED LOGISTICAL AND OPERATIONAL SUPPORT THROUGH ILLICIT CORPORATE TRANSACTIONS IN THE TELECOM, COMMUNICATIONS, AND IT SECTORS ........................................ 248

B.     DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED SECURE AMERICAN SMARTPHONES, ENTERPRISE LEVEL SERVERS, NETWORK COMPUTING TECHNOLOGIES, AND WEAPONS TO FLOW THROUGH THE IRGC

TO LEBANESE HEZBOLLAH, THE QODS FORCE, AND THEIR TERRORIST PROXIES ...................................................................... 252

C.  DEFENDANTS MADE ILLICIT DEALS WITH FRONTS, OPERATIVES, AGENTS, AND CUT-OUTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, THAT CAUSED FUNDS TO FLOW THROUGH THE IRGC TO HEZBOLLAH, THE QODS FORCE, AND THEIR TERRORIST PROXIES ...... 257

    1.  Procurement Bribery ................................................................ 257

    2.  "Free Goods" ......................................................................... 259

    3.  Exit40 .................................................................................... 261

        i.  Exit40 Was An IRGC Front ...................................... 261

        ii.  MTN Group Knowingly Used Exit40 To Finance Hezbollah And The Qods Force ...................................................... 261

        iii.  ZTE Corp. Knowingly Used Exit40 To Finance Hezbollah And The Qods Force ...................................................... 263

        iv.  Huawei Co. Knowingly Used Exit40 To Finance Hezbollah And The Qods Force ...................................................... 264

VII.  DEFENDANTS KNEW THAT THEIR AGREEMENT TO JOIN THE CONSPIRACY, TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, AND ILLICIT SMARTPHONE PURCHASES, FACILITATED TERRORIST ATTACKS ON AMERICANS IN IRAQ, AFGHANISTAN, SYRIA, YEMEN, AND ISRAEL ....................................... 265

A.  DEFENDANTS KNEW IRAN'S "SECURITY" AGENDA COMPRISED INTERNAL AND EXTERNAL TERROR OPERATIONS BY THE IRGC, LEBANESE HEZBOLLAH, QODS FORCE, AND IRAN'S TERRORIST PROXIES IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, AND ISRAEL ........... 265

    1.  In-Person IRGC Communications as Terrorist Tradecraft ................ 266

    2.  Iranian Constitution ................................................................ 266

    3.  Iranian National Security Council ............................................... 267

    4.  Lebanese Hezbollah Structure ................................................... 267

    5.  IRGC Doctrine ....................................................................... 267

    6.  Iran-Focused Scholars .............................................................. 268

7.      Terrorist Statements ................................................................................ 270

8.      Iran-Related "Security" Media Coverage .............................................. 271

9.      "Security" Euphemism-Related Media Coverage ................................. 273

10.     Each Defendant's Consciousness of Guilt ............................................ 275

B.      DEFENDANTS KNEW THEIR TRANSACTIONS WITH IRGC,
        LEBANESE HEZBOLLAH, AND QODS FORCE FRONTS, OPERATIVES,
        AGENTS, AND CUT-OUTS AIDED THE CONSPIRACY'S TERRORIST
        ATTACKS AGAINST AMERICANS IN IRAQ, AFGHANISTAN, YEMEN,
        SYRIA, AND ISRAEL ................................................................................ 278

C.      DEFENDANTS KNEW THEIR ILLICIT SMARTPHONE PURCHASES
        AIDED THE CONSPIRACY'S TERRORIST ATTACKS AGAINST
        AMERICANS IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, AND ISRAEL ..... 284

VIII.   EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS
        THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED
        TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT THE ISLAMIC
        REVOLUTIONARY GUARD QODS FORCE, INCLUDING THE QODS
        FORCE, AND THEIR TERRORIST PROXIES HEZBOLLAH AND JAYSH
        AL-MAHDI ................................................................................................ 285

A.      THE MTN DEFENDANTS ....................................................................... 285

1.      MTN Group Entered Its Transnational Corporate Alliance With The
        IRGC, Including Lebanese Hezbollah And The Qods Force, In Order To
        Seize The "Virgin" Telecom Markets In Iran, Afghanistan, Syria, Yemen,
        And Lebanon, Each Of Which Was Controlled, Contested, Or Influenced
        By The IRGC And Its Terrorist Proxies ................................................ 285

2.      MTN Group, MTN Dubai, And All MTN Subsidiaries And Affiliates
        Worldwide Joined The Terrorist Conspiracy ........................................ 288

        i.      MTN Group Effectively Serves As A Joint Venture Partner With
        MTN Irancell And Its Iranian Shareholders, The IRGC, Including Its
        Hezbollah Division And Qods Force ..................................................... 288

        ii.     On September 18, 2005, MTN Group's CEO And President Caused
        Every MTN Entity Worldwide To Join the Terrorist Conspiracy When
        He Executed The IRGC's "Security" Agreement On Behalf Of MTN
        Group, MTN Dubai, And All MTN Subsidiaries, i.e., "MTN" ......................... 290

        iii.    After Joining The Conspiracy, MTN Group And MTN Dubai
        Routinely Acted In Furtherance Of The Conspiracy ........................................ 290

iv.    MTN Group's And MTN Dubai's Recent Conduct Demonstrates That MTN Group And MTN Dubai Remain Active Co-Conspirators With Foreign Terrorist Organizations .................................................. 292

3.    MTN Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including Lebanese Hezbollah's And The Qods Force's, Terrorist Enterprise Against Americans Worldwide ......................................... 309

    i.    MTN Assumed A Financial Role In The Terrorist Enterprise..................... 314

    (a)    MTN's Bribes to Terrorist Fronts ............................................... 314

    (b)    MTN's License Fee Payments to Terrorist Fronts ..................................... 316

    (c)    MTN's Funding of Terrorist Fronts through MTN Irancell Cash Flow ............................................................................. 316

    ii.    MTN Assumed An Operational Role In The Terrorist Enterprise.............. 317

4.    MTN Knowingly Assumed A Financial, Logistical, And Operational Role In The Taliban's, Including The Haqqani Network's, Terrorist Enterprise In Afghanistan, Directly And Indirectly Financing And Arming IRGC Proxy Attacks In Afghanistan And Iraq............................................................ 334

i.    MTN Made Protection Payments To The Taliban............................................. 334

ii.    MTN Supported The Taliban By Deactivating Its Cellular Towers At Night ..................................................................................... 342

5.    MTN's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With MTN's Historical Business Practices in International Markets ................................................................... 348

    i.    MTN Aided Terrorists in Afghanistan ......................................... 348

    ii.    MTN Aided the IRGC's Terroristic Violence against Iranian Pro-Democracy Demonstrators..................................................... 349

    iv.    MTN Aided Terrorists in Nigeria .............................................. 350

6.    MTN's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States ........................... 351

    i.    MTN's Conduct Targeted The United States................................... 352

    ii.    MTN's Conduct Relied On American Contacts ......................................... 356

    (a)    From 2012 Through 2019, MTN Group Regularly Reached Into The United States In Order To Unlock The U.S. Financial System So

That MTN Group Could Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell ........................................................................ 357

(b)   MTN Group Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The IRGC And Into The Budget Of The IRGC, Including Its Hezbollah Division And Qods Force ........................................................................................................... 359

(c)   MTN Group And MTN Dubai Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The IRGC, Including Its Hezbollah Division And Qods Force, Including Untraceable Ameican Smartphones ........................................................ 359

(d)   MTN Obtained U.S. Technology For The Benefit Of The IRGC, Including Its Hezbollah Division And Qods Force ............................... 361

(e)   MTN Obtained Essential U.S. Services That Aided The IRGC's, Including Its Hezbollah Divison's And Qods Force's, Terrorist Capabilities. ........................................................................................ 362

B.      THE ZTE DEFENDANTS ............................................................................ 364

1.      ZTE Joined The Terrorist Conspiracy ................................................ 364

i.    Through Agreements With IRGC Fronts Including But Not Limited To TCI, ZTE Agreed To Join A Company-Wide Conspiracy ........................... 364

ii.   ZTE, ZTE USA, And ZTE TX Each Made Overt Acts In Furtherance Of The Conspiracy ............................................................. 364

2.      ZTE Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's — Including Lebanese Hezbollah's And The Qods Force's — Terrorist Enterprise Against Americans Worldwide ..................................... 365

i.    ZTE Corp., ZTE USA, And ZTE TX Knowingly Facilitated MTN Irancell And TCI's Acquisition Of Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies ............................................................. 365

ii.   ZTE Corp., ZTE USA, And ZTE TX Substantially Increased MTN Irancell And TCI Revenue By Illicitly Sourcing Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies ......................................... 377

iii.  ZTE Corp., ZTE USA, And ZTE TX Routed Bribes To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies ......................................... 377

3.     ZTE's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With ZTE's Historical Sales Practices In International Markets ................................................................................. 380

4.     ZTE's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States ........................... 383

     i.   ZTE's Conduct Targeted the United States ................................. 383

     ii.  ZTE's Conduct Relied on American Contacts ............................ 393

C.     THE HUAWEI DEFENDANTS ............................................................... 395

     1.     Huawei Joined The Terrorist Conspiracy .......................................... 395

         i.   Through Agreements With IRGC Fronts, Including But Not Limited to TCI, Huawei Agreed To Join A Company-Wide Conspiracy ...................... 395

         ii.  Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Each Made Overt Acts In Furtherance Of The Conspiracy ................. 395

     2.     Huawei Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including its Hezbollah Division's And Qods Force's, Terrorist Enterprise Against Americans Worldwide ........................... 396

     3.     Huawei Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including Its Hezbollah Division's And Qods Force's, Terrorist Enterprise Against Americans Worldwide ........................... 397

         i.   Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Knowingly Facilitated MTN Irancell And TCI Acquisition of Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies ............... 397

         ii.  Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Substantially Increased MTN Irancell And TCI Revenue By Illicitly Sourcing Embargoed American Technology, Which Flowed Through To The IRGC's Terrorist Proxies ......................................................... 410

         iii.  Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Routed Bribes To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies .................................................................................... 411

         iv.  Huawei Co, Huawei USA, Huawei Device USA, Futurewei, And Skycom Routed "Free Goods" To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies ......................................................... 412

4.     Huawei's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With Huawei's Historical Sales Practices In International Markets ................................................................ 412

5.     Huawei's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States ........................... 413

     i.     Huawei's Conduct Targeted The United States ............................................ 414

     ii.    Huawei's Conduct Relied On American Contacts ...................................... 417

IX.    DEFENDANTS KNEW THAT THEIR TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, FACILITATED EVERY NODE OF THE TERRORIST CONSPIRACY AND DIRECTLY AIDED TERRORIST ATTACKS AGAINST AMERICANS THROUGHOUT THE MIDDLE EAST AND EUROPE, INCLUDING IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, AND ISRAEL .................................... 419

A.    COMMAND, CONTROL, COMMUNICATIONS, AND INTELLIGENCE ......... 428

B.    TERRORIST FINANCE ............................................................. 431

1.     Cash Flow From MTN Irancell And TCI Revenue ............................. 431

2.     Cash Flow From Terrorist Fundraising Campaigns, Procurement Bribery, Khums, And Financial Management ................................... 436

C.    WEAPONS .................................................................................. 437

1.     Improvised Explosive Devises (IEDs) and Explosively Formed Penetrators (EFPs) .................................................................. 437

2.     Rockets ........................................................................................... 438

D.    RECRUITING, FUNDRAISING, STRATEGIC COMMUNICATIONS, AND DISINFORMATION ............................................................ 438

1.     Recruiting and Fundraising .......................................................... 439

2.     Strategic Communications and Disinformation .......................... 442

X.    JOINT CELLS COMPRISED OF HEZBOLLAH, JAYSH AL-MAHDI, AND ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING QODS FORCE, KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN IRAQ THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE .............................................. 448

A.    THE JUNE 23, 2011, EFP ATTACK IN BAGHDAD ............................ 451

1. The Everhart Family And Estate.........................................................453

2. The Mughal Family........................................................................453

B. THE JULY 7, 2011, EFP ATTACK IN BAGHDAD.....................................455

1. The Newby Family ........................................................................455

2. The Rzepa Family .........................................................................456

C. THE JULY 8, 2011, ROCKET ATTACK IN BAGHDAD.............................457

1. The Ogden Family .........................................................................457

D. THE JULY 10, 2011, ROCKET ATTACK IN BASRA .............................458

1. The Chinn Family ..........................................................................458

2. The Niquette Family ....................................................................459

E. THE JULY 15, 2011, EFP ATTACK IN BASRA ....................................460

1. The Elliott Family .........................................................................460

F. THE OCTOBER 12, 2011, ROCKET ATTACK IN BASRA ...............................461

1. The Alldridge Family ...................................................................462

G. THE NOVEMBER 2, 2011, EXPLOSIVE ATTACK IN DIWANIYAH ..............463

1. The Sullen Family .........................................................................463

H. THE NOVEMBER 14, 2011, EFP ATTACK IN BAGHDAD ...............................464

1. The Hickman Family .....................................................................465

I. THE JANUARY 15, 2016, KIDNAPPING ATTACK IN BAGHDAD .................465

1. The Frost Family And Estate .......................................................467

2. The El-Maadawy Family ...............................................................468

3. The Mohamed Family ...................................................................470

J. THE APRIL 29, 2017, IED ATTACK IN NINEVEH ...............................471

1. The Lee Family ............................................................................471

XI. THE IRGC-BACKED TALIBAN TERRORIST SYNDICATE IN
AFGHANISTAN AND PAKISTAN LED BY AL-QAEDA AND THE

TALIBAN KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN AFGHANISTAN THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ............................................... 472

A.    THE JANUARY 14, 2019, SUICIDE BOMB ATTACK IN KABUL ................... 473

   1.    The Kamaleson Family And Estate ................................................... 473

B.    THE JULY 29, 2019, INSIDER ATTACK IN URUZGAN ................................... 474

   1.    The Nance Family.................................................................................. 474

   2.    The Kreischer Family ........................................................................ 476

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act (the "ATA") on behalf of American service members and civilians, and their families, who were killed or wounded while serving their country in Iraq between 2011 and 2017 or in Afghanistan in 2019. Plaintiffs seek to hold MTN, a South African telecom company, and ZTE and Huawei, two Chinese telecom companies and technology manufacturers, accountable for their conspiracy with, and substantial assistance to, multiple Foreign Terrorist Organizations ("FTOs") targeting Americans in Iraq, Afghanistan, the Middle East, and Europe.

2.      Plaintiffs' allegations are based on information derived from confidential witnesses with direct and indirect knowledge of the alleged facts, internal company documents, declassified military-intelligence reporting, congressional testimony and reports, press accounts, and Plaintiffs' recollections.

3.      MTN, ZTE, and Huawei are large multinational companies that had lucrative business with Iranian entities that MTN, ZTE, and Huawei knew, or recklessly disregarded, served as fronts for terrorist finance and logistics, and MTN, ZTE, and Huawei engaged in illicit, terrorism-sanctions-busting transactions with known terrorist fronts in order to boost their profits.  Those transactions aided and abetted terrorism by directly funding, arming, and logistically supporting a terrorist campaign that stretched for more than a decade, killing and injuring thousands of Americans.

4.      This case reveals conduct that is far more depraved than even the ordinarily culpable ATA defendant.  No ATA defendant has ever been credibly accused of the full spectrum of behavior identified in this Complaint.  MTN, ZTE, and Huawei directly conspired with known fronts for designated terrorist organizations.  In serving as a full-spectrum telecommunications and computing partners for Iran's Islamic Revolutionary Guard Corps (the

1

"IRGC"), and thereby the world's worst terrorist organizations, Defendants aided *every* facet of the IRGC's terrorist enterprise.

5.      MTN, ZTE, and Huawei aided the terrorists because they were co-conspirators with the IRGC, including its subordinate branches, Lebanese Hezbollah and the Qods Force, as each signed written agreements pledging to support the "security" agenda of their counterparty "Iranian Shareholders" – which were themselves fronts for the IRGC – which they and the IRGC both knew meant supporting the IRGC's, including Hezbollah's and the Qods Force's, industrial scale exportation of terror targeting Americans around the world, but most of all, in the two countries flanking Iran on either side:  Iraq to the west, and Afghanistan to the east.

6.      Here's how the conspiracy worked.  The IRGC led a conspiracy, the object of which was to commit terrorist attacks on Americans in Iraq and Afghanistan (the "IRGC Conspiracy").

7.      The IRGC established the IRGC Conspiracy after 9/11 and it continued until the end of the war in Afghanistan.

8.      The co-conspirators along with the IRGC in the IRGC Conspiracy were the terrorist organizations supported by the IRGC, including the IRGC's Qods Force, Lebanese Hezbollah, Jaysh al-Mahdi Special Group Ka'taib Hezbollah, Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, al-Qaeda, al-Qaeda-in-Iraq, Ansar-al-Islam, the Taliban, and the Haqqani Network. Corporate fronts for the IRGC, including the telecom companies the IRGC controlled such as Irancell, the Telecommunications Company of Iran ("TCI"), and Mobile Communication Co of Iran ("MCI") were also co-conspirators.

9.      The IRGC Conspiracy operated through its terrorist members to carry out attacks on Americans, with the IRGC providing logistical and financial support.  The attacks in this case

were all acts in furtherance of the IRGC Conspiracy. Every person and entity that agreed to join the IRGC Conspiracy is therefore liable for the harm caused by these attacks.

10.     Defendants MTN, ZTE, and Huawei joined the IRGC Conspiracy on the specific dates they agreed with known IRGC fronts (variously, MTN Irancell, TCI, and MCI) to provide resources, technical materials, and technical support, and to support Iran's "security" objective.

11.     Each of MTN, ZTE, and Huawei acted in furtherance of that agreement to join the IRGC Conspiracy each time they provided money and other resources, provided technical goods, such as cell phones and telecom infrastructure, assisted with technical support, as was their obligation as joint venturers with and contractual counterparties to known IRGC fronts, when they evaded U.S. sanctions in order to do so, and when they attempted to obfuscate their respective roles. Each time MTN, ZTE, and Huawei did these acts in furtherance of the IRGC Conspiracy, each Defendant assisted the IRGC Conspiracy's objective to attack Americans and furthered the IRGC Conspiracy's ultimate objective to expel Americans from Iraq and Afghanistan.

12.     MTN, ZTE, and Huawei, entered into the IRGC Conspiracy with the IRGC, and acted in furtherance thereof in open, obvious, programmatic, and enduring ways for well over a decade. MTN, ZTE, and Huawei were one in spirit with their IRGC terrorist partners because each calculated that, if they remained aligned with the interests of their partners' "Iranian Shareholders" – fronts for the IRGC – their company would reap billions in easy profits by seizing a monopoly in one of the world's fastest growing and youngest potential subscriber pools.

13.     To earn their billions, MTN, ZTE, and Huawei simply needed to believe that the obvious, and vast, American bloodshed in Iraq and Afghanistan that was sure to follow their

3

decision was an acceptable price to pay to yield a profitable outcome for their own shareholders and the "Iranian Shareholders" with whom they were at times joint venture partners and at others explicit contractual counterparties.

14.     Seasoned investors, however, know that any time one shareholder's investment does well, that means somewhere out there is another shareholder on the opposite side of the issue, for whom the investment went badly.

15.     For every shareholder who wins, there must be another shareholder in the world who loses.  But this is not a case about trading shares on the NASDAQ.  In this case, the "shareholders" who lost were not day traders who got crushed making a unwise stock pick.  They were the Plaintiffs, and others.

16.     Plaintiffs were patriotic American servicemembers and civilians who volunteered for hard, thankless, jobs on the other side of the world in Iraq and Afghanistan.  Some returned, badly injured.  Some never came back at all.  None will ever be the same again.  MTN, ZTE, and Huawei played an enormous role in the sequence of events that led to this outcome.  Plaintiffs are among the victims. This lawsuit followed.

17.     It is impossible to overstate the magnitude of MTN's, ZTE's, and Huawei's defilement of the Anti-Terrorism Act.  This case concerns one of the single most depraved, expansive, deceitful, and persistent international corporate conspiracies since the end of World War II.  There is little doubt that this conspiracy changed the trajectory of Afghanistan, Iraq, and countless other countries.

18.     When Plaintiffs originally filed their Complaint in the summer of 2021, the world was a very different place.  American servicemembers were still on the ground in Afghanistan.  Sirajuddin Haqqani was busy planning suicide bombings against hotels and restaurants.

19.     Since then, the world changed.  America withdrew from Afghanistan.  A well-organized, cohesive, and integrated Taliban seized the country.  Tens of thousands of Afghan heroes fled everyone and everything they knew, for a new life in the U.S.

20.     Defendants' business partners and their "Iranian Shareholders" celebrated the terrorists' victory (undoubtedly joined, as discovery is likely to reveal, by many of MTN's, ZTE's, and Huawei's non-U.S. employees and management).

21.     Plaintiffs kept investigating.  This Complaint outlines the unprecedented nature of Defendants' conduct, and it likely remains the tip of the iceberg.  No other defendant in the history of the ATA has engaged in conduct as comprehensively violative, for more money, over a longer period, with a more violent counterparty, in a more open and notorious manner, with more devastating consequences, while demonstrating a greater sense of corporate impunity.  For more than a decade, MTN, ZTE, and Huawei funded, partnered with, and helped develop the technical capabilities for the world's worst terrorist organization – the IRGC – by entering into deals with notorious fronts for the IRGC and pledging to assist with Iran's "security" agenda – all while fraudulently concealing it from everyone, including their own shareholders.

22.     MTN, ZTE and Huawei are three of the worst corporate sponsors of terrorism in the history of the ATA.  As a result, this case is likely to be different than a typical ATA case because of what Defendants have done, and this Complaint is longer than many ATA complaints.  MTN, ZTE, and Huawei each funneled hundreds of millions in value to the terrorists in nearly every conceivable modality of terrorist fund transfer:  direct transactions with FTO fronts while knowing (and not caring) about the FTO relationship; illicit acquisition of valuable American technologies; procurement bribes; "free goods" kickbacks; black market purchasing; cash flow from the companies; and so on.

23.     The evidence regarding Defendants' intent is even worse.  Defendants made shocking admissions in writing, and then destroyed everything to try to cover their tracks (none succeeded completely).  Some Defendants lied to federal law enforcement.  Witness intimidation was common.  Innocent Canadians were kidnapped to extort the United States and Canada.

24.     MTN's, ZTE's, and Huawei's conduct, spending amount, and terrorist tradecraft is startlingly like how a State Sponsor of Terrorism acts—hundreds of millions of dollars in direct funding to terrorists, critical technical support that aids their victory given with the hope that it will occur, and a commitment to never-ending lies, falsehoods, and deceptions no matter how much evidence accumulates or how ridiculous it becomes.

25.     MTN, ZTE, and Huawei may have learned this "never stop lying" tactic at the feet of their client, the IRGC, which is notorious amongst national security professionals for, in effect, being some of the world's most persistent long-term liars, capable of sustaining a lie for decades.  MTN, ZTE, and Huawei made similar choices.

26.     MTN Group continues to openly conspire with multiple FTOs in plain sight.  This is not normal, nor is it acceptable, but it is damning proof that MTN Group conspired with them all along.

27.     MTN Group is currently the joint venture partner of known fronts for an FTO so committed to terror that it midwifed, and controlled thereafter, a mine run of additional FTOs: Lebanese Hezbollah (FTO); Jaysh al-Mahdi Special Group Ka'taib Hezbollah (FTO); Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (FTO); al-Qaeda-in-Iraq (FTO); Ansar-al-Islam (FTO). The list goes on.

28.     MTN is unrepentant about its embrace of FTO terrorist fronts for cash, even though: (i) in 2012, a whistleblower heroically exposed MTN's secret deal, resulting in MTN's

public humiliation in South Africa after the formerly iconic company became a subject of national mockery that year; (ii) also in 2012, a competitor, Turkcell, sued MTN for the latter having pilfered the former's lucrative contract out from under them; (iii) in 2019, being sued by hundreds of American victims of terrorist attacks in Afghanistan under the ATA concerning MTN's protection payments in Afghanistan; and (iv) being sued by Plaintiffs in the instant case.

29.     Why would a publicly traded South African company like MTN Group do this? Money.  MTN Irancell, the joint venture at issue, is MTN Group's cash cow and is, depending on metrics, either the second or third largest subscriber market in MTN Group's entire global portfolio.  MTN Group concluded that it and its shareholders could reap billions of dollars in profits and lock in the single best international telecoms market opportunity in decades if it could achieve a meeting of the minds with the Iranian Shareholders who controlled Irancell.

30.     To make billions of dollars running the phone system and internet working with these people in partnership, MTN Group had to fully commit itself worldwide to corporate criminality on an almost impossible to comprehend scale.  ZTE and Huawei eventually joined MTN, and these three companies combined to enable unprecedented aid to terrorists:

- a secret, undisclosed, direct, written, terrorist joint venture agreement signed by an active, senior-ranks Iranian terrorist, on the one hand, and the CEO of one of Africa's largest publicly traded companies, on the other;

- direct contractual obligations with Iranian entities known to be owned and controlled by fronts for the IRGC, whereby substantial banned technology useful to terrorists was transferred, and entire telecommunication systems used by the terrorist conspirators was assembled, used, and maintained;

- a nearly two decade-long conspiracy that operationalized the secret deal into a technological, financial, services, and communications supply chain for the world's worst transnational terrorist organization;

- a large publicly traded company that refuses, even now, to exit its conspiracy with the IRGC, even after it has been publicly outed and even after the IRGC was designated as an FTO; and

7

- shocking bribery including tens of millions of "free goods" bribes designed to be diverted by terrorist to the black market, and large U.S. Dollar wire transfers after the bribe recipient performed his or her illicit deed.

31. After the U.S.-led invasions of Afghanistan in 2001 and Iraq in 2003, an alliance of Shiite terrorists led by Hezbollah and its Iraqi proxy, Jaysh al-Mahdi, and funded and armed by the IRGC including its subordinate international "security" branch Qods Force and its subordinate Lebanese Hezbollah Division ("Hezbollah Division" or "Division"), combined forces to pursue a shared terrorist campaign against Americans in Iraq.

32. The IRGC's ambitions did not stop at Iraq. As the IRGC grew, it intensified the terror campaign in Afghanistan as well, led by al-Qaeda and its long-time ally, the Taliban.

33. To attack the citizens protected by the world's most powerful military in Iraq and Afghanistan after 2003, the IRGC, including the Hezbollah Division and Qods Force, organized a transnational terrorist alliance – a NATO for Islamists – that included both Shiite and Sunni, and stretched throughout the Middle East, from Syria to Afghanistan.

34. In Iraq, the IRGC furthered its conspiracy by tasking its Hezbollah Division to stand up a grand Shiite terror group in Iraq explicitly modeled after Hezbollah called Jaysh al-Mahdi. Thereafter, IRGC-backed Shiite terrorists in Iraq formed joint cells comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force ("Joint Cells"). To further their shared goal of driving America out of Iraq, the Joint Cells attacked civilians indiscriminately; conducted kidnappings, torture, and executions; and refused to identify themselves or otherwise comply with the Geneva Conventions.

35. In Afghanistan, the IRGC furthered the conspiracy by funding, arming, training, logistically sustaining, and providing safe havens to, among other groups, al-Qaeda and the

Taliban, including its Haqqani Network. Al-Qaeda and the Taliban also followed a similar Joint Cells approach

36. In the twenty years between 9/11 and the American withdrawal from Afghanistan, the IRGC, including its Hezbollah Division and Qods Force, prosecuted a grinding, global terrorist campaign, which it supported from a latticework of cells arrayed across six continents. The grim result: more than 4,000 Americans were killed in terrorist attacks in Iraq and Afghanistan by designated terrorist groups that were funded, armed, and logistically sustained by the IRGC. Indeed, each of the designated terrorist groups were members of the same global terrorist conspiracy led by the IRGC, which included the regular IRGC, the Hezbollah Division, and the Qods Force.

37. While Plaintiffs, or their loved ones, worked to stabilize Iraq nearly a decade after the U.S. invasion, and Afghanistan on the eve of the terrorists' victory there, they were attacked by U.S. Government-designated terrorist organizations that participated in an Iran-backed, Hezbollah-led terrorist conspiracy campaign that MTN's, ZTE's, and Huawei's transactions helped finance, arm, logistically support, conceal, and upgrade.

38. MTN, ZTE, and Huawei helped revolutionize the efficiency of the Big Data management practices and capabilities of Hezbollah and the Qods Force, in addition to the "regular" IRGC inside of Iran. It is impossible to overstate the scale of the carnage that followed Defendants' decision to midwife the IRGC, including its Hezbollah Division and Qods Force, into the modern, networked, Big Data world.

39. Prior to Defendants, the IRGC, including its Hezbollah Division and Qods Force, had the will but not the modern gear. While the IRGC, including its Hezbollah Division and Qods Force, had the scale of a global multinational corporate behemoth – tens of thousands of

personnel, consultants, agents, and partners, distributed across dozens of countries on six continents – the IRGC lacked even rudimentary network computing technologies.

40.     By 2004, the IRGC was surrounded on both flanks by "the Great Satan," and the enormous technological gap between the IRGC and its mortal enemy – the "Big Data Gap" – forced the IRGC to do something drastic, which it had never done before:  bring in foreign companies to revolutionize Iran's computing and telecommunications infrastructure.

41.     Two problems, however, still confronted the IRGC, including its Hezbollah Division and Qods Force.  *First*, the IRGC knew that most large technology companies would have nothing at all to do with them.  The IRGC also knew what any intelligence operative knows:  that large telecom and networking computing companies come from an exceptionally ethical industry that has never experienced a major terrorist finance scandal and are internationally notorious within the telecoms industry for being unabashed patriots.

42.     *Second*, and worse still, if the IRGC wanted to acquire the key technologies that it had determined were essential to prosecuting its terror campaign, it could not avoid an outcome in which the IRGC, indirectly, needed to reach into America's markets, and acquire embargoed dual-use technologies on an industrial scale while surmounting three separate detection hurdles, in a race where any stumble would likely result in the exposure of the entire scheme.

43.     The solution to both?  Find some corporate criminals, bring them all the way into the circle of trust, and count on their limitless greed.  Enter, Defendants.  Since the 1979, the IRGC has always sought to kills Americans in large numbers.  What it lacked was not the will, but the capabilities.  After 9/11, the story remained the same – until MTN, ZTE, and Huawei answered the IRGC's call for multinational corporate assistance to the "security" operations of Hezbollah Division and the Qods Force.

10

44.     What the IRGC, including its Hezbollah Division and Qods Force, had never had – until Defendants – were true, established multinational corporate criminal partners.  And Defendants furnished the IRGC three:  MTN Group, ZTE Corporation, and Huawei Co.  One has pleaded guilty (ZTE), one is currently defending itself in a criminal trial in this District (Huawei), and one is defending itself in South Africa (MTN).

45.     After 9/11, the IRGC coordinated a grand alliance of Islamist terrorists to attack Americans in the Middle East.  On the eve of the U.S. invasion of Iraq, the IRGC, including its Hezbollah Division and Qods Force, and Lebanese Hezbollah agreed to prepare, instigate, and sustain a nationwide campaign of terror against Americans in Iraq, which was planned and authorized by the IRGC's lead foreign terror agent, Lebanese Hezbollah.  To sustain an ever-escalating terrorist campaign against the United States in Iraq, and later Afghanistan, Iran relied upon Lebanese Hezbollah, which, in turn, depended upon IRGC funding and illicitly sourced gear from a constellation of IRGC, including Qods Force, and Lebanese Hezbollah terrorist fundraising and logistics cells scattered across dozens of countries on every continent but Antarctica, which the IRGC, including Qods Force, and Lebanese Hezbollah relied upon to fund and equip forward deployed Lebanese Hezbollah, Qods Force, and local Jaysh al-Mahdi proxies in Iraq.

46.     To sustain their insurgency, the terrorists relied upon three substantial funding streams: sources from within Iraq, most of all, the river of cash and free goods that Jaysh al-Mahdi obtained from corrupt companies doing business before the Iraqi Ministry of Health, sources from within Iran, and sources from the latticework of IRGC, including Qods Force, and Lebanese Hezbollah logistics and fundraising cells that stretch the globe from Dubai to South Africa, Houston to Syria, and countless other geographies.

47.     This case is about those second and third sources of funding; while the Iraqi Ministry of Health was the largest overall single source of funding for the terrorists, the second and third streams were equally potent.  Cash flow from the telecom company Irancell was either the largest or second largest source of cash flow from any IRGC front and caused hundreds of millions per year to flow to the IRGC, including $4.2 billion between 2005, when MTN Group bribed its way to the license, and 2013 – approximately $500 million per year, every year. Similarly, the fundraising and logistics cells around the world coordinated cash flows from narcotics smuggling, and the Qods Force's and Lebanese Hezbollah's various transnational criminal rackets, e.g., collecting 10%-20% "taxes" as *khums* from allied businesspeople in Dubai, U.A.E., or Pretoria, South Africa.

48.     Given the transnational nature of the conspiracy they led, the Qods Force and Lebanese Hezbollah depended upon illicitly sourced, embargoed American communications and information technologies, which they acquired through Defendants MTN Group, MTN Dubai, ZTE Corp., ZTE TX, ZTE USA, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom.  Defendants' conduct changed the trajectory of the entire terrorist campaign in Iraq by revolutionizing the communications capabilities of both the IRGC, including the Qods Force, and Lebanese Hezbollah, in Iraq and throughout the Middle East and crippling the ability of U.S. forces in Iraq to detain Qods Force and Lebanese Hezbollah operatives in the country – because we could almost never find them.  Because of Defendants' conspiracy, Plaintiffs suffered the consequences.

49.     MTN Group, ZTE Corp., and Huawei Co. entered the conspiracy through secret deals signed by their senior leadership, on behalf of their entire corporate families, with IRGC

operatives similarly signing on behalf of the entire IRGC, necessarily including its external terrorist arms, the Qods Force and Hezbollah Divisions.

50.     This case is about that IRGC structure: from the terrorists' fundraising and logistics fronts (like the Bonyads) to the various strategies for illicitly sourcing U.S. Dollars and weapons technologies (like using agents, cut-outs, and intentional overpayments in Dubai), and raising money (such as through bribes, taxes, and front company cash flows), to the terrorists' strategy for concealing the scheme (through removing U.N. sanctions that interfered with front companies necessary to the scheme), to the terrorists' ability to securely communicate with one another (through illicitly obtained American phones), to the terrorists' ability to better surveil kidnapping targets and anticipatory Quick Reaction Forces in response (from enhanced computing technologies) and finally, to their ability to build more powerful and accurate roadside bombs and rockets necessary to punch through the cocoon of armor that protected American service members and civilians (through a host of illicit technologies illegally sourced from the U.S.).

51.     MTN Group, ZTE Corp., and Huawei Co. signed either literal terrorism joint venture agreements and/or entered into contracts with known IRGC fronts.  MTN Group kept its agreement locked in a safe, concealed from the world.  On information and belief, ZTE Corp. and Huawei Co., practicing better terrorist tradecraft than their sloppy co-conspirators at MTN Group, smartly destroyed their copies, but their parallel performance to MTN Group confirms their agreement all the same.

52.     Ever since, publicly, MTN, ZTE, and Huawei variously lied, dissembled, intimidated witnesses, destroyed evidence, all to avoid admitting the obvious:  that they directly armed, funded, and enabled the communications of the IRGC, including its Hezbollah Division

13

and Qods Force, Lebanese Hezbollah, and Jaysh al-Mahdi, in Iraq, as well as Qods Force and Lebanese Hezbollah support cells from around the world, stretching from Syria to Afghanistan. Even today, MTN Group remains, effectively, in a joint venture with two fronts for an FTO.

53.     MTN Group, ZTE Corp., and Huawei Co. are each culpable.  Each did, essentially, the same thing.  The only difference is that MTN Group's secret vault of smoking documents were leaked by a whistleblower in March 2012, revealing the scheme MTN Group had fraudulently concealed from the world, its own shareholders, the South African government, the U.S. government, and the U.A.E. government, to name but a few.

54.     The MTN Group document revelation in 2012 did not just reveal MTN Group's scheme.  Critically, it outed the ***IRGC's terrorist tradecraft*** when it comes to virtually every facet of the terrorist logistics, funding, and communications chains.  MTN Group's conduct is not just probative of what MTN Group itself did; as informed by information that emerged years later, it shows what the IRGC demanded of *every* corporate business partner in this space. Consequently, MTN Group's conduct offers a reasonable inference regarding the conduct of ZTE Corp. and Huawei Co., as well as that of their mutual business partner – the IRGC.

55.     Like MTN Group, ZTE Corp. and Huawei Co. also joined the conspiracy and also fraudulently concealed their participation by following the same Lebanese Hezbollah/Qods Force playbook that MTN Group followed.  Unlike MTN, however, ZTE and Huawei did not experience their own whistleblower revolts until later, but, eventually, everyone got caught. MTN Group has been enmeshed in litigation for nearly a decade.  And ZTE and Huawei were both investigated by the U.S. law enforcement, with serious criminal charges flowing out of each inquiry.  From these cases, there is overwhelming evidence that the IRGC, including its Hezbollah Division and Qods Force, and Lebanese Hezbollah, relied upon ZTE and Huawei, just

14

as it did with respect to MTN, to surreptitiously acquire U.S. Dollars and vital U.S. technologies critical to every aspect of the terrorist enterprise.

56.     MTN Group, ZTE Corp., and Huawei Co. were one in spirit with the terrorists. Each pledged, in writing, their commitment to aiding the IRGC's "security" – which all involved understood to be a euphemism for anti-American terror.  They did this because IRGC domination of the Middle East was great for each Defendants' profits and, with respect to ZTE Corp. and Huawei Co., the victory of the IRGC, including its Qods Force and Hezbollah Division, over the United States, served the hostile national security objectives of the Chinese Communist Party, which sought to aid Shiite terrorists in the region to inflict pain on Americans in Iraq in order to cause the United States to withdraw from the country.

57.     After entering the conspiracy with known IRGC fronts called Irancell and TCI, MTN Group, ZTE Corp., Huawei Co., and their respective subsidiaries, knowingly partnered with notorious fronts for Hezbollah, such as the Bonyad Mostazafan.  Through such business MTN, ZTE, and Huawei provided direct financial support, revenue, U.S.-origin, embargoed technology and equipment, and training and expertise—all of which the IRGC, including its Hezbollah Division and Qods Force, provided to their terrorist allies operating in Iraq and Afghanistan—and all of which was used to target to kill and injure Americans, including Plaintiffs.

58.     As long-term strategic partners with one another who worked closely together in Iran, MTN, ZTE, and Huawei all understood their counterparties were notorious terrorist fronts used to raise money and source weapons for the Qods Force, Lebanese Hezbollah, and their proxies in places like Iraq and Afghanistan.  Defendants knew or were willfully blind to the fact

that their "business" with terrorist front counterparties was serving the terrorists' ends but proceeded in any event.

59.     The IRGC, including its Qods Force and Hezbollah Division, used its relationships with MTN Group, ZTE Corp., and Huawei Co. to optimize Iran's terrorist enterprise by bolstering the financial and technical capacities of Iran's terrorist proxies in Iraq and Afghanistan.

60.     Through the IRGC's, including Qods Force's, transactions with MTN Group, ZTE Corp., and Huawei Co., Hezbollah and the IRGC's terrorist proxies were able to evade the international sanctions regime to source weapons and weapons components for terror, modernize their communications systems to better encrypt signals traffic, improve their surveillance and intelligence capabilities, and generate tens of millions in annual revenue to fund Hezbollah-led attacks – all of which Hezbollah, and the proxies it commanded in Iraq, used to attack Americans there from 2011 through 2016.

61.     The total value of the money, technology, and services that the IRGC, including its Hezbollah Division and Qods Force, obtained via MTN Group's, ZTE Corp.'s, and Huawei Co.'s business with the IRGC, including its Hezbollah Division and Qods Force, collectively extracted likely ranges into the hundreds of millions of U.S. Dollars in cash and cash equivalents—and the terrorists used those resources to pay for the Joint Cells' campaign by Hezbollah and its terrorist proxies in Iraq and Afghanistan.  The IRGC facilitated violence by all, fueled by Defendants' aid.

62.     But this case is not just about money; the technology that MTN Group, ZTE Corp., and Huawei Co. provided to the IRGC, which then flowed through its Hezbollah Division and Qods Force to Hezbollah for use by the Joint Cells in Iraq, was uniquely important to the

terrorists, enabling them to inflict maximum damage because, among other things, it allowed them to spy on Americans, avoid detection, clandestinely communicate, build and detonate more effective bombs, and develop more accurate and lethal rockets. And on top of the money and the technology, Defendants also provided substantial ongoing logistical and operational aid for the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise.

63.    This is not a case about one or two alleged rogue employees who engaged in a frolic and detour that resulted in a company's money reaching terrorists. Here, each Defendants' executives were thoroughly implicated in the terrorist finance and logistics scheme, and actively supported doing business with known terrorist fronts.

64.    Indeed, MTN's leadership even mocked those who raised concerns about the risks of becoming joint venture partners with two notorious Iranian terror fronts: When queried by investors about the "risk of doing business with Iran," MTN's then-CEO "laughed off" such questions, joking that "[MTN] hadn't budgeted for bomb shelters or anything like that."

65.    ZTE's executives were similarly culpable. According to the then-Acting Assistant Attorney General, Mary B. McCord, "ZTE engaged in an elaborate scheme to acquire U.S.-origin items, send the items to Iran and mask its involvement in those exports," and the plea agreement ZTE signed, on behalf of itself and its subsidiaries, "alleges that the highest levels of management within the company approved the scheme."

66.    Huawei is much the same. Acting U.S. Attorney for the Eastern District of New York Nicole Boeckmann announced a deferred prosecution agreement by Huawei Co's CFO wherein she "[took] responsibility for her principal role in perpetrating a scheme to defraud a global financial institution," and admitted in the related statements of facts that she had "while acting as the Chief Financial Officer for Huawei, . . . made multiple material misrepresentations

to a senior executive of a financial institution regarding Huawei's business operations in Iran"
and that she and "her fellow Huawei employees engaged in a ***concerted effort to deceive global
financial institutions, the U.S. government and the public about Huawei's activities in Iran***."

67. MTN's, ZTE's, and Huawei's transactions, and the terrorist attacks they funded,
were acts of "international terrorism." 18 U.S.C. § 2333(a).

68. The Joint Cells' terrorist attacks against Plaintiffs were "planned," "authorized,"
and jointly "committed" by Hezbollah, 18 U.S.C. § 2333(d)(2), the Islamist terrorist group that
serves as the lead worldwide terrorist agent for the IRGC, including its Hezbollah Division and
Qods Force. Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, have
long been fused together: Hezbollah pledged allegiance to the IRGC, including its Hezbollah
Division and Qods Force, who, in turn, serve as Hezbollah's lead patron, protector, funder, and
weapons supplier. Hezbollah and the IRGC, including its Hezbollah Division and Qods Force,
shared money, weapons, and personnel in Iraq, Iran, and Lebanon.

69. Plaintiffs are U.S. citizens, and their family members, who served in Iraq between
2011 and 2017, or in Afghanistan in 2019, and who were killed or wounded in terrorist attacks
committed by attacks committed by the IRGC's terrorist proxies in Iraq and Afghanistan. As
alleged below, Plaintiffs are entitled to recover for their injuries under the federal Anti-Terrorism
Act. MTN Group, ZTE, and Huawei are liable under the ATA, 18 U.S.C. § 2333(d)(2), because
they aided and abetted the campaign by Hezbollah, Jaysh al-Mahdi, and the IRGC, including its
Hezbollah Division and Qods Force, to commit terrorist attacks in Iraq and Afghanistan that
were committed, planned, or authorized by Hezbollah, a designated Foreign Terrorist
Organization (with respect to the Iraq Plaintiffs). The Afghanistan Plaintiffs' loved ones were

killed in attacks that were committed, planned and authorized by designated Foreign Terrorist Organizations al-Qaeda and the Haqqani Network.

70.    Each Plaintiff was killed or injured by a terrorist attack committed by terrorists who received direct funding, weapons, weapons components, communications technology, and/or operational support made possible by MTN's, ZTE's, and Huawei's conduct.

## DEFENDANTS

### A.    The MTN Defendants

71.    Defendant MTN Group Limited ("MTN Group," together with its subsidiaries, "MTN") is a South African telecommunications company whose stock trades publicly on the Johannesburg Stock Exchange under the ticker symbol MTN:SJ.  Its principal place of business is in Roodepoort, South Africa.

72.    Defendant MTN Irancell is a joint venture between MTN Group, which has a 49% stake and is not in charge, and the Bonyad Mostazafan and Iran Electronics Industries ("IEI"), which collectively own a 51% stake and are fronts for the IRGC, including its Hezbollah Division and Qods Force (sometimes abbreviated "IRGC-QF").  MTN Irancell is an Iranian company and its principal place of business is in Tehran, Iran.  MTN Irancell operates as, and MTN Irancell's employees and agents work as operatives for, a front for the IRGC, including its Hezbollah Division and Qods Force.

73.    Defendant MTN (Dubai) Limited ("MTN Dubai") is a wholly owned subsidiary of MTN Group.  It is a Dubai company, and its principal place of business is in Dubai.

### B.    The ZTE Defendants

74.    On information and belief, Defendant ZTE Corporation ("ZTE Corp.," together with its subsidiaries, "ZTE"), is a Chinese corporation with a principal place of business located

at ZTE Plaza, Keji Road South, Hi-Tech Industrial Park, Nanshan District, Guangdong Province, People's Republic of China 518057.

75. Defendant ZTE (USA), Inc. ("ZTE USA") is a New Jersey Corporation that is a wholly-owned subsidiary of ZTE Corp., headquartered and authorized to do business at 2425 North Central Expressway, Suite 323, Richardson, Texas, 75080. On March 7, 2017, ZTE and its subsidiaries (including, on information and belief, ZTE USA) entered into a settlement agreement with the U.S. Department of the Treasury's Office of Foreign Assets Control (the "ZTE 2017 OFAC Settlement"). Therein, ZTE USA admitted, *inter alia*, (a) it knowingly participated in a scheme with ZTE Corp. to illegally transfer over $39 million in U.S. goods to Iran, and otherwise (b) conducts business for ZTE Corp. on its behalf. For these reasons, allegations regarding "ZTE" in this Complaint apply equally to ZTE USA, because ZTE USA was instrumental in the scheme alleged herein by ZTE generally.

76. Defendant ZTE (TX) Inc. ("ZTE TX") is a wholly-owned subsidiary of ZTE Corp. ZTE TX is a corporation organized and existing under the laws of the State of Texas with its principal place of business in California at 1900 McCarthy Boulevard, #420, Milpitas, California 95035. As a subsidiary of ZTE, ZTE TX also was party to the ZTE 2017 OFAC Settlement. In the ZTE 2017 OFAC Settlement, ZTE TX admitted, *inter alia*, (a) it knowingly participated in a scheme with ZTE Corp. to illegally transfer over $39 million in U.S. goods to Iran and otherwise (b) conducts business for ZTE Corp. on its behalf. For these reasons, allegations of acts after ZTE TX's formation regarding "ZTE" in this Complaint apply equally to ZTE TX, because ZTE TX was instrumental in the scheme alleged herein by ZTE generally.

### C. The Huawei Defendants

77. On information and belief, Defendant Huawei Technologies Co., Ltd. ("Huawei Co.," together with its subsidiaries and affiliates, "Huawei") is a Chinese company with a

principal place of business located at Huawei Industrial Base, Bantian Street, Longgang District, Shenzhen, Guangdong Province, People's Republic of China 518129. Huawei Co. is owned by its parent company Huawei Investment & Holding Co., Ltd. ("Huawei Holdings"), a Chinese company registered in Shenzhen, Guangdon, People's Republic of China.

78. Defendant Huawei Technologies USA Inc. ("Huawei USA") is a corporation organized under the laws of the State of Texas with its principal place of business in Texas at 16479 Dallas Parkway, Suite 355, Addison, Texas 75001. Huawei USA is a wholly-owned indirect subsidiary of Huawei Co.

79. Defendant Huawei Device USA Inc. ("Huawei Device USA") is a Texas corporation that is organized under the laws of the State of Texas with its principal place of business in Texas at 16479 Dallas Parkway, Suite 355, Addison, Texas 75001. Huawei Device USA is a subsidiary of Huawei Co. and Huawei Co.'s parent, Huawei Holdings.

80. Defendant Futurewei Technologies, Inc. ("Futurewei") is a corporation organized under the laws of the State of Texas with its principal place of business in California at 2220 Central Expressway, Santa Clara, California 95050. Futurewei is a subsidiary of Huawei Co. and Huawei Co.'s parent, Huawei Holdings.

81. Defendant Skycom Tech Co., Ltd. ("Skycom") is a corporation registered in Hong Kong with its principal place of business located in Iran at No. 114 Corner of Kordestan Highway, Tehran, Iran. As of 2007, Skycom was wholly-owned by Huawei Co.'s subsidiary Hua Ying ("Hua Ying"). In November 2007, Huawei Co. directed Hua Ying to transfer its shares in Skycom to Calicula Holdings Ltd. ("Calicula"), another a subsidiary controlled by Huawei Co.

## JURISDICTION AND VENUE

82.     This Court has subject-matter jurisdiction under 18 U.S.C. § 2338 and 28 U.S.C. § 2331.

83.     This Court has personal jurisdiction over each of the Defendants under Federal Rule of Civil Procedure 4(k)(1)I and/or 4(k)(2), and 18 U.S.C. § 2334(a).

84.     MTN's acts in the United States, including but not limited to obtaining U.S.-origin technology and equipment for export to Iran, and targeting the United States, including by entering into transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over MTN.

85.     MTN does business in New York, including by procuring U.S.-origin goods and services from companies located in the U.S., including New York, for the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, agents, and operatives, maintaining accounts with financial institutions located in New York, including, on information and belief, a loan facility with Citibank and a depository account with the Bank of New York, using the New York-based financial system and institutions to manage cash flow for MTN Group, MTN Irancell, and MTN Dubai, utilizing a bank account in New York to wire funds to an agent of the IRGC, including its Hezbollah Division and Qods Force, to consummate a bribe relating to MTN's acquisition of the Irancell license, and working with a New York-based financial institution to issue a sponsored American depository receipt (ADR).

86.     ZTE's acts in the United States, including but not limited to obtaining U.S.-origin technology and equipment for export to Iran, including but not limited to working with and through, ZTE USA and ZTE TX to do so, and targeting the United States, including by entering into transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah

22

Division and Qods Force, that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over ZTE Corp., ZTE USA, and ZTE TX.

87.    ZTE does business in New York, including by selling cell phones and telecommunications equipment.  ZTE USA is registered to do business in the state of New York, and its Registered Agent is Incorp Services Inc. of Albany, NY.  ZTE also maintains accounts with financial institutions, located in New York, which, on information and belief, ZTE utilized in furtherance of their scheme alleged herein.  Additionally, the U.S. Attorney's Office for the Southern District of New York is currently investigating ZTE with regard to potential bribes paid by ZTE, and on information and belief the conduct being investigated occurred in New York. ZTE has consistently, during the relevant time period, entered into major partnership and business deals in New York, and typically announces new product offerings at events physically in New York.  When ZTE entered into a partnership with the New York Knicks, Lixin Cheng, ZTE USA's then CEO said that New York was a community "in which we live and work." Further, ZTE entered into other key partnership with counterparties in New York necessary for ZTE to obtain the devices and technology that its IRGC-front counterparties sought (and which ZTE delivered).  Specifically, ZTE entered into an agreement with a counterparty in New York to source rugged glass fronts for their cell phones, which was necessary for the rough physical environments in which the terrorists operate, and entered into another agreement with a counterparty in New York that assisted ZTE with enhancing the security features on its smartphones, which was necessary for the terrorists to be able to avoid detection and operate without surveillance.

88.    Huawei's acts in the United States, including but not limited to, obtaining U.S.-origin services, technology, and equipment for export to Iran, working with and through

Skycom, Futurewei, Huawei Device USA, and Huawei USA to do so, and targeting the United States, including by entering into transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, that were intent on harming United States nationals in Iraq, make appropriate this Court's jurisdiction over Huawei Co., Huawei USA, Futurewei, Huawei Device USA, and Skycom.

89.     Huawei does business in New York, including by selling cell phones and telecommunications equipment.  Huawei also maintains accounts with financial institutions, located in New York, which, on information and belief, Huawei utilized in furtherance of their scheme alleged herein.  Additionally, the U.S. Attorney's Office for the Eastern District of New York is currently pursuing criminal charges against Huawei, including its American subsidiaries Futurewei and Huawei Device USA, for, *inter alia*, their unlawful conduct, relating to their Iranian business interests, including conduct in the Eastern District of New York.

90.     Venue is proper in this District under 18 U.S.C. § 2334(a), because Plaintiffs Zeinab El-Maadawy, Mustafa El-Maadawy, and Ihab El-Maadawy reside in the Eastern District of New York.

## FACTUAL ALLEGATIONS

**I.** **THE IRGC SHAREHOLDERS' CONSPIRACY TO ACCOMPLISH THEIR "SECURITY" MISSION OF EXPELLING THE UNITED STATES FROM THE MIDDLE EAST AND FULFILL THE IRGC'S CONSTITUTIONAL DUTY TO PROMOTE TERRORISM TO EXPORT THEIR ISLAMIC REVOLUTION**

91.     Given the complexity of Defendants' participation in the IRGC Conspiracy as alleged in this Complaint, Plaintiffs first outline the conspiracy's structure, before proceeding to set forth detailed allegations regarding the same.

92.     In this section, Plaintiffs identify: (A) the object to the conspiracy; (B) the parties to the Conspiracy; (C) how the attacks that occurred in this case were acts in furtherance of the Conspiracy; and (D) the dates on which we think each Defendant joined the Conspiracy and the manner by which they joined the Conspiracy.

### A.     The Object Of The IRGC Conspiracy And Its Leadership

93.     The IRGC established the IRGC Conspiracy after 9/11 and it continued until the end of the war in Afghanistan.

94.     The Object of the IRGC Conspiracy was for the IRGC Shareholders to accomplish their "security" mission of expelling the United States from the Middle East, including Iraq and Afghanistan.

95.     The "IRGC Shareholders" who organized the Conspiracy comprised the three constituent parts of the IRGC, i.e., the IRGC's Hezbollah Division, the IRGC's Qods Force, and the Regular IRGC (hereinafter, the "IRGC Shareholders").[1]

---

[1] The IRGC Shareholders are one and the same with the Iranian Shareholders, defined above, because the Iranian Shareholders were merely fronts for the IRGC Shareholders.

25

96.     On information and belief, at all relevant times, each of the three IRGC

Shareholders made a roughly co-equal contribution to the Conspiracy with respect to funds,

equipment, weapons, terrorist personnel, technologies, and logistics.

97.     **The IRGC's Hezbollah Division**, has the same meaning as Lebanese Hezbollah,

and was one of the leaders of the Conspiracy (hereinafter, "Hezbollah Division" or "Hezbollah").

(i)     **Role:**  At all relevant times, Hezbollah was a designated FTO based upon its service as the IRGC's External Security Organization, meaning, Hezbollah's service as the IRGC's lead agent for conducting "External Security" operations (i.e., anti-American terrorism) worldwide.  At all relevant times, Hezbollah served as the IRGC's "security" proxy specialist worldwide and, as such, was tasked with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.  Hezbollah did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

(ii)    **Leadership:**  At all relevant times, Hezbollah was commanded by **Hassan Nasrallah** ("Nasrallah").  At all relevant times, Nasrallah was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Hezbollah Division and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts.  Nasrallah did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

98.     **The IRGC's Qods Force,** meaning the IRGC's Iranian-staffed external

"Security" Operations Division, which at all relevant times worked in close partnership with the

IRGC's Hezbollah Division.

(i)     **Role:**  At all relevant times, the Qods Force was a designated SDGT based upon its service as the IRGC's Iranian-located terror organization that is the flip side of the coin of Hezbollah's External Security Organization and designed to work with Hezbollah through the IRGC's joint cell approach.  At all relevant times, the Qods Force served alongside Hezbollah as the IRGC's "security" proxy specialist worldwide and, as such, was tasked, alongside Hezbollah, with organizing anti-American "resistance" attack campaigns in, among other places, Iraq, Syria, Lebanon, and Afghanistan.  The Qods Force did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

(ii)    **Leadership:**  Until his death in 2020, the Qods Force was commanded by **Brigadier General Qassem Soleimani** ("Soleimani").  At all relevant times, Soleimani was

26

internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the head of the Qods Force and commanded some of the largest and most important IRGC terrorist finance, logistics, communications, weapons, narcotics, and operations fronts, and worked closely with Hezbollah pursuant to the IRGC's joint cell model. Soleimani did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

99.     **Regular IRGC**, meaning the IRGC's Internal Security Division (hereinafter as an organization, "Regular IRGC," and as individual members, "IRGC Regulars").

(i)     **Role:**  At all relevant times, Regular IRGC and the IRGC Regulars who served within it operated ***exclusively*** within the geographic borders of Iran and served primarily as fronts for IRGC's terrorist finance, logistics, illicit technology acquisition, and intelligence activities, in order to coordinate the logistics and supply chain needs for the other two IRGC Shareholders i.e., the IRGC's Hezbollah Division and Qods Force, through Regular IRGC's maintenance of various fronts and cover companies, charities, and foundations, inside Iran, including, but not limited to, the Bonyad Mostazafan, IEI, IEDC, and TCI.  Regular IRGC did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

(ii)    **Leadership:**  At all relevant times, Regular IRGC was commanded by the IRGC terrorist, **IRGC Chief of Staff Mohammad Forouzandeh** ("Forouzandeh").  At all relevant times, Forouzandeh was internationally notorious (as covered by the media) around the world for being a terrorist, known within Iran for being a terrorist, and, on information and belief, understood by each Defendant to be an IRGC terrorist operative who served as the IRGC Chief of Staff and commanded the largest and most important IRGC terrorist finance, logistics, and operations front, the Bonyad Mostazafan.  Forouzandeh did all of this to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

100.    To accomplish the object of the Conspiracy by recruiting additional terrorist groups, corporate partners, criminal organizations, and individuals to aid their campaign terrorizing Americans through a coordinated global campaign of terrorist violence facilitated by the IRGC Shareholders in order to conduct "resistance" operations, i.e., anti-American terrorist attacks, in furtherance of the Conspiracy (such joining person, a "Member" of the Conspiracy), each person who joined the Conspiracy organized by the IRGC Shareholders to regularly provide valuable **"Security Aid"** (as Plaintiffs define below) provided such aid, which flowed through

27

the Members to facilitate attacks that aided the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy. Each Member's actions were to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

101. Each Member who joined the Conspiracy had to pledge that they would provide significant aid to help the Iranian Shareholders support their "security" operations, by directly or indirectly facilitating one or more of the following flows of material support to travel from to the Defendants and/or the United States as a result of the Defendant's conduct, to flow through the Defendant or another entity whom the Defendant owns or otherwise controls, before reaching the persons who committed the attacks that killed and injured Plaintiffs.

102. Each Member facilitated the provision of one or more of the following forms of "Security Aid" to the IRGC (inclusive of each of its IRGC Shareholders) and, in the case of Defendant MTN Group, the Haqqani Network (an FTO and Member of the Conspiracy):

(i) fundraising to finance terrorist operations, including "tax" collection and diaspora donations);

(ii) terrorist logistics;

(iii) attack planning;

(iv) assassinations and bombings (design and execution);

(v) illicit technology acquisition;

(vi) Big Data analytics and management;

(vii) operations;

(viii) communications;

(ix) transportation;

(x) narcotics trafficking;

(xi) smuggling; and

28

(xii)     intelligence operations (each, a form of **"Security Aid"**).

103.     Each form of Security Aid materially assisted the Members' ability to commit attacks to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

   **B.     The Parties To The Conspiracy:  When Each Member Provided Security Aid To Other Members Of The Conspiracy, Such Member Did So To Aid The Iraq Terror Campaign And Afghanistan Terror Campaign in furtherance of the Conspiracy.**

   **1.     FTO/SDGT Co-Conspirators**

104.     Hezbollah, the Qods Force, and the Real IRGC started the Conspiracy and led it throughout.

105.     As to one or more Plaintiffs,[2] the FTO Co-Conspirators are Hezbollah, the Qods Force, the Real IRGC, Jaysh al-Mahdi Special Group Ka'taib Hezbollah, Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, al-Qaeda, al-Qaeda-in-Iraq (later ISIS), Ansar-al-Islam, and the Haqqani Network.  (The Taliban, of which the Haqqani Network is a part, is an SDGT.)  Each FTO/SDGT Co-Conspirator's actions were to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

106.     Jaysh al-Mahdi leader Muqtada al-Sadr publicly joined the Conspiracy on or about 2003, when Muqtada al-Sadr publicly and privately committed himself to be, among other things, Hezbollah's "striking arm in Iraq."  Jaysh al-Mahdi terrorists publicly affirmed their status as Members of the Conspiracy by regularly marching through Baghdad chanting "We are Hezbollah," which Jaysh al-Mahdi terrorists did several times in 2006 alone.  Jaysh al-Mahdi's

---

[2] Given the IRGC's FTO designation, the FTO status differs per Plaintiff, but the conclusion does not.  The FTOs common to all Plaintiffs (i.e., accounting for the IRGC pre- and post-designation) are: Hezbollah, Jaysh al-Mahdi Special Group Ka'taib Hezbollah, al-Qaeda, al-Qaeda-in-Iraq (later ISIS), Ansar-al-Islam, and the Haqqani Network.

attacks against Plaintiffs were to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

107.    On information and belief, Jaysh al-Mahdi (inclusive of Jaysh al-Mahdi Special Group Ka'taib Hezbollah, Jaysh al-Mahdi Special Group Asaib Ahl al-Haq) joined the Conspiracy and agreed to facilitate attacks to aid the Iraq Terror Campaign on or about 2003, and the Afghanistan Terror Campaign on or about 2004.

108.    On information and belief, al-Qaeda, al-Qaeda-in-Iraq (later ISIS), Ansar-al-Islam, and the Haqqani Network joined the Conspiracy at the same time and agreed to facilitate attacks to aid the Iraq Terror Campaign on or about 2005, and the Afghanistan Terror Campaign on or about 2006.[3]

### 2.    Corporate Front Co-Conspirators

### i.    MTN Irancell

109.    The corporate fronts or "covers" for the IRGC, who joined the Conspiracy were: (1) MTN Irancell; (2) TCI and MCI; and (3) Exit40.  Discovery will likely reveal additional Corporate Front Co-Conspirators.  1

110.    MTN Irancell was (and remains) a front for Hezbollah, the Qods Force, and the Real IRGC.

111.    MTN Irancell joined the Conspiracy on or about 2005, when MTN Group's President and CEO executed the Letter Agreement at in Tehran in the presence of one or more notorious IRGC terrorists, in which MTN Group promised to ensure that MTN Irancell aided the

---

[3] For the avoidance of all doubt, Plaintiffs do not mean to suggest that these groups were not engaged in terrorist attacks prior to these dates, only that this was when these groups reached agreement with the Iranian Shareholders.

"security" agenda of the "Iranian Shareholders" Irancell, TCI, and MCI were also co-conspirators.

112.    MTN Irancell remains in the Conspiracy today.

113.    MTN Irancell served (and continues to serve) as an IRGC front to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

### ii.    MTN Group

114.    MTN Group was (and remains) a cover for Hezbollah, the Qods Force, and the Real IRGC.

115.    MTN Group joined the Conspiracy on or about 2005, when MTN Group's President and CEO agreed that MTN Group would cause all of MTN's subsidiaries and affiliates to serves as fronts for the "Iranian Shareholders," which MTN Group' CEO knew was a direct reference to Hezbollah (an FTO at the time) and the Qods Force.

116.    MTN Group's serial deceptions about the Letter Agreement demonstrate MTN's consciousness of guilt at having joined the Conspiracy.

117.    Thereafter, MTN Group served as a front for the financial and procurement activities of Hezbollah (through Exit40) and all three IRGC Shareholders through their other "Security Aid" identified in the Complaint.

118.    MTN Group served (and continues to serve) as an IRGC cover to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

119.    MTN Group authorized the payment of, at a minimum, millions of dollars each year from 2009 through 2020 that MTN Group caused to be paid to the Haqqani Network, which, on information and belief, MTN Group continued to pay even after it was designated an FTO.  Each such payment or authorization by MTN Group was an act in furtherance of the Conspiracy because MTN Group knew it was paying money to an ally of the IRGC Shareholders

31

who would use it to aid their proxy terror attacks against Americans in the Middle East. When MTN Group made or authorized each such payment, MTN Group did so to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

120. MTN Group's promises to pay (in 2005) and payments (in 2007) of a $400,000 bribe to "Short John" (an IRGC cut-out) and $200,000 bribe to "Long John" (to corruptly swing a U.N. vote), were acts in furtherance of the Conspiracy because MTN Group knew it was paying money to an ally of the IRGC Shareholders who would use it to aid their proxy terror attacks against Americans in the Middle East. When MTN Group made or authorized each such payment, MTN Group did so to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

121. MTN Group's attempts to repatriate, and repatriation of, money from Irancell using the mails and wires of the United States from 2012 through 2018 were acts in furtherance of the Conspiracy because, on information and belief, MTN Group had to also authorize a substantial financial transfer to MTN Irancell as a condition of accessing the money, MTN Group knew that this would result in MTN Group causing money to flow to an ally of the IRGC Shareholders who would use it to aid their proxy terror attacks against Americans in the Middle East. When MTN Group made or authorized each such payment, MTN Group did so to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

### iii. TCI and MCI

122. TCI and MCI were (and are) fronts for Hezbollah, the Qods Force, and the Real IRGC.

123. TCI and MCI joined the Conspiracy on or about 2009.

124. TCI and MCI remain in the Conspiracy today.

32

125.    TCI and MCI served (and continues to serve) as an IRGC front to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

### iv.    Exit40

126.    On information and belief, Exit40 ("Exit40") is a front company owned, controlled, and operated by Hezbollah.

127.    On information and belief, Exit40 was purpose-built by Hezbollah, following IRGC terrorist tradecraft, to serve as a front for illicit fundraising and acquisition of embargoed U.S. technologies including American smartphones and servers.

128.    On information and belief, Exit40 supplied the described Security Aid to other Members of the Conspiracy in order to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

129.    On information and belief, Exit40 joined the conspiracy no later than on or about 2005, when MTN Group caused Exit40 to be hired as a consultant or a distributor on behalf of MTN Group, MTN Irancell, or another MTN subsidiary.

130.    On information and belief, Exit40 routed tens of millions in value through MTN Group, MTN Dubai, MTN Irancell or another MTN entity, which was all done at the direction of MTN Group, and which flowed the value to Hezbollah from 2005 until on or about 2012. Hezbollah, in turn, shared such resources to facilitate attacks to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

### 3.    Corporate Supplier and Manufacturer Co-Conspirators

131.    The IRGC Conspiracy operated through its terrorist members to carry out attacks on Americans, with the IRGC providing logistical and financial support.  The attacks in this case were all acts in furtherance of the IRGC Conspiracy.  Every person that agreed to join the IRGC Conspiracy is therefore liable for the harm caused by these attacks.

33

132.     Defendants MTN Group, ZTE Corp., and Huawei Co. joined the IRGC Conspiracy when they agreed with known IRGC fronts (variously, MTN Irancell, TCI, and MCI) to provide resources, technical materials, and technical support, and to support Iran's "security" objective.

133.     MTN Group, ZTE Corp., and Huawei Co. agreed to provide such assistance in order to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

134.     Each of MTN Group, ZTE Corp., and Huawei Co., and each of their U.S. manufacturer co-Defendants, acted in furtherance of that agreement to join the Conspiracy each time they provided money and other resources, provided technical goods, such as cell phones and telecom infrastructure, assisted with technical support, as was their obligation as joint venturers with and contractual counterparties to known IRGC fronts, when they evaded U.S. sanctions in order to do so, and when they attempted to obfuscate their respective roles.

135.     Each time MTN, ZTE, and Huawei did these acts in furtherance of the IRGC Conspiracy, each Defendant assisted the IRGC Conspiracy's objective to attack Americans, and furthered the IRGC Conspiracy's ultimate objective to expel Americans from Iraq and Afghanistan.

136.     From at least 2005 through 2021, terrorists from the IRGC, including its Hezbollah Division and Qods Force, aided al-Qaeda and the Taliban as the Taliban conspired with Mullah Omar and others to conduct and maintain the Taliban as a terrorist enterprise capable of: (1) carrying out sophisticated attacks on American targets in Afghanistan; and (2) aiding the Taliban's co-conspirators, the IRGC (including its Hezbollah Division and Qods Force) fund attacks on Americans in Iraq and elsewhere in the Middle East through the Taliban,

including its Haqqani Network's, assistance to the IRGC, including its Hezbollah Division and Qods Force, to profit from shared narcotrafficking, money laundering, and arms supply activities, all of which were illegal. Throughout that time, the IRGC, inclusive of its Hezbollah Division and Qods Force, al-Qaeda, and the Taliban, inclusive of its Haqqani Network, was a group of associated individuals that functioned as a continuing unit, and the IRGC's, including the Qods Force's, al-Qaeda's, and the Taliban's, including the Haqqani Network's express purpose at all times included the sustainment and propagation of violence against, and the expulsion of, Americans in Afghanistan and Iraq by one or more of the following members of the conspiracy: (1) the IRGC, including its Hezbollah Division and Qods Force, and the Iranian Shareholders who own or control the fronts and/or covers associated with the IRGC, including its Hezbollah Division and Qods Force; (2) MTN Irancell; (3) Telecommunications Company of Iran; (4) al-Qaeda; (5) the Taliban, including its Haqqani Network; (6) Ansar al-Isam; and (7) al-Qaeda-in-Iraq. The Taliban engaged in, and its activities affected, foreign commerce.

### C. Plaintiffs Were Injured By Attacks That Occurred In Furtherance Of The Conspiracy

137. Plaintiffs were injured by attacks that were conducted in one of terrorist campaigns that the IRGC facilitated in furtherance of the IRGC Conspiracy in Iraq and Afghanistan.

138. Attacks committed in the Afghanistan Terror Campaign strengthened the potency of the Iraq Terror Campaign, and vice versa, because they reduced morale, increased resource strain, promoted efficiencies for the terrorists, provided real-time portable training in the form of live-fire exercises, and promoted the cross-pollination of IRGC Shiite Terrorist Proxies with IRGC Sunni Terrorist Proxies.

35

139.    Institutional sources of illicit transnational terrorist finance in the Iraq Terror

Campaign – especially narcotics trafficking – strengthened the potency of the Iraq Terror

Campaign, and vice versa, because the Hezbollah and the Qods Force worked closely with al-

Qaeda and the Taliban (including its Haqqani Network) to maximize the huge income for all

involved.  Such strategies produced tens of millions in cross-pollinated income streams between

IRGC Shiite Terrorist Proxies with IRGC Sunni Terrorist Proxies, which increased the flow of

resources to facilitate attacks to aid the Iraq Terror Campaign and Afghanistan Terror Campaign

in furtherance of the Conspiracy.

**1.    The Iraq Terror Campaign**

140.    The Iraq Terror Campaign comprised terrorist attacks in Iraq from 2006 through

2021 that were committed by IRGC Shiite Terrorist Proxies and/or IRGC Sunni Terrorist Proxies

against Americans in Iraq for the specific purpose of inflicting pain on the United States to drive

the United States out of Afghanistan and Iraq in furtherance of the IRGC Conspiracy, where the

FTO or FTOs that committed the attack received material support from the IRGC, including its

Hezbollah Division and Qods Force, to aid such attacks against Americans in Iraq.

141.    In furtherance of the IRGC Conspiracy, from on or about Fall of 2002 through on

or about Summer of 2005, the IRGC's Qods Force coordinated with the IRGC's Hezbollah

Division to begin preparing for a dramatic escalation in attacks against Americans in Iraq to

begin once the IRGC, including its Hezbollah Division and Qods Force, could properly supply

Hezbollah, the Qods Force, the IRGC Shiite Terrorist Proxies, and the IRGC Sunni Terrorist

Proxies, with the funding, arms, communications equipment, intelligence, training, logistical

support, transportation support, and safe haven necessary to conduct a broad, interlocking

Islamist terrorist campaign flowing out of the IRGC, in Iran, and aiding Hezbollah and Qods

Force activities to support attacks by IRGC proxies that are intended to aid one of the Attack

36

Campaigns that the IRGC aided in furtherance of the IRGC Conspiracy (hereinafter, "Iraq Terror Campaign Planning Meetings").

142. The Iraq Terror Campaign Planning Meetings were organized by all three IRGC Shareholders: regular IRGC, the Hezbollah Division, and the Qods Force.

143. On information and belief, the members of the IRGC Conspiracy conducted substantially more than one hundred (100) in-person Iraq Terror Campaign Planning Meetings in Iran, Lebanon, Syria, and Iraq, including, but not limited to:

(i) Dozens of Iraq Terror Campaign Planning Meetings between on or about Fall 2002 through on or about Spring 2005, during which meetings the Members, among other things:

    a. agreed to organize the Campaign in furtherance of the IRGC Conspiracy;

    b. agreed for Hezbollah to plan the Campaign;

    c. agreed for the IRGC Shareholders to each substantially contribute to the Joint Cells in key geographies in Iraq;

    d. agreed for Hezbollah and the Qods Force to collaborate with the IRGC Shiite Terrorist Proxies to establish at least four regional Joint Cell commands in Sadr City, Baghdad, Diyala, Basra, and Central Iraq, respectively;

    e. agreed that such Joint Cells were to emphasize the most terrifying attacks possible in furtherance of the conspiracy because such attacks were necessary in order to terrorize Americans into leaving Iraq and Afghanistan, including, but not limited to, EFPs, hostage-taking, rocket attacks, and attacks targeting embassies and consulates that were co-located in the same four geographies (Baghdad, Basra, Diyala, and Central Iraq) as the Joint Cells;

    f. agreed that all three components of the IRGC – Regular IRGC, Hezbollah Division, and Qods Force – would materially support the Joint Cells through transnational terrorist finance and logistics operations worldwide including, but not limited to, the United States, Iran, Iraq, Lebanon, Syria, U.A.E., Afghanistan, Pakistan, South Africa, Singapore, Malaysia, and Hong Kong;

(ii) fifty (50) or more Iraq Terror Campaign Planning Meetings between on or about Spring 2005 and on or about Spring 2007, during which meetings the Members agreed to escalate the pace of the Iraq Terror Campaign in furtherance of the Conspiracy, including, but not limited to, to dramatically intensify the operational tempo and eligible geographies for EFP attacks and hostage taking cells; and

(iii)    dozens of Iraq Terror Campaign Meetings each time that the IRGC Shareholders chose to substantially escalate the Campaign, continuing through Spring 2007, when the Iraq Terror Campaign substantially escalated, and continuing against through Spring 2008, when the Iraq Terror Campaign substantially escalated once more.

144.    On information and belief, the below members of the Conspiracy met, at least, more than twenty (20) times in person in Tehran, Iran.

145.    On information and belief, most of these ten (10) or more meetings occurred at Regular IRGC's headquarters in Iran and were directed by, hosted by, organized by, funded by, staffed by, and jointly led by, among others, IRGC Chief of Staff Mohammad Forouzandeh:

(i)    Regular IRGC, which the members of the Conspiracy tasked with sourcing cash flow, weapons, and equipment through entities that were owned or otherwise controlled by the IRGC to aid the Iraq Terror Campaign in furtherance of the Conspiracy, including the Regular IRGC terrorist who counter-signed the Letter Agreement alongside MTN Group's CEO in which MTN Group pledged to aid the Iranian Shareholders' "security" goals;

(ii)    the IRGC's Hezbollah Division, which the members of the Conspiracy tasked with serving as the overall planner for the Iraq Terror Campaign, with responsibility for leading the Joint Cells on the ground in Iraq; and

(iii)    the Qods Force, which the members of the Conspiracy tasked with serving as the logistician, and coordinator amongst allied groups.

146.    The Iraq Terror Campaign Planning Meetings occurred primarily at the IRGC's headquarters in Iran.  On information and belief, the location of such meetings alternated between the Regular IRGC's headquarters in Iran and the Qods Force's headquarters in Iran, including in the offices of IRGC Chief of Staff Mohammad Forouzandeh.

147.    On information and belief, the following IRGC-affiliated terrorists (regular IRGC, Hezbollah, or Qods Force) participated (directly, or via proxy, e.g., an executive officer) in the Iraq Terror Campaign Planning Meetings.

148.    On or about spring of 2005, and in furtherance of the IRGC Conspiracy, the IRGC, including its Hezbollah Division and Qods Force, commenced the Iraq Terror Campaign

after a series of in-person meetings at the IRGC in Tehran, Iran, which transpired mostly in Tehran, Iran and Beirut, Lebanon beginning on or about fall of 2002 and regularly continued through today.

149.    In furtherance of the Conspiracy, the members held a series of in-person meetings, primarily in Tehran, Iran, but also in Beirut, Lebanon; Damascus, Syria; Baghdad, Iraq; Najaf, Iraq; Basra, Iraq; and Herat, Afghanistan; and one or more locations controlled by the Haqqani Network in Paktika, Paktia, or Khost Province (Afghanistan) and from the fall of 2004 through the spring of 2005 (collectively, the "Iraq Terror Campaign Meetings.")

150.    On information and belief, the Iraq Terror Campaign Meetings were regularly attended by all or nearly all the following terrorist leaders who intended to aid the Iraq Terror Campaign in furtherance of the Conspiracy:

    (i)   **the IRGC Shareholders,** i.e., the IRGC's Regulars, the IRGC's Hezbollah Division, and the IRGC's Qods Force, which, on information and belief, deployed the following terrorist operatives to all or nearly all such Meetings.

        a.   *Hezbollah:* Hassan Nasrallah (Chief); Imad Mugniyeh (Chief Terrorist Planner); Mohammed Daqduq (Iraq field lead);

        b.   *Qods Force:* Qassem Soleimani;

        c.   *Regular IRGC:* IRGC Chief of Staff Mohammad Forouzandeh;

  (ii)  **Jaysh al-Mahdi:** Muqtada al-Sadr (through a proxy representative); Qais Khazali (in person), Laith Khazali (in person); Abu Muhandis (in person).

151.    Each Iraq Plaintiff was injured in an attack committed by one or more of the above-identified designated FTOs who joined the IRGC Conspiracy and committed the attack in furtherance of the Conspiracy.

## 2.    The Afghanistan Terror Campaign

152.    The Afghanistan Terror Campaign comprised terrorist attacks in Afghanistan from 2007 through 2021 that were committed by IRGC Shiite Terrorist Proxies and/or IRGC

Sunni Terrorist Proxies against Americans in Afghanistan for the specific purpose of inflicting pain on the United States to drive the United States out of Afghanistan and Iraq in furtherance of the Conspiracy, where the FTO or FTOs that committed the attack received material support from the IRGC, including its Hezbollah Division and Qods Force, to aid such attacks against Americans in Afghanistan.

153.    The Afghanistan Terror Campaign unfolded much in the same manner as the Iraq Terror Campaign but started about a year later (the IRGC began with Iraq before broadening to Afghanistan).

154.    In 2005, Hezbollah, the Qods Force, and the Real IRGC helped kickstart the Afghanistan Terror Campaign.  Hezbollah, the Qods Force, and the Real IRGC did so to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

155.    Jaysh al-Mahdi's attacks against Plaintiffs were to aid the Iraq Terror Campaign and Afghanistan Terror Campaign in furtherance of the Conspiracy.

156.    On or about 2006, the Taliban, including its Haqqani Network, joined the Conspiracy.  On information and belief, the Taliban, including its Haqqani Network did so after a series of meetings between emissaries in Afghanistan and Iran, including, but not limited to, in Herat, Afghanistan, and Mashhad, Iran.

157.    Attacks committed in the Afghanistan Terror Campaign strengthened the potency of the Iraq Terror Campaign, and vice versa, because they reduced morale, increased resource strain, promoted efficiencies for the terrorists, provided real-time portable training in the form of live-fire exercises, and promoted the cross-pollination of IRGC Shiite Terrorist Proxies with IRGC Sunni Terrorist Proxies.

158.  Institutional sources of illicit transnational terrorist finance in the Afghanistan

Terror Campaign – especially narcotics trafficking – strengthened the potency of the Iraq Terror

Campaign, and vice versa, because the Hezbollah and the Qods Force worked closely with al-

Qaeda and the Taliban (including its Haqqani Network) to maximize the huge income for all

involved.  Such strategies produced tens of millions in cross-pollinated income streams between

IRGC Shiite Terrorist Proxies with IRGC Sunni Terrorist Proxies, which increased the flow of

resources to facilitate attacks to aid the Iraq Terror Campaign and Afghanistan Terror Campaign

in furtherance of the IRGC Conspiracy.

159.  Each Afghanistan Plaintiff was injured in an attack committed by one or more of

the above-identified designated FTOs who joined the IRGC Conspiracy and committed the

attack in furtherance of the Conspiracy.

II.  **SINCE THE ISLAMIC REVOLUTION IN 1979, THE ISLAMIC
REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, HAS
FOMENTED AND SUSTAINED ANTI-AMERICAN TERRORISM**

A.  **The Islamic Revolutionary Guard Corps Has Long Supported Anti-
American Terrorism As Part Of Iran's Foreign Policy**

160.  Iran is politically and ideologically hostile to the United States and its allies.  Iran

often acts through its lead terrorist agent, Lebanese Hezbollah – a designated Foreign Terrorist

Organization since 1997 – which Iran funds, arms, and logistically supports.  Through

Hezbollah, Iran provides material support and resources for acts of international terrorism

targeting the United States and its overseas interests.[4]

---

[4] Federal courts have repeatedly held that Hezbollah is an agent of the IRGC, including the Qods
Force.  *See Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 61 (D.D.C. 2018), *Friends of
Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 53-55 (D.D.C. 2018);
*Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic
Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

161.    Article 176 of the Iranian Constitution provides that Iran's "security policies" sought to "preserv[e] the Islamic revolution" (i.e., export Iran's Islamist revolution abroad through proxy terrorism), through the "[e]xploitation of materialistic and intellectual resources of the country" (i.e., Iranian funds, arms, and training for terror proxies), "for ***facing the*** internal and ***external threats***" (meaning, to target the United States for terrorist violence).

162.    Article 176 is widely understood, in Iran and worldwide, to explicitly enshrine the IRGC's anti-American terrorist mission into Iran's constitution because the IRGC is directed to "fac[e]" (i.e., target) "the" (i.e., an identified object) "external threats" (i.e., the U.S. and Israel).

## 1.    Islamic Revolutionary Guard Corps

163.    The 1979 Iranian Revolution was fueled in large part by militant anti-Americanism.  Eliminating the United States's role in the geographic region surrounding Iran – including through violence – was and remains a central tenet of Iranian foreign policy.[5]

164.    The IRGC was established to safeguard the revolution, meaning, to pursue violence inside of Iran, i.e., terrorism against its own people, and external to Iran, i.e., terrorism against the United States and Israel, whom the IRGC considered to be the "Great Satan" and "Little Satan," respectively.  As Monika Gill, a defense researcher, explained in an analysis published by NATO in 2020: "The aphorism that 'war made the state and the state made war' applies to the IRGC; war made the Guard and the Guard made war."[6]

---

[5] Col. (ret.) Richard Kemp and Maj. (ret.) Charles Driver-Williams, *Killing Americans and Their Allies: Iran's Continuing War against the United States and the West*, Jerusalem Ctr. For Public Affairs (2015) ("*Killing Americans and Their Allies*").

[6] Monika Gill, *Capitalism, Communications, and the Corps: Iran's Revolutionary Guard and the Communications Economy*, Defence Strategic Communications: The Official Journal of the NATO Strategic Communications Centre of Excellence, at 97 (Autumn 2020) ("Gill, *Capitalism, Communications, and the Corps*").

165.    Enmity toward America is foundational for the Iranian regime in general, and most of all, for Grand Ayatollah Khamenei, who is the effective leader of the IRGC, including its Hezbollah Division and Qods Force, both of which are responsible to him personally.  At a 2005 rally, Khamenei explained, "Our people say 'Death to America,' and this is like the saying 'I seek God's refuge from the accursed Satan,' which is recited before any chapter of the Koran, even before 'In the name of Allah the Compassionate, the Merciful.'"  Khamenei said the routine chanting of "Death to America" is designed so that Iranians "will never forget, even for a moment, that Satan is ready to attack him.  . . .  The saying 'Death to America' is for this purpose."[7]

166.    In her analysis of MTN Irancell, as published by NATO, Ms. Gill explained that under the IRGC's official, publicly communicated security doctrine, the IRGC's "security" interests are defined as "leading an ongoing resistance" in a zero-sum fight the United States:

> [T]here is a strong feeling of shared Shi'a victimhood driving the IRGC worldview. Ayatollah Khomeini in particular, held the view … This sense of being surrounded by enemies of Iran and therefore, enemies of Shi'ism pervades the strategic narrative of both the neoconservative clerical establishment and the IRGC. Paradoxically, the IRGC's strategic narrative is well served by maintaining enemies and continually reinforcing the notion that the Islamic Republic is under attack. It allows the IRGC to define Iran in *diametric opposition to the enemies of the revolution* and to profess that it is *leading an ongoing resistance*. In this view, the IRGC strategic narrative is a *narrative of resistance*, expressing defiance against threats to the revolution, externally imposed hard and soft war, and the enemies of the Iranian state.[8]

167.    As a result of the IRGC's consistent and longstanding support of anti-American terrorism, Iran was designated as a State Sponsor of Terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979 (50 U.S.C. § 4605), section 620A of the

---

[7] Ali Khamenei, Channel 1, Iranian TV (Mar. 14, 2005).

[8] Gill, *Capitalism, Communications, and the Corps*  at 97 (emphasis added).

Foreign Assistance Act of 1961 (22 U.S.C. § 2371), and section 40 of the Arms Export Control Act (22 U.S.C. § 2780). The United States has maintained that designation at all times since.

168.    On October 29, 1987, President Ronald Reagan issued Executive Order 12613 based upon his finding "that the Government of Iran is actively supporting terrorism as an instrument of state policy," and also as a result of Iran's "aggressive and unlawful military action against U.S.-flag vessels." Exec. Order 12813, 52 Fed. Reg. 4194D (Oct. 30, 1987).

169.    In 1990, the IRGC transferred activities outside of Iran to its subordinate branch, the Qods Force, which translates to "Jerusalem Force," in reference to the IRGC's desire to destroy the state of Israel and take back Jerusalem.

170.    On March 15, 1995, President Clinton announced that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security … of the United States. …" Exec. Order 12957, 60 Fed. Reg. 14615 (Mar. 17, 1995).

171.    On August 21, 1997, President Clinton issued Executive Order 13059 to consolidate and clarify Executive Orders 12957 and 12959, and comprehensively prohibit trade intended to benefit, among other things, the IRGC, including its Hezbollah Division and Qods Force. Exec. Order 13059, 62 Fed. Reg. 44531 (Aug. 21, 1997). (That same year, the U.S. also designated Iran's lead terror agent, Hezbollah, as an FTO.)

172.    In 1998, Brigadier General Qassem Soleimani was appointed head of the Qods Force, a role in which he served continuously until his death in a U.S. airstrike in 2020.

173.    The Department of Treasury implemented regulations pursuant to these Executive Orders which, in general, broadly prohibit any economic transactions with any entities that are controlled by the Government of Iran. 31 C.F.R. § 560.304 (defining "Government of Iran"), 31

C.F.R. § 560.313 (defining "entity owned or controlled by the Government of Iran"); 31 C.F.R.

§ 560.314 (defining "United States person").

174.    In 2007, the U.S. State Department described Iran as "the most active state

sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the

Middle East because of its continued support for violent groups."[9]

175.    On May 27, 2009, the U.S. Treasury Department announced additional IRGC-

related sanctions further reflecting the long-standing U.S. conclusion that the IRGC used its

revenue to pay for Hezbollah's operations and training activities:

> The U.S. Department of the Treasury [] designated … two Africa-based
> supporters of the Hizballah terrorist organization, under E.O. 13224. E.O. 13224
> targets ***terrorists and those providing support to terrorists or acts of terrorism*** by
> … prohibiting U.S. persons from engaging in any transactions with them.

> "We will continue to take steps to protect the financial system from the threat
> posed by ***Hizballah and those who support it***," said Under Secretary for
> Terrorism and Financial Intelligence Stuart Levey. …  Iran … provide[s]
> significant support to Hizballah, giving money, weapons and training to the
> terrorist organization.  In turn, Hizballah is closely allied with and has an
> allegiance to [Iran].  ***Iran is Hizballah's main source of weapons and uses its***
> ***Islamic Revolutionary Guard Corps to train Hizballah operatives in Lebanon***
> ***and Iran.***  Iran provides hundreds of millions of dollars per year to Hizballah.[10]

176.    The U.S. State Department has observed that "Iran used the [Qods Force] to

implement foreign policy goals, provide cover for intelligence operations, and create instability

in the Middle East.  The Qods Force is Iran's primary mechanism for cultivating and supporting

terrorists abroad."[11]  The Qods Force is the driving force behind Iran's activities in Iraq, as well

as in Syria, Afghanistan, and elsewhere in the Middle East.

---

[9] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

[10] Press Release, U.S. Treasury Dep't, *Treasury Targets Hizballah Network in Africa* (May 27,
2009) (emphases added).

[11] U.S. State Dep't, *Country Reports on Terrorism 2015* at 300 (June 2, 2016).

177. The IRGC, including its Hezbollah Division and Qods Force, has a long and well-documented history of assassinations, kidnappings, bombings, and arms dealing. It also regularly trains foreign terrorist proxies whose attacks promote Iran's political goals, often working side-by-side with Hezbollah.

178. The Qods Force is responsible to and directed by the Supreme Leader of Iran. Major General Qassem Soleimani was the chief of the Qods Force for more than twenty years and oversaw the Qods Force's support for Hezbollah and its proxies to promote Iran's policies throughout the region. Soleimani took his directions from Khamenei, with whom he shared a close personal relationship. Soleimani was killed in a U.S. airstrike in Baghdad, Iraq on January 3, 2020. Khamenei then appointed General Esmail Ghaani to replace Soleimani.

179. The IRGC, including its Hezbollah Division and Qods Force, provides weapons, funding, and training for terrorist operations targeting American citizens, including for Hezbollah and, through Hezbollah, for Jaysh al-Mahdi. Iran's Supreme Leader and central government are aware of and encourage those acts. Applying pressure against the United States by funding and supplying Hezbollah and other terrorist proxies in the Middle East and Central Asia is an official component of IRGC, including Qods Force, policy.

180. The Qods Force has four regional commands, with each focused on implementing Iran's foreign policy in a neighboring region. The First Corps focuses on Iraq, the Second Corps on Pakistan, the Third Corps on Turkey and Kurdistan, and the Fourth Corps on Afghanistan.

181. The Qods Force's leader until his death, Qassem Soleimani, infamously boasted about his ability to threaten American lives in Iraq by relaying a message, through an intermediary, directly to U.S. General David Petraeus, who commanded U.S. forces in Iraq at the time, in which Soleimani taunted: "Dear General Petraeus, You Should know that I, Qassem

46

Soleimani, control the policy for Iran with respect to Iraq, Lebanon, Gaza, and Afghanistan." Soleimani taunted General Petraeus after Iran-backed, Hezbollah-trained Jaysh al-Mahdi terrorists in Baghdad and elsewhere launched an especially brutal wave of terrorist attacks against Americans in Iraq that relied upon using IRGC-manufactured advanced rockets and explosively formed penetrators ("EFP") built by Hezbollah with IRGC-sourced components, which caused the U.S. government to protest Iranian terrorist activity in Iraq.

182.    The IRGC, including its Hezbollah Division and Qods Force, has used Hezbollah and its proxies to commit terrorist attacks.  While it is a Lebanese-based terrorist group, Hezbollah has pledged fealty to Iran's Supreme Leader.  Each year the IRGC, including its Hezbollah Division and Qods Force, provides Hezbollah approximately $100 million to $200 million in funding and weapons.  As Ali Akbar Mohtashemi (a Hezbollah founder, former Iranian ambassador to Syria and Lebanon, and former Iranian Minister of Interior) explained, "[Hezbollah] is part of the Iranian rulership; [Hezbollah] is a central component of the Iranian military and security establishment; the ties between Iran and [Hezbollah] are far greater than those between a revolutionary regime with a revolutionary party or organization outside its borders."[12]

183.    The IRGC, including its Hezbollah Division and Qods Force, has long provided support – routed through Hezbollah – for terrorist attacks against American military forces and contractors in Iraq.  For example, the IRGC, including its Hezbollah Division and Qods Force, sponsored a substantial training, logistics, travel, and communications campaign, all of which was implemented by Hezbollah (in Lebanon, Iran, and Iraq) using IRGC, including Qods Force, resources that enabled Hezbollah to train, guide, direct, and motivate Jaysh al-Mahdi terrorists,

---

[12] *Killing Americans and Their Allies*.

who operated as part of the Joint Cells with Hezbollah and the IRGC, including its Hezbollah
Division and Qods Force, targeting American service members and civilians in key Iraqi
geographies like Baghdad and Basra.

184.     Similarly, the IRGC, including its Hezbollah Division and Qods Force, paid for,
and sourced key components necessary for Hezbollah to build, each EFP used by the Joint Cells,
all of which were constructed by Hezbollah based upon Hezbollah designs.  Hezbollah then
provided such EFPs to the Joint Cells at the instruction of the IRGC, including its Hezbollah
Division and Qods Force, for the Joint Cells to use to attack Americans in Iraq through 2017.

185.     The IRGC, including its Hezbollah Division and Qods Force, also paid for, and
helped Hezbollah build and/or deliver, advanced rockets – including upgraded 107mm variants
such as the IRGC-manufactured 107mm rockets known as Improvised Rocket-Assisted
Munitions ("IRAMs") – which Hezbollah then provided to the Joint Cells at the instruction of
the IRGC, including its Hezbollah Division and Qods Force, for the Joint Cells to use to attack
Americans in Iraq between 2011 and 2016.

186.     The IRGC, including its Hezbollah Division and Qods Force, intentionally used
Hezbollah to lead every aspect of its terrorist campaign against Americans in Iraq, at least in
part, because the IRGC, including its Hezbollah Division and Qods Force, wanted "plausible
deniability" of Iranian involvement based upon the Iranian propaganda that Hezbollah is not and
was not an Iranian agent.  To that end, when MTN, ZTE, and Huawei provided embargoed
technology and funds, and any other materials useful for terrorist tradecraft to their IRGC,
including Qods Force, counterparties, those items flowed through the IRGC, including its
Hezbollah Division and Qods Force, to Hezbollah, which, in turn, distributed money, arms, and
technology to Hezbollah's lead Shiite terrorist proxy in Iraq, Jaysh al-Mahdi.  In this way, the

48

IRGC, including its Hezbollah Division and Qods Force, were able to maintain influence on the terror campaign in Iraq while simultaneously delegating its planning, commission, and authorization to Hezbollah.

187.    Because Hezbollah is widely understood amongst officials of the U.S. government, and those in academia, business, and the media, to be a part of the IRGC, including its Hezbollah Division and Qods Force, it is not uncommon for U.S. officials to lump "Hezbollah" into discussions of IRGC, including Qods Force, malign activity in Iraq.  For the avoidance of all doubt, Plaintiffs allege that all or nearly all of the support that the IRGC, including its Hezbollah Division and Qods Force, provided to Jaysh al-Mahdi as described in this Complaint – including the funds, weapons, weapons components, communications technology, and computers – was routed through Hezbollah in its capacity as the IRGC's and Qods Force's lead terrorist agent worldwide and in its status as a constituent member of both organizations. Plaintiffs expressly disclaim any allegation in this Complaint that the IRGC or Qods Force bypassed Hezbollah to directly fund, arm, or logistically support Jaysh al-Mahdi, and Plaintiffs allege that all such IRGC, including Qods Force, support of Jaysh al-Mahdi was either (a) routed through Hezbollah; or (b) provided in the context of a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force.

188.     Hezbollah's campaign of attacks via EFP, rocket, and hostage-taking inflicted nearly all the American casualties in Iraq between 2011 and 2016.

189.    On April 15, 2019, the U.S. State Department designated the IRGC, including its Hezbollah Division and Qods Force, as a Foreign Terrorist Organization.[13]  Announcing the designation, President Trump explained that "the IRGC *actively participates in, finances, and*

---

[13] *See* 84 Fed. Reg. 15,278-01 (Apr. 15, 2019).

*promotes terrorism as a tool of statecraft.*"[14]   According to the U.S. State Department's public

statement explaining the designation, the IRGC, including its Hezbollah Division and Qods

Force, have "been directly involved in terrorist plotting; its support for terrorism is *foundational*

*and institutional*, and it has killed U.S. citizens."[15]   Through the IRGC's, including the Qods

Force's, support for terrorist organizations throughout the region, "[t]he Iranian regime has made

a clear choice not only to fund and equip, but also to fuel terrorism, violence, and unrest across

the Middle East."[16]

190.    When the U.S. State Department designated the IRGC, including its Hezbollah

Division and Qods Force, as a Foreign Terrorist Organization, Secretary of State Michael R.

Pompeo stated:

> This is the first time that the United States has designated a part of another
> government as an FTO. … *[T]he Iranian regime's use of terrorism as a tool of*
> *statecraft makes it fundamentally different from any other government.* …
>
> For 40 years, the [IRGC] has actively engaged in terrorism and created,
> supported, and directed other terrorist groups. The IRGC … regularly violates the
> laws of armed conflict; it plans, organizes, and executes terror campaigns all
> around the world. …
>
> The IRGC institutionalized terrorism shortly after its inception, directing horrific
> attacks against the Marine barracks in Beirut in 1983 and the U.S. embassy annex
> in 1984 alongside *the terror group it midwifed, Lebanese Hizballah*. Its
> operatives have worked to destabilize the Middle East from Iraq to Lebanon to
> Syria and to Yemen. …
>
> The IRGC … supports: Lebanese Hizballah, Palestinian Islamic Jihad, Hamas,
> Kata'ib Hizballah, among others, all of which are already designated as foreign
> terrorist organizations. …

---

[14] Statement from the President on the Designation of the Islamic Revolutionary Guard Corps as
a Foreign Terrorist Organization (Apr. 8, 2019) (emphasis added).

[15] U.S. State Dep't, *Fact Sheet: Designation of the Islamic Revolutionary Guard Corps* (Apr. 8,
2019) (emphasis added).

[16] *Id.*

Our designation makes clear … that [the] Iranian regime not only supports terrorist groups, but engages in terrorism itself. This designation also brings unprecedented pressure on figures who lead the regime's terror campaign, individuals like Qasem Soleimani. … He **doles out the regime's profits to terrorist groups across the region and around the world**.

**The blood of the 603 American soldiers the Iranian regime has found to have killed in Iraq is on his hands and on the hands of the IRGC more broadly**.[17]

191.    As the world's worst sponsor of terrorism, Iran is unique.  It is not a "normal" country, but a place where the IRGC, including its Hezbollah Division and Qods Force, rely upon their corporate allies to directly enable violence in an open and shocking manner.  As Ambassador Mark D. Wallace, the CEO of United Against Nuclear Iran ("UANI"), explained, "[i]nternational organizations must also realize that their relationship with Iran is not just … 'business as usual,' …  Put bluntly, Iran is in violation of many of its international treaty obligations, and it **should not be treated like a member in good standing** of international bodies."[18]

### 2.    Lebanese Hezbollah

192.    Lebanese Hezbollah "first emerged as a militia in opposition to the 1982 Israeli invasion of Lebanon."[19]

---

[17] Secretary of State Michael R. Pompeo, U.S. Department of State, *Remarks to the Press* (Apr. 8, 2019) (emphasis added).

[18] Statement of the Honorable Mark D. Wallace, CEO United Against Nuclear Iran before the U.S. U.S. House of Representatives Committee on Foreign Affairs, *Iran Sanctions*, Congressional Testimony via FDCH (May 17, 2012) (emphasis added), 2012 WLNR 10405070 ("Wallace May 17, 2012 Testimony").

[19] Marc Lindemann (Captain, New York National Guard), *Laboratory of Asymmetry: The 2006 Lebanon War and the Evolution of Iranian Ground Tactics*, Military Review (May 1, 2010), 2010 WLNR 28507137 ("Lindemann, *Laboratory of Asymmetry*").

193.    "Although Iran was engaged in the Iran-Iraq War at the time of the Israeli occupation, Iran's Islamic Revolutionary Guard Corps (IRGC) took the lead in organizing, training, and equipping Hezbollah."[20]

194.    "To this end, Syria allowed 2,500 members of the IRGC to enter Lebanon and set up training camps among the Shi'ite population in the Beqa'a Valley … Training at the IRGC camps became a prerequisite for membership in Hezbollah."[21]

195.    The IRGC created Lebanese Hezbollah as a subordinate part of the IRGC known as the "Hezbollah Division."[22]

196.    Hezbollah likewise considers itself a part of the IRGC.  In 1985, "Hezbollah publicly acknowledged its reliance on Iran,": "We view the Iranian regime as the vanguard and new nucleus of the leading Islamic State in the world. We abide by the orders of one single wise and just leadership, represented by *'Wali Faqih'* [rule of the jurisprudent] and personified by Khomeini."

197.    Hezbollah operatives swear a personal oath of loyalty to Iran's Supreme Leader, Ayatollah Khamenei, and personally pledge to carry out their terrorist missions in his name.

198.    The IRGC directly funds its Hezbollah Division in the same manner as its Qods Force, as they are two sides of the same IRGC external terror coin.  As the Defense Intelligence Agency ("DIA") concluded with "high confidence" in 2010, "Iran has methodically cultivated a network of sponsored terrorist surrogates capable of conducting effective, plausibly deniable

---

[20] Lindemann, *Laboratory of Asymmetry*.

[21] *Id*.

[22] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, Combating Terrorism Center at West Point, CTC Sentinel, Vol. 3, No. 11 (Nov. 2010) ("Knights, *The Evolution of Iran's Special Groups in Iraq*").

attacks against … the United States," and the DIA "judge[d]" that "Tehran provide[d] support to terrorist and militant groups to support Iran's strategic interests in each situation."[23]

199.   DIA concluded: "[e]lements of Iran's Islamic Revolutionary Guard Corps []have provided direct support to terrorist groups, assisting in the planning of terrorist acts or enhancing terrorist group capabilities."[24]

200.   Articles 150 and 154 of the Iranian Constitution order the IRGC to export Iran's Islamist revolution and aiding insurgents.  Under Article 150, the IRGC is responsible for "guarding the revolution and its achievements," (meaning, exporting the Islamist revolution),[25] and Article 154 confirms that Iran "supports the just struggles of the *mustad'afun* [downtrodden] against the *mustakbirun* [oppressors] in every corner of the globe."  Thus, Iran's constitution directly embraces proxy terror ("the just struggles of the downtrodden") targeting the United States (i.e., "against the oppressors").[26]

201.   Hezbollah, translated as "Party of God," planned and authorized the terrorist campaign against Americans in Iraq, partnering with the IRGC, including its Hezbollah Division

---

[23] Defense Intelligence Agency, *Unclassified Report on Military Power of Iran* (Apr. 2010).

[24] *Id*.

[25] Under Iran's revolutionary doctrine, the Iranian government posits that it must always remain on the attack with respect to its promotion of insurgents against the Great Satan because, if Iran were to fall back (according to this paranoid theory), the U.S. would overrun Iran. Consequently, inside Iran and around the world, people familiar with Iran and the IRGC understand that references to "guarding the revolution" are ***not*** defense, but rather, are ***offensive*** because, under the paranoid Iranian view, the only way to "guard the revolution" is to go on the attack outside of Iran, through proxy terror campaigns.  Any suggestion to the contrary is, quite literally, IRGC terrorist propaganda.

[26] When the Iranian government references "the oppressors" without any specification as to whom, that ***exclusively*** means only two countries:  the United States and Israel.  This is so because the Iranian regime was founded in direct opposition us and our ally, and Iran's founding documents mention no other hostile actor beyond the U.S. and Israel.  Any suggestion to the contrary is, literally, Iranian propaganda designed for a western audience.

and Qods Force, and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq and Jaysh al-Mahdi Special Group Ka'taib Hezbollah, to commit attacks against Americans in Iraq.

202.    On January 25, 1995, the United States designated Hezbollah as a Specially Designated Terrorist.

203.    On October 8, 1997, the United States designated Hezbollah as an FTO, and it has retained that designation ever since.

204.    Richard Armitage, the Deputy Secretary of State under President George W. Bush, has described Hezbollah as "the 'A-Team of Terrorists,'"[27] and former CIA director George Tenet has opined that Hezbollah "is [al-Qaeda's] equal if not far more capable organization."[28]  Hezbollah's chief terrorist mastermind, Mugniyeh, helped Sadr found Jaysh al-Mahdi to inflict "mass casualties" on Americans in Iraq and recruited many of its first members; Hezbollah has since orchestrated Jaysh al-Mahdi's campaign of terror against Americans in Iraq.

205.    Hezbollah was and is the IRGC's, including the Qods Force's, lead terrorist proxy in Iraq and the broader Middle East, serving, in effect, as the IRGC's external terrorist operations arm in conjunction with Hezbollah's close ally and patron, the Qods Force.  As the Honorable Randolph D. Moss found, "Hezbollah envisions itself as 'the sharp end of the spear[,]' going where Iran tells it to go in defense of…. Shia [Muslims] around the world."[29]  Federal courts

---

[27] Ed Bradley, *Hezbollah:  "A-Team of Terrorists"*, CBS News (Apr. 18, 2003).

[28] *Current and Future Worldwide Threats to the National Security of the United States:  Hearing Before the S. Comm. on Armed Services*, 108th Cong.  60 (Feb. 12, 2003) (testimony of George J. Tenet).

[29] *Fritz*, 320 F. Supp. 3d at 60.

have repeatedly found that Hezbollah is an agent of the IRGC, including its Hezbollah Division and Qods Force.[30]

206.    Hezbollah's activities have stretched far beyond Lebanon's borders.  Hezbollah's primary stated goal is the destruction of the United States and Israel, which it calls the "Great Satan" and the "Little Satan," respectively.[31]  Hezbollah also frequently functions as a terrorist proxy for the IRGC, including its Hezbollah Division and Qods Force, committing and orchestrating terrorist attacks abroad with the IRGC's, including the Qods Force's, support. Hezbollah's 1985 manifesto proclaims that the "first root of vice is America" and explains that "Imam [Ruhollah] Khomeini, our leader, has repeatedly stressed that America is the cause of all our catastrophes and the source of all malice."[32]  In 2003, Hezbollah Secretary-General Hassan Nasrallah proclaimed:  "Let the entire world hear me.  Our hostility to the Great Satan [America] is absolute . . . .  Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan:  Death to America."[33]

207.    Hezbollah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies.  As Dr. Matthew Levitt has explained, "Hezbollah is extremely adept at

---

[30] *E.g.*, *id.* at 61 ("Consistent with numerous other decisions from this Court, the Court, accordingly, finds that Hezbollah is an Iranian proxy."); *see also Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, No. 16-1436, 313 F. Supp. 3d 50, 53–55, 2018 WL 2023498, at *2 (D.D.C. May 1, 2018); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003).

[31] *See* Times of Israel, *Nasrallah Proud that PM, Obama Discussed Hezbollah* (Nov. 11, 2015); Ariel Ben Solomon, *Nasrallah 'Proud' that Netanyahu and Obama Discussed Hezbollah in White House Meeting*, Jerusalem Post (Nov. 11, 2015).

[32] Hezbollah Manifesto, *reprinted in Anti-American Terrorism and the Middle East:  A Documentary Reader* 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[33] Sept. 27, 2002 Al-Manar broadcast, *quoted in* "Hassan Nasrallah:  In His Own Words," Committee for Accuracy in Middle East Reporting in America (July 26, 2006).

recruiting members from local populations in areas where they have networks on the ground."[34]

Hezbollah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hezbollah's behalf. Hezbollah has successfully employed this strategy to facilitate attacks by its proxies in (among other places) Paris, France (1985-86); Buenos Aires, Argentina (1992); and Khobar, Saudi Arabia (1996).

208. In *Fritz*, the Court found that "Hezbollah's development into an Iranian proxy in Lebanon [was] relevant" in at least "two respects":

> First, it serve[d] as an example of how Iran cultivate[d] militant organizations in other countries and employ[ed] them as surrogates—a model that Iran then applied to [Jaysh al-Mahdi]. Second, Hezbollah served as a liaison between Iran and [Jaysh al-Mahdi] and helped Iran establish a proxy relationship [with Jaysh al-Mahdi]. … Iran's relationship with Hezbollah, accordingly, is part of the story of [how Jaysh al-Mahdi] emerge[d] as an Iranian proxy.[35]

209. Hezbollah could not have committed, planned, and authorized each of the terrorist attacks in this case without the IRGC's, including the Qods Force's, funds and logistical support. For example, as celebrated journalist Michael R. Gordon reported in 2007:

> U.S. intelligence experts believe that Hezbollah has provided some of the logistical support and training to Shiite militias in Iraq [in EFP attacks against Americans there] but they assert that such steps would not be taken without Iran's blessing. "All source reporting since 2004 indicates that Iran's Islamic Revolutionary Corps-Quds Force is providing professionally-built EFPs and components to Iraqi Shia militants," notes a still classified U.S. intelligence report that was prepared in 2006. "Based on forensic analysis of materials recovered in Iraq," the report continues, "Iran is assessed as the producer of these items."[36]

---

[34] Matthew Levitt, *Hezbollah: A Case Study of Global Reach*, Remarks to a Conference on "Post-Modern Terrorism: Trends, Scenarios, and Future Threats" at 4 (Sept. 8, 2003).

[35] *Fritz*, 320 F. Supp. 3d at 60.

[36] Michael R. Gordon, *Iran Supplies Shiite Arms, U.S. Asserts Iraqi Militias Deploy Roadside Explosive*, International Herald Tribune (Feb. 12, 2007), 2007 WLNR 2751110.

210.    Iran considers Hezbollah as part of the IRGC, including its Hezbollah Division

and Qods Force, specifically serving as the "Hezbollah Division" of the IRGC, including its

Hezbollah Division and Qods Force.

### 3.    Qods Force

211.    On October 25, 2007, the U.S. Treasury Department designated the Qods Force as

a SDGT under Executive Order 13224 ("E.O. 13224") for providing material support to terrorist

groups in Iraq and other terrorist organizations, including Hezbollah; the U.S. also designated

multiple Qods Force members as Specially Designated Nationals pursuant to E.O. 13224, based

on their activities in Iraq, including their support for Hezbollah.[37]

212.    Announcing the Qods Force's SDGT-related designations, the Treasury

Department stated as follows in its official press release:

> The U.S. Government is taking [] major actions today to counter Iran's …
> ***support for terrorism*** by exposing ***Iranian … companies*** and individuals that
> have been involved in these dangerous activities and by cutting them off from the
> U.S. financial system. … The Treasury Department [] designated the IRGC-Qods
> Force (IRGC-QF) under E.O. 13224 for providing material support to … terrorist
> organizations…
>
> Last week, the Treasury Department issued a warning to U.S. banks setting forth
> the risks posed by Iran…. Today's actions are consistent with this ***warning, and***
> ***provide additional information to help [] institutions protect themselves from***
> ***deceptive [] practices by Iranian entities and individuals engaged in or***
> ***supporting … terrorism.*** … As a result of our actions today, all transactions
> involving any of the designees and any U.S. person will be prohibited … Today's
> designations also ***notify the international private sector of the dangers of doing***
> ***business with … the many IRGC-affiliated companies that pervade several***
> ***basic Iranian industries.*** …
>
> **Support for Terrorism -- Executive Order 13224 Designations**
> E.O. 13224 is an authority aimed at freezing the assets of ***terrorists and their***
> ***supporters, and at isolating them from the U.S. financial and commercial***

---

[37] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

*systems*. Designations under the E.O. prohibit all transactions between the designees and any U.S. person …

**IRGC-Qods Force (IRGC-QF):** The Qods Force, a branch of the [IRGC], provides material support to the Taliban, Lebanese Hizballah, Hamas, [and] Palestinian Islamic Jihad …

The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. … Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.

The Qods Force has had a ***long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support***. The Qods Force operates training camps for Hizballah in Lebanon[] … and has [] trained more than 3,000 Hizballah fighters at ***IRGC training facilities in Iran***. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.

In addition, the Qods Force provides ***lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces*** ...[38]

B.      **The Islamic Revolutionary Guard Corps, Lebanese Hezbollah, And The Qods Force Operate As An Integrated Transnational Terrorist Organization With A Common Doctrine, Strategy, Financial Structure, Logistics Structure, And Command-And-Control**

1.      **The IRGC's Transnational Terrorist Strategy, Doctrine, And Tactics Emphasizes The Deployment Of Joint Cells Of Terrorists Led By Lebanese Hezbollah, Funded And Resourced By The Qods Force, And Supported By Local Iranian Terrorist Proxies**

213.    The IRGC, including its Hezbollah Division and Qods Force, has long followed a

common terrorist strategy and doctrine, which deploys common tactics across every component

of the IRGC (regular, Hezbollah Division, and Qods Force) – including the use of Hezbollah as

---

[38] *Id.* (emphases added).

the cell leader and Qods Force as cell funder and logistician – and every geography in which the IRGC or any of its proxies operate.

214.    The IRGC adheres to an integrated global terror strategy, and follows the same rules for terrorist tradecraft, out of a recognition that the IRGC and its proxies were likely to always suffer from a resource deficit, which meant that the intelligent deployment of its human assets was paramount because unlike, say, China, the IRGC did not have limitless resources or an enormous pool of human capital from which to draw.  Given these "equipment and logistical constraints, Hezbollah – with the guidance of Iranian advisors – adopted a doctrine of guerrilla warfare against the Israeli occupation."[39]

215.    The Joint Cell approach is the foundation of the IRGC's terrorist doctrine and the cornerstone of the Hezbollah Division's entire terrorism "business model" when, as in most use cases, the Hezbollah Division and Qods Force are being deployed outside of Iran, or are being deployed inside of Iran but specifically to target Americans, e.g., to torture an American hostage being held in Iran, or to plan for a raid targeting Americans from a site in Iran.

> **2.    The IRGC, Including Its Hezbollah Division And Qods Force, Follow Common Terrorist Techniques, Tactics, And Procedures And Use The Same Terrorist Tradecraft To Ensure Concealment And Cover Around The World**

216.    "Tradecraft" refers to the methodologies and philosophies of engaging in covert operations (including killings) and general espionage.  Terrorists and clandestine intelligence operatives both practice tradecraft.

217.    The tradecraft rules that govern the IRGC, including its Hezbollah Division and Qods Force, are ironclad, inflexible, widely known, and universally applied worldwide, befitting

---

[39] Lindemann, *Laboratory of Asymmetry*.

the IRGC's status as the world's largest, most globally distributed, professionalized transnational terrorist organization. IRGC tradecraft emphasizes concealment and cover above all other operational imperatives.

218. While Islamist terrorists and western intelligence officials do not agree on much, they concur on the core doctrinal point that the two *absolute requirements* for nearly any successful operation by terrorists or intelligence operatives are **(i) Concealment**, i.e., something or someone that protects something (or someone) else from being identified; and **(ii) Cover**, i.e., something that provides protection or shelter to someone otherwise at risk.

219. Amongst counter-terror professionals, it is axiomatic that "cover" and "concealment" are a necessary ingredient to any successful long-term terrorist finance and logistics strategy that depends upon commercial transactions to facilitate terror.

220. Nearly everything a terrorist does requires cover and concealment in some form: meeting with cell members, communicating with leadership, surveilling targets, traveling across an international border to attend a training camp, and so on.

221. Since its founding, the security doctrine followed by the IRGC, including its Hezbollah Division and Qods Force, has consistently emphasized cover and concealment as the essential aspect of any successful terrorist operation in light of the unique, violent, and affirmative need for the IRGC to "go on offense" and attack Americans abroad.

222. The IRGC, including its Hezbollah Division and Qods Force, adheres to cover and concealment as the two most important principles in terrorist tradecraft for a simple reason: from inception, and ever since, the IRGC's security policy was specifically built on paranoid, antisemitic, Islamist aggression that explicitly targeted America (sometimes by name, sometimes in code), and posited that an alliance between Christians (Americans) and Zionists (Israelis) was

60

bent on taking over the Middle East and defiling Islam, and thus each member of the IRGC (including its Hezbollah Division and Qods Force) must always be attacking Americans, and always focusing specifically on targeting the United States for terror.

223.   The IRGC (including its Hezbollah Division and Qods Force) was built purposely for the specific task of attacking America and Israel in order to protect Iran's Islamic Revolution by staying on a perpetual state of "offense," i.e., a never ending campaign of terror against Americans and their allies in the Middle East and around the world designed to strike the "infidels" on their own ground – rather than fight on Iranian soil – via terrorist attacks usually carried out through a Joint Cell approach that outsources much of the violence to local IRGC proxies, but always under the control of Lebanese Hezbollah and the Qods Force.

224.   The IRGC, including its Hezbollah Division and Qods Force, adhered to the above-described security policy for the purported purpose of preventing "Christians" and "Zionists" from overrunning the Middle East, ending Iran's Islamic Revolution, and forcibly converting every Muslim in the world to Christianity and Judaism.[40]  At all times, and continuing to this day, the Iranian Shareholders with whom MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. conspired, i.e., fronts for the IRGC (including its Hezbollah Division and Qods Force), have adhered to this doctrine.

225.   The ability of the IRGC, including its Hezbollah Division and Qods Force, to depend upon the reliability of its covers – corrupt corporate partners – was essential to the

---

[40] The last point reflects a particularly ominous aspect of the theological doctrine underpinning the "security" doctrine adhered to by the IRGC, including Lebanese Hezbollah and Qods Force. Under the theology espoused by Iran's radical clerics, a Muslim conversion to Christianity (forcibly or not) is viewed as an apostasy, the worst possible thing someone can do, and the worst possible fate that could befall someone in return.

conspiracy's ability to obtain the vast storehouse of high-tech American smartphones, network computing technologies.

### i.    Concealment

226.    Every principle of terrorist tradecraft practiced by the IRGC, including its Hezbollah Division and Qods Force, begins with concealment.  While every Foreign Terrorist Organization, like the IRGC, prioritizes concealment, few have more practical experience accomplishing concealment.  And, from experience, organizations grow (for good or ill).  The IRGC, including its Hezbollah Division and Qods Force, has decades of terrorist experience and is the most experienced, practiced terrorist organization in the world today with respect to concealment, a status it earned in the 1990s and has maintained ever since.

227.    Under the "security" doctrine universally practiced at all times by the IRGC, including Lebanese Hezbollah and Qods Force, IRGC terrorists are taught as a matter of terrorist tradecraft that, if they are faced with a choice between: (a) possibly blowing the concealment of an IRGC, including Lebanese Hezbollah and Qods Force, cover, plot, operative, or transaction, and exposing the IRGC asset in question to capture by the hated "Great Satan," i.e., the U.S., and "Little Satan," i.e., Israel, detection by the "Christians," i.e., the United States, and/or the "Zionists," i.e., Israel, or (b) simply lying, cheating, stealing, defrauding, burning, kidnapping, or murdering your way out of the problem, there is **_no choice at all_** for any terrorist who is a member of the IRGC, including its Hezbollah Division and Qods Force.  For such a terrorist, IRGC doctrine commands them to maintain concealment of the asset to prevent discovery by the U.S.

228.    To be clear, Plaintiffs do not allege that IRGC, including Lebanese Hezbollah and Qods Force, have any discretionary authority in the immediately preceding hypothetical.  **_Just the opposite_**:  a well-trained terrorist following the tradecraft of the IRGC, including its

Hezbollah Division and Qods Force, is ***affirmatively compelled*** to lie, cheat, defraud, kidnap,

torture, rape, and murder – whatever is necessary to maintain concealment – as a religious duty,

analytically no different from other pious acts because the crime in question was purportedly in

service of the Islamic Revolution and the IRGC's holy mandate to "preserve" the Revolution

since 1979 by conducting waves of terror campaigns coordinated by Hezbollah's External

Security Organization.

229.     The IRGC's obsession with preserving concealment underpins this case.  Because

the IRGC, including its Hezbollah Division and Qods Force, prioritizes concealment above all

else, an operative of the IRGC, including its Hezbollah Division and Qods Force, would never

truthfully reveal their "security"-related status – i.e., that they were a terrorist operative assigned

to the IRGC's Hezbollah Division's External Security Office or through the IRGC's Qods Force

and currently on a mission.

230.     The ordinary "use case" for most Foreign Terrorist Organizations, including the

IRGC, assumes that the FTO's forward deployed terrorists worked in-country with local proxies

to attack Americans nearby, and that the FTO's operatives are often highly motivated, but

isolated and poorly resourced.  IRGC (including Lebanese Hezbollah and Qods Force) tradecraft

emphasizes the intense vulnerability of Iranian terrorists considering America's military power,

intelligence capabilities, surveillance prowess, dominance of the global financial system through

New York banks, and status as the world's most technologically advanced country.

231.     IRGC (including Hezbollah Division and Qods Force) "security" operatives (i.e.,

terrorists) were (and are) paranoid about their concealment and went to extreme lengths to

preserve it.

232.     When a forward deployed intelligence operative or terrorist is operating under concealment, as most do, one key challenge involves how to develop reliable partners outside of the terrorist group (e.g., a partner who helps Hezbollah but is not himself a member) or intelligence service (e.g., a source).

233.     The IRGC, including its Hezbollah Division and Qods Force, does not lightly accept foreigners in their terrorist "circle of trust."  And the IRGC did not do so here.

234.     To earn – and keep – the trust of the IRGC, including its Hezbollah Division and Qods Force, the IRGC insisted that MTN Group and MTN Dubai, and on information and belief, ZTE Corp. and Huawei Co., sign the same IRGC template, in which each Defendant pledged to facilitate the "security" operations of the IRGC, i.e., Lebanese Hezbollah and Qods Force attacks against Americans worldwide.

235.     IRGC concealment doctrine emphasizes an "Orbit" strategy under which the IRGC, including its Hezbollah Division and the Qods Force, structures transactions so that the IRGC is behind one side, one step removed, but fully in control.  This IRGC tradecraft is designed to give the IRGC, and its corrupt corporate and financial enablers, the ability to falsely claim that the IRGC did not directly benefit from an otherwise suspect transaction because the counterparty himself was not a member of the IRGC.

236.     In 2020, NATO confirmed the IRGC's "Orbit" strategy in an analysis by Monika Gill, a defense scholar who closely studied how the IRGC deploys communications technology to facilitate anti-American terror,[41] that NATO published in *Defence Strategic Communications*, "[t]he official journal of the NATO Strategic Communications Centre of Excellence."[42]

---

[41] Gill, *Capitalism, Communications, and the Corps*, at 88.

[42] *Id*.

237.     According to Ms. Gill's study of the IRGC's communications technology strategies, the IRGC's practices while exercising control of Iran's heavy construction industry show the IRGC's "Orbit" strategy as being part of their terrorist tradecraft, because the entire point of the strategy is to enable a future accomplice – like a company that gets caught red-handed – to protest that there is no direct linkage between them and the IRGC:

> The IRGC-CF is comprised of a complex network of Orbit 1 companies and Orbit 2 companies. In Orbit 1 companies, the IRGC-CF is directly represented on the board of directors, whilst in Orbit 2 companies, there **appears to be no direct representation and therefore, seemingly no links** to the IRGC-CF. Whilst Orbit 2 companies appear independent of the IRGC, they maintain ties to the directly affiliated companies, and therefore remain under indirect IRGC influence. Baharahn Gostar Kish for example, is an information technology and communications company that has no formal links to the IRGC-CF, with no IRGC members on the board of directors.  However, two board members represent Baharahn and Mowj Nasr Gostar, which are both Orbit 1companies, **meaning that the company still effectively falls under the IRGC economy**.[43]

238.     Ms. Gill's analysis leaves no doubt as to the true nature of Defendants' counterparties.  Indeed, it compels the conclusion that, even now, Defendants' representations merely further the IRGC's conspiracy.  Simply put, it is textbook IRGC terrorist tradecraft to structure deals that are designed to route value to the IRGC even when both sides to the transaction are **not** IRGC, which is a long-standing IRGC practice from transactions involving companies the IRGC effectively controls even when the IRGC is not a party to the transaction.

239.     NATO would only publish a lengthy article replete with complex factual assertions if the professional staff at NATO, on behalf of NATO, believed the article:  (1) accurately characterized the facts to avoid misleading the contemplated primary audience or making any assertions that are implausible, e.g., a government official working for NATO to defend the U.S. and Europe from, *inter alia*, terrorism; (2) offered reasonable opinions worthy of

---

[43] *Id.* at 101-102 (emphasis added).

consideration by responsible parties, e.g., analyzing how NATO should respond to the IRGC

takeover of MTN Irancell and Telecommunication Company of Iran ("TCI"); and (3)

strengthened NATO's ability to fight terrorism, as that was NATO's primary mission for the two

decades after 9/11.

### ii. Cover

240. The IRGC's terrorist doctrine emphasizes the reliance upon charities,

corporations, and endowments, and other ostensibly "civilian" or "economic" entities as covers

for the IRGC, including its Hezbollah Division and Qods Force.

241. In recognition of the central role of cover to IRGC doctrine, the IRGC created

Unit 400 within the Qods Force. As one regional newspaper explained in 2021:

> Unit 400 has a network of facilitators and proxies, including elements in organized crime
> syndicates. These individuals collect information, make preliminary logistical
> preparations, and carry out operations if necessary. These individuals sometimes are
> trained inside Iran and sometimes in the Quds Force's training camps across the globe.
> Unit 400 has various front companies that both provide cover and money for this terrorist
> entity to operate. Two companies, Arash Zoobin, and Aria Navid, are used to secretly
> transfer weapons for Unit 400. Besides, the IRGC uses its vast network of front
> companies, religious or charitable organizations around the world to recruit facilitators.[44]

242. As a consequence, the IRGC, including its Hezbollah Division and the Qods

Force, relied upon the importance of using crooked corporate partners to provide "cover" to

facilitate, among other things: **(i) illicit financial transactions to acquire and distribute U.S.**

**Dollars**, e.g., laundering and recycle U.S. Dollar-denominated drug profits to finance Hezbollah

operations; **(ii) illicit purchases of embargoed American technology**, e.g., bulk purchasing

thousands of black market secure American mobile phones; **(iii) illicit movement of terrorist**

**operatives**, e.g., a Hezbollah attack planner whose need to visit Europe requires a visa supplied

---

[44] Shahriar Kia, *Global Terrorist Activities Of The Iranian Mullah Regime*, Weekly Blitz
(Bangladesh) (Dec. 4, 2021), 2021 WLNR 39679934.

by a credible front company; **(iv) illicit safe havens**, e.g., a fictitious company used as cover for an al-Qaeda safehouse in Afghanistan; and **(v) illicit cache sites**, e.g., Hezbollah attack planner whose need to visit Europe requires a visa supplied by a credible front company.

### iii. Slush Funds For "Off-Books" Terrorist Finance

243.     Given the IRGC's programmatic emphasis on deception and the use of "slush funds," core IRGC doctrine emphasizes that the IRGC, including its Hezbollah Division and the Qods Force, must draw a substantial portion of the funds, arms, personnel, and logistical support for anti-American terrorism globally from "off-books" sources, with the Bonyad Mostazafan being the most notorious – and important – terrorist slush fund of them all.

244.     Moreover, "all the IRGC's economic activities are monitored only by internal IRGC auditors and that the corps pays no taxes."[45]

### iv. Corruption As Terrorist Tactic And Tool

245.     The terrorist tradecraft practiced and taught by the IRGC, including its Hezbollah Division and Qods Force, has long used corruption, bribery, kickbacks, "taxes," and protection money as a core strategy to facilitate terrorist attacks against Americans in Iraq, Afghanistan, and elsewhere through:  (1) terrorist finance, including raising funds, concealing funds, converting funds to U.S. Dollars (the currency of choice for all terrorists), and moving the Dollars to the necessary terrorist cell; (2) terrorist logistics, including acquiring the embargoed technologies necessary to improve the bombs, rockets, communications, and surveillance capabilities necessary to kill or kidnap Plaintiffs; and (3) terrorist freedom of movement, including securing

---

[45] Rasool Nafisi, *Iran's Revolutionary Guard Has A Lot To Lose*, Radio Free Europe Documents (Sept. 18, 2009), 2009 WLNR 18604289.

visa and other government papers necessary to a plot, bribing law enforcement to prevent the roll-up of a cell, and the like.

246.    Decades of Hezbollah operations, investigations, and prosecutions confirm how the IRGC, including its Hezbollah Division and Qods Force, converted income from the transnational corruption economy for terror, including, but not limited to, examples ranging from Hezbollah's role in the Lebanese banking system (Hezbollah dominated it), to Hezbollah's sponsorship of narcotics trafficking (Hezbollah serves as an elite global management consulting company for narcotraffickers), to Hezbollah's involvement in transnational organized crime worldwide (where Hezbollah serves as both partner, client, and management consultant).

247.    By 2004, the IRGC, including its Hezbollah Division and Qods Force, had spent more than two decades developing and refining their shared tradecraft, networks, strategies, and tactics relevant to using corruption as a tool for terror.  As a result, the IRGC, including its Hezbollah Division and Qods Force, already had a purpose-built transnational infrastructure enabling to convert the economic profits they derive from the "corruption economy" in one country into attacks in that country, but also others.

**v.        Required Donations (*Khums*) From All IRGC Members**

248.    Shiite theological traditions call for donations (*khums*), usually equal to twenty percent (20%) of a person's income on every transaction, to support the cause.  The IRGC, however, has twisted this religious tradition, like tithing in Christianity, into something far different.

249.    Under the longstanding IRGC doctrine that Lebanese Hezbollah teaches to Iranian proxies like Jaysh al-Mahdi, the IRGC emphasizes the need to consistently collect donations (or taxes) as something that is universally required from all profit-generating activities and transactions – *without exception* – including, but not limited to, profits generated through

official business, criminal rackets, bribery and kickbacks, and a broad array of other illicit cash flow schemes.  The IRGC's "no exceptions" rule ensures that the terrorist have an administratively simple scheme (analogous to a terrorist flat tax), which ensures ease of implementation, and comports with the broader IRGC emphasis on its terrorists and proxies embracing administrative simplicity in their jihad.

250.    Under IRGC doctrine, *khums* donations are mandatory on multiple different transaction types, all of which ultimately flow back to fund the IRGC, including its Hezbollah Division and the Qods Force.  *First*, if income flows through and IRGC-controlled front (i.e., MTN Irancell) to the IRGC shareholders behind that front (i.e., the IRGC, including its Hezbollah Division and the Qods Force), the respective shareholders provide a donation to the others.  Thus, for example, if MTN Irancell flowed through $100 million to the IRGC, one may infer that the IRGC would, in turn, donate approximately twenty percent (20%) – $20 million – to its Hezbollah Division and the Qods Force in order to export Iran's Islamist revolution abroad through anti-American terror.

251.    *Second*, if a member of the IRGC – or a cutout acting on their behalf – receives a substantial economic benefit, such as a $400,000 bribe, IRGC doctrine mandates that the bribe recipient kickback, mafia-style, twenty percent of their income to the IRGC.  Thus, for example, an IRGC member (or cut-out) who received a $400,000 bribe could ordinarily be expected to kickback $80,000 to the IRGC, or likely meet the same fate that would befall a captain in the Gambino crime family who tried to keep a nearly half-million-dollar score from the Don (death).

**C. The Terrorist Tradecraft And Doctrine Of The IRGC, Including Its Hezbollah Division And Qods Force, Has Historically Relied On Fronts, Operatives, Agents, Cut-Outs, And Orbits To Fund, Arm, And Operationally Support Iran's Anti-American Terrorist Proxy Attacks Against Americans**

252.     The terrorist tradecraft and doctrine of the IRGC, including its Hezbollah Division and Qods Force, has a long and notorious history of relying on fronts, operatives, and agents to obtain funding, weapons, and operational support to benefit the IRGC's, including the Qods Force's, terrorist operations and Anti-American proxies around the world, most of all Hezbollah.

253.     On February 10, 2010, the U.S. Treasury Department announced additional IRGC front-related designations and stated that the IRGC, including its Hezbollah Division and Qods Force, were using illicit commercial transactions to bolster Iran's terrorist enterprise:

> The U.S. Department of the Treasury [] took further action to implement existing U.S. sanctions against Iran's [IRGC] by designating an individual and four companies affiliated with the IRGC … "As the ***IRGC consolidates control over broad swaths of the Iranian economy***, … ***it is hiding behind companies … to maintain vital ties to the outside world***," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. "Today's action … will help ***firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities***." … The U.S. has previously acted against the IRGC and the IRGC-Qods Force for their involvement in proliferation and terrorism support activities, respectively. In joint actions on October 25, 2007, the State Department designated the IRGC, under E.O. 13382, for having engaged, or attempted to engage, in proliferation-related activities, and ***Treasury designated the IRGC--Qods Force pursuant to E.O. 13224 for providing material support to … terrorist organizations***. …[46]

254.     On August 3, 2010, the U.S. Treasury Department announced additional IRGC- and Qods Force-related terrorist designations that bolstered the U.S. message that the "IRGC and IRGC-QF" provided "Support for Terrorist Organizations," including Hezbollah, and relied upon

---

[46] U.S. Treasury Dep't, *Treasury Targets Iran's Islamic Revolutionary Guard Corps* (Feb. 10, 2010) (emphasis added).

illicit commercial transactions to fund and arm the Hezbollah-led terrorist campaign against

Americans in Iraq:

> The U.S. Department of the Treasury announced [] a set of designations targeting the Government of Iran's support for terrorism and terrorist organizations, including Hizballah … Iran is the primary funder of Hizballah and has long been recognized as the most active state sponsor of terrorism. Today's designations expose Iran's use of its state apparatus – including the Islamic Revolutionary Guard Corps-Qods Force – and state-run social service organizations to support terrorism under the guise of … economic development …

> **IRGC and IRGC-QF Support for Terrorist Organizations:**
> The IRGC-QF is the Government of Iran's primary arm for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training and financial support to militants and terrorist operatives throughout the Middle East and South Asia. It was designated by Treasury pursuant to E.O. 13224 in October 2007 for its support of terrorism.

> The Government of Iran also uses the Islamic Revolutionary Guard Corps (IRGC) and IRGC-QF to implement its foreign policy goals, including, but not limited to, ***seemingly legitimate activities that provide*** cover for intelligence operations and ***support to terrorist and insurgent groups***. ***These activities include economic investment … implemented by companies and institutions that act for or on behalf of, or are owned or controlled by the IRGC and the Iranian government***.

> - … In Iraq, the Government of Iran trains, equips, and funds Iraqi Shia militant groups.
> - In the Levant, the IRGC-QF continues to support designated terrorist groups such as Hizballah…[,] the largest recipient of Iranian financial aid, training, and weaponry; and Iran's senior leadership has cited Hizballah as a model for other militant groups.[47]

255.    On December 21, 2010, the U.S. Treasury Department announced additional

IRGC-related designations, and stated once again that IRGC, including its Hezbollah Division

and Qods Force, relied upon illicit commercial transactions, including through the Bonyads like

Bonyad Mostazafan, to facilitate Iran's terrorist enterprise:

---

[47] U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010) (emphasis added).

The U.S. Department of the Treasury announced [] a set of designations targeting the financial networks of the Islamic Revolutionary Guard Corps (IRGC) … Today's actions further expose the continued engagement of the IRGC … in illicit activities and deceptive behavior.

"[T]he IRGC … [is a] major institutional participant[] in Iran's illicit conduct and in its attempts to evade sanctions.  We will therefore continue to target and expose [its] networks," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. …  The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in Iran's … support for terrorism ….  The U.S., UN, EU, Japan, South Korea and others have all targeted the IRGC for sanctions because of this illicit activity. With the IRGC's expanding influence and control over broader segments of the Iranian economy … increasing numbers of Iranian businesses are subsumed under the IRGC's umbrella and identified with its illicit conduct.

… Iranian bonyads are opaque, quasi-official organizations controlled by key current and past government officials and clerics. Bonyads receive benefits from the Iranian government but are not required to have their budgets publicly approved. They account for a significant portion of Iran's non-petroleum economy. …  Treasury has designated 14 IRGC-affiliated individuals and entities since June 2010 for facilitating Iran's nuclear and ballistic missile program or support for terrorism.[48]

256.    On June 23, 2011, the U.S. Treasury Department announced additional IRGC-related designations that reinforced the U.S. message that illicit transactions with IRGC commercial fronts directly aided terrorism against Americans by Iranian terrorist proxies:

***Treasury Targets Commercial Infrastructure of IRGC, Exposes Continued IRGC Support for Terrorism***

Today, the U.S. Department of the Treasury took action to designate … Iranian commercial entities … owned by [IRGC] … The IRGC continues to be a primary focus of U.S. and international sanctions against Iran because of the central role it plays in all forms of Iran's illicit conduct, including Iran's … support for terrorism …  As Iran's isolation has increased, the IRGC has expanded its reach into critical sectors of Iran's economic infrastructure – to the detriment of the Iranian private sector – ***to generate revenue and conduct business in support of Iran's illicit activities***.  Today's actions target core commercial interests of the IRGC, while also undermining the IRGC's ability to continue using these interests to facilitate its … illicit conduct. …  The IRGC has a growing presence in Iran's

---

[48] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010).

financial and commercial sectors and extensive economic interests …, controlling billions of dollars in corporate business.  Given its increased involvement in commercial activity, imposing financial sanctions on commercial enterprises of the IRGC has a direct impact on revenues that could be used by the IRGC to facilitate illicit conduct.[49]

## III. AFTER 9/11, THE ISLAMIC REVOLUTIONARY GUARD CORPS, LEBANESE HEZBOLLAH, QODS FORCE, JAYSH AL-MAHDI, SYRIAN GOVERNMENT, TALIBAN, AND HAMAS JOINED A CONSPIRACY LED BY IRAN TO DRIVE THE UNITED STATES OUT FROM THE ENTIRE MIDDLE EAST, INCLUDING IRAQ, AFGHANISTAN, SYRIA, AND YEMEN, AND TO SHARE COMMON FUNDING SOURCES, TECHNOLOGIES, AND CORPORATE PARTNERS IN ORDER TO FORM A TERRORIST ALLIANCE THAT COULD COUNTERBALANCE NATO AND DRIVE THE UNITED STATES OUT

### A. The Formation Of The Conspiracy

#### 1. After 9/11, The IRGC, Acting Through Its Hezbollah Division And Qods Force, Led A Transnational Terrorist Conspiracy Targeting Americans In Europe, The Middle East, Asia, And Africa To Inflict Pain On "The Great Satan"

257.    After 9/11, the IRGC organized a transnational terrorist alliance – the Islamists' answer to NATO – in order to marshal efficiencies across the anti-American terrorists, thereby maximizing the lethality of their shared terrorist campaign.

258.    By 2007, under the leadership of Qassem Soleimani, Lebanese Hezbollah and the Qods Force had organized "resistance" (i.e., terror) cells in dozens of countries on six continents. As the *Montreal Gazette* reported at the time:

> Under the Ahmadinejad administration, U.S. officials said, the [Iran's Revolutionary Guard] has moved increasingly into commercial operations, ***earning profits*** and extending its influence in Iran in areas involving big government contracts, including … ***providing cell phones***.

> Washington has claimed the Revolutionary Guard's Quds Force wing is responsible for the growing flow of explosives, roadside bombs, rockets and other arms to Shiite militias in Iraq and the Taliban in Afghanistan.

---

[49] U.S. Treasury Dep't, *Fact Sheet: Treasury Sanctions Major Iranian Commercial Entities* (June 23, 2011) (emphasis added).

Quds Force has also been blamed for supporting Shiite allies such as Lebanon's Hezbollah and to such Sunni movements as s…[50]

  **2. To Maximize The Lethality Of Their Terrorist Conspiracy, The IRGC, Acting Through Its Hezbollah Division And Qods Force, Provided Material Support To Every Other Member of the Conspiracy, Including Funds, Arms, Training, And Logistical Support, Which Their Co-Conspirators Used To Attack Americans in Iraq, Afghanistan, Syria, Yemen, Israel, Africa, And Asia**

259. After 9/11, the IRGC, including its Hezbollah Division and Qods Force, organized a global terrorist alliance comprised of a litany of allied Shiite and Sunni terrorist groups.  Generally, such groups could be divided between, on the one hand, transnational groups which seek to attack Americans anywhere, or regional groups, which focus on a geography.

260. In all cases, however, the terrorists: (a) sought to attack and kill Americans to force the United States to withdraw from the Middle East, including Iraq and Afghanistan; and (b) relied upon a network of terrorist allies – an Islamist NATO – necessary to counteract the U.S.-led coalitions in Iraq and Afghanistan, which organized the world's most powerful militaries and intelligence services to confront these terrorists.

261. Simply put, the IRGC and its terrorist co-conspirators knew they needed their own transnational alliance with all the same functionalities as NATO to successfully prosecute a global terror campaign against Americans on multiple continents for decades.

262. After 9/11, the IRGC's Hezbollah Division and Qods Force led the IRGC's support for this conspiracy.  With respect to the Hezbollah Division, Hezbollah's terrorist mastermind, Imad Mugniyeh, led this effort until the U.S. and Israel killed him in 2008, after which Mugniyeh was replaced by other well-trained and experienced Hezbollah Division

---

[50] Montreal Gazette (Canada), *What is the Revolutionary Guard?* (Aug. 16, 2007), 2007 WLNR 28659733.

terrorist operatives.  With respect to the Qods Force, the IRGC's terrorist mastermind, Qassem

Soleimani, led the Qods Force-related aspects of the scheme until his own death at the hands of a

U.S. drone strike in 2020.

263.    To operationalize the various nodes of the conspiracy – including transnational

logistics, financial relationships, arms pipelines, smuggling routes, and the like – Hezbollah and

the IRGC worked hand-in-hand with each other globally (as they have since the IRGC

"midwifed" Hezbollah to execute this conspiracy.  Hezbollah and the Qods Force followed the

same terrorist playbook and tradecraft around the world, which essentially breaks down into two

modes of support.

### i.    IRGC Shiite Terrorist Proxies

264.    If Hezbollah and the Qods Force were (a) sectarian allies with the proxy terrorists,

meaning that everyone is Shiite, e.g., Hezbollah, the Qods Force, and Jaysh al-Mahdi; or (b) had

a long-standing alliance regardless of sect, e.g., their 30+ years of supporting the Sunni terrorist

groups Hamas and Palestinian Islamic Jihad, then (c) the IRGC's doctrine mandated that

Hezbollah and the Qods Force follow the joint cell model.

265.    In such a case, the groups established joint cells comprised of Hezbollah, Qods

Force, and their local terrorist proxy to attack Americans in the country in question, or to provide

logistical, weapons, operational, financial, or concealment support to another part of the

conspiracy that targeted Americans outside of their own country, e.g., a joint cell comprised of

Hezbollah, the Qods Force, and allied Syrian operatives who manage a listening post on the

Syrian side of the Iraq border designed to facilitate logistics flow benefiting the terrorist

campaign in Iraq and the broader Middle East.  The IRGC terrorist proxies who joined the

conspiracy under this approach include, but are not limited to:

(i)    **Jaysh al-Mahdi**, which the IRGC, including its Hezbollah Division and Qods Force, supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iraq through the participation of Hezbollah and Qods Force operatives in joint cells in Iraq comprised of Hezbollah, Qods Force, and Jaysh al-Mahdi terrorist working together as an integrated unit;

(ii)    **the Houthis**, which the IRGC, including its Hezbollah Division and Qods Force, supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Yemen through the participation of Hezbollah and Qods Force operatives in joint cells in Yemen comprised of Hezbollah, Qods Force, and Houthi terrorist working together as an integrated unit;

(iii)    **Hamas and Palestinian Islamic Jihad**, which the IRGC, including its Hezbollah Division and Qods Force, supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Israel through the participation of Hezbollah and Qods Force operatives in joint cells in Yemen comprised of Hezbollah, Qods Force, and Hamas and/or Palestinian Islamic Jihad terrorist working together as an integrated unit; and the

(iv)    **Assad Regime "Security" Forces**, which the IRGC, including its Hezbollah Division and Qods Force, supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Syria through the participation of Hezbollah and Qods Force operatives in joint cells in Syria comprised of Hezbollah, Qods Force, and Assad regime "security" operatives working together as an integrated unit (collectively, **"IRGC Shiite Terrorist Proxies"**).[51]

266.    The IRGC, including its Hezbollah Division and Qods Force, relied upon the full complement of its global terrorist finance, arms, logistics, personnel, communications, operations, and training infrastructure to fund, arm, equip, train, transport, protect, and facilitate terrorist attacks by IRGC Shiite Terrorist Proxies against Americans in Iraq, Syria, Yemen, Lebanon, the United Arab Emirates, Iran, and Afghanistan.

        **ii.**       **IRGC Sunni Terrorist Proxies**

---

[51] Please note that this category also includes certain non-Shiite groups that have decades-long client relationships with the Hezbollah and the Qods Force, such as Hamas and Palestinian Islamic Jihad. While Sunni, these two groups have become so embedded in the transnational Shiite terror architecture that they fit within this category notwithstanding sect.

267.    If Hezbollah and the Qods Force did ***not*** have a decades-long alliance with the terrorist proxy and were also not sectarian allies, then the IRGC and Hezbollah followed a different approach, which was the terrorist equivalent to President Ronald Reagan's famous maxim: "trust but verify." Under this approach, Hezbollah and the Qods Force, backed by all the money and logistics the IRGC could provide, identified Sunni terrorist groups that could serve as allies of convenience for their shared terrorist agenda against the United States. The IRGC terrorist proxies who joined the conspiracy under this approach include, but are not limited to:

(i)     **al-Qaeda**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Afghanistan, and Pakistan, through the provision of funds, safe haven, communications, and logistical support;

(ii)    **the Taliban and its Haqqani Network**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Afghanistan, and Pakistan, through the provision of funds, arms, training, safe-haven, communications, and logistical support;[52]

(iii)   **al-Qaeda-in-Iraq**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven, communications, and logistical support, other than the period from on or about 2013

---

[52] Hezbollah, the Qods Force, al-Qaeda, and the Taliban, including its Haqqani Network, sometimes combined forces to jointly commit an attack against Americans in Iraq, Afghanistan, or another geography to which every organization could contribute or network connections. On information and belief, all these groups coordinated – in a plot led by Brigadier General Esmail Ghaani of the Qods Force and Sirajuddin Haqqani of al-Qaeda and the Taliban, including its Haqqani Network – to facilitate one or more joint Qods Force/Haqqani Network attacks in Afghanistan in 2020 and/or 2021 as explicit retaliation for the January 2020 U.S. drone strike in Iraq that killed Qassem Soleimani (head of Qods Force) and Abu Muhandis (head of Jaysh al-Mahdi Special Group Kataib Hezbollah).

through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017;[53] and

(iv) **Ansar al-Islam**, which Hezbollah and the Qods Force supported through their global network of cells with respect to their logistics, funding, transportation, arms supply, and which Hezbollah and the Qods Force supported inside of Iran, Iraq, Syria, and Turkey, through the provision of funds, arms, training, safe-haven, communications, and logistical support, other than the period from on or about 2013 through on or about 2016 (when they halted all cooperation to kill each another), before resuming on or about 2017; which Hezbollah and the Qods Force supported in Iraq; and (collectively, **"IRGC Sunni Terrorist Proxies"**).

**B.**  **After IRGC Shiite Terrorist Proxies Joined The IRGC's Conspiracy, Hezbollah And The Qods Force Provided Them With Money, Weapons, Training, Secure Cell Phones, Logistical Support, Safehouses Inside Iran, And Technical Assistance To Facilitate Terrorist Attacks Against Americans In Iraq, Afghanistan, Yemen, Syria, Lebanon, Europe, And Elsewhere**

268.  The IRGC, including its Hezbollah Division and Qods Force, materially aided every aspect of the IRGC Shiite Terrorist Proxies' terrorist campaigns against Americans in Iraq, Afghanistan, Yemen, Syria, Lebanon, Europe in furtherance of the conspiracy.

---

[53] One of the signal mistakes that western analysts routinely make is to assume that terrorist groups in the Middle East are not willing to cooperate with one another while other arms of the same organization are murdering each other. The examples of this phenomenon are legion, and the common glue binding it all together is the Islamists' universal hatred of the United States and Israel, which typically motivates the leading Islamist groups in the Middle East to put aside their differences to kill a common foe. This pattern asserted itself in Iraq after the U.S. departure in 2011. Even at the height of the Sunni-Shiite violence in Iraq from 2012 through 2016, Sunni and Shiite groups still routinely cooperated with one another. For example, ISIS and Jaysh al-Mahdi operatives were reputed for negotiating cease fires so that they could barter with one another and replenish their stocks before resuming the slaughter (e.g., a Jaysh al-Mahdi terrorist trading a few thousand dollars' worth of "free goods" in the form of a pharmaceuticals that serve as pre-attack stimulants to get the terrorist jacked up and ready to kill) with an ISIS terrorist, who trades his own lucrative "free goods" (in the form of an untraceable American smartphone that has a black market street resale value of $2,000). Opposing terrorists did this because they often had differing strengths and weaknesses in their respective supply lines, and bartering with even a hated enemy was better than any other alternative.

269. The IRGC, including its Hezbollah Division and Qods Force, materially aided every aspect of the IRGC Shiite Terrorist Proxies' terrorist campaign against Americans in Iraq in furtherance of the IRGC's conspiracy.

270. To facilitate terrorist attacks against Americans by IRGC Shiite Terrorist Proxies, the IRGC, including its Hezbollah Division and Qods Force, depended upon the large flow of money, equipment, weapons, and logistical support, as well as the "cover" provided by the corporate entity, from the complicit corporate partners, including MTN Irancell, TCI, and any corporate allies that conspired with the IRGC to create and operate these terrorist fs.

**C.     After IRGC Sunni Terrorist Proxies Joined The IRGC's Conspiracy, Hezbollah And The Qods Force Provided Them with Money, Weapons, Training, Secure Cell Phones, Logistical Support, Safehouses Inside Iran, And Technical Assistance To Facilitate Terrorist Attacks Against Americans In Iraq, Afghanistan, Yemen, Syria, Lebanon, Europe, And Elsewhere**

271. The IRGC, including its Hezbollah Division and Qods Force, materially aided every aspect of the IRGC Sunni Terrorist Proxies' terrorist campaigns against Americans in Iraq, Afghanistan, Yemen, Syria, Lebanon, Europe in furtherance of the conspiracy.

272. The IRGC, including its Hezbollah Division and Qods Force, materially aided every aspect of the IRGC Sunni Terrorist Proxies' terrorist campaign against Americans in Iraq, Afghanistan, Pakistan, Syria, and Europe in furtherance of the IRGC's conspiracy.

273. To facilitate terrorist attacks against Americans by IRGC Sunni Terrorist Proxies, the IRGC, including its Hezbollah Division and Qods Force, depended upon the large flow of money, equipment, weapons, and logistical support, as well as the "cover" provided by the corporate entity, from the complicit corporate partners, including MTN Irancell, TCI, and any corporate allies that conspired with the IRGC to create and operate these terrorist fronts.

**D.    In Furtherance Of The IRGC's Conspiracy, The IRGC, Including Its Hezbollah Division And Qods Force, And Jaysh Al-Mahdi Waged A Deadly Terrorist Campaign Against Americans In Iraq, Iran, Syria, Yemen, And Lebanon**

274.    On March 19, 2003, the United States invaded Iraq.  U.S. troops seized control of Baghdad less than three weeks later, and on April 9, 2003, Saddam Hussein's government fell. Shortly thereafter, the Coalition Provisional Authority ("CPA") began overseeing the reconstruction of a democratic Iraqi government, ultimately transitioning to Iraqi rule.

275.    Formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003.  After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function.  American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy. The official end of major combat operations was important because it allowed civilian reconstruction teams to enter the country.

276.    The U.S. invasion of Iraq was watched closely by Qassem Soleimani, the Qods Force, and the Qods Force's lead terrorist agent, Hezbollah.  Even before the invasion began, as early as September 2002, the Qods Force and Hezbollah plotted to undermine the anticipated U.S. presence in Iraq.  For example, the leaders of Hezbollah and the Qods Force, Hassan Nasrallah and Qassem Soleimani, regularly coordinated the Qods Force's support for the Hezbollah-directed terrorist campaign in Iraq in which Jaysh al-Mahdi helped commit attacks.

277.    Immediately after Saddam's government fell in April 2003, Hezbollah dispatched its chief terrorist mastermind, Imad Mugniyeh, to Iraq.  Mugniyeh's assignment was to contact Muqtada al-Sadr, an influential Shiite cleric, and to work with Sadr to build a terrorist organization modeled on Hezbollah capable of carrying out sophisticated attacks on Americans in Iraq.  Mugniyeh contacted Sadr shortly thereafter and the two immediately began work on

80

creating the terrorist organization that would become known as Jaysh al-Mahdi. An Israeli intelligence report confirmed in October 2003 that Hezbollah was already planning to "set up a resistance movement that would cause mass casualties" among American forces in Iraq.

278.    Drawing on this influence, Muqtada al-Sadr became the leader of masses of impoverished Iraqi Shi'a after Saddam's fall in April 2003. Sadr's followers took over Saddam City – the two-million-person slum in eastern Baghdad, which is the most densely populated area in Iraq – and renamed it "Sadr City" after Muqtada's father, Sadiq al-Sadr. During this time period, Sadr's public sermons in the Shiite holy city of Najaf decried the U.S. invasion of Iraq, labeled U.S. troops as an illegal occupying force, and urged Iraqis to expel Americans from the country. Sadr's rallies commonly ended with public "Death to America" chants.

279.    By the summer of 2003, Sadr had channeled his popularity into a nascent organization called the "Sadrist Trend" (members of the Sadrist Trend and related groups are known as "Sadrists"). The Sadrist Trend was modeled expressly on Hezbollah. Like Hezbollah, the Sadrist Trend had both a political wing, called the Office of Martyr Sadr, and a terrorist wing, called "Jaysh al-Mahdi" (Arabic for "the Mahdi Army") or "JAM." And, like Hezbollah, the Sadrists seized control of important neighborhoods (such as Sadr City) and used Jaysh al-Mahdi to attack U.S.-led Coalition forces.

280.    By early 2004, Sadr's growing influence, along with the escalating violence employed by his terrorist militia, threatened the U.S. strategy in Iraq. That led the CPA, on March 28, 2004, to order a 60-day closure of *al-Hawza*, the Sadrist newspaper that Sadr used to proselytize anti-American and anti-Israeli violence. Sadr reacted by intensifying his denunciations of the U.S. government and urging his followers to "'terrorize' their enemy." According to *The Endgame: The Inside Story of the Struggle For Iraq, From George W. Bush to*

*Barack Obama* ("*Endgame*"), Michael Gordon and General Bernard Trainor's celebrated account of the Iraq war, Sadr's Friday sermon on April 2, 2004, was a "bitter invective against the United States, denouncing the Americans and even praising the September 11 attacks."[54]

281.    From that point forward, Sadr and Jaysh al-Mahdi increased their attacks on Americans in Iraq, resulting in mass casualties among U.S. citizens (both military and civilian) working to stabilize and rebuild the country.  By late 2004, Sadr had effectively seized control of large swaths of Iraq, including but not limited to Basra, Amarah, Najaf, Wasit, Kufa, Nasiriyah, and the entire eastern half of Baghdad.  By early 2005, Sadr controlled 20 Jaysh al-Mahdi brigades – all of which were trained by Hezbollah – operating out of his command-and-control safe-haven in Sadr City, from which Jaysh al-Mahdi coordinated and launched Hezbollah-supported attacks against Coalition forces throughout Iraq.

282.    In service of its terrorist agenda, and relying on Hezbollah training, weapons, and personnel, Jaysh al-Mahdi mastered several types of attacks that proved especially deadly for U.S. troops and civilians, including the attacks that killed and injured Plaintiffs.  As one commentator explained, Jaysh al-Mahdi was "[a]nalogous to the Sunni terrorist organization, al Qaeda," "committed thousands of bombings," "detonated roadside explosives," and "fired mortar shells toward the Green Zone."[55]  In total, Jaysh al-Mahdi's terrorist attacks throughout Iraq likely killed more than 500 Americans and wounded thousands more.  The death toll inflicted by Jaysh al-Mahdi became so severe that, by July 2007, General David Petraeus

---

[54] *Endgame* at 67.

[55] Birgit Svensson, *The Mahdi Army:  Turbans, Kalashnikovs and Plans to 'Slaughter'*, Deutsche Welle (June 22, 2014).

concluded that "JAM is more of a hindrance to long-term security in Iraq than is [al-Qaeda-in-Iraq]," the Sunni terrorist group that became ISIS.[56]

283.    Hezbollah's proxy in Iraq was Jaysh al-Mahdi.  The IRGC, including its Hezbollah Division and Qods Force, relied upon Hezbollah and Jaysh al-Mahdi to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public-facing IRGC, including Qods Force, role inside Iraq.  Rather than directly engage in armed conflict with the U.S. or other Coalition Forces, the Persian IRGC, including its Hezbollah Division and Qods Force, usually attempted to present an Arab face in its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence in Iraq.

284.    Hezbollah, funded and logistically supported by the IRGC, including its Hezbollah Division and Qods Force, trained Jaysh al-Mahdi, at sites in Iran, Lebanon, and Iraq, to create and use sophisticated IEDs, EFPs, rockets, and other advanced weaponry.  While Jaysh al-Mahdi terrorists who had completed IRGC-funded, Hezbollah-provided training were sometimes referred to as "Jaysh al-Mahdi Special Groups" or "Special Groups," Hezbollah also provided, and the IRGC (including its Hezbollah Division and Qods Force) also funded, the same Hezbollah training regime for Jaysh al-Mahdi terrorists who were not in a Special Group.

285.    Continuing the joint attack planning exemplified by Hezbollah's provision of Qods Force-funded training to Jaysh al-Mahdi terrorists operating in Iraq, the IRGC (including its Hezbollah Division and Qods Force), Lebanese Hezbollah, and Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah) formed and sustained the Joint Cells.  They operated in key regions where Hezbollah emphasized bombing and rocket

---

[56] *See Endgame* at 422.

attacks against Americans in Iraq including, but not limited to, Baghdad Province (Baghdad), Basra Province (Basra and Amarah), Diyala Province (Baqubah), and Babil Province (Hilla).

286.    The Joint Cells had broad geographic reach and were not limited to committing attacks just in their own locales.  For example, the Joint Cell operating in Babil Province (where Hilla is located) also committed attacks in nearby Qadisiyah Province (where Diwaniyah, about an hour away from Hilla via Route 8, is located), and the Joint Cell in Basra Province (where Basra and Amarah are located) committed terrorist attacks throughout southern Iraq.

287.    Each attack that injured Plaintiffs was committed by a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and IRGC, including Qods Force, operatives, and was planned and authorized by Hezbollah.

288.    The IRGC's, including the Qods Force's, support for Hezbollah and Jaysh al-Mahdi – including the Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah – ensured that the terrorist campaign had maximum effect.  Due to Hezbollah's planning, authorization, and joint commission of the attacks in this case as supported by the local muscle of Jaysh al-Mahdi, Qods Force funds benefited Hezbollah and Jaysh al-Mahdi attacks, and Qods Force support for Hezbollah supported Jaysh al-Mahdi, and vice versa.

289.    Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, recognized those interrelationships and so the IRGC, including its Hezbollah Division and Qods Force, could comfortably ramp up the spending for Hezbollah's campaign in Iraq knowing that the professional Hezbollah terrorists would retain command-and-control of the Joint Cells in Sadr City, Basra, and elsewhere.  The IRGC, including its Hezbollah Division and Qods Force, has used the same joint cell approach – combining Shiite terrorists into a single unified command

84

structure under Hezbollah's leadership to support wide-ranging attacks – in other conflict zones bordering Iraq, most notably Syria.

290.    Hezbollah's support of terrorists in Iraq – made possible by IRGC, including Qods Force, funds, weapons, technologies, and logistical support – likely collectively accounted for more Americans killed or injured in terrorist violence after 9/11 than any other single terrorist campaign.  As Karim Sadjadpour of the Carnegie Endowment explained in an interview, given the IRGC's, including the Qods Force's, support for anti-American terror under Soleimani,

> That's why you have … one, if not two, generations of American military forces whom if you were to ask them, who is your worst adversary in the world, the person you see as the greatest threat to the United States? Even when Osama bin Laden was living and Baghdadi [the leader of ISIS] was living, they would have still said Qassem Soleimani.[57]

291.    Plaintiffs identify below the principal terrorist groups that participated in the Joint Cells that committed, planned, and/or authorized the attacks that killed and injured them and their family members.

### 1.    Jaysh al-Mahdi

292.    Jaysh al-Mahdi, translated as "the Mahdi Army," including the notorious Jaysh al-Mahdi "Special Group" cells Asaib Ahl al-Haq and Ka'taib Hezbollah, was Hezbollah's most dangerous terrorist proxy group in Iraq.  In this Complaint, Plaintiffs refer to Jaysh al-Mahdi, Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Ka'taib Hezbollah collectively as "Jaysh al-Mahdi."[58]

---

[57] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

[58] All references to Jaysh al-Mahdi in this Complaint are inclusive of Asaib Ahl al-Haq and Kataib Hezbollah, both of which were "Special Groups" of Jaysh al-Mahdi that were created by Hezbollah using funds, arms, and logistical support provided by the IRGC, including the Qods Force, and the Special Groups were led by senior Jaysh al-Mahdi commanders (Qais and Laith

293.     Jaysh al-Mahdi was at all relevant times led by the notorious radical anti-American terrorist, Muqtada al-Sadr.

294.     Sadr founded Jaysh al-Mahdi in April 2003 with the assistance of Imad Mugniyeh, the chief terrorist mind of Hezbollah.  From the beginning, Jaysh al-Mahdi's publicly stated, primary goal was the expulsion of Americans from Iraq.  In July 2003, Sadr publicly announced the founding of Jaysh al-Mahdi by calling for a "general mobilization to fight" the so-called "American and British occupiers."[59]  During Sadr's Friday sermons on March 26, 2004, among other things, Sadr:

- exalted in "[t]he date of September 11th," which he explained "is the date of the collapse of the Two Towers, and therefore is a miracle from God, who never disappoints his servants but allows infidels time before striking them;"

- pledged his fealty to Hezbollah, which he couched in Shi'a Islamist terms such that he was communicating to his followers that support for Hezbollah is a religious duty, stating at one point, "our victorious party, Hezbollah;" and

- called for violent resistance to, and "jihad" against, the American "occupiers" and "invaders" of Iraq, invoking multiple passages from the Koran to provide a purported religious justification for attacking Americans in Iraq.

In a later sermon delivered by an aide on August 6, 2004, Sadr amplified Hezbollah's "Great Satan" narrative in Iraq by calling America "the greatest of Satans" and proclaimed: "America is our enemy and the enemy of the people, and we will not accept its partnership."[60]

---

Khazali in the case of Asaib Ahl al-Haq and Abu Mahdi al-Muhandis in the case of Kataib Hezbollah), and supportive of Hezbollah's overall terrorist agenda for its terrorist proxies in Iraq. Often, the same terrorist operatives worked for multiple Jaysh al-Mahdi cells, such as a terrorist who commands a Jaysh al-Mahdi battalion, while also leading a Jaysh al-Mahdi Special Group Asaib Ahl al-Haq cell, acting under the direction of Hezbollah as supported by the IRGC, including the Qods Force.

[59] Mahan Abedin, *Dossier:  The Sadrist Movement*, Middle East Intell. Bull. (July 2003).

[60] Abdul Hussein al-Obeidi, *Rebel Shiite Cleric Blames 'Occupier' for Church Attacks, Kidnappings in Iraq*, Assoc. Press (Aug. 6, 2004).

295.     Like many terrorist organizations, Jaysh al-Mahdi was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization.  As Dr. David E. Johnson, a former Army Colonel who has studied Jaysh al-Mahdi's tactics, explained, "[Jaysh al-Mahdi] was mostly a franchise operation, nationally integrated in support of al-Sadr's political program, but locally owned and operated."[61]  The most prominent Jaysh al-Mahdi "Special Groups" were Asaib Ahl al-Haq and Ka'taib Hezbollah.

296.     Despite its cellular structure, Jaysh al-Mahdi maintained a basic hierarchical command structure.  As two counterterrorism scholars explained in June 2008, "although Sadr frequently gives [Jaysh al-Mahdi cells] autonomy over their local actions, he maintains the ability to control them when he chooses."[62]  Formally separate Jaysh al-Mahdi cells also shared membership and leadership, relied on common sources of financing and institutional support from the broader Sadrist organization, and frequently operated together in coordinated attacks.[63]

297.     Jaysh al-Mahdi cells were also unified ideologically by radical Shiite ideology, devotion to Sadr, and violent opposition to American presence in Iraq.  According to an unclassified (as redacted) summary of an interview with a detained Jaysh al-Mahdi operative from 2008, the operative "look[ed] to Muqtada al-Sadr (MAS) for guidance . . . [and] ha[d] no knowledge of who would replace MAS as the leader of [Jaysh al-Mahdi] should anything happen

---

[61] David E. Johnson *et al.*, *The 2008 Battle of Sadr City: Reimagining Urban Combat* 23 (RAND Corp. 2013) ("*2008 Battle of Sadr City*").

[62] Daveed Gartenstein-Ross & Bill Roggio, *Sadr's Special Groups*, Weekly Standard (June 9, 2008).

[63] *See*, *e.g.*, *2008 Battle of Sadr City* at 25-26.

to MAS," because "[t]here is no one who can replace MAS."[64]  A March 2008 U.S. State Department cable (as published online) similarly reported that Jaysh al-Mahdi's various elements "are different faces of the same group controlled by a single hand, who assigns each a role."[65] And a U.S. military-intelligence officer told the *Washington Post* in May 2008 that Jaysh al-Mahdi's various cells "all have direct communication with [Sadr]."[66]

298.     Jaysh al-Mahdi's cellular structure prevented Coalition forces from engaging Jaysh al-Mahdi in a conventional military manner, especially in urban settings.  For example, when Coalition forces took control of Sadr City in 2008, Jaysh al-Mahdi cells disappeared underground and hid among civilians while continuing to attack American forces.

299.     Jaysh al-Mahdi operatives acting in the Joint Cells used a variety of tactics and weaponry against Americans in Iraq, including IEDs, EFPs, rockets, mortars, complex attacks, sniper attacks, and kidnapping operations.

300.     In 2008, Sadr rebranded Jaysh al-Mahdi as the "Promised Day Brigades," which operated as a Special Group of his own whose purpose was to carry out attacks against Americans in Iraq. The Promised Day Brigades also received funding, training, and weapons from Hezbollah, which was paid for and provided to Hezbollah by the IRGC, including its Hezbollah Division and Qods Force.  The Promised Day Brigades actively targeted U.S. forces

---

[64] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 010, at 1 (Spring 2007-Early 2008).

[65] U.S. State Dep't Cable, *PM Chief Of Staff Abdallah Tells Ambassador GOI Will Continue Basra Military Operations* (Mar. 31, 2008).

[66] Amit R. Paley, *U.S. Deploys a Purpose-Driven Distinction*, Wash. Post (May 21, 2008).

to disrupt security operations and further destabilize Iraq, and actively participated in the Joint Cells.[67]

301.    Jaysh al-Mahdi has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including its Hezbollah Division and Qods Force, including the terrorist fronts that engaged in transactions with MTN, ZTE, and Huawei.

### 2.    Asaib Ahl Al-Haq, A Jaysh Al-Mahdi Special Group

302.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq (also called "Asaib Ahl al-Haq" or "AAH"), translated as "the League of the Righteous," was a Jaysh al-Mahdi Special Group supported by the IRGC, including its Hezbollah Division and Qods Force, through Hezbollah, that conducted terrorist attacks against Americans.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Jaysh al-Mahdi Special Group Asaib Ahl al-Haq.

303.    Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has targeted U.S. personnel at the direction of Hezbollah, acting as their proxy in Iraq.  As a Jaysh al-Mahdi Special Group, Asaib Ahl al-Haq operatives in the Joint Cells deployed the same attack types used by Jaysh al-Mahdi, including IEDs, EFPs, rockets, and hostage-taking, attacking Americans through the Joint Cells in attacks that were planned and authorized by Hezbollah.

304.    The 2007 arrest of Jaysh al-Mahdi Special Group operatives, and AAH leaders, Qais and Laith Khazali, alongside their handler, senior Hezbollah operative Ali Musa Daqduq, demonstrated the Joint Cells in action:  Jaysh al-Mahdi terrorists and their direct Hezbollah sponsor were detained in Iraq because they had been working together to attack Americans.

---

[67] Because the Promised Day Brigades name change was about branding rather than substance, Plaintiffs refer to the Promised Day Brigades as "Jaysh al-Mahdi."

89

305.     On January 10, 2020, the U.S. government designated Jaysh al-Mahdi Special Group Asaib Ahl al-Haq as a Foreign Terrorist Organization.  85 Fed. Reg. 1,369, 1,369 (Jan. 10, 2020).

306.     Jaysh al-Mahdi Special Group Asaib Ahl al-Haq has received significant funding, training, arms, and communications technology from Hezbollah, which was made possible by Hezbollah's receipt of such money and goods from the IRGC, including its Hezbollah Division and Qods Force, including the terrorist fronts that engaged in transactions with MTN, ZTE, and Huawei.

### 3.     Ka'taib Hezbollah, A Jaysh Al-Mahdi Special Group

307.     Jaysh al-Mahdi Special Group Ka'taib Hezbollah (also called "Ka'taib Hezbollah" or "KH"), translated as "the Hezbollah Brigades," was a Jaysh al-Mahdi Special Group that was stood up by Hezbollah, with funding and arms from the IRGC, including its Hezbollah Division and Qods Force, to help commit terrorist attacks against Americans in Iraq. Jamal al-Ibrahimi, more commonly known by his *nom de guerre*, Abu Mahdi al-Muhandis ("Muhandis"), was an Iraqi Shiite who lived in Iran after he was involved in a plot bomb a U.S. embassy in the 1980s, and later led his own Jaysh al-Mahdi Special Group.

308.     Muhandis was an Iran-backed Shiite terrorist in Iraq who was an agent of multiple allied Shiite terrorist organizations.  As of 2011, when all but one of the attacks in this case occurred, Muhandis was an operative and/or agent of:  (1) Jaysh al-Mahdi, for which he led numerous Special Groups; (2) Jaysh al-Mahdi Special Group Ka'taib Hezbollah, which he led before and after its FTO designation in 2009; and (3) Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, for which he was an operative.  Muhandis served all roles simultaneously, and there was no firewall between his activities relating to these terrorist groups.

309.     Supported by Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, Muhandis established Ka'taib Hezbollah to be a Jaysh al-Mahdi Special Group, supported by Hezbollah training, planning, and direction, and IRGC, including Qods Force, funds and logistics (which the IRGC, including its Hezbollah Division and Qods Force, provided through its network of forward deployed operatives inside Iraq) to carry out attacks against Americans in Iraq.  As such, the allegations concerning Jaysh al-Mahdi apply with equal force to Ka'taib Hezbollah.

310.     Jaysh al-Mahdi Special Group Ka'taib Hezbollah was led by Jaysh al-Mahdi commanders who received specialized training from Hezbollah cells in Iran and Lebanon and was part of Jaysh al-Mahdi in its capacity as a Jaysh al-Mahdi Special Group.  Jaysh al-Mahdi Special Group Ka'taib Hezbollah regularly relied upon Jaysh al-Mahdi resources and personnel to commit terrorist attacks, and often used operatives who were members of multiple terrorist groups, including Hezbollah, who were all operating in support of the Joint Cells.

311.     Jaysh al-Mahdi Special Group Ka'taib Hezbollah received significant funding, training, arms, and communications technology from Hezbollah, which help from Hezbollah was funded and sourced by the IRGC, including its Hezbollah Division and Qods Force, including by IRGC, including Qods Force, fronts that transacted business with MTN, ZTE, and Huawei.

312.     On July 2, 2009, the U.S. government designated Jaysh al-Mahdi Special Group Ka'taib Hezbollah as an FTO and a SDGT, also designating Muhandis individually as an SDGT. 74 Fed. Reg. 31,788, 31,788 (July 2, 2009) (FTO designation); 74 Fed. Reg. 34,639, 34,639 (July 16, 2009) (SDGT Designations).

313.     On January 2, 2020, Muhandis was killed by a U.S. drone strike that targeted a terrorist convoy in which he was riding, along with Qassem Soleimani, outside of Baghdad

International Airport.  The U.S. government conducted the drone strike because, among other reasons, Soleimani and Muhandis had worked closely with Hezbollah to orchestrate a campaign of terror against Americans in Iraq, and the terrorists were working together to plan more attacks against Americans in Iraq at the time.  Indeed, just days prior to the U.S. drone strike that killed Soleimani and Muhandis, a Joint Cell fired a rocket attack against an American target in the northern Iraqi city of Kirkuk, killing an American contractor.

    **4.**    **The IRGC's, Including its Hezbollah Division's And Qods Force's, Aid To Jaysh Al-Mahdi To Facilitate Attacks Against Americans In Iraq And Afghanistan**

314.    Hezbollah, funded and supported by the IRGC, including its Hezbollah Division and Qods Force, used Defendants' resources to carry out the Joint Cells' terrorist attacks against Americans in Iraq.  As a scholar summarized in the 2010 journal published by the Combating Terrorism Center at West Point, "it is clear that Iran has a proven ability to commission violence inside Iraq" because "Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate [that] Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."[68]

315.    When U.S. forces arrived in Iraq, Iran's nationwide terror campaign against Americans there was assigned to the Qods Force under the command of Soleimani, who answered directly to Ayatollah Khamenei.  Soleimani caused the IRGC, including its Hezbollah Division and Qods Force, to partner with Hezbollah in Iraq so that Hezbollah would serve as the bridge between the IRGC, including its Hezbollah Division and Qods Force, and Jaysh al-Mahdi.

316.    According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for

---

[68] Knights, *The Evolution of Iran's Special Groups in Iraq*.

cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[69]

317.　The First Corps of the Qods Force, one of its four regional commands, executes Iran's terrorist agenda in Iraq. During the relevant timeframe, the Qods Force did so largely by providing Hezbollah the funding, weapons, and logistical support it needed to facilitate the attacks by the Joint Cells. The First Corps' al-Ramazan Headquarters is based across several sites in Iran's largest city (and capital), Tehran, a short trip from the border with Iraq.

318.　Raids conducted in Iraq by the elite U.S. Joint Special Operations Command ("JSOC") also proved that the IRGC, including its Hezbollah Division and Qods Force, directly deployed their own terrorists inside Iraq to augment the Hezbollah-led Joint Cells attacks on Americans there. For example, in a late 2006, during a JSOC raid in central Iraq, U.S. forces detained **Mohsen Chizari, the Qods Force's Head of Operations and Training**, as well as the Qods Force's station chiefs for Baghdad and Dubai. In another raid in northern Iraq, U.S. forces captured five Qods Force terrorists.

>     i.　**Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Created Jaysh Al-Mahdi And Jaysh Al-Mahdi Special Groups Asaib Ahl Al-Haq And Ka'taib Hezbollah**

319.　Through Iran's proxy Hezbollah, the IRGC, including its Hezbollah Division and Qods Force, provided material support to the Joint Cells attacking Americans in Iraq.

320.　The IRGC's – and therefore Hezbollah's – objective was always to kill Americans in order to drive the U.S. out of Iraq.

---

[69] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

321.     The IRGC, including its Hezbollah Division and Qods Force, provided material support to its longstanding lead terrorist agent and proxy, Hezbollah, to facilitate Hezbollah-led attacks against Americans in Iraq, and Hezbollah's commission, planning, and/or authorization of attacks carried out by the Joint Cells between 2011 and 2016.

322.     Hezbollah's role regarding Jaysh al-Mahdi and the attacks by the Joint Cells in Iraq was similar to its role in other terror campaigns it sponsored:  Hezbollah recruited, trained, armed, and directed Jaysh al-Mahdi terrorists, who carried out terrorist attacks against Americans on Hezbollah's behalf.  Hezbollah Secretary-General Hassan Nasrallah was deeply involved in this campaign, reportedly spending "several hours daily dealing with 'the situation in Iraq.'"[70]

323.     Federal judges have recognized the key role that the IRGC, including its Hezbollah Division and Qods Force, played in ensuring that Hezbollah had the funds, arms, and logistical aid it needed to manage the Joint Cells' attack campaign against Americans in Iraq. For example, in *Fritz*, the Honorable Randolph D. Moss found that "Iranian support—in the form of funding, weapons, and training—was critical to the success of the Special Groups, which otherwise 'would [have been] unable to conduct their terrorist attacks in Iraq.'"[71]

324.     Hezbollah at all times acted at the instruction of the IRGC, including its Hezbollah Division and Qods Force, to benefit its terrorist enterprise targeting Americans in Iraq, by helping establish Jaysh al-Mahdi, including the Jaysh al-Mahdi Special Groups, and later supporting the Jaysh al-Mahdi terrorist campaign against Americans in Iraq.[72]

---

[70] Hamza Hendawi & Qassim Abdul-Zahra, *Shiite Sources:  Hezbollah Helping Iraqi Militia*, NBC News (July 1, 2008).

[71] *Fritz*, 320 F. Supp. 3d at 62.

[72] The Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Kataib Hezbollah were both the fruits of Iran's and Hezbollah's strategy of standing up and supporting Jaysh al-Mahdi in Iraq.

325.     In April 2003, Hezbollah dispatched to Iraq its chief terrorist mastermind, Imad

Mugniyeh, to help Muqtada al-Sadr found Jaysh al-Mahdi.  Hezbollah's goal, according to an

October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass

casualties" on Americans.  A U.S. Special Operations task force report quoted by the *U.S. News

& World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the

struggle in Iraq is the new battleground in the fight against the U.S."[73]  As one embedded war

correspondent put it, Jaysh al-Mahdi was created to be "the Iraqi branch of Hezbollah."[74]

326.     Sadr was a natural fit to lead Hezbollah's campaign of terror in Iraq.  In addition

to being the descendant of two revered Shi'a martyrs (Sadiq al-Sadr and Baqir al-Sadr) and

sharing Hezbollah's affinity for violence, Sadr himself had a close relationship with Hezbollah

and Iran.  Hassan Nasrallah, Hezbollah's Secretary-General, had studied under Muqtada al-

Sadr's uncle, Baqir al-Sadr.  Muqtada's cousin, Musa al-Sadr, founded Hezbollah's predecessor

in Lebanon.  A 2004 U.S. military-intelligence report concluded that Sadr had a direct

relationship with Hassan Nasrallah, the head of Hezbollah, and that a top adviser to Nasrallah

had personally delivered funds to Sadr in Najaf.  Sadr himself visited Tehran and Beirut on

numerous occasions.  And, in 2016, Nasrallah personally brokered talks between Sadr and the

Iraqi government.

327.     Immediately after Jaysh al-Mahdi's founding in April 2003, Mugniyeh began to

recruit and train soldiers for Jaysh al-Mahdi.  Mugniyeh soon recruited 300 terrorists for Jaysh

al-Mahdi from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to

---

For that reason, all of allegations concerning Jaysh al-Mahdi also apply to Asaib Ahl al-Haq and
Kataib Hezbollah.

[73] *Id.*

[74] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J. (Aug. 14, 2007).

Lebanon for training in the use of assault rifles, booby traps, and kidnapping. These 300 fighters were some of Jaysh al-Mahdi's first members. That same month, according to the *Asia Times*, Hezbollah "opened two offices in the Iraqi cities of Basra and Safwan" in order to "build[ ] up [its] organizational and military apparatuses in Iraq."[75] By August 2003, Hezbollah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train Jaysh al-Mahdi terrorists. At the same time, these Hezbollah operatives were acquiring rocket-propelled grenades, anti-tank missiles, and other weapons for Jaysh al-Mahdi.

328. Hezbollah's involvement in Jaysh al-Mahdi's campaign of terror only grew during the subsequent months and years. By January 2004, nearly 800 Hezbollah agents had been sent to Iraq where they were deployed to direct Jaysh al-Mahdi's terrorist campaign from key Jaysh al-Mahdi strongholds in Iraq, including, but not limited to, Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hezbollah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published online) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after traveling to Iraq on tourist visas.[76] Mugniyeh continued to personally supervise Jaysh al-Mahdi's campaign of terror until his death in February 2008, at which point he was replaced by other Hezbollah operatives. At the time Mugniyeh was killed in 2008, the U.S. government continued to view him as an ongoing threat to Americans in Iraq.

329. In addition to its terrorist mastermind Imad Mugniyeh, Hezbollah deployed a litany of its senior terrorist planners to direct Jaysh al-Mahdi's campaign of terror against Americans in Iraq, including, but not limited to, the following Hezbollah terrorists:

---

[75] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times (July 29, 2006).

[76] U.S. Dep't of Defense, *US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala* (Oct. 10, 2006).

- **Ali Mussa Daqduq (Senior Hezbollah Field Commander).** Hezbollah directed its senior field commander, Ali Mussa Daqduq, to work with the Qods Force to instruct Jaysh al-Mahdi on the use of EFPs, mortars, rockets, and other terrorist tactics, including kidnapping operations.

- **Muhammad Kawtharani (Nasrallah's Personal Liaison to Sadr).** Hezbollah also deployed a senior cleric, Muhammad Kawtharani, to serve as a liaison to Jaysh al-Mahdi. In 2013, the U.S. Treasury Department identified Kawtharani as a member of "Hizballah's leadership" who "act[ed] for, or on behalf of Hizballah," and was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities."[77] Kawtharani, as personal adviser to Nasrallah, was directly involved in coordinating attacks against Americans in Baghdad.

- **Yusuf Hashem (Iraq Operations – Country-wide).** Hezbollah also tasked another senior Hezbollah terrorist commander, Yusuf Hashem, to coordinate Hezbollah's Jaysh al-Mahdi operations in Iraq.

- **Ali Falih Hadi (Iraq Operations – Basra and Amarah).** According to a Coalition threat report (as published online), Ali Falih Hadi was a member of Hezbollah who was based in Amarah in Basra Province and was "responsible for supplying" weapons to members of a joint Jaysh al-Mahdi/Hezbollah cell operating in Basra.

- **Hezbollah Bombmakers.** On information and belief, Hezbollah deployed one or more experienced bombmakers into Iraq to provide in-country direction to Jaysh al-Mahdi terrorists relating to the design, manufacture, storage, and maintenance of EFPs and IEDs for use against Americans in Iraq.

330. At Hezbollah's direction, Jaysh al-Mahdi escalated its attacks on Americans in Iraq beginning in the winter of 2005. This escalation was the result of Hezbollah's own "strategic decision" to ratchet up pressure on the United States by boosting Hezbollah's "support [for] Sadr" and fostering "managed instability" in Iraq.[78] According to the *New York Times*, a senior American intelligence official assessed that, as part of this "strategic decision" to escalate the terrorist campaign against Americans in Iraq, IRGC, including its Hezbollah Division and

---

[77] U.S. Dep't of Treasury, *Treasury Sanctions Hizballah Leadership* (Aug. 22, 2013).

[78] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times (Nov. 28, 2006).

Qods Force, served as "a link to Lebanese Hezbollah" and "helped facilitate Hezbollah training inside of Iraq, but more importantly Jaish al-Mahdi members going to Lebanon" for training.[79]

331.    Jaysh al-Mahdi and Sadr publicly embraced their links to Hezbollah.  During his Friday sermon on March 26, 2004 – in which he praised the attacks of September 11th and called for violence against Americans in Iraq – Sadr swore fealty to Hezbollah in Shi'a Islamist terms, pledging support to "our victorious party, Hezbollah."  Weeks later, in a sermon in April 2004, Sadr declared that he was Hezbollah's "striking arm in Iraq," proclaiming:  "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[80]  In an August 2007 interview, Sadr again reportedly acknowledged that Jaysh al-Mahdi "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[81]  Another Jaysh al-Mahdi member told an interviewer that "[w]e learned [from Hezbollah] how to take advantage of an armored vehicle's weakness" – referring to the use of EFPs – "and how to wait and kill the soldiers who try to escape."[82]

332.    In the years after 2003, Jaysh al-Mahdi fighters regularly participated in anti-American marches in which they marched under Hezbollah flags and banners.  Tens of thousands of members of Jaysh al-Mahdi publicly swore fealty to Hezbollah in various marches in Sadr City in 2006, including on July 21, 2006, and August 4, 2006.

333.    On August 4, 2006, more than 10,000 members of Jaysh al-Mahdi attended a joint Jaysh al-Mahdi/Hezbollah march in Sadr City, which further demonstrated Hezbollah's control

---

[79] *Id.*

[80] The Buffalo News, *Iraqi Cleric Calls for Alliance with Hezbollah, Hamas* (Apr. 2, 2004).

[81] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent (Aug. 20, 2007).

[82] *Id.*

over Jaysh al-Mahdi operations. As recounted in a field report in *Al Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[83] The crowd of Jaysh al-Mahdi fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[84] The close, symbiotic connection between Jaysh al-Mahdi and Hezbollah was summed up by Jaysh al-Mahdi members' repeated declaration at the rally: "we are Hezbollah."

334. In 2009, the U.S. Treasury Department formally recognized the links between Hezbollah and Jaysh al-Mahdi when it designated Jaysh al-Mahdi Special Groups Commander, Abu Mahdi al-Muhandis as a SDGT. The press release noted that, "[a]s of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces."[85] According to the press release, these Jaysh al-Mahdi cells "received training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles" from Hezbollah instructors.[86]

335. The U.S. Treasury Department again recognized the links between Hezbollah and Jaysh al-Mahdi in 2012, finding that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[87] According to the Treasury's findings,

---

[83] Al-Jazeera, *Iraq's Shia March for Hezbollah* (Aug. 4, 2006).

[84] *Id.*

[85] U.S. Dep't of Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009).

[86] *Id.*

[87] U.S. Dep't of Treasury, *Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq* (Nov. 19, 2012).

in 2005, "Iran asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq. In response, Hassan Nasrallah established a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups."[88] As of 2006, that unit was working with the Iranian Qods Force "to provide training and equipment to JAM Special Groups to augment their ability to inflict damage against U.S. troops."[89]

336. The IRGC, including its Hezbollah Division and Qods Force, used Hezbollah to provide material support to Asaib Ahl al-Haq, which was one of the most dangerous of Jaysh al-Mahdi's so-called "Special Groups." As such, AAH was a terrorist proxy of the IRGC's lead terrorist agent, Hezbollah. Given Asaib Ahl al-Haq's status as a Jaysh al-Mahdi Special Group, the IRGC, including its Hezbollah Division and Qods Force, through its agent, Hezbollah, caused the provision of the same types of support to Asaib Ahl al-Haq as Hezbollah provided to Jaysh al-Mahdi and Ka'taib Hezbollah.

337. Federal courts have previously concluded that the IRGC, including its Hezbollah Division and Qods Force, provided material support to Jaysh al-Mahdi Special Group, Asaib Ahl al-Haq through Hezbollah that proximately caused terrorist attacks against Americans in Iraq. For example, in *Fritz*, the Honorable Randolph D. Moss ruled that, "Based on the testimony of these witnesses, and almost one hundred trial exhibits, the Court finds as follows: … Iran provided AAH with significant support—in the form of training, supplies, intelligence, and funding—as part of its larger strategy to destabilize Iraq and drive the United States from the Middle East using Iraqi Shia militias as proxies. … [and] AAH could not have committed any of

---

[88] *Id*.

[89] *Id.*

these acts without Iran's support."[90]  Indeed, Judge Moss found that "Iran played a central role in Qais Khazali's ascent and AAH's formation."[91]

338.    The IRGC, including its Hezbollah Division and Qods Force, also used Hezbollah to provide material support to Jaysh al-Mahdi Special Group Ka'taib Hezbollah.  As such Ka'taib Hezbollah was Hezbollah's terrorist proxy in Iraq.

> ii.      **Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With The Weapons Used To Attack Americans In Iraq**

339.    The IRGC, including its Hezbollah Division and Qods Force, relied upon Hezbollah to provide Jaysh al-Mahdi the weapons it used to attack Americans in Iraq, including, but not limited to, IEDs, EFPs, advanced rockets (including IRAMs), and rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. peacekeeping and allied forces and civilian convoys in Iraq.

340.    As Judge Moss found in *Fritz*, the "[t]he Special Groups were … armed[] and directed by Iran's Q[u]ds Force, with help from Lebanese Hezbollah" and "[t]he U.S. Department of Defense estimated that, in addition to training, the Quds Force supplied the Special Groups with arms and funding valued at between $750,000 and $3 million a month." [92]

341.    The IRGC, including its Hezbollah Division and Qods Force, through their lead terrorist agent, Hezbollah, provided the Joint Cells with weapons to use against Americans in Iraq.

---

[90] *Fritz*, 320 F. Supp. 3d at 58.

[91] *Id.* at 62.

[92] *Fritz*, 320 F. Supp. 3d at 63.

342.     Hezbollah supplied many of the weapons that Jaysh al-Mahdi used to commit acts of terror against Americans in Iraq – though Jaysh al-Mahdi still required money and resources to acquire those weapons and transport them to the appropriate cells in Iraq.  A Jaysh al-Mahdi commander told journalists in June 2007 that "[a]ll of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[93]

343.     Hezbollah facilitated the flow of these weapons from Iran into Iraq by working with Jaysh al-Mahdi to set up cross-border smuggling networks.  The *Long War Journal* reported in June 2007 that rockets that Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[94]  Later that year, on August 12, 2008, Coalition forces arrested nine Hezbollah members who had been funneling weapons into Iraq.  Hezbollah's involvement in these smuggling operations accorded with its longstanding role as Iran's weapons smuggler (including its attempt in 2003 to smuggle 50 tons of weapons from Iran to the Palestinian Authority, the largest Iranian-linked smuggling operation ever uncovered).

344.     Hezbollah also used funds provided by the IRGC, including its Hezbollah Division and Qods Force, to purchase weapons for Jaysh al-Mahdi outright.  For example, according to a U.S. military-intelligence document, "Hezbollah was 'buying rocket-propelled grenades . . . antitank missiles' and other weapons for Sadr's militia."

345.     Weapons supplied to Jaysh al-Mahdi by Hezbollah include the same types of weapons on which Hezbollah trained Jaysh al-Mahdi:  small arms, IEDs, EFPs, rockets, mortars, and RPGs.  These weapons were first smuggled into the Jaysh al-Mahdi command-and-control

---

[93] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC (June 22, 2007).

[94] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

safe haven of Sadr City and then distributed to Jaysh al-Mahdi cells in outlying provinces.  For attacks carried out with those weapons, Hezbollah not only trained Jaysh al-Mahdi how to use them; it supplied the weapons themselves.

346.    These trends accelerated "[a]fter Lebanese Hizb Allah's successful 'summer war' against Israel in July 2006," when Hezbollah and the IRGC, including its Hezbollah Division and Qods Force, "sought to replicate this victory in Iraq, opening the floodgates to provide advanced [EFP] munitions and other weapons to" Jaysh al-Mahdi terrorists in Iraq.[95]  As one analyst explained in 2010:

> Iran's support to Special Groups appears to be largely focused on anti-U.S. resistance operations … The most visible symbol of Iran's support is the 20-30 rocket attacks launched against U.S. bases each month in Iraq, almost all of which involve entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence specialists. The IRGC has been supporting such attacks since the early 1980s … Iran [] smuggle[d] large numbers of 107mm Hesab and 122mm Grad rockets into Iraq, as well as some larger 240mm Fajr rockets.[96]

347.    U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Iraq, many of which bore markings of Iranian origin, and all of which, on information and belief, were smuggled into Iraq by Hezbollah.  Coalition forces regularly recovered weapons caches from Iranian proxies that were replete with newly manufactured weapons often stamped "Made in Iran."  Examples include a massive seizure of a Joint Cell terrorist weapons cache near Basra in 2010, which seized "76 rockets, 15 tons of TNT and significant amounts of bomb-making material," and "41 magnets for making under-vehicle IEDs and silenced weapons."[97]  Indeed, "[t]he Iranian government does not appear to be unduly concerned about plausible deniability,

---

[95] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[96] *Id*.

[97] *Id*.

deploying new Iranian-produced 'signature' weapons across Iraq. The U.S. government has released many photographic slideshows of newly-produced weapons systems in Iraq that are known to be manufactured by Iran."[98]

> **iii.** **Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Provided Jaysh Al-Mahdi With Key Training And Logistical Support To Attack Americans In Iraq**

348. The IRGC's, including the Qods Force's, funding for Hezbollah and support for the Hezbollah-led training and logistical effort relating to Jaysh al-Mahdi had cross-cutting effects. As the State Department explained in 2009, "[t]he Qods Force, in concert with Lebanese Hizballah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry."[99]

349. Hezbollah trained Jaysh al-Mahdi, including its Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah, in the use of weapons and tactics that were specifically designed to target Americans in Iraq.

350. Jaysh al-Mahdi successfully used Hezbollah training to perpetrate terrorist attacks against Americans in Iraq.

351. This training began at Jaysh al-Mahdi's inception in April 2003, when Imad Mugniyeh recruited and trained some of Jaysh al-Mahdi's first 300 fighters in Lebanon. It continued through at least 2008, when Hezbollah held training camps for Jaysh al-Mahdi fighters in Iran (in conjunction with Iran's Qods Force), Lebanon, and Iraq. According to a captured Jaysh al-Mahdi operative, paraphrased in an unclassified (as redacted) U.S. military-intelligence

---

[98] *Id.*

[99] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

report, "[w]ithout a doubt, all training received in Iran" – at Hezbollah-run camps – "is intended for use against [Coalition forces]."[100]

352.    From 2003 through the present, Jaysh al-Mahdi recruits have traveled to Hezbollah training camps in Lebanon and Iran through meticulously planned routes.  Because of the logistical challenges associated with bringing Jaysh al-Mahdi militants into Iran and Lebanon, Hezbollah occasionally trained members of Jaysh al-Mahdi to become "master trainers," who learned terrorist tactics from Hezbollah in Iran or Lebanon and then passed that knowledge on to other Jaysh al-Mahdi members in Iraq.[101]  U.S. officials have referred to this practice as "training the trainer."[102]  Hezbollah also trained members of Jaysh al-Mahdi inside of Iraq, including, but not limited to, in Sadr City, Najaf, Basra, and Safwan.

353.    Hezbollah's training was rigorous.  According to unclassified (as redacted) U.S. military-intelligence reports, Hezbollah's training camps lasted anywhere from three weeks to several months.[103]  Trainees were awakened at 5:30 a.m. every day to pray and exercise.  Classes started at 8:00 a.m. and continued until dusk.  Each class lasted roughly 50 minutes, with 10-minute breaks in between classes.  Some classes were held in actual classrooms with whiteboards and projectors; others were held at firing ranges and other outdoor locations.  The training included programs in a myriad of skills, including "[w]eapons, bomb-making, intelligence, assassinations, the [gamut] of skill sets," according to a U.S. intelligence official

---

[100] Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 002, at 2 (Spring 2007-Early 2008).

[101] Michael R. Gordon, *Hezbollah Trains Iraqis in Iran, Officials Say*, N.Y. Times (May 5, 2008).

[102] *Id.*

[103] *See* Combating Terrorism Ctr. at West Point Harmony Program, Redacted Intelligence Report 005, at 2-3 (Spring 2007-Early 2008).

quoted in the *New York Times* in November 2006.[104]  The topics covered in these training

programs included the following:

354.  **EFPs.**  In 2004, Hezbollah "introduced [to Iraq] a new breed of roadside bomb

more lethal than any seen before" – the EFP.[105]  Hezbollah trained members of Jaysh al-Mahdi

in the deployment of EFPs, which were expressly designed to penetrate the American armor.

Hezbollah was essential to those EFP training efforts because Hezbollah fighters had direct

experience using EFPs against Israeli armor in Lebanon.  Indeed, at that point, Hezbollah was the

world's foremost expert on EFPs.  Hezbollah also imparted to Jaysh al-Mahdi the complex

expertise required to manufacture and use EFPs, and drawing on its experience in Lebanon,

Hezbollah instructed Jaysh al-Mahdi to use EFPs against American soldiers.  The *New York

Times* reported in 2013 that "Iran passed E.F.P. technology to the Lebanese militia Hezbollah,

which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[106]  On information and belief,

the EFP factory that Iraqi forces discovered in Jaysh al-Mahdi's Sadr City stronghold in October

2008, was built using the EFP technology that Hezbollah had provided to Jaysh al-Mahdi with

funding provided by the IRGC, including its Hezbollah Division and Qods Force.  As a

declassified British intelligence report concluded, EFPs used in Iraq were "exclusively associated

with Hizballah."[107]

355.  Hezbollah planned the Joint Cells' EFP attacks (as with the other attacks outlined

in this Complaint) in Iraq through the extensive training and coordination set forth above.

---

[104] Michel R. Gordon & Dexter Filkins, *Some Mahdi Army Fighters Trained with Hezbollah*, N.Y. Times (Nov. 28, 2006).

[105] Michael Ware*, Inside Iran's Secret War for Iraq*, Time (Aug. 22, 2005).

[106] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times (Oct. 18, 2013).

[107] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

Hezbollah's planning of the Joint Cells' EFP attacks against Americans included: (1) targeting specific geographies in Iraq, such as Baghdad and Basra, where Jaysh al-Mahdi and the Joint Cells were permitted to launch EFP attacks; (2) instructing Jaysh al-Mahdi and the Joint Cells to use EFPs against American armored vehicles in the first instance; (3) providing technical assistance to Jaysh al-Mahdi and the Joint Cells with respect to EFP design schematics and concepts; (4) helping manufacture EFPs for use against Americans in Iraq; (5) training senior Jaysh al-Mahdi terrorist commanders in Lebanon, Baghdad, and Iran with respect to all aspects of the EFP network, from design, to manufacture, to transportation, to attack strategy; (6) training lower-level Jaysh al-Mahdi members in camps in Lebanon, Iraq, and Iran with respect to EFP tactics; (7) preparing and distributing sophisticated, high production value, Arabic-language CD-ROMs and instructional videos concerning EFPs; and (8) forward deploying senior Hezbollah terrorists, including but not limited to Daqduq, to coordinate EFP attacks against Americans with Jaysh al-Mahdi and the other members of the Joint Cells.

356. **Rockets.** Hezbollah trained members of Jaysh al-Mahdi in the use of rocket launchers and anti-aircraft missiles. In particular, Hezbollah directed Jaysh al-Mahdi members to launch indirect-fire rocket attacks on the Green Zone from Sadr City, and it instructed them on how to do so. Hezbollah's direction to fire rockets on the Green Zone specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks in 2008, Jaysh al-Mahdi rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hezbollah's instruction. By that point, Hezbollah had become renowned for its use of rockets during the 2006 Israel-Hezbollah war, when it fired rockets at civilian targets in northern Israel. Indeed, the *Long War Journal* reported that the

rockets Jaysh al-Mahdi fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[108]

357.    **Kidnappings**.  Hezbollah is well-known for its kidnapping operations.  In 2006, for example, Hezbollah agents conducted cross-border raids into Israel and abducted a number of Israeli soldiers.  Hezbollah also trained Jaysh al-Mahdi operatives "on how to conduct precision, military style kidnappings," according to a 2006 U.S. government cable (as quoted in the *New York Times*).[109]  Jaysh al-Mahdi put this training to use during the 2007 raid on the Provincial Joint Coordination Center in Karbala, where Jaysh al-Mahdi terrorists kidnapped four U.S. soldiers and killed another.  And a 2011 letter from five U.S. Senators documented that Hezbollah operative Daqduq instructed "Iraqi extremists" who were part of Jaysh al-Mahdi on "how to conduct intelligence and kidnapping operations."

358.    As Judge Moss found in *Fritz*, IRGC, including its Hezbollah Division and Qods Force, through Hezbollah, "played a significant role in the success of AAH and other Special Groups. Without that Iranian-backed training, the Special Groups would have been 'nowhere' near as effective as they were."[110]

359.    The extent of Hezbollah's involvement in Jaysh al-Mahdi's attacks was demonstrated by evidence gathered in connection with Daqduq's capture in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" memorializing Hezbollah's wide-ranging involvement in the terrorist attacks detailed above. This "planning guide" included specific instructions describing how to plant IEDs and carry out

---

[108] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J. (June 3, 2007), http://www.longwarjournal.org/archives/2007/06/mahdi_rocket_teams_d.php.

[109] *Id*.

[110] *Fritz*, 320 F. Supp. 3d at 64.

abductions of Americans.  Hezbollah's instruction as reflected in this "planning guide" enabled

Jaysh al-Mahdi to execute an array of sophisticated attacks against Americans that it otherwise

would have been unable to carry out.

**iv.**      **Acting Through Hezbollah, The Islamic Revolutionary Guard Corps, Including The Qods Force, Routed Funds To Jaysh Al-Mahdi To Finance Attacks Against Americans In Iraq**

360.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods

Force, also provided substantial financial support to Jaysh al-Mahdi, including its Special Groups

Asaib Ahl al-Haq and Ka'taib Hezbollah.

361.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods

Force, regularly provided large cash payments to Jaysh al-Mahdi, channeled via Hezbollah, in

the latter's role as the connector between Jaysh al-Mahdi and the IRGC, including its Hezbollah

Division and Qods Force.  Jaysh al-Mahdi Special Groups were supported by the Qods Force,

through Hezbollah, with arms and funding valued at between $750,000 and $3 million a

month.[111]  "In the words of Dr. Levitt, although far less than the funding Iran provided to

Hezbollah, the funds provided to AAH were devoted 'to carry[ing] out operations,' and 'three-

quarter[s] of a million dollars to $3,000,000 a month ... can buy a lot of damage.'" [112]

362.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods

Force, also paid the Joint Cells to kill U.S. forces.  As one scholar examining Iranian support for

Hezbollah and Jaysh al-Mahdi found in 2010, "[m]oney continues to be provided in significant

---

[111] *Id*. at 63.

[112] *Id*.

109

volumes, allowing cells to be paid between $4,000 and $13,000 per rocket or roadside bomb

attack, depending on the circumstances."[113]

363.    Acting through Hezbollah, the IRGC, including its Hezbollah Division and Qods

Force, also provided funding to individual Jaysh al-Mahdi commanders, including for Asaib Ahl

al-Haq and Ka'taib Hezbollah.  For example, through Hezbollah, the IRGC, including its

Hezbollah Division and Qods Force, paid millions each to Muqtada al-Sadr, Qais and Laith

Khazali, and Abu Mahdi al-Muhandis.

> **E.    In Furtherance Of The IRGC's Conspiracy, The IRGC, Including Its
> Hezbollah Division And Qods Force, Al-Qaeda, The Taliban, Including Tts
> Haqqani Network, And The Members Of The Al-Qaeda-Taliban Terrorist
> Syndicate Waged A Deadly Terrorist Campaign Against Americans In
> Afghanistan, Pakistan, and Europe**

364.    Iran's support of terrorist proxies like Hezbollah, Hamas, the Taliban, and al-

Qaeda is well-documented.[114]  The IRGC's and its Qods Force's support for such groups is

especially prevalent in areas where Iran abstains from open conflict.  As a result of the IRGC's

consistent and longstanding support of anti-American terrorism, the U.S. State Department

formally designated Iran as a State Sponsor of Terrorism in 1984.[115]  It has maintained that

designation at all times since.[116]  In 2007, the U.S. State Department described Iran as "the most

---

[113] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[114] *See* Alireza Nader, Joya Laha, *Iran's Balancing Act in Afghanistan* at 9 (RAND Corp. 2011)
("*Iran's Balancing Act*").

[115] *See* 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Sec'y of State George P. Shultz
designating Iran); U.S. State Dep't, *State Sponsors of Terrorism*, https://www.state.
gov/j/ct/list/c14151.htm.

[116] *Id.*

active state sponsor of terrorism" in the world and "a threat to regional stability and U.S. interests in the Middle East because of its continued support for violent groups."[117]

365. While Americans worked to rebuild post-war Afghanistan, they were attacked by Taliban and al-Qaeda terrorists. The IRGC, including its Hezbollah Division and Qods Force, sponsored those terrorist attacks in an effort to undermine American foreign policy in Afghanistan. To that end, the IRGC, including its Hezbollah Division and Qods Force, supported the Taliban, including its most radical part, the Haqqani Network, by, among other things, training Taliban terrorists how to attack Americans effectively and paying terrorists who killed U.S. forces. The IRGC, including its Hezbollah Division and Qods Force also provided the Taliban with sophisticated weapons that it used to kill and injure thousands of Americans.

366. The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda was equally potent. That support dates back decades and has included money, weapons, training, logistical assistance, and safe harbor for key al-Qaeda leaders. In 2007, Osama bin Laden himself referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication." The IRGC's, including its Hezbollah Division's and Qods Force's, longstanding decision to back al-Qaeda despite sectarian differences between the two reflected Iran's overriding desire to foment anti-American terrorism around the world. That decision, like the one to provide material support to the Taliban, paid dividends. the IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda's activities in Afghanistan substantially contributed to the terrorist violence that killed and injured Americans there.

367. The IRGC's, including its Hezbollah Division's and Qods Force's, support for al-Qaeda complemented its support for the Taliban because of the close relationship between the

---

[117] U.S. State Dep't, *Country Reports on Terrorism 2007* at 172 (Apr. 2008).

two terrorist groups. Although al-Qaeda and the Taliban were nominally separate groups, they acted together in a terrorist "syndicate" that planned and authorized terrorist violence throughout Afghanistan. That syndicate – which involved mafia-style meetings between leaders of the syndicate's various members – provided a superstructure that organized and facilitated a range of terrorist attacks in Afghanistan. By funneling material support to multiple members of that syndicate, the IRGC, including its Hezbollah Division and Qods Force, ensured that its policy of sponsoring anti-American terrorism in Afghanistan achieved maximum effect.

368. The IRGC's conspiracy succeeded. The U.S. substantially completed its withdrawal from Afghanistan on or about August 2021, which was one of the four primary objects of the conspiracy. Afghanistan was also, along with Iraq, one of the two central theaters where both the IRGC, including its Hezbollah Division and Qods Force, and its Sunni allies al-Qaeda and the Taliban, regularly collaborated in a two-way manner, sharing resources, personnel, smuggling routes, financiers (in-country and around the world), and sometimes even jointly committing attacks with one another.

369. The public reaction of the IRGC, including its Hezbollah Division and Qods Force, to the U.S. withdrawal from Afghanistan confirms that the terrorists believe they achieved one of the objects of the conspiracy:

370. Plaintiffs identify below several terrorist groups, subgroups, and partnerships responsible for the specific attacks that killed and injured them. Each worked in concert and shared resources, personnel, and operational plans. Indeed, the Taliban and al-Qaeda often participated in mafia-style meetings – attended by the leaders of several allied terrorist groups –

in which they planned and authorized various terrorist attacks throughout Afghanistan.[118]  Given

such coordination, one former CIA official and senior White House advisor called the resulting

terrorist superstructure a "syndicate," composed of al-Qaeda, the Taliban, and several allied

FTOs.[119]  In fact, bin Laden himself conceived of al-Qaeda as the leader of a broader coalition of

terrorists drawing from other terrorist organizations in Pakistan and Afghanistan.[120]

     371.    Iran's support for multiple components of this "syndicate" ensured that its support

had maximum effect.  Due to the mutually reinforcing ties between the Taliban and al-Qaeda in

Afghanistan, support for the one benefited the other – and vice versa.  Iran recognized those

interrelationships and so spread its support across multiple parts of the Afghan terror syndicate.

In doing so, Iran was able to achieve its intended effect:  wide-ranging terrorist attacks against

Americans, executed mostly by the Taliban but supported by (and sometimes jointly committed

with) al-Qaeda and the other components of the syndicate.

     372.    Against that backdrop, Plaintiffs identify below the principal Afghan terrorist

groups, subgroups, and cells that committed the attacks that killed and injured them.  Plaintiffs

also identify how the IRGC, including its Hezbollah Division and Qods Force, facilitated

terrorist attacks by al-Qaeda, the Taliban (including its Haqqani Network), and their allies.

     **1.    Al-Qaeda**

     373.    Since its inception, al-Qaeda doctrine has emphasized terrorist strategy that

borrows heavily from cooperative game theory principles, including concepts such as

---

[118] *See* Bill Roggio and Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Wash. Exam'r (July 4, 2011) ("*The al Qaeda-Taliban Connection*"), archived at https://www.washingtonexaminer.com/weekly-standard/the-al-qaeda-taliban-connection.

[119] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at 1 (Brookings Inst. Press 2d ed. 2011).

[120] *The al Qaeda-Taliban Connection*.

cooperation theory, franchising, and joint ventures. "Since the September 11, 2001 terrorist attacks, al Qaeda emerged as the head of a global Islamist terror movement, comprised of dozens of deadly jihadist groups" and "[s]everal members of the al Qaeda terror movement [were] designated as FTOs" including, but not limited to, "Islamic Movement of Uzbekistan," "Jaish-e-Mohammed," and "Lashkar-e-Tayyiba."[121] This reflected al-Qaeda's tactical and operational fusion with its affiliates in Afghanistan and Pakistan.

374. Since 9/11, and continuing through the present, Al-Qaeda led the Syndicate and worked jointly with its inseparable ally, the Taliban, with whom al-Qaeda had been essentially fused since before 9/11 and have remained so ever since. The overlap between the organizations meant that al-Qaeda often played a key role in Taliban and Haqqani Network attacks. As terrorism scholars Bill Roggio and Thomas Joscelyn observed, "[i]t is not clear where, say, al Qaeda ends and the Taliban and other terrorist groups begin. This is by design. Bin Laden envisioned al Qaeda as the vanguard of a broader jihadist coalition. Al Qaeda was always a joint venture."[122] Mr. Joscelyn testified that the word "syndicate" – referring to al-Qaeda's terrorist joint venture with its Afghan and Pakistani affiliates – offers an "excellent description of how al Qaeda operates."[123]

375. The U.S. State Department designated al-Qaeda as a FTO on October 8, 1999.

---

[121] Jimmy Gurulé, *Unfunding Terror: The Legal Response to the Financing of Global Terrorism* 89 (Edward Elgar 2008) (hereinafter, "Gurulé, *Unfunding Terror*" or "Gurulé").

[122] *The al Qaeda – Taliban Connection*.

[123] *Al-Qaeda In Afghanistan and Pakistan: An Enduring Threat*, Hr'g Before the U.S. House Committee On Foreign Affairs, Subcommittee On Terrorism, Nonproliferation, and Trade, S. Hr'g 113-156, at 28 (May 20, 2014) (statement of Thomas Joscelyn, Sr. Research Fellow, Found. for Def. of Democracies), 2014 WLNR 13518260.

376.     Al-Qaeda's and the Taliban's close relationship continued long after 9/11.  In the years since, it has become clear that the al-Qaeda and Taliban organizations have been fused together:  al-Qaeda terrorists have often worked in close conjunction with Taliban terrorists and the affiliated Haqqani Network and Kabul Attack Network.  In May 2007, Taliban official Mullah Dadullah said, "[W]e and al-Qaeda are as one."[124]  In early 2009, a military-intelligence official was quoted as saying, "The line between the Taliban and al Qaeda is increasingly blurred, especially from a command and control perspective."[125]  By the end of that year, Chairman of the Joint Chiefs of Staff Admiral Michael Mullen said the same thing openly.  "We are deeply concerned about the growing level of collusion between the Taliban and al Qaeda," he told *The Wall Street Journal*.[126]  And as Lieutenant General Ronald L. Burgess, Jr. reported in a February 2010 Hearing of the Senate Select Committee on Intelligence, "al Qaeda's propaganda, attack planning and support of the Taliban and Haqqani networks continues."[127]

377.     By 2009, al-Qaeda and the Haqqani Network intensified their attack campaign inside Afghanistan.  To do so, they ramped up their terrorist finance campaigns worldwide, putting out a call to all al-Qaeda and Haqqani Network financiers to support the jihad against Americans in Afghanistan the same way both groups had previously rallied terrorist financiers worldwide to support the campaign against the Soviets in the 1980s.

378.     Thereafter, due in large part to the Syndicate's terrorist finance, al-Qaeda's terrorist campaign grew more lethal each month and year.

---

[124] Thomas Ruttig, *The Other Side* 23, Afghanistan Analysts Network (July 2009).

[125] Bill Roggio, *Al Qaeda Builds A 'Shadow Army'*, Wash. Times (Feb. 13, 2009).

[126] Anand Gopal, *Afghan Police Killings Highlight Holes in Security*, Wall St. J. (Dec. 15, 2009).

[127] Transcript, Hr'g Of The Senate Select Committee On Intelligence Subject: "Current And Projected Threats To The United States, Fed. News Serv., 2010 WLNR 27828348 (Feb. 2, 2010).

379.     Al-Qaeda's Syndicate-counterattack-strategy reflected bin Laden's long-standing vision of al-Qaeda (and him, specifically) as the leader of a grand terrorist coalition across Afghanistan and Pakistan.[128]  Due to the mutually reinforcing ties between al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and D-Company in Afghanistan – including their practice of cross-donations to each other – support for one benefited all.  Defendants' support to the Syndicate's terrorist finance bombmaking logistics thus had crosscutting effects: they enabled wide-ranging terrorist attacks against Americans in Afghanistan.

380.     Al-Qaeda's leadership of that terrorist syndicate reflected the degree to which al-Qaeda and the Taliban became fully and operationally intertwined.  As India's Permanent Representative to the United Nations explained in describing the al-Qaeda-Taliban "syndicate of terrorism," both groups were by 2011 "ideologically and operationally fused."[129]  By the fall of 2009, noted journalist Peter Bergen concluded, "the Taliban and Al Qaeda function more or less as a single entity.  The signs of this are everywhere."[130]

381.     Internationally, al-Qaeda and the Haqqani Network (and through it, the Taliban) shared intertwined streams for fundraising, financing, logistics, smuggling, and weapons.  According to Haqqani Network expert Gretchen Peters, international "funding streams" were "intertwined across" amongst al-Qaeda, the Haqqani Network, and the Taliban.[131]  As Ms. Peters

---

[128] *See* Bill Roggio & Thomas Joscelyn, *The al Qaeda – Taliban Connection*, Weekly Standard (July 4, 2011) ("*The al Qaeda – Taliban Connection*").

[129] *India Against Hasty Troop Withdrawal From Afghanistan*, Daily Fin. Post (Oct. 1, 2011), 2011 WLNR 20105460 (quoting Hardeep Singh Puri, India's Permanent Representative to the United Nations).

[130] Peter Bergen, *The Front: The Taliban-Al Qaeda Merger*, New Republic (Oct. 19, 2009) ("*The Front*").

[131] Gretchen Peters, *Haqqani Network Financing: The Evolution Of An Industry* 32, Combatting Terrorism Ctr. (July 2012) ("Peters, *Haqqani Network Financing*").

explained in 2012, al-Qaeda, the Haqqani Network, and their allies "derive[d] income in and outside Afghanistan" and their "money move[d] between key network actors and into banks in Pakistan, the [U.A.E.] and beyond."[132]

382.     The Taliban and al-Qaeda have remained intimately intertwined.  For example, in 2015, Osama bin Laden's successor, Ayman Zawahiri, pledged an oath of allegiance to the recently-installed Taliban leader Mullah Akhtar Mohammad Mansour, who publicly announced his acceptance of the pledge the following day.[133]  When Mansour was killed in May 2016, Zawahiri pledged allegiance to his successor, Mawlawi Haibatullah Akhundzada.

383.     Often, individual Taliban leaders are also members of al-Qaeda.  For example, in late 2011 or early 2012 the Taliban appointed Sheikh Mohammed Aminullah, who has close ties to al-Qaeda, as the head of its Peshawar Regional Military Shura, which is responsible for attacks in northern and eastern Afghanistan.

384.     Al-Qaeda also encouraged the Taliban to embrace new terrorist techniques.  In February 2003, bin Laden issued a recording calling specifically for suicide attacks in Afghanistan and Iraq.  Taliban terrorists had previously viewed suicide attacks as taboo, but al-Qaeda convinced them they were religiously permissible.  Indeed, al-Qaeda trumpeted their ideological success online, announcing, "While suicide attacks were not accepted in the Afghani culture in the past, they have now become a regular phenomenon!"[134]  With al-Qaeda's encouragement and training, the number of such suicide attacks in Afghanistan increased from

---

[132] *Id.*

[133] Thomas Joscelyn & Bill Roggio, *New Taliban Emir Accepts al Qaeda's Oath Of Allegiance*, Long War J. (Aug. 14, 2015).

[134] Brian Glyn Williams, *Suicide Bombings In Afghanistan*, Jane's Islamic Affairs Analyst at 5 (Sept. 2007).

one in 2002, two in 2003, and six in 2004, to 21 in 2005 and more than 100 in 2006. Al-Qaeda further encouraged these attacks by paying the families of suicide bombers in Afghanistan.

385. Al-Qaeda's role in that suicide-bombing trend was pivotal. As Islamic history scholar Bryan Glyn Williams explained, "Al Qaeda operatives carried out two to three [suicide] bombings per year on the Afghan government and NATO troops from 2002 to 2004 that were meant to demonstrate the effectiveness of this alien tactic to the local Taliban. These demonstrative acts and videos of successful [Al Qaeda] suicide bombings in Iraq seem to have convinced the Taliban to condone the previously taboo tactic of suicide bombing."[135]

386. Al-Qaeda operatives also served as embedded trainers with Taliban forces. These experienced trainers provided instructions, funding, and resources for conducting local and international attacks. By 2005 at the latest, al-Qaeda began bringing instructors from Iraq to train the Taliban how to fight Americans. For example, al-Qaeda members trained Taliban commanders in bomb-making techniques. Al-Qaeda also invited Taliban commanders to Iraq, where they learned how to make armor-penetrating "shaped" charges,[136] a type of IED later known as an EFP. Taliban trainees also learned how to use remote controls and timers, and urban warfare tactics.

387. As one writer put it in November 2009, "[s]mall numbers of Al Qaeda instructors embedded with much larger Taliban units have functioned something like U.S. Special Forces do – as trainers and force multipliers."[137]

---

[135] Bryan Glyn Williams, *Afghanistan Declassified: A Guide to America's Longest War* at 202 (Univ. Penn. Press 2012).

[136] Sami Yousafzai, *Unholy Allies*, Newsweek (Sept. 25, 2005).

[137] Peter Bergen, *The Front*, New Republic (Oct. 19, 2009), https://newrepublic.com/article/70376/the-front.

388.    By the mid-2000s, al-Qaeda's partnership with the Haqqani Network had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan. According to a declassified 2008 Defense Intelligence Agency intelligence report.[138]

389.    Al-Qaeda has also established multiple training camps within Afghanistan reportedly "hosted by the Taliban."[139]  One such camp covered nearly 30 square miles and contained heavy weapons, IED-making material, anti-aircraft weapons, rocket-propelled grenade systems, machine guns, pistols, rifles, and ammunition.

390.    On top of the myriad forms of support detailed above, al-Qaeda also jointly planned and authorized terrorist attacks that the Taliban carried out.  Those joint planning sessions often occurred in meetings in which al-Qaeda, the Taliban, and other members of the al-Qaeda-Taliban syndicate (such as Lashkar-e-Taiba) would confer about particular geographies and targets to attack.[140]  The close operational coordination not only manifested itself in the Kabul Attack Network, but also provided a broader terrorist superstructure that organized the insurgency throughout Afghanistan.  In observing that this superstructure formed an Afghan-Pakistani "syndicate" of sorts, a former CIA analyst and White House advisor documented several notable syndicate-sponsored terrorist attacks in Afghanistan that "demonstrated the

---

[138] Defense Intelligence Agency, *Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))*, Intelligence Information Report (Apr. 16, 2008), https://www.dia.mil/FOIA/FOIA-Electronic-Reading-Room/FOIA-Reading-Room-Other-Available-Records/FileId/155424/.

[139] Thomas Joscelyn and Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

[140] *The al Qaeda-Taliban Connection*.

intricate connections between al Qaeda and its allies in Pakistan and Afghanistan."[141]  Those

intimate connections enhanced the lethality of the overall anti-American insurgency.

391.    Information derived from al-Qaeda and Taliban detainees held at Guantanamo

Bay, Cuba ("Gitmo") corroborates the planning and authorization activities of the al-Qaeda-

Taliban syndicate.  For example, according to purported Gitmo intelligence files quoted by

terrorism experts Bill Roggio and Thomas Joscelyn, one detainee, Abdul Razak, was a "high-

level military commander in a newly-conceived 'unification' of Al Qaeda, [Hezb-e-Islami

Gulbuddin ("HIG"),] and Taliban forces within Afghanistan," which the leaders of the respective

terrorist groups "envisioned [as a] new coalition of HIG, Al Qaeda, and Taliban during a meeting

in Pakistan in early spring 2003."[142]  Another purported Gitmo detainee file quoted by Messrs.

Roggio and Joscelyn concerning Haroon al Afghani, a dual-hatted al-Qaeda/HIG terrorist,

contained the following intelligence report:

> [Afghani] is assessed to have attended a joint operations meeting among extremist
> elements in mid-2006.  A letter describing an 11 August 2006 meeting between
> commanders of the Taliban, al Qaeda, [Lashkar e Taiba], . . . and the Islamic Party
> (probably a reference to the HIG), disclosed that the groups decided to increase terrorist
> operations in the Kapisa, Kunar, Laghman, and Nangarhar provinces, including suicide
> bombings, mines, and assassinations.[143]

392.    Taken together, these reports "demonstrate a high degree of collusion between al

Qaeda and other terrorist groups" as part of a "jihadist hydra" that shares the "common goal" of

seeking to "drive the U.S.-led coalition out of Afghanistan."[144]  One al-Qaeda operative, whom

U.S. officials characterized as "an important al-Qaida planner and explosives expert," Ghazwan

---

[141] Bruce Riedel, *Deadly Embrace: Pakistan, America, And The Future Of The Global Jihad* at
100 (Brookings Inst. Press 2d ed. 2011).

[142] *The al Qaeda – Taliban Connection*.

[143] *Id.*

[144] *Id.*

al-Yemeni, trained Taliban members in Pakistan.[145]  He eventually helped plan the December 30, 2009 attack on Camp Chapman that killed seven Americans.[146]

393.  Al-Qaeda doctrine emphasized the development and deployment of dual- or even three-hatted terrorists, whom counter-terror and counter-narcotics professionals describe as "polyterrorists" (or "poly-traffickers").  Al-Qaeda fashioned itself a multi-national corporation for Islamist terrorists, and therefore embraced an aggressive expansion strategy in the late 1990s, which accelerated even more after 9/11, in which al-Qaeda scaled up by making new partners from other terrorist groups.

394.  Al-Qaeda's doctrines concerning cooperation with other jihadists and the need for interoperability substantially mirrors that of the IRGC, including its Hezbollah Division and Qods Force.  As a result, al-Qaeda, and its star pupil, the Taliban, often relied upon joint cell tactics to carry out their most spectacular attacks.

395.  Al-Qaeda terrorists also regularly attacked U.S. forces alongside Taliban terrorists, including in some of the attacks that killed or injured Americans.  For example, in the early 2000s, al-Qaeda's third-ranking member participated in attacks on Americans in Afghanistan alongside Taliban terrorists under the command of Sirajuddin Haqqani.  As another example, on July 13, 2008, Taliban and al-Qaeda members jointly attacked a U.S.-Afghan outpost in Nuristan Province.  Nine ISAF soldiers were killed in the attack.

396.  In 2010, one terrorism scholar warned against drawing a bright line between al-Qaeda and the Afghan terrorist groups that it sponsored.  In explaining the importance of "recogniz[ing] the link between al Qa'ida and Afghan insurgent groups," he observed that a

---

[145] Evan F. Kohlmann, *Al-Qa'ida's Yemeni Expatriate Faction in Pakistan*, CTC Sentinel at 11-12 (Jan. 2011).

[146] *Id*.

"policy focused on targeting al-Qa'ida – and not the Taliban, Haqqani Network, or other groups – would ignore one of the most egregious lessons from September 11."[147]

      397.    The U.S. government agreed.  During the relevant timeframe, the U.S. government repeatedly stated that al-Qaeda and the Taliban acted together in a terrorist "syndicate," and warned against efforts to distinguish between them.  Examples include:

- Secretary of State Hillary Clinton, July 2009:  "[W]e had an intensive strategic review upon taking office[.]  And we not only brought the entire United States government together, but we reached out to friends and allies . . . [T]he result of that strategic review was to conclude that al-Qaeda is supported by and uses its extremist allies like elements within the Taliban . . . to be proxies for a lot of its attacks . . . So the Taliban . . . [is] part of a kind of terrorist syndicate with al-Qaeda at the center[.]"[148]

- Secretary of State Hillary Clinton, December 2009:  "[W]e have increasingly come to see these organizations not as separate independent operators that occasionally cooperate with one another, but as part of a syndicate of terrorism. . . . [T]he level of operational cooperation, training, equipping, financing, has grown exponentially.  And at the head of the table, like an old Mafia kind of diagram, sits al Qaeda."[149]

- Secretary of Defense Robert Gates, January 2010:  "Defense Secretary Robert M. Gates said yesterday that Al Qaeda was using proxy terrorist groups to orchestrate attacks in . . . Afghanistan as part of a broader strategy to destabilize the region.  In a news conference held after two days of meetings with Indian officials, Gates said Al Qaeda had formed a 'syndicate' of terrorist groups with Taliban factions in Afghanistan and Pakistan . . . 'What we see is that the success of any one of these groups leads to new capabilities and a new reputation for all,' Gates said.  'A victory for one is a victory for all.'  US intelligence officials have said that jihadi groups in the region are cooperating more closely than ever . . . Gates said all of the factions were working under the umbrella of Al Qaeda."[150]

- Secretary of Defense Robert Gates, May 2010:  "The other concern we have . . . is the creation of the syndicate of terrorist organizations that are working with each other, al Qaeda, the Taliban in Pakistan, the Taliban in Afghanistan, the Haqqani Network.  There are five or six of these groups that are now really working together and a success for one is a success for all . . . And so this problem has become more complex as these groups have gotten closer and

---

[147] Seth G. Jones, *In the Graveyard of Empires:  America's War in Afghanistan* at 332 (W.W. Norton & Co. 2010) ("*Graveyard of Empires*").

[148] *Sec. of State Hillary Clinton*, NBC News:  Meet the Press (July 26, 2009).

[149] S. Hr'g 111-479, at 24.

[150] *Gates Casts Qaeda As Terror Syndicate*, Wash. Post (Jan. 21, 2010), 2010 WLNR 1263055 ("*Gates Casts Qaeda As Terror Syndicate*").

cooperated operationally in a way that we really haven't seen, I think, significantly before 2007, 2006."[151]

- Under Secretary of Defense for Policy Michele Flournoy, April 2011:  "We view al Qaeda, Haqqani, the Taliban, these are all part of a syndicate of groups that help each other.  The Pakistanis tend to make finer distinctions between them – you know, not being . . . tolerant to some, like al Qaeda, but otherwise tolerating others.  We are trying to work with them to shift that perspective and shift that calculus."[152]

398.    Al-Qaeda's interdependence and joint venture with its affiliates in Afghanistan and Pakistan continued throughout the period in which Plaintiffs were killed and injured.  As two journalists noted in 2016, the U.S. military's relative success against al-Qaeda neither eliminated al-Qaeda nor broke apart its Syndicate:  Afghanistan's southern and eastern provinces remained a "hub of Afghan insurgents and [the] al-Qaeda-led terrorist syndicate."[153]  Similarly, as two terrorism scholars explained in a 2018 book, "[t]he Taliban still retain[ed] a close alliance with al-Qaeda," which represented "the worst possible scenario for terrorism."[154]

399.    Today, Afghanistan is a safe-haven for al-Qaeda under the control of the "Islamic Emirate of Afghanistan."[155]

400.    The Taliban promised U.S. negotiators that they would sever their alliance with al-Qaeda and kick them out of Afghanistan.  That was a lie, and they have done the exact

---

[151] *John King Presents:  Full Interview with Secretary of Defense Robert Gates*, CNN (May 8, 2010), 2010 WLNR 27823364.

[152] Hindustan Times, *Pakistan Must Meet Certain Expectations on Counter-Terrorism* (Apr. 22, 2011).

[153] Ayaz Ahmed & Dr. Faisal Javed, *Pakistan And SCO:  Opportunities for Pakistan*, Asian Defence J. (Aug. 31, 2016), 2016 WLNR 25890108.

[154] Walter Laquer and Christopher Wall, *The Future of Terrorism* 153 (St. Martin's Press 2018) ("Laquer and Wall, *Future of Terrorism*").

[155] Plaintiffs categorically reject, in the strongest possible terms, any suggestion that the self-proclaimed "Islamic Emirate of Afghanistan" is a lawful government or anything other than terrorists.  Plaintiffs recognize, however, that these terrorists – who remain a Foreign Terrorist Organization (in the case of al-Qaeda and the Haqqani Network) or Specially Designated Global Terrorist (in the case of the Taliban), now exercise territorial control over Afghanistan.

opposite since their victory. Indeed, al-Qaeda's continuing fusion with the Taliban, including its

Haqqani Network, was amply demonstrated after the fall of the U.S.-allied government there to

the terrorists, when a litany of high-level al-Qaeda terrorists publicly traveled back, media

retinue in tow, to their ancestral haunts in Afghanistan for the "conquering hero" photo-op.

### 2. Sirajuddin Haqqani (Al-Qaeda; Taliban; Haqqani Network)

401. From 9/11 through today, al-Qaeda's terrorist enterprise benefited from al-Qaeda

operatives who were "polyterrorists," *i.e.*, al-Qaeda terrorist operatives who ***also*** simultaneously

served as a terrorist operative for one or more al-Qaeda affiliates. By design, al-Qaeda

operatives were often members of other Pakistan-based al-Qaeda affiliates, most commonly, the

Haqqani Network and Lashkar-e-Taiba. Typically, al-Qaeda's and the Haqqani Network's

polyterrorist operatives or agents served the group's transnational terrorist activities in support of

the attack campaign against Americans in Afghanistan. Former assistant Treasury secretary for

terrorist finance Juan C. Zarate explained in 2013:

> Treasury's [counter-terror] strategy ... aimed at targeting networks of key
> financial actors and nodes in the terrorist support system. The point was ... to
> make it harder for individuals who were financing terrorists to access the formal
> financial system. Our analyses therefore focused on the networks of actors and
> institutions providing the financial backbone to terrorist enterprises. Interestingly,
> we found that there were all-purpose financiers who would give to multiple
> causes—"polyterror" supporters.[156]

402. Since the mid-2000s, Sirajuddin Haqqani was – and remains today – the signal

example of an al-Qaeda "polyterrorist" operative who killed Americans. Sirajuddin Haqqani

was the son of bin-Laden's long-standing ally, mentor, and protector, Jalaluddin Haqqani. By

2008, Sirajuddin Haqqani was simultaneously: (1) a senior al-Qaeda operative, leader, and

---

[156] Juan C. Zarate, *Treasury's War: The Unleashing of a New Era of Financial Warfare* 41
(Public Affairs 2013) ("Zarate, *Treasury's War*").

attack planner, who served as the most important member of al-Qaeda's military council (essentially, it's terrorist planning committee); (2) the Haqqani Network's top operative, attack planner, and leader; and (3) a senior leader of the Quetta Shura Taliban, which would eventually make him its number two leader (Deputy Emir).

403.  Sirajuddin Haqqani's father, Jalaluddin Haqqani, was the most iconic Islamist terrorist in Afghanistan and Pakistan after bin Laden (and a far bigger deal there than bin Laden prior to 9/11). Sirajuddin grew up observing his father Jalaluddin play a leadership role coordinating the efforts of more than half a dozen separate Islamist groups that had all united in an alliance to attack Soviet forces in Afghanistan to drive the Soviet Union out of there. Like the phenomenon of the children of professional coaches going into coaching themselves because they grew up marinating in it and becoming great coaches as a result, Sirajuddin's unparalleled biography and personal networks made him the hub of al-Qaeda and Taliban terror.

404.  On February 29, 2008, the U.S. State Department designated Sirajuddin Haqqani a Specially Designated Global Terrorist for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States" and the U.S. Congress specifically identified Sirajuddin Haqqani as "the overall leader of the Haqqani Network as well as the leader of the Taliban's Mira shah Regional Military Shura" in 2012.[157]

405.  When the U.S. Treasury Department designated Sirajuddin Haqqani's uncle Khalil Al-Rahman Haqqani as a SDGT, it noted that he "has also acted on behalf of al-Qa'ida

---

[157] Public Notice, *In the Matter of the Designation of Sirajuddin Haqqani, aka Sirajuddin Haqani, aka Siraj Haqqani, aka Siraj Haqani, aka Saraj Haqqani, aka Saraj Haqani, as a Specially Designated Global Terrorist Pursuant to Section 1(b) of Executive Order 13224, as Amended*, 73 Fed. Reg. 12,499 (Mar. 7, 2008); Pub. L. 112-168, 126 Stat. 1299, § 2(a)(8) (Aug. 10, 2012).

and has been linked to al-Qa'ida military operations."[158] The Treasury Department likewise has repeatedly recognized links between Haqqani Network leaders and al-Qaeda.

406.    Sirajuddin Haqqani facilitated al-Qaeda members' efforts to join and fight with the Haqqani Network and the rest of the Taliban. According to U.S. intelligence officers, Sirajuddin Haqqani acts as a member of al-Qaeda's military council. U.S. officials have described him as al-Qaeda's top facilitator in Afghanistan.

407.    Other than Osama bin Laden, Sirajuddin Haqqani was the single most important al-Qaeda leader since 9/11.  By joining al-Qaeda management, Sirajuddin achieved a level of interoperability and cohesion between al-Qaeda and the Taliban, including its Haqqani Network, that greatly magnified the lethality of the terrorists' campaign.

408.    Sirajuddin Haqqani was also, like his father Jalaluddin Haqqani, famous for his pragmatism in defense of his extremism.  Sirajuddin was willing to do deals and make trades with people, groups, and governments whom he may otherwise wish to kill if the deal in question made it more likely that al-Qaeda and the Taliban, including its Haqqani Network, could kill Americans in Afghanistan.

409.    Sirajuddin Haqqani was the most important transnational Syndicate leader and played a vital role in harmonizing the various strategies and tactics, as well as promoting network efficiencies.  Thus, for example, if a Qods Force "security" operative needed secure travel into Paktika Province (a Haqqani Network stronghold), the Qods Force terrorist could contact someone from the Haqqani clan and make the necessary arrangements.

---

[158] Press Release, U.S. Dep't of Treasury, *Treasury Targets the Financial and Support Networks of Al Qa'ida and the Taliban, Haqqani Network Leadership* (Feb. 9, 2011).

410.    When Plaintiffs were attacked, Sirajuddin Haqqani, and the al-Qaeda and Taliban organizations he led, promoted deep cooperation amongst al-Qaeda, the Taliban (including its Haqqani Network), and the IRGC (including its Hezbollah Division and Qods Force).

411.    When Plaintiffs were injured between August 2017 and 2019, Sirajuddin Haqqani served as the top Syndicate "polyterrorist" responsible for coordinating key transnational-facing aspects of the Syndicate's terrorist campaign in Afghanistan and, in coordinating with other al-Qaeda and affiliated terrorists.  Each of the below attack campaigns or types constituted an act of international terrorism committed by al-Qaeda, the Taliban, including its Haqqani Network, that was aided by the IRGC, including its Hezbollah Division and Qods Force.

(i)     **Kabul Attack Network Attacks.**  Sirajudin Haqqani planned and authorized the Syndicate attacks that targeted Kabul – which Sirajuddin Haqqani personally viewed as a tactical priority – that were committed by joint al-Qaeda/Taliban (including Haqqani Network)/Lashkar-e-Taiba cells known as the Kabul Attack Network, including such joint cell's IED and suicide bomb attacks in Kabul and the surrounding provinces.

(ii)    **Fertilizer Bomb Attacks.**  Alongside al-Qaeda, Sirajjudin Haqqani planned and authorized al-Qaeda's fertilizer bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's strategy for:

   a.   sourcing fertilizer;

   b.   purchasing and transporting fertilizer;

   c.   operating al-Qaeda bombmaking factories hosted at Sirajuddin's personal network of joint al-Qaeda-Haqqani Network terrorist camps in Pakistan; and

   d.   deploying fertilizer bombs as IEDs and suicide bombs to attack Americans in Afghanistan.

(iii)   **Suicide Bomber Attack**s.  Sirajjudin Haqqani planned and authorized al-Qaeda's suicide bombing campaign, including, but not limited to, al-Qaeda's and the Haqqani Network's shared strategy for:

   a.   planning the targets for suicide bomber attacks in Afghanistan;

127

    b.   sourcing suicide bombers through al-Qaeda's and the Haqqani Network's long-standing allies, Lashkar-e-Taiba and Jaish-e-Mohammed; and

    c.   coordinating the "suicide bomber infrastructure" of camps, madrassas, ratlines, and safehouses, which relied heavily upon al-Qaeda and Haqqani Network resources and polyterrorists like Sirajuddin.

(iv)    **Kidnapping Attacks.** Sirajuddin Haqqani planned and authorized kidnappings in Kabul.

(v)    **Transnational Terrorist Finance and Logistics.** Sirajuddin Haqqani planned and authorized al-Qaeda's and the Taliban's, including its Haqqani Network's, transnational terrorist logistics, including, but not limited to:

    a.   al-Qaeda and the Taliban's, including its Haqqani Network's, transnational rackets necessary to the success of their:

        i.   criminal funding efforts, e.g., money laundering, protection rackets, and tax fraud);

        ii.   fundraising and money movement, e.g., diaspora donations, banking relationships;

        iii.   "tax" collection from the criminal underworld of their diaspora globally, e.g., logistics, communications in the U.A.E., Pakistan, Afghanistan, and Europe; and

    b.   al-Qaeda's and the Haqqani Network's transnational-operations and activities in Afghanistan, Pakistan, and the U.A.E. as they relate to smuggling or logistics, both of which have always ranked as top Haqqani Network specialties.

(vi)    **Coordination Between FTOs.** Sirajuddin Haqqani led two FTOs (al-Qaeda and the Haqqani Network) and was responsible for, or supervised those who were responsible for (like his brother Anas) managing al-Qaeda's and the Taliban's (including its Haqqani Network's) relationships with a broad international alliance of allied terrorists, including, but not limited to:

    a.   the IRGC, including its Hezbollah Division and Qods Force;

    b.   the Pakistani Taliban, a member of the Syndicate;

    c.   Lashkar-e-Taiba, a member of the Syndicate; and

    d.   Jaish-e-Mohammed, a member of the Syndicate.

412. For more than a decade, and continuing through to today, Sirajuddin Haqqani was wanted by the FBI for his involvement in numerous acts of terror against Americans (he still is).

413. Even though he was (and remains) an FBI-Most-Wanted mass murderer with a reputation for savagery that was extreme even by Islamist standards, the *New York Times's* editorial board shamefully elected to publish an op-ed authored by Sirajuddin himself, titled "What We, the Taliban, Want,"[159] on February 20, 2020. Sirajuddin's op-ed was pure terrorist propaganda designed to persuade an American audience that the Taliban, including its Haqqani Network, had turned a more "inclusive" and "peaceful" page. Other than its title and the fact that Sirajuddin wrote it, the *Times* opinion piece was propaganda and of no value.

414. Along with his brothers, who were also (and remain) key Haqqani Network leaders, as well as al-Qaeda operatives and/or agents, Sirajuddin Haqqani personally spearheaded the terrorists' successful campaign on Kabul in August 2021.

415. Today, Sirajuddin Haqqani serves as the terrorist who is responsible for the "Islamic Emirate of Afghanistan's"[160] borders and guns, while his brothers have responsibilities relevant to intelligence and information.

### 3. The Taliban, Including Its Haqqani Network

416. The Taliban is a Sunni Islamic terrorist organization comprised originally of former mujahideen fighters who had expelled the Soviet Union from Afghanistan.

417. The Haqqani Network is the most radical part of the Taliban. While Plaintiffs address each separately, they are part of the same organization (i.e., the Taliban).

---

[159] Sirajuddin Haqqani, *What We, the Taliban, Want*, New York Times (Feb. 20, 2020).

[160] Plaintiffs refuse to recognize the legitimacy of the self-proclaimed "Islamic Emirate of Afghanistan," but recognize that these terrorists, who remain FTOs (in the case of al-Qaeda and the Haqqani Network) and SDGTs (in the case of the Taliban), now exercise complete territorial control of a nation.

### i.  The Taliban

418.    In 2002, the U.S. designated the Taliban and its leader Mohammed Omar as Specially Designated Global Terrorists. President Bush found that these designations guarded against "grave acts of terrorism and threats of terrorism committed by foreign terrorists."[161]

419.    On December 26, 2007, Congress enacted a law declaring that, for purposes of "section 212(a)(3)(B) of the Immigration and Nationality Act, . . . the Taliban shall be considered to be a terrorist organization."[162] As a State Department official explained, the U.S. government treats the Taliban "as a Foreign Terrorist Organization for immigration purposes."[163]

420.    At all relevant times, the U.S. government viewed the Taliban as a terrorist group, not as the legitimate armed force of any nation.

421.    The Taliban's principal goal has long been to expel Americans from the country and undermine the democratically elected government of Afghanistan. To that end, the Taliban attacked U.S. forces from 2001 through 2020, and achieved its objective in 2021.

### ii.  The Haqqani Network

422.    The Haqqani Network is a Sunni Islamic terrorist organization that has been operating in Afghanistan since the 1970s. It was founded by Jalaluddin Haqqani and is now led by his son, Sirajuddin Haqqani. The Haqqani Network is a member of the Syndicate, has been a part of the Taliban for decades, and is closely allied and interdependent with al-Qaeda.

423.    On September 19, 2012, the U.S. State Department designated the Haqqani Network as an FTO.

---

[161] Exec. Order No. 13,268, 67 Fed. Reg. 44,751 (July 3, 2002).

[162] Consolidated Appropriations Act of 2007, § 691(d), Pub. L. No. 110-161, 121 Stat. 1844, 2365.

[163] U.S. Dep't of State, *Senior Administration Officials on the Terrorist Designation of the Haqqani Network* (Sept. 7, 2012).

424.    The U.S. designated multiple Haqqani leaders as SDGTs.  As previously mentioned, the U.S. designated Sirajuddin Haqqani as an SDGT in 2008 and, in 2010 and 2011, the followed up by designating three other Haqqanis—Nasiruddin, Khalil Al-Rahman, and Badruddin—as fundraisers and commanders of the Haqqani Network.  By February 2014, the U.S. had designated fourteen leaders in the Haqqani Network under Executive Order 13224.[164]

425.    The Haqqani Network was especially active in the southeastern parts of Afghanistan, particularly in the Paktia, Paktika, and Khost ("P2K") Provinces.  It also developed a significant presence in the surrounding Provinces of Kabul, Logar, Wardak, Ghazni, and Zabul. Because of the Haqqani Network's longstanding tribal connections to the southeastern region of Afghanistan, the Taliban often acts through the Haqqani Network in those areas.

426.    The Haqqani Network's influence is not limited to one Afghan region. There is also significant overlap between the broader leadership of the Taliban and the Haqqani Network. Sirajuddin Haqqani has been a member of the Taliban's governing council since at least 2010. Since 2015, he has been the Deputy Emir of the Taliban, the Taliban's second in command. Working alongside al-Qaeda, the Haqqani Network has overseen the Taliban's terrorist attacks on U.S. and Coalition forces in Afghanistan. For example, after September 11, Jalaluddin Haqqani effectively served as the Taliban's secretary of terrorism and planned many of the Taliban's attacks on U.S. forces in the early days following the overthrow of the Taliban government while sheltering al-Qaeda leadership at the time.

---

[164] It is not uncommon for the U.S. government to issue a terrorism-related designation years, and sometimes even decades, after a terrorist suspect first becomes internationally notorious for his or her role enabling terror.  This ordinarily does not reflect uncertainty about whether someone was a terrorist, only the uniquely cumbersome inter-agency legal and diplomatic process, which often stretches years, that the U.S. government completes before most terrorism-related designations including, on information and belief, each designation identified in this Complaint.

427. Both Sirajuddin and Jalaluddin Haqqani have confirmed that the Haqqani Network operates as part of the Taliban. The Taliban has rejected claims that the Haqqani Network is separate from the Taliban.

428. The Haqqani Network has significant links to al-Qaeda, dating back to the 1980s when Osama bin Laden established a training camp for his nascent terrorist group in Haqqani-controlled territory. After September 11, the Haqqanis provided sanctuary to bin Laden.

429. The Haqqani Network's close relationship with al-Qaeda and other terrorist groups has helped grow the modern terrorist Syndicate operating in Afghanistan. In furtherance of that goal, the Haqqani Network provides protection to al-Qaeda so that it can launch attacks in Afghanistan and plan acts of international terrorism abroad. Senior Haqqani Network officials also have publicly indicated that the Haqqani Network and al-Qaeda are one. And in July 2008, Jalaluddin Haqqani's son—18-year-old Muhamman Omar Haqqani—was killed alongside a top al-Qaeda commander in southeast Afghanistan. The Haqqani Network also maintains training camps and safe houses that have been used by al-Qaeda and Taliban operatives.

430. Along with al-Qaeda, the Haqqani Network jointly operated and conducted al-Qaeda's CAN fertilizer bomb campaign in Afghanistan, and Haqqani Network agents, operatives, and fronts, including Haqqani Network co-conspirators Fatima and Pakarab, were vital to sourcing every component necessary for the Syndicate to execute its CAN fertilizer bomb campaign at a nationwide scale throughout Afghanistan.

431. The Haqqani Network ordinarily managed the Taliban's transnational terrorist finance and logistics operations and often aided al-Qaeda's transnational terrorist finance and logistics activities. When doing so, the Haqqani Network used its network of agents, operatives, and fronts in the U.A.E. as an alias for its fellow Syndicate terrorists. As explained by Haqqani

Network expert Gretchen Peters, the Haqqani Network's interlocking financial support of other Syndicate members through cross-border transactions included, but was not limited to: (1) managing the Taliban's international narcotics enterprises, and repatriating[165] profits back to the Taliban to fund attacks against Americans in Afghanistan; (2) raising funds for al-Qaeda and the Taliban from commercial activities overseas and repatriating those monies back to al-Qaeda and the Taliban to fund attacks against Americans in Afghanistan; and (3) committing transactions through known Haqqani Network operatives, agents, or fronts around the world, including, but not limited to, such Haqqani Network assets in the U.A.E., Afghanistan, Pakistan, Russia, Central Asia, Germany, Italy, Cyprus, and other key sites in Europe, the Middle East, and Asia, all of which directly funded al-Qaeda and Haqqani Network operations that supported their shared terrorist campaign against Americans in Afghanistan.

432. The Treasury Department determined that the Haqqani Network regularly used its transnational terrorist finance activities to fund multiple al-Qaeda-affiliated Syndicate members simultaneously. For on February 9, 2011, the Treasury Department designated Syndicate operatives, Said Jan Abd Al-Salam and Khalil Al-Rahman Haqqani (Jalaluddin's brother), as SDGTs to "target the financial and support networks of al-Qa'ida, the Taliban and the Haqqani Network leadership."[166]

---

[165] By "repatriating profits," Plaintiffs refer to the process through which al-Qaeda, the Haqqani Network, and their allies, used their operatives, agents, fronts, or partners to launder illicit overseas income, convert such funds into U.S. Dollars from their original currency (*e.g.*, Russian Rubles), and transfer such cleansed money back to the terrorist group's designated "controller," *e.g.*, Altaf Khanani, who then manages the money and disperses it consistent with the needs and request of the terrorist group. Such "repatriation" by al-Qaeda, the Taliban (including the Haqqani Network), and their allies occurred through their use of operatives, agents, fronts, and partners throughout the world.

[166] *Id.*

133

433.    By 2010, CAN fertilizer sourced from Pakistan was "one of the most coveted substances in a Taliban bomb-maker's arsenal" and served as "the basic ingredient of the Taliban's roadside bombs,"[167] and the Syndicate had developed a sophisticated end-to-end logistics chain for the sourcing, manufacture, and distribution of al-Qaeda CAN fertilizer bombs. By 2011, "U.S. military officials believe[d] the Haqqani [N]etwork" was "working closely with [CAN fertilizer] suppliers," *e.g..*, Fatima, "to help smuggle the fertilizer across the border."[168]

434.    By the time it was designated as an FTO on September 19, 2012, the Haqqani Network, working closely with al-Qaeda, had grown and refined the Syndicate's CAN fertilizer bomb logistics chain in Afghanistan and Pakistan for more than five years.

### 4.    The Kabul Attack Network

435.    The Kabul Attack Network was an operational manifestation of the terrorist syndicate led by al-Qaeda and the Taliban, including its Haqqani Network.  Specifically, the Kabul Attack Network was a set of terrorist cells, which included members from each of the terrorist groups involved in the Syndicate and focuses on attacks against targets in Kabul and extending outward into the provinces of Logar, Wardak, Nangarhar, Kapisa, Kunar, Ghazni, and Zabul.[169]  It was active around key waypoints and transit routes on the way to Kabul, including Wardak, Ghazni City, and areas of Logar Province.

436.    The Kabul Attack Network's forward-deployed terrorists were drawn from joint cells comprised of al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, and

---

[167] Alex Rodriguez, *Bribes Keep Taliban Flush with Explosives*, L.A. Times (May 8, 2010), 2010 WLNR 9039604.

[168] Aamer Madhani, *Tensions With Pakistan Rise Over Bomb Ingredient*, National Journal Daily (Jul. 6, 2011), 2011 WLNR 13371684.

[169] Bill Roggio, *Karzai Assassination Plotters Part of Kabul Attack Network*, Long War J. (Oct. 5, 2011).

Jaish-e-Mohammed, each of whom participated in Kabul Attack Network attacks and contributed personnel and resources to such attacks. For each group, the Kabul Attack Network's attacks were the most important, or among the most important, priorities of the Syndicate's entire terrorist campaign since 9/11, and thus received special focus from each Syndicate member.

437.     Attacks committed by the Kabul Attack Network were committed jointly by a combined cell comprised of these terrorists. By the same token, funding for any of the involved terrorist groups contributed to the Network's attacks.

438.     The Kabul Attack Network was responsible for high profile and/or mass casualty attacks on Americans in Kabul and the surrounding areas that relied upon fertilizer bombs, suicide bombers, kidnappers, or insider attacks.[170]

439.     On January 24, 2010, the Afghan government accused al-Qaeda of specifically planning the Kabul Attack Network's CAN fertilizer bomb attacks in Kabul, which the Syndicate delivered via IED and suicide bomb.

440.     Sirajuddin Haqqani, the dual-hatted al-Qaeda-Taliban terrorist, planned and authorized every attack committed by the Kabul Attack Network, working with local commanders like Mullah Dawood. to execute the Kabul Attack Network's attacks. As a result, at all relevant times, the Kabul Attack Network's attacks were planned and authorized by at least one FTO (al-Qaeda), and after September 19, 2012, Kabul Attack Network attacks were planned and authorized jointly by two FTOs (al-Qaeda and the Haqqani Network).

441.     According to an ISAF public affairs officer, the "Haqqani Network [was] deeply entrenched in the Kabul Attack Network specifically with the facilitation of weapons and

---

[170] Bill Roggio, *Afghan Intel Captures Taliban Commander Involved In Targeting 'Foreigners' In Kabul*, Long War J. (Mar. 31, 2015).

fighters into the area south of Kabul in Logar and Wardak."[171]  Additionally, senior Haqqani leaders operating from their traditional strongholds often planned and executed terrorist attacks by the Kabul Attack Network, sometimes even giving tactical advice during attacks.

442.    The Kabul Attack Network's attacks were funded and logistically supported by al-Qaeda, the Taliban (including its Haqqani Network), Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company access to terrorist finance in Afghanistan, Pakistan, and worldwide, including through their conspiracy with the IRGC, including its Hezbollah Division and Qods Force. Thus, terrorist finance that flowed to any of these groups aided Kabul Attack Network attacks.

> **5.      The IRGC's, Including Its Hezbollah Division's And Qods Force's, Aid To Al-Qaeda, the Taliban, Including Its Haqqani Network, to Facilitate Attacks Against Americans In Afghanistan**
>
> > **i.      The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support For Anti-American Terrorism In Afghanistan To Undermine The U.S. Mission There**

443.    Although there are religious differences between the Shiite Iranian regime and the Sunni Taliban organization, those differences have not deterred Iran from supporting the Taliban's terrorist activities.  Iran and the Taliban share a core geopolitical aim:  to inflict mass casualties on Americans in the region.  As two military-intelligence scholars observed, "the Iranian regime is ideologically and religiously opposed to the Taliban, [but] it nevertheless views the group as a useful counterweight to the United States."[172]  Similarly, as a Taliban commander stated in 2010 of Iran, "Our religions and our histories are different, but our target is the same –

---

[171] Bill Roggio, *Senior Taliban Commander Killed in Eastern Afghanistan*, Long War J. (Aug. 20, 2010).

[172] *Iran's Balancing Act* at 5.

we both want to kill Americans."[173]  Sectarian distinctions aside, Iran has supported and funded attacks by the Taliban on U.S. and allied forces in Afghanistan to harm the United States.

444.    The Fourth Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Afghanistan.[174]  During the relevant timeframe, the Qods Force did so largely by providing the Taliban (including the Haqqani Network) with material support for terrorist attacks in Afghanistan.  The Fourth Corps' al-Ansar Command Center is based in Iran's second-largest city, Mashhad, near the border with Afghanistan.[175]  Mashhad naturally serves as a stopping point between Afghanistan and Tehran, Iran's capital.[176]

445.    Following the 9/11 attacks on the United States, Iran met with senior Taliban officials to offer military aid to support the Taliban's fight against U.S.-led Coalition forces.  Iran planned that meeting and hosted it on the Iranian side of the Afghanistan border.  As part of this initial offer of support, Iran pledged to sell advanced military equipment to the Taliban for use against U.S. and allied forces, boasted of Iran's ability to track U.S. troop movements, and promised to allow terrorists entering Afghanistan to travel through Iranian territory.  Iran also provided safe harbor to Taliban leaders who escaped U.S. forces.

446.    Immediately following the U.S. invasion of Afghanistan, Iran made a pretense of professing support for the U.S. and NATO mission, but in reality was already seeking to undermine it.  In February 2002, then-CIA Director George J. Tenet testified before Congress that "initial signs of Tehran's cooperation and common cause with us in Afghanistan are being

---

[173] Bill Roggio, *Taliban Commander Linked To Al Qaeda, Iran, Killed In US Strike In Western Afghanistan*, Long War J. (July 16, 2010).

[174] *JIEDDO Report* at 5.

[175] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

[176] *JIEDDO Report* at 5.

eclipsed by Iranian efforts to undermine US influence there.  While Iran's officials express a

shared interest in a stable government in Afghanistan, its security forces appear bent on

countering the US presence."[177]  As one scholar explained, Iran "feared the US might use

Afghanistan as a base from which to launch a kinetic attack on Iran.  The Taliban insurgency

thus became viewed by Tehran as a tool with which to keep American forces preoccupied."[178]

447.    The U.S. government documented Iran's escalating support for the Taliban

terrorists over the course of the United States' involvement in Afghanistan.  In April 2007,

General Peter Pace, Chairman of the U.S. Joint Chiefs of Staff, stated that Iranian explosives had

been captured in Kandahar Province en route to the Taliban but acknowledged that it was not yet

entirely clear who within Iran was responsible.[179]  The next day, U.S. Assistant Secretary of

State Richard Boucher described "a series of indicators that Iran is maybe getting more involved

in an unhealthy way in Afghanistan."[180]

448.    Those indicators rapidly grew in intensity, and soon there was little doubt that

Iran was actively sponsoring the Taliban terrorists as a core part of its foreign policy.  A

purported May 2007 U.S. State Department cable (as published online), for example, reported

that Afghan President Hamid Karzai had expressed concerns "over Iranian agents engaging

Taliban and supplying them with weapons."  A purported July 2007 U.S. State Department cable

(as published online) similarly reported that Taliban terrorists had received "light weapons and

---

[177] *DCI Testimony:  Converging Dangers in a Post 9/11 World*, Central Intelligence Agency
(Feb. 6, 2002).

[178] Farhad Rezaei, *Iran and the Taliban:  A Tactical Alliance?*, The Begin-Sadat Center for
Strategic Studies (Jan. 15, 2019) ("*Iran and the Taliban:  A Tactical Alliance?*").

[179] Breffni O'Rourke, *Afghanistan:  U.S. Says Iranian-Made Weapons Found*, RadioFreeEurope
(Apr. 18, 2007).

[180] *Id.*

grenade launchers [that] bore the stamps of the Iranian factories where they were manufactured, primarily in 2006 and 2007." The same cable explained that the fighters claimed they had received training in Iran and had been promised access to antiaircraft rockets by Iranian officials. A purported military-intelligence summary the next month (as published online), reported on an "'alarmingly rapid increase' in Iranian presence in Afghanistan."

449.    When the U.S. Treasury Department designated the Qods Force as a SDGT later in 2007, it confirmed that the "Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan."[181]  As the designation explained:

> The Qods Force is the Iranian regime's primary instrument for providing lethal support to the Taliban. The Qods Force provides weapons and financial support to the Taliban to support anti-U.S. and anti-Coalition activity in Afghanistan. Since at least 2006, Iran has arranged frequent shipments of small arms and associated ammunition, rocket propelled grenades, mortar rounds, 107mm rockets, plastic explosives, and probably man-portable defense systems to the Taliban. . . .  Through Qods Force material support to the Taliban, we believe Iran is seeking to inflict casualties on U.S. and NATO forces.[182]

450.    Similar observations continued in 2008.  According to the U.S. State Department's 2008 Country Reports on Terrorism:  "The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[183]

451.    The U.S. government's JIEDDO recognized in a 2009 report that "Iran's intentions are the same in both Iraq and Afghanistan:  to develop, fund and arm proxy networks

---

[181] Press Release, U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

[182] *Id.*

[183] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

to leverage against the perceived U.S. aim of pursuing an active regime change doctrine in Iran."[184]  Similarly, a purported January 2010 cable (as published online) explained that senior officials from the United Arab Emirates' State Security Department had accused Iran, through the IRGC, of supporting the Taliban by providing money and weapons, smuggling drugs, and facilitating the movement of Taliban leaders and fighters.

452.    According to another purported February 2010 cable (as published by online), President Karzai's Chief of Staff and former Ambassador to Iran, Omar Daudzai, reported that Iranian officials were no longer denying Iran's support for the Taliban in Afghanistan, instead remaining silent in the face of the assertion by the Government of Afghanistan.

453.    By April 2010, the U.S. Department of Defense reported that Iran was "covertly" supporting the Taliban.  "Arms caches have been recently uncovered with large amounts of Iranian manufactured weapons, to include l07mm rockets, which we assess IRGC-QF delivered to Afghan militants." [185]  It further explained that "Tehran's support to the Taliban is inconsistent with their historic enmity, but fits with Iran's strategy of backing many groups to ensure that it will have a positive relationship with the eventual leaders."[186]

454.    On August 3, 2010, the U.S. Treasury Department – pursuant to Executive Order 13224 – designated General Hossein Musavi and Colonel Hasan Mortezavi, senior officials in the Qods Force, as SDGTs for their roles in supporting the Taliban.[187]  General Musavi was the

---

[184] *JIEDDO Report* at 5.

[185] Unclassified Report on Military Power of Iran (Apr. 2010), https://fas.org/man/eprint/dod_iran_2010.pdf.

[186] *Id*.

[187] Press Release, U.S. Treasury Dep't, *Fact Sheet: U.S. Treasury Department Targets Iran's Support for Terrorism Treasury Announces New Sanctions Against Iran's Islamic Revolutionary Guard Corps-Qods Force Leadership* (Aug. 3, 2010).

leader of the Ansar Corps, also known as the Fourth Corps, the branch of the Qods Force responsible for carrying out activities within Afghanistan.[188]  The U.S. Treasury Department found that both General Musavi and Colonel Mortezavi, acting in their capacity as senior Qods Force officers, had provided "financial and material support to the Taliban."[189]  The U.S. Treasury Department further concluded that "the IRGC-QF provides select members of the Taliban with weapons, funding, logistics and training."[190]

455.    General David Petraeus, then the Commander of the ISAF, testified before the Senate Armed Services Committee in March 2011 that Iran "without question" supplied weapons, training, and funding to the Taliban in order to "make life difficult" for U.S. and NATO forces in Afghanistan.[191]

456.    When the U.S. Department of Defense provided Congress with its Annual Report on Military Power of Iran in April 2012, it explained that, even though Iranian "support to the Taliban is inconsistent with their historic enmity, it complements Iran's strategy of backing many groups to maximize its influence while also undermining U.S. and [NATO] objectives by fomenting violence."[192]  By means of "the IRGC-QF, Iran provides material support to terrorist

---

[188] *Id.*

[189] *Id.*

[190] *Id.*

[191] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

[192] *Annual Report on Military Power of Iran* 2 (Apr. 2012).

or militant groups such as . . . the Taliban."[193]  The U.S. Department of Defense characterized the support as part of a "grand strategy" to "challeng[e] U.S. influence."[194]

457.    In its 2012 Report on Progress Toward Security and Stability in Afghanistan, the U.S. Department of Defense reported to Congress that Iran was engaging in "covert activities" in Afghanistan, including the provision of weapons and training to the Taliban.[195]  As the report explained, "Since 2007, Coalition and Afghan forces have interdicted several shipments of Iranian weapons.  Tehran's relationship with the insurgency, although not ideologically based, is consistent with Iran's short- to mid-term goal of undermining Coalition efforts and opposing the international military presence in Afghanistan."[196]

458.    Less than two years later, the U.S. Treasury Department concluded that the Qods Force "utilized now-detained Afghan associate, Sayyed Kamal Musavi, who was designated today, to plan and execute attacks in Afghanistan."  It further confirmed that "[t]wo IRGC-QF officers also designated today, Alireza Hemmati and Akbar Seyed Alhosseini, provided logistical support to this associate."[197]  Similarly, according to a Taliban commander in central Afghanistan in 2015:  "Iran supplies us with whatever we need."[198]

459.    In 2016, Taliban leader Mullah Mansour was killed by an American drone strike while returning to Afghanistan from Tehran, where he had been meeting with Iranian security

---

[193] *Id*. at 3.

[194] *Id*. at 1.

[195] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 148 (Dec. 2012).

[196] *Id.*

[197] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[198] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

officials, and possibly directly with Ayatollah Ali Khameni, to discuss tactical coordination of Taliban terrorist activities in Afghanistan. He had made at least two visits to Iran since 2013.

460. Iran's support for terrorist groups in Afghanistan has continued. The U.S. State Department stated in 2017 that "Iran is responsible for intensifying multiple conflicts and undermining the legitimate governments of, and U.S. interests in, Afghanistan . . . ."[199] The U.S. Department of Defense similarly confirmed that Iran "provides some support to the Taliban and Haqqani Network."[200] In May 2018, U.S. Secretary of State Michael Pompeo publicly accused Iran of supporting the Taliban and other terrorist groups in Afghanistan.[201]

461. In October 2018, the U.S. Treasury Department, pursuant to Executive Order 13224, designated additional Qods Force officials "for acting for or on behalf of IRGC-QF and for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the Taliban."[202] The U.S. Treasury Department acted along with the six other member nations of the Terrorist Financing Targeting Center – a multinational, cooperative effort to combat terrorism in the Middle East.[203]

---

[199] *Country Reports on Terrorism 2017* at Foreword.

[200] U.S. Dep't of Def., *Enhancing Security and Stability in Afghanistan at 21* (June 2017).

[201] *Mike Pompeo speech: What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018).

[202] Press Release, U.S. Treasury Dep't, *Treasury and the Terrorist Financing Targeting Center Partners Sanction Taliban Facilitators and their Iranian Supporters* (Oct. 23, 2018).

[203] *Mike Pompeo speech: What are the 12 demands given to Iran?*, Al Jazeera News (May 21, 2018); Press Release, U.S. Treasury Dep't, *U.S. and Saudi Arabia to Co-Chair New Terrorist Financing Targeting Center* (May 1, 2017).

462.     The Secretary of Iran's Supreme National Security Council, Ali Shamkhani, publicly acknowledged Iran's support for the Taliban in January 2019, claiming that it was designed to "curb the security problems in Afghanistan."[204]

463.     Most recently, the United States has recognized Iran's support of the Taliban in the aftermath of Qassem Soleimani's death.  In a press conference in the days after the killing of General Soleimani, Secretary of State Michael Pompeo publicly accused Iran of backing the Taliban and associated groups, including the Haqqani Network.

464.     Iran, in turn, signaled its continued focus on destabilizing U.S. forces in Afghanistan by appointing General Esmail Ghaani ("Ghaani" or "Qaani"), the former head of Iran's Qods Force branch in Afghanistan, to be the top commander of the Qods Force.  General Ghaani traveled to Afghanistan in 2018 as the deputy ambassador of Iran to Kabul and remains focused on cultivating Iran's relationship with the Taliban in Afghanistan.

465.     The Taliban's reaction to Soleimani's death similarly recognized Iran's support for its terrorist activities.  A Taliban statement condemned American forces for the attack on Soleimani and expressed regret for his "martyrdom."  Additional details were reported in Taliban-aligned publications about Soleimani's support for the Taliban, including his meeting with Taliban delegations in Iran, personally traveling to Afghanistan, and planning attacks.

466.     Consistent with the policy described above, Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs or their family members.  As explained below, that support took the form of "currency . . .  lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications

---

[204] *Iran and the Taliban:  A Tactical Alliance?*

144

equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[205]

### ii. The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban, Including its Haqqani Network, With Weapons, Explosives, And Lethal Substances

467.    Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the Taliban.  Many of the weapons Iran provided were designed to be particularly effective against U.S. and allied forces operating in Afghanistan.  For example, Iran provided the Taliban with anti-tank mines, long range rockets, explosively formed penetrators, suicide vehicle-borne improvised explosive devices, rocket-propelled grenades, and explosives, which were uniquely suited for terrorist attacks on U.S. and allied forces.

468.    U.S. and allied forces have seized large caches of Iran-made weapons and explosives in Afghanistan, many of which bore markings of Iranian origin.  A purported April 2007 military-intelligence summary (as published online) reported that "Iranian officials" were sending "to Afghanistan explosive devices and vehicles ready to be used as SVBIEDs [suicide vehicle-borne improvised explosive devices]."[206]  A purported U.S. government document from August of that year (as published online) also reported that the Afghanistan National Police had found evidence of a planning meeting for 25 suicide attacks in which it was stated that "[t]he materials for the bombs will be supplied by Iran Government . . . ."

---

[205] 18 U.S.C. § 2339A(b)(1).

[206] *Afghanistan War Logs:  Anti-aircraft Missiles Clandestinely Transported From Iran Into Afghanistan – US Report*, The Guardian (July 25, 2010) ("*Anti-aircraft Missiles Clandestinely Transported*"); *see also Afghanistan War Logs: Afghan Government Seeking to Maintain Friendly Relations With Iran,* The Guardian (July 25, 2010) (referencing Iranian-made weapons recently found in Kandahar Province).

469.     When the U.S. Treasury Department designated the Qods Force as a SDGT under Executive Order 13224 in October 2007, it specifically documented Iran's frequent shipments of weapons to the Taliban over at least the prior year.  A purported December 2007 military-intelligence summary (as published online) further reported that explosive samples in suicide vests seized from four suicide bombers "tasked by Taliban/Al-Qaeda leaders" with carrying out a suicide attack in Helmand Province were found to be a 92% probability of a match against a suspected sample of Iran-sourced C4.

470.     In January 2008, a raid by Afghan Police in Farah Province discovered 130 mines, of which the Afghan Police concluded 60 were Iran-made.[207]  That same month the U.S. Ambassador to Afghanistan stated that "[t]here is no question that elements of insurgency have received weapons from Iran."[208]

471.     A purported June 2008 U.S. State Department cable (as published online) detailed multiple instances of Iran transferring arms to the Taliban in 2007 and 2008 and concluded that analyses of the weaponry "indicate the Taliban had access to Iranian weaponry produced as recently as 2006 and 2007."  Similarly, Afghan forces discovered a large cache of Iran-made explosives hidden near the Bakhshabad Dam in Farah Province in March 2009.  That same month, a purported military-intelligence summary (as published online) indicated that Taliban commanders had obtained portable surface-to-air missiles that originated in Iran.

472.     In May 2009, 44 bricks of Iran-made explosives and dozens of Iran-made mortars were discovered in a Taliban stronghold in Helmand Province.  Also in May 2009, Afghanistan border police intercepted a shipment crossing the Iranian border with dozens of anti-tank mines

---

[207] *JIEDDO Report* at 10.

[208] Brian Bennett, *Iran Raises the Heat in Afghanistan*, Time (Feb. 22, 2008).

bound for Afghan militants.  And in September 2009, a purported military-intelligence summary report (as published online) claimed that the Taliban had received "six very powerful anti-tank mines from Iran" to target ISAF forces or important Afghan Police Officers.  That same year, the U.S. State Department reported that, "[s]ince at least 2006, Iran has arranged arms shipments to select Taliban members, including small arms and associated ammunition, rocket-propelled grenades, mortar rounds, 107mm rockets, and plastic explosives."[209]

473.    By 2011, Taliban terrorists were using Iran-made and -sourced long-range rockets to attack Coalition targets in Afghanistan.  In February 2011, British forces intercepted more than four dozen 122-milimeter rockets in Nimruz Province near the Iranian border, which gave the terrorists roughly double the range to attack Coalition targets.  British Foreign Secretary William Hague stated that "detailed technical analysis, together with the circumstances of the seizure, leave us in no doubt that the weaponry recovered came from Iran."[210]  The *Wall Street Journal* similarly reported that U.S. officials "said the rockets' markings, and the location of their discovery, give them a 'high degree' of confidence that they came from the Revolutionary Guard's overseas unit, the Qods Force."[211]  General Petraeus later confirmed that the Qods Force had supplied these rockets to a "known Taliban facilitator."[212]  The U.S. Department of

---

[209] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[210] Julian Borger & Richard Norton-Taylor, *British Special Forces Seize Iranian Rockets In Afghanistan*, The Guardian (Mar. 9, 2011).

[211] Jay Solomon, *Iran Funnels New Weapons to Iraq and Afghanistan*, Wall St. J. (July 2, 2011).

[212] *The Situation in Afghanistan: Hr'g Before the S. Comm. On Armed Services,* 112 Cong. 40 (Mar. 15, 2011) (statement of General David Petraeus), https://www.govinfo.gov/content/pkg/CHRG-112shrg72295/pdf/CHRG-112shrg72295.pdf.

Defense's 2011 Report on Progress Toward Security and Stability in Afghanistan similarly stated that "[f]orensics teams examined the rockets and confirmed an Iranian point of origin."[213]

474.    In June 2015, Iran hired smugglers to ferry supplies across the Iranian border and deliver them to Taliban units in Afghanistan.  These Iran-supplied weapons included 82mm mortars, light machine guns, AK-47 rifles, rocket-propelled grenades, and materials for making roadside bombs.

475.    Iran also provided EFPs to the Taliban.  EFPs are specially shaped charges, first used by Hezbollah in Lebanon, which typically employ a manufactured concave copper disk and an explosive-packed liner.  Thus, when Iran "smuggled [EFPs] to Afghan insurgents for use against U.S. Forces,"[214] Iran supplied the Taliban with a particularly lethal form of support.  Indeed, Iran and Hezbollah designed EFPs to defeat armored vehicles like the ones used by Coalition forces in Afghanistan.  Those EFPs gave the Taliban a sophisticated anti-American weapon that it could not have obtained or deployed effectively on its own.

476.    The Taliban began using EFPs against Coalition forces in 2007.  A purported May 2007 U.S. State Department cable (as published online) reported on increased IED attacks and noted that recent attacks had been successful against armored ISAF vehicles, which indicated an Iran-supplied EFP.  Just days later another purported cable (as published online) reported that two EFPs had been discovered in April 2007 in Herat Province.  Through the summer of 2007, at least four EFPs were discovered in Herat Province, near other Iranian arms shipments.

477.    A purported September 2007 cable (as published online) stated that British forces "in Farah Province, Afghanistan intercepted an arms convoy they had been tracking from inside

---

[213] U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* at 107 (Apr. 2011).

[214] *JIEDDO Report* at 1.

Iran," which included EFPs "of Iranian origin."  One week later, another purported cable (as published online) reported that, according to the U.K. Ambassador to NATO, Stewart Eldon, analysis of the munitions "showed a clear link to Iran and weapons the Iranian Revolutionary Guard Corps Qods Force has sent to insurgents in Iraq."  In 2008, the United Kingdom obtained proof that Iran was supplying the components for these EFPs.

478.    By 2007, the JIEDDO concluded that Iran was attempting to "inflict psychological damage" on the United States by smuggling EFPs "to Afghan insurgents for use against U.S. Forces."[215]

479.    In Afghanistan, Iranian EFPs earned the nickname "Dragons" because their explosive force was concentrated in the direction of the designated target rather than blasting in all directions and dispersing the impact.[216]  Unlike ordinary mines that cause only minor damage to U.S. military vehicles, a Dragon "superbomb" can completely destroy a military Humvee or tank.[217]  According to one Taliban commander, "If you lay an ordinary mine, it will only cause minor damage to Humvees or one of their big tanks.  But if you lay a[n] [Iranian] Dragon, it will destroy it completely."[218]

480.    On information and belief, many Plaintiffs, or their family members, were severely injured or killed in terrorist attacks using Iran-supplied EFPs.

481.    Iran also provided the Taliban with rockets and similar weapons that were particularly effective against U.S. and Coalition forces.  A purported April 2007 military-

---

[215] *JIEDDO Report* at 3.

[216] Kate Clark, *Taliban Claim Weapons Supplied By Iran*, The Telegraph (Sept. 14, 2008).

[217] *Id.*

[218] Steven O'Hern, *Iran's Revolutionary Guard: The Threat That Grows While America Sleeps* at 112 (Potomac Books, 1st ed. 2012) (internal quotations and citation omitted); Kate Clark, *Taliban claim weapons supplied by Iran*, The Telegraph (Sept. 14, 2008).

intelligence summary (as published online), for example, reported that Iran had purchased anti-aircraft missiles from Algeria in late 2006 and then smuggled them from Mashhad, Iran – where the Fourth Corps of the Qods Force is headquartered – into Afghanistan.[219]  A purported Afghanistan Police Report from the next month (as published online) claimed that Iran intelligence sources issued three anti-aircraft launchers and ammunition to a Taliban commander. A purported march 2009 military intelligence summary (as published online) included intelligence reports of portable surface-to-air missiles arriving in Afghanistan from Iran. Similarly, a purported July 2009 military-intelligence summary (as published online) included reports of two dozen "Stinger" style surface-to-air missiles smuggled from Iran into Afghanistan.

482.    According to a purported September 2009 military-intelligence summary (as published online), Taliban terrorists used an Iran-made rocket-propelled grenade launcher to shoot down Coalition helicopters.  The launcher was marked "Made In Iran."  The launcher was particularly effective because, unlike some other launchers, the Iran-made launcher had a scope that could be adjusted for targeting and was more accurate for shooting helicopters.

### iii.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation

483.    Iran also provided members of the Taliban and affiliated terrorist groups with lodging, training, expert advice or assistance, safe harbor, and transportation.  Iran taught the Taliban attack techniques that were particularly effective against U.S. and Coalition forces. Without the training from Iran and its agents, the Taliban would not have been able to launch as successful a terrorist campaign against American forces.

---

[219] *Anti-aircraft Missiles Clandestinely Transported.*

484.    According to a purported June 2006 military-intelligence summary (as published online), two members of the Iranian Intelligence Secret Service had arrived in Parwan Province to help Taliban members "in carrying out terrorist attacks against the [Afghanistan] governmental authorities and the [Coalition] members, especially against the Americans forces."[220]  A purported military-intelligence summary later that year (as published online), reported that injured Taliban terrorists were evacuating to Tehran for shelter.[221]

485.    Iran also trained Taliban fighters at camps within Iran.  For example, a purported April 2007 military intelligence summary (as published online) reported that "Iranian officials train" members of the Taliban at an Iranian base in Birjand, Iran, near the Afghanistan border.[222]  A similar purported June 2007 military intelligence summary (as published online) claimed that the IRGC was training roughly 300 foreign fighters in Iran, presumably to fight in Afghanistan.

486.    A purported military-intelligence summary (as published online) from May 2008 claimed that a Taliban commander had traveled to Iran for training and returned with 40 trained terrorists.  Similarly, a military-intelligence summary (as published online) from July 2008 referenced "trained fighters moving in from Iran."  And a purported military-intelligence summary (as published online) from October 2009 likewise reported on the return of a Taliban commander from training "in an Iran army barracks."

487.    Iran provided Taliban terrorists with specialized training on how best to deploy Iran-supplied weapons against U.S. and Coalition forces.  A purported December 2008 military-

---

[220] *Afghanistan War Logs: US Claims Iran Spies Helping Insurgents to Attack Coalition Forces,* The Guardian (July 25, 2010).

[221] *Afghanistan War Logs: Iranians Alleged to Be Sheltering Wounded Taliban Fighters in Tehran*, The Guardian (July 25, 2010).

[222] *Anti-aircraft Missiles Clandestinely Transported.*

intelligence summary (as published online) reported on a group of 40 insurgents "who allegedly were trained in an Iranian Military base" who had plans to attack the capital of Farah Province using weapons that "Iran Intelligence could have provided." According to a purported April 2009 military-intelligence summary (as published online), Iran was recruiting Taliban terrorists for training in Iran on shooting down Coalition helicopters. And another purported April 2009 military-intelligence summary (as published online), reported on the return of a Taliban commander after receiving IED-manufacturing training in Iran.

488. A March 21, 2010 article in London's *The Sunday Times* reported extensively on Iranian security officials training Taliban recruits to "ambush" Coalition forces, attack checkpoints, and use guns and IEDs. The *Times* interviewed two Taliban commanders – from Wardak and Ghanzi province – who had traveled to Iran with groups of Taliban terrorists for training, which improved their ability to launch lethal attacks on Coalition forces. According to the commanders, Iran paid for this travel and training. One commander who received training in Iran observed that the Taliban's and Iran's "religions and . . . histories are different, but our target is the same — we both want to kill Americans."[223]

489. By 2009, U.S government officials were openly accusing the IRGC of training the Taliban. In an August 2009 report, ISAF Commander General Stanley McChrystal explained that "the Iranian Qods Force is reportedly training fighters for certain Taliban groups and providing other forms of military assistance to insurgents."[224] He confirmed again in May 2010

---

[223] Miles Amoore, *Iranian military teaches Taliban fighters the art of ambush*, The Times (Mar. 21, 2010).

[224] Quoted by Sajjan M. Gohel, in *Iran's Ambiguous Role in Afghanistan* at 13, CTC Sentinel (March 2010).

that Iran was training Afghan fighters in Iran.[225]  In its 2009 Country Reports on Terrorism, the

U.S. State Department reported:  "Iran's Qods Force provided training to the Taliban in

Afghanistan on small unit tactics, small arms, explosives, and indirect fire weapons . . . ."[226]

Similarly, in 2012 it explained: "the IRGC-QF trained Taliban elements on small unit tactics,

small arms, explosives, and indirect fire weapons, such as mortars, artillery, and rockets."[227]

490.    Iran's training of Taliban terrorists has not diminished.  By 2015, the IRGC was

operating at least four Taliban training camps within Iran.

491.    Iran also facilitated the Taliban's attacks by allowing the Taliban to establish

offices in Iran to serve as bases for planning terrorist attacks.  For example, Iran permitted a

senior leader of the Taliban to set up an office in Zahedan, Iran, near the borders with

Afghanistan and Pakistan.  In or about 2014, the Taliban also opened an office in Mashhad, Iran,

where the Fourth Corps of the Qods Force is headquartered.[228]  As of January 2019, the Taliban

maintained an office in Tehran, Iran.[229]

492.    Iranian fighters also conducted attacks alongside Taliban terrorists.  In an October

2016 Taliban attack in Farah Province, four senior Iranian commandos were killed, and many of

the other Taliban dead were taken across the border to Iran for burial.

493.    Mohammad Arif Shahjahan, the governor of Farah Province in western

Afghanistan, told Radio Free Afghanistan in 2017 that Taliban leaders had been traveling

---

[225] *Killing Americans and Their Allies*.

[226] U.S. State Dep't, *Country Reports on Terrorism 2009* at 192 (Aug. 2010).

[227] U.S. State Dep't, *Country Reports on Terrorism 2012* at 196 (May 2013).

[228] Oved Lobel, *Afghanistan:  The Forgotten Front Against Iran*, Australia/Israel & Jewish Affairs Council (Nov. 16, 2018).

[229] *Iran and the Taliban:  A Tactical Alliance?*

frequently to Iran, where they received protection and support.[230] He reported that Qods Force operatives had recently met with and advised the Taliban in Farah Province.[231]

494. Iran's training of Taliban terrorists in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Taliban to more effectively attack U.S. forces and Coalition forces. The Taliban and affiliated terrorist groups in Afghanistan used Iran's training to kill or injure Plaintiffs or their family members.

### iv. The IRGC, Including Its Hezbollah Division And Qods Force, Provided The Taliban With Financial Support

495. Iran has also supported the Taliban financially. On an annual basis, Iran provided large cash payments to the Taliban. For example, a purported February 2005 military intelligence summary (as published online) reported that the IRGC delivered 10 million Afghanis (worth roughly $212,000) to a location on Iran's border where the money was transferred to four members of a Taliban-associated terrorist group.[232]

496. Iran also directly paid Taliban insurgents to kill U.S. forces. Another purported February 2005 military-intelligence summary (as published online) reported on a Taliban group that was being paid by the Iranian government $1,740 for each Afghanistan soldier killed and $3,481 for each Government of Afghanistan official killed. The report further explained that the group would begin attacking U.S. forces if the attacks on Afghans were successful.[233] Iran paid Taliban terrorists an estimated $1,000 for each U.S. soldier murdered in Afghanistan and $6,000

---

[230] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[231] *Id.*

[232] *Afghanistan War Logs: Iran Smuggles Money into Afghanistan to Fund Insurgents, says US Report*, The Guardian (July 25, 2010).

[233] *Afghanistan War Logs: Iran Offers Reward for Each Afghan Official and Solider Killed, According to Coalition Report*, The Guardian (July 25, 2010).

for each destroyed American military vehicle. In one specific example, Taliban fighters received $18,000 from Iran as a reward for an attack in 2010 than killed several Afghan forces and destroyed an American armored vehicle.[234]

497.     Iran also provided funding to individual Taliban commanders, often as they were returning to Afghanistan from training in Iran. A purported May 2008 military-intelligence summary (as published online) reported on a Taliban leader returning from training in Iran "along with a considerable amount of money." A purported May 2009 U.S. State Department Cable (as published online) stated that the IRGC may provide Taliban Commander Mullah Sangin with financial support to engage Coalition forces, including U.S. contractors.

498.     Iran has also supported the Taliban's finances by supporting its ability to traffic narcotics, which Taliban terrorists use "to finance their acts of terror and violence."[235] As the U.S. Treasury Department explained when it designated Iranian Qods Force General Gholamreza Baghbani as a Specially Designated Narcotics Trafficker in March 2012, General Baghbani allowed Afghan narcotics traffickers to smuggle opiates through Iran, facilitated the smuggling of chemicals necessary to produce heroin from Iran into Afghanistan, and helped "facilitate shipments of opium into Iran."[236] General Baghbani also had narcotics traffickers deliver weapons on his behalf to the Taliban.[237]

499.     As reported in a 2015 *Wall Street Journal* article, a Taliban commander described Iran's financial support of the Taliban in the form of recruiting and paying individual terrorists.

---

[234] Miles Amoore, *Iran pays the Taliban to Kill US Soldiers*, The Times (Sept. 5, 2010).

[235] Press Release, U.S. Treasury Dep't, *Treasury Targets Taliban Shadow Governor of Helmand Afghanistan as Narcotics Trafficker* (Nov. 15, 2012).

[236] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Qods Force General Overseeing Afghan Heroin Trafficking Through Iran* (Mar. 7, 2012).

[237] *Id.*

The commander explained that he had been detained for working illegally in Iran when he was approached by the IRGC and offered double his previous salary – to be paid by Iran – if he fought with the Taliban in Afghanistan.[238] And in 2017, officials in Ghor Province accused Iran of financing a Taliban offensive that briefly enabled the Taliban to overtake a key district.[239]

**v.** **The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support to Al-Qaeda to Facilitate Syndicate Attacks in Afghanistan**

500. Iran has also long provided material support to al-Qaeda. As with the Taliban, the sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership have not hindered cooperation between the groups. Whatever their religious differences, both groups share a hatred of America and support anti-American violence.

501. Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan. Iran, through the IRGC and Hezbollah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general attack tactics directed at American interests. For example, senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by Hezbollah and sponsored by the Qods Force.[240] The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa.[241] According to one senior al-Qaeda official, trainers at this time were already

---

[238] Margherita Stancati, *Iran Backs Taliban With Cash And Arms*, Wall St. J. (June 11, 2015).

[239] Abubakar Siddique & Noorullah Shayan, *Mounting Afghan Ire Over Iran's Support For Taliban*, Gandhara (July 31, 2017).

[240] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) ("Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.").

[241] *Id.*

researching how to develop shaped charges to pierce armor plating – the technology later perfected in EFPs.

502.    When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West, particularly the United States."[242]  This Court subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[243]

503.    Following the 9/11 attacks on the United States, Iran provided safe harbor to many senior leaders of al-Qaeda and their families, including Osama bin Laden's sons.  Iran permitted these senior leaders to move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world.[244]  In essence, Iran provided al-Qaeda with a safe location to orchestrate its terrorist activities.[245]

504.    In 2007, Osama bin Laden discouraged terrorist attacks against Iran because of its historical support for al-Qaeda's terrorist operations, and he referred to Iran as al-Qaeda's "main artery for funds, personnel, and communication."[246]  Similarly, a letter reportedly written by al-

---

[242] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[243] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[244] *Id.*

[245] *Id.* at 150-51 ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse.'").

[246] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence, https://www.dni.gov/files/documents/ubl2016/english/Letter%20to%20Karim.pdf.  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including

Qaeda's second-in-command, Ayman al-Zawahiri, thanked the IRGC for its support in setting up al-Qaeda's terrorist network in Yemen in 2008.

505.    In 2012, the Council on Foreign Relations reported that "al-Qaeda has stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[247]

506.    The U.S. government has also recognized these connections.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under a secret agreement between Iran and al-Qaeda.[248]  The agreement provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities in Afghanistan and Pakistan."  The Treasury Department found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money, facilitators and operatives from across the Middle East to South Asia."[249]  Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shi'a Muslims elsewhere in the Middle East.

---

this letter.  *See* Bin Laden's Bookshelf, Office of the Director of National Intelligence, https://www.dni.gov/index.php/features/bin-laden-s-bookshelf?start=2.

[247] *al-Qaeda (a.k.a. al-Qaida, al-Qa`ida)*, Council on Foreign Relations (June 6, 2012), https://www.cfr.org/backgrounder/al-qaeda-aka-al-qaida-al-qaida.

[248] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa`ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

[249] *Id.*

507. The U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations under Executive Order 13224. In February 2012, the department designated the Iranian Ministry of Intelligence and Security as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda.[250] In 2014, the department likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."[251]

508. The close relationship between al-Qaeda and Iran has continued in recent years. In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed AQ facilitators to operate a core facilitation pipeline through the country, enabling AQ to move funds and fighters to South Asia and Syria."[252] It further accused Iran of remaining unwilling to bring to justice or identify al-Qaeda members in its custody.[253] The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[254]

509. As alleged above, the mafia-style "syndicate" of which both the Taliban and al-Qaeda formed a part made attacks by each group more lethal. Iran's mutually reinforcing support for both the Taliban and al-Qaeda made both organizations more effective.

510. By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families. Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family

---

[250] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012).

[251] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[252] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

[253] *Id.*

[254] *Country Reports on Terrorism 2017* at Foreword.

members.  Moreover, al-Qaeda was closely intertwined with the Taliban and associated terrorist

groups acting in Afghanistan, and al-Qaeda planned and authorized the Taliban attacks in which

it did not directly participate.  Material support and resources provided to al-Qaeda thus flowed

to the Taliban, causing the injury and deaths of Plaintiffs or their family members.

> **F.   In Furtherance Of The IRGC's Conspiracy, The IRGC, Including Its Hezbollah Division And Qods Force, Al-Qaeda, Al-Qaeda-In-Iraq, And Ansar-Al-Islam Waged A Deadly Terrorist Campaign Against Americans In Iraq, Syria, Iran, And Europe**

511.    Iran did not, however, limit its support of anti-American terrorism in Iraq to Iran's

traditional Shiite terrorist proxies like Hezbollah.  Iran, through the "sinister genius" of IRGC

terrorist mastermind Qassem Soleimani, also supported the burgeoning Sunni terrorist insurgency

against Americans in Iraq. This insurgency was led by a litany of IRGC assets, including the top

two Sunni leaders of the Iraqi terrorism campaign: Saif al-Adel, al-Qaeda's military chief who

coordinated its campaign, including support for al-Qaeda-in-Iraq, from his Qods Force-provided

safe haven in Iran, and Abu Musab al-Zarqawi, the al-Qaeda operative who led al-Qaeda-in-Iraq

on the ground and co-led Ansar al-Islam with Mullah Krekar, another IRGC asset.  Al-Qaeda, al-

Qaeda-in-Iraq, and Ansar al-Islam, between them, accounted for essentially all Sunni terrorist

attacks on Americans in Iraq from 2004 through the present, with AQI ultimately becoming ISIS.

The common goal connecting all Iranian strategy was that, as one analyst explained, "Iran would

do everything it could to ensure that America's experiment [in Iraq] turned into a smoldering

failure."[255]

512.    It is likely that Qassem Soleimani's support of Shiite and Sunni terrorists in Iraq

collectively accounted for more Americans killed or injured in terrorist violence after 9/11 than

---

[255] Karim Sadjadpour, *The Sinister Genius of Qassem Soleimani*, Wall St. J. (Jan. 10, 2020) ("Sadjadpour, *Sinister Genius*").

any other single terrorist.  As Karim Sadjadpour of the Carnegie Endowment for International

Peace explained in an interview, given Soleimani's support for anti-American terror,

> That's why you have … one, if not two, generations of American military forces
> whom if you were to ask them, who is your worst adversary in the world, the person
> you see as the greatest threat to the United States? Even when Osama bin Laden
> was living and Baghdadi [the leader of ISIS] was living, they would have still said
> Qassem Soleimani.[256]

513.     Since 2003, Sunni terrorists have repeatedly attacked American service members

and civilians working to rebuild Iraq and support its elected government.  Iran provided material

support for those attacks, which killed or injured Plaintiffs.

514.     Plaintiffs identify below several terrorist groups, subgroups, and partnerships

responsible for the specific attacks that killed and injured them.  Each worked in concert with their

sectarian allies and shared resources, personnel, and operational plans.

515.     Iran's multi-faceted support for Sunni terrorists in Iraq is consistent with bin

Laden's "grand alliance" approach to anti-American terror.  In fact, bin Laden himself portrayed

al-Qaeda as the leader of a broader coalition drawing from other terrorist organizations in Pakistan

and Afghanistan and supported by a latticework of jihadist affiliates and allies around the world.[257]

516.     Iran's support for multiple components of bin Laden's "syndicate" ensured that its

support for Sunni terrorist groups had maximum effect.  Due to the mutually reinforcing ties

between the IRGC, al-Qaeda, AQI, and Ansar al-Islam, support for any one benefited the others –

and vice versa.

517.     Iran recognized those interrelationships and so spread its support across multiple

Sunni terrorist groups targeting Americans in Iraq.  In doing so, Iran was able to achieve its

---

[256] Karim Sadjadpour, *quoted in* National Public Radio, *'Throughline': The Origins Of Iran's Gen. Qassem Soleimani* (Jan. 30, 2020) ("NPR, *Throughline*").

[257] *The al Qaeda-Taliban Connection*.

intended effect: wide-ranging terrorist attacks against Americans, executed mostly by the Sunni terrorist group AQI, but supported by (and sometimes jointly committed with) other Iranian terrorist allies (*e.g.*, AQI jointly committing a suicide bombing attack with al-Qaeda).

518.    Like Iran's use of Shiite proxies, the IRGC's use of Sunni proxies was consistent with Iran's twin strategic goals: to impose maximum terrorist violence against Americans in Iraq while simultaneously maintaining "plausible deniability" by reducing the public Iranian role inside Iraq. Rather than openly engage in armed conflict with the U.S. or other Coalition Forces, Iran usually attempted to present an Iraqi face to its efforts to undermine U.S. peacekeeping efforts by supporting terrorism and sectarian violence there.

519.    From 2003 through the present, Iran was responsible for increasingly lethal attacks on U.S. forces in Iraq and, as one example, provided Sunni terrorist proxies with the capability to assemble explosives designed to defeat armored vehicles.

520.    Against that backdrop, Plaintiffs identify below the principal Iraqi terrorist groups, subgroups, and cells that committed the attacks that killed and injured them.

## 1.    Al-Qaeda

521.    Starting in 2002, al-Qaeda and its affiliated clerics began calling for jihad against the United States in the event of an American invasion of Iraq. For example, al-Qaeda terrorist "thought leader" Abu Qatada publicly boasted to international media that al-Qaeda and its affiliates would launch a jihad against Americans and their Iraqi allies just as al-Qaeda had launched a similar jihad against America and its Afghan allies following the U.S. invasion of Afghanistan after 9/11, and stated: "The growth of American tyranny … and its plan to attack Iraq and establish an 'Iraqi Karzai' will necessitate an even fiercer battle."

522.    Al-Qaeda's leaders messaged to its terrorists and sympathizers that the American presence in Iraq was an American "plot" to kickstart a religious war between Sunnis and Shiites

to divide the Muslim world so that the "Crusaders" (the United States) and "Jews" (Israel) could divide and conquer it.

523.　Following the U.S. invasion of Iraq, al-Qaeda escalated its support for the Sunni terrorist insurgency in Iraq from its safe havens in Iran, Afghanistan, and Pakistan.  For example, on March 24, 2004, an al-Qaeda spokesman issued a call for Muslims "to take part in jihad against the United States in Iraq."  Demonstrating how the Sunni groups worked together on their shared jihad against Americans in Iraq, Ansar al-Islam's website widely repeated al-Qaeda's message.

524.　By the mid-2000s, al-Qaeda's partnership with the Haqqani Network – a part of the Taliban that was a long-standing ally of al-Qaeda in Pakistan and Afghanistan, and that also received material support from Iran – had facilitated the emergence of a network of al-Qaeda training camps in North Waziristan, Pakistan, near the Afghan-Pakistan border, less than a week's overland travel to Iran.  According to a declassified 2008 Defense Intelligence Agency intelligence report:

> [Sirajuddin] Haqqani is also affiliated with the several foreign fighter (ff) training facilities that are controlled by or associated with al Qaeda (AQ) in North Waziristan. . . .  A list and brief description of each facility follows . . .
>
> A.  Mohammad Taher ((Yuldashov)), leader of the Islamic Movement of Uzbekistan (IMU), and his 60 bodyguards are staying at an AQ training center in Miram Shah Dand.
>
> B.  There is an al-Qaeda training center located at the Miskeen and Khaisur in Miram Shah.  Approximately 45 U/I Arabs and Uzbeks receive training there.
>
> C.  An AQ training facility called "Shaki Massod" is located in Miram Shah and over 200 AQ members (NFI) reside there; Usama bin Laden has been seen in this center (NFI).

D.  Another AQ training facility is located at Spin-Qamar in Masood District of Northern Waziristan.  Over 80 Arabs receive training there (NFI).[258]

525.    Al-Qaeda also established multiple training camps within Afghanistan reportedly "hosted by the Taliban."[259]  One such camp covered nearly 30 square miles and contained heavy weapons, IED-making material, anti-aircraft weapons, rocket-propelled grenade systems, machine guns, pistols, rifles, and ammunition.  Al-Qaeda used these camps, in part, to help run what amounted to a "continuing education" program for senior terrorist commanders and operatives that provided instruction in the above-described al-Qaeda camps in Afghanistan and Pakistan for operations against Americans in Iraq.

526.    Al-Qaeda forward deployed a significant number of operatives and planners into Iraq, who were often dual-hatted terrorists who served as members of both al-Qaeda and al-Qaeda-in-Iraq.  Most famously, Zarqawi was a dual-member, serving as both a member of al-Qaeda as well as the founder and leader of al-Qaeda-in-Iraq.  Al-Qaeda-forward-deployed terrorists in Iraq were essential force multipliers for al-Qaeda-in-Iraq's terrorist campaign against Americans there. Al-Qaeda operatives served in a similar role as American Green Berets, helping to "train the trainer" and scale up AQI's terrorist capabilities.

527.    Through al-Qaeda's use of training camps in Afghanistan and Pakistan – which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam all accessed through the terrorist land bridge provided by Iran – terrorists from all three groups obtained the training, technical expertise, and indoctrination essential to executing the signature al-Qaeda attack types used by all three groups

---

[258] Defense Intelligence Agency, *Location and Activities of the Training Centers Affiliated with the Haqqani Network, Taliban, and al-Qaeda in Northern Waziristan and Future Plans and Activities of Sarajuddin ((Haqqani))*, Intelligence Information Report (Apr. 16, 2008).

[259] Thomas Joscelyn and Bill Roggio, *Trump's Bad Deal With The Taliban*, Politico (Mar. 18, 2019).

in Iraq, including suicide bombings, improvised explosive devices (or "IEDs") derived from fertilizer, and attacks against helicopters. Al-Qaeda thus helped its Iraqi affiliates, including al-Qaeda-in-Iraq and Ansar al-Islam, bring its signature tactics to the Iraqi theater. They proved highly effective at countering American defenses.

528. Al-Qaeda training and expertise, in combination with that of the IRGC, was also essential to the successful adaptation of sophisticated IED types and attack strategies by Sunni terrorists in Iraq. Al-Qaeda developed sophisticated techniques for refining fertilizer into ammonium nitrate, marrying the ammonium nitrate with a lethal triggering device and delivery system, and training terrorists how to move, deploy, and maximize the lethality of the resulting fertilizer bombs, which were delivered via IED or suicide bomber. As Senator Charles Schumer stated in 2004, "truck bombs using [calcium ammonium nitrate ("CAN") fertilizer] are the weapon of choice of al-Qaida."

529. At all relevant times, al-Qaeda was the world leader amongst Sunni terrorist groups with respect to building sophisticated bombs, including through the process of converting CAN fertilizer into bombs to attack Western targets, having used the technique in every major area of operations for al-Qaeda-affiliated terrorists since 9/11, including, but not limited to, attacks in Indonesia, Turkey, Syria, Yemen, Iraq, Afghanistan, and Pakistan. After 9/11, al-Qaeda supported fertilizer-based bomb strategies in every theater in which it engaged in terrorist attacks against America and its allies. As one journalist wrote in 2007, "[i]n the new age of Islamist terrorism, [CAN] fertilizer packed into a truck with plastic explosive as a detonator has also become an al Qaida trademark."[260]

---

[260] David Barrett, *Deadly Fertiliser Bombs Used By Terrorists Worldwide*, Press Association News (Apr. 30, 2007).

530.     Al-Qaeda regularly instructed terrorist operatives from its Iraqi affiliates, in

person (at camps in Afghanistan, Pakistan, and Iran) and in writing, regarding CAN fertilizer

bombs.  For example, a 39-page al-Qaeda memo recovered from an al-Qaeda laptop in Pakistan

in 2004 instructed that military explosives were often impractical to acquire, and instructed

jihadists to instead use home-made explosives, including ammonium nitrate bombs derived from

CAN fertilizer.

### 2.     Al-Qaeda-In-Iraq

531.     Bin Laden always viewed al-Qaeda as the leader of a terrorist joint venture in which

al-Qaeda led a broader anti-American jihadist coalition.  As a result, while al-Qaeda sometimes

committed attacks itself, it most often acted through its Iraqi affiliates, al-Qaeda-in-Iraq and/or

Ansar al-Islam, who themselves often worked together.

532.     Al-Qaeda-in-Iraq was a Sunni terrorist group and al-Qaeda affiliate that was

established in 1999.  Though it had many names,[261] al-Qaeda-in-Iraq had one consistent mission:

killing Americans and others who opposed al-Qaeda's agenda.

533.     Al-Qaeda-in-Iraq was founded and originally led by a Jordanian national who was

a senior member of al-Qaeda:  Ahmad Fadil Nazzal Al-Khalayleh, better known by his *nom de*

*guerre*, Abu Musab al-Zarqawi.  Until his death, Zarqawi was a notorious anti-American terrorist

---

[261] Zarqawi's al-Qaeda affiliate has had various names since its creation, including Tawhid wal
Jihad, aka al-Tawhid & al-Jihad (from inception to October 2004), al-Qaeda in the Land of Two
Rivers, aka al-Qaeda-in-Iraq (from October 2004 through January 2006), the Mujahideen Shura
Council (from January 2006 through October 2006), the Islamic State of Iraq (from October 2006
through April 2013), Islamic State in Iraq and Syria, aka ISIS (from April 2013 through June 2014)
and finally the Islamic State (from June 2014 through present).  While the names changed, at all
relevant times, the organization built by Zarqawi with Iran's backing pursued attacks against
Americans in Iraq.  In this Complaint, Plaintiffs collectively refer to all such groups, prior to al-
Qaeda's split from Islamic State in 2014, as "al-Qaeda-in-Iraq."

who, among other things, was a known senior member of al-Qaeda, and known to have personally decapitated at least one American hostage in Iraq on camera.

534.     Zarqawi joined al-Qaeda in Afghanistan in the late 1990s.

535.     According to a confidential document of the Spanish antiterrorist agency the *Unidad Central de Información Exterior* ("UCIE"), Zarqawi joined the senior ranks of al-Qaeda's leadership in the summer of 1999, becoming one of the small circle of terrorists who served as a direct "lieutenant" of bin Laden himself.  As such, the UCIE concluded that Zarqawi was responsible for planning al-Qaeda's operations and commanded dozens of al-Qaeda terrorists to that end.

536.     An obvious terrorist mastermind and leader, he moved rapidly up al-Qaeda's ranks, becoming a member of al-Qaeda's managerial staff in Afghanistan only a few months after moving there.  By 2000, Zarqawi had established himself as al-Qaeda's most indispensable terrorist operator and was a critical al-Qaeda leader in Afghanistan.

537.     In 2001, Zarqawi took the oath of allegiance to al-Qaeda and Osama bin Laden. Written by bin Laden himself, Zarqawi declared as his oath to al-Qaeda and bin Laden personally: "I recall the commitment to God, in order to listen to and obey my superiors, who are accomplishing this task with energy, difficulty, and giving of self, and in order that God may protect us so God's words are the highest and his religion victorious."

538.     Having sworn an oath of allegiance to al-Qaeda and bin Laden in 2001, Zarqawi had to follow al-Qaeda's instructions and advance al-Qaeda's terrorist agenda.  Indeed, this was the point of the oath in the first instance:  to ensure Zarqawi's fidelity to al-Qaeda and its jihad for the rest of his life with a public commitment to God to fight under al-Qaeda's banner, advance its jihad, and avoid any conflict of interest with al-Qaeda.  Though he would sometimes spar with his

al-Qaeda masters in later years, Zarqawi was always, until his death in 2006, a senior al-Qaeda terrorist.

539.    By the summer of 2001, Zarqawi was a well-known senior al-Qaeda operative, and was equally well-versed in every aspect of the al-Qaeda terrorist playbook that he later imported into Iraq.  Indeed, he was so well-established that a 30-page guide to al-Qaeda in Afghanistan for new al-Qaeda recruits specifically identified Zarqawi as one of the al-Qaeda leaders there who could be contacted by recruits in order to help them with respect to religious, logistical, or lodging needs in country.

540.    Less than a year after joining al-Qaeda, Zarqawi had so demonstrated his terrorist talent and trustworthiness that the group permitted him to establish his own al-Qaeda training camp near the border with Iran in Herat, Afghanistan, which Zarqawi did with al-Qaeda's financial and logistical support.  In less than two years, Zarqawi's presence in Herat quickly grew from a dozen al-Qaeda personnel in 2000 to several thousand terrorists and supporters by the time they evacuated the camp prior to U.S. airstrikes in October 2001.

541.    After he set up al-Qaeda's camp in Herat, Zarqawi regularly traveled between Herat and Kabul on behalf of al-Qaeda.  Herat was known then (as it is today) as a key site of terrorist activity, as the hub that opens the way to Iraqi Kurdistan through Iran.  Accordingly, Iran's consulate in Herat – which also serves as a hub for IRGC-QF terrorist activities – kept records of the travels of terrorists associated with al-Qaeda and its affiliates, Zarqawi and his cell in particular. As a result, Zarqawi's operations for al-Qaeda were known to Iranian authorities before and after 9/11.

542.    Zarqawi's frequent travels back and forth between Herat, Afghanistan, and Iraqi Kurdistan – accomplished every time via Iran – was to secure al-Qaeda's survival after 9/11.  Bin

Laden anticipated, correctly, that the United States would expel al-Qaeda and its Taliban protectors from Afghanistan after 9/11 and planned for a "progressive redeployment" of al-Qaeda to two locations: Pakistan (where bin Laden and Zawahiri planned to regroup) and Iraqi Kurdistan (where bin Laden contemplated Zarqawi and his cell would regroup).

543.    Before and after 9/11, Zarqawi also effectively controlled Ansar al-Islam by installing Jordanian allies from his hometown of Zarqa into key operational positions throughout Ansar al-Islam, including, but not limited to, Khaled Al-Aruri (alias Abu Ashraf) and Abdel Hadi Ahmad Mahmoud Daghlas (alias Abu Ubaydah), both of whom were living in Iran at the time, on the border with Iraqi Kurdistan.  In this capacity, Zarqawi's Ansar al-Islam lieutenants coordinated Ansar al-Islam operations, taking orders from Zarqawi, their commander.

544.    Zarqawi's Ansar al-Islam cell grew to include more than a dozen Jordanian terrorists recruited by Zarqawi. These lieutenants ensured Zarqawi's effective control over Ansar al-Islam, in combination with al-Shami (in Iraqi Kurdistan) and Mullah Krekar (from his Norwegian refuge).  While Ansar al-Islam operated in Iraqi Kurdistan, under Zarqawi's lead, Ansar al-Islam's network was based in Iran and was comprised nearly entirely of Zarqawi's men.

545.    Months after 9/11, Zarqawi was injured in an American airstrike in Afghanistan. Needing to elude capture by American forces and obtain urgent medical care, Zarqawi fled Afghanistan in an escape that was organized by Iran.  When he fled to Iran for safe haven and medical treatment, Zarqawi was already a widely-known al-Qaeda terrorist who was understood to be a key lieutenant of bin Laden. His terrorist career was already quite familiar to the IRGC and Soleimani, who knew his reputation as one of the few al-Qaeda commanders who could plan and conduct large-scale, mass-casualty attacks, and that he had established himself as a de facto head of operations for al-Qaeda.

546.     On or about 2002, with the support of Iranian operatives under the direction of Qassem Soleimani, Zarqawi founded al-Qaeda-in-Iraq.  By the onset of the U.S. presence in Iraq in 2003, Zarqawi turned al-Qaeda-in-Iraq into the primary Sunni terrorist threat against Americans there by working with al-Qaeda to mobilize the coalition of anti-American Sunni terrorists in Iraq under al-Qaeda's banner—carried in Iraq by AQI—and conducting a series of mass-casualty strikes against prominent U.S. and international targets in Iraq in 2003.

547.     Assessing his first nine months of jihad against Americans in Iraq in a January 2004 letter, Zarqawi claimed credit for nearly all of the suicide attacks against Americans in Iraq:

> We have been the key for all the suicide missions that have taken place, except in the north.  By the grace of God, I have conducted twenty-five operations … against … the Americans and their soldiers and the forces of the coalition.

548.     As 2004 began, Zarqawi accelerated his efforts to rally Sunnis to join his "resistance" against the United States in Iraq, leaning into his deep al-Qaeda rolodex and celebrity in jihadist circles.  In a January 2004 letter to al-Qaeda attributed to Zarqawi by the U.S. government, Zarqawi asked for al-Qaeda's aid and support for his terrorist campaign against Americans in Iraq, and wrote:

> We need to create armies of mujahidin … to fight the enemy—the Americans, the police, the soldiers. … We are continuing to train ourselves and strengthen our ranks.  We will strike at them with suicide operations and car bombs. … If you are of the same opinion, if you adopt it as your program, … and you are convinced by the idea of fighting the infidels, we will be your soldiers, under your banner, obeying your orders and taking a public oath of allegiance to you.

549.     Zarqawi also began broadcasting messages in various media in which he urged Muslims to join the violent campaign against Americans in Iraq, citing his warped view of Islam as justification for mass violence against Americans throughout the country.

550.     Zarqawi at all times believed it served al-Qaeda's and al-Qaeda-in-Iraq's interests to mobilize public opinion in Iraq and throughout the Muslim world against the U.S. presence in Iraq.  As a result, al-Qaeda-in-Iraq prioritized targeting Americans to drive the U.S. out of Iraq.

551.     By the spring of 2004, Zarqawi had fully unified violent Sunni extremists against Americans in Iraq into one grand coalition of terror, playing off his al-Qaeda credentials, leadership of Ansar al-Islam, and status as a broadly respected operational leader amongst the Sunni terrorist community.

552.     Zarqawi cemented his leadership of Sunni terrorists in Iraq through his gruesome murder of an American contractor, Nicholas Berg, whom al-Qaeda-in-Iraq kidnapped west of Baghdad on April 9, 2004.  On May 11, 2004, Zarqawi beheaded Mr. Berg in a videotaped murder of unspeakable barbarity.[262]   For Zarqawi and al-Qaeda-in-Iraq, barbarity was the entire point:  Through his murder of Mr. Berg, Zarqawi was communicating to other Sunni extremists in Iraq that they should join the fight under his leadership in Iraq.

553.     Demonstrating the interconnections between al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam, Zarqawi's beheading of Mr. Berg was widely broadcast on websites linked to al-Qaeda and its affiliates.  For example, the video was published on Ansar al-Islam's website with the title "Sheikh Abu Musab Zarqawi Slays an American Infidel."

554.     In May 2004, Zarqawi branded his al-Qaeda affiliate, which he had turned into a trans-Sunni terrorist coalition against Americans in Iraq, under the banner Tawhid wal Jihad

---

[262] In the video, Mr. Berg was bound, forced to kneel, and dressed in an orange jumpsuit like those worn by Guantanamo Bay detainees.  Zarqawi read an anti-American screed that called Americans the enemy and demanded a broad Sunni jihad against Americans in Iraq, stating: "You are tired of the oratorical squabbling and public debates. … The time has now come to make jihad and brandish the sword that the prophet has sent us. … You will see your warrior brothers hang the head of this infidel from one of the bridges in Baghdad so that no one will forget the way we treat infidels.  May he bear witness to the honor of the Muslims."  Zarqawi then beheaded Mr. Berg.

(meaning "Monotheism and Jihad"). Ansar al-Islam, Ansar al-Sunna, Jaysh Mohammed, al-Jamaa Salafiya, Takfir wal Hirja, and Jund al-Sham all joined Zarqawi's campaign. (Several of these groups, including Ansar al-Islam and Jund al-Sham, were also groups Zarqawi himself helped establish.) While some continued to exist under their own names, all these groups were controlled by al-Qaeda and al-Qaeda-in-Iraq (then known as Tawhid wal Jihad), through Zarqawi, from that point. Boasting about his ability to transit between Iran, Iraq, and Syria in support of his attacks against Americans there, on May 25, 2004, Zarqawi declared: "I am global, and no land is my country."

555. By 2004, Zarqawi had well more than 1,000 well-trained al-Qaeda-in-Iraq terrorists under his command throughout the country. While his grand Sunni terrorist coalition conducted attacks throughout Iraq, their primary area of operations was the Sunni Triangle, which was "a central region in Iraq that supplied the power base of Saddam's Baath party," and "mainly comprised of Sunni Muslims," and which was "outlined by Tikrit in the north, Ramadi in the southwest and Baghdad in the southeast."[263]

556. Falluja served as the Zarqawi group's headquarters in the Sunni Triangle (commanded by Zarqawi lieutenant Abu Nawras Al-Faluji). Al-Qaeda-in-Iraq also maintained large cells throughout Iraq, which were in each instance commanded by hand-selected Zarqawi lieutenants, including in Baghdad (Umar Bazyani), northern Iraq (Husain Salim), Anbar (Abu Azzam Abdallah), and Mosul (Abu Talha). Zarqawi also prioritized building cells at key transport and smuggling nodes for al-Qaeda and al-Qaeda-in-Iraq and stood up AQI cells in an array of other Iraqi cities and provinces including Samarra (on the approach to Baghdad), Diyala (near the border with Iran, and a critical waypoint on the road to Lebanon), and al-Qaim (on the border of Syria).

---

[263] Bill Roggio, *The Battle of the Sunni Triangle*, FDD's Long War Journal (Oct. 22, 2004).

557.     On October 16, 2004, the U.S. military launched a comprehensive offensive to oust Zarqawi's terrorists from their Falluja stronghold in the Sunni triangle.  The day after the start of the American operation, Tawhid wal Jihad publicly declared that it was joining al-Qaeda in order to coordinate the Sunni campaign against Americans in Iraq under one leader in theater (Zarqawi) who was acting on behalf of, and supported by, al-Qaeda, whose leader (bin Laden) they, in turn, swore fealty to.  Zarqawi did so in a boldly titled public oath, entitled "The Tawhid wal Jihad Movement, its Emir [Zarqawi], and its Fighters Have Joined the Cause of al-Qaeda and Sworn Allegiance to Sheikh Osama bin Laden," which he signed "Abu Musab Al-Zarqawi, commander of the Tawhid wal Jihad movement."  Unambiguously and publicly confirming the Tawhid wal Jihad's status as an al-Qaeda affiliate, Zarqawi announced that Tawhid wal Jihad would now be known as "al-Qaeda in the Land of Two Rivers," i.e., al-Qaeda-in-Iraq.  In his declaration, Zarqawi recognized bin Laden's authority, publicly embraced al-Qaeda's terrorist campaign against Americans in Iraq, and urged all Iraqi Sunnis to do so as well:

> O Sheikh of the mujahidin, if you cross the sea, we shall cross it with you.  If you give orders, we shall listen; if you forbid, we shall obey.  You are the designated leader for the armies of Islam against all infidels, Crusaders, and apostates.

558.     Shortly after Zarqawi's announcement, al-Qaeda formally accepted his public declaration of fealty and commitment of al-Qaeda-in-Iraq to al-Qaeda's banners.

559.     As a practical matter, Zarqawi's declaration was immaterial because he was already a long-standing member of al-Qaeda who had sworn fealty to bin Laden, and Tawhid wal Jihad was already al-Qaeda's widely-recognized affiliate in Iraq.  The date chosen for the announcement, however, demonstrated the tight nexus between al-Qaeda and al-Qaeda-in-Iraq with respect to Sunni extremists' efforts to rally against the U.S. presence in Iraq.

560. On December 17, 2004, the U.S. government designated al-Qaeda-in-Iraq as a Foreign Terrorist Organization, which designation it has maintained ever since.

561. At all times, al-Qaeda-in-Iraq carried out al-Qaeda's agenda in Iraq with ruthless efficiency. Using al-Qaeda's personnel (including Zarqawi), money, expertise, and training infrastructure, al-Qaeda-in-Iraq consolidated essentially all non-Kurdish Sunni terrorists in Iraq under one banner, led by Zarqawi and his followers.

562. Al-Qaeda and al-Qaeda-in-Iraq worked closely with one another to execute a comprehensive campaign of terrorism against Americans serving in Sunni strongholds in Iraq, including, but not limited to, Ramadi, Falluja, Mosul, and other geographies where al-Qaeda and al-Qaeda-in-Iraq had a monopoly on anti-American terror. In so doing al-Qaeda and al-Qaeda-in-Iraq aggressively pursued every signature al-Qaeda attack type: suicide bombings, IED attacks, attacks against helicopters, kidnappings, sniper attacks, and complex attacks.

563. Even after being rebranded as the ISIS, the group formally known as al-Qaeda-in-Iraq continued to be an al-Qaeda affiliate until on or about 2014, when al-Qaeda and ISIS formally separated.

### 3. Ansar Al-Islam

564. Ansar al-Islam, translated as "supporters, partisans or followers of Islam," was a primarily Kurdish Salafist terrorist group based in northern Iraq in Iraqi Kurdistan.

565. Ansar al-Islam was initially organized in Iraqi Kurdistan on September 1, 2001, under its previous name Jund al-Islam (soldiers of Islam). It was formally founded three months later through the merger of several other Kurdish terrorist groups, including Kurdish Hamas, Tawhid, and the Al-Tawid Islamic Front, the Second Sorand Unit, the Reformist Group, and Jund al-Islam.

566.    Ansar al-Islam was a Salafist group that followed the teachings of al-Qaeda terrorists, including bin Laden, Zawahiri, and Zarqawi.

567.    Although Ansar al-Islam was initially comprised mainly of Kurds, it grew to include Sunni Arabs who lived in, or traveled to, northern Iraq, including Palestinians, Iranians, Jordanians, Afghans and Arabs from other countries.

568.    Ansar al-Islam focused its terrorist activities in northern Iraq.  At all times, Ansar al-Islam sought to impose an Islamic caliphate in Kurdistan and has conducted a campaign of terror against Americans in Iraq to drive the U.S. out of Iraq.

569.    From before 9/11 through 2003, Ansar al-Islam was led by Mullah Krekar, Najim al-Din Faraj Ahmad (also known as Faraj Ahmad Najmuddin) of the Reformist Group.  Mullah Krekar studied Islamic jurisprudence under Osama bin Laden's mentor, Abdullah al-Zam, and generally adopted a theological viewpoint similar to al-Qaeda's.

570.    In November 2001, Mullah Krekar publicly celebrated Osama bin Laden and expressed his desire to see the creation of a grand alliance of jihadist groups in Kurdistan.

571.    In 2002, Zarqawi and his lieutenants met in Kurdistan with Mullah Krekar and his associate Abu Abdullah Al-Shafii, the founder of Jund al-Islam.  During this meeting, Zarqawi, on behalf of al-Qaeda and his own al-Qaeda affiliate (then known as Tawhid wal Jihad), Ansar al-Islam, and Jund al-Islam all agreed to effectively merge as allies in order to share weapons, personnel, safehouses, and other logistical resources.

572.    By the eve of the U.S. invasion of Iraq, Zarqawi's command of Ansar al-Islam had grown such that Zarqawi now commanded hundreds of Arab fighters who fought for Ansar al-Islam under Zarqawi's leadership.

573.     Shortly after the U.S. invasion, Mullah Krekar fled to Norway.  Thereafter, Ansar al-Islam was operationally led by Zarqawi (traveling between Iran, Iraq, and Syria) and Abu Abdullah al-Shafi (also known as Warba Holiri al-Kurdi), who was based in Iran, until Shafi's arrest in 2010, while Mullah Krekar supported the group from his refuge in Norway.

574.     In June 2003, Ansar al-Islam issued a public statement calling for terrorist attacks against Americans in Iraq by imploring Muslims in the region to "volunteer[] to join the ranks [of Ansar al-Islam] to fight the Americans," and threatening to use "the weapons of urban guerilla warfare" in order to "confront the American infidels with the aim of destroying them throughout Iraq."  Referencing Ansar al-Islam's close alliance with Iran, the statement further explained that "the zones of entry and exit in the territory had been secured so as to ensure the flow of supplies for the fighters."

575.     On March 22, 2004, the U.S. government designated Ansar al-Islam as a Foreign Terrorist Organization, which designation it has maintained ever since.

576.     On April 15, 2004, Ansar al-Islam escalated its calls for violence against Americans in Iraq by issuing a statement urging Iraqis to embrace violent jihad against Americans in Iraq in order to combat "the band of traitors and criminals" through suicide attacks and other "heroic operations" against Americans.  In the same statement, Ansar al-Islam also embraced its status as an al-Qaeda affiliate:  "We strongly support the heroes who are undertaking difficult missions, such as the members of the al-Qaeda organization under the leadership of the venerable and courageous companion, the standard-bearer of jihad, the brave Osama Bin Laden."

577.     In 2006, Joint Special Operations Command Task Force 16 member concluded that "Al Qaeda and Ansar al-Islam are working hand in hand."

578.    On December 7, 2006, the U.S. Department of the Treasury designated Mullah Krekar as a Specially Designated Global Terrorist and stated as follows:

> Apart from the instances of direct facilitation of terrorist groups which form the basis for his designation, Krekar has exhorted others to violence and supplied religious justifications for murder. In a 2004 interview, Krekar supported holy war in Iraq and identified legitimate targets, stating "Not just the officers, but also the civilians who help the Americans. If anyone so much as fetches them a glass of water, he can be killed. ... Everyone is a target. If an aid organization gives the Americans as much as a glass of water, they will become a target."[264]

579.    From 2003 through at least 2010, Ansar al-Islam cooperated closely with al-Qaeda and al-Qaeda-in-Iraq, sometimes working together to jointly commit attacks, share bombs or other terrorist supplies, and provide logistical support and safehouses for each other's mutual benefit. For example, an al-Qaeda operative traveling from Afghanistan to Iraq to train and instruct al-Qaeda-in-Iraq operatives would depend upon Ansar al-Islam operatives, safehouses, and ratlines, for part of his journey, or an Ansar al-Islam operative would receive training in an al-Qaeda camp in Afghanistan.  Similarly, an al-Qaeda-in-Iraq operative would detonate a suicide bomb that was built by a forward-deployed al-Qaeda bombmaker in Iraq using materials provided by Ansar al-Islam.

580.    By 2003, Ansar al-Islam was a recognized al-Qaeda "surrogate" and the groups maintained a close relationship with one another (including al-Qaeda-in-Iraq) based upon their shared terrorist agenda, common Salafist beliefs, and history of close cooperation.

### 4.    The IRGC's, Including Its Hezbollah Division's And Qods Force's, Aid To Al-Qaeda, Al-Qaeda-In-Iraq, And Ansar Al-Islam Facilitated Attacks Against Americans In Iraq

581.    Iran has supported a broad coalition of anti-American terrorists in the countries bordering it, Iraq and Afghanistan, including virtually every prominent Shiite and Sunni terrorist

---

[264] U.S. Dep't of the Treasury, *Treasury Designations Target Terrorist Facilitators* (Dec. 7, 2006).

group that has operated in Iraq since the fall of Saddam.  Until his death on January 2, 2020, Qassem Soleimani masterminded Iran's support for both Shiite and Sunni Anti-American terrorists, following the simple rule that any terrorist group that (a) was targeting the United States while (b) foregoing attacks inside Iran would (c) receive weapons, funding, training, logistical support, and safe havens courtesy of the IRGC, including the Qods Force.  This simple calculus has underscored Iran's terrorist agenda against America in the countries bordering Iran (Iraq and Afghanistan) for decades and continues to do so through this day.

582.    As one scholar writing in the journal published by the Combating Terrorism Center at West Point summarized the evidence in 2010, "it is clear that Iran has a proven ability to commission violence inside Iraq. … As the unclassified Iraqi government Harmony records collated by the Combating Terrorism Center at West Point illustrate, the Islamic Republic of Iran has been in the business of sponsoring Iraqi paramilitary proxies for 30 years, practically the government's entire existence."[265]

583.    When U.S. forces arrived in Iraq, Iran's nationwide terror campaign against Americans there was assigned to the Qods Force under the command of Soleimani, who answered directly to Ayatollah Khamenei.

584.    As the Congressional Research Service reported in 2007, "DOD officials reportedly captured four Iranian terrorists in July 2007 who [were] accused of smuggling explosives and personnel from Iran into Iraq," and "Iran [was] suspected of supplying Iraq insurgents with IEDs, training, and new designs and technology for explosive devices, such as 'passive infrared' electronic sensors that [were] used for triggering roadside bombs" and were "more resistant to

---

[265] Knights, *The Evolution of Iran's Special Groups in Iraq*.

electromagnetic countermeasures [] employed by U.S. forces."[266]   These findings by DOD officials accord with the reality that "[a] constant feature of Iran's policy for more than 20 years has been the importance of uninterrupted cross-border resupply for Iran's proxies in Iraq."[267]

585.   According to the U.S. State Department's 2008 Country Reports on Terrorism: "The Qods Force, an elite branch of the [IRGC], is the regime's primary mechanism for cultivating and supporting terrorists abroad.  The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hizballah, Iraq-based militants, and Taliban fighters in Afghanistan."[268]

586.   The First Corps of the Qods Force, one of its four regional commands, implements Iran's foreign policy in Iraq.  During the relevant timeframe, the Qods Force did so largely by providing the Shiite and Sunni terrorists with material support for terrorist attacks in Iraq.  The First Corps' al-Ramazan Headquarters is based across several sites in Iran's largest city (and capital), Tehran, a short trip from the border with Iraq.[269]

587.   Raids conducted in Iraq by the elite U.S. Joint Special Operations Command ("JSOC") also proved that the IRGC and Qods Force directly deployed their own terrorists inside Iraq to help attack Americans there and to directly participate, on occasion, in attacks themselves. For example, in a late 2006 JSOC raid in central Iraq, U.S. forces detained Mohsen **Chizari, the Qods Force's head of Operations and Training**, as well as the Qods Force's station chiefs for

---

[266] Clay Wilson (Specialist in Technology and National Security), *Improvised Explosive Devices (IEDs) in Iraq and Afghanistan: Effects and Countermeasures*, CRS Report for Congress, at 3 (Aug. 28, 2007).

[267] Knights, *The Evolution of Iran's Special Groups in Iraq*.

[268] U.S. State Dep't, *Country Reports on Terrorism 2008* at 182-83 (Apr. 2009).

[269] Joseph Felter & Brian Fishman, *Iranian Strategy in Iraq, Politics and "Other Means"* at 18, Combating Terrorism Center (Oct. 13, 2008).

Baghdad and Dubai. In another raid in northern Iraq, U.S. forces captured five Qods Force terrorists. To counter Iran's malign activities in Iraq, JSOC bifurcated its terrorist task forces and created Task Force 16 (to hunt al-Qaeda-in-Iraq) and Task Force 17 (to hunt Shiite terrorists in Iraq). In so doing, JSOC personnel from Task Force 16 and Task Force 17 discovered that Sunni and Shiite terrorists were secretly working together. They concluded that Soleimani and the Qods Force helped al-Qaeda-in-Iraq based on the Iranian conclusion that any agent of chaos and murder in Iraq – no matter whom they were or targeted– would quicken the American exit from Iraq and therefore, on balance, advance their interests given their belief that the U.S. was their top enemy.

588. "A consistent feature of Iran's patronage has been careful efforts to spread Tehran's bets across many different horses."[270] As set forth below, Iran afforded a comprehensive program of material support to Sunni terrorists targeting Americans in Iraq, as long as such groups did not also target Iran itself.

> **i.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided Material Support And Resources To Sunni Terrorists Targeting Americans In Iraq, Including Al-Qaeda, Al-Qaeda-In-Iraq, And Ansar Al-Islam To Undermine The U.S. Mission There**

589. Through the Qods Force, and other Iranian terrorist relationships, Iran provided material support and resources to all prominent Sunni terrorist groups targeting Americans in Iraq, supporting attacks committed directly by al-Qaeda, al-Qaeda-in-Iraq, and/or Ansar al-Islam.

590. Although there are religious differences between the Shiite Iranian regime and the Sunni terrorist organizations that targeted Americans in Iraq, those differences have not deterred Iran from supporting Sunni terrorist activities. Iran and their Sunni terrorist partners share a core geopolitical aim: to inflict mass casualties on Americans in the region. Sectarian distinctions

---

[270] Knights, *The Evolution of Iran's Special Groups in Iraq*.

aside, Iran has supported and funded attacks by Sunni terrorists on U.S. and allied forces in Iraq to harm the United States, including al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

591.    Soleimani was ready to work with any terrorist group that could grow Iran's "axis of resistance" to the U.S., even if they were Sunnis who ordinarily opposed Iran's Shiite theocracy. As Iran expert Karim Sadjadpour of the Carnegie Endowment for International Peace explained, "[u]nder Soleimani's command, Iran became the only country in the region capable of harnessing both Shiite extremism and, at times, Sunni radicalism too."[271]

> [Soleimani's] sinister genius in bridging sectarian divides has given Iran an enormous asymmetric advantage over its great Sunni Arab rival in the Gulf, Saudi Arabia. All Shiite extremists are willing to fight for Iran, while most Sunni extremists—including al Qaeda and Islamic State—want to overthrow Saudi Arabia, which they see as a corrupt, impious agent of the West.
>
> Soleimani conceived of using Sunni jihadists to fight the U.S. in much the same way that the U.S. used Sunni jihadists to fight the Soviet Union in Afghanistan in the 1980s. Iran's Shiite theocracy has managed, at times, to cooperate tactically with deadly Sunni extremist groups—including the Taliban in Afghanistan and the Palestinian groups Hamas and Palestinian Islamic Jihad—against their common foes, the U.S. and Israel, even as Iran has been fighting on the front lines against the Sunni fanatics of Islamic state.[272]

592.    Federal judges have made similar findings.  For example, in a 9/11-related case against Iran, the Honorable George B. Daniels of the United States District Court for the Southern District of New York found, as a factual matter, that:

> The well-known historical religious division between Sunnis and Shi'a did not, in fact, pose an insurmountable barrier to cooperation in regard to terrorist operations by radical Islamic leaders and terrorists. Iran, which is largely Shiite, and its terrorist proxy organization, Hizballah, also Shiite, entered into an alliance with al Qaeda, which is Sunni, to work together to conduct terrorist operations against the

---

[271] Sadjadpour, *Sinister Genius*.

[272] *Id.*

181

United States during the 1990s and continuing through, and after, September 11, 2001.[273]

593.    According to Colin P. Clarke, a terrorism expert at the Soufan Center, "Iran uses sectarianism as a cudgel when it suits the regime, but is also willing to overlook the Sunni-Shia divide when it suits Iranian interests," and therefore Iran's assistance to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam "would not be the first time that Iran had joined forces with Sunni militants, having supported Hamas, Palestinian Islamic Jihad and the Taliban."[274]

594.    U.S. officials concurred.   As one observed during the height of the Sunni insurgency: "I think it stands to reason that Iran is getting something out of this as well."

595.    The "election" of Mahmoud Ahmadinejad in 2005 only deepened Iran's affinity with Sunni extremists who shared a common hatred of America.

596.    Consistent with the alliance between Iran, Lebanese Hezbollah, and al-Qaeda, and pursuing Soleimani's terrorist vision, Iran provided material support to the three primary Sunni terrorist groups that were committing attacks against Americans in Iraq:  al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.  These groups committed attacks on their own, as well as in combination with one (or both) of the other groups.  In so doing, al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam were part of a grand alliance of Sunni terrorists that targeted Americans in Iraq with the support of Iran.

---

[273] *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *12 (S.D.N.Y. Dec. 22, 2011) (findings of fact).

[274] Adam Goldman, Eric Schmitt, Farnaz Fassihi and Ronen Bergman, *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*, N.Y. Times (Nov. 13, 2020).

ii.     **The IRGC, Including Its Hezbollah Division And Qods Force,
        Provided Material Support And Resources To Al-Qaeda That
        Established Al-Qaeda's Capabilities Before 9/11, Prevented Al-
        Qaeda's Collapse After 9/11, And Ensured Al-Qaeda's Status
        As An Iranian Sunni Terrorist Proxy In Iraq**

597.    Iran has long provided material support and resources to al-Qaeda. The sectarian differences between the Shiite regime in Tehran and the Sunni al-Qaeda leadership have not hindered cooperation between the groups. Whatever their religious differences, both groups share a hatred of America and support anti-American violence.

598.    Iran has supported al-Qaeda's terrorist activities since the early 1990s, when Osama bin Laden lived in Sudan. As Judge Daniels found, "[i]n 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."[275] "Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[276]

599.    "In 1993, in a meeting in Khartoum, Sudan, arranged by Ah Mohamed, a confessed al Qaeda terrorist and trainer now in a U.S. prison, Osama bin Laden and Ayman al Zawahiri met directly with Iran's master terrorist Imad Mughniyah and Iranian officials, including IRGC Brigadier General Mohammad Baqr Zolqadr, a multipurpose member of the Iranian terrorist structure."[277]

---

[275] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *11 (findings of fact).

[276] *Id.*

[277] *Id.* (internal citations and quotations omitted).

600.    "At the 1993 Khartoum conference, representatives of Iran, Hizballah, and al Qaeda worked out an alliance of joint cooperation and support on terrorism."[278]

601.    "Imad Mughniyah convinced Osama bin Laden of the effectiveness of suicide bombings in driving the U.S. out of Lebanon in the 1980s, and Mughniyah became a major connection point between Iran and al Qaeda."[279] "Osama bin Laden had been a guerilla fighter in Afghanistan and it was Mughniyah who made bin Laden into an accomplished terrorist."[280]

602.    "The 1993 meeting in Khartoum led to an ongoing series of communications, training arrangements, and operations among Iran and Hizballah and al Qaeda. Osama bin Laden sent more terrorist operatives, including Saef al Adel (who would become number 3 in al Qaeda and its top 'military' commander), to Hizballah training camps operated by Mughniyah and the IRGC in Lebanon and Iran. Among other tactics, Hizballah taught bin Laden's al Qaeda operatives how to bomb large buildings, and Hizballah also gave the al Qaeda operatives training in intelligence and security."[281]

603.    "Another al Qaeda group traveled to the Bekaa Valley in Lebanon to receive training in explosives from Hizballah, as well as training in intelligence and security."[282]

604.    "Iran's *Charge d'Affaires* in Khartoum, Sudan, Majid Kamal, an IRGC commander, coordinated the training expeditions; Kamal had performed the same function in Beirut, Lebanon, in the early 1980s during the formation of Hizballah."[283]

---

[278] *Id.* (internal citations and quotations omitted).

[279] *Id.*

[280] *Id.* (internal citations and quotations omitted).

[281] *Id.* (internal citations and quotations omitted).

[282] *Id.* (internal citations and quotations omitted).

[283] *Id.* at *12 (internal citations and quotations omitted).

605.     Under its alliance with al-Qaeda, Iran also regularly hosted Zawahiri during al-Qaeda's formative years.  As Judge Daniels previously found, "[a]s a result of the creation of this terrorist alliance, al Qaeda's Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with officers of MOIS [Iran's Ministry of Intelligence and Security], including chief Ali Fallahian, and Qods Force chief Ahmad Vahidi."[284]

606.     "The creation of the Iran–Hizballah-al Qaeda terrorist alliance was followed by a string of terrorist strikes directly against the U.S. and its allies," leading to the first World Trade Center attack in 1993, the Khobar Towers bombing in 1996, the African embassy bombings in 1998, the USS Cole attack in 2000, and 9/11.[285]

607.     As a result of the foregoing, Iran was the proximate and but-for cause of al-Qaeda's embrace of suicide bombing as a tactic.  Qods Force and Hezbollah agents acting at Iran's direction originally instructed al-Qaeda in the theological, technological, and tactical aspects of suicide bombing as a terrorist strategy based upon Iran's and Hezbollah's own successful use of suicide bombers during Iran's war against Iraq and during the joint Iranian/Hezbollah terrorist campaign against Americans in Lebanon in 1983, in which Hezbollah terrorists used suicide bombers to kill hundreds of Americans serving in Lebanon.

608.     When the U.S. Department of Justice indicted Osama bin Laden for the 1998 bombings of the U.S. embassies in Kenya and Tanzania, the indictment alleged that al-Qaeda had "forged alliances" with "the government of Iran and its associated terrorist group Hezballah [sic] for the purpose of working together against their perceived common enemies in the West,

---

[284] *Id.* (internal citations and quotations omitted).

[285] *Id.*

particularly the United States."[286]  A court in this District subsequently found that Iran had caused the East Africa Embassy bombings by materially supporting al-Qaeda's operations.[287]

609.    The 9/11 Commission has also confirmed that there was solid and substantial proof of Iran's repeated willingness to support terrorist proxies targeting Americans in the Middle East, including Sunnis with whom the Iranians are normally hostile, which had been demonstrated by Iranian assistance to a litany of terrorists, including 9/11 hijackers.[288]

610.    After 9/11, senior al-Qaeda leadership, sheltering in Iran under the patronage and with the counsel of Qods Force operatives, explicitly modeled their post-9/11 organization and tactics on the approach of Hezbollah and the Qods Force.

611.    While al-Qaeda was re-building itself in Iran after 9/11, the Iranians were busy rejecting U.S. and allied requests to stop aiding al-Qaeda.  For example, on or about 2002 or 2003, Iran rejected a lawfully issued extradition request by the Jordanian government for Zarqawi on the preposterous grounds that Zarqawi – whom the Iranians knew well – was not Jordanian but, rather, Syrian.  Similarly, in a 2003 face-to-face meeting in Geneva, Switzerland, then-U.S. ambassador to Iraq Ryan Crocker implored Iranian officials to cease their support for al-Qaeda's terrorism targeting Americans in the Persian Gulf, which request the Iranians refused.  By then, al-Qaeda had demonstrated its usefulness to Iran with respect to its ability to kill Americans, and Iran was

---

[286] Indictment at 3, *United States v. Bin Laden*, No. 1:98-cr-00539-LAK (S.D.N.Y. filed Nov. 5, 1998), Dkt. 1, *available at* https://fas.org/irp/news/1998/11/indict1.pdf.

[287] *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).

[288] *See, e.g., The 9/11 Commission Report* at 60 ("[T]he evidence of Iranian involvement" in the June 1996 truck bomb attack against Americans in Khobar Tower in Saudi Arabia was "strong" and there were "also signs that al Qaeda played some role.") (July 1, 2004); *see also id.* at 240-241 (significant Iranian transportation and logistical support for 9/11 attackers).

already sheltering and supporting al-Qaeda's military leader, Saif al-Adel (who was also al-Qaeda's manager for Zarqawi's activities in Iraq) in his Qods Force-provided Tehran safe house.

612.     The Iranians rebuffed U.S. outreach because they had already reached a secret deal with al-Qaeda.  Following the 9/11 attacks on the United States and subsequent routing of Sunni terrorists in Afghanistan (including al-Qaeda) in late 2001, Iran met with senior al-Qaeda leaders who had fled Afghanistan into Iran to offer military aid to support al-Qaeda's fight against America.  Iran hosted these meetings for its al-Qaeda "guests" throughout 2001 and 2002.  As part of this initial offer of support, Iran pledged to provide funds and logistical support to facilitate the development of terrorist activities targeting Americans in countries bordering Iran.  While the focus at the time was on Afghanistan, all involved expected the U.S. to eventually move into Iraq and for their shared terrorist enterprise to follow us there.

613.     Under this secret deal between Iran and al-Qaeda after 9/11, Iran intensified its material support for al-Qaeda's terrorist campaign against Americans around the world.  Through the secret deal between Iran and al-Qaeda and the assistance that the former provided to the latter thereafter, Iran was the proximate and but-for cause of al-Qaeda's survival as a terrorist organization after 9/11 and the al-Qaeda linked terrorist attacks against Americans in Iraq, including Plaintiffs, that inevitably followed.

614.     Osama bin Laden personally concluded that al-Qaeda would have collapsed after 2001 without the secret deal and Iran's key support for al-Qaeda in the years following 9/11, and al-Qaeda's subsequent ability to execute terrorist attacks depended upon the "artery" provided by Iran.  For example, in 2007, bin Laden criticized an al-Qaeda terrorist who had been planning to strike Iran-linked targets; in a secret internal al-Qaeda communique authored by bin Laden himself, bin Laden identified the key, organization-saving assistance that Iran had been providing

to al-Qaeda after 9/11, stating because of Iran's historical support for al-Qaeda's terrorist operations, Iran was al-Qaeda's "***main artery for funds, personnel, and communication***."[289]

615.   Zawahiri also emphasized close strategic cooperation between al-Qaeda and Iran, following a pragmatic approach under which al-Qaeda focused on expanding its presence in Iran. Like bin Laden, Zawahiri agreed that al-Qaeda could not survive and thrive without the support it received from Iran.  In a letter reportedly written by Zawahiri, al-Qaeda thanked Iran for the Qods Force's support in setting up al-Qaeda's terrorist network in Yemen in 2008 and stated, in effect, that al-Qaeda could not have established its franchise in Yemen without the IRGC's assistance.

616.   The U.S. government has also recognized the close partnership between Iran and al-Qaeda after the secret deal between the two.  In July 2011, the U.S. Treasury Department designated as SDGTs six members of al-Qaeda operating in Iran under the previously described secret agreement between Iran and al-Qaeda.[290]  In so doing, the Treasury Department concluded that the secret deal provided that al-Qaeda terrorists "must refrain from conducting any operations within Iranian territory and recruiting operatives inside Iran while keeping Iranian authorities informed of their activities.  In return, the Government of Iran gave the Iran-based al-Qa'ida network freedom of operation and uninhibited ability to travel for extremists and their families" and permitted al-Qaeda to use Iran as a "critical transit point for funding to support [al-Qaeda's] activities."  The Treasury Department also found that "Iran's secret deal with al-Qa'ida" facilitated a terrorist network that "serves as the core pipeline through which al-Qa'ida moves money,

---

[289] October 18, 2007 translated letter from Osama bin Laden to Karim at 1, *Bin Laden's Bookshelf*, Office of the Director of National Intelligence (2016) (emphasis added).  In March 2016, the Office of the Director of National Intelligence declassified items that had been obtained by U.S. special operators in the May 2011 raid on bin Laden's compound, including this letter.  *See* Bin Laden's Bookshelf, Office of the Director of National Intelligence.

[290] Press Release, U.S. Treasury Dep't, *Treasury Targets Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (July 28, 2011).

facilitators and operatives from across the Middle East to South Asia."[291]  Indeed, al-Qaeda has honored its commitment to Iran despite its attacks on Shiite Muslims elsewhere in the Middle East.

617.    The U.S. Treasury Department has repeatedly recognized the link between al-Qaeda and Iran in making SDGT designations under Executive Order 13224.  In February 2012, the agency designated the Iranian Ministry of Intelligence and Security ("MOIS") as a terrorist-sponsoring entity for, among other things, supporting al-Qaeda.[292]  In 2014, the agency likewise designated a "key Iran-based" al-Qaeda facilitator who has "assisted extremists and operatives transiting Iran on their way into and out of Pakistan and Afghanistan."[293]

618.    The close relationship between al-Qaeda and Iran has continued in recent years.  In 2017, the U.S. State Department explained, "Since at least 2009, Iran has allowed [al-Qaeda] facilitators to operate a core facilitation pipeline through the country, enabling [al-Qaeda] to move funds and fighters to South Asia and Syria."[294]  It further accused Iran of remaining unwilling to bring to justice or identify al-Qaeda members in its custody.[295]  The next year, the agency reaffirmed those conclusions and reiterated Iran's close relationship with al-Qaeda.[296]

619.    Iran also supported al-Qaeda through its proxy, Lebanese Hezbollah.  As the *Washington Post* reported at the time in 2002, Iran's lead terrorist proxy, Lebanese Hezbollah, was "increasingly teaming up with al Qaeda on logistics and training for terrorist operations, according

---

[291] *Id.*

[292] Press Release, U.S. Treasury Dep't, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012).

[293] Press Release, U.S. Treasury Dep't, *Treasury Targets Networks Linked To Iran* (Feb. 6, 2014).

[294] U.S. State Dep't, *Country Reports on Terrorism 2016* at Iran Section (July 2017).

[295] *Id.*

[296] *Country Reports on Terrorism 2017* at Foreword.

to U.S. and European intelligence officials and terrorism experts."[297] "The new cooperation …
includes coordination on explosives and tactics training, money laundering, weapons smuggling
and acquiring forged documents, according to knowledgeable sources. This new alliance, even if
informal, has greatly concerned U.S. officials in Washington and intelligence operatives abroad
who believe the assets and organization of Hezbollah's formidable militant wing will enable a
hobbled al Qaeda network to increase its ability to launch attacks against American targets."[298]

620.     The "collaboration" between Iran (through Lebanese Hezbollah) and al-Qaeda
"illustrate[d] what analysts [said] [was] an evolving pattern of decentralized alliances between
terrorist groups and cells that share[d] enough of the same goals to find common ground: crippling
the United States, and forcing the U.S. military out of the Middle East and Israel out of Palestinian
territory. 'There's a convergence of objectives,' said Steven Simon, a former National Security
Council terrorism expert." [299]  As the *Washington Post* reported, "[a]lthough cooperation between
al Qaeda and Hezbollah may have been going on at some level for years, the U.S. war against al
Qaeda [] hastened and deepened the relationship. U.S. officials believe that after al Qaeda was
driven from Afghanistan, leader Osama bin Laden sanctioned his operatives to ally themselves
with helpful Islamic-based groups, said a senior administration official with access to daily
intelligence reports."[300]  The *Post* concluded:

> European and U.S. intelligence operatives on the ground in Africa and Asia said
> they have been trying to convince headquarters of the new alliances but have been
> rebuffed. "We have been screaming at them for more than a year now, and more
> since September 11th, that these guys all work together," an overseas operative
> said. "What we keep hearing back is that it can't be because al Qaeda doesn't work

---

[297] Dana Priest and Douglas Farah, *Terror Alliance Has U.S. Worried; Hezbollah, Al Qaeda Seen
Joining Forces*, Washington Post (June 30, 2002), 2002 WLNR 15332564.

[298] *Id.*

[299] *Id.*

[300] *Id.*

that way. ***That is [expletive]***. Here, on the ground, these guys all work together as long as they are Muslims. There is no other division that matters."[301]

621.   Al-Qaeda's alliance with Iran's lead terrorist proxy, Lebanese Hezbollah, continued at all relevant times and proved the intelligence operatives on the ground had been right all along.  For example, in 2012, the Council on Foreign Relations reported that "al-Qaeda ha[d] stepped up its cooperation on logistics and training with Hezbollah, a radical, Iran-backed Lebanese militia drawn from the minority Shiite strain of Islam."[302]

622.   On or about August 7, 2020, on the anniversary of the Iran/al-Qaeda bomb attack against U.S. embassies in Africa, Israeli commandos acting at the request of the United States killed al-Qaeda's number 2 leader, Abu Muhammad al-Masri, in a covert mission in Tehran.[303] Masri was in Iran as a guest of the Iranian government and was permitted to freely plan attacks against the United States from an Iranian-provided safe-haven in Tehran.  The timing of the attack was not a coincidence, but a rather a professional slap in the terrorists' face extended by the U.S. and Israeli governments to Iran and al-Qaeda, as the latter allies suffered an embarrassing and catastrophic loss on the anniversary of one of their greatest terrorist triumphs.

623.   The mafia-style "syndicate" of which al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam formed a part, made attacks by each group more lethal.  Iran's mutually reinforcing support for al-Qaeda, AQI, and AI therefore made each group more effective.

624.   By supporting al-Qaeda, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families.  Al-Qaeda directly participated in many of the attacks that killed or injured Plaintiffs or their family members.

---

[301] *Id*.

[302] *al-Qaeda (a.k.a. al-Qaida, al-Qa`ida)*, Council on Foreign Relations (June 6, 2012).

[303] Goldman at al., *Al Qaeda's No. 2, Accused in U.S. Embassy Attacks, Was Killed in Iran*.

Moreover, al-Qaeda was closely intertwined with al-Qaeda-in-Iraq and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda planned and authorized the Sunni attacks in which it did not directly participate. Material support and resources provided to al-Qaeda thus also flowed to al-Qaeda-in-Iraq and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### iii. The IRGC, Including Its Hezbollah Division And Qods Force, Established Al-Qaeda-In-Iraq As An Iranian Sunni Terrorist Proxy In Iraq

625. Iran used the IRGC to provide Zarqawi with the Iranian patronage necessary to establish al-Qaeda-in-Iraq and turn it into the terrorist killing machine it would become.

626. "When the Taliban government collapsed, a strange opportunity presented itself. Many members of al-Qaida fled Afghanistan and crossed the border into Iran."[304]

627. All told, Zarqawi was based in Iran for at least a year after his escape from Afghanistan after 9/11. After bin Laden family members and Zarqawi joined Iran as "guests" following 9/11, Soleimani devised a successful plan to turn them into Iranian terrorist assets to carry out attacks against America. As Mr. Sadjadpour explained:

> After the U.S. military campaign to topple the Taliban began, Iran detained hundreds of al Qaeda fighters fleeing Afghanistan, including some members of Osama bin Laden's family and Abu Musab al-Zarqawi, the future leader of al Qaeda in Iraq. Many Iranians saw these jihadists as a threat—Sunni zealots who hated overwhelmingly Shiite Iran. Yet Soleimani, the architect of the Islamic Republic's plans for regional dominance, realized that they could also be an asset. … many al Qaeda members [] spent months and even years as "guests" of Iran. Soleimani broke bread with bin Laden's sons, who affectionately called him Hajji Qassem … He appointed two senior Quds Force officers to "provide the guests with whatever they needed," including refrigerators, widescreen TVs and an "unlimited budget" to furnish a religious library. Saif al-Adel, a notorious al Qaeda explosives expert, had access to a sports complex in a posh Tehran neighborhood, where he swam laps alongside Western diplomats.[305]

---

[304] NPR, *Throughline*.

[305] Sadjadpour, *Sinister Genius*.

628.     "Now that Soleimani had these al-Qaida fighters on his side, he had to figure out exactly how to use them.  And when the U.S. invaded Iraq in 2003, he saw his opening."[306]  As Mr. Sadjadpour of the Carnegie Endowment explained, "[i]f you're Qassem Soleimani, you think to yourself - we will do everything in our power to make sure that the U.S. war in Iraq is a colossal failure."[307]  Thus, under Soleimani's plan, Iran "unleashed the al-Qaida fighters into Iraq," doing so "[w]ith the understanding that you guys, go do what you do. Go after the United States" by deploying terrorist attacks like "car bombings, [and] suicide bombings."[308]

629.     Backed by Iran's material support, just a few months after Soleimani helped unleash him into Iraq, "Abu Musab al-Zarqawi, the Jordanian al-Qaida leader, [] set[] off these three major bombs which essentially destroy[ed] the American experiment in Iraq in its infancy."[309]  As terrorism scholar David Blair summarized the Zarqawi-Iran alliance:

> By 2002, an Anglo-American invasion of Iraq seemed inevitable. Sensing an opportunity, Iran allowed Zarqawi to travel across its territory and enter northern Iraq in late 2002. Just as the Kaiser's Germany transported Lenin from Switzerland to Russia in 1917 delivering him "like a plague bacillus", in Churchill's phrase so Iran conveyed the virus represented by Zarqawi to Iraq.  The Shia rulers of Iran are natural opponents of al-Qaeda's Sunni zealots, but the evidence suggests that the two have sometimes been tactical if mistrustful allies against a common Western enemy. So it was that al-Qaeda's plague had arrived in Saddam Hussein's domain, courtesy of Iran, even before the invasion. By the time that American and British tanks rolled across the Iraqi frontier in 2003, Zarqawi was already in position to organise an insurgency. Later that year, he proclaimed the birth of 'al-Qaeda in the Land of Two Rivers'. … From 2005 onwards, he set out to kill as many Iraqi Shias as possible[,] a bitter irony given that Zarqawi owed his very presence in Iraq to the indulgence of Shia Iran.[310]

---

[306] NPR, *Throughline*.

[307] Sadjadpour, *quoted in* NPR, *Throughline*.

[308] *Id*.

[309] *Id*.

[310] David Blair, *The Rise of the Fanatics that Now Control ISIL*, Sunday Independent (Apr. 12, 2015), 2015 WLNR 10684439.

630. As a result, Iran, through Soleimani's plan, was the proximate and but-for cause of al-Qaeda-in-Iraq's existence and ability to commit attacks targeting Americans in Iraq, including against Plaintiffs. As Osama bin Laden himself concluded, without Iran's key support for al-Qaeda in the years following the 9/11 attacks, al-Qaeda would have collapsed, and al-Qaeda's subsequent terrorist schemes carried out in Iraq through al-Qaeda-in-Iraq would not have come to fruition.

631. Iran's strategy recognized that the Iranians could use their sectarian enemies, including Shia-haters like Zarqawi, to harm Iran's two primary enemies, the United States and Israel, and pragmatically and ruthlessly to pursue Iranian interests throughout the world.

632. Iran and Soleimani pursued this strategy towards Sunni terrorists targeting Americans in Iraq at all relevant times because it inflicted harm on America while providing Iran iron-clad protection from being attacked by these same Sunni terrorists. Indeed, in a May 2014 message to Ayman al-Zawahiri from Abu Muhammad al-Adnani – who was once a Zarqawi ally and former al-Qaeda member but had departed with ISIS becoming its spokesman after ISIS and al-Qaeda split earlier in 2014 – Adnani reminded al-Qaeda, on behalf of ISIS, that:

> ISIS has not attacked the Rawafid [Shia] in Iran since its establishment. … It has kept its anger all these years and endured accusations of collaboration with its worst enemy, Iran, for refraining from targeting it, leaving the Rawafid [Shia] there to live in safety, acting upon the orders of al Qaeda to safeguard its interests and supply lines in Iran. Let history record that Iran owes al Qaeda invaluably.

633. The four intelligence services that knew Zarqawi the best (other than Iran) – those of the U.S., Iraq, Jordan, and Germany – all concluded that Iran deliberately helped stand up Zarqawi's terrorist network in Iraq. Like their U.S. and Iraqi counterparts, the Jordanian and German intelligence and law enforcement communities developed overwhelming evidence as to

the sustained and substantial nature of Iran's provision of material support and resources to Zarqawi.

634.   Given Zarqawi's Jordanian roots, Jordan's intelligence service, the *Mukhabarat*, knew him as well as anyone. Jordanian intelligence concluded that Iran deliberately stood-up Zarqawi's terrorist network in Iraq in order to inflict pain on Americans there and advance Iranian interests in the country, providing terrorist seed capital in the form of arms and early essential logistical support, and sustained Zarqawi's network thereafter by permitting them to travel freely between Iran and Iraq as long as they continued attacking Americans in Iraq.

635.   German intelligence and law enforcement also confirmed the close nexus between Zarqawi and Iran. In 2002, the German intelligence services, the *Bundesnachrichtendienst* ("BND"), successfully wiretapped and surveilled several members of the Zarqawi network in Germany, which allowed BND agents to precisely track Zarqawi's travel patterns during and after his flight from Afghanistan. Based on insights from these leads, German intelligence concluded that Zarqawi received refuge and medical care in Mashhad, Iran on January 5, 2002, and remained in Iran until at least April of 2002, during which time he directed the retreat of his al-Qaeda operatives from Afghanistan, through Iran, into to the Kurdistan region on both sides of the Iran/Iraq border. Thereafter, Zarqawi traveled to Tehran and Zahedan in support of his efforts to stand up al-Qaeda-in-Iraq. During this entire time, Zarqawi benefited from Iranian patronage and protection, including his own personal team of IRGC minders provided by Soleimani himself.

636.   German law enforcement also developed solid evidence that Iran had provided essential material support to Zarqawi. According to files from Germany's Federal Office of Criminal Investigation, German prosecutors concluded that Iran gave Zarqawi essential state-sponsored terrorist support and was a key logistical partner for his terrorist enterprise in Iraq.

637. Other European counter-terror authorities concurred with the findings of U.S., Iraqi, Jordanian, and German governments. For example, a noted Spanish terrorism judge, Baltasar Garzon, concluded that al-Qaeda's board of managers were operationally active from their Iranian safe-haven, coordinating operations against America and its Coalition partners. Similarly, in 2004, French intelligence officials concluded that al-Qaeda leaders had permission to move within Iran and support terrorist operations against America from their Iranian safe-haven.

638. Iran – and Soleimani himself – recognized that Iran's support for Zarqawi advanced Iranian interests even after Zarqawi began slaughtering Shiites in Iraq. For example, Soleimani reportedly told the audience at an Iranian military seminar that the Qods Force permitted Zarqawi and more than a dozen of his senior terrorist followers to enter Iran whenever they pleased via border crossings between Ham and Halabja. At this same discussion, when asked why Iran supported Zarqawi given his anti-Shiite attacks, Soleimani reportedly replied that Zarqawi's attacks in Iraq "serve the supreme interests of Iran" by stopping the formation of pro-American government in Iraq.

639. Even when al-Qaeda-in-Iraq began massacring Iraqi Shiites at scale in 2006, Iranian support for al-Qaeda-in-Iraq still advanced Iran's perceived self-interest in Iraq by fostering anti-American violence there and by forcing Iraqi Shiites to seek protection from Iranian Shiite terrorist proxies, like Jaysh al-Mahdi, who were also fighting al-Qaeda-in-Iraq. As Mr. Sadjadpour explained, Zarqawi's attacks against Shiites "totally radicalized the Shiite community in Iraq" and "essentially pushed them into the arms of Iran and Qassem Soleimani, who said to the

Shiites of Iraq, we can protect you."[311]   Simply put, "[i]t served the interests of the Islamic Republic to maintain Iraq in a state of controlled chaos and anarchy."[312]

640.   By supporting al-Qaeda-in-Iraq, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families.  Al-Qaeda-in-Iraq directly participated in many of the attacks that killed or injured Plaintiffs or their family members.  Moreover, al-Qaeda-in-Iraq was closely intertwined with al-Qaeda and Ansar al-Islam and associated terrorist groups acting in Iraq, and al-Qaeda-in-Iraq planned and authorized the Sunni attacks in which it did not directly participate.  Material support and resources provided to al-Qaeda-in-Iraq thus also flowed to al-Qaeda and Ansar al-Islam, causing the injury and deaths of Plaintiffs or their family members.

### iv.   The IRGC, Including Its Hezbollah Division And Qods Force, Established Ansar Al-Islam As An Iranian Sunni Terrorist Proxy In Iraq

641.   To ensure Iranian influence in Kurdish communities on both sides of the Iran/Iraq border, and consistent with Iranian policy supporting anti-American terror in countries bordering Iran, Ansar al-Islam has been, and remains to this day, a longstanding terrorist proxy of the IRGC. Iran, through the activities orchestrated by Qassem Soleimani and those acting at his instruction, was the proximate and but-for cause of Ansar al-Islam's existence and ability to commit attacks targeting Americans in Iraq, including against Plaintiffs.

642.   Iran's support for Ansar al-Islam is rooted in the former's obsession over Kurdish issues and support for Sunni terrorists in Kurdistan was a foundation of Iranian efforts to exercise influence in Northern Iraq. This region had historically been beyond Baathist reach when Saddam

---

[311] Sadjadpour, *quoted in* NPR, *Throughline*.

[312] NPR, *Throughline*.

ran Iraq, and it could provide an unbroken Iranian corridor across the "Shiite Crescent," which stretches from Iran through Iraq to Syria and Lebanon.

643.    Ansar al-Islam could not exist, let alone pose a terrorist threat to Americans in Iraq, without the key assistance provided by Iran through the IRGC and Qods Force.  As the anti-terrorism think tank, the Jamestown Foundation, concluded, "a significant degree of Iranian support was necessary for Ansar al-Islam to function, given that the group's military supplies came in from Iran (the mountainous region they controlled touches the Iranian border), veterans from Afghanistan joined them via Iran, and their cadres (including Mullah Krekar himself) entered and left the area via Iran."[313]    Similarly, the International Crisis Group concluded that it was "indisputable … that [Ansar al-Islam] could not survive without the support of powerful factions in neighbouring Iran, its sole lifeline to the outside world."[314]

644.    Contemporaneous American and British intelligence reports concerning Iran and Iraq support these conclusions.

645.    Al-Qaeda was responsible for the success of Ansar al-Islam's suicide bomb attacks against Americans in Iraq.  Through its relationship with al-Qaeda and Ansar al-Islam, Iran was the proximate and but-for cause of Ansar al-Islam's suicide bombing attacks against Americans in Iraq.

646.    Iran's support for al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam was mutually reinforcing.  Zarqawi's ability to leverage safe havens on Iranian soil and his membership and leadership role in all three groups played a key role in facilitating AQI's development.  By

---

[313] David Romano, *An Outline of Kurdish Islamist Groups in Iraq* at 12, The Jamestown Foundation (Sept. 2007) ("Romano, *An Outline of Kurdish Islamist Groups in Iraq*").

[314] International Crisis Group, *Radical Islam In Iraqi Kurdistan: The Mouse That Roared?* at 1-2, IRAQ Briefing (Feb. 7, 2003).

providing leadership, training, logistical support, and instruction to al-Qaeda, AQI, and Ansar al-Islam, Zarqawi created a network of al-Qaeda affiliated terrorists working together in a shared campaign against Americans in Iraq, which he then leveraged to attack Americans throughout Iraq.

647.    By supporting Ansar al-Islam, Iran provided material support and resources for the extrajudicial killings that killed or injured Plaintiffs or members of their families.  Ansar al-Islam directly participated in some of the attacks that killed or injured Plaintiffs or their family members. Moreover, Ansar al-Islam was closely intertwined with al-Qaeda, al-Qaeda-in-Iraq, and associated terrorist groups acting in Iraq, and Ansar al-Islam provided essential logistical support for the entire Sunni campaign by facilitating the smuggling of weapons into Iraq, and therefore Ansar al-Islam aided the Sunni attacks in which it did not directly participate.  Material support and resources from Iran provided to Ansar al-Islam thus also flowed to al-Qaeda and al-Qaeda-in-Iraq, causing the injury and deaths of Plaintiffs or their family members.

648.    Consistent with Iran's policy of material support to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam (collectively, Iran's "Sunni Terrorist Proxies") described above, Iran provided material support or resources to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam for the acts of extrajudicial killing that killed or injured Plaintiffs or their family members.  As explained below, that support took the form of "currency . . .  lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, . . . and transportation."[315]

---

[315] 18 U.S.C. § 2339A(b)(1).

v.    **The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Sunni Terrorist Proxies With Weapons, Explosives, And Lethal Substances**

649.    Iran provided material support or resources for the acts of extrajudicial killing that killed or injured Plaintiffs, or their family members, by providing (among other things) weapons, explosives, and lethal substances to the al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.

650.    Iran provided a regular flow of weapons and military equipment to Sunni terrorists targeting Americans in Iraq, including al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam.  According to a senior al-Qaeda terrorist, "the Quds Force … supplied Zarqawi with weapons" and as a result, the al-Qaeda member concluded that, if "Osama was responsible for financing the butchers of Baghdad [i.e., Zarqawi and al-Qaeda-in-Iraq], so was Tehran."

651.    Middle Eastern and Western intelligence services concurred with this assessment and have long documented Iran's provision of weapons and equipment to Sunni terrorists targeting Americans.  As one Jordanian intelligence professional explained, placing himself from the perspective of a Sunni extremist (paraphrased) "I go to the Saudis when I need money and I go to the Iranians when I need arms, training, or supplies."

652.    Regional Kurdish security officials also documented Iran's provision of weapons and equipment to Sunni terrorists targeting Americans in Iraq.  "[I]n the town of Tuwella, the local PUK [Patriotic Union of Kurdistan, a large political party] chief, Ismail Ameen, said [that] … [j]ust before the war, in February 2003, he saw six gray Toyota Landcruisers drive into town from the Iranian border. He said the trucks were loaded with bullets and mortar shells for [an al-Qaeda affiliate's] fighters.  'They would have run out of ammunition . . . without the supplies they got from Iran,' he said.  Two top PUK security officials, and three members of the PUK's political

bureau, also contended that Iran has continued to support Islamist insurgents."[316]  As one report

explained in 2004:

> For years, and with the blessing of Iranian officials, Islamist terrorist groups have
> smuggled weapons … into Iraq … many Kurdish intelligence and security officials
> said. … [H]ere in the mountains of Kurdistan … are tangible footprints of Iran's
> collaboration with terror and insurgent groups responsible for attacks inside Iraq.
> According to a half-dozen officials in the Patriotic Union of Kurdistan,… Iran has
> extended its network of agents inside Iraq.  Iran, the officials say, continues to aid
> groups like Ansar al-Islam and Abu Musab al-Zarqawi's group, now named Al
> Qaeda in Mesopotamia.  Even though Iran is a Shi'ite theocracy, these officials
> said, it helps Sunni insurgent groups because it wants to prevent a strong unified
> government from taking shape in Iraq.  "They go back and forth after running
> missions here," said Anwar Haji Othman, head of security in the area … including
> a long stretch of the Iranian border.[317]

653.    Regional papers in the Middle East also agree with this conclusion.  As one

Bahraini paper observed, Iran's decision to "transfer[] munitions to Sunni extremists fighting the

Americans in Iraq," accords with similar decisions Iran made to "export[] weapons to the Taliban"

and other anti-American terrorists who did not follow the Khomeneist school of Iranian theological

supremacy like "the Zaidi Houthis" and "Syria's Alawites … [who]  hail from significantly

different schools of Islam."[318]

654.    Iran also funneled weapons to Sunni terrorists in Iraq through its proxy, Ansar al-

Islam.  Given its location on both sides of the Iran/Iraq border, Ansar al-Islam could not have

sourced any of its supplies or fighters without the active cooperation of the IRGC and the Qods

Force.  As the Jamestown Foundation concluded, Ansar al-Islam's "military supplies came in from

Iran," as did the group's fighters, who had depended upon the cooperation of Iran to transit through

---

[316] Thanassis Cambanis, *Along Border, Kurds Say, Iran Gives Boost To Uprising*, Boston Globe
(Nov. 7, 2004), 2004 WLNR 6887856 ("Cambanis, *Along Border*").

[317] *Id.*

[318] DT News (Bahrain), *Why is Tehran Recruiting Daesh Jihadists?* (Nov. 5, 2018), 2018 WLNR
34281745

Iran (between Iraq and the Afghanistan-based camps they also attended) as well as to provide a safe-haven from which to plan attacks.[319]

655.    After American forces destroyed Ansar al-Islam's camp in Iraqi Kurdistan in March 2003, Zarqawi and his Ansar al-Islam lieutenants fled to Iran, where they regrouped, rearmed, trained, and continued to plan operations against Americans in Iraq, all while "Iran continued to supply Ansar al-Islam and its ally, Abu Musab al-Zarqawi, smuggling supplies for the insurgency against the U.S. and its coalition partners.  In this way, the Zarqawi-Iran connection was maintained from his retreat from Afghanistan to his arrival in Iraq."[320]

656.    Indeed, as the *Boston Globe* reported in 2004, "[f]or years, and with the blessing of Iranian officials," Ansar al-Islam "smuggled weapons … into Iraq on this [Iranian] road [near the Iraqi border], many Kurdish intelligence and security officials said."[321]

657.    Ansar al-Islam received weapons and munitions from Iran, including Katyusha rocket launchers, mortar rounds, and the ubiquitous Toyota Land Cruiser SUVs used by Ansar al-Islam, which "could not have been smuggled into the area without the tacit approval of the Iranian government and security apparatus."[322]

658.    Iranian support was also key to al-Qaeda's and its affiliates' ability to execute their signature attacks.  Al-Qaeda's IEDs and suicide bomb attacks offer two examples.  With respect to the former, Iranian aid was key to the success of Sunni terrorists' campaign of IED attacks

---

[319] Romano, *An Outline of Kurdish Islamist Groups in Iraq*.

[320] Dore Gold and Lt. Col. (Res.) Jonathan D. Halevi (Israel Defense Forces), *Zarqawi and Israel: Is There a New Jihadi Threat Destabilizing the Eastern Front?*, Jerusalem Center for Public Affairs, Jerusalem Issue Brief Vol. 5 No. 12 (Dec. 15, 2005) ("Gold and Halevi, *Zarqawi*").

[321] Cambanis, *Along Border*.

[322] The Washington Institute for Near East Policy, *The Islamist Threat from Iraqi Kurdistan* (Dec. 1, 2001).

against Americans in Iraq. Coalition personnel on the ground in Iraq concluded that Iran provided substantial IED-related support to Sunni terrorists targeting Americans in Iraq. For example, by the summer of 2006, Task Force 16 members responsible for hunting al-Qaeda-in-Iraq terrorists had concluded that Iran was providing sophisticated IED technology to Sunni terrorists in Iraq, led by al-Qaeda, in order to inflict casualties on Americans in Iraq. British military personnel in Iraq reached a similar conclusion a year prior when, in 2005, "a senior British general repeated a claim that bomb-making technology is crossing into Iraq from Iran."[323] As reported at the time:

> Major-General Jim Dutton, who commands a multinational force in south-eastern Iraq, said the know-how for advanced bombs was coming 'across that border'. … Defence sources quoted independently by the BBC were more blunt, saying that the Revolutionary Guards, an elite fighting force appointed by the country's supreme leader, were indeed giving original bomb-making training to Iraq's insurgents. At first and even second glance, allegations of an alliance between Iran and Al-Qaeda, especially if it incorporates cells affiliated to the terror organisation presently operating in Iraq, defies all sense and logic. For a start, Iran is Persian/Shi'ite, while Al-Qaeda is Arab/Sunni. … [I]t now seems clear that Iran and Al-Qaeda generally have been drawn together, despite their obvious ideological and religious differences, by a common goal: To facilitate global jihad and help hasten American failure in Iraq.[324]

659.   Iran also helped provide al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam the "weapons" they used when they deployed suicide bombers in Iraq, as Iran was the original source of the groups' collective embrace of suicide bombing as a tactic, and Iranian geography was necessary for the travel of suicide bombers into Iraq, which in the case of a suicide bomber accomplished the "insertion" of the weapon into the country.

660.   Separately, Iranian territorial aid was also key to the success of al-Qaeda's IED attacks and suicide bombs because only through Iran could al-Qaeda and its affiliates maintain the

---

[323] John R. Bradley, *Real Threat From Iran Is Here, Now*, Straits Times (Singapore) (Nov. 14, 2005), 2005 WLNR 18356274 ("Bradley, *Real Threat From Iran*").

[324] Bradley, *Real Threat From Iran*.

CAN fertilizer supply chain from the Pakistani supplier upon which they relied. As a result, al-Qaeda could not have executed its campaign of fertilizer-based suicide bomb and IED attacks against Americans in Iraq without the terrorist land bridge provided by Iran. On information and belief, al-Qaeda sourced some of its fertilizer for use in their Iraqi bombs from a supplier in Pakistan and transported such fertilizer across from Pakistan to Iraq by using the terrorist land bridge offered by Iran, which al-Qaeda could not have accomplished without the aid of the IRGC, which controls Iran's borders with Afghanistan and Iraq, and whose permission is necessary to transport any goods overland from the above-described route from Pakistan to Iraq.

### vi. The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Lodging, Training, Expert Advice Or Assistance, Safehouses, Personnel, And Transportation

661. Iran also provided its Sunni Terrorist Proxies in Iraq with lodging, training, expert advice or assistance, safehouses, and transportation. Iran taught its Sunni Terrorist Proxies attack techniques that were particularly effective against U.S. and Coalition forces. Without the training, lodging, safehouses, and transportation assistance from Iran and its agents, Iran's Sunni Terrorist Proxies would not have been able to launch as successful a terrorist campaign against Americans in Iraq.

662. **Lodging, Safehouses, and Transportation.** Iran has maintained a decades-long travel assistance relationship with al-Qaeda as part of the terrorist alliance between Iran, al-Qaeda, and Lebanese Hezbollah.

663. By no later than January 2002, the Qods Force had approved a strategic plan to actively support al-Qaeda's post-9/11 terrorist attacks against Americans in the Middle East by providing sanctuary in Iran to senior al-Qaeda terrorists and their family members, directly supported and managed by the Qods Force. To facilitate al-Qaeda members' flight from

Afghanistan to their newfound Iranian safe-haven, the Qods Force relied upon the assistance of Zarqawi – whom it already knew based on his travels in the region – to coordinate the travel of senior Qaeda operatives, including Saif al-Adel, from Afghanistan to Iran.

664.    Sitting between Iraq and Afghanistan and having a long history of facilitating Sunni terrorist travel and logistics, Iran was ideally suited to aid the ascendant Sunni insurgency in Iraq after March 2003 because al-Qaeda's assistance could only flow from Afghanistan to Iraq via Iran. Reporting the views of Kurdish security officials, one journalist explained in 2004 that there is a long history in the Middle East "of nations giving shelter to their enemies' enemies" and thus "[t]he apparent Iranian ties to [Sunni] mujahedeen groups operating inside Iraq only continue[d] this long Machiavellian tradition," and reflected Iran's willingness to "work with [Sunni] groups … whose ideology is so opposed to theirs, because they want to have a card to play in Iraq."[325]

665.    Iran's service as the "terrorist land bridge" by its provision of travel assistance to al-Qaeda and al-Qaeda-in-Iraq was essential to the terrorists' ability to conduct attacks against Americans in Iraq.  As Judge Daniels found in another case against Iran,

> Perhaps the most important form of aid Iran gave al Qaeda prior to 9/11 (and continues to give today) involves the facilitation of travel.  … Travel assistance "is invaluable," not only to avoid detection and arrest, but established lines of transit make recruitment and training easier, as individuals can travel to and from training camps without fear of interference. Also, travel facilitation enables better communication and coordination. Even before 9/11, al Qaeda was aware that the United States monitored phones and other forms of communication and recognized that many sensitive deliberations are best done face-to-face. Doing so requires individuals who can travel freely from one area to another.[326]

---

[325] Cambanis, *Along Border*.

[326] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *28 (findings of fact).

666.    "In the mid–1990s, when the Iran–Hizballah-al Qaeda terror alliance was forming, al Qaeda operative Mustafa Hamid had 'negotiated a secret relationship with Iran that allowed safe transit via Iran to Afghanistan.'"[327]

667.    "Numerous admissions from lower level al Qaeda members who were interrogated at the detention facility at Guantanamo Bay confirm the existence of the clandestine Iran–Afghanistan passageway, managed by MOIS.  Al Qaeda had 'total collaboration with the Iranians,' and had its own organization in Iran 'that takes care of helping the mujahedin brothers cross the border.'"[328]  "By … providing safe passage through Iran and into Afghanistan, and by permitting Hezbollah to receive the traveling group ... Iran, in essence, acted as a state sponsor of terrorist travel."[329]  These trends have continued without interruption since the 1990s.

668.    After 9/11, Iran provided safehouses to many senior leaders of al-Qaeda and their families, including Osama bin Laden's sons.  Iran permitted these senior leaders to move freely within Iran in the early 2000s, while they continued to direct, organize, and support al-Qaeda's terrorist operations throughout the world.[330]  In essence, Iran provided al-Qaeda with a safe haven from which to orchestrate its terrorist activities.[331]  As Judge Daniels found:

> When the United States-led multi-national coalition attacked the Taliban regime in Afghanistan in the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous al Qaeda leaders, operatives, and their families. The Iran–Afghanistan safe passageway, established earlier to get al Qaeda recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of al Qaeda fighters and their families from Afghanistan into Iran for safe haven there. The

---

[327] *Id.* at *17 (findings of fact) (internal citations omitted).

[328] *Id.* (internal citations omitted).

[329] *Id.* (internal citations omitted).

[330] *Id.*

[331] *Id.* at 150-51 ("When a foreign sovereign allows a terrorist organization to operate from its territory, this meets the statutory definition of 'safehouse.'").

IRGC knew of, and facilitated, the border crossings of these al Qaeda fighters and their families entering Iran.

Osama bin Laden's friend, Gulbuddin Hekmatyar, who was then in exile in Iran near the Afghan border, was instrumental in the evacuation of al Qaeda into Iran, as were Imad Mughniyah and Iran's Qods Force commander Ahmad Vahidi.

Among the high-level al Qaeda officials who arrived in Iran from Afghanistan at this time were Saad bin Laden and the man who would soon lead "al Qaeda in Iraq," Abu Mussab Zarqawi.[332]

669.    The Coalition's civilian military leadership in the United States and Iraq also concluded that Iran provided such safe haven support to Zarqawi and other AQI terrorists.

670.    The list of al-Qaeda-affiliated terrorists who supported al-Qaeda attacks against Americans from their post 9/11 Iranian safe-haven reads like an al-Qaeda management roster, featuring nearly two dozen senior leaders, organizers, planners, ideologues, and terrorist operatives from around the world – comprising most of al-Qaeda's military council between from 9/11 through 2015.  The following terrorists all sheltered at the Qods Force facility in Tehran, and most (all but Zarqawi, who died a year earlier) were witnessed by a person who visited the facility on or about 2007:

- **Osama bin Laden's family**, including sons Saad, Mohammad, Othman, Ladin, and Hamza (one of whom even got married in Iran), wife Najwa, and daughter Iman;

- **Abu Musab al-Zarqawi**, who launched al-Qaeda-in-Iraq's campaign against America from Iran;

- **Abu Muhammad al-Masri**, al-Qaeda's chief of foreign relations and a senior member of al-Qaeda's military council who became al-Qaeda's the number 2 overall, behind only Zawahiri, after bin Laden was killed in 2011, and who managed al-Qaeda operations from his safe haven in Iran from 9/11 until he was killed in Tehran by Mossad agents on August 7, 2020;

- **Saif al-Adel**, al-Qaeda's military chief and number 3 overall, who, among other things, personally managed al-Qaeda's support for Zarqawi and the Zarqawi/bin Laden relationship, was tasked with facilitating al-Qaeda's support for the Sunni insurgency

---

[332] *Id.* at *25 (internal citations omitted).

against Americans in Iraq from Iran, and directed anti-American attacks from Iran under the wing of the Qods Force;

- **Abu Musab al-Suri**, a senior al-Qaeda strategist who was one of the most important thinkers for the group;

- **Mahfouz Ibn El Waleed**, a key member of al-Qaeda's leadership council and its sharia committee, who helped approve and justify attacks against America from his safe haven in Iran;

- **Abu Dagana al-Alemani**, a senior al-Qaeda attack planner who coordinated al-Qaeda's logistical support for its global affiliates from Iran; and

- **Sulaiman Abu Ghaith**, who served as al-Qaeda's spokesman from Iran and helped rally support for al-Qaeda's anti-American jihad from there.

671.    Among the senior al-Qaeda leaders who fled to Iran after 9/11, most remained ensconced in Iran thereafter, never leaving their Iranian safe-haven while continuing to support the jihad against America.  Zarqawi and his lieutenants were the one notable exception:  they accepted the Qods Force's offer of money, arms, and transportation from Kurdistan to Baghdad, all of which they used to launch their terror campaign against Americans in Iraq and launch al-Qaeda-in-Iraq's campaign against Americans there.

672.    Iran's safe haven support for al-Qaeda did not diminish in the years after 9/11.  For example, in 2011, Judge Daniels found, as a matter of law, that "[s]ince the 9/11 attacks, and continuing to the present day, Iran continues to provide material support and resources to al Qaeda in the form of safe haven for al Qaeda leadership and rank-and-file al Qaeda members."[333]

673.    As the *Washington Post* reported after al-Qaeda's number 2, Masri, was killed in Tehran in 2020, "[m]any of al-Qaeda's senior commanders have been sheltered in Iran, though one by one, they have been killed in recent years. With Masri's death, the only remaining member of

---

[333] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *41 (findings of fact).

al-Qaeda's shura council — its core leadership — with operational al-Qaeda terrorist experience is Saif al-Adel, who is believed still to be in Iran."[334]

674.    Iran's assistance also extended to permitting al-Qaeda and its affiliates, like al-Qaeda-in-Iraq, to use Iran as a safe-haven from which to plan and prepare attacks against Americans in Iraq.  As Judge Daniels found, after 9/11, "[t]here have been numerous instances of al Qaeda operatives and leaders meeting, planning, and directing international terrorist operations from the safety of Iranian territory. Senior al Qaeda members continued to conduct terrorist operations from inside Iran."[335]

675.    In August 2003, Iran facilitated a meeting in Tehran between lieutenants from al-Qaeda-in-Iraq and Ansar al-Islam, in which the participants agreed in Zarqawi's name to establish a permanent terrorist base in Kurdistan to facilitate attacks against Americans and ensure the smooth functioning of the pipeline between the Arab world and Afghanistan, which ran through Iran and was essential to Sunni terrorists supply of weapons, funds, and personnel.

676.    In Tehran, the Qods Force operated a facility for al-Qaeda and al-Qaeda-in-Iraq leaders and operatives that was known as "Block 300."  At Block 300, the Qods Force provided shelter, communications, training, and other assistance to al-Qaeda and al-Qaeda-in-Iraq terrorists from 2001 through the present day.  For example, in August 2007, a visitor to Block 300 saw bin Laden's sons Saad, Mohammed, Othman, Hamzah, and Ladin, as well as Saif al-Adel, Abu al-Khayr al-Masri, and Sulaiman Abu Ghaith.  The same visitor in 2007 observed that all of al-

---

[334] Ellen Nakashima, *Israel, At Behest of U.S., Killed al-Qaeda's Deputy in a Drive-By Attack in Iran*, Washington Post (Nov. 14, 2020), 2020 WLNR 32556539

[335] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *25 (findings of fact) (internal citations omitted).

Qaeda's military council was present at Block 300 other than Zawahiri and Sheikh Saeed al-Masri. Key female members of bin Laden's family were also housed at Block 300.

677.    Soleimani personally assigned two senior Qods Force officers to see to the needs of the senior al-Qaeda leaders and their family members sheltering at Block 300. Throughout, the Qods Force provided senior al-Qaeda leaders with everything they needed to sustain their leadership inside Iran and maintain the morale of their military council and their families, including generous residential accommodations, trips to luxury shopping destinations, gym memberships, and the finest medical care in Iran (which was otherwise only available to the clerics and senior leaders of the Iranian regime).

678.    Al-Qaeda's relationship with its Qods Force protectors was so warm that al-Qaeda's military council and bin Laden's sons invited their Qods Force handlers to break their Ramadan fast with them at Block 300. The Qods Force responded by taking al-Qaeda's military council out to a five-star restaurant for an *iftar* meal. Days later, Soleimani himself arrived in person at Block 300 to celebrate Eid with bin Laden's sons, joining them to break the fast.

679.    At this time, al-Qaeda depended upon the assistance of the Qods Force to maintain al-Qaeda's Iran pipeline, through which the group moved funds and personnel between the Middle East and its home base in Pakistan.

680.    In meetings at Block 300 on or about 2007 and 2008, Iranian officials met with the designated leader of the al-Qaeda and al-Qaeda-in-Iraq terrorists who were sheltering in their Qods Force-provided safe-haven. During these meetings, the Iranian officials told al-Qaeda and al-Qaeda-in-Iraq, through their designated spokesman at Block 300, in sum and substance, that the welfare of bin Laden's family was Soleimani's personal responsibility. By this time, Soleimani had a positive relationship with bin Laden's sons residing in Iran, who referred to Soleimani as

"Hajji Qassem" and relayed to other al-Qaeda leaders that Soleimani and al-Qaeda had both been targeted by America and should therefore work together.  At these meetings, the Iranian officials and al-Qaeda agreed that they should cooperate regarding the conflict in Iraq.

681.    In one meeting at Block 300 on or about 2008, Soleimani addressed al-Qaeda's senior leaders, as well as bin Laden's family, and stated that "I did my best to serve you" and "I stopped those who wanted to hurt you."  Soleimani also made it clear on multiple occasions to al-Qaeda's leaders that Iran remained willing to continue helping as long as Iran benefited.

682.    Soleimani continued to personally tend to his al-Qaeda assets at Block 300 until Soleimani's own demise in 2020.  For example, after bin Laden was killed in 2011, to try to break the malaise that had overtaken Block 300, Soleimani instructed his Qods Force deputies to take the al-Qaeda women and children on a trip for shopping and to an amusement park, while al-Qaeda's assembled *shura* in Iran could discuss strategy.

683.    In 2015, an intelligence review at the Defense Intelligence Agency confirmed additional measures of Iran's support for al-Qaeda, including Iranian facilitation of al-Qaeda travel between Iraq and Pakistan.

684.    Iran also provided transportation assistance, lodging and safe-haven assistance to al-Qaeda-in-Iraq terrorists, including Zarqawi himself and other senior leaders of the group.  In doing so, Iran provided similar lodging, training, expert advice or assistance, safehouses, and transportation to al-Qaeda-in-Iraq as it did for al-Qaeda.

685.    Zarqawi had deep relations in Iran owing to his status as the top terrorist and operator at al-Qaeda's training camp in Herat, Afghanistan, close to the Iranian border.

686.    After 9/11, Zarqawi took refuge in Iran and established new al-Qaeda training camps and safe houses inside Iran at sites in Zahedan, Isfahan, and Tehran.  From his new Iranian

safe-haven, Zarqawi invited his followers, including seasoned terrorists in Europe, to travel to Tehran to meet with him, bringing money and receiving instructions from Zarqawi.

687.    To facilitate al-Qaeda-in-Iraq's communications and attack planning, the Qods Force provided AQI with phone and facsimile numbers and facilitated AQI's use of couriers.  With respect to the former, the Qods Force provided substantial communications support to al-Qaeda-in-Iraq, including the following numbers for AQI's use courtesy of Iran:  0X9X-9X1X3X1X3X, 0X9X-9X1X3X9X4X, 0X9X-2X8X5X6X8, and 0X9X-9X3X1X3X9X.[336]

688.    During this time, the Qods Force also provided false documents to al-Qaeda-in-Iraq leaders and operatives to aid in their ability to move between Iran, Iraq, Afghanistan, Syria, Lebanon, and Jordan.  For example, the Qods Force arranged for special passports and false documents for Zarqawi and his fighters to be able to enter Iraq without a visa.

689.    Zarqawi's apparent close relationship with the Syrian regime – which is Iran's closest nation-state ally – corroborates the existence of his alliance with Iran.  Given the Syrian regime's support for the Iraqi insurgency, the ease with which Zarqawi was able to enter and exit Syria, and the regular flow of some AQI recruits through Syria into western Iraq, it is reasonable to conclude that Zarqawi had a close and collaborative relationship with the Syrian regime.  Given Syria's status as an Iranian client, such relations further corroborate Zarqawi's receipt of support from Iran, as Syria would not have supported such activities without Iran's blessing.

690.    Iran also provided safe-haven to other senior AQI leaders in addition to Zarqawi. Based on the confession of one of Zarqawi's Jordanian associates, Ahmad Mahmud Salih Al-Riyati, who was detained by Coalition forces in March 2003, Jordanian intelligence confirmed that nearly all the senior leaders of Zarqawi's group had been sheltering and planning attacks from

---

[336] Plaintiffs have redacted every other number in the numbers affiliated with Zarqawi.

Iran. Jordanian intelligence also concluded that Zarqawi himself probably directed al-Qaeda-in-Iraq's attacks against Americans in Iraq from his safe-haven in Iran.

691. **Training, Expert Advice or Assistance, and Personnel.** Iran's (including Lebanese Hezbollah's) training of the IRGC's Sunni Proxies in small unit tactics, small arms, explosives, indirect fire, and other techniques enabled the Sunni Proxies to more effectively attack Americans in Iraq. The Sunni Proxies in Iraq used Iran's training to kill or injure Plaintiffs or their family members.

692. Like its transportation assistance to al-Qaeda, Iran has also maintained a decades-long training relationship with al-Qaeda as part of the terrorist alliance between Iran, al-Qaeda, and Lebanese Hezbollah.

693. Iran, through the IRGC and Hezbollah, served as the original trainer for al-Qaeda with respect to suicide bombings, attacks against large buildings, IEDs, explosives, intelligence, and general tactics for attacks directed at American interests. For example, senior al-Qaeda operatives traveled to Iran and Lebanon during this period to camps run by Hezbollah and sponsored by the Qods Force.[337] The operatives received advanced explosives training that enabled al-Qaeda to launch large-scale terrorist attacks on American embassies in Africa.[338] According to one senior al-Qaeda official, trainers at this time were already researching how to develop shaped charges to pierce armor plating – the technology later perfected in Iranian EFPs.

694. As Judge Daniels found in another case against Iran, "[t]hroughout the 1990s, the al Qaeda–Iran–Hizballah terrorist training arrangement continued. Imad Mughniyah himself

---

[337] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011) ("Prior to al Qaeda members' training in Iran and Lebanon, al Qaeda had not carried out any successful large scale bombings.").

[338] *Id*.

coordinated these training activities, including training of al Qaeda personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon. At all times, Iran's Supreme Leader was fully aware that Hizballah was training such foreign terrorists."[339]

695.    Through its relationship with al-Qaeda and al-Qaeda-in-Iraq, Iran was the proximate and but-for cause of al-Qaeda-in-Iraq's suicide bombing attacks against Americans in Iraq, because Al-Qaeda was responsible for the success of al-Qaeda-in-Iraq's suicide bomb attacks against Americans in Iraq, and al-Qaeda itself could not have survived after 9/11 without the key support provided by Iran.

696.    Iran also provided training to Zarqawi and other al-Qaeda-in-Iraq terrorists at IRGC training camps in Iran.  Indeed, on or about 2004, Soleimani reportedly boasted that Zarqawi had trained at an IRGC camp in Mehran, Iran, and that Zarqawi and his network were free to travel between Iran and Iraq through multiple IRGC-controlled border crossings.

697.    Iraqi officials also confirmed Iran's key logistical support for Zarqawi's terrorist campaign in Iraq.  For example, in December 2004, a senior Iraqi defense official publicly alleged – based on information derived from an interrogation of an al-Qaeda-in-Iraq operative who had been detained in Iraq – that Iran and Zarqawi were working together to train AQI terrorists at IRGC facilities in Iran.

698.    By 2004, Iran's relationship with Zarqawi grew to be so open and notorious that the "United States … warned Iran against providing any type of support to Al-Qaeda-linked

---

[339] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *12.

214

foreign militant Abu Mussab al-Zarqawi and his Tawhid wal Jihad (Unity and Holy War) group, saying such backing would be a 'very, very serious matter.'"[340]

699.    As Judge Daniels found, "[t]he IRGC maintained a separate terrorist training camp especially for Saudi nationals because of their distinct cultural habits and religious practices. This training camp was located in Iraqi Kurdistan and controlled first by Iranian intelligence and later by Abu Musab Zarqawi, later to be the notorious head of 'al Qaeda in Iraq.'"[341]

700.    Iran's provision of lodging, safe harbor, and transportation to key al-Qaeda-in-Iraq leaders, including but not limited to, Zarqawi, was the but for and proximate cause of the formation of al-Qaeda-in-Iraq in the first instance.

701.    Iran also provided logistical, training, and safe-haven directly to Ansar al-Islam terrorists targeting Americans in Iraq.  As documented in a U.S. intelligence report, "there were approximately 320 Ansar al-Islam terrorists being trained in Iran . . . for various attack scenarios including suicide bombings, assassinations, and general subversion against U.S. forces in Iraq." Similarly, a British defense report noted "some elements [of Ansar al-Islam] remain in Iran. Intelligence indicates that elements [of Iran's Islamic Revolutionary Guard Corps] are providing safe haven and basic training to Iran-based [Ansar al-Islam] cadres."

###### vii.    The IRGC, Including Its Hezbollah Division And Qods Force, Provided IRGC Iraqi Sunni Terrorist Proxies With Financial Support

702.    Iran also provided financial support to al-Qaeda, al-Qaeda-in-Iraq, and Ansar al-Islam for the purpose of causing violence against Americans in Iraq.  Iran accomplished this financial support through a number of direct and indirect means.

---

[340] Agence France-Presse English Wire, *US Warns Iran Against Any Support For Zarqawi* (October 18, 2004).

[341] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *12.

703.    In some instances, Iran directly paid money to Sunni terrorists.  For example, regional Kurdish security officials documented Iran's provision of cash to Sunni terrorists cycling back and forth between Iraq and their safe havens in Iran:

> For years, and with the blessing of Iranian officials, Islamist terrorist groups have smuggled … money into Iraq … When US special forces and Kurdish peshmerga fighters attacked Ansar al-Islam, an Al Qaeda affiliate, in March 2003, hundreds of its members fled to Iran, the officials said, and have regrouped in several towns just over this border.  There, they continue to … raise funds, and plan terrorist operations in Iraq … Iraqi and US officials have grumbled for more than a year about what they perceive as Iranian interference in Iraq. …  According to a half-dozen officials in the Patriotic Union of Kurdistan, known as the PUK, which controls the southern half of the Kurdistan region of Iraq, and commanders in the peshmerga, the force that provides security in the region, Iran has extended its network of agents inside Iraq.  Iran, the officials say, continues to aid groups like Ansar al-Islam and Abu Musab al-Zarqawi's group, now named Al Qaeda in Mesopotamia.  Even though Iran is a Shi'ite theocracy, these officials said, it helps Sunni insurgent groups because it wants to prevent a strong unified government from taking shape in Iraq.  "They go back and forth after running missions here," said Anwar Haji Othman, head of security in the area around Halabja, including a long stretch of the Iranian border. "They bring cash from Iran to Iraq across the border."[342]

704.    When it imposed sanctions in 2011, the Obama Administration recognized the funding nexus between Iran and al-Qaeda.  Moreover, "Obama Administration officials have stated that senior Iranian officials know about the money transfers and allow the movement of al–Qaeda foot soldiers through Iranian territory."[343]

705.    Iran specifically funded Zarqawi's terrorist campaign against Americans in Iraq.  According to a senior al-Qaeda terrorist, "the Quds Force … supplied Zarqawi with … money.  If Osama was responsible for financing the butchers of Baghdad [i.e., Zarqawi], so was Tehran."

706.    As two terrorism scholars explained:

> The critical point is that there is considerable evidence that Zarqawi may have developed an Iranian connection for financial and logistical support. It was not the

---

[342] Cambanis, *Along Border*.

[343] *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *26.

first time Shiite Iran reached out to radical Sunni terrorist organizations. For years, Iran has sponsored Palestinian Islamist groups, particularly Islamic Jihad but also Hamas, as well. Iran had a constant interest to reach out beyond the Shiite Islamic communities of the Middle East to the much wider Sunni Muslim world, and Zarqawi had objective needs that could be met by Iran. Unlike Osama bin Laden, who could fall back on his own family's wealth and the backing of both Saudi charities and individuals, Zarqawi came from a poor background in Jordan. To wage his terrorist campaign, he needed state backing from somewhere. Indeed, *Al-Sharq al-Awsat* wrote in May 2004 that the Iranians had offered Zarqawi about $900,000 and explosives. The same Arabic source reported in August that Brig.-Gen. Qassem Suleimani of the Revolutionary Guards was asked why Iran backs Zarqawi, given his attacks on Shiites. Suleimani reportedly answered that Zarqawi's actions serve the interests of Iran by undermining the emergence of a pro-U.S. government in Iraq.[344]

707.    Like its relationships with al-Qaeda and al-Qaeda-in-Iraq, Iran also provided substantial financial assistance to Ansar al-Islam terrorists to underwrite their attacks against Americans in Iraq.

### G.    In Furtherance Of The IRGC's Conspiracy, The IRGC, Including Its Hezbollah Division And Qods Force, Managed A Transnational Network Of Terrorist Finance, Logistics, Operations, And Communications Cells To Fund, Arm, Logistically Sustain, And Facilitate Terrorist Attacks Against Americans In Iraq, Afghanistan, Yemen, Syria, Israel And Elsewhere

708.    The IRGC, including its Hezbollah Division and Qods Force, relies upon a global network of cells, operatives, cover companies, and allied criminals in the corporate world (like Defendants) and the criminal world (like narcotraffickers and transnational crime organizations).

709.    The IRGC, including its Hezbollah Division and Qods Force, operated the conspiracy in the same manner as a multinational corporation, seeking to leverage geographic efficiencies, networks, and distributed competencies to maximize the lethality of the conspiracy's terrorist campaigns against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.  This section briefly outlines how the IRGC, including its Hezbollah

---

[344] Gold and Halevi, *Zarqawi*.

Division and Qods Force, leveraged terrorist finance, logistics, technical and communications support from around the world to directly aid the terror campaign against Americans in Iraq, Yemen, Syria, Europe, Afghanistan, Pakistan, and elsewhere.

### 1. United States

710.    The IRGC, including its Hezbollah Division and Qods Force, depended upon its ability to access technologies, markets, and systems that were found exclusively in the United States to execute key parts of the conspiracy.  Simply put, they needed as much access to America as possible to kill as many Americans as possible.

#### i. American Technologies

711.    The IRGC, including its Hezbollah Division and Qods Force, relied upon American-designed, protected, manufactured, and/or assembled technologies, including but not limited to, mobile phones, smartphones, enterprise level servers, computer networking technologies, and software, because they have been the gold standard from 9/11 through today. No other country made a credible version of a competing device, that is available for sale to the public as opposed to their own "security" agencies at any point in time between 2001 and 2022, e.g., enterprise level servers and secure encrypted smartphones that can access the full panoply of universally sought-after "apps"), at any point in time between 2001 and 2022.

#### ii. American Markets

712.    The IRGC, including its Hezbollah Division and Qods Force, relied upon in-person and online sales markets in the United States, including but not limited to currency markets (relying upon the U.S. Dollar as the IRGC's preferred currency) technology markets (relying on U.S. goods as the IRGC's preferred technology source), financial markets (relying on U.S. financial markets because U.S. banks have connectivity to the 50+ countries on six continents in which Hezbollah and the Qods Force operates), labor markets (relying on skilled

laborers, particularly information technology consultants, to service the IRGC's illicitly acquired U.S. technologies), and black markets (relying on the ability to acquire some of the above items that can only be purchased in the U.S.).

713.    In every instance, the IRGC, including its Hezbollah Division and Qods Force, depended upon its ability to access American markets at home to kill Americans abroad because such U.S. markets have unique power to set the terms and pricing for the world, and were often also the only location where the IRGC, including its Hezbollah Division and Qods Force, could acquire a key item in the covert manner needed under the IRGC's terrorist tradecraft.  For example, the IRGC did not have the ability to source large amounts of U.S. Dollars or access state-of-the-art American technologies without the IRGC, or one of its corporate co-conspirators, reaching into the United States to further the conspiracy.  This case concerns the various nodes and modalities by which the IRGC accomplished that.

### iii.        American Systems

714.    The IRGC, including its Hezbollah Division and Qods Force, relied upon its ability to access certain financial, technical, and knowledge systems that were stored exclusively inside the United States.  For example, the IRGC depended upon the ability of its terrorist computer programmers to be able to access certain proprietary databases located inside of the United States in order to complete the design of a particular part necessary for a new type of bomb being developed by the IRGC.

### 2.        U.A.E.; Iraq; Iran; Lebanon; Yemen; Syria; Afghanistan; Pakistan

715.    From 9/11 through the present, attack planners, logisticians, and financiers for the IRGC, including its Hezbollah Division and Qods Force, as well as nearly every other major Islamist terrorist group, including but not limited to al-Qaeda, the Taliban (including its Haqqani Network), and others, have relied upon the U.A.E., especially Dubai, as a logistical, financial,

219

and operational hub, from which they could organize their terrorist campaigns in Iraq, Iran, Lebanon, Yemen, Syria, Afghanistan, and Pakistan.

716.    With respect to the IRGC Shiite Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Yemen, and Syria in furtherance of the IRGC's conspiracy, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity,[345] comprised for purposes of the IRGC Shiite Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

717.    With respect to the IRGC Sunni Terrorist Proxies' terrorist campaign against Americans in Iraq, Iran, Lebanon, Syria, Europe, Afghanistan, and Pakistan in furtherance of the IRGC's conspiracy, the U.A.E. served as a logistical, financial, and operational hub for the campaign, and the U.A.E. was functionally part of one interlocking geography of extreme terrorist finance and logistics risk and hub of activity, comprised for purposes of the IRGC Sunni Terrorist Proxies' terror campaign of the U.A.E., Iraq, Iran, Lebanon, Yemen, and Syria.

718.    Simply put, the terrorists did not respect the borders of any of these countries – other than Iran and Syria, with whom they were allied rendering the issue moot – and viewed the entire geography as one combined theater.

---

[345] For the avoidance of all doubt, the government of the U.A.E. was, and remains, an ally of the U.S. in the fight against terrorism.  The terrorists' use of the U.A.E. as a hub was based on a range of other factors, including, but not limited to, geography, history, particular trading networks, transportation channels, and an advanced infrastructure for conducting transactions and moving goods and monies throughout the Middle East.  The terrorists, like many multinational corporations, set up their regional headquarters in Dubai for these reasons.

### 3. South Africa

719. The IRGC, including its Hezbollah Division and Qods Force, has long operated openly and notoriously in South Africa. "Iran and South Africa have cooperated on a number of fronts in recent decades, including at the U.N., where South Africa has at times advocated for Iran" and "[t]he pair also have a military relationship."[346]

720. The IRGC's freedom of movement in South Africa is a legacy of Ayatollah Khomeini, who stood against the Apartheid regime while, unfortunately, the United States (for a time) did not.

721. For decades, the IRGC, including its Hezbollah Division and Qods Force, leveraged Iran's historical feat of standing up to Apartheid, in much the same way that the Soviet Union exploited Jim Crow to undermine the America's image as a bastion of liberty during the Cold War. Both messages were effective.

722. Because of this unique Iranian-South African history, the IRGC, including its Hezbollah Division and Qods Force, has viewed South Africa as a veritable home away from home for the IRGC, as South Africa was one of the few major democracies to have abstained from joining the sanctions regime against Iran and to afford the IRGC relatively unfettered freedom of movement. As a result, the IRGC, including its Hezbollah Division and Qods Force, has operated clandestine fundraising, logistics, and operations networks in South Africa for decades.

723. In an interview with *Politico*, American intelligence officials confirmed on background that "[t]he Iranian government [] operate[d] clandestine networks in South Africa,"

---

[346] Nahal Toosi and Natash Bertrand, *Officials: Iran Weighing Plot To Kill U.S. Ambassador To South Africa*, Politico (Sept. 13, 2020).

"and has had a foothold there for decades."[347]  "In 2015, Al Jazeera and The Guardian reported on leaked intelligence documents that detailed an extensive secret network of Iranian operatives in South Africa."[348]

724.    According to leaked documents from the South African intelligence service, Lebanese Hezbollah and the Qods Force operate cells in South Africa showing "confirmed" links between Iranian operatives in overseas embassies and "terrorists."

725.    In or about 2020, American intelligence services detected that the IRGC, including its Hezbollah Division and Qods Force, was planning a terrorist attack in South Africa to kill the U.S. ambassador to South Africa as retaliation for the killing of Qassem Soleimani in January of that year.

726.    Lebanese Hezbollah's choice of South Africa as the potential attack site is revealing, as the terrorists had the chance to survey the entire world to choose the best location to kill an American ambassador.  As Politico noted, the U.S. ambassador to South Africa "may also [have] be[en] an easier target than U.S. diplomats in other parts of the world, such as Western Europe, where the U.S. ha[d] stronger relationships with local law enforcement and intelligence services."[349]

### 4.    Europe

727.    Europe has long been a hub for terrorist finance, logistics, and operational support for the IRGC, including its Hezbollah Division and Qods Force, as well as al-Qaeda, the Taliban, including its Haqqani Network, and their allied Syndicate terror partners in Afghanistan and

---

[347] *Id.*

[348] *Id.*

[349] *Id.*

Pakistan. Europe's proximity to many of the attack theaters and ease of travel make it a key site for the terrorist campaign.

### 5. The Americas

728. The IRGC, through Lebanese Hezbollah and the Qods Force, maintains a substantial presence in the Americas, including, but not limited to, in Venezuela, Colombia, Paraguay, and other nations.

729. Lebanese Hezbollah and the Qods Force maintained operational, finance, and logistics cells throughout multiple nations in the Americas, through which Hezbollah operated an array of money-making criminal schemes, e.g., narcotics trafficking, in order to repatriate money back to the terrorist campaign.

730. Lebanese Hezbollah and the Qods Force support the terrorist campaign in the Middle East from their cells in the Americas. Indeed, that is the purpose of the cells far from Hezbollah's home in Beirut – cash and logistics flow for the terror campaign.

### 6. Southeast Asia

731. The IRGC, through Lebanese Hezbollah and the Qods Force, maintains a substantial presence in Southeast Asia.

732. Lebanese Hezbollah and the Qods Force maintain operational, finance, and logistics cells throughout multiple Southeast Asian nations, including Malaysia and Singapore.

733. Lebanese Hezbollah and the Qods Force support the terrorist campaign in the Middle East from their Southeast Asian cells. Indeed, that is the purpose of the cells far from Hezbollah's home in Beirut – cash and logistics flow for the terror campaign.

IV. **THE TERRORIST CONSPIRACY DEPENDED UPON ROBUST ACCESS TO U.S. TECHNOLOGY, U.S. DOLLARS, AND U.S. PERSONS TO CARRY OUT ATTACKS AGAINST AMERICANS IN THE MIDDLE EAST**

A. **After The U.S. Invasions Of Afghanistan And Iraq, The Iran-Led Conspirators Concluded That They Needed To Revolutionize Their Access To U.S. Technologies Through Corrupt Corporate Partners**

734. In the decade prior to the U.S. invasion of Iraq in 2003, the technological gap between IRGC, including Lebanese Hezbollah and Qods Force, "security" operatives, on the one hand, and the counter-terrorist forces hunting them (and protecting against their threats), on the other, grew from large (in the 1980s) to vast (in the 1990s).

735. By 2003, the tech-gap between the "security" operatives deployed by the IRGC, including its Hezbollah Division and Qods Force, on the one hand, and U.S. counter-terrorists, law enforcement, and intelligence officers, on the other, was so vast it was as if Americans and the IRGC "security" operatives targeting them lived on two different technological planets: "Earth 1" and "Earth 2".

736. After the fall of Saddam Hussein in 2003, U.S. personnel in the Middle East practiced their counter-terror tradecraft on **Earth 1** where Americans wielded 24/7 surveillance powers that were difficult to overstate, possessed unparalleled intelligence networks, and had real-time data analytic abilities that played a key role in reducing the threat of Islamist terror. The single most important contributor to America's dominant technological edge – and greatest barrier to the IRGC's terrorist conspiracy succeeding – was the fact that America could count on achieving close, reliable, and robust cooperation from the iconic, well-capitalized, and patriotic American telecommunications and network computing companies, which have historically worked as responsible partners with the U.S. government to prevent terror.

737. Meanwhile, on **Earth 2** – where IRGC "security" operatives practiced their tradecraft – the world was upside down and terrifying. A sloppy phone call could result in a

precision American airstrike a few minutes later. An errant text message could enable the "Great Satan" to take down a Joint Cell. A carelessly documented transaction could reveal an important laundering scheme. Most of all, the "security" operatives of the IRGC, including its Hezbollah Division and Qods Force, were caught in a digital cage from which they could not carry out their religious, and constitutionally prescribed duty – attack and kill Americans.

738.    The IRGC knew that the U.S. telecom and network computing industry would not solve their problem – if anything, the American industry would only widen the gap even more between the IRGC and the Americans it wanted to kill. For decades, large U.S. telecom and network computing companies have been reliable partners of the U.S. government with respect to reducing the threat from terrorism. Indeed, the anti-terrorism track record of America's telecommunications and network computing companies has been among the best of any industry anywhere in the world.[350]

739.    This matters because the robust commitment of American telecom and network computing companies to anti-terrorism compliance was known to the IRGC (and all other industry participants), which meant that the terrorists knew they would be unable to count on their normal strategy for illicitly acquiring something – pay a bribe, threaten extortion, engage in fraud – because none of those strategies held the promise of working at the industrial scale that the IRGC, including its Hezbollah Division and Qods Force, required for their global terrorist conspiracy against American.

740.    By 2003, the IRGC knew that its operatives would never be able to sustain the global terrorist conspiracy it had planned against America after 9/11 unless the IRGC could find

---

[350] Plaintiffs are not aware of any federal criminal terrorism-related prosecutions, civil Anti-Terrorism Act allegations, or analogous anti-terrorism matter brought by any government against any such companies.

a way to break out of the digital detention cell that was effectively created by the wall of compliance offered by America's telecommunications and network computing companies.

741.    Lebanese Hezbollah ordinarily serves as the IRGCs illicit procurement agent of choice for a litany of reasons including, but not limited to, deniability, cultural affinities, and the presence of a Lebanese diaspora relatively evenly dispersed around the world, upon which Hezbollah, like most Islamist groups, heavily relies.

742.    By 2003, the IRGC had tasked Lebanese Hezbollah with solving a riddle:  how do they, the terrorists, establish the reliable, secure, and covert pipeline that they need to illicitly acquire the tens of thousands of state-of-the-art American smartphones and network computing technologies *each year* necessary to sustain their decades-long, global terrorist campaign against America?

743.    The answer?  Identify potential multinational corporate partners who would be willing to provide the technology they needed.

744.    As the IRGC spun up its transnational terrorist conspiracy, its leadership worked with Lebanese Hezbollah and the Qods Force to develop a comprehensive plan to revolutionize their respective terrorist capabilities to prepare for their anticipated decades-long terrorist campaign against Americans throughout the Middle East.  To accomplish the object of the conspiracy – ejecting the United States from the entire Middle East through a campaign of terror – the terrorists had five critical requirements.

745.    *First*, the IRGC and its terrorist allies needed a generational upgrade in the security of their computer systems and network technologies, especially the state-of-the-art American servers that were *the* condition precedent for the IRGC's ability to execute its Revolution in Terrorist Affairs, and without which, the IRGC's efforts would be less effective,

would be less efficient, would be more expensive, and would produce, ultimately, fewer dead Americans.  Given the sheer scale of the IRGC's terrorist conspiracy targeting Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and elsewhere, even marginal improvements in IRGC computing power translated to more plots being shared, more fundraising solicitations, more recruits, and ultimately, more attacks.

746.    *Second*, the IRGC and its terrorist allies needed a reliable, replenishable, untraceable source of suppliers for illicit high-quality American-manufactured mobile phones sold in markets inside the United States, and then illegally reexported to eventually flow through the Qods Forces logistics channels – as intended – before reaching Lebanese Hezbollah, who relied upon American phones to coordinate Iran's global terrorist conspiracy, including its campaign against Americans in Iraq.

747.    Given the transnational nature of the IRGC's terrorist conspiracy, Lebanese Hezbollah, the Qods Force, and the leadership of terrorist proxies like Jaysh al-Mahdi (in Iraq) and the Taliban (in Afghanistan), faced a simple, but potentially fatal, problem confronting their post-9/11 terrorist enterprise against America: how to facilitate the free movement of key terrorist leaders, attack planners, fundraisers, and logisticians between the various hubs of the conspiracy, e.g., a senior Lebanese Hezbollah operative who shuttles from Beirut (where Hezbollah is based), to Syria (where Hezbollah and the IRGC maintain a listening post), to Baghdad (where Hezbollah led Joint Cells targeting Americans), and then to Tehran (where the IRGC is based).  This isn't the plot of a spy movie: it describes the ordinary travel patterns of thousands of Hezbollah, Qods Force, and Jaysh al-Mahdi terrorists each year.

748.    While most people think of false identification papers as being the most indispensable thing to freely traveling, that's analog thinking.  The IRGC understood that, in the

modern terrorist era, their operatives were at one critical disadvantage: Lebanese Hezbollah and the Qods Force lacked the industrial scale supply, and re-supply, of secure mobile phones, and therefore Hezbollah and the Qods Force were at an enormous disadvantage because their operatives were hemmed in with Americans in Iraq and Afghanistan and unable to move for fear their phones were compromised by the Americans (as they likely were).

749. Worse, the IRGC lacked any easy solutions because America dominated the mobile phone industry and was not open for business to the IRGC. Shut off from the U.S. marketplace, the IRGC was unable to build their own phones and unwilling to place the lives of their most prized operatives – the people who led Joint Cells and coordinated operations – in the hands of the junky, unreliable, and often prone-to-failure mobile phones being made outside of the United States at the time.

750. Thus, the IRGC embarked on a comprehensive strategy designed to achieve its Revolution in Terrorist Affairs, obtain reliable industrial scale supplier relationships that could source American mobile phones, close the communications gap with the "Great Satan," and enhance the lethality of its global terrorist campaign against America. To do so, the IRGC needed to source tens of thousands of untraceable mobile phones *every year* to ensure the secure and untraceable communication lines between combined cells of Hezbollah, Qods Force, and local proxy terrorist allies operating in dozens of countries worldwide and, among other people, their local organized crime allies (e.g., narco-traffickers), corrupt politicians (essential for things like passports and permits), and terrorist headquarters, as examples.

751. Unfortunately for the IRGC, including its Hezbollah Division and Qods Force, who were responsible for the conspiracy's transnational logistics, weapons, financial, personnel flows, they could not source the tens of thousands of advanced American smartphones they

needed every year with a few purchase orders on Bonyads Mostazafan letterhead, because the terrorists were sanctioned.  Even if the IRGC were not sanctioned, as a matter of IRGC terrorist tradecraft, lawful purchases of American phones inside U.S. markets by the precious Hezbollah or Qods Force assets inside the United States (for whom exposure was not to be risked lightly), while viable in small increments, was impossible at the commercial scale necessary for the conspiracy to succeed.  Moreover, direct purchases by Hezbollah or Qods Force assets themselves would leave an evidentiary paper trail and risk the terrorists' operatives being rolled up by law enforcement or intelligence operatives – a potential catastrophe for the IRGC, including its Hezbollah Division and Qods Force.

752.    Logically, that left the IRGC in a predicament.  The IRGC could only satisfy its various operational requirements through the bulk acquisition of thousands of high-end American mobile phones every year but if the IRGC attempted to do so directly, even using IRGC front companies, the terrorist enterprise would not be nearly as effective or yield nearly as many American phones, because the black-market cell phone trade is a volume business where deals and goods must move rapidly.  Thus, the IRGC needed front companies that offered the agility, resources, global networks, and executives with willingness to aid the world's worst terrorists for profit.[351]

753.    Accordingly, the IRGC's ability to prosecute a global terrorist campaign against the United States required the services of corrupt multinational corporate partners, with deep

---

[351] Because the global market for the sale of illegal American smartphones was vulnerable to law enforcement shocks that could rapidly suppress (temporarily) the supply chain – e.g., a raid in Detroit that removed one of the largest dealers from servicing the black market – it was imperative for the IRGC that its purchasing agents have the agility, financial resources, and global assets to source illicit American-exported cell phones in black markets worldwide, including, but not limited to, illicit cell phone markets on every continent but Antarctica.

resources, large logistics chains, and a willingness to conspire with anti-American terrorists. The following characteristics were key:

(1) **New terrorist cash flow** generated by taking over a "civilian" company, to make it *easier* to illicitly acquire American technology (that's the point of being a cover) and make it *harder* for the IRGC's enemies to mobilize effective sanctions against the funding source (because IRGC apologists, like MTN Group, could publicly spread disinformation to undermine any pressure campaigns (as MTN Group did, and continues to do to this day);

(2) **Illicit acquisition of critical American technologies**, including secure American smartphones, computer networks, and sensitive dual-use American technologies to accomplish the IRGC's own Revolution in Terrorist Affairs; and the

(3) **Robust logistics capabilities** befitting the operation of the IRGC, including its Hezbollah Division and Qods Force, as a multinational terrorist corporation that had a constant need to manage and rationalize the flow of illicit funds, arms, communications, narcotics, and personnel across six continents, all in support of the shared terrorist enterprise stretching from Syria to Iraq to Afghanistan.

754.    At bottom, decrepit telecommunications, network computing, and associated technologies posed an immediate, and dire, threat to Iran's ability to kill as many Americans as possible in Iraq and Afghanistan because they were generations behind the United States on virtually every key class of communications and computing technologies necessary to sustain a modern transnational terrorist campaign stretching from Syria to Afghanistan.

755.    The "Revolution in Military Affairs" or "RMA" refers to a widely accepted military hypothesis that emerged in the 1990s and posited that Western militaries needed to prepare for future asymmetrical threats by maximizing the technological gap between Western militaries and local hostile forces, e.g., terrorist Joint Cells in Iraq, in order to achieve objectives such as increasing the speed with which forces can maneuver, increasing the flow of intelligence to troops, facilitating real-time information sharing amongst allied friendly forces, and promoting "interoperability" between the militaries of different nations, e.g., making sure that British forces in southern Iraq can communicate on the same channels as their American counterparts.

756.     By early 2004, the IRGC's terrorist conspiracy was in full bloom.  The IRGC, including its Hezbollah Division and Qods Force, had embraced its own take on the RMA, but repurposing the principles for use by Iran-backed terrorists.  In particular, the IRGC concluded that it needed to overhaul the terrorists' communications, computing, internet, and cyber capabilities to enable Iran to continue supporting attacks against Americans in Iraq and Afghanistan.

757.     The IRGC had no choice but to seek American technology because America held the dominant position with respect to the world's computers, mobile phones, servers, routers, and the like, and the IRGC understood that it needed to illicitly acquire vast amounts of embargoed American technologies to commit terrorist attacks.

758.     By late 2004, the IRGC was desperate to upgrade its telecommunications because it understood that its ability to help kill and maim Americans at scale in Iraq, Afghanistan, and elsewhere depended upon the ability of its Lebanese Hezbollah and Qods Force operatives, and their proxies to solve their American mobile phone access crisis.  The IRGC's terrorist proxy Jaysh al-Mahdi was routed by U.S. forces twice that year.  Moreover, the escalating gap between American counter-terrorists and IRGC "security" operatives, i.e., Lebanese Hezbollah and Qods Force terrorists, threatened to eviscerate the ability of the IRGC, including its Hezbollah Division and Qods Force, to facilitate terrorist violence against the United States in Iraq and Afghanistan.

759.     Indeed, the IRGC watched, with escalating alarm, as its communications and computing gap widened, and threatened its ability to attack and kill Americans in Iraq and Afghanistan and, viewed the need to find a long-term technology supply fix as on par with Iran's

purported need to build a nuclear weapon and was one of the highest priorities of the IRGC,

including its Hezbollah Division and Qods Force.

> **B. The Islamic Revolutionary Guard Corps, Lebanese Hezbollah, And Qods Force Addressed The Conspiracy's Funding And Logistics Needs By Militarizing The Iranian Telecommunications Industry And Seizing Control Of Iran's Largest Telecommunications Companies In Order To Acquire The Communications Technologies, Cash Flow, Logistical Support, Financial Management Support, Operational Support, Management Consulting Support, And Crisis Response Support From Corporate Partners Necessary To Sustain A Twenty-Year Terrorist Campaign Against Americans**

760.    In 2004, the IRGC embarked on a two-step solution.  ***Step One:*** the IRGC seized

Iran's large state-owned telecom companies and converted them into tools of terrorist finance,

logistics, propaganda, recruiting, and operations.  As Ms. Gill explained, "just prior to

[Mahmoud] Ahmadinejad's election in 2005":

> Ayatollah Khamene'i issued a decree … ordering 25% of state-owned assets to be privatised within 5 years.  $120 billion worth of government assets were sold … Yet, the ***largest purchaser of privatised government assets was the IRGC***, which received favourable terms from the Ahmadinejad regime. Under the ***guise*** of de jure privatisation, state-owned assets were ***de facto militarised***.[352]

761.    ***Step Two***: the IRGC secured the agreement of complicit, corrupt

telecommunications companies, including Defendants MTN Group, MTN Dubai, ZTE Corp.,

and Huawei Co., which were willing to do business with fronts for the IRGC's transnational

terrorist logistics, technology, and financial enterprise and help the terrorists illicitly source the

comprehensive suite of state-of-the-art American technologies that the IRGC determined were

necessary to the ability of its own Revolution in Terrorist Affairs, so that Lebanese Hezbollah

and the Qods Force could do what they ended up doing:  launch a devastating wave of violence

against Americans throughout Iraq and Afghanistan.

---

[352] Gill, *Capitalism, Communications, and the Corps*, at 104 (emphasis added).

762.     The IRGC's two most important telecom front company targets were Irancell and

TCI, and the IRGC quickly assumed full control of both companies, completely converting each

to its terrorist enterprise.

### 1. MTN Irancell

763.     In 2004, the IRGC negotiated with Turkcell, a mobile phone company based in

Turkey, hoping Turkcell would be the corrupt corporate partner the IRGC required in order to

extract a vast digital armory of embargoed American technologies.  As negotiations progressed,

however, Turkcell made it clear that they would not enable the IRGC's "security" agenda.

Among other things, Turkcell refused to act as a communications technology logistics front for

the IRGC.  While Turkcell was willing to help build a modern Iranian phone system, it was not

willing to provide direct "security" assistance to the IRGC.

764.     MTN Group and MTN Dubai had no such scruples.  Sensing weakness in the

IRGC's negotiations with Turkcell, MTN Group and MTN Dubai hatched a comprehensive plan,

which they internally called "Project Snooker," designed to steal the Irancell license from

Turkcell – and the billions of dollars in profits that would flow to MTN Group and MTN Dubai

thereafter.  Ms. Gill explained the result:

> the **IRGC asserted their role** in the communications economy through two
> significant developments in telecommunications infrastructure involving MTN
> Irancell and TCI. MTN Irancell was launched in 2005, at the start of
> Ahmadinejad's presidency, as a … joint venture between … MTN Group and the
> Iran Electronic Development Company (IEDC).  A subsidiary company of the
> Iranian Ministry of Defence, IEDC maintained **close ties with the Revolutionary
> Guard**.  **Following the IRGC's opposition** to foreign involvement in Iran's
> strategic telecommunications sector, IEDC negotiated 51% ownership of the
> MTN Irancell joint venture, ensuring that **the military had a majority stake in the
> newly formed telecommunications infrastructure**.[353]

---

[353] Gill, *Capitalism, Communications, and the Corps*, at 105 (emphasis added).

765.   In her article documenting how the IRGC converted MTN Irancell and TCI into tools of terrorist finance and logistics, published by NATO, Ms. Gill explained:

> Communications infrastructure, particularly media and telecommunications licenses, are a source of state revenue. … [T]he communications economy is lucrative for those involved. Ahmadinejad's regime faced a dichotomy between reaping the 'business benefits of a modern information infrastructure', whilst simultaneously preventing the communication of political criticism of the regime or of the broader Islamic revolutionary system.  Therefore, communications infrastructure was treated as a political asset. Whilst the regime de jure separated telecommunications providers and regulators from the direct control of the Iranian state, de facto control was 'rarely surrendered by privatisation'.  Khamene'i's Article 44 decree shows that the legal separation between state and assets allowed leaders to remain influential in the communications economy by appointing politically like-minded affiliates.  By **militarising, rather than privatising the economy**, the regime transferred ownership from 'relatively transparent parts of the public sector to **other parts of the public sector shielded from public scrutiny', such as the Revolutionary Guard**.  It is in this **fictional separation between the public and private sector in Iran that the invisible hand of the IRGC can be assessed**.  **Power projection and realpolitik** remained central to the Guard's strategic thinking to the same extent as their ideological devotion.[354]

766.   The IRGC's takeover of MTN Irancell and TCI produced a financial windfall for the IRGC, including its Hezbollah Division and Qods Force.  Ms. Gill explained that:

> From a business perspective, the IRGC … create[ed] a military-commercial complex in which the Guard benefitted from the construction of a perceived and persistent threat. … Whilst publicly promoting rhetoric about national **security** and the defence of Shi'ite Islamic culture, the IRGC was **sustaining a military-commercial complex that benefited them financially**. The IRGC and the Iranian communications economy maintained a **close partnership**, with both taking advantage of the articulation of a soft war. …[T]here [was] a notably profit-driven motive to the Guard's economic involvement. … the involvement of the IRGC in the communications economy under Ahmadinejad was reflective of an ideological, but also increasingly opportunistic Revolutionary Guard.[355]

767.   "[T]he IRGC became a moneymaking machine" after it deliberately blended the commercial and terrorist functions of MTN Irancell and TCI in order to ensure that the IRGC,

---

[354] Gill, *Capitalism, Communications, and the Corps*, at 108-109 (emphasis added).

[355] Gill, *Capitalism, Communications, and the Corps*, at 110-111 (emphasis added)

including its Hezbollah Division and Qods Force, could use MTN Irancell and TCI revenues to furnish off-books cash to, among other things, keep former members of the IRGC, including its Hezbollah Division and Qods Force, on the IRGC's payroll. According to Ms. Gill,

> The IRGC acts as a business fraternity within which members of the Guard can progress along a prescribed career path. Following active service, IRGC members are offered senior positions in state-affiliated media organisations and telecommunications networks **such as IRIB, TCI, and MTN Irancell. Accordingly, 'no one ever leaves the IRGC'**; its senior officers are viewed as an Iranian 'freemasonry' and 'Ivy League network', signalling that the IRGC exceeds ideological devotion. … When 'privatising' the national media and telecommunications infrastructure, the Ahmadinejad regime sold its majority stake to the IRGC, **blending its mission of national security with 'investor profits'.** In holding senior economic positions in communications infrastructure companies and accruing profits, **the IRGC became a 'moneymaking machine** … The IRGC's opportunistic and exploitative involvement in the communications economy facilitated a system of military crony capitalism within Ahmadinejad's Iran. … The IRGC **grew to depend on the communications economy to support the personal and financial endeavours of the Guard**, who valued safeguarding their own self-interest to the same extent as they valued safeguarding the revolution.[356]

768. In sum, according to Ms. Gill, "the IRGC as an institution was reliant on the communications economy as a source of capital gain" and "the IRGC used the fictional separation between the public and private sectors in Iran to facilitate its rise as an economic conglomerate."[357] At bottom, the IRGC's control over MTN Irancell and TCI was not just about propaganda – the IRGC depended upon such control to support its "security" agenda, i.e., anti-American terror by using the fronts to raise money:

> whilst the Guard relied on the communications economy to propagate their ideology, they also **acquired and monopolised** communications infrastructure as a **source of capital gain**. The Guard's involvement with the communications economy moved beyond the projection of revolutionary ideology, becoming equally a matter of realpolitik and of **accruing military capital**.[358]

---

[356] Gill, *Capitalism, Communications, and the Corps*, at 111-12 (emphasis added).

[357] Gill, *Capitalism, Communications, and the Corps*, at 112.

[358] Gill, *Capitalism, Communications, and the Corps*, at 112 (emphasis added).

### 2. Telecommunications Company Of Iran (TCI)

769.    In 2009 – four years after the IRGC's strategy to illicitly source terrorist material through Irancell relied upon "using IEDC as a front" in the IRGC's 2005 agreement with MTN Group – the IRGC emerged from its previous position of cover on Irancell to publicly assume a majority stake in Iranian telecom company, TCI:

> In addition to rejecting foreign majority ownership in Iranian telecommunications infrastructure, IRGC telecommunications activity was driven largely by 'lucrative no-bid contracts awarded by the Iranian government'. Testament to this, in September 2009, shortly after the violent protests following Ahmadinejad's re-election, the government announced plans to privatise TCI. Amongst the investors were **numerous IRGC-backed institutions**, including the IRGC-CF, the Mostazafan Foundation, and the Execution of the Imam's Order company. Minutes after TCI was privatised, **the IRGC acquired 51% of the company** in a $5 billion deal—the 'largest trade in the history of the Tehran Stock Exchange'. This represented **'yet another calculated step' in the IRGC's campaign to dominate Iran's communications economy**. Rather than using IEDC as a front, as they had done in 2005, the **IRGC had overtly purchased a majority stake** in TCI's monopoly over Iranian telecommunications.[359]

## V.    DEFENDANTS TRANSACTED BUSINESS WITH FRONTS, OPERATIVES, AND AGENTS CONTROLLED BY THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE

770.    MTN, ZTE, and Huawei did business with fronts, agents, and operatives for the IRGC, including its Hezbollah Division and Qods Force.

771.    The IRGC controlled the entire Iranian telecom sector from top to bottom.  The following Iranian fronts, operatives, and agents played especially prominent roles in ensuring that any telecom transactions in Iran benefited the IRGC's, including the Qods Force's, global terrorist agenda.

---

[359] Gill, *Capitalism, Communications, and the Corps*, at 105-06 (emphasis added).

## A. The Bonyad Mostazafan

772.     The Bonyad Mostazafan, also known as the *Bonyad Mostazafan va Janbazan*,

Mostazafan Foundation, and Alavi Foundation (herein, the "Bonyad Mostazafan"), was

established after the Islamic Revolution to steal and manage property, including that originally

belonging to religious minorities in Iran such as Baha'is and Jews, to fund the export of the

Iran's Islamist Revolution around the world.

773.     The Bonyad Mostazafan was and is an IRGC, including its Hezbollah Division

and Qods Force, front.  The Bonyad Mostazafan's purpose was and is to raise funds and obtain

weapons (including weapons components) for the IRGC's, including the Qods Force's, terrorist

operatives and proxies, including Hezbollah.  As a front for the IRGC, including its Hezbollah

Division and Qods Force, funds and weapons (including weapons components) provided to the

Bonyad Mostazafan through its commercial transactions inevitably flowed through the Bonyad

Mostazafan to Hezbollah (through the IRGC, including its Hezbollah Division and Qods Force)

and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against

Americans in Iraq from 2011 through 2016.

774.     At all times, the Bonyad Mostazafan has been led by an agent or cut-out for the

IRGC, including its Hezbollah Division and Qods Force, and has served as a central hub of

IRGC, including its Hezbollah Division and Qods Force, fund raising, weapons development and

acquisition, computing, and communications infrastructure for Iran's terrorist enterprise, which

value has flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.

775.     The Bonyad Mostazafan is currently led by IRGC Brigadier General Parviz

Fattah, who is also, on information and belief, a Qods Force operative.

776.     The Bonyad Mostazafan has been widely understood in business, diplomatic,

military, and media circles to be a front for Iranian terrorism through the IRGC, including its

Hezbollah Division and Qods Force, since the 1990s.  On May 28, 1995, the Bonyad

Mostazafan's status as an Iranian terrorist front made international news when *Newsday* – which

was republished around the world through various affiliate relationships – reported that the

Bonyad Mostazafan served as a front for raising money and sourcing weapons for Iran's terrorist

proxies, including Hezbollah:

> [I]n a four-month investigation based on dozens of interviews with law-enforcement officials and U.S. government specialists, knowledgeable Iranians who support the regime as well as dissidents, and public and private documents, *Newsday* has found that:
>
> - [The Bonyad Mostazafan] … is controlled by Iran's clerical leadership, federal officials say.
>
> - Several of [the Bonyad Mostazafan's] current and former officers and directors have been ***implicated in arms and technology shipments to Iran***, and a former president of the foundation allegedly tried to ship germ-warfare agents to Tehran, according to these officials.
>
> - [The Bonyad Mostazafan] ***served as a front*** … for the placement of agents from the [IRGC, including Qods Force], dedicated zealots who … spy and ***obtain military technology*** from the United States and abroad.
>
> - [The Bonyad Mostazafan] finances [entities] in the United States that support Iran's militant version of Islam and provides safe haven for groups and individuals supporting the Islamic terrorist group[] … ***Hezbollah.*** …
>
> In a classified report … the FBI asserted that [the Bonyad Mostazafan] was "entirely controlled by the government of Iran," which ***used [the Bonyad Mostazafan] to set up "covert subbranches disguised*** as educational centers, mosques and other centers." …  The FBI report, according to a U.S. official, claims that [the Bonyad Mostazafan] ***funds "fundamentalist extremist groups"*** and that Iranian students who received scholarships from [the Bonyad Mostazafan] to study in the United States ***"gather[ed] intelligence"*** … and ***collected "technical and scientific information" for the Iranian regime***.
>
> In 1989, Oliver Revell, then the No. 2 official at the FBI, told the Senate terrorism subcommittee that some of the "students" receiving [the Bonyad Mostazafan] grants were in fact [IRGC, including Qods Force] agents. …  Revell … said much of [the Bonyad Mostazafan]'s funds go to "a great number of mosques (in the United States) . . . where there are ***organizations which directly support Hezbollah…***[,]" an Iranian-supported militant group … that has launched terrorist

attacks under the tutelage of the Revolutionary Guards. … *The [Bonyad Mostazafan] is administered by Mohsen Rafiqdoost, founder of the Revolutionary Guards*. Rafiqdoost reports only to the Ayatollah Ali Khamenei, Iran's spiritual leader.[360]

777.    In the same investigative report, *Newsday* also disclosed that "U.S. and European officials say that [the Bonyad Mostazafan] has long been a front for the procurement of military goods and prohibited technology for Iran, particularly for the Revolutionary Guards."[361]

778.    The same *Newsday* report also disclosed that "[the Bonyad Mostazafan]'s secretary until 1992, Mojtaba Hesami-Kiche, was at the same time the executive secretary of Vena Industries, a German company wholly owned by [the Bonyad Mostazafan], according to public records filed in Germany. U.S. sources said that Vena has been active in "military procurement" for the Tehran regime."[362]

779.    Prior to publishing its international media blockbuster report on Bonyad Mostazafan, *Newsday* questioned the Bonyad Mostazafan about its connections to terrorism and allegations that it was used as a front to raise money and source weapons for Iranian terrorist proxies like Hezbollah. The Bonyad Mostazafan replied, through counsel, that it "ha[d] no interest in responding" to such because of their "provocative tone."[363]

---

[360] Knut Royce and Kevin McCoy, *Militants Build On Iranian Foundation*, Newsday, *republished by* Pittsburgh Post-Gazette (May 28, 1995), 1995 WLNR 2452536 (emphasis added). After the Islamic Revolution, the Ayatollah seized what had previously been the Alavi Foundation and merged it with the Bonyad Mostazafan. Thereafter, they were one and the same and always were indistinguishable and different names for the same Iranian terrorist front. *See, e.g.*, *id.* ("Vincent Cannistraro, who left the CIA in 1990 as a top official of its counterterrorism center, said in a recent interview, 'The [Bonyad Mostazafan] and the Alavi Foundation are the same, under different names.' Other U.S. officials agreed.").

[361] Knut Royce and Kevin McCoy, *N.Y. Foundation Linked To Iran's Islamic Militants*, Newsday, *republished by* Seattle Times (May 26, 1995), 1995 WLNR 1308563 ("Royce and McCoy, *N.Y. Foundation Linked*").

[362] *Id.*

[363] *Id.*

780.     When *Newsday* published its investigation revealing that the Bonyad Mostazafan served as a front for providing money, weapons, and logistical support to Hezbollah, the latter was already a U.S.-government designated terrorist group, having been designated by the United States as a Specially Designated Terrorist several months prior.  As a result, from 1995 onwards, the Bonyad Mostazafan's status as a front for Iranian terrorist operations, including the IRGC's, including the Qods Force's, support for, Hezbollah was widely known in the international business community and known to Defendants.

781.     In 1998, *Newsday* again reported on the western intelligence services' consensus that the Bonyad Mostazafan was a front for funneling funds and weapons to Iranian proxies:

> [T]he quasi-official Mostazafan Foundation [] controls billions of dollars of investments in Iran and around the world. The foundation … ***has been accused by western intelligence services of*** espionage, ***supporting terrorism*** and smuggling arms. … *Newsday* disclosed in 1995 that several officers and directors … had been implicated in arms and technology shipments to Iran, that it was controlled by Iran's clerical leadership and that the ***FBI believed it had served as a front for placement in the United States of Revolutionary Guards [Qods Force]***, Iranian zealots who conducted espionage and stole military technology.[364]

782.     After these two *Newsday* reports in 1995 and 1998, the media regularly published similar reports thereafter, which routinely described the Bonyad Mostazafan as a front or funding source for Iranian-backed terrorists operating in the Middle East, including Hezbollah.

783.     On December 17, 2008, the U.S. government reinforced its messaging that the Bonyad Mostazafan was a terrorist front that served to raise money and source weapons for the IRGC, including its Hezbollah Division and Qods Force.  On that date, the U.S. Departments of Justice, Treasury, and State all announced enforcement actions and sanctions against the Bonyad

---

[364] Knut Royce, *No Legal Recourse In Iranian's Case / Supreme Court Won't Reopen Suit*, Newsday (Dec. 8, 1998), 1998 WLNR 604387 (emphasis added).  Since the IRGC personnel placed in the United States through the Mostazafan Foundation were operating overseas, they were Qods Force.

Mostazafan, and the U.S. Department of State's Counterterrorism Office issued a press release

calling attention to U.S. sanctions against entities affiliated with Bonyad Mostazafan.

784.    The heightened U.S. crackdown on the Bonyad Mostazafan caused a new round

of media coverage drawing attention to the Bonyad Mostazafan's status as a front for Iranian

terror.  For example, the *Washington Post* reported that:

> A Fifth Avenue building … is secretly co-owned by an Iranian bank that helped
> finance that country's nuclear program, the Justice Department alleged [].  Justice
> is seeking to seize the share of the property …, charging that 40 percent of [the
> building] was actually co-owned by Iran's Bank Melli …[,] [which] was
> previously designated by the Treasury Department as a key financier of  … the
> ***[IRGC] and the Quds Force, which has been linked to terrorist groups***. …
> "This ***scheme to use a front company … to funnel money from the United States
> to Iran is yet another example of Iran's duplicity***," said Stuart Levey, the
> Treasury Department's undersecretary for terrorism and financial intelligence.[365]

785.    The Bonyad Mostazafan's notorious reputation for directly funding Iranian

terrorist proxies in the Middle East continued at all relevant times.  For example, in 2014,

Jonathan Schanzer, the Vice President of Research at the Foundation for Defense of

Democracies, testified that "[t]he Bonyad-e Mostazafan" was "a splinter of Iran's IRGC" and

had "reportedly opened its coffers to Hamas, providing critical financial support."[366]

786.    On November 18, 2020, the U.S. Treasury Department designated the Bonyad

Mostazafan, observed that it served as a "bridge to the IRGC," and announced as follows:

> The U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC)
> took action today against a key patronage network for the Supreme Leader of
> Iran, the Islamic Revolution Mostazafan Foundation (Bonyad Mostazafan, or the
> Foundation) …  While Bonyad Mostazafan is ***ostensibly*** a charitable organization
> charged …, its holdings are expropriated from the Iranian people and are used by

---

[365] Glenn Kessler, *U.S. Links Iranian Bank To Fifth Avenue Building*, Washington Post (Dec. 18,
2008) (emphases added), 2008 WLNR 28032529.

[366] Statement of Jonathan Schanzer, Vice President of Research at the Foundation for Defense of
Democracies, Committee on House Foreign Affairs Subcommittee on Terrorism,
Nonproliferation, and Trade. Subcommittee on the Middle East and North Africa, *Hamas and
Terrorism*, Congressional Testimony via FDCH (Sept. 9, 2014), 2014 WLNR 24926764.

[Ayatollah] Khamenei to … enrich his office, reward his political allies, and persecute the regime's enemies. … "Iran's Supreme Leader uses Bonyad Mostazafan to reward his allies under the *pretense of charity*," said Secretary Steven T. Mnuchin. …

**PARVIZ FATTAH, BONYAD MOSTAZAFAN'S BRIDGE TO THE IRGC**

Bonyad Mostazafan maintains close ties to the IRGC, personified by current Foundation president and former IRGC officer **Parviz Fattah**. Appointed to the presidency of the Foundation by the Supreme Leader in July 2019, Fattah previously . . . . served as head of the Imam Khomeini Relief Committee, whose Lebanon branch was designated pursuant to *counterterrorism authorities in 2010 for being owned or controlled by, and for providing financial and material support to, Hizballah*. Known for his loyalty to the Supreme Leader, Fattah has also forged ties to senior IRGC-Qods Force (IRGC-QF) officials. According to Fattah, former IRGC-QF commander Qassem Soleimani sought Fattah's assistance to finance the Fatemiyoun Brigade, an IRGC-QF-led militia composed of Afghan migrants and refugees in Iran coerced to fight in Syria under threat of arrest or deportation. . . . The Fatemiyoun Brigade, like the IRGC-QF itself, is designated pursuant to [] counterterrorism … authorities. …

**SANCTIONS IMPLICATIONS**

As a result of today's action, … OFAC's regulations generally prohibit all dealings by U.S. persons or within (or transiting) the United States that involve any property or interests in property of blocked or designated persons. In addition, persons that engage in certain transactions with the individuals or entities designated today may themselves be exposed to sanctions. …[367]

787. The Bonyad Mostazafan primarily serves as a front for terror and performs little legitimate charitable work. As the Treasury Department found when it imposed sanctions, "[w]hile the Supreme Leader enriches himself and his allies, the Foundation's primary mission to care for the poor has *become a secondary objective*. According to the Foundation's previous president, in past years as little as *seven percent of the Foundation's profit* has been spent on projects aimed at reducing poverty."[368]

---

[367] U.S. Treasury Dep't, *Treasury Targets Vast Supreme Leader Patronage Network and Iran's Minister of Intelligence* (Nov. 18, 2020) (emphases added).

[368] *Id*. (emphases added).

788.    The Bonyad Mostazafan directly funds Iranian terrorist proxy military activities outside of Iran.  Fattah, who currently runs the Bonyad Mostazafan, has publicly admitted it.

789.    Fattah was separately designated for his terrorism-related connections in 2010.[369]

790.    The Bonyad Mostazafan's participation in Irancell played a role in persuading the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[370]

### B.    Iran Electronics Industries

791.    Iran Electronics Industries, also known as IEI, Sanaye Electronic Iran, Sasad Iran Electronics Industries, or Sherkat Sanayeh Electronics Iran ("IEI"), was and is a front for the IRGC, including its Hezbollah Division and Qods Force.

792.    IEI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's, including the Qods Force's, terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by IEI through its commercial transactions inevitably flowed through IEI to Hezbollah (through the IRGC, including its Hezbollah Division and Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

793.    Since the 1990s, IEI has been widely understood in business, diplomatic, military, and media circles to be a front for Iranian terrorism through the IRGC, including its Hezbollah Division and Qods Force.

---

[54] U.S. Treasury Dep't, *Fact Sheet: Treasury Designates Iranian Entities Tied to the IRGC and IRISL* (Dec. 21, 2010) ("Parviz Fattah, the Executive Director of Bonyad Taavon Sepah was designated today for acting on behalf of, and providing services to, Bonyad Taavon Sepah.").

[370] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

794.     On or about 2006, a Treasury official, Stuart Levin, told representatives of MTN's competitor, Turkcell, that IEI was "fully owned" by the IRGC, including its Hezbollah Division and Qods Force.

795.     On information and belief, Undersecretary Levin communicated to MTN Group that IEI was "fully owned" by the IRGC and that economic interactions with IEI foreseeably aided Iranian proxy terrorist attacks against Americans.

796.     On September 17, 2008, the U.S. Treasury Department designated IEI and explained that it builds weapons intended for use against the U.S. military.[371]

797.     IEI's participation in Irancell played a role in persuading the State Department to conclude (as published online) that Irancell was "fully owned by the IRGC."[372]

### C.     MTN Irancell

798.     MTN Irancell is a joint venture between two IRGC, including Qods Force, fronts, the Bonyad Mostazafan and IEI, which collectively own 51% of MTN Irancell, and MTN Group Ltd., which owns 49% of MTN Irancell ("MTN Irancell").

799.     MTN Irancell was and is a front for the IRGC, including its Hezbollah Division and Qods Force.

800.     MTN Irancell's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of the IRGC's, including the Qods Force's, terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by MTN Irancell through its commercial transactions inevitably flowed through MTN Irancell to Hezbollah (through the IRGC, including its Hezbollah Division and

---

[371] U.S. Treasury Dep't, *Treasury Designates Iranian Military Firms* (Sept. 17, 2008).

[372] U.S. State Dep't Cable, *U/S Levey Seeks Turkish Cooperation Against Iranian Terrorism Finance & Nuclear Proliferation* (Dec. 18, 2006).

Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

801.    The U.S. State Department purportedly referred to Irancell (as published online) as being "fully owned by the IRGC."

802.    Irancell's recognized status as being "fully owned by the IRGC" was also widely reported in the media, beginning in 2010 with the initial *WikiLeaks* reporting, and continuing thereafter.  For example, in 2012, the news commentator Greta Van Susteren noted on her widely-watched Fox News show: "we're talking about Iran, which is trying to wipe … Israel off the map, … and **this joint venture** with [MTN Irancell], **it was not a mystery**.  In fact, the [U]ndersecretary of [the Treasury, Stuart Levin in] 2006 according to [] WikiLeaks … said that the Iran Cell was [] **fully owned by the Iranian Revolutionary Guard** [Corps]."[373]

803.    IRGC specialists agree.  For example, in 2015, Dr. Emanuele Ottolenghi, of the Foundation for Defense of Democracies, identified "telecommunications" as a "sector where the IRGC [was] bound to reap economic benefits" because "all three mobile operators in Iran" – including MTN Irancell – "are directly or indirectly partners with IRGC-affiliated companies."[374]

**D.    Telecommunications Company Of Iran (TCI)**

804.    The Telecommunications Company of Iran (or TCI) was and is a front for the IRGC, including its Hezbollah Division and Qods Force.

---

[373] FOX: On the Record, *Interview with Byron York* (August 7, 2012), 2012 WLNR 16563491 (emphasis added).

[374] Statement of Dr. Emanuele Ottolenghi Senior Fellow Foundation for Defense of Democracies, Committee on House Foreign Affairs Subcommittee on Middle East and North Africa, *Iran Nuclear Deal*, Congressional Testimony via FDCH (Sept. 17, 2015), 2015 WLNR 27612447 ("Dr. Ottolenghi Sept. 17, 2015 Testimony").

805. TCI is the parent company of MTN Irancell's nominal competitor in Iran, MCI.

806. TCI's express purpose was and is to raise funds and obtain weapons (including weapons components) for the benefit of Iran's terrorist operatives and proxies, including Hezbollah. Funds and weapons (including weapons components) obtained by TCI through its commercial transactions inevitably flowed through TCI to Hezbollah (through the IRGC, including its Hezbollah Division and Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

807. TCI is known to be an IRGC, including Qods Force, front. The *Economist*'s due diligence unit, the *Economist Intelligence Unit*, reported in 2009 that "[t]he question of possible IRGC involvement in the TCI acquisition was raised in subsequent discussion in the Iranian majlis (parliament)," where "[t]he speaker, Ali Larijani, [was] quoted by Aftab-e Yazd, an Iranian newspaper, as saying that the IRGC was a direct party to the deal."[375] The same report also noted the "[b]lurred distinctions" between the IRGC and Iranian telecom companies:

> [In 2006,] the Supreme Leader, Ayatollah Ali Khamenei, lent his personal support to the proposed asset sales. As with many other privatisation programmes in authoritarian states, there are strong grounds to suspect that elite groups are manipulating the process to advance their own interests unfairly. It is clear that over the past few years much political and economic power has flowed towards the IRGC. … The telecoms sector in Iran has expanded rapidly over the past five years, in particular in the mobile segment, which recorded a compound annual growth rate of 65% between 2003 and 2008. There is still room for expansion of mobile telephony as the penetration rate is only about 70%, and broadband services are notably underdeveloped. ***This makes telecoms one of the most attractive targets for investment in Iran***. At the same time, telecoms is a critical sector for the security forces, as the Islamic Republic faces unprecedented domestic opposition along with growing external threats. ***If the IRGC is indeed behind the TCI deal, it would make sense from both the commercial and the security perspective.***[376]

---

[375] Economist Intelligence Unit, *Iran Telecoms: Dial I for IRGC?*, Telecoms and Technology Forecast (Oct. 12, 2009), 2009 WLNR 20135393.

[376] *Id.* (emphasis added).

246

808.     IRGC specialists concur.  For example, when Dr. Ottolenghi identified "telecommunications" as "[a]nother sector where the IRGC [was] bound to reap economic benefits," Ottolenghi also noted that "[t]he IRGC control[led] Iran's largest telecom company, the Telecommunication Company of Iran or TCI," which the "[t]he Guards bought … in September 2009 in a controversial bid that at the last minute disqualified the only non-IRGC offer."[377]  As Dr. Ottolenghi further explained:

> TCI's main shareholder is now Toseye Etemad Mobin (50%), a company **controlled by the IRGC** jointly with the supreme leader's financial network, through two companies - the Tadbir Group-owned Gostaresh Electronic Mobin and Shahriar Mahestan Company.  TCI has a monopoly over Iran's landlines, and thus controls much of the country's Internet traffic.  As *Al-Monitor* reported in August 2013, **all three mobile operators in Iran are directly or indirectly partners with IRGC-affiliated companies**.[378]

### E.     The Akbari Front Companies

809.     Mahmood Akbari, also known as John Wasserman (herein, "Akbari"), was an Iranian resident who purchased dual-use commercial grade computers, related equipment and services from illegal sources in the United States to benefit the IRGC, including its Hezbollah Division and Qods Force.  On information and belief, Akbari was an IRGC operative who was used by the Qods Force to serve as a cut-out to help source dual-use technology from America for use by the Joint Cells to attack Americans in Iraq, doing so upon the instruction of one or more Defendants.

810.     Patco Group Ltd. ("Patco") was a company in the U.A.E. operated by Akbari for the purpose of receiving commercial grade computers and related equipment from illegal sources in the United States to benefit the IRGC, including its Hezbollah Division and Qods Force.

---

[377] Dr. Ottolenghi Sept. 17, 2015 Testimony.

[378] *Id*. (emphasis added).

811.    Managed Systems and Services (FZC) ("MSAS") was a company in the U.A.E. operated by Akbari and used as a front company and consignee for computer parts to make it appear that the computer parts were being sent to the U.A.E. when in fact they were being diverted to Iran.

812.    TGO General Trading LLC, also known as Three Green Orbit (herein, "TGO"), was a company in the U.A.E. operated by Akbari and used as a front company to make it appear that payments were being made from the U.A.E., rather than from Iran.

813.    On information and belief, Patco, MSAS, and TGO (collectively, "Akbari Entities") were fronts for the IRGC, including its Hezbollah Division and Qods Force, that served as cut-outs in order to help the IRGC, including its Hezbollah Division and Qods Force, source sensitive dual-use technology from America for the benefit of Iran's terrorist operatives and proxies, including Hezbollah.  Funds and weapons (including weapons components) obtained by the Akbari Entities through their commercial transactions inevitably flowed through Akbari Entities to Hezbollah (through the IRGC, including its Hezbollah Division and Qods Force) and Jaysh al-Mahdi (through Hezbollah) to fund and arm the Joint Cell terrorist attacks against Americans in Iraq from 2011 through 2016.

## VI.    DEFENDANTS' TRANSACTIONS WITH FRONTS, OPERATIVES, AND AGENTS OF THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING ITS HEZBOLLAH DIVISION AND QODS FORCE, PROVIDED WEAPONS, FINANCING, LOGISTICAL, AND OPERATIONAL SUPPORT TO TERRORISTS

### A.    The IRGC, Including Its Hezbollah Division And Qods Force, Sourced Weapons, Raised Funds, And Obtained Logistical And Operational Support Through Illicit Corporate Transactions In The Telecom, Communications, And IT Sectors

814.    As western sanctions clamped down on Iranian terror fronts, the IRGC, including its Hezbollah Division and Qods Force, responded by expanding its efforts to obtain funds,

purchase weapons and source operational support through illicit corporate transactions in the U.S., U.A.E., and Iran.

815.    In so doing, the IRGC, including its Hezbollah Division and Qods Force, relied on transactions with multinational corporations, like MTN Group, MTN Dubai, ZTE Corp., and Huawei Co., who operated in key sectors for the dual-use technologies that were essential to the IRGC's, including Lebanese Hezbollah's and the Qods Force's, communications, surveillance, bombmaking, rocket attacks, intelligence gathering, and project management – everything a transnational terrorist group needs to coordinate attacks against Americans in the Middle East.

816.    Sadegh Zibakalam, a professor of political science at the University of Tehran, explained to the BBC in 2012 that "[d]uring the past decade Iran has come up with various ways of getting around international sanctions."[379]  Per the BBC, Professor Zibakalam "said Iranian companies had been able to source many American … goods through international markets, especially companies based in Dubai … He added that international companies have been eager to assist Iran with equipment it needs."[380]

817.    The IRGC, including its Hezbollah Division and Qods Force, relied upon the use of concealment and corporate covers to illicitly acquire the technology necessary to continue to scale its conspiracy.  At all relevant times, the IRGC, including its Hezbollah Division and Qods Force, has operated purpose-built units designed to extract American technology for use by Lebanese Hezbollah and the Qods Force by coordinating with organized crime and facilitators.  Indeed, the IRGC's use of crooked corporations as fronts is consistent with longstanding IRGC terrorist doctrine, which emphasizes the use of mafia-like "buffers," cut-outs, and fraud schemes

---

[379] BBC News, *Iran Mobile Operator Irancell 'Secures US Technology'* (June 6, 2012).
[380] *Id.*

designed to route value and services without leaving a paper trail: in short, IRGC terrorist tradecraft.

818.    It is widely understood globally that illicit transactions that route money or technology to the IRGC inevitably result in its Hezbollah Division and the Qods Force receiving money, technology, or services that it can use in its terrorist enterprise, and vice versa.

819.    Scholars who have studied the IRGC, including its Hezbollah Division and Qods Force, concur that both benefit from illicit transactions and that the purported distinction between them is largely immaterial when it comes to Iran's terrorist enterprise and support for terrorist proxies.  For example, British researcher Ben Smith, who studied the IRGC, including its Hezbollah Division and Qods Force, for the House of Commons, identified telecoms as a key area that financially benefits all:

> [T]he Revolutionary Guards, have **large and expanding business interests** … The Iranian economy is "marked by a bloated, inefficient state sector".  That has allowed the president to appoint allies and old colleagues from the Revolutionary Guard into key positions in the public sector, and to award government contracts to companies owned **or** controlled by Guard members, many of which are involved in dual use technology … **including telecommunications** … The **al-Quds force is thought to be no less involved in the business world than the rest of the Revolutionary Guard**, and analysts suspect that these growing business interests provide **clandestine sources of funding to be channelled to overseas groups and individuals, hidden from [] scrutiny** …[381]

820.    Prominent media reports also support this conclusion.  According to a 2007 report in *TheT New York Times*, "[s]ome specialists even question whether the Quds Force exists as a formal unit clearly delineated from the rest of the Revolutionary Guard."[382]  As one such Iran

---

[381] Ben Smith (International Affairs and Defence Section of the UK House of Commons Library), *The Quds Force of the Iranian Revolutionary, Guard -- Standard Note: SN/IA/4494*, UK House of Commons Library Standard Note (Oct. 30, 2007) (emphasis added).

[382] Scott Shane, *Iranian Force, Focus of U.S., Still a Mystery*, N.Y. Times (Feb. 17, 2007).

specialist, Vali R. Nasr of the Naval Postgraduate School explained to the *Times*, "[i]t could be that anyone with an intelligence role in the Revolutionary Guard is just called Quds."[383]

821.    Moreover, any lines between the IRGC and the Qods Force blur when it comes to Iran's support for Islamist terrorists outside of Iran. As the same *New York Times* report noted in 2007, "[w]hether properly identified as part of the Quds Force or not, members of the Revolutionary Guard mobilized intelligence and paramilitary agents in Lebanon in the 1980s, where they trained the Shiite militia Hezbollah; in Afghanistan, during the anti-Soviet jihad in the 1980s and episodically since then; in the former Yugoslavia, supporting the Bosnian Muslims against Serbian forces; and in other trouble spots."[384]

822.    As the Foundation for Defense of Democracies similarly concluded, given the tight nexus between IRGC commercial activity and violence by Iranian proxies, any transaction with IRGC fronts benefits Iran's terrorist enterprise – even when it does not result in the IRGC or Qods Force directly obtaining any embargoed arms or technology:

> IRGC front companies … have stakes in telecommunications …. of which Iran is the largest manufacturer in the Middle East. … Many IRGC projects are military in nature, and the group ***diverts much of the technology and expertise it acquires from Western companies for seemingly innocuous projects to unsavory ends***. … Any company that does business in Iran risks becoming an unwitting accomplice to the IRGC's nefarious activities … Yet ***even when companies provide services and technologies that cannot be diverted to illicit projects, partnering with the IRGC entails some complicity with its activities.*** In June 2006, [the head of an IRGC-owned company] confirmed in an interview with a local daily that the ***organization's funds finance various national defense projects, including arming and training Hezbollah***.[385]

---

[383] *Id.*

[384] *Id.*

[385] Mark Dubowitz and Emanuele Ottolenghi (Foundation for Defense of Democracies), *The Dangers Of Doing Business With Iran's Revolutionary Guards*, Forbes (June 15, 2010) (emphasis added).

**B.** **Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, That Caused Secure American Smartphones, Enterprise Level Servers, Network Computing Technologies, And Weapons To Flow Through The IRGC To Lebanese Hezbollah, The Qods Force, And Their Terrorist Proxies**

823.    Beginning in 2005, after the IRGC, including its Hezbollah Division and Qods Force, had intensified its support of the terrorist campaign in Iraq, MTN Group, ZTE Corp., and Huawei Co. made illicit deals with IRGC, including its Hezbollah Division and Qods Force, fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and network computing sectors.  Those deals directly benefited MTN Group, MTN Dubai, ZTE Corp., and Huawei Co., and caused tens of millions of dollars' worth of embargoed American technologies to flow into the IRGC's (including its Hezbollah Division's and Qods Force's) terrorist enterprise each year.

824.    The IRGC, including its Hezbollah Division and Qods Force, was able to leverage Defendants' insatiable appetite for Iran's telecom market, which was widely understood to represent a unique opportunity.  As *The Economist* explained in 2004, "[w]ith a population of some [70 million people] and a mobile-phone penetration rate of below 5%, ***Iran offers a unique opportunity for telecommunications investors***. … However, the wrangles with … Turkcell illustrate the difficulties in assessing the political risk associated with trying to enter the Iranian market."[386]

825.    MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. engaged in virtually identical conduct throughout the course of the conspiracy.  Since MTN Group joined the conspiracy in 2005, MTN Group, MTN Dubai, ZTE Corp, and Huawei Co. have each acted in a

---

[386] Economist Intelligence Unit, *Iran: Putting Up The Shutters*, Business Middle East (Sept. 1, 2004) (emphasis added), 2004 WLNR 10893473.

manner consistent with terrorist operations, and each of them have demonstrated the ability to execute complex financial frauds spanning multiple continents without detection, bearing all the hallmarks of the IRGC's terrorist tradecraft.

826. MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. followed a common tradecraft when pursuing their illicit acquisitions of embargoed American technologies for the IRGC, including its Hezbollah Division and Qods Force.

827. MTN Group's, MTN Dubai's, ZTE Corp.'s, and Huawei Co.'s transactions provided financial, technical, logistical, and operational support to the IRGC, including its Hezbollah Division and Qods Force, worth tens of millions of U.S. dollars per Defendant each year, which funds their terrorist proxies including, but not limited to, Jaysh al-Mahdi in Iraq, al-Qaeda (worldwide), and the Taliban, including its Haqqani Network, in Afghanistan.

828. MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. furthered the conspiracy by ensuring its concealment for years through their rigorous adherence to the core principles of terrorist tradecraft specifically practiced by the IRGC, including its Hezbollah Divisions and Qods Force, while performing "security"-related operations, e.g., Joint Cell attacks against Americans in Iraq, or Qods Force facilitation of al-Qaeda/Taliban attacks in Afghanistan. Defendants' rigorous adherence to IRGC terrorist tradecraft furthered the conspiracy because it provided concealment to the fronts, operatives, and illicit transactions that channeled millions through to the IRGC, including its Hezbollah Division and Qods Force, and through them, to the IRGC's Shiite and Sunni Terrorist proxies worldwide.

829. MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. deployed numerous illicit strategies to covertly route embargoed American smartphones, servers, network computing systems, and the associated technical support services without which their high-end gear was of

253

little value.  While the strategies differed over time, each shared a common specific intent:  to cause tens of millions in valuable state-of-the-art American technologies, services, and currency to flow from the United States to the IRGC, including its Hezbollah Division and Qods Force, and through them, to the IRGC's Shiite and Sunni terrorist proxies worldwide, in order to sustain the terrorist campaigns in Iraq, Afghanistan, Yemen, Syria, and Europe.

830.    While Defendants pursued several different strategies for flowing terrorist finance through the MTN Irancell and TCI fronts to the IRGC terrorists standing behind it, two had the greatest impact.

831.    Defendants' illicit deals with the IRGC, including its Hezbollah Division and Qods Force, fell into three broad categories of deal type: (1) weapons procurement through sham deals; (2) financing through illicit transactions; and (3) operational support obtained through the legitimacy of the companies helping the IRGC, including its Hezbollah Division and Qods Force.

832.    Although Defendants' illicit transactions with, and resulting cash flow to, fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, provided especially valuable assistance for the Joint Cells' terrorist attacks, the causal nexus was not limited to Iran sanctions violations.  Whether or not MTN, ZTE, and Huawei technically violated Iranian sanctions (although they did), their transactions with a counterparty that was openly controlled by terrorists – and which openly diverted the fruits of the transactions to terrorist ends – supplied the IRGC, including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi, with funds, weapons, weapons components, computers, communications gear, enterprise data management solutions, and essential logistical support that their Joint Cells relied upon to commit terrorist attacks against Americans in Iraq.

833.    Defendants knowingly helped the IRGC, including its Hezbollah Division and Qods Force, source hundreds of distinct items of state-of-the-art embargoed American technology that was illicitly acquired within the U.S. and then re-exported to Defendants' respective IRGC-front counterparties, to be given to terrorists.  Plaintiffs offer representative examples of the "security" assistance that Defendants provided MTN Irancell and TCI (including MCI).

834.    For decades, the IRGC, including its Hezbollah Division and Qods Force, have recognized the centrality of cell phones to the modern terrorist.  Hezbollah has long widely deployed mobile phones as a tool of terror.

835.    MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. deliberately engaged in complex schemes to acquire sensitive American technologies on the black market, and route the "security" assistance to the IRGC, including its Hezbollah Division and Qods Force.

836.    Decades of media coverage alerted Defendants to Lebanese Hezbollah's specific reputation for using cell phones to help commit terrorist violence, including, but not limited to:

- *L.A. Times*, November 1997:  "Hezbollah us[ed] ***mobile phones to coordinate attacks*** and roadside bombs camouflaged as rocks."[387]

- *Montreal Gazette*, March 2001:  "Two men … were accused of aiding the Islamic extremist group Hezbollah in an indictment … They are said to have conspired to provide Hezbollah with cash, night-vision goggles, global-positioning devices, mine-detection equipment, ***cell phones*** and blasting equipment."[388]

---

[387] Marjorie Miller, *Hezbollah Battles to Shed Extremist Image in Lebanon*, Los Angeles Times (Nov. 28, 1997) (emphasis added), 1997 WLNR 5640765.

[388] Montreal Gazette (Canada), *B.C. Men Accused of Aiding Hezbollah* (Mar. 29, 2001) (emphasis added), 2001 WLNR 6561271.

- *Globe & Mail*, July 2006:  "Air strikes took out relay towers belonging to Lebanon's three main cellular phone companies, Hezbollah's al-Manar television network … Such communications channels are traditional targets ahead of military action."[389]

- *Detroit Free Press*, July 2006:  "Capt. Jacob Dallal, an Israeli army spokesman, said the targets of the strikes were Al-Manar and Al-Nour, Hizballah's TV and radio stations, respectively. He said five of the radio station's antennas were hit.  'It's important to understand why the attack was carried out,' Dallal said. 'This will disrupt their ability to communicate,' he said, adding that ***cell phones were a 'key communication link' for Hizballah***."[390]

- *Daily Mail*, November 2007:  "Back at base, [Chris] Hunter [a "veteran 'ammunition technical officer' or counterterrorist bomb-disposal expert"] looks for patterns in the way that bombs are made and laid. At first his main opponent is a Sunni bomb-making gang, who are happy to slaughter scores of Shia civilians along with Coalition soldiers. Then, in the spring of 2004 comes the Shia militia uprising. ***They increasingly receive high-tech help from Iran and even Lebanese Hezbollah in using devices such as mobile phones ....... to detonate bombs by remote control***."[391]

- *Washington Times*, March 2009:  "Almost everyone I met warned me about using my cell phone. It was ***common knowledge that Hezbollah officers in the security forces were regularly intercepting phone calls*** and ***tracking their human targets*** by triangulating the signals the phones send out to cell phone towers around the city."[392]

- *Derby Evening Telegraph*, November 2009:  "Mr Godsmark told the jury that a video clip found on an external hard-drive at Lusha's home gave instructions on how to turn a mobile phone into a bomb trigger. The prosecutor also said video clips produced by organisations undertaking "fundamentalist violent jihad in Iraq, Afghanistan and Chechnya … Mr Godsmark said 14 mobile phones were also found at Lusha's home. Documents found on computers or drives include the Hezbollah Military Instruction Manuals; Middle Eastern Terrorist Bomb Design; Improvised Radio Detonation Techniques; Radnar's Detonators; The Mujahideen Explosives Handbook and The Bomb Book. A video film entitled "mobile detonators" was also discovered."[393]

---

[389] Carolynne Wheeler, *Israeli Troops Enter Village in Lebanon*, globeandmail.com (Toronto), (July 22, 2006), 2006 WLNR 27225853.

[390] Detroit Free Press, *Israeli Push Deepens Conflict* (July 23, 2006) (emphasis added), 2006 WLNR 25249492.

[391] Jonathan Foreman, *Defusing the Iraqi Conflict*, Daily Mail (UK) (Nov. 2, 2007) (emphasis added), 2007 WLNR 21680052.

[392] Kenneth Timmerman, *Fear Grips Democracy in Lebanon*, Washington Times (Mar. 2, 2009) (emphasis added), 2009 WLNR 4034008

[393] Kenneth Timmerman, *Fear Grips Democracy in Lebanon*, Washington Times (Mar. 2, 2009), 2009 WLNR 4034008

837. Indeed, Defendants should have been alerted by Hezbollah's own public statements taunting the United States concerning a purported "US 'request' for information on mobile phones."[394]

### C. Defendants Made Illicit Deals With Fronts, Operatives, Agents, And Cut-Outs Of The Islamic Revolutionary Guard Corps, Including Its Hezbollah Division And Qods Force, That Caused Funds To Flow Through The IRGC To Hezbollah, The Qods Force, And Their Terrorist Proxies

838. Beginning in 2005, after the IRGC, including its Hezbollah Division and Qods Force, had intensified its support of the terrorist campaign in Iraq, MTN Group, MTN Dubai, ZTE Corp., and Huawei Co. made illicit deals with IRGC, including its Hezbollah Division and Qods Force, fronts, operatives, agents, cut-outs, and Orbits in the telecom, communications, and network computing sectors. Those deals directly benefited MTN Group, MTN Dubai, ZTE Corp., and Huawei Co., and caused tens of millions of U.S. dollars to flow into the IRGC's (including its Hezbollah Division's and Qods Force's) terrorist enterprise each year.

### 1. Procurement Bribery

839. Under official IRGC, including Qods Force, policy, the IRGC, including its Hezbollah Division and Qods Force, follows a mafia-style financial approach under which all IRGC, including Lebanese Hezbollah and Qods Force, fronts, operatives, agents, cut-outs, and Orbits share a percentage of all income they realize with the IRGC, including its Hezbollah Division and Qods Force, like how a mafia lieutenant kicks up a portion of his earnings to the

---

[394] Al-Sharq al-Awsat, BBC International Reports (Middle East), *Lebanese Hezbollah Reacts to US "Request" For Information on Mobile Phones* (Mar. 3, 2010) ("Lebanese Hezbollah reacts to US "request" for information on mobile phones. Accusations against the US Embassy in Beirut that it seeks to obtain sensitive information on the mobile phone networks raised doubts within Hezbollah. Hezbollah has doubts that this information might be used by the US intelligence in infiltrating the communications network and tracking Lebanese figures.").

mob boss. For example, in 2003, the IRGC issued a directive decreeing that profits realized by IRGC fronts, operatives, and agents must be shared with the broader IRGC organization, i.e., its Hezbollah Division and Qods Force. The IRGC issued this directive as it was ramping up for a long multi-front terrorist campaign against the United States, and the point of the directive was to escalate the flow of funding supporting the IRGC's Shiite Terrorist Proxies in Iraq, and the IRGC's Sunni Terrorist Proxies in Afghanistan and Iraq.

840.    The IRGC, including its Hezbollah Division and Qods Force, have long emphasized weaponizing their control (directly or indirectly) of procurement processes to generate cash flow.

841.    Acting through its Hezbollah Division, the IRGC has long counseled its terrorist proxies about the utility of seizing government ministries, state-owned-enterprises, and private commercial businesses in order to convert them into tools of terrorist finance.

842.    IRGC Shiite Terrorist Proxies made this a calling card of IRGC-backed terror, having deployed the strategy in every IRGC-backed terror campaign since the Islamic Revolution in 1979, including Hezbollah's control of social services in Lebanon, Jaysh al-Mahdi's control of the Iraqi Ministry of Health, and the Houthis' control of certain geographies in Yemen, as three examples.

843.    From the perspective of an operative, agent, cut-out, cover, or proxy ally of the IRGC, including its Hezbollah Division and Qods Force, the IRGC's procurement bribery tradecraft usually calls for the following principles:

(i)     for ordinary procurement projects, e.g., a captive ministry purchasing a supply of commodities, the terrorist should extract a bribe or kickback of ten percent or more, often styled as a *khums* and delivered in cash (U.S. Dollars required) or "free goods";

(ii)    for mega-blockbuster procurement projects, e.g., build the complete nationwide infrastructure for a communications device, the terrorist should extract whatever the

terrorist can get, but should not get greedy or let the perfect be the enemy of the good (the terrorist analogue to the maxim "pigs get fat, hogs get slaughtered"); and

(iii)    regardless of project type, follow similar terrorist tradecraft, including, but not limited to, emphasis on concealment and covers.

## 2. "Free Goods"

844.    The IRGC, including its Hezbollah Division and Qods Force, have long emphasized manipulation of local and regional black markets as an ideal source of cash flow.

845.    The IRGC has long preferred "free goods" bribes as a tool of terrorist finance because "free goods" serve as cash equivalents given the ease of black-market access throughout the region, and "free goods" do not leave as large (or any) of a paper trail.

846.    The IRGC, including its Hezbollah Division and Qods Force, and every IRGC Shiite Terrorist Proxy, has deep experience monetizing every conceivable type of "free good" on the black market because every such terrorist group draws most of its members from geographies where black markets have been endemic for decades, including several where certain goods could only be acquired on the black market (e.g., medicine in Syria during the violence).

847.    The IRGC, including its Hezbollah Division and Qods Force, specifically trained its operatives with respect to terrorist tradecraft concerning cell phones, including, but not limited to, how a terrorist can treat cell phones as cash equivalents to be sold or traded like any other precious commodity, e.g., gold, in support of the conspiracy.

848.    The IRGC, including its Hezbollah Division and Qods Force, also taught its operatives that they could use their mobile phones as cash equivalents.

849.    This is important because each Defendant caused thousands, if not tens of thousands, of secure American mobile phones, to flow through MTN Irancell and/or TCI to the terrorists.

259

850. The going rate for a "clean" American cell phone on the black market is a 10X markup. The phones that get busted out into this market are ordinarily priced at around $200 per phone (because the annual contract heavily subsidizes the device itself). Thus, when black market sellers flip an ordinary American cell phone, they can expect to earn about $2,000 per black market cell phone.

851. The IRGC's historic preference for "free goods" as a form of terrorist finance was met by Defendants' willingness to spend their own money to buy American mobile phones for the IRGC, including its Hezbollah Division and Qods Force. Each Defendant understood that it could curry favor with its IRGC business partner by flooding the zone with untraceable American smartphones.

852. On information and belief, Defendants supplied free mobile phones to the IRGC, including its Hezbollah Division and Qods Force, because Defendants understood that the IRGC, including its Hezbollah Division and Qods Force, as well as Shiite terrorist proxies like Jaysh al-Mahdi, have long emphasized the exploitation of black markets to derive untraceable terrorist cash flow. Such a view comports with the IRGC's intense doctrinal focus on concealment as the first virtue of a "security" operatives, and the paranoia that IRGC personnel could be detected by the "Great Satan." Black markets are safely anonymous.

853. Moreover, for decades, corrupt companies in the Middle East have leveraged "free goods" schemes to route bribes to Iran-backed terrorists, and as a result, at all relevant times there has been a thriving "corruption economy" that roughly traces the "Shia crescent" from Iran through Iraq into Syria and terminating in Lebanon. Given the pervasive black markets that flourishes here, and throughout the Middle East, Asia, and Africa, so-called "free

goods" bribery schemes offer several ideal features for the hardened corporate criminal (or terrorist), including built-in cover if detected (e.g., "we are just a civilian phone company").

854.    Indeed, free goods are an especially potent form of terrorist finance for the IRGC, including its Hezbollah Division and Qods Force, because free goods (in the form of technologies like mobile phones) are usually compact, lucrative, odorless, valuable, and easy to unload on the black market.  Moreover, free goods offer an enormous tradecraft benefit for terrorists – no paper trail and no electronic or data signature for the Americans to capture.

### 3.    Exit40

#### i.    Exit40 Was An IRGC Front

855.    The IRGC, including its Hezbollah Division and Qods Force, have active cells in India, Switzerland, and the U.A.E., and rely upon all three as critical geographies to flow through precious U.S. Dollars and illicitly acquired American technologies, ultimately flowing back to the IRGC's Hezbollah Division and Qods Force, to be used to aid the attack campaigns in Iraq, Afghanistan, and elsewhere in furtherance of the IRGC's conspiracy.

856.    Exit40 was a company with letter box offices in the U.A.E., Florida, India, and Switzerland.  On information and belief, Exit40 was a front company created by or for Lebanese Hezbollah and the Qods Force.

857.    On information and belief, Lebanese Hezbollah and the Qods Force used Exit40 to extract millions of U.S. Dollars and tens of millions worth of American technologies, from inside the United States, through a hub location overseas (e.g., Singapore) before reaching the relevant terrorist cell in Iraq, Afghanistan, Iran, Pakistan, or the U.A.E.

#### ii.    MTN Group Knowingly Used Exit40 To Finance Hezbollah And The Qods Force

858.    MTN Group and MTN Dubai had a business relationship with Exit40.

859.     MTN Group and MTN Dubai have gone to extreme lengths to conceal their business relationship with Exit40.  Among other things, MTN Group and MTN Dubai employees have been instructed not to mention Exit40 over the phone or in an email.

860.     On information and belief, MTN Group and MTN Dubai personnel discouraged any telephonic or email discussions concerning Exit40 because they knew the relationship with Exit40 to be illegal, they believed Exit40 was acting on behalf, directly or indirectly, of the IRGC, including its Hezbollah Division and Qods Force, to facilitate attacks against Americans.

861.     On information and belief, an operative, employee, agent, or cut-out from MTN Irancell, TCI, the Bonyad Mostazafan, or another IRGC-controlled entity, made MTN Group and MTN Dubai aware that MTN Group and MTN Dubai should use Exit40 in order to help source the U.S. Dollars and American technologies that the IRGC, including its Hezbollah Division and Qods Force, needed to deploy in furtherance of the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

862.     On information and belief, MTN Group caused the retention of Exit40 by MTN Group, MTN Dubai, or MTN Mauritius, so that Exit40 would serve as MTN Group's, MTN Dubai's, MTN Irancell's and/or TCI's agent or cut-out in order to intentionally route U.S. Dollars and embargoed American technologies through the MTN-related entities, so that some or all of the associated funds or technologies flowed through to the IRGC, including its Hezbollah Division and Qods Force, to be deployed in furtherance of the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

863.     MTN Group caused MTN Group personnel, MTN Dubai, or an MTN subsidiary, affiliate, agents, cut-out, or business partner to pay millions of U.S. Dollars to Exit40 in order to cause Exit40 to procure the embargoed American technologies identified by the IRGC, including

its Hezbollah Division and Qods Force, in order to support the IRGC's terrorist conspiracy and attacks against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

864.    On information and belief, such transactions by MTN Group and MTN Dubai, or caused by MTN Group and MTN Dubai, routed millions of U.S. Dollars and American technologies from the United States to the terrorists overseas from on or about 2005 through on or about 2012, which discovery should reveal.

### iii.    ZTE Corp. Knowingly Used Exit40 To Finance Hezbollah And The Qods Force

865.    On information and belief, ZTE Corp. had a business relationship with Exit40. Plaintiffs' belief is based upon, among other things, the nature of the conspiracy, requirements of IRGC tradecraft, and specific indicia unique to Exit40.

866.    ZTE Corp. destroyed vast amounts of data.  On information and belief, the data ZTE Corp. destroyed included data relating to Exit40.

867.    On information and belief, an operative, employee, agent, or cut-out from MTN Irancell, TCI, the Bonyad Mostazafan, or another IRGC-controlled entity, made ZTE Corp. aware that ZTE Corp., or an affiliate, subsidiary, cut-out, or agent of ZTE Corp., should use Exit40 in order to help source the U.S. Dollars and American technologies that the IRGC, including its Hezbollah Division and Qods Force, needed to deploy in furtherance of the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

868.    On information and belief, ZTE Corp. caused the retention of Exit40 by either ZTE Corp. or another ZTE subsidiary, affiliate, or agents, so that Exit40 would serve as ZTE Corp.'s, MTN Irancell's and/or TCI's agent or cut-out in order to intentionally route U.S. Dollars and embargoed American technologies through the ZTE-related entities, so that some or all of

the associated funds or technologies flowed through to the IRGC, including its Hezbollah Division and Qods Force, to be deployed in furtherance of the IRGC's terrorist conspiracy and attacks against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

869.    On information and belief, ZTE Corp. caused ZTE Corp. personnel, or a ZTE subsidiary, affiliate, agents, cut-out, or business partner to pay millions of U.S. Dollars to Exit40 in order to cause Exit40 to procure the embargoed American technologies identified by the IRGC, including its Hezbollah Division and Qods Force, in order to support the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

870.    On information and belief, such transactions by ZTE Corp., or caused by ZTE Corp., routed millions of U.S. Dollars and American technologies from the U.S. to the terrorists overseas from on or about 2005 through on or about 2012, which Discovery should reveal.

### iv.    Huawei Co. Knowingly Used Exit40 To Finance Hezbollah And The Qods Force

871.    On information and belief, Huawei Co. had a business relationship with Exit40. Plaintiffs' belief is based upon, among other things, the nature of the conspiracy, requirements of IRGC tradecraft, and specific indicia unique to Exit40.

872.    Huawei Co. destroyed vast amounts of data.  On information and belief, the data Huawei Co. destroyed included data relating to Exit40.

873.    On information and belief, an operative, employee, agent, or cut-out from MTN Irancell, TCI, the Bonyad Mostazafan, or another IRGC-controlled entity, made Huawei Co. aware that Huawei Co., or an affiliate, subsidiary, cut-out, or agent of Huawei Co., should use Exit40 in order to help source the U.S. Dollars and American technologies that the IRGC, including its Hezbollah Division and Qods Force, needed to deploy in furtherance of the IRGC's terrorist conspiracy and attacks against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

874. On information and belief, Huawei Co. caused the retention of Exit40 by either Huawei Co. or another Huawei subsidiary, affiliate, or agents, so that Exit40 would to serve as Huawei Co.'s, MTN Irancell's and/or TCI's agent or cut-out in order to intentionally route U.S. Dollars and embargoed American technologies through the Huawei-related entities, so that some or all of the associated funds or technologies flowed through to the IRGC, including its Hezbollah Division and Qods Force, to be deployed in furtherance of the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

875. On information and belief, Huawei Co. caused Huawei Co. personnel, or a Huawei subsidiary, affiliate, agents, cut-out, or business partner to pay millions of U.S. Dollars to Exit40 in order to cause Exit40 to procure the embargoed American technologies identified by the IRGC, including its Hezbollah Division and Qods Force, in order to support the IRGC's terrorist conspiracy and attack campaign against Americans in Iraq, Afghanistan, Yemen, and elsewhere.

876. On information and belief, such transactions by Huawei Co., or caused by Huawei Co., routed millions of U.S. Dollars and American technologies from the U.S. to the terrorists overseas from on or about 2005 through on or about 2012, which Discovery should reveal.

## VII. DEFENDANTS KNEW THAT THEIR AGREEMENT TO JOIN THE CONSPIRACY, TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, AND ILLICIT SMARTPHONE PURCHASES, FACILITATED TERRORIST ATTACKS ON AMERICANS IN IRAQ, AFGHANISTAN, SYRIA, YEMEN, AND ISRAEL

### A. Defendants Knew Iran's "Security" Agenda Comprised Internal And External Terror Operations By The IRGC, Lebanese Hezbollah, Qods Force, And Iran's Terrorist Proxies In Iraq, Afghanistan, Yemen, Syria, And Israel

877. By 2005, Defendants knew that Iran's "security" was controlled by the IRGC, Lebanese Hezbollah, and the Qods Force and that "security" was a widely known euphemism for kidnapping and terrorist attacks against Americans by these groups.

### 1. In-Person IRGC Communications as Terrorist Tradecraft

878. Under standard principles of IRGC terrorist tradecraft, each of the "Iranian Shareholders," including but not limited to each Defendants' handlers and contacts at the IRGC, including its Hezbollah Division and the Qods Force, communicated to Defendants the core price of doing business with Irancell and TCI: that they would have to aid the "security" agenda of Iran, and in particular, Iran's transnational terrorist logistics enterprise. MTN Group and MTN Dubai's experience negotiating with the IRGC from 2004 through 2005 proves it, and the IRGC, on information and belief consistently followed the same approach with ZTE and Huawei. As a result, MTN Group, MTN Dubai, ZTE, and Huawei knew the deal.

### 2. Iranian Constitution

879. Defendants knew that Iran's constitution[395] distinguishes "security" from other Iranian governmental functions consistent with what Defendants knew — that "security" in Iran means "terror" against Americans outside of it. Examples drawn from Iran's constitution include, but are not limited to:

- Preamble: "[T]he Islamic Revolutionary Guards Corps are to be … responsible …for fulfilling the ***ideological mission of jihad*** in God's way; that is, ***extending the sovereignty of God's law throughout the world*** (this is in accordance with the Qur'anic verse 'Prepare against them whatever force you are able to muster, and strings of horses, striking fear into the enemy of God and your enemy, and others besides them' [8:60])."[396]

- Article 145: "No foreigner will be accepted into the Army ***or security forces*** of the country."

- Article 172: "Military courts will be established by law to investigate crimes committed in connection with military ***or security duties*** by members of the Army, the Gendarmerie, the police, and the Islamic Revolution Guards Corps."

---

[395] https://www.constituteproject.org/constitution/Iran_1989.pdf?lang=en.

[396] The emphasized passages are widely understood, inside Iran and around the world, to refer to the IRGC's foundational mission of attacking the United States around the world in order to advance the Iranian Islamic revolution.

### 3. Iranian National Security Council

880. The Iranian National Security Council's structure ensured Defendants knew that "security" was a euphemism for Iran-backed terrorist campaigns against the United States worldwide. Most obviously, Iran's National Security Council is responsible for its terrorist agenda, including Iran's routine deployment of proxies like Lebanese Hezbollah to coordinate attack campaigns against Americans globally.[397]

### 4. Lebanese Hezbollah Structure

881. Hezbollah's organizational chart also confirmed that Defendants knew that "security" was a euphemism for terror. As the "Hezbollah Division" of the IRGC, Hezbollah is a subordinate branch of the IRGC, and therefore because the IRGC is in charge of "security" in Iran, it necessarily follows that "security" matters in Iran also include Lebanese Hezbollah and the Qods Force. Moreover, from the 1990s through the present, the structure of Hezbollah's purported "terrorist wing"[398] has always been officially and publicly referred to as Hezbollah's "External *Security* Organization."

### 5. IRGC Doctrine

882. Unlike nearly every other terrorist group, the IRGC was founded and explicitly committed to anti-American terror as a matter of Iranian national security doctrine targeting the United States (the "Great Satan") for external terrorist attacks in order to advance Iran's Islamic

---

[397] *See, e.g.*, Ali Reza Nader (Senior International Policy Analyst at RAND Corp.), *Iran Vote is Cause for Optimism*, Realism, Star Tribune (June 19, 2013) ("A 20-year parliamentarian, Rowhani formerly led *Iran's security council*, so he has had direct knowledge and/or involvement in Iran's internal repression and *external support of terrorist organizations like Hezbollah.*"), 2013 WLNR 15146323.

[398] Like its IRGC overlords, and Iranian terror proxies like Jaysh al-Mahdi, Lebanese Hezbollah maintains a fictional separation between their "terrorist" and "political" wings, but this is just terrorist tradecraft designed to provide concealment for Hezbollah operatives, and there is no meaningful firewall between the two wings.

revolution globally.  As Dr. Mark Silinsky, a 36-year veteran military intelligence analyst of the

U.S. Department of Defense and an affiliated professor at the University of Haifa, explained in

2019:

> The third **major goal** of the IRGC is **combatting Iran's declared enemies, the most reviled of whom are the United States**, Israel, and Saudi Arabia. A leading IRGC-controlled media outlet claims that those three countries "finance terrorists and provide them with weapons."  Iranian hatred of the United States is deep and enduring. Early in his adulthood, Khomeini named the United States the "Great Satan," a moniker that endures today. … Iranian leaders often clamor that the United States has dominated weaker countries for centuries and proclaim that the United States intends to destroy Islam and the Islamic Republic of Iran. In Iran, there are broadcasts, television shows, movies, songs, and video games with the theme of destroying America.[399]

### 6.    Iran-Focused Scholars

883.    According to a broad consensus of Iran scholars, "security" ordinarily is

understood in the Iranian context, by all sides, to refer to IRGC-related terror operations against

Americans carried out by the Lebanese Hezbollah, the Qods Force, and associated terrorist

proxies, including, but not limited to:

- Tony Badran, September 2011:  "[T]he Qataris also ran their initiative by Tehran, in order to … assure the Iranians that Syria's **'security doctrine'** meaning its policy of **support for so-called 'resistance movements' sponsored by Iran** would remain intact."[400]

- Ambassador R. Nicholas Burns, January 2016:  "[T]he people who **actually run Iran's security policies**, their intelligence networks, their **support to the terrorist groups like Hezbollah and Hamas, are in the Iranian Revolutionary Guard Corps**. That group of

---

[399] Dr. Mark Silinsky, *Iran's Islamic Revolutionary Guard Corps: Its Foreign Policy and Foreign Legion*, Marine Corps University, Expeditions with MCUP (Digital Journal) (Jan. 2019) (emphasis added), https://www.usmcu.edu/Outreach/Marine-Corps-University-Press/Expeditions-with-MCUP-digital-journal/Irans-Islamic-Revolutionary-Guard-Corps/.

[400] Tony Badran (Research Fellow Foundation for Defense of Democracies), *U.S. Human Rights Policy in Iran and Syria*, Congressional Testimony via FDCH (Sept. 22, 2011) (emphasis added), 2011 WLNR 24786203.  Syria and Iran share a common "security doctrine," which is dictated by the IRGC, including Lebanese Hezbollah and the Qods Force.

people has a ***fundamentally more anti-American***, cynical, brutal view of the future of Middle East politics."[401]

- <u>Nakhleh Emile, June 2017</u>:  "Iran has supported Sunni and Shia terrorist organizations over the years … in the service of its national interest.  ***Supporting proxy terrorist groups has been a principle of Iran's security doctrine for years***, especially during the period when Iran was threatened with the possibility of regime change."[402]

- <u>Dr. Ronen Bergman and Dr. Raz Zimmt, July 2018</u>:  "While the Iranian nuclear program isn't under the ***IRGC's command***, its ***security definitely is***."[403]

- <u>Seth Frantzman, July 2020</u>:  "Iran said it hoped Iraq would play a greater role in ***regional security, apparently meaning*** helping Iran work with Syria and perhaps be a conduit for Iran's weapons trafficking to Syria.  Iran has sent ballistic missiles to Iraq in 2018 and 2019 and trafficking precision guided munitions via Iraq's Al-Qaim border area with Syria. Iraq has recently tried to replace some units on the border to make the border more secure. ***Regional security, for Iran, means regional Iranian hegemony***. Iraq is Iran's 'near abroad' in this equation. The pressure on Kadhimi was intense during the recent visit and ***Iran showed it means business in terms of pressuring the US to leave Iraq***."[404]

- <u>Ariane Tabatabai, November 2020</u>:  "[Qassem] Soleimani and [Mohsen] Fakhrizadeh," the "head of research and innovation at Iran's Ministry of Defense," "were the architects of ***two pillars*** of ***Iran's security policy***: its ***proxy*** and nuclear programs … Both helped ***create the infrastructure*** and develop the programs. But their deaths won't lead to a fundamental change, as institutions will continue the projects."[405]

---

[401] R. Nicholas Burns, *quoted in interview with* Ashish Kumar Sen (Atlantic Council), *Dealing with Iran: A Policy of Engagement and Deterrence*, Harvard Belfer Center for Sci. & Int'l Affairs, States News Service (Jan. 19, 2016).

[402] Nakhleh Emile, *Aligning With Iran Necessary to Combat Sunni Extremism*, Iran Times International (June 9, 2017) (emphasis added), 2017 WLNR 23277897.

[403] Dr. Ronen Bergman and Dr. Raz Zimmt, *Israel's Most Dangerous Enemy: Who Are You, Hajj, Qasem Soleimani?*, Yedioth Ahronoth (Israel) (July 3, 2018) (emphasis added), 2018 WLNR 20323696.

[404] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020) (emphasis added), 2020 WLNR 20379547.

[405] *Quoted in* Arkansas Democrat Gazette, *Iran Claims Israel, U.S. Linked To Slaying Of Key Nuclear Scientist* (Nov. 28, 2020) (emphasis added), 2020 WLNR 34141033.

### 7. Terrorist Statements

884. Public statements by the IRGC, Lebanese Hezbollah, and the Qods Force also alerted Defendants that "security" was a code word for anti-American terror operations by the IRGC, Lebanese Hezbollah, and the Qods Force, including, but not limited to:

- BBC, July 2013: "Iran's MP on *security* and foreign affairs denounce[d] an EU decision to include Hezbollah military wing in the list of terrorist organizations."[406]

- Fars News Agency (Iran), February 2014: "An Iranian deputy foreign minister blasted Washington for raising baseless allegations against Tehran, and said the US which supports terrorist groups with financial, political and arms aids cannot accuse others of advocating terrorism. … '*The Lebanese Hezbollah is strongly fighting terrorism in support of the country's security and stability*,' the Iranian official added."[407]

- IRIB World Service (Iran), March 2016: "Iran says a decision by Persian Gulf Arab states to brand Lebanon's Hezbollah as a terrorist group is a 'new mistake' that will undermine peace in the region and unity in Lebanon. … '*Those who call Hezbollah terrorists*, have intentionally or unintentionally targeted the unity and *security* of Lebanon,' Iran's Deputy Foreign Minister Hossein Amir-Abdollahian said."[408]

- Naharnet (Lebanon), March 2016: "A top Iranian security official … hailed … 'Hizbullah has played a key role in … protecting Lebanon's *security*,' said Ali Shamkhani, the head of the Supreme National Security Council of Iran."[409]

- Seth Frantzman, July 2020: "The Ayatollah stressed that while Iran does not interfere in Iraq, it is the 'corrupt' Americans who are interfering in Iraq and who only sow destruction in the region. … [Iraqi Prime Minister] Kadhimi also met with Ali Shamkhani, the head of the Supreme National *Security* Council. Shamkhani has visited Iraq earlier this year to *pressure Iraq to expel US forces.* … Shamkhani's meeting with Kadhimi was meant to be yet another piece of Iran's *maximum pressure to get US forces*

---

[406] BBC International Reports (Central Asia), *Programme Summary of Iranian Gorgan Radio News 1600 gmt 24 Jul 13* (July 25, 2013) (emphasis added).

[407] Fars News Agency (Iran), *Iran Raps US Double-Standard Policy Towards Terrorism* (Feb. 12, 2014).

[408] IRIB World Service (Iran), *[P]GCC Branding of Hezbollah as Terrorist a New Mistake: Iran* (Mar. 3, 2016), 2016 WLNR 6748676.

[409] Naharnet (Lebanon), *Iran: Hizbullah Played Key Role in Eradicating Terror in Syria, Protecting Lebanon* (Mar. 17, 2016), 2016 WLNR 8288436.

***out of Iraq. Shamkhani said the Us was 'evil' and that it was a 'malicious, terrorist' element in Iraq that was leading to insecurity****.*"[410]

### 8.   Iran-Related "Security" Media Coverage

885.    Regular media discussions also specifically alerted Defendants that "security"

was a code word for anti-American terror operations by the IRGC, Lebanese Hezbollah, and the

Qods Force, including, but not limited to:

- *Denver Rocky Mountain News*, April 1992:  "Imad Mughniyeh, **chief of security** for Hezbollah, the Iranian-sponsored Party of God, and **head of its terrorist arm**, Islamic Jihad (Holy War)."[411]

- *San Francisco Chronicle*, September 2001:  "Arranges security for meeting between bin Laden and Imad **Mughniyeh, security chief for the Iran-sponsored terrorist group Hezbollah**."[412]

- *Washington Post*, November 2001:  "Iran's foreign and **security policies** … back terrorist groups such as Hezbollah and Hamas … Ayatollah Mahmoud Hashemi Shahroudi, the head of Iran's judiciary, recently summed up the view of this wing of the government: '**Our national interests lie with antagonizing the Great Satan**,' he stated. … It would be a mistake for the Bush administration to warm relations without serious progress in reining in Iran's … terrorist links."[413]

- *Jerusalem Post*, June 2002:  "Once in southern Lebanon, the 1992 Palestinian deportees, like Jenin Islamic Jihad leader Sheikh Bessam Sa'adi learned **bomb-making and terror techniques** from Hizbullah militants and **Iranian security agents**."[414]

- *Boston Herald*, March 2004:  "All this would be news for Iranians and specialists were it not for [the] fact[] [that] **Iran's security agencies … are the biggest backers of terrorism in the Middle East**, notably through … Hezbollah…."[415]

---

[410] Seth J. Frantzman, *Iran's Maximum Pressure on Iraq to Remove US Forces*, Jpost.com (Jerusalem Post online) (July 22, 2020), 2020 WLNR 20379547.

[411] Holger Jensen, *Sanctions Target Libya, Ignore Other Terrorist Regimes*, Denver Rocky Mountain News (Apr. 16, 1992), 1992 WLNR 425546.

[412] Lance Williams and Erin McCormick, *Bin Laden's Man in Silicon Valley*, San Francisco Chronicle (Sept. 21, 2001), 2001 WLNR 5755282.

[413] Washington Post (Op-Ed), *The Irony of Iran* (Nov. 11, 2001), 2001 WLNR 13678266.

[414] Matthew Gutman, *Packing Up Our Troubles*, Jerusalem Post (June 28, 2002), 2002 WLNR 164656.

[415] Boston Herald (Op-Ed), *Taking First Steps in Iran* (Mar. 21, 2004), 2004 WLNR 393400.

- *Newsweek*, June 2004: "While the link to Iran has been publicly known for some time, the 9/11 commission has uncovered evidence that in the mid-1990s Osama bin Laden cast aside religious differences with the Iranians and arranged to have his terror operatives conduct training in explosives and **security at Iranian-backed camps run by Hizbullah in Lebanon**."[416]

- *Express on Sunday*, March 2005: "[T]he terrorist group Hezbollah and [] **Iranian security chiefs** … are **key sponsors of international terrorism**."[417]

- *AP Worldstream*, August 2006: "State Department spokesman Sean McCormack … denounced Iran as a **supporter of terror groups** in defiance of U.N. resolution. That support, he said, was '**an integral part**' of Iran's foreign and national **security policy**."[418]

- *Khaleej Times*, September 2009: "The Middle East Times reported … that the [U.S.] was stepping up scrutiny of **Iranian security** and military personnel in the Lebanese communities of Latin America. … US officials said that in addition to boosting rates of recruitment, Hezbollah agents, supported by Iran, are using **very effective routes to smuggle drug profits to the Middle East to aid anti-US counterparts** …"[419]

- *Australian*, April 2010: "An ASIO assessment included in the [Australian] federal government's recent counter-terrorism white paper drew attention to the presence in Australia of the Lebanese Hezbollah **External Security** Organisation (ESO), an Iranian-sponsored group described on the federal government's national security website as '**among the best-organised terrorist networks in the world**' … ASIO pinpointed ESO as a group 'with a long history of engaging in terrorist acts.'"[420]

- *American Forces Press Service*, April 2010: "Defense officials have described the **security threats** posed by Iranian proxies operating in the Middle East -- Hamas in Gaza and Hezbollah in Lebanon -- which the United States and Israel consider terrorist organizations."[421]

---

[416] Michael Isikoff and Mark Hosenball, *Terror Watch: Friends of Al Qaeda*, Newsweek Web Exclusives (June 16, 2004), 2004 WLNR 3641416.

[417] Tim Shipman, *How Real is Terror Threat to Britain?*, Express on Sunday (UK) (Mar. 6, 2005), 2005 WLNR 3482170.

[418] Barry Schweid, *U.S. Foresees Further Defiance By Iran To U.N. Demands On Uranium Enrichment*, AP Worldstream (Aug. 8, 2006).

[419] Khaleej Times, *The Enemy at the Gates - Fear of the Unknown in Latin America* (Sept. 27, 2009), 2009 WLNR 19020314.

[420] Australian, *Iranian Embassy 'Spying on Activist Students'* (Apr. 6, 2010), 2010 WLNR 7047177.

[421] John J. Kruzel, *Gates Satisfied with U.S. Planning to Counter Iran*, American Forces Press Service, Defense Department Documents (Apr. 27, 2010), 2010 WLNR 8757413.

- *Reuters*, October 2017: "The Revolutionary Guards (IRGC) are Iran's most powerful internal and external security force."[422]

### 9. "Security" Euphemism-Related Media Coverage

886. Defendants could not possibly have missed the meaning of "security" in their conspiracy with the terrorists because decades of media discussions, television, and film events across a broad array of cultures, religions, and languages in the U.S., Europe, the Middle East, and Africa, where Defendants' employees and agents live and work, alerted Defendants that "security" was a famously common euphemism for "terrorism,", including, but not limited to:

- *Miami Herald*, July 1992: "[T]he FMLN has created what the government calls **'terror squads' euphemistically** named '**security commissions.**'"[423]

- *Journal of Commerce*, November 2002: "The Maritime Transportation Security Act gives us a new **euphemism**. Inside the Beltway, a '**terrorist** attack' is now a 'transportation **security** incident.'"[424]

- *Aberdeen American News*, June 2004: "'On the roller coaster ride that Iraq has become, …[w]hat's **euphemistically** referred to as '**security concerns**' … **would be referred to as violent, bloody terrorism** in most other parts of the world.'"[425]

- *Jerusalem Post*, August 2004: ""The term '**security** prisoners' is … a **euphemism** for ideologically motivated murderers convicted of **terrorist** activities against Israelis.""[426]

- *Toronto Star*, May 2005: "In an extraordinary trip to Abu Ghraib prison … she encounters the now-notorious U.S. Army General Janis Karpinski, who tells her that

---

[422] Reuters, Yedioth Ahronoth (Israel), *Iran Warns US Against Imposing Further Sanctions* (Oct. 8, 2017), 2017 WLNR 30811998.

[423] Miami Herald, *Peace on a Razor's Edge* (July 30, 1992), 1992 WLNR 2253569.

[424] R. G. Edmonson, *Washington View: Port Security Bill a Good Start*, Journal of Commerce (Nov. 18, 2002), 2002 WLNR 1291549.

[425] Aberdeen American News (SD), *U.N. Vote Brings Glimmer of Hope* (June 10, 2004), 2004 WLNR 18926896.

[426] Efraim Inbar (Professor of Political Studies at Bar-Ilan University), *Let Them Starve*, Jerusalem Post (Aug. 22, 2004), 2004 WLNR 237090.

'*security* detainees,' the **euphemism for terrorism** suspects held by the U.S. forces, are 'relaxed, comfortable, and had everything they need.'"[427]

- *Times of India*, November 2006: "To paraphrase Chesterton, there are an infinity of angles at which Anglo-Pakistani relations fall but there is only one - *security* - at which they stand. **The 'S' word is a euphemism for the 'T' word. Terrorism, as sponsored by Pakistan**."[428]

- *New American*, April 2008: "Lieutenant General Keith Dayton, the Bush administration's Security Coordinator for Palestine, testified … on the supposed need to fund President Abbas' **'security forces,' a euphemism for the collection of terrorist thugs** from the al-Aqsa Martyrs Brigades, Islamic Jihad, Force 17, and various other PLO/Fatah militias."[429]

- *Birmingham Post*, October 2008: "[A]n event … sought to consider **'security and community cohesion' a euphemism for extremism and terrorism, natch**)."[430]

- *BBC International Reports (Latin America)*, October 2013: "Although paramilitary forces could serve the interests of the State, its members act as mercenaries, assault squads, thugs, and private **security groups**, the latter a **euphemism for terrorists**."[431]

- *Electronic Intifada (Palestine)*, August 2021: "The term 'ISF' – which stands for 'Israeli security forces' – is a total misnomer and euphemism for occupation forces who provide anything but 'security.' Their job, rather, is to terrorize and repress."[432]

---

[427] Olivia Ward, *Finding Dignity Amid the Chaos; Iraq Journal*, Toronto Star (May 22, 2005), 2005 WLNR 8118912.

[428] Rashmee Roshan Lal, *TomKat Nuptials Like Blair-Mush Compact*, Times of India (Nov. 19, 2006), 2006 WLNR 27474749.

[429] William F. Jasper, *A Bad Investment: U.S. Support For So-Called "Moderate" Terrorists as the Alternative to Worse Terrorists, as we have Given in Palestine, is a Recipe for Disaster*, New American (Apr. 28, 2008), 2008 WLNR 25511423.

[430] Chris Allen, *Freedom of Expression is Built on the Right to Offend*, Birmingham Post (UK) (Oct. 16, 2008), 2008 WLNR 19647906. "Natch" means "naturally; as may be expected."

[431] BBC International Reports (Latin America), *Costa Rican Daily Warns Caution Over Alleged Presence of Paramilitary Group* (Oct. 3, 2013).

[432] Electronic Intifada (Palestine), *Video Shows Israeli Shooting That Killed 11-Year-Old Boy* (Aug. 4, 2021), 2021 WLNR 25165762. Plaintiffs categorically reject the antisemitic bile displayed in this quotation and offer it merely to show the widespread euphemistic use of "security."

- *Canada Stockwatch*, September 2014: "[I]n the Democratic Republic of the Congo … a … '**security incident**[]' … is one of several **euphemisms for an 'act of terror**,' 'war,' or even a spontaneous hacking."[433]

### 10. Each Defendant's Consciousness of Guilt

887. The conduct of MTN Group, MTN Dubai, MTN Group's President and CEO, MTN Group's Commercial Director, ZTE Corporation, ZTE USA's in-house attorney, Huawei Co., Huawei Co.'s CFO, and others compels the conclusion that each Defendant knew that "security" was a euphemism for the external terror operations of the IRGC, including its Hezbollah Division and Qods Force. Each Defendant manifested obvious **consciousness of guilt** concerning their relationship with the Iranian Shareholders:

- **MTN Group's President and CEO** concealed the secret agreement from MTN Group's shareholders, Board of Directors, outside counsel, auditors, as well as various governments including, on information and belief, the U.S. government and the South African government.

- **ZTE Corp.**, and its internal legal department, also showed consciousness of guilt because it created internal memoranda intended to guide a company-wide scheme to evade U.S. sanctions to get embargoed U.S.-origin technology to Iran and oversaw a cover-up campaign designed to destroy and distort evidence of its criminal wrongdoing. When the ZTE USA general counsel learned of the company-wide scheme, he became a whistleblower that spawned massive criminal investigations, prosecutions, and fines.

- **Huawei Co.** showed consciousness of guilt because it devised a scheme to conceal its role in sourcing embargoed U.S.-origin goods and services to Iran, while directing its officers, including its CFO, to make multiple material misrepresentations to U.S. authorities and financial institutions to conceal the scope and nature of its Iranian business. Further, when Huawei learned of the U.S. government's investigations concerning Huawei's Iranian interests, Huawei Co. ordered its employees, and the employees of its subsidiaries, including Huawei Device USA, to destroy documentary evidence and remove witnesses outside the jurisdiction of the U.S. authorities.

888. Defendants' consciousness of guilt can *only* be explained by each Defendants' knowledge that the IRGC's "security" assistance needs comprised knowingly providing material

---

[433] Canada Stockwatch, *\*MKTDIAM Diamonds & Specialty Minerals Summary for Sept. 22, 2014* (Sept. 22, 2014).

support for the terrorist agenda of the IRGC, including its Hezbollah Division and Qods Force, for the specific purpose of facilitating the anti-American terror "security" operations of the IRGC, including its Hezbollah Division and Qods Force:  (a) **inside of Iran**, e.g., joint training camps funded by the IRGC and staffed by Lebanese Hezbollah, through which the IRGC's Shiite Terrorist Proxies and Sunni Terrorist Proxies received essential training, safe haven, and logistical support designed to facilitate their terrorist attacks against Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe; and (b) **outside of Iran**, including, but not limited to, though IRGC proxies in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe e.g., a Joint Cell in Basra  that specializes in kidnapping and was comprised of Lebanese Hezbollah, the Qods Force, and Jaysh al-Mahdi, as well as a Joint Cell in Syria that provides communications and smuggling support for the IRGC's Shiite Terrorist Proxies.

889.    This conclusion is ineluctable for several reasons.  *First*, with respect to the phrase "defensive, security, and political cooperation," two of those three items were unquestionably legal in Defendants' home countries.  At all relevant times, South African and Chinese companies could legally sell weapons to Iran, and therefore it is implausible that Defendants were worried about the criminal risk of facilitating weapons sales from South Africa because however disgusting such conduct was, it was not illegal under South African law (and MTN Group did not have any U.S. affiliates).

890.    Moreover, the South African and Chinese governments were both longstanding close allies of Iran based upon their unique historical bonds, and in such context, it is implausible that Defendants were concerned about breaking the law by promoting "political cooperation" between their respective countries and Iran, since "political cooperation" with Iran was a perfectly acceptable thing in both South Africa and China at all relevant times.

891.   ***Only*** Defendants' knowledge that "security" meant "Lebanese Hezbollah, Qods Force, and anti-American terror" explains the totality of each Defendant's conduct, as well as the parallel nature of their crimes, e.g., rampant document destruction.  For Defendants to facilitate a helicopter sale to the regular Iranian Army (not the IRGC), or help broker political cooperation, was not only legal, but in furtherance of the economic and political agendas of all but the U.S. Manufacturer Defendants' home countries, South Africa and China.  For Defendants to agree to provide "security assistance" to the IRGC (including its Hezbollah Division and Qods Force), however, was a categorically different matter.

892.   With respect to MTN Group and MTN Dubai, directly assisting the "security" operations of the IRGC, including its Hezbollah Division and Qods Force, plainly ran the risk of committing a litany of crimes under South African law (e.g., terrorism crimes and espionage), and created obvious – and dire – potential risk to any MTN Group or MTN Dubai executive, employee, or agent who participated in the conspiracy without making a noisy withdrawal. Indeed, to this date, MTN Group and MTN Dubai have yet to exit the conspiracy.

893.   With respect to ZTE and Huawei, the motivation to conceal their direct "security" assistance to the IRGC was rooted in an obvious explanation:  both sought to facilitate the hostile activities of the Chinese Communist Party that aided the IRGC's Shiite Terrorist Proxies and the IRGC's Sunni Terrorist Proxies in order to facilitate attacks against targeted Americans in Iraq, Afghanistan, and throughout the Middle East to drive the U.S. out so that China could become the dominant regional power consistent with the ideology and agenda of the Chinese Communist Party.

**B.  Defendants Knew Their Transactions With IRGC, Lebanese Hezbollah, And Qods Force Fronts, Operatives, Agents, And Cut-Outs Aided The Conspiracy's Terrorist Attacks Against Americans In Iraq, Afghanistan, Yemen, Syria, And Israel**

894.    Defendants knew or recklessly disregarded that their transactions with fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force, financed, armed, and operationally supported Iranian proxy terrorist attacks against Americans in Iraq.

895.    Defendants knew that "'[c]ompanies doing business in Iran face substantial risks…,' said Sigal Mandelker, Treasury Department undersecretary for terrorism.  She added:

> …. "deceptive" Iranian transactions that ultimately channel money to terrorists. The Iranian government "uses shell and front companies to conceal its tracks" as part of an elaborate scheme designed to procure cash for the Quds Force of Iran's militant Islamic Revolutionary Guard Corps, which the U.S. designates as a terrorist organization.

896.    By early 2005, it was widely understood in diplomatic, business, and military circles that the IRGC, including its Hezbollah Division and Qods Force, had seized control of Iran's telecom, communications, and information technology sectors.  Before they transacted with IRGC, including Qods Force, fronts, operatives, and agents, Defendants were aware that IRGC, including its Hezbollah Division and Qods Force, had seized control of these sectors.

897.    Defendants were aware of IRGC's, including Qods Force's, capture of Iran's telecom, communications, and information technology companies in part through their local agents and affiliates, whom Defendants relied upon to keep abreast of Iranian market conditions; these agents (who were subject to Defendants' control and whose knowledge is imputed to Defendants) knew that the IRGC, including its Hezbollah Division and Qods Force, controlled Iran's telecom, communications, and information technology sectors and used that control to raise money, obtain weapons, and source operational support for terrorism.  As a general matter, those agents spoke fluent Farsi, had relationships with people throughout Iranian government

278

and industry, and were well-informed about Iranian politics and economics. They could not have remained ignorant of the common understanding that the Iranian telecom, communications, and information technology sectors were controlled by the IRGC, including its Hezbollah Division and Qods Force.

898.    Defendants knew, or recklessly disregarded, that the IRGC, including its Hezbollah Division and Qods Force, routinely used commercial transactions to raise money and acquire key weapons and weapons components in support of the IRGC's, including the Qods Force's, lead terrorist agent, Hezbollah, as well as Hezbollah's Iraqi proxy, Jaysh al-Mahdi. As a regional studies professor explained, "Dubai … maintains crucial avenues for the IRGC … to generate money" and serves as "the gate to the world for" Iranian terrorist front company efforts.[434]

899.    Defendants knew, or recklessly disregarded, that as American sanctions sought to choke off IRGC, including Qods Force, access to the global financial system escalated, the IRGC, including its Hezbollah Division and Qods Force, responded by using IRGC, including Qods Force, front companies and agents in the United Arab Emirates, Iraq, and elsewhere to raise money through criminal enterprise, facilitate terrorist finance through the banking system, and maintain the steady supply of key telecom, communications, and information technologies necessary to continue to prosecute a terrorist campaign against Americans in Iraq and elsewhere. Per *Reuters*, the IRGC, including its Hezbollah Division and Qods Force, has:

> long proved successful in defending [its] economic interests, including in recent years when the sanctions … effectively exclude[ed] Iran from the global financial and trading system. "Even under very difficult economic circumstances, the funds for the IRGC's activities, whether domestic or overseas, remained intact," said a former official close to the [Iranian] government… As the U.S. and EU

---

[434] TRT World (Turkey), *Amid Soleimani Crisis, Iran Threatens to Level Dubai and Israel. But Why?* (Jan. 8, 2020), 2020 WLNR 663153.

sanctions on Iran's oil and finance sectors in 2012 started to bite, the [IRGC] responded by setting up complex operations involving the likes of Dubai …. "*The IRGC started to buy hundreds of … companies around the [U.A.E.] to use as front companies,*" said a trader involved in … the oil industry. *"These companies partnered with some foreign companies to bypass sanctions. Most of the time cash was delivered to a foreign account in a neighbouring country.*"[435]

900.    At all relevant times, Defendants understood that the U.S. government believed that IRGC, including Qods Force, activities in the U.A.E. supported anti-American terrorism in Iraq and Afghanistan.  For example, in 2008, President George W. Bush gave a widely-reported speech to U.A.E. government and business leaders in which he called Iran "the world's leading sponsor of terrorism" and stressed that illicit transactions in the U.A.E. were important to the IRGC's, including the Qods Force's, ability to provide "support for Islamist groups and militants in Afghanistan, Iraq, Lebanon and the Palestinian territories."[436]  Press reports concerning President Bush's speech emphasized the U.S. government's efforts "to enforce US sanctions against … the Quds Force of the IRGC" because "Dubai in particular ha[d] become a financial centre handling substantial Iranian investments which the administration want[ed] to restrict."[437]

901.    From 2005 through 2016, accounts from prominent Western media sources also reported on the direct link between the Iranian telecom, communications, and information technology sectors and the IRGC, including its Hezbollah Division and Qods Force.

902.    On information and belief, Defendants were aware of these reports documenting the link between their Iran-related counterparties and the IRGC, including its Hezbollah Division and Qods Force.  Each Defendant generally maintained a corporate security group responsible

---

[435] Parisa Hafezi, *RPT-INSIGHT-Iran's Elite Guards to Gain Regional, Economic Power in Post-Sanctions Era*, Reuters News (Jan. 20, 2016) (emphasis added).

[436] APS Diplomat Redrawing the Islamic Map, *Bush Says Iran Poses Threat To Global Security* (Jan. 14, 2008), 2008 WLNR 25283869.

[437] *Id*.

for supervising their global supply chains, doing counterparty diligence, and preventing the theft or diversion of the devices or services they sold, including in the Middle East. As part of such efforts, Defendants' standard practice would have been to conduct basic open-source research on the Iranian telecom market and the mechanics of making telecom deals in Iran – even a modicum of which would have uncovered the reports discussing the Iranian front entities' terrorist ties set forth above.[438]

903. After 2005, Defendants could not have conducted credible due diligence that would have "cleared" their transactions with their counterparties controlled by the IRGC, including its Hezbollah Division and Qods Force. Defendants also knew or recklessly disregarded the IRGC's, including the Qods Force's, control of their business partners based upon the statements set forth in prominent due diligence materials concerning Iran.

904. MTN's collusion against Turkcell with the conservatives who controlled the IRGC, including its Hezbollah Division and Qods Force, fronts responsible for the Irancell contract itself became a notable "red flag" about the highly risky Iranian business environment that Defendants knew of, and ignored. For example, as the *Economist*'s flagship due diligence report, the *Economist Intelligence Unit*, explained in June 2005:

> There is considerable doubt that [] Turkish investment projects … will proceed after facing opposition from the new conservative-dominated [Iranian parliament, the] Majlis. The Majlis in late 2004 passed a law giving it a veto over foreign investment and in early 2005 ruled that Turkcell … should reduce its stake in [] Irancell … to 49% from 70% [and] … that a majority of Iranian shareholders would have to support any management decisions and that security issues be

---

[438] This allegation applies to all Defendants except MTN Irancell. Plaintiffs allege that MTN Irancell relied upon the IRGC, including the Qods Force, to conduct diligence on the counterparties with whom MTN Irancell conducted business, and that the IRGC, including Qods Force, fronts, operatives, and agents that owned and managed MTN Irancell would not have approved any significant investment or hire by MTN Irancell if the IRGC, including the Qods Force, believed that such proposed deal did not benefit the "security" agenda of the IRGC, including the Qods Force.

referred to the intelligence ministry and the Supreme National Security Council. … The Majlis's opposition to the projects … is sure to cause nervousness among foreign investors who will see it as calling into question the value of contracts in the Islamic Republic and as a sign of arbitrariness in governance.[439]

905.     After MTN had finished off Turkcell and secured the Irancell license from the IRGC, including Qods Force, fronts who controlled Irancell, the *Economist* updated its standard diligence briefing concerning Iran to warn potential investors, including Defendants, against the "High Risk" of doing business with Iranian entities:

> *Foreign investors are deterred by the nationalist stance of the Majlis towards foreign investment (High Risk)*.  The Majlis in late 2004 passed a law giving it a veto over foreign investment which it has used to ... severely tighten up on the terms of a project by Turkcell … *The conditions imposed on Turkcell have seen its bid superseded by a South African company, MTN.* The episodes caused nervousness among foreign investors who fear that they called into question the value of contracts in [Iran] and indicated arbitrariness in government decision-making. President Mahmoud Ahmadinejad's presidency (until at least 2009, when fresh elections will take place) will *continue to heighten such concerns*. …[440]

906.     Public statements made by prominent Members of Congress also alerted Defendants to the IRGC's, including the Qods Force's, control of the Iranian telecom sector.  For example, on February 10, 2011, a bipartisan group of United States Senators and Representatives confirmed the widespread understanding that the IRGC's (and by extension, the Qods Force's) control of the "Iran telecom sector, of which the Iranian Revolutionary Guard Corps owns a significant stake."[441]  These Members' letter received widespread coverage in the global media.

---

[439] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (June 29, 2005), 2005 WLNR 26571496.

[440] Economist Intelligence Unit, *Iran Risk: Legal & Regulatory Risk*, Risk Briefing (Nov. 9, 2006) (emphasis added), 2006 WLNR 26677912.

[441] Letter from U.S. Senators Jim Webb, Jon Kyl, and Richard Burr, and U.S. Representatives Ileana Ros Lehtinen and Sue Myrick, *Sens. Webb, Kyl: Sale of U.S. Computer Technology to Chinese Firm Poses Serious Risk Chinese Firm Has History of Illegal Behavior and Ties with the People's Liberation Army, Taliban and Iranian Revolutionary Guard*, States News Service (Feb. 10, 2011).

907.    Pressure campaigns, also known as "private sanctions," by public interest groups also warned Defendants about the IRGC's, including the Qods Force's, control of the Iran telecom sector.  For example, from 2011 through the present, the non-partisan group UANI[442] has pressured technology and telecom companies to cut ties with IRGC, including Qods Force, fronts in order to pressure the Iranian regime to cease its support for anti-American terror and other malign activities in the Middle East.  As Ambassador Mark D. Wallace explained in 2012:

> [I]n 2011 UANI launched its "Tech and Telecom Campaign" to **publicly highlight the role of telecommunications companies in Iran and about how their technology was being misused by Iranian government security forces** … In so doing, companies were **directly facilitating the ability of the Iranian regime to wage a campaign of terror** … In response to UANI's campaign, companies like Nokia Siemens Networks and Ericsson agreed to not take on any new business in Iran. … In today's integrated business and financial worlds, companies cannot exist in a national vacuum.  Any corporation that seeks access to American capital [] is subject to American law, public pressure and American public opinion.[443]

908.    Defendants also knew that most of their multinational peers had already chosen to exit ventures in which they participated alongside Iranian entities that could potentially be fronts for the IRGC, including its Hezbollah Division and Qods Force.  By 2012, the roster of companies that announced an intention to depart Iran included such prominent multinationals as Siemens, Ingersoll Rand, Hitachi, ABB, Porsche, Caterpillar, Komatsu, Bobcat, and others.  Huawei was one of the companies to announce its intentions to depart Iran as well, but as alleged herein, Huawei actually did not pull out of the Iranian market.  Regardless of whether

---

[442] UANI is a non-partisan group that focuses on protecting American national security from the threat posed by Iran.  In 2012, UANI and its Advisory Board included an array of former national security officials from the U.S. U.K., Germany, Israel, and others, including "Graham Allison, Les Gelb and Fouad Ajami, and former government officials including former CIA Director Jim Woolsey, former Homeland Security Advisor Fran Townsend, former Mossad Chief Meir Dagan, former head of the German Intelligence Service Dr. August Hanning, and former head of the United Kingdom`s MI6 Sir Richard Dearlove among many others."  Wallace May 17, 2012, Testimony.

[443] Wallace May 17, 2012, Testimony (emphasis added).

Defendants' other multinational peers, in fact, exited these Iranian relationships, their public announcement of their intention to do so further alerted Defendants to the extreme risk posed by their continued economic relationships with their Iranian counterparties.

909. On April 24, 2016, the *Washington Post* published an opinion written by Senator Joseph I. Lieberman, and Amb. Mark D. Wallace in which the authors warned multinational corporations of the severe financial and reputational risk attendant to doing business with a notorious IRGC front, like MTN Irancell, presciently warning Defendants that, "[s]evere risks exist for companies thinking about investing with the ayatollah, including doing business with the wide array of front companies tied to the IRGC, a terrorist organization sanctioned by the United States and the international community."[444]

## C. Defendants Knew Their Illicit Smartphone Purchases Aided the Conspiracy's Terrorist Attacks Against Americans In Iraq, Afghanistan, Yemen, Syria, And Israel

910. Since 9/11, *every* major transnational Islamist terrorist organization that has targeted Americans has prioritized providing its operatives have a robust, reliable, and covert supply of two material items above all else:  stockpiling vast quantities of secure, untraceable American mobile phones, and obtaining as much U.S. currency as possible.  This maxim holds true for Shiite and Sunni groups alike, including, but not limited to, the IRGC (including its Hezbollah Division and Qods Force) Jaysh al-Mahdi, al-Qaeda, the Taliban (including its Haqqani Network), ISIS, al-Nusra Front, and every other major group.

---

[444] Sen. Joseph I. Lieberman (I-NY) and Amb. Mark D. Wallace, *Why Iran Is Arming Up*, Washington Post (Apr. 24, 2016).

## VIII. EACH DEFENDANT ENGAGED IN COMMERCIAL TRANSACTIONS THAT IT KNEW OR RECKLESSLY DISREGARDED WERE STRUCTURED TO FINANCE, ARM, AND/OR OPERATIONALLY SUPPORT THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, AND THEIR TERRORIST PROXIES HEZBOLLAH AND JAYSH AL-MAHDI

### A. The MTN Defendants

#### 1. MTN Group Entered Its Transnational Corporate Alliance With The IRGC, Including Lebanese Hezbollah And The Qods Force, In Order To Seize The "Virgin" Telecom Markets In Iran, Afghanistan, Syria, Yemen, And Lebanon, Each Of Which Was Controlled, Contested, Or Influenced By The IRGC And Its Terrorist Proxies

911.　The MTN Defendants consist of two companies that each provided material support to Hezbollah, the Qods Force, the Regular IRGC, and the Taliban, including its Haqqani Network (MTN Group and MTN Dubai) and one company that serves as a front for the IRGC (MTN Irancell).　MTN Group and MTN Dubai are MTN Afghanistan's parent companies that held themselves out as responsible for how MTN Group affiliates worldwide manage "security" issues.

912.　MTN Group oversaw and authorized MTN Afghanistan's practice of providing support to the Taliban, as well as MTN Group and MTN Dubai's aid routed through MTN Irancell, Exit40, and the other sources of MTN Irancell-related cash-flow alleged in this Complaint.

913.　MTN Group executed the Letter Agreement with the Iranian Shareholders on behalf of the entire MTN corporate family.　On information and belief, the President of MTN Group was personally compelled to do so during an in-person meeting at the Bonyad Mostazafan office in Tehran, Iran, when a IRGC Regular Brigadier General communicated to MTN Group's President that the Iranian Shareholders insisted that MTN Group execute the Letter Agreement on behalf of the entire MTN corporate family.

914.    On information and belief, the Letter Agreement reflects the Iranian Shareholders' template "Security Aid" agreement, and the Iranian Shareholders specifically styled MTN Group as "MTN" in the Letter Agreement to reinforce to MTN Group and its President, that he was committing the entire MTN corporate family to the deal.

915.    It would not be proper to interpret the reference to MTN Group's performance of its "security" related services for the Iranian Shareholders to be limited to being "in South Africa." That passage was a reference by the Iranian Shareholders to their prior frustration with Turkcell, whose C-Suite leadership, on information and belief, refused to commit to providing "security" services to the Iranian Shareholders.

916.    Separately, Hezbollah and the Qods Force rely heavily on South Africa-to-Middle East routes, networks and relationships to manage the IRGC's transnational financial, logistics, and technical enterprise. Funds and technology sourced by Hezbollah and the Qods Force in South Africa will ordinarily follow back to the IRGC to be shared with the IRGC's proxy terrorists, including the Joint Cells in Iraq an the al-Qaeda/Taliban Syndicate in Afghanistan.

917.    MTN Group maintained direct contact with the MTN Afghanistan security official responsible for interfacing with the Taliban, and MTN Group officials encouraged and approved MTN Afghanistan's practice of paying off the Taliban. MTN Group also instructed MTN Afghanistan to comply with the Taliban's directives to switch off its cell towers at night.

918.    MTN Dubai was an MTN Group subsidiary and shell company created for financial and tax purposes. It contained no independent business operations from MTN Group, was run by MTN Group employees, and agreed as part of a U.S.-based financing deal to assume responsibility for MTN Afghanistan's operations – including its interactions with the Taliban.

919.    On information and belief, MTN Group also furthered the Conspiracy by coordinating strategic communications to provide concealment for the Conspiracy by reaching into the United States to communicate IRGC disinformation concerning whether Irancell is an IRGC front.

920.    MTN Group follows a hub-and-spoke business model where the Group headquarters in South Africa provides a substantial amount of financial, operational, technical, and personnel support to every other MTN subsidiary and affiliate.[445]

921.    MTN Group and MTN Dubai worked closely to coordinate the technical buildout of MTN Irancell, and senior executives from MTN Group and MTN Dubai regularly coordinated their financial, technical, and logistical support to MTN Irancell.

922.    Plaintiffs use the term "MTN" in this section to refer collectively to the MTN family of companies.  Unless otherwise specified, when Plaintiffs use that term to describe MTN's conduct in Afghanistan, "MTN" refers to conduct that was implemented on the ground by MTN Afghanistan and approved by both MTN Group and MTN Dubai, and when Plaintiffs use that term to describe MTN's conduct in Iraq and concerning Irancell, "MTN" refers to conduct that was implemented on the ground by MTN Irancell and approved by both MTN Group and MTN Dubai.

---

[445] In such a business model, one can ordinarily infer a reasonable estimate regarding the range of monies the hub  (here, MTN Group) can be presumed to be reinvesting back into the spoke (here, MTN Irancell), so that the latter can sustainably grow.  On information and belief, MTN Group reinvests at least five percent (5%) of MTN Group's net income derived directly or indirectly from MTN Irancell back into MTN Irancell.

2. **MTN Group, MTN Dubai, And All MTN Subsidiaries And Affiliates Worldwide Joined The Terrorist Conspiracy**

i. **MTN Group Effectively Serves As A Joint Venture Partner With MTN Irancell And Its Iranian Shareholders, The IRGC, Including Its Hezbollah Division And Qods Force**

923. MTN Group's business model depends on MTN Group's ability to remain well-resourced in order to make significant investments as necessary. This model recognizes that many MTN joint ventures and subsidiaries may have capital expenditure ("CapEx") challenges as they scale their business – a classic corporate function where MTN Group can, and ordinarily does, contribute funds and personnel.

924. During the 2010s, MTN Irancell tore through its CapEx. In a business model similar to that of MTN Group, MTN Irancell's CapEx issues were beneficial for MTN Group as it reflected growth and profit. On information and belief, MTN Group provided one or more infusions of cash to MTN Irancell.

925. From 2003 through 2018, MTN Group served in an over-sized role compared to other competitors' parents: Global CEO (recall that MTN Group's CEO committed every MTN entity to the Letter Agreement); Global Logistics and Supply Chain, Global Back-Office;; and Global Financier. Simply put, MTN Group did it all.

926. From 2004 through 2018, MTN Group operated in a top-down manner that regularly disregarded the corporate form when necessary to advance the conspiracy. Examples include, but are not limited to:

- MTN Group disregarded the corporate form when MTN Group's President & CEO executed the secret Letter Agreement with the IRGC, including its Hezbollah Division and Qods Force, on behalf of every "MTN" entity worldwide.

- MTN Group and MTN Mauritius disregarded the corporate form when MTN Group's President & CEO instructed another MTN executive to approve a $400,000 "necessary payment" (i.e., a bribe) out of the MTN Mauritius account after MTN Group secured the Irancell license. The decision by MTN Group's President and CEO to take the key

$400,000 bribe off MTN Group's books reflected the MTN Group President and CEO's consciousness of guilt.

- MTN Group disregarded the corporate form when MTN Group routinely made decisions on behalf of MTN Nigeria while the Nigerian government investigated allegations concerning allegation that MTN Nigeria facilitated operations by Boko Haram.

927.    Beginning in 2004, MTN Group and MTN Dubai pursued an aggressive expansion in the Middle East, in which MTN Group and MTN Dubai worked together to dominate the "virgin" mobile markets of Iran, Afghanistan, Lebanon, Syria, and Yemen.

928.    By 2004, few "virgin" market opportunities remained in the world.  The collective market share attributed to this Iranian-dominated "Shiite crescent" of Iran, Syria, and Lebanon, combined with the two other nations where Iran actively fomented terrorist proxies (Afghanistan and Yemen), was by far the most lucrative "virgin" mobile phone market opportunity in the world at the time.

929.    MTN Group and MTN Dubai knew that the IRGC, through its subordinate divisions, Lebanese Hezbollah and the Qods Force, actively sponsored anti-American terrorism in all five of the markets they coveted:  Iran, Syria, Lebanon, Afghanistan, and Yemen.

930.    Mobile phone companies like MTN Group and MTN Dubai are heavily dependent upon infrastructure vulnerable to terrorist attacks.  As a result, MTN Group and MTN Dubai knew they would have to reach an agreement with the IRGC, which was the only way MTN Group and MTN Dubai could win the business, not just in Iran, but also in its client states (e.g., Syria, Lebanon), or where it played a spoiler role (e.g., Afghanistan).  This meant MTN

Group and MTN Dubai had to make a deal with the IRGC as the latter exercised a de facto veto over the telecoms' procurement decisions in Syria and Lebanon (among other places).).[446]

> ii. **On September 18, 2005, MTN Group's CEO And President Caused Every MTN Entity Worldwide To Join the Terrorist Conspiracy When He Executed The IRGC's "Security" Agreement On Behalf Of MTN Group, MTN Dubai, And All MTN Subsidiaries, i.e., "MTN"**

931.  MTN secured its joint venture with the IRGC, including its Hezbollah Division and Qods Force — i.e., MTN Irancell — through MTN's direct contractual promise to the IRGC, its Hezbollah Division, and Qods Force.  This was done in order to aid the IRGC and Qods Force terrorist enterprise and MTN's corrupt payments to one or more IRGC and Qods Force agents.

932.  A leaked report from a South African intelligence agency confirmed MTN Group's terrorism quid-pro-quo with the IRGC.  One month after the September 2005  in which MTN Group's CEO signed the secret Letter Agreement pledging "security" assistance to the "Iranian shareholders," i.e., the IRGC, which at that time was an Iranian delegation led by the head of Iran's Supreme National Security Council, Hassan Rouhani.

> iii. **After Joining The Conspiracy, MTN Group And MTN Dubai Routinely Acted In Furtherance Of The Conspiracy**

933.  MTN Group and MTN Dubai joined the conspiracy more than sixteen (16) years ago in 2005, when MTN Group's President and CEO executed the IRGC's terrorist template contract on behalf of all MTN entities worldwide.  This committed MTN Group, MTN Dubai,

---

[446] MTN Group and MTN Dubai each have deep experience doing business throughout the Middle East.  As such, they knew of the widespread, and often reported, practice of the IRGCIRGC, through Lebanese Hezbollah and the Qods Force, to regularly interfere in the ministerial decisions of its neighbors on commercial, military, and political matters.  MTN Group and MTN Dubai therefore knew that all roads to the business in Lebanon, Syria, Afghanistan, and Yemen traveled through the "Iranian Shareholders," i.e., the IRGC, including its Lebanese Hezbollah division and the Qods Force.

and every other MTN entity to provide "security" assistance to the "Iranian Shareholders,"
meaning the IRGC, including its Hezbollah Division and Qods Force.

934.    MTN Group and MTN Dubai have not exited the conspiracy.

935.    MTN Group acted as an international logistics and financial agent for the IRGC,
including its Hezbollah Divisions and Qods Force.  In doing so, MTN Group acted within the
scope of the instruction from MTN Group (the principal) in the Letter Agreement from the
"Iranian Shareholders," committing the MTN Group to assist the "security" operations (i.e.,
terrorist attacks) of Lebanese Hezbollah and the Qods Force.  Indicia of MTN Group's service as
an agent for the IRGC include, but are not limited to:

- MTN Group represented the Iranian Shareholders as their purchasing agent, and
  coordinated efforts to obtain vital U.S. technology that aided bomb and rocket
  construction and terrorist surveillance, as requested by IRGC-QF and Lebanese
  Hezbollah, reaching into U.S. to acquire such gear;

- MTN Group Repeatedly sourced precious U.S. dollars to funnel to IRGC-QF as bribes
  ($400,000) or to pay to others as bribes in order to help further conceal IRGC-QF front
  companies, including pursuing a scheme to bribe the South African UN delegation in
  order to successfully kill a UN resolution that would have sanctioned IRGC-QF front
  companies necessary to the terrorist enterprise;

- MTN Group provided public relations support and crisis management services designed
  to benefit the IRGC-QF front, MTN Irancell, by coordinating the strategic
  communications response to media stories, government investigations, and/or lawsuits
  that exposed MTN Irancell as an IRGC-QF front;

- MTN Group Organized IRGC-QF finances and managed IRGC-QF assets through
  Irancell, and MTN Group had to reach into the United States to do so because of the
  complicated technology that MTN used, which relied on purloined American technology;

- MTN Group coordinated the secret use of U.S. IT experts to handle sensitive tasks that
  Irancell personnel could not, knowing that such contractors were performing their work
  from the U.S. (indeed that was the point, since MTN needed people who had U.S. tech
  expertise); and

- MTN Group prepared detailed studies at the request of the IRGC-QF that were designed
  to improve Iranian weapons capabilities, with a specific understanding that the IRGC-

QF's primary target was the United States, and therefore that the weapons studies they were sharing would target the U.S.

### iv. MTN Group's And MTN Dubai's Recent Conduct Demonstrates That MTN Group And MTN Dubai Remain Active Co-Conspirators With Foreign Terrorist Organizations

936.    In 2004, Iran awarded a cellular-phone license to MTN's competitor, Turkcell. MTN then engaged in a corrupt scheme to take the license away from Turkcell and enter the Iranian market itself.  MTN's efforts were successful and led it to acquire a 49% stake in Irancell – a joint venture with an Iranian government-controlled consortium.  MTN internally called its corrupt scheme to enter the Iranian market "Project Snooker".[447]

937.    MTN threw itself into Project Snooker with abandon, dedicating senior MTN Group executives to the mission, including, but not limited to, its President and CEO, Commercial Director, and the regional head responsible for the Middle East.

938.    On November 16, 2004, MTN's Commercial Director, Irene Charnley, documented MTN's aggressive support for the terrorist agenda of the IRGC, including its Hezbollah Division and Qods Force.  In a fax to Iranians, Ms. Charnley provided MTN's help to Iranian efforts to violate terror-related sanctions against the IRGC, including its Hezbollah Division and Qods Force, by sourcing "major components" for American-made "Bell" and "Sikorsky" helicopters that were intended, in part, for "military use" by the IRGC, including its Hezbollah Division and Qods Force.

939.    Project Snooker required close cooperation between MTN and the Iranian government.  On July 5, 2005, MTN sent a letter from its CEO to two Iranian terrorists, one of whom was the former Chief of Staff of the IRGC who had led the Bonyad Mostazafan and the

---

[447] *See* Memorandum from Phuthuma Nhleko to Sifiso Dabengwa *et al.*, *Overview & Way Forward – Project Snooker* (Sept. 21, 2005) ("*Project Snooker Mem.*").

IEI, which were the two terrorist fronts with which MTN was attempting to join in the Irancell

joint venture (the "July 5, 2005, Letter"). In the July 5, 2005 Letter, MTN Group wrote to its

prospective IRGC, including Qods Force, joint venture partner:

> We appreciated the very hospitable manner that you received the MTN Group executive team. During the course of my visit it became clear to me that your organisations play a very important role in the economy of the Islamic Republic of Iran. I was also convinced that your organizations together with MTN could create a partnership that would be ***mutually beneficial*** in ***meeting all our objectives*** in the telecommunications sector in Iran.

> I would be honoured if you could find the time to pay a visit to the MTN Group Head Office in … South Africa … [in] July 2005. … [D]uring your visit, … [t]he two key discussion points are:

> 1. The nature and extent of ***financial assistance that the MTN Group could provide to the Iranian partners*** in the Second Mobile licence in Iran.

> 2. The nature and extent of the co-operation between your esteemed organizations and the MTN Group in current and future telecommunications projects in Iran. [Emphases added.]

940.    The negotiations were successful. On September 18, 2005, MTN Group signed a

Letter Agreement with the IRGC and Qods Force fronts with whom MTN had been negotiating.

It gave MTN the right to participate in the MTN Irancell joint venture as a junior partner with a

49% stake, leaving 51% collectively – and all decision-making authority – to MTN's two

partners that MTN knew were IRGC and Qods Force fronts (hereinafter, the "Letter Agreement"

or "Agreement"). MTN's Letter Agreement with the IRGC, including its Hezbollah Division

and Qods Force, is attached hereto as Exhibit A.

941.    On information and belief, the Letter Agreement was drafted by the IRGC,

including its Hezbollah Division and Qods Force, and constitutes the IRGC's and Qods Force's

"template" for the terms under which Iranian terrorist fronts in industries essential to the terrorist

enterprise are permitted to enter business arrangements with foreign companies such as MTN

and ZTE.  The Letter Agreement is replete with indicia that it was drafted by the IRGC, including its Hezbollah Division and Qods Force, rather than a sophisticated multinational corporation like Defendants.  Such indicia include but are not limited to: (1) the reference to God at the start of the Agreement; (2) the inclusion of the Islamic calendar date (27/06/1384) in the Agreement; (3) the generic reference to "Iranian shareholders," rather than any specific reference to any specific Iranian entity; and (4) the inclusion of a blank space for the handwritten insertion of certain terms.  Here is how the Agreement begins:



In the Name of God

**Letter Agreement**

On September 18, 2005 (27/06/1384)  this letter agreement is concluded between local shareholders of Irancell Consortium and MTN, regarding the manner and conditions of transfer of 49% of Irancell Consortium shares to MTN. Parties herein agreed as follows:

942.    The Letter Agreement pledged broad cooperation between MTN Group and its IRGC, including Qods Force, partners in furtherance of Iran's terrorist agenda.  Section 8 obligated MTN Group to assure that, with respect to its new "Iranian shareholder[]" partners, "[t]he cooperation between MTN and Iranian shareholders should be in the line of defensive, security and political cooperation."  Notably, Section 8 expressly contemplated that MTN would work with new IRGC partners outside of Iran:  "MTN shall fully support cooperation regarding the aforementioned issues in South Africa."

943.    Thus, MTN officers, employees, and agents directly partnered with Qods Force operatives because when MTN "fully" cooperated on "security" matters with IRGC operatives

and agents outside of Iran as it contractually promised to do, MTN was directly aiding Qods

Force terrorists because IRGC personnel acting outside of Iran are Qods Force.

944.    The Letter Agreement's deliberate ambiguity through its repeated generalized

references to "Iranian shareholders," rather than the Iranian entities with which MTN Group was

reportedly partnering, was itself an indication of, and evidence that, the Iranian shareholders in

MTN Irancell were fronts, operatives, and agents for the IRGC, including its Hezbollah Division

and Qods Force.  Indeed, the execution of the Agreement was deliberately designed to obscure

each signatory:



945.    The Letter Agreement did not merely obligate MTN Group to help the IRGC,

including its Hezbollah Division and Qods Force, source weapons in furtherance of the IRGC's,

including the Qods Force's, "security" agenda.  It also obligated MTN to both pay its new IRGC

front partners as well as serve in effect as their financial manager:

- Section 2 required that MTN Group "agreed to put in trust twenty-one (21) percent of
  Irancell Consortium before Bank Melli as trustee."  Bank Melli is another IRGC,
  including Qods Force, front and has been sanctioned by the U.S. government.

- Section 3 required that MTN pay the IRGC, including its Hezbollah Division and Qods
  Force, hundreds of millions of dollars in up-front license fees as a condition for becoming
  the new junior partner in the Irancell joint venture, and that "MTN and Bank Melli shall
  be responsible for arranging project financing."

- Section 7 set forth an additional catch-all provision designed to route additional money
  from MTN Group to the IRGC, including its Hezbollah Division and Qods Force, and
  provided that:  "[t]he costs and expenses incurred by Iranian shareholders" – i.e.,
  Irancell's two IRGC, including Qods Force, fronts – "if any, due to transfer of Irancell's
  share to MTN shall be compensated by MTN."  On information and belief, MTN routed

295

millions of additional dollars to the IRGC, including its Hezbollah Division and Qods Force, under Section 7.

946.     Although MTN was the IRGC's, including Qods Force's, junior partner in the MTN Irancell joint venture, the Letter Agreement nonetheless empowered MTN with the legal authorities it needed to effectively shut down the IRGC's, including the Qods Force's, ability to weaponize MTN Irancell as an instrument of terror.  Most directly, MTN could immediately and unconditionally announce its plans to rapidly exit the joint venture.

947.     MTN is also responsible for MTN Irancell's conduct because MTN had (and continues to have) veto power over most of the major decisions at MTN Irancell, similar to the veto possessed by its joint venture partners, the terrorist fronts Bonyad Mostazafan, and IEI.  For example, Section 5.1 of the Agreement provides that:

> The resolutions on the below mentioned issues require the affirmative votes of MTN:
>
> - Annual business plans and budgets of [MTN Irancell], including, but not limited to, medium and long term financing;
>
> - Major acquisitions, partnerships, formation of joint ventures or consortiums;
>
> - Discontinuation of business activities;
>
> - Entering into any agreement with persons, individuals or entities that are directly or indirectly related to Non-Iranian or Iranian Shareholders;
>
> - Charging the assets of the Company in any manner which could have significant impact on the Company's ability to use or benefit from its assets in its ordinary course of business;
>
> - Profit appropriates and dividend policy; and
>
> - Approval of annual accounts.

948.     The Letter Agreement confirmed that MTN promised to provide other "off-the-books" value to the Iranian Shareholders with whom MTN had partnered in MTN Irancell,

which was itself another obvious reference to MTN's support for the IRGC's, including the Qods Force's, terrorist enterprise. Section 9 provides, "for this agreement to be effective, it is necessary that the above-mentioned documents and related agreements be signed by MTN as well as to pay license fee and equity as provided in item 3 above [i.e., Section 3 of the Agreement] within 20 days from the signature of Addendum No. 1 to [sic] license agreement, simultaneously, the parties try to finalize the other relevant operational agreements."[448]

949.     MTN Group and its "Iranian shareholder[]" joint venture partners went to great lengths to keep the Letter Agreement a secret. The Letter Agreement was a "close hold" document at MTN Group and was only known to a select group of senior MTN Group executives because MTN understood that it memorialized an obviously illegal scheme between MTN Group and two fronts for the IRGC, including its Hezbollah Division and Qods Force. MTN Group also conspicuously failed to obtain any sign-off from any of MTN's elite, white-shoe global law firms, none of which would have approved the Letter Agreement.

950.     Before MTN Group's President signed the Letter Agreement, a senior official on behalf of the IRGC stated to MTN Group, in sum and substance, that the Letter Agreement was the standard template that the Iranian Shareholders use when a counter-party agrees to assist, among other things, the Iranian Shareholders' "security" operations.

951.     MTN Group, including its President, knew this statement to be a direct reference to IRGC proxy terrorist attacks targeting Americans around the world.

---

[448] In the Letter Agreement, the number "1" in this sentence is handwritten into what was obviously a placeholder.

952.    MTN Group deliberately concealed the fact that its President and CEO signed the Letter Agreement.  On information and belief, MTN Group has never publicly admitted that MTN Group's President and CEO signed the Letter Agreement.

953.    MTN Group's attempts to conceal the Letter Agreement, and the fact that MTN Group's President and CEO signed the Letter Agreement, reflects consciousness of MTN Group's guilt and MTN Group's recognition that its promise to assist the Iranian Shareholder's "security" operations, i.e., anti-American terrorism, was illegal.

954.    One MTN executive later stated that MTN recognized that it was dealing with a counterparty was comprised of violent killers (referencing the "Iranian Shareholders") whom MTN Group knew ordinarily went around making people mafia-like an "offer they could not refuse," which referred to the negotiating strategy of a violent mafia crime family in the iconic mafia movie, *The Godfather*, in which Don Vito Corleone secured favorable commercial terms that advanced his mafia empire by making a counterparty "an offer he could not refuse," in which he promised to murder the counterparty if he did not give Don Corleone what he desired.[449]  On information and belief, officers, managers, employees, and agents of MTN Group and MTN Dubai regularly expressed similar sentiments.

955.    MTN Group's executives quickly got to work after MTN Group executed the Letter Agreement on September 18, 2005.  Three days later, MTN's President and CEO, Mr. Nhleko, circulated a memorandum from himself to five senior MTN executives (the "September 18, 2005 Memo").  Captioned "**<u>STRICTLY CONFIDENTIAL</u>**" and headed with the subject

---

[449]    In the movie, a recalcitrant counterparty refuses to sign a contract demanded by Don Corleone, who dispatches his muscle to communicate to the counterparty that "either his brains or his signature" will be on the contract, which causes the contract to be executed.

"**OVERVIEW AND WAY FORWARD – PROJECT SNOOKER**," the September 18, 2005

Memo provided, in part, as follows:

1. **OPPORTUNITY**
   Project Snooker still presents *one of the most significant "virgin" mobile opportunities in the world*. … [N]otwithstanding the significant challenges that lie ahead, [MTN] must continue to pursue this opportunity vigorously.

2. **CURRENT STATUS**
   *The signing of the various agreements this week [under duress]* was to "book our place at the foot of the mountain – we still need to scale it to get to the peak." It was a choice between inheriting an advanced arrangement [Turkcell revenue share and various negotiated agreements] or taking the chance that the window of opportunity may close on us whilst we try to reconstruct the deal and arrangements from scratch. We chose the former.

3. **RISK AND REWARD**
   *Snooker is "no normal country".* The Ministry of Defense, Government controlled banks and companies, together with Government *essentially control all the commercial activity in the country*. *Consequently, a conventional mindset, orthodox financial and operational approach to this project is unlikely* to provide us with an outcome that I would feel comfortable to recommend to the board on an investment of over €400 million [license fee and working capital] into Snooker. It is therefore imperative to *think laterally on how we can secure the investment* … in a manner that allows us to penetrate the market achieving an acceptable IRR [i.e., "internal rate of return," a measure of investment profitability]. …

4. **TIMING**
   The expectation is that the license fee should be paid within weeks and the operation launched commercially within a six month period. … The implied time scale can only be achieved through a well thought out and coordinated project management structure up …

5. **PROJECT MANAGEMENT**
   *Given the size of the market*, limited time to launch and all that has to be reviewed and completed before the MTN Group board ratifies the revised business plan, *a special project structure must be put in place*. …

   5.1.2 **Finance Structure, project funding and ancillary loan agreements**
   The Group CFO should take responsibility for this area, primarily in the following categories:
   - Flow of license fee and working capital

299

- Appropriate security arrangements for funding of local partners together with the loan agreements
- Arranging the project finance …

6. **PROJECT STEERING COMMITTEE** [sic]
I will chair a project steering committee that will have the responsibility of meeting regularly to oversee both Phase I and Phase II until the project is passed onto the MD / COO. The Steering Committee shall comprise of:
CEO
COO
CFO
CTO
Commercial Director
Group Executive HR …

8. **CONCLUSION**
***This is one of the most significant opportunities the Group will undertake*** and will require teamwork to achieve these objectives. [Emphases added; formatting adjusted.]

956. After MTN's executive team successfully executed Project Snooker, the conservative-dominated and Qods Force-applauding Iranian parliament determined that MTN's operation of Irancell would improve Iran's "security."

957. Project Snooker was successful not only because MTN pledged strategic cooperation with the Iranian government, but also because MTN made corrupt payments to government officials, at least one of which it structured as a sham consultancy payment. On December 11, 2006, MTN Group's CEO instructed MTN Group's CFO to "finalise all agreements with the consultants" who had "assisted the Company" in obtaining the Iran deal. The first agreement called for MTN Group to make a $400,000 payment for the benefit of an Iranian government operative. The payment was effectuated through an MTN Group subsidiary, MTN International (Mauritius) Limited, and sent to a consulting firm owned by the Iranian operative's associate. On April 4, 2007, MTN wired the $400,000 to the putative "consultant." MTN has never proffered a legitimate explanation for that payment.

300

958.     MTN's second corrupt payment was to South Africa's ambassador to Iran. MTN's Iran Director has admitted to paying the Ambassador $200,000 in cash out of his own funds, which he tied to cooperation in helping MTN secure its equity interest in Irancell.

959.     MTN Group's senior executives knew of, and approved, MTN Group's bribes to the IRGC, including Qods Force, agents who helped MTN secure the Irancell joint venture.  For example, on December 11, 2006, MTN's President and CEO, Mr. Nhleko, wrote a memorandum to MTN Group's commercial director, in which Mr. Nhleko authorized MTN's bribes (the "December 11, 2006 Memo").  The December 11, 2006 Memo provided, in full, as follows:



# MEMORANDUM

| | | |
|---|---|---|
| TO | : | IRENE CHARNLEY |
| DATE | : | 11 DECEMBER 2006 |
| FROM | : | PHUTHUMA NHLEKO |
| **SUBJECT** | : | **CONSULTANCY AGREEMENTS** |

Dear Irene

With reference to the process in terms of which MTN International (Mauritius) Limited acquired a 49% equity interest in Irancell, you are authorized to finalise all agreements with the consultants that assisted the Company during the run up to and actual negotiating period, and to effect the necessary payments.

Kind regards

**PHUTHUMA F. NHLEKO**
**GROUP PRESIDENT & CEO**

960.     The phrase "necessary payments" in the December 11, 2006 Memo was a direct admission that the consultancy payments were bribes. Indeed "necessary payments" has long been understood to refer to bribery.

961.    A host of other highly confidential internal MTN Group documents, leaked by a whistleblower, also confirm that MTN Group's executives directed MTN's financial, technological, and operational support for MTN Irancell and the IRGC, including Qods Force, fronts that controlled Irancell.  For example, a March 25, 2007 memorandum from MTN's regional manager responsible for Iran, Chris Kilowan, and MTN's CEO, Mr. Nhleko extensively documents MTN Group's illicit activities (the "March 25, 2007 Memo").

962.    The March 25, 2007 Memo was intended to remain highly confidential, as reflected by what is set forth at the top of it:



**MTN GROUP LIMITED**

**MEMORANDUM – HIGHLY CONFIDENTIAL**

**To:**    Phuthuma Nhleko

**From:**    Chris Kilowan

**Date:**    25 March 2007

**Re:**    Ambassador Briefing: Larijani, Mottaki and MTN

963.    In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that "it was the [President of South Africa's] view that the matter of MTN has nothing to do with the Government of South Africa as it is a private business in which the Government of South Africa plays no role."

964.    In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that he had met with "Mr. Motakki" on behalf of the "Minister of Foreign Affairs."  On information and belief, "Mr. Motakki" was an IRGC,

including Qods Force, cut-out who was either relaying a message from the IRGC or acting as an IRGC operative himself.  In the Memo, MTN's regional director for Iran told its CEO that Mr. Motakki "re-iterated [the IRGC's, including the Qods Force's] understanding that MTN was allowed to replace Turkcell in exchange for defence co-operation," and that "the office of the Supreme Leader" had personally intervened based upon the conclusion by the IRGC, including its Hezbollah Division and Qods Force, "that there are significant defence benefits in it for [the IRGC, including its Hezbollah Division and Qods Force,] were MTN to be allowed into the process.  On that basis [the IRGC, including its Hezbollah Division and Qods Force] withdrew their objections [to a foreign company playing a role in the Iranian telecom sector] and allowed the process to proceed in MTN's favour."

965.    In the March 25, 2007 Memo, MTN's regional director responsible for Iran confirmed to MTN's President and CEO that MTN had only become a candidate for the Irancell joint venture after it had promised to pledge to aggressively support the "security" needs of the IRGC, including Qods Force, fronts that controlled the Bonyad Mostazafan and IEI.  He noted, as a "brief recap of history," that "MTN only seriously got back into the [bidding] process" after its Iranian counterparties perceived that MTN would affirmatively aid their "security" needs.

966.    In the March 25, 2007 Memo (emphases added), MTN's regional director for Iran underscored to MTN's President and CEO that MTN would need to serve as a weapons supplier for its Iranian counterparties if it wanted to win and maintain its position in the joint venture:

> It would seem clear that the issue of ***defence co-operation*** has become a pressing matter with the government of Iran.
>
> If regard is had to the latest UNSC [i.e., U.N. Security Council] Resolution there is a clear move towards dealing with Iran's conventional weapons capability. … Russia has traditionally played the ***role of key weapons supplier*** to Iran.  Given recent developments …, [Russia] is actively looking at more secured suppliers of defence materials. … Because the entire political situation has now deteriorated

significantly it is highly unlikely that the Government of South Africa will be prepared to sign any defence agreements or deliver defence materials to Iran.

Given the *clear linkage that the Government of Iran has drawn between the defence assistance and allowing MTN into the country the likelihood that there will be serious blowback for MTN is increasing*.

Because there has been a recognition of the *non-business imperatives that drove MTN's entry into Iran*, the Distant Thunder … projects have been developed to deepen MTN's position, as opposed to and distinct from Irancell, inside Iran so that MTN would be able to rely on broad popular support for its continued presence. More recently a more mid to long range strategy has been proposed to ensure that MTN puts in place an exit strategy that would ensure that it not be caught in a situation where it loses its entire investment in the country. …

I am preparing a document that spell out the range of actions that can be taken against MTN and will submit that to you as soon as it is complete. In summarized form it can be said that there is every possibility that MTN could be effectively isolated from Irancell with very little negative effect on Irancell.

While 1 million subscribers will act as a defensive buffer for Irancell, it does not provide the same protection for MTN. This is because these subscribers are reflected locally as Irancell subscribers and not MTN. *All the innovations are not sold as MTN innovations but as Irancell's*. …

To give MTN a realistic chance to navigate through what is potentially going to be a difficult few months (if not years until the end of the current presidency in 2009), I make the following recommendations:

1. Implementation of Project Distant Thunder at the earliest opportunity. We could pre-empt some of the activity that is almost certain to be started in the public sphere against MTN. … (Dimension 1)

2. Approval of the creation of the committee to pursue mid to long term strategies for MTN's investment in Iran. (Dimension 2)

3. Finalisation of the diplomatic support initiative. The *first consultant is still waiting for the transfer of the agreed amount. This is causing considerable anxiety in his mind and going forward we are going to need his support.* We still have not given the second consultant any indication whether we are seriously considering his request. He too is developing some anxiety and I have to field almost daily questions on it. (Dimension 3)

967. A November 10, 2007 memorandum from MTN's regional manager responsible

for Iran, Chris Kilowan, and MTN's then-CEO, Mr. Nhleko, further documented MTN Group's

open support for the illicit activities conducted by the fronts operating on behalf of the IRGC, including its Hezbollah Division and Qods Force, with whom MTN had partnered in Irancell, including MTN partners whom MTN nicknamed "Short John" and "Long John" (the "November 10, 2007 Memo").  On information and belief, the Iranian operative whom MTN derisively nicknamed "Short John" was an agent for the IRGC, including its Hezbollah Division and Qods Forces.

968.    The November 10, 2007 Memo was labeled "**STRICTLY CONFIDENTIAL**" in bright red bolded all-caps font and was titled "**SUBJECT: OUTSTANDING ISSUES**" in bolded all-caps black font.  In it, MTN's executive for Iran communicated to MTN's CEO that:

> Pursuant to [our] last communication … I set out below the issues that I believe are still outstanding [] and will have an impact … on MTN's investment. …

> **2.  FINALISATION OF CONTRACT WITH SHORT JOHN**

> Subsequent to our last discussion on this matter [in early 2007] I did not do anything about the agreement, preferring to wait until December [2007] to do an agreement … I can certainly state that [Short John] has **come to the party on every occasion that I called upon him**.  The fact that the **quid pro quo that has threatened at one stage to be the primary stick with which we could be hit has now largely disappeared** because of his efforts.

> The initial concessions on promised support for the revenue share issue was **because of his direct involvement** … With me out of the picture he will probably be the only friendly source of information and interaction for MTN on this side.  I would recommend that **MTN finalise arrangements with him and offer fair compensation commensurate with the huge role he has played right from the outset**.

> **3.  RENEWED APPROACH BY LONG JOHN**

> I have communicated this to you a few weeks ago and recently forwarded an SMS from him.  The background to this new approach is centered in planned developments within the area that he is currently working.  Whatever his motivations, it is not something that should be ignored.  While he has very little power to do anything positive, **he can be a destructive force** or simply an unnecessary distraction. …

### 6. PERSISTENT NEGATIVE VIEWS ABOUT SOME MTN EXPATS

> I beg your forgiveness if I sound like a record with a stuck needle but I …
> alert[] you to a serious risk to MTN's investment. … In [Mr. Mokhber's] view
> MTN made a mistake and inflicted a huge insult on Iran by placing [a woman]
> here [as Chief Operating Officer of MTN Irancell]. …

(Bolded all-caps emphases in original; bolded italicized emphases added.)

969.     In June 2018, South Africa's anti-corruption police – called the "Hawks" – raided the offices of MTN and its outside counsel as part of an investigation into Irancell-connected bribery.  Roughly eight months later, the Hawks also arrested the former Ambassador whom MTN had bribed.  On information and belief, that investigation remains ongoing.

970.     One reason MTN chose to become the IRGC's, including the Qods Force's, joint venture partner was the potential for enormous profits.  As the *Financial Times* reported at the time in 2013, "[a]s the international community was weighing whether to impose yet more sanctions on Iran over its nuclear programme, [MTN President and CEO] Phuthuma Nhleko was making other plans.  Instead of seeing a country with mounting political problems, Mr Nhleko saw a nation with relatively few mobile phone users.  Iran, he reckoned, could quickly add 2.5m-3m new customers for MTN Group, the mobile phone company he was running in 2006."[450]

971.     After MTN secured its joint venture with two fronts for the IRGC, including its Hezbollah Division and Qods Force, MTN's President and CEO, Phuthuma Nhleko, "laughed off questions about the political risk of doing business with Iran."[451]  As he chuckled in a discussion with investors after closing the deal with the Iranians, he stated "[MTN] hadn't

---

[450] Lina Saigol and Andrew England, *Telecoms: Dealings in the Danger Zone; MTN of South Africa's Ventures in Iran and Syria Have Dented Its Reputation and Rattled Shareholders*, Financial Times (July 2, 2013) ("Saigol and England, *Telecoms: Dealings in the Danger Zone*").
[451] *Id.*

budgeted for bomb shelters or anything like that."[452]  MTN's CEO's choice to literally "laugh

off" questions about the obviously dire risks associated with MTN's new joint venture in Iran

typifies MTN's deliberate choice to align itself with anti-American terrorists as the cost of doing

business as the IRGC's, including the Qods Force's, junior partner in the MTN Irancell joint

venture.

972.    MTN continued to pursue Project Snooker even after the U.S. Undersecretary of

the Treasury told Turkish officials that Irancell was "fully owned" by the IRGC, including its

Hezbollah Division and Qods Force.  Undersecretary Levey did so as part of a campaign in

which he alerted every major western business and financial partner of the IRGC, including its

Hezbollah Division and Qods Force, about the inherent terrorism risks attendant to any

transactions with fronts for the IRGC, including its Hezbollah Division and Qods Force.  On

information and belief, Undersecretary Levey told MTN Group that Irancell was "fully owned"

by the IRGC, including its Hezbollah Division and Qods Force, and, by extension, when Irancell

operated outside of Iran, Qods Force operatives were in charge.

973.    MTN's bribes and alliance with the IRGC, including its Hezbollah Division and

Qods Force, "is a saga that illustrates the extraordinary risks MTN has taken to profit from doing

business with pariah states."[453]

---

[452] *Id.*

[453] *Id.*

3. **MTN Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including Lebanese Hezbollah's And The Qods Force's, Terrorist Enterprise Against Americans Worldwide**

974. For more than fifteen years, MTN Group and MTN Dubai has served as a reliable joint venture partner for the world's worst terrorist organization, the IRGC, including its Hezbollah Division and Qods Force.

975. MTN Group coordinated with MTN Dubai to manage the procurement scheme. On information and belief, MTN Group directed the conduct of the purported "third parties" in the U.A.E. who were, in fact, shared corporate covers acting on behalf of both MTN Group, MTN Irancell, and the IRGC, including its Hezbollah Division and Qods Force.

976. MTN Group specifically decided that MTN Group and MTN Dubai would closely coordinate to extract vast amounts of state-of-the-art American technologies from the U.S. marketplace on behalf of MTN Group's IRGC partners. In its Special Report, *Reuters* explained, "[a]ccording to a person familiar with the matter, ***MTN [Group] was determined that MTN Irancell procure substantial amounts of U.S. equipment***: The U.S. products had ***performed well in its other networks***, and the ***company's technicians were familiar with them***."[454]

977. MTN Group, and its employees, set out to evade America's IRGC-related terrorism sanctions. According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell."[455]

---

[454] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[455] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

309

978.    MTN Group's employees understood that their transaction activities on behalf of the IRGC were illegal.  According to Reuters, "internal [MTN Group] documents" "show that MTN [Group] employees" "address[ed] the potential consequences of getting caught" in written MTN Group documents.[456]

979.    MTN Group's C-Suite directed its support for the conspiracy, and continued doing so even after MTN Group finished pilfering the Irancell license from Turkcell in 2005:

> The new MTN documents appear to detail an ***intentional effort to evade sanctions***.  For example, a January 2006 PowerPoint presentation prepared for the project steering committee - ***comprised of then top-level MTN executives*** - includes a slide titled "Measures adopted to comply with/bypass US embargoes." It discussed how the company had decided to outsource Irancell's data centre after receiving legal advice.  "In the absence of applicable U.S. consents, it is a less risky route to MTN for Irancell to outsource data centre than it is to purchase restricted products," the PowerPoint slide says.[457]

980.    MTN Group, its executives, and employees, knew there were potential "civil and criminal consequences" to their scheme – and intensified it anyway:

> **"CIVIL AND CRIMINAL CONSEQUENCES"**
> According to [] internal procurement documents, right from the start MTN was well aware of what it termed "embargo issues" and the ***inherent risks involved***. A December 2005 PowerPoint presentation marked confidential and emblazoned with MTN's logo noted that the ***"Consequences of non compliance" included "Civil and criminal consequences."***  The PowerPoint slide added that the U.S. government could blacklist MTN, "which could result in all MTN operations being precluded from sourcing products/services from U.S. based companies."[458]

981.    MTN Group, its C-Suite, and its employees had actual knowledge of the scheme. MTN Group personnel routinely prepared written materials that memorialized the illicit

---

[456] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[457] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[458] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

importation of embargoed U.S. technologies, for the specific purpose of flowing the technology through to Iran, where MTN Group and its personnel knew there would be only one end recipient: the IRGC, including its Hezbollah Division and Qods Force. Per *Reuters*:

> A delivery schedule also dated June 2006 lists U.S. equipment needed for "value-added services," including voice mail and a wiretapping system. The schedule states that the equipment would be "Ready to Ship Dubai" that July and August. It estimates it would take two weeks to arrive in the southern Iranian port of Bandar Abbas by "Air or Sea/Road," and then up to 30 days to clear Iranian customs. According to a person familiar with the matter, the equipment ultimately arrived by boat. "It all showed up," this person said.[459]

982. MTN Group maintained "a lengthy spreadsheet of '3rd Party' equipment dated June 2006 that list[ed] hundreds of U.S. components - including servers, routers, storage devices and software - required for a variety of systems."[460]

983. MTN Group, and its employees, set out to evade America's IRGC-related terrorism sanctions. According to *Reuters*, "internal [MTN Group] documents" "show that MTN [Group] employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell."

984. From the course of negotiations with its IRGC, including Qods Force, counterparts in 2004 and 2005, MTN knew at all times that it was acting to benefit the IRGC's, including the Qods Force's terrorist agenda. MTN contractually agreed to benefit the "security" needs of its Iranian Shareholders (a direct reference to the two fronts for the IRGC, including its Hezbollah Division and Qods Force, with whom MTN agreed to serve as the junior partner in

---

[459] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

[460] Steve Stecklow, *Special Report: Documents Detail How MTN Funneled U.S. Technology to Iran*, Reuters (Aug. 30, 2012).

their shared joint venture).  MTN's agreement with the IRGC, including its Hezbollah Division and Qods Force, is attached hereto as Exhibit A.

985.    MTN Group and MTN Dubai knew that MTN's pledge to aid the IRGC's, including the Qods Force's, "security"-related efforts committed MTN Group and MTN Dubai to actively participating in the IRGC's, including the Qods Force's, terrorist enterprise against Americans outside of Iran, including in Iraq.

986.    MTN Group remained committed to its IRGC, including Qods Force, allies even after withering U.S. pressure.  For example, in or around 2010 or 2011, MTN representatives met with senior executive officials from the U.S. government.  During these meetings, MTN representatives falsely assured the U.S. government that they were not helping the IRGC, including its Hezbollah Division and Qods Force, or supplying them with any embargoed U.S. technology in violation of U.S. sanctions against Iran that are intended to deprive Iran the IRGC, including its Hezbollah Division and Qods Force, of the money and technology useful to the Joint Cells' shared terrorist enterprise.  MTN provided the U.S. such false assurances even after "MTN ha[d] carried out orders from the regime to shut off text messaging and Skype during times of political protest, and reportedly ha[d] a floor in its Tehran headquarters controlled by Iranian security officials."

987.    As the IRGC, including its Hezbollah Division and Qods Force, joint venture partner responsible for sourcing the most important technological items for modern terrorism – the communications, computing, and encryption technologies that were vital to attacking Americans – MTN assumed a key financial and operational role in the IRGC's, including the Qods Force's, terrorist enterprise, including their technological support of Hezbollah.

312

988.     Under the structure of the MTN Irancell joint venture, the two fronts for the IRGC, including its Hezbollah Division and Qods Force, that exercised 51% control of MTN Irancell – the Bonyad Mostazafan and IEI – had the mandate to promote the IRGC's, including the Qods Force's, "security" agenda, including the obligation to block any significant MTN Irancell-related transaction or commercial relationship unless it improved the IRGC's, including the Qods Force's, terrorism capabilities.  Given the IRGC's, including the Qods Force's, view that MTN Irancell was essential to IRGC, including Qods Force, "security" operations, the terrorist fronts that controlled MTN Irancell (Bonyad Mostazafan and IEI) would not have approved any material MTN Irancell transaction unless they determined that, on balance, the particular transaction improved the IRGC's, including the Qods Force's, ability to execute terror operations as the central element of the IRGC's "security" agenda.  As a result, one may infer that every significant commercial transaction and business relationship that MTN Irancell entered into was: (1) vetted by the IRGC, including its Hezbollah Division and Qods Force; and (2) determined by the IRGC, including its Hezbollah Division and Qods Force, to advance the IRGC's, including the Qods Force's, "security"-related capabilities, which was a specific Iranian euphemism for external terror operations.

989.     MTN was the lead target of a major public pressure campaign demanding that MTN exit its joint venture with the IRGC, including its Hezbollah Division and Qods Force.  For example, on March 7, 2012,  UANI "renewed its call on investors, affiliated institutions and potential customers to cease all business with South African telecommunications firm MTN in response to MTN Group President and CEO Sifiso Dabengwa's callous remarks and irresponsible posture on MTN's partnership with sanctioned Iranian entities that are linked to the

313

Islamic Revolutionary Guards Corps (IRGC)."[461]  MTN chose to stay in their alliance with the IRGC, including its Hezbollah Division and Qods Force, in the face of such pressure and even after nearly every other multinational had exited such ventures.

990.    From 2005 through the present, MTN's joint venture with MTN Irancell, and MTN's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and the Akbari Fronts, each provided tens of millions of dollars annually in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

### i.    MTN Assumed A Financial Role In The Terrorist Enterprise

991.    MTN assumed a financial role in the terrorist enterprise by, among other things, bribing its IRGC, including Qods Force, joint venture partners to win the Irancell license in the first instance, paying large license fees, and generating revenue for MTN Irancell throughout the operation of the joint venture.

992.    "In Iran, MTN has been accused of paying bribes to South African and Iranian officials to secure a licence there in 2005."[462]

### (a)    MTN's Bribes to Terrorist Fronts

993.    On information and belief, the recipient of MTN's $400,000 wire acted as a front, operative, or agent for the IRGC, including its Hezbollah Division and Qods Force.  On

---

[461] United Against Nuclear Iran ("UANI"), *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012); *see* Business Wire, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (broad international publication of this UANI press release).

[462] Agence France Presse English Wire, *South African Telecom MTN Gains Clients Despite Scandals* (Mar. 7, 2019).

314

information and belief, the recipient of MTN's $400,000 wire was a cut-out for MTN to route value to "Iranian shareholders" who were the IRGC, including its Hezbollah Division and Qods Force. The IRGC, including its Hezbollah Division and Qods Force, ensures that all economic value is shared amongst constituent parts of the organization, and would not have permitted such value transfer here relating to a contract decision-making process the IRGC, including its Hezbollah Division and Qods Force, controlled without obtaining their share of the payment under the IRGC's mafia-like revenue sharing practices.

994. MTN knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire was acting as a cut-out to allow money to flow through for the benefit of the IRGC, including its Hezbollah Division and Qods Force, which had proved vital to MTN's successful campaign to steal Turkcell's license.

995. MTN also knew, or recklessly disregarded, that the recipient of MTN's $400,000 wire instructed MTN to wire the money, in U.S. Dollars, to a bank account in the U.A.E., and therefore that the recipient of MTN's $400,000 wire was specifically acting as a pass-through for the benefit of the Qods Force because MTN's $400,000 wire instruction, on information and belief, caused a bank in the United States to send $400,000 to a bank account controlled by a cut-out for the IRGC, including its Hezbollah Division and Qods Force, acting in Dubai, which was the Qods Force's most notorious financial and logistical hub in the Middle East outside of Iran.

996. On information and belief, MTN regularly makes similar sham "consulting" payments like one that MTN used to attempt to justify MTN's $400,000 wire. Such. Such payments benefitted fronts, operatives, or agents for the IRGC, including its Hezbollah Division and Qods Force, in their MTN Irancell-related terrorist fundraising efforts from 2005 through today.

(b)     **MTN's License Fee Payments to Terrorist Fronts**

997.     After it corruptly secured the 15-year Irancell license, MTN Group Ltd. paid the IRGC, including its Hezbollah Division and Qods Force, through the Bonyad Mostazafan and IEI, an approximately $300 million license fee when it secured its 49% status as the junior partner in the MTN Irancell joint venture.  This money benefited the IRGC's, including the Qods Force's, terrorist enterprise, and the Qods Force received a substantial amount per standard practice by the IRGC, including Qods Force.

(c)     **MTN's Funding of Terrorist Fronts through MTN Irancell Cash Flow**

998.     MTN reaped enormous profits from its involvement in MTN Irancell, and sourced copious amounts of dual-use technology to benefit MTN Irancell and the IRGC, including its Hezbollah Division and Qods Force.  Indeed, by 2013, "MTN has faced a huge headache in seeking to get dividends out of Iran because stringent sanctions prevent[ed] banks from moving cash easily in and out of the country. MTN … ***was virtually printing money in Iran***, where it has a 46% share of the market."[463]

999.     Under MTN's joint venture with its two IRGC, including Qods Force, front partners in MTN Irancell, for every dollar (or Iranian Rial) MTN generated for the joint venture, MTN's terrorist partners received 51 cents to invest in their terrorist enterprise.  Thus, every dollar in profit for MTN Irancell inevitably helped fund Hezbollah's coordination of a nationwide insurgency against Americans in Iraq, the IRGC's, including the Qods Force's, industrial-scale production of EFP components, advanced rockets, and other high-tech weapons for use by Shiite terrorists against Americans in Iraq, and the aggressive forward deployment of

---

[463] Business Day Live, *Iran Deals Forced MTN Boss to Quit* (July 28, 2013) (emphasis added).

IRGC, including Qods Force, operatives throughout Iraq to partner with Hezbollah and Jaysh al-Mahdi to maximize the effectiveness of the Joint Cells maintained by the terrorist groups in Sadr City, Basra, and elsewhere.

1000.   Through its participation in MTN Irancell, MTN caused the IRGC, including its Hezbollah Division and Qods Force, to realize tens of millions of dollars per year in income that the IRGC, including its Hezbollah Division and Qods Force, used to fund terrorist operations against Americans in Iraq including, among other things, by funding Hezbollah and Jaysh al-Mahdi, including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah.

ii.      **MTN Assumed An Operational Role In The Terrorist Enterprise**

1001.   MTN Group and MTN Dubai deliberately provided "security" assistance to its JV partners, the "Iranian Shareholders," i.e., the IRGC, including its Hezbollah Division and Qods Force.  In its blockbuster Special Report breaking one MTN Group scandal, *Reuters* revealed that "internal documents seen by *Reuters*," showed that "MTN Group" "***plotted to procure embargoed U.S. technology products for an Iranian subsidiary through outside vendors*** to circumvent American sanctions on the Islamic Republic."[464]

1002.   According to Reuters, "[h]undreds of pages of internal documents reviewed by Reuters show that MTN employees created presentations for meetings and wrote reports that openly discussed circumventing U.S. sanctions to source American tech equipment for MTN Irancell. … [and] also address[ed] the potential consequences of getting caught."[465]  Indeed, "[t]he documents show that MTN was well aware of the U.S. sanctions, wrestled with how to

---

[464] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

[465] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

deal with them and ultimately decided to circumvent them by relying on Middle Eastern firms inside and outside Iran."[466]

1003.   On August 30, 2012, MTN Group issued a statement to *Reuters*, in which "MTN denied any wrongdoing."[467]  According to Reuters, "Paul Norman, MTN Group's chief human resources and corporate affairs officer," issued a statement to *Reuters*:

> MTN denies that it has ever conspired with suppliers to evade applicable U.S. sanctions on Iran or had a policy to do so.  MTN works with reputable international suppliers.  Our equipment is purchased from turnkey vendors and all our vendors are required to comply with U.S. and E.U. sanctions.  We have checked vendor compliance procedures and continue to monitor them and we are confident they are robust.[468]

1004.   MTN Group's denial was a lie, and MTN Group intended to conceal MTN Group's and MTN Dubai's membership in the IRGC's terrorist conspiracy, which MTN Group joined on behalf of itself and MTN Dubai in 2005, and from which MTN Group and MTN Dubai have yet to exit.  MTN Group's statement aided the IRGC's terrorist finance and logistics scheme by engaging in strategic communications targeted at the United States, which maintained MTN Group's status as a viable "cover" for the illicit fundraising and acquisition of embargoed American technologies by the IRGC, including its Hezbollah Division and Qods Force, while MTN Group was under close scrutiny.

1005.   As the IRGC's, including the Qods Force's, and Qods Force's chief outside telecommunications partner, MTN helped the IRGC, including its Hezbollah Division and Qods

---

[466] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

[467] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

[468] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

Force, grow their cellular-phone capabilities, evade American sanctions, and acquire embargoed

U.S.-made communications technology.

1006.  From 2005 through the present, MTN has illegally sourced embargoed dual-use U.S. technology at the request of the IRGC, including its Hezbollah Division and Qods Force, in coordination with MTN's Qods Force handlers in the U.A.E., where MTN and the IRGC, including its Hezbollah Division and Qods Force, coordinate their technical collaboration. Plaintiffs' belief is based upon, among other things, information and inferences based upon statements made by one or more witnesses, MTN's own internal documents, financial records, and investigations by major global media outlets.

1007.  For example, on June 4, 2012, *Reuters* reported on MTN leading efforts to

illegally acquire hundreds of dual-use, military-grade embargoed communications, telecom, and

computer technologies for the IRGC, including its Hezbollah Division and Qods Force:

> A fast-growing Iranian mobile-phone network managed to ***obtain sophisticated U.S. computer equipment despite sanctions that prohibit sales of American technology to Iran***, interviews and documents show.  MTN Irancell, a joint venture between MTN Group Ltd of South Africa and an Iranian government-controlled consortium, sourced equipment from Sun Microsystems Inc, Hewlett Packard Co and Cisco Systems Inc, the documents and interviews show.  MTN owns 49% of the joint venture but provided the initial funding. …

> Chris Kilowan, who was MTN's top executive in Iran from 2004 to 2007, said in an interview … [that] ***MTN's parent company, MTN Group, was directly involved in procuring U.S. parts for MTN Irancell***, which launched in 2006 and is now Iran's second-largest mobile-phone operator.  ***"All the procedures and processes around procurement were established by MTN,"*** he said.  He said the company ***agreed to allow its Iranian partners and MTN Irancell*** to set up a local Iranian company with the ***"basic" purpose of evading sanctions on Iran.*** …

> Reuters provided MTN with the names of four current MTN Group executives believed to have knowledge of the procurement of U.S. parts by MTN Irancell. MTN declined to make any of them available for interviews. …

> Kilowan's claims regarding how MTN Irancell obtained U.S. parts for its network … were supported in documents and numerous interviews conducted by Reuters. For example, Reuters reviewed an 89-page MTN Irancell document from 2008 that shows the telecom carrier was specifically interested in acquiring embargoed products.  … In a section on managing product-support agreements for third-party equipment, ***the MTN Irancell document states, "This should include embargo***

319

*items.*" The document also includes ***lists of network equipment, including Cisco routers, Sun servers and products from HP***. …[469]

1008.   *Reuters* "documented … how Iranian telecoms - including the MTN joint venture – [] managed to obtain embargoed U.S. computer equipment through a network of Chinese, Middle Eastern and Iranian firms."[470]   As *Reuters* put it, "[t]he Turkcell-MTN case offers further evidence that there are always companies willing to do business with a country even when it becomes an international pariah."[471]

1009.   MTN's technical assistance to the IRGC, including its Hezbollah Division and Qods Force, had a devastating impact on the U.S. government's ability to protect Americans in Iraq from Shiite terrorist attacks.  By helping to revolutionize the IRGC's, including the Qods Force's, communications capabilities, MTN helped the IRGC, including its Hezbollah Division and Qods Force, better conceal their communications with their Hezbollah, and, through Hezbollah, Jaysh al-Mahdi, proxies inside Iraq to make it nearly impossible for American counter-terror forces in Iraq to monitor the Joint Cells attacking Americans in Iraq.  By making it easier for Hezbollah and Jaysh al-Mahdi to securely communicate with one another, MTN made it easier for the Joint Cells to attack Americans – and they did.  MTN accomplished this "communications concealment" assistance to the IRGC, including its Hezbollah Division and Qods Force, which flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi, in at least three ways.

---

[469] Steve Stecklow, *Exclusive:  Iranian Cell-Phone Carrier Obtained Banned U.S. Tech*, Reuters (June 4, 2012) (emphasis added; formatting adjusted).

[470] Steve Stecklow and David Dolan, *Special Report: How An African Telecom Allegedly Bribed Its Way Into Iran*, Reuters (June 15, 2012).

[471] *Id.*

1010.  *First*, MTN acquired advanced American-made encryption technologies for the IRGC, including its Hezbollah Division and Qods Force, their agent, Hezbollah, and Jaysh al-Mahdi.  The terrorists used the MTN-acquired, U.S.-manufactured and embargoed technologies to encrypt their communications.

1011.  *Second*, MTN sourced more than one thousand (1,000) advanced, encrypted American smart phones each year from 2006 through 2017 that were intended to be used, and were in fact used, by the IRGC, including its Hezbollah Division and Qods Force and Lebanese Hezbollah, for terrorism targeting Americans.  The American smart phones sourced by MTN for the IRGC, including its Hezbollah Division and Qods Force and Lebanese Hezbollah, were used to increase the effectiveness of Hezbollah-designed, IRGC-funded (including and Qods Force-funded) IEDs and EFPs in Iraq by making it easier for terrorists to detonate them and harder for American counter-IED technologies to prevent their detonation by "jamming" them.

1012.  *Third*, MTN lied to the U.S. government about its ongoing cooperation with and work on behalf of the IRGC, including its Hezbollah Division and Qods Force and Lebanese Hezbollah.  This furthered the Joint Cells' terrorist campaign by preventing the U.S. government from knowing and understanding what technology the terrorists had, and when it was obtained.

1013.  Even as of the date of this Complaint, MTN continues to dissemble about its relationship with the IRGC, including its Hezbollah Division and Qods Force.  Even after the United States designated the IRGC as a Foreign Terrorist Organization on April 19, 2019, MTN stubbornly refused to acknowledge any need to change its business practices in Iran for more than a year, instead rolling out a host of new offerings designed to ***increase revenue*** flowing to MTN Irancell and, by extension, the two newly-designated-FTO-fronts that controlled MTN Irancell.

1014.   Finally, on August 6, 2020 – ***475 days after the IRGC's FTO designation*** – MTN announced that it was exiting the Middle East.  Even then, however, MTN refused to condemn the IRGC, including its Hezbollah Division and Qods Force, refused to promise a rapid withdrawal from its terrorist joint venture, MTN Irancell, and merely offered a blithe promise that MTN would eventually exit MTN Irancell in four or five years (i.e., sometime in 2024 or 2025).

1015.   On information and belief, MTN declined to immediately exit its joint venture with two FTO fronts after the IRGC's FTO designation because MTN determined that MTN would lose, at least, hundreds of millions of dollars if MTN rapidly withdrew from its MTN Irancell joint venture with the Bonyad Mostazafan and IEI.

1016.   As alleged, MTN knew, or recklessly disregarded, that it was dealing with Qods Force fronts, but given the IRGC's designation as an FTO in 2019, MTN's ongoing relationship with two widely recognized IRGC fronts proves MTN deliberately chose to join the IRGC's, including the Qods Force's, terrorist enterprise against the United States, which MTN self-evidently views as an acceptable cost of doing business.

1017.   MTN's ongoing refusal in 2021 to immediately and unconditionally (as in weeks, not months or years) exit its joint venture with fronts for the IRGC, including its Hezbollah Division and Qods Force, even after the IRGC had been designated as an FTO in 2019, and nearly every other multinational corporation had withdrawn from such joint ventures with Iranian fronts nearly a decade earlier, further confirms that MTN meant to support Iran-backed terror all along.  The following history of the UANI's public pressure campaign demonstrates this.

1018.   On January 25, 2012, Ambassador Wallace, the president of UANI, wrote to

Sifizo Debengwa, MTN Group's then-President and CEO:

> [UANI] is writing to express its concern about the ongoing business of [MTN] in Iran.  Recently, UANI launched its "Tech and Telecom Campaign" to highlight the Iranian regime's misuse of technology … In response …, a number of corporations, including Huawei and Nokia Siemens Networks ("NSN"), have curbed their business activities in Iran.  We now ask MTN to do the same.

> The reasons for this call by UANI are manifold. … Iran [] remains the ***world's leading state sponsor of terrorism and has sponsored notorious terrorist groups like … Hezbollah….  Iran's … terrorist activities should be reason enough for a corporation to pull out of Iran***….

> MTN is a 49% shareholder of MTN Irancell, the second largest mobile phone network operator in Iran.  The majority 51% is in turn owned by the Iranian regime, which has exploited the network and telecommunication technology of MTN Irancell …

> In addition, in 2009 MTN Irancell bought a mobile-positioning center from Ericsson.  Iranian security forces have reportedly utilized such mobile positioning centers to pinpoint the location of mobile telecommunications users. (Bloomberg, "Iranian Police Seizing Dissidents Get Aid of Western Companies," 10/30/2011) More recently, MTN Irancell reportedly purchased a system from Creativity Software that enables Iranian security forces to monitor the location of cellular phone users.  The system also stores data and can generate reports about a person's movements. (Bloomberg, "Iranian Police Seizing Dissidents Get Aid of Western Companies," 10/30/2011) As co-owner of MTN Irancell, MTN certainly had knowledge of such purchases and by collaborating directly with the Iranian regime, MTN is complicit in facilitating the abuses that occurred … as a result.

> In short, it appears that MTN is taking advantage of the fact that responsible corporations are leaving Iran, and eagerly filling the void.  MTN must end its irresponsible business practices in Iran and, in particular, its direct collaboration with the Iranian regime. …  [Emphasis added.]

1019.   On February 29, 2012, Ambassador Wallace followed up on his January 2012

letter to MTN Group's President and CEO:

> [MTN] fails to respond to evidence of Iran's routine use of telecommunications equipment to illegally track, monitor, and in some cases arrest, detain, and torture Iranian citizens opposed to the current extremist regime.  More specifically, [MTN] also fails to refute the fact that the Iranian regime, the majority 51% holder of Irancell and partner of MTN, "has exploited the network and

323

communications of peaceful dissidents in Iran." Finally, [MTN] fails to respond to UANI's inquiries regarding multiple reports of collaboration by MTN Irancell and the Iranian regime … MTN is a 49% shareholder of MTN Irancell, and the majority 51% is in turn owned by the Iranian regime. ***This means that MTN's "partner" in MTN Irancell is the Iranian regime***. …

In addition, given MTN's relationship with the regime, MTN's assertion that it is a "liberating force," "enriching the lives" of Iranians is completely untenable. MTN cannot reasonably assert that the substantial profits it earns from its growing role in the Iranian telecommunications market are merely a byproduct of a larger altruistic goal to empower the citizens of Iran and the developing world….

Recent reports in the news media regarding MTN's Iran business further belie MTN's assertion that its business in Iran is altruistic or ethical in nature. For example . . . . ***MTN Irancell's other Iranian partial owner is the Mostazafan Foundation of Islamic Revolution, a "Bonyad" organization directly supervised by Iran's Supreme Leader. Both IEI and Mostazafan are closely linked to the regime's radical [IRGC].*** … [Emphases added.]

1020. MTN's President and CEO responded to UANI in an an on on-the-record interview with the *Wall Street Journal*, during which MTN's CEO stated: "What the [Iranian] government decides to do with that equipment ***is not in our hands***. We cannot say who they listen to and when."[472] In the same 2012 article regarding that interview, the *Journal* reported that:

MTN Group Ltd. will leave Iran ***only if*** South Africa applies sanctions on the country, Chief Executive Sifiso Dabengwa said Wednesday. The South African telecom company is facing international pressure to pull out or scale down operations in Iran … "We are guided by South African government policies internationally," Mr. Dabengwa said, noting that the country hasn't imposed sanctions on Iran. MTN has a 49% stake in Iran's second-largest mobile-phone operator and derives 21% of its subscriber base from Iran, according to recent figures from MTN. …[473]

1021. On March 7, 2012, Ambassador Wallace, the president of UANI, publicly responded:

The facts are clear: MTN is partners with sanctioned Iranian entities with direct links to the IRGC. … If MTN does not respect its own stated corporate values, it

---

[472] Devon Maylie, *South African Wireless Firm MTN To Remain In Iran*, Wall St. J. (Mar. 8, 2012) (emphasis added).

[473] *Id*. (emphasis added).

should … respect the will of the international community, which is working to isolate the Iranian regime in response to its … ***support of global terrorism*** … Investors and affiliated institutions should immediately divest themselves from MTN until MTN ceases its complicity with the Iranian regime.[474]

1022.   On March 12, 2012, MTN Group issued a press release that stated, in part:  "On human rights, the [MTN] group takes direction from and adheres to the policies of both the South African government and the United Nations.  South Africa has human rights enshrined as fundamental principles within its Constitution."  MTN then shamefully invoked South Africa's history of apartheid to suggest that it was a responsible corporate citizen, stating:  "Given South Africa's own recent history and our struggle against apartheid, the centrality of civil rights is at the core of our culture as a company and as individuals."  MTN further defiantly – and absurdly – claimed that there was no "evidence that the Iranian government has used the data [MTN] collected [and shared with the IRGC via Irancell] to identify and locate citizens or dissidents."

1023.   After issuing its press release, MTN subsequently scrubbed any presence of it from MTN's websites.  On information and belief, MTN did so because it knew that its statement was a damaging admission that MTN believed that although it was violating U.S. law, it could not be held accountable under U.S. law regardless of what it did with Iranian terrorist fronts like the IRGC, including its Hezbollah Division and Qods Force.

1024.   On March 14, 2012, Ambassador Wallace, the president of UANI, replied to MTN's March 12, 2012 press release, in part by stating:

If MTN was serious about respecting human rights, it would withdraw from Iran … Respecting human rights would also mean not trying to whitewash what MTN is really doing in Iran.  MTN is not a liberating force for the Iranian people, as it claims.  On the contrary, MTN is partnered with sanctioned Iranian entities with

---

[474] UANI, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (emphasis added); *see* Business Wire, *UANI Responds to MTN CEO's Irresponsible Position on Iran and Renews Call for MTN to End its Business in Iran* (Mar. 7, 2012) (broad international publication of this UANI press release).

direct links to the IRGC, and has provided the regime with location data on Iranian citizens … MTN must end its irresponsible business in Iran, and stop contributing to the regime's continual human rights violations.[475]

1025.   On March 28, 2012, Turkcell filed suit against MTN Group in United States District Court for the District of Columbia.  *See* Complaint [Dkt. 1], *Turkcell İletişim Hizmetleri A.Ş. and East Asian Consortium B.V v. MTN Group, Ltd. and MTN International (Mauritius) Ltd.*, No. 1:12-cv-00479-RBW, (D.D.C. Compl. Filed Mar. 28, 2012) ("*Turkcell v. MTN*").[476]  In its complaint (at 1), Turkcell alleged that MTN "violat[ed] … the law of nations through bribery of sitting Iranian … officials and trading influence to steal the first private Iranian Global System for Mobile Communications ("GSM") license (the "License") from Turkcell," which included MTN's "promis[e] [to] Iran [MTN would source] defense equipment otherwise prohibited by national and international laws" and MTN's "outright bribery of high-level government officials in both Iran and South Africa," which "acts … deliberately resulted in Turkcell losing its rightfully-won valuable telecommunications opportunity and in MTN's taking over the License."

1026.   In its complaint (at ¶ 9), Turkcell alleged that, "[b]etween the end of 2004 and receiving the License in November 2005, MTN through 'Project Snooker' made at least five illegal bribes and trades in influence to government officials with the intention and belief that the bribes would cause the Iranian government to grant the License to MTN rather than Turkcell."

- Paragraph 9(B) – labeled "Illicit Arms for the GSM License" – alleged that "MTN struck a deal to deliver 'The Fish' the Iranian Ministry of Defense in August 2004.  'The Fish' was a code name for a combination of military cooperation and big ticket defense equipment, including … frequency hopping encrypted military radios, sniper rifles, … radar technology, … and other defense

---

[475] UANI, *UANI Responds to MTN's Claims that it Adheres to UN Human Rights Policies* (Mar. 14, 2012); *see* Business Wire, *UANI Responds to MTN's Claims that it Adheres to UN Human Rights Policies* (Mar. 14, 2012) (broad international publication of this UANI press release).

[476] Turkcell subsequently voluntarily dismissed the case to pursue the matter in South Africa. *See* Notice of Voluntary Dismissal (Dkt. 47) and Minute Order (Dkt. 48) in *Turkcell v. MTN*, No. 1:12-cv-00479-RBW (D.D.C. May 1, 2013).

articles—particular items including U.S. systems or components. This equipment was unavailable to Iran through legitimate means because of U.S. and international restrictions at the time. MTN officials … promise[d] delivery of the elicit [i.e., illicit] arms and technology in exchange for the License."

- Paragraph 9(C) – labeled "<u>Bribe of Iranian Deputy Foreign Minister</u>" – alleged that "MTN promised in May 2005, and later paid through a sham consultancy, the Iranian Deputy Foreign Minister, Javid Ghorbanoghli, $400,000 in U.S. dollars for his efforts to politically undermine and destroy Turkcell's position as the license-holder and to deliver the License to MTN."

- Paragraph 9(D) – labeled "<u>Bribe of South African Ambassador to Iran</u>" – alleged that, "[i]n June 2005, MTN promised, and later paid, the South African Ambassador to Iran, Yusuf Saloojee, the equivalent of U.S. $200,000 to help MTN deliver on the nuclear vote and the weapons trafficking and to support MTN within the Iranian government. Ambassador Saloojee was integral to MTN's ultimate success in securing the License."

- Paragraph 9(E) – labeled "<u>Bribes of Iranian Defense Organizations</u>" – alleged that, "MTN promised the Iranian Ministry of Defense through its state-owned defense company Sairan (also known as Iran Electronics Industries or 'IEI') and the 'Bonyad' (one of the five Iranian quasi-independent 'Charitable Foundations,' an organization integral to the Iranian defense establishment), that MTN would pay all of Sairan [i.e., the IEI's] and the Bonyad's 51% share of the €300 million license fee, plus its entire capitalization cost and a share transfer tax, in exchange for their assistance within the Ministry of Defense and with the Supreme Leader. MTN later paid these amounts. These promises and payments, made through sham loans MTN knew at the time would not be repaid, were essential to MTN's takeover of Turkcell's License."

1027. Turkcell's complaint against MTN also specifically alleged that MTN had engaged with an IRGC-controlled company. For example, Turkcell alleged that to

establish[] itself within Iran[,] … [MTN] reached out to … Mr. Mohammed Mokhber, the Deputy President of a major "charitable foundation" controlled by the Supreme Leader of Iran, known as the Bonyad Mostazafan ("the Bonyad"), which is … **controlled by the Iran Revolutionary Guard Corps**, the Iranian military complex formed by Iran's Supreme Leader Ayatollah Ali Khamenei, which is believed to control approximately one third of the Iranian economy. … The Bonyad **reports directly to the Supreme Leader** and MTN was confident that its relationship with Mr. Mokhber and the Bonyad he controlled provided direct access to the Supreme Leader. **The Bonyad is well known for engaging in "Iran's shadow foreign policy."**

327

*Id.* ¶ 65 (emphasis added; citations omitted).[477]

1028.   Turkcell's complaint against MTN alleged that MTN's senior executives, including its CEO, met with Iranian agents in South Africa (whom, Turkcell alleged, MTN invited to South Africa on a "trip" that "MTN funded"), during which time MTN's executives "[t]ogether [] promised [the Iranian agents] that South Africa would deliver 'heaven, earth, and the fish,' meaning whatever military equipment [Iran] desired." *Id.* ¶ 93.  Turkcell continued: "The entire trip was organized and coordinated by MTN so that they could corruptly induce the Iranian government to eliminate Turkcell … and replace it as the owner of the GSM opportunity." *Id.*

1029.   On April 5, 2012, the *Mail & Guardian Centre* for Investigative Journalism in South Africa published a detailed expose on MTN's partnership with Iranian terrorists, titled "Iran 'Puts the Screws' on MTN," which reported that MTN "fac[ed] a storm over claims that it helped the Iranian government in 2009 and 2010," and reported that:

> Sources close to MTN's Iranian business have [] described ***an Orwellian environment in the company's Tehran headquarters***, where it allegedly ***gave military intelligence officials "open" access*** …. [S]ources claimed:
>
> - Because MTN Irancell and its data centre were part-owned by the Iranian military, subscriber data was shared "on a collegial basis" with the intelligence sector;

---

[477] Similarly, Turkcell also alleged (at ¶ 86), that "[t]hroughout 2004 and 2005, MTN regularly met with … the Bonyad [Mostazafan] and Sairan [i.e., IEI]," during which time MTN's "goal was to entice those entities to support MTN and abandon Turkcell, on the promise that MTN had more to offer than Turkcell." *Turkcell v. MTN* Complaint at ¶ 86.  Turkcell continued: "The Bonyad and [IEI] responded exactly as MTN planned:  They not only used political leverage to increase delay and shift Turkcell's regulatory requirements, but also they directly began disengaging from their relationship with Turkcell.  After mid-2005, the Bonyad and [IEI]'s involvement with Turkcell was merely a charade along the path to forming its venture with MTN." *Id.* ¶ 86.

- A shadowy *"second floor" in MTN's building was populated by military intelligence officials*, the volunteer militia known as the Basij ("morality police") and clerics;

- During the 2009 and 2010 Green movement protests, men from the second floor, accompanied by Irancell chief executive Alireza Dezfouli, allegedly approached data warehouse staff regularly to demand detailed records for individuals;

- In one case, they demanded the number of a known Green Party activist, who could not be reached after his information had been given to military intelligence; and

- Third parties listened in to staff calls over Irancell SIMs and would intervene and demand that the staff speak in English and not in other South African languages. …

[Turkcell's lawsuit] accuses MTN of bribing South African and Iranian officials, facilitating weapon trade agreements between the two countries and influencing South African foreign policy … in a bid to stop Turkcell from being awarded a second cellular network licence in Iran. … MTN is a 49% shareholder in Iran-cell. Fifty-one percent is held by an Iranian state-linked consortium, which is dominated by a subsidiary owned by the defence ministry known as Sairan, or Iran Electronics Industries. Sairan is subject to US and European Union sanctions that target proliferators of "weapons of mass destruction". It also holds a share in consortium Arya Hamrah, which owns and runs MTN Irancell's data centre that houses the company's servers and hardware. …

**Military intelligence**
The sources familiar with MTN's Iranian operations said that, because of these ownership structures, Irancell readily gave information about subscribers to intelligence officials. … One of the sources said: *"MTN's data centre in Iran is effectively run by the military and military intelligence. None of the intelligence organisations needs to go through normal procedures to access subscriber data and track individuals."*

Describing the climate at MTN's headquarters, a senior official said it was *dominated by the presence of Iran's military intelligence officials and the "morality police".*

"There was a tea lady who just stood at the printer all day. Her job was to watch us." The woman, understood to be a member of the "morality police", would scold female staff whose clothing was considered too revealing and signaled her displeasure over "inappropriate" behaviour.

Communicating by email, the source said: "The people on the second floor are from military intelligence and the Basij and some clerics. They oversee the intelligence and moral activities of the employees of Irancell. All emails, telephone conversations and SMSes of employees are monitored on an ongoing basis. This is then exposed to MTN against the threat that they will kick out MTN when they need concessions from it."

The staffer described how men from the second floor would accompany Dezfouli to collect data on individuals and political dissidents: "On several occasions someone from the second floor and [Dezfouli] would come to the managed services group and say 'give us all the details for this number', and they would have to." The staffer said subscription and location data and call and SMS histories were handed over. …[478]

On information and belief, the *Mail & Guardian*'s investigative report accurately described operations at MTN Irancell.

1030. Shortly before the *Mail & Guardian*'s investigative piece was published, MTN issued a written statement to the *Mail & Guardian* from MTN Human Resources Head Paul Norman that was replete with falsehoods designed to conceal MTN's ongoing joint venture with the IRGC, including its Hezbollah Division and Qods Force, including MTN's awareness that such a business partnership could conceivably result in violence. In that statement, MTN's head of HR stated:

MTN's role in Iran is mostly as a technical partner. It is a non-controlling shareholder. Fewer than 30 MTN expats (not all South African) are employed in Irancell, out of around 2000. … MTN works hard, with international legal advisors, to ensure that it is sanctions compliant. … Civic and human rights are vital to the company … We expect all our business partners to abide by our code of ethics. Mobile telecoms has been a force for political and economic liberation … But we accept the ethical complexities around telecoms in this new environment, and the potential for their manipulation for unethical means.[479]

---

[478] Craig McKune and Sharda Naidoo, *Iran 'Puts the Screws' on MTN*, Mail & Guardian (Apr. 5, 2012) (emphases added).

[479] *Id.*

1031.   MTN remained defiant even though nearly every other major multinational corporation exited their own joint ventures with fronts for the IRGC, including its Hezbollah Division and Qods Force, after the Bush and Obama administration ramped up sanctions enforcement in the 2000s.  As Ambassador Wallace explained in May 2012,

> despite the action of other responsible telecommunication companies, South African telecom company MTN continues to openly partner with sanctioned Iran entities affiliated with the brutal Iranian regime.  ***Companies like MTN deserve the condemnation of the American public and concerned citizens worldwide as well as the attention of this Congress, which should investigate MTN`s collaboration with the Iranian regime***.  Nevertheless, UANI will continue to educate citizens and apply pressure against recalcitrant companies that pursue short-term profits at the expense of global security.[480]

1032.   Even after a decade of Iran-backed terrorism against the United Sates, MTN's President and CEO told interviewers in 2013 that the company had no regrets about doing business with the Iranian and Syrian regimes that sponsored anti-American terror.  As the *Financial Times* reported at the time, "[y]et [MTN's CEO] Mr Dabengwa says MTN has few regrets about entering Iran or Syria and includes them among countries that will be important to MTN's growth.  'The starting point for entering frontier markets is the business case.  ***The other risks, we can manage***,' he says."[481]  This view reflected MTN's corporate DNA that emphasizes taking risks that the rest of the industry thinks are too great:  "Venturing into areas where others might fear to tread is a characteristic that has been at the heart of MTN's rapid expansion since it was established in 1994, the year South Africa held its first democratic election."[482]

---

[480] Wallace May 17, 2012 Testimony (emphasis added).

[481] Saigol and England, *Telecoms: Dealings in the Danger Zone*.

[482] *Id*.

1033.   As the *Financial Times* reported in 2013, even the prospect of "deadly conflict" did "little to diminish MTN's appetite for risk."[483]  Indeed, MTN's CEO admitted, in effect, that MTN believed that American lives in Iraq and Afghanistan did not count in MTN's calculations. Specifically, commenting on how MTN operates in conflict zones, MTN's President and CEO stated:  "I would say, is our presence there enhancing anybody's position in this conflict? That, for me, would be the test.  If you could turn around and say our presence there is enhancing the government's position or it's enhancing the other side's position, then I guess it's an issue. Walking out today is not an option."[484]

1034.   On or about November 2012, the Treasury Department announced additional sanctions targeting the IRGC's, including the Qods Force's, use of the telecommunications industry to help inflict violence upon innocent civilians.  As was reported in real time by the South African media, MTN understood that these new Treasury sanctions punished MTN's counterparty for its support of terrorism.  For example, according to the South African financial publication Fin24, these "[s]anctions announced … by the US treasury against Iranian individuals and companies have led to panic at mobile operator MTN," because MTN "believed" that the Treasury announcement "target[ed] 17 individuals believed to be related to human rights abuses by the Iranian government, as well as to supporting terrorism and the Islamic Revolutionary Guard."[485]  As *Fin24* reported at the time, "the mobile operator [was] concerned sanctions will cause a hardening of attitudes in the US against the company," which was problematic for it as "MTN [was] being sued in the US for allegedly bribing Iranian officials to

---

[483] *Id*.

[484] *Id*.

[485] Fin24, *Panic at MTN Over US Treasury Sanctions* (Nov. 11, 2012).

obtain an operating licence, while it [was] negotiating with the US treasury to allow the operator to expatriate its cash profits from Iran before the Iranian rial completely bottom[ed] out."[486]

1035.   Incredibly, even after MTN understood the Treasury Department to be sanctioning its business partners in Iran for sponsoring terror, MTN sources still complained to the media about the audacity of the United States expecting MTN to follow U.S. law.  As one anonymous "MTN source[]" complained to *Fin24* that "[t]his is a [South African] company that ***should not be subjected to US foreign policy decisions***."[487]

1036.   By the end of 2012, MTN was nearly alone (joined by ZTE, among others) as one of the few large multinational corporations that remained willing to work – openly or surreptitiously – as an IRGC, including Qods Force, joint venture partner.  As Nathan Carleton, communications director for UANI, summed it up at the time "MTN stands out as one of the single most irresponsible businesses in the world and should be ashamed of the depths it has gone to in pursuit of profit."[488]

1037.   MTN is virtually alone in the corporate world as a multinational corporation that rarely explicitly and unambiguously condemns terrorist violence against Americans, for the obvious reason that openly condemning anti-American terror would anger MTN's joint venture partners in Iran.  Instead of expressing any sympathy for Americans killed and maimed in Iraq and Afghanistan – which, on information and belief, MTN never publicly did prior to being sued by victims of Taliban terrorism in 2019 – MTN instead showered its business partner, Ayatollah Khamenei, with adulation.  For example, MTN Irancell was the lead sponsor of an Ayatollah-

---

[486] *Id*.

[487] *Id*. (emphasis added).

[488] *Id*.

backed contest, which MTN Irancell as offering a chance "to visit the Supreme Leader of the

Islamic Revolution Ayatollah Seyyed Ali Khamenei during [the competitors'] stay in Tehran."[489]

### 4. MTN Knowingly Assumed A Financial, Logistical, And Operational Role In The Taliban's, Including The Haqqani Network's, Terrorist Enterprise In Afghanistan, Directly And Indirectly Financing And Arming IRGC Proxy Attacks In Afghanistan And Iraq

#### i. MTN Made Protection Payments To The Taliban

1038.   MTN has become one of the world's most valuable telephone companies by

"wading into nations dealing with war, sanctions and strife."[490]  Success in unstable markets,

including Afghanistan, has yielded profits.  MTN is now, due to this business model, "bigger by

some measures than its U.S. counterparts."[491]

1039.   MTN followed that model in Afghanistan.  In mid-2006, MTN Group bought

Areeba, a Lebanese telephone company that had recently won a license to provide cellular-

telephone service in Afghanistan.  MTN entered the Afghan market shortly thereafter and began

as the country's third-largest provider (consistent with its status as the third entrant), well behind

the two incumbents.  But MTN grew quickly, and by late 2010 it had obtained an estimated 32%

market share – the largest of Afghanistan's then-five cellular-phone providers.  As MTN grew, it

rebranded Areeba as MTN Afghanistan, and it expanded its geographical footprint throughout

the country.  By 2012, MTN had a presence in virtually every province in Afghanistan, including

many that were under Taliban control or influence.

---

[489] Tehran Times, *Reciters From 75 Countries to Participate in Tehran Quran Competition* (May 14, 2015), 2015 WLNR 14128237.

[490] Alexandra Wexler, *Telecom Giant Pushes Into Dangerous Areas*, Wall St. J. (Aug. 10, 2019).

[491] *Id.*

1040.   While MTN was achieving rapid growth in Afghanistan, the cellular-telephone sector provided a critical source of financing for the Taliban.  As reported by the *Wall Street Journal* in 2010, telephone industry executives themselves "say operators or their contractors routinely disburse protection money to Taliban commanders in dangerous districts.  That's usually in addition to cash that's openly passed to local tribal elders to protect a cell-tower site – cash that often also ends up in Taliban pockets."[492]  "Coalition officers," the article continued, "confirm that carriers make payments to the Taliban."[493]  Those payments mirrored the protection money delivered by other Defendants.  As terrorist-financing expert Thomas Ruttig documented, just as the Taliban raised "taxes" from international contractors doing business in Afghanistan, so too did it levy similar "taxes" on "the big telecom companies" like MTN.[494]

1041.   The logic behind MTN's protection payments partially matched the logic motivating the other Defendants.  The MTN Defendants intended to harm American interests in Afghanistan, and supporting the Taliban allowed them to do so.  In addition, MTN had economic motivations similar to those of the other Defendants.  Specifically, the Taliban asked MTN to "pay monthly protection fees in each province, or face having their transmission towers attacked."[495]  The going rate was "usually in the range of $2,000 per tower, per month, but it depends on who controls the zone around each tower."[496]  In some areas, MTN made payments to local Taliban commanders in exchange for protection.  In others – such as Helmand and

---

[492] Yaroslav Trofimov, *Cell Carriers Bow To Taliban Threat*, Wall St. J. (Mar. 22, 2010) ("*Cell Carriers Bow To Taliban Threat*").

[493] *Id.*

[494] Thomas Ruttig, *The Other Side* at 20, Afghanistan Analysts Network (July 2009) ("*Ruttig, The Other Side*").

[495] *Crime & Insurgency* at 32.

[496] *Id.*

Kandahar – MTN operated in a Taliban-controlled environment in which protection "payments must go directly to Quetta."[497]  For example, one company confirmed to *Deutsche Presse Agentur* that it made $2,000-per-tower monthly payments to the Taliban.  The company's owner posited:  "You have to do it.  Everybody does."[498]

1042.   The Taliban conveyed its protection-money demands to MTN and other large cellular-phone providers via Night Letters.  Dr. Barnett Rubin, an Afghanistan policy expert, obtained a copy of one such letter in 2008 from an industry source and explained why "[s]etting up a cell phone tower anywhere in Afghanistan requires the consent of whoever 'controls' the territory, or at least has the power to blow [it] up."[499]  As a result, cellular-phone companies in southern Afghanistan – where MTN had a heavy presence – typically believed they "ha[d] to pay the Taliban."[500]  The *Financial Times* likewise reported in 2008 that Taliban commanders in Wardak Province had "sent letters to mobile phone companies demanding 'financial support' in return for operating" in Taliban-run areas.[501]  Those tactics were successful.  One industry source estimated in 2009 that "every single one of the shadow provincial governors set up by the Taliban leadership council receives $50,000 to $60,000 in protection money each month alone from the telecommunications sector, the largest legal growth market in Afghanistan."[502]

---

[497] *Id*.; *see id*. (one company admitting it "routinely sen[t] a representative to Pakistan to pay off the Taliban leadership").

[498] *How The Taliban Has Turned Extortion Into A Gold Mine*.

[499] Barnett Rubin, *Taliban & Telecoms – Secret Negotiations Just Got Easier, And At A Price You Can Afford!* (Mar. 31, 2008), icga.blogspot.com/2008/03/rubin-taliban-and-telecoms-secret.html.

[500] *Id*.

[501] Jon Boone, *Telecom Chief Says Rivals Pay Taliban Protection*, Fin. Times (June 9, 2008) ("*Rivals Pay Taliban Protection*").

[502] *How The Taliban Has Turned Extortion Into A Gold Mine*.

1043.   The Taliban itself confirmed that practice.  After the *Financial Times* obtained a copy of a Taliban Night Letter demanding protection payments from cellular-phone companies in Wardak Province, the reporter called the telephone number listed as the point of contact in the Taliban's letter.  A "local Taliban official" answered and confirmed that "two companies had responded to their demands" by agreeing to pay.  On information and belief, MTN was one of them.  The Taliban official explained:  "When a company sets up they have to pay tax to the government of Afghanistan. . . .  We are the government here and they must pay tax to us."[503]

1044.   MTN was a particularly aggressive practitioner of protection payments.  Rather than invest in expensive security for its transmission masts, MTN purchased cheaper "security" by buying it from the Taliban.  Indeed, MTN declined to use armed guards to protect its towers.  Without paying for physical security, MTN both had the free cash flow and the incentive to buy peace with the Taliban.  The CEO of one of MTN's largest competitors, Roshan, alleged as much in 2008.  According to an interview the CEO gave to the *Financial Times*, other "phone companies in Afghanistan [were] bowing to criminal and Taliban demands to pay protection money to avoid the destruction of their transmission masts."[504]  In the interview, Roshan's CEO continued:  "I believe the competition is paying money, but we don't do that."[505]  Of Roshan's four largest competitors, three of them denied the accusation on the record.  Only "MTN, the South African based multinational phone company, was not available for comment."[506]

---

[503] *Rivals Pay Taliban Protection.*

[504] *Id.*

[505] *Id.*

[506] *Id.*

1045.  MTN's public statements reflect its practice of paying protection money.  Because MTN paid the Taliban, it was, in its own words, "'not a target.'"[507]  According to an MTN Afghanistan executive, "it's enough for a driver to show at a Taliban checkpoint a company letter stating that equipment aboard the truck belongs to MTN and not to the U.S. forces."[508]

1046.  MTN negotiated its protection payments in direct discussions between MTN Afghanistan's security department and Taliban commanders.  MTN's security department consisted of roughly 600 total staff in Afghanistan, which included both local Afghan employees of MTN Afghanistan and a South African security component from MTN Group.  The security department consisted of three different layers:  provincial, regional, and a Tactical Operations Center in Kabul.  Security personnel throughout those levels orchestrated pay offs to the Taliban.  For example, one high-ranking MTN Afghanistan official conducted at least 38 telephone negotiations (which he recorded) with Taliban officials from 2007-2014, in which he engaged in so-called "security coordination" with the insurgency.  The MTN employees who witnessed those conversations knew they were illegal, so they typically went to the roof of MTN Afghanistan's Kabul headquarters building – where they could maintain absolute privacy – to conduct their Taliban negotiations in secret.  In addition, on at least one occasion, MTN negotiated its payments at an in-person meeting held with Taliban officials near Quetta, Pakistan.  MTN employees in Afghanistan understood that those negotiations involved MTN agreeing to make both cash payments and in-kind bribes (including equipment) to the Taliban.

1047.  The ATFC gathered evidence from 2008-2012 confirming MTN Afghanistan's practice of paying off the Taliban.  The ATFC generated intelligence products, memorialized in

---

[507] *Cell Carriers Bow To Taliban Threat*.

[508] *Id.*

DEA Form 6's and Intelligence Information Reports, describing the common practice among Afghan telecommunications firms of paying the Taliban. According to the ATFC's evidence, MTN Afghanistan was the worst offender of all the companies. The ATFC confirmed MTN Afghanistan's frequent insurgent payments both in interviews with MTN employees and in wire intercepts collected by the Afghan government's Sensitive Investigative Unit. In witness interviews with ATFC investigators, MTN employees admitted that MTN Afghanistan paid insurgents not to threaten its cell towers. They justified those payments by appealing to MTN's commercial interests: MTN sources told the ATFC that it was cheaper to pay the Taliban than it would have been to rebuild the towers in the face of Taliban threats.

1048. MTN's practice of making protection payments to the Taliban extended to the Haqqani Network. From at least 2010 through 2016, MTN operated towers in Haqqani-controlled territory in southeast and eastern Afghanistan, and it purchased security for those towers by paying the Haqqani Network. The Network's chief financial operative, Nasiruddin Haqqani, oversaw those payments, and they typically occurred on a semi-annual basis.

1049. The U.S. government strongly opposed MTN's practice of paying the Taliban. ISAF's leadership was aware of cell-phone companies making protection payments to the Taliban and pressured the companies to stop. On information and belief, the U.S. government exerted that pressure in direct discussions between the U.S. government and MTN, and also through the Afghan Ministry of Communications. On one occasion, an ISAF commander raised the issue directly with President Karzai. In such conversations, ISAF's leadership specifically rejected the argument that protection payments represented an acceptable price of MTN maintaining its network in Afghanistan. ISAF and the Afghan government warned MTN

339

Afghanistan that its business practices were supporting the insurgency and were threatening Coalition forces, and both entities instructed MTN to stop. MTN refused.

1050. MTN supplied the Taliban with more substantial assistance than its competitors did. MTN's 2006 entry into Afghanistan set the stage for the Taliban's cellular-tower rackets by adding another participant to the Afghan cellular marketplace. Until that point, the Taliban's ability to extract money from the two incumbent providers had been limited. Once MTN emerged in 2006, it became the third cellular company in Afghanistan, which gave the Taliban additional leverage to execute on its protection racket. That is because, with MTN agreeing to pay the Taliban, the Taliban was free to follow through on its threats against other companies without the risk that doing so would cut off all cellular service in Afghanistan – service on which the Taliban itself relied. Indeed, because Taliban fighters commonly preferred to use MTN's network for their own communications, the Taliban did not want to destroy MTN's network.

1051. A review of available cell-tower attack data supports the same conclusion. Plaintiffs have analyzed all of the available purported U.S. military Significant Activities reports, as published online, that describe attacks between 2004 and 2010 against or in the immediate vicinity of a cellular tower in Afghanistan. The data shows a clear disparity between MTN and its two main competitors, Roshan and Afghan Wireless Communication Company ("AWCC"). From 2004 to 2009, AWCC and Roshan suffered at least 6 and 7 attacks on their towers, respectively, whereas MTN – which did not even pay guards to protect its towers – faced only 1 (non-lethal) attack. The disparity is consistent with Roshan's accusation that MTN paid protection money to the Taliban.

1052. That attack disparity existed despite MTN's and Roshan's deployment of transmission masts at similar times in similar locations. For example, Roshan's CEO cited to the

*Financial Times* an instance on May 14, 2008, in which the Taliban attacked one of Roshan's towers in Wardak Province, yet two similar nearby towers (including one belonging to MTN) were not attacked.[509] The most likely explanation for the difference is that MTN had paid protection money, whereas Roshan had not. Indeed, in 2009, Roshan maintained company rules that prohibited it from paying protection money to terrorists. Because Roshan refused to pay, the Taliban destroyed 18 of Roshan's towers in and around the 2009 Afghan elections.

1053. The senior MTN Afghanistan security official who oversaw many of MTN Afghanistan's protection payments to the Taliban reported directly to the head of MTN Group's head of business risk management, in Johannesburg, South Africa. MTN Group was specifically aware of, and approved, MTN Afghanistan's practice of paying the Taliban for security. In fact, MTN Group compensated MTN Afghanistan's security team with cash bonuses reflecting its success at resolving "security issues" involving the Taliban. Those bonuses typically had three levels: Level 1 ($1,500, for local operatives); Level 2 ($5,000, for regional operatives); and Level 3 ($10,000, for national operatives). The head of MTN Afghanistan's security group received roughly $66,000 in such bonuses during the relevant timeframe, which specifically compensated him for negotiating with the Taliban successfully. MTN Group even gave him an award for best "display[ing] the Group's values in MTN Afghanistan."

1054. MTN's overall payments to the Taliban reached tens, if not hundreds, of millions of dollars. Applying the standard rate of $2,000 per tower per month to MTN's collection of roughly 1,300 towers yields an estimated payment of $2.6 million per month. At that rate, MTN's payments from 2007 through 2016 well surpassed $100 million.

---

[509] *Rivals Pay Taliban Protection.*

###### ii. MTN Supported The Taliban By Deactivating Its Cellular Towers At Night

1055.   MTN also provided material support to the Taliban by deactivating its cell towers at the Taliban's request.  In or about 2008, the Taliban began demanding that Afghanistan's major cellular-phone providers switch off their towers at night.  The Taliban justified that demand by arguing that Coalition forces were "using the cellular networks to track its insurgents throughout the war-torn country."[510]  Coalition forces, a Taliban spokesman stated, were "misusing the cell towers for their intelligence works."[511]  Because the Taliban believed that shutting down nighttime service would impede Coalition intelligence efforts, it demanded that the cellular-phone companies deactivate their transmission masts from 5 p.m. until 3 a.m.  Later, the Taliban insisted that the companies keep their masts deactivated until 6:30 a.m.

1056.   MTN granted the Taliban's requests.  In early 2008, MTN Group issued a statement that it was "aware of reports of the Taliban communicating a need for mobile operations to be suspended at certain times during the night in sensitive areas.  We are evaluating the situation and liaising with our executives and the relevant authorities in Afghanistan."[512]  The "executives" apparently decided to accommodate the Taliban's "need" and shut down MTN's transmission masts at night.  MTN and others, the *Wall Street Journal* reported in 2010, "strictly abide[d] by Taliban hours in several provinces, going off air precisely at 5 p.m. and going back on at 6:30 a.m."[513]  And when the Taliban ordered cellular-phone companies in Helmand to

---

[510] Paul Vecchiatto, *MTN Concerned By Afghanistan Threats*, ITWeb Cape Town (Feb. 28, 2008) ("*MTN Concerned By Afghanistan Threats*"), https://www.itweb.co.za/content/dgp45MaYRYZMX9l8.

[511] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

[512] *MTN Concerned By Afghanistan Threats*.

[513] *Cell Carriers Bow To Taliban Threat*.

"switch off the signal," MTN Afghanistan's head of legal and government affairs told the media: "We decided to obey the orders and we have been shut down since yesterday."[514]  Since 2008, MTN's policy has remained consistent:  it has followed the Taliban's directives and switched off its transmission masts for the Taliban's benefit – typically at night.

1057.   MTN shut down its towers for the same reason it paid protection money:  to maintain good relations with the Taliban.  MTN made no effort to hide its motivation in that regard.  When asked about shutting down its network, MTN Afghanistan's head of legal and government affairs explained that the company could not "afford to be seen as siding with the Afghan government against the Taliban . . . 'You should not give a justification to the others that you are favoring the government – and you have to prove in words and in deeds that you are neutral.'"[515]

1058.   MTN went to great lengths to maintain its "neutrality" and do what the Taliban asked of it.  Even in 2011, after President Karzai issued a decree formally demanding that MTN (and its competitors) reactivate their towers at night, MTN refused the recognized government's directive and continued to follow the Taliban's requests.  One executive summed up MTN's (and others') refusal to follow President Karzai's directive:  "We're not going to turn on our masts and become part of the army of the Afghan government."[516]  By shutting down its towers, MTN decided, it could reduce the risk that the Taliban would threaten MTN's commercial interests.

---

[514] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011).

[515] *Cell Carriers Bow To Taliban Threat*.

[516] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

1059.   The ATFC gathered evidence confirming that MTN was switching off its transmission masts at night to comply with Taliban demands.  Based on intelligence reporting, wire intercepts, and interviews with MTN sources, the ATFC concluded that MTN Afghanistan was deactivating its cell towers in coordination with the Taliban.  The justification offered by MTN Afghanistan employees was, again, financial:  turning off the towers helped MTN save money by avoiding the need for MTN to invest in expensive security or to rebuild its towers. The ATFC observed that the security threat MTN faced was not primarily to its employees; it was to equipment that MTN did not want to spend the money to protect or rebuild.

1060.   MTN Afghanistan implemented tower shutdowns through a secretive process that originated with its security team.  The head of MTN Afghanistan's security division would negotiate with the Taliban to determine which towers (called "Base Transceiver Stations" by MTN's technical team) to shut down, and at which times.  Then, based on information received from the Taliban, MTN's security team relayed instructions to MTN Afghanistan's technical team directing them to implement the shutdowns.  The instructions pinpointed the particular quadrant(s) within particular MTN towers' coverage areas in which Taliban operatives were located, specifying that MTN should turn off the signal within those quadrants.  That enabled MTN to satisfy the Taliban's demands while also allowing MTN to continue earning revenue from customers in the other quadrants – and also to deceive the government about the extent of its shutdown.  MTN employees further avoided memorializing these instructions over company email or in memos; they instead used phone calls or text messages with the purpose of avoiding a paper trail that would document their cooperation with the Taliban.

1061.   At all relevant times, MTN Group was aware of, and approved, MTN Afghanistan's practice of shutting down its towers to comply with the Taliban's requests.  MTN

Afghanistan would not have maintained that policy without specific buy-in from MTN Group's senior management in South Africa.

1062.   MTN's conduct strengthened the Taliban and undermined U.S. counterinsurgency efforts.  By 2010, the Taliban was "using the cellphone system as an instrument of war against the Afghan government and the U.S.-led coalition."[517]  The insurgents, one Army officer told the *New York Times*, used MTN's cell towers "as a weapons system" against Coalition forces.[518] Indeed, cell phones were crucial to the Taliban – they provided a convenient form of communication and helped insurgents coordinate attacks – but they also came with two major downsides.  First, U.S. intelligence tracked the Taliban's phone signals and used them to locate high-level targets for capture-or-kill missions.  Second, cell phones provided Afghan civilians with the ability to call Coalition tip lines and provide valuable human intelligence.

1063.   Nighttime deactivation was the Taliban's solution to both problems.  U.S. Special Forces typically execute high-value raids at night, and deactivated cell signals impeded those missions by making the insurgent targets harder to track.  That was the Taliban's stated rationale for demanding nighttime signal deactivation:  its spokesman argued that Taliban fighters had "been increasingly targeted by foreigners recently and we know they are using the services of these phone companies against us.'"[519]  As another Taliban spokesman explained publicly, the Taliban viewed the "cutoffs as a line of defense," in which its "'main goal is to degrade the

---

[517] *Cell Carriers Bow To Taliban Threat*.

[518] Indira A.R. Lakshmanan, *Fighting The Taliban With Cellphones*, N.Y. Times (Mar. 23, 2010).

[519] Agence France Presse, *Taliban Shut Down Cell Phones In Afghan Province* (Mar. 24, 2011) ("*Taliban Shut Down Cell Phones*").

enemy's capability in tracking down our mujahedeen.'"[520]  Consistent with that statement, *AFP* reported that "Taliban militants regularly demand that mobile phone companies switch off their networks at night, fearing that NATO-led forces can track them through phone signals."[521]

1064.   Similarly, nighttime deactivation obstructed Coalition efforts to gather human intelligence.  Cell phones provided a key conduit for Afghan civilians to pass intelligence to Coalition personnel.  But as the U.S. military director of the Telecommunication Advisory Team explained, "[i]f the masts are off Afghans can't report anything . . . If you see an insurgent you can't call the police to say check this out."[522]  And Afghan informants were "usually reluctant to call in tips during daytime, when they can be spotted by Taliban sympathizers."[523]  Human intelligence thus typically flowed to the Coalition at night.  By agreeing to shut down its transmission masts, MTN knowingly deprived Coalition forces of that vital intelligence.

1065.   In 2010, *CBS News* reported on this so-called "détente" between the Taliban and large mobile-phone companies, including MTN.  "The phone companies shut down their cell towers at night, preventing local residents from discreetly calling coalition military tip lines.  In exchange, Taliban militants don't target the costly cell towers with explosives."[524]  The trade was a major strategic victory for the Taliban.  As Roshan's COO explained in trying to justify a

---

[520] Alissa J. Rubin, *Taliban Using Modern Means To Add To Sway*, N.Y. Times (Oct. 4, 2011).

[521] *Taliban Shut Down Cell Phones*.

[522] Jon Boone, *Taliban Target Mobile Phone Masts To Prevent Tipoffs From Afghan Civilians*, The Guardian (Nov. 11, 2011).

[523] *Cell Carriers Bow To Taliban Threat*.

[524] Alex Sundby, *Afghan Cell Carriers Follow Taliban Rules*, CBS News (Mar. 24, 2010).

similar decision: "We play by their rules; we don't like to play around when people's lives are at stake. . . . From a political perspective, it's quite a coup for them."[525]

1066.   MTN's tower shutdowns substantially contributed to the Taliban's ability to commit the attacks that killed and injured Plaintiffs.  The Taliban targeted its shutdown orders at key districts and provinces with tactical importance for ongoing Taliban operations.  As MTN knew, tower deactivation in those areas impeded Coalition forces from locating Taliban operatives and degraded the Coalition's ability to interdict Taliban ongoing attacks.  Indeed, the U.S. intelligence benefits gleaned from active cell towers were so potent that ISAF often executed operations designed specifically to induce Taliban operatives to use their phones.  By the same token, the operational impact of MTN's tower-shutdown policy was so extreme that ISAF, U.S. Embassy, and Afghan government personnel repeatedly pressured MTN to stop.  ISAF command considered such shutdowns to be a significant threat to U.S. counterinsurgency efforts.  And those shutdowns occurred in the key provinces and districts in which Plaintiffs (or their family members) were operating when they were killed and injured.  By defying the U.S. government and obeying the Taliban in the contested areas in which the insurgents were fighting Americans, MTN materially supported the Taliban attacks that killed and injured Plaintiffs.

1067.   The U.S. government tried to address those problems by encouraging Afghanistan's cellular-phone providers to move their transmission masts onto secure U.S. bases.  As the U.S. government explained in proposing the idea, securely located transmission masts would be difficult for the Taliban to attack – and could thus eliminate the putative reason MTN was deactivating its cell towers when the Taliban told it to.  Roshan, according to a purported 2009 U.S. State Department cable (as published online), was "keen to develop this partnership

---

[525] *Id.*

with the USG and sees it as a way to promote mutual security, communications, and commercial strategies for Afghanistan."[526]  MTN, by contrast, refused to participate and declined even to join Roshan and AWCC at the U.S. government-brokered meeting to discuss the idea.

1068.   Neither the U.S. government nor the Afghan government ever condoned or conveyed approval of MTN's tower-shutdown policy.  Although news reports on occasion quoted individual Afghan government officials suggesting a resignation to the reality of MTN's shutdown policy, the official Afghan government position – conveyed at in-person meetings held with MTN, including at least one with President Karzai himself – was that cell-phone companies must keep their towers active at night.  The U.S. government was even more strongly committed to that position.  ISAF leadership especially rejected the suggestion that MTN's conduct represented an acceptable way of protecting its network.  ISAF expected MTN to keep its towers on, invest in security to protect them itself rather than paying the Taliban, and ultimately rebuild them if necessary.  ISAF considered that course of action not only feasible, but mandatory for a company like MTN reaping profits in an insurgency-afflicted country like Afghanistan.

### 5.   MTN's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With MTN's Historical Business Practices in International Markets

1069.   MTN's conduct above reflected a willingness to support America's enemies as a way to increase profits in Iran.

### i.   MTN Aided Terrorists in Afghanistan

1070.   While MTN Group was devising a plan to maximize its profits from its IRGC, including Qods Force, joint venture partner, the same MTN Group management team was

---

[526] U.S. State Dep't Cable ¶ 11, *Using Connection Technologies To Promote US Strategic Interests In Afghanistan* (July 23, 2009).

working to obtain business in Afghanistan. In 2006, MTN entered the Afghan market, and quickly established itself as the leading telecommunications company there through its embrace of its joint venture partner's ally, the Taliban, which at all relevant times was a SDGT.

1071.   Since entering the Afghan telecom market in 2006, MTN has grown to a dominant position by paying off terrorists. On information and belief, MTN made "protection payments" to the Taliban (including the Haqqani Network) of approximately $2,000 per month per cell tower, and at that rate MTN has paid the Taliban (including the Haqqani Network) more than $100 million in protection money since it entered Afghanistan. MTN has therefore provided millions in payoffs each year to anti-American terrorists in Afghanistan.

1072.   As it did in Iraq, MTN also provided direct operational support to anti-American terrorists targeting Americans in Afghanistan. MTN did so by covertly working with the Taliban to coordinate the shutdown of cell phone towers in a manner that was timed to benefit Taliban offensive operations against Coalition forces.

### ii.     MTN Aided the IRGC's Terroristic Violence against Iranian Pro-Democracy Demonstrators

1073.   MTN enabled the terroristic violence deployed by IRGC agents against peaceful pro-democracy and human rights protestors in Iran during the 2009 uprising popularly known as the "Green Revolution."

1074.   As the *L.A. Times* explained at the time, while Iran "brac[ed] for further confrontations between security forces and supporters of Mousavi …[,] [o]ne of the country's main cellphone operators, Irancell, co-owned by South Africa's MTN, warned customers [] that it would be suffering unspecified 'technical' problems over the next three days, which

349

coincide[d] with the anticipated unrest."[527]  MTN was lying to its customers and the world –

there were no "technical" problems but, rather, simply the IRGC's desire to shut down any

avenue for mass democratic mobilization against it – which MTN happily obliged.

1075.  MTN went beyond merely lying to its customers when it shut down its network at

the request of the IRGC.  MTN actively aided the IRGC by helping it develop sophisticated tools

for monitoring, eavesdropping, and surveilling targets.  MTN's technical services for the IRGC

did not merely benefit its domestic regime suppression; the exact same functions also benefit

foreign intelligence gathering, surveillance, and communications – critical competencies relevant

to the success of a terrorist attack against Americans in Iraq.

### iv.    MTN Aided Terrorists in Nigeria

1076.  MTN also aided violent actors in Nigeria.  On or about October 26, 2015, the

Nigerian Communication Commission fined MTN Group $5.2 billion for failing to meet a

deadline to disconnect 5.1 million unregistered subscribers in Nigeria.  Nigeria imposed the

deadline on all cellular operators in the country due to evidence that unregistered phones were

facilitating the activities of criminal gangs and terrorists, including Boko Haram.  The

requirements that MTN violated, the *Wall Street Journal* reported, were "meant to combat

terrorism."[528]  MTN eventually negotiated the criminal fine down to $1.67 billion and agreed to

pay it in seven installments.

---

[527] Borzou Daragahi, *Iran Court Warns Against Criticizing Proceedings*, L.A. Times (Aug. 3, 2009), 2009 WLNR 14945080.

[528] Alexandra Wexler, *Nigeria Reduces MTN Group Fine By $1.8 Billion*, Wall St. J. (Dec. 3, 2015).

### 6.  MTN's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States

1077.  MTN's joint venture with the IRGC, including its Hezbollah Division and Qods Force, and its related assistance for Hezbollah and Jaysh al-Mahdi, relied on significant contacts with the United States.  MTN Group was a key player in orchestrating both those U.S. contacts and MTN's material support to the IRGC, including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi.

1078.  MTN employs a top-down management structure in which MTN Group centralizes operational control over the functions performed by its various subsidiaries.  During the relevant timeframe, MTN Group divided responsibility for its subsidiaries into six business groups; MTN Irancell (and Afghanistan) fell under the purview of the Middle East and North Africa ("MENA") group.  The MENA group's functional units resided in Dubai and reported directly to senior management in South Africa.

1079.  MTN Group made the decision to enter a joint venture with the IRGC, including its Hezbollah Division and Qods Force, in 2004, when it began plotting "Project Snooker" to eject Turkcell from the existing deal.  As part of "Project Snooker" – negotiated and executed by MTN Group's senior management – MTN ejected Turkcell from Irancell.  MTN Group later rebranded Irancell as MTN Irancell.

1080.  Because MTN's business model depends on unstable countries, including Iran, one of MTN Group's core management responsibilities is to manage operational and political risk in the countries MTN enters.  Assessments of those risks occur both before the decision to enter a market – here, as MTN entered Afghanistan in the mid-2000s – and on an ongoing basis. In mitigating those risks – which here included designing a strategy for coordinating MTN's operational support for the IRGC, including its Hezbollah Division and Qods Force, in Dubai

351

and Iran – MTN Group implemented a number of measures, including the "appointment of a Group crisis manager"; the implementation of "physical and staff security measures"; and "[c]ontinual monitoring of the political environment in operating countries."[529]  MTN Group, not its operating subsidiaries, decided to do business with the IRGC, and Qods Force, fronts, and developed MTN's strategy related thereto.

1081.   Those policies required MTN Group's close supervision of MTN's payments to Qods Force fronts, operatives, and agents, and MTN Irancell's joint venture with the IRGC.  As explained above, MTN Group made the decision – and instructed its subsidiary – to enter into a joint venture with the IRGC, including its Hezbollah Division and Qods Force.  MTN Group also approved its subsidiary's practice of providing payments and operational support to the IRGC, including its Hezbollah Division and Qods Force, including sourcing hundreds of sensitive dual-use items for IRGC, including Qods Force fronts, operatives, and agents inside and outside Iran in Dubai to benefit the Iranian IRGC's, including Qods Force's, terrorist enterprise.  Those decisions had a substantial connection to the United States for the reasons explained below.

### i.        MTN's Conduct Targeted The United States

1082.   MTN's provision of material support to the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times, MTN knew that the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States.  The Joint Cells operated by the Qods Force, Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, these Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they

---

[529] *Id.*

could inflict pain in the United States and influence U.S. policy. As the Treasury Department stated when it announced the Qods Force's designation as a SDGT in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces…."[530] The Qods Force's, Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly stated goal was to effect a withdrawal of American forces from Iraq. Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

1083. MTN's decision to reach into the United States to obtain embargoed dual-use technology to aid the IRGC's, including the Qods Force's, terrorist enterprise was also expressly aimed at the United States. MTN knew, based on conversations with IRGC, including Qods Force, agents that the IRGC, including its Hezbollah Division and Qods Force, viewed MTN's assistance to the IRGC, including its Hezbollah Division and Qods Force, as vital to Iran's ability to protect the "security" of its Islamist revolution, *i.e.*, external terror operations aimed to spread the revolution and counteract the Great Satan (the United States). MTN knew that the IRGC's, including the Qods Force's, understanding of what was needed to protect Iranian "security" inherently involved terrorist violence against Americans as part of Iran's effort to export its Islamist revolution and drive the United States out of the Middle East.

1084. MTN also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including Qods Force, plot to develop cash flow and to source vital dual-use components for the IRGC, including Qods Force, Hezbollah, and Jaysh al-Mahdi.

---

[530] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

MTN further knew of the critical importance that communications and computing technology plays for terrorists.

1085.   When MTN sourced embargoed technology that the United States had publicly declared could benefit IRGC's, including Qods Force, efforts to kill others, it intentionally helped arm terrorists it knew were targeting the United States.  Indeed, the IRGC's, including the Qods Force's, direct statement in their contract with MTN obligated MTN to help the IRGC, including its Hezbollah Division and Qods Force, protect Iran's "security."  MTN at all times knew or recklessly disregarded that "security" was a euphemism for IRGC, including Qods Force, terrorist operations outside of the territorial borders of Iran.  When MTN obtained the technology requested by its partners in the IRGC, including its Hezbollah Division and Qods Force, MTN targeted the United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

1086.   Although MTN's primary motivation for assisting the IRGC, including its Hezbollah Division and Qods Force, was financial, it also intended to harm Americans in Iraq.  One reason MTN cooperated with the IRGC, including its Hezbollah Division and Qods Force, was to align itself with their effort to drive Americans out of the country.  MTN had two distinct but related reasons for desiring that outcome.

1087.   *First*, MTN intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the Ayatollah and the IRGC, including its Hezbollah Division and Qods Force.  The Ayatollah and the IRGC, including its Hezbollah Division and Qods Force, were explicit – both in public, and in conversations with MTN – that it wanted MTN's financial and technical help in fighting against U.S. forces in particular.  Thus, for MTN to achieve its business objectives vis-à-vis its joint venture partners the Ayatollah and

the IRGC, including its Hezbollah Division and Qods Force, MTN needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

1088.  *Second*, MTN Group's support for attacks against U.S. citizens by the Joint Cells advanced the foreign-policy interests of MTN Group's most important business partner, the Bonyad Mostazafan and IEI, which MTN at all times knew to be IRGC, including Qods Force, fronts.

1089.  MTN Group depends on its partnership with the Ayatollah and the IRGC, including its Hezbollah Division and Qods Force.  As of 2012, Iran was MTN's fastest growing market and its third largest source of revenue overall.  Today, Iran is MTN's second-biggest market by subscribers.  MTN Group's financial incentive to satiate the Ayatollah and its IRGC, including Qods Force, partners has led it to take a number of illegal steps to assist the Iranian regime.  Three South African investigative journalists summarized these acts in an informative headline, "MTN [is] in bed with Iran's military."[531]

1090.  MTN Group cooperates with the Ayatollah, and the IRGC, and including the Qods Force, despite knowing that the Ayatollah, and the IRGC, and including the Qods Force, are collectively the world's worst sponsor of anti-American terrorism.

1091.  MTN Group's agreement to aid the IRGC, including its Hezbollah Division and Qods Force, served the IRGC's, including the Qods Force's, agenda of inflicting death and injury on U.S. forces.  It also fulfilled MTN Group's contractual obligation to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force, partner.[532]

---

[531] Craig McKune et. al, *MTN In Bed With Iran's Military*, Mail & Guardian (Feb. 10, 2012).

[532] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005), attached as Exhibit A.

Such cooperation offered MTN Group additional motivation for becoming joint venture partners with the IRGC, including its Hezbollah Division and Qods Force. MTN's support for the IRGC, including its Hezbollah Division and Qods Force, did not merely grow its profits by allowing it to obtain the Irancell business in the first instance; it also benefited MTN's business by inflicting harm on an enemy (the United States) of MTN's most lucrative business partner (the IRGC, including its Hezbollah Division and Qods Force, fronts that controlled MTN Irancell) in order for MTN to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market in Iran.

### ii.    MTN's Conduct Relied On American Contacts

1092.   MTN Group also connected MTN Group's and MTN Dubai's support of the IRGC, including its Hezbollah Division and Qods Force, and Jaysh al-Mahdi, to the United States by obtaining technology and vital operational support in reliance on U.S. contacts. MTN Group and MTN Dubai orchestrated a complex scheme to surreptitiously supply technology and operational support for the MTN Irancell through various U.S. agents. In doing so, MTN Group and MTN Dubai tied MTN's unlawful conduct to the United States in several ways.

1093.   Even while MTN Group was reaching into the United States to launch a multifaceted campaign to facilitate the flow of U.S. dollars to and from MTN Irancell, its CEO continued expressing his contempt for the United States. Instead of exiting MTN Group's and MTN Dubai's conspiracy with the IRGC, MTN Group's President and CEO defiantly pronounced that "U.S. sanctions should not have unintended consequences for non-U.S. companies."[533]  This public statement by MTN Group's President and CEO furthered the

---

[533] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

terrorist conspiracy because it concealed the existence of the conspiracy while simultaneously releasing specific IRGC disinformation.

> **(a)** **From 2012 Through 2019, MTN Group Regularly Reached Into The United States In Order To Unlock The U.S. Financial System So That MTN Group Could Repatriate Hundreds Of Millions Of Dollars Out Of MTN Irancell**

1094.   MTN Group and MTN Dubai regularly engaged in large six- and seven-figure U.S. dollar transactions that flowed through the New York financial system before leaving the United States to flow into accounts controlled by an IRGC "buffer" such as an agent, operative, cut-out, front, and Orbit companies.

1095.   MTN Group and MTN Dubai's use of the New York financial system was not incidental.  On information and belief, beginning on or about 2012 and continuing through on or about 2019, MTN Group, MTN Irancell, and MTN Dubai routinely relied upon banks in New York to manage the cash flow of MTN Group, MTN Dubai, and MTN Irancell, which was its most important (and cash intensive) investment in the Middle East.

1096.   MTN Group established banking relationships with U.S. financial institutions and multinational financial institutions with U.S.-based subsidiaries or offices no later than 2013.

1097.   For example, MTN Group disclosed that it has a relationship with the Bank of New York, located at 101 Barclay Street, New York, NY 10286, as its depository bank. Similarly, in 2015, MTN Group disclosed its relationship with Citibank, whereby it guaranteed a syndicated loan facility worth $1 billion, the same facility from which MTN International (Mauritius) Limited, the MTN Group subsidiary used to make corrupt payments to Iranian officials, had drawn $670 million.

1098.   Following the easing of sanctions, in January 2016, MTN focused on repatriating funds from Iran.  Indeed, MTN Group saw the easing of sanctions as an opportunity to "normalize" its repatriation of monies from MTN Irancell.

1099.   On October 24, 2016, MTN Group admitted that "MTN has commenced the repatriation of funds from MTN Irancell to MTN Group."[534]  On December 14, 2016, "Bloomberg report[ed] that MTN Group … extract[ed] several hundred million dollars with the help of European banks, and it [was] looking to take a total of around USD1 billion by the end of March 2017," which "include[d] a *USD430 million loan repayment from MTN* Irancell."[535]

1100.   The MTN Irancell profits that MTN Group withdrew covered the period when nearly every Plaintiff was injured.  When MTN Group coordinated a global strategy to facilitate the repatriation of its MTN Irancell profits, MTN Group reached into the United States to obtain an enormous benefit – the money it made – that was itself the motivation for the terrorist finance that killed and injured Plaintiffs.

1101.   On information and belief, MTN Group utilized its banking relationships with U.S. financial institutions and/or financial institutions with U.S. subsidiaries or offices, including but not limited to the Bank of New York and Citibank, to facilitate the repatriation of funds from MTN Irancell to MTN Group.

1102.   Each time MTN Group and MTN Dubai used New York's financial system, they did so in a context where they benefited from the New York financial system, and New York laws, and they knew that the New York financial system imparted extra value to every transaction based upon its stability and reputation.

---

[534] MTN Group Ltd., Mtn Group Limited - Quarterly Update For The Period Ended 30 September 2016, South African Company News Bites – Stock Report (Oct. 24, 2016).

[535] CommsUpdate, MTN Extracts First Cash From Iran (Dec. 14, 2016), 2016 WLNR 38124973.

**(b)   MTN Group Facilitated A $400,000 Bribe That Flowed Through The New York Financial System To A Cut-Out For The IRGC And Into The Budget Of The IRGC, Including Its Hezbollah Division And Qods Force**

1103.   MTN Group's U.S. contacts were essential to the initial bribe that allowed MTN Group to pilfer the Irancell license from Turkcell in the first instance and was the proximate and but-for cause of MTN Group's and MTN Dubai's subsequent ability thereafter to assist the IRGC, including its Hezbollah Division and Qods Force's, terrorist enterprise, and join the terrorist conspiracy.

1104.   MTN Group relied upon bank accounts in New York to complete the $400,000 wire that MTN Group sent to a recipient in 2007 who acted on behalf of the IRGC, including its Hezbollah Division and Qods Force.  That payment depended upon MTN Group's use of bank accounts in New York, which cleared the dollar transaction.

1105.   MTN Group caused the issuance of the $400,000 wire to the cutout for the IRGC, including its Hezbollah Division and Qods Force, also aided the IRGC's, including the Qods Force's, efforts to covertly obtain U.S. dollars – the vital common currency of terrorist finance – to fund Joint Cell attacks against Americans in Iraq.

1106.   It would be improper to suggest that the absence of a direct on-paper linkage between the IRGC's cutout and the IRGC plausibly suggests that the $400,000 did not flow through to the IRGC, including its Hezbollah Division and Qods Force.

**(c)   MTN Group And MTN Dubai Conspired To Provide, And Did Provide, A Stable, Robust, And Devastating Pipeline Of Illicitly Acquired State-of-the-Art American Technologies To The IRGC, Including Its Hezbollah Division And Qods Force, Including Untraceable American Smartphones**

1107.   MTN Group's co-conspirators have already confessed to the crimes they committed in coordination with MTN Group's joint offenses with MTN Group.  For example,

359

Mohammad Hajian testified "that he sold super-computers worth about $14-million to 'a South African cellphone company in Iran [a reference to MTN]', rather than to the regime itself."[536]  At the time, his "alleged co-conspirator [was] also on trial in the US on charges that he serviced embargoed US technology for a 'front company' of MTN Irancell."[537]

1108.   Like MTN Group and MTN Dubai, Mr. Hajian's legal "memorandum" "stated that the network was geared solely for a deal with MTN Irancell: 'All the merchandise was for non-military use and was intended to facilitate a joint venture between a South African cellphone company and a non-governmental Iranian entity related to the provision of civilian cellular telephone service within Iran.'"

1109.   United States District Judge "Virginia Hernandez-Covington" rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and "ruled that the ["[e]nterprise level server"] equipment sold to MTN Irancell in 2009 'could be dangerous' in Iran, whether controlled by the government or by MTN Irancell."[538]

1110.   Federal "[p]rosecutors" also rejected the suggestion that MTN Irancell was a civilian phone company that was not under the control of the IRGC, and told the district court" "that the ['[e]nterprise level server'] equipment sold to MTN Irancell in 2009 could have military applications and be used to spy on citizens."[539]  Prosecutors explained:  "Even if used by [MTN] Irancell now, Iran could redeploy the equipment at any time … The equipment is capable of

[536] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[537] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[538] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[539] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

being used by Irancell, or others, to access private information about subscribers and possibly communications content."[540]  Indeed, "[t]he equipment Hajian was found to have illegally sold included a Sun Microsystems M9000 'enterprise level server, the largest and most powerful Unix processor that Oracle Sun sells," and a "Hitachi Data Systems array," which prosecutors "described as having the capacity to support various applications and 'store vast amounts of data useful for large companies and [defense] departments.'"[541]

1111.   After pointedly noting Judge Hernandez-Covington's ruling that the provision of U.S.-sold enterprise level server equipment to MTN Irancell "could be dangerous," the *Mail & Guardian* journalists who followed Mr. Hajian's trial also rejected the suggestion that MTN Irancell was a civilian company rather than an IRGC front:

> In any event, Hajian's assertion that Irancell was a civilian, non-governmental partnership was ***inaccurate***.  Although MTN owns 49% of the company, the balance is held by a consortium owned by two state-linked partners.  The first, the purportedly charitable Bonyad Mostazafan Foundation, is ***understood to be controlled by the Iran Revolutionary Guard*** and the second, the state-owned defence company Sairan, reports directly to Iran's minister of defence.[542]

### (d)     MTN Obtained U.S. Technology For The Benefit Of The IRGC, Including Its Hezbollah Division And Qods Force

1112.   MTN's U.S. contacts were essential to the technological assistance it provided to the IRGC, including its Hezbollah Division and Qods Force, and Hezbollah and, through Hezbollah, to Jaysh al-Mahdi.  At all relevant times, MTN relied upon U.S. agents to illegally

---

[540] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[541] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

[542] Rowan Philp and Craig McKune, *US Trial Turns Heat On MTN*, Mail & Guardian (Feb. 15, 2013), https://mg.co.za/article/2013-02-15-00-us-trial-turns-heat-on-mtn-1/.

source dual-use technology from the United States that benefited the Joint Cells' terrorist enterprise.

1113.   As a condition of its contract with the IRGC, including its Hezbollah Division and Qods Force, MTN promised to obtain embargoed U.S. technology to benefit the IRGC's, including the Qods Force's, terrorist enterprise.

1114.   Between 2009 and 2012, one or more purchasing agents working for the IRGC, including its Hezbollah Division and Qods Force, in the U.A.E. and elsewhere, spending money provided by MTN Group, and acting at the direction of MTN Group and its IRGC, including Qods Force, ally, collectively wired more than $5,000,000 into the United States to associates in the U.S. who purchased embargoed technology for the IRGC's, including the Qods Force's benefit, which was then shipped from the U.S. to the U.A.E., where the IRGC, including its Hezbollah Division and Qods Force, assumed possession of the technology for use in its terrorist enterprise.

1115.   On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents to pay for the embargoed dual-use U.S. technology it illegally obtained for the IRGC, including its Hezbollah Division and Qods Force, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally obtain embargoed dual-use U.S. technology for the benefit of the Qods Force's terrorist enterprise.

> **(e)     MTN Obtained Essential U.S. Services That Aided The IRGC's, Including Its Hezbollah Divison's And Qods Force's, Terrorist Capabilities.**

1116.   MTN's U.S. contacts were also key to its ability to obtain technical support from U.S. persons operating inside America, without which the IRGC, including its Hezbollah

Division and Qods Force, could not have derived the terrorist benefits they did from MTN Irancell including the cash flow, network reliability, and enterprise computing benefits.

1117.   Between 2009 and 2012, and on information and belief ever since the mid-2000s, MTN Irancell relied upon one or more U.S. persons to service MTN Irancell's enterprise-level computers and associated networks, relying on one or more U.S. persons to maintain MTN Irancell's network remotely from the U.S. and, on at least one occasion, having such U.S. person travel to meet with MTN's IRGC, including Qods Force, allies in the U.A.E. to provide training to the Qods Force.  MTN, or agents acting at MTN's direction, sourced embargoed technology for the IRGC's, including the Qods Force's, benefits from, among others, Akbari, Patco, MSAS, and TGO.

1118.   MTN routed millions of dollars each year to its U.S. agents, and sourced the sensitive dual-use U.S. technology, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to provide services, or obtain sensitive dual-use U.S. technology, for the benefit of the IRGC's, including the Qods Force's, terrorist enterprise.

1119.   On information and belief, MTN and/or MTN's agents routed millions of dollars each year to its U.S. agents in order to pay for the technology support services it illegally obtained for the IRGC, including its Hezbollah Division and Qods Force, via transactions through the New York banking system, by causing money to be wired to MTN's U.S. agents to pay for MTN's U.S. agents to illegally provide technological support to maintain MTN Irancell for the benefit of the IRGC's, including the Qods Force's, terrorist enterprise.

B. **The ZTE Defendants**

1. **ZTE Joined The Terrorist Conspiracy**

    i. **Through Agreements With IRGC Fronts Including But Not Limited To TCI, ZTE Agreed To Join A Company-Wide Conspiracy**

1120.   MTN Group and ZTE Corp. followed the same IRGC playbook because they joined the same conspiracy.  Reuters concluded that "MTN was not alone" because "other foreign companies, including" "China's ZTE Corp, [] helped Iran undermine increasingly tougher sanctions."[543]

1121.   ZTE and its subsidiaries, including ZTE USA and ZTE TX, entered into a conspiracy to provide U.S.-origin goods and services, in violation of U.S. sanctions, to TCI.  The agreement was in the form of contracts that ZTE signed with TCI and, on information and belief, MTN Irancell and MCI.  The conspiracy was adopted by ZTE's senior leadership and deployed throughout ZTE and its subsidiaries, including ZTE USA and ZTE TX.

1122.   On information and belief, ZTE's contracts with its IRGC-front Iranian counterparties all included pledges to assist with the "security" of Iran.

    ii. **ZTE, ZTE USA, And ZTE TX Each Made Overt Acts In Furtherance Of The Conspiracy**

1123.   Each of the ZTE Defendants, ZTE, ZTE USA, and ZTE TX acted in furtherance of the conspiracy by, *inter alia*, (a) sourcing U.S.-origin technology, embargoed by the United States and useful to the terrorists, for export to the IRGC, including its Hezbollah Division and Qods Force, (b) entering into contractual relationships with U.S. suppliers to acquire the "essential" technology needed by the terrorists, (c) developing and using third-party companies

---

[543] Steve Stecklow, *How A Telecom Gian Got Round Sanctions On Iran*, Reuters (Aug. 30, 2012).

to both conceal and facilitate its business with IRGC-front companies, (d) comingling U.S.-origin technology with non-U.S.-origin technology in order to evade detection of the scheme and conspiracy, (e) lying to U.S. prosecutors and financial institutions regarding the nature of their activities in Iran and their true IRGC-front counterparties, (f) destroying evidence related to the scheme and conspiracy, and (g) moving one or more witnesses in the United States with knowledge of the scheme and conspiracy out of the jurisdictional reach of the United States.

> **2.      ZTE Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's — Including Lebanese Hezbollah's And The Qods Force's — Terrorist Enterprise Against Americans Worldwide**

1124.   ZTE bid on and secured contracts worth hundreds of millions of dollars to install cellular and landline network infrastructure in Iran.  ZTE knew that its counterparties were IRGC, including its Hezbollah Division and Qods Force, fronts, operatives, or agents.  ZTE thereafter developed an elaborate system to fulfill those contracts using US-origin items, including dual-use goods controlled by the U.S. government due to their terrorism applications. ZTE did this in collaboration with, and with the assistance of, ZTE USA and ZTE TX.

> **i.      ZTE Corp., ZTE USA, And ZTE TX Knowingly Facilitated MTN Irancell And TCI's Acquisition Of Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies**

1125.   Before 2011, ZTE sourced U.S. technology for the IRGC, including its Hezbollah Division and Qods Force.  A Department of Justice Press Release dated March 7, 2017 (the "March 2017 Press Release") stated that ZTE violated U.S. sanctions by sending U.S.-origin items to Iran.  It also announced ZTE's guilty plea to those charges and agreement to pay the U.S. government $892,360,065.  ZTE repeatedly violated export controls and illegally shipped U.S. technology to Iran, according to the March 2017 Press Release.  On information and belief, ZTE did so in collaboration with and with the assistance of ZTE USA and ZTE TX.

1126.   ZTE's, ZTE USA's, and ZTE TX's (after its formation) company-wide scheme to obtain U.S.-origin goods and to evade export controls to get telecommunications technology into the hands of the IRGC, including its Hezbollah Division and Qods Force, lasted from as early as 2010 to as late as 2016.  While ZTE TX was not formed until at least 2013, Plaintiffs allege that ZTE TX and its employees participated in the scheme thereafter.

1127.   The cell phone technology and equipment ZTE sourced from inside the United States was subject to the embargo imposed and enforced by the United States Government.  ZTE thus violated export controls designed to keep sensitive American technology out of the hands of IRGC, including its Hezbollah Division and Qods Force.

1128.   Through this scheme between January 2010 and January 2016 ZTE exported over 20 million U.S.-origin items to the IRGC, including its Hezbollah Division and Qods Force, with a value of approximately $32,000,000.  ZTE did so without obtaining proper export licenses.

1129.   To evade the U.S. embargo, ZTE devised a scheme whereby an "isolation company" would be the vehicle used to hide ZTE's shipment of prohibited U.S. technology to the IRGC, including its Hezbollah Division and Qods Force.

1130.   In early 2011, when ZTE determined that the use of its original "isolation company" was insufficient to hide ZTE's connection to the illegal export of U.S.-origin goods to the IRGC, including its Hezbollah Division and Qods Force, ZTE re-evaluated its strategy.  In September 2011, four senior ZTE managers signed an Executive Memo which proposed that ZTE identify and establish new "isolation companies" that would be responsible for supplying U.S. component parts necessary for projects in embargoed countries.

366

1131.   After an international publication in March 2012 publicly revealed ZTE's sale of prohibited equipment to Iran, ZTE temporarily stopped sending U.S. equipment to the IRGC, including its Hezbollah Division and Qods Force.

1132.   But in July 2014, ZTE began shipping U.S.-origin equipment to the IRGC, including its Hezbollah Division and Qods Force, once again without the necessary licenses. Thus, properly understood, ZTE's temporary pause was not the rumblings of a corporate conscience causing it to separate from terrorists but, rather, an effort to pause their support while they assessed whether they could get away with it.  Once ZTE believed it could, on or about 2014, they resumed their support for the IRGC, including its Hezbollah Division and Qods Force.

1133.   ZTE made these additional shipments by using a new "isolation company."  In the new version of the scheme, ZTE purchased and manufactured all relevant equipment – both U.S.-origin and ZTE-manufactured – and prepared them for pick-up at its warehouse by the new isolation company.  The new isolation company then shipped all items to the IRGC, including its Hezbollah Division and Qods Force.

1134.   In the ZTE 2017 OFAC Settlement, ZTE, and its subsidiaries, including but not limited to ZTE USA and ZTE TX, admitted, in relevant part:

(i)      From on or about January 2010 to on or about March 2016, ZTE, ZTE USA, and ZTE TX (starting on or after the date of its formation) together exported, sold, or supplied United States goods to Iran or the Government of Iran with knowledge that the goods were intended specifically for Iran or the Government of Iran and thereby evaded or avoided, attempted and/or conspired to violate, and/or caused violations of the prohibitions set forth in the ITSR.

(ii)     ZTE, ZTE USA, and ZTE TX together engaged in at least 251 such transactions, and the total value of U.S.-origin goods in the 251 transactions constituting the apparent violations was $39,622,972.

(iii)     From approximately as early as November 2010 to approximately March 2016, ZTE's senior leadership developed and adopted a company-wide scheme (meaning ZTE USA and ZTE TX, starting on or after the date it was formed, were involved) to evade U.S. economic sanctions and export control laws.

(iv)     ZTE's actions were developed and approved by the highest levels of its management and entailed the use of third-party companies to both conceal and facilitate its business with fronts for the IRGC, including its Hezbollah Division and the Qods Force.

(v)     ZTE, ZTE USA, and ZTE TX together were "specifically aware of and considered the legal risks and consequences of violating U.S. economic sanctions and export control laws," and were "specifically aware" of the potential consequences "if the U.S. government learned of [ZTE]'s unauthorized reexportation of U.S.-origin goods to sanctioned countries, including Iran."

(vi)     Despite recognizing that "violations of U.S. law would be 'inevitable' if ZTE exported and/or reexported U.S.-origin goods to Iran," ZTE, ZTE USA, and ZTE TX (starting on or after the date of its formation) together reexported and supplied a substantial volume of U.S.-origin goods to Iran from at least January 2010 to approximately March 2016 and "pursued and developed an evasive practice of 'risk avoidance' by utilizing isolation companies and other concealment activities" to do so.

(vii)     ZTE's contracts with Iranian companies from 2010 and 2012 required ZTE to export and/or reexport goods, services, and technology to Iran with the purpose of enhancing

Iran's telecommunications infrastructure, which in turn required supplying and/or attempting to supply Iran with U.S.-origin goods subject to the U.S. Department of Commerce's Commerce Control List for anti-terrorism, national security, regional stability, and encryption item purposes and enhancing the law enforcement surveillance capabilities and features of Iran's telecommunications facilities and infrastructure.

(viii)  ZTE temporarily ceased performance of one of its contracts with an Iranian company [TCI], when Reuters reported in March 2012 that ZTE was circumventing U.S. sanctions law to provide U.S.-origin goods to TCI, but ZTE resumed its unlawful activity thereafter and "would not ultimately cease its unlawful activity or cooperate with the U.S. government until on or about March 2016."

(ix)  ZTE informed the U.S. government agencies and the public in 2012 that it was winding down its reexports of U.S.-origin goods to Iran.  However, approximately one year later in November 2013, ZTE resumed its unlawful business activities with Iran without updating or informing the U.S. government agencies of this change until on or about April 6, 2016.

(x)  In connection with the decision to resume its business with fronts for the IRGC, including its Hezbollah Division and the Qods Force, in approximately November 2013, ZTE's highest-level leadership instituted directives authorizing various divisions of the company to surreptitiously resume business with those IRGC fronts, including by using a new third-party isolation company to conceal the resumption of prohibited activities from U.S. government investigators, the media, and others outside of ZTE.

(xi)  ZTE USA and ZTE TX were directly implicated and directly participated in the scheme:  (i) the ZTE 2017 OFAC Settlement Agreement, including its admissions of wrongdoing, was entered into by ZTE and its subsidiaries and affiliates, including ZTE USA and

369

ZTE TX; (ii) the acts ZTE, ZTE USA and ZTE TX, agreed they had done included shipping embargoed items from the United States by comingling those items with foreign-made non-embargoed items; (iii) the conduct detailed therein as violations of the U.S. sanctions regime was done via activity within the United States, was described as a "company wide" scheme, and U.S.-origin goods were described as "essential," so on information and belief ZTE USA and ZTE TX participated directly in those activities; (iv) ZTE entered into contractual arrangements with U.S. suppliers, including Qualcomm and Broadcom, through and by ZTE USA, through which ZTE obtained the key technology for export to Iran; (v) an employee, on information and belief, of either a ZTE USA or ZTE TX, was instructed by ZTE in China to leave the United States based on conduct done within the United States; (vi) ZTE has disclosed publicly that the same individual, Cheng Lixin, was simultaneously an officer of ZTE and the CEO of ZTE USA; and (vii) on information and belief the ZTE USA and ZTE TX were subject to multiple law enforcement subpoenas and ZTE USA and ZTE TX facilities were searched by United States authorities related to wrongdoing done in the United States.

    1135. ZTE modernized telecommunications technology used by Iranian entities that were controlled by the IRGC, including its Hezbollah Division and Qods Force, fronts, thereby pumping additional revenue into the coffers of the IRGC, including its Hezbollah Division and Qods Force, and thereby Hezbollah and Jaysh al-Mahdi.

    1136. ZTE, ZTE USA, and ZTE TX (after its formation) provided substantial banned technology to Iranian companies that were controlled by the IRGC, including its Hezbollah Division and Qods Force. Thereby, ZTE's illegally sourced technology ordinarily flowed through to Hezbollah. That banned technology was crucial to perpetrate terrorism. By way of

example, terrorists were able to use cell phones and other telecommunication technology and software to perpetrate attacks on Americans.

1137.  ZTE also assisted the terrorist enterprise by serving as a long-term strategic partner for MTN Irancell, which was a front for the IRGC, including its Hezbollah Division and Qods Force.

1138.  It would be improper to characterize ZTE's role as only modernizing Iran's cellular and communications systems or providing cellular and landline telecommunications infrastructure for use by the Iranian population.  On top of the millions of dollars that ZTE provided to the IRGC (including its Hezbollah Division and Qods Force) via TCI, ZTE also provided technical aid to the IRGC (including its Hezbollah Division and Qods Force) which facilitated terrorism.  ZTE's, ZTE USA's, and ZTE TX's (after its formation) technology transfers were devastating to America's ability to protect Americans overseas from attacks committed by Iranian terrorist proxies like Hezbollah. This was because, as a result of their actions, "[t]he IRGC will also [was] a position to benefit from sensitive monitoring technology it can put to its advantage to enhance its surveillance abilities," which the IRGC, including its Hezbollah Division and Qods Force, acquired after "ZTE Corporation sold TCI a powerful surveillance system capable of monitoring landline, mobile and internet communications."[544] ZTE's, ZTE USA's, and ZTE TX's (after its formation) technology transfer uniquely provided terrorists the ability to intimidate and coerce civilian populations.

1139.  For example, according to U.S. diplomatic cables and statements by Lebanese government officials, TCI and the Qods Force helped build Hezbollah's fiber optic communication system, which was upgraded to include encrypted high-speed lines, and

---

[544] Dr. Ottolenghi Sept. 17, 2015 Testimony.

included, according to public reports and on information and belief, Defendants' "Western

technology." This communication network facilitated intelligence collection and operations in

Iraq, and helped Hezbollah defend against US intelligence collection. Hezbollah officials said

that this network was their most valuable weapons system.[545] TCI's work in Lebanon,

incorporating technology illegally smuggled by Defendants, enabled the IRGC, including its

Hezbollah Division and Qods Force, to fully integrate Hezbollah into its transnational command,

control, communications, computing, intelligence, surveillance, and reconnaissance apparatus.[546]

1140. Further, Iranian cellular networks, administered by ZTE and Huawei (for MTN),

were also used to track and target U.S. forces in Iraq. Because they included US technology,

they could be used to locate U.S. forces with precision. U.S. soldiers close to the Iranian border

would get continuously pinged by Iranian cell phone towers. The "ZXMT" monitoring system

that ZTE sold to Iran (with U.S.-origin components) could use this data to triangulate their

positions and monitor their communications. The IRGC, including its Hezbollah Division and

Qods Force, also continuously upgraded Hezbollah's communications systems, enabling them to

deploy cellular phone systems securely and thwarting U.S. efforts to collect intelligence on their

operations.[547]

1141. For a terrorist group intent on targeting Americans traveling in tightly secured

convoys or on heavily fortified bases, the technology that ZTE (via, on information and belief

ZTE USA and ZTE TX) provided bolstered the terrorists' ability to conduct successful

---

[545] Liz Sly, Lebanon's fiber-optic powder keg; Iran's hand seen in Hezbollah's growing
communication grid, amid fears of 'state within a state, ' *Chicago Tribune*, May 16, 2008.

[546] Carl Anthony Wege, "Hizbollah–Syrian Intelligence Affairs: A Marriage of Convenience,"
*Journal of Strategic Security*, Volume 4, Issue 3, 2011.

[547] Colin P. Clarke, "How Hezbollah Came to Dominate Information Warfare," *Jerusalem Post*,
September 17, 2017.

surveillance. The technology ZTE provided was vitally important to their ability to execute successful attacks, like the ones that killed and injured Plaintiffs and their loved ones. For these reasons, ZTE's acts, which allowed terrorists access to modern telecommunications technology they could not otherwise obtain, facilitated intimidation, coercion, and violent acts and acts dangerous to human life.

1142.   The ample evidence of ZTE's own consciousness of guilt supports the inference that ZTE knew it was benefiting the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise.

1143.   In 2017, the United States Commerce Department disclosed two internal ZTE documents it had discovered during its investigation. The first, from 2011 and signed by several senior ZTE executives, detailed how the company had ongoing projects in Iran. Written by ZTE's general counsel, signed by its senior management, and flagged as "Top Secret," the document described a number of ways in which Defendants ZTE and its U.S. subsidiaries (including ZTE USA) were, in concert, violating U.S. laws well before 2011.[548]  In sum and substance, it indicates that while high-level managers of ZTE were also directors of ZTE USA, and frequently shuttled between the two countries, their company's U.S. research centers — soon thereafter to be overseen by ZTE TX — were "often" engaged in the illegal transfer of U.S. research data to China. It also indicates that ZTE was illegally exporting US-origin technology as early as 2005, and that ZTE, as well as its officers, knew that they could face both criminal and civil penalties based on their then-existing contracts. The second document laid out detail in

---

[548] ZTE "Report Regarding Comprehensive Reorganization and the Standardization of the Company Export Control Related Matters (Top Secret Internal Use Only)," August 5, 2011.

a complex flow chart a ZTE's proposed method for circumventing United States export controls and getting U.S.-origin technology to Iran.

1144. According to the then-Acting Assistant Attorney General, Mary B. McCord, "ZTE engaged in an elaborate scheme to acquire U.S.-origin items, send the items to Iran and mask its involvement in those exports," and the plea agreement ZTE signed "alleges that the highest levels of management within the company approved the scheme."

1145. In 2012, after ZTE's original contract with TCI, which allowed the IRGC (including its Hezbollah Division and Qods Force) to build a country-wide surveillance system capable of monitoring landline, mobile, and internet communications, was widely reported, ZTE claimed it would stop its business with fronts for the IRGC, including its Hezbollah Division and the Qods Force. In or around March 2012, ZTE spokesman David Shu said in a telephone interview "[w]e are going to curtail our business in Iran." Although that was a lie, because ZTE thereafter doubled-down on its business relationships with the IRGC, including its Hezbollah Division and Qods Force, fronts, it was also an admission that such business was fraught with risk that it would support and contribute to terrorism.

1146. Ashley Kyle Yablon, ZTE USA's former general counsel, gave the FBI an affidavit in May 2012 in which he alleged ZTE had plotted to cover up the Iran sales. ZTE employees asked Mr. Yablon, a ZTE USA employee, to help develop a strategy to transfer U.S.-origin goods to sanctioned countries. Yablon has indicated that in the course of the U.S. investigation into ZTE's transfer of U.S.-origin technology to Iran, ZTE internally discussed destroying evidence, and it has been reported that ZTE employees told Mr. Yablon to gather the evidence that he had of the U.S.-origin technology transfers to Iran, which he had in the United States, and Mr. Yablon instructed ZTE USA employees not to destroy evidence regarding ZTE

USA's exports relevant to ZTE's agreement to export U.S.-origin goods. After the Yablon affidavit became public in July 2012, ZTE, which otherwise directed his activities in the United States, placed Yablon on administrative leave.

1147. ZTE destroyed evidence of its business with fronts for the IRGC, including its Hezbollah Division and Qods Force, and, on information and belief, ZTE USA destroyed evidence in the United States of its business with fronts for the IRGC, including its Hezbollah Division and Qods Force.

1148. There has been public reporting related to ZTE's internal documentation of its strategies for how to get around export controls so it can do business with state sponsors of terrorism. Those strategies included using a codeword for Iran in internal documents. On information and belief ZTE USA and/or ZTE TX participated in these strategies.

1149. Throughout the scheme, ZTE attempted to conceal its export of U.S.-sourced technology to the IRGC, including its Hezbollah Division and Qods Force, by, among other things, requiring its employees to sign non-disclosure agreements, lying to its own lawyers regarding its exports, lying to a forensic expert hired to conduct an internal investigation, and adopting a policy and hiring thirteen (13) employees to alter, delete, and hide data relevant to the export sales.

1150. ZTE admitted that it assembled and authorized a team of IT employees to engage in a project to alter, process, sanitize, and/or remove references to Iran in ZTE's internal databases regarding its business with fronts for the IRGC, including its Hezbollah Division and the Qods Force. The IT team coordinated with various relevant divisions throughout the company, including the sales, procurement, and finance divisions, as well as ZTE's subsidiaries in the United States including but not limited to ZTE USA, to locate and remove any references

to Iran or ZTE's business with fronts for the IRGC, including its Hezbollah Division and the Qods Force. The employees executing this IT project were instructed to, and did in fact, delete their emails related to the project.

1151.  ZTE's acts related to its export of U.S. embargoed technology to Iran, and its attempts to hide and obscure the same, were labelled by the United States Government as a "cover-up."

1152.  In relation to ZTE's acts to export U.S. embargoed technology to Iran, and its attempts to hide and obscure the same, the U.S. Government charged ZTE with making materially false, fictitious, and fraudulent statements and representations to the United States Federal Bureau of Investigation.

1153.  In 2017, ZTE chairman and chief executive acknowledged guilt for its acts to evade the embargo and provide banned technology and goods to Iran, saying "ZTE acknowledges the mistakes it made, takes responsibility for them and remains committed to positive change in the company."

1154.  ZTE knew that it was breaking U.S. law when it exported sensitive telecommunications technology to the IRGC, including its Hezbollah Division and Qods Force, and knew or recklessly disregarded that the entities with which it was transacting business (and indeed who were receiving that technology) were fronts for IRGC, including its Hezbollah Division and Qods Force, terrorists who were actively attempting to kill Americans in Iraq as part of Joint Cells, and benefitted thereby.

1155.  From 2008 through at least 2016, ZTE's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC (including

its Hezbollah Division and Qods Force) which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

### ii. ZTE Corp., ZTE USA, And ZTE TX Substantially Increased MTN Irancell And TCI Revenue By Illicitly Sourcing Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies

1156. ZTE Corp.'s ZTE USA's, and ZTE TX's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI (including MCI), Exit40, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

1157. ZTE Corp., ZTE USA, and ZTE TX significantly increased the cash flowing through MTN Irancell and TCI, and ultimately being deployed by the IRGC, including its Hezbollah Division and Qods Force. They did so by illicitly supplying the state-of-the-art American technologies, like servers, to MTN Irancell and TCI, and by extension the IRGC (including its Hezbollah Division and Qods Force) needed to attack Americans abroad.

### iii. ZTE Corp., ZTE USA, And ZTE TX Routed Bribes To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies

1158. ZTE Corp. has engaged in serial bribery around the world to win business including large 6- and 7-figure bribes. According to a report published by a team of investigators hired by a hedge fund, "ZTE has engaged in systemic, centrally managed corruption at a scale rarely seen in international commerce."[549]

---

[549] Bill Gertz, Report Urges U.S. Action Against Chinese Telecom Giant ZTE Over Corruption Record, Washington Times (December 10, 2020), 2020 WLNR 35230015

1159.   On at least two prior occasions, the same ZTE Corp. leadership team here bribed foreign officials in procurement settings that were like MTN Irancell (other than being in a different geography).  ZTE Corp. paid nearly $800,000 to one decision-maker, more than $1 million to a second, and $10 million to a third (all serving in different countries).[550]

1160.   On March 13, 2020, NBC News reported that "ZTE" was "the subject of a new and separate bribery investigation by the Justice Department," under the Foreign Corrupt Practices Act ("FCPA").  The investigation "center[ed] on possible bribes ZTE paid to foreign officials to gain advantages in its worldwide operations."[551]

1161.   The Justice Department's current FCPA investigation concerning ZTE Corp. involves ZTE Corp.'s conduct within the United States.[552]

1162.   ZTE is not a "normal" multinational corporation but rather, a notoriously dirty company that seeks to advance the agenda of the Chinese Communist Party.  It is willing to engage in corrupt deals that most other corporations shun.  For example, NBC News (citing a Norges Bank Council on Ethics report) noted that "Norway's giant government pension fund

---

[550] Don Woolford, *Somare, The Controversial Father of PNG*, AAP Newswire (Febr. 25, 2021) ("[Michael Somare] faced various claims of impropriety or worse, including being given a $780,000 bribe by Chinese phone giant ZTE. He was found guilty of submitting late and incomplete financial statements.").

[551] Gretchen Morgenson and Tom Winter, *The U.S. Is Now investigating Chinese Telecom Giant ZTE For Alleged Bribery*, NBC News (Mar. 13, 2020) ("Morgenson and Winter, U.S. Is Now Investigating").

[552] This is necessarily true because, as the *Wall Street Journal* reported, "[t]he U.S. usually doesn't have jurisdiction to enforce the FCPA against foreign companies lacking securities that trade in the U.S., but can investigate such cases if actions took place within its borders, or if money used in the alleged scheme was wired through the nation's financial system."  Aruna Viswanatha and Corinne Ramey, *U.S. Probes Chinese Telecom Giant ZTE for Possible Bribery; The Justice Department Investigation Comes After The Company Already Pleaded Guilty To Dodging U.S. Sanctions On Iran*, Wall Street Journal (Mar. 13, 2020).

banned ZTE from its investment universe" in 2016 "based on 'the risk of severe corruption.'"[553] As *NBC News* stated, "*[o]nly three other companies* are barred by the Norwegians for 'gross corruption' alongside ZTE."[554]

1163.   ZTE Corp. has pursued an integrated global sales strategy, under which one may infer that ZTE Corp. followed the same, or a substantially similar, bribery tradecraft with respect to similar "pitches" for other state-owned telecom companies.

1164.   Plaintiffs' allegations comport with ZTE Corp.'s kickback schemes in other similarly situated governments, e.g., the Philippines, where ZTE Corp. paid millions in bribes.[555]

1165.   Audrye Wong is an Assistant Professor of Political Science and International Relations at USC and a Wilson Center China Fellow.  In 2021, Ms. Wong published a detailed analysis of Chinese economic tradecraft including, among other things, the Chinese Communist Party's heavy emphasis on bribery as a matter of policy:

> But perhaps *the most prominent feature of China's economic statecraft* is its use of *positive inducements*. These incentives come in two forms: under the table, whereby Beijing buys off political leaders through illicit deals, and by the book. … China often provides economic inducements in illicit and opaque ways … As Chinese companies have increasingly invested overseas, state-owned enterprises or private companies, sometimes with the tacit approval of Chinese officials, have offered bribes and kickbacks to elites in countries receiving investment or aid projects in order to grease the wheels of bureaucracy. At other times, Chinese

---

[553] *Id*.

[554] *Id*.

[555] "Chinese subversion has not worked as well in countries with greater transparency and oversight. Take the Philippines during the presidency of Gloria Arroyo, … Costs for a national broadband network, to be built by the Chinese state-owned company ZTE, skyrocketed by $130 million to $329 million *because of kickbacks to key political players*, including the chair of the Philippines' electoral commission and the president's husband. As if on cue, in 2005, the Philippines' national oil company signed an undersea resource exploration agreement that legitimized China's maritime claims.  Audrye Wong, *How Not to Win Allies and Influence Geopolitics: China's Self-Defeating Economic Statecraft*, Foreign Affairs, Volume 100; Issue 3 (May 1, 2021), 2021 WLNR 15954005.

companies have bypassed the process of competitive bidding and regulatory approval to secure a contract, often at inflated costs, generating extra profits for both Chinese actors and local elites. I call such inducements "subversive carrots." In many ways, their use reflects China's domestic political economy, where businesses depend on official connections, corruption is widespread, and few regulations govern foreign investment and foreign aid. My research shows that this method works **best** in countries that also have **little public accountability**-where the flow of information is restricted, and political leaders need not worry about public opinion and the rule of law.[556]

1166.   On information and belief, from 2010 through 2016, ZTE Corp. caused the payment of at least several million dollars, denominated in U.S. Dollars, to one or more officers, agents, or directors of MTN Irancell, TCI, and/or MCI. This money flowed through to fund and arm the IRGC's Shiite Terrorist Proxies and the IRGC's Sunni Terrorist Proxies to support their attacks against Americans around the world.

### 3.   ZTE's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With ZTE's Historical Sales Practices In International Markets

1167.   Like MTN, ZTE's conduct reflected a willingness to support America's enemies, and engage in illicit financial transactions, as a way to increase profits in Iran.  The same calculation pervaded ZTE's other conduct throughout the world.  ZTE's other conduct further demonstrates its pattern and practice of entering transactions with violent actors to increase ZTE revenue.

1168.   ZTE has been called a "poster child" for sales of Chinese made network equipment at low prices that "allow the Chinese government to eavesdrop on all communications running on their equipment."[557]

---

[556] Audrye Wong, *How Not to Win Allies and Influence Geopolitics: China's Self-Defeating Economic Statecraft*, Foreign Affairs, Volume 100; Issue 3 (May 1, 2021), 2021 WLNR 15954005.

[557] Bill Gertz, *Report Urges U.S. Action Against Chinese Telecom Giant ZTE Over Corruption Record*, Washington Times (December 10, 2020), 2020 WLNR 35230015

1169. **ZTE Aided North Korean Sanctions Busting.** Like Iran, North Korea is a designated state sponsor of terrorism with a long history of attacking and murdering Americans overseas. ZTE's illicit transactions concerning North Korea, therefore, further inform ZTE's deliberate support for terror.

1170. ZTE had a long-term relationship with North Korea. A 2020 civil forfeiture action revealed that — based on ZTE's disclosures to the U.S. government — it had dedicated account executives and a physical presence in North Korea no later than 2005 and 2007, respectively. ZTE tasked its North Korea account manager with creating two shell companies, one of which received North Korean payments in dollars, and the other of which transferred the money — often using the U.S. financial system — to ZTE. The value of the goods smuggled this way exceeded $300 million. During this time, North Korea had an extensive relationship with the IRGC, including its Hezbollah Division and Qods Force, and Hezbollah. One Court found this support included providing military hardware and training, most notably training for senior leaders and Hezbollah's intelligence cadre. Thereby, North Korea provided material support to Hezbollah, including but not limited to in relation to the illicit technology transferred to North Korea by ZTE.

1171. As part of its guilty plea, "ZTE … pleaded guilty … to violating U.S. sanctions against Iran and North Korea."[558] Like with Iran, when it helped North Korea source embargoed goods, ZTE knew or recklessly disregarded that it was engaging in illicit transactions with North Korean counterparties in violation of U.S. and international sanctions that were designed to choke off North Korea's support for terrorism. Moreover, even after ZTE got caught helping

---

[558] Gretchen Morgenson and Tom Winter, *The U.S. Is Now investigating Chinese Telecom Giant ZTE For Alleged Bribery*, NBC News (Mar. 13, 2020) ("Morgenson and Winter, *U.S. Is Now Investigating*").

North Korea evade U.S. sanctions (and pledged to be truthful with the U.S. government), ZTE lied and made additional false statements to American authorities.[559]

1172. Indeed, ZTE continuously pursued its strategy to bust terrorism-related sanctions for profit continuously since 9/11. For example, less than two weeks after that attack, commentators were already marveling over the audacity of ZTE's efforts to curry favor with the Taliban, even though they were understood to have sheltered bin Laden and contributed to the attack as a result. As one wrote at the time:

> China … has been playing its own complex "Great Game," through the Taliban in Afghanistan … [China] has not hesitated to link itself with revolutionary movements … The Chinese attitude towards radical "Islamism" is two-faced. Beijing is happy to train and send armed insurgents – separatist terrorists -- to … sow mischief wherever it can against Western interests. But it is also worried, sometimes to the point of paranoia, about the security threat to its own Uighur territory. … From the Beijing point of view, co-operation with the Taliban kills two birds with one stone. On the one hand, China has been **helping to nurture a very painful thorn in the West's backside**; on the other, it is buying off Taliban encouragement for Uighur separatists. …. [L]ast year, [the] Chinese telecommunications firm[], … ZTE, began work laying secure land-based phone lines between and within Kabul and Kandahar, and they may well be directly involved in providing communications services to the terrorist "underground" (literally, for it works from caves) in the Kandahar region. … China trie[d] to help the Afghan terrorist regime in its struggle against the West …[560]

---

[559] As *NBC News* noted, "[i]n the deal with the U.S. government [in 2017], ZTE also agreed to a denial of export privileges that could be activated for seven years if the company committed additional violations. In mid-April 2018, the Commerce Department activated the denial of privileges after determining that ZTE had made false statements to the government about actions it had taken to punish employees involved in the Iran and North Korea activities. While ZTE said it had reprimanded the employees, the government later found that the company had rewarded them with bonuses. Activating the denial meant that ZTE could not buy semiconductors required for its products." *Id*.

[560] David Warren, *How China Advances Its Imperial Ambitions By Backing The Taliban*, Ottawa Citizen (Canada), (Sept. 22, 2001), 2001 WLNR 6660411.

1173.   As legal commentator Stewart Baker noted at the time in 2012, when discussing

ZTE's corporate criminal culture, that "[a] kind of perfect storm has struck ZTE, … [a] storm

largely of ZTE's own making."[561]  He explained:

> ***ZTE … ha[s] been the subject[] of great national security concern for years***. …
> Now, though, the mess is everywhere, and the House intelligence investigation
> will surely be heavily influenced by the new evidence that ZTE at least is quite
> capable of ***carrying out sophisticated telecommunications surveillance, of
> violating US law, and perhaps even lying about it later***. Which, come to think of
> it, is pretty much what US intelligence agencies have been saying all along.[562]

### 4.   ZTE's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States

1174.   ZTE's assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its

Hezbollah Division and Qods Force, relied on significant contacts with the United States.  As it

has admitted, ZTE orchestrated both those U.S. contacts and ZTE's violation of U.S. law,

including, on information and belief, by and through coordination with ZTE USA and ZTE TX.

Like MTN, ZTE employs a top-down management structure in which ZTE centralizes

operational control over the functions performed by its various subsidiaries.

1175.   ZTE's decision to assist the IRGC, including its Hezbollah Division and Qods

Force, and by extension their proxies, had a substantial nexus to the United States for the reasons

explained below.

### i.   ZTE's Conduct Targeted the United States

1176.   ZTE's provision of material support to the IRGC (including its Hezbollah

Division and Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United

States.  At all relevant times, ZTE knew that the IRGC (including its Hezbollah Division and

---

[561] Stewart Baker, *And You Think You're Having A Bad Day?*, The Volokh Conspiracy (July 13, 2012) (emphasis added), 2012 WLNR 14621514.

[562] *Id*.

Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States. The IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance. Instead, the Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy. As the Treasury Department stated when it announced the Qods Force's designation as a SDGT in 2007, "the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition … forces…"[563] The IRGC's (including the Qods Force's), Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly stated goal was to effect a withdrawal of American forces from Iraq and the broader Middle East. Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

1177. ZTE's decision to reach into the United States, including by coordinating with ZTE USA and ZTE TX, to obtain embargoed dual-use technology to aid the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise was also expressly aimed at the United States. Like MTN, ZTE knew, based on conversations with IRGC, including its Hezbollah Division and Qods Force, agents, that the IRGC, including its Hezbollah Division and Qods Force, viewed ZTE's assistance as vital to Iranian national "security,"," which ZTE understood to inherently involve the promotion of terrorist violence against Americans around the world as part of the IRGC's (including its Hezbollah Division's and Qods Force's) effort to export its Islamist revolution and drive the U.S. out of Iraq.

---

[563] U.S. Treasury Dep't, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007).

1178.   On information and belief, like MTN, ZTE also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC (including its Hezbollah Division and Qods Force) plot to develop cash flow and source vital dual-use components for the IRGC (including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi).  ZTE further knew of the critical importance that communications and computing technology plays for terrorists.

1179.   When ZTE, ZTE USA, and ZTE TX sourced embargoed technology, including by coordinating with ZTE USA and ZTE TX, that the United States had publicly declared could benefit IRGC, including its Hezbollah Division and Qods Force, efforts to kill others, they intentionally helped arm terrorists they knew were targeting the United States.  On information and belief, the IRGC, including its Hezbollah Division and Qods Force, made ZTE agree to a similar contractual pledge as the one in which MTN agreed to aid Iran's "defensive, security, and political" interests outside of Iran.  On information and belief, at all times, ZTE knew or recklessly disregarded that "security" was a euphemism for IRGC, including Qods Force, terrorist operations outside of the territorial borders of Iran.  When ZTE, ZTE USA, and ZTE TX obtained the technology requested by its IRGC, including its Hezbollah Division and Qods Force, partners, each took actions in the United States and targeted at United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

1180.   Although ZTE's primary motivation for assisting the IRGC, including its Hezbollah Division and Qods Force, was financial, it also intended to harm Americans in Iraq.  One reason ZTE cooperated with the IRGC, including its Hezbollah Division and Qods Force, was to align itself with their effort to drive Americans out of Iraq.

1181.   Like MTN, ZTE intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the IRGC, including its Hezbollah Division and Qods Force, who were explicit, that they expected their partners to provide significant help in fighting against U.S. forces in particular.  Thus, for ZTE to achieve its business objectives vis-à-vis the IRGC, including its Hezbollah Division and Qods Force, fronts who controlled TCI and MTN Irancell – both of which ZTE serviced – ZTE needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

1182.   On information and belief, like MTN, ZTE's agreement to aid the IRGC, including its Hezbollah Division and Qods Force, also fulfilled an obligation by ZTE, like MTN, to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force and Qods Force, counterparties.[564]

1183.   Indeed, ZTE's contract with TCI, according to Yablon, obligated ZTE to transfer its U.S.-built surveillance systems to TCI.  When *Reuters* revealed that the ZXMT system contained U.S.-origin components, the Department of Commerce, BIS, served ZTE USA with an administrative subpoena and the U.S. Attorney's office for the Northern District of Texas opened its grand jury investigation and the FBI served ZTE USA with criminal subpoenas.

1184.   The "surveillance function" built into ZTE's contract, on information and belief, obligated ZTE to collaborate with Iranian 'security' authorities, including, *inter alia*, IRGC entities that implemented the regime's campaign of terrorism.

1185.   Thereby ZTE, along with IRGC-controlled TCI, are responsible for helping the IRGC collect signals intelligence within Iran.  According to the U.S. government, the IRGC

---

[564] Exhibit A, MTN-Irancell Consortium Letter Agreement § 8.

Committee to Determine Instances of Criminal Content identifies websites, which TCI blocks and monitors.

1186.   In their campaign of mass repression, these IRGC, including its Hezbollah Division and Qods Force, agencies rely on technology illegally supplied by the Defendants, and, to justify their actions, a law which criminalizes any effort to evade the IRGC's censorship, creating online "groups or gatherings" that threaten the state, or linking to sites connected to "wayward and illegal groups and movements" as "creating content against national security."[565]

1187.   *First*, ZTE's support for the IRGC, including its Hezbollah Division and Qods Force, did not merely grow ZTE's profits by allowing it to obtain lucrative business from MTN Irancell and TCI in the first instance; it also benefited ZTE's business by inflicting harm on an enemy (the United States) of one of ZTE's most important business partners (the IRGC, including its Hezbollah Division and Qods Force) in order for ZTE to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market (Iran).

1188.   *Second*, ZTE's support for attacks against U.S. citizens by Shiite terrorists advanced the foreign-policy interests of ZTE's most important business partner:  the Chinese Communist Party (or "CCP").

1189.   At all relevant times, ZTE has acted as an anti-American Chinese nationalist company that actively seeks to advance the interests of the Chinese Communist Party.

1190.   ZTE specifically pursued transactions with Qods Force fronts in order to harm the United States in the Middle East as part of a broader Chinese Communist Party strategy to inflict

---

[565] Justice for Iran "*Gerdab*: a Dictated Scenario" 2012 p.36 https://justice4iran.org/wp-content/uploads/2012/03/Gerdab-a-dictated-scenario.pdf.

pain on America in the Middle East by supporting the Qods Force and its terrorist campaign against Americans there.

1191.   Indeed, ZTE has pursued this objective continuously since 9/11.  For example, less than two weeks after that attack, commentators were already observing ZTE's efforts to curry favor with the Taliban, even though they were understood to have sheltered bin Laden and contributed to the attack as a result.  As one wrote at the time:

> China … has been playing its own complex "Great Game," through the Taliban in Afghanistan, and in alliance with Pakistan. …
> One of the great myths about modern, Communist China is that it has no territorial or imperial ambitions. It has them, but does not admit they are imperial, in the western sense.
>
> This modern China still aspires to rule directly over all her immediate neighbours, including Korea, and to exact "tribute" from the countries beyond them. It aspires to be a superpower, on a level with the United States, and has not hesitated to link itself with revolutionary movements …
>
> The Chinese attitude towards radical "Islamism" is two-faced.  Beijing is happy to train and send armed insurgents – separatist terrorists -- to … sow mischief wherever it can against Western interests. But it is also worried, sometimes to the point of paranoia, about the security threat to its own Uighur territory. …
>
> From the Beijing point of view, co-operation with the Taliban kills two birds with one stone. On the one hand, China has been helping to nurture a very painful thorn in the West's backside; on the other, it is buying off Taliban encouragement for Uighur separatists. Until Sept. 11, it appeared Beijing's prospects in Kabul were win-win.
>
> By coincidence or otherwise, on Sept. 10, the day before the organized terror assault on New York City and Washington D.C., Chinese representatives in Kabul signed a memorandum of understanding for economic and technical co-operation with Mullah Mohammed Ishaq, the Taliban minister for mining.
>
> It was the most comprehensive of a series of contractual agreements between Beijing and the Taliban, in defiance of the spirit if not the letter of both Western and United Nations sanctions. It confirmed the Chinese role as the Taliban's best friend outside the Islamic world.

The most interesting part of the agreement is a promise to build desperately needed infrastructure for the Taliban regime, throughout the 90 per cent of Afghanistan's surface area now under Taliban control.

Already, last year, two Chinese telecommunications firms, Huawei Technologies and ZTE, began work laying secure land-based phone lines between and within Kabul and Kandahar, and they may well be directly involved in providing communications services to the terrorist "underground" (literally, for it works from caves) in the Kandahar region.

Huawei is the firm that has been installing communications equipment for Iraq's air-defence system. It was named in a protest to the Chinese government by the Bush administration on its first day in office.

The aid to Afghanistan is by no means confined to economy and infrastructure. Political contacts between China and the Taliban have been increasing rapidly. …

China tries to help the Afghan terrorist regime in its struggle against the West …[566]

1192.   Faithful to its Chinese Communist Party-supporting trade efforts, ZTE always continued pursuing its nationalistic Chinese agenda.  As the legal commentator Stewart Baker noted at the time in 2012, "[a] kind of perfect storm has struck ZTE, … [a] storm largely of ZTE's own making."[567]  He explained:

For starters, ZTE and its larger Chinese rival, Huawei, have been the subjects of great national security concern for years. The US intelligence community fears that, if allowed to install equipment here, the two companies will surreptitiously permit Chinese government wiretaps inside the United States. But proof of this suspicion has been hard to find. And the firms, backed by Chinese government-subsidized loans, have been able to offer enormous discounts to carriers, devastating the global telecom equipment market and leaving carriers eager to buy their products. Whether the US government would continue to act on its suspicions in the face of commercial pressure was an open question. …

Now, though, the mess is everywhere, and the House intelligence investigation will surely be heavily influenced by the new evidence that ZTE at least is quite

---

[566] David Warren, *How China Advances Its Imperial Ambitions By Backing The Taliban*, Ottawa Citizen (Canada), (Sept. 22, 2001), 2001 WLNR 6660411.

[567] Stewart Baker, *And You Think You're Having A Bad Day?*, The Volokh Conspiracy (July 13, 2012), 2012 WLNR 14621514.

capable of carrying out sophisticated telecommunications surveillance, of violating US law, and perhaps even lying about it later.

Which, come to think of it, is pretty much what US intelligence agencies have been saying all along.[568]

1193.   Indeed, ZTE is known to be an "important geopolitical pawn" for the Chinese Government, with direct links to both the Chinese Government and the People's Liberation Army.  It has "substantial ties to the Chinese government and military apparatus."

1194.   China's Foreign Ministry confirmed its approval for ZTE's efforts to undermine U.S. national security when it expressed anger after the U.S. Commerce Department placed export restrictions on ZTE for violating U.S. export controls on Iran.  "We hope the U.S. stops this erroneous action and avoids damaging Sino-U.S. trade cooperation and bilateral relations," Chinese Foreign Ministry spokesman Hong Lei said at a briefing in March 2012.

1195.   ZTE's aid for the IRGC and Qods Force are consistent with the Chinese Communist Party's desire to inflict pain on Americans in Iraq.  The Chinese Communist Party views the United States being pinned down in conflict in the Middle East, and American being killed or injured in Iraq as beneficial to its interests.  This is because protracted conflict in Iraq could give China the ability to expand its influence in the Middle East and could pin down the U.S. military in the Persian Gulf so that it is harder to pivot toward the Pacific.

1196.   That is why, from the Chinese Communist Party's perspective, there is strategic value in helping Iran develop enough military capabilities to counter U.S. dominance of the Persian Gulf.  Indeed, Wang Jisi, Dean of the Peking University School of International Studies, has argued that the U.S. war with Iraq benefited China because "It is beneficial for our external

---

[568] Stewart Baker, *And You Think You're Having A Bad Day?*, The Volokh Conspiracy (July 13, 2012), 2012 WLNR 14621514.

environment to have the United States militarily and diplomatically deeply sunk in the Mideast to the extent that it can hardly extricate itself."

1197.   Thus, a strong economic, diplomatic, and military partnership with the Islamic Republic could help China offset U.S. power in the Middle East.  Similarly, Renmin University professor Shi Yinhong has recently argued that "Washington's deeper involvement in the Middle East is favorable to Beijing, reducing Washington's ability to place focused attention and pressure on China."

1198.   This year, Iran and China signed an agreement expressing a desire to increase cooperation and trade relations over the next 25 years.  It has been reported that this agreement commemorates a shared desire between China and Iran to reduce and resist U.S. influence in the region.

1199.   ZTE's agreement to aid the IRGC, including its Hezbollah Division and Qods Force, served the Chinese Communist Party's agenda of inflicting pain on U.S. forces in Iraq. On information and belief, it also fulfilled an obligation by ZTE, similar to that of MTN, to engage in "defensive, security and political cooperation" with its IRGC, including its Hezbollah Division and Qods Force, partner.[569]  Such cooperation offered ZTE added motivation for ZTE's illicit transactions with the IRGC, including its Hezbollah Division and Qods Force.  ZTE's support for the IRGC, including its Hezbollah Division and Qods Force, did not merely grow its profits by allowing it to obtain lucrative business from MTN Irancell and TCI in the first instance; it also benefited ZTE's business by inflicting harm on an enemy of ZTE's most important business partner (the Chinese Communist Party) and decisionmakers (the IRGC and Qods Force) in a key telecom market (Iran).

---

[569] MTN-Irancell Consortium Letter Agreement § 8 (Sept. 18, 2005).

1200.   Plaintiffs' allegations also comport with the widespread view of relevant U.S. government officials from the executive and legislative branches.  For starters, ZTE was forced to plead guilty and the largest criminal fine, to that date, in a United States sanctions case.

1201.   Moreover, a group of 33 Senators expressed concern about ZTE.  On May 15, 2018, they sent a letter to President Trump indicating they viewed ZTE as a security threat.  In relevant part the Democratic Senators (a) noted that ZTE violated US sanctions law and repeatedly lied about steps it would take to remedy the problems; (b) argued that America's national security must not be used as a bargaining chip in trade negotiations; (c) labeled ZTE as a "bad actor"; and (d) argued that loosening restrictions on ZTE could "risk American national security".

1202.   Concerns about ZTE's hostility to American national security are bipartisan.  For example, Senator Marco Rubio has warned against allowing ZTE "to operate in U.S. without tighter restrictions," given national security and espionage concerns, and Senator Mark Warner has publicly reported to label ZTE as a "national security threat."

1203.   Moreover, a multi-year bipartisan investigation by the House Select Committee on Intelligence concluded in October 2012 that ZTE "cannot be trusted to be free of foreign state influence and thus pose[s] a security threat to the United States and to our systems."

1204.   Further, the FCC recently designated ZTE as a "national security threat," and stated that "ZTE's violation of U.S. trade agreements and export laws, coupled with its obstruction of the Department of Justice's investigation, indicate a clear disregard for U.S. law and national security."  Indeed, the FCC noted that ZTE has broken laws that pertain to U.S. national security, and ZTE has "shown a willingness to obstruct the investigations into such national security threats."  The FCC stated concern regarding "ZTE's knowing violations of U.S.

392

national security laws and its proven lack of cooperation in dealing with U.S. criminal investigators."

1205. OFAC, as well as the other U.S. government agencies, opened an investigation of ZTE in March 2012. As agreed by ZTE in its Settlement Agreement with OFAC, at or around that time, "an undisclosed person in ZTE's legal department in Shenzhen called at least one ZTE employee present within the United States to instruct him to leave the country. These instructions were provided on the same day or shortly after search warrants were executed upon ZTE's facilities located in the United States." On information and belief, these statements relate to actions taken by employees of ZTE's subsidiaries in the United States, including by not limited to ZTE USA.

1206. As part of ZTE's attempt to "cover up" its acts to provide U.S.-origin technology to TCI, ZTE and ZTE USA retaliated in the United States against the ZTE USA whistleblower in the United States who reported the scheme. ZTE also coordinated with ZTE USA in the United States and used ZTE USA as ZTE's agent and instrumentality through which ZTE hired legal representation in the United States to respond to United States criminal investigations.

### ii. ZTE's Conduct Relied on American Contacts

1207. ZTE reached into the United States to acquire U.S.-sourced embargoed technology that it then provided to Telecommunication Company of Iran and Aryacell.

1208. TCI is predominantly state-controlled. Indeed, TCI is owned by the Iranian government and a private consortium with reported ties to IRGC, including its Hezbollah Division and Qods Force.

1209. Aryacell is part of the consortium that, along with the IRGC, including its Hezbollah Division and Qods Force, controls TCI.

1210.   ZTE, including but not limited to in coordination with ZTE USA and ZTE TX, reached into the United States to support the IRGC, including its Hezbollah Division and Qods Force, and by implication, Hezbollah and Jaysh al-Mahdi, when it obtained technology and vital operational support from the U.S.  ZTE supplied technology and operational support for TCI and MTN Irancell through various U.S. agents, including but not limited to ZTE USA and ZTE TX. In doing so, ZTE tied its unlawful conduct to the United States by obtaining irreplaceable, best-in-class, and embargoed U.S.-supplied dual-use technology to aid the IRGC's, including the Qods Force's, terrorist enterprise.  This U.S. contact was closely related to ZTE's, ZTE USA's, and ZTE TX's support for the IRGC, including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi.

1211.   ZTE relied on U.S.-made materials as components for its smartphones, cell phone systems, and computer networking gear.  U.S.-origin goods were technically essential to ZTE's IRGC-related, including its Hezbollah Division-related and Qods Force-related, projects and/or end-users as there were no suitable foreign-made substitutes for many of them.

1212.   The embargoed United States technology included but was not limited to servers, switches, routers, and component parts of cellular network infrastructure.

1213.   The United States Commerce Department has said that ZTE sold prohibited American electronics to Iran to help Iran build its telecom networks.

1214.   Just about every product that ZTE makes has some American components or software in it, such as microchips, modems, and Google's Android operating system.

1215.   Public reports indicate ZTE helped funnel software and hardware from U.S. firms including Oracle, Microsoft, and Cisco Systems to the government of Iran in 2010 for use building what was described as a massive, nationwide surveillance system.

1216.   Simply put, ZTE could not do the business it did with IRGC (including its

Hezbollah Division and Qods Force) and thereby cause the transfer of key technology to

Hezbollah and Jaysh al-Mahdi without reaching into the United States to obtain that technology.

### C.      The Huawei Defendants

#### 1.      Huawei Joined The Terrorist Conspiracy

##### i.      Through Agreements With IRGC Fronts, Including But Not Limited to TCI, Huawei Agreed To Join A Company-Wide Conspiracy

1217.   Huawei and its subsidiaries— including Huawei USA, Huawei Device USA,

Futurewei, and Skycom —entered into the conspiracy with the IRGC, including its Hezbollah

Division and Qods Force, to provide U.S.-origin goods and services, in violation of U.S.

sanctions, to TCI and Irancell.  The agreement was in the form of contracts that Huawei signed

with TCI and, on information and belief, MTN Irancell and MCI.  The conspiracy was adopted

by Huawei's senior leadership and deployed throughout Huawei and its subsidiaries (including

Huawei USA, Huawei Device USA, Futurewei, and Skycom).

1218.   On information and belief, Huawei's contracts with its IRGC-front Iranian

counterparties all included pledges to assist with the "security" of Iran.

##### ii.      Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Each Made Overt Acts In Furtherance Of The Conspiracy

1219.   Each of the Huawei Defendants, Huawei Co., Huawei USA, Huawei Device

USA, Futurewei, and Skycom, acted in furtherance of the conspiracy by, *inter alia*, (a) sourcing

U.S.-origin technology, embargoed by the United States and useful to the terrorists, for export to

the IRGC, including its Hezbollah Division and Qods Force, (b) entering into contractual

relationships with U.S. suppliers to acquire the "essential" technology needed by the terrorists,

(c) stealing or otherwise misappropriating U.S.-origin technology and intellectual property from

U.S. companies to deliver the same to the IRGC, including its Hezbollah Division and Qods Force, (d) developing and using third-party companies to both conceal and facilitate its business with IRGC-front companies, (e) comingling U.S.-origin technology with non-U.S.-origin technology in order to attempt to evade detection of the scheme and conspiracy, (f) providing U.S.-based financial services for its Iranian businesses, (g) lying to U.S. government authorities and financial institutions regarding the nature of their activities in Iran and their true IRGC-front counterparties, (h) destroying evidence related to the scheme and conspiracy, (i) providing the services of a U.S. citizen for its Iranian subsidiary (Skycom) that concealed Huawei's sourcing of U.S.-origin goods, and (g) moving one or more witnesses in the U.S. with knowledge of the scheme and conspiracy out of the jurisdictional reach of the U.S.

      **2.    Huawei Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including its Hezbollah Division's And Qods Force's, Terrorist Enterprise Against Americans Worldwide**

    1220.   Huawei bid on and secured contracts worth hundreds of millions of dollars to provide telecommunications and network infrastructure equipment and related services in Iran. Huawei knew that its counterparties were IRGC's, including its Hezbollah Division's and Qods Force's, fronts, operatives, or agents. Huawei developed an elaborate system to fulfill those contracts using U.S.-origin items and services, which Huawei Co. did in collaboration with and with the assistance of Huawei USA, Huawei Device USA, Futurewei, and Skycom.

3.   **Huawei Knowingly Assumed A Financial, Logistical, And Operational Role In The IRGC's, Including Its Hezbollah Division's And Qods Force's, Terrorist Enterprise Against Americans Worldwide**

  i.   **Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Knowingly Facilitated MTN Irancell And TCI Acquisition of Embargoed American Technology, Logistical Support, And Technical Services, Which Flowed Through To The IRGC's Terrorist Proxies**

1221.   Huawei Co.'s, Huawei USA's (after its formation), Huawei Device USA's (after its formation), Futurewei's, and Skycom's company-wide scheme to obtain U.S.-origin goods and to evade export controls to get telecommunications technology into the hands of the IRGC, including its Hezbollah Division and Qods Force, lasted from as early as 2008 and as late as 2014.  To be clear, although Huawei USA was not formed until at least 2011 and Huawei Device USA was not formed until at least 2010, Plaintiffs allege that Huawei USA, Huawei Device USA, and their employees participated in the scheme to advance the conspiracy after their respective formations.

1222.   The technology and equipment Huawei sourced from inside the United States was subject to the embargo imposed and enforced by the United States Government.  Huawei thus violated export controls designed to keep sensitive American technology out of the hands of the IRGC, including its Hezbollah Division and Qods Force.

1223.   Through this scheme, which last at least between January 2008 and January 2014, Huawei exported U.S.-origin items to the IRGC, including its Hezbollah Division and Qods Force without obtaining proper export licenses.

1224.   The Huawei scheme operated in the Eastern District of New York, the Central District of California, the District of Columbia, the District of Delaware, the District of New Jersey, the Eastern District of Texas, the Northern District of California, the Northern District of Illinois, the Northern District of Texas, the Southern District of California, the Southern District

of New York, the Western District of New York, the Western District of Washington and elsewhere, including overseas.

1225.   To circumvent the U.S. embargo and advance its conspiracy with the IRGC, including its Hezbollah Division and Qods Force, Huawei devised a scheme, whereby Huawei would set up subsidiaries disguised as un-related Iranian "partners" and use those subsidiaries to hide Huawei's business with, and shipment of prohibited U.S. technology to, the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, agents, and operatives.  Skycom, which was controlled by Huawei, was one of Huawei's subsidiaries to serve as an Iranian "partner" in this scheme.

1226.   After a series of international publications in 2012 publicly revealed Huawei's sale of prohibited equipment to Iran, Huawei issued statements that denied its involvement in any violations of Iranian sanctions, as well as its ownership and control of Skycom.  Despite the media revelations of Huawei's sanctions-busting scheme, Huawei continued sending U.S.-origin goods and services to the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, agents, and operatives.

1227.   In 2018, a federal grand jury indictment against Huawei Co., Huawei Device, Huawei Device USA, Futurewei, Skycom, and Wanzhou Meng ("Meng") in *U.S. v. Huawei Technologies Co., Ltd., et al.* (E.D.N.Y. Case No. 1:18-cr-00457-AMD) (the "Huawei Criminal Case") was unsealed, revealing numerous criminal charges against the Huawei Defendants relating to their scheme to support Huawei's global business interests, including its efforts to provide embargoed goods and services to Iran.  As detailed in the Superseding Indictment filed

on February 13, 2020,[570] in the Huawei Criminal Case, Huawei, including its American

subsidiaries, including on information and belief Huawei USA, Huawei Device USA, and

Futurewei, engaged in a series of unlawful conduct in and/or targeting the United States to carry

out its scheme.

1228.   As part of its international business model, Huawei engaged in business in

countries subject to U.S., E.U. and/or U.N. sanctions, including Iran.  This business, which

included shipping Huawei goods and services to end users in sanctioned countries, was typically

conducted through local affiliates in the sanctioned countries, such as Skycom in Iran.

1229.   Even though the U.S. Department of the Treasury's ITSR, 31 C.F.R. Part 560,

proscribed the export of U.S.-origin goods, technology and services to Iran and the Government

of Iran, Huawei operated Skycom as an unofficial subsidiary to obtain otherwise prohibited U.S.-

origin goods, technology and services, including banking services, for Huawei's Iran-based

business while concealing the link to Huawei.  Huawei could thus attempt to claim ignorance

with respect to any illegal act committed by Skycom on behalf of Huawei, including violations

of the ITSR and other applicable U.S. law, when providing U.S.-origin goods and services to the

IRGC, including its Hezbollah Division and Qods Force.

1230.   At all relevant times, Skycom was owned and/or controlled by Huawei.  In her

Deferred Prosecution Agreement in the Huawei Criminal Case (dated September 22, 2021),

Meng, Huawei Co.'s CFO and Deputy Chairwoman of its Board of Directors, and the daughter

of Huawei's founder, admitted that between 2010 and 2014, (a) Huawei Co. controlled Skycom's

business operations in Iran, (b) Skycom was owned by Huawei Co., (c) all significant Skycom

---

[570] *U.S. v. Huawei Technologies Co., Ltd., et al.*, No. 18-457 (S-3) (AMD), 2020 WL 1319126
(E.D.N.Y. Feb. 13, 2020).

business decisions were made by Huawei Co., (d) Skycom's country manager (for Iran) was a Huawei Co. employee, and (e) that Huawei's prior public denials of its ownership and control of Skycom was incorrect.

1231.   Meng was the Secretary of Hua Ying, which is a subsidiary of Huawei Co., when Huawei caused Hua Ying to transfer its Skycom shares to Calicula, which was controlled by Huawei.  After the transfer, Meng joined Skycom's Board of Directors, which was comprised of Huawei employees.  Meng served on the Skycom Board of Directors until April 2009.  After her departure, Skycom's Board members continued to be comprised of Huawei Co. employees.  As of August 2012, Huawei included Skycom among a list of "other Huawei subsidiaries" in Huawei Co. corporate documents.

1232.   Huawei's substantial efforts to circumvent U.S. sanctions and ensure a lucrative stake in the Iranian mobile network market is evidenced by its significant business with the largest (MCI) and second largest (MTN Irancell) Iranian mobile service providers, both of which are controlled by the IRGC, including its Hezbollah Division and Qods Force.

1233.   The success of MTN Irancell depended on its ability to source critical American technology and equipment for its systems and network, including, but not limited to, equipment from Sun Microsystems Inc., Oracle Corp., International Business Machines Corp., EMC Corp., Hewlett-Packard Co., and Cisco Systems, Inc., that were used to provide such services as wiretapping, voicemail, and text messaging.

1234.   Huawei, including its U.S. subsidiaries Huawei USA, Huawei Device USA, and Futurewei, leveraged its relationships and contracts with U.S. companies and research and development institutions to access and unlawfully export American equipment and technology through the Skycom scheme.

1235.   For example, in 2020, Huawei produced internal company records from 2010 evidencing its shipment of Hewlett-Packard equipment, including computer servers and switches, to MCI via Skycom, contrary to Huawei's prior denials about violating applicable sanctions and its ownership and control over Skycom.

1236.   At the time this transaction occurred, Huawei had a business relationship with Hewlett-Packard that allowed Huawei to incorporate Hewlett-Packard products into Huawei systems.  Huawei took advantage of this arrangement to export surreptitiously embargoed U.S.-origin equipment and technology to Iran.  Huawei's conduct was in violation of its distribution contract with Hewlett-Packard, which prohibited the sale of its products into Iran and required compliance with U.S. and other applicable export laws.

1237.   Huawei's internal company documents confirm that Huawei, including its U.S. subsidiaries Huawei USA, Huawei Device USA, and Futurewei, successfully procured and exported to Iran other U.S.-origin technology as well, including software made by Microsoft Corp, Symantec Corp, and Novell Inc.  On information and belief, like it did with Hewlett-Packard, Huawei leveraged its relationships with these American companies to acquire and export U.S.-origin equipment and technology, in violation of its agreements with the American companies and U.S. law.

1238.   To further Huawei's global business interests, including its desire to export U.S.-origin equipment or technology to MCI and/or MTN Irancell, Huawei, including its U.S. subsidiaries Huawei USA, Huawei Device USA, and Futurewei, misappropriated and/or reverse-engineered US-origin equipment and technology.

1239.   As revealed by the Department of Justice's investigation, and subsequent indictment of Huawei Co., Huawei Device USA, and Futurewei for racketeering activity,

Huawei and its subsidiaries engaged in a decades-long effort to misappropriate intellectual property, including from six U.S. technology companies, in an effort to grow and operate Huawei's business. The misappropriated intellectual property included trade secret information and copyrighted works, such as source code and user manuals for internet routers, antenna technology and robot testing technology.

1240. Huawei, including Huawei USA, Huawei Device USA, Skycom, and Futurewei, and others executed a scheme to operate and grow the worldwide business of Huawei and its parents, global affiliates, and subsidiaries through the deliberate and repeated misappropriation of intellectual property of companies headquartered or with offices in the United States for commercial use.

1241. The means and methods of the misappropriation included entering into confidentiality agreements with the owners of the intellectual property and then violating the terms of the agreements by misappropriating the intellectual property for Huawei's own commercial use, recruiting employees of other companies and directing them to misappropriate their former employers' intellectual property, and using proxies such as professors working at research institutions to obtain and provide the technology to Huawei and its subsidiaries.

1242. As part of the scheme, Huawei launched a policy instituting a bonus program to reward employees who obtained confidential information from competitors. The policy made clear that Huawei employees, including employees of Huawei USA, Huawei Device USA, and Futurewei, who provided valuable information were to be financially rewarded by Huawei.

1243. By misappropriating the intellectual property of the U.S. companies, Huawei received income directly and indirectly, including by benefitting from the sale of products containing stolen intellectual property to the IRGC, including its Hezbollah Division and Qods

Force, and saving on research and development costs, which income Huawei and its subsidiaries agreed to use to establish and operate the worldwide business of Huawei and its parents, global affiliates, and subsidiaries, including in the United States and Iran.

1244.   Huawei, including Huawei USA, Huawei Device USA, Skycom, and Futurewei, agreed to use the proceeds derived from the theft of U.S.-origin intellectual property to establish and operate the business of Huawei and its parents, global affiliates, and subsidiaries in the U.S. and abroad, including Iran.

1245.   Huawei, including Huawei USA, Huawei Device USA, Skycom, and Futurewei, agreed to benefit from the cost savings generated by stolen intellectual property to innovate more quickly and to establish and operate the business of Huawei and its parents, global affiliates, and subsidiaries in the U.S. and abroad, including Iran.

1246.   Huawei USA's, Huawei Device USA's, and Futurewei's theft of American technology, trade secrets, and intellectual property under this scheme were directed by, and for the benefit of, Huawei Co. and Huawei's global business interests, including Huawei's agreements with the IRGC, including its Hezbollah Division and Qods Force.  For example, as revealed in an investigation conducted by the Permanent Select Committee on Intelligence for the U.S. House of Representatives, several current and former employees of Huawei USA provided information indicating that Huawei USA is managed almost completely by Huawei Co. in China.

1247.   Huawei Co. controlled and directed each of its American subsidiaries' participation in its scheme to source U.S.-origin goods and services for the IRGC, including its Hezbollah Division and Qods Force, and each of its American subsidiaries provided Huawei

different channels by which Huawei could obtain or misappropriate U.S.-origin goods and services.

1248.   According to Huawei's public statements and disclosures, Huawei USA specializes in enterprise and network carrier business, Huawei Device USA focuses on the consumer business (e.g., handsets and routers), and Futurewei is Huawei's research and development arm.  Thus, by directing each of its American subsidiaries to participate in its scheme to source U.S.-origin technology for the IRGC, including its Hezbollah Division and Qods Force, Huawei created a comprehensive system for maximizing its procurement and export of U.S.-origin goods and services.

1249.   Huawei's scheme also included the provision of unlawful financial services to the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, operatives, and agents.

1250.   In the Eastern District of New York and elsewhere, Huawei Co. and Skycom, together with others, conspired to cause the export, reexport, sale and supply, directly and indirectly, of banking and other financial services from the United States to Iran and the Government of Iran, without having first obtained the required OFAC license, contrary to Title 31, C.F.R., Sections 560.203, 560.204 and 560.206.

1251.   For example, after Huawei's Senior Vice President testified before U.S. Congress on September 13, 2012 that Huawei's business in Iran had not "violated any laws and regulations including sanction-related requirements" and other Huawei officers repeated those misrepresentations to financial institutions, Huawei Co. and Skycom completed the following unlawful financial transactions in the United States, involving U.S. financial institutions, and/or international financial institutions and their U.S. subsidiaries:  $52,791.08 U.S.-dollar clearing transaction on July 24, 2013, $94,829.82 U.S.-dollar clearing transaction on July 24, 2013,

$14,835.22 U.S.-dollar clearing transaction on August 20, 2013, $32,663.10 U.S.-dollar clearing transaction on August 28, 2013, and $118,842.45 U.S.-dollar clearing transaction on April 4, 2014.

1252.   Additionally, Huawei Co. and Skycom, together with others, knowingly and intentionally conspired to transport, transmit and transfer monetary instruments and funds, specifically wire transfers, from one or more places in the United States to and through one or more places outside the United States and to one or more places in the United States from and through one or more places outside the United States, with the intent to IEEPA. the

1253.   Huawei Co. repeatedly misrepresented to financial institutions that Huawei would not use the financial institution and its affiliates to process any transactions regarding Huawei's Iran-based business.  However, Huawei used a U.S. subsidiary of a global financial institution and other financial institutions operating in the United States to process U.S.- dollar clearing transactions involving millions of dollars in furtherance of Huawei's business with the IRGC, including its Hezbollah Division and Qods Force.  Some of these transactions passed through the Eastern District of New York.

1254.   As a result of Huawei's scheme and misrepresentations, financial institutions unwittingly cleared hundreds of millions of dollars in transactions that violated U.S. sanctions against doing business with Iran.

1255.   On information and belief, despite scrutiny from the media, financial institutions, and governmental authorities, Huawei never ceased sourcing U.S.-origin goods and services to the IRGC, including its Hezbollah Division and Qods Force.  In addition to sourcing the requested U.S.-origin products and services in contravention of U.S. law, Huawei aggressively

pursued relationships with IRGC's, including its Hezbollah Division's and Qods Force's, fronts, agents, and operatives to protect its lucrative business interests in Iran.

1256.   While many international vendors withdrew from the Iranian market to avoid violating sanctions, Huawei aggressively secured numerous contracts with both MTN Irancell and MCI to provide telecommunications equipment and services.  As reported by the Wall Street Journal on October 27, 2011, Huawei secured numerous contracts with both MCI and MTN Irancell, and in doing so, agreed to carry out orders from, and support the interests of, the IRGC, including its Hezbollah Division and Qods Force.[571]

1257.   The *Wall Street Journal* reported, in relevant part, that Huawei "filled the vacuum" after "Western companies pulled back from Iran after the government's bloody crackdown on its citizens," and thereby, Huawei "plays a role in enabling Iran's state security network."  The Wall Street Journal further reported that "a person familiar with Huawei's Mideast operations" said Huawei's role included "overseeing parts of the network -- at MTN Irancell, which is majority owned by the government," and that in 2009 Huawei "carried out government orders on behalf of its client, MTN Irancell, that MTN and other carriers had received to suspend text messaging and block the Internet phone service, Skype, which is popular among dissidents."

1258.   Huawei's agreement to abide by the directives of the IRGC, including its Hezbollah Division and Qods Force, was openly promoted by Huawei and the Chinese government.  For example, in August 2009, two months after the mass protests began in Iran, the "website of China's embassy in Tehran reprinted a local article under the headline, 'Huawei

---

[571] Steve Stecklow, Farnaz Fassihi, and Loretta Chao, *Chinese Tech Giant Aids Iran*, Wall Street Journal (October 27, 2011).

Plans Takeover of Iran's Telecom Market.' The article said the company 'has gained the trust and alliance of major governmental and private entities within a short period,' and that its clients included 'military industries.'"[572]

1259.   Huawei's agreement to abide by the directives of the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, operatives, or agents, was not limited to its work with MTN Irancell.  Huawei secured contracts with the largest Iranian mobile network provider MCI, which is controlled by TCI, by expressly agreeing to provide support for the IRGC's, including its Hezbollah Division's and Qods Force's, "security" and intelligence objectives.

1260.   In fact, to secure its place in the Iranian market, Huawei has done "considerable business" with Zaeim Electronic Industries Co. ("ZEI"), an Iranian electronics firm, which is the "*security* and intelligence wing of every telecom bid."  ZEI launched its telecommunications division in 2000 in partnership with Huawei and have completed at least forty-six telecommunication projects together.  ZEI's website noted its clients include "the intelligence and defense ministries, as well as the country's elite special-forces unit, *the Islamic Revolutionary Guards* Corps."[573]

1261.   Huawei also assisted the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, agents, and operatives by installing surveillance equipment, including surveillance equipment used to monitor, identify, and detain protestors during the anti-government demonstrations of 2009 in Tehran, Iran.

1262.   As reported by the *Wall Street Journal*, and similar to MTN's agreement to assist with "security," Huawei agreed as part of its bid to install MCI's surveillance system to "support

---

[572] *Id.*

[573] *Id.* (emphasis added)

and deliver offline and real-time lawful interception," and that, "for public security," the service would allow "tracking a specified phone/subscriber on map."

1263.   Huawei's scheme to provide assistance to the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, operatives, and agents was not limited to the sourcing of U.S.-origin equipment and technology.  For example, Skycom, on behalf of Huawei, employed a U.S. citizen in Iran.  Huawei and Skycom were indicted for this unlawful provision of U.S.-based services.

1264.   Huawei modernized telecommunications technology used by Iranian entities that were controlled by IRGC, including its Hezbollah Division and Qods Force, fronts, thereby pumping additional revenue into the coffers of the IRGC, including its Hezbollah Division and Qods Force, and, thereby, Hezbollah and Jaysh al-Mahdi.

1265.   Huawei Co., Huawei USA (after its formation), Huawei Device USA (after its formation), Futurewei, and Skycom provided substantial banned technology to Iranian companies that were controlled by the IRGC, including its Hezbollah Division and Qods Force and, thereby, Huawei's illegally sourced technology ordinarily flowed through to Hezbollah. That banned technology was crucial to perpetrating terrorism.  By way of example, terrorists were able to use cell phones and other telecommunication technology and software to perpetrate attacks on Americans.

1266.   Huawei also assisted the terrorist enterprise by serving as a long-term strategic partner for MTN Irancell and MCI, both of which were fronts for the IRGC, including its Hezbollah Division and Qods Force.

1267.   Like ZTE, on top of the millions of dollars that Huawei provided to the IRGC, including its Hezbollah Division and Qods Force, via TCI (and MCI), Huawei also provided

technical aid, including surveillance technology, to the IRGC, including its Hezbollah Division and Qods Force, which facilitated terrorism. Huawei Co.'s, Huawei USA's (after its formation), Huawei Device USA's (after its formation), Futurewei's, and Skycom's technology transfer provided terrorists the ability to intimidate and coerce civilian populations.

1268. For a terrorist group intent on targeting Americans traveling in tightly secured convoys or on heavily fortified bases, the technology that Huawei provided bolstered the terrorists' ability to conduct successful surveillance and was vitally important to their ability to execute successful attacks, like the ones that killed and injured Plaintiffs and their loved ones. For these reasons, Huawei's acts, which allowed terrorists access to modern telecommunications technology they could not otherwise obtain, facilitated intimidation, coercion, violent acts, and acts dangerous to human life.

1269. The ample evidence of Huawei's own consciousness of guilt supports the inference that Huawei knew it was benefiting the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise.

1270. As part of the scheme to operate and advance the business of Huawei, including its agreement with the IRGC, to avoid interference in their scheme by U.S. governmental bodies or other private actors, Huawei, Huawei Device USA, and Futurewei repeatedly made material misrepresentations as to their misappropriation and subsequent commercial use of intellectual property, as well as other criminal activity, including the nature and extent of Huawei's business in Iran, to U.S. governmental bodies from whom Huawei, Huawei Device USA, and Futurewei sought regulatory authorization that would help grow Huawei's U.S.-based business.

1271.   Huawei, Huawei Device USA, and Futurewei made similar material misrepresentations to financial institutions from whom the Defendants sought banking services to process Huawei's and Skycom's Iranian business transactions.

1272.   Huawei, Huawei USA, Huawei Device USA, and Futurewei made material misrepresentations to the U.S. government about the nature and the scope of Huawei's business activities related to sanctioned countries such as Iran and North Korea, to avoid the economic and regulatory consequences of making truthful statements, including the restriction of Huawei from U.S. markets and business opportunities.

1273.   In or about 2017, Huawei Co. and Huawei Device USA became aware of the U.S. government's criminal investigation of Huawei and its affiliates.  In response to the investigation, Huawei and Huawei Device USA made efforts to move witnesses with knowledge about Huawei's Iran-based business out of the United States and to the People's Republic of China, so that they would be beyond the jurisdiction of the U.S. government, and to destroy and/or conceal evidence located in the United States of Huawei's Iran-based business.

       **ii.**       **Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Substantially Increased MTN Irancell And TCI Revenue By Illicitly Sourcing Embargoed American Technology, Which Flowed Through To The IRGC's Terrorist Proxies**

1274.   From 2008 through at least 2014, Huawei Co.'s, Huawei USA's, Huawei Device USA's, Futurewei's, and Skycom's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI (including MCI), Exit40, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

410

1275.  Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom significantly increased the cash flowing through MTN Irancell and TCI, and ultimately being deployed by the IRGC, including its Hezbollah Division and Qods Force.  They did so by illicitly supplying the state-of-the-art American technologies, like servers, to MTN Irancell and TCI, and by extension the IRGC (including its Hezbollah Division and Qods Force) needed to attack Americans abroad.

### iii. Huawei Co., Huawei USA, Huawei Device USA, Futurewei, And Skycom Routed Bribes To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies

1276.  Huawei Co. has an extensively documented record of paying bribes around the world in order to win lucrative procurement contracts.  Huawei has been credibly accused of procurement-related corruption in, *inter alia,* Namibia,

1277.  Huawei Co. has pursued an integrated global sales strategy, under which one may infer that Huawei Co. followed the same, or a substantially similar, bribery tradecraft with respect to similar "pitches" for other state-owned telecom companies.

1278.   Huawei Co.'s "going rate" for bribing decision-makers in the procurement contract setting appears to be approximately one percent (1%) of contract value.

Huawei appears to have paid large sums to a former Serbian state telecom executive through an offshore shell company.

The Chinese tech giant Huawei signed deals to make large payments to two men close to Serbia's state telecommunications company, using offshore companies that financial crime experts say raise red flags for corruption.

One of these men, former Telekom Srbija executive Igor Jecl, appears to have received over $1.4 million in contracts, dividends, loans, consulting fees, and an apartment from an offshore company that was paid by Huawei for consultancy. Neither offshore company that dealt with Huawei has a public track record of doing consulting work, or any business at all.

411

"It is standard with bribery and corruption to dress them up as consultancy," said Graham Barrow, an expert on financial crime.

Although OCCRP has not uncovered evidence that the payments were improper, they were made over a period of time when Huawei was doing business in Serbia. In 2016, it landed a 150-million-euro deal to upgrade Serbia's telecommunications infrastructure.

1279. On information and belief, from 2008 through 2018, Huawei Co. caused the payment of at least several million dollars, denominated in U.S. Dollars, to one or more officers, agents, or directors of MTN Irancell, TCI, and/or MCI.

iv. **Huawei Co, Huawei USA, Huawei Device USA, Futurewei, And Skycom Routed "Free Goods" To The Key Procurement Decisionmakers At MTN Irancell And TCI, Which Flowed Through To The IRGC's Terrorist Proxies**

1280. Huawei Co. has a documented history of making a species of "free goods" payment – giving something away at below market pricing to obtain a collateral benefit.

1281. On information and belief, Huawei Co. has pursued a similar "free goods" bribery strategy through the sale of below-market-priced

4. **Huawei's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Comports With Huawei's Historical Sales Practices In International Markets**

1282. Like MTN and ZTE, Huawei's conduct reflected a willingness to support America's enemies and engage in illicit financial transactions, as a way to increase profits in Iran. The same calculation pervaded Huawei's other conduct throughout the world. Huawei's other conduct further demonstrates its pattern and practice of entering transactions with violent actors to increase Huawei revenue.

1283. **Huawei Aided North Korean Sanctions Busting.** Huawei's illicit transactions concerning North Korea demonstrates Huawei's deliberate support for terror.

412

1284.   On or about September 13, 2012, a Huawei representative testified before U.S. Congress, testifying that Huawei was not involved in North Korean business interests after 2009. As the Superseding Indictment notes, however, "Huawei was involved in business activities in North Korea, including numerous telecommunications projects, beginning no later than 2008."

1285.   Internal Huawei documents obtained by the Department of Justice referred to the geographic location of projects in North Korea with the code "A9"—Huawei's code for North Korea. Huawei employees took steps to conceal Huawei's involvement in projects in North Korea.

1286.   For example, shipping instructions provided by Huawei to a supplier in 2013 included the instruction that, for shipments to "A9/NK/NORTH KOREA," there should be "No HW [HUAWEI] logo," indicating that Huawei's corporate logo should not be included on shipments destined for North Korea.

### 5.    Huawei's Assistance To The IRGC, Including Its Hezbollah Division And Qods Force, Had A Substantial Nexus To The United States

1287.   Huawei's assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, relied on significant contacts with the United States. Huawei orchestrated both those U.S. contacts and Huawei's violation of U.S. law, including, on information and belief, by and through coordination with Skycom, Huawei Device USA, Huawei USA, and Futurewei.  Like MTN and ZTE, Huawei employs a top-down management structure in which Huawei centralizes operational control over the functions performed by its various subsidiaries.

1288.   Huawei's decision to assist the IRGC, including its Hezbollah Division and Qods Force, and by extension their proxies, had a substantial nexus to the United States for the reasons explained below.

413

### i.    Huawei's Conduct Targeted The United States

1289.   Huawei's provision of material support to the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi, was expressly aimed at the United States.  At all relevant times, Huawei knew that the IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi were targeting the United States.  The IRGC (including its Hezbollah Division and Qods Force), Hezbollah, and Jaysh al-Mahdi did not conduct an indiscriminate terrorist campaign that merely injured Americans by chance.  Instead, the Joint Cells directed attacks at *Americans* with the specific intent of killing *Americans* in particular – so that they could inflict pain in the United States and influence U.S. policy.  The IRGC's (including the Qods Force's), Hezbollah's, and Jaysh al-Mahdi's ultimate, shared, publicly stated goal was to effect a withdrawal of American forces from Iraq and the broader Middle East.  Each terrorist attack that killed and injured Plaintiffs was part of that campaign of anti-American terrorism.

1290.   Huawei's decision to reach into the United States, including by coordinating with Huawei USA, Huawei Device USA, and Futurewei, to obtain embargoed technology to aid the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise was also expressly aimed at the United States.  Like MTN and ZTE, Huawei knew, based on conversations with IRGC, including its Hezbollah Division and Qods Force, agents, that the IRGC, including its Hezbollah Division and Qods Force, viewed Huawei's assistance as vital to Iranian national "security,"," which Huawei understood to inherently involve the promotion of terrorist violence against Americans around the world as part of the IRGC's (including the Qods Force's) effort to export its Islamist revolution and drive the U.S. out of Iraq.

1291.   On information and belief, like MTN and ZTE, Huawei also knew, based on conversations with U.S. officials, that it was assuming an active role in an IRGC, including its

414

Hezbollah Division and Qods Force, plot to develop cash flow and source vital dual-use components for the IRGC, including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi. Huawei further knew of the critical importance that communications and computing technology plays for terrorists.

1292. When Huawei Co., including by coordinating with Skycom, Huawei USA, Huawei Device USA, and Futurewei, conducted U.S.-based financial transactions denominated in U.S. dollars and sourced embargoed technology that the United States had publicly declared could benefit IRGC, including its Hezbollah Division and Qods Force, efforts to kill others, they intentionally helped arm terrorists they knew were targeting the United States. On information and belief, the IRGC, including its Hezbollah Division and Qods Force, made Huawei agree to a similar contractual pledge as the one in which MTN agreed to aid Iran's "defensive, security, and political" interests outside of Iran. On information and belief, at all times, Huawei knew or recklessly disregarded that "security" was a euphemism for IRGC, including Qods Force, terrorist operations outside of the territorial borders of Iran. When Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom executed financial transactions and obtained the technology requested by its IRGC, including its Hezbollah Division and Qods Force, partners, each took actions in the United States and targeted at United States by helping the terrorists improve their bombs, rockets, communications, and intelligence gathering.

1293. Although Huawei's primary motivation for assisting the IRGC, including its Hezbollah Division and Qods Force, was financial, it also intended to harm Americans in Iraq. One reason Huawei cooperated with the IRGC, including its Hezbollah Division and Qods Force, was to align itself with their effort to drive Americans out of Iraq.

415

1294.   Like MTN and ZTE, Huawei intended to harm Americans because it decided that was the necessary price of maintaining a good relationship with the IRGC, including its Hezbollah Division and Qods Force, who were explicit, that they expected their partners to provide significant help in fighting against U.S. forces in particular.  Thus, for Huawei to achieve its business objectives vis-à-vis the IRGC, including its Hezbollah Division and Qods Force, fronts who controlled TCI (including MCI) and MTN Irancell – both of which Huawei serviced – Huawei needed to disassociate itself from the United States and prove that it could deliver value to the Shiite terrorist campaign against U.S. forces in Iraq.

1295.   On information and belief, like MTN, Huawei's agreement to aid the IRGC, including its Hezbollah Division and Qods Force, also fulfilled an obligation by Huawei, like MTN, to engage in "defensive, security and political cooperation" with its IRGC, including Qods Force and Qods Force, counterparties.[574]  Such cooperation offered Huawei added motivation for Huawei's illicit transactions with the IRGC, including its Hezbollah Division and Qods Force, counterparties.  Huawei's support for the IRGC, including its Hezbollah Division and Qods Force, did not merely grow Huawei's profits by allowing it to obtain lucrative business from MTN Irancell and TCI (and MCI) in the first instance; it also benefited Huawei's business by inflicting harm on an enemy (the United States) of one of Huawei's most important business partners (the IRGC, including its Hezbollah Division and Qods Force) in order for Huawei to curry Iranian favor to gain market share for a potentially uniquely lucrative telecom and communications market (Iran).

1296.   Plaintiffs' allegations also comport with the widespread view of relevant U.S. government officials from the executive and legislative branches.  For starters, Huawei and its

---

[574] Exhibit A, MTN-Irancell Consortium Letter Agreement § 8.

subsidiaries are subject to multiple criminal proceedings for their unlawful conduct with respect to Iran, including the Huawei Criminal Case.

1297.   Huawei's scheme to source U.S.-origin technology for the IRGC, including its Hezbollah Division and Qods Force, serves and/or conforms to the People's Republic of China's broader security and economic interests of competing against the U.S.

1298.   For example, the Chinese government arrested and jailed several Huawei whistleblowers who claimed that Huawei's business in Iran is an "open secret" and made some of these whistleblowers sign statements pledging to not go against Huawei's public position denying the nature and scope of its Iranian business.

1299.   Moreover, Huawei previously worked with Panda International Information Technology Co., Ltd. ("Panda Int'l"), a Chinese-state-owned firm, in their joint efforts to help build and maintain North Korea's wireless network using embargoed goods, and to conceal Huawei's sanctions-busting conduct.  Thus, Huawei's prior conduct reflects its deference to, and support for, the broader security and economic objectives of the People's Republic of China.

### ii.        Huawei's Conduct Relied On American Contacts

1300.   Huawei reached into the United States to acquire U.S.-sourced embargoed technology that it then provided to both MCI and MTN-Irancell.

1301.   Huawei Co., including but not limited to in coordination with Huawei Device USA, Huawei USA, Futurewei, and Skycom, reached into the United States to support the IRGC, including its Hezbollah Division and Qods Force, and by implication, Hezbollah and Jaysh al-Mahdi, when it obtained technology and vital operational support from the U.S. Huawei supplied technology and operational support for TCI, MCI, and MTN Irancell through various U.S. agents, including but not limited to Huawei Device USA, Huawei USA, and Futurewei.  In doing so, Huawei tied its unlawful conduct to the United States by obtaining

417

irreplaceable, best-in-class, and embargoed U.S.-supplied dual-use technology to aid the IRGC's, including its Hezbollah Division's and Qods Force's, terrorist enterprise. This U.S. contact was closely related to Huawei's support for the IRGC, including its Hezbollah Division and Qods Force, Hezbollah, and Jaysh al-Mahdi.

1302. Huawei relied on U.S.-made materials as components for its products for Iran. U.S.-origin goods were technically essential to Huawei's IRGC-related, including its Hezbollah Division-related and Qods Force-related, projects and/or end-users as there were no suitable foreign-made substitutes for many of them.

1303. To obtain other U.S.-origin goods for the IRGC, including its Hezbollah Division and Qods Force, Huawei Co., along with Huawei USA, Huawei Device USA, and Futurewei misappropriated trade secrets and intellectual property in the United States from American companies and/or companies with American offices.

1304. To source U.S.-origin goods and services, including financial services, to the IRGC's, including its Hezbollah Division's and Qods Force's, fronts, operatives, and agents, Huawei Co., along with Skycom, Huawei USA, Huawei Device USA, and Futurewei conducted financial transactions through the U.S. and with the use of U.S.-based financial institutions or the U.S. subsidiaries of international financial institutions.

1305. Huawei, including Huawei USA, Huawei Device USA, and Futurewei agreed to conceal their unlawful conduct in the U.S. related to its support for Huawei's Iranian business interests, including its contracts with both MTN Irancell and MCI. Thus, Huawei, including its American subsidiaries, destroyed documents in the U.S., deleted electronically stored documents, and directed its employees to make false statements to U.S. governmental authorities and financial institutions.

1306.   The embargoed United States technology included but not limited to servers, switches, routers, and component parts of cellular network infrastructure.

1307.   Just about every product that Huawei makes has some American components or software in it, such as microchips, modems, and Google's Android operating system.

1308.   Public reports indicate Huawei helped funnel software and hardware from U.S. firms including Hewlett-Packard, Microsoft Corp, Symantec Corp, and Novell Inc. to the government of Iran between 2008 and 2014.

1309.   Huawei Co. also unlawfully arranged a U.S. citizen to provide technology services in Iran for Skycom.   Simply put, Huawei could not do the business it did with IRGC, including its Hezbollah Division and Qods Force, and thereby cause the transfer of key technology to Hezbollah and Jaysh al-Mahdi, without reaching into the United States to obtain the required U.S.-origin goods and services and to conceal and shield its scheme to do so.

## IX.   DEFENDANTS KNEW THAT THEIR TRANSACTIONS WITH THE ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING THE QODS FORCE, FACILITATED EVERY NODE OF THE TERRORIST CONSPIRACY AND DIRECTLY AIDED TERRORIST ATTACKS AGAINST AMERICANS THROUGHOUT THE MIDDLE EAST AND EUROPE, INCLUDING IN IRAQ, AFGHANISTAN, YEMEN, SYRIA, AND ISRAEL

1310.   MTN, from at least 2005 through the present, ZTE, from at least 2008 through at least 2016, and Huawei, from at least 2008 through at least 2014, knowingly structured their transactions to facilitate the IRGC's, including the Qods Force's, fundraising, weapons procurement, and operational support from their IRGC-controlled, including Qods Force-controlled, counterparties – which the IRGC, including its Hezbollah Division and Qods Force, used to support Hezbollah and the Joint Cells' terrorist attacks against Americans in Iraq.  Senior Iranian entity officials involved in the Defendants' transactions were avowed, well-known fronts, operatives, and agents for the IRGC, including its Hezbollah Division and Qods Force.

419

1311.   On information and belief, the ZTE, Huawei, and MTN Defendants extensively collaborated in Iran, by sharing U.S.-origin technology between 2007 and the present day.  As early as 2004, MTN Group created a UK-based shell company called Surizon.  Surizon's co-owners, its CEO, and "head of international business development" were previously members of MTN Group's founding board, including its General Counsel and the architect of its international expansion.

1312.   Surizon's primary products were two software applications: Fast Access to Content, Trends and Statistics ("FACTS") and Network Management System ("NMS").  FACTS was, and still is, an "intelligence system."  NMS enables companies to manage and monitor networks like Irancell's and TCI's mix of incompatible US, European, and Chinese-supplied hardware to enable them to supply meaningful data to FACTS.

1313.   According to statements by Surizon and multiple MTN and Irancell employees, Surizon's products were, in essence, interfaces and data manipulation scripts wrapped around U.S.-origin technologies created by, *inter alia*, Oracle, Roambi, and BMC.  On information and belief, between 2006 and 2007, Surizon and MTN Group 'negotiated' a "21-country deal" to provide "FACTS… across all MTN Group operators."

1314.   Surizon and MTN Group customized and deployed FACTS and NMS to each and every one of MTN Group's operating companies, including Sudan, Syria, and Iran, and specifically including the companies whose facilities are integrated into Iran's transnational signals intelligence network.

1315.   On information and belief, MTN continues to use and share FACTS and NMS software with third parties, including the Huawei and ZTE Defendants.

1316.   The U.S.-origin technologies used by MTN Irancell and supplied by MTN to Huawei and ZTE, and through Huawei and ZTE to TCI, enabled IRGC, including its Hezbollah Division and Qods Force, to collect surveillance data and deliver intelligence in real time to terrorist agents in the field via smart phone applications.  Use of the U.S.-origin technology, as provided by MTN, Huawei, and ZTE, allowed the terrorists to monitor, track, and target Americans.  Indeed, the U.S.-origin technologies enabled FACTS users and Iranian third parties to receive text message alerts under user-specified conditions, and to access network data, including interactive maps of subscriber activity using their smart phones, and to query and mine the data its network operations centers collected, via ZTE and Huawei-supplied surveillance hardware (which themselves were also based on U.S.-origin technologies).

1317.   On information and belief, MTN provided ZTE, Huawei, and their Iran-based subsidiaries and shell companies with access to Surizon-developed software to realize a partnership in which ZTE and Huawei provided hardware to MTN-Irancell and managed its network operations centers, including those co-located with Iranian intelligence agents, on a day-to-day basis.

1318.   On information and belief, MTN also provided FACTS to TCI and MCI, and to its local Iranian partners, as well as to agents of the IRGC, including its Hezbollah Division and Qods Force. FACTS and NMS enabled the partnership to manage its highly complex multi-vendor network, and to collaborate seamlessly, avoiding serious compatibility issues that would have arisen from using their own in-house applications.

1319.   Defendants knew or recklessly disregarded that their corrupt transactions, overseen by a counterparty that the IRGC, including its Hezbollah Division and Qods Force, had totally commandeered, delivered resources directly to the IRGC, including its Hezbollah

Division and Qods Force, which they provided to Hezbollah in the form of funds, weapons, logistical support, and other aid to jointly commit terrorist attacks against Americans in Iraq through their Joint Cells.

1320.   The IRGC's, including the Qods Force's, control over the Iranian telecom, communications, and computer sector was so complete that by 2004, there was no longer any meaningful distinction between any of the large Iranian telecom, communications, or computer companies and the IRGC, including its Hezbollah Division and Qods Force.  Because the IRGC, including its Hezbollah Division and Qods Force, had effectively captured the Iranian telecom, communications, and computer sectors and was using such control to fund and arm Hezbollah as Hezbollah led the Joint Cell attacks against Americans in Iraq, transactions with Iranian telecom, communications, and information technology companies directly benefited the Hezbollah campaign targeting Americans in Iraq.

1321.   Defendants' transactions with their IRGC-controlled, including Qods Force-controlled, Iranian counterparties supplied Hezbollah, and through Hezbollah, Jaysh al-Mahdi, with resources critical to the Joint Cells' terrorist operations.  The IRGC's, including the Qods Force's, control over these critical Iranian economic sectors – and the enormous cash flow that came with it, both from normal revenue as well as corrupt payments from foreign companies – was a key source of the IRGC's, including the Qods Force's power.

1322.   Indeed, the telecom, communications, and information technology sectors were (and remain) controlled by the IRGC, including its Hezbollah Division and Qods Force, precisely because such control allows the IRGC, including its Hezbollah Division and Qods Force, to make groups like Hezbollah more effective at attacking the enemies of Iran, both foreign and domestic, through the substantial funding for the IRGC, including its Hezbollah

422

Division and Qods Force, which flows through to Hezbollah in its capacity as a constituent member of the IRGC, including its Hezbollah Division and Qods Force. The IRGC's, including the Qods Force's, complete conversion of the telecom, communications, and computer sectors of the Iranian economy as direct tools of terrorism further strengthened the potency of Defendants' illicit transactions as a means of financing, arming, and operationally supporting attacks.

1323.  Defendants provided fungible funds to the IRGC, including its Hezbollah Division and Qods Force, that inevitably flowed through to Hezbollah and, through Hezbollah, to Jaysh al-Mahdi for attacks against Americans in Iraq.  As Ambassador Mark D. Wallace explained in 2012, "[a]bsent *economic support from international businesses*, the Iranian regime would *not have the financial wherewithal to … support terrorism*."[575]

1324.  Writing in the *Eurasia Review*, a foreign affairs analyst specializing in Iran explained the tight nexus between economic transactions with the Bonyad Mostazafan and Hezbollah-led terrorist attacks against Americans in Iraq and elsewhere:

> The question is, where does the revenue go? …  Since US sanctions caused a sharp decline in Iran's official revenues, the regime is facing financial difficulties and cannot fund its proxies to meddle in the region or as the mullahs' call it "expand its strategic scope". *Iran cannot fund its proxies including Hezbollah, and its multitude of militia forces in Iraq* and Yemen, or its Afghan Fatemiyoun Division and Pakistani Zainebiyoun militias in Syria using its official annual budget. *The millions of dollars used to fund these group must be provided from other financial sources*. …[B]onyads such as Bonyad-e-Mostazafan, are among the organizations that have *directly assisted the Quds Force in this regard*. Iranian opposition sources have previously stated that the Quds Force receives *most of its funds* from [Bonyads]. … The US's decision to sanction [Bonyads] will definitely be welcomed by Iranians who are tired of having their *stolen wealth used for terrorism*.[576]

---

[575] Wallace May 17, 2012, Testimony (emphasis added).

[576] Cyrus Yaqubi, *Recently Sanctioned Iran Foundation Is Regime's Slush Fund For Terrorism*, Eurasia Review (Jan. 24, 2021) (emphasis added). While Mr. Yaqubi primarily focused on a separate bonyad, his claims apply equally to Bonyad Mostazafan.  *See id.* ("[B]onyads such as Bonyad-e-Mostazafan, … have directly assisted the Quds Force in this regard.").

1325.   Juan C. Zarate, former Deputy National Security Advisor for Combatting

Terrorism from 2005 through 2009, previously testified about the key role played by IRGC,

including Qods Force, front companies in funding and arming anti-American terrorist attacks

committed by Iranian terrorist proxy groups:

> We have limited tools to address … terrorism … And the use of financial power
> and the power to exclude from the global system is one of our principal if not
> most effective tools …. [W]e have to have a comprehensive strategy with the use
> of all tools of national power. No doubt. But the reality is at the end of the day,
> these tools are the ones that prove to be most effective.… So we are going to have
> to, ***if we are honest about what's happening in the international financial
> commercial order, we are going to have to crack down on Qods Force front
> companies***.…. That's the nature of the Iranian economy in the way that they do
> business, and the way they have reached precisely what we have cut off that
> hardened them so much.[577]

1326.   On April 23, 2012, the Treasury Department announced new sanctions against

Iran that recognized that the IRGC's, including the Qods Force's, control of the

telecommunications sector was inextricably linked with violence, and stated, in part, as follows:

> The Order targets …information and communications technology that facilitates
> computer or network disruption, monitoring or tracking that could assist in or
> enable human rights abuses by or on behalf of the … Government of Iran.
> Pursuant to this order sanctions were imposed on … Iran's Islamic Revolutionary
> Guard Corps (IRGC) … The IRGC's Guard Cyber Defense Command (GCDC)
> includes a special department called the Center for Inspecting Organized Crimes
> (CIOC). … The IRGC's CIOC has openly admitted that it would forcefully
> suppress anyone seeking to carry out "cultural operations" against the Islamic
> Republic via the Internet … Individuals arrested by the IRGC have been subjected
> to severe mental and physical abuse …."[578]

1327.   The nexus between Defendants' illicit transactions in the Iranian telecom sector

and terrorist violence by Iranian proxies was especially tight.  As Ali Alfoneh of the American

---

[577] Testimony of Juan Zarate, *Sen. Bob Corker Holds a Hearing on Sanctions and the Joint
Comprehensive Plan of Action*, SEC Wire (July 31, 2015) (emphasis added).

[578] U.S. Treasury Dep't, *Fact Sheet: New Executive Order Targeting Human Rights Abuses Via
Information Technology,* (Apr. 23, 2012).

Enterprise Institute explained, the IRGC, including its Hezbollah Division and Qods Force, pushed their way into the telecom sector mafia-style, and relied upon the funds and technology they acquired through their telecom front companies to fund IRGC, including Qods Force, operations:

> **Telecommunications**
> The ***IRGC has also muscled its way into the Iranian telecommunications sector***. In February 2002, Turkish cell phone company Turkcell … won a bid to inaugurate a second mobile phone network for Iran … ***The Iranian government welcomed Turkcell. That is, Turkcell was welcome until the IRGC complained.*** Turkcell would have been in direct competition with IRGC communications technology and electronics firms. The Council of Guardians–an executive body close to the IRGC and the supreme leader–protested that Iranians would have only 30 percent ownership of the new company. Even after the National Bank of Iran bought out foreign investors to achieve a 51 percent Iranian stake, ***the IRGC was not satisfied***. The IRGC-operated [IEI] and the [Bonyad Mostazafan]–an independent financial body ***traditionally run by a retired IRGC commander and used by the state as a proxy to fund off-the-books IRGC operations***–erected a cascade of legal and practical obstacles leading Turkish investors to retreat from the Iranian market.
>
> The IRGC rooted its rhetoric on Turkcell in national security. … ***the IRGC expects to maintain its dominant position not only on the battlefield, but in civilian sectors as well.*** … Because some of the Iranian economy's most advanced technological undertakings occur under the aegis of the IRGC and within the framework of the Iranian arms industry, the IRGC can monopolize the transfer and adaptation of high technology to civilian applications … The homepage of [IEI] … display[s] many consumer goods produced by the arms industry for sale in the Iranian market. The list includes personal computers, scanners, telephone sets and intercoms, mobile phones, and telephone sim cards. These ***purchases support … IRGC operations*** ….[579]

1328.   As national security analysts Elliot Hen-Tov and Nathan Gonzalez wrote in the *Washington Quarterly* in 2011, the IRGC, including its Hezbollah Division and Qods Force,

---

[579] Ali Alfoneh, *How Intertwined Are the Revolutionary Guards in Iran's Economy?*, American Enterprise Institute,(Oct. 22, 2007) (emphasis added).

"'cashed in' since 2005."[580]  Describing the "dramatic increase" in the IRGC's, including the

Qods Force's, "economic importance" since 2005, they explained that:

> [T]he Guards [i.e., the IRGC, including its Hezbollah Division and Qods Force] controlled less than five percent of GDP shortly after the end of the Iran-Iraq War in 1989.  Now, they directly or indirectly oversee … about 35 percent and growing. … Prior to 2005, the Guards … occasionally *used raw power to reverse high-profile tenders in their favor*.  One of the *most notable examples* is when it nullified Turkcell's winning bid to operate a second mobile-phone network as part of a consortium [in favor of Defendant MTN]. Upon *pressure by the Guards* and their patrons, the Majles was *forced to change the terms of the deal and revoke Turkcell's majority share in the consortium*. After Turkcell's departure, an Iranian-led consortium *under the ownership of a Guards' subsidiary* [i.e., Defendant MTN Irancell] received the license for the network.[581]

1329.   Defendants also helped the IRGC, including its Hezbollah Division and Qods

Force, arm their terrorist proxies Hezbollah and Jaysh al-Mahdi by providing embargoed dual-

use technology from the United States.  Defendants' contribution to the terrorist enterprise was

essential, as the embargoed American technology that Defendants provided to the IRGC fronts,

including its Hezbollah Division and Qods Force, directly improved the efficacy of the

Hezbollah-designed and built bombs that the Joint Cells used to attack Americans in Iraq

between 2011 and 2016.  As the RAND Corporation has explained,, "[s]everal *network

technologies, most notably cell phones … and other communication devices*, have *enabled

terrorists to improve their use of [IEDs]*.  There have been *well-publicized cases of terrorist use

of cellular phones in operations*."[582]

---

[580] Elliot Hen-Tov and Nathan Gonzalez, *The Militarization of Post-Khomeini Iran: Praetorianism 2.0*, The Washington Quarterly (Winter 2011).

[581] *Id*. (emphasis added).

[582] Bruce W. Don, David R. Frelinger, Scott Gerwehr, Eric Landree, Brian A. Jackson, *Network Technologies for Networked Terrorists: Assessing the Value of Information and Communication Technologies to Modern Terrorist Organizations* 38-39 (RAND Corp. 2007) (emphasis added).

1330.   The technology Defendants supplied also helped the IRGC, including its Hezbollah Division and Qods Force, to logistically support the Joint Cells operating in Iraq.  In their 2007 study, RAND explained that telecom, communications, and information technologies are vital for transnational terrorist organizations to plan, communicate, and execute attacks:

> ***Increasingly, as more functionality is integrated into personal electronic devices, clusters of technologies are likely to play an increasingly important role in enabling terrorist operations.*** Although these devices are referred to individually as smart phones, digital cameras, personal digital music devices, personal memory devices (e.g., jump drives), GPS devices, and digital video recorders, they increasingly embody ***clusters of technological capabilities that can be useful to terrorists***. The development trajectory of cell phones in particular may enable terrorists to have a single electronic device that can provide ***integrated, redundant mechanisms for signaling operations or detonating explosive devices***. … As communication technologies become increasingly able to use available wireless communication modes, it may become ***more difficult to interrupt the triggering of IEDs***. Early generations of terrorist detonation devices could frequently be jammed because they could only receive transmitted signals on a limited number of frequencies.  In the future, a single … smart phone will likely be able to receive information using [an array of signals]. The diversity of signals could make jamming devices based on these technologies difficult.[583]

1331.   As a result of the foregoing, each time Defendants publicly touted how each had helped improve the technical capabilities of the phones and other network devices supplied to MTN Irancell, TCI, or MCI, MTN, ZTE, and Huawei were also admitting that they were bolstering the communications networks, technologies, and operative phones relied upon by the IRGC, including its Hezbollah Division and Qods Force, to sponsor Hezbollah's terrorist attacks against Americans in Iraq.

1332.   The technology Defendants provided also helped the IRGC, including its Hezbollah Division and Qods Force, communicate with Hezbollah and Jaysh al-Mahdi (through Hezbollah) in Iraq by sourcing embargoed dual-use technology from the United States.  Indeed,

---

[583] *Id.* at 39-40 (emphasis added).

the IRGC's, including the Qods Force's, desire to ensure that it could securely communicate with

Hezbollah and Jaysh al-Mahdi in Iraq was what initially motivated it to instruct MTN, ZTE, and

Huawei to obtain the embargoed U.S. technology.  And for good reason:  for a terrorist alliance

seeking to evade the surveillance of the world's greatest military so that it could plan its attacks

unmolested, sensitive communications technology from the United States offered an almost

impossible-to-overstate communications advantage to the terrorists by arming them with state-

of-the-art communications and encryption technology.  As the RAND Corporation explained:

> For security forces monitoring terrorist communication, such mode nimbleness
> can **increase the challenges of successfully using terrorist communication
> traffic**. … **Terrorist access to easy-to-use devices with multiple modes of
> communication present challenges for security forces** attempting to intercept or
> track communications … Such communication networks can bypass security
> forces' centralized monitoring at switches or through the intermediate
> organization that manages the network infrastructure, **and thereby provide fairly
> secure communication** …[584]

## A.      Command, Control, Communications, And Intelligence

1333.   Command, Control, Communications, and Intelligence (or C3i) are a fundamental

cornerstone to all military operations.[585]  Without C3i, military operations cannot be

synchronized to effect combat operations at a specific time and place.  These principles apply not

only to legitimate military operations, but are necessary to effect terrorist operations as well.

1334.   As General George W. Casey explained in 2009:  "Technology is [a] double-

edged sword. Inexpensive access to information enables entrepreneurs and innovators to

---

[584] *Id*. at 35-36 (emphasis added).

[585] Lieutenant Colonel Dale E. Fincke, *Principles of Military Communications for C3i*, Army
War College School of Advanced Miliary Studies, (May 20, 1986),
https://apps.dtic.mil/sti/pdfs/ADA174214.pdf.

*collaborate in developing new technologies* and improving existing ones. Yet our adversaries can *exploit these same technologies to export terror around the globe*."[586]  He continued:

> The Israeli-Hezbollah conflict also illustrates the potential impact of hybrid threats. Hezbollah employed modern civil technology (secure cell phones, computers and video telecommunications systems) combined with military means (antitank, surface-to-air and antiship missiles, rockets, mortars and unmanned aerial vehicles) and improvised explosive devices in an innovative array of unanticipated patterns.[587]

1335.  Defendants' sourcing of illicit technologies for the IRGC, including its Hezbollah Division and Qods Force, enabled the IRGC to accomplish its Revolution in Terrorist Affairs, to devastating effect.

1336.  "In future operational environments," General Casey warned, "where the tactical environment and strategic environment will often be seamless, it is the network that will provide the ability to gain and maintain the operational advantage."[588]  When General Casey wrote this, the IRGC, including its Hezbollah Division and Qods Force, was already well on its way to becoming the world's first fully networked terrorist organization, resourced by Defendants' multi-national corporate muscle.

1337.  Indeed, in 2010, General Casey called attention to Hezbollah's use of cell phones and secure computers for command and control, which allowed Hezbollah to inflict far higher casualties on their Israeli enemies: "[Hezbollah] had *secure cell phones, used secure computers*

---

[586] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

[587] *Id.*

[588] *Id.*

*for command and control and got their message out* on local television, and about 3,000

Hezbollah operatives basically held off 30,000 well-armed, well-equipped Israeli soldiers."[589]

1338.  **Interoperability.**  Defendants also ensured that the IRGC, including its

Hezbollah Division and Qods Force, realized enormous gains in terrorist effectiveness and

lethality based upon the unique interoperability advantages that MTN Group, MTN Dubai, ZTE

Corp., and Huawei Co., afforded to the IRGC and its terrorist allies.

1339.  **Intelligence.**  Defendants also ensured that the IRGC, including its Hezbollah

Division and Qods Force, achieved a generational improvement in their intelligence collection.

As one analyst told the *Christian Science Monitor*, "[m]obile phone networks and how they

connect is one of the IRGC's key priorities because it's one of the key tools for opponents,","

and concluded the IRGC was "improving its connectivity and information-sharing."[590]

1340.  MTN Group, MTN Dubai, ZTE Corp, and Huawei Co. served as corporate

"covers" for the IRGC, including its Hezbollah Division and Qods Force, and intentionally

structured transactions, supplier relationships, and pricing decisions, among other things, for the

specific purpose of illicitly obtaining state-of-the-art American technology, like enterprise level

servers.  The end goal: transfer the illicitly obtained goods to the IRGC, including its Hezbollah

Division and Qods Force, for their use in the terrorist campaign against Americans around the

world.  By serving as corporate "covers" for the IRGC, including its Hezbollah Division and

Qods Force, each Defendant significantly increased the potency of the scheme, as demonstrated

by how long it has endured.

---

[589] J.D. Leipold, *CSA Addresses Worldwide Challenges at Brookings Institution*, Defense Department Documents (Feb. 2, 2010), 2010 WLNR 2196129.

[590] Iason Athanasiadis, *How Iranian Dissidents Slip Through Tehran's Airport Dragnet*, Christian Science Monitor (Feb. 8, 2010), 2010 WLNR 2676528.

B. **Terrorist Finance**

1. **Cash Flow From MTN Irancell And TCI Revenue**

1341.   The IRGC, including its Hezbollah Division and Qods Force, derived substantial terrorist funding from the billions of dollars in MTN Irancell and TCI-related cash flows, and at least hundreds of millions of dollars annually.

1342.   From 2005 through the present, MTN Group's and MTN Dubai's illicit transactions with MTN Irancell, the Bonyad Mostazafan, IEI, TCI (including MCI), Exit40, and/or the Akbari Fronts, provided millions, annually, in illicit funds, weapons, and operational support to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force, which the Joint Cells used to attack Americans in Iraq, including Plaintiffs and their loved ones.

1343.   MTN Group and MTN Dubai significantly increased the cash flowing through MTN Irancell and TCI, and ultimately deployed by the IRGC, including its Hezbollah Division and Qods Force.  They did so by illicitly supplying the state-of-the-art American technologies, like servers, to MTN Irancell and TCI, and by extension the IRGC (including its Hezbollah Division and Qods Force) needed to attack Americans abroad.

1344.   By illicitly helping MTN Irancell expand the footprint of its network, MTN Group helped generate new cash flow by connecting more customers to MTN and therefore causing more money to flow through MTN Irancell to the IRGC, including its Hezbollah Division and Qods Force.

1345.   As a matter of economic first principles, MTN Group's and MTN Dubai's participation in MTN Irancell caused the latter to become more profitable, because MTN Group was able to bring its networking expertise to the table.

431

1346.   MTN's logic compels this conclusion.  According to Gordon Kyomukama, Chief Technical Officer of MTN, "[a]t MTN, extending the footprint of our network and services to ***ensure that we connect more people*** has been and remains a high priority for our company."[591]

1347.   On information and belief, on or about 2012, MTN Group began discussions with one or more components of the U.S. government concerning MTN Group's desire to repatriate hundreds of millions of dollars from MTN Irancell.

1348.   The financial, technical, communications, intelligence, and operational support that that MTN Group, MTN Dubai, ZTE Corp., and Huawei Co., and their respective U.S. manufacturers provided to their IRGC-controlled, including Qods Force-controlled, counterparties flowed through to the Joint Cells that committed each attack that injured each Plaintiff through some channels that were "official" and some that were "off-the-books."

1349.   From 2003 through the present, the IRGC, including its Hezbollah Division and Qods Force, supplied the Joint Cells – at a Cell level and directly to each constituent member (i.e., Hezbollah, the Qods Force, and Jaysh al-Mahdi) – with substantial and regular arms deliveries, financial aid, training, logistical support, communications technology (including secure American mobile phones), safe-haven assistance, and aid with narcotics trafficking (conspiring with, among others, al-Qaeda and the Taliban, including its Haqqani Network), each form of aid facilitated their shared terrorist enterprise against America (i.e., the conspiracy), which the IRGC's Shiite Terrorist Proxies and IRGC's Sunni Terrorist Proxies used to aid the terrorists' ability to execute the attacks that injured the Iraq Plaintiffs.

---

[591] Intelsat, *Press Release: Uganda Joins Forces with Intelsat, ITSO and MTN to Accelerate 3G Network Infrastructure Deployment in Rural Areas* (May 4, 2018), https://investors.intelsat.com/news-releases/news-release-details/uganda-joins-forces-intelsat-itso-and-mtn-accelerate-3g-network.

1350.   The embargoed dual-use American technology –included the annual funneling of thousands of secure American smartphones, hundreds of millions of U.S. Dollars, and a vast network of logistical and operational support for the Irancell and TCI fronts that MTN Group, MTN Dubai, ZTE Corporation, and Huawei Corporation provided to their counterparties controlled by the IRGC, including its Hezbollah Division and Qods Force. This technology flowed through to the Joint Cells, including Lebanese Hezbollah, the Qods Force, and Jaysh al-Mahdi, and IRGC Shiite Terrorist Proxies who committed each attack that injured each Iraq Plaintiff, through transfers made by the IRGC, including its Hezbollah Division and Qods Force, to the Joint Cells and Jaysh al-Mahdi.

1351.   With respect to MTN Group's, MTN Dubai's, ZTE Corporation's, and Huawei Corporation's "official" transactions with the IRGC, including Lebanese Hezbollah and Qods Force, front counterparties – which, though open and notorious, were still illegal – flowed through the IRGC, including its Hezbollah Division and Qods Force, into the specific terrorist organizations upon which the IRGC relied to conduct Iranian "security" operations outside of Iran including, but not limited to:

(A)   **Hezbollah's External Security Organization Budget:**  In order to fund, arm, train, equip, and logistically support designated terrorist groups, or forward deployed Hezbollah terrorists, that joined the conspiracy to attack Americans including, but not limited to:

    (i)   Hezbollah's forward deployed operatives worldwide, including but not limited to, Hezbollah attack planners, bomb makers, logisticians, trainers, attack cells, fundraisers, financiers, propagandists, and videographers, all of whom were regularly forward deployed, under IRGC doctrine, to help commit and plan terrorist attacks alongside local proxy groups (e.g., Jaysh al-Mahdi in Iraq or the Taliban in Afghanistan) wherever Americans were found, including, but not limited to, Iraq, Iran, Lebanon, Syria, Yemen, Bahrain, the U.A.E., Afghanistan;

    (ii)   TheT other members of the Joint Cells (through forward-deployed in-country Hezbollah cell leaders) that committed each attack that injured each Plaintiff in Iraq, and to support Iranian terrorist proxies worldwide, including, but not

433

limited to, al-Qaeda, the Taliban (including its Haqqani Network), and the Houthis.

**(B)**    **The Qods Force's "Security" Budget:** In order to fund, arm, train, equip, and logistically support designated terrorist groups that specifically targeted Americans including, but not limited to:

(i)    Lebanese Hezbollah and, through Lebanese Hezbollah, Jaysh al-Mahdi, including Jaysh al-Mahdi Special Group Asaib Ahl al-Haq, and Jaysh al-Mahdi Special Group Ka'taib Hezbollah, in order to facilitate terrorist attacks against Americans in Iraq and, in the case of Lebanese Hezbollah, worldwide, including, but not limited to, Iraq, Syria, Yemen, Afghanistan, through cooperation with al-Qaeda and the Taliban including its Haqqani Network, and Europe (collectively, "IRGC Shiite Terrorist Proxies");

(ii)    al-Qaeda, al-Qaeda-in-Iraq, which later became ISIS, Hamas, Palestinian Islamic Jihad, al-Nusra Front, the Taliban, including its Haqqani Network, and Lashkar-e-Taiba, in order to facilitate terrorist attacks against Americans worldwide, including, but not limited to, Iraq, Syria, Yemen, Afghanistan, and Europe through cooperation with al-Qaeda and the Taliban including its Haqqani Network, and Europe (collectively, "IRGC Sunni Terrorist Proxies").

1352.    The millions in value that MTN Group, MTN Dubai, ZTE Corp., and Huawei Co., and their respective U.S. manufacturers, Defendants ZTE USA, ZTE TX, Huawei USA, Huawei Device USA, and Skycom, each showered upon the IRGC, including its Hezbollah Division and Qods Force, each year:  For MTN, from 2005 until the present; for ZTE, from at least 2008 through at least 2016; and for Huawei, from at least 2008 through at least 2014. Their official transactions flowed through Hezbollah to the terrorist(s) that committed each attack against each Plaintiff.

1353.    MTN Group's, MTN Dubai's, ZTE Corp.'s, Huawei Co.'s, and their respective U.S. manufacturers, Defendants ZTE USA, ZTE TX, Huawei USA, Huawei Device USA, and Skycom's covert "off-the-books" assistance to the terrorists was no less important.  The IRGC, including its Hezbollah Division and Qods Force, has provided tens of millions of dollars "off-the-books" to Hezbollah and (through Hezbollah) to local terrorist proxies since Hezbollah's inception.  Defendants' "off-the-books" financial-, technology-, and services-related transactions

434

with their IRGC, including Hezbollah Division and Qods Force, front counterparties also flowed through the IRGC, its Hezbollah Division and Qods Force, into Hezbollah's, the Qods Force's – and ultimately their proxies' – terrorist budgets in order to fund the attacks committed by the Joint Cells comprised of IRGC Shiite Terrorist Proxies in Iraq, the al-Qaeda-related cells comprised of IRGC Sunni Terrorist Proxies in Afghanistan, Iraq, Syria, and Europe, that committed each attack that injured each Plaintiff.  MTN's, ZTE's, and Huawei's illicit transactions with the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), and/or the Akbari Fronts provided millions in illicit "off-the-books" income, often in U.S. dollars, to the IRGC, including its Hezbollah Division and Qods Force, each year, which the IRGC, including its Hezbollah Division and Qods Force, then provided to Hezbollah so that the Joint Cells could commit each attack that injured each Plaintiff, which they did.

1354.   On information and belief, from 2006 through on or about 2010, the IRGC diverted approximately twenty percent (20%) of its net income cash flow from MTN Irancell to the IRGC, Qods Force, and Lebanese Hezbollah, with each receiving a similar amount each year. At those rates, MTN Irancell caused, at least, more than thirty million dollars to flow through the IRGC to the Qods Force each year, and MTN Irancell caused more than thirty million dollars to flow to Lebanese Hezbollah each year, and MTN Irancell caused more than thirty million dollars to flow to the IRGC each year.  Such cash flows were delivered in regular, predictable amounts, and supported Qods Force and Lebanese Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Qods Force and Lebanese Hezbollah throughout the Middle East including, but not limited to, Iran, Iraq, Lebanon, Afghanistan, Syria, and Yemen.

1355.   On information and belief, after economic sanctions began to hammer the IRGC on or about 2010, the IRGC responded by cutting spending across the board in half, and therefore cut the cash flow through from MTN Irancell to the IRGC, Qods Force, and Lebanese Hezbollah from twenty percent (20%) to ten percent (10%), with each receiving a similar amount each year.  At those rates, MTN Irancell caused, at least, more than fifteen million dollars to flow through the IRGC to the Qods Force each year, and MTN Irancell caused more than fifteen million dollars to flow to Lebanese Hezbollah each year.  Such cash flows were delivered in regular, predictable amounts, and supported Qods Force and Lebanese Hezbollah operations, weapons purchases, and personnel costs, among other expenses, in support of anti-American terrorist operations by Qods Force and Lebanese Hezbollah throughout the Middle East including, but not limited to, Iran, Iraq, Lebanon, Afghanistan, Syria, and Yemen.

**2.    Cash Flow From Terrorist Fundraising Campaigns, Procurement Bribery, Khums, And Financial Management**

1356.   Defendants' assistance facilitated terrorist fundraising campaigns by the IRGC, including its Hezbollah Division and Qods Force, that directly supported attacks in Iraq and Afghanistan by channeling resources to the IRGC and its terrorist allies.

1357.   Defendants' procurement bribes facilitated terrorist fundraising campaigns by the IRGC, including its Hezbollah Division and Qods Force, that directly supported attacks in Iraq and Afghanistan by channeling resources to the IRGC and its terrorist allies.

1358.   Defendants' indirect donations (*khums*), meaning the cash flow that Defendants triggered when they paid the IRGC, including its Hezbollah Division and Qods Force (e.g., when they bribed an IRGC cutout in Dubai), facilitated terrorist fundraising campaigns by the IRGC, including its Hezbollah Division and Qods Force, that directly supported attacks in Iraq and Afghanistan by channeling resources to the IRGC and its terrorist allies.

436

1359.   Defendants assisted the IRGC, including its Hezbollah Division and Qods Force, to revolutionize their financial management capabilities, which meant that the terrorists had more resources upon which to draw for killing Americans.

## C.   Weapons

### 1.   Improvised Explosive Devises (IEDs) and Explosively Formed Penetrators (EFPs)

1360.   MTN, ZTE, and Huawei also supported the terrorist campaign through their financial support of fronts acting for the IRGC, including its Hezbollah Division and Qods Force, which provided them funds, bomb parts, and other necessary material vital to the IRGC Shiite Terrorist Proxies' ability to conduct a nationwide IED and EFP campaign targeting Americans in Iraq.  The IRGC, including its Hezbollah Division and Qods Force, manufactured and/or sourced key components for Hezbollah's EFP attacks, including, but not limited to, the military- and factory-grade copper discs and embargoed technologies, which Hezbollah used and were vital to Hezbollah's ability to build the advanced Hezbollah-designed EFPs that the Joint Cells used to commit each EFP attack that injured each Plaintiff.

1361.   MTN's, ZTE's, and Huawei's conduct had an especially tight nexus with the Joint Cells' ability to execute signature Hezbollah attacks involving the use of EFPs, advanced rockets, and hostage-taking.  Each EFP and advanced rocket that the Joint Cells used to attack and injure each Plaintiff contained, reflected, was reverse engineered from, and/or was otherwise technologically aided by the IRGC's, including the Qods Force's, use of embargoed American technology.  In the case of Huawei, that embargoed American technology was obtained by and through, on information and belief, Huawei's subsidiaries and employees in the U.S., including but not limited to Huawei USA, Huawei Device USA, and Futurewei.  In the case of ZTE, that embargoed American technology was obtained by and through, on information and belief, ZTE's

subsidiaries and employees in the U.S., including but not limited to ZTE USA and ZTE TX. In the case of MTN, MTN provided such technology pursuant to MTN Group Limited's joint venture with the IRGC, including its Hezbollah Division and Qods Force, through MTN Irancell. The embargoed American technology that MTN, ZTE (via ZTE USA and ZTE TX), and Huawei (via Huawei USA, Huawei Device USA, and Futurewei) covertly supplied to the IRGC, including its Hezbollah Division and Qods Force, substantially improved the efficacy and lethality of each EFP and rocket used to attack and injure each Plaintiff.

1362. MTN, ZTE, and Huawei also supported the terrorist campaign through their financial support of fronts acting for the IRGC, including its Hezbollah Division and Qods Force, which funded the Joint Cell attacks. The IRGC, including its Hezbollah Division and Qods Force, manufactured and/or sourced key components for Hezbollah's EFP attacks, including, but not limited to, the military- and factory-grade copper discs and embargoed technologies, which Hezbollah used and were vital to Hezbollah's ability to build the advanced Hezbollah-designed EFPs that the Joint Cells used to commit each EFP attack that injured each Plaintiff.

### 2. Rockets

1363. Defendants' assistance directly improved the lethality and accuracy of the rockets deployed by the IRGC, including its Hezbollah Division and Qods Force.

### D. Recruiting, Fundraising, Strategic Communications, And Disinformation

1364. The IRGC, including its Hezbollah Division and the Qods Force, emphasized the centrality of orchestrated propaganda campaigns to drive recruiting and fundraising, strategic communications to deliver custom messages to custom audiences, and broad disinformation campaigns to conceal the conspiracy. The terrorists devoted so much time to these efforts for an obvious reason: they played a vital role in furthering the conspiracy and maximizing the number of Americans the terrorists could kill in Iraq, Afghanistan, and throughout the Middle East.

"Based on their extensive reach in the communications economy," according to Ms. Gill, "the IRGC orchestrated a 'comprehensive messaging strategy' using radio and television broadcasts, newspapers, websites, and social media accounts to amplify the message that the Islamic Republic was under attack from the West. Using media infrastructure … and telecommunications infrastructure …, the IRGC actively engaged the communications economy in defending the Islamic Republic against the soft war tactics of the West.[592]

1365.   In so doing, the conspiracy leveraged the explosion of information technologies and computing power since 2000.  As the United Nations Office on Drugs and Crime ("UNODC") documented in 2012:

> Technology is one of the strategic factors driving the increasing use of the Internet by terrorist organizations and their supporters for a wide range of purposes, including recruitment, financing, propaganda, training, incitement to commit acts of terrorism, and the gathering and dissemination of information for terrorist purposes. While the many benefits of the Internet are self-evident, it may also be used to facilitate communication within terrorist organizations and to transmit information on, as well as material support for, planned acts of terrorism, all of which require specific technical knowledge for the effective investigation of these offences.[593]

### 1.        Recruiting and Fundraising

1366.   Islamist terrorists have widely relied upon antisemitic appeals to raise money, recruit followers, and gain other advantages.  The Anti-Defamation League observed in 2015:

> Fourteen years after 9/11, terrorist groups motivated by Islamic extremist ideology, from Al Qaeda to the Islamic State of Iraq and Syria (ISIS), continue to rely on depictions of a Jewish enemy – often combined with violent opposition to the State of Israel – to recruit followers, motivate adherents and draw attention to their cause. Anti-Israel sentiment is not the same as anti-Semitism. However, terrorist groups often link the two, exploiting hatred of Israel to further encourage

---

[592] Gill, *Capitalism, Communications, and the Corps*, at 110.

[593] United Nations Office on Drugs and Crime, *The Use of the Internet for Terrorist Purposes* at 1 (Sept. 2012), https://www.unodc.org/documents/frontpage/Use_of_Internet_for_Terrorist_Purposes.pdf.

attacks against Jews worldwide and as an additional means of diverting attention to their cause.[594]

1367.   Few terrorists are more committed to this strategy than the IRGC, including its Hezbollah Division and Qods Force, who have long used baldly antisemitic propaganda as a core part of their terrorist conspiracy, by spreading the hateful slur that the United States and Israel are part of a Jewish-led cabal seeking to take over Muslim lands.

1368.   The IRGC's campaign to spread hateful antisemitic propaganda about Israel, the United States, and people of the Jewish faith were not the idle musings of disorganized radical Islamists blogging out of their parents' basements.  These were industrial scale, IRGC- and Lebanese Hezbollah-administered propaganda campaigns that sought to strengthen the terrorist conspirators' ability to attack Americans worldwide by, among other things:  (1) **bolster terrorist fundraising** by increasing the potency of the terrorists' online fundraising appeals, and thereby drive more dollars to the terrorist campaign; (2) **recruit more terrorists** by creating the initial touchpoints for new recruits, e.g., a 16-year old watches a splashy Hezbollah video and decides to join the group; and (3) **enhance the terrorists' concealment** by flooding the zone with propaganda designed to persuade the population to support the terrorists or, at least, not rat them out to the Americans nearby (almost as good), by portraying a common enemy.

1369.   Regular media discussions also specifically alerted Defendants that the IRGC, including its Hezbollah Division and the Qods Force deployed antisemitic propaganda to raise money and recruit terrorists.

---

[594] Anti-Defamation League, *Anti-Semitism: A Pillar of Islamic Extremist Ideology* at 1 (2015), https://www.adl.org/sites/default/files/documents/assets/pdf/combating-hate/Anti-Semitism-A-Pillar-of-Islamic-Extremist-Ideology.pdf..

1370.   In furtherance of the conspiracy, MTN Group and MTN Dubai were, and remain to this day, one in spirit with the antisemitic terrorist recruiting messaging of the IRGC, including Lebanese Hezbollah, and the Qods Force, as well as their co-conspirators in Syria (like the Assad regime) and Afghanistan (like al-Qaeda and the Taliban, including its Haqqani Network).

1371.   *First*, MTN Group and MTN Dubai regularly enabled the creation, uploading, distribution, downloading, and propagation of a near-constant 24/7 river of terrorist recruitment appeals by, among others, the IRGC, Lebanese Hezbollah, and the Qods Force, through their provision of technical, financial, operational, and personnel support to MTN Irancell and MTN Syria, both of which reinforced the recruiting campaigns.

1372.   *Second*, MTN Group and MTN Dubai have never publicly condemned the antisemitic terrorist propaganda they have enabled in Iran (through MTN Irancell), Syria (through MTN Syria), Yemen (through MTN Yemen), and Afghanistan (through MTN Afghanistan).  In every country, MTN Group and MTN Dubai facilitated the local MTN subsidiary's direct and indirect assistance to the recruiting campaigns, all of which followed the Lebanese Hezbollah playbook of using over-the-top bile to raise awareness for recruiting drives, fundraising solicitations, and more.

1373.   MTN Group and MTN Dubai were (and remain) one in spirit with the IRGC's, including Lebanese Hezbollah's and the Qods Force's, antisemitic terrorist recruiting message. Most obviously, MTN Group and MTN Dubai are the but-for cause of the terrorists' ability to spread their recruitment pitches so effectively through the litany of terrorist-enabling services that MTN Group committed every MTN subsidiary and affiliate to provide to all "Iranian

Shareholders," i.e., the IRGC, including its Hezbollah Division and the Qods Force, which substantially bolstered the terrorists' antisemitic recruiting and fundraising pitches.

1374.   Since 2005, MTN Group and MTN Dubai have broadcast the terrorists' antisemitic recruiting propaganda throughout the Middle East while never once publicly stating that: (a) Israel has a right to exist; (b) bomb attacks against Americans in Iraq by Iranian proxies are wrongful; or (c) the Holocaust should be remembered.  The reason is obvious:  MTN Group and MTN Dubai agree with their terrorist business partner:  they are one in spirit.[595]

### 2.   Strategic Communications and Disinformation

1375.   After 9/11, the IRGC, including its Hezbollah Division and Qods Force, was keenly aware how an effective strategic communications (or "stratcoms") campaign could directly aid their transnational terrorist conspiracy.  Indeed, no major global terrorist organization has a longer, more prolific, or more impactful record of turning effective strategic communications campaigns into new sources of funds, personnel, safe house, and the litany of other functions that required an ever-growing group of allies and enablers.

1376.   The U.S. military concluded long ago that there was a direct relationship between effective strategic communications and overall probability of success on a given venture.  This reflects a recognition, as General George W. Casey, Jr., explained, "Conflicts" will continue to

---

[595] A Westlaw News search designed to obtain any media report containing the phrases "MTN Group" or "MTN Dubai" within 100 words of the roots for Israel and antisemitism (Westlaw News "MTN Group" or "MTN Dubai" /100 Israel! Antisem! Holocaust!) reveals approximately 300 documents as responsive hits.  Nothing.  A comprehensive Google search similarly reveals no statement.  MTN Group could, of course, cease broadcasting terrorist propaganda, publicly issue a sweeping defense of Israel's right to exist, and unequivocally condemn roadside bomb attacks supported by Iran.  MTN Group's obvious refusal to do so in nearly two decades flies so contrary to international corporate norms, only one conclusion results:  MTN Group and the IRGC are one in spirit.

take place under the unblinking scrutiny of the 24-hour media cycle and the World Wide Web…. Adversaries will have many forums in which to disseminate their messages worldwide."[596]

1377.  The IRGC, including its Hezbollah Division and Qods Force, also understood that effective strategic communications were necessary to further the conspiracy by, among other things, promoting a disinformation campaign designed to conceal the conspiracy by causing the spread of falsehoods relating to it, and preventing controversies that could expose co-conspirators, incentivize people to exit the conspiracy, or foreseeably cause a co-conspirator to be financially or logistically unable to continue supporting the conspiracy, such as a threat that could cause a corporate co-conspirator to lose billions of dollars or cause an individual co-conspirator to lose their life or freedom.

1378.  Writing in an official NATO journal in 2020, Ms. Gill explained, "The Invisible Hand of the IRGC" touched every transaction relating to MTN Irancell, TCI, and their associated IRGC front company shareholders and, as a result, "the reliance of the IRGC's strategic narrative on the communications economy concerns more than explicitly ideological motivations; a distinctly coercive element can also be identified.  Beyond their devotion to the Construction Jihad, the Guard relied on the communications economy as a tool of power projection."[597]

1379.  MTN Group coordinated the strategic communications and crisis prevention efforts relevant to the entire terrorist conspiracy, and managed MTN Irancell-related strategic communications and public branding outside of Iran.

---

[596] General George W. Casey, Jr., *The Army of the 21st Century*, Army (Oct. 1, 2009), 2009 WLNR 30869494.

[597] Gill, *Capitalism, Communications, and the Corps*, at 108.  Ms. Gill concluded that "[w]hilst strategic narratives construct the truth, communications economies enable control over communicative processes; both reinforce one another to create a hegemonic understanding of reality that supports a political actor's values, interests, or objectives."  *Id.* at 113.

1380.   Ever since MTN Group committed itself and every MTN subsidiary and affiliate to the conspiracy on September 18, 2005, MTN Group pursued an aggressive, more than decade-long, strategic communications campaign to further the conspiracy.

1381.   MTN Group successfully suppressed any leaks, materially negative press reporting, or public sector investigations in the United States, Europe, Africa, or Southeast Asia concerning MTN Group's and MTN Dubai's secret agreement with the IRGC, including Lebanese Hezbollah and the Qods Force, until on or about March 28, 2012, when Turkcell sued MTN in federal district court in Washington, D.C., at which time a whistleblower revealed the secret Agreement to the world through Turkcell's lawsuit.  On information and belief, MTN Group relied upon effective strategic communications and crisis prevention services to prevent negative information from "leaking" for nearly seven years after the Agreement was signed.

1382.   MTN Group's successful communications strategy prevented any major media scandals concerning MTN Group from between 2005 and 2010.  Ordinarily, of course, a parent company's brand equity is of no moment in an Anti-Terrorism Act case.  But when that parent company is, effectively, the joint venture partner of terrorists, as is the case here, and when the point of the joint venture is to generate cash flow and serve as cover for sourcing illicit weapons parts, then the parent company's brand and reputation are essential.

1383.   Simply put, MTN Group began serving as the IRGC's telecommunications- and computing-related financial and logistics agent worldwide in 2005, never stopped doing so, and continues to play the same role today even after the IRGC was designated a FTO.  To accomplish that task, MTN Group coordinated a strategy with MTN Dubai to engage in a series of illegal and fraudulent transactions designed to raise money and source key terrorist components from the United States.

444

1384.   When MTN Group and MTN Dubai operated a worldwide campaign to, among other things, illicitly source more than ten thousand (10,000) high-tech American-manufactured smartphones from sellers within the United States to MTN Group and MTN Dubai's crooked agents, employees, and cut-outs worldwide, ***MTN Group and MTN Dubai were acting as a front for Lebanese Hezbollah and the Qods Force***.

1385.   MTN Group's and MTN Dubai's continued open and notorious service as a terrorist front even after these issues surfaced in litigation in 2012, 2019, and in the instant case. MTN Group and MTN Dubai continue to act as a now notorious front for the IRGC (aa FTO), the Qods Force (a FTO), Lebanese Hezbollah (aa FTO), all of whom, as constituent members of the IRGC were, and remain, parties to the Agreement between "MTN" (i.e., all MTN entities worldwide) and the Iranian Shareholders (i.e., all component parts of the IRGC, necessarily including the IRGC's Hezbollah Division and Qods Force).  Plainly, they mean to serve as a terrorist front.

1386.   In their capacity as long-standing joint venture allies, fundraising partners, and illicit sourcing fronts since 2005, MTN Group and MTN Dubai knew, or were generally aware, that there was a direct, linear, and measurable relationship between MTN Group's and MTN Dubai's public reputation and brand health on the one hand, and the volume of money and illicitly sourced technology that ultimately flowed through to the IRGC, Lebanese Hezbollah, the Qods Force, and their terrorist proxies worldwide on the other.  On information and belief, such knowledge, or general awareness, extended to, among others: (1) MTN Group's President and CEO; (2) MTN Group's Commercial Director; (3) MTN Group's Board of Directors; (4) MTN

Group's in-house counsel and "compliance"[598] staff; (5) MTN Group's external advisors; and (6) MTN Dubai's country manager.

1387.   The better MTN Group's and MTN Dubai's public reputation and brand health, the more cash to flow through MTN Irancell to the terrorists because, among other reasons:  (1) the better MTN Group's and MTN Dubai's brand, the better the sales for MTN Group's joint venture partner, the IRGC, through Irancell; and (2) the easier it was for MTN Group and MTN Dubai to illicitly source the technology demanded by Lebanese Hezbollah and the Qods Force – especially for the higher-cost items like servers, or unusually large bulk orders of less expensive (but still costly) items, like smartphones.  Often, such transactions required that MTN Group, MTN Dubai, and the agents and cut-outs acting on their behalf, transact with suppliers who were more concerned about reputational risk in comparison to the more traditional high-tech black-market resellers for things like smartphones.

1388.   From 2005 through at least 2011, MTN Group and MTN Dubai pursued a successful strategic communications campaign that prevented any catastrophic public relations scandals in the United States, Europe, Africa, or Southeast Asia concerning MTN Irancell, MTN Group, or any other MTN subsidiary or affiliate that could have undermined MTN Group's and MTN Dubai's ability to serve as "cover" most effectively for the conspiracy's continuing efforts to illicitly source weapons and funds to enable terrorist attacks against Americans globally.

---

[598] MTN Group and MTN Dubai are actively, and defiantly, aiding multiple Foreign Terrorist Organizations through the ongoing river of cash they are effectively causing to flow to the IRGC, including its Lebanese Hezbollah division and Qods Force, through MTN Irancell, which MTN Group and MTN Dubai refuse to immediately compel to wind down.  As such, one may reasonably assume that "compliance" as currently practiced at MTN Group and MTN Dubai is just another euphemism at MTN Group.

1389.   On or about December 2010 or January 2011, MTN Group caused MTN Nigeria to hire Individual 1, a former high-level official in the Obama Administration, ostensibly to give two speeches, for which Individual 1 accepted a $100,000 speaking fee.  On information and belief, MTN Group either wired the $100,000 to Individual 1's bank account in the United States itself, or MTN Nigeria wired the $100,000 to Individual 1's bank account at the direction of MTN Group, which thereafter reimbursed MTN Nigeria.

1390.   When MTN Group caused MTN Nigeria to pay Individual 1's $100,000 speaker fee, it was not because MTN Group or MTN Nigeria were interested in Individual 1's speech.  Instead, on information and belief, MTN Group caused MTN Nigeria to pay Individual 1, because MTN Group knew that Individual 1 would return to the Obama Administration, and MTN Group intended to induce Individual 1's service as a backdoor communications channel with the White House.

1391.   MTN Group paid Individual 1 because MTN Group knew Individual 1 would be immensely influential within the Obama Administration while it was analyzing, among other things, the geopolitical and public messaging concerns attendant to question of whether to soften the then-existing sanctions, which were crushing the IRGC, and therefore undermining MTN Group's joint venture partner – and, by extension, MTN Group.

1392.   MTN Group's retention of Individual 1 in December 2010 and indirect payment (through its captive subsidiary, MTN Nigeria) of $100,000 to Individual 1 was an act in furtherance of the conspiracy.  On information and belief, MTN Group wired $100,000 to Individual 1, causing it to be received by Individual 1 inside the United States, hoping that

Individual 1 would, in effect, be on MTN Group's "side" (or at least, willing to take a meeting) when the time was right concerning the sanctions on MTN Group's JV partner, the IRGC.[599]

## X. JOINT CELLS COMPRISED OF HEZBOLLAH, JAYSH AL-MAHDI, AND ISLAMIC REVOLUTIONARY GUARD CORPS, INCLUDING QODS FORCE, KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN IRAQ THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE

1393.   The **Iraq Plaintiffs** are American civilians, servicemembers, and contractors serving in Iraq and Syria, and their family members, who were killed or injured in terrorist attacks committed by:  (1) Hezbollah (a designated FTO at the time), Jaysh al-Mahdi (including Jaysh al-Mahdi Special Groups Asaib Ahl al-Haq and Ka'taib Hezbollah, the latter of which was a designated FTO at the time), and the Qods Force (collectively, **"IRGC Shiite Terrorist Proxies"**), which joined the IRGC's conspiracy and acted together in Joint Cells to commit attacks against Americans in Iraq and Syria; and/or (2) al-Qaeda, al-Qaeda-in-Iraq, which later became ISIS, al-Nusra Front, Ansar al-Islam, the Taliban (including its Haqqani Network), and Lashkar-e-Taiba (collectively, **"IRGC Sunni Terrorist Proxies"**), which joined the IRGC's conspiracy to commit attacks against Americans in Iraq and Syria (and Afghanistan).

1394.   Hezbollah has a history of significantly escalating the violence during its ongoing terroristic campaigns to drive its own (and that of the IRGC's, including the Qods Force's) terroristic Anti-American and Anti-Israeli messaging in the Middle East.  For example, in 2006, during its terrorist attacks against Israel, Hezbollah executed a coordinated rocket offensive that

---

[599] Plaintiffs have no reason to believe this scheme worked.  The effectiveness of MTN Group's transparent attempt to grease a senior insider is not the point.  What matters is that MTN Group – more than five (5) years after joining the conspiracy in 2005 – was still coordinating substantial expenditures of time and money for the obvious purpose of improving the economic climate in which MTN Irancell, and by extension the IRGC, operated, and regularly reaching into the United States to do so.

Hezbollah, and the IRGC, including its Hezbollah Division and Qods Force, touted to show that Hezbollah and its Iranian paymasters could militarily challenge the Great Satan (the United States) and the Little Satan (Israel), both of whom the terrorists claimed to be worthy of attacking.

1395.  Following this practice, Hezbollah escalated its ongoing terrorist campaign in Iraq to support a messaging strategy on behalf of Hezbollah and its Iranian patrons, the IRGC, including its Hezbollah Division and Qods Force.  Hezbollah's decision in 2005 to aggressively expand the EFP and rocket campaigns throughout Iraq, as well as Hezbollah's repeated tactic of targeting the Green Zone in Baghdad, such as in 2008, are two examples of Hezbollah following this longstanding Hezbollah strategy in Iraq.

1396.  On or about the spring of 2011, Hezbollah returned to its playbook and intensified its existing terrorist campaign targeting Americans in Iraq.  Hezbollah did so because it sought to drive a wave of anti-American violence until the then-contemplated, full withdrawal of U.S. forces from Iraq, which was scheduled to take place at the end of 2011.  Hezbollah sought to promote violence against Americans in order to intimidate the U.S. and Iraq during this critical period for both governments.  Hezbollah also sought to bolster its claims of victory over America in Iraq, and specifically, Hezbollah's claims that U.S. forces withdrew from Iraq because of Hezbollah's leadership of the jihadist alliance of Hezbollah, Jaysh al-Mahdi and the IRGC, including its Hezbollah Division and Qods Force.  Hezbollah sought to leverage its perceived "victory" over America in Iraq to show its strength and superiority to the jihadist world, including but not limited to, Hezbollah's Iranian patrons, the IRGC, including its Hezbollah Division and Qods Force, and other terrorists whom Hezbollah hoped to rally to Hezbollah's terrorist campaign.

1397.  In 2011, Hezbollah, acting through the Joint Cells, promoted a new wave of terrorist attacks against Americans in Iraq.  To execute these attacks, Hezbollah, as part of the Joint Cells, relied upon two signature Hezbollah weapons: (1) EFPs, which are a weapon exclusively associated with Hezbollah and which was the terrorists' most effective roadside bomb in Iraq; and (2) advanced rockets, which had been converted into so-called IRAMs or "lob bombs."

1398.  Hezbollah provided each bomb, EFP, and rocket (including IRAM) that the Joint Cells used to commit each attack that injured each Plaintiff.  Hezbollah also coordinated every aspect of the terrorist campaign that injured each Plaintiff.  In both respects, Hezbollah continued the same strategy and practice it had pursued in Iraq since 2003.

1399.  In its escalation of attacks in 2011, Hezbollah, acting through the Joint Cells, targeted Americans in key Iraqi geographies that had the greatest terroristic impact for Hezbollah's jihadist messaging purposes, including, but not limited to, Baghdad, Basra, and Diwaniyah. The Joint Cells had successfully carried out attacks against Americans in those locations as part of Hezbollah's campaign since Hezbollah first helped create Jaysh al-Mahdi in 2003 and to the present day.

1400.  The IRGC, including its Hezbollah Division and Qods Force, provided key aid to the intensified terrorist campaign through the Joint Cells in Iraq in 2011.  The IRGC, including its Hezbollah Division and Qods Force, specifically provided Hezbollah money, logistical support, telecommunications technology, and the advanced weapons or weapons components, which Hezbollah supplied to the Joint Cells to aid the terrorists' ability to execute the attacks that injured Plaintiffs.

1401.   Each Plaintiff who suffered injury because of a 2011 attack was injured because of Hezbollah's above-described strategic decision to further escalate Hezbollah's anti-American terror campaign in 2011 to intimidate the U.S. and Iraqi governments.

1402.   In late 2015, Hezbollah decided, once again, to return to its playbook of escalated attacks and intimidation in Iraq, which was designed to intimidate Americans and Iraqis during a critical period for both governments in Iraq.  Hezbollah created this surge of terrorism in its own campaign in Iraq through at least the spring of 2016.

1403.   Each Plaintiff who suffered injury because of an attack that took place in 2016 was injured because of Hezbollah's above-described strategic decision to further escalate Hezbollah's anti-American terror campaign in 2016 to intimidate the U.S. and Iraqi governments.

1404.   MTN, ZTE, and Huawei also aided the Joint Cell terrorist(s) who committed each attack by transacting with notorious terrorist front counterparties, including, but not limited to, the Bonyad Mostazafan, IEI, MTN Irancell, TCI (including MCI), and/or the Akbari Fronts, which had a widespread and specific reputation for raising money, providing logistical support, and obtaining weapons for terrorists, including Hezbollah, to use to attack Americans.  MTN's ZTE's, and Huawei's financial support and provision of embargoed American technologies and services for such IRGC-controlled, including the Qods Force-controlled, counterparties flowed through Hezbollah to the terrorist(s) that committed each attack that injured each Plaintiff.

A.   **The June 23, 2011, EFP Attack In Baghdad**

1405.   On June 23, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked a three-vehicle American civilian convoy traveling in civilian traffic with an EFP in the Karadah District on the road between the University of Baghdad and the Green Zone in Baghdad, Iraq ("The June 23, 2011 EFP Attack").  The convoy

was attacked while traveling to the U.S. Embassy after two of its passengers, Dr. Stephen S. Everhart and Abdul Ghaffar Mughal, had conducted a seminar designed to elevate an Iraqi business school to international standards and to advise the academic leadership on obtaining accreditation for its business school.

1406.   The June 23, 2011 EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell, comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.[600]   The Joint Cell that committed the June 23, 2011, EFP Attack was led by forward-deployed Hezbollah.

1407.   The EFP used by the Joint Cell to injure victims in the June 23, 2011, EFP attack was a Hezbollah-designed, Iranian-manufactured EFP emplaced by terrorists at the direction of Hezbollah, using specialized training and components supplied by Hezbollah and the IRGC.

1408.   The June 23, 2011, EFP Attack, and Dr. Everhart's murder, would have violated the laws of war if these terrorist groups were subject to them because, among other reasons, Dr. Everhart and Mr. Mughal were civilians not taking part in hostilities, and the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

---

[600] In their original Complaint, a copy-paste insert mistake caused Plaintiffs to incorrectly assert that the Joint Cells inside Iraq in places like Sadr City and Basra comprised, inter alia, "IRGC, including Qods Force." Although obviously a meaningless typo because any IRGC member deployed outside of Iran is definitionally, and exclusively, Qods Force. MTN and ZTE both, however, attempt to transmogrify a copy-paste typo into some sort of damning admission even though the purported admission – that there were "IRGC" in addition to "Qods Force" operating inside of Iraq – is a factual impossibility. Defendants' attempt to turn a copy-paste typo into a justification for dismissing an Anti-Terrorism Act case and concluding that the bombings were acts of war fails. For the avoidance of all doubt, Plaintiffs expressly disclaim any allegation that IRGC operatives -- other than the Qods Force or Lebanese Hezbollah – participated on the ground inside Iraq.

452

### 1.  The Everhart Family And Estate

1409.  Dr. Stephen S. Everhart served on the faculty of The American University in Cairo, including as the Associate Dean of the School of Business.

1410.  On June 23, 2011, Dr. Stephen S. Everhart was injured in the June 23, 2011, EFP Attack in Baghdad Province, Iraq.  Dr. Everhart died on June 23, 2011, as a result of injuries sustained during the June 23, 2011, EFP Attack.  He was 53 years old.

1411.  Dr. Stephen S. Everhart was a national of the United States at the time of the attack and his death.

1412.  Plaintiff Dr. Stephanie Zobay is the widow of Dr. Stephen S. Everhart.  She brings claims in both her personal capacity and her representative capacity on behalf of Dr. Everhart's estate.  She is a national of the United States.

1413.  Plaintiff Lindsay M. Everhart is the daughter of Dr. Stephen S. Everhart.  She is a national of the United States.

1414.  As a result of the June 23, 2011, EFP Attack, and Dr. Everhart's death, Dr. Zobay has experienced severe mental anguish, emotional pain and suffering, and the loss of Dr. Everhart's society, companionship, and counsel.

1415.  Dr. Everhart's estate is entitled to recover economic and non-economic damages from Defendants, due to his murder by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

### 2.  The Mughal Family

1416.  Plaintiff Dr. Abdul Ghaffar Mughal served in Iraq as a civilian contractor with the Iraq Financial Development Project of USAID and had travelled, along with Dr. Stephen S. Everhart, to Baghdad University to advise its academic leadership.

1417.  On June 23, 2011, Dr. Abdul Ghaffar Mughal was injured in the June 23, 2011, EFP Attack.  The attack severely wounded Dr. Mughal, who suffered from, among other injuries,

a broken hand, partial loss of hearing, a variety of shrapnel injuries, and post-traumatic stress disorder.

1418.   Dr. Abdul Ghaffar Mughal was a passenger alongside Dr. Stephen S. Everhart in the same vehicle when the Joint Cell terrorists exploded their EFP.  Along with his own injuries, Dr. Mughal witnessed Dr. Everhart's death.  As a result of the June 23, 2011, EFP Attack and his injuries, Dr. Mughal has experienced severe physical and emotional pain and suffering.

1419.   Dr. Abdul Ghaffar Mughal was a national of the United States at the time of the attack and remains one to this day.

1420.   Plaintiff Sitorai Khasanzod is the wife of Dr. Abdul Ghaffar Mughal.  She is a national of the United States.

1421.   Plaintiff Khalid Mughal is the son of Dr. Abdul Ghaffar Mughal.  He is a national of the United States.

1422.   Plaintiff Hamid Mughal is the son of Dr. Abdul Ghaffar Mughal.  He is a national of the United States.

1423.   Plaintiff Angela Mughal is the daughter of Dr. Abdul Ghaffar Mughal.  She is a national of the United States.

1424.   Plaintiff N.M., by and through his next friend Dr. Abdul Ghaffar Mughal, is the minor daughter of Abdul Ghaffar Mughal.  She is a national of the United States.

1425.   Plaintiff M.M., by and through his next friend Dr. Abdul Ghaffar Mughal, is the minor son of Abdul Ghaffar Mughal.  He is a national of the United States.

1426.  As a result of the June 23, 2011, EFP Attack and Dr. Abdul Ghaffar Mughal's injuries, each member of the Mughal family has experienced severe mental anguish, emotional pain and suffering.

**B.     The July 7, 2011, EFP Attack In Baghdad**

1427.   On July 7, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked an American military convoy that was traveling near the Victory Base Complex in the Mansour District of Baghdad, Iraq, with an EFP (the "July 7, 2011, EFP Attack").

1428.   The July 7, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1429.   The EFP used by the Joint Cell to injure victims in the July 7, 2011, EFP attack was a Hezbollah-designed, Iranian manufactured EFP emplaced by terrorists at the direction of Hezbollah, using specialized training and components supplied by Hezbollah and the IRGC.

1430.   The July 7, 2011, EFP Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

**1.     The Newby Family**

1431.   Specialist Nicholas W. Newby served in Iraq in the Idaho National Guard as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team, Idaho National Guard.

1432.   On July 7, 2011, SPC Newby was injured in the July 7, 2011, EFP Attack in Baghdad Province, Iraq.  SPC Newby died on July 7, 2011, as a result of injuries sustained during the July 7, 2011, EFP Attack.

1433.   SPC Newby was a national of the United States at the time of the attack and his death.

1434.   Plaintiff Wayne Newby is the father of SPC Newby.  He is a national of the United States.

1435.   Plaintiff Theresa Hart is the mother of SPC Newby.  She is a national of the United States.

1436.   Plaintiff Nathan Newby is the brother of SPC Newby.  He is a national of the United States.

1437.   As a result of the July 7, 2011, EFP Attack, and SPC Newby's death, each member of the Newby family has experienced severe mental anguish, emotional pain and suffering.

### 2.      The Rzepa Family

1438.   Plaintiff Staff Sergeant Jason Rzepa served in Iraq in the U.S. Army as part of the 145th Brigade Support Battalion, 116th Cavalry Heavy Brigade Combat Team, Idaho National Guard.

1439.   On July 7, 2011, SSG Rzepa was injured in the July 7, 2011, EFP Attack in Baghdad Province, Iraq.  SSG Rzepa lost both his legs below the knees.  As a result of the July 7, 2011, EFP Attack, SSG Rzepa has experienced extreme physical and emotional pain and suffering.

1440.   SSG Rzepa was a national of the United States at the time of the attack and remains one to this day.

1441.   Plaintiff Cassandra Rzepa is the former spouse of SSG Rzepa.  She is a national of the United States.

1442.  Plaintiff C.R., by and through his next friend Cassandra Rzepa, is the minor son of SSG Rzepa and Cassandra Rzepa.  He is a national of the United States.

1443.  Plaintiff K.R., by and through his next friend Adrian Davis, is the minor son of SSG Rzepa.  He is a national of the United States.

1444.  As a result of the July 7, 2011, EFP Attack, and SSG Rzepa's injuries, each member of the Rzepa Family has experienced extreme emotional pain and suffering.

### C.  The July 8, 2011, Rocket Attack In Baghdad

1445.  On July 8, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked Camp Victory, which housed American servicemembers in Baghdad, conducting an indirect fire attack against Americans with advanced rockets, including IRAMs (the "July 8, 2011, Rocket Attack").

1446.  The July 8, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1447.  The July 8, 2011, Rocket Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.  The Ogden Family

1448.  Plaintiff Technical Sergeant Tyler N. Ogden served in the U.S. Air Force in Iraq as part of the 477th Air Expeditionary Group.

1449.  On July 8, 2011, TSgt Ogden was injured during the July 8, 2011, Rocket Attack in Baghdad Province, Iraq.  The July 8, 2011, Rocket Attack resulted in severe injuries to TSgt

Ogden requiring extensive treatment, including shrapnel wounds to his right leg, knee, and ankle, muscle damage, hearing loss, and PTSD. Due to his injuries, he received an 80% disability rating from the VA.

1450.   As a result of the July 8, 2011, Rocket Attack and his injuries, TSgt Ogden has experienced severe physical and emotional pain and suffering.

1451.   TSgt Ogden was a national of the United States at the time of the attack, and remains one to this day.

**D.      The July 10, 2011, Rocket Attack in Basra**

1452.   On July 10, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked Forward Operating Base ("FOB") Gary Owen, which housed American servicemembers in Amarah in Basra Province in Southern Iraq, with advanced rockets, including IRAMs (the "July 10, 2011, Rocket Attack").

1453.   The July 10, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1454.   The July 10, 2011, Rocket Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who fired the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

**1.      The Chinn Family**

1455.   Plaintiff Staff Sergeant William M. Chinn served in the U.S. Army in Iraq as part of the 3rd Battalion, 8th Cavalry Regiment, 3rd Brigade Combat Team, 1st Cavalry Division.

1456.   On July 10, 2011, SSG Chinn was injured during the July 10, 2011, Rocket Attack in Basra Province, Iraq. The July 10, 2011, Rocket Attack resulted in severe injuries to

SSG Chinn requiring extensive treatment. Due to his injuries, SSG Chinn received a 100% disability rating from the VA.

1457.   As a result of the July 10, 2011, Rocket Attack and his injuries, SSG Chinn has experienced severe physical and emotional pain and suffering.

1458.   SSG Chinn was a national of the United States at the time of the attack and remains one to this day.

### 2.   The Niquette Family

1459.   Plaintiff First Lieutenant Sean M. Niquette served in the U.S. Army in Iraq as part of the 3rd Battalion, 8th Cavalry Regiment, 3rd Brigade Combat Team, 1st Cavalry Division.

1460.   On July 10, 2011, 1LT Niquette was injured during the July 10, 2011, Rocket Attack in Basra Province, Iraq.  The July 10, 2011, Rocket Attack resulted in severe injuries to 1LT Niquette requiring extensive treatment. Due to his injuries, 1LT Niquette received an 80% disability rating from the VA.

1461.   As a result of the July 10, 2011, Rocket Attack and his injuries, 1LT Niquette has experienced severe physical and emotional pain and suffering.

1462.   1LT Niquette was a national of the United States at the time of the attack and remains one to this day.

1463.   Plaintiff Lauren Niquette is the wife of 1LT Niquette.  She is a national of the United States.

1464.   Plaintiff Thomas Niquette is the father of 1LT Niquette.  He is a national of the United States.

1465.   Plaintiff Mary Niquette is the mother of 1LT Niquette.  She is a national of the United States.

1466.   As a result of the July 10, 2011, Rocket Attack and 1LT Niquette's injuries, each member of the Niquette family has experienced severe mental anguish, emotional pain and suffering.

### E.      The July 15, 2011, EFP Attack In Basra

1467.   On July 15, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked an American military convoy that was traveling in Basra, Iraq, with an EFP (the "July 15, 2011, EFP Attack").

1468.   The July 15, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1469.   The EFP used to injure the victims of the July 15, 2011, EFP attack was a Hezbollah-designed and Iranian-manufactured EFP emplaced by agents of Hezbollah and the IRGC-QF at their direction, using specialized training and components supplied by Hezbollah and the IRGC.

1470.   The July 15, 2011, EFP Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.      The Elliott Family

1471.   Specialist Daniel L. Elliott served in Iraq as part of the 290th Military Police Brigade, 200th Military Police Command, U.S. Army Reserve.

1472.  On July 15, 2011, SPC Elliott was injured in the July 15, 2011, EFP Attack in Basra Province, Iraq.  SPC Elliott died on July 15, 2011, as a result of injuries sustained during the July 15, 2011, EFP Attack.

1473.  SPC Elliott was a national of the United States at the time of the attack and his death.

1474.  Plaintiff Ed Elliott is the father of SPC Elliott.  He is a national of the United States.

1475.  As a result of the July 15, 2011, EFP Attack, and SPC Elliott's death, each member of the Elliott family has experienced severe mental anguish, emotional pain and suffering.

### F.  The October 12, 2011, Rocket Attack In Basra

1476.  On October 12, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked FOB Gary Owen in Amarah in Basra Province in Southern Iraq, with advanced rockets, including IRAMs (the "October 12, 2011, Rocket Attack").

1477.  The October 12, 2011, Rocket Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1478.  The October 12, 2011, Rocket Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who fired the rockets neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1. The Alldridge Family

1479.   Plaintiff Private First Class Brian C. Alldridge served in the U.S. Army in Iraq as part of the 8th Cavalry Regiment.

1480.   On October 12, 2011, PFC Alldridge was injured during the October 12, 2011, Rocket Attack in Basra Province, Iraq.  The October 12, 2011, Rocket Attack resulted in severe injuries to PFC Alldridge requiring extensive treatment.  Due to his injuries, PFC Alldridge received a 100% disability rating from the VA.

1481.   As a result of the October 12, 2011, Rocket Attack and his injuries, PFC Alldridge has experienced severe physical and emotional pain and suffering.

1482.   PFC Alldridge was a national of the United States at the time of the attack and remains one to this day.

1483.   Plaintiff Joann Alldridge is the wife of PFC Alldridge.  She is a national of the United States.

1484.   Plaintiff Ronald Alldridge is the father of PFC Alldridge.  He is a national of the United States.

1485.   Plaintiff Dianna Alldridge is the mother of PFC Alldridge.  She is a national of the United States.

1486.   Plaintiff Todd Jeffrey Alldridge is the brother of PFC Alldridge.  He is a national of the United States.

1487.   Plaintiff Andrew Major is the stepson of PFC Alldridge.  He is a national of the United States.

1488.   Plaintiff Ashley Major is the stepdaughter of PFC Alldridge.  She is a national of the United States.

462

1489.   Plaintiff Alyssa Major is the stepdaughter of PFC Alldridge.  She is a national of the United States.

1490.   As a result of the October 12, 2011, Rocket Attack and PFC Alldridge's injuries, each member of the Alldridge family has experienced severe mental anguish, emotional pain and suffering.

### G.   The November 2, 2011, Explosive Attack In Diwaniyah

1491.   On November 2, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked American servicemembers as they were traveling in Diwaniyah in Qadisiyah Province in Southern Iraq, with an Iranian manufactured anti-tank hand grenade (the "November 2, 2011, Explosive Attack").

1492.   The November 2, 2011, Explosive Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1493.   The November 2, 2011, Explosive Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who detonated the explosives neither wore uniforms nor otherwise identified themselves as enemy combatants.

### 1.   The Sullen Family

1494.   Plaintiff Private First Class Marcus Jamil Sullen served in the U.S. Army in Iraq as part of Bravo Company, 64th Brigade Support Battalion.

1495.   On November 2, 2011, PFC Sullen was injured during the November 2, 2011, Explosive Attack in Qadisiyah Province, Iraq.  The November 2, 2011, Explosive Attack

resulted in severe injuries requiring extensive treatment. Due to his injuries, PFC Sullen received 80% disability rating from the VA.

1496.   As a result of the November 2, 2011, Explosive Attack and his injuries, PFC Sullen has experienced severe physical and emotional pain and suffering.

1497.   PFC Sullen was a national of the United States at the time of the attack and remains one to this day.

1498.   As a result of the November 2, 2011, Explosive Attack and PFC Sullen's injuries, each member of the Sullen family has experienced severe mental anguish, emotional pain and suffering.

**H.      The November 14, 2011, EFP Attack In Baghdad**

1499.   On November 14, 2011, a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force attacked an American military convoy that was traveling in Baghdad, Iraq, with an EFP (the "November 14, 2011, EFP Attack").

1500.   The November 14, 2011, EFP Attack was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with a Jaysh al-Mahdi terrorist serving as the triggerman.

1501.   The EFP used by the Joint Cell to injure victims in the July 7, 2011, EFP attack was a Hezbollah-designed, Iranian manufactured EFP emplaced by terrorists at the direction of Hezbollah, using specialized training and components supplied by Hezbollah and the IRGC.

1502.   The November 14, 2011, EFP Attack would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who planted and detonated the EFP neither wore uniforms nor otherwise identified themselves as enemy combatants.

464

### 1.    The Hickman Family

1503.    Specialist David Emanuel Hickman served in Iraq as part of B Company, 2nd Battalion, 325th Airborne Infantry Regiment, 2nd Brigade Combat Team, 82nd Airborne Division.

1504.    On November 14, 2011, SPC Hickman was injured in the November 14, 2011, EFP Attack in Baghdad Province, Iraq.  SPC Hickman died on November 14, 2011 as a result of injuries sustained during the November 14, 2011, EFP Attack.

1505.    SPC Hickman was a national of the United States at the time of the attack and his death.

1506.    Plaintiff David Eugene Hickman is the father of SPC Hickman.  He is a national of the United States.

1507.    Plaintiff Veronica Hickman is the mother of SPC Hickman.  She is a national of the United States.

1508.    Plaintiff Devon F. Hickman is the brother of SPC Hickman.  He is a national of the United States.

1509.    As a result of the November 14, 2011, EFP Attack, and SPC Hickman's death, each member of the Hickman family has experienced severe mental anguish, emotional pain and suffering.

### I.    The January 15, 2016, Kidnapping Attack In Baghdad

1510.    On January 15, 2016, a team of Jaysh al-Mahdi terrorists, acting as part of a Joint Cell comprised of operatives from Hezbollah, Jaysh al-Mahdi, and the Qods Force, kidnapped

Plaintiff Russell Frost, Plaintiff Waiel El-Maadawy, and Plaintiff Amr Mohamed as they were attending a business meeting in Baghdad (the "January 15, 2016, Kidnapping Attack").[601]

1511. The terrorists targeted Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed in the January 15, 2016, Kidnapping Attack because Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed were American contractors working in Iraq on a contract for Blue Light LLC, which had been hired as a subcontractor by General Dynamics Information Technology, Inc. to perform work on a U.S. government subcontract relating to the training of Iraqi special forces.

1512. The January 15, 2016, Kidnapping Attack was the first successful Hezbollah proxy kidnapping operation in Iraq since 2011. After kidnapping them, the terrorists held Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed hostage for thirty-one days, during which they beat, tortured, and humiliated their American hostages, singling out Mr. El-Maadawy and Mr. Mohamed for special abuse because the terrorists believed that Mr. El-Maadawy and Mr. Mohamed, who are Arab American veterans, had betrayed Muslims by helping America in Iraq.

1513. On February 16, 2016, after thirty-one days in captivity, the terrorists released Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed.

1514. The January 15, 2016, Kidnapping Attack, and subsequent hostage taking and torture of Mr. Frost, Mr. El-Maadawy, and Mr. Mohamed, was committed by Hezbollah (a designated FTO at the time of the attack), Jaysh al-Mahdi, and the Qods Force acting together in a Joint Cell comprised of Hezbollah, Jaysh al-Mahdi, and the Qods Force, with Hezbollah planning the kidnapping and Jaysh al-Mahdi serving as the kidnappers.

---

[601] By 2016, Jaysh al-Mahdi had undergone several additional branding changes and the terror organization referred to itself as "Saraya al-Salam" at the time of the attack. Regardless of whether it called itself Jaysh al-Mahdi or Saraya al-Salam, the terrorist organization served as a proxy for Hezbollah in Iraq and was at all times led by notorious Shiite terrorist Muqtada al-Sadr.

1515.   The January 15, 2016, Kidnapping Attack, and subsequent hostage taking and torture of Russell Frost, Waiel El-Maadawy, and Amr Mohamed, would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who kidnapped them did not identify themselves as enemy combatants.

### 1.    The Frost Family And Estate

1516.   On January 15, 2016, and thereafter, Russell Frost was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.  As a result of the January 15, 2016, Kidnapping Attack and his injuries, Mr. Frost experienced severe physical and emotional pain and suffering before ultimately dying.

1517.   The January 15, 2016, Kidnapping Attack resulted in severe injuries that ultimately were the proximate cause of Russell Frost's death less than two years later:  after his hostage ordeal, Mr. Frost would only live for another 685 days, each one as agonizing as the last.

1518.   Russell Frost died on November 30, 2017, as a result of injuries sustained during the January 15, 2016, Kidnapping Attack.

1519.   Until his death, Russell Frost suffered from nerve damage to both feet, pain in his back, shoulder and elbow, Tarsal Tunnel Syndrome in both ankles, kidney damage due to dehydration, hearing loss, a chronic cough and breathing problems, vision loss, and permanent scarring on his face and wrists.  Mr. Frost also suffered from Post-Traumatic Stress Disorder, anxiety, anger, insomnia, and a general lack of energy and loss of stamina.  These conditions contributed to, and were a proximate cause of, his untimely death.

1520.   Russell Frost was a national of the United States at the time of the January 15, 2016, Kidnapping Attack, and remained one until his death.

1521.   Plaintiff Tammie Frost is the widow of Russell Frost.  She brings claims in both her personal capacity and her representative capacity on behalf of Mr. Frost's estate.  She is a national of the United States.

1522.   Plaintiff Madison Frost is the daughter of Russell Frost and Tammie Frost.  She is a national of the United States.

1523.   Plaintiff Crystal Frost is the daughter of Russell Frost and Tammie Frost.  She is a national of the United States.

1524.   Plaintiff Amanda Frost is the adopted daughter of Russell Frost, and the natural born daughter of Tammie Frost.  She is a national of the United States.

1525.   As a result of the January 15, 2016, Kidnapping Attack and Mr. Frost's injuries, each member of the Frost family has experienced severe mental anguish, emotional pain and suffering.

1526.   Russell Frost's estate is entitled to recover economic and non-economic damages from Defendants, due to his death being proximately caused by his kidnapping and being held hostage by Hezbollah, Jaysh al-Mahdi, and the Qods Force.

### 2.    The El-Maadawy Family

1527.   On January 15, 2016, and thereafter, Plaintiff Waiel El-Maadawy was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.

1528.   The January 15, 2016, Kidnapping Attack severely injured Mr. El-Maadawy.  He suffers from constant and ongoing pain in his lower back, wrists, elbows, knees, ankles, and shoulders.  Mr. El-Maadawy also experiences intermittent numbness in his extremities and has permanent scarring on his ankles and nose as a result of the restrains placed on him during his captivity.  He also suffers from Post-Traumatic Stress Disorder, frequent nightmares, and difficulty sleeping.

468

1529.   Plaintiff Waiel El-Maadawy was a national of the United States at the time of the attack and remains one to this day.

1530.   Plaintiff BilQis Aidara Adjei is the wife of Waiel El-Maadawy.  She was engaged to be married and living with Mr. El-Maadawy at the time of the hostage taking.  She is a national of the United States.

1531.   Plaintiff Alexis Grant is the stepdaughter of Waiel El-Maadawy.  She is a national of the United States.

1532.   Plaintiff Malik Elmaadawy is the son of Waiel El-Maadawy.  He is a national of the United States.

1533.   Plaintiff Gabriel Elmaadawy, is the son of Waiel El-Maadawy.  He is a national of the United States.

1534.   Plaintiff Zeinab El-Maadawy is the mother of Waiel El-Maadawy.  She is a national of the United States and resides in the Eastern District of New York.

1535.   Plaintiff Ihab El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States and resides in the Eastern District of New York.

1536.   Plaintiff Tamer El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States.

1537.   Plaintiff Mohammed El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States.

1538.   Plaintiff Mustafa El-Maadawy is the brother of Waiel El-Maadawy.  He is a national of the United States and resides in the Eastern District of New York.

1539.   As a result of the January 15, 2016, Kidnapping Attack and Waiel El-Maadawy's injuries, each member of the El-Maadawy family has experienced severe mental anguish, emotional pain and suffering.

### 3.   The Mohamed Family

1540.   On January 15, 2016, and thereafter, Plaintiff Amr Mohamed was injured during the January 15, 2016, Kidnapping Attack in Baghdad Province, Iraq.

1541.   The January 15, 2016, Kidnapping Attack severely injured Amr Mohamed.  Mr. Mohamed suffers from severe nerve damage that requires surgical repair in his ankles and wrists. The permanency of those injuries remains unknown at this time and will remain that way until the surgeries are performed.  He continues to experience significant pain in his back, neck, and head as a result of how he was treated.  Mr. Mohamed also suffered from Post-Traumatic Stress Disorder.  This mental condition is severe enough that at one point while Mr. Mohamed was hospitalized in February 2017 when he awoke to the sound of gunfire, fully believing that he was in the midst of a warzone and fearing for his life.  He then blacked out, and the next thing he remembers is waking up in a local jail.  Mr. Mohamed does not remember any of the events that occurred after he blacked out, but, despite a long history of public service and law-abiding behavior, he was accused of allegedly assaulting a hospital security guard.

1542.   Plaintiff Amr Mohamed was a national of the United States at the time of the attack and remains one to this day.

1543.   Plaintiff Brenda Mohamed was the wife of Amr Mohamed at the time of the January 15, 2016, Kidnapping Attack.  She is a national of the United States.

1544.   As a result of the January 15, 2016, Kidnapping Attack and Amr Mohamed's injuries, each member of the Mohamed family has experienced severe mental anguish, emotional pain and suffering.

### J.     The April 29, 2017, IED Attack In Nineveh

1545.   On April 29, 2017, IRGC Sunni Terrorist Proxies detonated an IED in Nineveh, Iraq ("The April 29, 2017, IED Attack").

1546.   On information and belief, the April 29, 2017, IED Attack was committed by al-Qaeda (a designated FTO at the time of the attack) and Ansar al-Islam (a designated FTO at the time of the attack).[602]

#### 1.     The Lee Family

1547.   First Lieutenant Weston Cecil Lee served in Iraq as a member of the U.S. military serving in the U.S. Army.

1548.   On April 29, 2017, 1LT Lee was injured in the April 29, 2017, IED Attack committed by IRGC Sunni Terrorist Proxies, with material support and resources from the IRGC, in Nineveh, Iraq.

1549.   1LT Lee died on April 29, 2017 as a result of injuries sustained during the attack.

1550.   1LT Lee was a national of the United States and a member of the armed forces at the time of the attack and his death.

1551.   Plaintiff Ms. Aldene Lee is the mother of 1LT Lee. She is, and has been at all relevant times, a national of the United States.

1552.   As a result of the April 29, 2017, IED Attack and 1LT Lee's injuries and death, each member of the Lee Family has experienced severe mental anguish, emotional pain and suffering, and the loss of 1LT Lee's society, companionship, and counsel.

---

[602] Plaintiffs believe this attack was either committed by Ansar al-Islam and al-Qaeda, or alternatively, by ISIS.  While the FTO attribution would change, Plaintiffs' ability to state a claim under JASTA would not because Plaintiffs have alleged that the IRGC provided material support that caused ISIS attacks as well.

## XI. THE IRGC-BACKED TALIBAN TERRORIST SYNDICATE IN AFGHANISTAN AND PAKISTAN LED BY AL-QAEDA AND THE TALIBAN KILLED AND INJURED THE PLAINTIFFS WHO WERE ATTACKED IN AFGHANISTAN THROUGH TERRORIST ATTACKS FOR WHICH DEFENDANTS PROVIDED SUBSTANTIAL ASSISTANCE

1553. The **Afghanistan Plaintiffs** are American civilians, servicemembers, and contractors serving in Afghanistan, and their family members, who were killed or injured in terrorist attacks committed by al-Qaeda (a designated FTO at the time), the Taliban, including its Haqqani Network (a designated FTO at the time), Lashkar-e-Taiba (a designated FTO at the time), and Jaysh-e-Mohammed (a designated FTO at the time), all of which collaborated in a terrorist alliance, known as the "Syndicate," that was funded, armed, and logistically supported by the IRGC, including its Hezbollah Division and Qods Force.

1554. The IRGC, including its Hezbollah Division and Qods Force, provided key aid to the Syndicate from inception through their victory in 2021. The IRGC, including its Hezbollah Division and Qods Force, specifically provided al-Qaeda and the Taliban (including its Haqqani Network) weapons, funds, training, logistical support, communications technology, safe-haven, and assistance with narcotics trafficking, which raised money for their shared terrorist enterprise against America (i.e., the conspiracy), which al-Qaeda and the Taliban, including its Haqqani Network, used to aid the terrorists' ability to execute the attacks that injured Plaintiffs.

1555. The embargoed dual-use American technology – including thousands of secure American smartphones every year – hundreds of millions of U.S. Dollars annually, and vast network of logistical and operational support for the Irancell and TCI fronts that MTN Group, MTN Dubai, ZTE Corporation, and Huawei Corporation provided to their counterparties controlled by the IRGC, including its Hezbollah Division and Qods Force, flowed through to al-Qaeda, the Taliban (including its Haqqani Network), and their Syndicate allies that committed each attack that injured each Plaintiff through transfers made by the IRGC, including its

472

Hezbollah Division and Qods Force, to al-Qaeda and the Taliban (including its Haqqani Network).

## A. The January 14, 2019, Suicide Bomb Attack In Kabul

1556. On January 14, 2019, a suicide bomber deployed by a Joint Cell of the Kabul Attack Network comprised of operatives from al-Qaeda, the Haqqani Network, and Lashkar-e-Taiba detonated a suicide bomb in Kabul, Afghanistan ("The January 14, 2019, Suicide Bomb Attack").

1557. The January 14, 2019, Suicide Bomb Attack was jointly committed by al-Qaeda (a designated FTO at the time of the attack), the Haqqani Network (a designated FTO at the time of the attack), and, and Lashkar-e-Taiba (a designated FTO at the time of the attack), acting together in a Joint Cell.

### 1. The Kamaleson Family And Estate

1558. Manoharan "Paul" Kamaleson served in Afghanistan as a civilian finance officer with First MicroFinance Bank.

1559. On January 14, 2019, Mr. Kamaleson was injured in a suicide bombing attack committed by the Kabul Attack Network in Kabul Province, Afghanistan. Mr. Kamaleson died on January 14, 2019, as a result of injuries sustained during the attack.

1560. Mr. Kamaleson was a national of the United States at the time of the attack and his death.

1561. The January 14, 2019, Suicide Bomb Attack, and Mr. Kamaleson's murder, would have violated the law of war if these terrorist groups were subject to them because, among other reasons, Mr. Kamaleson was a civilian not taking part in hostilities, and the terrorist(s) who planted and detonated the Suicide Bomb neither wore uniforms nor otherwise identified themselves as enemy combatants.

1562.   Plaintiff Nicole Kamaleson is the widow of Mr. Kamaleson.  She is a national of the United States.

1563.   Plaintiff Barclay Kamaleson is the son of Mr. Kamaleson.  He is a national of the United States.

1564.   Plaintiff Cade Kamaleson is the son of Mr. Kamaleson.  He is a national of the United States.

1565.   Plaintiff Cedric Paul Kamaleson is the son of Mr. Kamaleson.  He is a national of the United States.

1566.   Plaintiff Sunderraj Mark Kamaleson is the brother of Mr. Kamaleson.  He is a national of the United States.

1567.   As a result of the January 14, 2019, Suicide Bomb Attack, and Mr. Kamaleson's death, each member of the Kamaleson family has experienced severe mental anguish, emotional pain and suffering, and the loss of Mr. Kamaleson's society, companionship, and counsel.

**B.**  **The July 29, 2019, Insider Attack In Uruzgan**

1568.   On July 29, 2019, the Taliban, including its Haqqani Network, committed an insider attack involving small arms fire against U.S. Army personnel in Uruzgan Province, Afghanistan ("July 29, 2019, Insider Attack").

1569.   The July 29, 2019, Insider Attack was committed by the Taliban and its Haqqani Network (a designated FTO at the time of the attack).

1570.   On information and belief, al-Qaeda/Taliban polyterrorist Sirajuddin Haqqani personally planned the insider attack campaign that included this attack, and therefore, the attack was also directly planned by al-Qaeda (a designated FTO at the time of the attack).

**1.**  **The Nance Family**

1571.   Specialist Michael Nance served in Afghanistan as a member of the U.S. Army.

474

1572.   On July 29, 2019, SPC Nance was injured in an insider attack involving small arms fire committed by the Taliban in Uruzgan Province, Afghanistan.  SPC Nance died on July 29, 2019 as a result of injuries sustained during the attack.

1573.   SPC Nance was a national of the United States at the time of the attack and his death.

1574.   The July 29, 2019, Insider Attack, and SPC Nance's murder, would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the insider attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1575.   Plaintiff ShuShawndra Gregoire is the mother of SPC Nance.  She is a national of the United States.

1576.   Plaintiff J.D.G., by and through his next friend ShuShawndra Gregoire, is the minor brother of SPC Nance.  He is a national of the United States.

1577.   Plaintiff John Gregoire Sr. is the step-father of SPC Nance.  He is a national of the United States.  John Gregoire Sr. lived in the same household as SPC Nance for a substantial period of time and considered SPC Nance the functional equivalent of a biological son.

1578.   Plaintiff L.R.G., by and through her next friend John Gregoire Sr., is the minor step-sister of SPC Nance.  She is a national of the United States.  L.R.G. lived in the same household as SPC Nance for a substantial period of time and considered SPC Nance the functional equivalent of a biological brother.

1579.   As a result of the July 29, 2019 attack and SPC Nance's injuries and death, each member of the Nance Family has experienced severe mental anguish, emotional pain and suffering, and the loss of SPC Nance's society, companionship, and counsel.

## 2. The Kreischer Family

1580. Private First Class Brandon Kreischer served in Afghanistan as a member of the U.S. Army.

1581. On July 29, 2019, PFC Kreischer was injured in an insider attack involving small arms fire committed by the Taliban in Uruzgan Province, Afghanistan. PFC Kreischer died on July 29, 2019 as a result of injuries sustained during the attack.

1582. PFC Kreischer was a national of the United States at the time of the attack and his death.

1583. The July 29, 2019, Insider Attack, and PFC Kreischer's murder, would have violated the law of war if these terrorist groups were subject to them because, among other reasons, the terrorist(s) who committed the insider attack neither wore uniforms nor otherwise identified themselves as enemy combatants.

1584. Plaintiff Grace Kreischer is the widow of PFC Kreischer. She is a national of the United States.

1585. Plaintiff C.L.K., by and through his next friend Grace Kreischer, is the minor son of PFC Kreischer. He is a national of the United States.

1586. Plaintiff Brianne Barlow is the mother of PFC Kreischer. She is a national of the United States.

1587. Plaintiff Jason Barlow is the step-father of PFC Kreischer. He is a national of the United States. Jason Barlow lived in the same household as PFC Kreischer for a substantial period of time and considered PFC Kreischer the functional equivalent of a biological son.

1588. As a result of the July 29, 2019 attack and PFC Kreischer's injuries and death, each member of the Kreischer Family has experienced severe mental anguish, emotional pain and suffering, and the loss of PFC Kreischer's society, companionship, and counsel.

# CLAIMS FOR RELIEF

## COUNT ONE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Aiding-And-Abetting Liability, Attack Predicate]

1589.   Plaintiffs incorporate their factual allegations above.

1590.   The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by joint cells comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the Qods Force.

1591.   The terrorist attacks committed by joint cells comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the Qods Force, which killed or injured Plaintiffs and their family members, were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the jurisdiction of the United States or of the States.  In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively.

1592.   The terrorist attacks committed by the joint cell comprised of Hezbollah, a designated FTO at the time, Jaysh al-Mahdi, and the Qods Force appear to have been intended (a) to intimidate or coerce the civilian populations of Iraq, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Iraqi, and other Coalition governments by

intimidation and coercion, and (c) to affect the conduct of the U.S., Iraqi, and other Coalition governments by mass destruction, assassination, and kidnapping.

1593.   The terrorist attacks jointly committed by Hezbollah, Jaysh al-Mahdi, and the Qods Force occurred primarily outside the territorial jurisdiction of the United States.

1594.   Each of MTN Group, MTN Irancell, MTN Dubai, ZTE Corp., ZTE USA, ZTE TX, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom aided and abetted and knowingly provided substantial assistance to the IRGC, including its Hezbollah Division and Qods Force, and Jaysh al-Mahdi – and aided and abetted and knowingly provided substantial assistance to the Joint Cell attacks on Plaintiffs – by providing funds to known IRGC fronts and technical support to the IRGC, including its Hezbollah Division and Qods Force, that aided those attacks.

1595.   MTN also aided and abetted and knowingly provided substantial assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force – and aided and abetted and knowingly provided substantial assistance to the Joint Cell attacks on Plaintiffs – by serving as the joint venture partner of the IRGC, including its Hezbollah Division and Qods Force, and generating millions of dollars in annual cash flow for the IRGC, including its Hezbollah Division and Qods Force, to use in furtherance of Hezbollah's terrorist enterprise against Americans in Iraq.

1596.   ZTE, including but not limited to in coordination with ZTE USA and ZTE TX, aided and abetted and knowingly provided substantial assistance to the IRGC, including its Hezbollah Division and Qods Force, and Jaysh al-Mahdi – and aided and abetted and knowingly provided substantial assistance to the Joint Cell attacks on Plaintiffs – by contracting with TCI to modernize the IRGC-controlled Iranian cellular and landline communications systems, thereby

478

generating substantial revenue for the IRGC, including its Hezbollah Division and Qods Force, and provided U.S.-origin technology, all of which the Joint Cells used in furtherance of Hezbollah's terrorist enterprise against Americans in Iraq.

1597.   Huawei, including but not limited to and in coordination with Skycom, Huawei USA, Huawei Device USA, and Futurewei, aided and abetted and knowingly provided substantial assistance to Hezbollah, Jaysh al-Mahdi, and the IRGC, including its Hezbollah Division and Qods Force – and aided and abetted and knowingly provided substantial assistance to the joint cell attacks on Plaintiffs – by contracting with TCI to modernize the IRGC-controlled Iranian cellular and landline communications systems, thereby generating substantial revenue for the IRGC, including its Hezbollah Division and Qods Force, and illegally provided U.S.-origin technology, all of which the Joint Cells used in furtherance of Hezbollah's terrorist enterprise against Americans in Iraq.

1598.   The attacks that killed or injured Plaintiffs and their family members were all jointly committed, as well as planned and authorized, by Hezbollah, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1997.

1599.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks jointly committed by Hezbollah, Jaysh al-Mahdi, and the Qods Force.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1600.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT TWO:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d)
### [All Defendants:  Conspiracy Liability; Attack Predicate]

1601.   Plaintiffs incorporate their factual allegations above.

1602.   Each of MTN Group, MTN Irancell, MTN Dubai, ZTE Corp., ZTE USA, ZTE

TX, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom entered into a

conspiracy with the "Iranian Shareholders," and one another, including but not limited to the

Bonyad Mostazafan, MTN Irancell, IEI, and TCI (including MCI), all of whom were fronts for

the IRGC (collectively, "IRGC Fronts"), including its Hezbollah Division and Qods Force, as

well as the IRGC's terrorist co-conspirators including sectarian allies like Jaysh al-Mahdi, the

Syrian regime, the Houthis, as well as anti-American allies of convenience, such as al-Qaeda and

the Taliban (including its Haqqani Network), to join the IRGC's terrorist financing and logistics

campaign.

1603.   Each of MTN Group, MTN Irancell, MTN Dubai, ZTE Corp., ZTE USA, ZTE

TX, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom each furthered the

conspiracy through their knowing direct and/or indirect participation in the IRGC's broad,

coordinated, global campaign to source embargoed American technologies to aid the

conspiracy's terrorist enterprise, including but not limited to, secure American mobile phones

and computer network technologies.

1604.   Given the illegal nature of the illicit market for purchasing embargoed American

technologies, each Defendant's choice to further the conspiracy by paying inflated prices above

even the normal "going rate" for black market phones furthered the terrorist enterprise by

substantially growing the black market for such technologies through the power of supply and

demand.  Every time each Defendant flooded the zone by promising to outspend every other

black-market participant, Defendants swelled the ranks of their co-conspirator tech resellers on the supply side in the U.S.

1605.   Each of MTN Group, MTN Irancell, MTN Dubai, ZTE Corp., ZTE USA, ZTE TX, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom specifically intended to grow the overall global market for illicit American-manufactured mobile phones that were originally sold in a U.S. marketplace because they shared the goal of the conspiracy, which was to finance, arm, and logistically support the IRGC, including its Hezbollah Division and Qods Force.

1606.   Each of MTN Group, MTN Irancell, MTN Dubai, ZTE Corp., ZTE USA, ZTE TX, Huawei Co., Huawei USA, Huawei Device USA, Futurewei, and Skycom were one in spirit with the terrorists, including, but not limited to, the IRGC, including its Hezbollah Division and Qods Force, the Taliban, including its Haqqani Network, and the Houthis, all of whom were proxies of the IRGC and all of whom received weapons, funding, and training from the IRGC, including its Hezbollah Division and Qods Force.

1607.   Each Defendant hoped for the IRGC, including, but not limited to, its Hezbollah Division and Qods Force, to achieve the object of the conspiracy and force the United States to withdraw from Iraq, Afghanistan, and the rest of the Middle East.  Defendants knew that the IRGC, including its Hezbollah Division and Qods Force, were extremely lucrative customers and generated billions of dollars in profits for each Defendant, and Defendants wanted to see the conspiracy succeed because they calculated they would make more money if the terrorist campaigns in Iraq, Afghanistan, and the rest of the Middle East forced the U.S. out.

1608.   Defendants ZTE and Huawei also supported the object of the conspiracy because it furthered the hostile security strategy of the Chinese Communist Party to force the United

481

States out of Iraq, Afghanistan, and the rest of the Middle East by aiding the terrorist groups targeting Americans throughout the region.

1609.   Each Defendant furthered the conspiracy by directly aiding the growth of the terrorists' supply chain through the foreseeable, inevitable, and obvious result that Defendants knew – and intended – would occur when they paid above-black-market prices for illicit American technologies.  Defendants knew that their transactions would strengthen the terrorists' illicit technological supply chain by exploding the demand for suppliers, and specifically intended for this consequence to occur to the benefit the IRGC, including its Hezbollah Division and Qods Force.  As a result, each Defendant furthered the conspiracy by increasing the total volume of illicit American mobile phones and computer network technologies specifically available for, and intended to be purchased by, the agents, operatives, cut-outs, or corporate fronts acting on behalf of Lebanese Hezbollah, the Qods Force, and Jaysh al-Mahdi, all of whom received substantially more illicit technologies than would otherwise have been the case if Defendants had not participated in the black market.

1610.   Each supplier Defendant – MTN Group, MTN Dubai, ZTE, and Huawei– furthered the conspiracy by publicly denying the existence of their secret agreement to aid the "security" agenda of the Iranian Shareholders who own MTN Irancell and TCI, i.e., the IRGC, including its Hezbollah Division and Qods Force.  MTN Group continues to further the conspiracy to this day by continuing to publicly deny the existence of its secret agreement with the Iranian Shareholders who own MTN Irancell and TCI, i.e., the IRGC, including its Hezbollah Division and Qods Force.

1611.   Each manufacturer Defendant – ZTE (USA) Inc., ZTE (TX) Inc., Huawei Technologies Co., Ltd., Huawei Technologies USA Inc., and Huawei Device USA Inc., –

furthered the conspiracy by, among other things: (1) knowingly supplying state-of-the-art American technology while knowing that such technology was being transferred pursuant to deals that were designed to flow the technology through to the IRGC, including its Hezbollah Division and Qods Force; and (2) on information and belief, subsidizing the bribes that ZTE Corp. paid to IRGC officials to secure ZTE's business with the IRGC's fronts.

1612.  ZTE (USA) Inc. and ZTE (TX) Inc. also furthered the conspiracy by successfully interfering with whistleblower activity, which, on information and belief, materially delayed the disclosure of the fraud, and further concealed the scheme, causing substantial additional value to flow to the terrorists.

1613.  ZTE (USA) Inc.'s and ZTE (TX) Inc.'s retaliation against one or more whistleblowers was an act in furtherance of the Conspiracy because it was intended to deter future employees, officers, attorneys, or agents of ZTE (USA) Inc. and ZTE (TX) Inc. from alerting authorities about other potential acts that would destroy the effectiveness of the Conspirators to continue to access the ZTE (USA) Inc. and ZTE (TX) Inc. technology upon which they relied.

1614.  MTN Group, MTN Dubai, ZTE, and Huawei agreed to further this conspiracy by assisting the IRGC fronts to move large sums of money (primarily in U.S. dollars) through the international financial system (and particularly the United States) undetected.

1615.  MTN Group, MTN Dubai, ZTE, and Huawei agreed to further this conspiracy by each assisting the IRGC fronts to move tens of thousands of critical items of embargoed American technologies specifically identified by Lebanese Hezbollah and the Qods Force as necessary to the success of the conspiracy, doing so through the covert purchase of American-made technologies in U.S. markets, in transactions that were denominated in U.S. Dollars, in

sums of money (primarily in U.S. dollars) through the international financial system (and particularly the United States) undetected.

1616.   As explained above, the IRGC, including its Hezbollah Division and the Qods Force, conspired with proxies in Iraq (Jaysh al-Mahdi and al-Qaeda-in-Iraq), Yemen (the Houthis), Syria (the Assad regime), and Afghanistan (al-Qaeda and the Taliban, including its Haqqani Network), and these designated terrorist groups conspired to facilitate terrorist attacks targeting Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe, for the purpose of targeting U.S. citizens and institutions and affecting the policies of the U.S. government.

1617.   Each Defendant knew that the objective of the conspiracy between these sophisticated terrorist organizations and the other Defendants was to facilitate terrorist attacks against Americans in Iraq, Afghanistan, Syria, Yemen, Israel, and Europe. This includes the attacks at issue in this case that were planned, authorized, or executed by designated FTOs.

1618.   These attacks were a foreseeable act in furtherance of this conspiracy that caused Plaintiffs' injuries.

1619.   The attacks that killed or injured Plaintiffs and their family members were all jointly committed, as well as planned and authorized, by Hezbollah, which the United States has designated as an FTO under 8 U.S.C. § 1189 since 1997.

1620.   Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks jointly committed by Hezbollah, Jaysh al-Mahdi, and the Qods Force.  Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1621.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## COUNT THREE:  VIOLATION OF THE ANTI-TERRORISM ACT, 18 U.S.C. § 2333(d) [All Defendants:  Aiding-and-Abetting Liability, RICO predicate]

1622.   Plaintiffs incorporate their factual allegations above.

1623.   From at least 2007 through 2016, terrorists from Hezbollah, the Qods Force, the Regular IRGC, and al-Qaeda conspired with Mullah Omar and others to conduct and maintain the Taliban as a terrorist enterprise capable of carrying out sophisticated attacks on American targets in Afghanistan.  Throughout that time, the Taliban was a group of associated individuals that functioned as a continuing unit, and the Taliban's express purpose at all times included violence against, and the expulsion of, Americans in Afghanistan.  The Taliban engaged in, and its activities affected, foreign commerce.

1624.   From at least 2007 through 2016, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda (including without limitation Sirajuddin Haqqani, Jalaluddin Haqqani, and other terrorists described in this Complaint) have maintained interests in and conducted the affairs of the Taliban as an enterprise by engaging in a campaign to expel Americans from Afghanistan through crime and anti-American violence (the "IRGC-Taliban-al-Qaeda Campaign").

1625.   Specifically, Mullah Omar and other terrorists employed by or associated with the Taliban and al-Qaeda conducted and participated in the conduct of the Taliban's affairs (and conspired to do so) through a pattern of racketeering activity involving crimes that include murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law, and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing U.S. employees performing official duties, hostage taking,

485

damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, bombing places of public use, financing terrorism, and receiving training from an FTO, in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2332f, 2339C(a)(1)(B), and 2339D, respectively. The same terrorists also maintained interests in and control of the Taliban (and conspired to do so) through this pattern of racketeering activity.

1626. The IRGC-Taliban-al-Qaeda Campaign was an act of international terrorism. It was a violent act that was dangerous to human life and that violated the criminal laws of the United States prohibiting the conduct or participation in the conduct of an enterprise's affairs through a pattern of racketeering activity, 18 U.S.C. § 1962(c); the maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, 18 U.S.C. § 1962(b); and conspiring to do either of these acts, 18 U.S.C. § 1962(d); or would have violated these prohibitions had it been conducted within the jurisdiction of the United States. The IRGC-Taliban-al-Qaeda Campaign appears to have been intended (a) to intimidate or coerce the civilian populations of Afghanistan, the United States, and other Coalition nations, (b) to influence the policy of the U.S., Afghan, and other Coalition governments by intimidation and coercion, and (c) to affect the conduct of the U.S., Afghan, and other Coalition governments by mass destruction, assassination, and kidnapping.

1627. The IRGC-Taliban-al-Qaeda Campaign occurred primarily outside the territorial jurisdiction of the United States.

1628. Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the IRGC-Taliban-al-Qaeda Campaign. Specifically, the attacks that injured Plaintiffs were part of the pattern of racketeering activity through which Mullah Omar

and other terrorists associated with the Taliban conducted the affairs of, participated in conducting the affairs of, and maintained an interest in or control of the Taliban. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the IRGC-Taliban-al-Qaeda Campaign; are the survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

1629.   Defendants aided and abetted and knowingly provided substantial assistance to Hezbollah, the Qods Force, the Regular IRGC, which flowed through to the IRGC-Taliban-al-Qaeda Campaign. Defendants did so by making payments to the IRGC that indirectly financed the Taliban's terrorist attacks, and, in the case of MTN Group, by authorizing tens of millions in annual "taxes" to the Taliban, including its Haqqani Network, every year since on or about 2008, and MTN Group also aided the Taliban, including the Haqqani Network, by deactivating its transmission masts to assist the Taliban's counterintelligence activities and undermine U.S. counterinsurgency efforts in Afghanistan. On information and belief, MTN Group coordinated its towers shutdowns with the Haqqani Network to facilitate the final Taliban takeover of Kabul. Such conduct was consistent with MTN Group's past support for the Taliban, including its Haqqani Network,

1630.   The IRGC-Taliban-al-Qaeda Campaign was committed, planned, and/or authorized by Hezbollah, al-Qaeda, and the Haqqani Network, each of which the United States has designated as an FTO under 8 U.S.C. § 1189 since (in 1997, 1999, and 2012, respectively).

1631.   As a result of Defendants' liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

1632.   In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

1633.  Plaintiffs request that the Court:

(a)     Enter judgment against Defendants finding them jointly and severally liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(b)     Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)     Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(d)     Award Plaintiffs prejudgment interest; and

(e)     Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  February 4, 2022[603]

Respectfully submitted,

*/s/ Ryan R. Sparacino*

Ryan R. Sparacino (*pro hac vice*)
Eli J. Kay-Oliphant
    (EDNY Bar No. EK8030)
Sparacino PLLC
1920 L Street, NW, Suite 8358
Washington, D.C. 20036
Tel:  (202) 629-3530
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*

---

[603] This is a corrected version of Plaintiffs' Amended Complaint, which was originally filed on February 4, 2022.  The filing date of this corrected Amended Complaint is the date upon which the Court entered Plaintiffs' consent motion to file Plaintiffs' corrected Amended Complaint.