**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AUGUST WILDMAN, *et al.*,<br><br>               Plaintiffs,<br><br>          v.<br><br>DEUTSCHE BANK<br>AKTIENGESELLSCHAFT, *et al.*,<br><br>               Defendants. | No. 1:21-CV-04400 (KAM) (RML) |

**OPPOSITION TO THE DANSKE DEFENDANTS'
MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT**

Ryan R. Sparacino
Tejinder Singh
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 9

   I.   The Complaint Satisfies Federal Rule of Civil Procedure 8 ................................... 9

   II.   The Complaint States Claims for Aiding and Abetting Under the Justice Against
       Sponsors of Terrorism Act....................................................................................... 12

       A.  Danske Bank Was Generally Aware That It Was Playing a Role in Illegal
           Activity That Foreseeably Risked Terrorism ............................................... 14

       B.  Danske Bank Knowingly Provided Substantial Assistance ........................ 23

   III.  This Court Has Personal Jurisdiction Over Danske Bank ................................... 27

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

## Cases

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022) ........................................................................ *passim*

*Bartlett v. Société Générale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................................. 10, 27

*Boim v. Holy Land Found. for Relief & Dev.*,
   549 F.3d 685 (7th Cir. 2008) ......................................................................... 22

*Burke v. Dowling*,
   944 F. Supp. 1036 (E.D.N.Y. 1995) ............................................................... 10

*Estate of Klieman v. Palestinian Auth.*,
   923 F.3d 1115 (D.C. Cir. 2019), *cert. granted, judgment vacated,* 140 S. Ct. 2713 (2020),
   *and opinion reinstated in part,* 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020) ........................ 30

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021) .................................................................................. 29

*Freeman v. HSBC Holdings PLC*,
   465 F. Supp. 3d 220 (E.D.N.Y. 2020) ........................................................... 15

*Gonzalez v. Google LLC*,
   2 F.4th 871 (9th Cir. 2021) ........................................................................... 24

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ................................................................. 12, 13, 24

*Harnage v. Lightner*,
   916 F.3d 138 (2d Cir. 2019) ......................................................................... 10

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ......................................................................................... 30

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ....................................................................... *passim*

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) ......................................................................... 15

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   313 F. Supp. 2d 189 (S.D.N.Y. 2003) ........................................................... 10

*Kadamovas v. Stevens*,
   706 F.3d 843 (7th Cir. 2013) ......................................................................... 10

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) .................................................................... *passim*

*Lawson v. Rubin*,
   2018 WL 7958928 (E.D.N.Y. June 11, 2018) ................................................. 14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ................................................................ 27

*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017) ............................................................... 30

*Mwani v. bin Laden*,
  417 F.3d 1 (D.C. Cir. 2005) ................................................................. 29

*O'Sullivan v. Deutsche Bank AG*,
  2020 WL 906153 (S.D.N.Y. Feb. 25, 2020) ....................................... 15

*Salahuddin v. Cuomo*,
  861 F.2d 40 (2d Cir. 1988) ............................................................ 10, 12

*Siegel v. HSBC N. Am. Holdings Inc.*,
  933 F.3d 217 (2d Cir. 2019) ......................................................... 16, 17

*Singer v. Bank of Palestine*,
  2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ..................................... 30

*Smith v. Fischer*,
  2016 WL 3004670 (W.D.N.Y. May 23, 2016) ..................................... 10

*Sokolow v. Palestine Liberation Org.*,
  60 F. Supp. 3d 509 (S.D.N.Y. 2014) ................................................... 16

*Terry v. Fowles*,
  2021 WL 4197198 (E.D.N.Y. Sept. 15, 2021) .................................... 13

*United States v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011) ................................................................ 18

*Walden v. Fiore*,
  571 U.S. 277 (2014) ............................................................................. 30

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ................................................................ 29

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................ 27

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004) .................................................................. 10

**Statutes**

18 U.S.C. § 1962 ........................................................................................ 9

18 U.S.C. § 2331(1) .................................................................................. 14

18 U.S.C. § 2333 ........................................................................................ 9

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................. *passim*

  § 2(a)(5) ............................................................................................... 12

§ 2(a)(6) ................................................................................................................. 30

§ 2(b) ...................................................................................................................... 12

**Other Authorities**

Simon Bowers et al., *Inside Scandal-Rocked Danske Estonia and the Shell-Company
'Factories' That Served It,*
Int'l Consortium of Investigative Journalists (Sept. 21, 2020) ................................. 28

Bo Elkjær et al., *1,2 mia. kroner fra formodet momssvindel ført igennem Danske Bank i
Hørsholm*, Dagbladet Information (May 27, 2019) .................................................. 22

Organized Crime and Corruption Reporting Project, Danske Bank (2018),
https://www.occrp.org/en/poy/2018/ ......................................................................... 3

U.N. Security Council, *Letter dated 18 May 2001 from the Chairman of the Committee of
Experts on Afghanistan Appointed Pursuant to Security Council Resolution 1333 (2000)
Addressed to the Secretary-General* (May 18, 2001) ............................................... 5

U.N. Security Council, *Ninth Report of the Analytical Support and Sanctions Monitoring
Team, Submitted Pursuant to Resolution 1822 (2008) Concerning Al-Qaida and the
Taliban and Associated Individuals and Entities* (May 13, 2009) ............................ 5

U.N. Security Council, *Report of the Analytical Support and Sanctions Monitoring Team on
Specific Cases of Cooperation Between Organized Crime Syndicates and Individuals,
Groups, Undertakings and Entities Eligible for Listing Under Paragraph 1 of Security
Council Resolution 2160 (2014)* (Feb. 2, 2015) ...................................................... 5

U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* (2013)..... 5

U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan and
United States Plan for Sustaining the Afghanistan National Security Forces* (2012)............... 5

U.S. Dep't of State, *Country Reports on Terrorism 2015* (2016) ................................... 5

Plaintiffs respectfully oppose the Danske Defendants' motion to dismiss the Corrected Amended Complaint (Doc. 38).[1] Plaintiffs agree to the dismissal of Danske Markets Inc., but the motion should be denied as to Danske Bank A/S.

## BACKGROUND

Plaintiffs are 479 individuals comprising Americans who were killed or injured by terrorist attacks in Afghanistan between 2011 and 2016, and their close family members. ¶ 1 (p.1). Plaintiffs allege, and the Danske Defendants do not dispute, that the attacks were committed, planned, or authorized by al-Qaeda and the Haqqani Network (the most violent part of the Taliban). ¶¶ 12, 85-87, 364-408 (pp.4, 20-21, 124-40). These designated foreign terrorist organizations (FTOs) led a Syndicate of terrorists that also included the Taliban, Lashkar-e-Taiba, and D-Company, which carried out terrorist attacks against Americans and other Coalition forces in Afghanistan. ¶¶ 89-110 (pp.21-31). The Syndicate's horrific acts of violence included suicide bombings, improvised explosive device (IED) attacks (almost always involving fertilizer bombs), kidnappings, and insider attacks. *E.g.*, ¶ 92 (p.22).

Al-Qaeda, the Haqqani Network, and their Syndicate allies funded these attacks through a multinational criminal effort involving protection rackets in Afghanistan and Pakistan; drug exports; tax fraud in Europe; illicit "donations" and "taxes"; financial support from other terrorist organizations; sanctions evasion; and other criminal activity. ¶¶ 13, 128, 135-49 (pp.4, 38, 41-46). In these efforts, the Syndicate partnered with the Russian Mafia, infamous Syndicate money launderer Altaf Khanani and his money-laundering organization (which the Treasury Department refers to as "the Khanani MLO"), and fraud cells comprising al-Qaeda and Haqqani Network

---

[1] Citations to the Corrected Amended Complaint are by paragraph and page number. Citations to defendants' memorandum of law are to "Danske MTD" and page number.

operatives, among others. *E.g.*, ¶¶ 7-9 (pp.2-3).

