**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

---

AUGUST WILDMAN, *et al.*,

               Plaintiffs,

     v.

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

               Defendants.

No. 1:21-CV-04400 (KAM) (RML)

---

**OPPOSITION TO THE DEUTSCHE BANK DEFENDANTS'
MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT**

Ryan R. Sparacino
Tejinder Singh
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

BACKGROUND .............................................................................................................. 1

ARGUMENT ................................................................................................................... 9

I.   The Complaint Satisfies Federal Rule of Civil Procedure 8 ................................. 9

II.  The Complaint States Claims for Aiding and Abetting Under the Justice Against
     Sponsors of Terrorism Act ................................................................................... 15

     A.  Deutsche Bank Aided Terrorists ..................................................................... 16

     B.  Deutsche Bank Was Generally Aware That It Was Playing a Role in Illegal
         Activity That Foreseeably Risked Terrorism ................................................. 20

     C.  Deutsche Bank's Assistance Was Substantial ............................................... 27

CONCLUSION ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ............................................................... *passim*

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................... 10, 13

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ........................................................................ 17

*Burke v. Dowling*,
  944 F. Supp. 1036 (E.D.N.Y. 1995) ............................................................ 9

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020), *motion to certify appeal granted*, 2020 WL
  6700121 (E.D.N.Y. Nov. 13, 2020) ............................................................ 17

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ........................................................................ 28

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ............................................................. 15, 28

*Harnage v. Lightner*,
  916 F.3d 138 (2d Cir. 2019) ........................................................................ 9

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ................................................................. *passim*

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ........................................................................ 20

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ........................................................ 10

*Kadamovas v. Stevens*,
  706 F.3d 843 (7th Cir. 2013) ........................................................................ 9

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) ............................................................... *passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) ........................................................................ 13

*N.Y. Am. Water Co., Inc. v. Dow Chem. Co.*,
  2020 WL 9427226 (E.D.N.Y. Dec. 11, 2020) .......................................... 13

*Salahuddin v. Cuomo*,
  861 F.2d 40 (2d Cir. 1988) .................................................................. 9, 14

*Smith v. Fischer*,
  2016 WL 3004670 (W.D.N.Y. May 23, 2016) ............................................ 9

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755
  (E.D.N.Y. Sept. 30, 2017) .............................................................................................. 21

*United States v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011) ........................................................................................... 24

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ............................................................................ 13

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004) ............................................................................................... 9

**Statutes**

18 U.S.C. § 1962 ..................................................................................................................... 9

18 U.S.C. § 2331(1) ............................................................................................................... 16

18 U.S.C. § 2333 ..................................................................................................................... 9

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (2016) .............................................................. *passim*

  § 2(a)(5) ........................................................................................................................... 15

  § 2(b) ............................................................................................................................... 11

**Other Authorities**

U.N. Security Council, *Letter dated 18 May 2001 from the Chairman of the Committee of
  Experts on Afghanistan Appointed Pursuant to Security Council Resolution 1333 (2000)
  Addressed to the Secretary-General* (May 18, 2001) .................................................... 22

U.N. Security Council, *Ninth Report of the Analytical Support and Sanctions Monitoring
  Team, Submitted Pursuant to Resolution 1822 (2008) Concerning Al-Qaida and the
  Taliban and Associated Individuals and Entities* (May 13, 2009) ................................. 22

U.N. Security Council, *Report of the Analytical Support and Sanctions Monitoring Team on
  Specific Cases of Cooperation Between Organized Crime Syndicates and Individuals,
  Groups, Undertakings and Entities Eligible for Listing Under Paragraph 1 of Security
  Council Resolution 2160 (2014)* (Feb. 2, 2015) ........................................................... 23

U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan* (2013) ... 23

U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan and
  United States Plan for Sustaining the Afghanistan National Security Forces* (2012) .............. 22

U.S. Dep't of State, *Country Reports on Terrorism 2015* (2016) ................................................. 22

Plaintiffs respectfully oppose Deutsche Bank Aktiengesellschaft's (Deutsche Bank AG) and Deutsche Bank Trust Company Americas's (DBTCA, and together with Deutsche Bank AG, DB) motion to dismiss the Corrected Amended Complaint (Doc. 38).[1]

## BACKGROUND

Plaintiffs are 479 individuals comprising Americans who were killed or injured by terrorist attacks in Afghanistan between 2011 and 2016, and their close family members. ¶ 1 (p.1). Plaintiffs allege, and DB does not dispute, that the attacks were committed, planned, or authorized by al-Qaeda and the Haqqani Network (the most violent part of the Taliban). ¶¶ 12, 85-87, 364-408 (pp.4, 20-21, 124-40). These designated foreign terrorist organizations (FTOs) led a Syndicate of terrorists that also included the Taliban, Lashkar-e-Taiba, and D-Company, which carried out terrorist attacks against Americans and other Coalition forces in Afghanistan. ¶¶ 89-110 (pp.21-31). The Syndicate's horrific acts of violence included suicide bombings, improvised explosive device (IED) attacks, kidnappings, and insider attacks. *E.g.*, ¶ 92 (p.22).

Al-Qaeda, the Haqqani Network, and their Syndicate allies funded these attacks through protection rackets in Afghanistan and Pakistan; drug exports; tax fraud in Europe; illicit "donations" and "taxes"; financial support from other terrorist organizations; sanctions evasion; and other criminal activity. ¶¶ 13, 128, 135-49 (pp.4, 38, 41-46). In these efforts, the Syndicate partnered with the Russian Mafia, infamous Syndicate money launderer Altaf Khanani, a network of fraud cells comprising al-Qaeda and Haqqani Network operatives, Afghan warlords notorious for their assistance to the Taliban (including its Haqqani Network), and the Islamic Revolutionary Guard Corps (IRGC) (including the IRGC's Lebanese Hezbollah Division and Qods Force), and such terrorists' fronts and affiliates. *E.g.*, ¶¶ 7-9 (pp.2-3).

---

[1] Citations to the Corrected Amended Complaint are by paragraph and page number. Citations to defendants' memorandum of law are to "DB MTD" and page number.

The Syndicate's principal financial objective was to obtain U.S. Dollars (USD), the preferred currency for terrorist recruiting, salaries, arms, mobile phones, and logistical pipelines vital to the success of the Syndicate's terrorist alliance with the IRGC against America. ¶¶ 5, 112-13, 121, 150-56 (pp.2, 32, 35-37, 46-48). To access USD, the Syndicate needed help from large multinational banks. Most banks refused, and adopted robust compliance programs to prevent terrorists from using their systems. *E.g.*, ¶ 115 (p.33). But a few banks chose to become "laundromats," *i.e.*, hubs of illicit finance. ¶¶ 609-10 (pp.260-261). As documented in a slew of authoritative sources, these banks knew that by expressing their willingness to process illicit transactions, they would attract tremendous volumes of profitable but unlawful business from money launderers, transnational criminals, and terrorists looking to raise, clean, move, and spend dirty money. ¶¶ 611-52 (pp.261-76). And a chorus of counter-terrorism experts—including former U.S. leaders in Afghanistan, undercover agents, Treasury Department officials, and learned scholars—agree that the laundromat banks made themselves complicit with terrorist violence and allowed it to flourish. ¶¶ 719-25 (pp.303-07).

