**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, *et al.*,

               Plaintiffs,

     v.

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

               Defendants.

No. 1:21-CV-04400 (KAM) (RML)

**OPPOSITION TO PLACID EXPRESS'S
<u>MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT</u>**

Ryan R. Sparacino
Tejinder Singh
Eli J. Kay-Oliphant
Sᴘᴀʀᴀᴄɪɴᴏ PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 5

    I.    The Complaint Satisfies Federal Rule of Civil Procedure 8 ................................................ 5

    II.    The Complaint States Claims for Aiding and Abetting Under the Justice Against
          Sponsors of Terrorism Act ..................................................................................................... 9

          A.  Placid Express Was Generally Aware That It Was Playing a Role in Illegal
              Activity That Foreseeably Risked Terrorism ............................................................... 10

          B.  Placid Express Provided Substantial Assistance ......................................................... 17

          C.  Placid Express's Proximate Causation Argument Is Meritless ................................... 21

          D.  Designated Terrorist Organizations Committed, Planned, or Authorized the
              Attacks That Injured Plaintiffs .................................................................................... 23

CONCLUSION ...................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) .......................................................................... *passim*

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ............................................................ 7

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ........................................................................... 23

*Burke v. Dowling*,
  944 F. Supp. 1036 (E.D.N.Y. 1995) ..................................................................... 6

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020), *motion to certify appeal granted*, 2020 WL
  6700121 (E.D.N.Y. Nov. 13, 2020) ..................................................................... 16

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ............................................................................ 18

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) .......................................................................... *passim*

*Harnage v. Lightner*,
  916 F.3d 138 (2d Cir. 2019) ............................................................................. 6

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ....................................................................................... 23

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ............................................................................. *passim*

*In re Chiquita Brands Int'l, Inc.*,
  284 F. Supp. 3d 1284 (S.D. Fla. 2018) .................................................................. 19

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) ............................................................................ 11

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................... 7

*In re Platinum-Beechwood Litig.*,
  453 F. Supp. 3d 645 (S.D.N.Y. 2020) ................................................................... 22

*Kadamovas v. Stevens*,
  706 F.3d 843 (7th Cir. 2013) ............................................................................ 6

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) ........................................................................... *passim*

*Karlinsky v. N.Y. Racing Ass'n*,
  52 F.R.D. 40 (S.D.N.Y.1971) ............................................................................ 6

*Linde v. Arab Bank PLC*,
   882 F.3d 314 (2d Cir. 2018) ............................................................................ 21, 22

*Riles v. Semple*,
   763 F. App'x 32 (2d Cir. 2019) ................................................................................. 6

*Salahuddin v. Cuomo*,
   861 F.2d 40 (2d Cir. 1988) ....................................................................................... 5

*Siegel v. HSBC N. Am. Holdings, Inc.*,
   933 F.3d 217 (2d Cir. 2019) .................................................................................... 20

*Smith v. Fischer*,
   2016 WL 3004670 (W.D.N.Y. May 23, 2016) ......................................................... 5

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018) .................................................................................... 22

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755
   (E.D.N.Y. Sept. 30, 2017)........................................................................................ 16

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011) ............................................................................... 11, 12

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) .................................................................................... 11

*Wynder v. McMahon*,
   360 F.3d 73 (2d Cir. 2004) ....................................................................................... 6

**Statutes**

18 U.S.C. § 1962 ............................................................................................................. 5

18 U.S.C. § 2333 ............................................................................................................. 5

Justice Against Sponsors of Terrorism Act,
   Pub. L. No. 114-222, 130 Stat. 852 (2016)................................................... *passim*

   § 2(a)(5) ............................................................................................................... 9, 22

   § 2(b)................................................................................................................... 9, 22

Plaintiffs respectfully oppose Placid Express's motion to dismiss the Corrected Amended Complaint (Doc. 38).[1]

## BACKGROUND

Plaintiffs are 479 individuals comprising Americans who were killed or injured by terrorist attacks in Afghanistan between 2011 and 2016, and their close family members. ¶ 1 (p.1). The attacks were committed, planned, or authorized by al-Qaeda and the Haqqani Network (the most violent part of the Taliban). ¶¶ 12, 85-87, 364-408 (pp.4, 20-21, 124-40). These designated foreign terrorist organizations (FTOs) led a Syndicate of terrorists that also included the Taliban, Lashkar-e-Taiba, and D-Company, which carried out terrorist attacks against Americans and other Coalition forces in Afghanistan. ¶¶ 89-110 (pp.21-31). The Syndicate's horrific acts of violence included suicide bombings, improvised explosive device (IED) attacks (almost always involving fertilizer bombs), kidnappings, and insider attacks. *E.g.*, ¶ 92 (p.22).

Al-Qaeda, the Haqqani Network, and their Syndicate allies funded these attacks through protection rackets in Afghanistan and Pakistan; drug exports; tax fraud in Europe; illicit "donations" and "taxes" collected by al-Qaeda and Haqqani Network terrorists amongst Afghanistan's and Pakistan's diaspora in Europe, the Middle East, and Asia; robust financial support from the Syndicate's ally and sponsor, Iran's Islamic Revolutionary Guard Corps (IRGC); sanctions evasion; and other criminal activity. ¶¶ 13, 128, 135-49 (pp.4, 38, 41-46).

The Syndicate's principal financial objective was to obtain large amounts of U.S. dollars (USD), the preferred currency for terrorist finance, that it could use in Pakistan and Afghanistan to pay for terrorist recruiting, salaries, arms, mobile phones, and logistical pipelines vital to the success of the Syndicate's terrorist alliance with the IRGC against America in Afghanistan. ¶¶ 5,

---

[1] Citations to the Corrected Amended Complaint are by paragraph and page number. Citations to defendant's memorandum of law are to "Placid MTD" and page number.

