**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

AUGUST WILDMAN, *et al.*,

               Plaintiffs,

     v.

DEUTSCHE BANK
AKTIENGESELLSCHAFT, *et al.*,

               Defendants.

No. 1:21-CV-04400 (KAM) (RML)

**OPPOSITION TO THE STANDARD CHARTERED DEFENDANTS'
<u>MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT</u>**

Ryan R. Sparacino
Tejinder Singh
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

BACKGROUND ....................................................................................................................... 1

ARGUMENT ........................................................................................................................... 12

   I.    The Complaint Satisfies Federal Rule of Civil Procedure 8 ............................................. 12

   II.   The Complaint States Claims for Aiding and Abetting Under the Justice Against
        Sponsors of Terrorism Act ............................................................................................... 16

        A.  Standard Chartered Aided Syndicate Terrorists ........................................................ 17

        B.  Standard Chartered Was Generally Aware That It Was Playing a Role in
            Unlawful Activity That Foreseeably Risked Terrorism............................................. 18

        C.  Standard Chartered's Assistance Was Substantial..................................................... 25

   III.  This Court Has Personal Jurisdiction Over SC PLC and SCB Pakistan ......................... 28

CONCLUSION......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ......................................................................... *passim*

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) ............................................. 13, 25, 28

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ............................................................................ 17, 25

*Bowman v. HSBC Holdings PLC*,
  465 F. Supp. 3d 220 (E.D.N.Y. 2020) ..................................................................... 24

*Burke v. Dowling*,
  944 F. Supp. 1036 (E.D.N.Y. 1995) ....................................................................... 12

*Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
  495 F. Supp. 3d 144 (E.D.N.Y. 2020), *motion to certify appeal granted*, 2020 WL
  6700121 (E.D.N.Y. Nov. 13, 2020) ........................................................................ 17

*Est. of Klieman v. Palestinian Auth.*,
  923 F.3d 1115 (D.C. Cir. 2019), *cert. granted, judgment vacated,* 140 S. Ct. 2713 (2020),
  *and opinion reinstated in part,* 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020) ....................... 29

*Gonzalez v. Google LLC*,
  2 F.4th 871 (9th Cir. 2021) ..................................................................................... 25

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983) ................................................................... 16, 23, 25, 27

*Harnage v. Lightner*,
  916 F.3d 138 (2d Cir. 2019) .................................................................................... 12

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ................................................................................................... 30

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ................................................................................. *passim*

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009) .................................................................................... 19

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ..................................................................... 13

*Kadamovas v. Stevens*,
  706 F.3d 843 (7th Cir. 2013) .................................................................................. 12

*Kaplan v. Lebanese Canadian Bank, SAL*,
  999 F.3d 842 (2d Cir. 2021) .............................................................................. *passim*

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
  732 F.3d 161 (2d Cir. 2013) .................................................................................... 28

*Linde v. Arab Bank PLC*,
  882 F.3d 314 (2d Cir. 2018) ............................................................... 27

*Livnat v. Palestinian Auth.*,
  851 F.3d 45 (D.C. Cir. 2017) ............................................................... 30

*N.Y. Am. Water Co., Inc. v. Dow Chem. Co.*,
  2020 WL 9427226 (E.D.N.Y. Dec. 11, 2020) ...................................... 15

*O'Sullivan v. Deutsche Bank AG*,
  2020 WL 906153 (S.D.N.Y. Feb. 25, 2020)......................................... 24

*Salahuddin v. Cuomo*,
  861 F.2d 40 (2d Cir. 1988) .......................................................... 12, 15

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ............................................................... 23

*Smith v. Fischer*,
  2016 WL 3004670 (W.D.N.Y. May 23, 2016) ..................................... 12

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755
  (E.D.N.Y. Sept. 30, 2017)................................................................... 21

*United States v. Kozeny*,
  667 F.3d 122 (2d Cir. 2011) ............................................................... 21

*Walden v. Fiore*,
  571 U.S. 277 (2014)........................................................................... 30

*Waldman v. Palestine Liberation Org.*,
  835 F.3d 317 (2d Cir. 2016) ............................................................... 29

*Weiss v. Nat'l Westminster Bank PLC*,
  176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................. 28

*Wultz v. Islamic Rep. of Iran*,
  755 F. Supp. 2d 1 (D.D.C. 2010)........................................................ 23

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004) ................................................................. 12

**Statutes**

18 U.S.C. § 1962 ..................................................................................... 12

18 U.S.C. § 2333 ..................................................................................... 12

Justice Against Sponsors of Terrorism Act,
  Pub. L. No. 114-222, 130 Stat. 852 (2016)................................. *passim*

  § 2(a)(5) .............................................................................................. 16

  § 2(a)(6) .............................................................................................. 30

  § 2(b)................................................................................................... 16

**Other Authorities**

*In re: Standard Chartered Bank*,
    Order Pursuant to Banking Law § 39 (NYDFS Aug. 6, 2012)................................................. 10

Plaintiffs respectfully oppose the Standard Chartered defendants' (SCB) motion to dismiss the Corrected Amended Complaint (Doc. 38).[1]

## BACKGROUND

Plaintiffs are 479 individuals comprising Americans who were killed or injured by terrorist attacks in Afghanistan between 2011 and 2016, and their close family members. ¶ 1 (p.1). Plaintiffs allege, and SCB does not dispute, that the attacks were committed, planned, or authorized by al-Qaeda and the Haqqani Network (the most violent part of the Taliban). ¶¶ 12, 85-87, 364-408 (pp.4, 20-21, 124-40). These foreign terrorist organizations (FTOs) led a Syndicate of terrorists that also included the Taliban, Lashkar-e-Taiba, and D-Company, which carried out attacks against Americans in Afghanistan. ¶¶ 89-110 (pp.21-31). The Syndicate's horrific acts of violence included suicide bombings, improvised explosive device (IED) attacks (almost always involving fertilizer bombs), kidnappings, and insider attacks. *E.g.*, ¶ 92 (p.22).

Al-Qaeda, the Haqqani Network, and their Syndicate allies funded these attacks through protection rackets in Afghanistan and Pakistan; drug exports; tax fraud in Europe; illicit "donations" and "taxes"; financial support from other terrorist groups; sanctions evasion; and other crimes. ¶¶ 13, 128, 135-49 (pp.4, 38, 41-46). In these efforts, the Syndicate relied on a "who's who" of notorious international terrorist financiers and logisticians. *E.g.*, ¶¶ 7-9 (pp.2-3).

Al-Qaeda's and the Haqqani Network's principal financial objective was to obtain U.S. Dollars (USD), al-Qaeda's and its allies' preferred currency to pay for terrorist recruiting, salaries, arms, bomb components, mobile phones, and logistical pipelines key to the success of the Syndicate's terrorist alliance with the Islamic Revolutionary Guard Corps (IRGC) against America in Afghanistan. ¶¶ 5, 112-13, 121, 150-56 (pp.2, 32, 35-37, 46-48). To access USD,

---

[1] Citations to the Corrected Amended Complaint are by paragraph and page number. Citations to defendants' memorandum of law are to "SCB MTD" and page number.

al-Qaeda and its allies needed help from multinational banks. Most banks refused and adopted robust compliance programs to prevent terrorists from using their systems. *E.g.*, ¶ 115 (p.33). But a few chose to become "laundromats," *i.e.*, hubs of illicit finance. ¶¶ 609-10 (pp.260-61). A slew of authoritative sources show that these criminal banks knew and intended that by expressing their willingness to process illicit transactions, they would attract tremendous volumes of profitable but illegal business from launderers, transnational criminals, and terrorists looking to raise, clean, move, and spend dirty money. ¶¶ 611-52 (pp.261-76). And a chorus of counter-terrorism experts—including former U.S. leaders in Afghanistan, undercover agents, Treasury Department officials, and scholars—have explained that by playing this role, such laundromat banks made themselves complicit with terrorist violence and allowed it to flourish. ¶¶ 719-25 (pp.303-07).

