2022 WL 4074415
Only the Westlaw citation is currently available.
United States Court of Appeals,
District of Columbia Circuit.

Dana Marie BERNHARDT, et al., Appellants

v.

ISLAMIC REPUBLIC OF IRAN, et al., Appellees

No. 21-7018
|
Argued October 18, 2021
|
Decided September 6, 2022

**Synopsis**
**Background:** Family members of victims of fatal attack
by al-Qaeda operative at secret Central Intelligence Agency
(CIA) base in Afghanistan brought action against financial
institution incorporated in the United Kingdom (UK) and
several of its foreign and domestic affiliates, for aiding
and abetting violation of Anti-Terrorism Act (ATA), and
participating in conspiracy that caused victims' deaths,
through evasion of sanctions which sought to restrict flow
of money to individuals, entities, and countries on the
Office of Foreign Assets Control's (OFAC) list of specially
designated nationals and blocked persons. The United States
District Court for the District of Columbia, No. 1:18-
cv-02739, Timothy J. Kelly, 2020 WL 6743066, dismissed
action against foreign institutions due to lack of personal
jurisdiction, and for failure to state a claim. Family members
appealed.

**Holdings:** The Court of Appeals, Rao, Circuit Judge, held
that:

[1] exercise of specific personal jurisdiction over foreign
financial institutions was not consistent with Fifth
Amendment's Due Process Clause;

[2] family members failed to state aiding and abetting liability
claim against institution's domestic affiliates under ATA; and

[3] family members failed to state conspiracy claim against
institution's domestic affiliates under ATA.

Affirmed.

Wilkins, Circuit Judge, issued opinion concurring in part and
dissenting in part.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for
Lack of Personal Jurisdiction; Motion to Dismiss for Failure
to State a Claim.

West Headnotes (23)

[1] **Federal Courts** ⟜ Personal jurisdiction

Dismissal for lack of personal jurisdiction is
reviewed de novo by the Court of Appeals. Fed.
R. Civ. P. 12(b)(2).

[2] **Federal Courts** ⟜ In general; factors
considered

Pleading specific personal jurisdiction over
foreign defendant requires demonstrating a
close nexus between the United States, the
foreign defendant's conduct, and plaintiff's
claim; plaintiff must show the foreign defendant
has purposefully directed his or her activities at
residents of forum, and that alleged injuries arise
out of or relate to those activities. Fed. R. Civ. P.
4(k)(2).

[3] **Federal Courts** ⟜ In general; factors
considered

A district court may exercise specific personal
jurisdiction only over those foreign defendants
who had fair warning a particular activity may
subject them to jurisdiction of the United States
courts. Fed. R. Civ. P. 4(k)(2).

[4] **Constitutional Law** ⟜ Banks, banking,
finance, and securities

**Federal Courts** ⟜ Terrorism

Fatal attack by al-Qaeda operative at secret
Central Intelligence Agency (CIA) base in
Afghanistan neither arose out of nor was related
to foreign financial institutions' evasion of

sanctions through its coordination with domestic affiliates, which sought to restrict flow of money to individuals, entities, and countries on the Office of Foreign Assets Control's (OFAC) list of specially designated nationals and blocked persons, such that institutions did not purposefully direct their conduct at United States markets and, thus, exercise of specific personal jurisdiction over institutions, in Anti-Terrorism Act (ATA) action brought against them by family members of victims of attack, was not consistent with Fifth Amendment's Due Process Clause; although institutions processed transactions for intermediary Iranian and Saudi Arabian banks linked to designated state sponsors of terrorism and specially designated global terrorists such as Al-Qaeda, the institutions' aid to Iran and Saudi Arabia could just have plausibly benefited their otherwise legitimate operations, and family members did not establish that any aid flowed indirectly through intermediary banks to Al-Qaeda. U.S. Const. Amend. 5; 18 U.S.C.A. § 2333(a); Fed. R. Civ. P. 4(k)(2).

**[5]** **Federal Courts** 🔑 Pleading

The Court of Appeals reviews the district court's dismissal of claim for failure to state a claim de novo. Fed. R. Civ. P. 12(b)(6).

**[6]** **Federal Civil Procedure** 🔑 Insufficiency in general

In order to withstand motion to dismiss for failure to state a claim, a plaintiff's claim must rise above the speculative level. Fed. R. Civ. P. 12(b)(6).

**[7]** **Federal Civil Procedure** 🔑 Insufficiency in general

A claim cannot survive a motion to dismiss for failure to state a claim if based on inferences unsupported by facts or legal conclusions disguised as factual allegations. Fed. R. Civ. P. 12(b)(6).

**[8]** **Torts** 🔑 Aiding and abetting

"Aiding and abetting," as means of establishing vicarious civil liability for tort, includes three elements: (1) party whom defendant aids must perform wrongful act that causes injury; (2) defendant must be generally aware of his or her role as part of overall illegal or tortious activity at time that he or she provides assistance; and (3) defendant must knowingly and substantially assist principal violation.

**[9]** **War and National Emergency** 🔑 Private Remedies

In the context of the Anti-Terrorism Act (ATA), aiding and abetting liability requires a defendant be generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk. 18 U.S.C.A. § 2333(d)(2).

**[10]** **War and National Emergency** 🔑 Private Remedies

To allege that defendants had general awareness of role in overall illegal activity from which an act of international terrorism was a foreseeable risk, as required for aiding and abetting liability under Anti-Terrorism Act (ATA), plaintiffs must plead allegations of the facts or events they claim give rise to an inference that defendants acted with the requisite mental state. 18 U.S.C.A. § 2333(d)(2).

**[11]** **War and National Emergency** 🔑 Private Remedies

Knowledge and other mental states may be alleged generally, but must at least support a plausible inference of general awareness, as required for aiding and abetting liability under the Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333(d)(2); Fed. R. Civ. P. 8, 🚩9(b).

**[12]**  **War and National Emergency** 🔑 Private Remedies

When plaintiff's Anti-Terrorism Act (ATA) aiding and abetting claim depends on aid flowing through an intermediary, general awareness requirement is satisfied if defendant was aware of intermediary's connection to terrorist organization, and intermediary is so closely intertwined with terrorist organization's illegal activities as to give rise to inference that defendant was generally aware of its role in organization's terrorist activities. 18 U.S.C.A. § 2333(d)(2).

**[13]**  **War and National Emergency** 🔑 Private Remedies

There is no requirement of specific intent in order to establish Anti-Terrorism Act (ATA) aiding and abetting claim depending on defendant's aid flowing through an intermediary entity, and a defendant does not have to wish to bring about an act of terrorism or know of the specific attacks at issue. 18 U.S.C.A. § 2333(d)(2).

**[14]**  **War and National Emergency** 🔑 Private Remedies

Family members of victims of fatal attack by al-Qaeda operative at secret Central Intelligence Agency (CIA) base in Afghanistan failed to plausibly allege that domestic affiliates of financial institution were aware their financial dealings with intermediary banks in Iran and Saudi Arabia supported al-Qaeda's terrorist acts and, thus, family members failed to state aiding and abetting liability claim against domestic affiliates, under Anti-Terrorism Act (ATA), through the alleged processing of financial transactions for intermediary banks which evaded sanctions that sought to restrict flow of money to individuals, entities, and countries on the Office of Foreign Assets Control's (OFAC) list of specially designated nationals and blocked persons, absent any allegations that domestic affiliates were aware of Iranian banks' connections to al-Qaeda, any allegations the banks were so closely intertwined with al-Qaeda

to infer domestic affiliates' general awareness, or any allegations that, despite the fact that family members alleged Saudi Arabian bank maintained connections to al-Qaeda, the subsidiary affiliates were aware of these connections or had to be aware they were assuming role in al-Qaeda's terrorist activities by working with bank. 18 U.S.C.A. § 2333(d)(2).

**[15]**  **War and National Emergency** 🔑 Private Remedies

Aiding and abetting an act of international terrorism, under Anti-Terrorism Act (ATA), requires more than the provision of material support to a designated terrorist organization. 18 U.S.C.A. § 2333(d)(2).

**[16]**  **War and National Emergency** 🔑 Private Remedies

The requirement that a defendant be generally aware of role in overall illegal activity from which an act of international terrorism was a foreseeable risk in particularly important in indirect aiding and abetting claims under Anti-Terrorism Act (ATA), to avoid subjecting incidental participants to harsh penalties or damages. 18 U.S.C.A. § 2333(d)(2).

**[17]**  **War and National Emergency** 🔑 Private Remedies

Family members of victims of fatal attack by al-Qaeda operative at secret Central Intelligence Agency (CIA) base in Afghanistan failed to plausibly allege that domestic affiliates of financial institution knowingly and substantially assisted al-Qaeda's terrorist acts through their financial dealings with intermediary banks in Iran and Saudi Arabia and, thus, family members failed to state aiding and abetting liability claim against domestic affiliates, under Anti-Terrorism Act (ATA), through the alleged processing of financial transactions for intermediary banks which evaded sanctions that sought to restrict flow of money to individuals, entities, and countries on the Office

of Foreign Assets Control's (OFAC) list of specially designated nationals and blocked persons; although monetary aid was important to al-Qaeda's terrorist efforts, the amount of aid was not significant, family members failed to allege how much money indirectly flowed to al-Qaeda, domestic affiliates were not physically present at attack, family members failed to allege connection between banks and al-Qaeda sufficient to infer any relationship between domestic affiliates and al-Qaeda, failed to allege domestic affiliates provided knowing assistance or were generally aware acts of terrorism were foreseeable result of their actions, and foreign banks were global financial institutions with legitimate operations and uncertain ties to al-Qaeda. 18 U.S.C.A. § 2333(d)(2).

