**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AUGUST WILDMAN, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>DEUTSCHE BANK<br>AKTIENGESELLSCHAFT, *et al.*,<br><br>    Defendants. | No. 1:21-CV-04400 (HG) (RML) |

**OPPOSITION TO WALL STREET EXCHANGE'S
<u>MOTION TO DISMISS THE CORRECTED AMENDED COMPLAINT</u>**

Ryan R. Sparacino
Tejinder Singh
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
tejinder.singh@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

BACKGROUND ........................................................................................................................ 1

ARGUMENT ............................................................................................................................. 4

    I.    This Court Should Not Dismiss for Insufficient Service of Process ................................. 4

    II.   This Court Should Not Dismiss for Lack of Personal Jurisdiction.................................... 7

    III.  The Complaint Satisfies Federal Rule of Civil Procedure 8........................................... 12

    IV.  The Complaint States Claims for Aiding and Abetting Under the Justice Against
          Sponsors of Terrorism Act............................................................................................ 14

          A.  WSE Was Generally Aware That It Was Playing a Role in Illegal Activity That
               Foreseeably Risked Terrorism ............................................................................. 15

          B.  WSE Knowingly Provided Substantial Assistance.................................................... 20

          C.  Designated Terrorist Organizations Committed, Planned, or Authorized the
               Attacks That Injured Plaintiffs............................................................................. 24

CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

## Cases

*Associations Inc. v. Associa Menasa Inc.*,
   2017 WL 11617417 (N.D. Tex. July 21, 2017) ...................................................... 7

*Astor Chocolate Corp. v. Elite Gold Ltd.*,
   510 F. Supp. 3d 108 (S.D.N.Y. 2020) .................................................................... 6

*Atchley v. AstraZeneca UK Ltd.*,
   22 F.4th 204 (D.C. Cir. 2022) ....................................................................... *passim*

*Bartlett v. Société Générale de Banque Au Liban SAL*,
   2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................................. 9, 13

*Brown-Thomas v. Hynie*,
   367 F. Supp. 3d 452 (D.S.C. 2019) ........................................................................ 5

*Cabrera v. Black & Veatch Special Projects Corps.*,
   2021 WL 3508091 (D.D.C. July 30, 2021) ........................................................... 23

*Cabrera v. Islamic Republic of Iran*,
   2022 WL 2817730 (D.D.C. July 19, 2022) ........................................................... 13

*Chapman v. Trans Union LLC*,
   2011 WL 2078641 (S.D. Tex. May 26, 2011) ......................................................... 5

*Cox v. Cnty. of Yuba*,
   2011 WL 590733 (E.D. Cal. Feb. 10, 2011) ........................................................... 5

*Darden v. DaimlerChrysler N. Am. Holding Corp.*,
   191 F. Supp. 2d 382 (S.D.N.Y. 2002) .................................................................... 5

*DePalmer v. Jian Zhu*,
   2020 WL 7059233 (W.D. Wash. Dec. 2, 2020) ..................................................... 5

*Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*,
   722 F.3d 81 (2d Cir. 2013) ...................................................................................... 7

*Greenwood v. Arthrex, Inc.*,
   2022 WL 2117763 (W.D.N.Y. June 13, 2022) ..................................................... 11

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983) ...................................................................... *passim*

*Honickman v. BLOM Bank SAL*,
   6 F.4th 487 (2d Cir. 2021) ............................................................................ *passim*

*Howell v. Campbell*,
   2016 WL 1241529 (S.D.N.Y. Mar. 23, 2016) ........................................................ 5

*In re Bozel S.A.*,
   2017 WL 3175606 (S.D.N.Y. July 25, 2017) .......................................................... 6

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009) .................................................................................. 15

*In re Magnetic Audiotape Antitrust Litig.*,
   334 F.3d 204 (2d Cir. 2003) ................................................................................. 8

*Kaplan v. Lebanese Canadian Bank, SAL*,
   999 F.3d 842 (2d Cir. 2021) .............................................................. 15, 17, 19, 21

*King v. Habib Bank Ltd.*,
   2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022)................................................. 8, 13, 22

*Leon v. Shmukler*,
   992 F. Supp. 2d 179 (E.D.N.Y. 2014) .................................................................. 11

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   732 F.3d 161 (2d Cir. 2013) ............................................................................... 8, 9

*Morgan Stanley v. Babu*,
   448 F. Supp. 3d 497 (D. Md. 2020), *appeal dismissed*, 2021 WL 4936625 (4th Cir. June
   24, 2021) ................................................................................................................ 5

*Nabulsi v. Nahyan*,
   2009 WL 1658017 (S.D. Tex. June 12, 2009), *aff'd sub nom. Nabulsi v. Bin Zayed Al
   Nahyan*, 383 F. App'x 380 (5th Cir. 2010) ........................................................ 7

*Rankel v. Town of Somers*,
   999 F. Supp. 2d 527 (S.D.N.Y. 2014) .................................................................. 5

*Rodriguez v. N.Y. City Dep't of Educ.*,
   2022 WL 4484576 (S.D.N.Y. Sept. 26, 2022)....................................................... 5

*Salahuddin v. Cuomo*,
   861 F.2d 40 (2d Cir. 1988) ................................................................................. 12

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
   22 F.4th 103 (2d Cir. 2021) ................................................................................ 8

*Schweitzer ex rel. Schweitzer v. Crofton*,
   2010 WL 3516161 (E.D.N.Y. Sept. 1, 2010) ...................................................... 5

*Singer v. Bank of Palestine*,
   2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ..................................................... 11

*Smith v. Fischer*,
   2016 WL 3004670 (W.D.N.Y. May 23, 2016) .................................................... 12

*Strauss v. Credit Lyonnais, S.A.*,
   925 F. Supp. 2d 414 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755
   (E.D.N.Y. Sept. 30, 2017)................................................................................... 20

*United States v. Kozeny*,
   667 F.3d 122 (2d Cir. 2011) ............................................................................... 18

*Weiss v. Nat'l Westminster Bank PLC*,
   176 F. Supp. 3d 264 (E.D.N.Y. 2016) ................................................................ 9

*Weiss v. Nat'l Westminster Bank PLC*,
   768 F.3d 202 (2d Cir. 2014) ............................................................................... 15

*Zapata v. City of New York*,
    502 F.3d 192 (2d Cir. 2007) ................................................................. 6

**Statutes**

18 U.S.C. § 1962 ....................................................................................... 4

18 U.S.C. § 2333 ....................................................................................... 4

18 U.S.C. § 2333(d)(2) ............................................................................ 24

18 U.S.C. § 2335(a) ................................................................................... 6

Justice Against Sponsors of Terrorism Act,
    Pub. L. No. 114-222, 130 Stat. 852 (2016) ................................ 4, 12, 14

