# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 21st day of July, two thousand twenty-five.

Before:    José A. Cabranes,
           Richard C. Wesley,
           Alison J. Nathan,
                *Circuit Judges.*

_____

Jonathan L. Ashley, III, et al.,

    Plaintiffs-Appellants,

v.

Deutsche Bank Aktiengesellschaft, et al.,

    Defendants-Appellees.

_____

**JUDGMENT**

Docket No. 23-132

The appeal in the above captioned case from a judgment of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs.

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe—Clerk
United States Court of Appeals, Second Circuit

## In the
# United States Court of Appeals
## for the Second Circuit

———————————

August Term 2023
Argued: March 13, 2024
Decided: July 21, 2025

———————————

Docket No. 23-132

JONATHAN L. ASHLEY, III, ET AL.,

*Plaintiffs-Appellants,*

v.

DEUTSCHE BANK AKTIENGESELLSCHAFT, ET AL.,

*Defendants-Appellees.*[1]

———————————————————

Before:     CABRANES, WESLEY, and NATHAN, *Circuit Judges.*

Plaintiffs-Appellants are Americans who were killed or injured, as well as their family members, in terrorist attacks in Afghanistan.   They sued three sets of banks—Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas; Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan) Limited (together, "SCB"); and Danske Bank A/S—under the Anti-Terrorism Act, 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), *id.* § 2333(d)(2), for aiding and abetting the

———————————————————

[1] For a complete list of the parties to this appeal, contact the Clerk of Court.

terrorist organizations who committed the attacks. Plaintiffs allege that the banks' customers used their banking services to execute tax fraud and money laundering schemes; the proceeds went to terrorist organizations, providing them with access to crucial financial resources, including those necessary to commit the attacks that injured Plaintiffs. Plaintiffs also claim that SCB aided and abetted the terrorist attacks by providing banking services to two fertilizer companies whose product was smuggled into Afghanistan and used to make the bombs that killed or injured Plaintiffs.

The United States District Court for the Eastern District of New York (Hector Gonzalez, *J.*) granted Defendants' motion to dismiss Plaintiffs' amended complaint in its entirety. While Plaintiffs' appeal was pending, the Supreme Court decided *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), which clarified the appropriate pleading standard for an aiding-and-abetting claim under JASTA. Applying *Twitter* and our prior JASTA precedent, we agree that Plaintiffs have not plausibly alleged that Defendants are liable under JASTA for aiding and abetting. Accordingly, we AFFIRM the judgment of the district court.

———————————

TEJINDER SINGH (Geoffrey P. Eaton, *on the brief*), Sparacino PLLC, Washington, DC, *for Plaintiffs-Appellants*.

JEFFREY B. WALL (Judson O. Littleton, Zoe A. Jacoby, Sullivan & Cromwell LLP, Washington, DC; Sharon L. Nelles, Andrew J. Finn, Bradley P. Smith, Sullivan & Cromwell LLP, New York, NY, *on the brief*), *for Defendants-Appellees Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan) Limited*.

Brian T. Frawley, Sullivan & Cromwell LLP, New York, NY, *for Defendant-Appellee Danske Bank A/S*.

David G. Januszewski, Sheila C. Ramesh, Sesi V. Garimella, Miles Wiley, Cahill Gordon & Reindel LLP, New York, NY, *for Defendants-Appellees Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas*.

ANDRIANNA D. KASTANEK (Lee Wolosky, *on the brief*), Jenner & Block LLP, New York, NY, *for Amici Curiae Diana Bonacasa, Vincent Bonacasa, Raquel Bonacasa, Barbara Rosendahl, Jeffrey Muncy, Gilbert Russell, Abigail Russell, Sarah Russell, Noemi Russell, Benjamin Russell, Nathanael Russell, Debbie Williams, and Chelsea Mangano in support of Plaintiffs-Appellants*.

Mark G. Hanchet, Robert W. Hamburg, Benjamin D. Bright, Mayer Brown LLP, New York, NY; Andrew J. Pincus, Marc R. Cohen, Alex C. Lakatos, Mayer Brown LLP, Washington, DC, *for Amici Curiae The Institute of International Bankers, American Bankers Association, Bank Policy Institute, the Chamber of Commerce in support of Defendants-Appellees*.

WESLEY, *Circuit Judge*:

Plaintiffs-Appellants are American service members and civilians who were killed or injured, or their family members, during terrorist attacks in Afghanistan between 2011 and 2016. Improvised explosive devices ("IEDs") were used by the terrorists in nearly all of the attacks. Plaintiffs sued Defendants-Appellees

Deutsche Bank Aktiengesellschaft and Deutsche Bank Trust Company Americas (together, "Deutsche Bank"); Standard Chartered Bank, Standard Chartered PLC, and Standard Chartered Bank (Pakistan) Limited (together, "SCB"); and Danske Bank A/S ("Danske Bank") for aiding and abetting the terrorist attacks, in violation of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"), *id*. § 2333(d)(2). SCB, Deutsche Bank, and Danske Bank are among the world's largest international banks.

In the first cause of action, Plaintiffs offer three theories of liability. The thrust of Plaintiffs' theories is that the Banks "provided substantial assistance to the terrorist organizations behind the attacks," J.A. 668, by providing access to "resources they needed to commit the attacks that injured [P]laintiffs," thus aiding and abetting the attacks, Appellants' Br. at 3. First, Plaintiffs contend that SCB provided commercial bank services to two Pakistani fertilizer companies whose product was smuggled into Afghanistan and used to manufacture the IEDs that were employed in the bombings that injured Plaintiffs, thereby aiding and abetting those bombings. Second, Plaintiffs contend that the Banks purportedly facilitated large-scale money laundering schemes while knowing that money laundering is closely connected to terrorist financing. Under that theory, the

Banks aided and abetted the attacks because the proceeds of these sprawling money laundering operations ultimately reached the terrorist organizations. Third, Plaintiffs contend that the Banks aided and abetted the financing of a complex web of terrorists in Afghanistan and Pakistan known as the "Syndicate" by facilitating transactions in tax fraud schemes while knowing that such schemes were commonly used by terrorists.

In the second cause of action, Plaintiffs allege that Defendants' banking services aided and abetted a terrorist "campaign" engaged in a pattern of violent "racketeering" activities designed to remove Americans from Afghanistan. J.A. 669. Plaintiffs argue that liability can extend to Defendants for purportedly aiding *a group of terrorists* in their nearly decades-long racketeering activities, as opposed to aiding *a particular terrorist attack*.

The United States District Court for the Eastern District of New York (Gonzalez, *J.*) granted Defendants' motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), concluding that none of Plaintiffs' theories sufficiently alleged an aiding-and-abetting claim under JASTA. Plaintiffs argue on appeal that the district court erred in dismissing their complaint and argue that Defendants knowingly and culpably provided their customers with

assistance to aid and abet the attacks or the terrorist racketeering "campaign."

We disagree.    Accordingly, we **AFFIRM** the district court's dismissal.

## BACKGROUND

The factual background comes from the allegations in Plaintiffs' operative

complaint, as well as any documents incorporated by reference.    *See Chambers v.*

*Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).    In reviewing the district court's

dismissal under Rule 12(b)(6), we accept the allegations as true and construe them

in the light most favorable to Plaintiffs.    *See id.*

### I.    The Banks' Connections to the Attacks

Plaintiffs or their family members were injured or killed between 2011 and

2016 in attacks committed, planned, or authorized by members of the Syndicate, a

complex "joint venture" of terrorists in Afghanistan and Pakistan.    J.A. 98.    Al-

Qaeda led the Syndicate, which also included the Taliban, particularly "the most

extreme faction of the Taliban" known as the Haqqani Network.    J.A. 78.    The

U.S. Government designated Al-Qaeda as a foreign terrorist organization ("FTO")

in 1999 and the Haqqani Network in 2012.[2]    Plaintiffs seek to hold Defendants

---

[2] The U.S. Secretary of State "is authorized to designate an organization as a foreign terrorist organization" if it "engages in terrorist activity" or "retains the capability and intent to engage in terrorist activity" and "the terrorist activity . . . threatens the security

liable as aiders and abettors of the attacks for providing financial services to certain individuals and entities affiliated with the Syndicate.[3]

## A. SCB's Financial Services to Pakistani Fertilizer Companies

Plaintiffs allege that SCB aided and abetted the Syndicate by providing banking services to Fatima Fertilizer Company Limited and Pakarab Fertilizers Limited (together, "the Companies"). As further described below, downstream actors used a fertilizer both Companies produced to manufacture Syndicate bombs employed in attacks against Americans.

The Companies are two "related" Pakistani fertilizer companies with a "near-monopoly" in Pakistan on the production of calcium ammonium nitrate ("CAN") fertilizer. J.A. 308. The Companies "legally produce[]" CAN and other fertilizer, which is marketed by distributors "to millions of Pakistani cotton, fruit and wheat farmers."[4]

---

of United States nationals or the national security of the United States." 8 U.S.C. § 1189(a)(1).