The Syndicate's principal financial objective was to obtain U.S. Dollars (USD), the preferred currency in Pakistan and Afghanistan to pay for terrorist recruiting, salaries, arms, mobile phones, and logistical pipelines vital to the success of the Syndicate's terrorist alliance with the Islamic Revolutionary Guard Corps (IRGC) against America in Afghanistan. ¶¶ 5, 112-13, 121, 150-56 (pp.2, 31-32, 35-36, 46-48). To access USD, the Syndicate needed the help of large, international financial institutions, *i.e.*, multinational banks. Most banks refused, adopting robust compliance programs designed to prevent terrorists from flowing money through their systems. *E.g.*, ¶ 115 (p.33). But a handful chose to become "laundromats," *i.e.*, hubs of illicit finance. ¶¶ 609-10 (pp.260-61). As documented by a slew of authoritative sources—including governments, bankers, and experts—these banks knew that by expressing their willingness to process illicit transactions, they would attract tremendous volumes of profitable but unlawful business from money launderers, transnational criminals, and terrorists looking to raise, clean, move, and spend dirty money. ¶¶ 611-52 (pp.261-76).

"From 2007 through 2016, Danske Bank operated a laundromat out of its Estonia branch, and laundered substantial sums for Khanani, the Russian Mafia, the leadership of Azerbaijan, the Syndicate, and others." ¶ 534 (p.242). This laundromat "made over $233 billion dollars in suspicious transactions during that time period," and has been called the "Global Laundromat" due to its magnitude and geographic reach. ¶ 535 (p.243). Danske Bank admits to these violations—but attempts to downplay them with euphemisms, describing its gross misconduct as "some highly publicized anti-money laundering ('AML') lapses," Danske MTD 1, "regrettable lapses," *id.* at 2, "acknowledged AML failures," *id.* at 7, "deficiencies," *id.* at 15, "shortcomings," *id.*, and "defects," *id.*

2

Let's be clear: this wasn't a case of "Oops," where a bank tried its hardest to do the right thing but just came up a little short. Rather, "Danske Bank knew *in 2007* that the Estonia branch was a laundromat," because it investigated, after this "was pointed out to Danske Bank by regulators," by its own employees, and by counterparty banks. ¶ 921 (p.382) (emphasis added); ¶ 926 (p.383). The ensuing investigation revealed that "Danske Bank ignored years of signals about problematic transactions at its Estonia branch, including a warning in 2007 about criminal activity involving substantial sums on a monthly basis." ¶ 928 (p.384). And multiple informed observers—including the CEO of Danske Bank Estonia—have opined that senior bank management knew of the Estonia branch's unlawful activities. ¶¶ 928, 930 (p.384). Nevertheless, in the face of clear evidence of unlawful activity, "Danske Bank chose to keep operating the laundromat, and to aggressively grow the laundromat." ¶ 921 (p.382).

All of this is widely known and is not subject to serious dispute. Danske Bank's massive money-laundering operation in a known hotbed of terrorist financing activity has already resulted in multiple government investigations and criminal charges—not to mention the dubious distinction of being named the "2018 Actor of the Year in Organized Crime and Corruption," *i.e.*, the person who did "the most over the previous 12 months to advance organized criminal activity and corruption in the world." Organized Crime and Corruption Reporting Project, Danske Bank (2018), https://www.occrp.org/en/poy/2018/. Danske Bank even beat out Vladimir Putin for the top spot. *Id*.

Danske Bank does not challenge the allegations establishing it as one of the most corrupt money-laundering banks in the world. The crux of its motion to dismiss is that its $233 billion laundromat scheme has nothing to do with terrorist finance, and so its many years of criminal behavior do not make it complicit with terrorist violence. But Plaintiffs plausibly allege

otherwise—both as a general matter *and* with facts specific to Danske Bank's transactions.

As a general matter, Danske Bank "understood that any financial institution or money remitter who served as a 'Laundromat' would inevitably route substantial sums of U.S. Dollars to terrorist financiers seeking to raise and move money to support anti-American terrorist attacks." ¶ 610 (p.260). Indeed, this has been common knowledge among financial institutions since "the 1980s," ¶ 611 (p.261), and "no reasonable financial institution could have believed that acting as Laundromat for organized crime groups had no foreseeable link to terrorism," ¶ 612 (p.261). That knowledge became more acute after September 11, when the U.S. government and the Financial Action Task Force (FATF)[2] drew explicit connections between money laundering and terrorist financing. ¶¶ 117-18, 597-99 (pp.34-35, 255-56). Expert and media sources have also long recognized the close connection between laundromats and terrorism finance. *E.g.*, ¶¶ 131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78 (pp.39-40, 61-63, 78-79, 149-50, 159-60, 162-64, 257, 260-76, 394-95). Indeed, the complaint provides over 50 pages of detail, drawn from public sources, explaining why "the connections between" the unlawful transactions here "and Syndicate violence have been well-established since well before the first attacks at issue in this case." ¶ 592 (p.253); *see also* ¶¶ 596-725 (pp.255-307).

The connection between money laundering and terrorist violence is also especially strong with respect to opium profits, ¶¶ 974-75 (p.393). Indeed, multiple governments—including our own—have emphasized in official reports that "[d]rug trafficking in the region is *inextricably tied to terrorism*, and *drug proceeds enable this activity*" because "the illicit trafficking of opiates . . . destined for the Russian Federation and Eastern Europe was the predominant funding

---

[2] FATF is the gold-standard international organization to combat money laundering, which issued guidance that banks monitored closely. ¶¶ 598, 697 (pp.256, 294).

mechanism for *Afghan-based terrorist activity*." U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 257 (2016) (emphasis added).[3]

Danske Bank's laundromat had a particularly strong connection to the opium pipeline for at least three reasons. First, it served the Khanani MLO, which managed "every financial aspect of [the Syndicate's] coordinated transnational opium enterprise." ¶ 269 (pp.150-51). Second, it served the Russian Mafia, which also laundered massive amounts of opium profits. ¶ 534 (p.242). And third, Danske Bank sited its laundromat in Estonia, which "served as a key finance and logistics hub for transnational terrorist groups like al-Qaeda, the Haqqani Network, and the IRGC worldwide," and was particularly important "with respect to one of the Syndicate's most important funding streams: Afghan opium.". ¶¶ 239-41 (p.81).