DB was a global laundromat that helped terrorist agents raise and move tens of millions of dollars both before and during the attacks in this case, ¶¶ 351-53 (pp.179-80). DB's laundromat support for the Syndicate was intentional and took at least three different forms.

1. First, DB's bankers in Russia established what they internally referred to as DB's "Russian Laundromat" or "laundromat" to assist the Russian Mafia in converting rubles (many of which came from selling the Syndicate's opium) to USD without government scrutiny. *E.g.*, ¶ 779 (p.330); *see also* ¶¶ 390-408, 990-991 (pp.192-97, 398-99). The operation used "mirror trades" to convert currencies and move them across borders: a person in Russia would buy a publicly traded stock using rubles, and a related person in another country would sell the stock

shortly thereafter for USD. ¶ 355 n.281 (p.181). The USD transaction would clear through DBTCA in New York, and DB would send the dollars wherever they were needed—bypassing the scrutiny that international wire transfers require. *E.g.*, ¶ 357 (pp.181-82). A former DB banker commented that this system was "designed for criminal use" because it was "a scheme to create stashes of black cash"—which "is only needed by criminals." ¶ 739 (p.315). DB cleaned at least $20 billion in dirty cash this way. ¶ 371 (p.187). That money was critical to the opium-to-terrorism pipeline that funded the Syndicate's campaign of violence against Americans in Afghanistan. ¶¶ 215-17 (pp.71-72).

DB's Russian laundromat was devised by a DB banker in collaboration with the Russian Mafia and, Plaintiffs allege, infamous terrorist money launderer Altaf Khanani. ¶ 356 & n.283 (p.181); *see also* ¶¶ 766-75 (pp.327-29).[2] Khanani ran what the Treasury Department described as the Khanani money laundering organization (Khanani MLO), a web of companies that gathered, invested, moved, and repatriated billions of dollars for the worst criminal enterprises—including al-Qaeda and its Syndicate allies. ¶ 265 (pp.148-49). The Financial Action Task Force (FATF), an international organization to combat international money laundering, which issued guidance that banks monitored closely, ¶¶ 598, 697 (pp.256, 294), reported that Khanani's organization "provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organization." ¶ 267 (pp.149-50). Indeed,

---

[2] DB distorts the allegations about Khanani's role, arguing that the complaint only alleges on information and belief that Khanani had a connection to the laundromat. DB MTD 8 (citing ¶ 356 n.283 (p.181)). Not so. The complaint pleads verified facts that Khanani *received* at least $49 million from DB's laundromat. ¶ 396 (p.194). The allegation made "on information and belief" is that Khanani played a role in the *creation* of the laundromat. That allegation is plausible because it is plausible that "one of the world's most notorious terrorist financiers," *e.g.*, ¶ 685 (p.290), would play a role in the creation of a massive money laundering scheme by "the biggest money laundering bank in the world," ¶ 372 (p.188)—especially when that scheme was sending (at least) tens of millions of dollars his way.

Khanani was the Syndicate's principal money launderer, and was internationally infamous for his connections with Syndicate terrorists including the Haqqani family and Dawood Ibrahim. ¶¶ 253-55 (pp.142-45). His infamy began no later than 2008, when Pakistan charged him with money laundering offenses involving billions of dollars. ¶ 259 (pp.146-47). But public sources linked him to terrorism as early as 2001. ¶¶ 672-73 (pp.284-85).

The complaint details seven ways that Khanani and the Khanani MLO, assisted by DB, directly and indirectly supported Syndicate terrorist operations. ¶¶ 268-78 (pp.150-54). This included: (1) "repatriat[ing] overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans" and acting as the "global economic intelligence arm for the Syndicate"; (2) managing "every financial aspect of [the Syndicate's] coordinated transnational opium enterprise"; (3) providing "a comprehensive suite of financial services" to Syndicate entities, including but not limited to laundering, converting, moving, investing, protecting, and transferring their money; (4) paying millions of dollars in kickbacks (so-called "taxes") to both D-Company and the Haqqani Network; (5) commingling terrorist funds to provide liquidity to all Khanani MLO customers; (6) growing the Syndicate's money through investments; and (7) providing benefits of geographic, strategic, and counterparty diversification. *See id.*

Khanani also served as a financier for Sirajuddin Haqqani. ¶¶ 254, 272, 674, 687 (pp.143-45, 152, 285-86, 290-91). Sirajuddin was the Syndicate's single most important leader after 9/11 and was designated a Specially Designated Global Terrorist in 2008. ¶¶ 157, 160 (pp.48-49). By 2009, Sirajuddin simultaneously held leadership positions in al-Qaeda, the Haqqani Network, and the Quetta Shura Taliban. ¶ 159 (p.49). In these roles, he led the "Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012." ¶ 164 (p.50); *see also* ¶¶ 164-86 (pp.50-59). Money laundering transactions for Khanani

4

"supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources … relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan." ¶ 172 (p.54).

In 2013 and 2014 alone, DB's Russian laundromat enabled Khanani to obtain and repatriate at least $50 million to al-Qaeda, the Haqqani Network, and other members of the Syndicate. ¶¶ 395-96 (p.194). The true amount before and after those dates is likely to be much higher given that both Khanani's operation and DB's laundromat were multi-billion-dollar enterprises. ¶¶ 260, 394 (pp.147, 194).

2. In Europe, DB's bankers operated another laundromat out of Germany and the United Kingdom, which collaborated with al-Qaeda and Haqqani Network agents who stole millions by defrauding the Value Added Tax (VAT) system. Under DB's German laundromat scheme, sham companies used fake sales to claim fraudulent tax refunds. ¶¶ 281-82 (pp.155-56). By 2006, al-Qaeda and the Haqqani Network were training operatives to carry out VAT fraud in Europe and repatriate the money to Afghanistan (in USD) for use in terrorist attacks. ¶ 283 (p.156). Through their German laundromat, DB helped with each step of that process. *E.g.*, ¶ 410 (p.197).

DB supported two VAT fraud cells (the Azizi cell and the Ahmed cell). ¶ 287 (p.157). Samir Azizi, an Afghan national, raised millions of dollars that he repatriated to al-Qaeda and the Haqqani Network from the mid-2000s through 2015, when he was arrested. ¶¶ 288-89 (pp.157-58). Azizi appears "to have been one of the most prolific fundraisers for al-Qaeda in its history"; he raised tens of millions, if not more than $100 million, for al-Qaeda. ¶ 4 (p.2). DB helped Azizi send at least $8.5 million to al-Qaeda, the Haqqani Network, and their Syndicate allies from 2007 through 2012. ¶¶ 352, 416 (pp.179, 199). Imran Yakub Ahmed raised more than €1.15 *billion* through VAT fraud from the mid-2000s to 2010. ¶ 297 (p.161). DB helped him send at

least $10 million to these same terrorist groups. ¶ 352 (p.180).

Azizi admitted after his arrest that DB was "his willing financial partner in the Syndicate's VAT Finance Scheme." ¶ 414 (p.198). This included DBTCA in New York. ¶ 413 (p.198). Indeed, the scheme "would not have worked without the involvement of a bank," and DB's involvement was essential to give "the dealings a serious demeanor" and to "generate even more profit" by accelerating the scheme through the use of "a special Deutsche Bank program that enabled super-fast transfers" to run transactions "across multiple accounts" "[i]n just a few minutes." ¶ 415 (p.199) (emphases omitted).