112-13, 121, 150-56 (pp.2, 32, 35-37, 46-48). To access USD, the Syndicate needed the help of large, international financial institutions. Most banks categorically refused to participate in such efforts, adopting broad and robust compliance programs that prevented terrorists from using their systems. *E.g.*, ¶ 115 (p.33). But a handful of institutions chose to become "laundromats," *i.e.*, hubs of illicit finance. ¶¶ 609-10 (pp.260-61). As documented by a slew of authoritative sources—including statements from governments, bankers, and experts—these institutions knew that by expressing their willingness to process illicit transactions, they would attract tremendous volumes of profitable but unlawful business from money launderers, transnational criminals, and terrorists looking to raise, clean, move, and spend dirty money. ¶¶ 611-52 (pp.261-76). And a chorus of counter-terrorism experts—including former U.S. leaders in Afghanistan, undercover agents, Treasury Department officials, and learned scholars—have explained that by playing this role, the laundromats made themselves complicit with terrorist violence and allowed it to flourish. ¶¶ 719-25 (pp.303-07).

One key figure in the Syndicate's efforts was Altaf Khanani. Khanani was a member of the Syndicate and its principal money launderer. He was internationally infamous for his connections with prominent Syndicate terrorists including Sirajuddin Haqqani and Dawood Ibrahim. ¶¶ 253-54 (pp.142-45). His organization began laundering money in Pakistan in 2001, and in 2008 the Pakistani government charged him with money laundering offenses involving billions of dollars. ¶ 259 (p.146). At that point, Khanani fled to Dubai where he created the next iteration of his transnational money laundering operation, ¶ 259 (pp.146-47), "launder[ing] between $13 billion and $16 billion per year," ¶ 260 (p.147).  In 2015, the U.S. Treasury Department sanctioned Khanani and his organization, finding them to be involved in the movement of funds for the Taliban, and noting Khanani's relationships with multiple Syndicate

organizations including al-Qaeda, Lashkar-e-Taiba, Jaish-e-Mohammed, and D-Company. ¶ 265 (p.148). The Financial Action Task Force (the preeminent global organization to combat international money laundering, which issued critically important guidance and rules, ¶¶ 598, 697 (pp.256, 294), likewise reported that Khanani's organization "provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organization." ¶ 267 (pp.149-50).

After moving to Dubai, Khanani used a web of companies, including Al Zarooni Exchange, to launder at least hundreds of millions of dollars annually for the Syndicate. ¶ 250 (p.142). His family members (most of whom shared his last name) were active participants in these companies and in his money laundering organization (the Khanani MLO). ¶ 251 (p.142). These transactions allowed the Syndicate to convert the money it raised through criminal enterprises into USD, and to repatriate those funds to the Syndicate in Pakistan and Afghanistan where it funded violence against Americans. ¶¶ 215-17 (pp.71-72).

The complaint details seven different ways that Khanani and the Khanani MLO directly and indirectly supported Syndicate terrorist operations. ¶¶ 268-78 (pp.150-54). These included: (1) "repatriat[ing] overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans" and acting as the "global economic intelligence arm for the Syndicate"; (2) managing "every financial aspect of [the Syndicate's] coordinated transnational opium enterprise"; (3) providing "a comprehensive suite of financial services" to Syndicate entities, including but not limited to laundering, converting, moving, investing, protecting, and transferring their money; (4) paying millions of dollars in kickbacks (so-called "taxes") to both D-Company and the Haqqani Network; (5) commingling terrorist funds to provide liquidity to all Khanani MLO customers; (6) growing the Syndicate's money through investments; and (7)

providing benefits of geographic, strategic, and counterparty diversification. *See id*.

Khanani also served as a financier for Sirajuddin Haqqani. ¶¶ 254, 272, 674, 687 (pp.143-45, 152, 285-86, 290-91). Sirajuddin was the Syndicate's most important leader after 9/11, ¶ 157 (pp.48-49), and was designated a Specially Designated Global Terrorist in 2008 for "acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States," ¶ 160 (p.49). Sirajuddin simultaneously held leadership positions in al-Qaeda, the Haqqani Network, and the Quetta Shura Taliban. ¶ 159 (p.49). In these roles, he led the "Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012." ¶ 164 (p.50); *see also* ¶¶ 164-86 (pp.50-59) (providing details of Sirajuddin's central role in the Syndicate's criminal and terrorist activities, including the types of attacks at issue in this case). Money laundering transactions for Altaf Khanani "supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources . . . relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan." ¶ 172 (p.54).

Plaintiffs allege that Placid Express enabled Khanani's Syndicate-related money laundering activities by acting as a money remitter for him and his organization. This allegation is based on public records disclosing a web of relationships between the Khanani MLO and Placid Express. For example, Al Zarooni Exchange, one of Khanani's principal money laundering vehicles for the Syndicate, claimed a relationship with Placid Express in its business listings. ¶ 564 (p.248). Another entity previously owned by Alfaf Khanani's brother, Javed, was called Prime Currency Exchange; it transmitted funds to Pakistan first through KKI (Khanani's company from 2001 to 2008, and a part of the Khanani MLO, ¶ 250 (p.142)), and then through Placid Express (starting in 2009 after KKI faced criminal charges in Pakistan). *See* ¶ 565 (p.248).

The amounts remitted by Prime Currency through Placid Express and others exceeded $100 million from 2009 to 2013. *Id.* Placid Express also has a partner company called Placid Express Middle East LLC, which likewise has suspicious ties to the Khanani MLO: it shares multiple phone numbers with one of the Khanani MLO companies that has been sanctioned by the U.S. government. ¶ 566 (p.249). Plaintiffs further allege that "[d]iscovery will likely reveal significant additional relationships between Placid Express and Khanani, the Khanani MLO, and the Syndicate." ¶ 571 (p.249).

Based on Placid Express's knowing provision of substantial assistance to the Syndicate through Khanani, Plaintiffs allege that it aided and abetted the Syndicate's acts of international terrorism, and is liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act, (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, Plaintiffs allege that Placid Express aided two distinct acts of international terrorism: (1) the attacks that injured Plaintiffs, ¶¶ 2025-33 (pp.590-91); and (2) the Syndicate's overall terrorist campaign, which violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, ¶¶ 2034-43 (pp.592-94), and led to the attacks that injured Plaintiffs.