SCB was perfectly positioned to serve as a laundromat. The bank's "core business model has been to serve as the correspondent bank and clearing bank for USD-denominated transactions in high-risk emerging markets, with a particular emphasis on facilitating cross-border transactions in the Middle East and Asia." ¶ 49 (pp.12-13). SCB always "viewed conflict zones as uniquely strong market opportunities, since the U.S. Dollar is typically the currency of choice in conflict zones, and SCB is the world leader in facilitating USD-denominated transactions in such environments." ¶ 839 (p.349). Thus, much of SCB's foreign business was "denominated in dollars that must pass through America's financial system." ¶ 49 (p.13).

Sure enough, SCB was a laundromat, "providing USD financial services to suspected fronts for terrorist groups, money laundering enterprises, and criminal syndicates, while refusing to cooperate with most U.S. government terrorism-related requests if doing so would reduce [SCB]'s profits." ¶ 447 (pp.212-13). While other banks with a U.S. presence committed after

September 11, 2001, to adopt "rigorous measures to prevent terrorist finance from flowing through their accounts," SCB "calculated that the general trend towards better counterterrorist finance at large global banks offered a business opportunity for SCB to seize more USD market share by doubling-down on its Laundromat Strategy." ¶ 860 (pp.356-57).

SCB helped al-Qaeda, the Haqqani Network, and their Syndicate allies raise and flow through at least $13 million, and likely more than $100 million, to terrorists to facilitate attacks against Americans in Afghanistan. ¶¶ 445-46 (pp.211-12). SCB's misconduct prompted the New York Department of Financial Services (NYDFS) in 2012 to brand the bank a "'rogue institution' that '*left the U.S. financial system vulnerable to terrorists.*'" ¶ 449 (p.213). In 2019, a top federal prosecutor blasted SCB entities as "repeat corporate offenders" that "subvert[ed] our national security" by facilitating the systematic evasion of anti-terrorism sanctions. ¶ 848 (p.353). All told, SCB has paid *billions* of dollars in penalties for its unlawful conduct—which represents a fraction of the dirty money it moved over the years. ¶¶ 894-95 (pp.370-72).

Specifically, SCB knowingly served: (1) infamous Syndicate operative and financier Altaf Khanani and his money laundering organization; (2) al-Qaeda and Haqqani Network VAT fraud cells raising funds in Europe to support Syndicate attacks in Afghanistan; (3) Haqqani Network-influenced fertilizer companies that knowingly produced the key ingredient for al-Qaeda's signature fertilizer bombs even after learning about the key role they played in killing Americans in Afghanistan; (4) Iranian entities that were sanctioned for their connections to the IRGC's Lebanese Hezbollah Division (Hezbollah) and Qods Force and direct facilitation of attacks against Americans in the Middle East; and (5) other key leaders and fundraisers acting for the Syndicate from 9/11 through 2016. These channels are described in greater detail below.

1. SCB assisted Altaf Khanani's money laundering organization, the Khanani MLO,

which gathered, invested, moved, and repatriated billions of dollars for the worst criminal enterprises—including al-Qaeda and its Syndicate allies. ¶ 265 (pp.148-49). Khanani was the Syndicate's principal money launderer, and was internationally infamous for his connections with Syndicate terrorists including al-Qaeda, the Haqqani family, and Dawood Ibrahim. ¶¶ 253-55 (pp.142-45). He became infamous no later than 2008, when Pakistan charged him with money laundering offenses involving billions of dollars, ¶ 259 (pp.146-47). But public sources linked him to terrorist finance as early as 2001. ¶¶ 672-73 (pp.284-85). The Financial Action Task Force (FATF, the gold standard global organization to combat money laundering, whose guidance banks monitored closely, ¶¶ 598, 697 (pp.256, 294)) reported that Khanani's organization "provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organization." ¶ 267 (pp.149-50). Khanani used a web of companies, including Al Zarooni Exchange and Mazaka General Trading, to launder at least hundreds of millions of dollars annually for the Syndicate through accounts at SCB branches. ¶¶ 250-51, 458-62, 471 (pp.142, 217-18, 220-21). These transactions allowed the Syndicate to convert money it raised through criminal enterprises into USD, and to repatriate those funds to Pakistan and Afghanistan to fund violence against Americans. ¶¶ 215-17 (pp.71-72).

Khanani also served as a financier for Sirajuddin Haqqani. ¶¶ 254, 272, 674, 687 (pp.143-45, 152, 285-86, 290-91). Sirajuddin was the Syndicate's most important leader after 9/11 and was designated a Specially Designated Global Terrorist in 2008. ¶¶ 157, 160 (pp.48-49). By 2009, Sirajuddin simultaneously held leadership positions in al-Qaeda, the Haqqani Network, and the Quetta Shura Taliban. ¶ 159 (p.49). In these roles, he led the "Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012." ¶ 164 (p.50); *see also* ¶¶ 164-86 (pp.50-59). Money laundering transactions for Khanani

4

"supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources . . . relating to funding, arming, and … supporting Syndicate attacks against Americans." ¶ 172 (p.54).

SCB knew about Khanani no later than 2008 as a result of his notorious global reputation and the criminal charges against him. ¶ 464 (pp.218-19). That awareness was re-confirmed in 2012 and 2013 when "a senior compliance employee at SCB Dubai … learned that SCB Dubai had been using SCB New York to carry out USD money-laundering transactions for the Khanani MLO." ¶ 466 (p.219). That employee understood that Khanani was a suspected agent of Syndicate terrorist organizations, and that SCB was therefore involved in terrorist financing. ¶¶ 466-68. (pp.219-20). These revelations emerged "during the course of a terrorism-related audit concerning suspected terrorist finance activity facilitated by SCB Dubai." ¶ 466 (p.219). (SCB's motion never mentions these allegations.) Around the same time (2013), multiple other SCB employees and/or agents also found that SCB had processed transactions for Khanani's Al Zarooni Exchange, and that these transactions supported terrorism. ¶ 472 (p.221).

2. In Europe, SCB collaborated with al-Qaeda and Haqqani Network agents who stole millions by defrauding the Value Added Tax (VAT) system. *E.g.*, ¶¶ 474-75 (p.220). Under this scheme, sham companies used fake sales to claim fraudulent tax refunds. ¶¶ 281-82 (pp.155-56). By 2006, al-Qaeda and the Haqqani Network were training operatives to carry out VAT fraud in Europe and repatriate the money to Afghanistan for use in attacks. ¶ 283 (p.156).

SCB helped Afghan national and VAT fraudster Samir Azizi raise at least $10 million that he repatriated to the Syndicate from 2008 through 2015, when he was arrested. ¶¶ 288-89, 473-75 (pp.157-58, 221-22). "Azizi directly implicated [SCB] [in] his VAT fraud scheme when interviewed by law enforcement," indicating that SCB provided a company that Azizi used in his fraud. ¶ 476 (p.222). Members of Azizi's cell also "generally confessed" to the scheme,

confirming that SCB was complicit in a massive fraud that supported terrorism. ¶ 429 (p.207).

Again, SCB acted knowingly. Public sources—including FATF, as well as the U.K. Home Secretary—had reported links between VAT fraud and al-Qaeda terrorism well before the attacks in this case. ¶¶ 294, 690-99 (pp.159-60, 291-95). Moreover, when it facilitated Azizi's VAT fraud, SCB knew that VAT fraud was a specific red flag for al-Qaeda and the Haqqani Network. ¶ 694 (p.293). Indeed, "VAT fraud as practiced by al-Qaeda was one of the simplest of all terrorist finance schemes for banks to detect." ¶ 795 (p.335). The scheme "prioritized scale and simplicity," and so the "fraudsters usually copied-and-pasted (or close to it) the same schemes, entities, and everything." ¶ 798 (p.336). Consequently, VAT fraud as practiced by al-Qaeda and its allies only worked with "the willing involvement of corrupt western banks," because it requires "a constant stream of affirmative actions by the banks that are far outside what they routinely did (or are allowed to do)." ¶ 795 (p.335). The internal operations and external transaction data about Azizi showed VAT fraud so clearly that even compliance officers in Deutsche Bank's built-to-fail system could not ignore it. ¶¶ 741, 803-10 (pp.316, 337-39).