**[18]      War and National Emergency** 🖝 Private Remedies

Six factors are relevant in determining substantiality of defendant's substantial assistance to foreign terrorist organization (FTO), as required to support conviction for aiding and abetting a terrorist act under Anti-Terrorism Act (ATA): (1) nature of act encouraged; (2) amount and kind of assistance given; (3) defendant's absence or presence at time of tort; (4) defendant's relationship to tortious actor; (5) defendant's state of mind; and (6) length of time alleged aider-abettor has been involved. 18 U.S.C.A. § 2333(d)(2).

**[19]      War and National Emergency** 🖝 Private Remedies

Plaintiff need not allege that a defendant assisted a foreign terrorist organization (FTO) directly in order to allege defendant provided substantial assistance to FTO, as required to state a claim under the Anti-Terrorism Act (ATA); it is enough to provide factual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the foreign terrorist organization. 18 U.S.C.A. § 2333(d)(2).

**[20]      War and National Emergency** 🖝 Private Remedies

While knowledge of one's own actions and general awareness of their foreseeable results more powerfully supports aiding-and-abetting liability, under Anti-Terrorism Act (ATA), of defendants who share same goals as the principal or specifically intend the principal's tort, such intent is not required. 18 U.S.C.A. § 2333(d)(2).

**[21]      War and National Emergency** 🖝 Private Remedies

Duration of defendant's assistance to foreign terrorist organization (FTO) can influence quality and quantity of aid and may afford evidence of defendant's state of mind, when determining whether requisite substantial assistance exists to support conviction for aiding and abetting a terrorist act under Anti-Terrorism Act (ATA). 18 U.S.C.A. § 2333(d)(2).

**[22]      Conspiracy** 🖝 Terrorism, torture, and hostage taking

To plead civil conspiracy under Anti-Terrorism Act (ATA), plaintiff must allege: (1) an agreement between two or more persons; (2) to participate in unlawful act; (3) injury caused by unlawful overt act performed by one of parties to agreement; (4) which overt act was done pursuant to and in furtherance of common scheme.

**[23]      Conspiracy** 🖝 Particular Subjects of Conspiracy

Family members of victims of fatal attack by al-Qaeda operative at secret Central Intelligence Agency (CIA) base in Afghanistan failed to plausibly allege an agreement between domestic affiliates of financial institution and al-Qaeda or any relevant overt act performed by affiliates or al-Qaeda arising from agreement and, thus, family members failed to state conspiracy claim against domestic affiliates, under Anti-Terrorism Act (ATA); while family members alleged

domestic affiliates sought to make "substantial profits" by processing financial transactions for intermediary banks which evaded sanctions that sought to restrict flow of money to individuals, entities, and countries on the Office of Foreign Assets Control's (OFAC) list of specially designated nationals and blocked persons, they alleged al-Qaeda sought geopolitical goals through its actions. 18 U.S.C.A. § 2333(d)(2).

Appeal from the United States District Court for the District of Columbia (No. 1:18-cv-02739)

**Attorneys and Law Firms**

Randy Singer argued the cause for appellants. With him on the briefs were Kevin A. Hoffman and Rosalyn Singer.

Andrew J. Pincus argued the cause for appellees. With him on the brief were Mark G. Hanchet and Robert W. Hamburg.

Before: Wilkins and Rao, Circuit Judges, and Randolph, Senior Circuit Judge.

**Opinion**

Opinion concurring in part and dissenting in part filed by Circuit Judge Wilkins.

Rao, Circuit Judge:

 **\*1**  An al-Qaeda suicide bomber killed nine people at Camp Chapman, a secret CIA base in Afghanistan. Dana Bernhardt and other family members of the bombing victims ("Bernhardt") sued HSBC Holdings PLC and several of its foreign and domestic affiliates under the Antiterrorism Act. Bernhardt alleges that HSBC helped foreign banks evade U.S. sanctions and thereby provided material support to al-Qaeda's terrorist activities. Bernhardt claims that HSBC is liable for aiding and abetting and conspiring to bring about al-Qaeda's terrorist attack on Camp Chapman.

The district court dismissed the claims against the foreign HSBC defendants for lack of personal jurisdiction and dismissed Bernhardt's aiding and abetting and conspiracy claims for failure to state a claim. We affirm.

I.

A.

Bernhardt's claims arise under the Antiterrorism Act of 1990 ("ATA"), Pub. L. No. 101-519, 104 Stat. 2250, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 4, 130 Stat. 852, 854 (2016) (codified at 18 U.S.C. § 2333(d)). A plaintiff injured by "an act of international terrorism committed, planned, or authorized by" a designated foreign terrorist organization can assert liability against those who aided and abetted the act of terrorism, or who conspired with the person who committed the act of terrorism. 18 U.S.C. § 2333(d)(2). [1] This liability extends to those who "provided material support, directly or indirectly" to terrorists or terrorist organizations. JASTA § 2(b), 130 Stat. at 853. [2]

B.

Since Bernhardt appeals the district court's dismissal of her claims, "we accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiffs." Owens v. BNP Paribas, S.A., 897 F.3d 266, 272 (D.C. Cir. 2018). The following facts are drawn from the amended complaint unless otherwise noted.

 **\*2**  On December 30, 2009, al-Qaeda operative Humam Khalil al-Balawi detonated more than thirty pounds of C-4 explosives and shrapnel strapped to his chest shortly after entering Camp Chapman, a secret CIA base in Afghanistan. In the months leading up to the attack, Balawi had been captured and agreed to infiltrate al-Qaeda and become an informant for the CIA. The CIA planned to meet with Balawi at Camp Chapman to strategize about locating and killing al-Qaeda leadership. Unbeknownst to the CIA, Balawi had continued his allegiance to al-Qaeda and was feeding information to the CIA while training to execute the attack. At the direction of al-Qaeda and donning an al-Qaeda-made suicide vest, Balawi took the lives of nine people at Camp Chapman, including private security officers Dane Paresi and Jeremy Wise.

Paresi and Wise were survived by Dana Bernhardt and the other plaintiffs, who sued under the ATA. Bernhardt alleged that four HSBC-affiliated financial institutions [3] ("HSBC")

violated U.S. sanctions and thereby provided material support to al-Qaeda's terrorist activities. These sanctions restrict the flow of money to individuals, entities, and countries on the Office of Foreign Assets Control's ("OFAC") list of "specially designated nationals and blocked persons." The OFAC list includes state sponsors of terrorism like Iran and "specially designated global terrorists," such as al-Qaeda. The list also includes entities who finance terrorism-related organizations.[4] U.S. financial institutions must use this "OFAC filter" to identify and block financial transactions involving sanctioned parties. *See* Exec. Order No. 13,224, §§ 1, 5–7, 66 Fed. Reg. 49,079, 49,079–81 (Sept. 25, 2001) (authorizing the Department of the Treasury to regulate and designate who should be sanctioned).

Bernhardt alleges that HSBC evaded the OFAC filter beginning in the early 1990s and continuing through 2009. HSBC Bank UK implemented procedures to help sanctioned entities access and benefit from U.S. financial services. For instance, such entities would include a "cautionary note" in their transactions, such as "care sanctioned country," "do not mention our name in NY," or "do not mention Iran." Based on these notes, HSBC Bank UK would manually scrub all references to Iran or a sanctioned entity, which would allow otherwise illegal transactions to pass through to HSBC Bank US. This system allowed HSBC Bank US to "process[ ] thousands of 'repaired' transactions worth billions of dollars." HSBC Bank UK would also use "cover payments," or bank-to-bank transfers, to avoid disclosing the identity of its customers. Moreover, HSBC Holdings and HSBC Bank US understaffed their compliance group and failed to "conduct due diligence on HSBC affiliates." HSBC continued these practices, "mesmerized by the potential profits."

Facing a series of federal investigations, HSBC Bank US hired an outside auditor, who discovered over 25,000 deceptive transactions involving Iran that moved more than $19.4 billion through U.S. financial institutions. HSBC Holdings eventually settled with the Department of the Treasury for almost $900 million in penalties and admitted it had processed over $164 million "for the benefit of Iran and/ or persons in Iran, through a financial institution located in the United States in apparent violation of [U.S. sanctions]."[5] HSBC also admitted that its actions had "undermined U.S. national security, foreign policy, and other objectives of U.S. sanctions programs." In a separate deferred prosecution agreement with the Department of Justice, HSBC Holdings and HSBC Bank US agreed to forfeit over $1 billion

dollars and admitted that their conduct caused U.S. financial institutions "to process payments that otherwise should have been held for investigation, rejected, or blocked pursuant to sanctions regulations administered by OFAC."[6]

**\*3** According to Bernhardt, HSBC's evasion of sanctions benefitted several HSBC customers with terrorism ties: Bank Melli, Bank Saderat, and Al Rajhi Bank. Bank Melli, a bank operated and controlled by the government of Iran, was placed on OFAC's list for providing banking services to groups in Iran's military that supported "terrorist organizations like Hezbollah and al-Qaeda." Bank Saderat is also an Iranian nationalized bank, listed since 2007 as a specially designated global terrorist for "facilitat[ing] Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year."

HSBC also did substantial business with Al Rajhi Bank, "one of the largest banks in Saudi Arabia" with over "500 branches and assets totaling $59 billion." It is primarily owned by the Al Rajhi family, one member of which was a key financial contributor to al-Qaeda. In 2003, the CIA reported that "Islamic extremists have used [Al Rajhi Bank] since at least the mid-1990s as a conduit for terrorist transactions," and "[s]enior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank." HSBC Holdings ended its relationship with Al Rajhi Bank in 2005 due to Al Rajhi's connections with the September 11 and other terrorist attacks, but HSBC Bank US reestablished relations a year later. A database that HSBC Bank US relied on for its due diligence "identified Al Rajhi Bank's most senior official as having links to terrorism." HSBC Bank US nonetheless provided "nearly one billion in US dollars" to Al Rajhi Bank from 2006 to 2010 and "allowed Al Rajhi Bank to raise funds and launder money for terrorist organizations." Al Rajhi Bank also oversaw the accounts of al-Qaeda charity fronts.