    § 2(a)(5) ............................................................................................ 14

    § 2(a)(6) ............................................................................................ 12

    § 2(b) ................................................................................................. 14

N.Y. C.P.L.R. § 302 ................................................................................... 8

**Rules**

Fed. R. Civ. P. 4 advisory committee's note to 1993 Amendment.............. 6

Fed. R. Civ. P. 4(k)(2)................................................................................. 8

Fed. R. Civ. P. 12(b)(5)............................................................................... 4

Plaintiffs respectfully oppose Wall Street Exchange Centre LLC's (WSE's) motion to dismiss the Corrected Amended Complaint (Doc. 38).[1]

## BACKGROUND

The factual background is recited in the responses to other motions to dismiss, and only summarized here. Plaintiffs or their close family members were killed or injured by terrorist attacks in Afghanistan between 2011 and 2016. ¶ 1 (p.1). The attacks were committed, planned, or authorized by al-Qaeda and the Haqqani Network (the most violent part of the Taliban). ¶¶ 12, 85-87, 364-408 (pp.4, 20-21, 124-40). These designated foreign terrorist organizations (FTOs) led a Syndicate of terrorists that also included al-Qaeda's allies: the Taliban, Lashkar-e-Taiba, and D-Company, which attacked Americans in Afghanistan. ¶¶ 89-110 (pp.21-31).

To carry out these attacks, al-Qaeda, the Taliban, and their Syndicate allies needed vast amounts of money—particularly U.S. Dollars (USD), the preferred currency for terrorist finance—to fund terrorist recruiting, salaries, arms, mobile phones, and logistical pipelines. ¶¶ 5, 112-13, 121, 150-56 (pp.2, 32, 35-37, 46-48). As one strategy to obtain USD, al-Qaeda, the Taliban (including its Haqqani Network), and D-Company turned to Altaf Khanani, a member of the Syndicate and its principal money launderer. Khanani was internationally infamous for his connections with prominent Syndicate terrorists including Sirajuddin Haqqani (a dual-hatted member of both al-Qaeda and the Taliban) and Dawood Ibrahim (an al-Qaeda sponsor who led D-Company). ¶¶ 253-54 (pp.142-45).

Khanani's organization began laundering money in Pakistan in 2001, and in 2008 the Pakistani government charged him with money laundering offenses involving billions of dollars. ¶ 259 (p.146). Khanani fled to Dubai where he created the next iteration of his transnational

---

[1] Citations to the Corrected Amended Complaint are by paragraph and page number. Citations to WSE's memorandum of law are to "WSE MTD" and page number.

money laundering operation, ¶ 259 (pp.146-47), "launder[ing] between $13 billion and $16 billion per year," ¶ 260 (p.147).  In 2015, the U.S. Treasury Department sanctioned Khanani and his organization, finding them to be involved in the movement of funds for the Taliban, and noting Khanani's relationships with multiple Syndicate organizations including al-Qaeda, Lashkar-e-Taiba, and D-Company. ¶ 265 (pp.148-49). The Financial Action Task Force (the preeminent global organization to combat international money laundering, which issued critically important guidance and rules, ¶¶ 598, 697 (pp.256, 294), likewise reported that Khanani's organization "provide[d] the clearest example of a professional money laundering organisation, providing services to a UN designated terrorist organisation." ¶ 267 (pp.149-50).

Khanani used a web of companies to launder at least hundreds of millions of dollars annually for the Syndicate. ¶¶ 247, 250 (pp.141-42). His family members (many sharing his last name) were active participants in his organization (the Khanani MLO). ¶ 251 (p.142). These transactions allowed the Syndicate to convert the money it raised through criminal enterprises into USD, and to repatriate those funds to the Syndicate in Pakistan and Afghanistan to finance violence against Americans. ¶¶ 191-95, 207-10, 256-58 (pp.61-63, 67-70, 145-46).

The complaint details seven different ways that Khanani and the Khanani MLO directly and indirectly supported Syndicate terrorist operations. ¶¶ 268-78 (pp.150-54). These included: (1) "repatriat[ing] overseas income back to Afghanistan and Pakistan to support Syndicate attacks against Americans" and acting as the "global economic intelligence arm for the Syndicate"; (2) managing "every financial aspect of [the Syndicate's] coordinated transnational opium enterprise"; (3) providing "a comprehensive suite of financial services" to Syndicate entities, including but not limited to laundering, converting, moving, investing, protecting, and transferring their money; (4) paying millions of dollars in kickbacks (so-called "taxes") to both

2

D-Company and the Haqqani Network; (5) commingling terrorist funds to provide liquidity to all Khanani MLO customers; (6) growing the Syndicate's money through investments; and (7) providing benefits of geographic, strategic, and counterparty diversification. *See id*.

Khanani also served as a financier for Sirajuddin Haqqani. ¶¶ 254, 272, 674, 687 (pp.143-45, 152, 285-86, 290-91). Sirajuddin was the Syndicate's most important leader after 9/11, ¶ 157 (pp.48-49), designated a Specially Designated Global Terrorist in 2008, ¶ 160 (p.49). Sirajuddin simultaneously held leadership positions in al-Qaeda, the Haqqani Network, and the Quetta Shura Taliban. ¶ 159 (p.49). In these roles, he led the "Syndicate's dramatic escalation in its terrorist attack campaign targeting Americans in Afghanistan from 2008 through 2012." ¶ 164 (p.50); *see also* ¶¶ 164-86 (pp.50-59) (detailing Sirajuddin's role in the Syndicate's criminal and terrorist activities, including the types of attacks at issue in this case). Money laundering transactions for Altaf Khanani "supplied al-Qaeda and the Taliban, through Sirajuddin Haqqani, with key resources . . . relating to funding, arming, and logistically supporting Syndicate attacks against Americans in Afghanistan." ¶ 172 (p.54).

WSE "knowingly assumed a role in the Syndicate's terrorist fundraising and finance activities by directly aiding the Syndicate's efforts to repatriate illicit USD back to accounts controlled by al-Qaeda and Haqqani Network agents and operatives to finance attacks against Americans in Afghanistan." ¶ 572 (pp.249-50). This allegation is based, in part, on public reports describing WSE as "a 'key conduit' for the billion-dollar money laundering operation run by Khanani." ¶ 576 (p.250). These reports, citing law enforcement sources after Khanani's arrest, revealed that WSE helped Khanani and his companies move substantial funds from the U.A.E. ¶¶ 579-81 (p.251). As one example, a Khanani agent was charged with laundering over $100 million in a year, much of it through wire transfers using WSE. ¶ 947 (p.387). WSE engaged in

this conduct even though, "[b]y 2008," it "understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al-Qaeda and the Taliban"—as these facts were known "among financial services compliance professionals throughout the world, and regularly reported on by major media outlets." ¶ 584 (p.252). Nevertheless, WSE "allowed the Khanani MLO to transfer funds hundreds if not thousands of times, in amounts that total hundreds of millions if not billions of U.S. Dollars." ¶ 585 (p.252). These funds "went to the Syndicate and were used to perpetrate terrorist acts," ¶ 586 (p.252), and WSE knew this, but "pursued this business because it was lucrative," ¶ 589 (p.252).