[3] Plaintiffs also brought claims below against several money remitters, as well as under additional theories of liability against Defendants. Because Plaintiffs "have failed to make any meaningful—let alone meritorious—argument as to how the district court erred in analyzing" these issues, we deem these claims abandoned. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 428 (2d Cir. 2023).

[4] Chris Brummitt, *Pakistani Fertilizer Fuels Afghan Bombs, US Troop Deaths*, Associated Press (Aug. 31, 2011), https://www.nbcnews.com/id/wbna44346944. Plaintiffs fault the

In 2008, the Syndicate increased its use of "ammonium nitrate bombs derived from CAN fertilizer." J.A. 307. By 2009, "ammonium nitrate fertilizer bombs had become the deadliest weapons used by Syndicate terrorists to attack Americans." J.A. 309 (alterations adopted) (internal quotation marks and citation omitted). In response to the Syndicate's increased reliance on fertilizer-based IEDs, the Afghan government banned the "possession, production, and importation" of CAN in 2010. J.A. 310.

Smuggling CAN into Afghanistan, however, remained ubiquitous. A 2011 *Associated Press* article reported that CAN was being "smuggled" across the border by "militants" or "trucked" from Pakistan into Afghanistan by "wealthy people with links to the insurgents." J.A. 310–11 (quoting Chris Brummitt, *Pakistani Fertilizer Fuels Afghan Bombs, US Troop Deaths*, Associated Press (Aug. 31, 2011), https://www.nbcnews.com/id/wbna44346944). The article also identified the Companies as producers of the fertilizer used in the bombs killing Americans.

---

district court for referring to "farmers" and "fertilizer dealers," arguing that the complaint does not refer to such groups. Appellants' Br. at 42 & n.5. While the complaint does not explicitly refer to "farmers," the *Associated Press* article, quoted above, does. The district court was well within its authority to consider the article, which Plaintiffs cite and quote from extensively in their complaint. *See Chambers*, 282 F.3d at 152–53. Moreover, the portion of the complaint the district court cited quotes the article's reference to fertilizer "dealers" directly. *See* J.A. 311.

Military leadership concluded that about "one percent" of the Companies' total CAN output "was transferred to insurgents" who made it into inexpensive explosives, which in turn were responsible for around "80 percent of IEDs" and around "90 percent of U.S. casualties in Afghanistan." J.A. 311 (alteration adopted) (internal quotation marks and citation omitted).

The U.S. Government appealed directly to the Companies to try to prevent terrorists from obtaining CAN. The Government requested that the Companies facilitate better management of the flow of their fertilizer into Afghanistan. For example, the Government sought to have the Companies add "a color or an odor" (at the expense of the U.S. Government) to their fertilizer for easier detection at the Afghani-Pakistani border. J.A. 313. The Companies refused these requests.

Lawmakers expressed frustration with the Companies' unwillingness to help. One member of the U.S. House of Representatives opined that there was a connection between the Companies' refusal to help and "rogue" members of a Pakistani intelligence agency who wanted to "destabilize the Afghan government" by allowing the "Haqqani Network to smuggle this across the border." J.A. 312–13. By 2013, news reports indicated that evidence suggested that the intelligence agency was "influencing" the Companies' decisions. J.A. 315.

In the fall of 2012, members of the U.S. military began "complement[ing]" their efforts to "persuade" the Companies "to cease supplying the Syndicate with easy-to-divert fertilizer by identifying corporations and banks that, directly or indirectly, facilitated the Syndicate's CAN fertilizer bomb pipeline through [the Companies]." J.A. 317. Military personnel then "contacted" those corporations and banks "to encourage them to change their practices in order to interdict the flow" of CAN to Syndicate terrorists. J.A. 317. That effort included speaking to executives at SCB, which provided foreign exchange, export finance, and letter-of-credit services to the Companies from 2009 to at least 2016. In 2010, the Companies "publicly identified" SCB as "one of the 'major bankers of the company.'" J.A. 316 (citation omitted).

In January 2013, members of the U.S. military, including Lieutenant General Mike Barbero, then-leader of the Department of Defense's counter-IED organization, met with senior SCB executives in New York. At that meeting, Plaintiffs allege that Lieutenant General Barbero informed SCB that: (1) CAN—"exclusive[ly]" sourced from the Companies—was involved in "approximately 80% of all American bomb casualties in Afghanistan"; (2) the Companies "had repeatedly refused to cooperate with American efforts to stop, or even reduce, the

unfettered flow of . . . CAN Fertilizer into Afghanistan for use by al-Qaeda affiliated terrorists"; and (3) SCB provided "irreplaceable foreign exchange and export finance services" to the Companies, without which they would not be able to supply fertilizer to the Syndicate "at the scale necessary to sustain the Syndicate's nationwide CAN fertilizer bomb campaign." J.A. 317–18. The Lieutenant General "urg[ed]" SCB to stop providing banking services to the Companies, claiming it would "save American lives." J.A. 318. Nevertheless, SCB continued to provide the Companies with the same financial services after this meeting.

## B. Money Laundering

Plaintiffs allege that the Banks aided and abetted the Syndicate's terrorist attacks through their involvement in money laundering schemes. The Banks purportedly have a history of placing profits first, failing to employ robust anti-money laundering and counter-terrorist finance policies, and operating in "'high risk' terrorist finance jurisdictions," such as Afghanistan, Pakistan, and Russia. J.A. 350. The FBI apparently concluded that this "culture" allowed money laundering to thrive. *See* J.A. 396. Money laundering generated a particularly "potent form of terrorist finance" because "regular and predictable cash flow" in

U.S. dollars increased the Syndicate's effectiveness.   J.A. 469–70.   The U.S. dollar is the preferred currency "because it is stable and can be spent anywhere." J.A. 79.

## 1.  SCB

Plaintiffs allege that SCB contributed to the Syndicate's money laundering operations when SCB performed U.S.-dollar transactions for entities connected to a well-known Syndicate money launderer.   From 2008 through 2016, SCB provided financial services to two Emirati entities: Al Zarooni Exchange and Mazaka General Trading.   Al Zarooni and Mazaka served as "fronts" for Altaf Khanani, an "internationally infamous" money launderer for the Syndicate.   J.A. 219–20.   Khanani "used accounts" at SCB "on behalf of" Al Zarooni and "maintained accounts . . . on behalf of Mazaka" to execute "USD-denominated transactions" and "repatriate it back to al-Qaeda or Haqqani Network-controlled accounts to be shared with the other members of the Syndicate."   J.A. 222, 294–95.   News reporting in the early 2000s connected Khanani and an affiliated entity, Khanani & Kalia International, to terrorist financing.[5]   In 2008, Khanani was

---

[5]  *See* J.A. 361 ("The worldwide hunt for [al-Qaeda's] finances … could [] dead-end in a place like [the Khanani & Kalia currency exchange], one of [Pakistan's] ubiquitous currency exchanges." (alterations in original)); J.A. 362 ("One of the largest exchange

charged in Pakistan with laundering over "$10 billion annually"; he purportedly avoided conviction with a "bribe." J.A. 223. Khanani then moved to Dubai and continued his money laundering operation from there until his arrest by the United States in September 2015. Plaintiffs allege that the money laundering scheme "continued operating after Khanani's arrest" and conviction in 2016 for money laundering. J.A. 226.

Between 2012 and 2013, during "a terrorism-related audit," "a senior compliance employee" at SCB Dubai learned that SCB Dubai used SCB New York to process U.S. dollar-denominated transactions for "one or more known Khanani fronts" and that "Khanani was a suspected terrorist money launderer who laundered overseas funds on behalf of anti-American terrorist groups." J.A. 296. A "whistleblower" determined that "there were many SCB transactions post-2008 on behalf of Al Zarooni Exchange." J.A. 298 (alteration adopted). SCB purportedly "retaliated against one or more persons who questioned the foreseeable terrorism risks raised by SCB Dubai's and SCB New York's practices."

---

houses and *hawala* dealers in the Muslim world, [Khanani & Kalia International (or 'KKI', *i.e.*, the Khanani MLO ] … [was] now being investigated … on suspicion of having transferred money to militant groups, American and Pakistani officials said." (alterations in original)).

J.A. 297.  Plaintiffs estimate that SCB helped Khanani with at least $5,350,000 in terrorist financing between 2009 and 2016.

That would not have been the first time SCB was charged with facilitating terrorist financing.  In 2012, SCB entered into a deferred prosecution agreement with the U.S. Attorney's Office for the District of Columbia, resolving potential charges related to SCB's financial services for "known and suspected fronts for Iranian terrorist groups such as Hezbollah and the IRGC-QF."  J.A. 427–28.  That same year, SCB entered into a Consent Order with the New York State Department of Financial Services related to the same misconduct.  In 2014, when the New York State Department of Financial Services fined SCB for failing to adhere to the Consent Order, SCB admitted to "deficiencies in the anti-money laundering transaction surveillance system at its New York branch."  J.A. 452.