---

[3] *See also, e.g.*, U.N. Security Council, *Letter dated 18 May 2001 from the Chairman of the Committee of Experts on Afghanistan Appointed Pursuant to Security Council Resolution 1333 (2000) Addressed to the Secretary-General* at 11 (May 18, 2001) ("Funds raised from the production and trading of opium and heroin are *used by the Taliban to buy arms* … and to finance the training of terrorists and support the operations of extremists in neighboring countries and beyond."); U.N. Security Council, *Ninth Report of the Analytical Support and Sanctions Monitoring Team, Submitted Pursuant to Resolution 1822 (2008) Concerning Al-Qaida and the Taliban and Associated Individuals and Entities* ¶ 43 (May 13, 2009) (given "the huge amounts raised from opium production" linked to "Taliban" "involvement in the drug trade," "[t]he Security Council continue[d] to urge States to *consider this form of financing as sufficient evidence of association with the Taliban*"); U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan and United States Plan for Sustaining the Afghanistan National Security Forces* 108 (2012) ("Russia *recognizes terrorism as being closely intertwined with narcotics* trafficking."); U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* 16 (2013) ("The *convergence* of insurgent, terrorist, and criminal networks is *pervasive* … Revenue from opium trafficking continues to contribute to the insurgency … Criminal networks, insurgent groups, and corrupt government officials are *often interlinked* via multilayered connections"); U.N. Security Council, *Report of the Analytical Support and Sanctions Monitoring Team on Specific Cases of Cooperation Between Organized Crime Syndicates and Individuals, Groups, Undertakings and Entities Eligible for Listing Under Paragraph 1 of Security Council Resolution 2160 (2014)* ¶ 8 (Feb. 2, 2015) ("The Taliban have a *long-standing, close relationship with the illegal narcotics economy* in Afghanistan. … right from the start, the Taliban movement received *crucial funding* through narcotics cartels") (all emphases added).

These allegations show that any bank (*e.g.*, Danske Bank) knew that by operating a laundromat in a high-risk jurisdiction like Estonia, or by working with Syndicate operatives and fronts, it was invariably financing terrorism. A chorus of counter-terrorism experts—including former U.S. leaders in Afghanistan, undercover agents, Treasury Department officials, and learned scholars—agrees that laundromat banks knowingly made themselves complicit with terrorist violence and allowed it to flourish. ¶¶ 719-25 (pp.303-07).

Danske Bank's specific transactions also actually supported terrorism. Information revealing the full scale of Danske Bank's support for terrorism is not yet public—but it has already been reported that at least a 7-figure volume flowed through Danske Bank accounts into the coffers of agents or operatives acting for al-Qaeda, the Haqqani Network, and their Syndicate allies through two channels. It is no surprise, then, that "Danske Bank was subject to a control action in 2015 concerning compliance with measures of anti-money laundering and terrorist financing prevention." ¶ 545 (p.245).

The first channel of support was Danske Bank's assistance to the Khanani MLO with money laundering. The German newspaper *Süddeutsche Zeitung* reported that Danske enabled USD cash flow to the Khanani MLO through its front, Mazaka General Trading; that "Mazaka's 'customers'" included "[t]errorist organizations such as al-Qaeda" "and the Taliban"; and that "[b]etween April and August 2014" alone, "a total of $720,000 flowed into [Mazaka's] account at Danske Bank." ¶ 540 (p.244). Other sources have reported that Mazaka "exchanged millions with" one of Danske Bank's customers (an entity that suspiciously had "hidden owners"). ¶ 538 (p.243). Khanani's entities, including Mazaka were mere shells that "raised a litany of obvious counter-terrorist finance red flags," including suspicious "trading histor[ies]," and were not

engaged in any legitimate business. ¶ 682 (pp.288-89).[4]

These transactions necessarily led to revenue for the Syndicate. Khanani was the Syndicate's principal money launderer, and was internationally infamous for his connections with Syndicate terrorists including the Haqqani family and Dawood Ibrahim. ¶¶ 253-55 (pp.142-45). His infamy began no later than 2008, when Pakistan charged him with money laundering offenses involving billions of dollars. ¶ 259 (pp.146-47). But public sources linked him to terrorism as early as 2001. ¶¶ 672-73 (pp.284-85). FATF reported that Khanani's organization "provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organization." ¶ 267 (pp.149-50).

The complaint details seven ways that Khanani and the Khanani MLO directly and indirectly supported Syndicate terrorist operations. ¶¶ 268-78 (pp.150-54). These included using a web of companies, including Mazaka General Trading, to launder at least hundreds of millions of dollars annually for the Syndicate. ¶ 268 (p.150). These transactions allowed the Syndicate to convert the money it raised through criminal enterprises into USD, and to repatriate those funds to the Syndicate in Pakistan and Afghanistan where it funded violence against Americans. *Id.*; *see also* ¶¶ 215-17 (pp.71-72). Additionally, Khanani directly contributed a portion of the revenue from money laundering to the Syndicate as a tax, meaning that every time Danske Bank processed any Khanani-related transaction, it caused substantial money to flow through Khanani to the Syndicate through Khanani's "tax" payments. ¶¶ 271-74 (pp.151-53).

Khanani also served as a financier for Sirajuddin Haqqani. ¶¶ 254, 272, 674, 687 (pp.143-

---

[4] Danske Bank tries to use the fact that its customer had hidden owners to cast doubt on whether the owners had terrorist connections. Danske MTD 6. But the use of such anonymous shell entities in high-risk jurisdictions is itself an indicator of terrorist finance, which complicit banks promoted to create plausible deniability. ¶¶ 664-67 (pp.281-83).

45, 152, 285-86, 290-91). Sirajuddin was the Syndicate's single most important leader after 9/11, and was designated a Specially Designated Global Terrorist in 2008. ¶¶ 157, 160 (pp.48-49). Sirajuddin simultaneously held leadership positions in al-Qaeda, the Haqqani Network, and the Quetta Shura Taliban. ¶ 159 (p.49). In these roles, he led the "Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012." ¶ 164 (p.50); *see also* ¶¶ 164-86 (pp.50-59). Transactions for the Khanani MLO "supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources . . . relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan." ¶ 172 (p.54).

Danske Bank's second channel of support was facilitating Value Added Tax (VAT) fraud schemes, which were "used, among other things, to finance al-Qaeda in Afghanistan." ¶ 553 (p.246). In these schemes, sham companies used fake sales to claim fraudulent tax refunds. ¶¶ 281-82 (pp.155-56). By 2006, al-Qaeda and the Haqqani Network were training their operatives to carry out VAT fraud in Europe and repatriate the money to Afghanistan for use in terrorist attacks. ¶ 283 (p.156). "Syndicate VAT fraud cells based their fraud on various commodities, including mobile phones. As they grew more sophisticated, they traded carbon emissions credits." ¶ 284 (p.156).

VAT fraud is easily detectable by banks, and is a known mechanism for financing al-Qaeda terrorism specifically. ¶ 694 (p.293). Public sources, including FATF, reported links between VAT fraud and terrorism throughout the 2000s, and well before the attacks in this case. ¶¶ 294, 690-99 (pp.159-60, 291-95). Moreover, "VAT fraud as practiced by al-Qaeda was one of the simplest of all terrorist finance schemes for banks to detect." ¶ 795 (p.335). That is because the scheme "prioritized scale and simplicity," and so the "fraudsters usually copied-and-pasted (or close to it) the same schemes, entities, and everything." ¶ 798 (p.336). Consequently, the

scheme would only work with "the willing involvement of corrupt western banks," because it would require "a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to)." ¶ 795 (p.335). Accordingly, any bank paying attention had the ability to stop this fraud in its tracks—and indeed, as alleged in this case, other banks (*e.g.*, Deutsche Bank) spotted the signs of VAT fraud early. ¶ 741 (p.316). Although many banks stopped trading in carbon quotas to avoid participating in VAT fraud, Danske Bank took the opposite approach, picking up that volume and setting up an account for "later convicted VAT fraudsters." ¶ 547 (p.246).

Based on Danske Bank's knowing creation and maintenance of a laundromat that provided substantial assistance to violent Syndicate terrorists, Plaintiffs assert claims for aiding and abetting under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act, (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, Plaintiffs allege that Danske Bank aided two acts of international terrorism: (1) the terrorist attacks that injured Plaintiffs, ¶¶ 2025-33 (pp.590-91); and (2) the overall terrorist campaign, which violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, ¶¶ 2034-43 (pp.592-94), and led to the attacks that injured Plaintiffs.