Public sources—including the FATF—reported links between VAT fraud and terrorism well before the attacks in this case. ¶¶ 294, 690-99 (pp.159-60, 291-95) (public statements from the 1980s to the 2000s). DB also received direct notice of its role in VAT fraud. In 2009, a criminal investigator "marched into [DB London's] offices and told its lawyers that Deutsche had already been put on written notice that it was likely engaged in fraud and that the consequences for the continued misbehavior could be severe." ¶ 411 (p.198). DB blew off multiple warnings; its employees rationalized it to each other by explaining, "[W]e're that greedy." *Id*. In 2012, DB's offices were raided by German authorities, and seven DB bankers were later charged with crimes. ¶¶ 409 n.301, 412 (pp.197-98).

3. DB also used its laundromat to help notorious Hezbollah and Qods Force fronts from 2001 until at least 2012, causing tens of millions of USD each year to flow through illicit transactions. ¶¶ 432-34 (p.208). Iran has been designated a state sponsor of terrorism since 1984. ¶ 249 (p.85). It "carries out its support of terrorism largely through the IRGC," ¶ 250 (p.85), which has the stated mission of facilitating "terrorist attacks against the United States and Israel," ¶ 255 (p.87). Outside of Iran, the IRGC acts through its Lebanese Hezbollah Division

and Qods Force, both of which historically promote Syndicate terrorism in Afghanistan—as the U.S. government has recognized. ¶¶ 285, 290 (pp.96, 99-100); *see also* ¶¶ 298-363 (p.102-24); ¶ 334 (p.172). It has long been known that Hezbollah and the Qods Force use IRGC shell companies and fronts to raise money for violent terrorism. ¶¶ 726-735 (pp.307-13). Indeed, the U.S. government issued multiple public statements to this effect from 2007 to 2011. ¶ 735 (pp.310-13). In 2012, the government also sanctioned the National Iranian Oil Company (NIOC) and the National Iranian Tanker Company (NITC), both conduits to Hezbollah and the Qods Force. ¶¶ 338-43 (pp.173-75). Their purpose was "to raise funds and obtain weapons (including weapons components) for IRGC terrorist proxies that the IRGC supplied through its Hezbollah Division and Qods Force." ¶ 340 (p.174). DB assisted these entities.

All told, DB provided at least $59 million, and likely more than $120 million, to the Syndicate during the relevant period. ¶ 352 (p.180). That money goes a long way: "even a single transaction that recycled $2,000 in laundered funds back to al-Qaeda or the Taliban could . . . put ten fighters and a commander in the field for a month, and supply them with five IEDs." ¶ 984 (pp.395-96). The amounts, however, tell only part of the story. Another key element is that DB's reach and air of legitimacy allowed the Syndicate to secretly raise money at scale, and to repatriate that money to Afghanistan as USD. Without a large financial institution like DB willing to cooperate, the Syndicate simply could not have accessed this volume of dollars. ¶¶ 151-52, 601, 720-24, 972, 986-87 (pp.47, 257, 303-06, 392, 396-97).

Moreover, DB's conduct was clearly illegal—and the bank not only knew that, but pursued unlawful activity as a business model. To boost profits, DB sought out "damaged clients" seeking "to do deals that were too risky . . . for rival banks to stomach." ¶ 753 (pp.321) (emphasis omitted). Its bankers openly discussed the Russian laundromat operation—and

described it as such—after designing it in collaboration with criminals. *E.g.*, ¶¶ 749, 766-75, 991 (pp.320, 327-29, 398-99). Similarly, DB ignored unmistakable evidence that it was facilitating VAT fraud, ¶¶ 411, 741 (pp.198, 316), which was a known terrorist financing mechanism at the time, ¶ 294 (p.159-60).

DB's pattern of misconduct, spanning well over a decade, has been repeatedly recognized by knowledgeable observers. A well-known terrorism scholar observed that "[o]fficials at Deutsche Bank . . . were told to avoid warning signs or not to commit due diligence on what should be suspicious clients," resulting in the bank receiving "funds that are associated with terrorists" in the pursuit of "profits." ¶ 736 (p.314). A prominent German business ethicist concluded that the way DB operated was "close to a criminal organization." ¶ 369 (p.186). A renowned reporter for the *New York Times* agreed that DB operated as a "criminal enterprise," whose violations were "not the work of an isolated crew of rogue Deutsche employees," but instead condoned by top management pursuing "the single-minded purpose of maximizing immediate profits." ¶ 737 (p.314). Former DB employees concurred that "[t]here was cultural criminality" at DB, which "was structurally designed by management to allow corrupt individuals to commit fraud." ¶ 738 (p.315). Representative Maxine Waters, Chairwoman of the House Committee on Financial Services, investigated DB and concluded it was "the biggest money laundering bank in the world." ¶ 372 (p.188). DB's systematic misconduct has led to multiple enforcement actions against DB, including offices being raided by the authorities and billions of dollars in penalties. *E.g.*, ¶¶ 412, 742-43, 765 (pp.198, 316-18, 326-27). These criminal penalties would not have been exacted if DB had merely made honest mistakes; instead, they show overwhelming culpability over a period of years. In effect, "Deutsche Bank itself was a financier for al-Qaeda and the Taliban." ¶ 353 (p.180).

Based on the foregoing allegations, Plaintiffs assert claims for aiding and abetting under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, Plaintiffs allege that DB aided two distinct acts of international terrorism: (1) the attacks that injured Plaintiffs, ¶¶ 2025-33 (pp.590-91); and (2) the Syndicate's overall terrorist campaign, which violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, ¶¶ 2034-43 (pp.592-94), and led to the attacks that injured Plaintiffs.

## ARGUMENT

### I.   The Complaint Satisfies Federal Rule of Civil Procedure 8

DB argues that the complaint violates Rule 8's requirement of a short, plain statement. But dismissal under Rule 8 is an extreme measure "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *Smith v. Fischer*, 2016 WL 3004670, at *3-4 (W.D.N.Y. May 23, 2016) (holding that the law is "unambiguous" that "dismissal under Rule 8 is not warranted" merely because a complaint is lengthy; instead, dismissal is warranted only where "the complaint is so rambling that it is incomprehensible"). Under this rule, "long and involved complaints do not *per se* fail to pass the test of sufficiency under Rule 8." *Burke v. Dowling*, 944 F. Supp. 1036, 1049 (E.D.N.Y. 1995) (quotation omitted). Instead, dismissal should be denied if "courts and adverse parties can understand a claim and frame a response to it." *Id.*; *see also Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004); *Harnage v. Lightner*, 916 F.3d 138, 142 (2d Cir. 2019).

Moreover, "[b]revity must be calibrated to the number of claims and also to their character, since some require more explanation than others to establish their plausibility." *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013). Consistent with this admonition,

courts have permitted complaints similar to this one. For example, in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), the complaint resembled the one here: it was "588 pages long" and included what the court described as "unusual detail," "provid[ing] context and spell[ing] out connections relevant to the extraordinary events it describes . . . with reference to hundreds of identified sources." *Id*. at 213.[3] Similarly, in *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *1 (E.D.N.Y. Nov. 25, 2020), the court allowed a complaint including 5695 paragraphs spanning nearly 788 pages. This is not the only context in which substantial complaints have survived motions to dismiss in this circuit. *See, e.g.*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 212 (S.D.N.Y. 2003) (refusing to dismiss 326-page complaint alleging multiple claims rooted in a complex fraud).