## ARGUMENT

### I.    The Complaint Satisfies Federal Rule of Civil Procedure 8

Placid Express argues that the complaint violates Rule 8's requirement of a short, plain statement. Placid MTD 2, 5. The standard for granting such relief is demanding. Dismissal under Rule 8 is an extreme measure "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *Smith v. Fischer*, 2016 WL 3004670, at *3-4 (W.D.N.Y. May 23, 2016) (holding that "[t]he law is . . . unambiguous" that

"dismissal under Rule 8 is not warranted" merely because a complaint is lengthy; instead, dismissal is warranted only where "the complaint is so rambling that it is incomprehensible").

Under this rule, "long and involved complaints do not *per se* fail to pass the test of sufficiency under Rule 8." *Burke v. Dowling*, 944 F. Supp. 1036, 1049 (E.D.N.Y. 1995) (quoting *Karlinsky v. N.Y. Racing Ass'n*, 52 F.R.D. 40, 43 (S.D.N.Y.1971)). Instead, dismissal should be denied if "courts and adverse parties can understand a claim and frame a response to it." *Id.*; *see also Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) (refusing to dismiss a lengthy complaint because "plaintiff's long submission does not overwhelm the defendant's ability to understand or to mount a defense"); *Harnage v. Lightner*, 916 F.3d 138, 142 (2d Cir. 2019) (reversing Rule 8 dismissal for similar reasons); *Riles v. Semple*, 763 F. App'x 32, 34 (2d Cir. 2019) (same).

Moreover, "[b]revity must be calibrated to the number of claims and also to their character, since some require more explanation than others to establish their plausibility—and the Supreme Court requires that a complaint establish the plausibility of its claims." *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013). Consistent with this admonition, courts have permitted complaints similar to this one to survive the pleading stage. For example, in *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), the D.C. Circuit recently held that the plaintiffs' Third Amended Complaint survived a motion to dismiss. The complaint there resembled the one here: it was "588 pages long" and included what the court described as "unusual detail," "provid[ing] context and spell[ing] out connections relevant to the extraordinary events it describes . . . with reference to hundreds of identified sources." *Id.* at

213.[2] Similarly, in *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *1 (E.D.N.Y. Nov. 25, 2020), the court denied in pertinent part a motion to dismiss a complaint including 5695 paragraphs spanning nearly 788 pages. This is not the only context in which substantial complaints have survived motions to dismiss in this circuit. *See, e.g.*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 212 (S.D.N.Y. 2003) (refusing to dismiss 326-page complaint alleging multiple claims rooted in a complex fraud).

To be fair to Placid Express, the allegations against it are narrower than the allegations against the bank defendants in this case—and a stand-alone complaint against it would have been shorter. But that does not make the complaint incomprehensible. Instead, the complaint is organized according to the elements of Plaintiffs' cause of action and subdivided to allow each defendant group, including Placid Express, to see the allegations most relevant to it. *Compare Atchley*, 22 F.4th at 215-16 (listing elements of aiding-and-abetting cause of action under JASTA) *with* Complaint pp.ix-xii (table of contents mirroring the elements, with sub-headings for defendant-specific allegations and sub-elements). Far from being unintelligible, these allegations map logically onto the relevant cause of action and provide fair notice to each defendant of the allegations against it. Placid Express thus knows that its alleged liability is based on the assistance it provided to the Khanani MLO.

The length of the complaint is also reasonable in light of the scope, complexity, and gravity of the allegations. The complaint alleges one of the largest and longest-running terrorist finance schemes ever. It involves hundreds of plaintiffs who suffered horrific injuries in a plethora of terrorist attacks that took place over a five-year period. Those attacks involved

---

[2] Plaintiffs' attorney Ryan R. Sparacino served (and continues to serve) as lead investigative counsel for plaintiffs in *Atchley* and co-authored the complaint in *Atchley*.

different modes of violence, each of which is important to understand in order to see, for example, how an attack perpetrated by the Taliban could plausibly have been planned or authorized by al-Qaeda. The complaint also alleges multiple, independent channels of terrorist finance and support operated by different actors over different periods of time and in Russia, Germany, Cyprus, Iran, the U.A.E., Estonia, the United Kingdom, the United States, and other jurisdictions. The complaint involves five defendant groups facing partially overlapping allegations—such as the fact that they all collaborated with Altaf Khanani—but also distinct, defendant-specific allegations about their conduct and scienter, which span over a decade.

To plausibly allege all of this, the complaint includes robust factual support from authoritative sources. This is necessary because it is commonplace in ATA actions for defendants accused of wrongdoing to argue that allegations that they aided terrorists are speculative, conclusory, or implausible—and sadly, courts frequently credit those arguments. For example, in *Atchley*, the district court dismissed the aiding and abetting claim, reasoning (1) that the plaintiffs had not shown that an FTO had committed, planned, or authorized the attacks; (2) that the plaintiffs had not shown that the intermediaries to which they provided support were sufficiently connected to the terrorists; and (3) that the support was not substantial. *See Atchley*, 474 F.Supp.3d at 212-13. The D.C. Circuit correctly reversed that decision—and in the process relied on details similar to those alleged here, which established linkages among various terrorist groups and described how terrorists convert support into violence. *See generally Atchley*, 22 F.4th 204.

Placid Express also chides Plaintiffs for not modifying the complaint in response to this Court's instructions at the status conference. Placid MTD 2. That is unfair. This Court urged Plaintiffs to take their obligations under Rule 8 seriously—and Plaintiffs did. Plaintiffs thus cut

approximately 100 pages of material from the prior version of their complaint. Plaintiffs also heeded this Court's separate admonition that they put forth all of the facts that entitle them to relief. That necessitated adding new allegations. Most of these relate to the IRGC (a new channel of terrorist support). Others relate to Standard Chartered Bank's support for the Azizi cell (a fact that became apparent only after Plaintiffs found the Final Azizi Memo, which they did not have when they filed the original complaint).