3. SCB also knowingly provided substantial financial support to two affiliated fertilizer companies, Fatima Group and Pakarab, that deliberately produced the Calcium Ammonium Nitrate (CAN) fertilizer used in the vast majority of Syndicate IEDs and suicide bombs in a manner designed to facilitate their fertilizer's use by the Haqqani Network. SCB played an active role in facilitating the companies' fertilizer sales: the services provided included USD-denominated foreign exchange, correspondent account, and letter-of-credit services in connection with the sale of CAN fertilizer. ¶¶ 525, 527 (pp.239-40). In 2010, Fatima listed SCB as one of the "major bankers of the company." ¶ 526 (p.239) (capitalization and emphasis altered). The services continued until at least 2015. ¶ 531 (p.241).

CAN fertilizer bombs were a "signature" al-Qaeda attack type, ¶ 506 (p.230), and the deadliest weapons used by Syndicate terrorists to attack Americans as of 2009, ¶ 510 (p.232). These bombs "transformed the conflict," allowing the Syndicate to inflict heavy casualties on American forces, and to attack American armored vehicles. ¶¶ 507, 509 (pp.230-31). Al-Qaeda and the Haqqani Network depended on Fatima and Pakarab to provide a steady supply of CAN fertilizer to sustain the Syndicate's nationwide bombing campaign in Afghanistan. *E.g.*, ¶ 389 (p.132). Fatima and Pakarab provided "an unending supply." ¶ 510 (p.232).

American casualties were so high that in 2009 Afghan and Coalition forces adopted a policy of seizing any CAN fertilizer they found. ¶ 511 (pp.232-33). That policy was publicized in international publications like the *New York Times* as a response to "'Taliban insurgents.'" ¶ 511 (p.233). Almost all of the captured terrorists' fertilizer was traceable to Fatima and Pakarab (which controlled CAN manufacturing in Pakistan), including because much of it was in the original packaging. ¶ 508 (p.231). In 2010, the Afghan government banned CAN fertilizer in Afghanistan altogether. ¶ 512 (p.233). In 2011, outlets including (but not limited to) the *Associated Press* reported that CAN fertilizer from Fatima and Pakarab was being used in Syndicate bombs that were killing hundreds of Americans annually. ¶¶ 514-15 (pp.233-34).

In response, the U.S. government attempted to redress the problem at the source. Specifically, Lieutenant General Mike Barbero, then-head of the Joint IED Defeat Organization (JIEDDO) (the lead entity charged with protecting Americans from IEDs), lobbied Fatima in 2010 to take steps to prevent the use of its fertilizer in al-Qaeda's and the Haqqani Network's bombs (such as dying the fertilizer a color so that it would be more difficult to smuggle into Afghanistan). ¶¶ 514, 519, 529 (pp.233-36, 240-41). Fatima refused to help. ¶ 516 (p.235). Multiple media and government sources reported that Fatima and Pakarab did not *want* to help

because they were conspiring with rogue elements in the ISI, a Pakistani intelligence agency, who conspired with the Syndicate (specifically the Haqqani Network) to keep the Haqqani Network's fertilizer supply lines open. ¶¶ 518-24 (pp.-235-39). Thus, Fatima and Pakarab knowingly produced bomb materials that the Haqqani Network acquired, and al-Qaeda refined into bombs, being used to kill hundreds of Americans every year. *E.g.*, ¶¶ 390-92 (pp.132-33).

Stymied by the manufacturers, in "January 2013, JIEDDO leadership, led by LTG Barbero, met in person with senior executives at SCB New York's office." ¶ 529 (p.240). LTG Barbero showed SCB that Fatima and Pakarab were knowingly supplying explosive materials that were killing hundreds of American soldiers, showed that "Fatima and Pakarab would not be able to supply terrorists in Afghanistan with Fatima Group CAN Fertilizer at the scale necessary to sustain the Syndicate's nationwide CAN fertilizer bomb campaign without SCB New York's provision of financial services," and pleaded with the bank to "cease its provision of financial services to Fatima and Pakarab to save American lives by preventing future CAN fertilizer bomb attacks against Americans in Afghanistan." ¶ 529 (pp.240-41). SCB "never followed up with LTG Barbero or did anything positive." ¶ 530 (p.241). "LTG Barbero subsequently declared that [SCB] was 'utterly useless' in taking action to disrupt the supply chain." ¶ 505 (p.229). "Instead, the bank continued to reap profits from these Syndicate-aligned fertilizer companies, and in the process supported the Syndicate's bombmaking enterprise." ¶ 505 (pp.229-30).

In fact, SCB's USD financial services were critical to the most problematic sales—such as when purchasers in the United Arab Emirates bought fertilizer from Fatima in bulk (which makes little sense agriculturally), or when suspected Haqqani fronts made bulk purchases from Pakistan. ¶¶ 1070, 1073 (pp.427, 429). Having access to USD markets as well as foreign exchange, export finance, and USD letter of credit services was key to Fatima and Pakarab's

ability to keep prices low, ¶¶ 1072, 1074-76 (pp.428-430)—which was in turn critical to the Haqqani Network's ability to secure an "unending supply" of CAN fertilizer, ¶ 1077 (p.430).

4. From the early 2000s until at least 2014, SCB catered to sanctioned Iranian entities seeking U.S. dollars. Iran has been designated a state sponsor of terrorism since 1984. ¶ 249 (p.85). It "carries out its support of terrorism largely through the IRGC," ¶ 250 (p.85), which has the stated mission of facilitating "terrorist attacks against the United States and Israel," ¶ 255 (p.87). Outside of Iran, the IRGC acts through Hezbollah and the Qods Force, both of which historically promote Syndicate terrorism in Afghanistan—as the U.S. government has recognized. ¶ 285 (p.96); ¶ 290 (p.99); *see also* ¶¶ 298-363 (pp.102-24); ¶ 334 (p.172). Hezbollah and the Qods Force use IRGC shell companies and fronts to raise money for violent terrorism. ¶¶ 726-35 (pp.307-13). Indeed, the U.S. government issued multiple public statements to this effect from 2007 to 2011. ¶ 735 (pp.310-13). The government also sanctioned (in 2012) the National Iranian Oil Company (NIOC) and the National Iranian Tanker Company (NITC), both fundraising and logistical conduits to Hezbollah and the Qods Force. ¶¶ 338-43 (pp.173-75). These entities raise money from oil sales (priced in USD) and provide those funds to Hezbollah and the Qods Force to commit or promote acts of terrorism. ¶¶ 326, 340 (pp.170, 174).

SCB began doing a massive business with sanctioned Iranian entities no later than 2001. The complaint refers to an enforcement action by NYDFS in 2012, as well as a Deferred Prosecution Agreement between SCB and the Department of Justice. *E.g.*, ¶¶ 842-43 (pp.350-51). NYDFS's investigation found that in 2001, an Iranian state-owned bank called CBI/Markazi, which had been sanctioned by the U.S. Office of Foreign Assets Control (OFAC), approached SCB to act as the recipient bank for U.S. dollar proceeds from NIOC's daily oil sales. *In re: Standard Chartered Bank*, Order Pursuant to Banking Law § 39, at 10 (NYDFS

Aug. 6, 2012), *available at* https://tinyurl.com/27yhbbtx. "A critical component of the deal . . . was the timing of $500 million in daily U.S. dollar payments"; specifically, SCB had to be willing to pay away up to $200 million per day in advance of receipts. *Id*. SCB considered this business to be prestigious and pursued it aggressively—including by actively concealing the origins of the Iranian payments from its New York branch and creating a sham compliance program to hide Iran's involvement. *Id*. at 10-18.