In sum, Bernhardt maintains the Camp Chapman bombing was orchestrated, authorized, and executed by al-Qaeda, and that HSBC aided and abetted the attack "by providing substantial assistance to al-Qaeda through the countries, institutions, and entities that formed part of a terrorism financing and support network." In addition, HSBC joined a "group of conspirators" providing material support to a conspiracy between al-Qaeda, Iran, and others aimed at harming the United States through terrorist acts.

## C.

The district court dismissed the suit. *Bernhardt v. Islamic Republic of Iran*, No. 18-2739, 2020 WL 6743066 (D.D.C. Nov. 16, 2020). It held there was no specific personal jurisdiction over the foreign HSBC defendants because Bernhardt's injuries from the Camp Chapman bombing did not sufficiently arise out of or relate to the evasion of sanctions. Bernhardt failed to link HSBC's financial malfeasance to al-Qaeda's suicide attack on Camp Chapman. The district court also dismissed the ATA claims against HSBC for failure to state a claim. As to aiding and abetting, Bernhardt had not adequately alleged that HSBC was "aware [it was] supporting al-Qaeda, much less 'assuming a role' in al-Qaeda's violent activities." *Id.* at *5. Because HSBC had no "direct relationship with al-Qaeda or Balawi" and was merely "mesmerized by the potential profits," the court could not plausibly infer the necessary substantial assistance either. *Id.* at *6. The district court also held that Bernhardt failed to state a claim for conspiracy. Bernhardt had alleged at most that HSBC conspired to evade the OFAC filter, not that it had conspired with al-Qaeda to perpetuate terrorist acts. Bernhardt appealed.

## II.

**[1]** We first consider whether the district court could exercise personal jurisdiction over the foreign HSBC defendants. A dismissal for lack of personal jurisdiction is reviewed de novo. *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 214 (D.C. Cir. 2022).

**\*4** Bernhardt alleges only specific personal jurisdiction over the foreign HSBC defendants based on *Federal Rule of Civil Procedure 4(k)(2)*.[7] Such jurisdiction requires: (1) the defendant has either been served a summons or waived service; (2) the claim "arises under federal law"; (3) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"; and (4) "exercising jurisdiction is consistent with the United States Constitution and laws." FED. R. CIV. P. 4(k)(2); *see also Mwani v. bin Laden*, 417 F.3d 1, 10 (D.C. Cir. 2005). The parties do not dispute that the first three requirements are met. HSBC Holdings and HSBC Bank UK were properly served, Bernhardt's claims arise under the ATA, and the foreign HSBC defendants are not subject to any state court's jurisdiction. The only dispute is whether exercising jurisdiction would be consistent with the Constitution, namely whether the foreign HSBC defendants have "sufficient contacts with the United States as a whole to justify the exercise of personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani*, 417 F.3d at 11.

**[2]** **[3]** Pleading specific personal jurisdiction under Rule 4(k)(2) requires demonstrating a close nexus between the United States, the foreign defendant's conduct, and the plaintiff's claim. The plaintiff must show that the foreign defendant "has purposefully directed his activities at residents of the forum," and that the alleged injuries "arise out of or relate to those activities." *Id.* at 12 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)) (cleaned up); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). This test ensures that a district court exercises specific personal jurisdiction only over those foreign defendants who had "fair warning that a particular activity may subject them" to U.S. jurisdiction. *Mwani*, 417 F.3d at 11 (cleaned up). The Supreme Court recently explained it is not necessary to demonstrate "a strict causal relationship between the defendant's [domestic] activity and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, ––– U.S. ––––, 141 S. Ct. 1017, 1026, 209 L.Ed.2d 225 (2021). Because it is sufficient for the injuries to "relate to" the defendant's activities, "some relationships will support jurisdiction without a causal showing." *Id.* (cleaned up).

Bernhardt alleges the foreign HSBC defendants purposefully directed their conduct at U.S. markets by coordinating with HSBC domestic affiliates to evade the OFAC filter and to facilitate financial transactions in violation of U.S. sanctions. We assume that was enough for the first prong of the specific personal jurisdiction inquiry.

**[4]** Bernhardt's allegations do not, however, support an inference that the injuries from the Camp Chapman bombing arose out of or related to the foreign HSBC defendants' sanctions evasion. *See Atchley*, 22 F.4th at 233 (a plaintiff must allege a "relatedness between the contacts and the claim"). As we further explain below, *see infra* Part III.A, Bernhardt tries to connect the Camp Chapman bombing to HSBC's sanctions evasion on behalf of several intermediary banks. For Banks Melli and Saderat, Bernhardt primarily

relies on their OFAC designations and affiliation with Iran. The complaint alleges that Bank Melli was listed as a specially designated national and blocked person in October 2007 because it provided "a variety of financial services" to a special division of an Iranian military group "that promotes terrorism abroad." Bank Saderat was similarly listed as a specially designated global terrorist because of its "transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations each year." These allegations show possible connections between Banks Melli and Saderat and terrorism generally, yet they are not enough to allow us to infer the necessary connection to al-Qaeda specifically, or that the foreign HSBC defendants' conduct was related to Bernhardt's injuries at al-Qaeda's hand.

 **5** The dissent tries to close this gap by emphasizing the banks' ties to Iran and Iran's ties to al-Qaeda. *See* Dissenting Op. ——. But neither Iran's ownership of Bank Melli and Bank Saderat nor the HSBC transactions connected to Iran and its entities are enough to connect HSBC's conduct to Bernhardt's injuries. We have made clear in a similar context that "when an intermediary is a sovereign state with many legitimate agencies, operations, and programs," the country's designation as a "state sponsor of terrorism does not reduce the need for evidence of a substantial connection between the defendant and a terrorist act or organization." 🚩 *Owens*, 897 F.3d at 276 (cleaned up). Pleading Iran's involvement does not support an inference that Bernhardt's injuries sufficiently related to HSBC's conduct because aid to Iran could just as plausibly benefit its otherwise legitimate operations rather than al-Qaeda. [8]

The allegations tying Al Rajhi Bank to al-Qaeda are also insufficient. Bernhardt alleges that Al Rajhi Bank's founder was one of al-Qaeda's key financial contributors and that the bank maintained accounts for al-Qaeda's charity fronts. These connections show some connection between Al Rajhi Bank and al-Qaeda. But the bank's vast and otherwise legitimate operations make it impossible to infer that HSBC's conduct was connected to al-Qaeda's attack on Camp Chapman through Al Rajhi Bank. And as we explain below, Bernhardt fails to allege any aid flowing indirectly through these intermediary banks to al-Qaeda, further undercutting the necessary inference. *See infra* Part III.A.2.

The allegations here thus stand in stark contrast to those in 🚩 *Atchley*, where we found personal jurisdiction over foreign corporations. The defendants in that case had allegedly provided goods to a terrorist group that had overrun the Iraqi Ministry of Health, and the plaintiffs' injuries directly related to the monetization of those goods to promote acts of terrorism. 🚩 22 F.4th at 234–36; *see also* 🚩 *id.* at 237 (explaining that the goods "used to bribe Jaysh al-Mahdi[ ] were an instrument to achieve the very wrong alleged") (cleaned up).

We agree with Bernhardt that she did not need to allege the OFAC filter evasion *caused* the Camp Chapman bombing. *See* 🚩 *Ford*, 141 S. Ct. at 1026. Nor was she required to identify specific dollars spent on the terrorist attack. [9] Nonetheless, she was required to allege some relation between the sanctions evasion by the foreign defendants and the injuries suffered in the terrorist attack. But no such inference is supported by the complaint. And without allegations supporting a closer connection between the sanctions evasion and al-Qaeda's activities, allowing Bernhardt to sue the foreign HSBC defendants would collapse the core distinction between general and specific personal jurisdiction. *See* 🚩 *Ford*, 141 S. Ct. at 1024–25.

 **6** The dissent speculates that if the foreign HSBC defendants "had properly observed the sanctions ... it would have significantly hindered al-Qaeda's ability to successfully carry out terrorist attacks like the Camp Chapman bombing." Dissenting Op. ——. Yet Bernhardt does not allege that al-Qaeda's funding for terrorism depended on transactions with specific foreign banks who would then work with HSBC to evade U.S. sanctions. The fact that money is fungible works in both directions. Given the allegations of al-Qaeda's extensive access to foreign banks, a more reasonable inference is that al-Qaeda could have secured terrorism funding from another avenue, irrespective of whether HSBC evaded U.S. sanctions. Certainly nothing in the complaint supports the dissent's conjecture.

Because it would exceed the limits of specific personal jurisdiction to conclude the foreign HSBC defendants had "fair warning" that evading the OFAC filter would subject them to liability under the ATA for aiding and abetting or conspiring with al-Qaeda to bomb a secret CIA base in Afghanistan, 🚩 *Mwani*, 417 F.3d at 12, we affirm the district court's dismissal of claims against the foreign HSBC defendants for lack of personal jurisdiction.

III.

**[5] [6] [7]** The district court also dismissed Bernhardt's ATA aiding and abetting and conspiracy claims against the remaining HSBC defendants for failure to state a claim. We review the district court's dismissal de novo. *Atchley*, 22 F.4th at 214. Assuming the truth of Bernhardt's factual allegations, we consider whether she has stated a "plausible claim"—that is, whether the allegations lead to "the reasonable inference that the defendant is liable for the misconduct alleged." *Owens*, 897 F.3d at 272 (cleaned up). A plaintiff's claim must rise "above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim cannot survive a motion to dismiss if based on inferences "unsupported by facts" or legal conclusions disguised as factual allegations. *Owens*, 897 F.3d at 272 (cleaned up). We affirm the dismissal of both claims.