Based on WSE's knowing provision of substantial assistance to al-Qaeda, the Taliban, and their Syndicate allies through Khanani, plaintiffs allege that it aided and abetted the Syndicate's acts of international terrorism, and is liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act, (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, plaintiffs allege that WSE aided: (1) the attacks that injured plaintiffs, ¶¶ 2025-33 (pp.590-91); and (2) the Syndicate's overall terrorist campaign, which violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962, ¶¶ 2034-43 (pp.592-94), and led to the attacks that injured plaintiffs.

## ARGUMENT

### I.      This Court Should Not Dismiss for Insufficient Service of Process

WSE challenges the sufficiency of the service of process under Rule 12(b)(5). WSE MTD 7. WSE does not assert that it did not receive the complaint through plaintiffs' efforts; instead, it points to technical requirements of U.A.E. law that were not satisfied. *See id.* at 8-11. Plaintiffs do not dispute that service did not meet all the requirements of U.A.E. law. However, plaintiffs attempted in good faith to serve WSE, and believed in good faith that they had done so properly and promptly. Moreover, WSE suffered no prejudice: It has received and reviewed the

complaint, and has had time to retain counsel and respond to the allegations. In parallel with this response, plaintiffs are seeking an order permitting them to serve WSE electronically, by Federal Express, and through WSE's counsel. On these facts, dismissal is not warranted. Instead, the Court should permit plaintiffs to again serve WSE.

Even when service is insufficient, "dismissal is not mandatory." *Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 536 (S.D.N.Y. 2014) (quoting *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002)). When service is technically deficient, but the defendant has suffered no prejudice, the preferred remedy is not to dismiss. Instead, courts often either hold that service was sufficient, *see, e.g.*, *Morgan Stanley v. Babu*, 448 F. Supp. 3d 497, 509 (D. Md. 2020), *appeal dismissed*, 2021 WL 4936625 (4th Cir. June 24, 2021), or permit the plaintiff to attempt service again, granting extensions as necessary, *see, e.g.*, *Rodriguez v. N.Y. City Dep't of Educ.*, 2022 WL 4484576, at *4 (S.D.N.Y. Sept. 26, 2022); *DePalmer v. Jian Zhu*, 2020 WL 7059233, at *3 (W.D. Wash. Dec. 2, 2020); *Howell v. Campbell*, 2016 WL 1241529, at *4 (S.D.N.Y. Mar. 23, 2016); *Chapman v. Trans Union LLC*, 2011 WL 2078641, at *1 (S.D. Tex. May 26, 2011); *Cox v. Cnty. of Yuba*, 2011 WL 590733, at *5 (E.D. Cal. Feb. 10, 2011); *Schweitzer ex rel. Schweitzer v. Crofton*, 2010 WL 3516161, at *10 (E.D.N.Y. Sept. 1, 2010).

Denying dismissal is appropriate here because "[u]nder Federal Rule of Civil Procedure 4(m), parties do not face any time limits for effecting service upon an individual residing in a foreign country," and "it would be a pointless exercise for the court to dismiss Plaintiffs' Complaint when service could be properly effectuated at a later date." *Brown-Thomas v. Hynie*, 367 F. Supp. 3d 452, 467 (D.S.C. 2019). Courts in this circuit apply a "flexible due diligence" standard to determine whether foreign service is timely. *See*, *e.g.*, *Astor Chocolate Corp. v. Elite*

*Gold Ltd.*, 510 F. Supp. 3d 108, 123 (S.D.N.Y. 2020). "Under this standard, the court assesses the reasonableness of the plaintiff's efforts and the prejudice to the defendant from any delay." *In re Bozel S.A.*, 2017 WL 3175606, at *2 (S.D.N.Y. July 25, 2017). So far, plaintiffs have exercised diligence by attempting to serve WSE promptly, and by following up with alternatives once WSE objected to the original service attempt; on the other hand, WSE has not claimed that it has suffered or would suffer any prejudice from being served. Accordingly, the Court should hold that plaintiffs can still timely serve WSE in this action—and indeed, WSE does not argue otherwise. In this circumstance, the best course would be to grant plaintiffs' motion to serve WSE by alternative means, and deny WSE's motion to dismiss as premature.

The Court also should not dismiss because it is possible that a court would deem some of plaintiffs' claims time-barred if they were refiled. *Cf.* Fed. R. Civ. P. 4 advisory committee's note to 1993 Amendment (explaining that courts may extend the time for service "even if there is no good cause shown," and that such "[r]elief may be justified, for example, if the applicable statute of limitations would bar the refiled action"); *Zapata v. City of New York*, 502 F.3d 192, 197 (2d Cir. 2007) (same). Plaintiffs' position is that none of their claims are close to being time-barred because none accrued until JASTA was enacted on September 28, 2016, and the ATA's statute of limitations is ten years from the date of accrual, *see* 18 U.S.C. § 2335(a). But no court has yet considered that argument. If this Court (or an appellate court) were to hold that the claims accrued when plaintiffs were injured (even though the cause of action did not yet exist), then claims based on injuries occurring more than ten years before refiling could be deemed time-barred absent tolling. Dismissal without prejudice would effectively become dismissal with prejudice for those claims—an unduly harsh result that weighs heavily against dismissal.

The cases WSE cites also do not compel dismissal. In *Associations Inc. v. Associa*

*Menasa Inc.*, 2017 WL 11617417, at \*4 (N.D. Tex. July 21, 2017), the court merely denied the plaintiffs' motion for default judgment without prejudice when they failed to establish proper service; a far cry from dismissing an action. In *Nabulsi v. Nahyan*, 2009 WL 1658017, at \*1 (S.D. Tex. June 12, 2009), *aff'd sub nom. Nabulsi v. Bin Zayed Al Nahyan*, 383 F. App'x 380 (5th Cir. 2010), the court granted a motion to dismiss for "lack of personal jurisdiction and improper service," and the court of appeals affirmed solely on personal jurisdiction grounds. There, the plaintiffs attempted to sue a U.A.E. national, the service did not comply with U.A.E. law—and in the interim, the defendant moved to Germany. The district court found service insufficient and held that alternative service would be improper for two reasons: first, it made no sense to "order alternative service through individuals located in the U.A.E." when the defendant "lives in Germany"; and second, service would be pointless "because plaintiffs have failed to establish that the court is able to exercise personal jurisdiction" over the defendant. *Id*. at \*11. Moreover, the court noted that it had already warned the plaintiffs that it would dismiss the case "unless service was effected within sixty days," and the plaintiffs had failed to do so. *Id*. The court concluded "that plaintiffs' failure to serve [the defendant] should result in dismissal of their claims because [the defendant] is not amenable to service in this case." *Id*. This case is different because: (1) WSE is still in the U.A.E., and so plaintiffs' proposed alternative methods of service make sense; (2) this Court has not previously provided a timeframe to serve WSE; and (3) WSE's motion to dismiss for lack of personal jurisdiction should be denied.