### 2.  Deutsche Bank

Plaintiffs allege that Deutsche Bank set up a money laundering operation for Russian organized crime that benefitted the Syndicate's drug trade and the Syndicate's own money laundering efforts.  In 2011, Deutsche Bank's "head equities trader" in Moscow met with two unnamed (but allegedly well-known)

money launderers "notoriously associated with the Russian Mafia"[6] to "custom build" a "Russian Laundromat." J.A. 265, 258. The Russian Laundromat was an "industrial-scale operation" that used "mirror trades" to convert rubles to U.S. dollars and move the money undetected across international borders. J.A. 392, 404. Basically, a company asks a trading desk in Moscow to purchase a "blue chip Russian stock" in rubles while a different company asks another trading desk at the same bank to sell "the same number of shares of the same Russian stock in USD." J.A. 258 n.281. The companies are actually owned by the same person, thus allowing the individual to exchange rubles for U.S. dollars across borders "without scrutiny." J.A. 258 n.281.

As covered in public documents and the media, the Syndicate has for decades grown opium and sold it to Russians in exchange for laundered money and weapons. Plaintiffs contend that "the Russian Mafia used" the Laundromat "to convert al-Qaeda's and the Taliban's sea of Rubles from their Russian opium sales" into U.S. dollars, which was the "'gold standard' of Syndicate terrorist finance." J.A. 258. Deutsche Bank also exploited the Russian Laundromat to

---

[6] Plaintiffs allege that the "Russian Mafia" includes "the Solntsevskaya Group, which was Russia's largest transnational narco-terrorist cartel" and Semion Mogilevich, who was publicly described as "one of the world's most dangerous terrorists." J.A. 238–39.

execute trades on behalf of Khanani—via accounts held by Al Zarooni and Mazaka—which ultimately led to tens of millions of dollars making its way back to the Syndicate.[7]  Plaintiffs allege that processing the "bulk 7- and 8-figure USD cash transfers that were common in the Syndicate's opium trade" were something that only large global banks could handle.  J.A. 124.

Deutsche Bank's "size and global presence" also concealed the Russian Laundromat from detection.  J.A. 473.  However, it may not have escaped scrutiny altogether.  In 2014, a Cypriot bank found the "pattern" of a counterparty's transactions with Deutsche Bank "suspicious."  J.A. 417–18.  The bank sent a Request for Assistance to Deutsche Bank in London to learn more information.  Deutsche Bank's head equities trader in Moscow responded to the inquiry by reassuring the bank that the company "passed through our KYC [know-your-customer] procedures" and that there was "no reason for concern." J.A. 418.  Plaintiffs allege that "statement was a lie told to conceal and sustain Deutsche Bank's mirror trading scheme and the Russian Laundromat."  J.A. 418. The head equities trader later stated publicly, in October 2015, that Deutsche

---

[7] Plaintiffs allege that Khanani benefited from the Russian Laundromat.  However, the complaint stops short of alleging Khanani's involvement in its creation, instead conjecturing that discovery may reveal his direct or indirect assistance.

Bank's compliance department "must have known" about the mirror trades he conducted as part of the Russian Laundromat because he received "approvals" from "colleagues, including two senior Deutsche Bank managers at DB London." J.A. 422.

### 3. Danske Bank

Danske Bank operated the "Global Laundromat" through one of its branches in Estonia, called that because of "its magnitude and geographic reach," J.A. 320; Plaintiffs allege that a customer with connections to a Syndicate-affiliated entity used the Laundromat. The Global Laundromat "made over $233 billion . . . in suspicious transactions" from 2007 to 2016. J.A. 319–20. In 2022, Danske Bank pled guilty to conspiracy to commit bank fraud and agreed to forfeit $2 billion to resolve a U.S. investigation into its Estonian operations beginning in 2007.

Several individuals raised concerns about the operations in Estonia: "in 2013, a whistleblower, an employee at the Estonia branch, reported to Danske Bank that Danske Bank knowingly continued to deal with a company that it knew had committed crime," and "in 2014 Danske Bank's own internal auditors had found branch staff to have deliberately concealed the identities of suspicious

clients from local authorities." J.A. 460. In addition, Plaintiffs allege that the profitability of that branch (10.7% of Danske Bank's overall profit) was not "explainable," which, considered with the "sheer number and volume of U.S. dollar transactions," should have "raised red flags." J.A. 460.

Plaintiffs allege that the Global Laundromat is connected to the Syndicate because "[a] customer of Danske Bank's Estonia branch," which "purportedly had 'hidden owners,' exchanged millions" with Mazaka. J.A. 320. Plaintiffs cite a German news article from 2020, which states that "a total of $720,000 flowed into Mazaka's account at Danske Bank." J.A. 321 (alteration adopted).

## C. VAT Fraud

Plaintiffs allege that SCB and Deutsche Bank facilitated transactions and trades for value-added tax ("VAT") fraud schemes and that VAT fraud occurred through a Danish company's account held at Danske Bank. The Banks' involvement in these tax fraud schemes purportedly aided the Syndicate's terrorist financing for its operations in Afghanistan.

VAT is a form of sales tax used in Europe that is paid at each step along a product's chain of distribution. Each purchaser pays the increment of VAT corresponding to the value it adds to the sale. "[I]t is possible to engage in fraud

by moving goods across borders through a chain of sham businesses issuing fake invoices that give the appearance that VAT was paid when it was not." J.A. 232–33. The fraudster then submits to a tax authority an invoice that falsely states VAT was paid on a product in one country, causing the tax authority of a different country to improperly issue a VAT refund.

Public reports by European authorities and global financial organizations have linked VAT fraud schemes to terrorist finance activity since around 2006. For example, in 2006, the United Kingdom's Home Secretary John Reid "drew an explicit link between fundraising by terrorist groups and the European-wide so-called carousel VAT fraud." J.A. 236 (alteration adopted) (internal quotation marks and citation omitted). The Syndicate set up "VAT fraud cells" that obtained fraudulent refunds from European governments. J.A. 233. The proceeds would be laundered through international banks "to convert the Euros obtained through the VAT fraud into USD, which the Syndicate greatly preferred." J.A. 234. Plaintiffs generally identify three VAT fraud schemes involving the Banks: one run by a teenaged Syndicate operative, Samir Azizi, which used both SCB and Deutsche Bank; another by a British-Pakistani citizen, Imran Yakub Ahmed, using Deutsche Bank; and a third one through an account

at Danske Bank held by a Danish company.

Azizi perpetrated his VAT fraud by purchasing cell phones in the United States and sending them to Afghanistan "through Europe and Dubai." J.A. 281. Along the way, Azizi sought sham VAT refunds. SCB and Deutsche Bank facilitated transactions and trades, which allowed Azizi to purchase cell phones for his fraud and route millions of dollars "likely" to the Syndicate. J.A. 274. Azizi's scheme "used Deutsche Bank accounts," while SCB "transferr[ed] the funds" on the scheme's behalf, from around 2009 until his arrest in 2015. J.A. 275, 300. After Azizi's arrest, he reported to law enforcement that SCB "made available" a company that served as a "vital cog[]" in his VAT fraud scheme. J.A. 299. He similarly identified Deutsche Bank as a "willing financial partner" in the scheme. J.A. 275. The complaint does not state that SCB or Deutsche Bank were charged for their roles in Azizi's scheme.

Ahmed raised over a billion Euros from his VAT fraud schemes. From 2005 to 2010, Deutsche Bank "facilitat[ed] transactions" for Ahmed, J.A. 274, which resulted in at least $10 million in financing repatriated to the Syndicate. Ahmed was convicted in 2017 by an Italian court for "conspiracy to steal VAT." J.A. 238. The complaint does not allege that Deutsche Bank was charged for its role in

Ahmed's scheme.

For Azizi and Ahmed's schemes, Deutsche Bank employees also traded carbon emissions certificates. In the carbon trading market, companies buy emissions permits in one European country without paying VAT and then re-sell them in the market to another company, "adding VAT to the price and generating tax refunds when no tax had been paid."[8] Deutsche Bank purportedly would "buy up the certificates from various front companies, export them, and put them back into the system." J.A. 276. It also used a "program that enabled super-fast transfers," which allowed the transactions to "run across multiple accounts" and "generate even more profit." J.A. 276. At an unspecified time, a Deutsche Bank compliance employee told the team that the carbon-emissions market generally was "showing typical characteristics of a sales tax" fraud. J.A. 393. In April 2010, German law enforcement searched Deutsche Bank's Frankfurt offices on suspicions of "aiding and abetting VAT fraud" based on its carbon trades. J.A. 283. In December 2012, German authorities "raided" Deutsche Bank offices for

---

[8] Alexander Hübner & Jonathan Gould, *Seven Deutsche Bank Staff Charged Over Carbon Trading Scandal*, Reuters (Aug. 13, 2015), https://www.reuters.com/article/uk-deutsche-bankcarbon-idUKKCN0QI0M220150813. Plaintiffs cite and rely on this article in their complaint. *See* J.A. 274.

evidence related to VAT fraud and criminal charges were brought "against some of the [employees] involved" in 2015.  J.A. 275.  However, the complaint does not allege that Deutsche Bank was charged for its involvement.