**ARGUMENT**

Plaintiffs accept that the Court can dismiss the case against Danske Markets Inc. On the other hand, the Court should easily deny the motion with respect to Danske Bank A/S.

**I.     The Complaint Satisfies Federal Rule of Civil Procedure 8**

Danske Bank argues that the complaint violates Rule 8's requirement of a short, plain statement. Danske MTD 9-10. But dismissal under Rule 8 is an extreme measure "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d

40, 42 (2d Cir. 1988); *Smith v. Fischer*, 2016 WL 3004670, at *3-4 (W.D.N.Y. May 23, 2016)

(holding that "[t]he law is . . . unambiguous" that "dismissal under Rule 8 is not warranted"

merely because a complaint is lengthy; instead, dismissal is warranted only where "the complaint

is so rambling that it is incomprehensible"). Under this rule, "long and involved complaints do

not *per se* fail to pass the test of sufficiency under Rule 8." *Burke v. Dowling*, 944 F. Supp. 1036,

1049 (E.D.N.Y. 1995) (quotation omitted). Instead, dismissal should be denied if "courts and

adverse parties can understand a claim and frame a response to it." *Id.*; *see also Wynder v.*

*McMahon*, 360 F.3d 73, 80 (2d Cir. 2004); *Harnage v. Lightner*, 916 F.3d 138, 142 (2d Cir.

2019).

Moreover, "[b]revity must be calibrated to the number of claims and also to their

character, since some require more explanation than others to establish their plausibility."

*Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013). Consistent with this admonition,

courts have permitted complaints similar to this one. For example, in *Atchley v. AstraZeneca UK*

*Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), the complaint resembled the one here: it was "588 pages

long" and included what the court described as "unusual detail," "provid[ing] context and

spell[ing] out connections relevant to the extraordinary events it describes . . . with reference to

hundreds of identified sources." *Id.* at 213.[5] Similarly, in *Bartlett v. Société Générale de Banque*

*Au Liban SAL*, 2020 WL 7089448, at *1 (E.D.N.Y. Nov. 25, 2020), the court allowed a

complaint including 5695 paragraphs spanning nearly 788 pages. This is not the only context in

which substantial complaints have survived motions to dismiss in this circuit. *See, e.g.*, *In re*

*Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 212 (S.D.N.Y. 2003) (refusing to dismiss

---

[5] Plaintiffs' attorney Ryan R. Sparacino served (and continues to serve) as lead investigative
counsel for plaintiffs in *Atchley* and co-authored the complaint in *Atchley*.

326-page complaint alleging multiple claims rooted in a complex fraud).

Here, the complaint is organized according to the elements of Plaintiffs' cause of action and subdivided to allow each defendant group, including Danske Bank, to see the allegations most relevant to it. *Compare Atchley*, 22 F.4th at 215-16 (listing elements of aiding-and-abetting under JASTA) *with* Complaint pp.ix-xii (table of contents mirroring the elements, with sub-headings for defendant-specific allegations and sub-elements). Far from being unintelligible, these allegations are organized logically and provide fair notice to each defendant of the allegations against it.

The length of the complaint is reasonable in light of the scope, complexity, and gravity of the allegations. This case alleges one of the largest and longest-running terrorist finance schemes ever, involving hundreds of plaintiffs injured in attacks spanning a five-year period. Those attacks involved different modes of violence, which are important to understand in order to see, for example, how an attack perpetrated by the Taliban could plausibly have been planned or authorized by al-Qaeda. The complaint also alleges multiple, independent channels of terrorist finance and support operated by different actors over different periods of time and in different geographies. The complaint involves five defendant groups facing partially overlapping allegations—such as the fact that they all collaborated with Altaf Khanani—but also distinct, defendant-specific allegations about their conduct and scienter, which span over a decade.

The complaint also includes factual support from authoritative sources. This is necessary because corporate ATA defendants frequently disparage allegations of support to terrorism as speculative, conclusory, or implausible—and courts sometimes credit those arguments. For example, in *Atchley*, the district court dismissed the aiding and abetting claim on this basis, and the D.C. Circuit correctly reversed, relying on details like those alleged here. *See generally*

11

*Atchley*, 22 F.4th 204.

Danske Bank chides Plaintiffs for not modifying the complaint in response to this Court's remarks at the status conference. That is unfair. This Court urged Plaintiffs to take their obligations under Rule 8 seriously—and Plaintiffs did, cutting about 100 pages from the original complaint. Plaintiffs also heeded this Court's separate admonition to put forth all the facts that entitle them to relief. That necessitated adding new allegations, including about the IRGC and its fronts, as well as Standard Chartered Bank's support for the Azizi cell.

Plaintiffs have put forth a plausible pleading that provides fair notice to each defendant of the allegations against it. Danske Bank has not shown that the pleading is "incomprehensible," and so dismissal is unwarranted under the Second Circuit's binding precedents. At most, the Court should require amendment if any aspect of the complaint is deficient. *See Salahuddin*, 861 F.2d at 43 (allowing amendment and encouraging the district court not to dismiss the amended pleading even if it failed to comply with Rule 8, but instead to strike the improper parts).

## II. The Complaint States Claims for Aiding and Abetting Under the Justice Against Sponsors of Terrorism Act

Plaintiffs' claims for relief assert aiding and abetting liability under JASTA, which seeks to "'[p]rovide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

JASTA adopts the liability framework set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5). The facts of that case illustrate JASTA's broad scope. In *Halberstam*, the defendant was the "banker, bookkeeper, recordkeeper, and secretary" for a

burglar. *Halberstam*, 705 F.2d at 487. She was sued for damages after the burglar murdered a victim during a botched burglary. *See id*. at 474. The D.C. Circuit held that she could be liable for the unplanned murder, even if she did not know about it, or even know that her partner "was committing burglaries." *Id*. at 488. Instead, "it was enough that she knew he was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in any of these enterprises." *Id*. Even though the defendant's "own acts were neutral standing alone," they gave rise to liability for aiding and abetting and conspiracy. *Id*.

To state a claim for aiding and abetting under JASTA, a plaintiff must show: (1) that he or she was injured by an act of international terrorism that was committed, planned, or authorized by a designated FTO; (2) that the defendant "directly or indirectly aided" the party who "performed the injury-causing act"; (3) that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable"; and (4) that the defendant's assistance was "substantial." *Honickman*, 6 F.4th at 495-96, 499.

Danske Bank's motion focuses on the last two elements. Importantly, though, Danske Bank consistently argues as if this complaint only asserts liability based on the theory that it aided and abetted the attacks that injured Plaintiffs. That is Count One of the complaint. But Count Two advances a different theory, which is that Danske Bank aided and abetted the Taliban-al-Qaeda Campaign, *i.e.*, an enterprise that al-Qaeda and its Syndicate allies conducted to expel Americans from Afghanistan through crime and anti-American violence. ¶ 2036 (p.592). Danske Bank says almost nothing about this theory of liability; it addresses it in a single footnote that cites no law and simply asserts that liability is not available under this theory. Danske MTD 22 n.5. That is insufficient. *See, e.g.*, *Terry v. Fowles*, 2021 WL 4197198, at *7 (E.D.N.Y. Sept. 15, 2021) (holding that party "waived this argument by raising it only in a passing footnote");

*Lawson v. Rubin*, 2018 WL 7958928, at *1 (E.D.N.Y. June 11, 2018) (similar). Regardless, the Count Two theory has merit. RICO violations plainly can qualify as acts of international terrorism under the statutory definition of that term, *see* 18 U.S.C. § 2331(1), and the complaint explains why the specific allegations here suffice. In particular, this theory survives even if the Court agrees with Danske Bank that the assistance it provided was too attenuated from specific attacks—because the assistance was germane to the overall terrorist enterprise.