Here, the complaint is organized according to the elements of Plaintiffs' cause of action and subdivided to allow each defendant to see the allegations most relevant to it. *Compare Atchley*, 22 F.4th at 215-16 (listing elements of aiding-and-abetting under JASTA) *with* Complaint pp.ix-xii (table of contents mirroring the elements, with sub-headings for defendant-specific allegations and sub-elements). Far from being unintelligible, these allegations are logically organized and provide fair notice to each defendant of the allegations against it.

The length of the complaint is reasonable in light of the scope, complexity, and gravity of the allegations. This case alleges one of the largest and longest-running terrorist finance schemes ever, involving hundreds of plaintiffs injured in attacks spanning a five-year period. Those attacks involved different modes of violence, which are important to understand in order to see, for example, how an attack perpetrated by the Taliban could plausibly have been planned or

---

[3] Plaintiffs' attorney Ryan R. Sparacino served (and continues to serve) as lead investigative counsel for plaintiffs in *Atchley* and co-authored the complaint in *Atchley*.

authorized by al-Qaeda. The complaint also alleges multiple, independent channels of terrorist finance and support operated by different actors over different periods of time and in different geographies. The complaint involves five defendant groups facing partially overlapping allegations—such as the fact that they all collaborated with Altaf Khanani—but also distinct, defendant-specific allegations about their conduct and scienter, which span over a decade.

The complaint also includes factual support from authoritative sources. This is necessary because corporate ATA defendants often disparage allegations of support to terrorism as speculative, conclusory, or implausible—sometimes successfully. For example, in *Atchley*, the district court dismissed the aiding and abetting claim on this basis, and the D.C. Circuit correctly reversed that decision—relying on details similar to those alleged here, which established linkages among various terrorist groups and described how terrorists convert support into violence. *See generally Atchley*, 22 F.4th 204.

DB makes three arguments under the rubric of Rule 8. First, it contends that Plaintiffs cannot connect DB "to specific attacks," nor connect DB "directly to each of the FTOs alleged to have planned, authorized, or committed those attacks." MTD 12. That, however, is not an argument about excessive length or lack of clarity; it is an argument about the level of directness required to state a claim under JASTA. The argument is addressed in greater detail below—but for now, suffice it to say that Congress was quite clear that JASTA is intended to reach anybody that has "provided material support, directly or indirectly," to terrorists. JASTA § 2(b). Here, Plaintiffs allege both direct and indirect support because some of DB's customers (*e.g.*, Altaf Khanani) were themselves Syndicate members who DB helped move money, and others (*e.g.*, the Russian Mafia) were closely tied to the Syndicate. ¶ 139 (pp.42-43). Far from showing that the complaint has unnecessary length, DB's argument only illustrates why additional allegations

to establish indirect support are necessary and appropriate in this case.

Second, DB argues that the complaint engages in group pleading by failing to differentiate particular DB entities. MTD 12-13. This also is not a basis for dismissal. The cases DB cites hold that a plaintiff cannot simply lump all of the defendants together without providing any factual basis to distinguish their actions. That is not what the complaint does. For example, with respect to the mirror trading scheme, which forms the backbone of the allegations about Altaf Khanani and the Russian Mafia, the complaint includes detailed allegations explaining how DB Moscow acted as an agent for, among others, Deutsche Bank AG and DBTCA. ¶¶ 376-88 (pp.188-91). As the complaint explains, the activities of Tim Wiswell, the banker at DB Moscow who ran the mirror trading scheme, were known to and condoned by senior management at Deutsche Bank AG. ¶¶ 829-32 (pp.344-46). Indeed, Deutsche Bank AG's senior management was involved in enabling the laundromat. ¶¶ 995-96, 1008 (pp.400, 406). For this and other reasons, Wiswell acted as an agent for Deutsche Bank AG and DBTCA. ¶¶ 766-77 (pp.327-30). Moreover, trades through the laundromat "were routinely cleared through" DBTCA. ¶ 993 (p.399). The complaint includes additional detailed allegations about DBTCA's role in the scheme. ¶¶ 1031-46 (pp.411-18). The allegations with respect to other terrorist support are similar. *E.g.*, ¶¶ 411-15, 425-28 (pp.198-99, 206-07) (entity- and employee-specific allegations relating to VAT fraud).

Against that, DB argues that the complaint also sometimes uses the defined term "Deutsche Bank New York," which includes non-defendant Deutsche Bank Securities Inc. MTD 12-13. But Deutsche Bank AG and DBTCA can still respond to those allegations as applied to them. Thus, the named defendants have notice of the claim against them, and there is no Rule 8 problem. *See N.Y. Am. Water Co., Inc. v. Dow Chem. Co.*, 2020 WL 9427226, at *4 (E.D.N.Y.

Dec. 11, 2020) (rejecting defendant's "grouping" argument when plaintiff asserted the same claim against multiple parties because the complaint provided adequate notice).

DB makes a perfunctory personal jurisdiction argument, contending that the length of the complaint somehow makes it harder to understand what conduct DB performed in the United States. But DBTCA is resident in the United States, and therefore subject to general jurisdiction here. ¶ 79 (p.19). Defendant Deutsche Bank AG is subject to specific personal jurisdiction because it had minimum contacts with the United States, and Plaintiffs' claims arise out of or relate to those contacts. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169-70 (2d Cir. 2013). In *Licci*, a terrorist support case, the defendant bank had "no operations, branches, or employees in the United States," but it routed some of the offending wire transfers through its correspondent accounts at banks in the United States. *Id*. at 165-66. The Second Circuit held that this "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs," was purposeful availment. *See id*. at 171. "Since *Licci*, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name." *Bartlett*, 2020 WL 7089448, at *5 (collecting cases). This is so even when transfers flowing through New York constitute only "a part of" the offending activity. *Licci*, 732 F.3d at 170; *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

Deutsche Bank AG's contacts with the United States are far more robust than the contacts in *Licci*. It has branches, employees, and operations in New York and elsewhere in the United States. ¶ 29 (p.8). It has steered business (including the illicit business described in the complaint) to DBTCA. ¶¶ 31-32, 1029 (pp.9, 411). Indeed, access to U.S. Dollars was essential

13

to the success of Deutsche Bank AG's laundromat and tax fraud schemes, which cleared transactions through DBTCA in New York. ¶¶ 366, 1028, 1048-49 (pp.184, 411, 419-20).

These allegations exceed the contacts that sufficed to plead specific personal jurisdiction in *Licci*—and DB does not argue otherwise. Instead, it points to certain situations in which it is not clear whether the allegations point to Deutsche Bank AG or instead to its subsidiaries—but even if the Court disregards all of those, the remaining allegations suffice. Moreover, Deutsche Bank AG set the policies and the culture for its subsidiaries, *e.g.*, ¶¶ 600, 738 (pp.256-57, 315), which followed a "One Bank" model of pursuing their goals together, ¶¶ 31-35 (pp.9-10); so it would be fair to impute the contacts of those subsidiaries to Deutsche Bank AG.

Finally, DB urges dismissal with prejudice because Plaintiffs have already had one opportunity to amend. MTD 14. But even if the Court agrees with DB that the complaint violates the "short, plain statement" requirement, dismissal would not be warranted. Instead, the correct remedy would be to strike parts of the complaint that DB shows are improper, or to permit leave to amend; it would not be dismissal (let alone with prejudice). *See Salahuddin*, 861 F.2d at 43 (allowing amendment and encouraging the district court not to dismiss the amended pleading even if it failed to comply with Rule 8, but instead to strike the improper parts).