Plaintiffs have endeavored to put forth a pleading that is comprehensive and plausible, and that provides fair notice to each defendant of the allegations against it. Placid Express has not shown that the pleading is "incomprehensible," and so dismissal is unwarranted under the Second Circuit's binding precedents. At the absolute most, the Court should require an amendment if any aspect of the complaint is deficient.

## II. The Complaint States Claims for Aiding and Abetting Under the Justice Against Sponsors of Terrorism Act

Plaintiffs' claims for relief assert aiding and abetting liability under JASTA, which seeks to "'[p]rovide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

JASTA adopts the framework for liability set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5). The facts of that case illustrate JASTA's broad scope. In *Halberstam*, the defendant was the "banker, bookkeeper, recordkeeper, and secretary" for a burglar. *Id*. at 487. She was sued for damages after the burglar murdered a victim during a botched burglary. *See id*. at 474. The D.C. Circuit held that she could be liable for the unplanned

murder, even if she did not know about it, or even know that her partner "was committing burglaries." *Id*. at 488. Instead, "it was enough that she knew he was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in any of these enterprises." *Id*. Even though the defendant's "own acts were neutral standing alone," they gave rise to liability under both aiding and abetting and conspiracy theories. *Id*.

To state a claim for aiding and abetting under JASTA, a plaintiff must show: (1) that she was injured by an act of international terrorism that was committed, planned, or authorized by a designated FTO; (2) that the defendant "directly or indirectly aided" the party who "performed the injury-causing act"; (3) that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable"; and (4) that the defendant's assistance was "substantial." *Honickman*, 6 F.4th at 495-96, 499. Plaintiffs address the elements in the same order as Placid Express's motion.

### A. Placid Express Was Generally Aware That It Was Playing a Role in Illegal Activity That Foreseeably Risked Terrorism

The complaint plausibly pleads the general awareness element, which "requires the defendant to be 'generally aware' of its role in 'an *overall illegal or tortious activity*' at the time that [it] provides the assistance.'" *Honickman*, 6 F.4th at 496 (quoting *Halberstam*, 705 F.2d at 477) (emphasis added). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Id.* General awareness is also not an actual-knowledge standard; instead, the phrase connotes "something less than full, or fully focused, recognition," and is "less demanding than a requirement that [plaintiffs] show awareness." *Kaplan*, 999 F.3d at 863.

In evaluating general awareness allegations, the court must "consider all of the

complaint's allegations, rather than considering each in isolation, and . . . accept as true all permissible inferences that could be drawn from the complaint as a whole." *Kaplan*, 999 F.3d at 865. The inquiry is "fact-intensive," *id.* at 860, and "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation marks omitted), so controlling law requires courts to be "lenient in allowing scienter issues . . . to survive motions to dismiss"—even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 693 (2d Cir. 2009) (quotation marks omitted); *see also Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) (applying this lenient standard in a terrorism case).

Placid Express argues that the complaint does not plead general awareness because it does not show that Placid Express knew of its customers' relationships to terrorist organizations. Placid MTD 7-8. In support, Placid Express argues that the complaint does not cite any public articles connecting Al Zarooni Exchange and Prime Currency Limited to terrorists prior to Al Zarooni Exchange's designation in 2015.

Placid Express is wrong to focus narrowly on public sources. Such sources are *one way* to show a defendant's awareness—because when public sources say something, it is plausible that defendants also know it. *See Kaplan*, 999 F.3d at 865; *Honickman*, 6 F.4th at 501. But they are by no means the only way. When a defendant has access to information about its customers and their transactions that shows a connection to unlawful activity or terrorism, such information can support a plausible inference of the defendant's awareness even if it is not public. Moreover, evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" has been used to prove a defendant's guilty knowledge at trial. *United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011). If such evidence is sufficient to support a finding of guilty knowledge at trial, it surely can support a

plausible allegation of general awareness at the pleading stage.[3]

Here, the allegations of awareness against Placid Express do not depend principally on public sources. They instead turn on information that Placid Express had by virtue of its close relationships with multiple Khanani entities—and also on the fact that Khanani's transactions were inherently suspicious, and detectable as such, to vigilant financial institutions.

With respect to the relationships, Khanani was a known international money launderer operating through multiple affiliates including Al Zarooni Exchange. *E.g.*, ¶¶ 250, 260 (pp.142, 147). Placid Express was an international payments firm that had relationships with those affiliates and remitted substantial funds for Prime Currency to Pakistan, ¶¶ 564-65 (p.248), a hothouse for anti-American terrorism, ¶¶ 196-97 (pp.63-64). Prime Currency was previously

---

[3] In *Kozeny*, the government charged a defendant with violating the Foreign Corrupt Practices Act by attempting to bribe foreign officials to obtain access to an investment. *See* 667 F.3d at 126. With respect to scienter, the government pursued the theory of "conscious avoidance," which holds "that a defendant had culpable knowledge of a fact when the evidence shows that the defendant intentionally avoided confirming the fact." *Id*. at 132 (quotation marks omitted). Conscious avoidance is tantamount to actual knowledge. *See id.* To show conscious avoidance, the government introduced evidence that "others with access to the same sources of information available to" the defendant "were able to figure out [the] scheme and avoid participating." *See id*. at 134. The Second Circuit held that this evidence was appropriate to show that the defendant knew that something illegal was likely occurring, but asked his attorneys to avoid learning more, thus making out a case of conscious avoidance. *See id.* at 135. Importantly, the Second Circuit did not hold that the third parties actually had the same information as the defendant; instead, it held only that they had access to the same sources of information. *See id.* at 134-35.

*Kozeny* is persuasive here because the charge of conscious avoidance is harder to prove than JASTA general awareness—which does not require a deliberate effort to avoid learning the truth, but instead only requires a loose understanding that illegal activity was afoot (effectively, the first half of the conscious avoidance inquiry).