In the investigation that led to the 2012 consent order and deferred prosecution agreement, SCB represented to the government that it had ceased doing business with Iranian entities in 2007. This was false. SCB transacted "an additional $600 million in USD payments" with Hezbollah and Qods Force fronts in violation of U.S. sanctions from 2008 until 2014, while concealing that fact from regulators. ¶ 886 (p.366); *see* ¶ 847 (pp.352-53). In these transactions, SCB's employees in Dubai—collaborating with their colleagues around the world—coached Hezbollah and Qods Force fronts about how to clear payments through the bank and avoid detection by regulators. *E.g.*, ¶ 852 n.555 (p.354). In 2019, this misconduct led to $1.1 billion in penalties for violations from 2008 to 2014. ¶¶ 847-48 (pp.352-53).

SCB acted knowingly. It was common knowledge among banks that Iran's government and state-run businesses were sanctioned because of their support for terrorism—including Syndicate terrorism in Afghanistan—primarily through Hezbollah and the Qods Force. ¶¶ 249, 258, 260-61, 263-64, 266-68, 285, 289-90, 304-63 (pp.85, 88-90, 96, 99-100, 104-24). Nevertheless, SCB took extreme steps to secure illicit Iranian business, expand it, and conceal it from U.S. regulators. Its senior management was in on the scheme, and openly contemptuous of U.S. banking rules. For instance, in October 2006, "SCB's CEO for the Americas sent a panicked message to the Group Executive Director in London"—whose leadership role at SCB

10

cannot be overstated[2]—urging re-evaluation of the Iranian business and noting the possibility of "serious criminal liability"; the Group Director replied, "You fucking Americans. Who are you to tell us, the rest of the world, that we're not going to deal with Iranians." ¶ 844 (pp.351-52). Notwithstanding the position of the U.S. government, advice from outside counsel, and the concerns of its own executives, SCB knowingly processed hundreds of millions of dollars in illegal payments for Hezbollah and Qods Force fronts until at least 2014. ¶¶ 915-20 (pp.379-82).

5. For years, SCB assisted individuals who played a role in Syndicate violence. These included: Hikmatullah Shadman, an Afghan warlord who paid USD to the Taliban and Haqqani Network as "taxes" or bribes from 2009 to 2012, ¶¶ 486-87 (pp.224-25); Mustafa Ahmed al-Hisawi, who was "al-Qaeda's paymaster and key financial planner," and used SCB to fund terrorist attacks, including the 9/11 attack, ¶¶ 491-97 (pp.225-27); Viktor Bout, a notorious Russian arms dealer who ran guns, bombs, gold, cash, and drugs for al-Qaeda and the Taliban after September 11, ¶¶ 498-99 (pp.227-28); and Abdul Baqi Bari, a high-ranking Haqqani Network and al-Qaeda operative, ¶¶ 500-04 (pp.228-29).

SCB's longstanding pattern of egregious misconduct has prompted multiple enforcement actions resulting in more than $1 billion in penalties; it has also led the media, watchdog groups, and other educated commentators to repeatedly and forcefully describe SCB as a laundromat for terrorist funds. ¶¶ 450-53 (pp.213-16). The complaint includes myriad additional allegations showing how any reasonable financial institution would have known that what SCB was doing supported terrorism—and how SCB subjectively knew that, too. ¶¶ 896-920 (pp.372-82).

---

[2] The "Group Executive Director was a long-standing key player at SCB, having served as SCB's head of Finance, Corporate Treasury and Corporate Development, Head of Growth and Governance across Africa, Middle East, Pakistan, United Kingdom, Europe and the Americas, as well as SCB's Head of Risk, Group Special Asset Management, Legal and Compliance." ¶ 845 (p.352).

Based on the foregoing allegations, Plaintiffs assert claims for aiding and abetting under the Anti-Terrorism Act (ATA), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, Plaintiffs allege that SCB aided two distinct acts of international terrorism: (1) the attacks that injured Plaintiffs, ¶¶ 2025-33 (pp.590-91); and (2) the overall terrorist campaign, which violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, ¶¶ 2034-43 (pp.592-94), and led to the attacks that injured Plaintiffs.

## ARGUMENT

### I.   The Complaint Satisfies Federal Rule of Civil Procedure 8

SCB argues that the complaint violates Rule 8's requirement of a short, plain statement. SCB MTD 12. But dismissal under Rule 8 is an extreme measure "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *Smith v. Fischer*, 2016 WL 3004670, at \*3-4 (W.D.N.Y. May 23, 2016) (holding that "[t]he law is . . . unambiguous" that "dismissal under Rule 8 is not warranted" merely because a complaint is lengthy; instead, dismissal is warranted only where "the complaint is so rambling that it is incomprehensible"). Under this rule, dismissal should be denied if "courts and adverse parties can understand a claim and frame a response to it." *Burke v. Dowling*, 944 F. Supp. 1036, 1049 (E.D.N.Y. 1995); *see also Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004); *Harnage v. Lightner*, 916 F.3d 138, 142 (2d Cir. 2019).

Moreover, "[b]revity must be calibrated to the number of claims and also to their character, since some require more explanation than others to establish their plausibility." *Kadamovas v. Stevens*, 706 F.3d 843, 844 (7th Cir. 2013). Consistent with this admonition, courts have permitted complaints similar to this one. For example, in *Atchley v. AstraZeneca UK*

*Ltd.*, 22 F.4th 204 (D.C. Cir. 2022), the complaint resembled the one here: it was "588 pages long" and included what the court described as "unusual detail," "provid[ing] context and spell[ing] out connections relevant to the extraordinary events it describes . . . with reference to hundreds of identified sources." *Id.* at 213.[3] Similarly, in *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *1 (E.D.N.Y. Nov. 25, 2020), the court allowed a complaint including 5695 paragraphs spanning nearly 788 pages. This is not the only context in which substantial complaints have survived motions to dismiss in this circuit. *See, e.g.*, *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 212 (S.D.N.Y. 2003) (refusing to dismiss 326-page complaint alleging multiple claims rooted in a complex fraud).

Here, the complaint is organized according to the elements and subdivided to allow each defendant to see the allegations most relevant to it. *Compare Atchley*, 22 F.4th at 215-16 (listing elements of aiding-and-abetting cause of action under JASTA) *with* Complaint pp.ix-xii (table of contents with headings for elements and defendant-specific allegations). Far from being unintelligible, these allegations are logically organized and provide fair notice to each defendant.

The length of the complaint is reasonable in light of the scope, complexity, and gravity of the allegations. This case alleges one of the largest and longest-running terrorist finance schemes ever, involving hundreds of plaintiffs injured in attacks spanning a five-year period. Those attacks involved different modes of violence carried out by different terrorist actors. The complaint also alleges multiple, independent channels of terrorist finance and support operated by different actors over different periods of time and in different geographies. The five defendant groups face partially overlapping allegations, but also distinct, defendant-specific allegations

---

[3] Plaintiffs' counsel Ryan R. Sparacino served (and continues to serve) as lead investigative counsel for plaintiffs in *Atchley* and co-authored the complaint in *Atchley*.

about their conduct and scienter, which span over a decade.

The complaint also includes factual support from authoritative sources. This is necessary because corporate ATA defendants often disparage allegations of support to terrorism as speculative, conclusory, or implausible—sometimes successfully. For example, in *Atchley*, the district court dismissed the aiding and abetting claim on this basis; the D.C. Circuit correctly reversed that decision—relying on details similar to those alleged here, which established linkages among various terrorist groups and described how terrorists convert support into violence. *See generally Atchley*, 22 F.4th 204.