A.

To adequately plead an ATA aiding and abetting claim, a plaintiff must allege: (1) "an injury arising from an act of international terrorism"; (2) the act was "committed, planned, or authorized by" a designated foreign terrorist organization; and (3) the defendant "aid[ed] and abet[ted], by knowingly providing substantial assistance" to an "act of international terrorism." 18 U.S.C. § 2333(d)(2); *see also Atchley*, 22 F.4th at 216. The parties do not dispute that the Camp Chapman bombing was an act of international terrorism; that Bernhardt and the other plaintiffs were injured by the bombing; or that al-Qaeda, a designated foreign terrorist organization, was responsible for the attack.[10] Therefore, we evaluate whether Bernhardt's allegations demonstrate that HSBC aided and abetted the bombing by providing substantial assistance to al-Qaeda.

**[8]** The ATA does not provide a definition of aiding and abetting liability, but instead incorporates the analysis in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as "provid[ing] the proper legal framework for how such liability should function." JASTA § 2(a)(5), 130 Stat. at 852. *Halberstam* stated that aiding and abetting includes three elements: "(1) the party whom the defendant aids

must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477. It is undisputed that the Camp Chapman bombing caused Bernhardt's injuries. We consider whether the allegations in the complaint allow us to infer that HSBC was generally aware it played a role in al-Qaeda's terrorist activities and that HSBC knowingly and substantially assisted those activities.

1.

**\*7 [9] [10] [11]** In the ATA context, aiding and abetting liability requires a defendant be "generally aware of its role in an overall illegal activity from which an act of international terrorism was a foreseeable risk." *Atchley*, 22 F.4th at 220 (cleaned up). To allege that defendants had such awareness, plaintiffs "must plead ... allegations of the facts or events they claim give rise to an inference that defendants acted with the requisite mental state." *Id.* at 220–21 (cleaned up). Knowledge and other mental states may be alleged generally but must at least support a plausible inference of general awareness. *See Ashcroft v. Iqbal*, 556 U.S. 662, 686–87, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing FED. R. CIV. P. 8, 9(b)). Because there is rarely direct evidence of a defendant's mental state, the fact finder often must draw inferences from circumstantial evidence.[11] *See Halberstam*, 705 F.2d at 486 (inferring knowledge absent direct evidence because it defie[d] credulity that [the defendant] did not know that something illegal was afoot"); *see also Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988) (explaining that "[e]xtrinsic acts evidence may be critical to the establishment of" a defendant's mental state).

**[12] [13]** Bernhardt alleges HSBC aided and abetted the Camp Chapman bombing through its relationship with intermediary banks that facilitated al-Qaeda's terrorist activities. When a plaintiff's ATA aiding and abetting claim depends on aid flowing through an intermediary, the general awareness requirement is satisfied if (1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is "so closely intertwined" with the terrorist organization's illegal activities

as to give rise to an inference that the defendant was generally aware of its role in the organization's terrorist activities. [12] *Honickman v. BLOM Bank SAL,* 6 F.4th 487, 501 (2d Cir. 2021).

**[14]** Applying these standards, Bernhardt fails to plausibly allege HSBC was generally aware that its financial dealings with intermediary banks supported al-Qaeda's terrorist acts.

**[15]** With respect to Bank Melli and Bank Saderat, Bernhardt alleges neither that HSBC was aware of their connections to al-Qaeda nor that these banks were so closely intertwined with al-Qaeda to infer HSBC's general awareness. The complaint focuses on the fact that these banks were on OFAC's list of sanctioned entities. But that alone is insufficient. "[A]iding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*." 🚩 *Linde v. Arab Bank, PLC,* 882 F.3d 314, 329 (2d Cir. 2018); *see also Honickman,* 6 F.4th at 491–92, 501 (finding no general awareness despite defendant bank having clients who were specially designated global terrorists). According to the complaint, Bank Melli was listed in 2007 for providing banking services to a terrorist-affiliated group of Iran's military. Bank Saderat was designated for "facilitat[ing] Iran's transfer of hundreds of millions of dollars to Hezbollah and other terrorist organizations." These allegations connect the intermediary banks to terrorism generally but fail to support an inference that HSBC had general awareness it was playing a role in *al-Qaeda's* terrorist acts. [13]

***8** Bernhardt also relies on the fact that Bank Melli and Bank Saderat are nationalized Iranian banks and that Iran has historically supported terrorist groups, including al-Qaeda. But as explained above, sovereign nations invariably maintain legitimate government activities. Iran's support for terrorism is not enough to demonstrate HSBC's general awareness that its transactions with Iranian banks would support al-Qaeda's terrorist acts without some "additional allegations" more closely connecting these intermediary banks to the "terrorist act or organization." 🚩 *Owens,* 897 F.3d at 276.

Bernhardt's allegations regarding Al Rajhi Bank come closer to demonstrating general awareness but still fall short. Bernhardt alleges that Al Rajhi Bank was founded by a key financial contributor to al-Qaeda; "maintained accounts for many of al-Qaeda's charity fronts"; advertised the existence of those accounts to provide al-Qaeda a fundraising mechanism;

and facilitated transactions for terrorists who "provided the al-Qaeda cell of 9/11 hijackers with financial and logistical support." Bernhardt also alleged that members of the Al Rajhi family were aware their bank served as a conduit for al-Qaeda to move its money around. Taken together, we can plausibly infer that Al Rajhi Bank maintained connections to al-Qaeda.

Nevertheless, the complaint falls short because Bernhardt does not allege that HSBC was aware of these connections. The complaint states that an HSBC senior manager in 2002 expressed concern that "Al Rajhi Bank's account may have been used by terrorists," and that HSBC Bank US in 2006 flagged "Al Rajhi Bank's most senior official as having links to terrorism." These statements are not sufficient to show HSBC's awareness because they express only the possibility of a terrorist connection, say nothing about al-Qaeda specifically, and focus on conduct occurring years before the bombing. Therefore, they cannot support the dissent's inference that HSBC "had *actual* knowledge" of any connection between Al Rajhi Bank and al-Qaeda. Dissenting Op. ——.

Even if we could infer that HSBC was aware of Al Rajhi Bank's connections to al-Qaeda, Bernhardt fails to allege that those connections were so close that HSBC had to be aware it was assuming a role in al-Qaeda's terrorist activities by working with Al Rajhi Bank. *See Honickman,* 6 F.4th at 501; *see also* 🚩 *Siegel v. HSBC North America Holdings, Inc.,* 933 F.3d 217, 224 (2d Cir. 2019) (explaining that even when defendants were "aware that [Al Rajhi Bank] was believed by some to have links to [al-Qaeda] and other terrorist organizations," plaintiffs still had to allege defendants' awareness that they were "assuming a role in terrorist activities") (cleaned up). As the complaint notes, Al Rajhi Bank has substantial operations and "is one of the largest banks in Saudi Arabia, with more than 8,400 employees, 500 branches and assets totaling $59 billion."

Given the extensive legitimate operations of Al Rajhi Bank —with assets totaling $59 billion—and the absence of any allegation that a substantial part of these operations involved al-Qaeda, "HSBC had little reason to suspect that it was assuming a role in [al-Qaeda's] terrorist activities." 🚩 *Siegel,* 933 F.3d at 224; *cf.* 🚩 *Kemper v. Deutsche Bank AG,* 911 F.3d 383, 390 (7th Cir. 2018) ("While giving fungible dollars to a terrorist organization may be dangerous to human life, doing business with companies and countries that have significant legitimate operations is not necessarily so. That

these business dealings may violate U.S. sanctions does not convert them into terrorist acts.") (cleaned up). The pleadings do not adequately allege that Al Rajhi Bank was so closely intertwined with al-Qaeda that we can infer HSBC was aware it was assuming a role in al-Qaeda's terrorist activities simply by doing business with Al Rajhi Bank. [14]

**\*9** Bernhardt's allegations also fall far short of what we have previously found adequate in the ATA context. In *Atchley*, for instance, the plaintiffs alleged the defendants knew the Iraqi Ministry of Health was "notoriously corrupt" and "under the control of a terrorist group." *22 F.4th at 221*. Aside from ubiquitous media reports, the defendants finalized deals with the Ministry in offices where "armed terrorist fighters circulated openly and anyone who entered could see [the terrorist group's] distinctive flag, weapons, Sadr posters, and 'Death to America' slogans on display." *Id.* We inferred general awareness by the defendants because the plaintiffs plausibly alleged the Ministry was controlled by the terrorist group and so closely intertwined with it that they were effectively the same entity. *Id.* at 224.

**[16]** Finding general awareness on the facts here would mark an extension of aiding and abetting liability not supported by the ATA or our precedent. The general awareness element is particularly important in indirect aiding and abetting claims to "avoid subjecting ... incidental participants to harsh penalties or damages." *Halberstam, 705 F.2d at 485 n.14*. Under the ATA, liability is cabined to defendants who aid and abet "an act of international terrorism." *18 U.S.C. § 2333(d)(2)*. HSBC had client banks with ties to terrorist organizations and has admitted to helping those banks evade U.S. sanctions. But that is not sufficient for aiding and abetting liability under the ATA. While the amendments to the ATA expanded liability for indirect aid to terrorism, they did not equate the evasion of sanctions with terrorism liability. [15] Bernhardt's allegations failed to make the necessary connection to support an inference that HSBC was generally aware it was playing a role in al-Qaeda's terrorist activities.

2.

**[17]** Bernhardt's aiding and abetting claim also fails because she did not plausibly allege that HSBC "knowingly

and substantially assist[ed] the principal violation." *Halberstam, 705 F.2d at 477*.