## II.       This Court Should Not Dismiss for Lack of Personal Jurisdiction

To plead personal jurisdiction, plaintiffs must allege a *prima facie* case—meaning facts that, if credited, would support personal jurisdiction. "Prior to discovery . . . the plaintiff's *prima facie* showing may be established solely by allegations." *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (quotation marks omitted). At this

stage, the Court cannot consider WSE's affidavits, or resolve factual issues in a manner contrary to plaintiffs' allegations. *See id.* at 84; *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 113, 123-24 (2d Cir. 2021); *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003); *see also King v. Habib Bank Ltd*., 2022 WL 4537849, at *3 (S.D.N.Y. Sept. 28, 2022) (rejecting ATA defendant's attempt to use affidavits to refute jurisdictional allegations at the pleading stage).

Plaintiffs allege statutory personal jurisdiction under both the New York long arm statute, N.Y. C.P.L.R. § 302, which applies to any defendant that "transacts any business within the state," and Federal Rule of Civil Procedure 4(k)(2), which authorizes jurisdiction over a defendant in a federal case if the defendant is not subject to jurisdiction in any state court, and if exercising jurisdiction is consistent with federal law. As a practical matter, these inquiries are the same because plaintiffs' claims arise out of WSE's alleged use of accounts in New York to move USD—and that same conduct counts as both transacting business and purposeful availment. The only important point for present purposes is that if the accounts happened to be located elsewhere in the United States, Rule 4(k)(2) would nevertheless create jurisdiction.

To establish personal jurisdiction under these laws and the federal Constitution, plaintiffs must show that WSE had minimum contacts with the United States, and that plaintiffs' claims arise out of or relate to those contacts. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 169-70 (2d Cir. 2013). Ordinarily, "if a defendant transacted business in New York and the claim asserted arose from that business activity," that is enough to satisfy both the statutory and constitutional test. *Id*. at 170. In *Licci*, a terrorist support case, the defendant had "no operations, branches, or employees in the United States," but it routed some of the offending wire transfers through its correspondent accounts at banks in the United States. *Id*. at 165-66.

The Second Circuit held that this "selection and repeated use of New York's banking system, as an instrument for accomplishing the alleged wrongs," was sufficient. *See id*. at 171. "Since *Licci*, there have been a series of terrorism-financing cases in the Second Circuit concluding that jurisdiction lies over banks that executed funds transfers in New York, either through their New York branch or a correspondent account they maintained in their own name." *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (collecting cases). This is so even when transfers flowing through New York constitute only "a part of" the offending activity. *Licci*, 732 F.3d at 170; *Weiss v. Nat'l Westminster Bank PLC*, 176 F. Supp. 3d 264, 286 (E.D.N.Y. 2016).

Here, plaintiffs allege that WSE helped Khanani and the Khanani MLO move USD in and through the U.A.E. using facilities—*e.g.*, assets and accounts—in the United States. ¶¶ 1095-96 (p.434). It alleges that WSE, like the other defendants, used "correspondent account transactions with a bank in New York" to move USD. ¶ 78 (p.19). As the complaint explains, access to USD is critical to Syndicate terrorists, ¶¶ 5, 150-56, 603-08 (pp.2, 46-48, 258-60), and the Syndicate relied on Khanani to obtain USD for terrorist purposes, ¶¶ 7, 191-95, 203-04, 209-10, 252-58, 260 (pp.2-3, 61-63, 66-70, 142-47). Khanani, in turn, relied on money remitters including WSE to move funds. ¶¶ 277, 572, 575-86 (pp.154, 249-52). Indeed, the complaint alleges that WSE was reported "to be a 'key conduit' for the billion-dollar money laundering operation run by Khanani," ¶ 576 (p.250), moving funds "hundreds if not thousands of times, in amounts that total hundreds of millions if not billions of U.S. Dollars," ¶ 585 (p.252)—and that WSE's "unlawful acts were not 'one-off' instances," but instead a scheme that WSE pursued "because it was lucrative," ¶ 589 (p.252). The complaint also explains that "New York has remained a core financial capital and hub for dollar-clearing transactions" for terrorists and

money launderers. ¶ 604 (p.258). And it alleges, based on information that was widely available at the time, that any bank or money remitter that voluntarily did business with organizations like Khanani's knew "that a vast sum of USD-denominated terrorist finance would inevitably flow through U.S.-based accounts to overseas accounts foreseeably controlled by al-Qaeda and the Haqqani Network." ¶ 614 (p.262). Those allegations state *a prima facie* case of personal jurisdiction under *Licci* because they allege that WSE knowingly routed many USD transactions through New York, thus doing business here (for purposes of the New York long arm statute) and purposefully availing itself of the forum (for purposes of federal law).

WSE contends that the allegations are not specific enough. It argues that the complaint does not explain how WSE's USD-transaction activity related to the Khanani MLO, the Syndicate, or the attacks. WSE MTD 13. That is wrong. The complaint explains, in detail, how Khanani (a Syndicate agent and operative, ¶ 255, p.145) used USD flows to help al-Qaeda, the Taliban, and their Syndicate allies finance attacks on Americans in Afghanistan, describing the seven ways Khanani supported the Syndicate and also how important access to USD was to the enterprise. *See supra* pp.1-4, 9. And it alleges, based on public reporting, the WSE was a "key conduit" for Khanani's operation, helping him move USD around the world. ¶ 576 (p.250).

WSE argues next that the complaint does not sufficiently allege the deliberate and repeated, as opposed to incidental, use of New York accounts to move money. Here, although the complaint does not plead specific transfers, it is not conclusory; it shows purposeful availment by naming the specific Khanani MLO entities and people involved in the transactions, ¶¶ 250-51 (p.142), pleads that USD transactions principally clear through New York, ¶ 604 (p.258), explains that foreign currency transactions are often mediated through USD, ¶ 1077 (p.430), and alleges that WSE engaged in a massive volume of such transactions relating to this

case, ¶¶ 950-51, 1095, (pp. 387, 434), including transfers through New York, ¶ 1096 (p.434).