With respect to Danske Bank, Plaintiffs allege that in 2009, one of its branches in Denmark "allowed accounts controlled by the Danish-owned company Swefin to conduct VAT fraud of over $100 million."  J.A. 323.  The same account was used a year later to facilitate a VAT fraud scheme that targeted Spain's tax authorities.  The complaint adds that VAT fraud schemes by individuals with suspected ties to the Syndicate were common in Denmark; "[p]ublished reports indicate that VAT fraud in Denmark accounted for approximately $12 million in terrorist finance."  J.A. 325.

## II.    Procedural Background

Plaintiffs brought two causes of action against the Banks under JASTA: First, they alleged that the Banks' financial services to non-terrorist entities affiliated with the Syndicate indirectly aided and abetted the terrorist attacks that injured and killed the American service members and civilians.  Second, they claimed that the Banks' financial services more generally aided and abetted what Plaintiffs call the "Taliban-al-Qaeda Campaign," i.e., the Syndicate's "pattern of

racketeering activity" designed to "expel Americans from Afghanistan" through violence.   J.A. 669–70.

The district court granted Defendants' motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Wildman v. Deutsche Bank Aktiengesellschaft*, 21-CV-04400, 2022 WL 17993076, at *2 (E.D.N.Y. Dec. 29, 2022).   The court characterized the complaint as "a series of vignettes describing a wide range of criminal activity" that "go into great detail about the complex interplay between different criminal players, and how those criminals or terrorists contributed to Plaintiffs' injuries" but, in the end, failed "to establish the necessary nexus between any Defendant and the alleged terrorist acts that injured Plaintiffs."   *Id.* at *5.   The court dismissed the complaint with prejudice, concluding that any further amendment would be futile because Plaintiffs had already amended their six-hundred-page complaint once after Defendants raised in a pre-motion conference letter the same deficiencies that the district court relied on in dismissing.   *Id.* at *27 n.38.   Plaintiffs appeal the district court's dismissal of both causes of action.

**DISCUSSION**

"We review de novo a district court's dismissal of a complaint under Rule 12(b)(6)." *Freeman v. HSBC Holdings PLC,* 57 F.4th 66, 74 (2d Cir. 2023).   A complaint survives a motion to dismiss when, accepting its non-conclusory allegations as true, the complaint plausibly supports a claim for relief.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.*   That burden is not met where a pleading offers only "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement."   *Id.* (alteration adopted) (internal quotation marks and citation omitted).

## I.    JASTA

The ATA authorizes U.S. nationals who are "injured in his or her person, property, or business" to sue the primary perpetrator of an "act of international terrorism" for treble damages, plus attorney's fees and costs.[9]   18 U.S.C. § 2333(a).

---

[9]  International terrorism as defined in the ATA includes activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of

In 2016, JASTA added a cause of action for those who aid and abet an act of terrorism. *See* Pub. L. No. 114-222, 130 Stat. 852 (2016). Specifically, U.S. nationals may sue "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed . . . an act of international terrorism." 18 U.S.C. § 2333(d)(2); *see also id.* § 2333(d)(1) (incorporating the definition of "person" of 1 U.S.C. § 1, which includes "corporations" and "companies"). The "act of international terrorism" must have been "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under [8 U.S.C. § 1189] as of the date

---

any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—

    (i) to intimidate or coerce a civilian population;

    (ii) to influence the policy of a government by intimidation or coercion; or

    (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum; . . . .

18 U.S.C. § 2331(1).

on which such act of international terrorism was committed, planned, or authorized." *Id.* § 2333(d)(2).

When Congress enacted JASTA, it explicitly endorsed the D.C. Circuit's analysis in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the "proper legal framework" for assessing aiding-and-abetting claims. 130 Stat. at 852. *Halberstam* outlined three elements for aiding-and-abetting liability. First, "the party whom the defendant aids must perform a wrongful act that causes an injury." *Halberstam*, 705 F.2d at 477. Second, "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Id.* Finally, the defendant must "knowingly and substantially assist the principal violation." *Id. Halberstam* further identified six factors relevant to whether a defendant's assistance qualified as "substantial": "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483–84).

We have applied the pleading requirements to state a claim for secondary liability under JASTA on several occasions, each time guided by Congress's instruction to use the *Halberstam* framework. For example, in *Honickman v. BLOM Bank SAL*, we affirmed the dismissal of a JASTA claim where the plaintiffs did not sufficiently allege the defendant-bank's general awareness of its customers' ties to terrorists prior to the attacks. *See* 6 F.4th 487, 501–03 (2d Cir. 2021). Relatedly, in *Siegel v. HSBC North American Holdings, Inc.*, the plaintiffs provided only conclusory allegations that a defendant-bank's services to another bank with possible terrorist connections aided and abetted terrorist attacks; this Court held that the plaintiffs did not sufficiently allege that the defendant-bank was generally aware of its role in the terrorist activities or that it substantially assisted the terrorists. *See* 933 F.3d 217, 224–26 (2d Cir. 2019). But in *Kaplan v. Lebanese Canadian Bank, SAL*, the plaintiffs sufficiently alleged both the general awareness and knowing and substantial assistance factors, given the defendant-bank's targeted services that allowed customers—publicly-identified by senior officials of the terrorist organization that carried out the relevant attacks as "integral" to the

organization—to hide their money laundering transactions while circumventing U.S. sanctions. *See* 999 F.3d 842, 864–67 (2d Cir. 2021).[10]

In *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023)—decided after the district court's decision and while briefing for this appeal was ongoing—the Supreme Court clarified that *Halberstam*'s "elements and factors should not be taken as inflexible codes." *Twitter*, 598 U.S. at 497. Rather, *Halberstam*'s framework "rest[s] on the same conceptual core that has animated aiding-and-abetting liability for centuries: that the defendant consciously and culpably 'participate[d]' in a wrongful act so as to help 'make it succeed.'" *Id.* at 493 (second alteration in original) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Plaintiffs in *Twitter* brought an aiding-and-abetting claim under JASTA against several social media companies. They alleged that those companies aided and abetted a terrorist attack committed on behalf of the Islamic State of Iraq and Syria ("ISIS") because ISIS used the social media platforms and their

---

[10] We have also considered JASTA claims outside of the pleading context. *See Linde*, 882 F.3d at 328–29 (addressing whether instructional error on ATA primary liability claim was harmless in light of newly-available JASTA secondary liability claim); *Weiss v. Nat'l Westminster Bank, PLC*, 993 F.3d 144, 163–67 (2d Cir. 2021) (considering district court's denial of plaintiffs' motion to amend complaint to add secondary liability claims following grant of summary judgment dismissing ATA primary liability claims).

recommendation algorithms to recruit and fundraise—activities "crucial to ISIS' growth." *Id.* at 481–82. The plaintiffs did *not* allege that the particular terrorist attack was planned using the platforms or that the companies somehow favored ISIS' content, *id.* at 498; instead, they alleged that the companies failed to do enough to stop ISIS from using the platforms, *id.* at 500. They further claimed that these companies profited from advertisements automatically added to ISIS' posts, *id.* at 480–81, and that the companies knew for years that ISIS used their platforms, *id.* at 481.

The Supreme Court held that these allegations failed to state a viable aiding-and-abetting claim, considering both common law principles and *Halberstam*'s framework, which "reflected and distilled those common-law principles." *See id.* at 492, 497–504. Most significantly, the Supreme Court explained that the common law makes clear that "passive nonfeasance" is insufficient to support aiding-and-abetting liability without "a strong showing of assistance and scienter." *Id.* at 500. The social media companies did not elevate ISIS' content or screen it before allowing users to upload it—behavior that may have indicated a degree of affirmative misconduct. *See id.* at 498–99. Instead, the plaintiffs

effectively faulted the social media companies for "watching passively as ISIS carried out its nefarious schemes." *Id.* at 500.

That "some bad actors took advantage of these platforms" was insufficient to plead knowing and substantial assistance even though the social media companies knew that ISIS exploited the platforms to recruit, fundraise, and spread its message. *Id.* at 481, 503. In essence, the Supreme Court reasoned, "'[c]ulpability of some sort is necessary to justify punishment of a secondary actor,' lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491 (alteration omitted) (quoting *Monsen v. Consolidated Dressed Beef Co.*, 579 F.2d 793, 799 (3d Cir. 1978)). The Supreme Court also concluded, with reference to *Halberstam*'s "six substantiality factors," that the general availability of the companies' platforms, their mere "incidental" benefit to ISIS, and the indistinguishable nature of the companies' relationship with ISIS from their other users, supported the conclusion that the companies did not culpably direct any conduct towards ISIS. *Id.* at 504.