Danske Bank's remaining arguments are unpersuasive.

### A. Danske Bank Was Generally Aware That It Was Playing a Role in Illegal Activity That Foreseeably Risked Terrorism

"The general awareness element requires the defendant to be generally aware of its role in an overall illegal or tortious activity at the time that [it] provides the assistance." *Honickman*, 6 F.4th at 496 (quotation marks omitted). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Id*. General awareness is not an actual-knowledge standard; instead, the phrase connotes "something less than full, or fully focused, recognition," and is "less demanding than a requirement that [plaintiffs] show awareness." *Kaplan*, 999 F.3d at 863.

In evaluating general awareness allegations, the court must "consider all of the complaint's allegations, rather than considering each in isolation, and . . . accept as true all permissible inferences that could be drawn from the complaint as a whole." *Kaplan*, 999 F.3d at 865. The inquiry is "fact-intensive," *id.* at 860, and "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation marks omitted), so controlling law requires courts to be "lenient in allowing scienter issues . . . to survive motions to dismiss"— even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d

677, 693 (2d Cir. 2009) (quotation marks omitted).

"From 2007 through 2016, Danske Bank operated a laundromat out of its Estonia branch." ¶ 534 (p.242). To be more specific, Danske Bank "made over *$233 billion* dollars in suspicious transactions during that time period," a large proportion of which "was denominated in USD." ¶¶ 535-36 (p.243) (emphasis added). These "extensive and systematic" violations, ¶ 537 (p.243), were the result of deliberate decisions to "set up the Estonia branch to be separate from the rest of the bank, so that the Estonia branch would not receive adequate oversight," ¶ 925 (p.382). Notwithstanding this effort to manufacture plausible deniability, Danske Bank received a slew of warnings from internal and external sources, beginning in 2007 and consistently over the years, that its business was fundamentally tainted by criminal activity. ¶ 926 (p.383). It ignored all of these warnings. *Id.* Multiple sources have reported that senior management knew of the misconduct and allowed it to continue. ¶¶ 928, 930 (p.384).

Danske Bank argues that these money laundering allegations are "irrelevant." Danske MTD 15-16. In support, it relies on *Freeman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 230 (E.D.N.Y. 2020), which stated that "allegations that Defendants knowingly violated laws that were designed principally to prevent terrorist activity do not allege plausibly a general awareness that Defendants had assumed a role in a foreign terrorist organization's *act* of international terrorism." *Id.* at 230 (quoting *O'Sullivan v. Deutsche Bank AG*, 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020)).

The Second Circuit subsequently rejected that view of the legal standard. Indeed, in *Kaplan*, the Second Circuit specifically described the defendant's culpable conduct as "circumventing sanctions imposed in order to hinder terrorist activity," 999 F.3d at 866, and found that this conduct gave rise to JASTA liability. Under the Second Circuit's recent

15

controlling precedents, the "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury," *Honickman*, 6 F.4th at 496; it only needs to be generally aware "of its role in an 'overall illegal activity' from which an 'act of international terrorism' was a foreseeable risk," *id*. at 498 (quoting *Kaplan*, 999 F.3d at 860).

Under that legal standard, Danske Bank's money laundering qualifies. It is clearly an illegal activity; Danske Bank was at least generally aware that it was taking place from 2007 to 2016; and the complaint is replete with citations to authoritative sources stating that terrorism was a foreseeable consequence of money laundering at that scale, in that time and place, and for the types of customers Danske Bank catered to. *See supra* pp.4-9. At the absolute minimum, whether terrorism was a foreseeable risk of Danske Bank's money laundering is a factual question that should not be resolved against Plaintiffs at the pleading stage. *Cf., e.g.*, *Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 522 (S.D.N.Y. 2014) (holding that foreseeability, in the context of proximate cause inquiry for a primary liability claim under the ATA, "is a factual issue for the jury").

In addition to that overarching allegation, the complaint includes specific examples where Danske Bank's laundromat actually resulted in millions of U.S. Dollars flowing through Danske accounts through to al-Qaeda, the Haqqani Network, and their Syndicate allies. *See supra* pp.6-8. These facts make the ultimate allegation of foreseeability plausible. Danske Bank's responses to these allegations are unpersuasive.

With respect to the Khanani allegations involving Mazaka General Trading, Danske Bank argues that the complaint does not allege that the bank "knew or intended" that the funds would go to terrorist organizations. Danske MTD 12 (citing *Siegel v. HSBC N. Am. Holdings Inc.*, 933 F.3d 217, 225 (2d Cir. 2019)). But the general awareness standard requires neither actual

knowledge of a contribution to terrorism nor specific intent to support terrorism, and so this argument does not support dismissal. *See Kaplan*, 999 F.3d at 863.

The language Danske Bank quotes from *Siegel* does not suggest otherwise. In *Siegel*, the plaintiffs accused HSBC of providing banking services to Saudi Arabia's largest bank, Al Rajhi Bank (ARB), despite knowing that ARB had facilitated terrorist financing. *See* 933 F.3d at 220-21. The Second Circuit held that the plaintiffs "failed to allege that HSBC was aware that by providing banking services to ARB, it was supporting AQI, much less assuming a role in AQI's violent activities." *Id*. at 224. The court found it significant that ARB was "a large bank" and that the plaintiffs "did not allege that most, or even many, of ARB's banking activities are linked to terrorists." *Id*. The court also deemed it "crucial[]" that almost a year before the attacks, "HSBC ceased doing business with ARB altogether." *Id*. The court found that this decision "not to provide banking services to ARB . . . makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks." *Id*. In that same paragraph, the court explained that although HSBC had previously provided substantial funds to ARB, the plaintiffs had not plausibly alleged "that HSBC knew or intended that those funds would be sent to AQI or any other terrorist organizations." *Id*. at 225.

The allegations here are quite different from *Siegel*. Danske Bank's customers were not vast, established banks with largely legitimate operations; they were money launderers and criminals. Danske Bank did not stop doing business with those customers; instead, it willfully pursued a laundromat strategy despite multiple warnings over many years. And pursuant to this strategy, the funds Danske Bank provided *actually went* to terrorist agents. These are the same distinctions the Second Circuit relied on in *Kaplan* to distinguish *Siegel*. *See* 999 F.3d at 862.

Independently, the Court may infer that Danske Bank knew that its Khanani-related

transactions aided terrorists because Danske Bank's competitors reached the same conclusion based on similar information. For example, employees at Standard Chartered Bank, which traded with a similar Khanani front (Al Zarooni Exchange), were able to ascertain that the front was engaged in money laundering relating to terrorism in 2012 and 2013. ¶¶ 466-67 (pp.219-20). Danske Bank, which had access to information about its own accounts and transactions, plausibly had the same knowledge. ¶¶ 655-63 (pp.277-81) (explaining that banks have sophisticated techniques to analyze data and spot money laundering, such that it is reasonable to infer knowledge). *Cf. United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011) (holding that evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" can show the defendant's guilty knowledge).

The details bear this out. Danske Bank argues that the complaint does not allege that Mazaka had any customer relationship with Danske Bank Estonia. Danske MTD 12. That is incorrect. Paragraph 540 (p.244) quotes from a German newspaper article reporting that between April and August 2014, $720,000 flowed into *Mazaka's account at Danske Bank*.