In this regard, it bears noting that DB mischaracterizes Plaintiffs' response to this Court's admonition at the status conference. This Court urged Plaintiffs to take their obligations under Rule 8 seriously—and Plaintiffs did. Plaintiffs thus cut approximately 100 pages of material from the original complaint. Plaintiffs also heeded this Court's separate admonition to put forth all the facts that entitle them to relief. That necessitated adding new allegations, including allegations about the IRGC and its fronts (which DB and Standard Chartered Bank (SCB) assisted), as well as SCB's support for the Azizi cell (based on new evidence).

Put simply, Plaintiffs have endeavored to put forth a plausible pleading that provides fair notice to each defendant of the allegations against it. DB has not shown that the pleading is "incomprehensible," and so dismissal is unwarranted under Second Circuit precedent.

## II.   The Complaint States Claims for Aiding and Abetting Under the Justice Against Sponsors of Terrorism Act

Plaintiffs' two claims for relief assert aiding and abetting liability under JASTA, which seeks to "'[p]rovide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

JASTA adopts the liability framework set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5). The facts of that case illustrate JASTA's broad scope. In *Halberstam*, the defendant was the "banker, bookkeeper, recordkeeper, and secretary" for a burglar. 705 F.2d. at 487. She was sued for damages after the burglar murdered a homeowner during a botched burglary. *See id*. at 474. The D.C. Circuit held that she could be liable for the unplanned murder, even if she did not know about it, or even know that her partner "was committing burglaries." *Id*. at 488. Instead, "it was enough that she knew he was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in any of these enterprises." *Id*. Even though the defendant's "own acts were neutral standing alone," they gave rise to aiding-and-abetting and conspiracy liability. *Id*.

To state a claim for aiding and abetting under JASTA, a plaintiff must show: (1) that he or she was injured by an act of international terrorism that was committed, planned, or authorized by a designated FTO; (2) that the defendant "directly or indirectly" aided the party

who "performed the injury-causing act"; (3) that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable"; and (4) that the assistance was "substantial." *Honickman,* 6 F.4th at 495-96, 499.

DB does not dispute that the first element is met.[4] Its arguments about the remaining three are unpersuasive. Importantly, though, DB consistently argues as if this complaint only asserts liability based on the theory that it aided and abetted the attacks that injured Plaintiffs. That is the theory advanced in Count One of the complaint. But Count Two advances a different theory, which is that DB aided and abetted the Taliban-al-Qaeda Campaign, *i.e.*, an enterprise that al-Qaeda and its Syndicate allies conducted to expel Americans from Afghanistan through crime and anti-American violence. DB says almost nothing about this theory of liability; it addresses it in a single footnote that cites no law and simply asserts that liability is not available under this theory. DB MTD 4 n.3. That is not an argument. Violations of RICO plainly can qualify as acts of international terrorism under the statutory definition of that term, *see* 18 U.S.C. § 2331(1), and Plaintiffs explain why the specific allegations here suffice. In particular, this theory survives even if the Court agrees with DB that the support it provided was too attenuated from specific attacks—because it was not attenuated from the overall terrorist enterprise. Because DB has not argued that this theory of liability fails to state a claim, that argument is forfeited.

## A. Deutsche Bank Aided Terrorists

DB asserts that Plaintiffs' theory of aiding and abetting is that "Deutsche Bank is alleged

---

[4] DB argues in a footnote that the complaint does not specify various terrorist groups' roles in each attack. DB MTD 5 n.4. That is plainly wrong. *See* ¶¶ 82-408 (pp.20-140) (explaining each organization's role in the Syndicate, and spelling out why al-Qaeda either committed, planned, or authorized each and every attack in this case). In any event, DB does not argue that this element was not pleaded, and any such argument is accordingly forfeited.

to have provided benign financial services to intermediaries linked to other intermediaries, somehow linked to the attackers," and it argues that "[t]his attenuated chain does not satisfy *Halberstam's* first prong" because the complaint "does not allege that either Deutsche Bank Defendant provided financial services *directly* to the principal behind the Attacks." MTD 16-17 (emphasis added). DB is wrong about the law and mischaracterizes Plaintiffs' allegations.

The Second Circuit has explained that JASTA "reach[es] persons who provide support for international terrorism 'directly *or indirectly*." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021) (emphasis added) (citation omitted); *see also Atchley*, 22 F.4th at 225 ("Congress anticipated aiding-and-abetting liability of indirect funders."); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 158 (E.D.N.Y. 2020), *motion to certify appeal granted*, 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020). Nothing about this analysis requires that the intermediary be only one step removed from the attacker. Were it so, then JASTA could easily be evaded by wealthy terrorist fundraisers delivering cash through a chain of intermediaries. *Cf. Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701-02 (7th Cir. 2008) (en banc) (explaining that "donors to terrorism" should not "be able to escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations"). What matters is not the number of steps in the chain, but whether the defendant provides assistance with the requisite knowledge to satisfy JASTA's general awareness element.

Independently, DB's self-serving characterization of its conduct is wrong. There was nothing "benign" about the money laundering and tax fraud services DB provided to transnational criminals—many closely linked with the Syndicate. Indeed, when DB "helped its Syndicate customers raise, wash, and transfer tens of millions of U.S. Dollars . . . [it] assumed an active operational role in al-Qaeda and its Syndicate affiliates." ¶ 362 (p.183); *see also* ¶¶ 363-65

(pp.183-84) (explaining that DB directly participated in Syndicate terrorist financing). Thus, "Deutsche Bank affirmatively executed every key component of the Syndicate's end-to-end finance needs for two of its most important income streams." ¶ 353 (p.180).

The first stream was the Russian mirror trading scheme, which enabled the Khanani MLO and the Russian Mafia to launder dirty rubles into untraceable USD. *See supra* pp.2-5. The Khanani MLO was infamous because of Khanani's connections with prominent Syndicate terrorists including the Haqqani family and Dawood Ibrahim. ¶¶ 253-55 (pp.142-45). Any bank allowing such a customer to access money laundering services would be at least generally aware that it was engaging in activities from which terrorism was a foreseeable result.

The Russian Mafia, for example, was also obviously not an innocent customer. Knowledgeable scholars explain that "across many terrorist organizations, there is a complete fusion of terrorist and criminal activity. There is not a 'nexus' between the two worlds; they are one and the same." ¶ 139 (p.43) (cleaned up). Anybody laundering money in Russia would have known that the Russian Mafia had served for decades "as one of al-Qaeda's narcotics-related financing agents," and had maintained a "decades-long opium joint venture with most of the Syndicate." ¶ 215 (p.71). Indeed, "the FBI concluded that the Russian Mafia served as a key long-standing commercial ally of al-Qaeda and the Taliban in Afghanistan by purchasing large amounts of Afghan opium from them and then laundering the Syndicate's resulting profits as their agent, paying them back in guns and laundered money." ¶ 216 (p.71).

DB's knowledge was even more specific than that. In 2011, police raided DB Moscow's offices based on these suspicious transactions. ¶ 765 (pp.326-27). Undeterred, DB expanded its cooperation with the Russian Mafia in pursuit of greater profits. ¶¶ 765-89 (pp.326-33). Among other things, DB bankers "provided the Russian Mafia information concerning Deutsche Bank's

anti-money laundering and counter-terrorist-finance controls" in order "to enable terrorists to better conceal the millions of U.S. Dollar-denominated terrorist funds" they transferred "from New York to Syndicate-controlled accounts." ¶ 773 (p.328).