Here, plaintiffs allege that all sophisticated financial institutions have advanced due diligence methods that will enable them to identify illicit transactions based on simple information about their customers and their transactions. ¶¶ 655-63 (pp.277-81). In 2012 and 2013, Standard Chartered Bank used these tools to determine that it had processed transactions for a Khanani front, and to further determine that these transactions were used to support terrorist activities. ¶ 466 (pp.219-20). Under *Kozeny*, it is a plausible inference that if one sophisticated financial institution can spot such criminality based on the routine data available to it, others can, too.

owned by Javed Khanani, and it routed transactions through known Khanani front KKI before shifting to Placid Express. ¶ 565 (p.248). Also, Placid Express's Middle Eastern office "shares multiple phone numbers with a U.S.-sanctioned company directly owned by multiple Khanani family members," ¶ 566 (p.249),[4] a connection suggesting that Placid Express and the Khanani MLO entity were either the same exact people, or at least working together in the same space. Either way, it is reasonable to infer from that identical contact information that Placid Express had a close and familiar relationship with the Khanani MLO.

Could this thick web of connections be innocent or coincidental? It's possible, and Placid Express will have every opportunity to argue as much at trial. But for purposes of the pleading stage, these connections, taken together, "rather than consider[ed] each in isolation," support a "permissible inference[]" that Placid Express knew it was dealing with the Khanani MLO through members of the Khanani family; indeed, they support an inference that Placid Express was colluding with or working alongside the Khananis. *See Kaplan*, 999 F.3d at 865. And public sources had expressly linked the Khanani family to money laundering and terrorism since 2001. *See* ¶¶ 672-73 (pp.284-85) (citing four articles published from 2001 to 2008 reporting suspicions about Khanani and KKI); ¶ 683 (p.289) (later-published article recounting that Khanani "had long been suspected of ties to terrorist groups, with investigations . . . as long ago as 2003"). Yet Placid Express did business with the Khanani MLO anyway. Those facts plausibly support

---

[4] Placid Express nitpicks this allegation, arguing that because the Khanani entity that shares a phone number with Placid Express Middle East is "unnamed," the allegation is somehow implausible. Placid MTD 9. That makes no sense because having the same contact information as any Khanani MLO entity (whatever its name) is enough to set forth a plausible allegation of close ties. In any event, although the entity is not identified in this paragraph of the complaint, it is named in the publicly available document the complaint cites (which Placid Express calls the *2018 Sandcastles Report*), and so Placid Express had notice of the allegation. For the avoidance of doubt, the company is Kay Zone General Trading LLC, identified in the complaint as a Khanani front at ¶ 250 (p.142).

allegations of general awareness. ¶¶ 567, 931-34, 940-43 (pp.249, 385-86).

The transactions that Al Zarooni and other Khanani entities undertook with Placid Express were likewise suspicious. ¶¶ 937, 945 (pp.385, 387). First, all of Khanani's international transactions through companies like Al Zarooni were, in fact, for money laundering; none were legitimate. ¶¶ 681-82, 689 (pp.288-89, 291). Placid Express plausibly knew this. The clearest illustration is that employees at Standard Chartered Bank reviewing Al Zarooni transactions were able to discern that entity's connection to Khanani, money laundering, and terrorism in 2012 and 2013. *See* ¶¶ 466-67 (pp.219-20). Here, Placid Express was exposed to substantially similar information as bankers at Standard Chartered—*i.e.*, details of Al Zarooni's accounts and transactions, and about Al Zarooni itself through its customer diligence processes—and so it is a fair inference under *Kozeny* that Placid Express reached the same conclusions. *See supra* n.3.

Khanani was also "closely intertwined" with violent attacks by al-Qaeda, the Haqqani Network, and their Syndicate allies against Americans in Afghanistan. ¶ 941 (p.386). In *Kaplan*, the Second Circuit found this standard satisfied with respect to bank customers who were alleged to be constituent parts of Hezbollah. *See* 999 F.3d at 860. The customers were Bayt al-Mal, a "bank, creditor, and investment arm" for Hezbollah; Yousser Company, which was used "to secure loans and finance business deals" for Hezbollah companies; and Shahid Martyrs Foundation, which provided financial support to wounded Hezbollah terrorists and their families. *See id*. at 849. Khanani played a role vis-à-vis al-Qaeda, the Haqqani Network, D-Company, and other Syndicate allies that was like—but even more culpable than—the roles Bayt al-Mal and Yousser Company played vis-à-vis Hezbollah. As noted above, Khanani's organization assisted the Syndicate in seven different ways, including by acting as its "global economic intelligence arm," managing "every financial aspect of [its] coordinated transnational opium enterprise," and

14

"provid[ing] a comprehensive suite of financial services." ¶¶ 268-78 (pp.150-54). On top of that, Khanani was an internationally infamous money launderer by 2008 when the Pakistani government charged him. ¶¶ 253-54, 259, 671 (pp.142-47, 284). He was "one of the world's worst polyterrorist financers," and his organization was "the worst terrorist finance enterprise in the world." ¶ 253 (p.143).

The public sources discussed above bear this out. The first, from *USA Today* in 2001, connected Khanani's former company, KKI, to al-Qaeda and Taliban financing; the second, from the *New York Times* in 2003, reported that KKI was being investigated on suspicion of having transferred money to militant groups like al-Qaeda; the third, from *The Nation (Pakistan)* in 2008 reported that Khanani had been arrested on suspicion of money laundering, and said in the same paragraph that "[b]omb blasts can be stopped if the illegal business of" money laundering is stopped; and the fourth, from *Ummat* in Pakistan reported that "American officials are keeping an eye on . . . Khanani" because "American officials suspected that foreign money changers companies may have provided money to extremist militant groups." ¶¶ 672-73 (pp.284-85). These sources drew a straight line from Khanani to violent terrorism.