SCB takes issue with what it describes as "largely irrelevant allegations and assertions about banks and terrorism generally." SCB MTD 13. But these include new allegations about Iranian terrorism fronts that are important to the claims against SCB—which served these entities for over a decade. SCB contends that no allegations tie NIOC and NITC to attacks in Afghanistan, but that, too, is incorrect: these entities provide funds and weapons (including weapons components) to Hezbollah and the Qods Force, ¶¶ 326, 340-45 (pp.170, 174-77), which, in turn, facilitated terrorism in Afghanistan. *See, e.g.*, ¶¶ 285, 290, 298-363, 334 (pp.96, 99-100, 102-24, 172). But even if SCB were correct that these allegations are "irrelevant," that would not be grounds for dismissal because they do not make the complaint incomprehensible.

SCB argues that the complaint impermissibly groups separate defendants together. To support this argument, it cherry-picks a handful of allegations that it thinks are insufficiently precise. SCB MTD 14. But the complaint does not simply lump all defendants together without detail. Instead, it describes SCB as a globally integrated money laundering enterprise where each defendant entity was part of a whole. In that context, it makes sense that the complaint sometimes groups the defendants together, and sometimes describes their conduct individually.

For example, SCB cites ¶ 463, which alleges that various branches have access to common data and act as one bank. This explains why knowledge at one defendant or branch is imputable to others—which shows why it isn't necessary always to allege which branch knew each fact. But in other places, including surrounding paragraphs, the complaint differentiates among defendants. For example, it identifies branches where Khanani maintained accounts and discusses SCB Dubai's role in the Khanani allegations. ¶¶ 460-62, 466 (pp.217-18, 219-20).

Moreover, a key allegation in this case is that every SCB entity used the New York branch to process USD transactions relating to all of the alleged terror finance channels. *E.g.*, ¶¶ 43, 50-60, 455, 466, 477, 482, 489, 491, 494-95, 527, 855, 874, 887, 1056-61 (pp.11-15, 216, 219-20, 222, 224-27, 239-40, 355, 361, 366, 422-24). That allegation is precise enough to give notice of the claim, and does not raise a Rule 8 problem. *See N.Y. Am. Water Co., Inc. v. Dow Chem. Co.*, 2020 WL 9427226, at *4 (E.D.N.Y. Dec. 11, 2020) (rejecting defendant's "grouping" argument when plaintiff asserted same claim against multiple parties).

SCB also chides Plaintiffs for not modifying the complaint in response to this Court's remarks at the status conference. That is unfair. This Court urged Plaintiffs to take their obligations under Rule 8 seriously—and Plaintiffs did, cutting about 100 pages of material from the original complaint. Plaintiffs also heeded this Court's separate admonition to put forth all the facts that entitle them to relief. That necessitated adding new allegations, including allegations about SCB's support for the IRGC and the Azizi cell.

Plaintiffs have put forth a plausible pleading that provides fair notice to each defendant of the allegations against it. SCB has not shown that the pleading is "incomprehensible," and so dismissal is unwarranted under Second Circuit precedents. *See Salahuddin*, 861 F.2d at 43 (allowing amendment and encouraging the district court not to dismiss even if the amendment

failed to comply with Rule 8, but instead to strike the improper parts).

## II.    The Complaint States Claims for Aiding and Abetting Under the Justice Against Sponsors of Terrorism Act

Plaintiffs assert aiding and abetting liability under JASTA, which "'[p]rovide[s] civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries … wherever they may be found, that have provided material support, *directly or indirectly*, to … persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

JASTA adopts the framework set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5). The facts of that case illustrate JASTA's broad scope. In *Halberstam*, the defendant was the "banker, bookkeeper, recordkeeper, and secretary" for a burglar. 705 F.2d. at 487. She was sued for damages after the burglar murdered a homeowner during a botched burglary. *See id*. at 474. The D.C. Circuit held that she could be liable for the unplanned murder, even if she did not know about it, or even know that her partner "was committing burglaries." *Id*. at 488. Instead, "it was enough that she knew he was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in any of these enterprises." *Id*. Even though the defendant's "own acts were neutral standing alone," they gave rise to aiding-and-abetting and conspiracy liability. *Id*.

To state a claim for aiding and abetting under JASTA, a plaintiff must show: (1) that she was injured by an act of international terrorism that was committed, planned, or authorized by a designated FTO; (2) that the defendant "directly or indirectly aided" the party who "performed the injury-causing act"; (3) that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable"; and (4) that the defendant's assistance was "substantial." *Honickman*, 6 F.4th at 495-96, 499.

SCB argues as if the complaint only asserts liability based on the theory that it aided and abetted the attacks. That is Count One. But Count Two alleges separately that SCB aided and abetted the Taliban-al-Qaeda Campaign, *i.e.*, a criminal enterprise to expel Americans from Afghanistan through anti-American violence. SCB says nothing about this theory, and any objection to it is forfeited. This matters because even if this Court concludes that SCB's support was too attenuated from any one attack, it was not attenuated from the overall terrorist enterprise.

**A. Standard Chartered Aided Syndicate Terrorists**

SCB addresses this element last, arguing that the complaint fails to allege "a direct link between each SCB Defendant and the person(s) who carried out the attacks," or that SCB's customers "had a direct relationship with" those persons. SCB MTD 23. No direct link is required—and the complaint alleges enough to satisfy this element.

JASTA "reach[es] persons who provide support for international terrorism 'directly or indirectly." *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021) (citation omitted); *see also Atchley*, 22 F.4th at 225 (similar); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 158 (E.D.N.Y. 2020), *motion to certify appeal granted*, 2020 WL 6700121 (E.D.N.Y. Nov. 13, 2020). It does not matter if one or more intermediaries were involved; otherwise, JASTA could easily be evaded using a chain of intermediaries. *Cf. Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701-02 (7th Cir. 2008) (en banc) (explaining that "donors to terrorism" should not "be able to escape liability because terrorists and their supporters launder donations through a chain of intermediate organizations"). What matters is whether the defendant provided assistance with the requisite awareness.

SCB's laundromat transactions were not attenuated from terrorist violence; they were one of the principal mechanisms by which al-Qaeda and the Haqqani Network financed the terrorism against Americans in Afghanistan. The Syndicate relied upon access to USD to enable the

attacks that injured Plaintiffs. ¶¶ 111-56, 187-245 (pp.31-48, 60-83). The SCB defendants provided that access, giving direct aid to the Khanani MLO; Syndicate-operated VAT fraud schemes; fertilizer companies that knowingly produced materials for Syndicate bombs; fronts for Hezbollah and the Qods Force; and individuals who contributed to al-Qaeda, the Haqqani Network, and their Syndicate allies. *E.g.*, ¶ 1062 (pp.424-25); *supra* pp.1-11. Each of these entities enabled the Syndicate's violence in Afghanistan. *E.g.*, ¶¶ 268-78 (pp.150-54) (listing seven ways the Khanani MLO aided the Syndicate's terrorist operations in Afghanistan); ¶¶ 473-79, 690-99 (pp.221-23, 291-95) (VAT fraud schemes funded Syndicate terrorism); ¶¶ 508-15 (pp.231-34) (Fatima and Pakarab fertilizer used in Syndicate bombs); ¶¶ 90-95, 320-21, 331-34 (pp.21-24, 168, 171-72) (IRGC support for Syndicate terrorism in Afghanistan); ¶¶ 326, 337-45 (pp.170, 173-77) (NIOC and NITC funded the IRGC's terrorist-support efforts); ¶¶ 314-17 (pp.166-67) (Shadman paid taxes to the Syndicate in Afghanistan).

## B. Standard Chartered Was Generally Aware That It Was Playing a Role in Illegal Activity That Foreseeably Risked Terrorism

The second element "requires the defendant to be generally aware of its role in an *overall illegal or tortious activity* at the time that [it] provides the assistance." *Honickman*, 6 F.4th at 496 (quotation omitted) (emphasis added). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Id.* General awareness connotes "something less than full, or fully focused, recognition," and is "less demanding than a requirement that [plaintiffs] show awareness." *Kaplan*, 999 F.3d at 863.