The ATA states that a defendant "aids and abets" by "*knowingly* providing substantial assistance." *18 U.S.C. § 2333(d)(2)* (emphasis added). There is significant overlap between the requirement that the assistance be "knowing" and the general awareness required by *Halberstam*. A defendant who lacks general awareness cannot be said to have knowingly assisted a foreign terrorist organization. *See Honickman, 6 F.4th at 500* (explaining that a defendant need not "know anything more ... than what she knew for the general awareness element"). Thus, having failed to allege the requisite general awareness, Bernhardt's complaint also fails to allege knowing assistance. Because HSBC's assistance must be knowing and substantial, lack of knowing assistance is sufficient to dismiss Bernhardt's claim.

**[18]** It is an independent and alternative ground for affirming the dismissal that Bernhardt also failed to allege that HSBC provided "substantial assistance." Six factors are relevant in determining substantiality: (1) "the nature of the act encouraged"; (2) "the amount and kind of assistance given"; (3) "the defendant's absence or presence at the time of the tort"; (4) the defendant's "relationship to the tortious actor"; (5) "the defendant's state of mind"; and (6) the "length of time an alleged aider-abettor has been involved." *Halberstam, 705 F.2d at 483–84* (cleaned up); *see also Atchley, 22 F.4th at 221*. "No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that, on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism." *Atchley, 22 F.4th at 221*. Taken together, these factors lead us to conclude that Bernhardt failed to adequately plead that HSBC substantially assisted al-Qaeda's terrorist acts.

**\*10** The first factor identifies the "nature of the act encouraged" and "dictates what aid might matter." *Halberstam, 705 F.2d at 483, 484*. Greater access to capital —the alleged aid—is important to al-Qaeda's terrorist efforts, which depend on depositing, transferring, and expending money. *See Gonzalez v. Google LLC, 2 F.4th 871, 905 (9th Cir. 2021)* ("Financial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals.") (cleaned up). This factor weighs in favor of finding substantial assistance.

**[19]** The second factor is "significant" and requires considering the quantity and quality of aid. *Halberstam, 705 F.2d at 484*. A plaintiff need not allege that a defendant assisted a foreign terrorist organization directly. *See JASTA §* 2(b), 130 Stat. at 853; *Atchley, 22 F.4th at 225* ("The statute imposes no directness requirement."). It is enough to provide "[f]actual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the [foreign terrorist organization]." *Honickman, 6 F.4th at 500*. The district court thus erred in requiring Bernhardt to allege that assistance was directed to the Camp Chapman attack or that HSBC was involved in transactions that directly benefitted al-Qaeda. *See Bernhardt, 2020 WL 6743066, at \*6*.

The district court's error was harmless, however, because even applying the correct standard, the aid was not significant. Bernhardt alleged that HSBC facilitated over $19 billion in transactions with Iranian institutions and provided almost $1 billion in currency sales to Al Rajhi Bank. Yet she fails to allege how much (if any) of that money indirectly flowed to al-Qaeda. *Cf. Siegel, 933 F.3d at 225* (although plaintiffs alleged the provision of "hundreds of millions of dollars" to an intermediary, "they did not advance any non-conclusory allegation that [al-Qaeda] received any of those funds"); *Gonzalez, 2 F.4th at 907* (explaining that the substantiality of assistance is indeterminable when a complaint is "devoid of any allegations about how much assistance [the defendant] provided"). In light of Bernhardt's failure to allege a close connection between the foreign banks and al-Qaeda, we cannot reasonably infer that HSBC provided any aid to al-Qaeda. [16] This factor thus severely undermines a finding of substantiality.

The third factor looks at the defendant's presence at the time of the plaintiff's injury. *Halberstam* focused on a person's physical presence in the murder and burglary context. *See Halberstam, 705 F.2d at 488*. HSBC was not physically present at the terrorist attack on Camp Chapman, which may be sufficient for this factor to weigh against Bernhardt. *See Atchley, 22 F.4th at 223*.

**\*11** Other courts, however, have read *Halberstam*'s presence requirement more broadly in light of the ATA's context, which attaches liability to all "persons," including

"corporations, companies, associations, firms, partnerships, societies, and joint stock companies." *18 U.S.C. § 2333(d) (1); 1 U.S.C. § 1*. These entities cannot be physically present for an act of international terrorism, and so presence may be understood in a transactional sense, such as a bank's business relations with a terrorist organization. *See Siegel, 933 F.3d at 225* (finding "presence" to cut against liability when the defendant banks had cut ties with the intermediary bank ten months before the relevant terrorist attack). Even from a transactional perspective, however, we are unable to infer from Bernhardt's complaint any HSBC involvement with al-Qaeda before and leading up to the Camp Chapman bombing.

The fourth factor considers the closeness of any relationship between the defendant and the terrorist organization. Bernhardt does not allege a connection between the foreign banks and al-Qaeda sufficient to infer any relationship, much less a close one, between HSBC and al-Qaeda. *Cf. Brill v. Chevron Corp., 804 F. App'x 630, 632 (9th Cir. 2020)* (per curiam) (no relationship where Chevron had only "a contractual relationship with a third party that sold Iraqi crude oil on the open market," but did not know "its kickbacks would be used to provide financial support to the terrorist organization perpetrating the terrorist activity in Israel"). This factor also cuts against finding substantiality.

**[20]** The fifth factor looks to the defendant's state of mind, which requires "[k]nowledge of one's own actions and general awareness of their foreseeable results." *Atchley, 22 F.4th at 223*. While "this factor more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal or specifically intend the principal's tort, ... such intent is not required." *Id.* The district court thus erred in requiring Bernhardt to show that HSBC and al-Qaeda were "one in spirit." *Bernhardt, 2020 WL 6743066, at \*6; see also Atchley, 22 F.4th at 223–224* (explaining that a specific intent or "one in spirit" requirement is contrary to *Halberstam*). Even applying the correct standard, however, this factor cuts against Bernhardt because, as already discussed, Bernhardt fails to allege that HSBC provided knowing assistance or was generally aware that acts of terrorism were the foreseeable result of its actions.

**[21]** The final factor looks to the duration of a defendant's assistance, which can influence the quality and quantity of aid and "may afford evidence of the defendant's state of mind." *Halberstam, 705 F.2d at 484*. Bernhardt alleges

a years-long relationship between HSBC and the foreign banks. But a lengthy financial relationship does not terrorism assistance make. *Cf.* 🚩 *Siegel*, 933 F.3d at 225. Because the foreign banks are global financial institutions with legitimate operations and uncertain ties to al-Qaeda, we cannot infer substantial assistance to al-Qaeda from HSBC's lengthy business relationships with the foreign banks.

Considering the relevant factors, only the type of monetary aid alleged supports Bernhardt's claims, and therefore, "on balance," Bernhardt did not adequately plead that HSBC substantially assisted al-Qaeda's terrorist acts. 🚩 *Atchley*, 22 F.4th at 221.

* * *

While Bernhardt alleges financial wrongdoing and serious violations of U.S. sanctions, she fails to plausibly allege that HSBC was generally aware of its role in, or knowingly and substantially assisted, al-Qaeda's overall terrorist activities. We therefore affirm the district court's dismissal of Bernhardt's aiding and abetting claim.

B.

**[22]** We next analyze the sufficiency of Bernhardt's ATA conspiracy claim. To plead a civil conspiracy, a plaintiff must allege: "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." 🚩 *Halberstam*, 705 F.2d at 477. Bernhardt's conspiracy claim fails because she has not adequately alleged an agreement between HSBC and al-Qaeda, nor a relevant overt act.

**\*12** An "agreement" in the context of an ATA conspiracy requires that the defendant "conspire[ ] with the person who committed" the terrorist act. 18 U.S.C. § 2333(d)(2). Therefore, Bernhardt had to allege that HSBC was "pursuing the same object" as al-Qaeda. 🚩 *Halberstam*, 705 F.2d at 487; *cf.* 🚩 *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C. Cir. 1988) (proving a conspiracy requires evidence "each conspirator had the specific intent to further the common unlawful objective"). The shared objective can be "inferred from circumstantial evidence," but the inference

must still "reveal[ ] a common intent." 🚩 *Halberstam*, 705 F.2d at 480.

**[23]** Bernhardt alleges no common objective between HSBC and al-Qaeda. The complaint states that HSBC was trying to make "substantial profits" by evading sanctions, whereas al-Qaeda sought to "terrorize the U.S. into retreating from the world stage"; "use long wars to financially bleed the U.S. while inflaming anti-American sentiment"; "defend the rights of Muslims"; and "obtain global domination through a violent Islamic caliphate." These objectives are wholly orthogonal to one another. Bernhardt's allegations similarly do not support an inference that HSBC evaded sanctions with the object of funding terrorism. In the absence of any alleged concordance between HSBC's and al-Qaeda's objectives, Bernhardt's conspiracy claim is inadequate. *Cf.* 🚩 *Gonzalez*, 2 F.4th at 881–82, 907 (rejecting conspiracy claim absent allegations that "Google tacitly agreed to commit homicidal terrorist acts with ISIS").