Even the affidavit WSE presents to controvert jurisdiction (which the Court cannot use to grant

the motion at this stage) suggests that jurisdiction exists: although the affidavit states that "[a]s

part of its foreign exchange and money transfer services, Wall Street Exchange routes U.S.

dollars through various locations outside of the United States, including through the United Arab

Emirates, Austria, and Singapore," Doc. 80 ¶ 5, it never denies that WSE *also* conducts USD

transactions through the United States, including New York. At the pleading stage, that is

enough to state a *prima facie* case.

The authorities WSE cites also show that dismissal is not warranted here. In *Singer v.

Bank of Palestine*, 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021), the court held that a lack of

factual detail about the defendant's relationship with New York banks "does not necessarily spell

doom for plaintiffs" because "[i]t is well settled under Second Circuit law that, even where

plaintiff has not made a *prima facie* showing of personal jurisdiction, a court may still order

discovery, in its discretion, when it concludes that the plaintiff may be able to establish

jurisdiction if given the opportunity to develop a full factual record." *Id*. at *7 (quoting *Leon v.

Shmukler*, 992 F. Supp. 2d 179, 194 (E.D.N.Y. 2014)); *see also Greenwood v. Arthrex, Inc.*,

2022 WL 2117763, at *4 (W.D.N.Y. June 13, 2022) (holding that jurisdictional discovery is

appropriate when "it appears there may be a colorable jurisdictional claim") (quotation marks

omitted). In *Singer*, the court denied the defendant's motion to dismiss and held that

jurisdictional discovery regarding "number of transfers, dates, and monetary amounts" was

"appropriate"; the court ordered written discovery into the defendant's contacts with New York

during the relevant time period. 2021 WL 4205176, at *7. To the extent this Court believes that

additional transactional details are necessary here, it should similarly deny the motion to dismiss

and order jurisdictional discovery because it is likely that WSE's transactions flowed through New York. Indeed, it would be quite surprising if a money remitter that chose to name itself *Wall Street Exchange* had no purposeful contact with New York's financial system.

Independently, plaintiffs have an alternative theory of jurisdiction, which is that by knowingly participating in Syndicate terrorist finance, WSE purposefully directed its acts at the United States. ¶ 1097 (p.434). WSE asserts it is not enough to allege that the defendant participated in activity targeting *Americans*; the plaintiff must allege that the defendant aimed its conduct at the United States. WSE MTD 15. In support, WSE cites pre-JASTA cases. When Congress enacted JASTA, it expressly found that entities that:

> knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States or the national security, foreign policy, or economy of the United States, *necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States to answer for such activities.*

JASTA § 2(a)(6) (emphasis added). In the wake of Congress's clear finding, this Court should hold that providing support to terrorist organizations that target Americans or American foreign policy is sufficient to support personal jurisdiction on a direction theory.

### III.    The Complaint Satisfies Federal Rule of Civil Procedure 8

WSE argues that the complaint violates Rule 8's requirement of a short, plain statement. WSE MTD 16-17. The Rule 8 standard for dismissal is demanding; it requires the complaint to be "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988); *Smith v. Fischer*, 2016 WL 3004670, at *3-4 (W.D.N.Y. May 23, 2016) (holding that dismissal is warranted only where "the complaint is so rambling that it is incomprehensible"). The standard is addressed in greater detail in responses to other defendants' motions, and plaintiffs do not belabor it here.

WSE's Rule 8 argument is conclusory and does not satisfy the standard for dismissal. The complaint clearly accuses WSE of helping Khanani and the Khanani MLO move USD for the Syndicate so that the funds could be used to finance attacks on Americans in Afghanistan. It is logically organized by each element of the claim, and pleads facts to support each one. WSE asserts that the complaint is confusing, but never explains why. It says that some of the defined terms, "Khanani MLO" and "Syndicate," are unclear. That is wrong: The U.S. government itself coined "Khanani MLO" when it designated the Khanani MLO a transnational criminal organization, ¶ 265 (pp.148-49), and the complaint is clear about which organizations and people were involved, ¶¶ 250-51 (p.142); the term "Syndicate" has been recognized not only by plaintiffs, but also by prominent government officials, *e.g.*, ¶ 96 (pp.24-25) and the court in *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *1 (D.D.C. July 19, 2022). WSE also argues that some of the allegations are against all of the defendants, and not individual ones; but those allegations are common to each defendant—and there is nothing improper about asserting them alongside defendant-specific allegations.

To be sure, many allegations in the complaint don't relate to WSE, but instead to other defendants. But the complaint is organized to ensure that each defendant can understand the allegations against it. Similarly lengthy ATA complaints have survived motions to dismiss, *see Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 213 (D.C. Cir. 2022) (upholding 588 page ATA complaint, and in fact praising the level of detail); *Bartlett*, 2020 WL 7089448, at *1 (denying motion to dismiss 788 page complaint spanning 5695 paragraphs); *King*, 2022 WL 4537849, at *1 (denying motion to dismiss JASTA claims in three consolidated complaints totaling 635 pages). This Court should follow suit and deny WSE's Rule 8 motion.

13

IV.    **The Complaint States Claims for Aiding and Abetting Under the Justice Against Sponsors of Terrorism Act**

Plaintiffs' claims for relief assert aiding and abetting liability under JASTA, which seeks to "'[p]rovide civil litigants with the *broadest possible basis* . . . to seek relief against persons, entities and foreign countries, wherever acting and wherever they may be found, that have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States.'" *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (quoting JASTA § 2(b)).

JASTA adopts the framework for liability set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JASTA § 2(a)(5). There, the defendant was the "banker, bookkeeper, recordkeeper, and secretary" for a burglar. 705 F.2d at 487. She was sued for damages after the burglar murdered a victim during a botched burglary. *See id.* at 474. The D.C. Circuit held that she could be liable for the unplanned murder, even if she did not know about it, or even know that her partner "was committing burglaries." *Id*. at 488. "[I]t was enough that she knew he was involved in some type of personal property crime at night . . . because violence and killing is a foreseeable risk in any of these enterprises." *Id*. Even though the defendant's "own acts were neutral standing alone," they gave rise to liability for both aiding and abetting and conspiracy. *Id*.

To state a claim for aiding and abetting under JASTA, a plaintiff must show: (1) that she was injured by an act of international terrorism that was committed, planned, or authorized by a designated FTO; (2) that the defendant "directly or indirectly aided" the party who "performed the injury-causing act"; (3) that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable"; and (4) that the defendant's assistance was "substantial." *Honickman*, 6 F.4th at 495-96, 499. Plaintiffs address the elements in the same order as WSE's motion.