The parties dispute whether, and to what extent, *Twitter* conflicts with our past JASTA aiding-and-abetting cases.[11] There is no doubt that the conclusions

---

[11] *See* Appellees' Br. at 19 ("[*Twitter*] raise[d] the standard for pleading aiding-and-

we have reached in the past are entirely consistent with *Twitter*'s command that aiding-and-abetting liability is reserved "to cases of truly culpable conduct." *Id.* at 489. Nonetheless, given that *Twitter* offers some new guidance, it is best to revisit JASTA's sweep under the *Halberstam* framework with the benefit of *Twitter*.

## A. A Causal Relationship to the Injury

The first requirement under *Halberstam*'s framework is that "the party whom the defendant aids must perform a wrongful act that causes an injury." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). JASTA permits recovery against those who aid and abet international terrorism "directly or indirectly." *Kaplan*, 999 F.3d at 856 (quoting 130 Stat. at 853). Accordingly, a plaintiff may bring a claim for aiding and abetting under JASTA so long as "the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary." *Id.* at 856; *see also Honickman*, 6 F.4th at 495–96. A plaintiff must also satisfy the "definitional requirements" in 18 U.S.C. § 2331, including, most significantly, the statutory

---

abetting claims under the ATA above what this Court previously required"); Appellants' Reply at 15 ("*Twitter* is consistent with this Court's precedents").

definition of "international terrorism." *See Linde*, 882 F.3d at 329; 18 U.S.C. § 2331(1); *see also supra* n.9.

## B. The Defendant's General Awareness

Under the *Halberstam* framework, to hold a defendant liable as an aider and abettor, the defendant also must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance." *Twitter*, 598 U.S. at 486 (quoting *Halberstam*, 705 F.2d at 477). The phrase "generally aware" connotes "something less than full, or fully focused, recognition." *Kaplan*, 999 F.3d at 863. In other words, although a defendant need not be aware of its role in the specific terrorist attack that caused the plaintiff's injury, it must be generally aware of its role in some illegal activity from which the terrorist attack was foreseeable. *Honickman*, 6 F.4th at 496.

In many cases involving banks, a plaintiff's aiding-and-abetting theory postulates that the defendant-bank aided the principal indirectly through the bank's customers. In those circumstances, the general awareness inquiry focuses on (1) whether the bank was aware of the customers' connections with the terrorist organization before the relevant attacks; and (2) whether the customers "were so closely intertwined with" the terrorist organization's "violent terrorist activities

that one can reasonably infer" that the bank "was generally aware of its role in unlawful activities from which the attacks were foreseeable while it was providing financial services" to those customers. *Id.* at 501; *see also Kaplan*, 999 F.3d at 860–61. Plaintiffs typically seek to establish a bank's awareness of its customers' ties to terrorist organizations by citing public sources, such as media articles predating the attacks. *See, e.g., Kaplan*, 999 F.3d at 862 (alleging that terrorist organization "repeatedly publicized" on its own websites, radio, and television stations that the bank's customers were "integral parts" of the organization); *Honickman*, 6 F.4th at 502 & n.18. At the pleading stage, the plaintiff does not have to allege that the bank actually knew of or should have seen those public sources. *Honickman*, 6 F.4th at 501.

## C. The Defendant's Knowing and Substantial Assistance

The final requirement under the *Halberstam* framework is that the defendant provides knowing and substantial assistance. The "twin requirements" of "knowing and substantial assistance" are "part of a single inquiry designed to capture conscious and culpable conduct." *Twitter*, 598 U.S. at 491, 504. Both

considerations work "in tandem"—"a lesser showing of one" demands "a greater showing of the other."  *Id.* at 491–92.

A few principles guide analysis of this element.  First, whether the defendant rendered *knowing* assistance is distinct from a defendant's general awareness of its role in a terrorist scheme.[12]  *Id.* at 504.  Unlike the general awareness inquiry, the defendant's knowing assistance is "designed to capture the defendants' state of mind with respect to their actions and the tortious conduct." *Id.*  Second, the defendant must aid and abet "the act of international terrorism that injured the plaintiffs—though that requirement does not always demand a strict nexus between the alleged assistance and the terrorist act."  *Id.* at 497.  For example, the defendant need not "always" know "all particulars of the primary actor's plan" or even of "the particular terrorist act."  *Id.* at 495, 504.  But "a close nexus between the assistance and the tort might help establish that the defendant aided and abetted the tort."  *Id.* at 496.  Finally, the crux of *Halberstam*'s six substantial assistance factors requires balancing "the nature and amount of

---

[12] This Court noted in *Honickman* that to satisfy the "knowing" component, the defendant need not know anything more about the principal's unlawful activities beyond the defendant's general awareness.  6 F.4th at 500.  *Twitter* warns that it is inappropriate to collapse the general awareness element into the *knowing* and substantial assistance element.  *See* 598 U.S. at 503–04.

assistance on the one hand and the defendant's scienter on the other."[13]  *Id.* at

492–93.   The six factors are a tool to identify "participation in another's

wrongdoing that is both significant and culpable enough to justify attributing the

principal wrongdoing to the aider and abettor."  *Id.* at 504.

## II.    The Sufficiency of Plaintiffs' Complaint

Both parties agree that Plaintiffs sufficiently allege the first *Halberstam*

element: that the terrorists whom the Banks purportedly indirectly aided—the

Syndicate—committed the attacks that caused Plaintiffs' injuries.[14]   The parties

dispute whether the complaint sufficiently alleges the Banks' general awareness

and their knowing and substantial assistance as to each of Plaintiffs' theories of

aiding-and-abetting liability.   Plaintiffs allege sweeping theories of international

---

[13] This Court previously considered evidence of intent and the defendant's state of mind as part of the "the third *Halberstam* element of knowing and substantial assistance." *Kaplan*, 999 F.3d at 860.   Although we noted that "absence of proof of intent is not fatal," *id.*, *Halberstam* and *Twitter* necessitate balancing scienter with the degree of assistance.

[14] However, the parties dispute whether each attack was "committed, planned, or authorized" by an organization designated as an FTO by the Secretary of State as required under 18 U.S.C. § 2333(d)(2).   While the complaint alleges that the attacks were committed by the Syndicate, not every attack was committed by the same entities, nor was every entity designated as an FTO for the entire 2011–2016 timeframe.   Because we conclude that Plaintiffs otherwise fail to state a claim, we assume without deciding that the "committed, planned, or authorized" requirement is satisfied.

criminal conspiracies spanning different continents and terrorist organizations without ever persuasively tying those theories to the terrorist attacks here.

## A. SCB's Banking Services for the Fertilizer Companies

Plaintiffs seek to hold SCB liable as an aider and abettor of the Syndicate's terrorist attacks for continuing to provide the Companies with basic commercial banking services after learning that the Companies' product would be exploited by the Syndicate to make IEDs that would harm Americans. The complaint plausibly demonstrates that SCB was generally aware of its indirect role. However, the complaint does not allege that SCB provided knowing and substantial assistance to the Syndicate's terrorist activities by way of its banking relationship with the Companies.

The complaint alleges that SCB was generally aware that its banking services to the Companies indirectly had a connection to the Syndicate's terrorist activities. An article published in 2011 identified the Companies' fertilizer as the "main ingredient in most of the homemade bombs" used by the Syndicate against Americans in Afghanistan. J.A. 310. In 2012, a member of the U.S. House of Representatives expressed frustrations during a hearing that the Companies refused to help the U.S. Government facilitate detection of CAN at the Afghan

border.  SCB certainly became generally aware of its connection by 2013 when Lieutenant General Barbero told SCB that the Companies' product was the source for the explosive materials used by the Syndicate; that CAN IEDs had caused about 80 percent of all American bomb casualties in Afghanistan; that the Companies had refused to cooperate with efforts to prevent individuals from smuggling CAN into Afghanistan; and that SCB's banking services were crucial to allow the Companies to produce the amount of fertilizer necessary to "sustain" the Syndicate's attacks.  J.A. 317–18.  After that meeting, SCB was **generally** aware that its banking services would play a role (albeit indirectly) in the Syndicate's use of CAN bombs against Americans, especially because the Companies had rebuffed the U.S. Government's efforts to prevent traffickers from diverting CAN to Afghanistan.

But we know from *Twitter* that knowledge of one's role in terrorist activities by itself is insufficient to allege an aiding-and-abetting claim.  There, the social media companies knew that ISIS used their platforms to recruit and fundraise its operations.  The Supreme Court nonetheless concluded that the plaintiffs' allegations were insufficient to plead knowing and substantial assistance. *Twitter*, 598 U.S. at 497, 501.  The same is true here.  Even with SCB's general

awareness of its indirect role in the Syndicate's bombmaking operations, the complaint does not allege that SCB consciously or culpably sought to make the Syndicate's bombings succeed.