The complaint separately alleges that another customer, with suspicious hidden owners, had transactions worth millions with Mazaka. ¶ 538 (p.243). Thus, Plaintiffs allege that Mazaka was on both sides of transactions flowing through Danske Bank, and Danske Bank accordingly had substantial visibility into the entity. Danske Bank argues (MTD 13) that allegations that its customers sent money to Mazaka are too attenuated to support general awareness—but the transactions were inherently suspicious; they involved a customer with hidden owners, the amounts were "large and suspicious," ¶ 538 (p.243), and the counterparty was an actual money laundering entity—all of which would allow the bank to infer money laundering.

Danske Bank argues that the complaint does not plead that Danske Bank knew of any

connection between Mazaka and the Khanani MLO prior to 2014 (when the transactions occurred). Danske MTD 13. But by 2014, other banks that were trading with Khanani (*e.g.*, Standard Chartered) had figured out Khanani's involvement based on the same type of information Danske Bank had. In this context, where the only explanation for the transactions was money laundering, ¶ 541 (p.244), the paucity of public sources does not, on its own, defeat an allegation of general awareness because the bank plausibly made the connection based on information in its possession. To the extent the bank did not make the connection, that may be because, as Danske Bank has admitted, "employees of the Estonia branch assisted clients circumvent money-laundering controls," ¶ 927 (p.384), or it may be because "Danske Bank ignored years of signals about problematic transactions at its Estonia branch, including a warning in 2007 about criminal activity involving substantial sums on a monthly basis" that "should have sounded alarm bells," ¶ 928 (p.384). These facts do not negate general awareness; they support it because they show that Danske Bank knew it was engaged in an overall illegal activity.

Danske Bank argues that the complaint does not plead that public sources connected Khanani to terrorism before 2014. Danske MTD 13. Not so: the complaint cites four illustrative examples. ¶¶ 672-73 (pp.284-85). The first, from *USA Today* in 2001, connected Khanani's former company, KKI, to al-Qaeda and Taliban financing; the second, from the *New York Times* in 2003, reported that KKI was being investigated on suspicion of having transferred money to militant groups like al-Qaeda; the third, from *The Nation (Pakistan)* in 2008 reported that Khanani had been arrested on suspicion of money laundering, and said in the same paragraph that "[b]omb blasts can be stopped if the illegal business of" money laundering is stopped; and the fourth, from *Ummat* in Pakistan reported that "American officials are keeping an eye on . . . Khanani" because "American officials suspected that foreign money changers companies

may have provided money to extremist militant groups." *Id*. These examples illustrate the theme that Khanani was an internationally infamous money launderer based in Pakistan and then Dubai—two jurisdictions that were themselves infamous for terrorist finance. ¶¶ 196-204, 645-52 (pp.63-67, 273-76). Moreover, Standard Chartered concluded that Khanani-related transactions likely supported terrorism in 2012 and 2013, ¶¶ 466-67 (pp.219-220), and it is therefore a fair inference that Danske Bank was similarly aware.

Danske Bank also argues that Mazaka was not closely intertwined with terrorist violence. Danske MTD 14. But Mazaka was a front for Khanani (¶¶ 250, 268 (pp.142, 150)), who surely was intertwined with violence under the *Kaplan* standard. In *Kaplan*, the Second Circuit found the "closely intertwined" standard satisfied with respect to bank customers involved in Hezbollah's financing operation. *See* 999 F.3d at 849, 860. Khanani plays an even more culpable role vis-à-vis the Syndicate. ¶¶ 268-78 (pp.150-54) (describing Khanani's contributions to the Syndicate's ability to obtain USD to fund attacks). Khanani was "one of the world's worst polyterrorist financers," operating "the worst terrorist finance enterprise in the world," ¶ 253 (p.143), and was internationally infamous by 2008 when the Pakistani government charged him, ¶¶ 253-54, 259, 671 (pp.142-47, 284).

Danske Bank argues that there is no allegation that an FTO received laundered funds. Danske MTD 15. But the Second Circuit has explained that a plaintiff pleading general awareness "does not need to also allege the FTO actually received the funds," and so any such allegation is gravy. *Honickman*, 6 F.4th at 500. Here, Plaintiffs have the gravy: Danske Bank caused millions of U.S. Dollars, at a minimum, to flow through Danske accounts and reach al-Qaeda and Haqqani Network fronts, agents, and operatives each year from 2007 through 2016 via Danske's laundromat services to Khanani and the Russian Mafia, among others. ¶ 533

(p.242). Additionally, Khanani paid a portion of his organization's income (regardless of origin) as "taxes" to Syndicate leaders Sirajuddin Haqqani and Dawood Ibrahim. ¶¶ 270-73 (pp.151-52). Danske Bank's transactions for the Khanani MLO thus "supplied al-Qaeda and the Taliban . . . with key resources . . . relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan." ¶ 172 (p.54).

Danske Bank's arguments about VAT fraud likewise do not negate its general awareness—and can be addressed through amendment, if necessary. Plaintiffs allege, and Danske Bank does not dispute, that authoritative public sources like FATF linked VAT fraud to al-Qaeda and Haqqani Network terrorist financing throughout the 2000s, supporting an allegation of awareness. ¶¶ 294, 690-99 (pp.159-60, 291-95). Danske Bank argues that the complaint does not connect the specific VAT frauds that went through accounts at Danske Bank to terrorism. Danske MTD 18 (points 1 and 2).

That is incorrect. As the complaint explains, "in 2009 and 2010, the treasuries of Germany, Italy, and Spain were victims of VAT fraud, which was perpetrated using a Danske Bank account in the name of a company called Swefin." ¶ 546 (p.245). Thus, in 2009, "Danske Bank . . . allowed accounts controlled by the Danish-owned company Swefin to conduct VAT fraud of over $100 million." ¶ 548 (p.246). The Italian press reported that the same Italian VAT fraud was used to finance al-Qaeda in Afghanistan. ¶ 553 (p.246).[6] Thus, the complaint connects

---

[6] Danske Bank correctly points out that the complaint describes the VAT fraud against Spain and the Italian news article in the same paragraph, even though the article is about the Italian fraud. Danske MTD 17. That was an error, for which Plaintiffs apologize. But it is an immaterial error because the Italian fraud mentioned in the article also flowed through an account at Danske Bank. ¶ 546 (p.245).

the Italian fraud to both Danske Bank and al-Qaeda.[7]

Danske Bank's remaining arguments about VAT fraud fall flat. Specifically, Danske Bank argues that because much of the VAT fraud occurred before the attacks in this case, it could not contribute to general awareness vis-à-vis those attacks. Danske MTD 18 (point 3). But "[t]he defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman*, 6 F.4th at 496. In this case, the Syndicate's campaign of violence and its use of VAT fraud were both occurring, and both well-known, for years before the specific attacks in this case. In any event, given the low cost of terrorist violence, the contribution of substantial amounts of money still foreseeably supports terrorist operations years later. *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 700 (7th Cir. 2008) (en banc) ("Terrorism campaigns often last for many decades," and "[s]eed money for terrorism can sprout acts of violence long after the investment"). Ahmed's

---

[7] To the extent more is required, Plaintiffs can amend the complaint to cite an established Danish newspaper, which reported that the Swefin account at Danske Bank was used to hold proceeds of the Italian VAT fraud, which was perpetrated by the Ahmed cell, fundraisers for al-Qaeda and the Haqqani Network until 2010. ¶¶ 296-97 (p.161); *see* Bo Elkjær et al., *1,2 mia. kroner fra formodet momssvindel ført igennem Danske Bank i Hørsholm*, Dagbladet Information (May 27, 2019), tinyurl.com/57anmzj3. An English version made with Google Translate states that the Italian VAT fraud "had been used, among other things, to finance al-Qaeda in Afghanistan"; that "[t]he main suspect in the case was the British-Pakistani businessman Imran Yakub Ahmed"; that "the Danish-owned payment platform Swefin also played a role in this case" and "[t]he Italian network used exactly the same account in Danske Bank in Hørsholm to hide some of the money from the suspected fraud"; and that "triple-digit million amounts were transferred via the account and from there on to, among others, Hong Kong and Dubai." *See* Translation, *available at* tinyurl.com/3d8u3v7j. The article also quotes a money laundering expert who says that it was "suspicious that so much money was transferred through an account belonging to a company unknown to the public," which "should have caused Danske Bank to alert the authorities." *Id*.