DB's second major terrorist fundraising stream was the Syndicate's VAT fraud schemes in Europe, *i.e.*, the Azizi and Ahmed cells, which had long been publicly connected to terrorism. *See supra* pp.5-6. These "illicit transactions directly aided Syndicate cells operating in the Afghanistan and Pakistan border regions." ¶ 418 (p.203). Indeed, "[t]he nexus between [DB's] conduct and terrorist attacks committed by joint Syndicate cells against Americans" was demonstrated "by documents found by British special forces in a cave on the Afghan-Pakistan border, from which the *Independent* traced the proceeds from Deutsche Bank's trades to Middle Eastern terror groups," *i.e.*, the Syndicate. ¶ 419 (pp.203-04) (quotation marks omitted). These same schemes allowed al-Qaeda and the Haqqani Network to obtain untraceable cell phones, which conferred operational advantages to Syndicate terrorists. ¶¶ 420-24 (pp.204-05). Far from being "benign," these transactions triggered police raids on DB's German offices, and seven DB employees were charged with crimes. ¶¶ 409 n.301, 425-29 (pp.197, 206-07).

These are not the only ways that DB knowingly supported terrorism. But they illustrate a core theme of the complaint, which is that DB did not offer "benign" or "routine" banking services. ¶¶ 711-13 (pp.299-301) (explaining that terrorist financing transactions cannot be regarded as routine); *see also* ¶¶ 714-16 (pp.301-02) (explaining that even routine transactions with the Syndicate's operatives aid terrorism). Instead, DB deliberately sought out risky customers—a practice that reflected the bank's culture of criminality before 2017. *See* ¶¶ 366-72 (pp.184-88); *see also* ¶¶ 719-25 (pp.303-07) (explaining that banks that participate in illicit transactions on this scale are not being tricked, but are instead striking bargains with criminals

and terrorists to move and clean dirty money in pursuit of profits); ¶¶ 736-63 (pp.314-25) (describing DB's longstanding culture of criminality and the affirmative steps it took to get into the money laundering and terrorist financing business). The resulting money laundering transfers were not attenuated from terrorist violence; they were instead one of the principal mechanisms by which the Syndicate financed its campaign of terror against Americans in Afghanistan.

**B. Deutsche Bank Was Generally Aware That It Was Playing a Role in Illegal Activity That Foreseeably Risked Terrorism**

The complaint also plausibly pleads the general awareness element, which "requires the defendant to be generally aware of its role in an *overall illegal or tortious activity* at the time that [it] provides the assistance." *Honickman*, 6 F.4th at 496. "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury," but only "of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Id*. General awareness is not an actual-knowledge standard; instead, the phrase "generally aware" connotes "something less than full, or fully focused, recognition." *Kaplan*, 999 F.3d at 863. Moreover, the inquiry is "fact-intensive," *id*. at 860, and "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation marks omitted). Courts should thus be "lenient in allowing scienter issues . . . to survive motions to dismiss"— even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 693 (2d Cir. 2009) (quotation marks omitted).

Here, Plaintiffs allege that DB knowingly engaged in systematic money laundering and tax fraud on behalf of notorious al-Qaeda and Haqqani Network financiers, agents, and operatives. The inherently criminal nature of these acts satisfies the requirement of awareness of one's role in an "overall illegal or tortious activity." Put simply, this case is on another level from cases like *Honickman* in which banks provided wire transfer services to charities affiliated

20

with terrorist groups. In those cases, the defendant banks had an argument that they were providing ordinary banking services to facially innocuous customers. Here, by contrast, DB provided highly irregular services (*e.g.*, mirror trades) to suspicious customers (*e.g.*, the Russian Mafia and Khanani). That conduct was "illegal or tortious" on its face. *Honickman*, 6 F.4th at 496. The same is obviously true with respect to schemes like VAT fraud, for which seven Deutsche Bank AG employees were charged by German prosecutors. ¶ 409 n.301 (p.197).

These allegations surpass the ones the Second Circuit blessed in *Kaplan*. There, the court held that a foreign bank could be liable for aiding and abetting Hezbollah terror attacks when it provided banking services to entities alleged to be parts of Hezbollah, including providing some of these entities with "special treatment" by exempting them from certain regulatory restrictions on wire transfers. *See* 999 F.3d at 849-50, 865-66. Here, DB did not merely waive certain transaction safeguards; it actively sought to engage in illegal activity, ¶ 353 (p.180), and in the process undermined critical safeguards at every turn, *e.g.*, ¶¶ 356, 361-64, 761-62, 773 (pp.181, 183-84, 324-25, 328).

The only question left is whether terrorist violence was a foreseeable risk of the illicit transactions DB undertook. The answer is "yes." As courts have recognized, "there is no serious dispute that money laundering and terrorism are not mutually exclusive. It has been widely acknowledged that they can go hand in hand, as one certainly can be used to fund the other." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 431 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017). The steps the U.S. government took to curb money laundering after the September 11 attacks show the clear linkage between money laundering and terrorist financing. ¶¶ 117-18, 597, 653 (pp.34-35, 255, 276-77). Expert and media sources have also long recognized the close connection between money laundering and

terrorism. *E.g.*, ¶¶ 131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78 (pp.39-40, 61-63, 78-79, 149-50, 159-60, 162-64, 257, 260-76, 394-95). Indeed, the complaint provides over 50 pages of detail explaining why "the connections between" Defendants' alleged unlawful transactions "and Syndicate violence have been well-established since well before the first attacks at issue in this case." ¶ 592 (p.253); *see also* ¶¶ 595-725 (pp.255-307) (identifying public sources published before, during, and after the attacks confirming that sophisticated banks like DB were aware that their transactions foreseeably risked terrorism).

The connection between money laundering and terrorist violence is especially strong with respect to opium profits, ¶¶ 974-75 (p.393)—which were a principal focus of DB's Russian Laundromat, ¶¶ 212-18, 356-58 (pp.70-72, 181-82). Indeed, multiple governments—including our own—have emphasized in official reports that "[d]rug trafficking in the region is *inextricably tied to terrorism*, and *drug proceeds enable this activity*" because "the illicit trafficking of opiates . . . destined for the Russian Federation and Eastern Europe was the predominant funding mechanism for *Afghan-based terrorist activity*." U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 257 (2016) (emphasis added).[5]

---

[5] *See also, e.g.*, U.N. Security Council, *Letter dated 18 May 2001 from the Chairman of the Committee of Experts on Afghanistan Appointed Pursuant to Security Council Resolution 1333 (2000) Addressed to the Secretary-General* at 11 (May 18, 2001) ("Funds raised from the production and trading of opium and heroin are *used by the Taliban to buy arms* … and to finance the training of terrorists and support the operations of extremists in neighboring countries and beyond."); U.N. Security Council, *Ninth Report of the Analytical Support and Sanctions Monitoring Team, Submitted Pursuant to Resolution 1822 (2008) Concerning Al-Qaida and the Taliban and Associated Individuals and Entities* ¶ 43 (May 13, 2009) (given "the huge amounts raised from opium production" linked to "Taliban" "involvement in the drug trade," "[t]he Security Council continue[d] to urge States to *consider this form of financing as sufficient evidence of association with the Taliban*"); U.S. Dep't of Def., *Report on Progress Toward Security and Stability in Afghanistan and United States Plan for Sustaining the Afghanistan National Security Forces* 108 (2012) ("Russia *recognizes terrorism as being closely intertwined with narcotics* trafficking."); U.S. Dep't of Def., *Report on Progress Toward Security and*

Together, these allegations are more than enough to support a plausible allegation that DB was generally aware of its role, and that terrorist violence and aiding terrorist enterprises were foreseeable consequences of the activities DB aided.