The complaint also includes additional allegations explaining how money laundering is linked to terrorism. The steps that the U.S. government took to curb money laundering after the September 11 attacks show the clear linkage between money laundering and terrorist financing. ¶¶ 117-18, 597-608 (pp.34-35, 255-60). Educated commentary likewise highlights the close connection between money laundering and terrorism finance. *E.g.*, ¶¶ 131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78 (pp.39-40, 61-63, 78-79, 149-50, 159-60, 162-64, 257, 260-76, 394-95). And case law similarly holds that "money laundering and terrorism . . . can go hand in hand, as one certainly can be used to fund the other." *Strauss v. Credit Lyonnais, S.A.*,

925 F. Supp. 2d 414, 431 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017).

Placid Express argues that because the complaint alleges that Al Zarooni was a "front," that undermines the allegation that Placid Express was generally aware of what it was doing. Placid MTD 11. That might make sense if the argument were based solely on public sources—but the key point here is that Placid Express was on the *inside* of the front: it had relationships with multiple Khanani entities over a period of years, and visibility into private money laundering transactions that gave it access to information that was not publicly available. However Al Zarooni may have looked to the general public, Placid Express knew better.

Placid Express argues that the complaint is short on details regarding specific transactions. But such details are not required to establish plausibility at the pleading stage. Indeed, it is unreasonable to expect the victims of terror attacks to possess information that resides only in a defendant's own records. *See Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 156 (E.D.N.Y. 2020) ("As a practical matter—absent discovery— terrorist victims and their families understandably do not have conclusive evidence that bank officials or compliance staff had actual knowledge of various red flags that could have apprised them of their customer's nefarious activities."), *motion to certify appeal granted*, 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020). Here, the web of connections between Placid Express and Khanani entities, and the inherently suspicious nature of the Khanani entities' business, supports an inference of general awareness.

To be sure, the facts supporting knowledge for Placid Express are less detailed than the facts supporting knowledge for Deutsche Bank, Standard Chartered Bank, and Danske Bank— but that is hardly a defense as those are three of the worst terrorist "laundromats" in world

financial history. Under the broad standard for general awareness recognized in *Kaplan*, 999 F.3d at 863, and the permissive rules applicable to allegations of knowledge at the pleading stage set forth in *DDAVP*, 585 F.3d at 693, even if the Court concludes that the inference of general awareness is tenuous, it should deny the motion to dismiss.

### B. Placid Express Provided Substantial Assistance

As the Second Circuit has explained, "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499. Instead, the "knowledge component is satisfied if the defendant knowingly—and not innocently or inadvertently—gave assistance"; it does "not require [the defendant] to 'know' anything more about [the tortfeasor's] unlawful activities than what [defendant] knew for the general awareness element." *Id*. at 499-500 (cleaned up). Here, Placid Express did not act innocently or inadvertently; it was not "tricked," for example, by the Khanani entities. *See, e.g.*, ¶¶ 681, 719-25 (pp.288, 303-07).

As to whether the assistance is substantial, Placid Express correctly notes that this turns on a six-factor inquiry, in which no factor is dispositive and each is weighed on a case-by-case basis. *See Kaplan*, 999 F.3d at 856 ("Plainly these factors are variables, and the absence of some need not be dispositive.") (quotation marks and citation omitted). The complaint makes allegations about five of the factors. ¶¶ 964-1026 (pp.389-410). Placid Express attempts to address all of them in a single paragraph—but its arguments are unfounded. Placid MTD 13-14.

The first factor is the nature of the act assisted. As the Second Circuit explained, "'the nature of the act involved dictates what aid might matter'" and thus "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [bank's] customers) would be important to the nature of the injury-causing act ([the FTO's] terrorist attacks)." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484). Here, the act assisted is terrorism, and as the D.C. Circuit has explained, "[f]inancial support is indisputably important to the operation of a

terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley*, 22 F.4th at 222 (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021)). Moreover, when the act assisted is so "vicious" and extraordinarily blameworthy, "even 'relatively trivial' aid could count as substantial." *Id.* (citation omitted).

The support Placid Express provided "was tailored to the specific violence at issue" because al-Qaeda, the Haqqani Network, and their Syndicate allies needed U.S. Dollars, not local currency, to finance their attacks. ¶ 965 (p.390). In support, the complaint explains how important money laundering is to such terrorists' ability to carry out attacks, with reference to informed commentary from government officials, terrorism scholars, and media sources. ¶¶ 967-78 (pp.390-95).

Placid Express argues that the complaint "does not allege that Placid Express was aware of or encouraged the terrorist attacks, or knowingly provided any funds to any FTO for their violent activities." Placid MTD 13. The Second Circuit rejected this argument in *Honickman*, explaining that this factor has nothing to do with whether the bank "knowingly encouraged [the FTO's] violent activities," but instead focuses on whether the type of aid given generally tends to facilitate the type of tort at issue. 6 F.4th at 500 (quotation marks omitted). This factor thus weighs in favor of liability.

With respect to the amount of assistance, Placid Express argues that the complaint lacks details regarding the transactions, and does not allege that "Placid Express processed any transactions for Al Zarooni Exchange or Prime Currency that reached any FTO." Placid MTD 13. But the law does not require plaintiffs to trace the assistance in this manner. On the contrary, the Second Circuit holds that "if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should

focus on the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500. And as long as the "alleged assistance was at least significant, this factor supports substantiality." *Atchley*, 22 F.4th at 222. Plaintiffs allege that Placid Express assisted Khanani—who was a major money launderer, and so it is plausible to infer that the amounts were significant. Indeed, Plaintiffs allege on information and belief that the amounts were in the millions. ¶ 567 (p.249). Even small amounts of money can fund attacks like the ones that injured Plaintiffs. Here, the cost of putting a Taliban fighter in the field was only $100 per month, and the cost of Syndicate IEDs was also as low as $100. ¶¶ 983-84 (pp.395-96). In this context, the second factor supports liability. *See In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284, 1317 (S.D. Fla. 2018) (sustaining claim when funds provided were $32,000 per year because of the low cost of putting a guerilla fighter in the field).