In evaluating general awareness allegations, the Court must "consider all of the complaint's allegations" collectively, and "accept as true all permissible inferences that could be drawn from the complaint as a whole." *Kaplan*, 999 F.3d at 865. The inquiry is "fact-intensive,"

*id.* at 860, and "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation omitted). Thus, courts must be "lenient in allowing scienter issues . . . to survive motions to dismiss"—even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 693 (2d Cir. 2009) (quotation marks omitted).

The inferences of "general awareness" fairly drawn from the complaint are anything but tenuous. SCB "consciously chose to operate Laundromats for Syndicate agents, operatives, fronts, and partners from 2001 through 2016." ¶ 444 (p.211). SCB "understood that any financial institution or money remitter who served as a 'Laundromat' would inevitably route substantial sums of U.S. Dollars to terrorist financiers seeking to raise and move money to support anti-American terrorist attacks." ¶ 610 (p.260). Indeed, this has been common knowledge since "the 1980s," ¶ 611 (p.261), and "no reasonable [bank] could have believed that acting as Laundromat for organized crime groups had no foreseeable link to terrorism," ¶ 612 (p.261); *see also* ¶¶ 614-52, 719-25 (pp.262-76, 303-07) (many public sources confirming the link between laundromats and terrorist finance). Indeed, the complaint provides over 50 pages of detail explaining why "the connections between" the unlawful transactions at issue here "and Syndicate violence have been well-established since well before the first attacks at issue in this case." ¶ 592 (p.253); *see also* ¶¶ 596-735 (pp.255-313). Together, these allegations show that SCB was generally aware of its role in illegal activities, and that terrorist violence was a foreseeable risk.

SCB disputes that its customers were "closely intertwined" with violent terrorism. SCB MTD 16 (quoting *Honickman*, 6 F.4th at 499). In *Kaplan*, the Second Circuit found this standard satisfied with respect to customers who were alleged to be integral constituent parts of Hezbollah. *See* 999 F.3d at 860. The customers were Bayt al-Mal, a "bank, creditor, and investment arm" for Hezbollah; Yousser Company, which was used "to secure loans and finance

business deals" for Hezbollah companies; and Shahid Martyrs Foundation, which provided financial support to wounded Hezbollah terrorists and their families. *See id*. at 849.

SCB's customers were more closely intertwined with terrorism than the entities in *Kaplan*. Like the entities in *Kaplan*, Khanani was a financier for multiple Syndicate entities and leaders—and so much more: He was "one of the world's worst polyterrorist financers," and his organization was "the worst terrorist finance enterprise in the world." ¶ 253 (p.143). He was also internationally infamous after 9/11 (when he was name-checked in media reports linking him to terrorism), which was further reinforced in 2008 when the Pakistani government charged him. ¶¶ 253-54, 259, 672 (pp.142-47, 284-85).

The complaint also alleges specific knowledge at SCB. As explained *supra* p.5, in 2012 and 2013 a compliance employee determined that the bank was "carry[ing] out USD money-laundering transactions for the Khanani MLO," that "Khanani was a suspected agent of terrorist organizations," that revenues from the money laundering scheme "contributed to funds used to support terrorist activities that killed and wounded American service members," and that this "activity was part of a much broader practice." ¶ 466 (pp.219-20). This is one of the strongest scienter allegations in the complaint, and SCB never once discusses it.[4]

In addition to these Khanani-specific facts, every reasonable bank would have known that "money laundering and terrorism . . . can go hand in hand, as one certainly can be used to fund the other." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 431 (E.D.N.Y. 2013), *on*

---

[4] SCB disparages a separate allegation about whistleblowers. SCB MTD 10 n.8. SCB's knowledge inferred from whistleblowing activity, however, is distinct from plaintiffs' allegation in paragraph 466—which SCB ignores. SCB's response to the whistleblower allegations is also unpersuasive. The allegation is that other persons whose knowledge was imputed to SCB knew in 2013 that SCB was processing transactions for Al Zarooni Exchange, and knew that this entity was linked to terrorism. ¶ 472 (p.221). Rule 8 does not require more.

*reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017). The steps the U.S. government took to curb money laundering after the September 11 attacks show the clear linkage between money laundering and al-Qaeda/Taliban financing. ¶¶ 117-18, 597-607 (pp.34-35, 255-60). Educated commentary likewise highlights the close connection between money laundering and terrorism finance. *E.g.*, ¶¶ 131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78 (pp.39-40, 61-63, 78-79, 149-50, 159-60, 162-64, 257, 260-76, 394-95). SCB was thus aware that by enabling Khanani's laundering, it was foreseeably risking terrorism.

SCB also knew that VAT fraud funds terrorism. By the 2000s, authoritative public sources linked VAT fraud to al-Qaeda and Haqqani Network terrorist financing. ¶¶ 294, 690-99 (pp.159-60, 291-95). Samir Azizi was one of al-Qaeda's and the Haqqani Network's most prolific fundraisers. ¶ 428 (p.207). Evidence of his support for terrorism was found in an al-Qaeda/Haqqani Network cave hideout in 2010. ¶ 293 (p.159). SCB assisted Azizi for six years, ¶¶ 474-79 (pp.222-23), and Azizi admitted that SCB gave him access to a company he used in the scheme, ¶ 476 (p.222). Moreover, Deutsche Bank, which also assisted Azizi's VAT fraud, determined the truth about the transactions, ¶ 791 (p.334); it is a fair inference that SCB did too, ¶¶ 792, 806-09 (pp.334, 338-39). *Cf. United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011) (evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" can show the defendant's guilty knowledge). That suffices to plead general awareness under *Kaplan's* permissive standard.

Processing USD transactions for Fatima and Pakarab also foreseeably risked terrorism. Public sources linked these companies' CAN fertilizer to Syndicate bombs years before the first attack in this case, and consistently thereafter. ¶¶ 508-15 (pp.231-34). As a "major banker" for these companies, ¶ 526 (p.239), SCB knew that its services were indispensable, and so knew that

it was playing a role in bombmaking—which is obviously closely intertwined with violence.

More pointedly, Fatima and Pakarab's role in producing bomb materials was not incidental. Instead, there was a "widespread U.S. government view . . . that Fatima and Pakarab had joined rogue ISI's conspiracy with the Haqqani Network to support CAN fertilizer bomb attacks against Americans in Afghanistan." ¶ 519 (p.235). Thus, in September 2012, a member of Congress stated that that reason Fatima and Pakarab were not interested in making fertilizer harder to smuggle was that "the ISI finds it convenient to continue to be able to work with the Haqqani Network to smuggle this across the border" to "destabilize the Afghan government" and "the NATO allies," "and the Pakistanis continue to deal with these people . . . to kill American soldier[s] every day." ¶ 519 (p.236) (emphases omitted). On January 29, 2013, the *Washington Times* reported statements by another member of Congress stating that Fatima was a "pseudo-terrorist organization" and was being "influenced by 'bad actors in Pakistan who want to create havoc and chaos in Afghanistan and thwart the U.S. efforts there.'" ¶ 523 (p.238) (emphases omitted). The same article reinforced the broader theme that Fatima and Pakarab were deliberately supplying bomb materials for use by the Haqqani Network. *Id*.

Any doubts about SCB's knowledge were resolved in January 2013 when LTG Barbero visited SCB's New York offices to plead with the bank to curb the flow of dangerous explosives to Syndicate terrorists. ¶ 529 (pp.240-41). LTG Barbero showed SCB the casualty numbers, explained "that Fatima and Pakarab had repeatedly refused to cooperate with American efforts to stop, or even reduce, the unfettered flow of Fatima Group CAN Fertilizer into Afghanistan for use by al-Qaeda affiliated terrorists," and showed SCB that its provision of USD services was "irreplaceable," so that it could "save American lives" by stopping. ¶ 529 (pp.240-41). SCB did nothing; in LTG Barbero's words, the bank was "utterly useless." ¶ 505 (p.229). Similar

allegations have supported an inference of scienter even under more demanding standards. *Cf.*

*Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 49 (D.D.C. 2010) (intent requirement met when

a defendant bank "knowingly continued to carry out" transactions with a customer who

facilitated terrorism "after being expressly warned [by the Israeli government] of the

consequences of its actions and asked to desist").