Bernhardt also fails to allege an overt act in furtherance of a conspiracy. Under the ATA, the overt act must be the act of international terrorism that injures the plaintiff. *See* 18 U.S.C. § 2333(d)(2) (providing a cause of action "for an injury arising from an act of international terrorism"); 🚩 *Halberstam*, 705 F.2d at 477 (explaining that civil conspiracy liability requires "an unlawful overt act" to have "produced an injury and damages"). Bernhardt's injury arose from the Camp Chapman bombing, and therefore Bernhardt had to allege the bombing was the overt act that furthered a conspiracy between HSBC and al-Qaeda. But Bernhardt makes no such allegation, nor is it plausible to infer that an attack on a secret CIA base in Afghanistan would further HSBC's alleged objective of maximizing profits through the evasion of U.S. sanctions. *Cf.* 🚩 *Adams v. Alcolac, Inc.*, 974 F.3d 540, 545–46 (5th Cir. 2020) (per curiam) (plaintiffs failed to allege a conspiracy where the overt act—the use of mustard gas—was not done in furtherance of a broader conspiracy to evade U.S. export controls for a profit motive). Instead, Bernhardt's complaint consistently identifies HSBC's sanctions evasion as the relevant overt acts. That conduct is not, however, an overt act of international terrorism or the source of Bernhardt's injury under the ATA.

Because Bernhardt fails to allege an agreement between HSBC and al-Qaeda or an overt act in furtherance thereof, we affirm the dismissal of Bernhardt's ATA conspiracy claim. [17]

\* \* \*

Bernhardt and the other plaintiffs lost family members in an al-Qaeda suicide bombing. They seek to recover damages from HSBC, which has admitted to evading sanctions to benefit foreign banks with ties to terrorist organizations. While the ATA creates liability for those who materially assist acts of terrorism, a successful claim requires a plausible connection between HSBC and al-Qaeda. We cannot infer from the complaint the necessary connection to maintain the ATA aiding and abetting and conspiracy claims. Therefore, we affirm the decision of the district court.

**\*13** *So ordered.*

Wilkins, Circuit Judge, concurring in part and dissenting in part:

Although I concur in the dismissal of the conspiracy claim,[1] I respectfully dissent from the majority's affirmance of the dismissal of the foreign HSBC defendants for lack of personal jurisdiction as well as the dismissal of the aiding-and-abetting claim. When reviewing the dismissal of a complaint under the Federal Rule of Civil Procedure 12(b)(6), we must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015). The majority acts in contravention of this standard by failing to grapple sufficiently with all of the facts alleged in the complaint, which support exercising personal jurisdiction over the foreign HSBC defendants and upholding the aiding-and-abetting claim.

**I.**

Turning first to the issue of personal jurisdiction over the foreign HSBC defendants, the essential foundation of specific jurisdiction is a "relationship among the defendant, the forum, and the litigation." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, ––– U.S. ––––, 141 S. Ct. 1017, 1028, 209 L.Ed.2d 225 (2021) (internal quotation marks and citation omitted). Such a relationship is present here. The majority seems to acknowledge that the Plaintiffs adequately pled that "the foreign HSBC defendants purposefully directed their conduct at U.S. markets by coordinating with HSBC domestic

affiliates to evade the OFAC filter and to facilitate financial transactions in violation of U.S. sanctions." Maj. Slip Op. at ––– – –––. Yet the majority opines that the Plaintiffs failed to allege that this conduct related to al-Qaeda's terrorist activities. Nor did they, in the majority's view, allege that this sanction evasion "benefited or even impacted al-Qaeda." *Id.* at ––––. This contention ignores specific facts that were alleged in the Amended Complaint.

Specifically, the Plaintiffs pled that Bank Saderat, Bank Melli, and Al Rajhi Bank were all subject to strict economic sanctions due to their ties to terrorism and their provision of financial support to terrorist organizations. Am. Compl. ¶¶ 102–26. For example, the U.S. Under-Secretary for Terrorism and Financial Intelligence found in 2006 that Bank Saderat was responsible for facilitating Iran's transfer of hundreds of millions of dollars to terrorist organizations each year and announced sanctions against Bank Saderat, which was also designated as a specially designed global terrorist. *Id.* ¶¶ 103–04. Accordingly, the U.S. Under-Secretary announced that the U.S. would "no longer allow a bank like Saderat to do business in the American financial system, even indirectly." *Id.* ¶ 103 (internal quotation marks omitted). Likewise, the Amended Complaint provides that Bank Melli was designated as a Specially Designated Nationals and Blocked Persons after being found to have provided financial services to terrorist groups in Iran. *Id.* ¶ 109. "From 2002 to 2006, Bank Melli was used [by terrorist organizations] to send at least $100 million to the [Iranian-based terrorist organizations]." *Id.*

**\*14** The Plaintiffs further allege that the founder of Al Rajhi Bank was identified as a key financial contributor to al-Qaeda in the "Golden Chain Document," an authenticated al-Qaeda document that identifies al-Qaeda's most important financial benefactors. *Id.* ¶¶ 115–19. Al Rajhi Bank maintained accounts for many of al-Qaeda's charity fronts and as early as 2003, the CIA warned that Al Rajhi Bank served as a conduit for terrorist transactions. *Id.* ¶¶ 119–23. Indeed, HSBC's internal compliance officials raised concerns about Al Rajhi Bank being used by terrorists and this prompted HSBC to temporarily end its relationship with Al Rajhi Bank. *Id.* ¶¶ 175–77. All in all, the HSBC Defendants conducted nearly 25,000 transactions with Iran and Iranian entities (including Bank Melli and Bank Saderat) valued at approximately $19.4 billion. *Id.* ¶ 161. Additionally, one of the HSBC Defendants' largest Banknotes' customers was Al Rajhi Bank, whom the HSBC Defendants provided with nearly $1 billion U.S. dollars. *Id.* ¶¶ 172, 182.

Drawing all reasonable inferences from the allegations in the Plaintiffs' favor, they are sufficient to show that the activities of the HSBC Defendants related to al-Qaeda and benefited al-Qaeda. Iran is cited by the State Department as the most active state sponsor of terrorism in the world, and since the 1990s "has been operating under an alliance with al Qaeda ... by which Iran provides material support for terrorism including financing, facilitation of travel, training, safe havens and operational support." *Id.* ¶¶ 98–100. Under this alliance, Iran is a "critical transit point for funding" al-Qaeda activities and Iran's network "serves as the core pipeline through which [al-Qaeda] moves money." *Id.* ¶ 95; *see also id.* ¶ 93 (letter from Osama bin Laden, founder of al-Qaeda, describing Iran as al-Qaeda's "main artery for funds"). The majority contends these allegations are insufficient to show relatedness, "because aid to Iran could just as plausibly benefit its otherwise legitimate operations rather than al-Qaeda." Maj. Slip Op. at ——. In so ruling, the majority effectively backtracks from its concession that 🚩 *Ford* does not equate relatedness with causation, and it ignores 🚩 *Ford's* admonition that "[w]e have long treated isolated or sporadic transactions differently from continuous ones" for personal jurisdiction purposes. 🚩 141 S. Ct. at 1028 n.4.

Additionally, according to a report from the Treasury Department, the terrorist who engineered the Camp Chapman attack was al-Qaeda's emissary in Iran, was provided safe haven in Iran, and was allowed to travel freely in and out of the country with the permission of Iranian officials. *Id.* ¶ 96–97. Balawi, the al-Qaeda agent who committed the Camp Chapman suicide bombing, trained for his mission at a training camp in Pakistan, which "existed, in large part, through the funding and material support provided by Iran." *Id.* ¶ 229–31; *see also generally id.* ¶¶ 65–101 (describing the various ways Iran has materially supported al-Qaeda). Additionally, and perhaps most importantly, Al Rajhi Bank has documented ties with al-Qaeda and the HSBC Defendants were aware of these ties. *Id.* ¶¶ 115–26, 175–77.

The Plaintiffs have also pled allegations plausibly demonstrating that al-Qaeda's ability to secure funding impacted the success of its terrorist attacks. Specifically, the Plaintiffs allege that al-Qaeda's ability to plan and commit terrorist attacks required the use of a "global financing and logistics infrastructure," and that the Camp Chapman bombing in particular was a sophisticated attack requiring significant amounts of time, money, and logistics in order

to be successful. *Id.* ¶¶ 50–53. The U.S. Under-Secretary of Terrorism and Financial Intelligence stated:

> The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, plan operations and bribe corrupt officials for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous. *Id.* ¶ 54.

**\*15** As the majority concedes—a point which bears repeating—the Plaintiffs are not "required to identify specific dollars spent on the [Camp Chapman] terrorist attack." Maj. Slip Op. at ——. Nor could they. Because as the majority notes, " '[m]oney is fungible[,]' " Maj. Slip Op. at —— n.9 (quoting 🚩 *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010)), and "there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." 🚩 *Humanitarian L. Project*, 561 U.S. at 31, 130 S.Ct. 2705 (internal quotation marks, citation, and emphasis omitted).

Simply put, the Plaintiffs' factual allegations are entitled to a reasonable inference that there is a sufficient relatedness between the foreign HSBC Defendants' contacts with the United States and the Camp Chapman terrorist attack. If the foreign HSBC Defendants had properly observed the sanctions against these banks, it would have significantly hindered al-Qaeda's ability to successfully carry out terrorist attacks like the Camp Chapman bombing. Let this sink in for a moment: the majority holds that where HSBC regularly did business with a bank founded and run by one of al-Qaeda's largest financial supporters, Am. Compl. ¶¶ 114-120, and where the 9/11 Commission found that al-Qaeda hijackers used this same bank to facilitate their terrorist attacks, *id.* ¶ 121, and where this bank advertised how people could

deposit funds into al-Qaeda-front charity accounts held at the bank, *id.* ¶ 120, we cannot conclude that doing business with this bank "relates to" any of al-Qaeda's subsequent terrorist acts, including at Camp Chapman. Maj. Op. at —— – ——. This is supposedly because the bank has "vast and otherwise legitimate operations," *id.* at 12, but this reasoning ignores the conceded fungibility of money, the role that financial support and access to U.S. banknotes play in supporting terrorist activities, and this bank's specific record of funneling money to al-Qaeda.