**A.  WSE Was Generally Aware That It Was Playing a Role in Illegal Activity That Foreseeably Risked Terrorism**

The complaint plausibly pleads that WSE was "'generally aware' of its role in 'an *overall illegal or tortious activity* at the time that [it] provide[d] the assistance.'" *Honickman*, 6 F.4th at 496 (quoting *Halberstam*, 705 F.2d at 477) (emphasis added). "The defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury; instead, it must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Id.* General awareness also connotes "something less than full, or fully focused, recognition"; it is "less demanding than a requirement that [plaintiffs] show awareness." *Kaplan v. Lebanese Canadian Bank SAL*, 999 F.3d 842, 863 (2d Cir. 2021).

When evaluating general awareness, the court must "consider all of the complaint's allegations, rather than considering each in isolation, and . . . accept as true all permissible inferences that could be drawn from the complaint as a whole." *Kaplan*, 999 F.3d at 865. The inquiry is "fact-intensive," *id.* at 860, and "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *id*. at 864 (quotation marks omitted), so controlling law requires courts to be "lenient in allowing scienter issues . . . to survive motions to dismiss"— even "on fairly tenuous inferences," *In re DDAVP Direct Purchaser Antitrust Litig*., 585 F.3d 677, 693 (2d Cir. 2009) (quotation marks omitted); *see also Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 211 (2d Cir. 2014) (applying this lenient standard in a terrorism case).

Applying this standard, the Second Circuit holds that one way to satisfy it—but not the only way—is to allege that public sources identified a defendant's customers as related to terrorists, and the customers were closely intertwined with terrorist activities. *See Honickman,* 6 F.4th at 499 (citing *Kaplan*, 999 F.3d at 860-61). Plaintiffs need not allege that the defendant "knew or should have known of the public sources at the pleading stage." *Id*. at 501.

Plaintiffs allege WSE's general awareness that it was facilitating money laundering for Khanani and the Khanani MLO, which were "closely intertwined with the Syndicate's violent terrorist activities." ¶¶ 958-62 (pp.388-89). In support, plaintiffs identify a litany of public sources that placed WSE on notice that Khanani was a notorious terrorist money launderer, such that by assisting him, WSE was playing a role in illicit activities including money laundering and terrorist finance. ¶¶ 668-89 (pp.283-91). Thus, plaintiffs allege that "[b]y 2008, Wall Street Exchange understood that Khanani had a global reputation as a suspected money launderer and terrorist financier who worked for al-Qaeda and the Taliban based upon Khanani's well-known reputation for such conduct in Pakistan, among financial services compliance professionals throughout the world, and regularly reported on by major media outlets." ¶ 584 (p.252).

In addition to these public sources, the complaint alleges that WSE was "reported to be a 'key conduit' for the billion-dollar money laundering operation run by Khanani," ¶ 576 (p.250), and that law enforcement officials "told reporters that Wall Street Exchange knew it was evading anti-money laundering rules and supporting illicit groups," ¶ 580 (p.251). The complaint further explains that "the Khanani MLO's transfers of U.S. Dollars using Wall Street Exchange were inherently illegal in and of themselves, so Wall Street Exchange knew of its role in an illegal activity." ¶ 954 (p.388); *see also* ¶¶ 681-89 (pp.288-91) (describing sources explaining why WSE and the other defendants knew that Khanani and his entities had no legitimate business activities). It also provides a specific example of a Khanani-affiliated money launderer who was caught by Canadian authorities in 2016 and charged with laundering over $100 million in a year, who used WSE to execute international wire transfers. ¶¶ 947-49 (p.387). Based on these facts, plaintiffs allege that WSE's "unlawful acts were not 'one-off' instances of Khanani and Syndicate operatives slipping through the cracks of Wall Street Exchange's otherwise rigorous

counter-terrorist finance policies. Rather, the nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to execute demonstrate that Wall Street Exchange pursued this business because it was lucrative." ¶ 589 (p.252).

WSE argues that the complaint does not allege that it was generally aware that it was playing a role in "terrorist activities." WSE MTD 19. That is not the standard. Although courts sometimes loosely mentioned "terrorist activities," the correct standard asks whether the defendant was generally aware that it was playing a role in *any* illegal activity, as long as terrorism is a foreseeable consequence of that activity. *See*, *e.g.*, *Honickman*, 6 F.4th at 496. Money laundering for terrorist agents unambiguously qualifies. *See Kaplan*, 999 F.3d at 865.

WSE argues that public sources did not clearly identify Khanani and the Khanani MLO as suspicious prior to the attacks in this case. WSE MTD 20. But Khanani was not some garden-variety criminal; he was one of the world's most notorious money launderers, and the Syndicate's top money launderer. ¶ 253 (p.142-43). He moved billions of dollars every year. ¶ 577 (pp.250-51). He was also "*himself* both a Syndicate agent and operative," acting as "the equivalent of the Chief Financial Officer for D-Company," ¶ 255 (p.145), and a personal financier to Sirajuddin Haqqani and Dawood Ibrahim, ¶¶ 255, 272 (pp.145, 152).

Those facts were reflected in public sources linking Khanani and his family to money laundering and terrorism since 2001. *See* ¶¶ 672-73 (pp.284-85) (citing four articles published from 2001 to 2008 reporting suspicions about Khanani and KKI); ¶ 683 (p.289) (later-published article recounting that Khanani "had long been suspected of ties to terrorist groups, with investigations . . . as long ago as 2003"). Indeed, at least four sources—all published on or before 2008—drew a straight line from Khanani to violent terrorism. *USA Today* in 2001 connected Khanani's former company, KKI, to al-Qaeda and Taliban financing; the *New York Times* in

2003 reported that KKI was being investigated on suspicion of having transferred money to militant groups like al-Qaeda; *The Nation (Pakistan)* in 2008, reported that Khanani had been arrested on suspicion of money laundering, and said in the same paragraph that "[b]omb blasts can be stopped if the illegal business of" money laundering is stopped; and *Ummat* in Pakistan reported that "American officials are keeping an eye on . . . Khanani" because "American officials suspected that foreign money changers companies may have provided money to extremist militant groups." ¶¶ 672-73 (pp.284-85). Khanani was also charged by the Pakistani government in 2008 with money laundering offenses involving billions of dollars. ¶ 259 (pp.146-47). Yet WSE did business with the Khanani MLO anyway.

Independent of the public sources, the Khanani MLO transactions were suspicious on their face. ¶¶ 937, 945 (pp.385, 387). All of Khanani's international transactions through companies like Al Zarooni Exchange were, in fact, for money laundering; none were legitimate. ¶¶ 681-82, 689, 954 (pp.288-89, 291, 388). Moreover, the known nature of terrorist finance was such that when Khanani did illicit business through the U.A.E., it was likely that the transactions were for Syndicate terrorists specifically. ¶¶ 262-64 (pp.147-48). These facts—*i.e.*, the "nature, counterparties, and sheer volume of transactions Wall Street Exchange allowed the Khanani MLO to execute"—permit an inference of WSE's awareness. ¶¶ 953, 955 (p.388).