Plaintiffs argue that SCB's banking services, which continued after SCB's meeting with the U.S. Government, demonstrate the bank's knowing and substantial assistance. Plaintiffs emphasize that SCB's financial services were critical to the Syndicate's ready access to the Companies' fertilizer: without the ability to transact in U.S. dollars through the Companies' SCB accounts, the cost of two of the most important components for the fertilizer would have increased and thus the Companies "could not have maintained their stable low-cost prices" necessary to allow the Syndicate to acquire as much fertilizer and detonate as many bombs against Americans as it did. J.A. 505–06. Similarly, SCB's letter-of-credit services "ensure[d] the smooth operation of [the Companies'] fertilizer sales." J.A. 507.

Those allegations, while serious, unfortunately focus "primarily on the value" of SCB's services to the Companies and assume that those services ultimately inured to the benefit of the Syndicate, as opposed to "whether [SCB] culpably associated" itself with the Syndicate's wrongful actions. *See Twitter*, 598

38

U.S. at 504. Moreover, considering the **tenuous** connection between the banking services and the terrorist attacks, SCB's services were not substantial. SCB's banking services allowed the Companies to continue producing and selling their products, one of them being CAN fertilizer—legally produced and sold in Pakistan.

Plaintiffs do not allege that SCB directly aided the Syndicate in carrying out the bombings. Nor do Plaintiffs allege that SCB took steps to help the downstream actors' exploitation of CAN. The U.S. Government did not seek to close the Companies' operations; the Companies failed to "stop" or "reduce" the flow of CAN into Afghanistan by taking steps to make it more difficult to smuggle across the border. *See* J.A. 317; *see also* Oral Arg. Tr. 3:10–3:38 (Plaintiffs' counsel conceding the distribution to the Syndicate could have been "maybe one, perhaps sometimes two steps removed" from the Companies). When the Companies did not support the U.S. Government's efforts, the Government turned to SCB. Plaintiffs do not allege that SCB aided CAN fertilizer production or its smuggling; SCB "never . . . did anything positive." J.A. 318. Plaintiffs' theory of liability veers towards holding SCB liable for its refusal to stop providing routine banking services.

Without having alleged that SCB provided more than peripheral assistance to the Companies, Plaintiffs have a higher burden to allege that SCB was consciously trying to help or otherwise participate in the Syndicate's wrongdoing, *see Twitter*, 598 U.S. at 492—that is, Plaintiffs' claim might still succeed with plausible allegations that SCB wanted to help the Syndicate's bombmaking operation succeed by providing banking services to the Companies. Plaintiffs rely extensively on this Court's decision in *Kaplan* and argue that "[t]he level of culpability alleged . . . dwarf[s] what the Court held sufficient in *Kaplan*." Appellants' Br. at 36. But the services provided by the bank in *Kaplan* are not comparable to those identified here.

In *Kaplan*, a United Nations report identified that the defendant-bank's customer was a "Hizbollah-linked money laundering gang." 999 F.3d at 849. In response, the bank stated that the U.N. Report was "propaganda" and "not only refused to end the [banking] relationship, but instead authorized an *increase* in credit limits for the Hizbollah gang." *Id.* In addition, senior Hizbollah officials identified certain of the defendant-bank's customers on Hizbollah's official websites and in press conferences and news media interviews as "integral parts of Hizbollah." *Id.* at 850. The defendant-bank gave those customers "special

treatment, exempting them from submitting cash transaction slips" that disclosed the sources of cash deposits exceeding a certain amount and from restrictions on depositing certain amounts in Lebanese currency. *Id.* In holding that the complaint plausibly alleged knowing and substantial assistance, we reiterated that the defendant-bank gave its customers "special treatment," including allowing its customers to "deposit large sums in various accounts at different [bank] branches . . . without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity." *Id.* at 866.

Plaintiffs allege nothing of the sort here. The complaint offers not a single allegation of fact that SCB sought to indirectly assist the Syndicate's bomb operations by violating sanctions or other restrictions as they relate to banking services provided to the Companies. [15] Plaintiffs do not allege that SCB's customers were themselves terrorists. SCB simply offered the Companies basic

---

[15] Plaintiffs point to a single paragraph in their complaint that alleges that unidentified SCB "personnel knew of terrorist finance 'red flags' relating to" the Companies, but "facilitated" transactions by unspecified "known or suspected fronts, agents or operatives" of the Syndicate by "knowingly ignoring" the red flags and allowing the transactions to proceed. J.A. 500. This paragraph does not explain what these supposed "terrorist finance red flags" are; it conspicuously stops short of alleging that SCB knowingly violated U.S. sanctions or terrorist finance laws in engaging with the Companies. This vague and conclusory allegation, without more, does not save Plaintiffs' complaint.

commercial banking services—foreign exchange, export finance, and letter-of-credit services—which SCB had been providing when the Government met with SCB's executives and were utilized across the Companies' entire book of business.

Plaintiffs emphasize, however, that SCB's "relationship" with the Companies was not "routine" because the Companies were being controlled by rogue members of Pakistan's intelligence agency. Appellants' Reply at 6. But based on the complaint's allegations, SCB could not have reasonably foreseen that its services to the Companies were supporting rogue members of that agency. Plaintiffs cite two sources from the relevant time period, which merely surmise that the Companies' refusal to help may have been linked to the agency's influence.[16] Notably, Plaintiffs do not allege that Lieutenant General Barbero told SCB that the U.S. Government believed the Companies were under the agency's control. SCB could not have intended to reach the intelligence agency or support its causes without that knowledge; any subsequently confirmed connection between the Companies and the intelligence agency did not taint the nature of

---

[16] Eventually, a member of the U.S. military publicly stated that "rogue [intelligence agency members] supported the Taliban and had 'built two chemical fertilizer factories,'" referencing the Companies. J.A. 314 (citation omitted). But SCB could not have known of this particular U.S. Government position because it **post-dates** the relevant time period by nearly five years. *See Honickman*, 6 F.4th at 501–02.

SCB's services at the time it provided them. SCB's potential support to the intelligence agency was incidental.

Lacking sufficient factual allegations of scienter, Plaintiffs contend that *Twitter* allowed that some type of "aid to a known terrorist group would justify holding a secondary defendant liable for all of the group's actions or perhaps some definable subset of terrorist acts," and hypothesized that one category could include selling "dangerous wares" to a terrorist organization. *Twitter*, 598 U.S. at 502. In identifying that potential theory of liability, the Supreme Court cited its decision in *Direct Sales Co. v. United States*, 319 U.S. 703 (1943), which upheld a defendant-pharmacy's conviction for aiding a doctor's illegal distribution of "vast" amounts of morphine purchased by mail order. *Id.* at 704–05. The pharmacy used business strategies that "actively stimulated" the doctor's purchases, such as offering fifty-percent discounts that "pushed" quantity sales, and listing quantities in much larger tablet units than many of its competitors. *Id.* at 705–06. The pharmacy superficially complied with the Bureau of Narcotics' requests that it change its practices, but it continued with its "high pressure sales methods" in sum and substance. *Id.* at 707, 711. The pharmacy's tactics and "prolonged cooperation" to supply the doctor demonstrated not only that the

pharmacy knew and acquiesced to the doctor's "illicit enterprise" but also that it "join[ed] both mind and hand with him to make its accomplishment possible."[17] *Id.* at 713.

We assume that CAN fertilizer qualifies as a dangerous ware given its potential to cause harm when used to make IEDs. That deadly potential resulted in its ban in Afghanistan. *Cf. id.* at 711 (distinguishing "narcotic drugs, machine guns and such restricted commodities" from "sugar, cans, and other articles of normal trade" on the basis of "inherent capacity for harm").

*Direct Sales* illustrates what is lacking in Plaintiffs' theory of liability. While *Direct Sales* bears some resemblance to aspects of **the Companies'** conduct, Plaintiffs seek to hold **SCB** liable. SCB is one step removed from the Companies' manufacturing and then several steps removed from CAN's unlawful use in IEDs. Whatever the exact nature of liability for aiding and abetting "dangerous wares," *Direct Sales* does not suggest that such liability attaches to an upstream financial institution of a company that itself produces a potentially dangerous ware.

---

[17] Indeed, the pharmacy and doctor were co-conspirators in law and in fact, *see Direct Sales*, 319 U.S. at 713, which is far from the allegations here.

The Supreme Court recently emphasized this distinction in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. ___, 145 S. Ct. 1556 (2025), albeit in the context of a different statutory regime. The Government of Mexico sued American gun manufacturers under state tort law for aiding and abetting retail dealers' gun sales made in violation of federal gun laws, alleging that the manufacturers knew some dealers would make illegal sales to Mexican traffickers who would in turn deliver the guns to drug cartels. *Id.* at 1563. The manufacturers sold their guns to wholesale distributors—not directly to retail dealers or end purchasers. *Id.* at 1564. Mexico asserted that the gun manufacturers were liable for failing to "cut off the flow of firearms to the known rogue dealers." *Id.*

There, the Supreme Court concluded that Mexico's allegations "that the manufacturers ha[d] declined to suitably regulate the dealers' practices" were insufficient. *Id.* at 1568. The Court held as much because although "responsible manufacturers might well impose constraints on their distribution chains to reduce the possibility of unlawful conduct," the simple "failure to do so is . . . 'passive nonfeasance.'" *Id.* at 1568–69. And "[s]uch 'omissions' and 'inactions' . . . are rarely the stuff of aiding-and-abetting liability." *Id.* at 1569.