This also answers Danske Bank's point that the VAT fraud was not revealed in public sources until years later (Danske Bank MTD 18 (point 4)) because Danske Bank did not need public sources to suspect that its own accounts were being used for VAT fraud. VAT fraud is relatively easy for a bank to detect, ¶ 795 (p.335), and Swefin's accounts were also inherently suspicious.

fraud using the Swefin account was ongoing until 2010, ¶¶ 297, 546 (pp.161, 245), and it is entirely reasonable to infer that the millions of dollars he raised for al-Qaeda and the Haqqani Network were still causing harm years later.

It is also important to recognize that the foregoing transactions relating to Mazaka and the Ahmed cell only describe the confirmed terrorist financing that we already know about, without the benefit of discovery into the bank's records or of the findings of ongoing investigations. But Danske Bank laundered over $233 *billion* dollars for thousands of suspicious customers. The publicly available information is only the tip of the iceberg. What we see above the waterline shows seven-figure contributions to the Syndicate. The true amount is likely much, much higher.

With respect to general awareness, it is certainly a plausible inference that any bank that willfully laundered $233 billion over nine years for thousands of suspicious customers in a high-risk terrorist finance jurisdiction was at least generally aware that it was engaged in illegal activity—and in light of the Syndicate's well-documented reach (not to mention the specific examples of terrorist financing that we already know about), terrorist violence was at least a foreseeable risk; indeed, it was inevitable. Danske Bank accordingly cannot prevail on this element at the pleading stage.

### B.  Danske Bank Knowingly Provided Substantial Assistance

The remaining question is whether the complaint plausibly alleges that Danske Bank knowingly provided substantial assistance. As the Second Circuit has explained, "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499. Instead, the "knowledge component is satisfied if the defendant knowingly—and not innocently or inadvertently—gave assistance"; it does "not require [the defendant] to 'know' anything more about [the tortfeasor's] unlawful activities than what [the defendant] knew for the general awareness element." *Id*. at 499-500 (cleaned up). Here, Danske Bank did not act

innocently or inadvertently; it was not "tricked," for example, by its customers. *See, e.g.*, ¶¶ 719-25 (pp.303-07). Instead, as explained *supra*, Danske Bank's employees in Estonia willfully facilitated the misconduct, and Danske Bank's head office allowed it to continue despite multiple clear warnings. The "knowing" requirement is met.

As to whether the assistance is substantial, Danske Bank correctly notes that this turns on a six-factor inquiry, in which no factor is dispositive and each is weighed on a case-by-case basis. *See Kaplan*, 999 F.3d at 856 ("Plainly these factors are variables, and the absence of some need not be dispositive.") (quotation marks and citation omitted). The complaint makes allegations about five of the factors. ¶¶ 964-1026 (pp.389-410).

The first factor is the nature of the act assisted. "'[T]he nature of the act involved dictates what aid might matter'" and thus "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [bank's] customers) would be important to the nature of the injury-causing act ([the FTO's] terrorist attacks)." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484). "Financial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley*, 22 F.4th at 222 (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021)). Moreover, when the act encouraged is so "vicious" and extraordinarily blameworthy, "even 'relatively trivial' aid could count as substantial." *Id.* (citation omitted).

Danske Bank argues that it only encouraged the avoidance of AML controls, not terrorism. Danske MTD 20. But the Second Circuit rejected this argument in *Honickman*, explaining that this factor has nothing to do with whether the bank "knowingly encouraged [the FTO's] violent activities," but instead focuses on whether the type of aid given generally tends to facilitate the tort at issue. 6 F.4th at 500 (quotation marks omitted). Here, the support Danske

Bank provided "was tailored to the specific violence at issue" because Syndicate terrorists

needed USD to finance their attacks. ¶ 965 (p.390). Government officials, terrorism scholars, and

media sources all opine that the services Danske Bank provided were key to the Syndicate's

ability to carry out attacks. ¶¶ 967-78 (pp.390-95).

  With respect to the amount of assistance, Danske Bank again argues that its assistance

did not "encourage[] any violent activities, or actually assist[] the terrorist acts that caused

plaintiff's injuries." Danske MTD 20. As explained *supra*, however, Danske Bank's assistance

flowed to Sirajuddin Haqqani through his agent, Altaf Khanani, and Haqqani used such

assistance to facilitate the attacks that injured Plaintiffs. Regardless, the law does not require

plaintiffs to trace the assistance provided to specific attacks. On the contrary, "if a plaintiff

plausibly alleges the general awareness element, she does not need to also allege the FTO

actually received the funds. Instead, the inquiry should focus on the amount and type of aid the

defendant provided." *Honickman*, 6 F.4th at 500. Danske Bank provided "tens of millions of

U.S. dollars to the Syndicate." ¶ 981 (p.395). Even small amounts of money can fund attacks like

the ones that injured Plaintiffs. ¶¶ 983-84 (pp.395-96). The millions here plainly support liability.

*See Atchley*, 22 F.4th at 222. That is equally clear with respect to the theory advanced in Count

Two (the RICO theory).

  Danske Bank groups three factors—presence at the time of the tort (which the complaint

does not allege), relationship to the tortfeasor, and duration of assistance—arguing that it had no

relationship with the attackers and only provided routine banking services that did not assist their

attacks. With respect to relationship, "a direct relationship between the defendant and the FTO is

not required to satisfy this factor." *Honickman*, 6 F.4th at 501. Here, Danske Bank had

relationships with fronts for Syndicate members like Khanani, and al-Qaeda and Haqqani

Network fundraiser Ahmed. The bank's transactions with these fronts were not routine; instead, they were undertaken in violation of a multitude of laws and regulations pursuant to Danske Bank's laundromat strategy. ¶¶ 711-13 (pp.299-301). Indeed, Danske Bank has itself admitted that banking at its Estonia branch was nothing approaching routine; instead, the branch's policies and procedures were designed to be unusually hospitable to illicit transactions. *See* ¶¶ 543-44 (pp.244-45). But even if Danske Bank's services were "routine," that would not absolve Danske Bank of liability. As the D.C. Circuit explained in *Halberstam*, even when a defendant's acts are "neutral standing alone," they gave rise to liability when they assist an illicit enterprise. *Id*. 705 F.2d at 488. Here, the complaint details why even "routine" transactions for terrorists advance violence. ¶¶ 714-16 (pp.301-02). The relationship factor accordingly supports liability.

With respect to the duration of assistance, the court in *Atchley* held that "four years is a significant duration." 22 F.4th at 224. Here, Danske Bank provided assistance "for nearly a decade" from 2007 until 2016. ¶ 1022 (p.409). This factor supports liability.