DB responds by going through the various channels of terrorist support and arguing that there wasn't enough information in public sources linking the terrorist fundraisers to terrorism. MTD 19-22. These arguments are unpersuasive for two reasons.

First, public sources are not the only way to show general awareness. *Kaplan* holds that plaintiffs can rely on public information to support an inference of awareness at the pleading stage. *See* 999 F.3d at 865. But here, the core allegation is that DB's bankers knowingly pursued "damaged clients," ¶ 753 (p.321), including money launderers, mafiosi with known ties to terrorist groups, and known terrorist financiers. *E.g.*, ¶¶ 356, 361-64 (pp.181, 183-84). DB did not need newspapers to tell it that it was breaking the law, or that its lawbreaking could foreseeably result in terrorist violence. DB knew all this because it set out to break the law. Thus, independent of any public reports, the complaint plausibly pleads general awareness.

Second, to the extent public sources are necessary, they did link DB's customers to criminality and specifically to Syndicate terrorism. For starters, DB ignores the allegations about the Russian Mafia—which public sources have long linked to terrorism, including to al-Qaeda

---

*Stability in Afghanistan* 16 (2013) ("The *convergence* of insurgent, terrorist, and criminal networks is *pervasive* … Revenue from opium trafficking continues to contribute to the insurgency … Criminal networks, insurgent groups, and corrupt government officials are *often interlinked* via multilayered connections"); U.N. Security Council, *Report of the Analytical Support and Sanctions Monitoring Team on Specific Cases of Cooperation Between Organized Crime Syndicates and Individuals, Groups, Undertakings and Entities Eligible for Listing Under Paragraph 1 of Security Council Resolution 2160 (2014)* ¶ 8 (Feb. 2, 2015) ("The Taliban have a *long-standing, close relationship with the illegal narcotics economy* in Afghanistan. … right from the start, the Taliban movement received *crucial funding* through narcotics cartels") (all emphases added).

23

and the Taliban. ¶¶ 215-17, 301-05, 311 (pp.71-72, 162-65). This allegation, coupled with the

fact that DB deliberately did business with the Russian Mafia, is independently sufficient to

satisfy the general awareness prong, yet DB says nothing about it.

DB's quibbles with the other allegations likewise fall flat. For example, it argues that the

complaint does not connect Khanani or his money laundering organization to accounts at DB.

MTD 19. But the complaint cites sources as early as 2001 identifying Khanani and his company

as suspected terrorist money launderers. ¶¶ 672-73, 683 (pp.284-85, 289). Thus, "between 2013

and 2014, the Khanani MLO, acting through Mazaka General Trading, partnered with Deutsche

Bank . . . to repatriate at least $49,787,832 from overseas accounts to its Syndicate clients

through Deutsche Bank-designed and-executed mirror trades and/or one-legged trades." ¶ 396

(p.194). The complaint thus alleges over $50 million in transactions (and likely more than $100

million) relating to accounts operated by Khanani. ¶ 392 (p.193). Moreover, DB's mirror trade

system was purpose-built for criminal capital flight; it was only useful to criminals, and any

person or entity that used it was self-identifying as such. *E.g.*, ¶ 739 (p.315).

Moreover, an inference of knowledge is permissible when others who had access to the

same information as the defendant discerned that the conduct in question was unlawful. *See*

*United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011) (holding that evidence "that others

with access to the same sources of information available to [the defendant] were able to figure

out [an unlawful] scheme" can show the defendant's guilty knowledge). Here, employees at

Standard Chartered Bank's Dubai office discerned in 2012, based on the same type of

information that was available to DB, that a Khanani front was laundering money for terrorists.

¶¶ 466-68 (pp.219-20). DB plausibly had the same awareness. Perhaps even more tellingly, the

publicly available information enabled the New York Department of Financial Services

(NYDFS) to bring an enforcement action against Deutsche Bank regarding the mirror trade scheme Khanani used. ¶ 398 (p.195). DB had access to far more data and stronger analytical tools than NYDFS—and was therefore even better placed to spot the misconduct. *Id.*

Indeed, it would not have been hard. Khanani was an infamous money launderer by 2008, when the Pakistani government charged him for siphoning billions of dollars. ¶¶ 253-54, 259, 671 (pp.142-47, 284). He was not a minor player; he was "one of the world's worst polyterrorist financers," and his organization was "the worst terrorist finance enterprise in the world." ¶ 253 (p.143). His entities employed family members who recognizably shared his last name as senior managers. ¶ 251 (p.142). And the volume of money Khanani and his MLO laundered was tremendous, *i.e.*, between $13 billion and $16 billion per year. ¶ 260 (p.147). Any bank would notice that kind of volume. *See* ¶ 829 (pp.344-45) (DB employee explaining that DB management must have known about the mirror trades because "[y]ou can't just move $10 billion offshore without someone knowing it was going on."). And given the Syndicate's focus on obtaining USD through transnational criminal conduct, the idea that anybody could launder *billions* of dollars in Pakistan and Dubai *without* any connection to terrorism is implausible on its face. For these reasons and more, Plaintiffs allege that "Khanani's relationships with his shell companies were open and notorious to the banks and money remitters that serviced the Syndicate through Khanani." ¶ 688 (p.291); *see* ¶ 671 (p.284) (alleging that "[f]rom 2008 until 2017, Defendants knew that Altaf Khanani, and nearly every other member of Khanani's family, served as financiers for al-Qaeda and its allies based upon . . . open and notorious association with the fronts used by the Khanani MLO, including but not limited to: Mazaka General Trading, Al-Zarooni Exchange, and other Khanani-owned and/or controlled entities").

Deutsche Bank also had specific notice that it was engaged in VAT fraud no later than

2009, when a financial crimes investigator repeatedly warned DB that it was engaging in tax fraud, ¶ 411 (p.198), and then in 2010 when German law enforcement raided Deutsche Bank's Frankfurt offices because of VAT fraud suspicion, prompting DB's co-CEO to take notice. ¶¶ 425-27 (pp.206-07). Public sources—including FATF, as well as other government and media sources—also linked such fraud to terrorist financing in the 2000s. ¶¶ 294, 690-99 (pp.159-60, 291-95). Evidence linking the specific cells DB financed was found in a Syndicate cave hideout in 2010. ¶ 293 (p.159). That is more than enough to plead that terrorist violence was a foreseeable consequence of VAT fraud under *Kaplan*'s permissive standard.

DB argues that it did not purchase or sell cell phones to Azizi. DB MTD 22. That is beside the point. DB facilitated VAT fraud, which enabled the Syndicate to obtain money. The cell phones were merely a red flag that the relevant transactions were, in fact, terrorism-related, because it was known that terrorists in Afghanistan had a high demand for U.S. cell phones. ¶ 420 (p.204). And the cell phones themselves facilitated terrorism. ¶¶ 421-24 (pp.204-05). Regardless of whether DB touched the cell phones, DB is liable because terrorism was a foreseeable risk of aiding VAT fraud and the fraud DB enabled caused a pipeline of cell phones to flow from the United States to Afghanistan for use by al-Qaeda and the Haqqani Network.