With respect to the fourth factor (relationship to the tortfeasor), Placid Express argues that it had no "relationship with any FTO." Placid MTD 13. But "a direct relationship between the defendant and the FTO is not required to satisfy this factor." *Honickman*, 6 F.4th at 501. Here, Placid Express had relationships with entities controlled by D-Company member (and therefore Syndicate member), and Haqqani Network agent (and therefore Syndicate agent) Altaf Khanani. ¶¶ 255-56 (p.145) (identifying Khanani as a Syndicate member). That relationship is sufficiently close to the FTOs for this factor to support liability.

Regarding the fifth factor (state of mind), Placid Express argues that it did not "knowingly assume[] a role in the attacks or any FTO's activities, or otherwise support[] any FTO." Placid MTD 13. But no specific intent is required under this factor. *See Atchley*, 22 F.4th at 223. "Knowledge of one's own actions and general awareness of their foreseeable results, not specific intent, are all that is required." *Id*. Thus, "[a]iding-and-abetting liability reaches actors

. . . who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Id*. at 224. Indeed, to understand how broad the "state of mind" factor is, the Court need look no further than *Halberstam* itself. There, the court held the defendant liable for a murder that she did not even know about; indeed, she did not even have to know that her accomplice was committing burglaries. *See Halberstam*, 705 F.2d at 488. The complaint also details why even "routine" transactions for terrorists advance violence. ¶¶ 714-16 (pp.301-02). The state-of-mind factor accordingly supports liability.

Finally, with respect to the duration of assistance, the court in *Atchley* held that "four years is a significant duration." 22 F.4th at 224. Here, Placid Express began providing assistance in 2008. ¶ 1023 (p.409). Although the exact duration of the assistance is unknown, the allegations bespeak an ongoing relationship. This factor accordingly also supports liability.

Considering the six factors together, the assistance Placid Express provided was easily substantial enough to state a claim for aiding and abetting liability under JASTA. The cases Placid Express cites (Placid MTD 14) do not hold otherwise. Indeed, of all those cases, only one of them even applies JASTA. The remainder involve either the common law or pre-JASTA law. The sole relevant case, *Siegel v. HSBC North American Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019), was substantially clarified in *Kaplan*, and is not controlling here for the same reasons it wasn't there: (1) unlike the defendant in *Siegel*, there is no allegation that Placid Express terminated its relationship with Khanani before the attacks; and (2) unlike the defendant's customers in *Siegel*, the entities that Placid Express served were not multinational banks with generally legitimate businesses, but instead fronts for Khanani's MLO. *See Kaplan*, 999 F.3d at 862. Moreover, unlike the plaintiffs in *Siegel*, who were unable to allege that terrorists received any of the money, 933 F.3d at 225, Plaintiffs allege that transactions for Khanani necessarily led

to payments to Sirajuddin Haqqani (a leader in multiple Syndicate FTOs) and Dawood Ibrahim (leader of the Syndicate organization D-Company) in the form of "taxes" that Khanani paid, ¶¶ 271-73 (pp.151-52). "Through this mechanism, each transaction that benefited the Khanani MLO also indirectly lent financial support to the Syndicate through the income that flowed from Khanani to D-Company and the Haqqani Network." ¶ 272 (p.152). This was in addition to the service of laundering the Syndicate's criminal revenues into USD and repatriating those funds so that al-Qaeda and the Haqqani Network could use them to fund attacks against Americans. ¶ 268 (p.150).

### C. Placid Express's Proximate Causation Argument Is Meritless

Placid Express erroneously argues that both but-for and proximate cause are elements of aiding and abetting—and that they can only be satisfied if the plaintiff shows that his injury was *both* a "foreseeable" *and* "direct" consequence of the defendant's actions. Placid MTD 14-15. That is the law vis-à-vis primary liability—but not secondary liability under JASTA. Instead, under JASTA, foreseeability is required, but directness is not.

This is black letter law. In *Linde v. Arab Bank PLC*, 882 F.3d 314 (2d Cir. 2018), the Second Circuit considered this question directly and held that under JASTA, the argument that the defendant's conduct did not proximately cause the plaintiff's injury "provides no ground for reversal." *Id.* at 331; *see also id*. at 333 (holding that the defendant did not have a viable causation argument against the JASTA claim because there was "no dispute that the Hamas attacks that Arab Bank is supposed to have aided and abetted caused plaintiffs' injuries, both as a matter of proximate and but-for causation").

That conclusion also follows directly from *Halberstam*, which explained that "[a]n aider-abettor is liable for damages caused by the main perpetrator." 705 F.2d at 478. In *Halberstam* itself, there was no straight-faced argument that the defendant's acts as a banker, bookkeeper,

recordkeeper, and secretary for the property crime business were a but-for cause of the murder, nor that the murder resulted directly from such services. But no such argument was necessary; instead, the defendant was liable "because violence and killing is a foreseeable risk" of property crime enterprises. *Id*. at 488.

In subsequent JASTA cases, the Second Circuit has never listed "proximate cause" or "directness" as an element of a JASTA claim, and has repeatedly rejected a "directness" requirement. *See Honickman*, 6 F.4th at 494 (listing elements (which do not include proximate cause) and noting that Congress intended to impose liability on those who support terrorism indirectly); *Kaplan*, 999 F.3d at 866 ("[A] JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly"). That makes sense because when Congress enacted JASTA, it was quite clear that it wanted liability to reach anybody who provides support to terrorists—even "indirectly." JASTA § 2(b).

In response, Placid Express cites cases holding that under New York fraud law, aiding and abetting requires proximate causation. *See* Placid MTD 15 (citing *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) ; *In re Platinum-Beechwood Litig.*, 453 F. Supp. 3d 645, 650 (S.D.N.Y. 2020)). But this case is governed by JASTA, not New York fraud law JASTA. *Linde* holds that JASTA does not require causation, and *Halberstam*, which Congress expressly incorporated by reference into the statute, JASTA § 2(a)(5), likewise eschew this element.