 SCB responds that Fatima and Pakarab were not "entirely terrorist fronts without

legitimate business operations." SCB MTD 18. So what? Imagine, for example, that a defendant

knowingly assisted a prolific terrorist bombmaker who also spent most of his waking hours

painting landscapes. The bombmaker's lawful artistic interests would not vitiate the defendant's

liability. Here, public sources showed that Fatima and Pakarab willfully produced materials for

al-Qaeda and Haqqani Network bombs that killed hundreds of Americans. Any legitimate

business operations they may have also had are irrelevant. *Cf. Atchley*, 22 F.4th at 228-29

(explaining in the context of a proximate causation challenge to a primary liability claim that

"[a]id directed to beneficial or legitimate-seeming operations" can still "caus[e] terrorist acts").[5]

---

[5] Defendants cite *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 225 (2d Cir. 2019), where the plaintiffs did "not allege—even conclusorily—that most, or even many, of HSBC's services to ARB assisted terrorism." Here, Standard Chartered's services to Fatima and Pakarab were a but-for cause of those companies supplying bomb materials. ¶¶ 1075-82 (pp.429-32). Moreover, "the complaint in *Siegel* revealed that HSBC, after learning of reports that ARB had customers who were terrorists, terminated its relationship with ARB nearly a year before the relevant terrorist attacks occurred." *Kaplan*, 999 F.3d at 862. The complaint in *Kaplan* survived, in part, because the defendant continued serving its customers after learning of their contributions to terrorism. *See id.* So too here. Even after multiple public sources *and the head of JIEDDO* informed SCB that its business with Fatima and Pakarab was enabling the bombing campaign, SCB continued facilitating Fatima and Pakarab's sales. *E.g.*, ¶ 529 (pp.240-41).

This also answers SCB's argument that it merely provided "routine" banking services. First, Plaintiffs dispute that knowingly providing services that benefit terrorist bombers can ever be routine. *See Kaplan*, 999 F.3d at 858. Second, under *Halberstam*, even acts that are "neutral standing alone" can be actionable depending on context. 705 F.2d at 488. In this context, ordinary banking transactions often enabled Syndicate violence. *E.g.*, ¶ 715 (pp.301-02). And SCB's other acts, *e.g.*, VAT fraud and sanctions evasion, could never be described as "routine."

SCB was also aware that it was playing a role in unlawful activities when it violated sanctions on Iranian enterprises like NIOC and NITC that served as fronts for Hezbollah and the Qods Force. Iran has long been designated a state sponsor of terrorism, ¶ 249 (p.85), and Hezbollah's and the Qods Force's role and deployment of IRGC resources in Syndicate violence has likewise long been publicized, ¶¶ 256, 285, 289-91, 298-363 (pp.87, 96, 99-100, 102-24). When SCB provided services to these Hezbollah and Qods Force fronts, it was aware that it was playing a role in illegal activities from which terrorist violence was foreseeable.

SCB cites two district court cases, *Bowman v. HSBC Holdings PLC*, 465 F. Supp. 3d 220, 229 (E.D.N.Y. 2020), and *O'Sullivan v. Deutsche Bank AG*, 2020 WL 906153, at *6 (S.D.N.Y. Feb. 25, 2020), which held that violations of Iran-related sanctions were insufficient to support claims for aiding and abetting. SCB MTD 19. But under the Second Circuit's subsequent controlling decision in *Kaplan*, "circumventing sanctions imposed in order to hinder terrorist activity" can give rise to JASTA liability. 999 F.3d at 866. In *Kaplan*, the defendant provided funds to businesses and a foundation alleged to be part of Hezbollah. Here, NIOC and NITC were also funding conduits for Hezbollah, as well as the Qods Force. ¶¶ 318, 338-42, 345 (pp.167, 173-75, 177). The allegations that succeeded in *Kaplan* are indistinguishable.

Finally, SCB argues that some of its support for al-Qaeda supporters, most particularly individuals, occurred several years before the attacks in this case. SCB MTD 18. That may have been relevant to general awareness before *Honickman*, because courts frequently treated the question as whether the defendant was aware that it was playing a role in terrorist acts. But after *Honickman*, the question is whether the defendant was generally aware of its role in an "overall illegal activity" that foreseeably risked terrorism. 6 F.4th at 496, 498. Given the low cost of terrorist violence, the contribution of substantial amounts of money even years before an attack

24

still supports terrorist operations years later. *See Boim*, 549 F.3d at 700 ("Terrorism campaigns often last for many decades," and "[s]eed money for terrorism can sprout acts of violence long after the investment"). In any event, these examples also support the broader point that for years after September 11, SCB knowingly acted as a laundromat that supported terrorists.

## C.  Standard Chartered's Assistance Was Substantial

As SCB explains (SCB MTD 19-20), whether the assistance it provided was "substantial" turns on a six-factor inquiry, in which no factor is dispositive and each is weighed on a case-by-case basis. *See Kaplan*, 999 F.3d at 856.

The first factor is the nature of the act assisted. "[T]he 'nature of the act involved dictates what aid might matter'" and thus "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [bank's] customers) would be important to the nature of the injury-causing act ([the FTO's] terrorist attacks)." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484). Here, the act assisted is terrorism, and "[f]inancial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley*, 22 F.4th at 222 (quoting *Gonzalez v. Google LLC*, 2 F.4th 871, 905 (9th Cir. 2021)). Indeed, when the act is so "vicious" and extraordinarily blameworthy, "even 'relatively trivial' aid could count as substantial." *Id*. (citation omitted).

SCB argues that it did not "encourage[] any terrorist activity." SCB MTD 20. This factor, however, is not about whether the bank "knowingly encouraged [the FTO's] violent activities," but instead focuses on whether the type of aid given generally tends to facilitate the type of tort at issue. *Honickman*, 6 F.4th at 500 (quotation marks omitted); *Bartlett*, 2020 WL 7089448, at *12 n.11. Here, the support SCB provided "was tailored to the specific violence at issue" because Syndicate terrorists needed USD to finance their attacks, and because CAN fertilizer was essential to the ongoing bombing campaign against Americans. ¶¶ 965-66 (p.390). Informed

commentary from government officials, terrorism scholars, and the media shows that the services SCB provided were key to the Syndicate's attack capabilities. ¶¶ 967-78 (pp.390-95).

With respect to the amount of assistance, SCB faults the complaint for not "identify[ing] any actual assistance any SCB Defendant provided to any terrorist attack." SCB MTD 20. That is incorrect: SCB assisted Khanani, the personal financier for Sirajuddin Haqqani, a terrorist leader who directly participated in attacks that injured Plaintiffs, *e.g.*, by planning the kidnapping of Plaintiff Kevin King, ¶ 1489 (p.501), by managing bombmaking sites, *e.g.*, ¶ 1103 (p.436), and by coordinating the Kabul Attack Network, *e.g.*, ¶ 1171 (p.447). There is also a straight line from SCB's assistance to Fatima and Pakarab to nearly every IED and suicide bomb attack in this case. ¶¶ 983-85 (pp.395-96). Regardless, the law does not require plaintiffs to trace assistance to specific attacks. On the contrary, "if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500. SCB provided at least $13 million, and likely more than $130 million, to al-Qaeda, the Haqqani Network, and their Syndicate allies. ¶¶ 445-46 (pp.211-12). Even small amounts of money can fund attacks like the ones that injured Plaintiffs. ¶¶ 983-84 (pp.395-96). The millions here plainly support liability. *See Atchley*, 22 F.4th at 222.