As such, the foreign HSBC Defendants indeed had "fair warning" that evading U.S. sanctions and allowing sanctioned entities that funded terrorist organizations to access the U.S. financial markets and procure funds to carry out terrorist attacks would subject them to liability in the United States for attacks committed against its citizens. 🔖 *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

Accordingly, I would find that the Plaintiffs sufficiently pled a basis for exercising personal jurisdiction over the foreign HSBC Defendants.

## II.

Now turning to the ATA aiding-and-abetting claim, the only relevant issues in dispute are whether the complaint would allow us to infer that the HSBC Defendants were generally aware that they played a role in al-Qaeda's terrorist activities and that the HSBC Defendants knowingly and substantially assisted those activities. I would find that it does.

In 🔖 *Atchley v. AstraZeneca UK Ltd.*, we explained that a " 'defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable.' " 🔖 22 F.4th 204, 220 (D.C. Cir. 2022) (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021)). "[B]ear[ing] in mind the challenges of establishing a defendant's state of mind without the benefit of discovery[,]" 🔖 *Atchley*, 22 F.4th at 220, the Plaintiffs have sufficiently pled allegations that give rise to an inference that the HSBC Defendants were generally aware of their role in al-Qaeda's terrorist activities.

**\*16** It cannot be disputed that the complaint sufficiently pleads that at least one of the sanctioned entities, Al Rajhi Bank, had extensive, documented ties to al-Qaeda. The Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report"), which was published in 2004,[2] revealed the existence of a "Golden Chain" document that identified al-Qaeda's most important financial benefactors, one of which was Sulaiman bin Abdulaziz Al Rajhi ("Sulaiman"), a founder of Al Rajhi Bank and former Chief Executive Officer and Chairman of the Board. Am. Compl. ¶¶ 114–18. Under the leadership of Sulaiman, Al Rajhi Bank "maintained accounts for many of al-Qaeda's charity fronts" thereby "providing a mechanism for al-Qaeda supporters to deposit funds directly into those accounts." *Id.* ¶¶ 119–20; *see also id.* ¶ 122 (CIA detailing Sulaiman's control over "the bank's most important decisions"). The complaint went on to allege specific examples of Al Rajhi Bank funneling money to members of al-Qaeda that committed terrorist attacks:

> For example, money was funneled through Al Rajhi Bank to an al-Qaeda cell in Hamburg, Germany, through businessmen Mahmood Darkazanli and Abdul Fattah Zammar, who in turn provided the al-Qaeda cell of 9/11 hijackers with financial and logistical support. One of the 9/11 hijackers, Abdul Aziz al Omari, utilized a credit card drawn on Al Rajhi Bank when planning the attacks and, just four days before the attacks, received a wire transfer from Al Rajhi Bank into a SunTrust bank account.

*Id.* ¶ 121. The majority concedes that these allegations allow us to "plausibly infer that Al Rajhi Bank maintained connections to al-Qaeda," yet holds that the complaint does not allege that the HSBC Defendants were aware of these connections. Maj. Slip Op. at ——. This contention ignores altogether the allegations in the complaint from which we can reasonably infer that the HSBC Defendants had *actual* knowledge of these connections. For instance, the Golden Chain document, which established Al Rajhi Bank's ties to al-Qaeda, became public in 2004. Further information about these ties came to light in the 9/11 Commission Report and

Congressional hearings. Am. Compl. ¶¶ 174–77. We can infer that the HSBC Defendants were aware of this information because "public sources such as media articles ... plausibly suggest a defendant's knowledge which can be confirmed during discovery." *Honickman*, 6 F.4th at 502 n.18.

Undaunted by these allegations, the majority maintains that even if the HSBC Defendants were aware of these connections, the Plaintiffs "fail[ ] to allege that those connections were so close that HSBC had to be aware it was assuming a role in al-Qaeda's terrorist activities by working with Al Rajhi Bank." Maj. Slip Op. at ——. In the majority's view, because Al Rajhi Bank engaged in "extensive legitimate operations," the Plaintiffs had to allege "that a substantial part of these operations involved al-Qaeda" and that "Al Rajhi Bank was so closely intertwined with al-Qaeda that we can infer HSBC was aware it was assuming a role in al-Qaeda's terrorist activities simply by doing business with Al Rajhi Bank." *Id.* at ——. The Plaintiffs alleged that "Al Rajhi Bank advertised the existence and numerical designation of the accounts it maintained for [al-Qaeda-front charities] throughout the Muslim world, providing a mechanism for al-Qaeda supporters to deposit funds directly into those accounts." Am. Compl. ¶ 120. The majority therefore holds that a bank that literally advertises how members of the public can give money to al-Qaeda (and enables them to do so) is not sufficiently "closely intertwined" with al-Qaeda to satisfy the general awareness requirement. The majority's reasoning appears to be that the HSBC defendants were only generally aware that its customer, Al Rajhi Bank, supported al-Qaeda's "legitimate" charitable activities, rather than al-Qaeda's terrorism. As we have said in a different context, "[t]his finding is quite extraordinary, because it totally defies both logic and common sense." *Georgetown Hotel v. N.L.R.B.*, 835 F.2d 1467, 1471 (D.C. Cir. 1987).

 *17 Turning to the last element for aiding-and-abetting liability, the Plaintiffs must allege that the HSBC Defendants knowingly provided substantial assistance to the Camp Chapman attack. The knowledge component is satisfied "[i]f the defendant knowingly—and not innocently or inadvertently—gave assistance, directly or indirectly." *Atchley*, 22 F.4th at 222 (internal quotation marks and citation omitted). It cannot be disputed that the HSBC Defendants knowingly assisted sanctioned entities Bank Melli and Bank Saderat in evading U.S. sanctions and providing Al Rajhi Bank with access to U.S. Banknotes despite its knowledge of Al Rajhi Bank's ties to al-Qaeda. *See* Am. Compl. ¶¶ 37, 200–02 (the HSBC Defendants

accepting criminal responsibility for its conduct in the Deferred Prosecution Agreement); *see also Honickman*, 6 F.4th at 500 (noting that the "knowledge" component does "not require [a defendant] to 'know' anything more ... than what she knew for the general awareness element").

The Plaintiffs have also sufficiently pled that the HSBC Defendants provided substantial assistance. In determining whether a defendant has provided substantial assistance, we consider six factors: "(i) the nature of the act assisted, (ii) the amount and kind of assistance, (iii) the defendants' presence at the time of the tort, (iv) the defendants' relationship to the tortious actor, (v) the defendants' state of mind, and (vi) the duration of assistance." *Atchley*, 22 F.4th at 221. Bearing in mind that "[n]o factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim[,]" *id.*, I address each of these factors in turn.

Factors 1 and 2: Nature of Act & Amount and Kind of Assistance. The *Halberstam* Court noted that "the nature of the act involved dictates what aid might matter, *i.e.*, be substantial." *Halberstam v. Welch*, 705 F.2d 472, 484 (D.C. Cir. 1983) (first emphasis omitted). Therefore, a court may "apply a proportionality test to particularly bad or opprobrious acts, *i.e.*, a defendant's responsibility for the same amount of assistance increases with the blameworthiness of the tortious act or the seriousness of the foreseeable consequences." *Id.* at 484 n.13. "The particularly offensive nature of an underlying offense might also factor" on the defendant's state of mind. *Id.*

The nature of the act alleged here is terrorism that resulted in the deaths of nine people. There can be no dispute as to the severity and heinous nature of terrorist attacks. *See* Pub. L. No. 114-122, 130 Stat. 852 § 2(a)(1) ("International terrorism is a serious and deadly problem that threatens the vital interests of the United States."). The amount and kind of assistance that was provided is also significant. As we already noted in *Atchley*, "[f]inancial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." 22 F.4th at 222 (internal quotation marks and citations omitted). As aforementioned, here, the Plaintiffs allege that the HSBC Defendants devised fraudulent schemes to evade U.S. sanctions and processed 25,000 deceptive transactions for sanctioned banks connected to Iran, valued

at more than $19.4 billion. Am. Compl. ¶¶ 148–50. The Plaintiffs also allege that despite actual knowledge of Al Rajhi Bank's ties to al-Qaeda, the HSBC Defendants provided nearly $1 billion in U.S. Banknotes to Al Rajhi Bank leading up to the Camp Chapman attack. *Id.* ¶¶ 178–82.

Nevertheless, the majority contends that these allegations are insufficient because the Plaintiffs failed "to allege how much (if any) of that money indirectly flowed to al-Qaeda." Maj. Slip Op. at ——. The majority's position contradicts well-reasoned authority, including our own precedent. "[I]f a plaintiff plausibly alleges the general awareness element, she does not need to also allege the [foreign terrorist organization] actually received the funds." *Honickman*, 6 F.4th at 500. Rather, "[f]actual allegations that permit a reasonable inference that the defendant recognized the money it transferred to its customers would be received by the [foreign terrorist organization] would suffice." *Id.* As already outlined above, the Plaintiffs have pled that the HSBC Defendants provided Al Rajhi Bank—despite actual knowledge of its ties to al-Qaeda—with nearly one billion U.S. dollars leading up to the time of the Camp Chapman attack. As such, the complaint plausibly alleges that the HSBC Defendants recognized this money would be used to fund, at least in part, al-Qaeda operations.

**\*18** Moreover, even if one considers this assistance to be relatively trivial, compared to the "extraordinary blameworthiness" of al-Qaeda's terrorist attacks, "even relatively trivial aid could count as substantial." *Atchley*, 22 F.4th at 222 (internal quotation marks and citation omitted); *see also Halberstam*, 705 F.2d at 488 (explaining the importance of evaluating acts of assistance "in the context of the enterprise they aided" rather than in isolation because although the defendant's assistance "may not have been overwhelming as to any given" act in the "five-year life of this criminal operation," such assistance "added up over time to an essential part of the pattern"); Restatement (Third) of Torts § 28 cmt. d (2020) ("[A] clear understanding of wrongdoing can make a small act of assistance more blameworthy than it would seem if the defendant's knowledge were less certain or precise."); *id.* ("[T]he enormity of a wrong ... or the intimacy of a defendant's knowledge of it may appropriately cause such lesser acts to be considered aiding and abetting."). Therefore, these factors support substantiality.