Indeed, evidence "that others with access to the same sources of information available to [the defendant] were able to figure out [an unlawful] scheme" has been used to prove a defendant's guilty knowledge at trial. *United States v. Kozeny*, 667 F.3d 122, 134-35 (2d Cir. 2011). If such evidence suffices at trial, it surely can support a plausible allegation of general awareness at the pleading stage. Here, employees at Standard Chartered Bank reviewing transactions for Al Zarooni Exchange discerned that entity's connection to Khanani, money

laundering, and terrorism in 2012 and 2013. *See* ¶¶ 466-67 (pp.219-20). It is a fair inference that WSE was able to do the same because sophisticated financial institutions like WSE have advanced due diligence methods that enable them to identify illicit transactions based on simple information about their customers and their transactions. ¶¶ 655-63 (pp.277-81).

For similar reasons, Khanani was "closely intertwined" with violent attacks by al-Qaeda, the Haqqani Network, and their Syndicate allies against Americans in Afghanistan. ¶¶ 941, 959, 962 (pp.386, 389). In *Kaplan*, the Second Circuit held that three bank customers alleged to be constituent parts of Hezbollah were closely intertwined with terrorism. *See* 999 F.3d at 860. The customers were Bayt al-Mal, a "bank, creditor, and investment arm" for Hezbollah; Yousser Company, which was used "to secure loans and finance business deals" for Hezbollah companies; and Shahid Martyrs Foundation, which provided financial support to wounded Hezbollah terrorists and their families. *See id*. at 849. The court held that allegations that the bank provided "money-laundering banking services" to these customers were "sufficient to permit the inference" of general awareness. *Id*. at 865.

Khanani's role vis-à-vis al-Qaeda, the Haqqani Network, D-Company, and other Syndicate allies was even more culpable than the roles the *Kaplan* customers played vis-à-vis Hezbollah. As noted above, Khanani's organization assisted the Syndicate in seven different ways, including by acting as its "global economic intelligence arm," managing "every financial aspect of [its] coordinated transnational opium enterprise," and "provid[ing] a comprehensive suite of financial services." ¶¶ 268-78 (pp.150-54). He was an internationally infamous money launderer for terrorists by 2008 when the Pakistani government charged him. ¶¶ 253-54, 259, 671 (pp.142-47, 284). He was "one of the world's worst polyterrorist financers," and his organization was "the worst terrorist finance enterprise in the world." ¶ 253 (p.143).

The complaint also includes additional allegations linking money laundering to terrorism. The steps the U.S. government took to curb money laundering after September 11 show the clear linkage between money laundering and terrorist financing. ¶¶ 117-18, 597-608 (pp.34-35, 255-60). Educated commentary likewise highlights the close connection between money laundering and terrorist finance. *E.g.*, ¶¶ 131, 192-95, 234, 267, 294, 302, 304-05, 602, 609-52, 977-78 (pp.39-40, 61-63, 78-79, 149-50, 159-60, 162-64, 257, 260-76, 394-95). Case law similarly holds that "money laundering and terrorism . . . can go hand in hand, as one certainly can be used to fund the other." *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 431 (E.D.N.Y. 2013), *on reconsideration in part*, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017).

Finally, WSE argues that the Khanani MLO's use of "fronts" undermines the allegation that WSE was generally aware. WSE MTD 20. But plaintiffs allege that these fronts were "notorious," ¶ 250 (p.142), *i.e.*, known to be associated with Khanani, including because some had been identified in the media as early as 2001, and others were run by Khanani's family members—who openly used his name, ¶¶ 249, 251 (pp.141-42). In any event, plaintiffs allege that WSE knew who it was dealing with. ¶¶ 589, 681-83 (pp.252, 288-89). Any factual dispute about the truth of that allegation is not a basis to dismiss at the pleading stage.

## B.  WSE Knowingly Provided Substantial Assistance

As the Second Circuit has explained, "knowing and substantial assistance to the actual injury-causing act . . . is unnecessary." *Honickman*, 6 F.4th at 499. Instead, the "knowledge component is satisfied if the defendant knowingly—and not innocently or inadvertently—gave assistance"; it does "not require [the defendant] to 'know' anything more about [the tortfeasor's] unlawful activities than what [the defendant] knew for the general awareness element." *Id*. at 499-500 (cleaned up). Here, WSE did not act innocently or inadvertently; its "unlawful acts were not 'one-off' instances of Khanani and Syndicate operatives slipping through the cracks," ¶ 589

20

(p.252); and WSE was not "tricked" by the Khanani entities, *see*, *e.g.*, ¶¶ 681, 719-25 (pp.288, 303-07). The knowledge element is accordingly met.

Whether the assistance is substantial turns on a six-factor inquiry, in which no factor is dispositive and each is weighed on a case-by-case basis. *See Kaplan*, 999 F.3d at 856. The complaint addresses five of the factors. ¶¶ 964-1026 (pp.389-410). WSE's responses do not compel dismissal.

The first factor is the nature of the act assisted. "'[T]he nature of the act involved dictates what aid might matter'" and thus "requires assessing whether the alleged aid (facilitating the transfer of millions of dollars to the [bank's] [c]ustomers) would be important to the nature of the injury-causing act ([the FTO's] terrorist attacks)." *Honickman*, 6 F.4th at 500 (quoting *Halberstam*, 705 F.2d at 484). Here, the act assisted is terrorist finance, and as the D.C. Circuit has explained, "[f]inancial support is indisputably important to the operation of a terrorist organization, and any money provided to the organization may aid its unlawful goals." *Atchley*, 22 F.4th at 222 (quotation marks omitted)). Moreover, when the act assisted is so "vicious" and extraordinarily blameworthy, "even 'relatively trivial' aid could count as substantial." *Id.* (citation omitted).

The support WSE provided "was tailored to the specific violence at issue" because al-Qaeda, the Haqqani Network, and their Syndicate allies needed USD, not local currency, to finance their attacks. ¶ 965 (p.390). In support, the complaint explains how important money laundering is to such terrorists' ability to carry out attacks, with reference to informed commentary from government officials, terrorism scholars, and media sources. ¶¶ 967-78 (pp.390-95). The Southern District recently held that when "many of the alleged acts of terrorism that injured Plaintiffs were committed using IEDs and suicide bombers," "even relatively small

amounts of funding matter a lot and constitute 'substantial assistance' in facilitating attacks using those tactics." *King*, 2022 WL 4537849, at *9.