So too here. SCB certainly failed to "impose constraints" on its distribution chain because of downstream bad actors, but, without more, these are allegations of "indifferen[ce], rather than assistance." *Id.* at 1568–69 (alteration in original) (internal quotation marks and citation omitted). To extend aiding-and-abetting liability to these circumstances risks making a "manufacturer of goods . . . an accomplice to every unaffiliated retailer whom it fails to make follow the law." *Id.* at 1569.

An assessment of a defendant's knowing and substantial assistance under the JASTA framework is highly fact intensive; the analysis differs "on a case-by-case basis." *See Honickman*, 6 F.4th at 500. At bottom, Plaintiffs have not alleged facts leading to the reasonable inference that SCB consciously and culpably assisted the Syndicate's bombings. Similar banking services in a different context may lead to a different result. For example, Plaintiffs would have a much stronger claim if they plausibly alleged that SCB was treating the Companies differently than it treated its other clients. If SCB routinely cut off those clients whom the U.S. military asked it to but then refused in the instant case, the context would more readily allow an inference that the failure to act was nonetheless culpable—that SCB gave the Companies "special treatment." *Kaplan*, 999 F.3d at

850. But here, SCB's continued services demonstrate "knowledge, acquiescence, carelessness, indifference, lack of concern"—not "interested cooperation, stimulation, instigation." *See Direct Sales*, 319 U.S. at 713. Without something more to indicate a willingness to aid the Syndicate's terrorist activities, Plaintiffs' aiding-and-abetting claim against SCB for its banking services to the Companies fails.

## B. Money Laundering

Plaintiffs allege that by performing transactions connected to Altaf Khanani's money laundering organization, Deutsche Bank's Russian Laundromat, and Danske Bank's Global Laundromat, the Banks "assisted" with "terrorist money laundering that allowed [the] Syndicate to access funds in Afghanistan." Appellants' Br. at 61–62. Plaintiffs claim that this access, "particularly [to] U.S. dollars, was critical to the Syndicate's ability to attack Americans," because "[t]he Syndicate depended on money launderers to convert the proceeds of its opium trafficking, protection rackets, and other criminal enterprises into U.S. dollars that it could spend on weapons, supplies, and personnel in Afghanistan . . . ." *Id.* at 62. Plaintiffs' sweeping theory of liability is untenable for several reasons.

Plaintiffs posit a theory based on money's fungibility: because Defendants

engaged in widespread money laundering for individuals and entities with an apparent or possible connection to terrorists, some of the money must have gone to the terrorists' violent activities. But we have already rejected the notion that *Halberstam* allows aiding-and-abetting liability to attach based on such a "fungibility theory." *See Honickman*, 6 F.4th at 498–99 (internal quotation marks and citation omitted). In *Linde*, this Court distinguished between the requirements to bring a JASTA aiding-and-abetting claim and a claim under 18 U.S.C. § 2339B for knowingly providing a terrorist organization with material support. *See* 882 F.3d at 329–30. Whereas a material support claim "requires only knowledge of the organization's connection to terrorism," a JASTA claim requires "intent to further [a terrorist organization's] terrorist activities" and "awareness that one is playing a role in those activities." *Id.* at 330. In context of the material support statute, it does not matter whether material support is directed "to promote peaceable, lawful conduct" as opposed to terrorist activities because "'money is fungible' and 'there is reason to believe that foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations." *Honickman*, 6 F.4th at 498–99 (alteration adopted) (quoting

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 31 (2010)).   Importing the fungibility

rationale from the material support statute into the JASTA context "erase[s]" the

difference between the two statutes.   *Id.* at 499.   A "central" tenet of JASTA

aiding-and-abetting liability is the "foreseeability principle"—that the defendant

is not liable for the principal's wrongs without understanding, to some extent, the

foreseeable consequences of the defendant's actions.   *See id.* at 496–97, 499.   A

fungibility theory would "evade" that principle entirely.   *Id.* at 499.

In other words, it is not enough to say that facilitating the money laundering

operations, which are not themselves Syndicate entities, results in substantial

support to the Syndicate.   That level of attenuation between the Banks' conduct

and the Syndicate's attacks would effectively render the requirements of the

JASTA and the material support statutes the same while eliminating a key

requirement of JASTA aiding-and-abetting liability.

In addition, it is not enough to say that the defendant assisted the terrorist

organization's "activities in general," *see Twitter*, 598 U.S. at 503; the complaint

offers no discernable nexus between the money laundering and the attacks

committed against Plaintiffs, *see id.* at 501.   To be sure, it is possible that some of

the Banks' transactions in the money laundering schemes produced money that

was transferred to the Syndicate and used to facilitate bombings in Afghanistan during the relevant time. But the complaint fails to plead with specificity allegations from which this Court could draw adequate inferences to support a claim of aiding-and-abetting liability; in fact, it barely offers any information about the Banks' transactions in the money laundering operations. "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint demands a high degree of speculation, particularly because of the disconnect between the Banks' involvement and support for the terrorist attacks, which is insufficient to plead an aiding-and-abetting claim.

We rejected that type of attenuated connection in *Siegel*, where the plaintiffs sued a U.S. bank under JASTA for aiding and abetting al-Qaeda's suicide bombings at three hotels in Amman, Jordan. 933 F.3d at 219. There, the plaintiffs alleged that the U.S. bank assisted the bombings through its commercial relationship with a large Saudi bank that had known links to terrorist organizations. *Id.* at 220. Much like Plaintiffs' claims here, the U.S. bank in *Siegel* purportedly provided the Saudi bank with the "means" to transfer "millions of U.S. dollars" to al-Qaeda to use for bombings. *See id.* at 221. In addition to

the fact that the U.S. bank ceased its banking relationship prior to the bombings, making it implausible that the U.S. bank assumed a role in the attacks, *id.* at 224, we also emphasized the divide between the allegations and the assistance. In particular, even though the defendant-bank purportedly gave "hundreds of millions of dollars" to the Saudi bank and helped the bank "flout" U.S. sanctions laws, plaintiffs failed to plausibly suggest that the U.S. bank "knew or intended that [al-Qaeda] would receive the funds." *Id.* at 221, 225. The same is true here.

When a "concrete nexus" to the terrorist attack is lacking, *Twitter*, 598 U.S. at 501, it is possible for a plaintiff to instead allege that the defendant aided and abetted "a broad category of misconduct," *Smith & Wesson*, 145 S. Ct. at 1566. But the defendant's "participation must be correspondingly 'pervasive, systemic, and culpable'" such that we can say the defendant aided every wrongful act. *Id.* (quoting *Twitter*, 598 U.S. at 502). "At this point, aiding-and-abetting liability begins to blur with conspiracy liability, which typically holds co-conspirators liable for all reasonably foreseeable acts taken to further the conspiracy." *Twitter*, 598 U.S. at 496.

The allegations here do not meet that high bar. Even assuming the Banks' aid was pervasive and systemic, the complaint does not support the inference that

the Banks' money laundering operations were designed or performed with the intent to aid the Syndicate. The Banks are alleged to have culpably executed financially suspect transactions writ large, not in a manner that actively sought to "associate[] themselves" with the Syndicate's "operations" or to form "a near-common enterprise" with the Syndicate. *See id.* at 502. With each money laundering scheme, the Syndicate was at least one step removed, and the endpoint of the laundered money was entirely amorphous. As pled, the Banks may have opened their doors to criminals with ties to terrorists to clean their money—a portion of which was likely to end up in the Syndicate's pile of resources. That is insufficient.

This is not to say money laundering can never form the basis of a JASTA claim. In *Kaplan*, we held that the plaintiffs sufficiently stated a claim premised on the bank's role in money laundering. Not only were the bank's clients clearly and publicly identified as part of the terrorist organization, but the bank violated sanctions laws and granted exemptions to obscure the substance of deposits, including for a client known to provide financial support to suicide bombers' families. *Kaplan*, 999 F.3d at 858, 865. But with allegations that require making significant assumptions to establish a connection to the Syndicate's terrorist

activities, we decline to endorse the money laundering theory advanced here.

## C. VAT Fraud

Plaintiffs' claim premised on Defendants' facilitation of VAT fraud also fails. The allegations do not support an inference that any Bank was aware of its customers' connections with the Syndicate before the relevant attacks. The allegations also do not demonstrate that SCB and Deutsche Bank appreciated, while participating in VAT fraud transactions, that they played a role in a wrongful activity from which the Syndicate's bombings were foreseeable. *See Kaplan*, 999 F.3d at 860–61. Thus, the complaint fails the "general awareness" element of aiding-and-abetting liability.