Finally, with respect to state of mind, Danske Bank argues that it had no "intent to finance or otherwise promote or carry out terrorist acts." Danske MTD 22. But no specific intent is required. *See Atchley*, 22 F.4th at 223. Thus, "[a]iding-and-abetting liability reaches actors . . . who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Id*. at 224. Here, Danske Bank had a culpable mental state, as evidenced by the repeated warnings it received, by the sheer magnitude of its laundromat activity ($233 billion), and by the active participation of its employees in criminal activities. ¶¶ 1012-14 (pp.407-08). It cannot play innocent.

Considering the six factors together, the assistance Danske Bank provided was easily substantial enough to state a claim for aiding and abetting liability.

### III.    This Court Has Personal Jurisdiction Over Danske Bank

Danske Bank argues that due process prevents this Court from exercising personal jurisdiction over it. Danske MTD 23. But Danske Bank purposefully availed itself of the United States by aiding its clients in processing USD transactions through the U.S. banking system. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169-70 (2d Cir. 2013). Ordinarily, "if a defendant transacted business in New York and the claim asserted arose from that business activity," that is enough. *Id*. at 170. In *Licci*, a terrorist support case, the defendant bank had "no operations, branches, or employees in the United States," but it routed some of the offending wire transfers through its correspondent accounts at U.S. banks. *Id*. at 165-66. This "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs," was purposeful availment. *See id*. at 171. "Since *Licci*, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name." *Bartlett*, 2020 WL 7089448, at *5 (collecting cases). This is so even when transfers flowing through New York constitute only "a part of" the offending activity. *Licci*, 732 F.3d at 170; *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

Here, "[a]lmost all of the money that was laundered through the Danske Bank laundromat ended up denominated in dollars, via transactions with U.S. correspondence bank accounts." ¶ 1085 (p.432).[8] This included the transaction for Khanani's Mazaka General Trading. ¶ 538

---

[8] If necessary, this allegation can be bolstered by further amendment. Howard Wilkinson, a Danske Bank whistleblower, estimated in testimony to the European Parliament that "80 to 90 percent of the money that went through Danske Bank ended up in dollars, leaving through U.S. correspondent banks into the financial system." Simon Bowers et al., *Inside Scandal-Rocked*

(p.243). Moreover, access to USD was a key point of the underlying schemes, which were designed to turn dirty foreign cash into clean dollars. The Syndicate, especially, was seeking ways to generate, move, and repatriate large amounts of USD. ¶¶ 5, 151 (pp.2, 47). That was one of the Khanani MLO's key services. ¶ 270 (p.151). Ahmed's VAT fraud cell likewise "use[d] global financial institutions to convert the Euros obtained through the VAT fraud into USD." ¶ 287 (p.157); *see also* ¶ 296 (p.161). The upshot is that Danske Bank purposefully availed itself of the United States by processing the vast majority of its transactions—including the money laundering and VAT fraud transactions at issue here—through correspondent accounts in the United States. These allegations are every bit as strong as the allegations in *Licci*.

Danske Bank argues that the VAT fraud allegations do not discuss the United States (Danske MTD 24)—but as just shown, the allegations relating to the Ahmed Cell specifically allege that it converted proceeds to USD to repatriate to the Syndicate. To the extent the complaint needs to be amended to make it explicit that Danske Bank processed transactions for the Ahmed Cell, that can easily be done. Those transactions took place up to 2010.

Danske Bank argues that the transaction with Mazaka General Trading occurred in 2014, and most of the attacks occurred prior to that date. Danske MTD 24-25. But the Mazaka transaction is one example of a broader course of dealing, *i.e.*, a strategy by the bank to pursue USD transactions through correspondent accounts that existed for years before the Mazaka transaction. *E.g.*, ¶ 533 (p.242) (alleging that Danske Bank routed millions of USD to various Syndicate entities); ¶ 538 (p.243) (alleging that Danske Bank facilitated millions of dollars of exchanges with Mazaka); ¶ 539 (p.243) ("On information and belief, the Khanani MLO used

---

*Danske Estonia and the Shell-Company 'Factories' That Served It*, Int'l Consortium of Investigative Journalists (Sept. 21, 2020), tinyurl.com/mr7cxrr2.

Danske Bank's Laundromat to source millions of USD for al-Qaeda and the Haqqani Network."). The other transactions in this same course of dealing likewise support jurisdiction.

Indeed, even USD transactions that did not directly contribute to Syndicate violence support jurisdiction. The unstated premise of Danske Bank's argument is that a claim can only "arise out of or relate to" a defendant's contact with the United States if that contact causes the claim to occur. The Supreme Court rejected that premise in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1026 (2021). There, the Court explained that a claim can "relate to" a contact even absent causation—such as when a defendant serves a market for a product in the forum. *See id.* at 1027. Thus, when the defendant sold products in the forum, it was subject to jurisdiction in a case alleging that those products were defective even though the specific products that caused the injury had been sold elsewhere. *See id.* at 1028-29.

Under *Ford*, Danske Bank's robust business relationships with correspondent banks in the United States make it reasonable for U.S. courts to exercise jurisdiction over Danske Bank. There can be no serious dispute that access to correspondent banking services here is key to Danske Bank's overall business, including the transactions that harmed Plaintiffs. Accordingly, it is reasonable for Danske Bank to litigate claims that its conduct harmed U.S. nationals in U.S. courts.

Independently, Danske Bank's conduct was "directed at the United States because [it] knew that [its] material support would aid terrorists targeting Americans." ¶ 1090 (p.433). The attacks were designed to, and did, "cause pain and sow terror in [Plaintiffs'] home country." *Mwani v. bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005). These were not "indiscriminate" attacks that injured Americans by chance; they "were specifically targeted against [U.S.] citizens" and designed to influence U.S. policy. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 338-39

(2d Cir. 2016). Unlike in cases where personal jurisdiction has failed, then, Danske Bank supported attacks that were "indisputably aimed to kill Americans." *Estate of Klieman v. Palestinian Auth.,* 923 F.3d 1115, 1126 (D.C. Cir. 2019), *cert. granted, judgment vacated,* 140 S. Ct. 2713 (2020), *and opinion reinstated in part,* 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020). In such circumstances, effects-based jurisdiction is proper.

That result accords with Congress's finding that those who "directly or indirectly" fund terrorism "necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States." JASTA § 2(a)(6). Courts widely defer to the political branches' "national security and foreign policy" judgments, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010), and Congress here determined that defendants' support for terrorists "connects [its conduct] to the forum" in a meaningful way, *Walden v. Fiore*, 571 U.S. 277, 290 (2014); *see Livnat v. Palestinian Auth.*, 851 F.3d 45, 56 (D.C. Cir. 2017) ("congressional interests may be relevant to . . . due-process standards").

Even if the allegations of jurisdiction are insufficient, the remedy would be jurisdictional discovery to comprehensively identify which transactions Danske Bank conducted that involved Syndicate parties or counterparties and touched the United States. *See Singer v. Bank of Palestine*, 2021 WL 4205176, at *7 (E.D.N.Y. Apr. 30, 2021). In light of the clear statements in the public domain that the vast majority of Danske Bank's transactions flowed through U.S. correspondent accounts, there is more than a colorable allegation that specific jurisdiction is appropriate—and a colorable allegation is all that is necessary to order discovery.

## CONCLUSION

Danske Bank's motion to dismiss should be denied as to Danske Bank A/S.

Dated: May 13, 2022

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Ryan R. Sparacino
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*