In response to the Hezbollah and Qods Force allegations, DB argues that providing banking services to a terrorist organization, without more, cannot satisfy JASTA's scienter requirement. MTD 21. But the Second Circuit expressly disclaimed any notion that its precedents "hold or suggest . . . that knowingly providing material support to an FTO is never sufficient to establish JASTA aiding-and-abetting liability." *Kaplan*, 999 F.3d at 861. Instead, whether such support "suffices to establish general awareness is a fact-intensive inquiry" that can be satisfied if the people supported were "closely intertwined with . . . violent terrorist

activities." *Id*. at 860. Hezbollah, the Qods Force, and the broader IRGC organization are closely intertwined with terrorist violence; indeed, promoting such violence is their *raison d'etre*. *E.g.*, ¶¶ 95, 709-10 (pp.23-24, 299); *see also Kaplan*, 999 F.3d at 860-61 (holding that corporate entities affiliated with Hezbollah were closely intertwined with violence).

Finally, DB disputes that its assistance to the al-Qaeda Hamburg cell was culpable. But it ignores the most important allegation, which is that DB continued providing financial services to an al-Qaeda cell "even after one of its members, Salim, was publicly reported to have been arrested by German authorities in order to be extradited to the United States on terrorism charges." ¶ 441 (p.210). Equally important, DB's interactions with the Hamburg cell made it aware of the risk of Syndicate terrorist fundraising and operations in Europe—but DB did not minimize that risk going forward; instead, it embraced it as a profit center.

Accepting Plaintiffs' allegations "as true," considering them together "rather than considering each in isolation," and further "accept[ing] as true all permissible inferences that could be drawn from the complaint as a whole," Plaintiffs have plausibly alleged that DB was "*generally* aware of [its] role as part of an overall illegal or tortious activity." *Kaplan*, 999 F.3d at 863, 865. This activity foreseeably risked terrorist attacks (as required for Count One), and also risked supporting the terrorist enterprise (as required for Count Two).

### C. Deutsche Bank's Assistance Was Substantial

As DB explains (MTD 23), whether the assistance it provided was "substantial" turns on six factors, weighed on a case-by-case basis. *See Kaplan*, 999 F.3d at 856 ("Plainly these factors are variables, and the absence of some need not be dispositive.") (quotation marks and citation omitted). The complaint makes allegations about five of the factors. ¶¶ 965-1030 (pp.390-411). DB addresses them only briefly. MTD 23-24.

The first factor is the nature of the act encouraged. As the Second Circuit explained, "'the

nature of the act involved dictates what aid might matter'" and thus "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [bank's] customers) would be important to the nature of the injury-causing act ([the FTO's] terrorist attacks)." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484). Here, the act assisted is terrorism, and as the D.C. Circuit has explained, "[f]inancial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley*, 22 F.4th at 222 (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021)). Moreover, when the act encouraged is so "vicious" and extraordinarily blameworthy, "even 'relatively trivial' aid could count as substantial." *Id*. (citation omitted).

Here, the support DB provided "was tailored to the specific violence at issue" because the Syndicate needed USD to finance attacks. ¶ 965 (p.390). In support, the complaint explains how the financial services DB provided were key to the Syndicate's ability to operate, with reference to informed commentary from terrorism scholars to that effect. ¶¶ 967-78 (pp.390-95).

DB argues that it did not "encourage[] any attack." DB MTD 23. The Second Circuit rejected a similar argument in *Honickman*, explaining that this factor has nothing to do with whether the bank "knowingly encouraged [the FTO's] violent activities," but instead focuses on whether there is a relationship between the assistance (money) and the underlying tort (terrorism). 6 F.4th at 500 (quotation marks omitted). The relationship between money (especially USD) and terrorism is clear, and so this factor weighs in favor of liability.

With respect to the amount of assistance, DB argues that the complaint does not "identify any assistance that the Deutsche Bank Defendants provided to any terrorist attack." DB MTD 23. Not true: Plaintiffs allege that DB facilitated illicit transactions for Sirajuddin Haqqani's personal financier Khanani, and that Sirajuddin directly participated in attacks that injured Plaintiffs, *e.g.*,

by planning the kidnapping of Plaintiff Kevin King, ¶ 1489 (p.501), by managing bombmaking sites, *e.g.*, ¶ 1103 (p.436), and by coordinating the Kabul Attack Network, *e.g.*, ¶ 1171 (p.447).

Regardless, there is no requirement to fund any attack: "if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500. And in *Atchley*, the D.C. Circuit held that this factor supports liability if the "alleged assistance was at least significant"; there is no need for the defendant to be "the top funder of a terrorist action." 22 F.4th at 222. Here, DB routed tens of millions of dollars—and likely more than $100 million—to al-Qaeda, the Haqqani Network, and their Syndicate allies over a period of years. ¶ 982 (p.395). Even small amounts of money can fund horrific violence. ¶¶ 983-84 (pp.395-96). Moreover, DB's assistance gave the terrorists the advantage of secrecy, which further contributed to violence. ¶¶ 986-87 (pp.396-97). And DB facilitated access to cell phones, which directly provided key operational support to the terrorists. ¶¶ 420-21 (p.204). That is substantial by any measure.

DB argues that it did not have a "direct relationship with any of the groups that carried out the Attacks." DB MTD 23. But Khanani—who helped establish DB's mirror trading scheme, and made prolific use of it—was himself a member of the Syndicate, ¶ 255-56 (p.145). The same was true of VAT fraudsters Azizi and Ahmed. ¶ 287 (p.157). Regardless, "a direct relationship between the defendant and the FTO is not required to satisfy this factor." *Honickman*, 6 F.4th at 501. Here, DB dealt directly with criminals known to be associated with terrorism, actively catered to their illegal desires, and protected them from regulatory scrutiny. Indeed, DB "affirmatively helped its criminal customers set up their own bespoke terrorist finance/money laundering facilities, such as Deutsche Bank's Russian Laundromat." ¶ 1018 (p.409). That

29

relationship is close enough to support liability under *Honickman*.

Finally, DB says nothing about two of the factors pleaded in the complaint: duration of assistance and state of mind. Both factors support liability. In *Atchley*, the court held that "four years is a significant duration." 22 F.4th at 224. Here, DB provided assistance "for more than a decade." ¶ 1020 (p.409). The state of mind component "is satisfied if the defendant knowingly— and not innocently or inadvertently—gave assistance." *Honickman*, 6 F.4th at 499-500 (quotation omitted). The D.C. Circuit agrees that no specific intent is required under this factor. *See Atchley*, 22 F.4th at 223. Thus, aiding-and-abetting liability reaches actors who "seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Id*. at 224. Here, Plaintiffs allege that DB had a culpable mental state, stemming from a culture of criminality that pervaded the bank and its top management. *See, e.g.*, ¶¶ 990-1009 (pp.398-407).

Considering the six factors together, the assistance DB provided was substantial.

## CONCLUSION

The Deutsche Bank defendants' motion to dismiss should be denied.

Dated:  May 13, 2022

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Ryan R. Sparacino
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*