To the extent proximate causation *principles* matter, they are incorporated through the requirement of foreseeability, *i.e.*, the requirement that the plaintiff's injury must be a foreseeable risk of the illegal activity the defendant aided. *See Honickman*, 6 F.4th at 496-97 & n.10. As explained *supra*, that requirement is met here because providing substantial amounts of assistance to terrorist money launderers against the backdrop of a prolonged campaign of

terrorist violence foreseeably risks more violence. The complaint is replete with factually supported allegations to that effect, *e.g.*, paragraphs cited *supra* pp.3-4, 14, and the case law agrees. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 36 (2010) (holding that it was "wholly foreseeable" that providing resources to an FTO would "promote terrorism"); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 694 (7th Cir. 2008) (en banc) (holding that a "foreseeable consequence[]" of providing funds to an FTO is that the FTO will be able to kill or wound more people). At the very least, the allegation of foreseeability is plausible—and at this stage, the law does not require more.

### D. Designated Terrorist Organizations Committed, Planned, or Authorized the Attacks That Injured Plaintiffs.

Placid Express makes a one-paragraph argument that the attacks in this case that were committed by the Taliban, or by the Haqqani Network before it was designated an FTO, do not satisfy JASTA's predicate that the attack must be "committed, planned, or authorized" by a designated FTO. 18 U.S.C. § 2333(d)(2). *See* Placid MTD 16-17. This is incorrect. The complaint explains that these attacks "were 'planned' or 'authorized' by al-Qaeda, and therefore satisfy this element. ¶ 12 (p.4); *see also* ¶ 87 (p.21).

Placid Express's only answer is that this allegation is a "threadbare recital of the ATA elements," and therefore not sufficient. Placid MTD 17 (quotation marks omitted). But the ultimate allegation that al-Qaeda planned and authorized the attacks is supported by pages of detail about the inner workings of the Syndicate. The complaint paragraph after the one Placid Express cites explains that "[a]l-Qaeda's critical role in committing, planning, and/or authorizing the attacks that injured Plaintiffs is described in Section I.F and I.G." ¶ 88 (p.21).

Specifically, Section I.F—which has the heading, "Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs"—provides 40 paragraphs and 27

footnotes of explanation relating to planning and authorization. ¶¶ 364-403 (pp.124-37). With respect to authorization, these paragraphs explain that al-Qaeda provided religious authorization in the form of *fatwas* commanding attacks on Americans as well as other forms of authorization, ¶¶ 365-67 (pp.124-25), mafia-style coordination meetings where attacks were approved, ¶ 368 (p.125), and specific encouragement of suicide bombings and the use of IEDs that was, empirically, highly effective, ¶¶ 369-71 (p.126). With respect to planning, the complaint alleges that al-Qaeda planned Taliban attacks, ¶ 372 (pp.126-27), provided critical training to and with the Haqqani Network and Taliban, ¶¶ 373-75 (pp.127-28), coordinated the Kabul Attack Network, ¶ 376 (p.128), held joint operational meetings with the Taliban and other terrorist groups, ¶ 377 (p.128), instructed the Taliban in terrorist tradecraft, ¶ 378 (p.129), and played a critical role in planning the CAN fertilizer bomb campaign involving every attack in this case that used IEDs and suicide bombs, ¶¶ 379-403 (pp.129-37).

These allegations closely resemble the allegations that the D.C. Circuit found sufficient to plead the elements of authorization and planning in *Atchley*. There, the terrorist attacks were all carried out by Jaysh al-Mahdi (JAM), which was never designated an FTO. The plaintiffs alleged that the FTO Hezbollah planned and authorized JAM's attacks. The D.C. Circuit agreed, explaining that "[i]t is well known that terrorist organizations . . . often operate by proxy," and that Congress intended for JASTA to reach situations "in which a designated terrorist group stands behind the fighters who pull the trigger or detonate the device." 22 F.4th at 217.

More specifically, the D.C. Circuit held that Hezbollah's "provision of weaponry, training, and knowledge to Jaysh al-Mahdi with the intent of harming Americans in Iraq constituted a 'plan.'" *Atchley*, 22 F.4th at 217. The plaintiffs' complaint drew "geographical connections between Hezbollah's presence and the attacks . . . , detailing that Hezbollah

24

coordinated with Jaysh al-Mahdi terrorists in specific locations where plaintiffs were injured or killed." *Id*. at 218-19. And it determined that "Hezbollah's planning role was particularly evident in attacks using" specific forms of weapons—in that case explosively formed penetrators designed to destroy armor. *Id*. at 219. Thus, the court held that by connecting Jaysh al-Mahdi's tactics to Hezbollah's training and direction, the plaintiffs "[r]eadily meet the minimum required to plead that Hezbollah 'planned' the attacks." *Id*.

With respect to authorization, the D.C. Circuit held that the plaintiffs' "allegations that Hezbollah exerted religious, personal, and operational authority over Jaysh al-Mahdi show that it 'authorized' the attacks." *Atchley*, 22 F.4th at 219. For example, Hezbollah issued "a *fatwa* declaring a religious duty to attack Americans in Iraq," and exercised personal authority over JAM's leader, who openly aligned himself with Hezbollah. *Id*. JAM's fighters also "swore fealty to Hezbollah." *Id*. These allegations were "legally sufficient . . . to support the contention that Hezbollah authorized the attacks." *Id*.

All the factors the D.C. Circuit found compelling are present here. Plaintiffs' complaint identifies specific geographies, tactics, and weapons that al-Qaeda steered the Taliban and Haqqani Network toward—which resulted in massive American casualties. The complaint thus easily alleges that every attack in this case was committed, planned, or authorized by one or more designated FTOs. Indeed, none of the other defendants even challenges this element.

## CONCLUSION

Placid Express's motion to dismiss should be denied.

Dated: May 13, 2022

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Ryan R. Sparacino
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*