SCB argues that it did not have a "direct or close relationship" with "persons or groups that allegedly carried out the attacks." SCB MTD 20. But "a direct relationship between the defendant and the FTO is not required to satisfy this factor." *Honickman*, 6 F.4th at 501. Here, SCB had close customer relationships with Syndicate members like Khanani, ¶¶ 255-56 (p.145) (identifying Khanani as a Syndicate member); al-Qaeda and Haqqani Network operatives like Azizi, and Hezbollah/Qods Force fronts NIOC and NITC. SCB facilitated these customers'

unlawful business by retaliating against employees who complained about banking for Khanani, ¶ 469 (p.220), by directly assisting Azizi's VAT fraud, ¶ 476 (p.222), and by shielding Hezbollah and Qods Force transactions from regulatory scrutiny, ¶ 852 & n.555 (p.354).

SCB argues that providing fungible dollars to an FTO is not enough to support liability. SCB MTD 22. Even at face value, that argument proves only that some aid to FTOs (*e.g.*, to the charitable wing of Hamas) might not *prove* liability in every instance. *See Kaplan*, 999 F.3d at 860-61. But here, SCB assisted people closely intertwined with violence. Indeed, if the defendant in *Halberstam*—who provided banking, bookkeeping, and secretarial services—was liable for a murder that she did not even know about (let alone cause), SCB can easily be held liable here. *See* 705 F.2d at 487. This also disposes of SCB's causation argument. *See* SCB MTD 22. In aiding and abetting cases, it is black-letter law that the defendant's conduct need not *cause* the plaintiff's injury. *See Linde v. Arab Bank PLC*, 882 F.3d 314, 331 (2d Cir. 2018). Instead, the injury-causing act must be *foreseeable*. *Honickman*, 6 F.4th at 496.

SCB argues that the causation chain is too attenuated because only a small percentage of Fatima and Pakarab fertilizer was used to make bombs—but the manufacturers' business was otherwise lawful. SCB MTD 21-22. This argument is largely addressed *supra* by allegations that SCB knew that Fatima and Pakarab willfully produced bomb materials. SCB's attempt to downplay the quantity of materials is also unpersuasive because Fatima and Pakarab CAN fertilizer bombs caused 90% of all American casualties. ¶ 526 (p.239).

Finally, SCB says nothing about two factors: duration and state of mind. *Atchley* held that "four years is a significant duration." 22 F.4th at 224. SCB provided assistance "for nearly two decades." ¶ 1021 (p.409). SCB also had a culpable mental state, as evidenced by the involvement of SCB's senior executives, the magnitude of the misconduct, the resulting penalties, and the

company's refusal to change its ways. *See, e.g.*, ¶¶ 1010-11 (p.407).

Considering the six factors together, SCB's assistance was substantial.

### III.    This Court Has Personal Jurisdiction Over SC PLC and SCB Pakistan

Standard Chartered Bank does not dispute this Court's jurisdiction. SC PLC and SCB

Pakistan do. SCB MTD 24-27. These entities are subject to jurisdiction on three grounds.

First, they purposefully availed themselves of the United States by aiding their clients in

processing USD transactions through the U.S. banking system. *See Licci ex rel. Licci v.

Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169-70 (2d Cir. 2013). In *Licci*, a terrorist support

case, the defendant bank had "no operations, branches, or employees in the United States," but it

routed some of the offending wire transfers through its correspondent accounts at U.S. banks. *Id*.

at 165-66. This "selection and repeated use of New York's banking system, as an instrument for

accomplishing the alleged wrongs," was purposeful availment. *See id*. at 171. "Since *Licci*, there

have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction

lies over banks that executed funds transfers in New York, either through their New York branch

or a correspondent account they maintained in their own name." *Bartlett*, 2020 WL 7089448, at

*5 (collecting cases). This is so even when transfers flowing through New York constitute only

"a part of" the offending activity. *Licci*, 732 F.3d at 170; *Weiss v. Nat'l Westminster Bank PLC*,

176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

Here, the cornerstone of every SCB defendant's business model is providing USD

clearing services that flow through New York. ¶¶ 1055-60 (pp.422-24). Like the defendant bank

in *Licci*, SCB chose New York as the focal point of its business—but its presence here is even

more robust, including a domestic branch. Plaintiffs' claims arise out of and relate to those

contacts because access to USD is key to al-Qaeda's and the Haqqani Network's terrorism

finance strategy. *See* ¶¶ 150-56, 1062-69 (pp.46-48, 424-27). With respect to CAN fertilizer,

Fatima and Pakarab similarly depend on access to USD. ¶¶ 1070-82 (pp.427-32).

Second, SCB Pakistan and SC PLC acted as agents for SCB's New York branch by working actively to promote more USD clearing business for the branch. ¶¶ 51-60 (pp.13-15). This agency relationship was operationalized, in part, through SCB's "One Bank" model, under which all SCB affiliates operated as a "globally integrated business" that "aggressively promoted SCB New York to their global customer base." ¶ 52 (p.14). Similar allegations supported a finding of jurisdiction against foreign suppliers in *Atchley*. *See* 22 F.4th at 231.

Third, defendants "targeted the United States by directly undermining U.S. foreign-policy interests in Afghanistan and jeopardizing the safety of American service members deployed there." ¶ 1083 (p.432). When they assisted the Syndicate—especially through its CAN fertilizer campaign—defendants "knew they were helping al-Qaeda, the Haqqani Network, and their allies conduct attacks to influence U.S. policy by killing and injuring American personnel." *Id*. Those attacks were designed to, and did, "cause pain and sow terror in [Plaintiffs'] home country." *Mwani v. bin Laden*, 417 F.3d 1, 13 (D.C. Cir. 2005). These attacks were not "indiscriminate" attacks that injured Americans by chance; they "were specifically targeted against [U.S.] citizens" and designed to influence U.S. policy. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 338-39 (2d Cir. 2016). Unlike in cases where personal jurisdiction has failed, then, defendants supported attacks that were "indisputably aimed to kill Americans." *Est. of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1126 (D.C. Cir. 2019), *cert. granted, judgment vacated,* 140 S. Ct. 2713 (2020), *and opinion reinstated in part,* 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020). In such circumstances, jurisdiction based on effects is proper.

Asserting personal jurisdiction here accords with Congress's finding that defendants that "directly or indirectly" fund terrorism "necessarily direct their conduct at the United States, and

should reasonably anticipate being brought to court in the United States." JASTA § 2(a)(6).

Courts widely defer to the political branches' "national security and foreign policy" judgments,

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010), and Congress here determined

that defendants' support for terrorists "connects [its conduct] to the forum" in a meaningful way,

*Walden v. Fiore*, 571 U.S. 277, 290 (2014); *see Livnat v. Palestinian Auth.*, 851 F.3d 45, 56

(D.C. Cir. 2017) ("congressional interests may be relevant to . . . due-process standards").

Congress's finding also answers SCB's argument that the exercise of jurisdiction would be

unfair—but even if it didn't, a global bank that depends on USD clearing as a cornerstone of its

commercial success cannot reasonably argue that it should not have to answer in U.S. court when

it pursues that business in a way that leads to the deaths of American nationals.

SCB argues that banks can only be held liable for USD clearing activities when they clear

transactions for a terrorist customer or facilitate transfers directly to a terrorist group. SCB MTD

25. Given recent Second Circuit clarifications that JASTA applies to those who indirectly

support terrorism, it is now also clear that a valid JASTA claim can arise out of or relate to USD

clearing activities that do not involve direct contact with terrorists. That discredits SCB's legal

rule. But in any event, Plaintiffs allege that SCB provided services directly to terrorist

organizations or their agents (which is the same thing for jurisdictional purposes). *E.g.*, ¶ 446

(p.212). More broadly, many of the USD transactions SCB processed were tantamount to direct

support for terrorists. *See e.g.*, ¶¶ 134, 172, 202, 204, 236, 359-60, 314-15, 478-79 (pp.40-41, 54,

66-67, 79, 122-23, 166, 222-23). Thus, even under SCB's restrictive rule, the complaint alleges

personal jurisdiction over every named defendant, and there is no due process concern.

## CONCLUSION

SCB's motion to dismiss should be denied.

Dated: May 13, 2022

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Ryan R. Sparacino
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*