Factor 3: Presence or Absence at the Time of the Tort. Because the HSBC Defendants were not physically present at the scene, this factor may undermine the Plaintiffs' position. *See Atchley*, 22 F.4th at 223 (noting that because the "defendants were not physically present at the attacks on plaintiffs[,] [t]his factor cuts against counting" the defendants' assistance as substantial). However, as the majority notes, presence could be understood in a transactional sense and the HSBC Defendants were alleged to have ongoing business relations with sanctioned entities, particularly Al Rajhi Bank, before and leading up to the Camp Chapman attack. *See* Am. Compl. ¶¶ 161, 182. Thus, I would find that this factor neither supports nor weighs against substantiality.

Factor 4: Relationship to Principal. Because "there is no special relationship here between [the HSBC] defendants and the principal tortfeasors" I would also "treat this factor as neither supporting nor detracting from substantiality." *Atchley*, 22 F.4th at 223.

Factor 5: State of Mind. This factor favors finding substantiality because Plaintiffs have sufficiently alleged that the HSBC Defendants provided knowing assistance and such assistance "evidences a deliberate long-term intention to participate in an ongoing illicit enterprise." *Halberstam*, 705 F.2d at 488. As we have explained, "[a]iding-and-abetting liability reaches actors ... who may seek only financial gain but pursue it with a general awareness of some type of tort or crime." *Atchley*, 22 F.4th at 224. Here, the Plaintiffs allege the HSBC Defendants wanted to increase its business and purposefully devised a scheme to evade U.S. sanctions and engage in illicit transactions with entities that were sanctioned explicitly for their ties to terrorism. Therefore, the HSBC Defendants' alleged state of mind supports a finding of substantiality.

Factor 6: Duration of Assistance. The *Halberstam* Court considered this factor to be particularly "important" because "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Halberstam*, 705 F.2d at 484. Here, the HSBC Defendants' alleged aid spanned more than a decade. Am. Compl. ¶¶ 31–36. Accordingly, this factor weighs strongly in favor of substantiality.

In sum, four of the six 🚩 *Halberstam* factors weigh strongly in favor of finding substantial assistance, and the majority errs by concluding otherwise.

\* \* \*

When Congress amended the ATA in 2016, its purpose was:

> to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States.

**\*19**  Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016) (Amendment). Through its combination of "too stingy a reading of the complaint," *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.*, 52 F.3d 373, 376 (D.C. Cir. 1995) (reversing dismissal), and too stingy a reading of precedent and relevant authorities, the majority has frustrated Congress's intent. Just as importantly, the majority has unfairly deprived these Plaintiffs of their rightful opportunity to prove their well-pleaded allegations in court. I respectfully dissent.

**All Citations**

--- F.4th ----, 2022 WL 4074415

---

## Footnotes

1   The full text provides:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (🚩8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2).

2   JASTA substantially expanded civil remedies for victims of international terrorism. Initially, the ATA created a civil cause of action for the victims of international terrorism. *See* ATA, § 132(b), 104 Stat. at 2251 (codified as amended at 18 U.S.C. § 2333(a)). The ATA established principal liability for defendants who proximately caused a plaintiff's injury, but not secondary liability for those who facilitated or aided, yet did not themselves commit, terrorist acts. 🚩*Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 270, 276–78 (D.C. Cir. 2018).

3   The defendants include HSBC Holdings PLC ("HSBC Holdings"), a company incorporated in the United Kingdom that owns the U.K.-based HSBC Bank PLC ("HSBC Bank UK") and indirectly owns HSBC North American Holdings Inc. ("HSBC Holdings NA"). HSBC Holdings NA indirectly owns and controls the fourth defendant, the U.S.-based HSBC Bank USA, N.A. ("HSBC Bank US"). Although Bernhardt also named the Islamic Republic of Iran as a defendant, the claims against Iran are still pending before the district court and therefore are not before us. *See* FED. R. CIV. P. 54(b).

Bernhardt v. Islamic Republic of Iran, --- F.4th ---- (2022)

4    *See* U.S. Dep't of State, *Terrorism Designations FAQs* (Feb. 27, 2018), https://2017-2021.state.gov/terrorism-designations-faqs/index.html.

5    *See* U.S. Dep't of the Treasury, *Treasury Department Reaches Landmark Settlement with HSBC* (Dec. 11, 2012), https://home.treasury.gov/news/press-releases/tg1799.

6    The deferred prosecution agreement focused on drug money transfers but also mentioned the facilitation of terrorism. *See* U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations.

7    Bernhardt has not alleged general personal jurisdiction over the foreign HSBC defendants, which would require demonstrating that the defendants' contacts "are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (cleaned up).

8    The dissent emphasizes that *Ford* treated " 'isolated or sporadic transactions differently from continuous ones' for personal jurisdiction purposes." Dissenting Op. —— (quoting 141 S. Ct. at 1028 n.4). But *Ford* did not hold that *any* pattern of repeated transactions in the forum is sufficient to establish specific personal jurisdiction: rather, the repeated transactions must also relate to the specific claim at issue. In other words, the relatedness inquiry under *Ford* "does not mean anything goes." 141 S. Ct. at 1026. "In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Id.* Such limits are necessary to preserve the distinction between specific and general jurisdiction "since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (Scalia, J., concurring).

9    The Supreme Court has recognized that "[m]oney is fungible" and that foreign terrorist organizations "do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 31, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) (cleaned up).

10   Although Balawi detonated the suicide vest, no one disputes he was acting as an agent of al-Qaeda and that al-Qaeda is "the person who committed" the Camp Chapman bombing. *See Atchley*, 22 F.4th at 217 (explaining that a foreign terrorist organization often "stands behind the fighters who pull the trigger or detonate the device").

11   We reject Bernhardt's argument that "extreme recklessness" satisfies the standard. Because actual awareness is required, the inquiry is not whether a defendant should have been aware of its role.

12   There is no requirement of specific intent, and a defendant does not have to "wish[ ] to bring about" an act of terrorism or "kn[ow] of the specific attacks at issue." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018); *see also Atchley*, 22 F.4th at 220. Contrary to Bernhardt's contentions, the district court applied the correct standard and did not require a heightened standard of specific intent.

13   For the same reasons, Bernhardt's vague allegation that HSBC Bank US "supplied U.S. dollars to ... Islami Bank Bangladesh Ltd. and Social Islami Bank, despite evidence linking those banks to terrorism" is not

enough to connect HSBC to al-Qaeda. Nor is the allegation of Al Rajhi Bank smuggling money to Chechnian extremists relevant to HSBC's al-Qaeda connections.

14   This conclusion is not affected by the fact that Al Rajhi Bank publicly advertised its connections to Al-Qaeda charity fronts. *Cf.* Dissenting Op. ——. The question of HSBC's general awareness is context dependent and turns on the identity of Al Rajhi Bank considered in the round. Bernhardt alleges some public connection between Al Rajhi Bank and Al-Qaeda, but her allegations are not sufficient to demonstrate that Al Rajhi Bank's transactions with Al-Qaeda were so pervasive that HSBC should have known that by doing business with Al Rajhi Bank it was financing terrorism.

15   Under the dissent's expansive interpretation, virtually any bank that violates U.S. sanctions against an entity with some ties to terrorism will be liable under the ATA for any subsequent acts of terrorism. The government has already prosecuted HSBC for evading sanctions in its transactions with banks having terrorist ties. But simply alleging knowledge of a bank's ties to terrorism is not sufficient to make out liability under the ATA.

16   We are in accord with the dissent regarding the proper legal standard, although we disagree about whether Bernhardt's allegations were sufficient. *See* Dissenting Op. —— (citing *Honickman*). Bernhardt had to allege "[f]actual allegations that permit a reasonable inference" that the "money ... transferred to [an intermediary] would be received by" al-Qaeda. *Honickman*, 6 F.4th at 500; *see also* 18 U.S.C. § 2333(d)(2) (requiring a plaintiff to show a defendant, in fact, "provid[ed] substantial assistance" to a terrorist organization). "[A]lleg[ing] the general awareness element" can support that inference, but only if a plaintiff alleges that the intermediary was "so closely intertwined" with a terrorist organization that doing business with one was like doing business with the other. *Honickman*, 6 F.4th at 499, 500. Bernhardt has not alleged this closeness or any other form of aid "received by" al-Qaeda, and thus this factor weighs against Bernhardt.

17   Bernhardt's arguments that a jury should have the opportunity to identify single or multiple conspiracies is beside the point. The burden of pleading a plausible conspiracy rests squarely on Bernhardt, and that burden is not met here. Claims "shy of a plausible entitlement to relief" cannot avoid dismissal simply because a jury could rely on evidence deduced at later stages of trial. *Twombly*, 550 U.S. at 559, 127 S.Ct. 1955.

1   In my view, because the Plaintiffs have not adequately pled an unlawful agreement, we need not decide whether the Plaintiffs adequately pled an overt act in furtherance of the conspiracy.

2   While the complaint does not contain this publication date, we may take judicial notice of such date pursuant to FED. R. EVID. 201. *See* *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) ("Among the information a court may consider on a motion to dismiss are public records subject to judicial notice.") (internal quotation marks and citation omitted); *see also* National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* (2004), https://www.ojp.gov/ncjrs/virtual-library/abstracts/911-commission-report (last visited July 11, 2022).

**End of Document**      © 2022 Thomson Reuters. No claim to original U.S. Government Works.