WSE argues that this factor weighs in its favor because it did not itself encourage attacks. WSE MTD 22. The Second Circuit rejected this argument, explaining that this factor has nothing to do with whether the defendant "knowingly encouraged [the FTO's] violent activities," but instead focuses on whether the type of aid given generally tends to facilitate the tort at issue. *Honickman*, 6 F.4th at 500 (quotation marks omitted). This factor supports liability.

With respect to the amount of assistance, WSE concedes that "[p]laintiffs allege that WSE facilitated transfers totaling 'millions if not billions' of dollars." WSE MTD 22. But it argues that there are no non-conclusory allegations that FTOs received those funds. However, "if a plaintiff plausibly alleges the general awareness element, she does not need to also allege the FTO actually received the funds. Instead, the inquiry should focus on the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500. As long as the "alleged assistance was at least significant, this factor supports substantiality." *Atchley*, 22 F.4th at 222. The second factor also supports liability.

Plaintiffs do not allege that WSE was present at the attacks. But neither was the defendant in *Halberstam*. There, however, the court held that she played a substantial role in another "side of the business." 705 F.2d at 488. So too here because the ability to move money in and out of Afghanistan, specifically through the U.A.E., was important to the Syndicate's ability to mount attacks against Americans.

With respect to the fourth factor (relationship to the tortfeasor), WSE argues that it had no relationship with FTOs. WSE MTD 23. But "a direct relationship between the defendant and the FTO is not required to satisfy this factor." *Honickman*, 6 F.4th at 501. Here, WSE had

relationships with Khanani entities, and Khanani was himself a Syndicate member and operative, ¶¶ 255-56 (p.145). That relationship is sufficiently close to the FTOs for this factor to support liability. In any event, this factor is traditionally about whether the defendant and the principal tortfeasor have a close personal relationship that *mitigates* the defendant's culpability (*e.g.*, a spousal relationship). Here, no such relationship exists, and WSE should be held responsible for its knowing actions.

Regarding the fifth factor (state of mind), WSE argues that this factor requires it to be "one in spirit" with terrorists, citing a magistrate judge's Report and Recommendation in *Cabrera v. Black & Veatch Special Projects Corps.*, 2021 WL 3508091 (D.D.C. July 30, 2021). That statement is no longer good law, as the D.C. Circuit subsequently held that "Congress did not limit secondary liability to those who are 'one in spirit' with terrorists," and further held that "[a] specific intent, or 'one in spirit,' requirement is contrary to *Halberstam* as incorporated into the JASTA." *Atchley*, 22 F.4th at 223-24. Instead, as the court explained in *Atchley*, "[k]nowledge of one's own actions and general awareness of their foreseeable results, not specific intent, are all that is required." *Id*. at 223. Thus, "[a]iding-and-abetting liability reaches actors . . . who may seek only financial gain but pursue it with a general awareness of aiding some type of tort or crime." *Id*. at 224. To understand how broad the "state of mind" factor is, the Court need look no further than *Halberstam* itself. There, the court held the defendant liable for a murder that she did not even know about; indeed, she did not even have to know that her accomplice was committing burglaries. *See Halberstam*, 705 F.2d at 488. The complaint also details why even "routine" transactions for terrorists advance violence. ¶¶ 714-16 (pp.301-02). The state-of-mind factor accordingly supports liability.

Finally, with respect to the duration of assistance, *Atchley* held that "four years is a

significant duration." 22 F.4th at 224. Here, WSE began providing assistance in 2008. ¶ 1024 (p.409). Its assistance persisted at least until Khanani was arrested in 2015, and allegedly thereafter, too. *E.g.*, ¶ 947 (p.387). This factor readily supports liability.

Considering the six factors together, the assistance WSE provided was easily substantial enough to state a claim for aiding and abetting under JASTA.

## C. Designated Terrorist Organizations Committed, Planned, or Authorized the Attacks That Injured Plaintiffs.

WSE argues briefly that attacks committed by the Taliban or by the Haqqani Network before it was designated an FTO do not satisfy JASTA's predicate that the attack must be "committed, planned, or authorized" by a designated FTO. 18 U.S.C. § 2333(d)(2). *See* WSE MTD 24-25. This is incorrect because these attacks "were 'planned' or 'authorized' by al-Qaeda, and therefore satisfy this element." ¶ 12 (p.4); *see also* ¶ 87 (p.21).

That ultimate allegation is supported by pages of allegations explaining al-Qaeda's key role in Syndicate attacks. Specifically, Section I.F—which has the heading, "Al-Qaeda Authorized And Planned The Terrorist Attacks That Killed And Injured Plaintiffs"—provides 40 paragraphs and 27 footnotes of explanation relating to authorization and planning. ¶¶ 364-403 (pp.124-37). With respect to authorization, these paragraphs explain that al-Qaeda provided religious authorization in the form of *fatwas* commanding attacks on Americans as well as other forms of authorization, ¶¶ 365-67 (pp.124-25), mafia-style coordination meetings where attacks were approved, ¶ 368 (p.125), and specific encouragement of suicide bombings and the use of IEDs that was, empirically, highly effective, ¶¶ 369-71 (p.126). With respect to planning, the complaint alleges that al-Qaeda planned Taliban attacks, ¶ 372 (pp.126-27), provided critical training to and with the Haqqani Network and Taliban, ¶¶ 373-75 (pp.127-28), coordinated the Kabul Attack Network, ¶ 376 (p.128), held joint operational meetings with the Taliban and other

terrorist groups, ¶ 377 (p.128), instructed the Taliban in terrorist tradecraft, ¶ 378 (p.129), and played a critical role in planning the CAN fertilizer bomb campaign involving every attack in this case that used IEDs and suicide bombs, ¶¶ 379-403 (pp.129-37). These allegations closely resemble the allegations that the D.C. Circuit found sufficient in *Atchley*, where terrorist attacks were committed by Jaysh al-Mahdi, which was never designated an FTO, but planned and authorized by Hezbollah. 22 F.4th at 217. They suffice for the same reasons.

WSE makes a potentially distinct argument that the complaint does not link WSE to any FTO. This argument is addressed above: the complaint shows how providing services to Khanani and the Khanani MLO helped Syndicate FTOs, including al-Qaeda (an FTO at all times) and the Haqqani Network (an FTO after September 2012). Regardless, under JASTA, indirect assistance is plainly sufficient—as long as it is "substantial," which is also addressed above. There is no additional requirement to link WSE's assistance to any specific attack or FTO.

## CONCLUSION

WSE's motion to dismiss should be denied.

Dated: November 29, 2022

Respectfully submitted,

s/Tejinder Singh

Tejinder Singh
Ryan R. Sparacino
Eli J. Kay-Oliphant
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
tejinder.singh@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
eli.kay-oliphant@sparacinopllc.com

*Counsel for Plaintiffs*

25