### i. The Azizi Scheme

Plaintiffs contend that SCB and Deutsche Bank helped facilitate Azizi's VAT fraud scheme, but apart from the Banks' execution of trades and transactions on the scheme's behalf, the allegations about their conduct are too vague to survive a motion to dismiss. For example, the complaint alleges that SCB "made available" a company that was "vital" to the Azizi scheme's "value chain," J.A. 299, and Deutsche Bank "prepared" documents, J.A. 260. Whether Azizi maintained accounts in his own name or that of his front companies, and what those accounts

entailed, is left unsaid: the complaint states only that Azizi's scheme "used" Deutsche Bank accounts and SCB "transferr[ed] the funds" on the scheme's behalf. J.A. 275, 300. The estimated proceeds transferred from Azizi's sham companies to the Syndicate spanned from 2007 to 2012, but the majority of transfers fall outside of the relevant time period.[18]

Plaintiffs have not sufficiently alleged that either SCB or Deutsche Bank was generally aware of Azizi's terrorist-linked VAT fraud prior to his arrest. Plaintiffs cite several public sources connecting VAT fraud with terrorism generally, but no source that pre-dates Azizi's arrest connects him to terrorist organizations or VAT fraud. Plaintiffs also note that after Azizi's arrest, he apparently implicated SCB by claiming that it "made available" a company for his use, J.A. 299, and referred to Deutsche Bank as his "willing financial partner" in the tax fraud,[19] J.A. 275. Those reflections do not lead to the inference that Defendants knew of Azizi's ties to the Syndicate while executing trades on his

---

[18] However, SCB and Deutsche Bank purportedly worked with Azizi until 2015.

[19] Plaintiffs' brief argues that Azizi's colleagues confessed that SCB was complicit in his scheme. That is **not** what the complaint alleges. The portion Plaintiffs cite alleges only that "one or more members" of Azizi's scheme "'generally confessed' and 'cooperated with the investigation.'" J.A. 284 (alteration adopted) (citation omitted). This merely establishes that Azizi (or members of his scheme) knew they were committing VAT fraud; it says nothing about SCB's awareness.

behalf, even if they executed fraudulent trades willingly. And even though an internal compliance employee raised concerns about VAT fraud occurring at Deutsche Bank, and German authorities searched Deutsche Bank's offices for evidence of VAT fraud, in no instance did anyone raise concerns specific to Azizi or accounts associated with his scheme. This information does not plausibly allege that SCB and Deutsche Bank understood the "true nature and activities" of Azizi's scheme "from the public record at the time." *See Honickman*, 6 F.4th at 502.

Seemingly recognizing that the complaint does not allege the Banks' awareness, Plaintiffs highlight certain facts that they claim should have made the Banks aware of his nefarious conduct: (1) "Azizi was a young Afghan national with no demonstrable means of support," Appellants' Br. at 50; (2) his business involved purchasing cell phones and exporting them to Afghanistan—"definitive red flag of all red flags" for VAT fraud, J.A. 281; (3) VAT fraud schemes are easy to detect because they involve high volume transactions; and (4) banks perform diligence on their customers and have access to more data than what is publicly available. In other words, Plaintiffs argue that SCB and Deutsche Bank *should have known* that Azizi's "pattern fit the mold of a Syndicate VAT fraudster." Appellants' Br. at 50; *see also, e.g.*, J.A. 324 ("*These types* of VAT fraud schemes have

been linked to terrorist finance." (emphasis added)). Perhaps these allegations support the inference that the Banks were aware that they were involved in tax fraud. But the "red flags" made it *possible*—not *plausible*—that Azizi's transactions were "closely intertwined with" the Syndicate. *See Honickman*, 6 F.4th at 501. "'Plausibly' does not mean 'probably,' but 'it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Smith & Wesson*, 145 S. Ct. at 1565 (quoting *Iqbal*, 556 U.S. at 678).

Moreover, as mentioned above, Plaintiffs do not specify much about the scheme's accounts at either bank. It thus cannot be inferred from Plaintiffs' threadbare allegations that a deeper investigation of the accounts would have revealed a connection to terrorist activity. Accordingly, the complaint fails to plausibly allege that when the Banks made trades and transactions connected to Azizi's scheme, they were generally aware of their role in an activity from which the Syndicate's attacks were foreseeable.

### ii. Remaining Involvement in VAT Fraud

Plaintiffs' remaining VAT fraud allegations against Deutsche Bank and Danske Bank are easily dismissed. On behalf of Imran Yakub Ahmed, Deutsche Bank allegedly processed carbon emissions trades, resulting in millions

transferred for his scheme *from 2005 to 2010*.   Similarly, Plaintiffs claim that

Swefin, a Danish company with an account at Danske Bank, conducted VAT fraud

*in 2009 and 2010*.   Even if true, and even if the Banks were aware of those

individuals and entities' connections to the Syndicate, that means the Banks'

involvement concluded before the attacks here began.   Given that Deutsche Bank

and Danske Bank's involvement "ceased" at least a year prior to the first attack in

this case, it is "implausible under the circumstances" that either bank was aware

it "assumed a role in the [a]ttacks."   *See Siegel*, 933 F.3d at 224 (bank's decision to

stop dealing with customer connected to terrorism ten months before attacks

injuring plaintiffs made general awareness "implausible").   The complaint also

alleges that Denmark (where Danske Bank is located) was a hotspot for using VAT

fraud for terrorist financing; those allegations, pled at the generality of an entire

country, are simply too arbitrary and unconnected to any conduct by Danske Bank

to support aiding-and-abetting liability.[20]

---

[20]  Given that Plaintiffs have failed to allege general awareness with respect to their VAT
fraud theories, we need not address whether any Bank's participation in the tax fraud
was sufficiently "pervasive, systemic, and culpable" to justify liability for each of the
terrorist attacks that injured plaintiffs.   *See Twitter*, 598 U.S. at 502.

## D. Terrorist Campaign Aiding-and-Abetting Claim

Plaintiffs' second cause of action claimed that Defendants aided and abetted the "Taliban-al-Qaeda Campaign," "an act of international terrorism" comprising "an enterprise" of terrorist organizations "engaging in" a "pattern of racketeering activity" to "expel Americans from Afghanistan through crime and anti-American violence." J.A. 669–70. We affirm the district court's dismissal of this claim because JASTA does not provide relief where a "campaign" is alleged to be the "act of international terrorism."

This conclusion is supported by the statute's text. The ATA provides liability for injury suffered "by reason of *an act* of international terrorism." 18 U.S.C. § 2333(a) (emphasis added). JASTA likewise permits secondary liability for "an injury arising from *an act* of international terrorism" where the defendant assists a primary tortfeasor in committing "such *an act* of international terrorism." *Id*. § 2333(d)(2) (emphasis added).

*Twitter* reaffirms that the defendant must aid and abet a specific act, observing that JASTA expressly provides that liability only attaches for aiding and abetting a particular terrorist attack. 598 U.S. at 494 ("[A]iding and abetting is inherently a rule of secondary liability for *specific wrongful acts*." (emphasis

added)).  As *Twitter* explained, focusing on the terrorist attack makes sense in light of the common law.  "[T]ort law imposes liability only when someone commits an actual tort."  *Id.*  "'Enterprises' or 'conspiracies' alone are therefore not tortious—the focus must remain on the tort itself."  *Id.*  Accordingly, "it is not enough, as [P]laintiffs contend, that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it."  *Id.* at 495.  The focus must remain on whether the defendant aided and abetted "another person in the commission of the actionable wrong—here, an act of international terrorism."  *Id.*

Plaintiffs contend that the word "act," as used in the statute, can describe a "multifaceted enterprise," Appellants' Br. at 74, but that reading is strained.  *See Twitter*, 598 U.S. at 495.  To be sure, as noted above, a defendant may provide such systemic and intentional aid to an individual or organization that the defendant may be liable for each and every tortious act committed by the principal.  *See supra* 51–52.  Even in that circumstance, however, the defendant is liable for the injury-causing **act**, *see Twitter*, 598 U.S. at 495, not an overall group of activity that may or may not have led to the plaintiff's particular injuries.  The scope of Plaintiffs' racketeering theory would sweep as broad as covering every

terrorist attack of all time carried out against Americans by the Taliban-al-Qaeda Campaign. Accordingly, Plaintiffs' campaign and racketeering theory, vast in scope and unlinked to any culpable conduct, contravenes the statute's text and the JASTA aiding-and-abetting framework.

### III.  Leave to Amend

Plaintiffs ask that if we find fault with any of their factual allegations, we allow them leave to amend their complaint. We decline to allow Plaintiffs who, after filing two complaints together totaling over 1,200 pages, failed to state a claim for relief, and who have largely failed to provide any specific explanation as to how they would fix their complaint. *See, e.g.*, *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied.").

### CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.